```
1        did that use your Appleton Police Department

2        computer?

3    A   Yes.

4    Q   Okay.  And that computer is backed up by a server,

5        correct?

6    A   I'm assuming it is.

7    Q   When you spoke with Ryan Thao the second time in

8        April, he discussed great reluctance to become

9        involved even the second time, correct?

10   A   Yes.

11   Q   And over half of your interview was spent persuading

12       him to come forward; is that fair to say?

13   A   I would say maybe 30 minutes, 45 minutes talking to

14       him, yes.

15   Q   And the tape is an hour-and-a-half long, isn't it?

16   A   I didn't check it yet, but I assume that you're

17       correct.

18   Q   And the first time that you interviewed him, how did

19       he identify Chong Lee to you?

20   A   He indicated that he did not know Chong, obviously,

21       and that he did not know a lot of the people, but he

22       provided description of the person that ended up

23       shooting the person.

24   Q   Did you show him photographs during that first

25       interview?
```

50

| 1  | A | No, I did not. |
| 2  | Q | Did you use Chong Lee's name during that first |
| 3  |   | interview with him? |
| 4  | A | No, I did not. |
| 5  | Q | You never used his name? |
| 6  | A | I did not. |
| 7  | Q | Did you -- what description did he give you of the |
| 8  |   | person who was the shooter in the first interview? |
| 9  | A | Because at that time we really didn't know who |
| 10 |   | obviously did the shooting in terms of there were a |
| 11 |   | lot of people that were interviewed, or at least I |
| 12 |   | wasn't as I got into the investigation several days |
| 13 |   | after the shooting, I simply went there based on the |
| 14 |   | identification that was made on that white board to |
| 15 |   | talk to him as to what he observed or what happened, |
| 16 |   | so I was simply getting the information from him as |
| 17 |   | to his observations and what happened whether before |
| 18 |   | or after the shooting. |
| 19 | Q | What description did he give you of the shooter at |
| 20 |   | that time? |
| 21 | A | He indicated that it was a subject that was coming |
| 22 |   | from the bar into the foyer area with a couple other |
| 23 |   | peoples. |
| 24 | Q | What clothing description did he give you? |
| 25 | A | I don't recall specific about clothing.  He described |

51

```
 1          that there was three people coming from the bar and
 2          then a person, and then he see the smoke and he
 3          provided that it was that person that did the
 4          shooting.
 5    Q     Did he say the person had on what looked like a white
 6          jacket with dark sleeves?
 7    A     I don't recall that.
 8    Q     You didn't show him any pictures.
 9    A     I did not show him any picture.
10    Q     And Sergeant Meyer didn't show him any pictures at
11          the time.
12    A     No photo was shown to.
13    Q     At that time actually Paul Lee was the suspect in the
14          case, correct?
15    A     At that time, again, I got involved in the case two
16          or three days later.  I did not know the initial
17          information that other officers had received.  I went
18          into the interview with Ryan with an open mind just
19          to get information, so I really didn't know who did
20          the shooting or were potential suspect at that
21          time.
22    Q     Did this interview with Ryan occur before or after
23          you were involved in interviewing Paul Lee?
24    A     Before.
25                    ATTORNEY VISHNY:  I don't have any further
```

52

```
 1          questions right now.

 2                      THE COURT:  Attorney Schneider?

 3                      ATTORNEY SCHNEIDER:  Nothing further,

 4          Judge.

 5                      THE COURT:  Sergeant, you may be seated.

 6                      THE WITNESS:  Thank you.

 7                      ATTORNEY VISHNY:  I'm calling Lieutenant

 8          Gostisha.  He's not sequestered, but I didn't

 9          anticipate calling him, because I was completely

10          shocked by the testimony.

11                      (Oath administered to witness.)

12                      THE WITNESS:  I do.

13                      THE CLERK:  Please state your full name,

14          spelling your last name for the record please.

15                      THE WITNESS:  Michael D. Gostisha,

16          G-O-S-T-I-S-H-A.

17                              EXAMINATION

18     BY ATTORNEY VISHNY:

19     Q    Lieutenant Gostisha, were you involved in the

20          decision to destroy these recordings of the

21          interviews of Ryan Thao, Mikey Thao and Watou Lee?

22     A    Yes.

23     Q    Who made the ultimate decision, did you make it as

24          the most commanding officer?

25     A    Yes.
```

53

```
 1   Q   All right.  And when did you discuss that with Miss
 2       Schneider?
 3   A   I don't know.
 4   Q   But you did do so, correct?
 5   A   I'm not even sure of that, if I would have had any
 6       direct conversations with her concerning that.
 7   Q   Okay.  But you're aware of somebody had informed the
 8       prosecutor's office before this decision was made?
 9   A   Again, I am not aware of that necessarily.
10   Q   But you're familiar with the computer system at the
11       Appleton Police Department, correct?
12   A   Correct.
13   Q   So anything that is put on a person's computer is
14       backed up to a server automatically, isn't it?
15   A   It should be.
16   Q   And so, therefore, even if something has been
17       destroyed, a computer technology person can go to a
18       server and recover data; isn't that correct?
19   A   I believe so.
20           ATTORNEY VISHNY:  Okay.  Nothing further.
21           THE COURT:  Attorney Schneider.
22                      EXAMINATION
23   BY ATTORNEY SCHNEIDER:
24   Q   If you are aware, when discussions were held that
25       there were parties who didn't want to be identified,
```

54

1    were their names discussed with the prosecutors?

2  A  That I'm not aware of.  I didn't have any with them

3     that I can recall.  And the discussions I had were

4     all with the group of officers.

5  Q  And that would include discussions about what to do

6     with the recordings?

7  A  Correct.

8              ATTORNEY SCHNEIDER:  Nothing further.

9              THE COURT:  Attorney Vishny?

10             ATTORNEY VISHNY:  Is Sergeant Meyer here?

11             ATTORNEY SCHNEIDER:  No.

12             THE WITNESS:  He's retired.

13             ATTORNEY VISHNY:  He's retired?  Okay.

14       I'll call Sergeant Rabas then.  I'll go get him.

15             THE COURT:  Thank you.

16             (Oath administered to witness.)

17             THE WITNESS:  I do.

18             THE CLERK:  Please state your full name,

19       spelling your last name for the record please.

20             THE WITNESS:  Neal Rabas, R-A-B-A-S.

21                      **EXAMINATION**

22  **BY ATTORNEY VISHNY:**

23  Q  Sergeant Rabas, what's the name of the individual who

24     just walked in the courtroom who was talking to you

25     in the hallway?

55

Lied told him about the Questioning

1   A   Investigator Paul Black from the District Attorney's

2        office.

3   Q   And what did Investigator Black tell you about the

4        testimony that was going on in the courtroom?

5   A   We didn't -- nothing. We didn't talk about that.

6   Q   Nothing. Okay.

7        Now, proceeding to question you now about the

8        interviews of Ryan Thao, Mikey Thao and Watou Lee,

9        I'm going to ask you about all three of those. Okay?

10   A   Okay.

11   Q   Okay. Let's take them one at a time just so the

12        record is clear.

13        On April 17th, 2015 you and Sergeant Chue Thao

14        interviewed Ryan Thao, correct?

15   A   Yes.

16   Q   And when that interview was conducted, what did you

17        know about what Ryan Thao had stated in an earlier

18        interview?

19   A   I knew that he was in the area where the shooting

20        took place at Luna and that he had witnessed part of

21        what had taken place --

22   Q   Okay.

23   A   -- prior and right after the shooting.

24   Q   Did you know the details of what he had said he had

25        witnessed?

56

```
 1   A   No, I did not know all the details.  I knew that he
 2       was there with friends and that he may have witnessed
 3       part of what had taken place, but I didn't know the
 4       details of specifically what he had witnessed.
 5   Q   Had you listened to the recording of his prior
 6       interview?
 7   A   No.
 8   Q   Were there any written notes or reports concerning
 9       that interview that you were aware of?
10   A   None that I've ever seen.
11   Q   Were you aware of whether or not photographs had been
12       previously showed to him to see if he could identify
13       any of the people who were at Luna?
14   A   No, I don't.
15   Q   Okay.  Now, did you participate in the decision at
16       all to destroy the recording of his previous
17       interview?
18   A   I think as we were investigating this incident
19       information had come forward that there were
20       witnesses that had asked not to be identified as a
21       result of -- for fear of their own safety, as to what
22       should be done with the recordings of their
23       interviews and any of our notes.  I think as a group
24       we decided that that's something, because of the
25       request for confidentiality based upon their safety,
```

57

```
 1            that we would not retain any information associated
 2            with those interviews.
 3   Q    Okay.  Now the District Attorney's office had been
 4            made aware of all three of these individuals prior to
 5            the decision to destroy the recordings, correct?
 6   A    I don't recall the timing of all of that taking
 7            place.
 8   Q    And the District Attorney's office was consulted
 9            prior to destroying these recordings, correct?
10   A    I don't recall the timing of what had taken place.
11   Q    But you do know that they were consulted about the
12            destruction of the recordings, correct?
13   A    I don't know if they were advised that's what took
14            place after the fact or if they were questioned about
15            it prior to it occurring.
16   Q    Well, let me just say this.  If Sergeant Thao says
17            that they were advised of it before it occurring,
18            would you rely on that?
19   A    Sergeant Thao was the person who interviewed the
20            three individuals that you referred earlier, so he
21            had the most current or up-to-date information on
22            that.  My -- my information would have been
23            secondhand.
24   Q    Okay.  When you talked to all of these individuals
25            this last time around, were they shown any
```

58

```
1          photographs of any suspects or, in particular, Chong

2          Lee?

3     A    No, I don't believe we showed them a photograph of

4          Chong Lee.

5     Q    Okay.

6     A    It -- I should say, there was photographs shown from

7          the video from Luna of people exiting Luna, and the

8          photographs -- I don't recall -- obviously Chong Lee

9          is in some of those photographs, and I don't recall

10          specifically if the photographs that we included in

11          showing him -- showing the individuals how they were

12          identified through those photographs included Chong

13          Lee.

14     Q    So you're -- I'm a little bit confused now.  Were

15          those photographs of people exiting Luna shown to

16          these witnesses when they were reinterviewed in April

17          or do you believe they were shown to the witnesses

18          when they were originally interviewed back in

19          December of 2013?

20     A    In April we showed them photographs from the video

21          from Luna.  I don't -- I don't recall the earlier

22          because I was not part of that, or I should say I

23          don't know if there was any photographs shown to the

24          witnesses prior to that in the prior interview

25          because I was not part of that.
```

59

1  Q    In each one of these interviews, you began by telling
2       these witnesses that their identity had been
3       inadvertently turned over to the defense because they
4       had appeared on the white board; in other words,
5       their photos had been provided, correct?
6  A    Correct.

7  Q    In fact, the identities of all these people had been
8       provided in written discovery because there was a
9       traffic stop that had occurred that night outside of
10      Luna and the identities of Mikey Thao and Kevin Watou
11      Lee had been provided in discovery, correct?
12 A    Correct.

13 Q    And is Ryan Thao another name for Jack Thao or is
14      that somebody different?
15 A    I believe they're two different individuals.

16 Q    So Ryan Thao had not been in the car with Mikey Thao
17      and Watou Lee that was stopped?
18 A    Correct.

19 Q    And after telling them this, another thing you talked
20      with each one of these individuals about was the fact
21      that they might be interviewed by defense counsel at
22      some point, correct?
23 A    Correct.

24 Q    And what you told them was it was up to them whether
25      or not they wanted to talk to an investigator for the

60

```
 1         defense, correct?

 2    A    Correct.

 3    Q    But that they didn't have to talk to an investigator

 4         to the defense, right?

 5    A    Correct.

 6    Q    And what you specifically said was that they could

 7         tell the investigator for the defense that they had

 8         already given the statement to the police and didn't

 9         have to interview -- and did not have to consent to

10         be interviewed by defense investigator, correct?

11    A    I'm not sure if I worded it in that same fashion.

12    Q    Would you like me to play the tape to refresh your

13         recollection?  I'll have to do that on another

14         occasion.

15    A    I don't recall exactly.  I don't recall saying it in

16         the fashion that you presented it.

17    Q    Well, what fashion do you recall saying it in?

18    A    I don't know word-for-word, but something to the fact

19         of it's possible that the defense counsel or their

20         investigator may want to talk to you, and, sort of,

21         would you now be willing to give a statement --

22         because you were inadvertently identified, would you

23         be willing to give us a statement today in reference

24         to what you saw or witnessed.  That way, if the

25         defense would like to question you, then you've
```

61

| 1 | | already given a statement to the police. |
|---|---|---|
| 2 | Q | But that was at the outset of you talking to each one |
| 3 | | of these three individuals, correct? |
| 4 | A | In April? |
| 5 | Q | Yes. |
| 6 | A | Correct. |
| 7 | Q | But at the end of the interviews you repeated that |
| 8 | | they didn't have to talk to a defense investigator, |
| 9 | | didn't you? |
| 10 | A | Correct. |
| 11 | Q | And that in fact they could tell the investigate -- |
| 12 | | defense investigator that they had talked to the |
| 13 | | police and that the defense investigator could rely |
| 14 | | on that statement, right? |
| 15 | A | Correct. |
| 16 | | ATTORNEY VISHNY: Nothing further. |
| 17 | | THE COURT: Miss Schneider. |
| 18 | | **EXAMINATION** |
| 19 | | **BY ATTORNEY SCHNEIDER:** |
| 20 | Q | Do you remember at any point, I'm going to say, in |
| 21 | | December, immediately after, or the next few months |
| 22 | | after this occurring if the specific names of these |
| 23 | | three were discussed with prosecutors as to these are |
| 24 | | the three who don't want to be named? |
| 25 | A | No, I don't recall -- well, I should say I don't |

62

```
 1          believe that we provided any names.  I think we just
 2          threw out or mentioned that there was witnesses that
 3          had chosen not to be identified or requested not to
 4          be identified for fear of their safety.
 5    Q     And prior to going to talk to them in April of 2015
 6          do you remember any discussions with prosecutors to
 7          say, okay, these are the three people and we're going
 8          to go talk to them or giving their specific names or
 9          just saying we're going to go talk to some additional
10          witnesses?
11    A     Again, I believe it was just a general that we were
12          going to be speaking or contacting additional
13          witnesses in reference to that.  In particular, I --
14          I knew there were three individuals that were
15          identified inadvertently through the posting on the
16          white board that had not been named in the report
17          associated with the homicide.
18    Q     And when you were looking at that or prepping and
19          looked at the white board and saw those three names,
20          what thoughts did you have at that point?
21    A     My thought was that I had inadvertently -- I
22          indirectly had inadvertently released their names to
23          the defense counsel and the defendant after they had
24          requested not to be identified and associated with
25          the homicide case, and not only were their pictures
```

63

```
 1        but their full names were identified as a process of
 2        this investigation.  And as I was prepping for it, I
 3        realized through the submission of those photos that
 4        the defense counsel now had that.  And two things, I
 5        wanted to notify them that the defense is aware of
 6        who they are and that they may be interviewed, and
 7        then the second -- I guess I wanted to apologize that
 8        I had inadvertently done that as well as now to see
 9        if over a year-and-a-half later if they would be
10        willing to be formally identified as a witness.
11   Q    And that did -- their identification is because when
12        the white board was up with several photos, a photo
13        of the entire board was taken or captured, correct?
14   A    Correct.
15   Q    Do you ever recall any specific conversations with
16        myself or other prosecutors in my office about any
17        original reports or recordings or what was going to
18        be done with them?
19   A    No, I don't.
20   Q    Do you recall any direction given by myself or other
21        prosecutors as to what if anything should happen to
22        any information obtained from these people when they
23        ask to be named or remain confidential?
24   A    No, I don't.
25   Q    We've had several discussions about different
```

64

```
1        components of this case, correct?

2   A    Yes.

3   Q    But you don't recall any discussions with myself or

4        other prosecutors related to saying, yes, go ahead

5        and get rid of those prior recordings.

6   A    No.  I think that was a decision that was made with

7        the investigators that were working on the case as to

8        what do we do with this information, and we related

9        to the Monfils Law, and that we believe that if there

10       were any of those recordings, photographs or any

11       submissions like that, we knew through discovery the

12       defense would be able to obtain that, so I think as

13       an investigative team we just decided that nothing

14       would be retained.

15                ATTORNEY SCHNEIDER:  I have nothing else,

16       Judge, at this time.

17                THE COURT:  Attorney Vishny.

18                ATTORNEY VISHNY:  Yeah.  I have a few more

19       questions.

20                         EXAMINATION

21  BY ATTORNEY VISHNY:

22  Q    First of all, outside of these three witnesses, Mr.

23       Thao, Mr. Thao and Mr. Lee, are there any other

24       witnesses who exist in this case who do not want to

25       be identified or simply who were interviewed by the
```

65

| 1  |   | police that have not been disclosed to the State or |
|----|---|-----|
| 2  |   | the defense? |
| 3  | A | Yes. |
| 4  | Q | How many? |
| 5  | A | Well, there was about 150 people at the bar that we |
| 6  |   | interviewed. Some of those identities -- I believe |
| 7  |   | most of those identities you have, but the full |
| 8  |   | interviews as far as what was discussed during those |
| 9  |   | interviews was not retained, whether it was recorded |
| 10 |   | or notes taken from that or a report completed on |
| 11 |   | that. In addition to that, I know of two other |
| 12 |   | individuals -- I recall two other individuals who I |
| 13 |   | was part of -- I interviewed that had requested not |
| 14 |   | to be identified under the same concerns about their |
| 15 |   | own personal safety in reference to this case. |
| 16 | Q | Okay. What are the name of those individuals? |
| 17 | A | I don't recall or don't remember right now. |
| 18 | Q | So if we took a ten-minute break and you ran back to |
| 19 |   | your office you could retrieve that, correct? |
| 20 | A | I don't know if I have anything from those |
| 21 |   | interviews. |
| 22 | Q | Well did you reinterview those people in April of |
| 23 |   | 2015 as well? |
| 24 | A | No, I did not. |
| 25 | Q | Why not? |

66

```
 1   A    Because their photos and identities weren't turned
 2        over to you.
 3   Q    And those people did not tell you that Chong Lee did
 4        the shooting, did they?
 5   A    I think there is a double negative in there.  Could
 6        you repeat the question?
 7   Q    Okay.  Let's take the first individual, call them
 8        individual number one.  Regarding individual number
 9        one, did that person identify Chong Lee as the
10        shooter?
11   A    No.
12   Q    Did they identify another individual as the
13        shooter?
14   A    No.
15   Q    Did they witness the shooting?
16   A    No.
17   Q    Are you a hundred percent positive of that?
18   A    No.  I just base that -- base that response upon what
19        they told me.
20   Q    Well what did they tell you, individual number one?
21   A    Again, without my notes, what I believe is they
22        were -- they had just left or just outside the doors
23        of Luna at the time of the shooting and then
24        witnessed the individuals exiting the bar as well as
25        the fight between the two women that occurred on
```

67

```
 1          Division Street.
 2    Q     Okay.  What about individual number two?
 3    A     The same information.  They were together..
 4    Q     It was a man and a woman, wasn't it?
 5    A     No.  It was two males.
 6    Q     Okay.  And those two males were Hmong males?
 7    A     No.  One was a white male and one was a Hmong male.
 8    Q     But they were both affiliated with the same group of
 9          friends as Chong Lee, Joe Thor, Paul Lee, Phong Lee,
10          you know, other Hmong males who were at that bar?
11    A     No, they were not, not with that group of friends.
12    Q     They weren't.
13    A     No.
14    Q     Had they been hanging out with that particular group
15          of people earlier that evening?
16.   A     Not -- not that I recall.
17    Q     Had they been hanging out with Tom Lee earlier that
18          evening?
19    A     No.
20    Q     All right.  So aside from those two individuals are
21          there any other Hmong individuals who were
22          interviewed that the interview was not preserved?
23    A     By me directly?
24    Q     To your knowledge.  No.  You're the person who
25          actually kind of has been overall in charge of this
```

68

```
 1          well, there was no information in that report that
 2          associated them as a direct witness to the -- what
 3          had taken place in the foyer.
 4     Q    And Mikey Thao's information regarding him being a
 5          potential gang member had also been turned over in a
 6          packet of discovery regarding prior law enforcement
 7          contacts, correct?
 8     A    Correct.
 9     Q    And you had worked on that as well?
10     A    Part of that, yes.
11     Q    And so that was another means by which that had been
12          turned over prior to this interview you conducted in
13          April, correct?
14     A    Correct.  But that name was again associated with the
15          traffic stop in front of George Webb's, not
16          necessarily -- which is a total -- how should I say
17          it, it's a separate report, a separate incident
18          number.  Again, that report doesn't reflect any
19          information that he had direct knowledge of what had
20          taken place in the foyer at Luna.
21     Q    Regarding the interviews of those three individuals,
22          with the interview with Ryan Thao, there is a
23          substantial portion of time was devoted to persuading
24          him to come forward and be a witness in this case,
25          correct?
```

73

1   A   Yes.

2   Q   So there was more to these reinterviews than to

3       simply inform people that they had been inadvertently

4       identified, correct?

5   A   Correct.

6   Q   And in fact about half of the time that was spent

7       with Ryan Thao was to try and persuade him that he

8       should come forward and be willing to be a witness.

9   A   Yes.  We were trying to persuade him or, I guess at

10      this point, see if he would be willing to identify as

11      a witness in this incident since he did have some

12      information related to the shooting.

13  Q   And the same was done with Mr. Mikey Thao and Mr.

14      Watou Lee as well, but it didn't take that much time

15      because they fairly rapidly agreed to be identified.

16  A   Correct.

17          ATTORNEY VISHNY:  I don't have any

18      questions right now.

19          THE COURT:  Miss Schneider, any follow-up?

20          ATTORNEY SCHNEIDER:  No.

21          THE COURT:  Okay.  Attorney Vishny?

22          ATTORNEY VISHNY:  You're excused.

23          THE COURT:  Sorry?

24          ATTORNEY VISHNY:  I want to call Sergeant

25      Meyer.  I want to know how long it would take to get

74

1      him here, if we can get him here rapidly.  And if

2      not, which I can certainly appreciate that we not,

3      I'd like to set another date as soon as possible.

4      And I'm going to ask for a court order, since there

5      are many law enforcement agents in this room, that

6      none of them nor the prosecutor discuss any of the

7      testimony which has occurred today that -- because,

8      quite frankly, Judge, I was quite surprised by the

9      testimony regarding the destruction of these

10     recordings, and I want to ask him some further

11     questions.  It certainly appears that the evidence

12     would show that the State was informed of that before

13     it occurred since he was the lead investigator at

14     that time.

15        If Miss Schneider wants to make representations

16     to the court that the State was not informed, I'm

17     going to take the unusual step of asking that she be

18     sworn under oath and I be allowed to question her

19     rather than just make representations to the court

20     because she could potentially be a witness in this

21     matter.  So I would ask the court to decline to

22     accept any argument from Miss Schneider unless it

23     becomes part of the testimonial record in this

24     matter.  So that's the first order of business.

25        The second thing I'm going to be asking of the

75

```
 1          court is I'm going to ask the court to order the IT
 2          department at the Appleton Police Department, they
 3          may have to hire an outside provider, but it's my
 4          belief that if these recordings were destroyed, that
 5          they are probably still on the server.  And, you
 6          know, from what I know from the prosecution of child
 7          pornography cases, it appears that things never
 8          really leave a computer, and so it may be that this
 9          could be a lot of hooey about nothing if we can
10          retrieve the original recordings of all of these
11          witnesses.  Because if we can't, the next motion I'm
12          going to bring is to preclude them from testifying at
13          the trial as to anything inculpatory because I have
14          ample reason to believe that exculpatory material
15          exists on these recordings.  That would take me quite
16          a while to do that.  I would have to write a fairly
17          substantial brief outlining how Sergeant Thao
18          questions witnesses and contaminates witness
19          interviews by suggesting who the perpetrator is, but
20          I have seen it throughout this case on numerous
21          interviews that this court has not reviewed, and it
22          would be my belief that he would not have deviated
23          from that very much in interviews of any other
24          witnesses and that therefore that material would be
25          exculpatory.  Because I can never recover how to
```

76

```
1          cross-examine these witnesses.
2               So that's the plan that I am proposing to the
3          court.  I don't know how the court wants to proceed.
4                    THE COURT:  Let me ask the first question:
5          Do we know, Attorney Schneider, whether Attorney
6          Maier is -- Investigator Meyer is available, not
7          available?
8                    ATTORNEY SCHNEIDER:  He's retired so what
9          he's doing on any given day I have no idea.  We -- I
10         know we have access to cell numbers and home numbers
11         so we can try to make a call to see if he's available
12         yet today if that's the suggestion.  I know Mr.
13         Maier, Attorney Maier has been trying to check with
14         some other people who know more about Appleton and
15         their IT department, and I don't know that answer,
16         but my guess, Appleton has got a very good IT
17         department for the City that controls the police
18         department agency.  I just don't know, if Sergeant
19         Thao saved it within his file folder on his computer,
20         when the network backs everything up, does it back up
21         only what you put on the server or does it back up
22         everything on everyone's individual computer.  I
23         don't know that answer, but my guess is we can find
24         that out or ask them.
25                   THE COURT:  Why don't we do this.  Let's
```

77

```
1     see if we can get a hold of Investigator Meyer.
2     We'll take a five- or ten-minute break.
3               ATTORNEY VISHNY:  And would the court issue
4     that order that he's under sequestration, therefore
5     nobody may discuss with him the subject matter of
6     what's occurred before here.
7               ATTORNEY SCHNEIDER:  Just that it's on
8     Chong Lee, we're in the middle of a motion hearing
9     and trying to see if he can make it in yet today.
10              THE COURT:  Correct.
11              ATTORNEY VISHNY:  Thank you.
12              THE COURT:  And then if he's available on a
13    different day, we can cross the bridge of making that
14    an ongoing order.
15              ATTORNEY SCHNEIDER:  Yes.
16              ATTORNEY VISHNY:  Okay.
17              (A brief recess was taken.)
18              THE COURT:  It's my understanding that
19    Investigator Meyer is not available today, correct?
20              ATTORNEY VISHNY:  That's what I've been
21    told.
22              THE COURT:  Then in this case we will try
23    to get a date as soon as possible.
24              ATTORNEY VISHNY:  Yes.
25         Now the other thing that's happening is -- and
```

78

```
1    STATE OF WISCONSIN        CIRCUIT COURT      OUTAGAMIE COUNTY

2    ─────────────────────────────────────────────────────────────

3    STATE OF WISCONSIN,

4                       Plaintiff,
                                              Case No. 13-CF-1074
5    v.

6    CHONG LENG LEE,

7                       Defendant.

8    ─────────────────────────────────────────────────────────────

9                           MOTION HEARING

10   ─────────────────────────────────────────────────────────────
```

```
BEFORE:        HONORABLE GREGORY B. GILL, JR.
               Circuit Court Judge, Branch IV
               Outagamie County Justice Center
               Appleton, WI  54911


DATE:          September 29, 2015


APPEARANCES:   CARRIE SCHNEIDER
               District Attorney
               Appearing on behalf of the State

               ANDREW MAIER, ALEXANDER DUROS and PETER
               HAHN
               Assistant District Attorneys
               Appearing on behalf of the State

               DEBORAH VISHNY and EVAN WEITZ
               Attorneys at Law
               Appearing on behalf of the Defendant

               CHONG LENG LEE
               Defendant
               Appearing in person




     Joan Biese
     Official Reporter, Branch IV
     Outagamie County
```

1

EX-B

1    going to be an effort to obtain those recordings in
2    hopes that some backup may be located on a server or
3    something.
4             ATTORNEY SCHNEIDER:  And I think we
5    provided some updates between the May and the June
6    hearings because we checked some locations, but I can
7    tell you since June they've continued to look in
8    different locations.  Sergeant Meyer has since
9    retired, and I think the court was aware of that
10   because of scheduling with him last time.  There's
11   been a look there.  Sergeant Thao even told me today
12   that they sent his digital recorder at some point to
13   some other place for it to be checked to see if
14   anything was still on there that might have been
15   deleted previously.  So we've not found any of those
16   original recordings, which is kind of what we --
17   where we were last time.  We gave an update to what
18   we had checked, they were checking some additional,
19   but I think at this point they've looked everywhere
20   they can think of and looked on backups and in the
21   computer and in the overall evidence BEAST system,
22   and those they cannot locate.
23            THE COURT:  So, okay, Attorney Vishny, any
24   additional issues that you would like to have
25   addressed today other than those outlined by Attorney

                                6

```
 1  A    Correct.  I did testify to that they were not
 2       retained.
 3  Q    And the decision to not retain them, that wasn't a
 4       decision made by you alone.
 5  A    No, it was not.
 6  Q    And can you name all the people that you recall
 7       involved in that decision right now?
 8  A    It was a discussion in the unit in terms of the
 9       investigators that were working on the case, as they
10       were aware that we have interview those party, and
11       then I know one day Lieutenant Gostisha, former
12       Lieutenant Gostisha walked into my office saying that
13       we did not need to retain those recordings.
14  Q    Okay.  Were you aware that there were other
15       recordings of two people named Jared Randall and
16       Johnny Thao who had been interviewed and not turned
17       over to the defense but the recordings were retained?
18       Did you know anything about that?
19  A    No, I was -- I was -- I was aware of the name Johnny
20       Thao several months after the investigation, but I
21       did not know where to interview him.
22  Q    Now when you first interviewed Ryan Thao, the very
23       first time, you didn't show him any pictures, did
24       you?
25  A    No, I did not show him any picture.
```

85

1    Q    Do you remember him telling you that the shooter had
2         on a white coat the first time you interviewed him?
3    A    Based on the description of his observation, he
4         indicated that the clothing I believe.
5    Q    The coat was white, right? That's what he told
6         you?
7    A    I don't recall exactly.
8    Q    So you can't recover that information now because you
9         don't have the tape to refer to, correct?
10   A    He provided some descriptions of the person, but I --
11        I can't recall exactly what.
12   Q    Okay. So you don't know one way or another if he
13        told you the coat was white at that time, right?
14   A    Yeah. I don't recall from that first interview.
15   Q    Okay. And at that first interview did you
16        specifically ask him whether or not he knew who Chong
17        Lee was or not?
18   A    No. Again, at that time we did not know -- at least
19        I did not know any particular specific suspect in the
20        investigation. I was pulled into the case three days
21        or two days later, and I simply went in there based
22        on information on those subjects to simply listen to
23        them, get their observation of what they saw, and
24        gather the informations.
25   Q    Okay. And so no photos or showing -- there is no

86

```
 1          with Paul Lee at Norka?

 2    A     Yes.

 3    Q     And the name Mikey Thao came up there as well?

 4    A     I believe so.  It was a long interview and we

 5          discussed various people in terms of what they were

 6          doing in the foyer, and I believe that that name may

 7          have come up at that time.

 8    Q     Okay.  When you interviewed Paul Lee that day on

 9          December 11th, you had actually already interviewed

10          Mikey Thao for the first time, correct?

11    A     No, I have not.

12    Q     You hadn't interviewed him on December 11th?

13    A     Not at -- not at Norka when we interview Paul Lee.

14    Q     No.  I understand that.  But had you interviewed

15          Mikey Thao earlier that day?  Was it that same day

16          that you interviewed Mikey Thao?

17    A     No, it was after we interview Paul Lee at Norka that

18          I made contact with him that I interview him on that

19          night.

20    Q     Mikey Thao?

21    A     Mikey Thao.

22    Q     Okay.  So it came afterwards?

23    A     After Norka.

24    Q     What time that night did you interview Mikey Thao, if

25          you recall?
```

96

```
1    A    It was after Paul Lee was taken to the Appleton
2         Police Department for additional question by other
3         officer.  I remain at Norka to interview Michael
4         Xiong, which is Chong Lee, the defendant's
5         brother-in-law.  And then after that then I interview
6         -- I believe I made contact with Mikey and then I
7         interview him.
8    Q    Okay.  Where was that interview conducted?
9    A    It was in my squad.  I believe I met him somewhere.
10   Q    And you didn't show him any photographs either,
11        correct?
12   A    No, I did not.
13   Q    And at that time did he tell you that he thought
14        Chong Lee was still in jail?
15   A    Yes.
16   Q    Okay.  And he never identified Chong Lee as somebody
17        who did the shooting, right?
18   A    Not by name, he just provide descriptions of people
19        coming through.
20   Q    Okay.  And he said that the shooter had on a white
21        jacket, correct?
22   A    I guess -- I mean, I --
23   Q    At that time.
24   A    If he did mention some kind of clothing, again, I --
25        I don't recall exactly the type of color he used.  If
```

97

```
 1      he say it was white, then I'm assuming it's white.

 2   Q  In your re -- when you reinterviewed him in April of

 3      2015 he then told you the shooter had on a white

 4      jacket, correct?

 5   A  Again, I have not had a chance to look at that

 6      report.

 7   Q  Would it help you if I showed you your report to

 8      refresh your recollection?

 9   A  Yes.

10   Q  The report is actually written by Sergeant Rabas,

11      correct?

12   A  Correct.

13   Q  Okay.

14                  ATTORNEY VISHNY:  Sorry, Judge.  I thought

15      I was a little bit more organized than that.

16   Q  (BY ATTORNEY VISHNY)  Okay.  I'm showing you a copy

17      of Sergeant Rabas's summary of that interview

18      regarding Mikey Thao, and just ask you if that helps

19      refresh your memory as to what Mikey Thao said in

20      April of 2015 --

21   A  Yes.

22   Q  -- regarding what the shooter wore.

23   A  Yes.  On Page 346 he -- Michael -- Mikey stated that

24      he doesn't know who had the gun.  He initially states

25      a guy with a white coat with stripes on the arms have
```

93

1    STATE OF WISCONSIN      CIRCUIT COURT      OUTAGAMIE COUNTY

2    ──────────────────────────────────────────────────────────

     **STATE OF WISCONSIN,**
3
                    Plaintiff,
4    v.                                     Case No. 13-CF-1074

5    **CHONG LENG LEE,**

6                    Defendant.

7    ──────────────────────────────────────────────────────────

                         **MOTION HEARING**
8    ──────────────────────────────────────────────────────────

9

     BEFORE:        **HONORABLE GREGORY B. GILL, JR.**
10                  Circuit Court Judge, Branch IV
                    Outagamie County Justice Center
11                  Appleton, WI  54911

12
     DATE:          **January 8, 2016**
13

14   APPEARANCES:   **CARRIE SCHNEIDER**
                    District Attorney
15                  Appearing on behalf of the State

16                  **ALEX DUROS**
                    Assistant District Attorney
17                  Appearing on behalf of the State

18                  **DEBORAH VISHNY** and **EVAN WEITZ**
                    Attorneys at Law
19                  Appearing on behalf of the Defendant

20                  **CHONG LENG LEE**
                    Defendant
21                  Appearing in person

22

23

24   Joan Biese
     Official Reporter, Branch IV
25   Outagamie County

                              1

```
 1                        I N D E X

 2

 3   WITNESS                                            PAGE

 4   CHUE LEE THAO
         Examination by Attorney Schneider..............   15
 5       Examination by Attorney Vishny.................   27
         Examination by Attorney Schneider..............   41
 6       Examination by Attorney Vishny.................   43

 7

 8

 9   EXHIBITS                                           PAGE

10   1 - Email from Sergeant Rabas to Investigator Holdorf   5
     2 - APD Electronic Recording Policy.................   5
11   3 - Attorney Schneider Affidavit...................   6

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2

1    not every witness said the exact same thing, and
2    different witnesses had different knowledge of the
3    parties involved, so if he's going to make a claim
4    that a witness told him something, I think that
5    witness should be specifically identified by name and
6    what that individual told Sergeant Thao, not just a
7    general comment, they said this, they said that.
8         THE COURT:  And if we can, let's -- we'll
9    break it down by the individual witnesses.
10        ATTORNEY SCHNEIDER:  Okay.
11   Q    (BY ATTORNEY SCHNEIDER)  So Ryan Thao, did he express
12        having concern about getting information about
13        Chong?
14   A    Yes, he did.  Very specific about concern for his
15        safety, concern for his family, and how the people
16        involved would be able to find him or retaliate with
17        information he -- if he provided.
18   Q    Did he mention having any information about Chong's
19        background or his family background that was part of
20        his belief?
21   A    Not specifically names, but he's aware of the family
22        and the brothers and the concern about their safety
23        because of that.
24   Q    Okay.  And then at the time then do you remember if
25        Mikey Thao expressed having concerns about sharing

20

| 1 | | information about Chong? |
|---|---|---|
| 2 | A | Yes, to the point where I actually have to meet him |
| 3 | | outside his home so that we can at least have a good |
| 4 | | conversation between two of us. |
| 5 | Q | Did he share anything specific about why he was |
| 6 | | afraid? |
| 7 | A | Again, he -- he had more knowledge of Paul and his |
| 8 | | brothers and has some knowledge about some of the |
| 9 | | activity they were involved in in terms of violent |
| 10 | | incidents, beatings, fights. |
| 11 | Q | And then finally Watou, did he have some specific |
| 12 | | concerns? |
| 13 | A | I think just through his relationship with -- with |
| 14 | | Ryan and Mikey that he also expressed concern. I |
| 15 | | don't recall any specific in terms of that he's aware |
| 16 | | of Paul Lee or Chong or other brothers' activities, |
| 17 | | but he expressed concern about his safety, that these |
| 18 | | are dangerous people in that general term. |
| 19 | Q | When these concerns were expressed to you, did they |
| 20 | | appear to be -- well, let me ask you this. When they |
| 21 | | expressed those concerns to you and they were talking |
| 22 | | about being aware of his family or his brother or the |
| 23 | | history, based upon your information and knowledge |
| 24 | | you knew at the time, were those legitimate |
| 25 | | concerns? |

21

1   A    Yes.

2              ATTORNEY VISHNY:  Objection.  I don't see

3        what the relevance is.

4              ATTORNEY SCHNEIDER:  Judge, part of the

5        argument is that the -- she's arguing the officers

6        are either disingenuous when they say these people

7        had this significant fear and they made certain

8        choices because of what was expressed to them about

9        their fear, or that in some way, shape or form they

10       acted in bad faith.  I think Sergeant Thao should be

11       allowed to explain I believe this or I know this,

12       when in his experience or his knowledge did he know

13       or agree or was aware of those past instances with

14       Chong's family.  It's going to his belief and his

15       knowledge and the decisions that were made whether

16       those fears they expressed were so significant or

17       were legitimate.

18             THE COURT:  I think, if I understood the

19       question correctly, you're asking Sergeant Thao to

20       surmise whether or not he was aware of the incidents

21       which would legitimize the fear, and I think that

22       causes him to go into the mindset of Mikey and Watou

23       and Ryan, and so I think he could answer, based on

24       what they told you, did they appear legitimate, but I

25       don't think whether or not they actually took place,

                              22

```
 1          I don't think we can go into.

 2                    ATTORNEY SCHNEIDER:  Okay.  Then I'll --

 3                    THE COURT:  I'm going to sustain it as to

 4          how it's been phrased.

 5                    ATTORNEY SCHNEIDER:  Okay.

 6     Q    (BY ATTORNEY SCHNEIDER)  Could you see when the three

 7          of them were expressing their fears that they had an

 8          emotional reaction when they were talking about

 9          that?

10     A    Yes, obviously.

11     Q    Okay.  So they -- I'm going to try to -- my question

12          is going to be a little long, but I'm going to try to

13          direct him a little bit.

14               So they express these fears and they say we're

15          aware of the family history.  Were you aware of a

16          family history relating to violence or fighting in

17          the Chong Lee family?

18     A    Yes.

19                    ATTORNEY VISHNY:  Objection.  Relevance.

20                    ATTORNEY SCHNEIDER:  That goes to whether

21          or not he believed theirs fears and how he acted.

22          You can have a lot of people say I'm afraid of Alex

23          Duros because I think he's a bad person, and then you

24          want to maybe take action about Alex or take action

25          to protect that person, but when this officer, his
```

23

1    decisions in needing to protect those people or keep
2    their names out of reports, and when that's based
3    upon him telling them he was afraid and now you have
4    to weigh whether they were acting in bad faith, and
5    defense I think is trying to argue they've come up
6    with this fear argument, it's disingenuous, I think
7    what he knows about that family comes into his
8    mindset when he decides do we really need to protect
9    these people or is there an amount or a level of fear
10   when he weighs what he should do.
11        ATTORNEY VISHNY:  Judge, first of all, the
12   prior testimony is that Sergeant Thao didn't make
13   this decision on his own to destroy these reports,
14   this was a collective decision that was made with the
15   entire law enforcement team who discussed these
16   particular witnesses and what to do.  So I don't
17   believe it's relevant for that reason.
18        Number two, let's say hypothetically speaking
19   that Sergeant Thao is aware of some prior violent
20   incidents, what justification does that give to
21   destroy previous reports.  There are remedies such as
22   telling the prosecutor about the witnesses, telling
23   the prosecutor about the fears, asking for reports to
24   be redacted, asking for in camera inspections, asking
25   for protective orders.  I don't frankly see the

24

1    relevance to what the issues are that the court has
2    to decide, which is were reports intentionally
3    destroyed and what evidence did these reports
4    contain.  Those are the issues before the court, not
5    whether or not Sergeant Thao is aware that these
6    witnesses were afraid.
7                    THE COURT:  Miss Schneider.
8                    ATTORNEY SCHNEIDER:  There's a prong to
9    that though that talks about did they act in bad
10   faith, and so when the officers have previously
11   talked about -- and if she wants me to call every CRU
12   officer to come in and talk about their awareness of
13   the Lee family and the brothers and all the other
14   instances, I can, but I think Sergeant Thao is aware
15   of all of those because of his length of time and his
16   investigation in cases.  When they say these people
17   expressed fear to us and because of that we felt the
18   need to protect them, when they talked about the
19   Monfils, and I know Attorney Vishny thinks they're
20   interpreting it wrong, but when they have to make
21   that decision, I think if you have a witness say,
22   well, I'm afraid of John because he's got a bad
23   reputation, that officer knows nothing about it, he
24   then has to make decisions, should I protect this
25   person, you know, should I ask him more about their

25

```
1      fears because I think they're talking off the wall, I
2      think that is relevant.  It's relevant to why he did
3      what he did, and it's relevant to the prong of did
4      they act in bad faith.
5                  ATTORNEY VISHNY:  And again, bad faith
6      doesn't mean that the fears were or were not
7      legitimate.  Bad faith is really the issues regarding
8      what was the appropriateness of the actions taken by
9      the police officers.
10                 THE COURT:  Yeah.  I'm going to allow the
11     officer to testify, and I think he has, unless,
12     Attorney Schneider, you think I'm incorrect, as to
13     whether or not he felt that Watou and Ryan and Mikey,
14     whether their expressed fears appeared legitimate.  I
15     think the -- the knowledge of the officer I'm not
16     entirely certain is germane.  I'm going to sustain it
17     on that point.  Again, if you want to -- if you feel
18     that the question that I am going to allow hasn't
19     been answered, I'll allow that to be asked.
20  Q  (BY ATTORNEY SCHNEIDER)  So I think, Sergeant Thao,
21     what I'm going to ask you at this point then is when
22     they expressed these fears to you, did it appear to
23     you that their fears were being expressed in a way
24     where they weren't trying to make up something about
25     their fears?
```

```
 1   A    No, they were real.

 2   Q    Did they talk about specifics, if you know?

 3   A    I don't recall specific incident they provided, but

 4        for example, like Mikey and Ryan talk about how they

 5        are familiar with the Lee's brother and things that

 6        they have done in terms of some of the violent

 7        situations, particularly Mikey had talked about how

 8        he more familiar with Paul and his brothers and some

 9        of the things that they have done.  As you recall in

10        the second interview they talk about some of the

11        fights they involved in in some of the taverns in

12        downtown.

13   Q    When they talked about those things, were those

14        things you were aware of?

15   A    Yes.  And I have obviously more knowledge in terms of

16        what the Lee brothers have done in regard to some

17        crimes that are committed in the past or beatings or

18        weapon related situation, investigation that I

19        personally involved in.

20   Q    Okay.

21             ATTORNEY SCHNEIDER:  Then I don't have any

22        other questions.

23             THE COURT:  Attorney Vishny.

24             ATTORNEY VISHNY:  Okay.

25             **EXAMINATION OF CHUE LEE THAO**
```

27

**BY ATTORNEY VISHNY:**

2    Q    First of all, as to Jack Thao, you were aware that

3         Jack Thao was in a vehicle that was stopped with

4         Mikey Thao and Watou Lee after being at Luna lounge,

5         correct?

6    A    I was aware of that, I believe was sometime after we

7         interviewed Ryan and Jack and Watou.

8    Q    No.  You were aware -- I mean you became aware later

9         after the interviews that they had been in the car

10        stopped by you and another police officer?

11   A    I believe so, yes, I believe so.

12   Q    But you were aware before December -- before your

13        contacts with Jack Thao and his parents about the

14        store that Jack Thao had been in that car, right?

15   A    I -- I don't recall.  I don't believe so because

16        the -- the parents talked to me in January of 2014,

17        and it was kind of by that time that there was no

18        need to conduct additional interview with those

19        three.  And then Ryan names -- I mean Jack name came

20        up but I don't recall what time frame that came up.

21   Q    Okay.  And did you ever talk to Jack Thao

22        specifically at the Appleton Asian Market on College

23        Avenue?  That's his parents' store?

24   A    It's on Wisconsin Avenue.

25   Q    Wisconsin.  Excuse me.  Did you ever talk

28

```
 1        specifically with Jack Thao whether or not Jack Thao

 2        had heard rumors that Chong Lee was the alleged

 3        shooter in this case?

 4   A    No, I did not, not specific about this case.  I might

 5        have stopped by to talk about the counterfeit and

 6        just to ask some questions about what his parents but

 7        not about Luna.

 8   Q    Did you not, during the course of whatever your

 9        purpose was, actually have a conversation with him

10        where he told you he had heard rumors that Chong Lee

11        was the shooter and didn't you have that conversation

12        with him regardless of your purpose for going to the

13        store?

14   A    No.

15   Q    Okay.  And didn't you have a conversation with him at

16        all about whether or not he knew Chong Lee?

17   A    No.

18   Q    Okay.  All right.  Turning away from the Jack Thao

19        issue, I'm going to talk to you about Ryan, Mikey and

20        Watou.  What was the date that you interviewed these

21        people?

22   A    With Jack -- I mean with Ryan it would be sometime

23        the afternoon, I believe it was on December 11th,

24        2013.

25                   THE COURT:  And that was whom?  I'm
```

29

```
 1        sorry.

 2                  THE WITNESS:  That was Ryan Thao.

 3                  THE COURT:  Okay.

 4   Q    (BY ATTORNEY VISHNY)  Okay.  So you think -- you said

 5        which one was the afternoon of December 11th?

 6   A    Ryan Thao.

 7   Q    And what about Mikey?

 8   A    Mikey was after we interview Paul Lee at Norka, so

 9        something -- sometime around eleven p.m. to around

10        midnight.

11   Q    And what about Watou?

12   A    Watou I believe was about six p.m., between six and

13        seven p.m. on that same day, December 11, 2013.

14   Q    Now the suspect at the time of the shooting was Paul

15        Lee, right?

16   A    He was considered somewhat of a person of interest at

17        the time.

18   Q    Well he was more than a person of interest because at

19        the end of interrogating him at Norka, he was put

20        under arrest, wasn't he?

21   A    He was taken into custody.

22   Q    And he didn't have a hold for any other matter, he

23        was arrested for this particular homicide, right?

24   A    Yes, he was taken into custody.

25   Q    And when he was interrogating while at Norka it was
```

30

```
1     made quite clear to him that it was believed he was

2     the person involved in this shooting, correct?

3  A  I did not believe -- at least I did not draw the

4     conclusion myself personally, but I know the other

5     officer that have investigated two or three days,

6     four days prior to my involvement have shared some --

7     some I guess conclusion or some assumption that he

8     made because he was physically involved with Josh in

9     terms of the fighting that he was potentially the

10    suspect.

11 Q  Okay.  Let's try to just stick to answering my

12    question.

13 A  Sure.

14 Q  Trying to make the hearing short.  You were there

15    with Sergeant Rabas and you interrogated him,

16    correct?

17 A  Yes.

18 Q  And it was that Paul Lee was the suspect, correct?

19    It was stated explicitly, wasn't it?

20 A  Yes.

21 Q  And it was told to him explicitly, you had a gun in

22    your hand when you were there, right?

23 A  Based on the photo that they observed.

24 Q  My question is was it told to him explicitly.

25 A  To Paul?
```

31

```
 1   Q   Yes.

 2   A   He was told he was a suspect in the shooting, yes.

 3   Q   Well he was told more than he was a suspect, he was

 4       told that they believed he was guilty, correct?

 5           ATTORNEY VISHNY:  Judge, you know what, I'm

 6       going to ask this hearing be adjourned.  I have a lot

 7       of material that I could impeach Sergeant Thao with.

 8       I didn't expect him to be called as a witness today

 9       based on my conversation with Miss Schneider

10       yesterday.  I believed that Sergeant Rabas was going

11       to be called potentially but that he was ill, wasn't

12       going to be here.  I could spend about a good two or

13       three hours cross-examining Sergeant Thao and what he

14       just said, so I suggest that we do one of two things,

15       we either strike the entire record or we reset this

16       for a day where I can come in with the impeachment

17       materials.

18           This court has previously reviewed the

19       transcripts of these interrogations.  This court -- I

20       mean, I have the reports that he has written.  I

21       don't think that these gentlemen were interviewed

22       even on the 11th, I think it was the 10th.  Pretty

23       clear that Paul Lee was a suspect.  So I'm not

24       prepared to impeach him based on what's happened

25       here.  I can ask some other questions about this, but
```

```
1          in order to do a full impeachment, I simply can't
2          prove it today.
3                     ATTORNEY SCHNEIDER:  I would dispute
4          because I know we specifically talked yesterday
5          about, and I told her Sergeant Thao had not talked to
6          Jack Thao, there was this counterfeit grocery store
7          thing with his parents.
8                     ATTORNEY VISHNY:  Correct.
9                     ATTORNEY SCHNEIDER:  So I don't know why
10         she says she's surprised by Sergeant Thao's
11         testimony.
12                    THE COURT:  I think now we're talking about
13         Paul Lee.
14                    ATTORNEY VISHNY:  I'm not surprised about
15         the testimony about Jack Thao at all.  I wasn't
16         surprised, it's exactly what I expected.  But this
17         other stuff about interviewing Ryan, Mikey, Watou,
18         and, you know, I --
19                    ATTORNEY SCHNEIDER:  Well, it -- maybe I'll
20         say this.  My point of today was having him further
21         express their fears and his basis and his knowledge.
22         If we're going to argue over the dates and when they
23         interviewed them and in what order, I want to -- I
24         guess I'd object because her cross is beyond the
25         scope.  I don't know what she's trying to get to
```

33

1      through cross, but the purpose of why I recalled him

2      on that was my thought that I needed to further

3      express to the court his belief when it goes to the

4      argument on bad faith.

5              ATTORNEY VISHNY:  Let me try a few more

6      questions, maybe I can handle this without the

7      impeachment material.

8   Q   (BY ATTORNEY VISHNY)  Let's talk first about Ryan.

9      We're going to talk about each one specifically.

10     Okay?

11  A   Yes.

12  Q   Focusing on Ryan, what did Ryan tell you the shooter

13     wore in that interview?

14  A   He -- he did describe the person coming from which

15     directions and a description of the clothing, and

16     you're asking me to describe specifically what color

17     in terms of -- I can't -- I don't have --

18  Q   Because you don't remember, right?

19  A   Correct.

20  Q   And you can't refer to any notes because you've

21     destroyed the reports?

22  A   It was decided not to retain, yes.

23  Q   And you didn't show him any photographs at the time

24     at that interview, or did you?

25  A   I don't recall showing photograph to him.

```
 1   Q   Paul Lee was a suspect at that time, the main suspect
 2       of the Appleton Police Department investigation,
 3       correct?
 4   A   I'm telling you in my mind --
 5   Q   I'm not asking about your mind, I'm asking about what
 6       the suspect was that the team was working to develop,
 7       it was Paul Lee, wasn't it?
 8   A   No.  At the time it was not in my mind that Paul Lee
 9       was the suspect.
10   Q   It was in your mind that somebody else was?
11   A   No.  It's an open investigation to determine who have
12       done the shooting.
13   Q   When Ryan Lee told you he was afraid of people in the
14       Lee family, he didn't even mention Chong Lee's name
15       during that interview on December 10th or 11th,
16       whichever day it occurred, he didn't even mention
17       Chong Lee's name to you.
18   A   Right.  His name is Ryan Thao.  He did not.
19   Q   Excuse me.  He did not mention Chong Lee, we're
20       absolutely clear about that, correct?
21   A   No, he did not mention.
22   Q   The person he mentioned being afraid of was Paul
23       Lee?
24   A   I don't recall he mentioned Paul Lee, but he
25       expressed concern about the brothers, the family,
```

```
 1        because he's familiar with them.

 2    Q   He told you he knew Paul Lee, right?  That's who he

 3        was familiar with, right?

 4    A   I recall -- believe that, but the person that we

 5        actually have a better relationship or knowledge or

 6        interaction was Mikey Thao, that he --

 7    Q   I'm asking you about Ryan.  We're sticking to Ryan.

 8        Okay?

 9    A   I don't recall him saying Paul Lee that he knew, I

10        don't recall that.

11    Q   Okay.  So if he talked about the Lee brothers,

12        though, we are 100 percent positive the name Chong

13        Lee never came up, correct?

14    A   From Ryan Thao, no.

15    Q   No.  And he didn't even know Chong Lee, you found out

16        later when you reinterviewed him, right?

17    A   Correct.

18    Q   So now that we established the name Chong Lee was in

19        no way involved in the Ryan Thao discussion, let's

20        talk about Mikey Thao.  Mikey Thao also did not

21        mention Chong Lee as somebody he was specifically

22        afraid of, correct?

23    A   Not names but just association with brothers.

24    Q   Did he name specifically any specific brothers?

25    A   That he's aware of all of them.
```

36

```
1    Q    Did he name names?

2    A    I didn't -- I don't recall exactly names, but he

3         mentioned that he's familiar with Paul Lee.

4    Q    Okay.  Did he tell you what his description of the

5         shooter's clothing was?

6    A    Yeah, he did provide a description.

7    Q    What did he tell you it was at the time?

8    A    Again, I don't recall, but it was more of a jacket

9         and some type of two-tone color or different color,

10        and I can't give you precisely the color that he

11        described.

12   Q    And of course you can't remember because you didn't

13        write it down.

14   A    It was decided not to retain, yes.

15   Q    And you didn't retain the tapes, right?

16   A    Right.

17   Q    And clearly this was the most important thing of this

18        investigation was to get a description of who did the

19        shooting when you're talking to these witnesses a few

20        days before it -- after it occurred, excuse me.

21   A    Taking into consideration the express for their

22        safety, we decided not to retain the tape.

23   Q    I didn't ask you that.  What I asked you was, clearly

24        the focus of the investigation, whether it's two,

25        three, four days after this shooting, is to find out
```

37

```
1         who did it, right?

2    A    Correct.

3    Q    A description would be a crucial thing to find out,

4         correct?

5    A    Correct.

6    Q    Clothing would be a crucial thing, right?

7    A    Yes.

8    Q    Height and weight would be a crucial thing, right?

9    A    Correct.

10   Q    Showing photos could be a crucial thing, correct?

11   A    Yes.

12   Q    And you didn't show him any photographs either during

13        that?

14   A    I don't recall showing photo.

15   Q    Okay.  And he didn't specifically ever mention Chong

16        Lee as somebody he was afraid of?

17   A    Again, I did not give names other than have been

18        expressed concern, so the answer to your question

19        would be no.

20   Q    All right.  Watou Lee.  He didn't know Chong Lee

21        either, right?

22   A    No, he did not.

23   Q    Chong Lee's name never came up in the interview,

24        correct?

25   A    Yes.
```

```
 1   Q    Did you ask him for a description of what the shooter
 2        wore?
 3   A    Yes.
 4   Q    Height and weight?
 5   A    Yes.
 6   Q    You destroyed the tapes, right?
 7   A    Correct.
 8   Q    You knew at the time what other witnesses had told
 9        the police in terms of descriptions of the shooter,
10        right?
11   A    Yes.
12   Q    In fact one of the most crucial witnesses was Daniel
13        Kersten who was the bouncer.  You weren't aware of
14        any of his statements?
15   A    No.
16   Q    Or any of the other witness statements as to what the
17        shooter wore?
18   A    No.
19   Q    You were just aware that the police believed that
20        Paul Lee had a gun in his hand as he was fleeing
21        Luna?
22   A    It was expressed to me in that fashion, that he may
23        have something in his hand similar to a gun.
24   Q    And when Watou Lee said he was afraid of people in
25        the Lee family, did he specifically mention Paul
```

39

| 1 | | Lee's name? |
|---|---|---|
| 2 | A | Watou, he did not know the brothers. |
| 3 | Q | Then how could he have said he was afraid of the Lee |
| 4 | | brothers if he didn't know them? |
| 5 | A | Just through his socialization with Mikey Thao and |
| 6 | | with Ryan Thao and the fact that he's aware of the |
| 7 | | gang or the association with friends in that group. |
| 8 | Q | Now, you said that you're aware of prior violent acts |
| 9 | | by what I characterize as the Lee brothers, correct? |
| 10 | A | Yes. |
| 11 | Q | Actually, the prior violent acts you were aware of |
| 12 | | were those of Paul Lee. |
| 13 | A | No, his other brothers too. |
| 14 | Q | But it wasn't Chong Lee. |
| 15 | A | Not -- he was a victim of a shooting. |
| 16 | Q | Chong, yes, well, being a victim is not considered to |
| 17 | | be a violent act by the Appleton Police Department, |
| 18 | | is it? |
| 19 | A | Depending on what circumstance that caused it, but to |
| 20 | | answer your question, I would say no. |
| 21 | Q | Okay.  So aside from Chong Lee being a victim, you |
| 22 | | weren't aware of him being involved in any other |
| 23 | | incidents that were violent that you're describing |
| 24 | | when you say that you were certainly aware these were |
| 25 | | legitimate concerns, correct? |

40

```
1    A    Not specifically with him.

2    Q    But with Paul Lee you were aware of those, right?

3    A    Yes.

4    Q    And you were aware of that Paul Lee had been involved

5         in a prior shooting, correct?

6    A    Yes.

7    Q    And you had personally been involved in investigating

8         it, right?

9    A    Yes.

10   Q    And he was never charged with it, right, or was he?

11   A    He was referred to the DA, and there's some issue

12        with communication between the office.

13   Q    In other words, the charges weren't issued,

14        regardless of the reason?

15   A    At the end of the day, yes.

16   Q    Okay.  And any other violent incidents you're talking

17        about would either be Paul Lee, Hu Lee, Teng Lee,

18        other -- other brothers, but not Chong Lee, correct?

19   A    Not specifically him, yes.

20   Q    Okay.  All right.

21             ATTORNEY VISHNY:  Nothing further.

22             THE COURT:  Attorney Schneider.

23             ATTORNEY SCHNEIDER:  Just briefly.

24             **EXAMINATION OF CHUE LEE THAO**

25   **BY ATTORNEY SCHNEIDER:**
```

```
 1   Q    Ryan, Watou and Mikey all described the location the
 2        shooter came from, correct?
 3   A    Of course.
 4             ATTORNEY VISHNY:  Objection.  Relevancy.
 5        This has already been discussed.
 6             ATTORNEY SCHNEIDER:  Something she asked
 7        about, did they provide descriptions of A, B, C or D,
 8        so that wasn't asked, that's why I'm asking it.
 9             THE COURT:  I'll allow it.  Go ahead.
10   A    Yes.  All three provided directions or the location
11        where the shooter have come from.
12   Q    Other than Chong and Paul Lee, because defense asked
13        about it, when there was at least expressed about
14        concerns about the family, are you aware or were you
15        involved in investigations relating to the other
16        brothers that were violent where they were --
17             (Brief recess.)
18   Q    I think I asked you if you were aware of other
19        offenses where the Lee brothers were committing
20        offenses that you would consider to be violent.
21   A    Yes.
22   Q    Other offenses that involved firearms.
23   A    Yes.
24             ATTORNEY SCHNEIDER:  I have nothing further
25        then.
```

42

```
1                    ATTORNEY VISHNY:  Just very quickly.
2             EXAMINATION OF CHUE LEE THAO
3    BY ATTORNEY VISHNY:
4    Q    When you interviewed these three individuals, Ryan,
5         Mikey and Watou, the first time, did you have them
6         draw maps of where the shooter came from?
7    A    Yes.
8    Q    And so those were destroyed too?
9    A    Yes.
10                   ATTORNEY VISHNY:  Nothing further.
11                   ATTORNEY SCHNEIDER:  I don't have any
12        additional follow up, Judge.
13                   THE COURT:  All right.  I don't have any
14        questions for you, sir.
15              Any additional witnesses?
16                   ATTORNEY SCHNEIDER:  No.
17                   ATTORNEY VISHNY:  You don't want to put in
18        anything about the fact that this jump drive is
19        missing?
20                   ATTORNEY SCHNEIDER:  I just -- there's just
21        a couple other discovery issues we're dealing with,
22        I'm providing some reports, and so I think we'll just
23        file by stipulation, because I'll make sure she
24        doesn't have an objection to what I file, and we'll
25        do that next week.
```

43

| 1 | STATE OF WISCONSIN     CIRCUIT COURT     OUTAGAMIE COUNTY |
|---|---|

1    STATE OF WISCONSIN     CIRCUIT COURT     OUTAGAMIE COUNTY

2    ——————————————————————————

**STATE OF WISCONSIN,**

3

              Plaintiff,

4    v.                     Case No. 13-CF-1074

5    **CHONG LENG LEE,**

6             Defendant.      COPY

7    ——————————————————————————

8                  **DECISION**

    ——————————————————————————

9

10   BEFORE:         **HONORABLE GREGORY B. GILL, JR.**
                    Circuit Court Judge, Branch IV
11                   Outagamie County Justice Center
                    Appleton, WI 54911

12

13   DATE:           **February 3, 2016**

14   APPEARANCES:   **CARRIE SCHNEIDER**
                    District Attorney
15                   Appearing telephonically on behalf of the
                     State
16

17                   **ANDREW MAIER** and **ALEXANDER DUROS**
                   Assistant District Attorneys
18                   Appearing on behalf of the State

19                   **EVAN WEITZ**
                   Attorney at Law
20                   Appearing on behalf of the Defendant

21                   **CHONG LENG LEE**
                   Defendant
22                   Appearing in person

23

24   Joan Biese
    Official Reporter, Branch IV
25   Outagamie County

EX-D

                                      1

1  of the prosecution, I do not find the conduct to rise

2  to the level warranting dismissal of this action.

3  Accordingly, the request to dismiss is denied.

4     With that, the court now turns to the second

5  issue before it, and that is the destruction of

6  evidence, and, in particular, the destruction of

7  three interviews and related materials from

8  individuals who are at the scene of the incident.

9     Now, recently, the Supreme Court in *State v.*

10  *Luedtke* addressed the issue of destruction of

11  exculpatory evidence. 362 Wis.2d 1, 2015. And

12  again, that is *State v. Luedtke*. Therein the court

13  determined that in order for a moving party to

14  succeed on a destruction of evidence motion, the

15  party must show, number one, the State failed to

16  preserve evidence that was apparently exculpatory or,

17  two, acted in bad faith by prevailing -- or by

18  failing to preserve evidence that was potentially

19  exculpatory.

20     Now, as noted by the State in its brief,

21  apparently exculpatory evidence is that of the type

22  of evidence that possesses an exculpatory value that

23  was apparent to those who had custody of the evidence

24  before the evidence was destroyed, and, two, the

25  evidence is of such a nature that the defendant is

9

1    unable to obtain comparable evidence by other
2    reasonable available means.   *State v. Munford*, 330
3    Wis.2d 575, a 2010 Court of Appeals case.

4    Now, potentially exculpatory evidence conversely
5    is that type of evidence which has the potential to
6    be exculpatory or useful but does not provide the
7    direct link associated with apparently exculpatory
8    evidence.   In this case, the court, after reviewing
9    the briefs of the parties and the summaries provided
10   primarily by the defense, concludes that the
11   statements at issue are of the latter category,
12   namely, that of potentially exculpatory evidence.

13   That being the case, the court turns to the next
14   analysis, namely, was the destruction of evidence
15   done with bad faith.   Now, conduct is considered bad
16   faith if the State was, number one, aware of the
17   potentially exculpatory value or usefulness of the
18   evidence and the State filed to preserve, and, two,
19   acted with official animus or made a conscious effort
20   to suppress exculpatory evidence.   Again, the *Luedtke*
21   case provides us with that authority.

22   In this case the court concludes that there is a
23   sufficient indicia to suggest that bad faith as
24   defined here was present.   First of all we look at
25   the nature of the evidence.   Now, the court concludes

10

1    that the police were aware of the nature of the

2    evidence. The court reaches this conclusion based

3    upon the following: Number one, the court (sic) felt

4    it appropriate to initially interview the three

5    individuals as potential witnesses; number two, the

6    recordings of those individuals were maintained for

7    many months before destruction; number three, even

8    after the destruction of evidence, the images and

9    names of the three remained on the white board, a

10    board which the court understands is used to track

11    the investigation. There, the inclusion on the

12    board, begets the question, if not potentially

13    exculpatory, why remain on the white board. Once the

14    three were disclosed to opposing counsel, those three

15    individuals were reinterviewed, thus bringing to

16    question why reinterview if not potentially

17    exculpatory.

18        Next, at some point the police made an effort to

19    notify the DA of the destruction of the evidence.

20    With respect to the decision to eliminate the

21    records, the court notes that the *Luedtke* case does

22    not mandate that the suppression be of actual

23    exculpatory evidence. As such, the court concludes

24    that this element also allows for the consideration

25    of potentially exculpatory evidence. Here the court

11

1    concludes there was suppression.  It appears that the
2    decision to destroy was made with some forethought.
3    Two, while the choice to destroy the records may have
4    been purely motivated, i.e. to protect the witnesses,
5    the result is the intentional suppression of
6    interviews.  Three, based upon this court's review of
7    policies pertaining to the retention of interviews,
8    the destruction, while perhaps not in violation of a
9    direct policy, was certainly an unusual practice and
10   inconsistent with the spirit of interview retention
11   policies maintained by the Appleton Police
12   Department.

13       While the court recognizes it is imputing the
14   conduct of the police to the District Attorney's
15   office, and by all accounts the court finds the
16   District Attorney's office played no role in the
17   decision to delete the evidence, courts have held
18   that it is appropriate to attribute this conduct to
19   the State when there is a strong relationship between
20   the two agencies.  In *Jones v. State* the court,
21   addressing a distinct discovery issue from that in
22   this case, concluded that the prosecuting attorney's
23   obligations under the section extended to material
24   and information in the possession or control of
25   members of his staff and of any others who have

12

1 participated in the investigation or evaluation of
2 the case and who either regularly report or, with
3 reference to this particular case, have reported to
4 the office. Again, *Jones v. State*, 69 Wis.2d 337, a
5 1975 case. The court sees no reason why the same
6 logic should not exist here where the police was
7 working closely with the District Attorney's office
8 in pursuit of this matter.

9 As such, and in light of the foregoing, the
10 court concludes that action is warranted. While
11 dismissal is an option, the court finds it
12 unreasonable in light of the facts and circumstances
13 associated with this case. That said, the
14 alternative remedy of suppression is appropriate. As
15 such, the court (sic) shall be prohibited from
16 calling Ryan Thao, Mikey Thao and Watou Lee. That
17 said, should the police or, rather, should the
18 defense inquire into the police conduct of the
19 destruction of the tapes, it may present cause to
20 have the issue revisited.

21 The court should mention that it is not meant to
22 suggest that the court is of the opinion that the
23 police department engaged in intentional destruction
24 of evidence in an effort to usurp the defendant's
25 right to a fair trial. That said, the court does

13

STATE OF WISCONSIN    CIRCUIT COURT    OUTAGAMIE COUNTY

**STATE OF WISCONSIN,**

       Plaintiff,

v.    **Case No. 13-CF-1074**

**CHONG LENG LEE,**    ☐ **COPY**

       Defendant.

---

**JURY TRIAL - DAY THREE**

---

BEFORE:    **HONORABLE GREGORY B. GILL, JR.**
Circuit Court Judge, Branch IV
Outagamie County Justice Center
Appleton, WI 54911

DATE:    **February 26, 2016**

APPEARANCES:    **CARRIE SCHNEIDER**
District Attorney
Appearing on behalf of the State

**ANDREW MAIER** and **ALEXANDER DUROS**
Assistant District Attorneys
Appearing on behalf of the State

**DEBORAH VISHNY** and **EVAN WEITZ**
Attorneys at Law
Appearing on behalf of the Defendant

**CHONG LENG LEE**
Defendant
Appearing in person

EX-D

Joan Biese
Official Reporter, Branch IV
Outagamie County

1

```
 1                    I N D E X

 2                                              PAGE

 3    PROCEEDINGS OUTSIDE THE PRESENCE OF THE JURY........   4

 4    WITNESSES:

 5    JOHNNY THAO
          Examination by Attorney Schneider.................  10
 6        Examination by Attorney Vishny....................  15
          Examination by Attorney Schneider.................  24
 7        Examination by Attorney Vishny....................  25
          Examination by Attorney Schneider.................  26
 8        Examination by Attorney Vishny....................  26

 9    VIA XAI THAO
          Examination by Attorney Schneider.................  27
10        Examination by Attorney Weitz.....................  38
          Examination by Attorney Schneider.................  44
11        Questions from Jury...............................  45

12    KENG JOSEPH VANG
          Examination by Attorney Maier.....................  47
13        Examination by Attorney Weitz.....................  51

14    PETER MOUA
          Examination by Attorney Maier.....................  54
15        Examination by Attorney Vishny....................  61
          Examination by Attorney Maier.....................  65
16        Question from Jury................................  67
          Examination by Attorney Vishny....................  68
17        Examination by Attorney Maier.....................  68

18    KONG VANG
          Examination by Attorney Maier.....................  70
19        Examination by Attorney Weitz.....................  75

20    TODD PETERS
          Examination by Attorney Schneider.................  77
21        Examination by Attorney Vishny....................  89
          Examination by Attorney Schneider.................  94
22
      MICHAEL J. VERHEYDEN
23        Examination by Attorney Schneider................. 110
          Examination by Attorney Weitz..................... 117
24        Examination by Attorney Schneider................. 122

25
```

```
 1    Q    How would you describe the detectives that talked to
 2         you?
 3    A    Aggressive.
 4    Q    Are they black, white, Asian?
 5    A    They're white.
 6    Q    Male, female?
 7    A    Both males.
 8    Q    Both males.  What do you recall about them
 9         physically, can you describe them?
10    A    They were tall.  One had slicked back hair and the
11         other one had darker hair.  That's all I remember.
12    Q    Do you recall what they were wearing?
13    A    No, I don't.  I don't remember.
14    Q    Okay.  Nothing -- they weren't in -- they were not in
15         blue police uniforms though, right?
16    A    No.
17    Q    Like --
18    A    They were dressed up like --
19    Q    -- suits and ties?
20    A    Yeah.  Suits and tie.
21    Q    And you know -- did you know when you were talking
22         with them you were being recorded?
23    A    No, I did not know.
24    Q    Okay.  And you know that they prepared reports after
25         they spoke with you, right?
```

1   A   Yup.

2   Q   You've had a chance to look at that report?

3   A   No, they didn't show me.

4   Q   So you didn't indicate to the detectives that Chong

5       said, I got him, I shot him?

6   A   I didn't say he shot him.  I remember that he said he

7       just got him.  He didn't say he shot him.

8   Q   Chong said I got him?

9   A   Yup.  He just said he got him.

10  Q   When he said that, what -- what was the -- was that

11      in your room?

12  A   I believe so, yeah.

13  Q   And it's during the course of this conversation that

14      he starts with you about a shooting that happens at

15      Luna in Appleton?

16  A   Pretty much after.

17  Q   Like it's during the time that Joe is asleep in your

18      room and he comes in --

19  A   Yeah.

20  Q   -- right?  This isn't something you're real

21      comfortable talking about, is it?

22  A   Oh, I --

23              ATTORNEY VISHNY:  Judge, I'm going to

24      object to leading questions at this point.

25              THE COURT:  Mr. Maier, if you could please

60

1     rephrase the question.

2              ATTORNEY MAIER:  I guess I'd ask to be able

3     to impeach him given I think the statement that he

4     gave and some reluctance that we've had today.

5              ATTORNEY VISHNY:  I would like to approach

6     the bench.

7              (Bench conference.)

8              ATTORNEY MAIER:  Mr. Moua, thank you, I

9     don't have any further questions.

10             THE COURT:  Who from the defense is

11    handling questions?

12             ATTORNEY VISHNY:  I will.

13             THE COURT:  Attorney Vishny.

14                    **EXAMINATION OF PETER MOUA**

15    **BY ATTORNEY VISHNY:**

16    Q    Mr. Moua, is Joe Thor related to you at all?

17    A    I'd say like distant cousin.

18    Q    Okay.  You kind of call each other cousins

19         sometimes?

20    A    Yes.

21    Q    Even though he's not like a first cousin?

22    A    No, he's not.

23    Q    And you said that you met Chong Lee through Joe Thor,

24         right?

25    A    Yup.

```
 1    Q    So you've known Joe longer?

 2    A    Yup.

 3    Q    And he's more of a closer friend of yours?

 4    A    Yup.

 5    Q    Somebody you communicate with more?

 6    A    Correct, yup.

 7    Q    All right.  And somebody who where Chong is more of a

 8         casual acquaintance?

 9    A    Yup.

10    Q    Not somebody you know as well?

11    A    Yup.

12    Q    And certainly your kind of level -- personal

13         conversations are a lot greater with Joe Thor than

14         with Chong Lee.

15    A    Yup.

16    Q    Now, when the police -- I'm going to ask you some

17         questions now about when the police came to talk to

18         you.

19    A    All right.

20    Q    You said they were aggressive when they came?

21    A    Yup.

22    Q    Can you explain to the jury what you mean by

23         aggressive?

24    A    Well, they asked me what I was majoring in, and they

25         said that they could like ruin my career if I don't
```

62

```
 1        give them any information.
 2    Q   Okay.
 3    A   So that's about it.
 4    Q   Now, can you elaborate on that a little bit, what
 5        they meant when they said they could ruin your
 6        career?
 7    A   I told him I was going to radiology.
 8    Q   I'm sorry.  I can't hear you.
 9    A   I told him I was majoring in radiology, and they said
10        they have connections to radiology that can mess me
11        up.  And I just said okay.  That's about it.
12    Q   Did they say that to you more than once?
13    A   I'd say they only said it once.
14    Q   All right.
15    A   Yeah.
16    Q   How did you feel when they said that?
17    A   Well, it's my career that I want to go to so I kind
18        of felt, like, helpless maybe.
19    Q   All right.  And so what you remember actually telling
20        them after they said they were, you know, they could
21        threaten your career was that Chong Lee said I got
22        him?
23    A   Yeah.
24    Q   You don't remember saying I shot him, that Chong Lee
25        said that?
```

| | | |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | Just that he said I got him? |
| 3 | A | Yup. |
| 4 | Q | That's your memory? |
| 5 | A | Yup. |
| 6 | Q | And you were pretty scared, and at that point, after |
| 7 | | being threatened by the police, you wanted to tell |
| 8 | | them what you knew, right? |
| 9 | A | Yup. |
| 10 | Q | Because you absolutely didn't want them trying to do |
| 11 | | anything to ruin your career? |
| 12 | A | That's -- yup. |
| 13 | Q | And is it fair to say that that's a threat you took |
| 14 | | seriously? |
| 15 | A | Yeah.  That's serious because it's what I want to go |
| 16 | | for. |
| 17 | Q | And did you go for it? |
| 18 | A | I'm still pursuing it so -- |
| 19 | Q | But you've gotten your four-year bachelor degree? |
| 20 | A | Not yet. |
| 21 | Q | I thought you said you got your degree.  I |
| 22 | | misunderstood. |
| 23 | A | No. |
| 24 | Q | But you're in college? |
| 25 | A | Yup.  I'm still in college. |

# STATE OF WISCONSIN  CIRCUIT COURT  OUTAGAMIE COUNTY
## BRANCH IV

State of Wisconsin,

-vs-

Chong Leng Lee



CLERK OF CIRCUIT COURT
OUTAGAMIE COUNTY FILED

OCT 1 5 2015

AT_____O'CLOCK_____

CASE NUMBER #13 CF 1074

## ORDER

Before the Court is a motion of the Prosecution seeking to introduce certain statements of the Defendant. In particular, the Prosecution seeks permission to utilize various statements of the Defendant involving the phrase "beat the case". For the reasons stated herein, the motion of the Prosecution will be denied.

Wisconsin Statute Section § 904.01 defines "relevant evidence" as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. In this case, the Prosecution is offering the statements in question primarily to support its claim of intimidation of a victim. To sustain a claim of intimidation of a victim, a moving party must be able to establish that a Defendant "knowingly and maliciously prevents or dissuades, or who attempts to so prevent or dissuade any witness from attending

Ex-E

or giving testimony at any trial, proceeding or inquiry authorized by law." **Wis. Stat.§ 940.42** .

In this case, it the uses of the term "beat this case" and other like statements were recorded during jail conversations and letters made by the Defendant to other individuals. The Court fails to see how the statements made to individuals other than to the victims in the intimidation charges, or with instructions related to the victims are relevant.

Similarly, the statements in and of themselves appear subject to various meanings. Given the context, it is equally plausible that the comments are innocent or nefarious. For this reason too, the comments are excludable. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Wis. Stat. § 904.03 (West). This case standing alone is complex with many moving parts and witnesses. It is the opinion of the Court that were these statements be allowed it would only add confusion to the matters at hand.

IT IS ORDERED.

Dated this 14th, day of October, 2015.


Circuit Court Judge Gregory B. Gill, Jr.
Branch Four Outagamie County


cc Carrie Schneider
   Deborah Vishny
   Evan Weitz

1   STATE OF WISCONSIN     CIRCUIT COURT     OUTAGAMIE COUNTY

2   ────────────────────────────────────────────────────

3   STATE OF WISCONSIN,

                  Plaintiff,

4   v.                      Case No. 13-CF-1074

5   CHONG LENG LEE,

6                  Defendant.

7   ────────────────────────────────────────────────────

              POST-CONVICTION MOTION HEARING

8   ────────────────────────────────────────────────────

9

10  BEFORE:         HONORABLE GREGORY B. GILL, JR.
                Circuit Court Judge, Branch IV
                Outagamie County Justice Center
11               Appleton, WI  54911

12

    DATE:           February 26, 2018

13

14  APPEARANCES:    MELINDA TEMPELIS
                District Attorney
15               Appearing on behalf of the State

16            ALEX DUROS
                Assistant District Attorney
17               Appearing on behalf of the State

18            ANA BABCOCK
                Attorney at Law
19               Appearing on behalf of the Defendant

20            CHONG LENG LEE
                Defendant
21               Appearing in person

22

23

24  Joan Biese
    Official Reporter, Branch IV
25  Outagamie County

Ex-G

1

```
 1        to, but if you want to review the few pages before it
 2        to get some context and let me know.
 3    A   Is this the direct or the cross?
 4    Q   That is the direct?
 5    A   Okay.  Let me just take a look.  I'm finished
 6        reviewing it.
 7    Q   Do you recall what came in through that Exhibit 92?
 8    A   I don't have any independent recollection.  I have to
 9        rely on the transcript.
10    Q   Do you have any -- I guess I would start with, there
11        was no objection made to that testimony or that
12        exhibit, correct?
13    A   Apparently not.
14    Q   Do you have any recollection as to why or why not an
15        objection was made, if you can speak to that?
16    A   No, I don't.
17    Q   Now, I want to move to the last day of trial, just
18        sort of the specifics and dynamics of what was
19        happening.  So the final day of trial, do you recall
20        that there were jury instructions, closing -- closing
21        arguments, but there was no evidence presented that
22        day?
23    A   If that's what the record shows, that's what it
24        shows.  I -- that would make sense in light of the
25        length of the trial.
```

35

```
 1   Q   There's a little uncertainty in the transcripts in

 2       terms of how things happened.  I -- I'll have you

 3       read Day 11 of the transcripts, but it appears that

 4       once the jury was sent to deliberations, that court

 5       reporter was sent home, and then once the verdict was

 6       received, a new court reporter came in.  Is that what

 7       happened, do you recall?

 8   A   That rings a bell, but I don't really remember that

 9       very well.

10   Q   I will show you Day 11 of the jury trial, the

11       transcript for that hearing.  March 9th, 2016.  If

12       you want to go to Page 185, and then if you just want

13       to review the couple of pages after that, you'll also

14       see the start of a second transcript for that same

15       day by a different court reporter, and let me know

16       when you're finished.

17   A   Okay.  The transcript shows that a different reporter

18       came on.  That's highlighted on Page 188.

19   Q   And so is it fair to say that from the time that the

20       jury was sent out to deliberate to the time a verdict

21       was rendered, there was no court reporter recording

22       proceedings?  Do you recall any of that?

23   A   I don't have an independent recollection, but it

24       seems that there was a separate court reporter so I'm

25       assuming if there were things that happened that it
```

36

```
 1        would be on the record with the second reporter.  I

 2        don't have any memory of who was sitting in the

 3        courtroom.

 4   Q    But after the jury was sent out to begin

 5        deliberations to the time a verdict was received,

 6        there were issues that came up, questions from the

 7        jury, that sort of thing, do you recall that?

 8   A    Yeah.  I think we did have to come back, if I

 9        remember correctly.

10   Q    And do you know whether those discussions were

11        handled in the courtroom or in chambers?

12   A    I have no memory one way or the other.

13   Q    Do you recall if there was a court reporter present

14        in the courtroom?

15   A    I have no recall one way or the other.

16   Q    Do you have a recollection of any of the specific

17        questions from the jury?

18   A    No.

19              THE COURT:  I think, Counsel, if it helps,

20        as a matter of practice, if I'm not mistaken, all

21        questions that would be asked by jurors would be

22        marked as an exhibit and then they would be made a

23        part of the record.

24              ATTORNEY BABCOCK:  But not -- there would

25        be no court reporter transcript describing the
```

37

```
 1    discussions relative to those jury questions?

 2              THE COURT:  I don't -- I don't know the

 3    specifics -- I mean I don't have an independent

 4    recollection.  I know that questions that would be

 5    asked, whether it's during a trial or afterwards, I

 6    would mark those as exhibits.

 7              ATTORNEY BABCOCK:  And, Judge, that's

 8    what -- I'm really trying to get clarification from

 9    my perspective.  I do have the questions marked, but

10    the actual discussion in terms of what would go to

11    the jury didn't appear in any of the transcripts, so

12    I'm just trying to see if Attorney Vishny knows

13    whether there was a third court reporter brought in

14    or --

15  A    I really have no memory at all about what happened.

16    I -- I do remember that we had to come back to the

17    court.  I don't even remember if we were waiting here

18    or we walked to our hotel and walked back to the

19    courthouse.  But I do know that there were reasons to

20    have discussions that were before the verdict

21    occurred.  That I remember.  And I can't tell you

22    anything else about it.

23  Q    Attorney Vishny, I am showing you what was marked as

24    Trial Exhibit 207, it was received by the court on

25    March 9th, 2016.  A note from the jury.  If you could
```

38

```
 1          just review that and let me know when you're

 2          finished.

 3     A    All the pages --

 4     Q    Yes.

 5     A    -- you want me to look at?

 6     Q    Yes, please.

 7     A    Okay.  I'm finished.

 8     Q    Do you recall that question coming from the jury?

 9     A    I don't have an independent recollection.  I'm

10          relying on the exhibit.

11     Q    And if you can turn to page -- the third page of the

12          letter that's attached to that exhibit?

13     A    Yes.

14     Q    I guess I should just back up.  This -- the documents

15          attached to 207, were those the items that went to

16          the jury in response to their question?

17     A    I assume so based on you handing me Exhibit 207.  I

18          wasn't there when the documents were delivered to the

19          jury.

20     Q    Do you recall whether there was discussions in terms

21          of what documents would go to the jury on that

22          particular issue?

23     A    I don't have an independent recollection.  I'm sorry.

24     Q    And again, on Page 3 of the letter that's attached to

25          that, do you see the reference to I'll beat this case
```

39