1    STATE OF WISCONSIN    CIRCUIT COURT    OUTAGAMIE COUNTY

2    ─────────────────────────────────────────────────────────

     **STATE OF WISCONSIN,**
3
               Plaintiff,
4    v.                                  **Case No. 13-CF-1074**

5    **CHONG LENG LEE,**

6               Defendant.        **ORIGINAL**

7    ─────────────────────────────────────────────────────────

                      **MOTION HEARING**
8    ─────────────────────────────────────────────────────────

9
     BEFORE:        **HONORABLE GREGORY B. GILL, JR.**
10                  Circuit Court Judge, Branch IV
                    Outagamie County Justice Center
11                  Appleton, WI  54911

12
     DATE:          **May 26, 2015**
13

14   APPEARANCES:   **CARRIE SCHNEIDER**
                    District Attorney
15                  Appearing on behalf of the State

16                  **ANDREW MAIER** and **PETER HAHN**
                    Assistant District Attorneys
17                  Appearing on behalf of the State

18                  **DEBORAH VISHNY** and **EVAN WEITZ**
                    Attorneys at Law
19                  Appearing on behalf of the Defendant

20                  **CHONG LENG LEE**
                    Defendant
21                  Appearing in person

22

23

24   Joan Biese
     Official Reporter, Branch IV
25   Outagamie County

CLERK OF CIRCUIT COURT
OUTAGAMIE COUNTY FILED

JUN - 9 2015

AT _____ O'CLOCK ____

1                                         Exhibit 11

```
1                          I N D E X

2

3    WITNESSES                                         PAGE
```

```
4    CHUE LEE THAO
          Examination by Attorney Vishny....................  30
5         Examination by Attorney Schneider................  43
          Examination by Attorney Vishny....................  48
6
     MICHAEL D. GOSTISHA
7         Examination by Attorney Vishny....................  53
          Examination by Attorney Schneider................  54
8
     NEAL RABAS
9         Examination by Attorney Vishny....................  55
          Examination by Attorney Schneider................  62
10        Examination by Attorney Vishny....................  65
```

```
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:22-cv-00620-WCG    Filed 11/11/22    Page 2 of 96    Document 26-12

328-2

**TRANSCRIPT OF PROCEEDINGS**

2             THE COURT:  We are on the record in

3        13CF1074, *State of Wisconsin v. Chong Leng Lee.*

4             Mr. Lee appears in person, along with his

5        counsel, Attorney Deja Vishny and Evan Weitz.

6        Representing the State of Wisconsin, Outagamie County

7        District Attorney Carrie Schneider, along with

8        Outagamie County Assistant District Attorney Andrew

9        Maier.

10            This matter is scheduled today for a pretrial

11       conference.

12            What can we address today, Miss Schneider?

13            ATTORNEY SCHNEIDER:  I think we were

14       waiting for the court to maybe make some rulings or

15       decisions, but I think Miss -- Attorney Vishny has

16       filed a motion, Judge, labeled the Motion to Compel

17       Discovery, the last thing we talked about.  She said

18       she did subpoena, and I know they are here under

19       subpoena, both Sergeant Rabas and Sergeant Chue Thao

20       on that motion.  So she may want to call them to

21       elicit.  I probably am going to want to respond in a

22       written fashion to that, and it had been my intent to

23       try to do that prior to today's date, but then we had

24       a series of attempted homicides which threw away much

25       of my plans for earlier this month.

```
 1          And then we have a motion filed by defense, this
 2     would be a new motion, Motion to Permit
 3     Cross-examination of Witness Regarding Gang
 4     Affiliation.  I'd like to respond to that, instead of
 5     putting forth some document if I feel I need to, but
 6     I don't know if the -- it's their motion, so I'll let
 7     them speak on that.
 8          I think we were waiting -- and I'm trying to
 9     look back at my notes from the last times we were
10     here.  Yup.  I don't know if you've specifically
11     ruled, because I just have "court to decide" in
12     April, and this is when we were meeting in early
13     April, on references to beat the case.  I think that
14     was -- oh, that's right.  Okay.  We ruled on Paul
15     Lee's statements last time, we ruled on gang and
16     severing last time.  We had some additional testimony
17     about Facebook.
18          THE COURT:  Right.  And I still need -- and
19     I do need to rule on that.  I do know that.
20          ATTORNEY SCHNEIDER:  And then I think that
21     was it, Judge, that I have on my post for what we had
22     for today.  Things such as -- there are other
23     housekeeping things, but now that our trial date is
24     different -- we talked about witness priors in that
25     listing.  I can provide some of that, what we have so
```

1          far, but it's going to change prior to, so my thought
2          was just to provide that to defense for now and then
3          we can provide an updated copy to them prior to
4          trial.  Maybe even if we shoot for by November 1st we
5          would provide any updates, we'll provide something to
6          them about witness prior convictions and numbers.
7          Because we were searching, and I know my investigator
8          had looked through like Brown County juvenile,
9          because the court had some concerns about us being
10         able to potentially, given the age of some of these
11         people, if there were juvenile adjudications that
12         were relevant, you wanted those explored.
13                   THE COURT:  And then I think we were going
14         to make initial disclosures on that, I don't remember
15         the specific date, and then what we would do is close
16         to trial we would come up with a revised list in the
17         event that there were some changes to the original.
18                   ATTORNEY VISHNY:  I think there's going to
19         be changes.  Looking from the number of charges that
20         some of the witnesses have accumulated since the date
21         of this homicide.  One of the witnesses just picked
22         something up in March, I can't remember who right
23         now, but I was looking on CCAP last night, so there
24         is clearly --
25                   ATTORNEY SCHNEIDER:  It's going to be an

```
 1    ever changing list, but I can at least, if nothing

 2    else, provide, so they have a preliminary, so if they

 3    want to do some cross-checking knowing that updates

 4    would be --

 5            ATTORNEY VISHNY:  That's fine.  I don't see

 6    the point of really getting that list until about a

 7    month before trial.  I'm more concerned with some of

 8    these other issues today.

 9            THE COURT:  I do -- I will tell you right

10    now, I'm going to need some additional time, I want

11    to go over more on the Facebook issue.  I will have

12    that I expect within 30 days, but I do want to spend

13    some additional time on that, and I will get that

14    issue addressed as well.

15            ATTORNEY VISHNY:  That's fine.

16            THE COURT:  The -- I thought, Miss

17    Schneider and Miss Vishny, I thought I had ruled on

18    the beat the case, but I might be -- am I wrong?

19            ATTORNEY VISHNY:  No.  What I recall

20    happening was that what you said is that merely the

21    phrase standing alone beat my case is not necessarily

22    probative of anything, but -- and the defense agreed,

23    if it's like I don't want you to testify so I can

24    beat my case, that that would be probative and that

25    you were inclined to admit that.  And then, Judge,
```

6

```
 1       what I recall is that you asked the State to provide
 2       you the specific context for where they wanted to
 3       admit those phrases.
 4                ATTORNEY SCHNEIDER:  And you might have,
 5       Judge.  I apologize.  I probably didn't take good
 6       notes then.  I just have beat the case in quotes and
 7       then court to decide later without a note for myself
 8       to do any more.
 9                THE COURT:  No.  And, seemingly, Attorney
10       Vishny's recollection is correct, that I was -- at
11       its out -- outset, I think my impression was that it
12       was an amorphous enough concept it may mean
13       something, it may mean nothing, but I thought that,
14       Miss Schneider, the State was going to go back, give
15       me some more context to that so that I could make a
16       more educated assessment of that statement.
17                ATTORNEY SCHNEIDER:  And I apologize if we
18       didn't do that.
19                THE COURT:  That's okay.
20                ATTORNEY SCHNEIDER:  I'm just looking to
21       see.  Actually, I -- my calendars weren't starting in
22       July.
23                ATTORNEY VISHNY:  Okay.  That had been due
24       on April 27th, just for the record.  So, Judge, it's
25       going to depend on some of their issues, but I'm
```

7

1    going to be asking for a court date here in August

2    so --

3              ATTORNEY SCHNEIDER:  I mean, I'm thinking I

4    can have that to the court by either -- the 19th of

5    June even.  I mean we can get it turned around, I

6    just didn't know.  I have two other things the next

7    two weeks.

8              THE COURT:  Why don't we make that the

9    date.

10             ATTORNEY VISHNY:  Okay.  Due June 19th?

11   Thank you.

12             THE COURT:  And then assuming we're going

13   to get an August date, is there any reason -- and

14   I -- it's not that I can't do it, I'm just trying to

15   be convenient for the parties, do you want all the

16   rulings at that August date?  Otherwise, if you want

17   to come up in advance we can do that, if you want to

18   do it telephonically we can do that.  There is a lot

19   of ways to deal with this.

20             ATTORNEY VISHNY:  Well, as far as the

21   Facebook motion goes, I have very limited

22   availability between now and July 28th, so -- because

23   I'm going to be out of town a substantial portion of

24   that time.  If you want to rule on the Facebook

25   motion in June, I won't appear in person, but really,

8

```
 1          Mr. Weitz has handled that, and he and I discussed

 2          the fact that after the State's last filing, really,

 3          the defense had provided everything in writing it

 4          wanted to do for the court, so I'm perfectly

 5          comfortable if you want to issue a ruling on that

 6          that works with Mr. Weitz's calendar to do so.

 7                    THE COURT:  Okay.

 8                    ATTORNEY VISHNY:  And that might be

 9          convenient.  If that's convenient for all the

10          parties, then we can do that.  It might not even be a

11          day where I can participate telephonically, but I

12          feel perfectly comfortable with Mr. Weitz handling

13          that.

14                    THE COURT:  And I guess the long and the

15          short of it is, to be totally candid, is it more

16          convenient for me to have it done in August,

17          certainly, but I don't want to impinge upon your

18          preparation, and so if you are of the assessment,

19          Judge, this will help us strategize, I can get it

20          done much sooner.

21                    ATTORNEY VISHNY:  I don't really --

22                    ATTORNEY SCHNEIDER:  For us, whether you do

23          it in June or August isn't really going to change how

24          we prep this between then and December really.

25                    ATTORNEY VISHNY:  It does not make any
```

9

1       difference to the defense.

2               THE COURT:  Okay.  I'll get all the

3       decisions at one time.

4               ATTORNEY VISHNY:  That's fine.

5               ATTORNEY SCHNEIDER:  I'll put that down.

6               ATTORNEY VISHNY:  All right.  But then we

7       have some other issues.

8           Now, regarding the gang cross-examination, the

9       State wants an opportunity to respond, is that what

10      you said, Miss Schneider?

11              ATTORNEY SCHNEIDER:  Well --

12              ATTORNEY VISHNY:  I mean, I have written --

13      so what I have written is a memo of law regarding

14      my -- why I should be able -- why the defense should

15      be able to cross-examine the police and at least Joe

16      Thor.  I haven't reviewed every single witness, but I

17      think what I wrote about here is very typical of what

18      occurred regarding bias, and that I -- but not as to

19      a theory of the case that these people are covering

20      up for a fellow ACK member, Paul Lee, necessarily,

21      but just as to their bias and motive to falsify

22      generally in the case, that I be permitted to do that

23      cross-examination when the witnesses testify, and

24      that would also include, no doubt, cross-examining

25      the police about -- and I do intend to cross-examine

```
1          them about their interrogation methods of the various
2          witnesses, not just as to this but more broadly as to
3          their interrogation methods in general.  So I have
4          written a memo of law on that, and that's the defense
5          position.  If the State wants to respond to that and
6          have a ruling in August, I don't have any issue with
7          that, but I would like that to be ruled on by
8          August.
9                    THE COURT:  Absolutely.
10                    ATTORNEY SCHNEIDER:  We could use the same
11          June 19th date to respond, Judge.
12                    THE COURT:  Okay.  That's fine.  And then
13          do you want also an additional -- I don't know who's
14          handling that, if it's Attorney Vishny or Attorney
15          Weitz, do you want that -- some reply time?
16                    ATTORNEY VISHNY:  Yes.  I might have to
17          turn it over to Attorney Weitz though.
18                    THE COURT:  Why don't we look at -- we'll
19          look at a June 19th for the State to respond, and
20          then why don't we look at, let me take a look here,
21          maybe around July -- well, why don't we make it like
22          a July 7th.  Does that work, Attorney Weitz?
23                    ATTORNEY WEITZ:  Yeah.  That will be
24          fine.
25                    THE COURT:  It's about three weeks, and
```

11

```
 1          then I factored in the holiday weekend.

 2                    ATTORNEY WEITZ:  Sounds great.

 3                    THE COURT:  Okay.

 4                    ATTORNEY VISHNY:  So that leaves us two

 5          issues left.  One is the translation issue and the

 6          other is the latest motion to compel discovery.

 7                    THE COURT:  Okay.

 8                    ATTORNEY VISHNY:  The translation issue is

 9          probably the easier of the two, if you would like me

10          to go into that further.

11                    THE COURT:  That would be fine.  Go ahead,

12          Counsel.

13                    ATTORNEY VISHNY:  So what I did was this.

14          I think I had advised the court that there were

15          problems with United Translators' translations, and

16          the problems that I was aware of were not really as

17          to substance, per se, but regarding the fact that

18          there was untranslated English in between and so that

19          we couldn't really get a complete transcript.

20                    THE COURT:  Yes.

21                    ATTORNEY VISHNY:  So in order to prepare

22          for today I did two things.  Number one, I hired my

23          own translator whose name is Moua - one minute - Moua

24          Consulting Group.  I hired Moua Consulting Group in

25          Milwaukee, and the reason I hired that consulting
```

```
 1        group is because they are certified court
 2        interpreters who handle this.  So what the Moua
 3        Consulting Group did, specifically Mayhoua Moua, did
 4        was to review the translations by United Translators
 5        of Tom Lee and of one translation by United
 6        Translators of a phone call between Stephanie Thao
 7        and Chong Lee, and the United Translators' translator
 8        did find -- this is what she wrote me.  I'm just
 9        going to read it to you.
10                  THE COURT:  This is what the Moua
11        Consulting Group reported to you about United.
12                  ATTORNEY VISHNY:  Right.  I don't have the
13        actual translations yet, but this is what she did,
14        and she's -- because Mayhoua Moua is out of town for
15        several weeks, she wasn't able to provide me
16        transcripts yet, but what she said is:  We listened
17        to most of the CDs and the translations are not too
18        far off.  And what she wants to do is make
19        corrections where necessary using tracking so I can
20        see corrections, that's just like a complete waste of
21        money to have it totally retranslated.  So, you know,
22        I asked about one particular line, and she, you know,
23        said that her translation basically corresponds to
24        United Translators.  So, in general, based on that,
25        I'm not challenging, you know -- unless I see a major
```

13

1  difference somewhere on something critical, I'm not

2  going to challenge the substance of United

3  Translator, but I have major issues with how things

4  were translated so --

5  ATTORNEY SCHNEIDER:  I think she's talking

6  about the format of it.

7  THE COURT:  And my recollection is that the

8  State was going to go back to United and ask them to

9  either -- I think all of us expected this at the

10  outset, was if there was English that didn't need

11  translation it would be included in italics or bold

12  or something so that we could read the full context

13  of it.

14  ATTORNEY SCHNEIDER:  Right.

15  ATTORNEY VISHNY:  But I also talked to

16  Carmel Capati, C-A-P-A-T-I, from the -- she's the

17  Director of the State Courts Translation Service.

18  I'm just going to show the judge.  And I'm just going

19  to show this to you.  This is the appropriate form

20  for translation, so this is -- I received this by

21  e-mail to Miss Capati.  So what I'm showing the court

22  is an example in Spanish of what a translation should

23  look like, with the Spanish on one side and the

24  English translation on another, and that way it can

25  be reviewed by somebody.

14

```
 1              THE COURT:  Sure.
 2              ATTORNEY VISHNY:  So -- and then there is a
 3         key that should usually be included.  And then,
 4         according to Miss Capati, translation should then be
 5         certified so you know how the translator is.  So what
 6         I have asked of Miss Schneider is to have these
 7         matters not retranslated but retranscribed, including
 8         the English, and also done in this format of Hmong to
 9         English.  And if there's anything that the defense
10         decides to correct, we will also use this format.  I
11         suggested to Miss Schneider that that be done by the
12         middle of August.  That would give them
13         two-and-a-half months, basically, to complete that
14         work - Miss Schneider believes that's a reasonable
15         time period - and then that gives me adequate time if
16         I'm going to challenge anything to have time to
17         review it.  I really want to make sure that we don't
18         adjourn this case again, so I really want this to be
19         on track because this is such a crucial part of
20         what's going on in this case.  So Miss Schneider told
21         me she does not believe this is unreasonable.  So
22         what I'd like to do is have that done and set --
23         she's talked to United Translators, but there are
24         many other translation services that can do this.
25         I -- and I don't think this is going to take that
```

```
 1          long since they've already started the work, so I
 2          would like those to be provided to me by the court
 3          date that we set in the middle of August.
 4                    THE COURT:  Miss Schneider.
 5                    ATTORNEY SCHNEIDER:  I said I didn't think
 6          the time was reasonable, I'd go with whatever the
 7          court ordered.  I have used -- there isn't any set,
 8          this is the way they should be formatted.  And even
 9          with the seven circuit courts we have here in
10          Outagamie County, everybody has got different rules
11          about how they want it, what they want, page numbers
12          on every page, headings or not.  So I'm not aware of
13          any statutory requirement, any court rule from the
14          state or national level that says, here's how it is.
15          That, I agree, is probably the best for ease of
16          everyone, so I'll abide by -- if the court wants it
17          in that format, I'll have them do that in that
18          format.  And I had made the call to say we're going
19          to have you go back -- because there could be a
20          ten-second section where eight seconds of it is in
21          Hmong and you hear like I believe Miss Vishny said
22          Oshkosh which we -- okay, I believe that was the city
23          Oshkosh that was said.  There is other things within
24          that that weren't done.  They were very literal and
25          only put in what was Hmong.  So I'll abide by
```

16

| | |
|---|---|
| 1 | whatever court order the court wants.  I probably do |
| 2 | not want it presented that way, though, for the jury |
| 3 | because I don't want them being distracted by the |
| 4 | column where the bulk of it is going to be in Hmong |
| 5 | and not following along with what has been |
| 6 | translated.  But for us to get to that point of |
| 7 | trial, that's probably a good way for everybody to |
| 8 | work off of the document, but we can have discussions |
| 9 | as we go forward on what the jury might see. |
| 10 | ATTORNEY VISHNY:  That's fine. |
| 11 | THE COURT:  If we can, at least for |
| 12 | discovery purposes and working product, if you could |
| 13 | ask United Translators, I did that like that format, |
| 14 | I think it's easiest to follow along, especially for |
| 15 | preparation purposes.  If we could see if United can |
| 16 | do that format, that's what I'd like to see.  And if |
| 17 | they come and have a reasonable alternative, we can |
| 18 | talk about that, but that would be my -- my |
| 19 | expectation is that they're able to put together a |
| 20 | format akin to what has been provided by Attorney |
| 21 | Vishny. |
| 22 | ATTORNEY SCHNEIDER:  And what we've been |
| 23 | trying to do, I don't know if that's on there or not, |
| 24 | is at least on every page identify play points so if |
| 25 | we get to the point where we only want to play a |

17

```
 1          section, it's easy for the parties to figure out
 2          where we are in a 30-minute or two-hour video.
 3                    THE COURT:  That would be great.
 4                    ATTORNEY VISHNY:  That's fine.  I'm going
 5          to actually give this to Miss Schneider, these are
 6          copies, so that the State can show them to United
 7          Translators.  So then when we set the date, I
 8          would -- when we set our next court date, I would ask
 9          that be the date by which they be provided.  And will
10          the court order that?
11                    THE COURT:  That's fine.  I will order that
12          it be provided by that August date yet to be set.
13                    ATTORNEY VISHNY:  Okay.
14                    ATTORNEY SCHNEIDER:  I'm going to call it
15          our dual column format is probably the best way to --
16                    ATTORNEY VISHNY:  Yes.  I think that is.
17                    ATTORNEY SCHNEIDER:  I don't know if you
18          want to pick a date now and then do the motion and
19          the testimony?
20                    ATTORNEY VISHNY:  Doesn't matter to me.
21                    THE COURT:  We can see if we can get a
22          date.  Are we thinking -- in addition to the
23          decisions I will render, do you think that there will
24          be additional motion practice on that August date?
25                    ATTORNEY VISHNY:  I think it's quite
```

18

```
1     possible depending on what happens on our next issue
2     which is the discovery.
3                  ATTORNEY SCHNEIDER:  I'd rather book it and
4     have it than not.
5                  THE COURT:  Why don't we set it for a full
6     afternoon.
7                  ATTORNEY VISHNY:  We're talking mid-August?
8                  THE COURT:  August 17th.  Does that work?
9                  ATTORNEY VISHNY:  That's a Monday.  That's
10    really good for me.  In fact, I can do pretty much
11    any day that week except for Friday.  Is that good
12    for you?  Okay.  August 17th.  What time, Judge?
13                 THE COURT:  We'll make it 1:15 and just
14    block off the entire afternoon.
15                 ATTORNEY VISHNY:  Okay.  That's great.
16    Thank you.
17                 THE COURT:  All right.
18                 ATTORNEY SCHNEIDER:  Judge, this is just
19    more -- I don't think we're going to take as much
20    time as I anticipated today.  One of the things that
21    I had talked with defense on, and again this is more
22    a housekeeping planning thing, there may be use of
23    Google maps --
24                 THE COURT:  Okay.
25                 ATTORNEY SCHNEIDER:  -- in this case.  And
```

19

1          what the officers have showed me is how you can go to
2          the street view and take it from Luna, go up to a
3          location, go back, you can go down an alley even that
4          was a reference and up to the other cities or
5          residence.  What I'm just working out with the
6          officers is how we're going to do that.  If we do it
7          live off the web, I want it taped in some fashion so
8          that that becomes an exhibit, unless they do a route
9          before using Google maps that we can turn over to
10         defense and say this is Exhibit B and they'll walk
11         through that testimony.  The advantage of doing it
12         live is if they ask for a different location, he can
13         go to that location or go up the street or around the
14         corner.  So it's something we'll work out, but I at
15         least wanted to let you know it's something with the
16         technology and the use of that, I didn't realize how
17         it's still pretty accurate, or I should say very
18         accurate in all the different locations it can go to.
19         So, just for the court's information, my only concern
20         about doing it live is how do we preserve that to
21         know what was ever shown.  So we'll work through
22         that.
23                  THE COURT:  Let me ask this.  It may not be
24         overly significant.  In terms of monitors,
25         projectors, theoretically, I could have a larger TV

```
1        by then, but it's not likely.  Do you want me to
2        bring in -- do we want to have a screen and a --
3                ATTORNEY SCHNEIDER:  We have the equipment,
4        and I know the Clerk of Courts has one unit.  If not,
5        we have a second where we -- my thinking is if we're
6        going to need to show something, and this is part of
7        why we have all afternoon so we can talk through some
8        logistics about layout, is probably to utilize a
9        bigger screen, you can do it where your laptop even
10       on your table, if the cords are long enough, can be
11       used to push play, it will go through a device and
12       then show it on the larger screen.  The best spot is
13       probably -- I'm pointing kind of to the area where
14       the podium is so the parties can all stay oriented
15       where they are.  Only one time did I rearrange your
16       courtroom, but that was because we couldn't show the
17       back of the room what we were showing.
18               ATTORNEY VISHNY:  First of all I think it's
19       a really good idea to do it live if it can be
20       preserved for the record.  I do believe that that
21       would be fine.  I think what I would like to do,
22       since it's going to be an exhibit used in advance, is
23       to schedule a date sometime before the trial where,
24       since I can't get copies of it in advance, where I
25       can come and meet with Miss Schneider and whatever
```

21

1   officer she intends to present this through and just
2   review it so that I have a full appreciation of what
3   is going to be done in court.  I'm familiar,
4   generally speaking, with Google Earth.  I'd like
5   that.  I don't know what you can do to record that.
6   That's the only --

7   ATTORNEY SCHNEIDER:  We're going to have to
8   have somebody physically in here filming it.

9   THE COURT:  That's what I was going to
10  suggest.

11  ATTORNEY VISHNY:  I don't know if it's -- I
12  don't know enough about technology, if it would take
13  an IT person, if something can be hooked up that
14  would record it as it happens.  I think it would be
15  disruptive, somebody with a camera between the --

16  ATTORNEY SCHNEIDER:  Sergeant Rabas and I
17  had even talked about there's a way he can do it or
18  someone can do it here on a laptop, and then it's
19  going to be shown live so the person recording here
20  could be here, but Mr. Maier believes there might be
21  software that we can hit record and it will record
22  everything that shows up on the screen while it's
23  going and then we'll just stop and --

24  ATTORNEY VISHNY:  Yeah.  That's what I
25  thought.  So I think that's really a good idea.  I

22

```
 1         think having a larger TV is really important because,

 2         frankly, I don't think all the jurors are going to be

 3         able to see something on Google Maps through one of

 4         these.

 5                 THE COURT:  Really, the issue -- I guess

 6         the inquiry more specifically is if we have a screen

 7         that can accomplish what we need, certainly I'll get

 8         that.  If we think that simply getting a larger TV, I

 9         have no idea what size this is, 40 inches, 40

10         something?

11                 ATTORNEY VISHNY:  That looks like about a

12         40-inch television to me.

13                 THE COURT:  I can probably have, God

14         willing, a 70-inch, but I don't know if a -- if we

15         wouldn't still be better with a projector unit.

16                 ATTORNEY SCHNEIDER:  What we had thought

17         about doing originally when we were going to be

18         commencing in June was using the State to play around

19         with things.  What I can do otherwise for the August

20         17th date, I'll have our screen and some of the

21         equipment up, and when we're done, I can just show

22         Attorneys Vishny and Weitz, because they would be

23         here, how large it looks when we have that screen and

24         maybe we can give a preview on that day.

25                 THE COURT:  If you can bring the technology
```

23

```
 1        up for the August hearing, and if it looks like we
 2        need to do something different, that still gives me
 3        sufficient amount of time.
 4              ATTORNEY VISHNY:  There may be things we
 5        want to play so we would have to be using the State's
 6        equipment.
 7              ATTORNEY SCHNEIDER:  That's not a
 8        problem.
 9              ATTORNEY VISHNY:  While we're on the
10        technology issue, I know that because Luna was sold
11        that the Appleton Police Department had somebody from
12        the State Patrol come in and create a -- I don't know
13        if it's a 3-D diagram.  Do we know when that's going
14        to be ready?
15              SERGEANT RABAS:  Soon.  I don't have a --
16              ATTORNEY VISHNY:  Could we find out by the
17        mid-August date?
18              SERGEANT RABAS:  Oh, yeah.  I think it will
19        be ready for sure by that date.
20              THE COURT:  Okay.  If I understand
21        correctly, it's simply waiting for the formatting of
22        that.  They've already done the walk-through tour.
23              ATTORNEY SCHNEIDER:  Yeah.  They did that,
24        and they shot even more points than what I thought we
25        might need just to be safe so that we have that, or
```

24

```
 1     dimensions and things like that, so now they just
 2     have to, I think, put it together.
 3               THE COURT:  Right.
 4               ATTORNEY VISHNY:  So that will be helpful
 5     to both parties for preparation.
 6               THE COURT:  So we'll expect that at the
 7     August 17th date as well.
 8               ATTORNEY VISHNY:  Correct.
 9               THE COURT:  Very good.
10               ATTORNEY VISHNY:  Okay.  So that brings us
11     to the final issue.
12               THE COURT:  So we have the motion to compel
13     issue.
14               ATTORNEY VISHNY:  Okay.
15          Your Honor, just to give you the background of
16     this, on May 5th I received some new discovery from
17     the State.  If you think I'm being too repetitive
18     because I put this all in writing, I can certainly
19     silence myself.
20          In any event, there were three witness
21     interviews conducted by Sergeants Rabas and Thao.
22     The names were Ryan Thao, Mikey Thao and Watou Lee.
23     And all three have apparently been previously
24     interviewed by the police and didn't want their names
25     revealed.  And what happened here was I believe that
```

25

1   Sergeant Rabas and Sergeant Thao were, you know,
2   assisting the State in its final pretrial preparation
3   and went out and reinterviewed these witnesses and
4   asked all three witnesses whether they would be
5   willing to potentially come forward and have their
6   names disclosed, and they told these witnesses that
7   their identities had been inadvertently disclosed.
8        So, first of all, it's clear to me from having
9   reviewed these tapes that these people -- I have read
10  the reports of all of them.  I did not have a chance
11  to yet play Mr. Watou Lee's tape, so I can't say
12  what's on that, but I have listened to Ryan Thao and
13  Mikey Thao, and it's clear to me that these two
14  individuals were interviewed before and that I don't
15  have any discovery on the previous interviews.
16       So the first order of business is for -- the
17  first issue is I would like all reports, notes and
18  recordings of the initial interviews of these three
19  individuals, because I was aware of their identity,
20  that's true, but I didn't know the police had ever
21  interviewed them before.  So that's the first issue.
22  I am particularly interested with Mr. Ryan Thao, I
23  would also like to know how he identified Chong Lee,
24  because they don't know each other, and I don't know
25  what I'm going to find, but I'm going to ask leave of

26

1    the court to potentially bring a motion to suppress.

2    I don't know what happened in the prior procedures,

3    so I would like to know -- I don't know if the State

4    has an answer for that, but I do intend to question,

5    I believe it's Sergeant Thao who had talked to these

6    individuals previously.  I could be wrong, but I

7    believe he's the one who did it.

8                THE COURT:  And, Attorney Vishny, do you

9    already have what I understood to be the follow-up

10   interviews?  Do you already have that information?

11               ATTORNEY VISHNY:  I have only the follow-up

12   interviews that were conducted on April 17th and

13   18th.  So I only have that.  I don't have anything

14   from the initial interviews at all.  So what I do

15   have -- it's -- well, when Sergeant Rabas and

16   Sergeant Thao go interview these people, what they

17   tell these three individuals is, look, you know, we

18   gave your identities to the defense because we were

19   looking at pictures of people who came out of Luna

20   and your pictures were in there.  Okay?  In fact,

21   maybe their pictures are in there, I don't know what

22   everybody here looks like, but their identities had

23   been given to me in the original packet of discovery

24   because these three individuals were all in a car

25   that was stopped leaving Luna that very night, and

1     the discovery, going back all the way to April 2013,
2     I had the identities of these people except that Ryan
3     Thao is referred to as Jack Thao in that.  Not only
4     that, I was given -- if you recall, I think it was
5     back in either March or April, the State provided the
6     defense with a packet called gang witnesses.  It had
7     to do with prior arrests of suspected gang members.
8     Mikey Thao was in that packet.
9               THE COURT:  Was or was not?
10              ATTORNEY VISHNY:  Was in that packet with
11    another reference to this traffic stop, so -- and a
12    prior, so I don't really understand why, having been
13    given discovery on this from a long time ago, the
14    identity of these people, why this was withheld.  So
15    it wasn't turned over inadvertently through pictures,
16    it was given to me in discovery.  Whether they're
17    unaware of what they're giving me, I have no idea,
18    but there were no actual interviews.  So that's the
19    first order of business, what exists for prior
20    interviews of these people.  It's the policy of the
21    Appleton Police Department to record all interactions
22    with citizen witnesses, so I'm assuming that all
23    three of these have been interviewed and recorded
24    previously.
25              THE COURT:  Attorney Schneider?

28

```
1              ATTORNEY SCHNEIDER:  Judge, Mikey Thao, and
2       I want to say Mickey, it's Mikey, and Watou were
3       stopped in a traffic stop immediately the night of.
4       They said they knew nothing, they didn't see
5       anything, didn't have any information to provide
6       during that interview.  So they -- in that regard,
7       yes, their names were given because of that traffic
8       stop.  Part of the reason why, when we ran any of the
9       names that might have the gang ties, when you made
10      that order, we ran their names and provided anything
11      we could find.  And I'll let Sergeant Rabas speak as
12      to what they did in April and why, but it's -- the
13      specific information that was asked of them and
14      elicited from them in April of this year was not
15      previously provided.  They previously did speak with
16      law enforcement after the traffic stop but did not
17      want to be identified, asked not to be identified,
18      and that was done.  I'll let Sergeant Rabas speak as
19      to why he did what he did, because I don't want to
20      speak for him, in making contact with them again in
21      April, because it's not necessarily what Attorney
22      Vishny wants to argue or points out as to why they
23      went back to talk to these people.
24              ATTORNEY VISHNY:  Well, I can only argue
25      based on what I heard on the tape, so why don't we
```

```
 1          call the witnesses, and I would actually -- since
 2          it's my motion, I want to call Sergeant Thao first
 3          and ask Sergeant Rabas to please leave the room and
 4          be sequestered.
 5                  THE COURT:  All right.  I will grant the
 6          sequestration request.
 7              Sergeant Thao, if you would please come forward.
 8                  (Oath administered to witness.)
 9                  THE WITNESS:  I do.
10                  THE CLERK:  Please state your full name,
11          spelling your last name for the record please.
12                  THE WITNESS:  Chue Lee Thao, C-H-U-E,
13          L-E-E, last name is Thao, T-H-A-O.
14                  THE COURT:  Attorney Vishny, your
15          witness.
16                  ATTORNEY VISHNY:  Thank you.
17                             **EXAMINATION**
18      **BY ATTORNEY VISHNY:**
19      Q   Sergeant Thao, on April 17th and 18th of 2015, did
20          you accompany Sergeant Neal Rabas to conduct
21          interviews of Ryan Thao, Mikey, that's M-I-K-E-Y,
22          Thao, and Watou, W-A-T-O-U, Lee?
23      A   Yes, I did.
24      Q   I'm going to ask you then about these people one at a
25          time so the record is clear.
```

30

```
 1              First of all, Ryan Thao.  Ryan Thao is also
 2         known as Jack Thao, correct?
 3    A    No.  Jack Thao is a different person.
 4    Q    It is a different person?
 5    A    Yes, ma'am.
 6    Q    So was Ryan Thao in the vehicle with Mikey Thao and
 7         Watou Lee that was stopped outside of Luna on the
 8         night of the shooting in 2013?
 9    A    I was aware of Ryan Thao, Watou.  I'm not too certain
10         about the other person.  I wasn't aware of that
11         incident until several days later, and even as of now
12         I have not read that report so I don't know exactly
13         who was in the vehicle.
14    Q    Okay.  It's clear from listening to your interview of
15         Ryan Thao you have interviewed him previously.  When
16         was that?
17    A    That was on the afternoon of December 11, 2013.
18    Q    Where were you when you interviewed him?
19    A    I've learned that he work at Plexus so we went to his
20         workplace.
21    Q    Did you record that interview consistent with
22         Appleton Police Department policy?
23    A    Yes, I did.
24    Q    And where is that recording now located?
25    A    Based on his request, I destroyed that recording.
```

31

```
1   Q   When was that?

2   A   When was the interview?

3   Q   When was the destruction of the recording?

4   A   I believe it was -- it would be an estimation, I

5       would say maybe seven, eight months after the -- the

6       interview.

7   Q   Did you have it transcribed prior to destroying it?

8   A   No, I did not.

9   Q   When did you inform Miss Schneider about the

10      existence of Ryan Thao as a witness?

11  A   I don't recall exactly when.  It was part of

12      discussion here and there, but it was -- it was

13      disclosed about those three witnesses that did not

14      absolutely want to be identified.

15  Q   When did you make that disclosure to the District

16      Attorney's office?

17  A   Again, it was after the -- the interview.

18  Q   Correct.  So give me your best estimate of the month

19      and year that you made that disclosure to Miss

20      Schneider.

21  A   I would say within several either weeks or with --

22      after the interview was conducted.

23  Q   So clearly the prosecution was aware by, let's say,

24      February of 2014 of the existence of these witnesses,

25      that would be -- by the end of February, that would
```

32

```
 1        be about two-and-a-half months after the shooting at

 2        Luna, correct?

 3   A    I would say at least by then already.

 4   Q    Okay.  Now, you also informed Miss Schneider that you

 5        had recorded these interviews, correct?

 6   A    It's consistent with our policy that when we

 7        interview people they would record it, so it is aware

 8        that it would have been recorded.

 9   Q    Did you write any reports based on the interview of

10        Ryan Thao?  And again we're just talking about Ryan

11        Thao right now.

12   A    Based on his strong request not to be identified, no,

13        I did not complete a report on that.

14   Q    Okay.  And why did you destroy his recording

15        approximately eight months after the interview?

16   A    I guess because of his request that he did not want

17        to be identified, and based -- at that time I did not

18        know whether or not he was going to be willing to be

19        a witness, and so it was a decision that was made

20        that -- to destroy it because of his request and no

21        report was done so I came to the conclusion,

22        consultations as well, that it did not need to be

23        logged into evidence or saved.

24   Q    Who were those consultations done with?

25   A    With fellow investigators.
```

33

```
 1   Q    Please name their names.
 2   A    Sergeant Rabas, Schira, Tauber, as well as at the
 3        time Cary Meyer.
 4   Q    What about the District Attorney's office?
 5   A    They were aware of it as well.
 6   Q    They were aware that these tapes were being
 7        destroyed?
 8   A    That it was not going to be needed and so it was --
 9        we could destroy them.
10   Q    And who specifically in the District Attorney's
11        office did you discuss that with?
12   A    I don't recall specifically a person -- like an
13        individual person.  It was made known to me that it
14        did not need it and that it could be destroyed.  The
15        person that we have most contact with would be
16        District Attorney Carrie Schneider.
17   Q    And who usually would discuss these issues with Miss
18        Schneider directly?
19   A    Who would discuss with her?
20   Q    Yes.
21   A    Various detectives, depending on who have what
22        portion of the investigation and what informations.
23   Q    Okay.  Between the time of the original interview of
24        Ryan Thao and the time of the destruction of the
25        tape, did you have any further contact with him
```

34

1       regarding this case?

2   A   Ryan Thao?

3   Q   Yes.

4   A   No, I did not.

5   Q   Was the next time you had contact with him on the

6       interview that was conducted on April 17th, 2015?

7   A   Yes.

8   Q   And who decided to go reinterview him on April 17th,

9       2015?

10  A   Sergeant Rabas and myself.

11  Q   Was Miss Schneider aware that you were going to be

12      reinterviewing him?

13  A   Yes.  It was based on some motions that were made,

14      and we decided that possibly that the defense may try

15      to reach out to them so we decided to try to make

16      contact with them and see if they would be willing to

17      be a witness in the case.

18  Q   All right.  Moving on from Ryan Thao, Mikey Thao.

19      When was your original interview with Mikey Thao?

20  A   Mikey Thao.  I believe it was at night on December 11

21      as well.

22  Q   Was that interview recorded?

23  A   At that time it was, yes.

24  Q   What happened to that recording?

25  A   Again, similar to Ryan Thao, I ended up destroying

35

1       that recording.

2    Q    And as you did with Ryan Thao, that -- there was

3         consultation with other members of your department

4         prior to destroying the tape?

5    A    They were made aware of that interview, and they were

6         told that because of his strong request that he did

7         not want to be identified, did not want to be a

8         witness in the case because of fear for his safety,

9         yes.

10   Q    Furthermore, the District Attorney had been informed

11        similarly within a couple of months of the shooting

12        that Mikey Thao was a potential witness, correct?

13   A    That was conveyed to all parties.

14   Q    And similarly the District Attorney's office had been

15        consulted prior to the destruction of the tape,

16        correct?

17   A    It was discussion that were made aware that because

18        of the request, that we would honor their request,

19        and it was made aware, yes.

20   Q    Okay.  Now, third question is I'm going to ask you

21        the same questions now as to Watou Lee.  He's also

22        known as Kevin Watou Lee, correct?

23   A    That was news to me, but I know him as Watou.

24   Q    Okay.  When was he first interviewed by you?

25   A    That was similar, that evening of December 11 as

36

```
 1        well.

 2   Q    And was that recorded as well?

 3   A    Yes.

 4   Q    Was the District Attorney informed within a couple of

 5        months regarding that particular interview?

 6   A    Yes.

 7   Q    And regarding that particular interview, the District

 8        Attorney was -- that recording was also destroyed

 9        about eight months after it was made?

10   A    Yes.  It happened at around the same time of the

11        other two.

12   Q    And regarding that particular recording, the

13        prosecutor's office was also aware that that tape was

14        going to be destroyed, correct?

15   A    They were aware of the interview and it was made

16        known.

17   Q    You were aware from the interview of Mikey Thao that

18        he placed himself at the time of the shooting very

19        close to where the actual shooting occurred,

20        correct?

21   A    Yes.

22   Q    And you are also aware from that interview that he

23        did not identify Chong Lee as the shooter and said he

24        didn't know who the shooter was, correct?

25   A    From the first interview?
```

37

| | | |
|---|---|---|
| 1 | Q | Yes. |
| 2 | A | He -- at that time he indicated it was someone coming |
| 3 | | from the left from the bar. |
| 4 | Q | But even when reinterviewed on April 17th or 18th of |
| 5 | | 2015 he did not identify Chong Lee as the shooter, |
| 6 | | correct? |
| 7 | A | Not but name but by description in terms of the |
| 8 | | direction coming, but he did not identify by name. |
| 9 | Q | But he knows Chong Lee, correct? He knows who he |
| 10 | | is? |
| 11 | A | Mikey? |
| 12 | Q | Yes. |
| 13 | A | I believe he indicated that he did not think that |
| 14 | | Chong Lee was in the bar that night. He thought that |
| 15 | | Chong was still in jail. |
| 16 | Q | Okay. So he clearly indicated to you that he knew |
| 17 | | who he was, correct? |
| 18 | A | Mainly Paul, but he did say that he knew Chong as |
| 19 | | well. |
| 20 | Q | And he did not identify Chong Lee as the shooter, |
| 21 | | correct? |
| 22 | A | No, he did not. |
| 23 | Q | So therefore you describe -- well, I'll save that for |
| 24 | | argument. |
| 25 | | You're probably aware from your experience as a |

38

```
 1              police detective that when somebody does not identify
 2              a suspect in a case and the defendant in a case that
 3              the defense may want their prior statements and to
 4              call that person because that testimony can be
 5              exculpatory, aren't you, detective?  Sergeant.
 6              Excuse me.
 7    A         At the time he described to me, in terms of based on
 8              my watching the video, that it was someone coming
 9              from the bar.  It was consistent with the description
10              he provided, and he did not provide the names of the
11              person.  He thought that Chong was still in jail or
12              was not in the bar at that time.
13    Q         Okay.  Now, moving on to Watou Lee, Watou Lee also
14              did not identify Chong Lee as the shooter, correct?
15    A         Watou Lee did not know Chong.
16    Q         Okay.  And he certainly didn't identify him, did
17              he?
18    A         He did not know him, but he provided the description
19              of the direction of travel the person that did the
20              shooting.
21    Q         Well there were a lot of people coming out of the bar
22              towards the front who could have been in a position
23              to do the shooting on the left, correct?
24    A         I only go by what they say.
25    Q         Chong Lee -- certainly from your observation of
```

39

```
 1          people pouring out of that bar and from talks with

 2          other witnesses, there were numerous people on the

 3          left who could have done that shooting, correct?

 4    A     Based on the video and the timing of it and the three

 5          people that walking from the bar, my estimation would

 6          be that most likely it happened during the time that

 7          he disappeared from the bar into the foyer area.

 8    Q     But there were several other people in the foyer area

 9          to what could be the left of the deceased at that

10          time, right?

11    A     Yes.   There were people standing there talking to

12          each other as well as talking to the victim.

13    Q     And some of those people who were standing there are

14          in fact identified gang members of the ACK,

15          correct?

16    A     Yes.

17    Q     Like Tou Shoua Lee for example, that would just be

18          one name by example, correct?

19    A     Yes.

20    Q     And there are several others as well, correct?

21    A     A couple of them, yes.

22    Q     Now, besides these three individuals, how many other

23          people have you interviewed that -- whose identity

24          has not been disclosed as part of the discovery?

25    A     Nobody else.   Those are the only three.
```

| | | |
|---|---|---|
| 1 | Q | Are you one hundred percent positive of that? |
| 2 | A | I am certain. |
| 3 | Q | Are you certain of whether any other members of the |
| 4 | | Appleton Police Department have interviewed any of |
| 5 | | these individuals or not? |
| 6 | A | I can't -- I can't speak for them who they spoke to |
| 7 | | because there are lots of witnesses that night. |
| 8 | Q | Okay.  Let me ask another question. |
| 9 | | In your interviews with these three individuals, |
| 10 | | Ryan Thao, Mikey Thao and Watou Lee, in each one of |
| 11 | | the interviews you offered to contact their parents |
| 12 | | prior to them receiving a subpoena in court, correct? |
| 13 | A | Yes.  It was a courtesy. |
| 14 | Q | Okay.  So why did you offer to contact the parents of |
| 15 | | these three individuals before them receiving a |
| 16 | | subpoena? |
| 17 | A | It was a courtesy that I didn't want their parents to |
| 18 | | be surprised because this -- at least at the time |
| 19 | | they still live with their parents, and I didn't want |
| 20 | | official to show up at the door presenting a |
| 21 | | subpoena, whether it be to them directly or to the |
| 22 | | parents to give to them, and I wanted to honor -- at |
| 23 | | least show some courtesy that I would be willing to |
| 24 | | do that to explain to the parents, because some of |
| 25 | | them do not speak English and may not understand the |

41

```
 1          court system, so they at least have some idea what's
 2          going on.
 3    Q     Are you related to Mikey Thao?
 4    A     Describe in terms of relationship because there is
 5          different types of relationship in terms of Hmong
 6          culture.
 7    Q     All right.  In Hmong culture please describe how you
 8          are related to Mikey Thao.
 9    A     I'm not blood related to him.  In terms of
10          relationship in terms of in the community, I know
11          him, I know his parents, they go to my church.
12    Q     You're in the same clan?
13    A     Same last name, yes.
14    Q     All right.  What about Ryan Thao, are you related to
15          Ryan Thao?
16    A     Not by blood.
17    Q     How are you related in Hmong culture to him?
18    A     Same last name, we go to -- his parents attend the
19          same church that I attend, and we've been, at least,
20          you know, from Thailand to Laos -- I mean from
21          Thailand to United States and into Wisconsin
22          obviously have been living in the same area.
23                ATTORNEY VISHNY:  At this particular point
24          I don't have anymore questions for Mr. -- Sargent
25          Thao.
```

42

```
 1                    THE COURT:  Attorney Schneider.
 2                         EXAMINATION
 3    BY ATTORNEY SCHNEIDER:
 4    Q    Sergeant Thao, would you agree with me that the names
 5         Ryan Thao, Mikey Thao and Watou Lee as the specific
 6         names as parties who were at Luna but did not want to
 7         be disclosed, were those names ever provided to the
 8         State prior to your reports in April?
 9    A    Yes.
10    Q    Because of their other contact through law
11         enforcement?
12    A    Yes.
13    Q    And we talk about a white board.  Do you know what I
14         mean when I say the white board?
15    A    Yes.
16    Q    Can you describe that for the court?
17    A    Yes.  During the first several days after the
18         shooting, officer from various unit, including CRU,
19         ISU, put together pictures, shots, photos of people
20         in the bar, whether before, after the shooting, of
21         people either coming into the bar, and after the
22         shooting running out of the bar, and then names of
23         people that we, either through other sources or
24         through officer's knowledge, identify people --
25         individual people in that vicinity of the shooting.
```

43

```
1   Q   And is it such that the white board in essence
2       contained a lot of still photos of people in that
3       Luna video?
4   A   Yes.
5   Q   And the process for law enforcement was then to try
6       to identify who those different parties were?
7   A   Right.  Individual subjects.
8   Q   And on that white board were photos of Watou, Ryan
9       and Mikey, the three we're talking about, on that
10      white board?
11  A   Yes.  They were identified along with the rest of the
12      people.
13  Q   Okay.  So you can see them, and you've seen them
14      exiting Luna immediately after what we perceived to
15      be the time of the shooting, correct?
16  A   Yes.
17  Q   At some point then in December you spoke with the
18      three of them.  Each of them asked not to be
19      identified?
20  A   Yes.  They're very concerned about their safety and
21      they did not want to be identified.  They did not
22      want to get involved.
23  Q   And given their request to remain anonymous, you
24      didn't include their statements in any previous
25      reports.
```

44

```
 1    A    No, I did not.

 2    Q    Do you remember specifically telling the State these

 3         are the three who don't want to remain -- or want to

 4         remain anonymous or just saying there were parties

 5         who wanted to remain anonymous?

 6    A    I don't recall exactly the phrase, but it was

 7         indicated to all parties that they obviously did not

 8         want to be identified, they were concerned for their

 9         safety, they didn't want to get involved in the

10         case.

11    Q    But do you remember specifically sitting around and

12         saying it's Ryan Thao, Mickey (sic) Thao and Watou

13         Lee, or saying there are parties who don't want to be

14         unidentified?

15    A    Yes.

16    Q    Which one was it?

17    A    All three.

18    Q    That you specifically said names of people who didn't

19         want to be identified?

20    A    Yes.  There were people that we spoke to or

21         identified on the white board, and when I made

22         contact with, they did not want to be identified in

23         official report.

24    Q    Okay.  And then subsequently to that, when those

25         parties would be discussed, do you remember telling
```

45

```
 1         me or Assistant Maier or Mr. Hahn their specific
 2         names or just that there were three parties that
 3         didn't want to be identified?
 4    A    I believe I just mentioned that we interview three
 5         subjects and they did not want to be identified so we
 6         were -- the police were aware of who those people
 7         were, but it was indicated that there are three
 8         people that we have spoken to and they did not want
 9         to be identified in official report.
10    Q    Was there any -- you said it was months later that
11         you got rid of the recordings?
12    A    Yeah.  I mean I believe it was several months later
13         that they decided that because of their request that
14         we did not need to hold on to those recordings.
15    Q    Up to that point, had you had any follow-up contact
16         with any of them?
17    A    Not between December 13 -- December 11 and April, a
18         couple months ago that we talked to them.
19    Q    Okay.  Are you aware if anyone else that was a main
20         officer on this case had any contact with them prior
21         to December and when you got rid of their
22         recording?
23    A    Sergeant Cary Meyer and I interview Ryan together.
24    Q    That would have been initially, right?
25    A    Initially.  That first time on December 11.
```

46

| 1 | Q | Between when you spoke to them in December and when |
| 2 | | you got rid of the recordings, are you aware of |
| 3 | | anyone talking to them? |
| 4 | A | No, no, I do not believe so. |
| 5 | Q | And from what you're aware, other than those three |
| 6 | | parties, no one else -- I think defense asked this, |
| 7 | | but other than those three parties, no one else has |
| 8 | | asked not to be identified, correct? |
| 9 | A | Nobody else. |
| 10 | Q | That you're aware of? |
| 11 | A | That I'm aware of. |
| 12 | Q | Have you -- defense kind of asked you why you made |
| 13 | | the offer to contact their parents -- |
| 14 | A | Yes. |
| 15 | Q | -- before subpoenas were issued. Have you done that |
| 16 | | with other parties? |
| 17 | A | For those -- in the past, yes, I have done it just |
| 18 | | for courtesy and to explain to the parents because of |
| 19 | | misunderstandings because of their experience back in |
| 20 | | Laos or Thailand and want to make sure they're |
| 21 | | comfortable with the systems, they want to come to |
| 22 | | the court here, how it was going to be like, and so |
| 23 | | that -- just to provide that comfort level for the |
| 24 | | parents. |
| 25 | Q | And have you ever specifically done that for Watou, |

47

```
 1          Ryan or Mickey (sic), or has it been other people in
 2          general?
 3    A     I have not done it for them yet because no subpoena
 4          has been served yet.
 5    Q     But on any other cases you've never had to do that
 6          for them before?
 7    A     No, I never have.  I don't believe they were involved
 8          in any case of mine or in the past that I'm aware
 9          of.
10    Q     That's been a general offer you've made for other,
11          I'm going to say, young adult Hmong witnesses or
12          victims?
13    A     Yes, based on if I know the parents and their level
14          of involvement in the court systems, then I would
15          offer that.
16    Q     Okay.
17                    ATTORNEY SCHNEIDER:  I have no other
18          questions.
19                    ATTORNEY VISHNY:  I have some additional
20          questions.
21                         **EXAMINATION**
22    **BY ATTORNEY VISHNY:**
23    Q     You said that the original interview of Ryan Thao was
24          with Cary Meyer.  Who did you conduct the interviews
25          of Mikey Thao and Watou Lee with?
```

```
1    A    Mikey Thao I conduct and interviewed. The officers
2         were aware, but I conducted the interview by myself.
3         And then I conducted the interview with Watou Lee in
4         my office at the Appleton Police Department and then
5         information would share with the other officer.
6    Q    Who was that?
7    A    The information that I received from Watou was shared
8         with the other officer, but I conducted the interview
9         in my office by myself.
10   Q    Now, when you recorded -- digitally record these
11        interviews, were they video recorded or audio
12        recorded?
13   A    On these three interviews would be just audio
14        recorded.
15   Q    And what kind of equipment did you do the audio
16        recording on?
17   A    With a hand digital recorder.
18   Q    After you did the hand digital recording you backed
19        it up to the computer system at Appleton Police
20        Department, correct?
21   A    I believe I just save it into a personal working
22        file.  It wasn't put into a -- an evidence or ID, per
23        se, file, so I still maintained possession of that
24        file.
25   Q    Well when you said you put it into a personal file,
```

49

```
 1        did that use your Appleton Police Department
 2        computer?
 3   A    Yes.
 4   Q    Okay.  And that computer is backed up by a server,
 5        correct?
 6   A    I'm assuming it is.
 7   Q    When you spoke with Ryan Thao the second time in
 8        April, he discussed great reluctance to become
 9        involved even the second time, correct?
10   A    Yes.
11   Q    And over half of your interview was spent persuading
12        him to come forward; is that fair to say?
13   A    I would say maybe 30 minutes, 45 minutes talking to
14        him, yes.
15   Q    And the tape is an hour-and-a-half long, isn't it?
16   A    I didn't check it yet, but I assume that you're
17        correct.
18   Q    And the first time that you interviewed him, how did
19        he identify Chong Lee to you?
20   A    He indicated that he did not know Chong, obviously,
21        and that he did not know a lot of the people, but he
22        provided description of the person that ended up
23        shooting the person.
24   Q    Did you show him photographs during that first
25        interview?
```

1    A    No, I did not.

2    Q    Did you use Chong Lee's name during that first

3         interview with him?

4    A    No, I did not.

5    Q    You never used his name?

6    A    I did not.

7    Q    Did you -- what description did he give you of the

8         person who was the shooter in the first interview?

9    A    Because at that time we really didn't know who

10        obviously did the shooting in terms of there were a

11        lot of people that were interviewed, or at least I

12        wasn't as I got into the investigation several days

13        after the shooting, I simply went there based on the

14        identification that was made on that white board to

15        talk to him as to what he observed or what happened,

16        so I was simply getting the information from him as

17        to his observations and what happened whether before

18        or after the shooting.

19   Q    What description did he give you of the shooter at

20        that time?

21   A    He indicated that it was a subject that was coming

22        from the bar into the foyer area with a couple other

23        peoples.

24   Q    What clothing description did he give you?

25   A    I don't recall specific about clothing.  He described

51

```
 1              that there was three people coming from the bar and
 2              then a person, and then he see the smoke and he
 3              provided that it was that person that did the
 4              shooting.
 5    Q    Did he say the person had on what looked like a white
 6              jacket with dark sleeves?
 7    A    I don't recall that.
 8    Q    You didn't show him any pictures.
 9    A    I did not show him any picture.
10    Q    And Sergeant Meyer didn't show him any pictures at
11              the time.
12    A    No photo was shown to.
13    Q    At that time actually Paul Lee was the suspect in the
14              case, correct?
15    A    At that time, again, I got involved in the case two
16              or three days later.  I did not know the initial
17              information that other officers had received.  I went
18              into the interview with Ryan with an open mind just
19              to get information, so I really didn't know who did
20              the shooting or were potential suspect at that
21              time.
22    Q    Did this interview with Ryan occur before or after
23              you were involved in interviewing Paul Lee?
24    A    Before.
25                   ATTORNEY VISHNY:  I don't have any further
```

```
1          questions right now.
2                    THE COURT:  Attorney Schneider?
3                    ATTORNEY SCHNEIDER:  Nothing further,
4          Judge.
5                    THE COURT:  Sergeant, you may be seated.
6                    THE WITNESS:  Thank you.
7                    ATTORNEY VISHNY:  I'm calling Lieutenant
8          Gostisha.  He's not sequestered, but I didn't
9          anticipate calling him, because I was completely
10         shocked by the testimony.
11                   (Oath administered to witness.)
12                   THE WITNESS:  I do.
13                   THE CLERK:  Please state your full name,
14         spelling your last name for the record please.
15                   THE WITNESS:  Michael D. Gostisha,
16         G-O-S-T-I-S-H-A.
17                            **EXAMINATION**
18   **BY ATTORNEY VISHNY:**
19   Q    Lieutenant Gostisha, were you involved in the
20        decision to destroy these recordings of the
21        interviews of Ryan Thao, Mikey Thao and Watou Lee?
22   A    Yes.
23   Q    Who made the ultimate decision, did you make it as
24        the most commanding officer?
25   A    Yes.
```

53

Case 2:22-cv-00620-WCG    Filed 11/11/22    Page 53 of 96    Document 26-12

328-53

```
 1   Q   All right.  And when did you discuss that with Miss
 2       Schneider?
 3   A   I don't know.
 4   Q   But you did do so, correct?
 5   A   I'm not even sure of that, if I would have had any
 6       direct conversations with her concerning that.
 7   Q   Okay.  But you're aware of somebody had informed the
 8       prosecutor's office before this decision was made?
 9   A   Again, I am not aware of that necessarily.
10   Q   But you're familiar with the computer system at the
11       Appleton Police Department, correct?
12   A   Correct.
13   Q   So anything that is put on a person's computer is
14       backed up to a server automatically, isn't it?
15   A   It should be.
16   Q   And so, therefore, even if something has been
17       destroyed, a computer technology person can go to a
18       server and recover data; isn't that correct?
19   A   I believe so.
20           ATTORNEY VISHNY:  Okay.  Nothing further.
21           THE COURT:  Attorney Schneider.
22                          **EXAMINATION**
23   BY ATTORNEY SCHNEIDER:
24   Q   If you are aware, when discussions were held that
25       there were parties who didn't want to be identified,
```

54

```
 1           were their names discussed with the prosecutors?
 2    A      That I'm not aware of.  I didn't have any with them
 3           that I can recall.  And the discussions I had were
 4           all with the group of officers.
 5    Q      And that would include discussions about what to do
 6           with the recordings?
 7    A      Correct.
 8                    ATTORNEY SCHNEIDER:  Nothing further.
 9                    THE COURT:  Attorney Vishny?
10                    ATTORNEY VISHNY:  Is Sergeant Meyer here?
11                    ATTORNEY SCHNEIDER:  No.
12                    THE WITNESS:  He's retired.
13                    ATTORNEY VISHNY:  He's retired?  Okay.
14           I'll call Sergeant Rabas then.  I'll go get him.
15                    THE COURT:  Thank you.
16                    (Oath administered to witness.)
17                    THE WITNESS:  I do.
18                    THE CLERK:  Please state your full name,
19           spelling your last name for the record please.
20                    THE WITNESS:  Neal Rabas, R-A-B-A-S.
21                              **EXAMINATION**
22    **BY ATTORNEY VISHNY:**
23    Q      Sergeant Rabas, what's the name of the individual who
24           just walked in the courtroom who was talking to you
25           in the hallway?
```

```
 1   A     Investigator Paul Black from the District Attorney's
 2         office.
 3   Q     And what did Investigator Black tell you about the
 4         testimony that was going on in the courtroom?
 5   A     We didn't -- nothing.  We didn't talk about that.
 6   Q     Nothing.  Okay.
 7               Now, proceeding to question you now about the
 8         interviews of Ryan Thao, Mikey Thao and Watou Lee,
 9         I'm going to ask you about all three of those.  Okay?
10   A     Okay.
11   Q     Okay.  Let's take them one at a time just so the
12         record is clear.
13               On April 17th, 2015 you and Sergeant Chue Thao
14         interviewed Ryan Thao, correct?
15   A     Yes.
16   Q     And when that interview was conducted, what did you
17         know about what Ryan Thao had stated in an earlier
18         interview?
19   A     I knew that he was in the area where the shooting
20         took place at Luna and that he had witnessed part of
21         what had taken place --
22   Q     Okay.
23   A     -- prior and right after the shooting.
24   Q     Did you know the details of what he had said he had
25         witnessed?
```

56

```
 1   A    No, I did not know all the details.  I knew that he

 2        was there with friends and that he may have witnessed

 3        part of what had taken place, but I didn't know the

 4        details of specifically what he had witnessed.

 5   Q    Had you listened to the recording of his prior

 6        interview?

 7   A    No.

 8   Q    Were there any written notes or reports concerning

 9        that interview that you were aware of?

10   A    None that I've ever seen.

11   Q    Were you aware of whether or not photographs had been

12        previously showed to him to see if he could identify

13        any of the people who were at Luna?

14   A    No, I don't.

15   Q    Okay.  Now, did you participate in the decision at

16        all to destroy the recording of his previous

17        interview?

18   A    I think as we were investigating this incident

19        information had come forward that there were

20        witnesses that had asked not to be identified as a

21        result of -- for fear of their own safety, as to what

22        should be done with the recordings of their

23        interviews and any of our notes.  I think as a group

24        we decided that that's something, because of the

25        request for confidentiality based upon their safety,
```

```
 1              that we would not retain any information associated
 2              with those interviews.
 3    Q    Okay.  Now the District Attorney's office had been
 4              made aware of all three of these individuals prior to
 5              the decision to destroy the recordings, correct?
 6    A    I don't recall the timing of all of that taking
 7              place.
 8    Q    And the District Attorney's office was consulted
 9              prior to destroying these recordings, correct?
10    A    I don't recall the timing of what had taken place.
11    Q    But you do know that they were consulted about the
12              destruction of the recordings, correct?
13    A    I don't know if they were advised that's what took
14              place after the fact or if they were questioned about
15              it prior to it occurring.
16    Q    Well, let me just say this.  If Sergeant Thao says
17              that they were advised of it before it occurring,
18              would you rely on that?
19    A    Sergeant Thao was the person who interviewed the
20              three individuals that you referred earlier, so he
21              had the most current or up-to-date information on
22              that.  My -- my information would have been
23              secondhand.
24    Q    Okay.  When you talked to all of these individuals
25              this last time around, were they shown any
```

58

```
 1        photographs of any suspects or, in particular, Chong

 2        Lee?

 3   A    No, I don't believe we showed them a photograph of

 4        Chong Lee.

 5   Q    Okay.

 6   A    It -- I should say, there was photographs shown from

 7        the video from Luna of people exiting Luna, and the

 8        photographs -- I don't recall -- obviously Chong Lee

 9        is in some of those photographs, and I don't recall

10        specifically if the photographs that we included in

11        showing him -- showing the individuals how they were

12        identified through those photographs included Chong

13        Lee.

14   Q    So you're -- I'm a little bit confused now.  Were

15        those photographs of people exiting Luna shown to

16        these witnesses when they were reinterviewed in April

17        or do you believe they were shown to the witnesses

18        when they were originally interviewed back in

19        December of 2013?

20   A    In April we showed them photographs from the video

21        from Luna.  I don't -- I don't recall the earlier

22        because I was not part of that, or I should say I

23        don't know if there was any photographs shown to the

24        witnesses prior to that in the prior interview

25        because I was not part of that.
```

59

```
 1    Q    In each one of these interviews, you began by telling
 2         these witnesses that their identity had been
 3         inadvertently turned over to the defense because they
 4         had appeared on the white board; in other words,
 5         their photos had been provided, correct?
 6    A    Correct.
 7    Q    In fact, the identities of all these people had been
 8         provided in written discovery because there was a
 9         traffic stop that had occurred that night outside of
10         Luna and the identities of Mikey Thao and Kevin Watou
11         Lee had been provided in discovery, correct?
12    A    Correct.
13    Q    And is Ryan Thao another name for Jack Thao or is
14         that somebody different?
15    A    I believe they're two different individuals.
16    Q    So Ryan Thao had not been in the car with Mikey Thao
17         and Watou Lee that was stopped?
18    A    Correct.
19    Q    And after telling them this, another thing you talked
20         with each one of these individuals about was the fact
21         that they might be interviewed by defense counsel at
22         some point, correct?
23    A    Correct.
24    Q    And what you told them was it was up to them whether
25         or not they wanted to talk to an investigator for the
```

60

Case 2:22-cv-00620-WCG    Filed 11/11/22    Page 60 of 96    Document 26-12

328-60

```
 1          defense, correct?

 2     A    Correct.

 3     Q    But that they didn't have to talk to an investigator

 4          to the defense, right?

 5     A    Correct.

 6     Q    And what you specifically said was that they could

 7          tell the investigator for the defense that they had

 8          already given the statement to the police and didn't

 9          have to interview -- and did not have to consent to

10          be interviewed by defense investigator, correct?

11     A    I'm not sure if I worded it in that same fashion.

12     Q    Would you like me to play the tape to refresh your

13          recollection?  I'll have to do that on another

14          occasion.

15     A    I don't recall exactly.  I don't recall saying it in

16          the fashion that you presented it.

17     Q    Well, what fashion do you recall saying it in?

18     A    I don't know word-for-word, but something to the fact

19          of it's possible that the defense counsel or their

20          investigator may want to talk to you, and, sort of,

21          would you now be willing to give a statement --

22          because you were inadvertently identified, would you

23          be willing to give us a statement today in reference

24          to what you saw or witnessed.  That way, if the

25          defense would like to question you, then you've
```

```
 1              already given a statement to the police.

 2      Q       But that was at the outset of you talking to each one

 3              of these three individuals, correct?

 4      A       In April?

 5      Q       Yes.

 6      A       Correct.

 7      Q       But at the end of the interviews you repeated that

 8              they didn't have to talk to a defense investigator,

 9              didn't you?

10      A       Correct.

11      Q       And that in fact they could tell the investigate --

12              defense investigator that they had talked to the

13              police and that the defense investigator could rely

14              on that statement, right?

15      A       Correct.

16                      ATTORNEY VISHNY:  Nothing further.

17                      THE COURT:  Miss Schneider.

18                              EXAMINATION

19      BY ATTORNEY SCHNEIDER:

20      Q       Do you remember at any point, I'm going to say, in

21              December, immediately after, or the next few months

22              after this occurring if the specific names of these

23              three were discussed with prosecutors as to these are

24              the three who don't want to be named?

25      A       No, I don't recall -- well, I should say I don't
```

62

```
 1         believe that we provided any names.  I think we just
 2         threw out or mentioned that there was witnesses that
 3         had chosen not to be identified or requested not to
 4         be identified for fear of their safety.
 5    Q    And prior to going to talk to them in April of 2015
 6         do you remember any discussions with prosecutors to
 7         say, okay, these are the three people and we're going
 8         to go talk to them or giving their specific names or
 9         just saying we're going to go talk to some additional
10         witnesses?
11    A    Again, I believe it was just a general that we were
12         going to be speaking or contacting additional
13         witnesses in reference to that.  In particular, I --
14         I knew there were three individuals that were
15         identified inadvertently through the posting on the
16         white board that had not been named in the report
17         associated with the homicide.
18    Q    And when you were looking at that or prepping and
19         looked at the white board and saw those three names,
20         what thoughts did you have at that point?
21    A    My thought was that I had inadvertently -- I
22         indirectly had inadvertently released their names to
23         the defense counsel and the defendant after they had
24         requested not to be identified and associated with
25         the homicide case, and not only were their pictures
```

63

```
 1              but their full names were identified as a process of

 2              this investigation.  And as I was prepping for it, I

 3              realized through the submission of those photos that

 4              the defense counsel now had that.  And two things, I

 5              wanted to notify them that the defense is aware of

 6              who they are and that they may be interviewed, and

 7              then the second -- I guess I wanted to apologize that

 8              I had inadvertently done that as well as now to see

 9              if over a year-and-a-half later if they would be

10              willing to be formally identified as a witness.

11    Q         And that did -- their identification is because when

12              the white board was up with several photos, a photo

13              of the entire board was taken or captured, correct?

14    A         Correct.

15    Q         Do you ever recall any specific conversations with

16              myself or other prosecutors in my office about any

17              original reports or recordings or what was going to

18              be done with them?

19    A         No, I don't.

20    Q         Do you recall any direction given by myself or other

21              prosecutors as to what if anything should happen to

22              any information obtained from these people when they

23              ask to be named or remain confidential?

24    A         No, I don't.

25    Q         We've had several discussions about different
```

64

```
 1          components of this case, correct?

 2     A    Yes.

 3     Q    But you don't recall any discussions with myself or

 4          other prosecutors related to saying, yes, go ahead

 5          and get rid of those prior recordings.

 6     A    No.  I think that was a decision that was made with

 7          the investigators that were working on the case as to

 8          what do we do with this information, and we related

 9          to the Monfils Law, and that we believe that if there

10          were any of those recordings, photographs or any

11          submissions like that, we knew through discovery the

12          defense would be able to obtain that, so I think as

13          an investigative team we just decided that nothing

14          would be retained.

15               ATTORNEY SCHNEIDER:  I have nothing else,

16          Judge, at this time.

17               THE COURT:  Attorney Vishny.

18               ATTORNEY VISHNY:  Yeah.  I have a few more

19          questions.

20                         **EXAMINATION**

21     **BY ATTORNEY VISHNY:**

22     Q    First of all, outside of these three witnesses, Mr.

23          Thao, Mr. Thao and Mr. Lee, are there any other

24          witnesses who exist in this case who do not want to

25          be identified or simply who were interviewed by the
```

```
1          police that have not been disclosed to the State or
2          the defense?
3    A     Yes.
4    Q     How many?
5    A     Well, there was about 150 people at the bar that we
6          interviewed.  Some of those identities -- I believe
7          most of those identities you have, but the full
8          interviews as far as what was discussed during those
9          interviews was not retained, whether it was recorded
10         or notes taken from that or a report completed on
11         that.  In addition to that, I know of two other
12         individuals -- I recall two other individuals who I
13         was part of -- I interviewed that had requested not
14         to be identified under the same concerns about their
15         own personal safety in reference to this case.
16   Q     Okay.  What are the name of those individuals?
17   A     I don't recall or don't remember right now.
18   Q     So if we took a ten-minute break and you ran back to
19         your office you could retrieve that, correct?
20   A     I don't know if I have anything from those
21         interviews.
22   Q     Well did you reinterview those people in April of
23         2015 as well?
24   A     No, I did not.
25   Q     Why not?
```

```
 1    A    Because their photos and identities weren't turned
 2         over to you.
 3    Q    And those people did not tell you that Chong Lee did
 4         the shooting, did they?
 5    A    I think there is a double negative in there.  Could
 6         you repeat the question?
 7    Q    Okay.  Let's take the first individual, call them
 8         individual number one.  Regarding individual number
 9         one, did that person identify Chong Lee as the
10         shooter?
11    A    No.
12    Q    Did they identify another individual as the
13         shooter?
14    A    No.
15    Q    Did they witness the shooting?
16    A    No.
17    Q    Are you a hundred percent positive of that?
18    A    No.  I just base that -- base that response upon what
19         they told me.
20    Q    Well what did they tell you, individual number one?
21    A    Again, without my notes, what I believe is they
22         were -- they had just left or just outside the doors
23         of Luna at the time of the shooting and then
24         witnessed the individuals exiting the bar as well as
25         the fight between the two women that occurred on
```

```
 1          Division Street.

 2    Q     Okay.  What about individual number two?

 3    A     The same information.  They were together.

 4    Q     It was a man and a woman, wasn't it?

 5    A     No.  It was two males.

 6    Q     Okay.  And those two males were Hmong males?

 7    A     No.  One was a white male and one was a Hmong male.

 8    Q     But they were both affiliated with the same group of

 9          friends as Chong Lee, Joe Thor, Paul Lee, Phong Lee,

10          you know, other Hmong males who were at that bar?

11    A     No, they were not, not with that group of friends.

12    Q     They weren't.

13    A     No.

14    Q     Had they been hanging out with that particular group

15          of people earlier that evening?

16    A     Not -- not that I recall.

17    Q     Had they been hanging out with Tom Lee earlier that

18          evening?

19    A     No.

20    Q     All right.  So aside from those two individuals are

21          there any other Hmong individuals who were

22          interviewed that the interview was not preserved?

23    A     By me directly?

24    Q     To your knowledge.  No.  You're the person who

25          actually kind of has been overall in charge of this
```

```
 1         case for the police department, correct?
 2    A    Yeah, within the last six months, well, maybe nine
 3         months, I guess, I -- I took after Sergeant Meyer
 4         decided to retire.  Again, because there were so many
 5         investigators, I don't recall if there was any
 6         additional individuals -- I guess the easiest way, I
 7         don't believe anybody who's been turned over to the
 8         defense inadvertently has provided statements that,
 9         you know, have been not retained.
10    Q    That's who was turned over to the defense.  We're
11         talking about what wasn't turned over to the defense.
12         That's what I want the focus to be here.
13    A    Yeah, and I --
14    Q    How many other witnesses, besides the two
15         individuals, individual number one and individual
16         number two, were interviewed regarding the shooting
17         and have not been turned over to the defense?
18    A    Other than patrons in the bar and the two individuals
19         that I mentioned, I don't know of any other ones.
20    Q    Okay.  Of the patrons in the bar, did any of those
21         patrons observe the shooting?
22    A    Not that I'm aware of, no.
23    Q    But it's possible some did?
24    A    It's possible and they just didn't tell us that,
25         because if the information was that they had somehow
```

69

```
1          witnessed any or part of the shooting, their

2          information would have been further documented in a

3          report other than just a photograph and their

4          names.

5    Q     Right.  But that's because the police took a

6          photograph of every person in the bar with their

7          name, correct?

8    A     Correct.

9    Q     And that was turned over in the discovery, correct?

10   A     Correct.

11   Q     All right.  But what I'm really trying to find out is

12         whether there is any other witnesses with anything

13         substantive to offer in this case that has not been

14         provided either to the prosecution or the defense,

15         besides individuals number one and number two.

16   A     The only other -- the easiest way I can answer that

17         was no at this time.  There was another individual

18         that we were intending to interview who was a new

19         witness - her name was Megan Kelly - who we were

20         going to interview; however, she died.

21   Q     Okay.

22   A     Prior to us interviewing her.

23   Q     Okay.  How did you receive the information that that

24         person was a witness?

25   A     We had received a tip that she was communicating with
```

70

| 1  |   | Chong, and in fact was, through jail phone calls as |
|----|---|---|
| 2  |   | well in exchange of letters.  She was a resident of |
| 3  |   | the Outagamie County Jail for some time period, and |
| 4  |   | he established a relationship with her, and |
| 5  |   | apparently there is -- still exists extensive letters |
| 6  |   | and jail phone calls between the two of them. |
| 7  | Q | Do you have those in your possession? |
| 8  | A | No, I do not. |
| 9  | Q | Does the Appleton Police Department have those in |
| 10 |   | their possession? |
| 11 | A | The jail phone calls we have access to.  I do not |
| 12 |   | have any of them downloaded.  I listened to a few of |
| 13 |   | them, however have not saved them, or -- there is |
| 14 |   | quite a few of them.  But I am aware that the Grand |
| 15 |   | Chute Police Department is investigating her death |
| 16 |   | which we believe is a heroin overdose and is |
| 17 |   | investigating that, and they are in the process of |
| 18 |   | obtaining the letters. |
| 19 | Q | Okay.  Why did you go out to reinterview these three |
| 20 |   | individuals, Mr. Thao, Mr. Thao and Mr. Lee? |
| 21 | A | Like I said, when I was, I guess, assigned the lead |
| 22 |   | investigator, I continued to thoroughly or more |
| 23 |   | thoroughly read through the report, look at the -- |
| 24 |   | what evidence and information had been turned over to |
| 25 |   | the defense counsel, and continue preparation for the |

71

```
 1          trial.  It was during that time period I realized
 2          that the photos that I had taken and submitted into
 3          evidence of the white board included those three
 4          individuals, and I knew that that -- actually, at a
 5          prior motion hearing there was a question asked of me
 6          if we have identified everybody in the video that was
 7          in the video.  I believe you asked me that question.
 8          And I know we hadn't identified everybody; however,
 9          we had identified quite a few individuals.  As I was
10          looking through those photographs that had been
11          turned over to you, I realized there were three
12          individuals, Watou, Ryan and Mikey, who had been
13          interviewed by us, however, requested not to be
14          identified, and that I had essentially turned over
15          their identities to you and wanted to notify them.  I
16          think it was fair of me to notify them that I had
17          turned over their identities to the defense counsel
18          when they had specifically requested that not take
19          place.
20     Q    But their identities had been turned over in multiple
21          different ways, not just from the white board,
22          correct?
23     A    Well, the only other -- their identities have been
24          turned over in reference to the traffic stop, two of
25          them.  However, that was not associated directly --
```

72

```
 1           well, there was no information in that report that
 2           associated them as a direct witness to the -- what
 3           had taken place in the foyer.
 4     Q     And Mikey Thao's information regarding him being a
 5           potential gang member had also been turned over in a
 6           packet of discovery regarding prior law enforcement
 7           contacts, correct?
 8     A     Correct.
 9     Q     And you had worked on that as well?
10     A     Part of that, yes.
11     Q     And so that was another means by which that had been
12           turned over prior to this interview you conducted in
13           April, correct?
14     A     Correct.  But that name was again associated with the
15           traffic stop in front of George Webb's, not
16           necessarily -- which is a total -- how should I say
17           it, it's a separate report, a separate incident
18           number.  Again, that report doesn't reflect any
19           information that he had direct knowledge of what had
20           taken place in the foyer at Luna.
21     Q     Regarding the interviews of those three individuals,
22           with the interview with Ryan Thao, there is a
23           substantial portion of time was devoted to persuading
24           him to come forward and be a witness in this case,
25           correct?
```

```
 1   A      Yes.

 2   Q      So there was more to these reinterviews than to

 3          simply inform people that they had been inadvertently

 4          identified, correct?

 5   A      Correct.

 6   Q      And in fact about half of the time that was spent

 7          with Ryan Thao was to try and persuade him that he

 8          should come forward and be willing to be a witness.

 9   A      Yes.  We were trying to persuade him or, I guess at

10          this point, see if he would be willing to identify as

11          a witness in this incident since he did have some

12          information related to the shooting.

13   Q      And the same was done with Mr. Mikey Thao and Mr.

14          Watou Lee as well, but it didn't take that much time

15          because they fairly rapidly agreed to be identified.

16   A      Correct.

17                  ATTORNEY VISHNY:  I don't have any

18          questions right now.

19                  THE COURT:  Miss Schneider, any follow-up?

20                  ATTORNEY SCHNEIDER:  No.

21                  THE COURT:  Okay.  Attorney Vishny?

22                  ATTORNEY VISHNY:  You're excused.

23                  THE COURT:  Sorry?

24                  ATTORNEY VISHNY:  I want to call Sergeant

25          Meyer.  I want to know how long it would take to get
```

74

```
1      him here, if we can get him here rapidly.  And if
2      not, which I can certainly appreciate that we not,
3      I'd like to set another date as soon as possible.
4      And I'm going to ask for a court order, since there
5      are many law enforcement agents in this room, that
6      none of them nor the prosecutor discuss any of the
7      testimony which has occurred today that -- because,
8      quite frankly, Judge, I was quite surprised by the
9      testimony regarding the destruction of these
10     recordings, and I want to ask him some further
11     questions.  It certainly appears that the evidence
12     would show that the State was informed of that before
13     it occurred since he was the lead investigator at
14     that time.
15          If Miss Schneider wants to make representations
16     to the court that the State was not informed, I'm
17     going to take the unusual step of asking that she be
18     sworn under oath and I be allowed to question her
19     rather than just make representations to the court
20     because she could potentially be a witness in this
21     matter.  So I would ask the court to decline to
22     accept any argument from Miss Schneider unless it
23     becomes part of the testimonial record in this
24     matter.  So that's the first order of business.
25          The second thing I'm going to be asking of the
```

75

```
1          court is I'm going to ask the court to order the IT
2          department at the Appleton Police Department, they
3          may have to hire an outside provider, but it's my
4          belief that if these recordings were destroyed, that
5          they are probably still on the server.  And, you
6          know, from what I know from the prosecution of child
7          pornography cases, it appears that things never
8          really leave a computer, and so it may be that this
9          could be a lot of hooey about nothing if we can
10         retrieve the original recordings of all of these
11         witnesses.  Because if we can't, the next motion I'm
12         going to bring is to preclude them from testifying at
13         the trial as to anything inculpatory because I have
14         ample reason to believe that exculpatory material
15         exists on these recordings.  That would take me quite
16         a while to do that.  I would have to write a fairly
17         substantial brief outlining how Sergeant Thao
18         questions witnesses and contaminates witness
19         interviews by suggesting who the perpetrator is, but
20         I have seen it throughout this case on numerous
21         interviews that this court has not reviewed, and it
22         would be my belief that he would not have deviated
23         from that very much in interviews of any other
24         witnesses and that therefore that material would be
25         exculpatory.  Because I can never recover how to
```

76

```
 1          cross-examine these witnesses.

 2              So that's the plan that I am proposing to the

 3          court.  I don't know how the court wants to proceed.

 4              THE COURT:  Let me ask the first question:

 5          Do we know, Attorney Schneider, whether Attorney

 6          Maier is -- Investigator Meyer is available, not

 7          available?

 8              ATTORNEY SCHNEIDER:  He's retired so what

 9          he's doing on any given day I have no idea.  We -- I

10          know we have access to cell numbers and home numbers

11          so we can try to make a call to see if he's available

12          yet today if that's the suggestion.  I know Mr.

13          Maier, Attorney Maier has been trying to check with

14          some other people who know more about Appleton and

15          their IT department, and I don't know that answer,

16          but my guess, Appleton has got a very good IT

17          department for the City that controls the police

18          department agency.  I just don't know, if Sergeant

19          Thao saved it within his file folder on his computer,

20          when the network backs everything up, does it back up

21          only what you put on the server or does it back up

22          everything on everyone's individual computer.  I

23          don't know that answer, but my guess is we can find

24          that out or ask them.

25              THE COURT:  Why don't we do this.  Let's
```

1        see if we can get a hold of Investigator Meyer.

2        We'll take a five- or ten-minute break.

3                ATTORNEY VISHNY:  And would the court issue

4        that order that he's under sequestration, therefore

5        nobody may discuss with him the subject matter of

6        what's occurred before here.

7                ATTORNEY SCHNEIDER:  Just that it's on

8        Chong Lee, we're in the middle of a motion hearing

9        and trying to see if he can make it in yet today.

10               THE COURT:  Correct.

11               ATTORNEY VISHNY:  Thank you.

12               THE COURT:  And then if he's available on a

13       different day, we can cross the bridge of making that

14       an ongoing order.

15               ATTORNEY SCHNEIDER:  Yes.

16               ATTORNEY VISHNY:  Okay.

17               (A brief recess was taken.)

18               THE COURT:  It's my understanding that

19       Investigator Meyer is not available today, correct?

20               ATTORNEY VISHNY:  That's what I've been

21       told.

22               THE COURT:  Then in this case we will try

23       to get a date as soon as possible.

24               ATTORNEY VISHNY:  Yes.

25               Now the other thing that's happening is -- and

```
 1        Miss Schneider might be able to relay this better

 2        than me, but it's my understanding that the Appleton

 3        Police Department is attempting to see whether the

 4        data can be retrieved.  If the data can be retrieved

 5        and provided to the defense, we don't need to have

 6        another hearing on this issue because then the

 7        problem will appear to have been solved, at least --

 8        well, at least as to these three witnesses.  We still

 9        have another issue about the other two witnesses,

10        witnesses number one and number two.

11                      THE COURT:  Yes.

12                      ATTORNEY VISHNY:  And then the third named

13        witness which is Megan Kelly who is deceased.  That's

14        in the process of investigation.  If there is

15        anything related to this case from that, I'd like to

16        have a date by which that has to be turned over to

17        the defense.  You know, I realize there could be

18        other issues which are not part of this case at

19        all.

20                      ATTORNEY SCHNEIDER:  Correct.  And there is

21        a very significant ongoing investigation in that

22        regard.  But I -- if I can ask just one question, it

23        might take care of the Megan Kelly.

24              My understanding, this may assist Attorney

25        Vishny, is that Miss Kelly only became acquainted
```

79

```
 1          with Mr. Lee since they were both here, and through
 2          whatever means they can upstairs develop
 3          relationships, and there wasn't one that existed
 4          between them before.  So it would be almost in the
 5          same vein, you've heard me talk about this Amanda
 6          Krohn, spelled K-R-O-H-N, where there were letters
 7          between the defendant and she, they all come after
 8          the offense and since he's been incarcerated, just to
 9          give you a context it's going to be things shared
10          after.
11                    ATTORNEY VISHNY:  Right.  But it's just
12          whether or not there is things related to this case
13          which could be inculpatory or exculpatory.  I mean
14          Amanda Krohn had quite a bit of exculpatory
15          involvement as far as denial of involvement, but I
16          just don't know what's there.
17                    ATTORNEY SCHNEIDER:  So we did hear back
18          from -- I'm just going to -- Sergeant Meyer who --
19          okay.  It appears next week starting on Wednesday the
20          3rd through June 11th he's in Pennsylvania.  We did
21          ask about next week.
22                    ATTORNEY VISHNY:  I could be here --
23                    ATTORNEY SCHNEIDER:  I just throw that out
24          there.
25                    ATTORNEY VISHNY:  So I have a trial set on
```

1       June 1st in Milwaukee that I think is likely to
2       resolve based on an offer I was given today, so I
3       could tentatively schedule myself for the afternoon
4       of the 2nd.  I have a scheduling conference in the
5       morning that day in Milwaukee, but that will be early
6       at 8:30, but I would also have to set a backup date
7       in case my trial goes.  I think it's very unlikely,
8       Judge, but -- personally, June 2nd in the afternoon
9       would be really good for me, but I would suggest we
10      also set a backup date just in case.  And then when
11      did you say, he's gone through the 11th?
12              ATTORNEY SCHNEIDER:  Yes.
13              ATTORNEY VISHNY:  As far as the week of the
14      15th, I'm supposed to be out of town but I would make
15      myself available.
16              THE COURT:  What are the dates, the 2nd or
17      the --
18              ATTORNEY SCHNEIDER:  Looking at the week of
19      the 15th then.
20              ATTORNEY VISHNY:  Right now I'm supposed to
21      be out of town teaching, but I have not finalized
22      those arrangements, and all I would ask is if we're
23      going to do something that week, that in case I still
24      don't teach for this organization, that we either
25      schedule on Monday or Friday so I could potentially

Case 2:22-cv-00620-WCG    Filed 11/11/22    Page 81 of 96    Document 26-12

328-81

```
 1      give them part of a week if I go at all.

 2                  ATTORNEY SCHNEIDER:  My preference would be

 3      Monday the 15th because --

 4                  ATTORNEY VISHNY:  That's wide open for

 5      me.

 6                  THE COURT:  I'm tied up on both of those

 7      days.  I have treatment court training.

 8                  ATTORNEY VISHNY:  On the 2nd and the 15th?

 9                  THE COURT:  2nd I'm fine, 2nd we can put

10      down for the afternoon.

11                  ATTORNEY VISHNY:  Okay.  Starting at 1:30?

12                  THE COURT:  That's fine.

13                  ATTORNEY SCHNEIDER:  Here's another option,

14      just -- and I throw it out there.  The other option

15      could be we could make inquiries with Mr. --

16      Investigator Meyer if there's dates between the 3rd

17      and the 11th when he is not traveling if he could be

18      available via phone, if defense would agree to his

19      testimony via phone, but that's at least an option,

20      and I don't know whether he is available, but my

21      guess is if we ask him nicely he may make himself

22      available during that time when he's out in

23      Pennsylvania.

24                  THE COURT:  Attorney Vishny?

25                  ATTORNEY VISHNY:  I'm available the
```

```
1      afternoon -- so assuming my flight is not delayed,
2      I'm supposed to get back to Milwaukee June 9th at
3      8:30 in the morning.  I could be available in the
4      afternoon.  The 10th available anytime after ten a.m.
5                  ATTORNEY SCHNEIDER:  I am not available.
6      Actually, that week is pretty horrible.
7                  ATTORNEY VISHNY:  You're not anyway.  So
8      then the next possible time, the court is not
9      available on the 15th?  What about the 16th?
10                 THE COURT:  Same issue.  Then the next time
11     I'm available -- well, I could be available -- you
12     said you weren't -- the 19th didn't work for you or
13     doesn't?
14                 ATTORNEY SCHNEIDER:  Not the best.
15                 ATTORNEY VISHNY:  The 19th?  Then the last
16     days I'm available before departing are June 22nd
17     through 24th.
18                 THE COURT:  What about any days the 3rd,
19     4th or 5th, do any of those work?
20                 ATTORNEY VISHNY:  The 3rd, 4th or 5th, if
21     Investigator --
22                 ATTORNEY SCHNEIDER:  5th is bad, I know
23     that.  The 3rd for me in the morning until probably
24     11:30 is bad.
25                 ATTORNEY VISHNY:  I'm free on the 3rd in
```

```
1          the afternoon.

2                    THE COURT:  I can do the 3rd in the

3          afternoon.

4                    ATTORNEY VISHNY:  That depends on him being

5          available.

6                    THE COURT:  Is the 4th good or bad?

7                    ATTORNEY VISHNY:  The 4th would require me

8          to reschedule something that I have in Milwaukee, but

9          it's doable.  The 5th I have court in the morning in

10         Milwaukee so I have to be in attendance.

11                   THE COURT:  Did the 2nd work?

12                   ATTORNEY VISHNY:  The 2nd works for

13         everybody.

14                   ATTORNEY SCHNEIDER:  According to his

15         schedule he wouldn't be traveling yet on the 2nd.

16                   ATTORNEY VISHNY:  The main problem is if my

17         jury trial goes on June 1st.

18                   THE COURT:  That's right.

19                   ATTORNEY VISHNY:  Now I would definitely be

20         available by the 4th even if there was no verdict

21         because I have a second chair.  Really, it shouldn't

22         go, but you never know.

23                   THE COURT:  Let me ask this question.

24         Does -- is APD of the opinion that they would be able

25         to have their IT department or the City of Appleton's
```

```
 1        IT department have the information, assuming they can
 2        recover it, by the 2nd?  If that's -- if it's going
 3        to resolve the issue just to get the information, I
 4        would just as soon not have the hearing.
 5                   ATTORNEY VISHNY:  No, we wouldn't.
 6                   THE COURT:  Right.
 7                   ATTORNEY SCHNEIDER:  I think we would know
 8        more by that date, Judge.
 9                   THE COURT:  We would know more by that --
10                   ATTORNEY GOSTISHA:  Whether or not we could
11        have it we would know by then.
12                   THE COURT:  Why don't we shoot for the 2nd
13        in the afternoon.  And then we're waiting for a
14        response back?
15                   ATTORNEY MAIER:  Yes.
16                   ATTORNEY SCHNEIDER:  Right.  To find out
17        whether he would be available on the 3rd.
18                   THE COURT:  Or the 2nd.
19                   ATTORNEY VISHNY:  The 2nd he is
20        available.
21                   THE COURT:  The 2nd he is available and
22        then the 4th you would have a --
23                   ATTORNEY VISHNY:  I'm not sure I can come
24        on the 4th.  I have to reschedule something if we're
25        going to do it, but that's reschedulable because it's
```

1          a meeting not a court appearance.

2                    THE COURT:  So do we want to look at the

3          4th as a backup date, assuming it's -- then we have

4          to worry about Investigator Meyer?

5                    ATTORNEY SCHNEIDER:  Correct.  Because my

6          belief based on his earlier message is that he's

7          traveling on the 3rd and the 11th, so he should be

8          available on the 4th unless he's got like tickets

9          bought to something in the afternoon.  I just don't

10         know what he's going out there for.

11                   ATTORNEY SCHNEIDER:  Assuming we need the

12         4th, just making that assumption, morning or

13         afternoon or --

14                   ATTORNEY VISHNY:  Afternoon is better.

15                   THE COURT:  That's fine.

16                   ATTORNEY VISHNY:  Should we say 1:30 again?

17                   THE COURT:  1:30 on the 2nd, 1:30 on the

18         4th as a backup date.

19                   ATTORNEY SCHNEIDER:  And then we'll just

20         keep everybody advised when we hear back.

21                   THE COURT:  That would be great.

22                   ATTORNEY VISHNY:  Okay.  So there is a

23         couple of other issues, too, that have arisen.

24                   THE COURT:  So I don't forget, or although

25         maybe this is one of your points, to highlight, the

1    sequestration order as it relates to Investigator

2    Meyer remains in effect, nobody should discuss

3    anything as it relates to the subject matter.

4            ATTORNEY VISHNY:  Thank you.  All right.

5    So a couple of other issues I think arose during the

6    course of this hearing.  One is we have an

7    unidentified witnesses number one and two, and I

8    don't know if those -- I didn't ask Sergeant Rabas if

9    that was recorded, just ask off the -- out of oath,

10   were those interviews recorded?

11           SERGEANT RABAS:  Yes.

12           ATTORNEY VISHNY:  Yes.  So the State can --

13   do you know if they were downloaded?

14           SERGEANT RABAS:  No.

15           ATTORNEY VISHNY:  No, you don't know?

16           SERGEANT RABAS:  No, I don't know.

17           ATTORNEY VISHNY:  Okay.  I would ask that

18   the State also look to retrieve those.  I'm almost

19   positive I could name those two witnesses based on my

20   knowledge of this case, but I'm not a hundred percent

21   sure.  So I think through reading the discovery I may

22   know who was outside, but I'm not positive.  But I

23   believe that the -- I would like to know what those

24   witnesses had to say, and I think that the defense

25   should be told if they are at all exculpatory, and I

1    can see many reasons why what they say is
2    exculpatory.  For example, in this particular case,
3    some of the alternative suspects immediately exited
4    the door, went to the right past where the fight was,
5    and ran down the street, tossed away clothing, and if
6    these witnesses know anything about that, I may want
7    to call them as witnesses.  So, you know, I don't
8    think simply because a witness doesn't want their
9    identity turned over that that gives the State a
10   privilege not to disclose exculpatory evidence.  We
11   can see if these recordings can be retrieved, but I
12   want the identification of those witnesses.  Even if
13   the recordings can't be retrieved, I want a
14   reconstruction from Sergeant Rabas's memory as to who
15   these people are and what they said, because I
16   believe he can reconstruct that information at least
17   to some degree.

18       Then there is the Megan Kelly information.  I
19   would like to set a date by which, if there is
20   anything relevant to this homicide trial, whether
21   inculpatory or exculpatory, that that be given to the
22   defense.  I would be satisfied to receive that by
23   August 15th or whenever that mid-August date is going
24   to be that can we set because I realize that --
25                   ATTORNEY SCHNEIDER:  There's probably like

88

1    weeks worth of phone calls, just so the court is
2    aware.
3                ATTORNEY VISHNY:  So I'm assuming in
4    two-and-a-half months --
5                ATTORNEY SCHNEIDER:  We may just say here
6    they all are.  If they tell me they've investigated
7    her death, then here they are and you can listen and
8    determine if there is anything on them that you
9    think --
10               THE COURT:  Well, let's do this.  I'll
11   order they be released by the August 17th date.  If
12   for some reason, Miss Schneider, due to a pending
13   investigation or there is some concern, please notify
14   me by no later than July -- we'll say July 1.
15               ATTORNEY VISHNY:  Okay.  And she would
16   notify Mr. Weitz also?
17               THE COURT:  Yes.
18               ATTORNEY SCHNEIDER:  Yes.
19               ATTORNEY VISHNY:  I have no idea if there
20   is anything there, I suspect there probably isn't,
21   but I just want confirmation of that.
22               THE COURT:  Sounds good.
23               ATTORNEY SCHNEIDER:  As far as I know she
24   doesn't speak Hmong so the calls should all be in
25   English.

1           ATTORNEY VISHNY:  That's good.  And then
2      there were letters, too, that were being reviewed.
3           THE COURT:  Okay.
4           ATTORNEY VISHNY:  All right.  So we kind of
5      go back to this Witness No. 1 and No. 2 issue, and I
6      don't know how the court wants to handle its approach
7      to that.  We could first see if it's going to be
8      retrieved.  I don't know what the position is of the
9      State on whether if it is retrieved it should be
10     provided to the defense or not or if the State is
11     going to assert some kind of that it's not relevant
12     or that it's privileged.  I don't know what the
13     State's position is on that.
14          ATTORNEY SCHNEIDER:  Much like Watou, Ryan
15     and Mickey (sic) Thao, I don't know the names of
16     these parties, and I didn't know those three names
17     until I got the reports from the officers in April,
18     so I didn't even know the names of the people.
19     Whether -- who else was involved or not, other than
20     what Sergeant Rabas has testified about today, that
21     they were outside -- take a look at my notes from his
22     testimony.  They had just left, they were just
23     outside the doors, they saw parties run out of the
24     bar, then saw a fight between two females kind of out
25     on the street.  That's the extent of what I know

90

1     about those parties or any interviews. I don't know
2     if he's going to be able to retrieve them, and I
3     would potentially -- and I don't think there's been
4     any subsequent follow-up or contact with those
5     parties since, so it's our position at this point
6     that their claim or request to remain anonymous
7     stands. So if there is anything we can recover, I
8     might like to submit something in writing for the
9     court on that.

10          THE COURT: Let me ask this. What about
11    having Sergeant Rabas reconstruct from the best of
12    his memory those interviews without identifying the
13    names, provide those to both parties, let both
14    Attorneys Vishny and Weitz, as well as the State,
15    look at it, and if it is worth pursuing further, then
16    we go forward.

17          ATTORNEY VISHNY: Correct. Because if the
18    witness virtually saw nothing, then it's irrelevant.
19    If the witness can provide some details that will go
20    with the defense theory of the case in terms of which
21    direction certain people ran in, what they saw,
22    anything they heard spoken, it could be exculpatory,
23    then that would overcome their desire to not be
24    identified. So it's just going to really depend on
25    what's there. I don't know what's there. I don't

1     know whether this interview can be recovered either,
2     and Sergeant Rabas has indicated he is not aware
3     right now.  He doesn't know one way or the other
4     either.  So obviously, if they can be recovered,
5     that's better than him having to rely on his memory.
6                THE COURT:  What about that approach,
7     Attorney Schneider?
8                ATTORNEY SCHNEIDER:  I can ask him if he
9     can, from the best of his ability, do some kind of
10    summary of what they told him, just identifying them
11    as individual one and individual number two.
12               THE COURT:  Right.  And I think there
13    was --
14               ATTORNEY VISHNY:  That's exactly how we
15    referred to them, as witness one and witness two, and
16    one was a Hmong male and one was a white male.
17               THE COURT:  That's what I understood.
18               ATTORNEY VISHNY:  I would ask that also --
19    the Appleton Police Department also determine whether
20    or not those recordings are retrievable.  Okay.
21        Then the final thing is I'm asking the court for
22    a protective order that police officers not discuss
23    with witnesses that the defense investigators may
24    contact them and that they can choose to not talk to
25    the defense investigator unless the court is going to

1    say that the defense has a right to have our

2    investigators tell witnesses we talk to that police

3    may talk to them and that they can choose to tell the

4    police officers that they don't care to talk to them

5    and just say that we gave the defense a statement,

6    you can get it from there, which is exactly, by the

7    way, and I'm paraphrasing, what Sergeant Rabas did

8    tell at least one and I think probably two of these

9    witnesses.  I've only listened to two out of the

10   three tapes.  So, you know, it's one thing to tell a

11   witness the defense -- I just want to let you know

12   you might be contacted by a defense investigator, but

13   to start to give them legal advice -- and I do --

14   whether or not Miss Schneider knew what the police

15   were doing or not, I don't think it's material,

16   they're basically investigating on behalf of the

17   State.

18              THE COURT:  Well, without -- without --

19              ATTORNEY VISHNY:  Okay.

20              THE COURT:  -- getting into pointing

21   fingers, what I will do is simply indicate that there

22   shouldn't be any reference in terms of whether or not

23   a person has to provide a statement to the defense

24   or, alternatively, if the defense obtains a witness

25   that they don't indicate that the police -- they can

```
1        refuse to speak to the police.  We'll just leave it
2        as a quiet -- it's a quiet issue, and if the witness
3        wants to make their own conclusions or inquiries they
4        can do it on their own time on their own dime.
5                   ATTORNEY VISHNY:  Right.  Yes.  And just
6        for the record, we do not make witness -- statements
7        like that to witnesses because we believe it's not
8        ethical to do so.
9                   THE COURT:  Anything else, Miss Schneider?
10                   ATTORNEY SCHNEIDER:  No.  I'm just -- no.
11        I think that's it then, Judge.
12                   THE COURT:  Attorney Vishny, anything
13        further?
14                   ATTORNEY VISHNY:  I think we should set the
15        August date now though.
16                   ATTORNEY SCHNEIDER:  We did.
17                   ATTORNEY VISHNY:  We did?  Where was I?
18        Obviously so much has happened I've forgotten about
19        it, but it's in my book.
20                   THE COURT:  So we have the August 17th
21        date, and then we also have a June 19th disclosure
22        date, a July 1 response date, if Attorney Weitz would
23        like to respond by then, and then we have --
24                   ATTORNEY SCHNEIDER:  I think it was like
25        July 7th after the 4th.
```

94

```
 1                    THE COURT:  Thank you, Attorney

 2         Schneider.

 3                    ATTORNEY VISHNY:  Okay.  Thank you.

 4                    THE COURT:  July 1 was the date for --

 5                    ATTORNEY SCHNEIDER:  You said July 17th.

 6                    THE COURT:  Megan Kelly is the July 1 date.

 7         Okay.

 8                    ATTORNEY VISHNY:  Thank you very much.

 9                    THE COURT:  Thank you.

10                    (Proceedings concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1

2

3                    C E R T I F I C A T E

4

5   STATE OF WISCONSIN      )
                            ) ss.:
6   COUNTY OF OUTAGAMIE     )

7

8

9           I, JOAN BIESE, RMR/CRR, do hereby certify that I
    am the official court reporter for Branch IV of the
10  Circuit Court of Outagamie County;

11          That as such court reporter, I made full and
    correct stenographic notes of the foregoing proceedings;
12
            That the same was later reduced to typewritten
13  form;

14          And that the foregoing proceedings is a full and
    correct transcript of my stenographic notes so taken.
15

16          Dated this 9th day of June, 2015.

17

18

19                            _____

20                            JOAN BIESE, RMR/CRR

21

22

23

24

25
```

96