1   STATE OF WISCONSIN    CIRCUIT COURT    OUTAGAMIE COUNTY

2   ————————————————————————————————————

**STATE OF WISCONSIN,**

3

          Plaintiff,

4   v.                         **Case No. 13-CF-1074**

5   **CHONG LENG LEE,**   *ORIGINAL*

6          Defendant.

CLERK OF CIRCUIT COURT
OUTAGAMIE COUNTY **FILED**

**AUG 3 0 2016**

AT _____ O'CLOCK____

7   ————————————————————————————————————

               **MOTION HEARING**

8   ————————————————————————————————————

9

10   BEFORE:      **HONORABLE GREGORY B. GILL, JR.**
                 Circuit Court Judge, Branch IV
                 Outagamie County Justice Center
11                 Appleton, WI  54911

12

   DATE:        **June 18, 2015**

13

14   APPEARANCES:  **CARRIE SCHNEIDER**
                 District Attorney
15                 Appearing on behalf of the State

16                 **ANDREW MAIER** and **PETER HAHN**
                 Assistant District Attorneys
17                 Appearing on behalf of the State

18                 **DEBORAH VISHNY** and **EVAN WEITZ**
                 Attorneys at Law
19                 Appearing on behalf of the Defendant

20                 **CHONG LENG LEE**
                 Defendant
21                 Appearing in person

22

23

24   Joan Biese
      Official Reporter, Branch IV
25   Outagamie County

```
 1                         I N D E X

 2

 3    WITNESSES                                           PAGE

 4    CARY MEYER
         Examination by Attorney Vishny.....................    5
 5       Examination by Attorney Schneider.................   28
         Examination by Attorney Vishny....................   33
 6
      NEAL RABAS
 7       Examination by Attorney Schneider.................   37
         Examination by Attorney Vishny....................   41
 8       Examination by Attorney Schneider.................   54

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2

1       **TRANSCRIPT OF PROCEEDINGS**

2               THE COURT:  We are on the record in

3       13CF1074, *State of Wisconsin v. Chong Leng Lee*.

4               Mr. Lee appears in person, along with counsel,

5       Attorney Evan Weitz and Deja Vishny.  Representing

6       the State of Wisconsin is Outagamie County District

7       Attorney Carrie Schneider, along with Outagamie

8       County Assistant District Attorney Andrew Maier.

9               This matter is scheduled today for the

10      continuation of a motion hearing that was previously

11      commenced before this court.

12              My recollection is that today we were

13      anticipating the testimony of Officer Meyer, correct?

14              ATTORNEY SCHNEIDER:  That's correct, Your

15      Honor.

16              THE COURT:  All right.  And --

17              ATTORNEY SCHNEIDER:  And then we were

18      also -- we'll be able to provide some updates on

19      other things that have been looked for relevant to

20      these items, as well as Sergeant Rabas testified

21      about some other recordings he had of -- I think we

22      identified them as either witness one and two or

23      witness A and B, so our thought is to provide some

24      testimony on that at the point.

25              Then, in talking through issues with Attorneys

3

1     Vishny and Weitz, I think our thought process is
2     we're set for trial in December.  We have the August
3     17th date.

4                 THE COURT:  Yes.

5                 ATTORNEY SCHNEIDER:  What we think we would
6     like to do is also maybe pick an Octoberish date, and
7     then maybe my thought would also be to put something
8     a week or two weeks before the start of trial just
9     for any final pretrial issues, because my fear is if
10    we wait until August, everything else is going to get
11    filled in on everybody's schedule.

12                THE COURT:  That's fine.  We can certainly
13    make those accommodations.

14          And that's consistent with your expectation,
15    Attorney Weitz and Vishny?

16                ATTORNEY WEITZ:  Yes.

17                THE COURT:  Okay.  Very good.

18          Then, with that, are we prepared to take some
19    testimony from Officer Meyer?

20                ATTORNEY VISHNY:  Yes.

21                THE COURT:  All right.  Very good.  Please
22    come forward.

23                (Oath administered to witness.)

24                THE WITNESS:  I do.

25                THE CLERK:  Please state your full name,

4

```
 1              spelling your last -- that for the record please.

 2                            THE WITNESS:  Cary Meyer.  First name is

 3              spelled C-A-R-Y, last name is M-E-Y-E-R.

 4                            THE COURT:  Who will be -- who will be

 5              questioning?

 6                            ATTORNEY VISHNY:  Me.

 7                            THE COURT:  Attorney Vishny.

 8                            ATTORNEY VISHNY:  Just for the record, Your

 9              Honor, before I proceed, Sergeant Rabas has stepped

10              out of the room pursuant to the sequestration order

11              I'm about to ask the court for.  And my understanding

12              is Sergeant Thao is also outside.

13                            THE COURT:  Very good.  Then, although it

14              appears to have been prospectively dealt with, I will

15              grant that request.

16                            ATTORNEY VISHNY:  Okay.

17                                    **EXAMINATION**

18     **BY ATTORNEY VISHNY:**

19     Q     Sergeant Meyer, were you the member of the Appleton

20              Police Department who had centralized responsibility

21              for the homicide investigation concerning Chong

22              Lee's -- the allegation that he was the shooter in a

23              homicide that occurred at Luna in December of 2013?

24     A     I don't know if I would say centralized

25              responsibility.  There were many of us that were
```

5

```
 1          working on the case at the time.

 2    Q     Was there one person who is like more in charge or

 3          just kind of overall in charge of the

 4          investigation?

 5    A     I think most everything was funneled through our

 6          lieutenant, Mike Gostisha, at the time.

 7    Q     Okay.  Were you aware that there were witnesses who

 8          were interviewed who -- for whom recorded statements

 9          and reports were not provided to the District

10          Attorney?

11    A     I know of interviews that Sergeant Thao and I did

12          that were not -- not reduced to report form and sent

13          to the District Attorney's office, yes.

14    Q     Can you tell me who those were of?

15    A     I don't recall the names, other than I did see them

16          in the -- in the motion information that District

17          Attorney Carrie Schneider provided to me.

18              At the time, those people were known by Sergeant

19          Thao, and the information that -- that they had or

20          the information that they had to give to us would

21          have been given through Sergeant Thao at the time.

22          He knew the people.

23    Q     Okay.  And just -- let me just see if these names

24          ring a bill.  Number one, Ryan Thao, does that name

25          ring a bell to you?
```

6

```
 1   A    I believe so.

 2   Q    Michael Thao, Mikey Thao?

 3   A    I believe so.

 4   Q    And number three, Watou, W-A-T-O-U, Lee?

 5   A    Yes, I believe so.

 6   Q    The original interviews of these three individuals

 7        that were conducted by Sergeant Thao, did you

 8        participate in any of those original interviews?

 9   A    I was there for those original interviews, yes, I

10        was.

11   Q    All three of them?

12   A    I believe so.

13   Q    Okay.  And were they recorded?

14   A    I believe Sergeant Thao had recorded those, yes.

15   Q    Do you have a specific recollection of what those

16        people told you at the time?

17   A    At the time they told us that they were in the Luna

18        Lounge on the night of the shooting.  They said

19        that --

20   Q    Let me go back just because I don't want to confuse

21        the theys.  Were these individuals all interviewed

22        separately?

23                  THE COURT:  Can we break it down?

24                  ATTORNEY VISHNY:  I'm about to.  Yes.

25   Q    (BY ATTORNEY VISHNY)  Okay.  So I'm going to first
```

7

```
 1       ask about Ryan Thao.  So what did Ryan Thao tell you
 2       and Sergeant Thao?
 3    A  I can't tell you specifically what each one said.  I
 4       remember certain things that I took from those
 5       conversations that I -- that I remember, but I can't
 6       tell you specifically what each one said.  Again,
 7       there wasn't a report done on that, and I have
 8       nothing to review.
 9    Q  Okay.  But you remember he said he was in Luna
10       Lounge?
11    A  Correct.  I remember the people that you just
12       mentioned telling us about being in the Luna Lounge.
13       I remember them talking about the general area where
14       they were near the stairwell that went down to the
15       bathrooms, and I remember them talking about the
16       positioning of some of the people that were
17       interacting or by Josh Richards at the time of the
18       shooting.
19    Q  Okay.  Did all three of them say they were near the
20       stairwell then?
21    A  My recollection is that they were in the same general
22       area.
23    Q  Okay.  In these interviews did any of these people
24       describe the clothing that the shooter wore, to the
25       extent you can remember?
```

8

```
 1   A    I don't remember that.

 2   Q    Okay.  Do you know if during these interviews any of

 3        these people were shown photographs of people -- of

 4        individuals who were known to have been at Luna that

 5        evening in an effort to identify a suspect?

 6   A    I don't specifically recall that.

 7   Q    Okay.  Do you know at the time -- I'm going to ask

 8        first about Ryan Thao.

 9             At the time Ryan Thao was interviewed, was Chong

10        Lee a suspect yet in this shooting or was Paul Lee

11        the suspect?

12   A    I -- I don't remember right now.  If I had the date

13        of when the interview took place, that might help.

14   Q    Okay.  I think I can provide that to you.  The

15        original interview -- it's in this transcript.  It

16        probably will take me a minute, but -- one minute.

17             ATTORNEY VISHNY:  Judge, there is a

18        stipulation between the State and the defense that

19        the interview with Ryan Thao took place prior to the

20        arrest of Paul Lee.

21             THE COURT:  And were there two interviews?

22             ATTORNEY VISHNY:  We're just talking about

23        the interview of Ryan Thao.

24             THE COURT:  Interview of Ryan Thao.  Very

25        good.
```

```
 1                    ATTORNEY VISHNY:  The 2013 interview, just
 2          so that's clear, December 2013.
 3     Q    (BY ATTORNEY VISHNY)  Okay.  Does the stipulation
 4          between the State and the defense that Ryan Thao was
 5          arrested -- was, rather, interviewed prior to Paul
 6          Lee's arrest help refresh your recollection?
 7     A    Not necessarily.  I was thinking that perhaps that
 8          was -- it happened after, so if it was before, I'm
 9          thinking that it was -- we were still in the
10          information gathering stage of the -- of the
11          investigation.
12                    ATTORNEY VISHNY:  And just so the record is
13          clear, the State and defense are stipulating that
14          interview with Ryan Thao took place on December 11th,
15          2013.
16                    THE COURT:  Okay.
17     Q    (BY ATTORNEY VISHNY)  All right.  And so as far as
18          the other two individuals, Mikey Thao and Watou Lee,
19          you can't recall either whether or not Chong Lee had
20          been identified as the suspect at that point?
21     A    I don't remember specifically that, no.
22     Q    But in any event, Ryan Thao was interviewed, you
23          didn't get information that then made you believe
24          that Chong Lee was a suspect at that time, correct?
25     A    What I do recall is that -- I'm generalizing -- I
```

10

```
 1        apologize, but I'm generalizing that what those
 2        people were telling us would have been some
 3        positioning, and specifically my recollection is that
 4        Chong Lee would have been standing to the victim or
 5        Josh Richards' left side at the time or prior to the
 6        shooting or the gunshot going off, and that Paul Lee
 7        would have been standing on the right side.  That's
 8        my recollection.
 9   Q    But Ryan Thao didn't know the names of the people
10        when he talked to you about who the shooters were,
11        did he?
12   A    I -- I don't recall.
13   Q    So you don't know that he necessarily named Chong
14        Lee, correct?
15   A    I don't know that for sure.  For some reason -- I
16        believe that -- that somebody was giving us names.  I
17        don't remember which one now or who.
18   Q    Okay.  Is there anything at all that would refresh
19        your memory to a greater degree about this?
20   A    Not really.  I guess what I can tell you is that
21        Sergeant Thao knew these people, and I'm -- I have
22        not talked to Sergeant Thao about this since being
23        subpoenaed, but I believe it was through his church
24        or something such as that, so he knew of them or knew
25        them, and these people were willing to or wanted to
```

11

```
 1            provide some information to us but were very
 2            concerned about their safety and the repercussions of
 3            possibly giving us information about the situation.
 4            And Sergeant Thao obviously would know much better
 5            than I who they were and specifically what they said
 6            at the time, and that's why the report wasn't
 7            completed.
 8    Q       All right.  Is it fair to say that initially Paul Lee
 9            was taken into custody and was the initial suspect in
10            this case, and through interrogating Paul Lee, Chong
11            Lee was developed as the suspect and subsequently
12            arrested for this homicide, correct?
13    A       I think it's more complex than that, but Paul Lee was
14            taken to the station and questioned at one point, not
15            by myself but by other officers, prior to Chong Lee
16            being picked up.
17    Q       And Chong Lee was only arrested pursuant to the
18            information that Paul Lee gave, that's what gave
19            probable cause for Chong Lee's arrest; correct?
20    A       Again, I think there is a bit more to it than just
21            that.  I think, you know, we were taking into
22            consideration other witnesses that provided
23            statements about the positioning and who was standing
24            where and that type of thing.
25    Q       Do you know who those witnesses were?
```

12

```
 1    A    I -- I didn't -- I didn't interview all of them
 2         myself.  In fact, I probably didn't interview most of
 3         those witnesses.  So, I -- I don't want to guess at
 4         names right now.
 5    Q    Okay.  So after these three individuals were
 6         interviewed, were there ever reports written about
 7         any of these interviews?
 8    A    No.
 9    Q    Were there notes taken in a memo book at all or
10         spiral notebook or anything of that nature during the
11         interviews?
12    A    No, there weren't.  And again, the reasoning for that
13         is they were very specific about not wanting to be
14         put in the report at all.  And again, it was an
15         issue -- issue about their safety.  I know I was
16         concerned about the Monfils Law and different things
17         like that, and --
18    Q    The what log?
19    A    The Monfils Law.
20    Q    Can you explain what that is please?
21    A    A situation in Green Bay where some information
22         leaked out, I think it was a 911 call leaked out,
23         from the calling party to the police, and I believe
24         the calling party wanted to be kept anonymous, and
25         ultimately that person was killed.
```

13

```
 1    Q    And as a result of the Green Bay incident, which
 2         happened a long time ago, I believe.
 3    A    Yes.
 4    Q    You've now started to call something in Appleton a
 5         Monfils log?
 6    A    Well, I just -- I'm referring to it as that.
 7              ATTORNEY SCHNEIDER:  I think he said law,
 8         L-A-W, not log, L-O-G.
 9              ATTORNEY VISHNY:  You're right.  I'm sorry.
10    Q    (BY ATTORNEY VISHNY)  Okay.  So as a result there
11         were no -- the interviews were never reduced to
12         written summaries of what occurred, correct?
13    A    Correct.
14    Q    All right.  What about the recordings, what happened
15         to those?
16    A    I don't know.  I believe -- I don't want to guess.  I
17         don't know if Sergeant Thao had a recording.
18    Q    Did you ever have any contact with the District
19         Attorney's office about these witnesses?
20    A    Not that I'm aware of.
21    Q    Do you know if anybody from the Appleton Police
22         Department advised the District Attorney of the
23         existence of these witnesses?
24    A    I'm not aware of that, no.
25    Q    Okay.  Were you involved at all in any capacity or
```

```
 1          even to the extent of having knowledge that at some
 2          point the recordings of these interviews were
 3          apparently destroyed?
 4     A    I don't.
 5     Q    Do you -- did you even know before today that the
 6          recordings were destroyed?
 7     A    No.
 8     Q    Even with reading the motion?
 9     A    I'm not aware of that.
10     Q    Okay.  So you have no idea what happened to the
11          recordings of these interviews?
12     A    Correct.
13     Q    Is it -- well, rather, was it a policy of the
14          Appleton Police Department if a witness did not want
15          to be identified to not write reports regarding the
16          interviews of those witnesses?
17     A    I don't know that there is anything in policy form on
18          that.
19     Q    Okay.  What about to destroy recordings of an
20          interview of a witness?
21     A    I don't know of a policy on that either.
22                   ATTORNEY VISHNY:  One minute, please.
23     Q    (BY ATTORNEY VISHNY)  Well, it's fair to say that in
24          the course of police work of the Appleton Police
25          Department that confidential informants are routinely
```

15

| 1 | | spoken to, aren't they, in criminal investigations? |
| 2 | A | They are from time to time. |
| 3 | Q | And is it the policy there to not write reports about |
| 4 | | what a confidential informant states? |
| 5 | A | It depends on the -- on the case. I guess I saw this |
| 6 | | as being somewhat different than, you know -- being |
| 7 | | that it was a homicide case, a little differently |
| 8 | | than what we would normally assign someone a |
| 9 | | confidential informant number or something in the |
| 10 | | report. |
| 11 | Q | Would it be normal, however, to advise the District |
| 12 | | Attorney of witnesses that exist even if those |
| 13 | | witnesses wanted to be kept confidential, i.e. not |
| 14 | | publicly released or provided to defense counsel? |
| 15 | A | I think the best way that I could see to protect |
| 16 | | these witnesses, and I think they had a very real |
| 17 | | fear, would be to not list them in the report at |
| 18 | | all. |
| 19 | Q | Okay. But that's not what I asked you. What I asked |
| 20 | | you is wouldn't the District Attorney be advised of |
| 21 | | the existence of these witnesses even if they're not |
| 22 | | listed in a report? |
| 23 | A | Not necessarily. |
| 24 | Q | So the Appleton Police Department would withhold |
| 25 | | information from the prosecutor who was responsible |

16

```
 1         for the prosecution of the accused individual?
 2    A    I think at the time, if I'm not mistaken, I believe
 3         some of this information as far as the positioning
 4         had been coming out from some of the other witnesses
 5         as well, I believe, and therefore it was never our
 6         intent to withhold information from the District
 7         Attorney's office, but rather, you know, I guess it
 8         might have been a question of what was necessary.
 9    Q    For the prosecution in this case --
10    A    Yes.
11    Q    -- is that what you're saying?
12    A    Yes.
13    Q    So, in other words, it's your opinion that because
14         there were other witnesses available you didn't have
15         to disclose these witnesses to the District
16         Attorney?
17    A    Because there were other witnesses that were
18         essentially saying same or similar things, just felt
19         as though this was our best -- best way to protect
20         these witnesses.
21    Q    Were you aware that any of the other witnesses had
22         also expressed concerns about their safety?
23    A    Can you be more specific, like what witnesses?
24    Q    Well, let's take Alyson, A-L-Y-S-O-N, Blom, B-L-O-M.
25         Did you participate in interviewing Miss Blom?
```

17

1    A    I believe I did.

2    Q    And you were aware that she had some pretty strong

3         feelings about not wanting to get involved and being

4         afraid, right?

5    A    Yes.

6    Q    Nonetheless, there was reports written about Miss

7         Blom that were turned over to the District Attorney.

8    A    And I think it was maybe a judgment situation, but

9         she would have been with some of these people that

10        night prior to the shooting, and we may have viewed

11        that a little bit differently than these other three

12        that you had mentioned who were really sort of

13        bystanders in the area at that time and didn't come

14        to the bar with them or have any direct affiliation

15        with Mr. Chong Lee.

16   Q    Well, Mikey Thao was actually socializing with the

17        people directly involved in the fight and was very

18        close to it and knew the individuals, so he was

19        treated differently somehow than Alyson Blom in terms

20        of concern for safety?

21   A    Could you repeat that?

22   Q    Sure.  Mikey Thao was also good friends with these

23        individuals who were involved in the altercation with

24        the victim, Mr. Richards.

25   A    Um-hum.

18

1   Q   He was physically located in a spot that was much
2       closer to the shooting, possibly, than Alyson Blom,
3       so it was decided that it was worth protecting him
4       but not Alyson Blom because of who had walked into
5       the bar at the same time?  Is that what you're
6       saying?

7   A   I'm saying that my recollection is Alyson was with
8       the -- this group of people during the course of the
9       evening, and not just, essentially, a bystander there
10      in the lobby prior to the shooting, and I think we
11      may have looked or viewed her just a little bit
12      differently because she had more information in terms
13      of the entire evening.

14  Q   You mean in terms of who was where before walking
15      into the Luna bar?

16  A   Everything that happened that night.  And just, I
17      think, a closer affiliation with Mr. Lee.

18  Q   You were aware that -- and the police had in fact
19      recorded a phone call between a lady named Delinda,
20      D-E-L-I-N-D-A, Guzman, G-U-Z-M-A-N, and Alyson Blom
21      where Alyson Blom had clearly stated, not knowing
22      that she was being recorded, that she had not seen
23      the shooting, didn't know who did it, and that she
24      expressed in one way or another some fear about
25      getting involved.  Correct?

19

1   A   I don't remember that specifically, but if I'm not
2       mistaken, I believe Alyson Blom -- and I haven't
3       reviewed the report so I hope I'm not misspoken here,
4       but I believe that she had some communication even
5       that night after the shooting with Chong Lee's
6       brother Hu Lee over in Little Chute or, actually, I
7       think he was at work, but had some communication with
8       either Hu or Hu's wife following the shooting.
9   Q   Correct.  But even though you knew from a recorded
10      conversation that she had not seen the shooting and
11      didn't know who the shooting (sic) was, she was
12      interviewed and in fact threatened possibly with the
13      loss of her job if she didn't say who was involved in
14      this case, right?
15  A   I don't recall her being threatened.  I don't recall
16      that being a loss of her job.  But again, I guess my
17      point just being that I think that her interaction
18      with this group of guys, including Mr. Chong Lee, was
19      much, much larger than the other guys that were just
20      standing in the lobby that night.  In fact, I
21      remember at least two of those guys, I think, that
22      were in the lobby that night that you had mentioned
23      here talking about being concerned about Chong and
24      these others showing up there and not even wanting to
25      be there at the time because they were not affiliated

20

```
 1              with that gang.  And they were concerned for their

 2              safety, I guess, to some degree even at that point

 3              when they were just in the lobby of the -- of the

 4              Luna Lounge, as opposed to Alyson, for example, who

 5              was with them this entire time and follows through

 6              with going and talking to Hu Lee's wife and so

 7              forth.

 8    Q    Okay.  So, essentially, I understand your

 9         explanation, but ultimately the Appleton Police

10         Department decided to pick and choose which witnesses

11         were and were not going to be disclosed to the

12         District Attorney, correct?

13    A    I guess I can -- to some degree that was the case

14         here, but these were the only people that I'm aware

15         of that weren't -- that were spoken to that were not

16         put in report form.

17    Q    I see.  Were you aware that Watou Lee did not

18         identify Chong Lee as the shooter and that this might

19         perhaps be information that's exculpatory and

20         therefore there was going to be a duty on the part of

21         the State to turn that over to the defense?

22    A    I don't recall that specifically.

23    Q    Were you aware that Mikey Thao said that he could not

24         identify Chong Lee as being the shooter and

25         therefore, as close as he was, that this was
```

21

```
 1          exculpatory and there could be a duty to turn this

 2          over to the defense?

 3    A     I don't recall that.

 4    Q     Were you aware that Ryan Thao didn't even know who

 5          Chong Lee was and gave description that might match

 6          another individual and therefore the State would have

 7          a duty to disclose this to the defense because it was

 8          exculpatory?

 9    A     I am not aware of that.

10    Q     Now you also participated with some interviews of

11          individuals in Milwaukee after Chong Lee's arrest,

12          correct?

13    A     Yes.

14    Q     Did you participate in the interview of Kong Vang,

15          nicknamed Jesus, who worked at the Thai Kitchen?

16    A     Yes.  I remember going to a restaurant there.

17    Q     Okay.  And that was a short interview and it was

18          recorded, correct?

19    A     I believe so.

20    Q     Okay.  Did you participate in the interview of Xai --

21          Xai, excuse me, X-A-I, Thao who also had some

22          valuable information to give, correct?

23    A     I don't remember her specifically.  Can you tell me

24          where we interviewed her?

25    Q     It's a male.
```

22

```
 1   A    He.  Where did we interview him?

 2   Q    I'll let you know in a second.  It was -- excuse me.

 3        It's just going to make me a minute here to pull the

 4        file.

 5             You did these interviews with Sergeant Tauber,

 6        correct?

 7   A    Yes.

 8   Q    And that was an interview with Xai Thao at his place

 9        of employment on December 17th at about 7:45 p.m.

10        Does that help refresh your recollection?

11   A    If you could tell me where the place of employment

12        is, that might.

13   Q    Well, if it was in your report, I would love to.

14             ATTORNEY SCHNEIDER:  Actually, it's the

15        report of Sergeant Tauber, not Sergeant Meyer.

16             ATTORNEY VISHNY:  No.  I know.  That's

17        true.  Well, I don't have the last page, but I know

18        they're together.

19   Q    (BY ATTORNEY VISHNY)  I can't say that, but I could

20        show you the report to refresh your recollection.

21   A    Okay.

22   Q    To the extent that I have it.

23             ATTORNEY VISHNY:  I don't think I need to

24        get this marked, do I?

25             THE COURT:  No.  You're using it simply for
```

23

```
 1        refreshment.
 2   A    I believe we talked to him at -- it was one of the
 3        hospitals.
 4   Q    Okay.  So -- and that was recorded too, right?
 5   A    I believe so, yes.
 6   Q    You also talked to a female witness named Dia Vang,
 7        correct?
 8   A    Yes, yes.
 9   Q    A male witness, Keng Joseph Vang?  Keng is spelled
10        K-E-N-G in the report, but we believe the name might
11        be spelled Kong.  Do you remember that name?
12   A    I don't remember the name specifically.  Was it at an
13        apartment building?
14   Q    I can tell you in a minute.
15   A    I know we talked to a couple people in a hallway.
16   Q    If you'll allow me to refresh his recollection the
17        easiest way, 1320 East Capitol Drive?
18   A    Okay.  I believe that was in apartment building.
19   Q    And also Peter Moua, M-O-U-A, at an apartment
20        building?
21   A    Again, I don't remember the specific name, but I know
22        we talked to some people there out in the hallway.
23   Q    Okay.  Do you also recall talking to an individual
24        with a very long name but whose nickname was Cue?  I
25        can't even pronounce it.  S-A-E-N-G-P-H-A-C-H-A-N-H.
```

24

| 1 | | Do you recall that person too? |
|---|---|---|

1          Do you recall that person too?

2      A   I recall talking to someone.  Again, if I knew where

3          the interview took place it might help me a little

4          bit.

5      Q   Were those interviews recorded?

6      A   I believe so.

7      Q   Okay.  Can you offer any explanation as to why these

8          recordings have never been provided to the prosecutor

9          or the defense?

10     A   I'm not sure.  Maybe they weren't recorded,

11         especially people that we talked to out in the

12         hallway.  We weren't allowed into the apartment.

13     Q   Would that affect turning on a recording device?

14     A   Well, typically we'll turn it on when we sit down to

15         do an interview with someone.  We weren't sitting

16         down to do an interview with anyone there.

17     Q   Don't you turn on a recording device even before you

18         approach a house and knock on a door?

19     A   Not necessarily.

20     Q   Okay.  So you don't know why there is no recordings

21         available for these three witnesses?

22     A   I don't.

23     Q   Are you aware whether or not a witness named Alex

24         Schilling, S-C-H -- I'm not sure if it's S-C-H or

25         S-H-Y-L-I-N-G, was -- whether he was ever talked

25

```
1          to?
2    A     I apologize, but once again, I don't recall who that
3          is right off the top of my head.
4    Q     Or Noah Vang, V-A-N-G?
5    A     Not sure.
6    Q     Okay.  Do you know if somebody named Kou Lo, K-O-U
7          L-O, was ever interviewed?
8    A     Not just based on the name, I don't recall.
9    Q     Okay.  So it's pretty fair to say that without having
10         documentation to refresh your recollection, it's
11         pretty hard to remember exactly what witnesses said,
12         right?
13   A     Yes.
14   Q     So in respects to other aspects of this investigation
15         where you would be able to have reports to refresh
16         your recollection, that could assist you in
17         remembering certain interviews, correct?
18   A     Yes.
19   Q     But if reports are not available and recordings are
20         not available, such as the case with Ryan Thao, Mikey
21         Thao and Watou Lee, you really cannot recall,
22         correct?
23   A     I don't.
24   Q     Okay.  And you're not going to be able to refresh
25         your recollection with a recording or a report if
```

26

```
 1       they don't exist, right?

 2   A   Correct.

 3                ATTORNEY VISHNY:  Okay.  I don't have

 4       anything further.

 5                THE COURT:  Attorney Schneider.

 6                ATTORNEY SCHNEIDER:  Just for the record,

 7       Judge, today was the first day that Attorney Vishny

 8       had expressed to me that she couldn't locate

 9       recordings from Milwaukee or some potential Milwaukee

10       interviews, so while the questions have been asked of

11       Sergeant Meyer, I haven't been able to go back

12       through my materials.

13                ATTORNEY VISHNY:  Can I just talk to Miss

14       Schneider for a minute?

15                THE COURT:  That's fine.

16                ATTORNEY SCHNEIDER:  So just -- Attorney

17       Vishny just expressed at one point she had asked

18       Sergeant Rabas about these recordings to see if they

19       did exist or not, and he indicated that they didn't,

20       but this is the first I'm aware, so I haven't been

21       able to make sure that they weren't put someplace

22       else and not mislabeled, but I just at least want to

23       express that to the court.

24                ATTORNEY VISHNY:  Just so you know, when I

25       asked Sergeant Rabas about that, that was long before
```

27

```
 1          this came up about these three witnesses whose
 2          recordings were apparently destroyed.  So I didn't
 3          really think about it, I just accepted it at face
 4          value until this occurred.
 5                    THE COURT:  Sure.
 6                    ATTORNEY VISHNY:  Okay.
 7                         **EXAMINATION**
 8     **BY ATTORNEY SCHNEIDER:**
 9     Q    Sergeant Meyer, I just want to put a little bit on
10          the record to describe your background.  How long --
11          you're retired now, correct?
12     A    I am, yes.
13     Q    Retired when?
14     A    May 4th of this year.
15     Q    How long did you work in law enforcement?
16     A    33 years.
17     Q    How long of that time was with Appleton Police
18          Department?
19     A    28 years.
20     Q    How long did you work in investigations?
21     A    Just short of 19 years.
22     Q    And even before your retirement in May, you were off
23          of work for a medical reason for a period of time,
24          correct?
25     A    That is correct.
```

```
 1   Q   And just the months even, just so the court
 2       understands.
 3   A   It was -- I was off for that toward the end of
 4       January, I believe, January 22nd.  I came back to
 5       work for a two-week period of time at the end of
 6       April and then retired.
 7   Q   Okay.  So work that would have been ongoing in this
 8       case, January, February, March, April of 2015, you
 9       would not have been involved in?
10   A   That's correct.
11   Q   And in fact you -- I don't know this, but when did
12       you announce when you would be retiring?
13   A   I believe my official announcement was probably in
14       February.
15   Q   Okay.  So Lieutenant Gostisha and the other
16       investigators knew that you were going to be retiring
17       in April or May, correct?
18   A   Early May, correct.
19   Q   So for the two weeks you were back, did you do any
20       work on the Chong Lee case?
21   A   I did not.
22   Q   Were they keeping you apprised of what was going on
23       or what interviews they were conducting during the
24       time when you were off on medical leave?
25   A   Not necessarily.
```

29

| 1 | Q | Okay. Did you -- and I -- you reviewed defense |
| 2 | | two-page motion to compel discovery before today, |
| 3 | | correct? |
| 4 | A | Yes. |
| 5 | Q | Other than that, when you read that, did you even |
| 6 | | know that Ryan Thao, Mikey Thao or Watou Lee had been |
| 7 | | interviewed back in April of 2015? |
| 8 | A | I did not. |
| 9 | Q | Okay. And you never reviewed those recordings at |
| 10 | | all? |
| 11 | A | I have not. |
| 12 | Q | So you wouldn't know if listening to those recordings |
| 13 | | would refresh your recollection about what they told |
| 14 | | you originally in December. |
| 15 | A | True. |
| 16 | Q | Okay. And prior to today, because you're currently |
| 17 | | in retired status, you didn't go back to the police |
| 18 | | department and ask to look at any of your |
| 19 | | materials? |
| 20 | A | I've had no contact with anyone from the Appleton |
| 21 | | Police Department since getting this subpoena. |
| 22 | Q | Okay. And you express that you had some concerns |
| 23 | | over -- I'm going to use the word concerns twice. |
| 24 | | You express you had concerns over the concerns or |
| 25 | | sentiments that were expressed by these three when |

30

```
 1        you first spoke with them; is that correct?

 2    A   I did.

 3    Q   And why?

 4    A   Because they -- they had a very real fear for their

 5        safety, and because it's actually a homicide case

 6        that we're investigating, someone did die in this

 7        case, and also because Sergeant Thao had this close

 8        relationship with these -- I shouldn't say a close

 9        relationship, but a relationship of some sort outside

10        of being a police officer with these individuals,

11        that's why.

12    Q   And when the interviews were done, were they done in

13        Hmong or English or a mix, if you recall?

14    A   Those were done in English.

15                 THE COURT:  These are the December

16        interviews in 2013, correct?

17                 THE WITNESS:  Yes.

18    Q   (BY ATTORNEY SCHNEIDER)  Because you're not aware of

19        anything that they've said in the April 2015

20        interviews, correct?

21    A   That's correct.  I had nothing to do with those

22        interviews.

23    Q   Okay.  And until today didn't even know they had been

24        reinterviewed, correct?

25    A   Correct.
```

31

```
 1    Q    Defense asked -- well, let me ask you this.  The

 2         recording device that might have been used in

 3         December of 2013 with these three parties, was that

 4         your recording device or Sergeant Thao's?

 5    A    I believe Sergeant Thao's.

 6    Q    And you didn't maintain any notes from these

 7         interviews at all?

 8    A    I did not.

 9    Q    Okay.  And the three parties were interviewed

10         separately?

11    A    Yes.

12    Q    Were they even interviewed back in December at the

13         same location or at different locations, as best you

14         can recall?

15    A    I recall I believe two that we did at a business out

16         near the airport on County Trunk Highway CB.  I think

17         that third one may have been at a different location,

18         but right now I don't remember.

19    Q    And was there -- let me have one second.  Defense

20         asked you about Alyson Blom, and ultimately she was

21         identified in the reports, correct?

22    A    Correct.

23    Q    And from your recollection, while her name might not

24         have been known initially, was one of the first

25         individuals a female party who was tackled outside of
```

32

```
 1           Luna identified and shared with law enforcement?
 2    A      Yes.
 3    Q      And was that person's identity attempted to be found
 4           out?
 5    A      Yes, and ultimately we were able to determine that
 6           that was Alyson Blom.  She told us that she was
 7           tackled.
 8    Q      Okay.  And, from that, it was actually Mr. Richards'
 9           girlfriend, Brittany, who exited Luna immediately
10           after the shooting, tackled Alyson right outside the
11           doorway, correct?
12    A      That's correct.  And we have witnesses that said that
13           Brittany was saying something to the effect of that
14           you -- you had something to do with this; in other
15           words, Brittany is saying that to Alyson.
16    Q      And was that a reason why officers wanted to locate
17           that female party?
18    A      Yes.
19                    ATTORNEY SCHNEIDER:  I don't have any other
20           questions then, Your Honor.
21                    THE COURT:  Attorney Vishny, any follow-up
22           questions?
23                    ATTORNEY VISHNY:  Yeah.
24                          **EXAMINATION**
25    **BY ATTORNEY VISHNY:**
```

```
 1    Q    Did you participate originally in the interview at
 2         all with someone named Johnny Thao?
 3    A    Again, I apologize, I don't remember specifically.
 4    Q    Or Jared Randall?
 5    A    I don't recall.
 6    Q    All right.
 7              ATTORNEY VISHNY:  Nothing further.
 8              THE COURT:  Does that limited question --
 9              ATTORNEY VISHNY:  Wait.  I do have one more
10         question.  I'm sorry.  I forgot.  Mr. Weitz is much
11         more on top of things today than me.
12    Q    (BY ATTORNEY VISHNY)  When you go out and do
13         interviews with another individual, are these
14         interviews usually recorded by both investigators or
15         just by one?
16    A    It depends.
17    Q    What does it depend on?
18    A    You know, it depends if one person is the lead in
19         that specific interview, they may be recording.
20         Sometimes both may be recording.  Like when I say
21         Sergeant Thao in this case, he was the person who
22         knew these guys and knew, you know, that they wanted
23         to talk to us.  He's the person who, because of his
24         past relationship with them, had somewhat of a
25         rapport going into it.  And I guess I would see
```

34

```
1        myself as more of a secondary officer in that
2        scenario.
3    Q   So when you're the secondary officer, does that mean
4        you take notes at all?
5    A   Not necessarily.
6    Q   Okay.  So you -- do you recall if you even took notes
7        during these interviews?
8    A   I don't recall taking notes during this.
9    Q   And do you remember if you recorded this?
10   A   I don't.
11   Q   Does that mean you could have recorded it but you
12       don't know?
13   A   I don't believe I did.
14   Q   Okay.
15                  ATTORNEY VISHNY:  I don't have anything
16       further.
17                  THE COURT:  Attorney Schneider?
18                  ATTORNEY SCHNEIDER:  Nothing further.
19                  THE COURT:  All right.  Sir, I don't have
20       any questions.  You may be seated.
21                  ATTORNEY SCHNEIDER:  I'm going to ask
22       that -- ask that Sergeant Meyer just stay but be
23       sequestered just in case.
24                  THE COURT:  Very good.
25                  And, Attorney Vishny, do you have additional
```

```
1        witnesses?  I know we might have --
2                ATTORNEY VISHNY:  I think the State is
3        going to call them, so it doesn't really matter to me
4        who calls the witnesses.
5                ATTORNEY SCHNEIDER:  I was planning to
6        recall Sergeant Rabas briefly, Your Honor.
7                THE COURT:  That's fine.
8                ATTORNEY SCHNEIDER:  And just so the
9        court's aware, it was late last week that some
10       additional reports went out related to witness one
11       and two, that's how I'm going to refer to them today,
12       along with a disk, and I don't think defense has had
13       a lot of time to review the reports or the disks.
14               THE COURT:  Okay.
15               ATTORNEY SCHNEIDER:  But at least I can
16       tell you that fact, and I don't know if they'll want
17       additional time or, I mean, if they feel they want
18       to, after they have a chance to review it, ask a
19       question at a different hearing, we'll do that.
20               ATTORNEY VISHNY:  That's fine.  Why don't
21       we have -- if the State is going to call Sergeant
22       Rabas, that's fine.  I would ask for like two
23       minutes.  I really haven't read this new report, I've
24       skimmed it only, and I --
25               THE COURT:  Would you like a couple minutes
```

36

```
1          right now?
2                         ATTORNEY VISHNY:  Sure.
3                         THE COURT:  We can do that.
4                         ATTORNEY VISHNY:  That would be great.
5                         (A brief recess was taken.)
6                         THE COURT:  Sergeant Rabas, come up.
7                         (Oath administered to witness.)
8                         THE WITNESS:  I do.
9                         THE CLERK:  Please state and spell your
10         full name for the record please.
11                        THE WITNESS:  Neal Robert Rabas.  N-E-A-L,
12         last name R-A-B-A-S.
13                               **EXAMINATION**
14   **BY ATTORNEY SCHNEIDER:**
15   Q     Last time you testified here on May 26th, you at one
16         point provided some testimony about two witnesses, I
17         don't remember if we called them witness A and
18         witness B, but I'll say witness one and two, and
19         subsequent to that you were asked to go back and see
20         if you still had any recordings from those parties.
21         Do you recall that?
22   A     I do.
23   Q     And what were you able to locate?
24   A     I was able to locate the identity of the individuals
25         and the recordings of the interviews that we
```

| | | |
|---|---|---|
| 1 | | conducted in December of 2013. |
| 2 | Q | And what if anything did you do in regard to making |
| 3 | | contact with the parties? |
| 4 | A | After obtaining their identification, I recontacted |
| 5 | | them by phone and identified myself, asked if they |
| 6 | | remembered the interviews, and then asked for their |
| 7 | | permission to use the prior interview to be |
| 8 | | documented in this investigation. One of the |
| 9 | | concerns both individuals had expressed prior was |
| 10 | | being identified, as well as they had also identified |
| 11 | | Ryan Thao, who at that time was a direct witness to |
| 12 | | the shooting, and he had requested to remain -- not |
| 13 | | to be identified out of his safety -- concerns for |
| 14 | | his safety. So -- |
| 15 | Q | Go ahead. |
| 16 | A | So after advising them that Ryan Thao had now come |
| 17 | | forward and was being identified as a witness, and as |
| 18 | | I explained the ongoing investigation to them, they |
| 19 | | were willing to be identified formally in the report |
| 20 | | as a witness, or, I should say, they allowed me to |
| 21 | | use their prior interview to be documented in this |
| 22 | | investigation. |
| 23 | Q | So you made contact with them on May 29th? |
| 24 | A | Correct. |
| 25 | Q | And did you tell them that Ryan was now or had now |

38

| | | |
|---|---|---|
| 1 | | been identified as part of the report? |
| 2 | A | Yes. |
| 3 | Q | And both their names are Johnny Thao and Gerald |
| 4 | | Randall; is that correct?  Jared? |
| 5 | A | Jared Randall, yes. |
| 6 | Q | And they were willing to be identified? |
| 7 | A | Yes. |
| 8 | Q | In just a very brief summary, what did they directly |
| 9 | | see themselves as opposed to hear from other |
| 10 | | parties? |
| 11 | A | They observed a fight that took place outside of the |
| 12 | | bar -- the bar Luna on Division Street right after |
| 13 | | the shooting. |
| 14 | Q | And at the time when they described for you, back in |
| 15 | | December of 2013, seeing this fight with some girls, |
| 16 | | had those girls been identified? |
| 17 | A | Yes. |
| 18 | Q | And those girls were which two parties? |
| 19 | A | Alyson Blom and -- it would have been Josh's |
| 20 | | girlfriend. |
| 21 | Q | Brittany Olson? |
| 22 | A | Thank you. |
| 23 | Q | So what they told you back in December of 2013 was |
| 24 | | that they witnessed the fight between the girls |
| 25 | | outside of Luna but were not inside at the time of |

39

```
 1         the shooting?

 2    A    Correct.

 3    Q    And are you aware back in December of 2013 when both

 4         Alyson and Brittany were spoken with, did they

 5         indicate that they had been in a fight or a scuffle

 6         outside of Luna?

 7    A    Yes.

 8    Q    And were there other parties that also were

 9         identified in reports that described seeing the two

10         female parties fighting outside?

11    A    Yes.

12    Q    And from -- so back in December of 2013 when you

13         spoke with them, did they express concerns about

14         being identified?

15    A    Yes.

16    Q    Once or more than once?

17    A    More than once.

18    Q    Did it seem to you from speaking to them in December

19         that they even knew parties named Paul Lee or Chong

20         Lee?

21    A    They did not know either one of those individuals.

22              ATTORNEY SCHNEIDER:  I don't think I have

23         anything else then at this time, Your Honor.

24              THE COURT:  Attorney Vishny or Weitz?

25              ATTORNEY VISHNY:  Okay.
```

| | | |
|---|---|---|
| 1 | | **EXAMINATION** |
| 2 | **BY ATTORNEY VISHNY:** | |
| 3 | Q | As I understand it, Johnny Thao and Jared Randall |
| 4 | | wanted to remain confidential informants, for lack of |
| 5 | | a better word, right? By informant I just mean a |
| 6 | | person who gives information. I'm not attaching it |
| 7 | | to a drug deal or anything of that nature. |
| 8 | A | Correct. |
| 9 | Q | But you kept their recordings? |
| 10 | A | Yes. |
| 11 | Q | Even though they wanted to be kept confidential? |
| 12 | A | Yes. |
| 13 | Q | Why? |
| 14 | A | The -- I -- actually, the last time I testified I |
| 15 | | didn't recall -- I didn't even know I still had the |
| 16 | | recordings. I thought I no longer had retained them |
| 17 | | after -- after I had interviewed them. It's a |
| 18 | | process that we go through as far as when we do |
| 19 | | interviews, we -- they accumulate on your recorder. |
| 20 | | You sometimes delete them directly from your recorder |
| 21 | | or sometimes you put them onto a desktop and then -- |
| 22 | | and then delete them. And it was just in this |
| 23 | | process with the numerous interviews that these |
| 24 | | recordings were not deleted after the decision was |
| 25 | | made not to include them in the investigative |

```
 1            report.

 2    Q       Were there ever reports written about their

 3            interviews originally?

 4    A       No.

 5    Q       So the reports that you've written now that have been

 6            provided as of the other day are basically

 7            constructed from the original interviews, correct?

 8    A       Yes.

 9    Q       Did you go back and relisten to them in order to

10            refresh your memory before writing this report?

11    A       Yes.

12    Q       Okay.  Now there is other names mentioned in these

13            reports.  Do you know whether or not a Timothy

14            Jacobson was ever interviewed, also identified as

15            Jaco, J-A-C-O?

16    A       I believe he is identified in the report.  I don't

17            recall as to what nature and exactly what information

18            he was providing.

19    Q       Do you know if he was ever interviewed though?

20    A       I do not, without looking at the report.

21                 All right.  Do you know whether or not - well

22            you know Ryan Thao was interviewed, obviously - Jared

23            Randall, Kou, K-O-U, Lo, L-O, was ever interviewed?

24    A       I do not.

25    Q       Okay.  Do you know whether Alex Schilling was ever
```

42

```
 1        interviewed?

 2   A    No, I do not.

 3   Q    Do you know whether Noah Vang was ever interviewed?

 4   A    Yes.

 5   Q    Was he?

 6   A    I believe so, yes.

 7   Q    And was that recording -- was that interview

 8        recorded?

 9   A    I don't know.  I did not do the interview.

10   Q    Who did?

11   A    I don't recall.

12             ATTORNEY VISHNY:  Judge, at this point I'll

13        advise counsel that I've never been given any

14        discovery concerning an interview of Noah Vang, not a

15        report, not a written recording, so that apparently

16        we have another missing piece of discovery here.

17             THE COURT:  Very good.  Do we know if there

18        is a report that's been generated?

19             ATTORNEY SCHNEIDER:  I'd have to grab our

20        log to see, Judge.  We're at like 2900 pages of

21        discovery.

22   Q    (BY ATTORNEY VISHNY)  So you don't know one way or

23        another about Timothy Jacobson, right?

24   A    Correct.

25   Q    Would -- if I showed the report that you just wrote,
```

43

```
 1          would it help refresh your memory or not to whether
 2          or not he had ever been interviewed?
 3     A    The report I just wrote?
 4     Q    Yes.
 5     A    In reference to?
 6     Q    The one you just wrote on --
 7     A    Yeah.  I reference Timothy Jacobson in that report,
 8          but I -- I don't recall if he was interviewed or if
 9          the report documents an interview with him.
10     Q    Okay.  Now this was somebody who had allegedly given
11          Alyson Blom a ride home after she had been assaulted
12          outside of Luna?
13     A    Yeah.  Close to her home.
14     Q    Close to her home?
15     A    Or father's house.
16     Q    So you don't know if he was interviewed.
17     A    I'd have to look at the report.
18     Q    Okay.  And there is also mention Johnny Thao told you
19          that not only Timothy Jacobson gave her a ride home,
20          that a person who is not described by name but as
21          Jacobson's brother-in-law gave the ride home too,
22          correct?
23     A    Correct.
24     Q    And do you know if that person was ever identified or
25          interviewed?
```

44

```
1    A    No, I don't.

2    Q    Okay.  So you're just saying it's serendipitous that

3         these recordings still exist, right?

4    A    Yes.

5    Q    And you did participate in the decision to destroy

6         the other recordings, correct?

7    A    Yes.

8    Q    Were you -- and I don't remember, I'm sure it's in

9         the record, but I'm just going to ask because it's

10        quicker than looking up the transcript.

11            Were you involved in the original interview with

12        Ryan Thao?

13   A    No, I was not.

14   Q    Or Mikey Thao?

15   A    I was not.

16   Q    Or Watou Lee?

17   A    No, I was not.  Not the original interviews.

18   Q    Just the reinterviews that occurred.

19   A    Correct.

20   Q    Before you went out on the reinterviews, did you have

21        a discussion with Sergeant Thao about what these

22        three individuals had told him the first time

23        around?

24   A    Yes.

25   Q    What did he tell you with respect to Ryan Thao had
```

1       told him?

2   A    I -- I don't recall specifically. I -- just in

3       general terms that they were near.

4   Q    By "they" are you referring to all three people

5       now?

6   A    Yeah.  Because I don't know specifically who, if we

7       broke down the fact what each individual had spoken

8       of, just that they were in that area and had

9       witnessed some of what had taken place. They were in

10      the foyer area, and -- but I don't -- I can't recall

11      specifically what information he exchanged with me as

12      to what they previously had said.

13  Q    So any information you have about the content of

14      these witnesses really comes from the reinterviews

15      that you were present at.

16  A    Absolutely.

17  Q    And who made the decision to destroy these

18      recordings?

19  A    It was a -- a discussion that as an investigative

20      group we had talked about as far as the investigators

21      that were involved with the case as to what do we do

22      with this information.  So Sergeant Thao, myself, I

23      believe Sergeant Cary Meyer was involved with that

24      discussion, Sergeant Dan Tauber, I believe Lieutenant

25      Gostisha was also involved.

1   Q   And if I understood your testimony correctly from the
2       May hearing, the District Attorney's office was not
3       advised that these recordings were going to be
4       destroyed, correct?  Or was advised.  Which one?
5   A   Going to be advised?  I don't -- I don't recall -- I
6       know they were notified that these recordings had
7       existed and we did not retain them.
8   Q   Okay.  And they had been notified of some kind of
9       summary of what these witnesses had to say?  Were
10      they notified before the destruction of the
11      recordings?
12  A   I did not have a discussion with them in reference to
13      that.  I believe we talked in general terms.
14  Q   All right.  What do you mean by "general terms"?
15      Could you explain that please?
16  A   There were people who had provided some information
17      who requested not to be identified because of fear of
18      their own safety, that if they were identified some
19      harm could come to them as a result of Chong Lee's
20      gang connections, and were fearful for their lives.
21      And we stated that based upon, I guess, our
22      interpretation of what we refer to as the Monfils
23      Law, is that if a request like that is made, that we
24      also were aware that the fact that if we retained any
25      records that they would become part of discovery and

47

```
 1            would have to be turned over to -- to Chong Lee, thus
 2            violating the Monfils -- our interpretation of the
 3            Monfils Law, that we would be violating the Monfils
 4            Law if we retained those items, recordings, and any
 5            notes associated with them.  So before the discovery
 6            request came to be part of this process, we decided
 7            not to retain those so we would not violate their
 8            request based upon the -- our interpretation of the
 9            Monfils Law.
10    Q    What is the Monfils Law?
11    A    It's -- it really falls under an open records
12            request.  And it's -- it's based upon Tom Monfils who
13            actually reported a theft of a -- I guess, if you
14            want to get into it, a theft of electrical cord while
15            working in a mill and then --
16    Q    Okay.  Just to cut short, everybody knows what the
17            Monfils homicide case is about.
18    A    Okay.
19    Q    You're saying you believe it to be part of the
20            Wisconsin open records law?
21    A    Yes.
22    Q    But you don't know a statute number of course,
23            right?
24    A    Not offhand.
25    Q    Okay.  Now, there were other witnesses in this case
```

48

```
1          that also did not want -- that also said they were
2          afraid, didn't want to get involved, didn't want
3          their identity turned over.  These three people,
4          Thao, Thao and Lee, they weren't the only people that
5          said that, were they?
6     A    Correct.
7     Q    Right.  But yet those names were turned over in
8          discovery.
9     A    The individuals I talked to, it was a process where a
10         lot of people expressed that they didn't want to talk
11         to us or did not want to be identified as witnesses
12         in this case.  The individuals I talked to directly
13         who were initially named in this report, with the
14         exception of Jared Randall and Johnny Thao, I was
15         able to convince or persuade that we could use their
16         information in the investigation.  That's my
17         direct -- obviously I did not have the direct contact
18         with them, with the three individuals you're
19         referring to, so for that reason, that's why I was
20         part of the initial discussion, because I had
21         information from Jared Randall and Johnny Thao that
22         also part of the discussion was they were also
23         identifying someone who has requested not to be
24         identified for safety concerns, so that's -- played
25         the part of not providing their information, and we
```

49

```
 1              also weighed the fact that they were not direct
 2              witnesses to the incident, were not even in the bar
 3              when the incident took place.
 4        Q     Okay.  But you're aware there were other witnesses
 5              who asked to not be identified who were turned over
 6              in discovery, correct?
 7        A     I'm not sure, unless you name a name, who you're
 8              referring to.
 9        Q     What about Alyson Blom?
10        A     I never had a conversation with Alyson.
11        Q     Well, what about -- okay.  So you said there were
12              some witnesses you personally had talked to who
13              initially didn't want to be identified and you were
14              able to persuade them that this information would be
15              turned over to the District Attorney, correct?
16        A     Well, would be included in the report and eventually
17              turned over to the District Attorney's, correct.
18        Q     Is one of those people named Kasie, K-A-S-I-E, middle
19              initial L., Coel, C-O-E-L?
20        A     I'm not sure who that is.
21        Q     Okay.  Well, was one of those individuals Joe Thor
22              who didn't want to originally be identified but --
23        A     I don't -- I don't know if Joe Thor specifically
24              said, you know, I don't want my name in the report.
25              I think it was obvious with Joe Thor and our
```

| | | |
|---|---|---|
| 1 | | interaction with him that he was directly involved in |
| 2 | | this, because we identified him as being in there and |
| 3 | | on the video, and he was a friend of Chong's. |
| 4 | Q | What about Tom Lee, was that one of the individuals |
| 5 | | who had asked to not be identified initially? |
| 6 | A | I didn't talk to Tom Lee during this interview. |
| 7 | Q | Who did you talk to who initially told you they |
| 8 | | didn't want to be identified and you were able to |
| 9 | | persuade that they -- the information they had given |
| 10 | | should be released to the District Attorney's |
| 11 | | office? |
| 12 | A | I can let you know Sarah Besaw, who testified here in |
| 13 | | court, was an individual who did not want to be |
| 14 | | identified. That's the -- one individual that comes |
| 15 | | to mind right away. Without looking through my list |
| 16 | | of people I had spoken to, I can't think of -- I |
| 17 | | don't want to name someone and be incorrect, so I'd |
| 18 | | have to look at and review each of the interviews. |
| 19 | Q | And you're saying in each one of those interviews you |
| 20 | | were able to, while recording those interviews, talk |
| 21 | | the people into allowing their information to be |
| 22 | | given to the District Attorney? |
| 23 | A | Well, yeah, even the follow-up interview with -- I'm |
| 24 | | trying to think if it was Mikey Thao or -- one of the |
| 25 | | three that were initially not retained, and then the |

51

1    follow-up interview, I spoke with Mikey, I believe it
2    was Mikey, for probably a half hour to 45 minutes
3    trying to get his permission to now use his name in
4    the report.
5  Q Are you sure that wasn't Ryan Thao?
6  A It could have been, that's why I was hesitant to say
7    which one it was.
8  Q Okay.  Were you -- have you been involved in an
9    attempt to see whether or not since the last hearing
10   any of the recorded interviews of Ryan Thao, Mikey
11   Thao and Watou Lee could be retrieved from the
12   Appleton Police Department?
13 A I -- I mean did I myself search for them?  I know
14   that there was requests made in our IT department, I
15   know that Sergeant Thao's computer as well as a
16   handheld recorder, as well as Sergeant Cary Meyer's
17   computer and handheld recorder were all searched for
18   those items.
19 Q Why was Sergeant Meyer's computer and handheld
20   recorder searched?
21 A Because he was involved with one of the interviews, I
22   believe, the initial interviews of one of the
23   individuals.
24 Q And had he recorded that?
25 A I'm not sure.  We were just trying to fulfill your

52

| 1 | | request to look for it wherever we could. |
| 2 | Q | Okay. All right. So as I understand the District |
| 3 | | Attorney was aware of the general existence of these |
| 4 | | witnesses, that there were witnesses who did not want |
| 5 | | to come forward and became aware at some point that |
| 6 | | these recordings were not being retained. |
| 7 | A | I believe they were notified after the decision was |
| 8 | | already made and the items were no longer retained. |
| 9 | Q | Okay. And the items -- the destruction of the items |
| 10 | | occurred sometime in the middle of 2014, correct? |
| 11 | A | I would not say the middle of 2014. My belief is |
| 12 | | that it was done much sooner than that. |
| 13 | Q | Okay. So you think it was earlier in 2014? |
| 14 | A | Correct. |
| 15 | Q | And the District Attorney was notified shortly after |
| 16 | | the materials were destroyed, correct? |
| 17 | A | I -- I mean I believe it was after everything was |
| 18 | | destroyed, but I don't remember if it was shortly |
| 19 | | after. I mean there was a lot of ongoing discussions |
| 20 | | in reference to the investigation as it was |
| 21 | | continuing throughout this process. |
| 22 | Q | Are there e-mails memorializing those discussions? |
| 23 | A | No, I don't believe so. |
| 24 | Q | So the discussions happened in person? |
| 25 | A | Correct. |

53

```
 1   Q    But they're not in writing.

 2   A    Correct.

 3   Q    And how were -- since these reports were destroyed,

 4        how were you and Sergeant Thao able to remember the

 5        names of the people?

 6   A    Sergeant Thao were familiar with the three

 7        individuals -- well, two -- couple different ways.

 8        Sergeant Thao knew the individuals in essence because

 9        he -- they attended -- some of the individuals

10        attended his church.  The other process is they were

11        identified in the video from Luna and their names

12        were also attached to the white board underneath when

13        we took snapshots of that video, and then when they

14        were -- that was turned over to you, they were

15        identified to the defense through discovery process,

16        and that's also what prompted us to recontact them.

17             ATTORNEY VISHNY:  Okay.  I don't have

18        anything further right now.

19             THE COURT:  Attorney Schneider, any

20        follow-up.

21             ATTORNEY SCHNEIDER:  Just one second.

22                     **EXAMINATION**

23   **BY ATTORNEY SCHNEIDER:**

24   Q    And I think it's clear, you weren't involved in the

25        December interviews of Ryan, Mikey or Watou, correct?
```

54

```
 1    A    Correct.

 2    Q    And you only talked generally with Sergeant Thao

 3         before going to interview them in April of this year

 4         about what they had earlier disclosed?

 5    A    Correct.

 6    Q    But when you spoke to any of the three, did either

 7         express any difficulty in recalling what they saw?

 8    A    No.

 9              ATTORNEY SCHNEIDER:  Nothing further.

10              THE COURT:  Attorney Vishny, does that

11    prompt any follow-up?

12              ATTORNEY VISHNY:  No.

13              THE COURT:  Sir, I don't have any questions

14    for you.  You may be seated.

15              ATTORNEY SCHNEIDER:  I actually am not

16    going to call Sergeant Thao at this time.

17              ATTORNEY VISHNY:  I am.

18              THE COURT:  Okay.

19              ATTORNEY VISHNY:  Actually, let me think

20    about it.  I want to take a look at his testimony.

21              THE COURT:  That's fine.

22         And then, Attorney Schneider, are we at your

23    time to go to pretrial?

24              ATTORNEY SCHNEIDER:  No.  We got about ten

25    more minutes.
```

```
 1                   ATTORNEY VISHNY:  We have ten more minutes?
 2                   ATTORNEY SCHNEIDER:  If we let Judge
 3          Biskupic know I'm running five minutes behind.  I can
 4          go check.  He's in the middle of a jury trial.  We
 5          were taking our stuff up during what we anticipated
 6          were jury deliberations which, my belief, is what's
 7          going on.
 8                   THE COURT:  And how long -- do you have any
 9          idea on how long the pretrial will take?
10                   ATTORNEY SCHNEIDER:  We have 14, 15 issues.
11          We also have a date on June 30th, but the defense
12          attorney drives up from Milwaukee for that hearing as
13          well, so I think we were trying to get as much done
14          today as we could.
15                   ATTORNEY VISHNY:  Judge, you know what, at
16          this time I'm not going to call him either, so I
17          think the testimony is closed since neither party
18          will call him.
19                   THE COURT:  Sounds goods.
20                   ATTORNEY VISHNY:  I will do that.  If for
21          some reason I have really made a huge mistake here, I
22          may ask the court's indulgence to reopen it, but at
23          this time I'm not planning to do so.
24                   THE COURT:  I will allow you to reserve
25          that request.
```

56

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ATTORNEY VISHNY:  Thank you.

THE COURT:  Then are we expecting -- I know we have already some fully briefed items.  I'm rendering a decision in August on the Facebook issue. And then additionally --

ATTORNEY VISHNY:  Right.

THE COURT:  Are we expecting -- and I apologize if we've already set dates on this.  Am I expecting further briefing on this issue?

ATTORNEY VISHNY:  I'm not sure yet.  I really have to think about all of this testimony that's occurred, the new reports that I've just received, I haven't listened to the recordings, I need to research the law.

THE COURT:  All right.

ATTORNEY VISHNY:  I will be frank with the court and let you know that I'm not going to get it done before July 27th.

THE COURT:  That's okay.

ATTORNEY SCHNEIDER:  And I said to Attorney Vishny before we started that I thought because we had just given them some of that new stuff, elicit the additional testimony, and now they're going to need to assess any additional filings they need to do, which is what prompted me to think we should also

```
1        set maybe an October date as well as a December
2        date.
3                THE ATTORNEY VISHNY:  That would be fine,
4        because I think the issue here is whether or not what
5        occurred here should lead to the suppression of the
6        testimony, so --
7                THE COURT:  And when you talk about
8        suppression of the testimony, are we particularly
9        referencing Ryan, Mikey and Watou?
10               ATTORNEY VISHNY:  Yes.  I haven't had a
11       chance to seriously assess these other two witnesses,
12       but they're not eyewitnesses to what actually
13       occurred, so there is -- they're somewhat peripheral
14       in this whole process.
15               THE COURT:  All right.
16               ATTORNEY VISHNY:  Or any other -- I don't
17       know.  I mean, I haven't researched the case law on
18       this.  What I would like to say is that I will do the
19       research, and by the next court date --
20               THE COURT:  Why don't we -- why don't we do
21       this.  We have --
22               ATTORNEY VISHNY:  -- I'll just let you
23       know.
24               THE COURT:  We have the August dates.  Let
25       me know at the August date whether or not you want to
```

58

```
1       further brief this, what you want to do.

2                   ATTORNEY VISHNY:  Correct.  And if I want

3       to call anymore witnesses, I can do that on that date

4       too.

5                   THE COURT:  That's right.  Then we can

6       address it, then I can have that prepared for the

7       October decision, and hopefully that still gives

8       everyone enough time, in which case we will also get

9       today for you an October date as a closer pretrial,

10      and then we may even put in another last minute one

11      shortly before in December.  So we'll see -- provided

12      everyone is able, we'll see if we can get those dates

13      right now.

14                  ATTORNEY VISHNY:  I don't know if we have

15      something available the week of October 5th.  Now

16      that I'm back into the fall semester again, my best

17      days for court are Tuesdays, Thursdays and Fridays

18      because I have a lunch hour class on Monday and

19      Wednesday.  So I'm -- but I'm wide open basically the

20      week of October 5th and the week of October 12th.  I

21      have a homicide trial -- I'm out of town part of the

22      week of October 19th, and I have a first-degree

23      homicide trial in Milwaukee County on October 26th

24      that will, you know --

25                  ATTORNEY SCHNEIDER:  I'd say let's look at
```

59

```
1        the week of the 5th.
2                    ATTORNEY VISHNY:  Either the 6th, 8th or
3        9th are all good for me.
4                    THE COURT:  That's fine.  We'll see if we
5        can get it during that week.
6                    THE CLERK:  October 6th at 1:00?
7                    ATTORNEY VISHNY:  That's great.
8                    THE COURT:  And then I'm -- I -- I've asked
9        that we set aside two hours for that just so that we
10       have sufficient amount of time.
11                   ATTORNEY VISHNY:  Yeah.  Okay.
12                   THE COURT:  And then, additionally, we'll
13       see if we can get a final, final pretrial maybe a
14       week or two before the actual trial.
15                   THE CLERK:  November 16th at one?
16                   ATTORNEY VISHNY:  At one?  You know, the
17       week of November 16th is probably what I call a trial
18       week.  Trials begin at four p.m.  So a morning court
19       date, because I no longer have noon classes then but
20       I have to be back by four.
21                   THE COURT:  Let's see if we can get you in
22       the morning.  We'll try to do it mid-morning so that
23       allows you drive time.
24                   ATTORNEY VISHNY:  I can come in the night
25       before too.  It's not that big a deal.
```

```
 1                    THE COURT:  9:30?

 2                    ATTORNEY VISHNY:  Which day did we say?

 3                    THE COURT:  Same date, the 16th.

 4                    ATTORNEY VISHNY:  The 16th at 9:30?  Sounds

 5          goods.

 6                    THE COURT:  Very good.

 7                 Anything else then today, attorneys?

 8                    ATTORNEY VISHNY:  Not today.

 9                    ATTORNEY SCHNEIDER:  Not that I can think

10          of, Judge.  Thank you.

11                    THE COURT:  Very good.  Then we will be

12          adjourned.

13                       (Proceedings concluded.)

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2

 3                    C E R T I F I C A T E

 4

 5   STATE OF WISCONSIN      )
                            ) ss.:
 6   COUNTY OF OUTAGAMIE     )

 7

 8

 9           I, JOAN BIESE, RMR/CRR, do hereby certify that I
     am the official court reporter for Branch IV of the
10   Circuit Court of Outagamie County;

11           That as such court reporter, I made full and
     correct stenographic notes of the foregoing proceedings;
12
             That the same was later reduced to typewritten
13   form;

14           And that the foregoing proceedings is a full and
     correct transcript of my stenographic notes so taken.
15

16           Dated this 23rd day of June, 2015.

17

18
                            _____
19
                            JOAN BIESE, RMR/CRR
20

21

22

23

24

25
```

62