1    STATE OF WISCONSIN     CIRCUIT COURT     OUTAGAMIE COUNTY

2    ─────────────────────────────────────────────────────

     **STATE OF WISCONSIN,**

3
                  Plaintiff,

4    v.                                  **Case No. 13-CF-1074**

5    **CHONG LENG LEE,**          ORIGINAL

6                  Defendant.

                                          ┌─────────────────────────┐
7    ─────────────────────────────────── │ CLERK OF CIRCUIT COURT   │
                                          │ OUTAGAMIE COUNTY FILED   │
                     **MOTION HEARING**   │                          │
8    ─────────────────────────────────── │    OCT 1 5 2015           │
                                          │                          │
9                                         └─────────────────────────┘
     BEFORE:        **HONORABLE GREGORY B. GILL, JR.** AT_____O'CLOCK
10                  Circuit Court Judge, Branch IV
                    Outagamie County Justice Center
11                  Appleton, WI  54911

12
     DATE:          **September 29, 2015**
13

14   APPEARANCES:   **CARRIE SCHNEIDER**
                    District Attorney
15                  Appearing on behalf of the State

16                  **ANDREW MAIER, ALEXANDER DUROS** and **PETER HAHN**
17                  Assistant District Attorneys
                    Appearing on behalf of the State
18
                    **DEBORAH VISHNY** and **EVAN WEITZ**
19                  Attorneys at Law
                    Appearing on behalf of the Defendant
20
                    **CHONG LENG LEE**
21                  Defendant
                    Appearing in person
22

23

24   Joan Biese
     Official Reporter, Branch IV
25   Outagamie County


                              1                      Exhibit 13

```
1                          I N D E X

2

3   WITNESSES                                          PAGE
```

```
4   NEAL RABAS
        Examination by Attorney Vishny....................  13
5       Examination by Attorney Schneider................  48
        Examination by Attorney Vishny...................  74
6       Examination by Attorney Schneider................  82
        Examination by Attorney Vishny...................  83
7       Continued examination by Attorney Vishny.......... 112
        Examination by Attorney Schneider................ 113
8
    CHUE LEE THAO
9       Examination by Attorney Vishny...................  84
        Examination by Attorney Schneider................ 103
10      Examination by Attorney Vishny................... 110
        Examination by Attorney Schneider................ 111
11
    ERIC HOLDORF
12      Examination by Attorney Vishny................... 155
        Examination by Attorney Schneider................ 160
13      Examination by Attorney Vishny................... 162
```

```
14

15

16

17  EXHIBIT
```

```
18  1 - Photo -- White Board............................  35
```

```
19

20

21

22

23

24

25
```

**TRANSCRIPT OF PROCEEDINGS**

2      THE COURT:  We are on the record in

3   13CF1074, *State of Wisconsin v. Chong Lee.*

4      Mr. Lee appears in person, along with his

5   counsels, Attorneys Deja Vishny and Evan Weitz.

6   Representing the State of Wisconsin, Outagamie County

7   District Attorney Carrie Schneider.  Also seated at

8   counsel table is Assistant District Attorney Alex

9   Duros.

10      This matter is scheduled today for an oral

11   ruling on several motions, one of which relates to

12   the Facebook issue, of which there has been some

13   significant testimony and submissions.  The second

14   issue relates to concerns over a statement briefly

15   paraphrased as "beat this case".

16      That said, before I get to the decisions, let me

17   ask, Miss Schneider, are there other items that you

18   wish to address this morning?  And then I will make

19   the same inquiry of defense counsel.

20      ATTORNEY SCHNEIDER:  And I tried yesterday

21   to kind of come up with a list of issues that I had

22   that were remaining.  Some are just for us to talk

23   about for scheduling for our November court dates.

24      Last week Attorney Vishny sent us a list of --

25   I'm going to call it like four items.  She was

Case 2:22-cv-00620-WCG    Filed 11/11/22    Page 3 of 169    Document 26-14

330-3

```
1     looking for responses or just additional information
2     on those four items.  I had Sergeant Rabas, the same
3     day, forwarded it to him.  He started working on
4     that.  We got a response from Sergeant Rabas.  I
5     shared that electronically, the reports, with
6     Attorney Vishny yesterday and then today gave her the
7     hard copy, and there is a disk with some -- two
8     recordings.  I think from her discussions or our
9     discussions she has some additional questions for
10    Sergeants Chue and Sergeant Rabas, some on the same
11    issues we were dealing with in May and June, maybe
12    some additional questions on these four items she had
13    on the list, so she wants to take some additional
14    testimony from them.
15        I think then the plan is on those items we would
16    ask and try to establish a briefing schedule of when
17    things can be due over the next several weeks.  We
18    have -- the court never really set a date for witness
19    list, verdict form, jury instructions.  We can
20    probably talk about that.  I mention that because one
21    of the things my investigators have on their to do
22    list is running prior conviction checks on witnesses,
23    and so they can start working on that, but it's
24    something we can then address on the November dates.
25    I don't think we've ever set a motion date or a
```

4

```
1    deadline for -- I call it like the generic
2    housekeeping motions, how many alternates,
3    sequestration, some of those generic things, so we
4    could probably set a deadline for those prior to the
5    November dates.
6        I will provide some additional information on a
7    couple other items we've talked about at previous
8    hearings, some are just issues Miss -- Attorney
9    Vishny and I have to further discuss.  I can provide
10   an update on the transcript issue.
11       But I don't have anyone that I would be calling
12   as a witness today.  Obviously I might have questions
13   for Sergeant Rabas and Sergeant Thao based upon
14   questions Attorney Vishny or Weitz might ask, but
15   that's kind of the list of the things I had for us to
16   look at today.
17            THE COURT:  Okay.  And you had discussed
18   the previous motion and some items that would be
19   turned over, and I know we had spent some time at the
20   last hearing, and I -- I was looking over that
21   transcript, but there was concerns as it related to,
22   I believe, the interviews of three individuals.
23   There were initial interviews, there was going --
24   those were subsequently deleted, and I know that
25   there was some concern about that, but there was
```

5

1    going to be an effort to obtain those recordings in

2    hopes that some backup may be located on a server or

3    something.

4                ATTORNEY SCHNEIDER:  And I think we

5    provided some updates between the May and the June

6    hearings because we checked some locations, but I can

7    tell you since June they've continued to look in

8    different locations.  Sergeant Meyer has since

9    retired, and I think the court was aware of that

10   because of scheduling with him last time.  There's

11   been a look there.  Sergeant Thao even told me today

12   that they sent his digital recorder at some point to

13   some other place for it to be checked to see if

14   anything was still on there that might have been

15   deleted previously.  So we've not found any of those

16   original recordings, which is kind of what we --

17   where we were last time.  We gave an update to what

18   we had checked, they were checking some additional,

19   but I think at this point they've looked everywhere

20   they can think of and looked on backups and in the

21   computer and in the overall evidence BEAST system,

22   and those they cannot locate.

23                THE COURT:  So, okay, Attorney Vishny, any

24   additional issues that you would like to have

25   addressed today other than those outlined by Attorney

Schneider?

ATTORNEY VISHNY: One minute, Judge.
Sorry. I'm just trying to be organized here.

THE COURT: No.

ATTORNEY VISHNY: First of all, I thought
today the court was going to rule on three issues,
the gang cross issue, the beat your case issue, and
the Facebook issue. I did not hear -- I mean, I have
been working on this, but I thought you just said
this morning the Facebook issue.

THE COURT: You heard two of the three. I
was of the impression, and maybe I'm misunderstanding
what you're asking, the -- I thought we had already
resolved the gang issue some time ago.

ATTORNEY VISHNY: Well, I think the
question was if I cross-examined -- what hasn't
really been ruled on is how much cross-examination I
get to get into without, quote, unquote, opening the
door. Because what happens in these interrogations
of these witnesses, definitely Joe Thor, and I think
others as well, you know, I didn't refresh my memory,
but I know we've written on this, that, you know,
telling these people, well, you're in a gang so
therefore, you know, you're guilty, and this is not
what the exact words are, I'm just paraphrasing, but

1    inferring that they are guilty because they're in a
2    gang.  It was my position that the defense should be
3    allowed to cross-examine them, you know, not for the
4    purpose of showing that in fact Joe Thor or Paul Lee
5    is in fact in a gang, but for showing that when
6    interrogated by the police and confronted by the
7    police in this manner, that, you know, they had
8    substantial exposure for this homicide and that they
9    were suspects because of what the police believed
10   their affiliations to be, that that went to their
11   motives to testify untruthfully.  So, you know, we
12   had written a memo of law on that issue, and I don't
13   think we've had the specific ruling as to that issue.
14             THE COURT:  Okay.
15             ATTORNEY VISHNY:  So -- so that's different
16   than trying to prove they are in fact in a gang for
17   the truth of the matter asserted, and it's my
18   position that that should not open the door to the
19   State trying to prove Chong Lee is in a gang for the
20   truth of the matter asserted.  So that's another
21   ruling.
22        As far as the discovery issues, okay, so then
23   you're going to rule on the beat your case stuff
24   today.  Okay.
25        As far as the other issues that present

8

1        themselves in this case, there are other issues.

2        Number one, these translations.  They were to have

3        been provided completely to the defense by the August

4        court date which was canceled.  It's a month later.

5        We don't have them.  I'm asking the court to suppress

6        anything that we aren't provided with by today, and

7        I'd ask you for a ruling on that today so I know

8        that's going on.

9        Number two, I'm advising the State that we do --

10       defense is going to be calling an expert witness in

11       this trial.  I don't have the full report from my

12       expert yet, but there is an expert named James

13       T-R-A-I-N-U-M, he's a police practices expert,

14       retired homicide detective out of Washington DC, who

15       does quite a bit of case review, review of sentinel

16       events, is an expert at police interrogation and

17       appropriate methods.  He -- I retained him months

18       ago, but it's taken him a long time to review the

19       case, and it is not done yet, in order to do a full

20       report, and the fact that we're still missing

21       discovery in this case, which I'll get to in a

22       minute, but basically the essence of his testimony

23       will be too critique the handling of this case by the

24       Appleton Police Department, specifically that their

25       interrogation methods that they use of the witnesses

9

1    in the case are the kind that have been shown by

2    studies to lead to false statements.  So I'm putting

3    the State on notice that I do intend to call this

4    expert.  I'm not sure exactly when I can get a more

5    full report from him.  I will provide the State with

6    his curriculum vitae, I can do that sometime later

7    this week or next week, but I do have a copy of it on

8    my computer, I just forgot to print it out.  So

9    that's the next thing.

10        Next, we're still missing discovery in this

11   case, and that's why I want to question Rabas and --

12   Sergeants Rabas and Thao further about this.

13        And I -- I, frankly, do not believe that we have

14   had truthful responses to our inquiries.  Now I don't

15   know where the untruthfulness lies, but I intend to

16   show that in court today.

17             THE COURT:  Okay.

18             ATTORNEY VISHNY:  So are -- and, you know,

19   I'm filing another motion at the conclusion of this

20   testimony, and I'm going to ask for a briefing

21   schedule on suppressing evidence that has been

22   destroyed in this case because I -- I think there is

23   already ample evidence in the record that the

24   destruction -- the destruction was intentional and

25   willful, and I want to elicit a little bit more

10

1    testimony about this.

2            THE COURT:  Is this -- Attorney Vishny, is

3    this a new subject area or is this related to the

4    three interviews which we had talked about, and there

5    may have been reference to a couple other

6    interviews.

7            ATTORNEY VISHNY:  Yeah.  Not only are there

8    three interviews, we -- you know, we're getting stuff

9    yesterday of a witness that the State interviewed --

10   I mean the police department interviewed on December

11   11th, 2013, and a flimsy reason for why we weren't

12   given this claiming that his name was misfiled under

13   another name.  What kind of excuse is that for not

14   turning over a witness that was interviewed almost

15   two years ago?

16           We also believe that there are substantial other

17   witnesses who have been interviewed that have never

18   been provided to the defense.  Sergeant Rabas

19   basically as much testified to that when we were in

20   court.  He said that there were lots of eyewitnesses

21   for which they've never disclosed.  We're questioning

22   now what exists in these interviews based on what's

23   happened.

24           But I do need to elicit some further testimony,

25   and I don't really want to speak to this further.

11

```
1           So I don't know what order the court wants to
2       proceed in, if you want us to take the testimony
3       that --
4               THE COURT:  Why don't we take testimony
5       first, I'll render the decisions that I need to
6       render, and then we can set further scheduling.
7               ATTORNEY SCHNEIDER:  And if the court wants
8       to make notes - because I know your file is probably
9       very large with filings like ours - on the cross of
10      the gang topics, I have my notes that look like May
11      8th there was originally a filing submitted by
12      defense.  We responded on June 19th, and then they
13      responded on July 7th.  So if that helps the court
14      look for the documents related to that specific
15      issue.  I think we've all briefed it already, I feel
16      like we have, we're just waiting for the court to
17      give us some parameters of what's going to be
18      allowed.
19              ATTORNEY VISHNY:  I'd like to call Sergeant
20      Rabas then, and I would ask for Sergeant Thao to
21      please step outside.
22              THE COURT:  I will grant a sequestration
23      order.
24          And, Sergeant Rabas, if you would please come
25      forward to the witness stand, sir.
```

12

```
 1                      ATTORNEY VISHNY:  And I would ask, since
 2          there are other members of the department here, that
 3          they also step outside during this testimony so that
 4          they cannot listen to Sergeant Rabas just in case
 5          something comes up here that -- or puts me in a
 6          position of having to call them.
 7                      ATTORNEY SCHNEIDER:  It would just be
 8          Sergeant Tauber I would ask to step out.
 9                      ATTORNEY VISHNY:  Okay.  Thank you.
10                      (Oath administered to witness.)
11                      THE WITNESS:  I do.
12                      THE CLERK:  Please state your full name,
13          spelling it for the record please.
14                      THE WITNESS:  Neal Rabas, N-E-A-L
15          R-A-B-A-S.
16                              **EXAMINATION**
17     **BY ATTORNEY VISHNY:**
18     Q    Morning, Sergeant Rabas.
19     A    Good morning.
20     Q    Sergeant Rabas, you recall testifying in connection
21          with discovery issues in this case on May 26th at a
22          motion hearing where I called you as a witness?
23     A    Yes.
24     Q    And do you recall saying at that time that there were
25          only two witnesses who had been interviewed but tapes
```

13

```
1       not given to the defense that were connected with
2       this shooting other than other patrons in the bar?
3       Do you recall saying that?
4   A   Yes.
5   Q   Okay.  And in fact that is not true -- well, the two
6       witnesses at that time were subsequently identified
7       as Jared Randall and Johnny Thao, right?
8   A   Correct.
9   Q   And in fact it turns out that there are other witness
10      interviews that have not been previously disclosed
11      that we've been given since that time that you swore
12      under oath that there were only two witnesses on May
13      26th, correct?
14  A   Yes.
15  Q   And that included an interview with Letty Xiong,
16      X-I-O-N-G, correct?
17  A   Correct.
18  Q   And included an interview with Tim Jacobson, AKA
19      Jaco, J-A-C-O?
20  A   Correct.
21  Q   And Tim Jacobson was in fact interviewed on December
22      11th, 2013, correct?
23  A   Correct.
24  Q   And it's your claim that that was never turned over
25      because the report was misfiled under a different
```

14

| 1 | | name? |
|---|---|---|
| 2 | A | Correct. |
| 3 | Q | How did you discover that it was misfiled and what |
| 4 | | the name was? |
| 5 | A | After receiving an e-mail from you -- from District |
| 6 | | Attorney Carrie Schneider that was actually from you, |
| 7 | | it was forwarded from you, requesting an interview of |
| 8 | | Timothy Jacobson, J-A-C-O-B-S-O-N, I believe it is, |
| 9 | | and after receiving that e-mail, I looked once again |
| 10 | | through our evidence to see if that interview |
| 11 | | existed, if it was -- had been placed into evidence |
| 12 | | and discovered it in a different drive of our |
| 13 | | computer where we place items for evidence but had |
| 14 | | actually not been taken out of there and formally |
| 15 | | placed into evidence. |
| 16 | Q | Now, you, yourself are the person who had interviewed |
| 17 | | Tim Jacobson, correct? |
| 18 | A | Correct. |
| 19 | Q | And you have a distinct memory of interviewing him, |
| 20 | | don't you? |
| 21 | A | I do now, yes. |
| 22 | Q | So you're saying you just forgot when you testified |
| 23 | | on May 26th that you had interviewed him? |
| 24 | A | I didn't recall the -- the interview at that time.  I |
| 25 | | wasn't sure if -- if it coincided with the interview |

| 1 | | with Johnny Thao and Jared Randall. |
| 2 | Q | Yet his name had been mentioned in the Thao and |
| 3 | | Randall reports as somebody who had been involved |
| 4 | | with them but you just completely forgot that even |
| 5 | | though you had reviewed the Randall and Johnny Thao |
| 6 | | reports? |
| 7 | A | I think the question was if there was a report or a |
| 8 | | recording of that interview or if that existed, and |
| 9 | | that -- I answered truthfully at that time saying I |
| 10 | | didn't believe there was one that existed. |
| 11 | Q | Now, you had also done an interview with a Letty |
| 12 | | Xiong which had never been turned over, correct? |
| 13 | A | This -- there was an interview with Letty Xiong that |
| 14 | | was turned over, but the one you're referring to, I |
| 15 | | once again didn't know it existed until I received a |
| 16 | | recent e-mail. |
| 17 | Q | Okay. So the contact with Letty Xiong was -- |
| 18 | | actually, you interviewed her, right? |
| 19 | A | Correct. |
| 20 | Q | And in fact you wrote this e-mail in the first |
| 21 | | person, correct, I mean the e-mail, I'm sorry, the |
| 22 | | report that you recently wrote when you talked about |
| 23 | | Letty Xiong, this was something done in the first |
| 24 | | person, correct? |
| 25 | A | Referring to I interviewed her directly? |

16

```
 1   Q   Yes.

 2   A   Yes.

 3   Q   And it would be fair to say that this interview with

 4       Larry -- Letty Xiong included what could be fairly

 5       and reasonably called exculpatory evidence in as much

 6       Letty Xiong was questioned about giving Chong Lee a

 7       ride from Joe Thor's when she said she hadn't -- she

 8       had not seen him, correct, in connection with the

 9       Luna shooting?

10   A   I don't believe -- no, I don't believe so.  I don't

11       believe that is correct at all.

12   Q   Well, Letty Xiong, when you interviewed her, you

13       asked her on the date of this interview, on December

14       12th, 2013 -- first of all, that's the same day Chong

15       Lee was arrested, right?

16   A   Right.  In fact this interview took place like an

17       hour before he was taken into custody.

18   Q   Okay.  But it took place after being interviewed --

19       after interviewing Paul, right?

20   A   Correct.

21   Q   And Paul gave information about Letty Xiong having

22       been -- coming and picking Chong up, or he didn't?

23   A   Not to me.

24   Q   Okay.  But you were aware of it?

25   A   No.
```

17

```
 1   Q    Okay.  So you claim you were unaware of it, correct?

 2   A    Not during this first interview.  She was

 3        interviewed, I believe, like two or three days later

 4        when I questioned her in great detail about that,

 5        which you already have.

 6   Q    But on December 12th when you (sic) were interviewed

 7        you wrote in your report, you asked Letty if she

 8        talked to Chong and she said she hadn't, right?

 9   A    Correct.

10   Q    And that clearly can't be characterized as anything

11        other than exculpatory evidence, can it?

12             ATTORNEY SCHNEIDER:  I think I'm going to

13        object to that.  I mean, it's an officer.  And

14        defense and prosecution often have debates over

15        what's exculpatory or not, so, I mean, is it related

16        to the case, how did he view it, I don't mind those

17        types of questions, but ask him if he views it as

18        exculpatory or not is irrelevant because she may view

19        it as one way, you may view it different, and I'll

20        review it a third way.

21             ATTORNEY VISHNY:  That's fine.  I'll

22        rephrase the question.

23             THE COURT:  Please do.

24   Q    (BY ATTORNEY VISHNY)  You knew her statement was not

25        identical to a statement she gave later, correct?
```

18

```
 1   A   This was the first interview.  How would I know it's
 2       not identical to an interview that takes place later?
 3   Q   Did you review it, the one that took place later?
 4   A   Prior to when?  I'm not sure what --
 5   Q   Okay.  She was interviewed by you on December 12th.
 6       Who interviewed her the second time around?
 7   A   I did.
 8   Q   So you interviewed her within a few days of each
 9       other, right?
10   A   Correct.
11   Q   And you knew that she was telling you something
12       different in the second interview than she told you
13       in the first, right?
14   A   I don't -- I didn't -- during the first interview --
15       because the first interview primarily we were about
16       to serve a search warrant and take Chong into
17       custody, so the purpose of that first interview was
18       to determine whether Chong was in the house and if
19       she had recent contact with him, if she could verify
20       he was in the house.  The -- Letty had just left
21       Chong.  She was staying with Chong at the residence.
22       She was observed -- we had surveillance on the house.
23       She was observed leaving the house and a traffic stop
24       was conducted.  We had a SWAT team prepared to do a
25       search warrant at the house, so after she left the
```

19

1      residence, she was stopped.

2  Q   Okay.  Maybe you misunderstood my question.

3  A   And the purpose of it was to find out whether Chong

4      was in the house.  So the questions as to whether she

5      had talked to Chong or saw Chong was in reference to

6      officer safety concerns prior to executing a search

7      warrant on a person we wanted for a homicide.

8  Q   Well, that was part of it, but she also asked you if

9      Chong had done something wrong and you explained that

10     you thought he had done something wrong, correct?

11 A   Correct.

12 Q   And you also asked if she had talked to Chong and she

13     said she had not, correct?

14 A   Correct.

15 Q   And you asked her if she had heard who had done the

16     shooting and she said no, correct?

17 A   Correct.

18 Q   And you told her that what she would tell you would

19     not have to go in a report and that you would keep

20     some information from her confidential.  That's what

21     you said to her during this traffic stop, correct?

22 A   Correct.

23 Q   And then she said, you know who they are, and you

24     responded by saying, ACK, correct?

25 A   Correct.

20

```
 1   Q   So that certainly went beyond the scope of safety for
 2       conducting a search warrant, didn't it?
 3   A   I guess I wanted -- the questioning also was to see
 4       what knowledge she had in reference to the shooting
 5       that took place at Luna.
 6   Q   Okay.  And you were aware when you interviewed her a
 7       few days later that you had some different responses,
 8       correct?
 9   A   Correct.  She provided more information at a later
10       date because I also had more information at that
11       point.
12   Q   And nonetheless, it was chosen to not disclose the
13       report and the recording, if it exists, of this
14       earlier statement, correct?
15   A   You say chosen.  The recording was placed into --
16       it's a -- our J-drive where -- and it's -- it's where
17       we place recordings that we want to have placed into
18       evidence.
19   Q   Okay.  So you made a choice to not place her earlier
20       statement into evidence, right?
21   A   No.  I placed it into that drive, I just failed to
22       complete what we call a BEAST entry so that it would
23       have been taken out of that drive and placed into
24       evidence.
25   Q   Why did you fail to complete a BEAST entry?
```

21

1  A    Because we were conducting an investigation, and we
 2       conducted a number of interviews, and it was an
 3       interview that was placed in there, but one step of
 4       the process of having it taken out of there and
 5       placed into evidence was a mistake on my part.
 6  Q    Okay.
 7            THE COURT:  Let me just stop.
 8       Explain to me, Sergeant, when you -- when you do
 9       an interview, what is your normal protocol in terms
10       of -- I understand it was recorded, correct?
11            THE WITNESS:  Correct.
12            THE COURT:  What would be your normal steps
13       thereafter?  Because it sounds as if a step was not
14       completed, and I want to know what the normal steps
15       are, and then that may lead me to ask why it wasn't
16       done in this case.  But what are the normal steps?
17       Explain this to me.
18            THE WITNESS:  Normal steps as far as if
19       it's going to be placed into evidence?
20            THE COURT:  Well, you --
21            THE WITNESS:  Not all our recordings are
22       placed into evidence.
23            THE COURT:  Okay.  So you have this first
24       interview with Letty Xiong, correct?
25            THE WITNESS:  Letty Xiong.

22

```
 1              THE COURT:  Letty Xiong.  You ask Letty
 2     various questions, Attorney Vishny has eluded to some
 3     of them.  Afterwards, you now have a recorded
 4     conversation.
 5              THE WITNESS:  Correct.
 6              THE COURT:  At that point, what is your
 7     next step?
 8              THE WITNESS:  That conversation is recorded
 9     on a handheld digital recorder.  We take that
10     recording, we plug it into our computer, and there
11     are several drives that you can place it in.  One of
12     the drives is the J-drive under officer's digital
13     narratives, and each individual has their own file
14     for that.  After it's placed into that, you go to
15     what we call the BEAST.  It's our evidence computer.
16     Once it's placed into the officer digital narrative
17     file, the evidence technicians have access to it.
18     Prior to that, if you place it on your H-drive or
19     another location for you to review or to listen to,
20     they would not have it.  So once it's placed in the
21     J-drive under your officer digital narrative file,
22     they then have access to it, but we have to notify
23     them that it's there and what case we want it placed
24     into a secure evidence -- digital evidence file.  So
25     we would fill out what we call a BEAST label or an
```

23

1    entry into evidence documenting that this is some
2    evidence we want saved.  Once the ID techs receive
3    that, then they go in, and sometimes they remove the
4    entire file, sometimes they just move a copy or leave
5    a copy in the J-drive, my file, as well as then place
6    a copy into the evidence file associated with that
7    case.  So in my officer digital narrative file in the
8    J-drive I have hundreds of recordings from over the
9    years associated with numerous cases in that file.
10   With this Letty Xiong case, it was just labeled as
11   Letty Xiong and it didn't have the offense report
12   associated with it and there was not an evidence or
13   BEAST label completed for this digital audio
14   recording, and I didn't even know it existed -- I
15   knew I had done an interview with Letty Xiong prior
16   to the search warrant and taking Chong into custody;
17   however, I -- I wasn't sure I saved the recording
18   because in my view there wasn't much evidentiary
19   information, it was more for officer safety concerns
20   that this was recorded, so it wasn't until I received
21   an e-mail and again looked into the evidence file of
22   items that were placed into the file associated with
23   this particular case, and then I also went into the
24   J-drive under my officer digital interviews and
25   looked through thousands or hundreds of recordings

24

1    and saw a recording labeled Letty Xiong and

2    discovered this recording that she's referring to

3    now.  So there was no intention to not enter this

4    into evidence, it was a mistake on my part

5    considering everything that was going on during that

6    part of the investigation - I believe we worked,

7    literally, I think, over 26 or 28 hours straight -

8    that I failed to do a BEAST entry so that that

9    recording would have been entered into the file

10   associated with this case.

11             THE COURT:  Now normally when you -- if I

12   understand correctly, you have the digital recording,

13   you transfer it to the J-drive.  Is there a normal

14   practice in terms of how quickly thereafter you would

15   create a label and have it put on to -- I think you

16   referred to it as the BEAST drive, is that

17   contemporaneous, is it days later, is there a general

18   rule on how that takes place?

19             THE WITNESS:  No.  It's -- obviously you

20   try to do it as soon as -- as soon as you make that

21   transfer so you don't forget to do it.  Just like any

22   other case, you try to do it at the same time.

23   Sometimes you'll -- you'll work a case and you'll

24   have numerous recordings and then you'll put all the

25   recordings into evidence at one time.  So it -- it

```
1       varies on the type of case you're working on, your
2       availability to do it, a lot of different
3       circumstances.  Ideally, yeah, as soon as you place
4       it into the J-drive you should complete the BEAST
5       label so that what happens in this case doesn't take
6       place.
7               THE COURT:  Thank you for that
8       clarification for me.
9               Attorney Vishny, go ahead.
10              ATTORNEY VISHNY:  Thank you.
11   Q   (BY ATTORNEY VISHNY)  All right.
12              Moving on from Letty Xiong, there are quite a
13      few witnesses in the bar who were interviewed, and
14      their interviews have never been provided to the
15      defense, correct?
16   A   Correct.
17   Q   Why haven't they been provided as part of this
18      investigation?
19   A   The -- the interviews that were of the patrons in the
20      bar that we felt were significant or related or had
21      information, direct information as far as witnesses
22      or so forth have been provided to you.  There is
23      approximately 200 people in the bar.  We did a
24      screening process of trying to determine of those 200
25      people which individuals may or may not have
```

26

1    knowledge of what took place, either saw something,
2    heard something, those types of things.  So we
3    documented everybody who was in the bar in case we
4    would need to follow up or had obtained additional
5    information and just to identify everybody that was
6    possibly there.  So the -- the individuals who were
7    in the bar has also been provided to you, and some of
8    those individuals, or most of those individuals were
9    talked to at one point during the night by an
10   officer, or possibly an investigator; however, they
11   were screened out to say that their information
12   wasn't relevant so there was no report done in
13   reference to that.
14 Q  Okay.  So let me just ask this.  In the discovery
15   that you provided in the file that we received, most
16   of these people have signs on them that say, like, no
17   or no information, correct?
18 A  Correct.
19 Q  But there are six witnesses who have other signs on
20   them indicating some follow up who we've never been
21   provided in discovery; isn't that accurate?
22 A  You identified six individuals --
23 Q  Correct.
24 A  -- that you feel -- and as far as I know, there was
25   no report, or there is -- as far as I know right now

27

```
 1          as of today there is no report or no recording
 2          documenting their interviews or what information
 3          those interviews may have had.
 4     Q    Have you refreshed your memory lately by looking at
 5          all of the witnesses to see whether there are reports
 6          for each and every one of them?
 7     A    Yes.
 8     Q    Or recordings?
 9     A    Yes.  After receiving your e-mail, I ran -- we --
10          because it's in a Word document, I'm able to run
11          their names through the entire 389 page report, and
12          none of their names you provided appeared in the
13          report at any point.  In fact, one of the names I
14          believe you had wrong, Danny Daivong you had, it's
15          actually Danny Saivong with an S. instead of a D.
16          Their names do not appear in the report.  Also, after
17          receiving that, for the first time I actually looked
18          at each of the photos.  Lieutenant Gostisha was
19          assigned to kind of look through those paper
20          documents each individual had to determine as to what
21          ones need to be followed up with further interviews,
22          but after receiving your e-mail, the first time I
23          actually looked through all those photos of every
24          patron that was there.  The three -- I think there
25          was 389 photos.  Is -- so I did refresh my memory in
```

28

```
1         that fashion.

2    Q    Is there a recording of Danny Saivong, S-A-I-V-O-N-G,

3         who is on Page 119 of that pdf file?  You just said

4         there was no report.  Is there a recording of his

5         interview?

6    A    No.

7    Q    Is there a recording of Chris Petrick, P-E-T-R-I-C-K,

8         who is on Page 248 of that file?

9    A    No.

10   Q    Is there a report on Chris Petrick?

11   A    No.

12   Q    Is there a report on Erica Geiser, G-E-I-S-E-R, who

13        is on Page 295 of that file?

14   A    No.

15   Q    Is there a report -- and is there a recording of

16        Erica Geiser?

17   A    No.

18   Q    Is there a report of Tracy Tennessen,

19        T-E-N-N-E-S-S-E-N, who is on Page 328 of that file?

20   A    No.

21   Q    And is there a recording?

22   A    No.

23   Q    Is there a report on Gina Seehawer, S-E-E-H-A-W-E-R,

24        who is on Page 366?

25   A    No.
```

29

```
1    Q    Is there a recording?

2    A    No.

3    Q    Is there a report on Jose Gonzales Rios, R-I-O-S, who

4         is on Page 91?

5    A    No.

6    Q    And is there a recording?

7    A    No.

8    Q    And you've recently investigated all of these to make

9         sure that that's correct?

10   A    Yes.

11   Q    Okay.  Were they interviewed?

12   A    Yes.  I mean, you say interviewed.  And all I -- I

13        can say with certainty that an officer talked to them

14        because they had a right to tell them -- to instruct

15        them to write their names, and, obviously, whether

16        they were -- did they see something or something, so

17        they were part of the screening process.  Now, which

18        officer or whether an investigator formally sat down

19        and did an interview with them, I don't -- I don't

20        know that.  I can tell you there is no recording or

21        no documentation of that.

22   Q    Could there have been a recording that was

23        destroyed?

24   A    Very possible, yes.

25   Q    How would you be able to access that information?
```

30

```
1   A    I cannot.

2   Q    Okay.  Now, going back to the fact that you testified

3        in court that there had only been two witnesses but

4        tapes not given to the defense, in addition to

5        Timothy Jacobson and Letty Xiong, actually, it turned

6        out that there was an interview of a guy named Adam

7        Richardson, right, that was recorded?

8   A    Was that an interview I did?

9   Q    Do you have Page 135 please?  Well, you put

10       together -- you assisted with putting together the

11       tapes of Johnny Thao and Jared Randall, correct?

12       When we finally got those recordings and the reports,

13       you're the person who put the recordings onto disk or

14       somehow transmitted them, right?

15  A    No.  I mean, I -- no, I did not.

16  Q    Okay.  Somebody else did; is that what you're

17       saying?

18  A    Yes, probably our D-techs who have been preparing all

19       the reports for you.

20  Q    Okay.  Were you aware that there was a recording

21       provided with Jared Randall and Johnny Thao of Adam

22       Richardson?  Were you aware of that?

23  A    You have to refresh my memory who Adam Richardson

24       is.

25                    ATTORNEY SCHNEIDER:  Just one second.
```

31

```
 1   Q    (BY ATTORNEY VISHNY)  So Adam Richardson is somebody
 2        who was interviewed regarding -- on Page 135 of the
 3        Bates stamped discovery who was interviewed by
 4        Sergeant Meyer.  Does that help refresh your memory
 5        at all?
 6   A    No, it doesn't, because I -- I don't recall what his
 7        role is or if that was a recording that was located
 8        or I'm not sure the circumstances of that recording
 9        or report.
10   Q    Well, it was turned over, the recording, between May
11        26th and June 18th to the defense.  Did you cause
12        that -- whether you actually physically downloaded
13        it, did you actually cause that to be turned over?
14   A    Well, as the assigned now lead investigator, yes,
15        I've been tasked to make sure that you have
16        everything that we have.
17   Q    So the answer is yes, as the assigned investigator,
18        your answer is yes, you caused that to be turned over
19        to the defense, right?
20   A    Yes.
21   Q    Okay.  Now, what about Kou, K-O-U, Lo, is there a
22        recording or report on him?
23   A    Can you refresh my memory with who Kou Lo is?
24   Q    Sure.
25   A    Or what the circumstances where he may have been
```

32

1     interviewed?

2  Q   Well, Jared Randall, who was interviewed way back

3        when but just turned over to us recently --

4                ATTORNEY SCHNEIDER:  Judge, when she asks

5        this question, she's looking at a copy I provided to

6        her.  I don't have another copy that I can refer to

7        as she's asking this question.  Can we just make

8        another copy of this so we both have one?

9                THE COURT:  Sure.  That's fine.  We'll take

10       a couple minute break.

11               ATTORNEY VISHNY:  I'm just going to -- I've

12       got like one question.  I'm not going to put it as an

13       exhibit.

14  Q   (BY ATTORNEY VISHNY)  In the Jared Randall report, he

15       advised -- Mr. Randall was asked if anyone else knows

16       who did the shooting, and Jared Randall said Kou Lo

17       was in the bar when it happened and knew.  Does that

18       help refresh your recollection?

19  A   Yeah.  I don't recall -- I don't know if Kou Lo or

20       Lor was ever formally identified or interviewed.  I

21       guess my answer to that is I don't know.

22  Q   Okay.  So -- but on December 11th when you

23       interviewed Jared Randall -- and you're the one who

24       wrote the report, right?

25  A   Correct.

33

| | | |
|---|---|---|
| 1 | Q | So you're saying you just don't know if this was |
| 2 | | followed up on, correct? |
| 3 | A | Correct. |
| 4 | Q | All right. And what about John -- John Nielson, |
| 5 | | N-I-E-L-S-O-N? Do you recall that at all? |
| 6 | A | I do not. |
| 7 | Q | He all -- do you recall Jared telling you that John |
| 8 | | Nielson may have also heard the shooting or whether |
| 9 | | that was followed up on or not? |
| 10 | A | If I documented in that report I remember him saying |
| 11 | | that, but I don't remember if a follow-up interview |
| 12 | | was done with John or not. |
| 13 | Q | Okay. Now, one of the witnesses we asked you about |
| 14 | | was Noah Vang, correct? |
| 15 | A | Correct. |
| 16 | Q | And you say that Noah Vang was never interviewed, |
| 17 | | correct? |
| 18 | A | Not in reference to this investigation. |
| 19 | Q | Okay. On the white board there is a list of every |
| 20 | | witness who was interviewed, correct? |
| 21 | A | No. The -- I think it was a list of everybody that |
| 22 | | we were able to identify that was in the bar. |
| 23 | Q | Actually, there is a specific list of people who were |
| 24 | | thought to be somehow involved in this case and |
| 25 | | whether or not these people had been interviewed, |

34

```
1      correct?

2                  ATTORNEY SCHNEIDER:  I think I'm going to

3      object.  That calls for speculation.  She's referring

4      to notes on a board.  She might want to just show the

5      officer the notes and he can explain if he remembers

6      what --

7                  ATTORNEY VISHNY:  I'm preparing to do

8      that.

9                  THE COURT:  Very good.  I'll sustain it on

10     foundation.

11  Q  (BY ATTORNEY VISHNY)  I'm showing you what's been

12     marked as Exhibit No. 1.  This is a list of people on

13     a white board who were thought to have some

14     information or connection with this case who were

15     interviewed, correct?

16  A  Correct.

17  Q  All right.  And one of the people's names -- there is

18     a list of people under the word interviewed, right?

19  A  Correct.

20  Q  And there is check marks by each of those names

21     indicating they were interviewed.

22  A  Correct.

23  Q  One of those names is Noah Vang, V-A-N-G.

24  A  Correct.

25  Q  And there is a check mark indicating he was
```

35

```
 1        interviewed, right?

 2    A   I'm thinking as to --

 3    Q   I'm just asking you about the exhibit.

 4    A   I'm trying to think if the significance of the check

 5        mark is that they were interviewed, but there is a

 6        check mark next to his name, yes.

 7    Q   Not only is there a check mark, there's a number next

 8        to his name, 9202.

 9    A   Correct.

10    Q   And that is a number that goes with an officer in the

11        Appleton Police Department, isn't it?

12    A   Correct.

13    Q   Who is 9202?

14    A   I believe that's Sergeant Chad Probst.

15    Q   Okay.

16              ATTORNEY VISHNY:  I'd move Exhibit 1 into

17        evidence.

18              THE COURT:  Any objection?

19              ATTORNEY SCHNEIDER:  No.

20              THE COURT:  Exhibit 1 shall be received.

21    Q   (BY ATTORNEY VISHNY)  So, according to that document,

22        Sergeant Chad Probst would have interviewed Noah

23        Vang, right?

24    A   The -- I want to answer this correctly.  So the -- if

25        you're saying -- if you refer to that document in the
```

36

```
 1          way you presented it and you want to interpret it,

 2          that's what it would say, but I don't believe that's

 3          what took place.

 4    Q     Well each of the other names that was checked on that

 5          document have been interviewed, correct?

 6    A     Correct.

 7    Q     All right.  Now, I'm going to ask you some questions

 8          now about the destroyed recordings for Ryan Thao,

 9          Mikey Thao and Watou Lee, correct -- I mean, not

10          correct, I'm letting you know that.  Sorry.  I'm

11          getting a little carried away here.

12              Now, when you testified on May 26th, you said

13          that these recordings were destroyed because these

14          witnesses didn't want their identities disclosed,

15          right?

16    A     Yes.

17    Q     And that you and other members of the Appleton Police

18          Department didn't want to disclose their identities

19          to the defense and that they were only now

20          reinterviewed because you discovered that they had

21          been inadvertently turned over on the white board,

22          correct?

23    A     Correct.

24    Q     But in fact Johnny Thao and Jared Randall had also

25          asked to not have their identities disclosed but
```

37

| | | |
|---|---|---|
| 1 | | those recordings weren't destroyed, right? |
| 2 | A | Correct. |
| 3 | Q | So why were these three destroyed but not the reports |
| 4 | | of Johnny Thao and Jared Randall? |
| 5 | A | I'm assuming it's because different officers were |
| 6 | | involved with the recordings. |
| 7 | Q | Well, actually, it was a group decision to destroy |
| 8 | | these recordings, wasn't it? |
| 9 | A | Correct. |
| 10 | Q | I mean, according to the testimony, there was a |
| 11 | | meeting between the various investigators involved in |
| 12 | | this case and a deliberate decision was made eight |
| 13 | | months after these interviews to destroy these |
| 14 | | recordings. |
| 15 | A | Correct. |
| 16 | Q | So it's not just a random decision made by one |
| 17 | | particular interviewer to destroy the recordings, |
| 18 | | right? |
| 19 | A | Well, no, because the process, and I think I kind of |
| 20 | | explained that, is each individual officer has a |
| 21 | | different process. I had the recordings for Jared |
| 22 | | Randall and Johnny Thao. The -- Sergeant Thao had |
| 23 | | the recordings for Watou -- the other three |
| 24 | | individuals. |
| 25 | Q | But it was still a group decision that was |

38

| 1 | | specifically discussed by your team in terms of |
|---|---|---|
| 2 | | destroying these recordings, right? |
| 3 | A | Correct. In fact -- |
| 4 | Q | They specifically discussed so that the defense could |
| 5 | | not access them, correct? |
| 6 | A | So we wouldn't violate the Monfils Law and protect |
| 7 | | witnesses. |
| 8 | Q | Well, you know that the Monfils Law has to do with |
| 9 | | open records and that an open, pending case is not |
| 10 | | subject to an open records request, correct? |
| 11 | A | Well, we knew -- first, to answer your question, the |
| 12 | | reason those two recordings were still here was, |
| 13 | | again, just out of the number of recordings, I didn't |
| 14 | | believe that they were actually retained until we had |
| 15 | | a request -- a further request to look for them and |
| 16 | | they were found. We thought they were not retained. |
| 17 | | So it was part of the group decision not to have them |
| 18 | | retained, but they were retained, and they weren't |
| 19 | | entered into evidence or located until you made that |
| 20 | | request again. |
| 21 | Q | Okay. Did you or members of your team consult with |
| 22 | | any legal counsel regarding what the Monfils Law |
| 23 | | actually meant or was that something that you just |
| 24 | | decided on your own? |
| 25 | A | I -- I think we discussed it and reviewed information |

39

| | | |
|---|---|---|
| 1 | | and our interpretation of it.  I don't know if we |
| 2 | | consulted with any legal counsel prior to making the |
| 3 | | decision. |
| 4 | Q | Okay.  And so what you say is because these were |
| 5 | | inadvertently turned over on the white board, that |
| 6 | | was the reason for reinterviewing these people, |
| 7 | | correct? |
| 8 | A | Correct. |
| 9 | Q | But when you and Sergeant Thao questioned Paul Lee at |
| 10 | | Norka, he talked to you about Mikey Thao, didn't |
| 11 | | he? |
| 12 | A | I would have to review that interview. |
| 13 | Q | Okay. |
| 14 | | ATTORNEY VISHNY:  Judge, in your file you |
| 15 | | have, because of previous motions, the transcript of |
| 16 | | the Paul Lee interview at Norka. |
| 17 | | THE COURT:  Yes. |
| 18 | | ATTORNEY VISHNY:  I don't know where you |
| 19 | | have it, but what I'm going to show -- I wasn't |
| 20 | | really going to have this marked as an exhibit |
| 21 | | because it's already in the court's file, I'm just |
| 22 | | going to show Sergeant Rabas the transcript, partial |
| 23 | | transcript.  I'm looking at - I hope we have the same |
| 24 | | page numbers - Page 16.  But if the court wants, when |
| 25 | | I'm done with this I can have it marked and moved |

```
 1         into evidence too if it's easier.  Doesn't really
 2         make me any difference.
 3              THE COURT:  Go ahead.
 4    Q    (BY ATTORNEY VISHNY)  I'm showing you an excerpt from
 5         the transcript where you and Sergeant Thao
 6         interviewed Paul Lee at Norka.  You remember doing
 7         that, right?
 8    A    I do.
 9    Q    And Mikey Thao's name appears in the interview with
10         Paul Lee, correct?
11              Well, just to make this a little bit easier, you
12         -- you and Sergeant Thao were questioning Paul Lee
13         regarding who he was hanging out with at Luna, right?
14    A    Correct.
15    Q    And he said Mikey Thao as one of those people,
16         right?
17    A    He said Mikey and then I verified if it was Mikey
18         Thao.
19    Q    Okay.  So Mikey Thao's name has come up besides the
20         white board, correct?
21    A    Correct.
22    Q    Okay.  And Mikey Thao's name had also come up because
23         there had been a traffic stop of the vehicle that he,
24         Watou Lee, and I'm not sure if it was Ryan or Johnny
25         Thao, but three of them who had been at the bar
```

41

```
 1        together, that was also provided in discovery,
 2        correct?
 3   A    Trying to think, two of the three were in the car,
 4        the third person was not.
 5   Q    Okay.  And besides Mikey Thao's name being mentioned,
 6        when you interviewed Paul Lee you also asked whether
 7        or not Mikey Thao was the shooter in the case, didn't
 8        you?
 9   A    I don't recall.
10             ATTORNEY VISHNY:  Okay.  Judge, it would be
11        Page 45 on that transcript.
12             THE COURT:  And this is the Norka
13        interview, correct?
14   Q    (BY ATTORNEY VISHNY)  Continuing to another page on
15        the Norka transcript, I'm showing you what's been
16        marked -- it hasn't been marked, but Page 45 you ask
17        specifically, did you talk to anybody that was kind
18        of here, Mikey, did Mikey shoot him?  Anything like
19        that?  You asked that of Paul, right?
20   A    Correct.
21   Q    And Paul said no.
22   A    Correct.
23   Q    So his name came up more in just conjunction of Mikey
24        Thao merely having been present at the bar but asking
25        whether or not Mikey or Paul or someone else was the
```

42

```
 1        shooter.

 2   A    Correct.

 3   Q    And then a little bit later in the interview, Page

 4        56, 57, you asked Paul again about -- Mikey Thao's

 5        name came up again and is referenced in Page 56 to 57

 6        in the interview, correct?  Right?

 7   A    Correct.

 8   Q    And again on Page 68, you again asked about Mikey

 9        Thao and whether he was the shooter, right?

10   A    Correct.

11   Q    Now, when you interviewed Joe Thor, Joe Thor also

12        mentioned seeing Mikey Thao at the time of the

13        shooting, correct?

14   A    Correct.

15   Q    And in fact Mikey Thao's name appeared on Joe Thor's

16        diagram, right?

17   A    I'd have to see it to verify that.  I don't recall at

18        this time without seeing the diagram.

19             ATTORNEY VISHNY:  The State is willing to

20        stipulate that it's mentioned in there.  I can't find

21        the document right now, and I don't want to waste a

22        lot of time.  I recall pulling it for today.

23   Q    (BY ATTORNEY VISHNY)  All right.  So we have that

24        stipulation so you don't need to answer the question.

25             Now there are also missing recordings for some of
```

Case 2:22-cv-00620-WCG    Filed 11/11/22    Page 43 of 169    Document 26-14

330-43

```
 1        the witnesses in Milwaukee who were interviewed,
 2        correct?
 3   A    I don't know.  I don't know who you're referring
 4        to.
 5   Q    Well, on a previous occasion several months ago you
 6        were asked whether or not there were recordings for
 7        the following individuals, number one, Peter Moua,
 8        M-O-U-A; number two, Dia Vang, V-A-N-G; number three,
 9        Keng Joseph Vang, Keng is spelled K-E-N-G; and number
10        four, Phonesay, P-H-O-N-E-S-A-Y, Saengphachanh.  I'm
11        not sure if I'm pronouncing that correctly, but the
12        spelling would be S-A-E-N-G-P-H-A-C-H-A-N-H,
13        otherwise known by the initial Q, and none of those
14        recordings exist or have been provided either.  Do
15        you know where they are?
16   A    If they're not in evidence or you don't have them,
17        I'm assuming they don't exist.
18   Q    Have you looked for those?
19   A    Those specific interviews, no.
20   Q    Okay.  There is also a diagram.  You were aware that
21        Delinda Guzman was interviewed twice, correct?
22   A    Yes.
23   Q    And that she drew diagrams on both occasions,
24        correct?
25   A    That I -- I don't know.  I wasn't part of either one
```

44

1    of the interviews.

2  Q  Well, you were present when I came to the Appleton

3     Police Department and asked about a missing diagram

4     from Delinda Guzman, weren't you?

5  A  I don't remember if we talked about the diagram or

6     not.

7  Q  So you don't recall saying that you looked for it and

8     somehow it had been destroyed or was missing?

9  A  I don't recall that, no.

10 Q  Now, regarding Mikey Thao, in addition to the fact

11    that his name came up in the interview with Paul at

12    Norka, you also testified in a suppression hearing in

13    open court regarding your interview of Paul Lee,

14    correct?  Is that correct?

15 A  I'm not sure what the question is.

16 Q  Okay.  Maybe let me try and be more clear.

17        You testified in court at a suppression hearing

18    at a motion regarding the admissibility of Paul Lee's

19    statement that was filed by the defense, correct?

20 A  Correct.

21 Q  And so you testified in court in connection with that

22    case on January 27th, 2015, correct?

23 A  Correct.

24 Q  And during that testimony you were asked who the

25    initial focus was for the Appleton Police Department

45

```
1         of potential suspects in this case, correct?

2    A    Correct.

3    Q    And when you testified in open court, you gave a list

4         of names and that list included Mikey Thao.  Page 107

5         of the transcript on January 27th, 2015.  Would you

6         like to see the transcript to refresh your

7         recollection?

8    A    Yes, please.

9    Q    Okay.

10                  ATTORNEY SCHNEIDER:  Just so the court is

11        aware, for today I didn't entirely know the necessary

12        scope of what the questions would be so I sent to the

13        officers the May 26th and June 18th transcripts so

14        he's never, as far as I know, ever reviewed this

15        previous transcript related to Paul Lee.

16                  THE COURT:  What was the page again,

17        Counsel?

18                  ATTORNEY VISHNY:  107.

19   A    Yes.

20   Q    So Mikey Thao was initially in your suspect list,

21        along with Joe Thor, Phong Lee, Paul Lee, Tommy Lee,

22        Tou Shoua Lee, eventually Chong Lee and Delinda Gomez

23        (sic) and Alyson Blom, of people who may be suspects

24        or in some way connected with this shooting?

25   A    I was going to say I wouldn't necessarily classify
```

46

```
 1         them all as suspects, just people that we knew that
 2         were possibly in the foyer when the incident
 3         happened.
 4    Q    Well, what you said in court was they were an initial
 5         focus for the Appleton Police Department, correct?
 6    A    Correct, because they were in the foyer when the
 7         incident happened.
 8    Q    You also put Mikey Thao in some of your other police
 9         reports as well when you wrote about Joe Thor and
10         Paul Lee, correct?
11    A    Without reviewing them, I -- I can't say for
12         certain.
13              ATTORNEY SCHNEIDER:  I'll stipulate that --
14         I mean, there are different interviews with people
15         that -- the question that I'll probably follow up on
16         is the sequence of them, but I'll stipulate that I
17         don't even know if Watou was ever sent, but some of
18         these three may have been said in a recorded
19         interview with another person, and the officer -- I
20         mean, I'll follow up with questions, but, yeah, they
21         were referenced in other reports or in other
22         statements taken.
23              ATTORNEY VISHNY:  Okay.  I'm satisfied with
24         that.  I can file copies of those reports as
25         attachments later.
```

47

```
 1                    THE COURT:  Okay.

 2                    ATTORNEY VISHNY:  I don't have anything

 3          further at this time.

 4                    ATTORNEY SCHNEIDER:  Do you have the photo

 5          of the white board in front of you?

 6                    ATTORNEY VISHNY:  That went up by the

 7          judge.

 8                    ATTORNEY SCHNEIDER:  That's why I wandered

 9          up before.

10                            **EXAMINATION**

11     **BY ATTORNEY SCHNEIDER:**

12     Q    And I just want to ask, this is a -- a copy of what

13          was the white board at the Appleton Police Department

14          at one point, correct?

15     A    Correct.

16     Q    And so this is a list of names, Chong Lee, Paul Lee,

17          Phong Lee, Joe Thor, Tom Lee, Tou Shoua Lee, Noah

18          Vang, Michael Thor, Delinda, Alyson, and then below

19          is Alex Schyling, and then in quotes it says white

20          boy.

21     A    Correct.

22     Q    There are checks by most of them but for Alex

23          Schyling, correct?

24     A    Correct.

25     Q    But you don't recall if -- at this time if those
```

```
 1          checks mean those parties at that time had been

 2          interviewed or whether they had been assigned to

 3          someone to be interviewed?

 4    A     Correct.

 5    Q     Okay.  And one of those is Noah Vang?

 6    A     Correct.

 7    Q     Why don't you explain for us, Alex Schyling was

 8          someone you spoke with, correct?

 9    A     Actually, it was Sergeant Thao who spoke with Alex

10          Schyling.

11    Q     And Noah Vang's name came up during that interview

12          with Alex Schyling, correct?

13    A     Correct.

14    Q     Did you talk to Sergeant Thao about Noah after he

15          spoke about Alex?

16    A     Yes.

17    Q     What -- if you want to give the context, where did

18          Alex Schyling say he was at the time of the

19          shooting?

20    A     He was outside of the bar on College Avenue having a

21          cigarette just outside of Luna on the sidewalk.

22    Q     And is it consistent that you found, I would say,

23          given Appleton's smoking ban, that there were a

24          number of people outside the bar at the actual time

25          of the shooting having cigarettes?
```

49

```
 1    A    Correct.

 2    Q    Or outside with friends who might have been having

 3         cigarettes?

 4    A    Yes.

 5    Q    Okay.  So some of the people you spoke with or that

 6         were spoken to like Alex Schyling couldn't say it was

 7         -- and I'm going to say the wrong time, but 11:22

 8         when they heard shots, correct?

 9    A    Correct.

10    Q    Did some of them not even hear shots but suddenly saw

11         a mad rush of people exit?

12    A    Yes.

13    Q    And you, knowing the foyer video, put that at the

14         time of the shooting, correct?

15    A    Correct.

16    Q    Related to Alex Schyling, where did he say Noah was

17         related to him at the time of the shooting?

18    A    He said Noah was with him outside the bar on College

19         Avenue.

20    Q    Were you and Sergeant Thao able to confirm that in

21         some way, shape or form?

22    A    Yes.

23    Q    How did you do that?

24    A    Through the video.  I know through the foyer video we

25         were able to see people enter and exit Luna, and
```

|  |  |  |
|---|---|---|
| 1 |  | also, at times when the doors to Luna were open, the |
| 2 |  | -- you could actually see out onto College Avenue |
| 3 |  | sidewalk as well as there was traffic camera from |
| 4 |  | Division and College.  So I knew -- I think it was |
| 5 |  | primarily through the Luna video, surveillance video, |
| 6 |  | that we were able to confirm that the time the actual |
| 7 |  | shooting took place is that Tom Lee was not in the |
| 8 |  | foyer -- I'm sorry, Noah Vang was not in the foyer. |
| 9 | Q | Is it something where as part of this case you |
| 10 |  | watched the sequence of who went in and out for even |
| 11 |  | a time period before the actual time of the |
| 12 |  | shooting? |
| 13 | A | Yes. |
| 14 | Q | Is it something based upon clothing Alex Schyling was |
| 15 |  | seen wearing that you were able to identify when he |
| 16 |  | left prior to the time of shooting? |
| 17 | A | Yes. |
| 18 | Q | And same then with Noah leaving with him? |
| 19 | A | Yes. |
| 20 | Q | And then were you able to actually see them on the |
| 21 |  | video out in the street as well? |
| 22 | A | I believe so.  But I believe -- I believe it was |
| 23 |  | through the camera -- one of the cameras in the |
| 24 |  | foyers that, like I said, when the doors were open |
| 25 |  | you can actually see people out on the sidewalk |

51

```
 1            smoking.

 2    Q       And sometimes maybe you can only see a portion of the

 3            bottom of their clothing or shoes, correct?

 4    A       Correct.

 5    Q       After Sergeant Thao spoke to Alex, Alex says Noah was

 6            outside with him, is that when you checked the video

 7            to confirm that?

 8    A       Yes.

 9    Q       Did you then make a decision whether Noah Vang had to

10            be -- there needed to be any follow up with Noah?

11    A       It was not a priority at that point based upon that

12            information that we knew he was actually not in the

13            foyer as we were still trying to identify other

14            people that we knew were in the foyer that were

15            listed on that white board.

16    Q       Is it possible that whole point was discussed with

17            Officer Probst at some point?

18    A       Yes.

19    Q       Okay.  And based upon recent requests of Attorney

20            Vishny, you went to look to see if Noah was

21            interviewed and that's when you found that kind of

22            sequence which you just discussed?

23    A       Correct.

24                    ATTORNEY VISHNY:  Actually, I'm going to --

25            well, no.  Never mind.
```

                                    52

```
1   Q    (BY ATTORNEY SCHNEIDER)  What I should say is that's

2        when you then specifically put into a report why

3        Alex -- or why Noah wasn't interviewed, what you and

4        Sergeant Thao did related to checking the video

5        related to Noah and Alex, correct?

6   A    Correct.  I -- I believe, like you said, the

7        assignments, Sergeant Probst was assigned to

8        interview Noah Vang.  And the significance of the

9        check mark must have -- could be that after we

10       realized that Noah didn't need to be interviewed, he

11       didn't have to be.

12            ATTORNEY VISHNY:  Judge, at this point I'm

13       going to make an objection because I don't think

14       blatantly speculative what could be, what couldn't

15       be, is really admissible.  We are supposed to testify

16       about what is and isn't.  The document speaks for

17       itself.

18            ATTORNEY SCHNEIDER:  Well, but she's asking

19       him to speculate on what the check mark means and he

20       doesn't specifically remember it.  Defense says it

21       means X, which we do not know if it means X or does

22       not -- or does mean X.

23            THE COURT:  We'll resolve it this way.

24       Do you know what the check mark means?  I don't

25       want to know what it could mean.  Do you know what
```

53

1    the check marks on that white board mean?

2                  THE WITNESS:  No, I don't.

3                  THE COURT:  Okay.

4                  ATTORNEY SCHNEIDER:  Okay.

5    Q    (BY ATTORNEY SCHNEIDER)  I want to stick with --

6                  THE COURT:  Actually, let me -- I want to

7    follow up on that.

8          Who would have prepared the information on that

9    white board?

10                 THE WITNESS:  For the most part, I was

11   writing a lot of the information on the white board,

12   but I can tell you that the -- a lot of the names --

13   the writing of these names under what you're

14   referring to in this photo is not my handwriting, so

15   I'm not sure who specifically wrote the names or

16   officers' badge numbers and the check marks next to

17   it.  So I'm not sure who completed that.

18                 THE COURT:  And you don't know who would

19   have completed that?

20                 THE WITNESS:  No, I don't.

21   Q    (BY ATTORNEY SCHNEIDER)  And even -- I'll just ask

22   just to help clarify.

23         You've worked with a number of the same

24   investigators for a long time, sometimes you come to

25   recognize their handwriting?

1   A   Correct.

2   Q   Looking at that, do you -- could you give us if you

3       even know whose handwriting it might be?

4   A   No, I don't.

5   Q   Okay.  I just thought if you knew it would help us

6       out, but -- okay.  I'm going to continue to focus on

7       the bar people before we go back to Letty Xiong and

8       some other issues you were asked about.

9           Just to help assist the court understand, what

10      was done at the scene, you had, I think you said, 389

11      or 384 photos were taken of patrons, correct?

12  A   Correct.

13  Q   And these were just people who were located in the

14      bar?

15  A   Yes.

16  Q   Okay.  Not actually 380, I'll say nine, even though

17      it might be 84, people, because sometimes photos were

18      taken of a person close up and some further back.

19  A   Correct.

20  Q   Why were they taken of a person further back?

21  A   The -- to show the overall view to the officer, but

22      then oftentimes the writing on the document or the

23      sheet of paper they had was difficult to read from

24      that distance so then a closer photo was taken of the

25      actual paper they were holding.

55

1    Q    Was it -- is it sometimes important to identify

2        because somebody may remember a person wearing cowboy

3        boots or certain color pants or coat and that's why

4        those photos were also taken of all the parties?

5    A    Yes.

6    Q    And the way the photos were documented and recorded,

7        you know who the person is, correct?

8    A    Yes.

9    Q    And then you have a photo of what they were wearing

10       at Luna that night.

11    A    Correct.

12    Q    So anybody could do follow up based upon those

13       factors with any party?

14    A    Yes.

15    Q    And is it -- and officers did, what you say, somewhat

16       of a screening to determine if people were witnesses

17       or saw things, correct?

18    A    Yes.

19    Q    It's true that somebody could say they saw nothing

20       when they saw it all, right?

21    A    Yes.

22    Q    So this was just what officers were able to ask of

23       these parties that night.

24    A    Yes.

25    Q    Was it a situation where you felt you could hold

56

```
 1        these - I'm going to estimate there was probably 200
 2        people, if we know that some photos were taken of the
 3        same person more than once - for hours?
 4    A   No.  I mean, we -- this was bar closing time.  There
 5        was 200 people in a bar that didn't want to be there
 6        any longer.  And we tried to expedite the process.
 7        We actually had to call extra officers in because the
 8        crowd was becoming unruly based upon the short term
 9        we were detaining them.
10    Q   And some people were drunk because they were out at a
11        bar, right, and that added to their agitation?
12    A   Yes.
13    Q   But you took steps to record name and a photograph of
14        anybody -- when officers arrived, they kind of
15        locked -- I don't want to say they locked the front
16        doors, but they didn't allow anymore people to leave,
17        right?
18    A   Correct.
19    Q   Did the -- so defense has asked you questions about
20        Watou, Mikey Thao, I think Ryan Thao?
21    A   Yes.
22    Q   Okay.  That they were parties at one point who - and
23        Johnny Thao and Jared Randall might be in that same
24        group - gave information but were concerned about
25        their identities being revealed, correct?
```

57

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | And we've had previous testimony about this, but just |
| 3 | | to help the court understand, at the time those |
| 4 | | parties were spoken to, prior to that was Paul Lee |
| 5 | | interviewed? |
| 6 | A | I'm trying to think of the sequence of events.  I |
| 7 | | would have to look at the report as far as the timing |
| 8 | | of it. |
| 9 | Q | Okay. |
| 10 | A | Maybe you have that and can refresh my memory, but I |
| 11 | | don't recall specifically a timing of that. |
| 12 | Q | Okay.  And it's -- it's a situation, Officer, where |
| 13 | | the day this happened, and the next three or four |
| 14 | | days, multiple officers were interviewing different |
| 15 | | parties at the same time, correct? |
| 16 | A | Absolutely. |
| 17 | Q | So Sergeant Tauber and Sergeant Meyer could be |
| 18 | | interviewing somebody who is talking about Mikey Thao |
| 19 | | at the same time you're talking to Mikey Thao, |
| 20 | | correct? |
| 21 | A | Correct. |
| 22 | Q | And you're not able to communicate directly |
| 23 | | immediately, hey, this person said A and then you |
| 24 | | know that when you're interviewing Mikey Thao, |
| 25 | | correct? |

```
 1   A    Correct.

 2   Q    At some point, though, there is parties who don't

 3        want to be identified, they're concerned for their

 4        safety, correct?

 5   A    Yes.

 6   Q    And we had previous testimony about them, but a

 7        majority, or at least I believe three of them,

 8        identified in some way, shape or form, whether it be

 9        clothing or by name, Chong as the shooter, correct?

10   A    Yes.

11             ATTORNEY VISHNY:  Objection.

12             ATTORNEY SCHNEIDER:  Maybe I can rephrase

13        it.

14             ATTORNEY VISHNY:  That is not an accurate

15        representation of what is in these interviews.  There

16        is actually not one person who says they saw Chong

17        Lee do this shooting.  Not one single interview,

18        except for Paul, but virtually every witness says

19        they didn't actually see the shooting.  I can't

20        recall anybody who said they actually saw it.  I do

21        not have it memorized, exactly what Paul Lee said,

22        but they virtually all denied it in one way or

23        another.

24             ATTORNEY SCHNEIDER:  Well, maybe I can

25        rephrase, but I think --
```

59

```
 1                    THE COURT:  Please withdraw the question

 2          and rephrase.

 3     Q    (BY ATTORNEY SCHNEIDER)  In your opinion do the three

 4          parties who didn't want to be identified who were

 5          concerned for their safety, in your opinion, talking

 6          to them, did they somehow involve or implicate

 7          Chong?

 8     A    Yes.

 9     Q    Okay.  Now, it's a situation where when you're

10          talking to Paul Lee you may have said the name Mikey

11          Thao, correct?

12     A    Yes.

13     Q    But at the time did you know that Mikey Thao had

14          information and didn't want to be identified?

15     A    I don't -- I don't believe so.  I think we just knew

16          that Mikey Thao was in the foyer at that point.

17     Q    And in other interviews with Joe Thor or other

18          parties, you might have used these names, Mikey Thao

19          or Ryan or Watou or -- correct?

20     A    Correct.

21     Q    Or those people might have said those names to you,

22          correct?

23     A    Correct.

24     Q    Do you think some of those predated when you spoke to

25          those three people and they said we'll tell you what
```

60

1     we know but we don't want to be identified?
2   A  Correct.  In fact, I wasn't even part of the initial
3      interviews with Mikey Thao or Ryan Thao.  Like I
4      said, this was an ever evolving investigation in
5      which, like you said, different officers were
6      speaking with different people and at simultaneous
7      times all the way from Milwaukee up to Green Bay, so
8      there was, you know, obviously information that we
9      wanted to interview Paul and had identified a number
10     of individuals in there, but the specifics of what
11     each person said, you know, at that point was not
12     necessarily always shared with the investigative
13     group.  It might have been that the individual was
14     talked to or wasn't talked to, but I -- I was not
15     part -- so I didn't have direct knowledge as to what
16     Mikey or Ryan or Watou had said during their initial
17     interviews.
18  Q  So let me ask you this.  Even after they were
19     interviewed and you went and spoke to another witness
20     and they mentioned the name Watou or Mikey or Ryan,
21     would it be a subject where you said, oh, no, we
22     can't talk about those people, or would you let them
23     talk about those people?
24  A  We would let them talk about them.
25  Q  So even when there was a decision about the parties

```
 1          who asked -- they didn't want to be identified but

 2          they told you what they knew, and then there was

 3          discussion about what to do with the recordings, the

 4          specific interviews or recordings with those people

 5          were not initially shared as part of discovery,

 6          correct?

 7    A     Correct.

 8    Q     And there is a discussion, I'm going to use language

 9          defense, and I think you said earlier, there was a

10          discussion Appleton Police Department had about the

11          Monfils Law and these people requesting their

12          identities not be disclosed, correct?

13    A     Correct.

14    Q     But it wasn't that the department made or an

15          investigator made a decision, well, we better go back

16          through every other interview or every other

17          recording and make sure we blank out their name if

18          it's a recording or delete it out of the report,

19          correct?

20    A     Correct.

21    Q     So you didn't -- while you protected those specific

22          interviews and statements they gave, you didn't go

23          back to say, well, we better blank out or X out their

24          name throughout the report to hide their identities

25          in some other way?
```

62

| 1  | A | Correct. |
| 2  | Q | And you're aware -- I don't -- how long have you been |
| 3  |   | an investigator? |
| 4  | A | 26 -- well, 26 years with the police department, |
| 5  |   | probably 16 of those as an investigator. |
| 6  | Q | I should know this.  Based upon your years with APD, |
| 7  |   | you're aware when you list a name in a report it |
| 8  |   | means defense or someone else may go talk to that |
| 9  |   | person, correct? |
| 10 | A | Absolutely. |
| 11 | Q | You've had that experience in other cases? |
| 12 | A | Yes. |
| 13 | Q | So it wasn't that there was ever a decision by anyone |
| 14 |   | or a discussion, well, we need to go through every |
| 15 |   | report, every photograph, every recording and make |
| 16 |   | sure we X out the names of these parties. |
| 17 | A | Correct. |
| 18 | Q | And as far as you've been able to ascertain about the |
| 19 |   | six names defense counsel provided last week, these |
| 20 |   | were people who were at the bar, we had their photo, |
| 21 |   | we had their picture, but there is no reports and no |
| 22 |   | interviews or recording? |
| 23 | A | Correct. |
| 24 | Q | And just to give some explanation, the white board |
| 25 |   | had a series of photos put on it initially, right? |

Case 2:22-cv-00620-WCG    Filed 11/11/22    Page 63 of 169    Document 26-14

330-63

| 1 | A | Yes. |
| 2 | Q | And there was a series of parties that officers were |
| 3 | | attempting to identify who the people were, correct? |
| 4 | A | Correct. |
| 5 | Q | For example, initially you might have just identified |
| 6 | | somebody, okay, that's the guy in the white hat. |
| 7 | | Does anyone know who the guy in the white hat is? |
| 8 | A | Correct. We actually assigned them numbers. |
| 9 | Q | Okay. |
| 10 | A | It was a numbering sequence. And then we went to try |
| 11 | | to make sure we could -- you know, once we knew No. 8 |
| 12 | | was so and so, then we would say, okay, eight is this |
| 13 | | person, and then we went through that trying to |
| 14 | | identify each person. |
| 15 | Q | And use of the Luna video assisted in some way, |
| 16 | | correct? |
| 17 | A | Yes. |
| 18 | Q | Because there was also video of the bar area, |
| 19 | | correct? |
| 20 | A | Yes. |
| 21 | Q | So you could see -- I think there was one gentleman |
| 22 | | who bought some beers right before the time of the |
| 23 | | shooting, you can see him do that, and then you can |
| 24 | | see him exit after the shooting? |
| 25 | A | Correct. |

1    Q    So the white board photos were people you were trying
2         to identify?
3    A    Yes.  It was all snapshots or still photos, you know,
4         a pause of the surveillance video, we would take a
5         screen shot, and then, you know, from that screen
6         shot try to identify each of the individuals in that
7         area.
8    Q    Okay.  I want to talk and just have you explain a
9         little bit more about the initial time you spoke with
10        Letty Xiong on December 12th, 2013.  SWAT was outside
11        of the residence you believe to be Chong's residence
12        waiting to execute a search warrant?
13   A    Yes.
14   Q    Is it practice where in a situation such as this
15        officers go prior to watch the residence and see if
16        anybody leaves or how many people are coming and
17        going?
18   A    Yes.
19   Q    Is that pretty common?
20   A    Yeah.  It's called overwatch.  We normally do that,
21        at least for extended period of time, prior to
22        executing the search warrant, typically an hour,
23        depending on circumstances.
24   Q    Sometimes are you waiting for the actual warrant to
25        get drafted, presented to a judge and signed?

Case 2:22-cv-00620-WCG    Filed 11/11/22    Page 65 of 169    Document 26-14

330-65

1    A    Then -- that and then especially this one was with a

2         SWAT team, so we have to brief the SWAT team we used.

3         Because it was in Neenah, we used a Neenah SWAT team,

4         we had to meet with them and so forth.  In the

5         meantime we continued to gather intelligence as to

6         who may be in the residence or what may be

7         happening.

8    Q    And then during the course of that is when a vehicle

9         left, the vehicle was ultimately stopped, and that

10        was determined to be a vehicle that was being driven

11        by Letty Xiong?

12   A    Correct.

13   Q    And I don't know if we even identified.  Letty is a

14        female, right?

15   A    Correct.

16   Q    And she was stopped, you traveled to the location

17        where she was stopped?

18   A    I was actually on my way to Neenah.  I don't recall

19        where I was coming from, but I was actually on my way

20        to Neenah when, you know, I could hear the radio talk

21        about that, and they discussed stopping the vehicle

22        and if there was any additional officers in the area.

23        So I assisted when Sergeant Holdorf stopped the

24        vehicle, I was really -- actually pulled up right

25        behind him as the stop occurred and then took over

66

1      the interview process.

2   Q   At that point do you recall if the name Letty Xiong

3      had been identified in any way, shape or form as part

4      of the investigation?

5   A   No, I don't believe it was.

6   Q   What were some of the concerns you had when you

7      wanted to speak to Letty Xiong?

8   A   At this point we had a search warrant and arrest

9      warrant for Chong, and obviously we were looking for

10     a handgun, so my main concern was the officer safety

11     concern as far as the execution of the search warrant

12     that we were prepared to do, so I wanted to obtain

13     inside information as to whether Chong was there.  I

14     asked Letty about any guns, if she ever saw Chong

15     with guns.  So the main purpose was to try to

16     determine from Letty, who had just left the

17     residence, how many people were in the house, whether

18     there was any animals in the house, what type of

19     animals, were there any weapons in the house, those

20     type of -- of circumstances.

21  Q   Is that questions you've asked of other people who

22     have left the scene where a search warrant was going

23     to be executed?

24             ATTORNEY VISHNY:  Objection.  Relevancy.

25             THE COURT:  Sustained.

1    Q    (BY ATTORNEY SCHNEIDER)  Do you -- how long do you

2         think your contact with Letty was?

3    A    She was on her way to work and she was running late.

4         It was a relatively short interview.  I'd have to

5         look at the time of the recorded interview, probably

6         five minutes, five to ten minutes, ten minutes at the

7         most.  I can't even imagine it was that long.

8    Q    During this encounter with her, even though it was

9         brief, did she tell you how long she had been staying

10        at the residence?

11   A    Yes.

12   Q    And how long was that?

13   A    She -- she had moved in just a couple of days prior,

14        I believe it was like a Saturday, so I think it was

15        three -- three, four days prior to the interview.

16   Q    Okay.  And did you have concerns when you spoke with

17        her about whether you needed to -- let me ask you

18        this.  During the time you spoke with her, were you

19        aware if she had a cell phone?

20   A    Yes.

21   Q    Were you aware where she was planning to go?

22   A    Yes.

23   Q    Where was that?

24   A    To work at McDonalds.

25   Q    Did you have any concerns prior to the warrant

1    actually being able to be executed or being
2    finished?
3                    ATTORNEY VISHNY:  I'm going to object to
4    relevancy.  I mean, I think the issue is whether he
5    questioned her about witnesses or not and it wasn't
6    turned over, not -- he's already testified that he
7    had safety concerns.  That's not being challenged by
8    the defense, and so I -- I just don't see the further
9    relevance.
10                   ATTORNEY SCHNEIDER:  She asked a lot of
11   questions about isn't it true you asked her about
12   Chong and seeing Chong do the shooting and commit the
13   shooting, so I think I'm able to ask and identify
14   some of the questions and why he asked them.
15                   THE COURT:  I'll give some latitude.
16   Q   (BY ATTORNEY SCHNEIDER)  You knew where she was going
17       to?
18   A   Yes.
19   Q   Did you have concerns about her possibly sharing that
20       information with others if you just allowed her to
21       leave?
22   A   Yes, I did.
23   Q   Okay.  In that regard, did you ask more specifics
24       about her contact with Chong or her relationship or
25       how long she knew even his siblings and family or his

| 1 | | mother? |
| 2 | A | Yes, I did. |
| 3 | Q | And did you specifically in that talk ask her if she |
| 4 | | would not communicate what was going to happen at the |
| 5 | | house with anyone? |
| 6 | A | Yes. |
| 7 | Q | Did you decide to keep her, I'm going to say, with a |
| 8 | | police officer until the warrant was finished or did |
| 9 | | you allow her to go to work? |
| 10 | A | I allowed her to go to work. |
| 11 | Q | And at the time when you were speaking to her |
| 12 | | briefly, did she indicate to you she knew anything |
| 13 | | about the Luna shooting? |
| 14 | A | No.  She said she heard about it on the news. |
| 15 | Q | And your previous testimony is that you put that |
| 16 | | recording in the J-drive but, in essence, forgot to |
| 17 | | send the request to evidence or the notice to say, |
| 18 | | it's there, put it into the BEAST? |
| 19 | A | Correct. |
| 20 | Q | And at the time you initially spoke with her, you |
| 21 | | didn't have any information that she, after the |
| 22 | | shooting, had interaction with Chong or anything |
| 23 | | related to a ride or a vehicle ride, correct? |
| 24 | A | Correct. |
| 25 | Q | You learned that after you spoke to her the first |

70

```
 1        time?

 2   A    Correct.

 3   Q    And then you were able to speak to her a second time

 4        and went through that with her?

 5   A    Yes.

 6   Q    And then Tim Jacobson, someone you spoke with, did he

 7        - because I don't think this has been discussed or

 8        disclosed - at the time of the shooting, did he put

 9        himself inside Luna or outside Luna?

10   A    He was outside.

11   Q    Did he have any information directly to witnessing

12        the shooting?

13   A    No.

14   Q    Did he have any information about himself personally

15        seeing any of the parties that were involved in the

16        shooting?

17   A    No.

18   Q    He is someone who did provide you information about

19        seeing girls wrestle out on the street around the

20        time of the shooting?

21   A    Correct.

22   Q    Had that information been provided by others?

23   A    Yes.

24   Q    And in fact the two girls who were involved in that

25        altercation, those were interviewed, recordings were
```

71

| 1 | | provided, correct? |
| 2 | A | Yes. |
| 3 | Q | And when that name was provided to you last week, you |
| 4 | | then went and searched and found, I think, as your |
| 5 | | report indicates, it had been mislabeled as like -- |
| 6 | | the last name was completely mislabeled, correct? |
| 7 | A | Correct. |
| 8 | Q | He indicated to you he didn't know anyone in the |
| 9 | | shooting, doesn't know the victim. |
| 10 | A | Correct. |
| 11 | Q | Did Mr. Jacobson indicate to you he had some memory |
| 12 | | issues? |
| 13 | A | Yes. |
| 14 | Q | And even was prescribed medication related to that? |
| 15 | A | Yes. |
| 16 | Q | Is it a situation, Sergeant Rabas, in this where |
| 17 | | there are probably other people who were at the bar |
| 18 | | or who have mentioned other people that you could |
| 19 | | follow up with, correct? |
| 20 | | ATTORNEY VISHNY: Objection. |
| 21 | | Speculative. |
| 22 | | ATTORNEY SCHNEIDER: I'm asking -- |
| 23 | | THE COURT: It's overruled. |
| 24 | A | Yes. I mean, there was other -- well, there's, you |
| 25 | | know, 150 people that we could have followed up with |

72

```
1        as far as that were inside of the bar and could have
2        done formal sit-down interviews with each one of them
3        and other names that had -- had come up in reference
4        to this.  I mean, probably, you know, hundreds of
5        additional people that we could talk to.
6    Q   But at some point you as officers had made a decision
7        about whether you need to follow up or continue to
8        interview people, correct?
9    A   Correct.
10   Q   And even when you get additional names, if it was
11       tomorrow, you would still then make that assessment,
12       correct?
13   A   Correct.
14   Q   And you've done that in other cases as well?
15   A   Yes.
16   Q   But yet you know at least, to the best of the
17       ability, Appleton tried to identify everybody who was
18       at Luna through these photographs and boards with
19       identifying information, correct?
20   A   Yes.
21              ATTORNEY VISHNY:  Object.  Asked and
22       answered.
23              THE COURT:  Sustained.
24              ATTORNEY SCHNEIDER:  The only -- I don't
25       have any other questions for Sergeant Rabas today,
```

73

```
1        but I'm just going to ask for a little bit of
2        permission because this is a little unique.  Often we
3        come in and we have a stop motion so we know the
4        scope is to address the stop and what we're doing
5        there.  I knew Attorney Vishny wanted to do follow-up
6        with Sergeant Rabas and Sergeant Thao today, but on
7        what topics I didn't exactly know or where that was
8        going to go.  I had them review prior transcripts.
9        She's asked a few things today that I want to just
10       have the ability, if I need to, to recall them.  I'm
11       going to ask for that because --
12                ATTORNEY VISHNY:  No objection.
13                ATTORNEY SCHNEIDER:  Okay.  All right.
14       Then I don't have any other questions for Sergeant
15       Rabas.
16                ATTORNEY VISHNY:  Brief redirect.
17                          EXAMINATION
18       BY ATTORNEY VISHNY:
19    Q  Sergeant Rabas, it's your opinion that Noah Vang
20       wasn't interviewed because he was outside, right, and
21       not inside the bar and therefore wouldn't have been
22       an eyewitness to the shooting, right?
23    A  Correct.
24    Q  However, Tim Jacobson, Jared Randall, Johnny Thao,
25       John Nielson and Alex Schyling were all known to have
```

74

```
 1        been outside the bar and were interviewed, right?
 2    A   We didn't know that until they were interviewed.
 3    Q   I see.  And -- even though you had studied the tape
 4        and looked at who was inside and who was outside?
 5    A   I -- I didn't know what each of those individuals
 6        looked like.  I was familiar with Noah Vang, and also
 7        Noah Vang did make himself available to us.
 8    Q   But you had pictures of everyone at the bar, right?
 9    A   Are you referring to the people that had their signs
10        up?
11    Q   No.  I'm referring to the various persons of interest
12        who you thought might know the individuals involved
13        and you wanted to interview.
14    A   Yes.
15    Q   And in fact interviews were conducted of many
16        witnesses in this case who were not necessarily at
17        the bar but who you thought might have information
18        pertinent to the investigation, correct?
19    A   Correct.
20    Q   Now, did you talk to Sergeant Probst specifically
21        about whether or not he interviewed Noah Vang?
22        Because I noticed when you were being questioned by
23        Miss Schneider you said, well, he probably didn't
24        interview him.  Did you interview him before today to
25        find out whether he talked to Noah Vang?
```

75

```
 1    A    Yes.  After your e-mail request I sent out an e-mail

 2         to -- we have a group e-mail for all APD

 3         investigators, which he's included on that, as well

 4         as to our CRU Unit, which also assists with this

 5         investigation, and every other officer, including

 6         Sergeant Holdorf from the MEG Unit, Officer -- Deputy

 7         Wang Lee from the sheriff's department, and the

 8         e-mail request was sent out to them and asked them to

 9         respond as to whether they interviewed the

10         individuals, not only Noah Vang but the other

11         individuals you had listed in there.  I received a

12         response back indicating that they did not talk to

13         him in reference to this case.

14    Q    And was that response specifically from Sergeant

15         Probst?

16    A    Yes.

17    Q    Now, it's your opinion that Ryan Thao, Watou Lee and

18         Mikey Thao somehow implicated Chong Lee in this

19         shooting?

20    A    Yes.

21    Q    Okay.  Well, Ryan Thao, when he was interviewed by

22         you guys in April, he made it clear that at the time

23         of the shooting he didn't know who Chong Lee was,

24         correct?

25    A    Correct.
```

76

```
 1   Q   And nobody had ever shown him any photographs of
 2       Chong Lee back when his memory would have been fresh,
 3       correct?
 4   A   There -- are you talking about the first interview?
 5   Q   Yup.
 6   A   I wasn't part of that first interview.
 7   Q   I understand that, but didn't you discuss it with
 8       Sergeant Thao before you went out and did the
 9       reinterview with Sergeant Thao?
10   A   We discussed the interview.  I don't -- I don't know
11       if we specifically discussed as to whether he
12       presented photographs or not.
13   Q   And in your interview with Ryan Thao, the first
14       person who mentioned the name Chong Lee wasn't Ryan
15       Thao, it was actually you or Sergeant Thao, correct?
16   A   Yeah.  At that point Chong Lee has already been
17       formally charged.
18   Q   Correct.  And what Ryan Thao told you is that he
19       didn't know Chong and he was never asked in this
20       interview to give a physical description of what
21       Chong looked like, correct?
22   A   I believe so.  I'd have to look -- I'd have to listen
23       or check the notes on that interview again.
24   Q   And when Ryan said he -- would keep naming the name
25       Chong, it was pretty clear from that interview is the
```

77

```
 1        way he was aware of Chong Lee was because of

 2        community gossip, rumors and information that was

 3        made public after Chong's arrest, correct?

 4   A    Well, when he referred to him in person, obviously

 5        part of the interview also was where people were and

 6        where they were moving and what other information he

 7        had.

 8   Q    Well he talked about the shooter, but his information

 9        that it was Chong came because other people told him

10        that Chong Lee had done the shooting, correct?

11   A    He -- at this point he was associating the name with

12        Chong as the shooter.  However, he was identifying

13        the shooter as an individual person from based upon

14        where he was standing and his description of the

15        events.

16   Q    Right.  So -- but you didn't show him any photo

17        lineup, right?

18   A    A photo lineup, no.

19   Q    Did you show him photographs at the time?

20   A    I don't believe so.

21   Q    Okay.  And you didn't take a specific description of

22        height, weight, hair from him, did you?

23   A    No.

24   Q    Or a specific description of clothing, correct,

25        hats?
```

```
 1   A   We may have asked about that.  I don't know if he

 2       provided that.

 3   Q   Okay.  Now, when it came to Mikey Thao, Mikey Thao

 4       actually told you specifically he did not see Chong

 5       Lee shoot the deceased, even though he was in the

 6       immediate area of the shooting, and he even thought

 7       Chong Lee, who he knew, wasn't in Luna tavern because

 8       he thought he was in jail at the time, right, or

 9       prison?  That's what he said, right?

10   A   I don't -- I'd have to review the report.

11   Q   Okay.  And he also told you that the shooter was

12       wearing a white jacket, correct?

13   A   Again, I'd have to review the report.

14   Q   And you know that Chong Lee was not wearing a white

15       jacket from having examined the photographs,

16       correct --

17   A   Correct.

18   Q   -- from the bar.  And, in fact, the jacket that he

19       was wearing you had in custody and the color is black

20       and gray, isn't it?

21   A   We have a jacket that's in custody.  We haven't

22       confirmed if it is Chong's or not.

23   Q   Have you bothered to look at the jacket and look and

24       see if it matches the jacket in the video?

25   A   The video, because it's an infrared, is -- it's
```

```
 1          similar to it, but we're actually not sure if it is

 2          based on some striping on the -- on the coat near the

 3          sleeves and so forth.

 4     Q    Okay.  Can I refresh your recollection about Mikey

 5          Thao?  Page 2941.

 6     A    Are you asking me or the judge?

 7                    THE COURT:  What -- counsel, what is this

 8          document?

 9                    ATTORNEY VISHNY:  This is the police report

10          written by -- I'll put that in the record.

11     Q    (BY ATTORNEY VISHNY)  Sergeant Rabas, this is a

12          police report you wrote summarizing your interview

13          with Mikey Thao, right?

14     A    Yes.

15     Q    Okay.  And what he told you is even though he was in

16          the immediate vicinity of the shooting, he told you

17          that he knew Chong Lee, correct?

18     A    Yes.

19     Q    And although it could have been Chong Lee who did the

20          shooting, he wasn't sure because he thought Chong was

21          in jail and didn't see Chong Lee at Luna that night,

22          right?  Isn't that correct?

23     A    Correct.

24     Q    And regarding Watou Lee, Watou Lee also told you that

25          he didn't know Chong Lee and didn't see him do the
```

80

| | | |
|---|---|---|
| 1 | | shooting, right? |
| 2 | A | I don't think he knew Chong Lee.  I don't -- so |
| 3 | | obviously he wouldn't be able to identify Chong Lee |
| 4 | | as the shooter -- |
| 5 | Q | Okay.  Now -- |
| 6 | A | -- by name. |
| 7 | Q | Okay.  This interview of Mikey Thao, by the way, it |
| 8 | | occurred on December 11th, right, the one that the |
| 9 | | recording has been destroyed? |
| 10 | A | I was not part of that interview.  I don't recall. |
| 11 | Q | Okay.  But December 11th is before Paul Lee was |
| 12 | | interviewed. |
| 13 | A | I believe Paul Lee was interviewed that -- on |
| 14 | | December 11th at night. |
| 15 | Q | But that was starting pretty late at night, right, |
| 16 | | when you went to Norka where he was working that |
| 17 | | second shift? |
| 18 | A | Yeah.  It was in the evening, I believe, like eight |
| 19 | | or 9:00. |
| 20 | Q | Right.  And -- |
| 21 | A | So I -- Mikey might have been interviewed earlier |
| 22 | | that day. |
| 23 | Q | Okay.  And as far as Mikey being interviewed earlier |
| 24 | | that day, that was Sergeant Thao had interviewed him, |
| 25 | | right? |

81

```
 1    A    Correct.

 2    Q    And it was also Sergeant Thao who went with you to

 3         interview Paul Lee, correct?

 4    A    Correct.

 5    Q    And at that time Paul Lee was your primary suspect in

 6         this case, correct?

 7    A    Correct.

 8              ATTORNEY VISHNY:  Nothing further.

 9              THE COURT:  Attorney Schneider.

10                          EXAMINATION

11    BY ATTORNEY SCHNEIDER:

12    Q    The 10th, 11th and 12th of December, every interview

13         every other officer does, was it always shared with

14         everyone else?

15              ATTORNEY VISHNY:  That's not within the

16         scope of my --

17              ATTORNEY SCHNEIDER:  She's asking about the

18         timing of when Mikey Thao and Sergeant Thao spoke to

19         Mikey Thao and was it before or after Paul Lee's

20         interview or was it on the same day.  What I'm just

21         trying to establish is every time an officer

22         finished, did they then stop and have a discussion so

23         everybody was always kept up contemporaneous as to

24         what everyone else was saying.

25              THE COURT:  Phrased as that, I'll allow it.
```

1   A    No.

2   Q    Was there any ability to do that?

3   A    No.  Because it was fast moving.  In fact, some

4        people -- actually, during the interview with Paul

5        Lee and during that day, there was -- Sergeant Tauber

6        and Sergeant Meyer were actually down from

7        Milwaukee.

8                  ATTORNEY VISHNY:  Objection.  Lack of

9        relevancy.  The record is clear.  Thao interviewed

10       Mikey Thao, Thao was with this sergeant later on to

11       interview Paul Lee.

12                 THE COURT:  That portion of the answer I'll

13       sustain, the rest will be stricken.

14                 ATTORNEY SCHNEIDER:  Nothing then.

15                 THE COURT:  Attorney Vishny.

16                        **EXAMINATION**

17  **BY ATTORNEY VISHNY:**

18  Q    Had you talked with Sergeant Thao about whether or

19       not he had interviewed Mikey Thao earlier that day?

20       Had he told you?

21  A    No, he did not.

22                 ATTORNEY VISHNY:  Okay.  Thank you.

23                 ATTORNEY SCHNEIDER:  Nothing.

24                 THE COURT:  Okay.  Sergeant Rabas you may

25       be seated.

83

```
1              And you'll be calling Sergeant Thao?

2                   ATTORNEY VISHNY:  Which will be a lot more

3         brief.

4                   THE COURT:  Why don't we take five

5         minutes.

6                   ATTORNEY VISHNY:  Sure.

7                   THE COURT:  And this will --

8                   ATTORNEY VISHNY:  I'd ask that the State

9         not be permitted to talk to Sergeant Thao at all

10        regarding what's been testified to.

11                  THE COURT:  That request will be granted.

12                  (A brief recess was taken.)

13                  THE COURT:  Sergeant Thao, would you please

14        come forward.

15                  (Oath administered to witness.)

16                  THE WITNESS:  I do.

17                  THE CLERK:  Please state your full name,

18        spelling it for the record please.

19                  THE WITNESS:  Chue Lee Thao, C-H-U-E,

20        L-E-E, last name is T-H-A-O.

21                            **EXAMINATION**

22   **BY ATTORNEY VISHNY**:

23   Q    Sergeant Thao, you testified previously regarding the

24        fact that recordings were destroyed of witnesses

25        named Ryan Thao, Mikey Thao, and Watou Lee?
```

84

```
 1   A    Correct.  I did testify to that they were not
 2        retained.
 3   Q    And the decision to not retain them, that wasn't a
 4        decision made by you alone.
 5   A    No, it was not.
 6   Q    And can you name all the people that you recall
 7        involved in that decision right now?
 8   A    It was a discussion in the unit in terms of the
 9        investigators that were working on the case, as they
10        were aware that we have interview those party, and
11        then I know one day Lieutenant Gostisha, former
12        Lieutenant Gostisha walked into my office saying that
13        we did not need to retain those recordings.
14   Q    Okay.  Were you aware that there were other
15        recordings of two people named Jared Randall and
16        Johnny Thao who had been interviewed and not turned
17        over to the defense but the recordings were retained?
18        Did you know anything about that?
19   A    No, I was -- I was -- I was aware of the name Johnny
20        Thao several months after the investigation, but I
21        did not know where to interview him.
22   Q    Now when you first interviewed Ryan Thao, the very
23        first time, you didn't show him any pictures, did
24        you?
25   A    No, I did not show him any picture.
```

85

| | | |
|---|---|---|
| 1 | Q | Do you remember him telling you that the shooter had |
| 2 | | on a white coat the first time you interviewed him? |
| 3 | A | Based on the description of his observation, he |
| 4 | | indicated that the clothing I believe. |
| 5 | Q | The coat was white, right?  That's what he told |
| 6 | | you? |
| 7 | A | I don't recall exactly. |
| 8 | Q | So you can't recover that information now because you |
| 9 | | don't have the tape to refer to, correct? |
| 10 | A | He provided some descriptions of the person, but I -- |
| 11 | | I can't recall exactly what. |
| 12 | Q | Okay.  So you don't know one way or another if he |
| 13 | | told you the coat was white at that time, right? |
| 14 | A | Yeah.  I don't recall from that first interview. |
| 15 | Q | Okay.  And at that first interview did you |
| 16 | | specifically ask him whether or not he knew who Chong |
| 17 | | Lee was or not? |
| 18 | A | No.  Again, at that time we did not know -- at least |
| 19 | | I did not know any particular specific suspect in the |
| 20 | | investigation.  I was pulled into the case three days |
| 21 | | or two days later, and I simply went in there based |
| 22 | | on information on those subjects to simply listen to |
| 23 | | them, get their observation of what they saw, and |
| 24 | | gather the informations. |
| 25 | Q | Okay.  And so no photos or showing -- there is no |

86

```
 1          identification procedures whatsoever that took place

 2          at that time?

 3    A     No.

 4    Q     And you really can't recall specifically what he said

 5          because, after all, you interviewed a lot of

 6          witnesses and you have no tapes now to refresh your

 7          memory, right?

 8    A     I wouldn't classify as interview a lot of witness.  I

 9          know I interview maybe five, six people in this

10          investigations.  In regards to Mr. Ryan Thao, again,

11          it was recorded initially, and based on discussion by

12          the unit and Lieutenant Gostisha, I was asked that it

13          did not need to be retained.

14    Q     Okay.  Now -- and so it was based on that -- it was a

15          discussion of all the investigators, it wasn't like

16          you going off on some tangent on your own deciding to

17          get rid of tapes?

18    A     That's not my style, no.

19    Q     Okay.  Thank you.  All right.

20              Now, I'm going to ask you about a witness you

21          interviewed named Alex Schyling, okay?

22    A     Yes.

23    Q     You remember interviewing Alex Schyling?

24    A     Yes, I did.

25    Q     And that was recorded and that tape was retained,
```

87

```
 1         correct?

 2    A    Yes.

 3    Q    Even though Alex Schyling was not an actual

 4         eyewitness to the homicide because he was outside

 5         when it happened, right?

 6    A    Yes.

 7    Q    And when you talked to Alex Schyling, one of the

 8         things you were doing was asking him some questions

 9         about Noah Vang, correct?

10    A    I believe it was asking about people that were --

11         have contacted each other and them going to a number

12         of bars starting in Menasha and then who -- how they

13         end up in Appleton and then names were then provided

14         to me.

15    Q    And one of the names mentioned was Noah Vang,

16         right?

17    A    Yeah, I believe so.

18    Q    And another one was Tou Shoua, T-O-U S-H-O-U-A,

19         Lee?

20    A    I don't have -- Tou Shoua Lee, yes.

21    Q    And you also asked if he knew a guy named Tom Lee,

22         right?

23    A    I believe so, just basically who were all together

24         that night.

25    Q    Okay.  Do you remember asking him specifically where
```

```
1          Noah Vang lived or worked?
2    A     I believe so, because I -- again, I don't have
3          current information at that time about, you know, his
4          address or phone number.
5    Q     Do you remember saying the following to Alex
6          Schyling, quote, somebody obviously talked to him
7          already -- referring to Noah Vang, somebody obviously
8          talked to him already so there is no need for me to
9          talk to him, but I just want to get an idea how long
10         you guys have known each other.  Do you remember that
11         you said that to Alex Schyling in your recorded
12         interview?
13   A     I have to refer back, but if I did say that, then
14         obviously it's in the recording.  And it was my
15         understanding that Noah Vang was identified by a
16         number of investigator during the first day or two of
17         the investigation based on that white board, and we
18         identified that person, and it was my understanding
19         that someone was going to talk to him or had talked
20         to him.
21   Q     Okay.  Now, I'm going to show you what's been marked
22         as Exhibit 1.  When you're referring to the white
23         board, I'm just going to show you Exhibit 1.  Is this
24         what you're referring to?
25   A     It's partial.  It's a partial -- not the complete
```

89

```
 1          white board but two picture of the many pictures that
 2          were placed on the white board.
 3     Q    And to the right of the photos, do you see how there
 4          is a list that says interviewed?  Are you familiar
 5          with that?
 6     A    Yes.
 7     Q    What does that mean, the list that says interviewed,
 8          if you know?
 9     A    That basically just to keep track of number of people
10          that investigator may have interviewed them.
11     Q    Okay.  Now, everybody on that list is checked except
12          for Alex Schyling, right?
13     A    Yes.
14     Q    Okay.  So next to Alex Schyling is the No. 9141.  Is
15          that your number?
16     A    Yes, that's correct, my badge number.
17     Q    So would this mean, if you know, that the people
18          whose names were checked had been interviewed already
19          but Alex Schyling had not yet been interviewed at
20          that point since he's not checked?
21     A    Again, I'm not sure exactly when this was done.
22     Q    Okay.
23     A    But based on the handwriting, that's my handwriting
24          in terms of Alex Schyling and my number next to his
25          name.
```

```
1   Q    Okay.  Is that your handwriting for the other names
2        here?
3   A    I believe so, at least for some of them.
4   Q    Okay.  So right here Noah Vang's name shows up with a
5        check mark.  Does that help refresh your memory
6        whether or not you knew if Noah Vang was interviewed
7        or not?
8   A    There is a check mark there and then there is a badge
9        number in front of his name.
10  Q    Okay.  And so what does that mean to you?
11  A    That that officer either have contact with him or
12       have some type of interaction with him or possibly
13       may have conducted interview, but I don't know the --
14  Q    Do you know who number 9202 is?
15  A    Yes.
16  Q    Who is that?
17  A    That would be Officer Eric Holdorf.
18  Q    Okay.  Thanks.
19            So it sounds like at the time you talked to Mr.
20       Schyling, if you said to him, somebody obviously
21       talked to him already, that that would have been your
22       belief at the time.
23  A    That's my belief at that time that someone did make
24       contact with him.
25  Q    Okay.  And have you looked into that any time since
```

91

```
 1        then or not?

 2    A   No, I have not.

 3    Q   Okay.  Now, regarding Mikey Thao, one of the

 4        witnesses whose tapes were destroyed, when you talked

 5        to Joe Thor, Mikey Thao's name came up, right?  Do

 6        you remember that?

 7    A   I spoke to Joe Thor briefly, and I believe he -- I

 8        don't recall whether he actually mentioned the name,

 9        but the name came to us or our attention when I first

10        got involved.

11    Q   I'm going to show you, just to refresh your memory,

12        just a couple of pages of transcript, and if you want

13        to just take a look at it, does this refresh your

14        memory at all about talking to Joe Thor on December

15        18th, 2013?

16             THE COURT:  What transcript is this,

17        Attorney Vishny?

18             ATTORNEY VISHNY:  It's nothing that's been

19        filed with the court, Judge.

20             THE COURT:  Oh, it's not.

21             ATTORNEY VISHNY:  No.

22    A   It's an interview.

23             ATTORNEY VISHNY:  It's an interview by

24        Sergeant Thao of Joe Thor, and it's only a couple of

25        pages.  I'm just trying to see if it refreshes his
```

92

```
 1          recollection.

 2    A     I interview Joe Thor or have contact with Joe Thor at

 3          his residence on that day, but I don't recall if this

 4          is kind of representing our conversation. Just the

 5          verbiage itself and the structures of the exchange

 6          doesn't really help me to really remember the

 7          exchange in terms of between him and I. I know I

 8          have interview him briefly because my intention at

 9          that time was to speak to Michael Thor. If he

10          mentioned his name, that they have -- that he was

11          talked to Michael -- I mean to Mikey that night, then

12          obviously it would have captured in my report.

13    Q     Okay. Well, in the transcript itself he doesn't

14          mention talking to Mikey while he was at Luna bar,

15          right?

16    A     That's what the transcription here said. And again,

17          I -- I have not reviewed my report in terms of my

18          dictations on that, so the structure here doesn't

19          really help me to remember the contents.

20    Q     And in fact part of it is in Hmong so you can't even

21          hear exactly everything that happened until a

22          translation is received, correct?

23    A     Yes.

24    Q     Okay. But if it's not mentioned in your report, that

25          doesn't mean it didn't come up in the interview. I
```

93

```
 1           mean, you don't write down word-for-word in your
 2           reports what occurred.
 3      A    Correct.  But it would have been saved in the
 4           recording.
 5      Q    Right.  Okay.  Were you aware that when Joe Thor
 6           talked to Sergeant Schira that he mentioned seeing
 7           Mikey Thao at Luna?
 8      A    I wasn't part of that interview so I can't say what
 9           they discussed.
10      Q    Okay.  Now, Mikey Thao, were you aware from your
11           overall discussions in the interview that unlike Ryan
12           Thao or Watou Lee that he had some friendlier
13           associations with Joe Thor, Phong Lee and Paul Lee?
14      A    Yes, I was aware of that when I first got involved in
15           the investigation.
16      Q    Okay.  So that unlike Ryan Thao and Watou Lee, he
17           grew up with these various people, Joe Thor, Phong
18           Lee, Paul Lee, knew them and did some socializing
19           with them while at Luna bar, right?
20      A    Yeah, that's my understanding, that's how they ran
21           into each other in the foyer.
22      Q    And you also talked to Phong Lee, you interviewed
23           him, right?
24      A    Sergeant Tauber and I interview him, yes.
25      Q    And the name Mikey Thao also came up in your
```

1      interview of Phong Lee, correct?

2   A  Again, I don't recall whether or not we discuss this

3      extensively about Mikey or not, but a report has been

4      -- would have been completed on that interview, and

5      if names were given it would have captured in that

6      report.

7   Q  Okay.  I'm going to show you a report written by

8      Sergeant Tauber of the interview and just see if that

9      helps to refresh your recollection as to whether or

10     not Mikey Thao's name came up.  Does that help

11     refresh your memory, even though you didn't write the

12     report, as to whether or not the name Mikey Thao came

13     up in your discussions with Phong Lee?

14  A  Yes.

15  Q  And did it come up?

16  A  Yes.  I believe he mentioned that it was toward the

17     end of bar closing time and they happened to run into

18     each other in the foyer area and then started

19     engaging in conversation because of whether they grew

20     up together or because there was some relationship

21     between them.

22  Q  Okay.  Thank you.

23         Also, the Mikey Thao name also came up when you

24     interviewed Paul Lee at Norka, right?  Do you

25     remember the interview you did with Sergeant Rabas

95

| 1 | | with Paul Lee at Norka? |
| 2 | A | Yes. |
| 3 | Q | And the name Mikey Thao came up there as well? |
| 4 | A | I believe so.  It was a long interview and we |
| 5 | | discussed various people in terms of what they were |
| 6 | | doing in the foyer, and I believe that that name may |
| 7 | | have come up at that time. |
| 8 | Q | Okay.  When you interviewed Paul Lee that day on |
| 9 | | December 11th, you had actually already interviewed |
| 10 | | Mikey Thao for the first time, correct? |
| 11 | A | No, I have not. |
| 12 | Q | You hadn't interviewed him on December 11th? |
| 13 | A | Not at -- not at Norka when we interview Paul Lee. |
| 14 | Q | No.  I understand that.  But had you interviewed |
| 15 | | Mikey Thao earlier that day?  Was it that same day |
| 16 | | that you interviewed Mikey Thao? |
| 17 | A | No, it was after we interview Paul Lee at Norka that |
| 18 | | I made contact with him that I interview him on that |
| 19 | | night. |
| 20 | Q | Mikey Thao? |
| 21 | A | Mikey Thao. |
| 22 | Q | Okay.  So it came afterwards? |
| 23 | A | After Norka. |
| 24 | Q | What time that night did you interview Mikey Thao, if |
| 25 | | you recall? |

96

| 1 | A | It was after Paul Lee was taken to the Appleton |
| 2 | | Police Department for additional question by other |
| 3 | | officer. I remain at Norka to interview Michael |
| 4 | | Xiong, which is Chong Lee, the defendant's, |
| 5 | | brother-in-law. And then after that then I interview |
| 6 | | -- I believe I made contact with Mikey and then I |
| 7 | | interview him. |
| 8 | Q | Okay. Where was that interview conducted? |
| 9 | A | It was in my squad. I believe I met him somewhere. |
| 10 | Q | And you didn't show him any photographs either, |
| 11 | | correct? |
| 12 | A | No, I did not. |
| 13 | Q | And at that time did he tell you that he thought |
| 14 | | Chong Lee was still in jail? |
| 15 | A | Yes. |
| 16 | Q | Okay. And he never identified Chong Lee as somebody |
| 17 | | who did the shooting, right? |
| 18 | A | Not by name, he just provide descriptions of people |
| 19 | | coming through. |
| 20 | Q | Okay. And he said that the shooter had on a white |
| 21 | | jacket, correct? |
| 22 | A | I guess -- I mean, I -- |
| 23 | Q | At that time. |
| 24 | A | If he did mention some kind of clothing, again, I -- |
| 25 | | I don't recall exactly the type of color he used. If |

97

```
 1         he say it was white, then I'm assuming it's white.
 2    Q    In your re -- when you reinterviewed him in April of
 3         2015 he then told you the shooter had on a white
 4         jacket, correct?
 5    A    Again, I have not had a chance to look at that
 6         report.
 7    Q    Would it help you if I showed you your report to
 8         refresh your recollection?
 9    A    Yes.
10    Q    The report is actually written by Sergeant Rabas,
11         correct?
12    A    Correct.
13    Q    Okay.
14              ATTORNEY VISHNY:  Sorry, Judge.  I thought
15         I was a little bit more organized than that.
16    Q    (BY ATTORNEY VISHNY)  Okay.  I'm showing you a copy
17         of Sergeant Rabas's summary of that interview
18         regarding Mikey Thao, and just ask you if that helps
19         refresh your memory as to what Mikey Thao said in
20         April of 2015 --
21    A    Yes.
22    Q    -- regarding what the shooter wore.
23    A    Yes.  On Page 346 he -- Michael -- Mikey stated that
24         he doesn't know who had the gun.  He initially states
25         a guy with a white coat with stripes on the arms have
```

Case 2:22-cv-00620-WCG    Filed 11/11/22    Page 98 of 169    Document 26-14

330-98

1      the gun.

2   Q   Okay.  And he told you he thought the stripes were on
3       the complete arms and not just the cuff, right?
4   A   That's what's in the report, yes.
5   Q   Earlier in this investigation had you been looking
6       for somebody with a white coat with stripes on the
7       arms, like back in December of 2013?  Do you know?
8   A   We -- again, when I first got involved, which was a
9       couple days later, I did not have any specific
10      information about a particular suspect other than
11      making contact with witnesses to get information as
12      to what they saw and who were they with that night.
13      So I don't -- I didn't have any specific information
14      about particular color, clothing or description of
15      suspect other than what happened in the lounge based
16      on who was there, who came in and who went out.
17  Q   Now, Mikey Thao told you that he knew Chong Lee
18      because he had gone to school with Chong and his
19      family, correct?
20  A   Yes.  He grew up with them.  I think he was more of a
21      -- had more of a relationship in terms of
22      acquaintance and know each other with Paul Lee, but
23      he did mention the other brothers as well.
24  Q   And in this interview in April of 2015 you asked
25      Mikey whether he thought -- whether he knew that

99

```
 1          Chong had been charged with the shooting, and Mikey
 2          said, yes, he knew that Chong had been arrested,
 3          correct?
 4    A     Yes.
 5    Q     And you asked him if Chong was the right guy, and his
 6          response was, well, it could have been him, but he
 7          didn't say I saw Chong Lee do it, correct?
 8    A     Correct.  He didn't give -- he didn't say the names
 9          but -- other than what he saw.
10    Q     And what he said was, in fact, he wasn't sure because
11          he thought Chong Lee was in jail and he had not seen
12          Chong Lee at Luna that particular night, correct?
13    A     Correct.  He thought he was in jail.
14    Q     Right.  And that -- so whatever information he has
15          linking Chong Lee specifically is because of things
16          he saw in the news afterwards, right?
17    A     No.  I think it's based on what he saw that night.
18    Q     Well, what he told you was he didn't see -- he
19          thought -- wasn't sure because he thought Chong was
20          in jail, didn't see Chong Lee that night, and he saw
21          on the news that Chong was charged with the murder
22          and, again, he can't identify the shooter, correct?
23    A     Correct.  He mention about Chong had been arrested
24          for the shooting.
25    Q     Okay.  So he had what might be called post-event
```

```
 1         information.  In other words, his memory included

 2         things he had heard about after the arrest, not just

 3         what he knew at the time after the shooting but

 4         before a suspect had been arrested, correct?

 5    A    I'm not an expert in the area so I can't go that

 6         far.

 7    Q    Okay.  Well, he told you that he had information that

 8         had occurred after the arrest, not just from the time

 9         of the shooting, right?

10    A    He indicated that he had learned that Chong has been

11         arrested for the --

12    Q    And clearly when you interviewed him on December 11th

13         he wouldn't have known that because Chong hadn't been

14         arrested yet, correct?

15    A    Not on December 11th, no.

16    Q    And when you interviewed Ryan Thao back in December,

17         he couldn't have possibly known that because Chong

18         hadn't been arrested yet, right?

19    A    Correct.

20    Q    And Ryan Thao didn't know Chong Lee, correct?  Told

21         you he didn't know him, didn't he?

22    A    Correct.

23    Q    And Watou Lee also told you he didn't know Chong Lee,

24         correct?

25    A    Yes.
```

| | | |
|---|---|---|
| 1 | Q | And none of these individuals back in the December |
| 2 | | interviews were shown any pictures of Chong Lee or |
| 3 | | other people from the white board, correct? |
| 4 | A | I didn't. |
| 5 | Q | You didn't. Well you're the person who interviewed |
| 6 | | them, right? |
| 7 | A | Correct. |
| 8 | Q | Okay. And during the interviews in April of 2015 you |
| 9 | | didn't show any photographs to them either, right? |
| 10 | A | On the April one with Sergeant Rabas? I think we did |
| 11 | | bring picture of them from the white board showing |
| 12 | | that their name has been or the picture has been |
| 13 | | inadvertently turned over to the defense and that |
| 14 | | possibly defense may reach out to them just to make |
| 15 | | them comfortable in terms of why we reengaged them. |
| 16 | Q | Right. But you didn't show them pictures of other |
| 17 | | suspects like Chong Lee, Paul Lee, Joe Thor or Phong |
| 18 | | Lee, correct? |
| 19 | A | No. |
| 20 | Q | You know, the last time -- I mean both now and |
| 21 | | previously you testified about consultation about |
| 22 | | destroying these tapes. Were there consultations to |
| 23 | | your knowledge about destroying any other tapes in |
| 24 | | this case? |
| 25 | A | It's -- no, at least there was no -- because the |

102

```
 1          other witness have not come forward or make it known
 2          that they did not want to get involved, they did not
 3          want to be identified.  The only discussion I have
 4          was with those three particular parties.
 5      Q   Okay.  So you weren't aware that Johnny Thao or Jared
 6          Randall had been talked to and said they didn't want
 7          to be identified either but their tapes had been
 8          retained?
 9      A   I did not participate in those interviews, so I can't
10          say as to what they did say to the officer or did not
11          say.
12      Q   But was there a -- so there was no discussion
13          regarding what to do with the tapes of other
14          witnesses who did not want to be identified.
15      A   Not -- not with me, no.
16      Q   Okay.
17                  ATTORNEY VISHNY:  Nothing further.
18                  THE COURT:  Miss Schneider?
19                          EXAMINATION
20      BY ATTORNEY SCHNEIDER:
21      Q   Related to Noah Vang, you spoke with Alex Schyling
22          who indicated he and Noah were outside of Luna at the
23          time of what they believe to be the time of the
24          shooting, correct?
25      A   Correct.
```

103

```
 1   Q   Based upon that did you do anything to check or
 2       verify what Alex said in that regard?
 3   A   No, I did not.  It was my understanding that other
 4       officer either was going to or have made contact with
 5       Noah.
 6   Q   Okay.  But what I mean is do you remember at any
 7       point trying to check video from either Luna or
 8       outside of Luna to confirm Alex when he said he was
 9       outside the bar at the time of the shooting?
10   A   Yes.  There was a discussion about someone would look
11       at the street cameras on Division and College and to
12       verify that, and I think that that was done.
13   Q   Okay.  But you didn't do that.
14   A   Not myself.
15   Q   Your work probably related to the video and watching
16       the videos has been very limited?
17   A   Yes.
18   Q   Okay.  Okay.  So at -- you speak to Paul Lee at
19       Norka?
20   A   Yes.
21   Q   I just want to walk through a sequence.  And then you
22       talk to Mike Xiong, his brother-in-law, at Norka.
23   A   Yes.
24   Q   Then you went and spoke to Mikey Thao.
25   A   Yes.
```

104

```
 1   Q   And at that time Paul Lee had been taken to the
 2       Appleton Police Department.
 3   A   Yes.
 4   Q   You then go back and are involved again in the
 5       interview with Paul Lee at the Appleton Police
 6       Department.
 7   A   Yes.
 8   Q   Okay.  Did you share with Sergeant Rabas what Mikey
 9       Thao had told you prior to the time when you spoke to
10       Paul Lee at the police department?
11   A   No.  Sergeant Rabas was not involved in that second
12       interview, it was Sergeant Schira, and another
13       officer, investigators were doing other tasks, and I
14       don't recall actually going to him and say this is
15       what Mikey said, other than when I return back to the
16       police department I was asked to reinterview Paul
17       Lee.
18   Q   Did you tell Sergeant Schira what you had learned
19       from Mikey Thao before you went back to speak to Paul
20       Lee at the police department, to the best of your
21       recollection?
22   A   I don't recall sitting down with him and talk about
23       what Mikey said, other than I may have mentioned
24       about making contact with Mikey just so that people
25       would know, but in terms of discussing content, I
```

105

```
 1          don't believe so.

 2    Q     Was it something where there were multiple officers

 3          interviewing multiple witnesses at the same time?

 4    A     Yes.  I mean you got officers that were in Milwaukee

 5          at the time, you got other officers that were trying

 6          to reconfirm information or recontact other people.

 7          Again, I was not a supervisor so I didn't oversee who

 8          was doing other than I was tasked to reinterview Mr.

 9          Paul Lee that night.

10    Q     Okay.  Is the photograph of a portion of the white

11          board still in front of you, Sergeant Thao?

12    A     No, it's not.

13    Q     But I don't think you need it unless you feel you

14          need it.  You don't truly know what those check marks

15          mean, correct?

16    A     The check mark that I put -- I were putting there was

17          simply to indicate people that has been identified

18          from the white board.  The actual day that they --

19          where the contact was make or interview, I -- I have

20          no idea.

21    Q     Were you responsible for writing the names or placing

22          the check boards (sic) on there?

23    A     No, I was not.  I did write names -- some names on it

24          just to keep track of who the officer made contact

25          with those people so that we have an idea so we don't
```

106

```
 1       repeat the same interview.

 2    Q  And I think earlier did you say you actually wrote

 3       Alex Schyling's name on the list?

 4    A  Yes.

 5    Q  Do you recognize that as your own handwriting?

 6    A  Yes.

 7    Q  Okay.  Now, at the time -- so you talked to Mikey

 8       Thao, and he at that point tells you he doesn't want

 9       to be identified, right?

10    A  Very firmly.

11    Q  When you were involved in follow-up interviews with

12       other parties, or even initial interviews, if they

13       brought up the name Mikey Thao, Ryan Thao or Watou

14       Lee, did you turn the direction of the interviews so

15       those names weren't mentioned again?

16    A  No.

17    Q  Did you tell them we can't talk about those people?

18    A  No.

19    Q  Did you let them share whatever they may or may not

20       know about those people?

21    A  Of course.

22    Q  Okay.  And is it a situation when there was a

23       decision, or discussion and then a decision made not

24       to retain the Mikey, Ryan and Watou recordings, did

25       you take any steps to go back and try to get rid of
```

```
 1          any reference to those people in all the other
 2          reports or recordings?
 3     A    Yes.
 4     Q    Okay.  But did you go back -- maybe you got rid of
 5          what they told you, correct?
 6     A    Yes.
 7     Q    But if you did an interview with Paul Lee and Paul
 8          Lee mentioned the name Mikey Thao, did you go back to
 9          Paul Lee's interview and like bleep over or X out on
10          a report so you couldn't read or there weren't
11          references to those people?
12     A    No, we did not do that, or I did not do that.
13     Q    So you left all those names in the reports?
14     A    Of course.
15     Q    Okay.
16              ATTORNEY SCHNEIDER:  Then I don't have
17          anything further for Sergeant Thao.
18              THE COURT:  Sergeant, I just want to follow
19          up with you on the check marks.
20              My recollection is that you were the individual
21          who wrote, amongst other names, but you wrote the
22          name Noah Vang on the -- I'm referencing Exhibit 1 as
23          the white board, correct?
24              THE WITNESS:  Yup.
25              THE COURT:  Did you also write the check
```

1      mark on there?

2              THE WITNESS:  I don't -- I don't recall all

3      of them, but definitely some of them.  For example,

4      like, I interview Tou Shoua Lee.  My badge number is

5      in front of it, check mark after that saying that I

6      interview him.  There is a check mark after Tom Lee.

7      Of course I did not interview Tom Lee.  I don't know,

8      you know, who put that check mark there.  I interview

9      Phong Lee with Sergeant Tauber, and that's why our

10     badge number were there, even though he was interview

11     previously by other officers.  So I can't say that

12     all of them were done by me, or I can't say that

13     just, you know, but for sure those names I mentioned

14     to you, sir.

15             THE COURT:  Now, next to Mr. Vang, Noah

16     Vang, there was -- I believe it was No. 9202, which I

17     think you had identified as Officer Holdorf, correct?

18             THE WITNESS:  Yes.

19             THE COURT:  And what is the -- what was

20     your understanding as to the connection between

21     Officer Holdorf and Mr. Vang?

22             THE WITNESS:  It's my understanding that

23     that's why the officers's badge number or name, in

24     this case the badge number, was in front of each name

25     was that that officer would be responsible for trying

                              109

```
 1          to make contact with that particular individual,

 2          would either have made or going to make.

 3                    THE COURT:  Okay.  So although you don't

 4          know the specifics of the contact between Mr. Vang

 5          and Officer Holdorf, it was your understanding that

 6          there was an expectation that some contact, be it an

 7          interview or other contact, would be conducted

 8          between Officer Holdorf and Noah -- Noah Vang; is

 9          that a fair understanding?

10                    THE WITNESS:  Correct.  Basically just an

11          organizational chart with names so we don't repeat

12          making contact with one individual many times.

13                    THE COURT:  Attorney Vishny?

14                    ATTORNEY VISHNY:  Yes.

15                              **EXAMINATION**

16     **BY ATTORNEY VISHNY:**

17     Q    To your knowledge, on that list, every single person

18          has been interviewed and a report filed except for

19          Noah Vang, right?

20               If you look at that list, of all the names with

21          the check marks, you're aware that everyone of those

22          people has been interviewed and police reports and

23          tapes provided to the state and the defense, correct?

24     A    I'm very concerned that at least with Tou Shoua Lee,

25          with Alex, and obviously with Paul Lee that we talked
```

```
 1          that I completed a report.  I want to assume that if
 2          those people interviewed that those officers would
 3          have completed report and would have included in
 4          there too.
 5                    ATTORNEY VISHNY:  Okay.  Nothing further.
 6                    THE COURT:  Attorney Schneider.
 7                              EXAMINATION
 8     BY ATTORNEY SCHNEIDER:
 9     Q    But before today, you didn't have Exhibit 1 to look
10          at or go -- the ability to go ask or check with
11          anyone?
12     A    No, I wasn't aware of it so I did not have the
13          ability to go back and confirm and be able to answer
14          question.
15                    ATTORNEY SCHNEIDER:  Okay.  Thank you.
16                    ATTORNEY VISHNY:  Nothing further.
17                    THE COURT:  All right.  Thank you.
18                    THE WITNESS:  Thank you.
19                    THE COURT:  Are we ultimately going to talk
20          to Officer Holdorf now as a result of this?
21                    ATTORNEY VISHNY:  Why don't we just let --
22                    ATTORNEY SCHNEIDER:  I can -- I mean, Rabas
23          said he checked with MEG guys, so I think even if we
24          bring him in and just ask if that included checking
25          with Lieutenant -- or Sergeant Holdorf.  I'm not sure
```

111

```
 1        of the title.  I'm thinking of his dad when I say

 2        lieutenant.

 3                    ATTORNEY VISHNY:  Yeah.  Let's just recall

 4        him.  I'll recall him.  That's fine.

 5                    THE COURT:  You're still under oath.

 6                              **EXAMINATION**

 7    **BY ATTORNEY VISHNY**:

 8    Q    Do you know Officer Eric Holdorf?

 9    A    Yes.

10    Q    And did you check with him to see whether or not he

11        had ever interviewed Noah Vang?

12    A    Yes.  In reference to this case, yes.

13    Q    Yes.  In reference to this case.  What did he tell

14        you?

15    A    He said no.  At least he responded in an e-mail that

16        he did not.

17    Q    Okay.

18                    ATTORNEY VISHNY:  Judge, I'm going to move

19        for the production of the e-mails between Sergeant

20        Rabas, Officer Holdorf and -- Officer Probst -- or

21        Officer Probst.  I'm going to ask that the State

22        provide those.  It looks like we're going to be back

23        here at 1:30 at this point.

24                    ATTORNEY SCHNEIDER:  Do we have all day or

25        just the morning set?
```

112

```
 1                    THE COURT:  We did have just the morning

 2     set.  I can squeeze you in and around things maybe.

 3                    ATTORNEY SCHNEIDER:  Okay.

 4                    ATTORNEY VISHNY:  I'd ask that those be

 5     produced at 1:30.

 6                    ATTORNEY SCHNEIDER:  That should be no

 7     problem.

 8                    THE COURT:  That request will be granted.

 9                           EXAMINATION

10     BY ATTORNEY SCHNEIDER:

11     Q   Let me just ask you this.  Could you be wrong and

12         9202 is actually Sergeant Holdorf and not Officer

13         Probst?

14     A   Yeah.  That's why when -- I wasn't sure of the

15         number.  I'd have to actually look at our officer

16         numbers.  Not being on the road, I'm not familiar

17         with them.

18                    ATTORNEY SCHNEIDER:  Nothing further.

19                    ATTORNEY VISHNY:  Nothing.

20                    ATTORNEY SCHNEIDER:  Should we approach to

21     talk about timing?

22                    THE COURT:  Sure.  Why don't we do that.

23                    (A bench conference was held.)

24                    (Lunch recess.)

25                    THE COURT:  Okay.  We have --
```

1          ATTORNEY VISHNY:  Judge, before you

2     start.

3          ATTORNEY SCHNEIDER:  We tried to make peace

4     during the break.

5          ATTORNEY VISHNY:  We've come to an

6     agreement.  Well, at least a partial agreement.  This

7     is what I've agreed to.

8          THE COURT:  You just stole my thunder.

9          ATTORNEY VISHNY:  Sorry.  I just can't help

10    myself.

11         THE COURT:  That's all right.  Go ahead.

12         ATTORNEY VISHNY:  I'm not going to ask for

13    suppression of the translated materials as long as

14    they're provided by October 12th, which is when Miss

15    Schneider says they can do, but I'm asking the court

16    to rule today that if they aren't provided on that

17    date that it should be suppressed.

18         ATTORNEY SCHNEIDER:  I don't have any issue

19    with that.  It allowed me to check e-mails over lunch

20    and e-mail back and forth with the person doing it.

21    What I'll do is I'll send them in parts.  I'm not

22    going to wait and send them all on the 12th.  Right

23    now I know I have eight phone calls that I just have

24    to finalize and organize and get to her.

25         The other thing I think we discovered this

114

```
1    morning is that there may have been, and we're going
2    to sort this out, some doubling of efforts on English
3    portions of interviews with witnesses, so we're
4    trying to sort that out to figure out what's been
5    done, what's not been done, or who's doing what at
6    this point, because she used Joe Thor's transcript,
7    which I didn't realize she had one done yet.  So
8    we're working through that too.
9              THE COURT:  Okay.
10             ATTORNEY SCHNEIDER:  We picked some
11   tentative dates for things to be due.  I don't know
12   if the court's okay with the dates we're suggesting,
13   but I'm going to at least explain what we've talked
14   about.
15        Right now on November 5th we have a motion
16   hearing scheduled already in this case because we had
17   blocked some additional time.  I think at least
18   tentative jury instructions, witness lists, verdict
19   form filed.
20             ATTORNEY VISHNY:  I'm sorry.  What?  Jury
21   lists?
22             ATTORNEY SCHNEIDER:  Jury instructions,
23   witness list and verdict form filed, you know, the
24   day or when we come to the motion hearing.
25        I think probably long ago we both filed some
```

1    motions in limine, but I'm just going to double-check

2    to make sure those housekeeping ones --

3              THE COURT:  Some of the boilerplate ones

4    have been filed already.

5              ATTORNEY VISHNY:  Yes.

6              ATTORNEY SCHNEIDER:  So, if not, we'll try

7    to update anything on the 5th.

8         I don't know what I may need to request related

9    to defense expert, so I asked -- I don't know if I'm

10   going to want a *Daubert* on them or not.  I asked,

11   rather than try to pick another date, to have them

12   check to see if he might be available for phone

13   testimony on the 5th because we have the afternoon

14   blocked off, and then if that's not going to work,

15   we'll let the court know, but I at least want to put

16   you, given their notice, that we likely may want to

17   request a *Daubert* hearing, and we're going to try to

18   work that in within the current time we already have

19   scheduled.

20             THE COURT:  Is there going to be -- the

21   expert may not have a report that he's preparing.  Is

22   there going to be a disclosure of an expert report,

23   Attorney Vishny?

24             ATTORNEY VISHNY:  Okay.  So here's what's

25   going on.  Very brief summary was prepared and

116

```
 1        provided today, and I will also e-mail curriculum
 2        vitae of my expert, which I have, to Miss Schneider.
 3        I don't know when Mr. Trainum's report is going to be
 4        done exactly.  I did text him after talking to Miss
 5        Schneider, and he wrote back saying that he probably
 6        could be available for telephonic testimony November
 7        5th.  He writes, have two weeks including that
 8        blocked off for a DC trial where I'm told I will
 9        probably not testify.  Sure I can do a work around if
10        that changes.  So it appears to me likely that he'll
11        be available.  I don't know, you know, in terms of
12        his report when I'm going to have something exactly,
13        but when I get it, I'll turn it over immediately.
14                  THE COURT:  Okay.
15                  ATTORNEY VISHNY:  I mean, there is no
16        reason to wait so --
17                  ATTORNEY SCHNEIDER:  And I didn't know,
18        because I didn't have my calendar, how much time on
19        the 24th we had blocked because we said pretrial, so
20        I don't know if we just thought we had an hour.
21                  THE COURT:  And my clerk just confirmed we
22        have three hours set aside, so I think we had -- I
23        think we had expected that we might need additional
24        time.
25                  ATTORNEY SCHNEIDER:  On both days, the 5th
```

117

1     and the 24th?  Okay.

2            ATTORNEY VISHNY:  I'm going to text him

3     right now, too, that -- just bear with me if you

4     think I'm being rude using my phone.

5            THE COURT:  No.  That's fine, Counsel.

6            ATTORNEY SCHNEIDER:  Then, just in terms,

7     while she's doing that, we had talked about witness

8     lists so that we could get -- I could have my

9     investigator start doing prior conviction checks, and

10    what -- and we had this discussion months ago when I

11    talked with Attorney Vishny out in the hallway.  I

12    think she said she's not going to have any additional

13    witnesses other than those that have been disclosed

14    in the reports.  I told her my concern about that is

15    I don't want the officers to run 170 names when a lot

16    of these people won't be called.  So I'm going to

17    file a witness list, they're going to, I think, if

18    there are people I'm not specifically naming that

19    they know they might be likely to call, they'll

20    provide those so we can have some prior conviction

21    checks done.  I don't want to start trial and then

22    the morning of get the list of here's three people

23    we're calling.

24           ATTORNEY VISHNY:  I just have a question

25    about prior conviction checks.  I mean we have the

1   same -- we have access to CIB, but the police run an
2   NCIC record so things from out of state pull up.  We
3   don't have access to that.

4                ATTORNEY SCHNEIDER:  Yes.  And I explained
5       what I would do for a format is we list the person's
6       name, we list any criminal we could find within ten
7       years, except for traffic, we list anything we can
8       find outside of ten years, then after that separate
9       subheading.  We agreed we're not listing any OARs,
10      but then I would list after that any traffics whether
11      it's within or with outside of ten years.  We have a
12      group of people who are young so we will also look to
13      see what we can -- I don't have access to everybody's
14      juvenile records, and sometimes people think we do
15      and we don't, but I will check and do a juvenile
16      record search, because a lot of our people are 22 and
17      younger as well to see what records we can provide.
18      I'll give a -- I'll prepare those sheets.  I'll give
19      copies to everyone.  If I give them to the court, if
20      there is anyone with juvenile, I'm going to put the
21      whole packet then under seal just so that it's sealed
22      in the court's file.  That would be our plan.  And we
23      would try to have that -- those lists and summaries
24      done by November 13th is the date we thought because
25      then we would still have time before the 24th to kind

1    of have them double-check or if we miss someone there
2    would be time to look at that.

3            For whatever reason, and I know it's because of
4    scheduling, the 3D, we talked about this before,
5    because Luna has been bought and we knew that the new
6    owner was going to make significant changes to the
7    building and to the inside, so we had the state
8    patrol prior to that go and scan using different
9    equipment so that they could create some 3D images.
10   Those are supposed to be done and they are not done.
11   Part of the reason I'm now being told is because they
12   were leasing the equipment and now they're purchasing
13   the equipment, so I think they're waiting to get
14   their purchased equipment.  And I also know, their
15   supervisors wouldn't say this out loud, but without a
16   deadline they're given very limited ability to work
17   on a lot of the reconstruction stuff anymore, but if
18   the court does an order, which I'm going to ask the
19   court to do, then my trooper can go to his
20   supervisors and say, I need you to authorize me to do
21   overtime to complete this, because that's basically
22   what I'm finding out is having to be done to get
23   these done.

24           THE COURT:  So do we want to use a November
25   13th deadline?

```
 1              ATTORNEY SCHNEIDER:  I was going to say
 2    October 23rd.
 3              THE COURT:  That's fine.
 4              ATTORNEY SCHNEIDER:  What I'm going to do
 5    though is I just want to make sure that the officer
 6    doesn't already have major trials between now and
 7    then, so my order will come to you either with the
 8    23rd or the 30th of October as a deadline for those.
 9              THE COURT:  And you're okay with that,
10    Attorney Vishny?
11              ATTORNEY VISHNY:  Yes.
12              THE COURT:  Okay.
13              ATTORNEY SCHNEIDER:  Okay.  Then just to
14    put on the record, previously we had talked about a
15    person named Megan Kelly, and we had talked about a
16    lot of letters and then phone calls.  And there was
17    some information I was supposed to provide the court
18    about phone calls, and I did in a memo.  We provided
19    a disk of all the letters, as well as Sergeant Rabas
20    summarized portions of various letters.  After that,
21    I discussed with Attorney Vishny that there are
22    hundreds of hours of calls.  Literally, we'd sit here
23    through our trial date listening to all of them.  I
24    don't intend to use any of them.  I don't know, I
25    mean, there is discussions about 50,000 other things,
```

1    but my -- I'm not using them.  Given that, I think
2    they don't want to get them to listen to either, but
3    I just want to -- if it's something the court had on
4    its checklist, we've kind of come to resolution on
5    that.
6         There aren't any Amanda Krohn jail phone calls
7    because she was in jail with the defendant, but there
8    are letters between the defendant and Amanda Krohn,
9    and it would be my intention to potentially use some
10   of those letters.  I will continue to work with them.
11   And I know Sergeant Rabas did identify a series of
12   those that may be relevant as opposed to a lot of the
13   other ones we found that just are talking about
14   whatever under the sun.
15        I think that's everything I had.  We want to get
16   all our other miscellaneous stuff done before you
17   started making your ruling, but I think that's
18   everything I had on my list for today, and I'll just
19   ask for permission if I missed something.
20        THE COURT:  I just want to talk briefly
21   before I make my rulings.  Was the reference to "beat
22   this case", and I know that's all -- that's been
23   briefed.  One of the -- and largely what it comes
24   down to is, is it relevant, or if it's relevant, is
25   it more prejudicial than not.  And, Miss Schneider, a

122

1    little bit more detail on how that becomes relevant.
2    My understanding is that this is a comment made by
3    Mr. Lee once he's in jail and makes reference to --
4    makes the statement "beat this case", as I understand
5    it, and the question being that's such an amorphous
6    concept.  It could mean, hey, I -- I'm going to --
7    I'm going to be proven not guilty, I'm going to be
8    acquitted, it could mean something else.  And how
9    does that help the fact finder at the end of the day.
10   And I think that's largely Attorney Vishny's point is
11   that it --

12            ATTORNEY VISHNY:  It doesn't.  We didn't
13   see any examples where it was tied into, well, if my
14   brother Paul doesn't show up for court, I'll be okay
15   then because I'm gonna beat my case, which would be
16   tied into, I think, the State's theory, the
17   intimidation of witness count.

18            THE COURT:  And to a certain degree that's
19   what I'm asking for.  Is there context around it that
20   tends to make it more relevant other than an isolated
21   comment.

22            ATTORNEY VISHNY:  The defense position is
23   that there is not.  And I think the State filed a
24   list with the court of the references, if I'm not
25   mistaken.

1           ATTORNEY SCHNEIDER:  Yup.  The court wanted
2       us to.  I'm just looking at my June 19th filing
3       because that was the filing the court had wanted.
4           ATTORNEY VISHNY:  So the -- so I'm
5       gathering -- I'm a little unclear about one thing
6       about Miss Schneider's memo which is that she writes
7       "beat the case" or like phrases appear in numerous
8       letters and transcripts and then she gives some
9       examples.  Are there other examples besides these
10      that the State would seek to admit?
11          ATTORNEY SCHNEIDER:  No.
12          ATTORNEY VISHNY:  Okay.  So I can address
13      each and every one of them, Judge, if you would
14      like.
15          THE COURT:  That would be fine, Counsel.
16          ATTORNEY VISHNY:  Okay.  So in a letter to
17      somebody named Steph, I have no idea who that is, but
18      I don't think it's a witness for the State at all, he
19      says, I'm pretty sure I'll "beat this case" though.
20      Well, I -- I don't see the difference between that
21      and saying -- I mean saying that "beat this case" is
22      in the vernacular, I'm pretty sure I'm going to be
23      found not guilty.  That can be an assessment of the
24      evidence in a case.  I don't see how it's relevant.
25          In a letter to Joe Thor he says, I just never

124

1   thought family would do this to me but that's past.

2   I will beat this and be out. He's not connecting

3   this at all with trying to intimidate any witnesses,

4   he's expressing confidence that no matter what, he is

5   going to be found not guilty and therefore be out of

6   custody.

7        In a letter to Blong, I don't know who Blong is,

8   I don't think that's a State witness. I have a big

9   chance of winning. I really do hope that I beat this

10  case. After I beat it, I'm going to move to

11  California, far away from these people. I don't see

12  the relevance of that.

13       Now, in a letter to Teng Lee, who it's unclear

14  to me if the State is going to call him, he said that

15  Sunny Vang, I don't know who that is, that's not a

16  State witness, should, quote, shut the fuck up or

17  when I beat this case I'll be happy to catch a case

18  for putting an AC wannabe in his grave. I ain't in

19  prison yet until they say guilty, so that bitch ass

20  AC want to best learn who he talks about. You know,

21  this goes on and on. The language is really

22  offensive in here. Do you want me to keep reading it

23  out loud since you have it in the file?

24            THE COURT: No. That's okay.

25            ATTORNEY VISHNY: Okay. I think I'll not

125

1   do that.  But this reference to shut the F up by
2   Sunny Vang, Sunny Vang is not a witness in this case
3   against Chong Lee, you know, at all.  That name
4   doesn't appear anyway in the discovery.  I think that
5   this is a reference to other matters that are not
6   before the court allegedly involving Chong Lee and
7   his social circle and that they are not relevant to
8   the trial in this case.  He's simply talking about
9   something that's angering him that's going on on the
10  street that he intends to deal with.
11      And then, finally, in the letter to Amanda
12  Krohn, everybody be like how you gonna beat your
13  case.  LMFAO.  My case is a walk in the park.  That's
14  why I'm not worried.  Why worry when I wasn't the one
15  to do it.  I don't want to catch a homi before seeing
16  my fate on my current one.  A homi meaning -- is
17  probably a homicide.  I'm assuming that's what it
18  means.  I don't know.  H-O-M-I.  I'm not sure what
19  the reference is.  And he's expressing some anger.
20      But, again, there is nothing that has any
21  relevance to the facts of this particular case.  So,
22  I don't see any of these directly being relevant to
23  the intimidation of witness charges.  So there is
24  nothing in one of these saying that he's attempting
25  to prevent any of these individuals to testify --

126

```
 1      from testifying, and when he talks about this, he's
 2      really talking on two occasions, he's expressing
 3      confidence that he'll be found not guilty, and on the
 4      other two occasions he appears to be referring to
 5      other matters that are not part of this charge but
 6      could potentially involve some type of criminal
 7      activity that are -- have nothing to do with this.
 8      So I don't see how they're relevant or probative, and
 9      I -- I frankly don't see them as being relevant or
10      probative at all, but they are so vague that any
11      marginal probative value, if the court were to find
12      that, would be substantially outweighed by the danger
13      of unfair prejudice.
14              THE COURT:  Miss Schneider, anything
15      further?
16              ATTORNEY SCHNEIDER:  You know, and I
17      frequently get to the point where we see one side of
18      a coin and defense sees another, but I think there
19      are several references.  Some of these are pretty
20      innocuous.  I'm pretty sure I'll beat this case
21      though.  That can be argued either way.  I think what
22      we submitted in our filings is that, through cross or
23      other means, they can, well, elicit or ask, well
24      wouldn't that mean that he didn't do that and that's
25      why he's writing "beat the case" or "beat this case".
```

127

1    But there are other references in here, Judge, where
2    there is threats, I would argue, there are threats or
3    comments about people talking about him and when he
4    beats his case and coming out and what's potentially
5    going to happen that I think are important and
6    relevant to the intimidation charge.  The one long
7    quote she didn't finish was a letter to Teng where it
8    says, pussy ass nigga wasn't saying shit when I was
9    on the streets.  Ain't no one want to talk shit bout
10   me when I was on the street.  Niggas gonna learn, or
11   niggas gon learn real quick when I beat this case and
12   come out.  And that's in the same letter where he
13   talks about Sunny Vang needing to shut up or he's
14   going to catch a case for putting an AC wannabe in
15   his grave.
16        The last one, everyone asks me about how I'm
17   gonna beat my case.
18             THE COURT:  But are those -- are those
19   references made with respect to potential witnesses?
20   I mean, those -- giving the benefit of the doubt,
21   those could be construed as indications of future
22   criminal activity - and again, looking at it in its
23   broadest terms - but in and of itself, are those
24   people to whom he's referencing, are those witnesses?
25             ATTORNEY SCHNEIDER:  Sunny Vang is not a

1       witness to the incident.  Sunny Vang was someone who
2       was sending Facebook messages or posting Facebook
3       messages to Chong.  I don't know if they were
4       directly communicated to his sister.  And that's why
5       I just asked Sergeant Thao to help me clarify about
6       that.  And Chong got upset about whatever Sunny was
7       posting.
8                    ATTORNEY VISHNY:  Let me just say this.  I
9       don't -- I've never heard of Sunny Vang until this
10      filing.  I don't know who it is.  It's not a witness
11      in the case.  It's not anybody who ever made a
12      statement to the police.  And --
13                   ATTORNEY SCHNEIDER:  I think it just -- my
14      argument --
15                   ATTORNEY VISHNY:  It wasn't in the
16      discovery, so I don't think it appears to be related
17      to this case.
18                   ATTORNEY SCHNEIDER:  My argument is it
19      still goes and it's related to the time period of our
20      intimidation charges.  And then when he makes the,
21      everyone be like how you gonna beat your case, I
22      don't want to catch a homi, yeah, I would say homi,
23      before seeing my fate on my current one, and I'm
24      close to beating people's ass right now.  When you
25      talk about the intimidation charge, I think those are

```
 1       relevant and related.

 2                 ATTORNEY VISHNY:  How is he going to beat

 3       somebody up?  He's in jail.  You know?  And he's

 4       letting off steam in these letters about what's going

 5       on, and these letters were written quite -- he's been

 6       in jail, the letters to Amanda Krohn, he's been in

 7       jail for a substantially lengthy period of time and

 8       they are really unrelated in time to the times where

 9       on the phone he is attempting to dissuade witnesses

10       from showing up, which, by the way, are never in

11       terms of violent threats, it's just like, I really

12       don't want somebody to show up because then it's

13       going to hurt me before my -- these are all before

14       his preliminary hearing.  Amanda Krohn letters happen

15       almost a year later.  But -- so they -- they really

16       don't necessarily relate to that time period.  But

17       even if they were in the time period, they have to

18       have some nexus or some link with an attempt to

19       dissuade a witness from showing up in court, and that

20       can't be shown in any of these quotes.

21                 ATTORNEY SCHNEIDER:  There is a lot of

22       things people can direct and ask and do from jail,

23       arrange drug deals, arrange people to communicate

24       with other people, send letters to people, sell

25       drugs, go delete things, do things, while they're in
```

1    jail that can be related to. So I wouldn't say just
2    because he's in jail doesn't mean he's not a threat
3    or couldn't be a threat.

4                THE COURT: Let me -- because I want to
5    make sure I get enough information on the other --
6    the gang -- the gang related motion that has been
7    filed in terms of allowing reference to the gangs,
8    and if I understand correctly, you want to be able,
9    Attorney Vishny, Attorney Weitz, to be able to make
10   reference to a gang affiliation that allegedly Mr.
11   Lee and the person making the statements or the
12   person who was questioned are -- they're part of the
13   same gang, correct?

14                ATTORNEY VISHNY: No, that's not what I
15   want to do.

16                THE COURT: Okay. That's where I was
17   mistaken. I was of the understanding, which is --

18                ATTORNEY VISHNY: No. Originally I had
19   written a briefing to the court saying, basically, if
20   the State is allowed to put in the gang references
21   that we would have as part of our theory of the case
22   that in fact Chong Lee is not a member of the same
23   gang as these witnesses --

24                THE COURT: Yes.

25                ATTORNEY VISHNY: -- against him. And if

131

1    the State is allowed to bring in this gang matter, we

2    would still incorporate that as part of our theory of

3    the case.  My understanding was the court said the

4    State could not bring those things in, and I said

5    unless the defense opened the door.

6         But I have a different evidentiary purpose for

7    wanting to cross-examine some of the prosecutor's

8    witnesses and the police who questioned these

9    witnesses about the methods that they were

10   interrogated.  So, in other words, and I haven't

11   memorized or prepared my cross-exams yet, so if I

12   misspeak, I apologize in advance, but I believe that

13   numerous witnesses were questioned by members of the

14   Appleton Police Department, and during these

15   interrogations, members of the Appleton Police

16   Department basically, for lack of a better word,

17   threatened these witnesses with prosecution that they

18   were part of this gang and therefore they must be

19   involved in this homicide and they must have

20   something to do with it and that they had a choice,

21   they could either cooperate with the police or they

22   could cover up for their gang buddies, they could,

23   you know, potentially go to jail themselves, and that

24   is cross-examination for the testimonial intent of

25   those witnesses, both at the time they talked to the

132

1     police and potentially as they walk into a courtroom.

2         The second matter is that there is a question

3     about whether or not this is an appropriate and

4     legitimate police interrogation tactic that leads to

5     what are, I'm sure, going to be argued by the State

6     are truthful statements by these witnesses when they

7     say that Chong Lee either -- they saw him do the

8     shooting or Chong Lee admitted doing the shooting to

9     them.  And I'm intending to elicit expert testimony

10    that these are not good, solid police interrogation

11    techniques and that, in fact, using these kinds of

12    threats during the witness interviewing process,

13    coupled with promises of leniency should those

14    individuals give the police the information they

15    want, along with the feeding of information to these

16    witnesses, constitutes police interviewing techniques

17    that can obtain false statements.

18         THE COURT:  Okay.

19         ATTORNEY VISHNY:  So it really is two-fold,

20    but not to bring in substantively the issue of, well,

21    you're in one gang so your gang is covering up

22    against Mr. Lee because he's not in your gang.  That

23    kind of thing.

24         THE COURT:  No.  If I understand correctly,

25    and to probably poorly paraphrase, your purpose is

1  not to utilize the references to gangs to prove the
2  truth of the matter asserted, it's more to say this
3  is the investigative technique that was going on,
4  that witness felt that because he was being tied into
5  a gang that he was going to be compelled to give
6  particular answers.

7  ATTORNEY VISHNY: Yes.

8  THE COURT: Is that largely -- the question
9  then -- and so far I'm following you on the logic.
10  The question I have is how do you get that out
11  without making reference to Mr. Lee perhaps being a
12  part of a gang or does it just come out and then
13  there is no further inquiry into that issue?

14  ATTORNEY VISHNY: Well, I have to look line
15  by line at the interrogations, but I don't think that
16  when the police interviewed these witnesses that they
17  said explicitly in these questions and answers, well,
18  Chong Lee is a member of this gang so therefore you
19  and he aren't members of the same gang so therefore
20  you must know or he must have told you. I don't
21  think it's -- it comes out like that in these
22  transcripts.

23  ATTORNEY SCHNEIDER: It's almost -- and if
24  I can just add to her point in that, unless there is
25  some points I'm missing, and there may be, Judge,

134

1   it's almost more dangerous because it is just left
2   broad.  You're hanging out with these people, you
3   know these people.  So then the jury might infer it's
4   Chong and everybody else we're talking about, it's
5   some of the people or none of the people.
6           ATTORNEY VISHNY:  Except that the defense
7   theory is that really the initial suspect in this
8   case was Paul Lee, and the police investigation was
9   focused heavily on Paul Lee until Paul Lee say said,
10  no, it's my brother Chong who did it, and then the
11  police switched their investigation and they
12  interviewed everybody with Chong Lee in mind as a
13  suspect.  I mean, we're not just going to show that
14  there was this type of interviewing where the witness
15  was interviewed and kind of being, you know, the
16  quasi threatening combined with promises of leniency
17  but that the interviews made it very clear to the
18  interviewees who the police wanted them to implicate,
19  and therefore that we have contaminated statements.
20  And it's impossible to really do this cross without
21  tying in what the police actually said, you know,
22  that -- so it was a combination of contamination,
23  threats and promises implied, implied promises.  I
24  can't remember how explicit some of them were.  There
25  were occasions where they were actually quite

135

1    explicit too.  And I think it primarily centers on

2    the interrogations of Phong Lee, Paul Lee and Joe

3    Thor.  There may be a much more minor extent to some

4    of the other witnesses, but my recollection is it

5    primarily has to do with these people.  And they're

6    the most central witnesses to the State's case.

7         THE COURT:  My -- my initial reaction is

8    that it -- it should be allowed to come in.  My

9    concern is, is it creating more of a prejudice

10   against Mr. Lee than not by sort of leaving these

11   amorphous ideas out there, and I don't know that

12   that's -- I suppose that's more your issue than mine

13   to some degree.  But here's what I'd like you to do.

14   I want you to think on that issue, and let me know if

15   that changes your position.  My inclination is to

16   allow it.

17        ATTORNEY VISHNY:  Okay.

18        THE COURT:  But I want you to think on

19   that.  And then, before I make my final decision, let

20   me know if your position changes.

21        ATTORNEY VISHNY:  Okay.

22        THE COURT:  The -- the other issue, and I

23   apologize, I am -- I've been going through the file,

24   my clerk has been going through the file.  I have the

25   June 19th motion, I don't have the specific

136

1    excerpts.

2                ATTORNEY SCHNEIDER:  That's within the June

3    19th motion, if you read Page 1 and then into --

4                ATTORNEY VISHNY:  In the factual portion.

5    Right.  I was reading directly from there.

6                THE COURT:  Oh, you were.  Okay.  Oh, there

7    it is.  Okay.

8         Let me at least dispense with the Facebook

9    issue, and then what we'll do is come back to these

10   other issues.

11        As the -- as the parties are aware, we have the

12   motion related to a search warrant involving a

13   Facebook account associated with the name

14   little.lee.1614.  There's been a challenge to the

15   search warrant on many different fronts, those

16   including that the warrant was overbroad, was

17   conclusory, lacked probable cause, and the undercover

18   account infringed upon Mr. Lee's expectations of

19   privacy and law enforcement committed a trespass.

20        We'll look at each of those issues in turn.

21        Now, the first issue is that of the breadth.

22   And under the US and Federal Constitutions, persons

23   are to be secure from unreasonable searches and

24   seizures and, moreover, no warrant shall issue but

25   upon probable cause supported by oath or affirmation

1   and particularly describing the place to be searched

2   and the persons or things to be seized.

3       Now, of note for this portion of the analysis,

4   the affirmation must describe with particularity the

5   items to be sought. *State v. Sveum*, 328 Wis.2d 369.

6   A 2010 case.  Now, in order to satisfy the

7   particularity requirement, the warrant must enable

8   the searcher to reasonably ascertain and identify the

9   things which are authorized to be seized.  *State v.*

10  *Noll*, 116 Wis.2d 443, an '84 case.  A general

11  description of the items to be seized is

12  constitutionally acceptable when a more specific

13  description is not available.

14      Now, against that above backdrop, it is asserted

15  that the warrant at issue was overbroad, whereas the

16  data sought was too expansive and the time frame for

17  which the information was sought was too large.

18      Now, the warrant in this case sought the

19  following information:  Any and all records

20  concerning the identity of the user with the user ID

21  associated with the URL,

22  https:www.facebook.com/littlelee -- I'm sorry,

23  /little.lee.1614 (user contact information) including

24  birth date, e-mail address, physical address,

25  telephone number, user profile information (neo

138

1    print) and all photos uploaded (photo print); and all

2    IP logs for user from December 6, 2013 at 00:01 hours

3    central standard time to December 16th, 2013, 23:59

4    hours central standard time, or any and all

5    communications with Facebook users from -- and again,

6    that same time period.

7         In support of the expansiveness of the request,

8    the defense has directed the court to two cases,

9    *United States v. Ganias*, 755 F.3d 125, a 2nd Circuit

10   Court from 2014, and *US v. Galpin*, 720 F.3d 436,

11   again a 2nd Circuit Court case from 2013.  While

12   those cases are not binding on this court, they are

13   nonetheless persuasive.

14        Now, in *Ganias*, the government copied several

15   hard drives belonging to Ganias and then retained

16   possession of those hard drives for an extended

17   period of time.  Well into that retention period the

18   government sought a second search warrant and used

19   the retained information as a means to Ganias's

20   information.  Ganias filed a suppression motion which

21   was granted and the court found that the retention of

22   the computer files was unreasonable in light of the

23   scope of the case.

24        In *Galpin*, the court took issue with the fact

25   that the search warrant sought largely information

139

```
 1        related to, quote, violations of the NYS Penal Law or
 2        Federal Statutes.  Again, the court found this
 3        language akin to a generalized warrant.
 4              Notwithstanding the differences between those
 5        cases and this case, the cases do bring to light a
 6        concern that should be addressed, most particularly
 7        that advances in technology and centrality of
 8        computers in the lives of the average person have
 9        rendered the computer hard drive akin to a residence
10        in terms of the scope and quantity of private
11        information it may contain.  That said, to compare
12        the computer to a residence is not entirely on point
13        because computers hold so much personal and sensitive
14        information touching on many aspects of private life.
15        There is far greater potential for the intermingling
16        of documents and a consequent invasion of privacy
17        when police execute a search for evidence on a
18        computer.  *US v. Walser,* a 10th Circuit case from
19        2001, 275 F.3d 981.  To that same degree, the
20        knowledge necessary to understand a computer and its
21        nuances is greater than that necessary for searching,
22        by way of example, a residence, a location which most
23        people have at least a general understanding.
24              It is for this reason that there must be as much
25        specificity as reasonably possible.
```

140

1          In this case the search warrant identified
2     information for a limited period of time and for a
3     specific account.  While the search warrant sought
4     information from both before and after the shooting,
5     as well as after Mr. Lee's incarceration, the court
6     does not find the time unreasonable, notwithstanding
7     the fact that the case was not planned, as the time
8     frame may have contained discussions about, amongst
9     other things, the gun utilized, the decision to go to
10    the club in question, as well as what happened on the
11    night in question.  All of these things are at least
12    discoverable, if not relevant to the crime of
13    first-degree intentional homicide, which by -- which
14    the court would note was the crime identified in the
15    affidavit in support of the search warrant.

16          Now, aside from the date, there is also concern
17    over the content sought within the specific time
18    period.  Again, while the court agrees that there is
19    greater potential for obtaining information than may
20    be beyond that which is germane to this case,
21    particularly given the potential for intermingling,
22    this must be weighed against the general skills of
23    the officer seeking information.  It would be
24    unreasonable for the court to limit what on its face
25    may be reasonable based upon a concern that upon

141

```
 1        closer examination the person requesting the
 2        information may not possess computer know-how such
 3        that the request could be defined with greater
 4        precision.  The question is one of reasonableness,
 5        not of perfection.  Elaborate specificity regarding
 6        the items to be seized is not required in affidavits
 7        for search warrants, and if a more specific
 8        description is not available, general descriptions
 9        are permitted.  State v. Noll, 116 Wis.2d 443, an '84
10        case.  The officers executing a search warrant are
11        entitled to support of usual inferences which
12        reasonable people draw from facts.  State v. Marten,
13        165 Wis.2d 70, a '91 Court of Appeals case.  A
14        warrant is sufficiently particular when an officer
15        reading the warrant's description would reasonably
16        know what objects are to be seized.  Again, the Noll
17        case.  Technical requirements of an elaborate
18        specificity once exacted under common law proceedings
19        have no place in this area.  A grudging or negative
20        attitude by reviewing courts toward warrants will
21        tend to discourage police officers from submitting
22        their evidence to a judicial officer before acting.
23        State v. Starke, 81 Wis.2d 399, a '78 case.
24             In this case, as mentioned, the information was
25        related -- the information sought was related to a
```

1    single account belonging to an individual believed to
2    have engaged in the crime of homicide.  The
3    information sought was largely identifying
4    information that is certainly relevant.
5    Additionally, the search warrant sought content and
6    communications which for the reasons discussed above
7    may also be germane.
8        While the court understands the concerns raised,
9    as well as the need to have particularity, the court
10   cannot conclude that the search warrant at issue
11   exceeds what should be considered as permissible.
12       Having concluded that on its face the warrant is
13   not overbroad, the court turns its examination to the
14   second issue with the search warrant, namely, that
15   the warrant should be disregarded based upon the
16   conclusory allegations contained within the warrant.
17       In this case Mr. Lee asserts that the search
18   warrant should be disregarded due to the conclusory
19   nature of the affidavit.  In particular, and for this
20   argument, Mr. Lee takes issue with Paragraph 10 which
21   states, it was discovered through other investigative
22   techniques that Little Lee was identified as Chong
23   Lee, date of birth 9/15/85.  Lee was later found to
24   be the individual that shot the victim in the head.
25   Now this paragraph was but one of 17 enumerated

143

1 paragraphs contained within the affidavit of

2 Investigator Michael Medina of the Appleton Police

3 Department.  While courts shall not consider an

4 affidavit that is solely conclusory, as noted by

5 *State v. Higginbotham*, the court also recognizes that

6 affidavits for search warrants must be tested and

7 interpreted by magistrates and courts in a common

8 sense and realistic fashion.  They are normally

9 drafted by non-lawyers in the midst and haste of a

10 criminal investigation.  Technical requirements of

11 elaborate specificity once exacted under common law

12 pleadings, as mentioned, have no place.  A grudging

13 or negative attitude towards warrants will tend to

14 discourage officers from submitting their evidence to

15 a judicial officer before acting.  The court has

16 already identified that as coming from *State v.*

17 *Starke*.

18  To establish probable cause to support this

19 warrant, there must be some factual connection

20 between the items that are evidence of the suspected

21 criminal activity and the area to be searched.

22 Probable cause to believe that a person has committed

23 a crime does not automatically give the police

24 probable cause to search a house for evidence of that

25 crime.  *State v. Marquardt*, 286 Wis.2d 204, a 2005

144

1    case.

2         In this case the affidavit, as mentioned,

3    contains 17 separate paragraphs.  Of those

4    paragraphs, Paragraph 6 through 11 are factually

5    specific to the case at hand as opposed to more

6    generic background information.  It is further

7    evident from the review of those same paragraphs that

8    the affiant partook in an active investigation into

9    the matter.  While the detail in Paragraph 10 is more

10   conclusory than not, when examined against the

11   backdrop of the surrounding paragraphs and which add

12   to the explanation of how Little Lee came to be made

13   known and why the Facebook account is relevant, the

14   court cannot conclude in light of the low burden of

15   proof necessary for probable cause and the desire to

16   encourage the use of warrants that the warrant is

17   deficient due to being conclusory.

18        That said, this should not be construed to

19   suggest that the court would encourage further

20   affidavits that are this simple.  While the court

21   understands that an officer in an investigation may

22   have many commitments, the court routinely encounters

23   affidavits in other matters that are much more

24   lengthy and detailed for crimes that are much less

25   serious than the matter at hand.  Officers should not

145

1    find it acceptable to provide only the bare minimum
2    and instead should strive for excellence, a standard
3    which was not met in this affidavit.
4        That said, and as mentioned, the court cannot
5    conclude as a whole that the affidavit must fail.
6        The third argument proffered is that the
7    Facebook warrant should be disregarded based upon the
8    affidavit containing statements that were
9    deliberately false or made with reckless disregard
10   for the truth.  In particular, the defense takes
11   issues with Paragraph 7 through 9 which state:
12       Paragraph 7:  Upon arrival at Luna night club,
13   affiant made contact with the bartender, Sara Besaw,
14   who was working at the time of the incident and
15   thought she recognized one of the individuals leaving
16   the scene.  Besaw said she saw an Asian male who
17   wears a light-colored vest with dark sleeves which
18   she recognized as Little Lee from her Facebook
19   friends.
20       Paragraph 8:  After speaking with Besaw I
21   watched the surveillance video from the club and saw
22   a number of male Asians leaving the scene at the time
23   of the incident, one of which was wearing a
24   light-colored vest with dark sleeves and a hat.
25       Paragraph 9:  Later that day affiant began to

146

1       monitor Little Lee on Facebook public access and

2       found that there was a posting between Little Lee and

3       other individuals on Facebook just prior to the

4       incident at Luna's club.  Affiant identified Chong

5       Lee to have a Facebook account of

6       little.lee.1614@facebook.com.

7           Now, in order for some or all of the paragraphs

8       to be disregarded, the court must conclude whether

9       the statements were not only false, but that the

10      false statements were made with the reckless

11      disregard for the truth or were made intentionally

12      while known to be false.  *Franks v. Delaware*, 1978

13      Supreme Court case, 98 S.Ct. 2674.

14          Now, the central complaints of the defense are

15      that Officer Medina repeatedly made statements

16      indicating that he obtained information by way of

17      public access versus private access.  Moreover, it

18      was pointed out how the police actually used multiple

19      undercover accounts to access Mr. Lee's account

20      versus obtaining the information exclusively by means

21      of Sara Besaw's account.

22          As a secondary complaint, it is pointed out how

23      references to Mr. Lee's clothing should not be given

24      any credibility whereas the camera identifying the

25      clothing did not have reliable color discerning

1     ability.

2          With respect to the former, the court is

3     concerned at the failure of Officer Medina to

4     accurately recollect events related to a crime of

5     such magnitude.  Officer Medina is a seasoned

6     officer.  He should be aware that to the extent an

7     individual is not able to photographically recollect

8     events and occurrences, a skill which this court

9     would note is not common, there should be substantial

10    and accurate documentation of events.  The reason for

11    this is to avoid the situation such as the one we

12    have here where Officer Medina is being required to

13    recall events from several months prior in which his

14    recollection of the same is fading.  That said, while

15    the defense has shown Officer Medina to be somewhat

16    sloppy in his investigation on the issue of public

17    versus privacy and friend versus non-friend, as the

18    parties are aware, this is not the standard at issue.

19    The question that must be answered is whether the

20    statements at issue were false and were made with

21    reckless disregard for the truth or were made

22    intentionally while known to be false.  Defense has

23    not done this.  Simple errors in recollection and

24    even false statements alone are not enough to grant

25    the requested relief.  There must be a showing of an

1    intent to deceive.

2        The same issue exists with respect to the

3    clothing.  While Officer Medina's reliance on video

4    to describe the clothing may have been unwise, the

5    court cannot conclude that the description was done

6    with the intent to deceive or gain an otherwise

7    tactical advantage.  While there are many plausible

8    explanations, it is not lost on the court that Miss

9    Besaw was watching the surveillance video with

10   Officer Medina and the description may have been

11   based on what they both saw.  Again, the court does

12   not state that this is what happened, but it is a

13   plausible explanation and thus negates the showing

14   necessary for the court to suppress based on the

15   *Franks'* case.

16       The final argument that the defense has raised

17   were those brought to light at the court's request,

18   and those issues relate to consent.

19       In this case the defense points out that usage

20   of the undercover account violated certain terms of

21   usage of Facebook.  While this may be true, such a

22   violation does not become a violation of the law.

23   The court would also note that in this instance, and

24   based upon the understanding as to the other

25   undercover accounts, Mr. Lee would have to accept the

149

```
 1        friend request to allow the officers to view some of
 2        his information.  While the practice may have been
 3        deceptive, such deception, as noted by the
 4        prosecution, is not illegal.  Although not perfectly
 5        analogous, it is well established that a government
 6        agent may accept an invitation to enter a private
 7        dwelling in the same manner as private persons for
 8        the very purposes contemplated by the occupant.  To
 9        that same end, it has long been acknowledged that
10        valid consent for entry of government agents into a
11        dwelling may be obtained even though accomplished by
12        deceit and concealed identity.  *State v. Johnston*,
13        184 Wis.2d 794, a 1994 case.  The court sees no
14        reason to treat the instant situation as different
15        from the precedent found in the *Johnston* case,
16        particularly whereas there has been no argument that
17        Mr. Lee was not the one to accept the friend request
18        of the undercover agent.
19             The court also finds that Miss Besaw was able to
20        give consent to her accounts, which then allowed
21        access to her friends.  Therefore, the court takes no
22        issue with this aspect of the officer's conduct.
23             And thus, and for the reasons stated, the motion
24        with respect to Facebook suppression is denied.
25             I'm assuming that the parties would prefer
```

150

```
 1      ruling on the other two issues much sooner than the
 2      24th.  Is that a fair statement?
 3                  ATTORNEY VISHNY:  Yes.
 4                  ATTORNEY SCHNEIDER:  Yeah.
 5                  THE COURT:  I will have my judicial
 6      assistant either come out or we will get with the
 7      parties and get a telephone date on those two issues
 8      within the next week or so, if that works.
 9                  ATTORNEY SCHNEIDER:  Okay.
10                  ATTORNEY VISHNY:  Within the next week or
11      so we're going to talk about the date?
12                  THE COURT:  No.  I'll give you a telephone
13      decision on those two issues.
14                  ATTORNEY VISHNY:  Okay.  Just so you're
15      aware, I'm basically unavailable the rest of this
16      week and all of next week.
17                  THE COURT:  Not a problem.  We'll work
18      around that.
19                  ATTORNEY VISHNY:  So my availability -- I'm
20      partially available the week of the 12th.  Later in
21      the week -- thursday the 15th, is really good.
22                  ATTORNEY SCHNEIDER:  By telephone, you mean
23      Attorney Vishny doesn't have to drive up for it.
24                  THE COURT:  Right.
25                  ATTORNEY SCHNEIDER:  Okay.  Do you want him
```

151

```
 1          just to issue a written decision?

 2                    THE COURT:  Sure.  I can do that.

 3                    ATTORNEY VISHNY:  Is October 15th okay?

 4                    THE COURT:  That's fine.

 5                    ATTORNEY SCHNEIDER:  And obviously, if you

 6          run into an issue or you need further clarification,

 7          you'll just advise, but otherwise you'll issue a

 8          written decision by October 15th.

 9                    THE COURT:  Let me ask this, Attorney

10          Vishny.  I apologize if I suggested you hadn't

11          contemplated it.  On the gang-related issue, I'm

12          confident you've considered that issue, your position

13          is not going to change.

14                    ATTORNEY VISHNY:  No, it's not.  My

15          position is that we should be allowed this

16          cross-examination and that it won't open the door to

17          substantive presentation that Chong Lee is actually

18          in a particular gang.

19                    THE COURT:  Okay.

20                    ATTORNEY VISHNY:  So that -- that's the

21          defense position.  It's not going to change.  If for

22          some reason I thought it was a really bad idea as I

23          prepare further for trial, then I wouldn't ask the

24          questions.

25                    THE COURT:  Miss Schneider, anything else
```

152

1    you want to add on that issue?

2              ATTORNEY SCHNEIDER:  No.  And I think when

3    we discussed this before, in some ways we're trying

4    to be cautious before we delve into an area and then

5    have to argue what has this opened the door to, but I

6    think we still may have to cross that bridge when we

7    get to it.

8              THE COURT:  And that's -- my inclination is

9    I'm going to allow that.  I think, Attorney Schneider

10   and Attorney Vishny, as we've talked about before, we

11   are -- we're -- there is still the possibility we may

12   have to have a side bar and say, wait a minute,

13   Judge, the jury has to step out and we need to

14   address this on an individual basis, but, in concept,

15   I am going to allow the questioning of the -- it

16   would be the questioning of the individuals who were

17   interrogated as it relates to the gang.

18             ATTORNEY VISHNY:  Right.

19             ATTORNEY SCHNEIDER:  The officers used gang

20   references or gang threats.  It would be like

21   comments about gangs in a way that threatened or

22   influenced or was improper.

23             THE COURT:  And that in and of itself will

24   not open the door to further gang inquiry, but again,

25   you'd reserve the right to ask for a side bar and

153

1    say, Judge, I think now we've opened the door.

2            ATTORNEY SCHNEIDER:  Yeah.  We're going to

3    -- my guess, and this is just my guess, is that we're

4    going to have to be very cautious about how they

5    respond to some of those questions, because I could

6    see somebody, even though we tell them not to, say,

7    well, we all were, you know what I mean?

8            ATTORNEY VISHNY:  Well then the witnesses

9    are going to have to be instructed before they take

10   the stand as to what they can and can't say.

11           ATTORNEY SCHNEIDER:  I know that, but I

12   just -- I've done that and then had them come in and

13   not -- and ask a question or had the other side ask a

14   question not thinking that was going to come as a

15   response.

16           ATTORNEY VISHNY:  I'm not too worried about

17   the police, instructing them, because -- but I also

18   know how to ask very tight, leading questions, and --

19           ATTORNEY SCHNEIDER:  I think what we've

20   done is we tell them if you feel you get stuck and

21   you can't answer without saying gang or something

22   about that, then you have to look at the judge and

23   say, I'm not sure how to answer this question.  If

24   we're not picking up on it.  At least that's kind of

25   what I've done with other witnesses before.  They

154

```
1        feel that they can't answer in some way without
2        bringing it up, that's what they should do.
3             So if the -- I think the court is just going to
4        issue a written decision.
5                 THE COURT:  It will just be a written
6        decision, and now it's going to be just on the
7        reference to "beat the case".
8                 ATTORNEY SCHNEIDER:  Okay.  Thank you.  And
9        we have your discussion on the gang cross.
10                THE COURT:  That will be the 15th or
11       sooner.
12                (Oath administered to witness.)
13                THE WITNESS:  I do.
14                THE CLERK:  Please state your full name and
15       spell it for the record please.
16                THE WITNESS:  Eric, E-R-I-C, Holdorf,
17       H-O-L-D-O-R-F.
18                         **EXAMINATION**
19       **BY ATTORNEY VISHNY**:
20   Q   Well here's my first question.  Should I address you
21       as officer, sergeant, investigator, what's your
22       title?
23   A   Investigator, technically, but whatever.
24   Q   Okay.  Investigator Holdorf, did you talk with
25       somebody named Noah Vang in connection with an
```

155

```
 1        investigation that took place on December 13th of

 2        2013?

 3   A    I did.

 4   Q    And that investigation, as I understand it, had to do

 5        with seizure of contraband from the post office,

 6        correct?

 7   A    It was an assist of the United States Post Office,

 8        correct.

 9   Q    Okay.  And when you came and spoke with -- I'm not

10        going to ask you any questions regarding the

11        investigation into the postal matter at all.

12   A    Okay.

13   Q    When Noah Vang was taken into custody pursuant to

14        that investigation, did you try to speak with Noah

15        Vang regarding not only that investigation but

16        whether or not he had any information that was

17        pertinent to a shooting that had taken place at the

18        Luna tavern which resulted in a homicide?

19   A    I did.

20   Q    Okay.  And at whose direction did you attempt to

21        interview Noah Vang regarding that homicide?

22   A    I don't recall specifically.  I had spoken with

23        several investigators from the City of Appleton

24        Police Department reference the incident at Luna

25        Lounge, but I do not recall specifically who I spoke
```

156

| 1 | | to about speaking with Noah. |
| 2 | Q | Okay. When you spoke with Noah, or attempted to |
| 3 | | speak with Noah Vang regarding the homicide, did you |
| 4 | | record your conversation with him? |
| 5 | A | I did. |
| 6 | Q | And was that recording preserved? |
| 7 | A | It was. |
| 8 | Q | Have you refreshed your memory about what occurred by |
| 9 | | listening to that recording today? |
| 10 | A | I watched it very briefly, yes. |
| 11 | Q | Okay. How long is the recording altogether? |
| 12 | A | It is, I believe, an hour and 14 minutes total, |
| 13 | | approximately. |
| 14 | Q | And did you watch the entire thing today? |
| 15 | A | I did not. |
| 16 | Q | What did you watch today? |
| 17 | A | The video portions where you can see myself speaking |
| 18 | | with Mr. Vang. |
| 19 | Q | And did that -- did the part you watched cover in |
| 20 | | their entirety your conversation with Mr. Vang |
| 21 | | regarding the Luna homicide? |
| 22 | A | It covers portions of it. In the very beginning I |
| 23 | | state that I wanted to talk to Noah further, and I |
| 24 | | don't recall if at the time he was arrested I spoke |
| 25 | | to him about the events that occurred Saturday or if |

157

```
 1        it was just about the case that we were working with
 2        the postal service.  So whatever is on the video is
 3        all that I have answers for.
 4    Q   What questions did you ask Noah Vang about the Luna
 5        homicide?
 6    A   I asked him where he was that night, I asked him who
 7        he was with.  Specifically from the video, I asked
 8        him if he ran away or if he saw people running away,
 9        and I asked him if he drove home.
10    Q   What answers did he give you to your questions?
11    A   Without watching the video, I don't want to give the
12        wrong names.  He stated two names.  Without assuming,
13        I believe it was Thong Phong and possibly Joe, and at
14        the very end of the interview I had asked him if he
15        was with Paul, I believe.
16    Q   Okay.  And what did he say regarding that?
17    A   The first two were affirmative, as far as Thong and
18        Joe.
19    Q   Would that be Thor or Thong?  Would that be Phong,
20        P-H-O-N-G?
21    A   Possibly, yes.
22    Q   Okay.  And they were affirmative, meaning?
23    A   He did state that he was with individuals.  Like I
24        said, without watching the video again, I don't want
25        to give the wrong names.  And then the very last
```

| | | |
|---|---|---|
| 1 | | question that I asked him, I believe it was the name |
| 2 | | Paul, I asked him if he was with Paul, and he stated |
| 3 | | that he didn't want to answer anymore questions. |
| 4 | Q | Did he answer anymore questions at all? |
| 5 | A | No. |
| 6 | Q | Did he ask for a lawyer? |
| 7 | A | No. |
| 8 | Q | Did you attempt to reinterview him on any later date |
| 9 | | regarding the Luna homicide? |
| 10 | A | No. |
| 11 | Q | Are you aware of whether or not any other |
| 12 | | investigators at the Appleton Police Department |
| 13 | | attempted to interview him later regarding the Luna |
| 14 | | homicide? |
| 15 | A | I'm not. |
| 16 | Q | Did you write a report regarding this interview? |
| 17 | A | I did not. |
| 18 | Q | After the interview, did you have any conversation |
| 19 | | with anybody at the Appleton Police Department |
| 20 | | regarding information or lack of information that you |
| 21 | | obtained in this interview? |
| 22 | A | I did. I can't say specifically whom. |
| 23 | Q | Was that back at the time, back in 2013? |
| 24 | A | That was. |
| 25 | Q | Okay. And you just don't remember who it was. |

159

```
 1    A    I have no clue.

 2    Q    And the interview in its entirety is accessible and

 3         available to be watched, correct?

 4    A    It is.

 5              ATTORNEY VISHNY:  I have nothing further.

 6              THE COURT:  Attorney Schneider.

 7                          **EXAMINATION**

 8    **BY ATTORNEY SCHNEIDER:**

 9    Q    You were working as part of an officer assigned to

10         the MEG Unit at the time, correct?

11    A    Correct.

12    Q    So you were also there in your role in investigating

13         the postal office investigation at the same time?

14    A    Correct.

15    Q    You said the entire length was an hour and 14

16         minutes.  Is that -- was that the entire interview

17         with Noah or is only portions of that when you're

18         speaking with Noah?

19    A    The -- the video that is an hour and 14 minutes is

20         video from a single room which Noah is seated in.

21         Initially when he's brought into the room he's

22         brought into the room by two US postal inspectors,

23         spoken to.  I'm present for that.  And then I begin

24         questioning him on the questions I just testified to.

25         And then long portions of that are him seated in the
```

| | | |
|---|---|---|
| 1 | | room alone.  And then at the end of it he's released |
| 2 | | without charges. |
| 3 | Q | Okay.  And so the nature of what you asked him and |
| 4 | | that he agreed to answer was asking him if he was |
| 5 | | with Phong or Joe or he made comments that he was |
| 6 | | with a Phong and a Joe? |
| 7 | A | I believe those are the names.  I don't want to give |
| 8 | | the wrong names, but he does -- he does say or I do |
| 9 | | ask specifically names that he -- asking if he was |
| 10 | | with and he replied that he was. |
| 11 | Q | And Paul also was one of those names? |
| 12 | A | That was.  Cautiously I say that was the last name |
| 13 | | that I gave him. |
| 14 | Q | Okay.  But did not give any further information at |
| 15 | | all, other than that? |
| 16 | A | Besides the fact of locations he was at, he stated |
| 17 | | that he was at some locations that night and that he |
| 18 | | had driven home, that he had seen people running |
| 19 | | away, that was basically the entirety of our |
| 20 | | conversation. |
| 21 | Q | Okay.  And have you -- I know we asked you, because |
| 22 | | this was unexpected to have you come today, did you |
| 23 | | bring copies of that recording with you? |
| 24 | A | I did. |
| 25 | Q | Do you have multiple copies or just one? |

161

```
 1    A     I have two copies.
 2               ATTORNEY SCHNEIDER:  I'll make sure - and
 3          we'll use our Bates numbering system when we're
 4          done - that Attorney Vishny gets one of those copies
 5          today, Judge.
 6               THE COURT:  That's fine.
 7    Q     (BY ATTORNEY SCHNEIDER)  And when you were done with
 8          this investigation, the recording you have was placed
 9          into the MEG Unit file; is that correct?
10    A     That's correct.
11    Q     And it has been there, that's where you received it
12          or recovered it from today?
13    A     That's correct.
14               ATTORNEY SCHNEIDER:  I have nothing else
15          then at this time, Judge.
16               THE COURT:  Attorney Vishny.
17                            EXAMINATION
18    BY ATTORNEY VISHNY:
19    Q     You said the recording was placed in the MEG Unit
20          file.  Does that then get cross-referenced with the
21          homicide files that are kept or not?
22    A     I have no knowledge of which files you're talking
23          about.  I -- I can't answer that accurately.  I --
24          when we -- when we log evidence, it's logged under
25          this specific case.
```

162

1   Q   So was it only logged under the drug case or was it
2       also logged under the homicide case?
3   A   I only logged it under the drug case.
4   Q   Okay.  What's your badge number or your officer
5       number?
6   A   I have two radio distinctions, one is for the City of
7       Appleton, that's 9202, and one is through the Lake
8       Winnebago MEG Unit which is Zebra 56.
9           ATTORNEY VISHNY:  Do you have Exhibit 1
10      there?
11  Q   (BY ATTORNEY VISHNY)  I'm going to show you Exhibit
12      1, and I don't know if you've ever seen this before
13      or not.  I'm going to show you Exhibit 1.  It's a
14      white board concerning the homicide investigation.
15      Does that look familiar to you at all?
16  A   The white board?
17  Q   Yeah.
18  A   I can't say that it does specifically.
19  Q   Okay.  So do you know anything about the fact --
20      9202, that's your name and Noah Vang and a check mark
21      next to it.  Do you have any idea how that got
22      there?
23  A   I do not.
24  Q   Okay.
25          ATTORNEY VISHNY:  Nothing further.

```
 1                    THE COURT:  Attorney Schneider, any
 2       follow-up?
 3                    ATTORNEY SCHNEIDER:  No.
 4                    THE COURT:  Investigator, thank you for
 5       your testimony.
 6                    THE WITNESS:  I apologize for the
 7       appearance.
 8                    THE COURT:  That's all right, sir.
 9                 Anything else, Attorney Vishny?
10                    ATTORNEY VISHNY:  No.
11                    ATTORNEY SCHNEIDER:  I'll take that.
12                    THE COURT:  Attorney Schneider?
13                    ATTORNEY SCHNEIDER:  Just one second, I
14       can --
15                    THE COURT:  You're excused, Investigator.
16                    ATTORNEY VISHNY:  Well, Judge, as far as
17       Noah Vang is concerned, I think that closes that
18       issue because the State is going to provide defense
19       counsel with the tape.
20                    THE COURT:  So there will be no briefing?
21                    ATTORNEY VISHNY:  Not on that issue, but
22       there will definitely be a briefing on the issue
23       which I have filed the motion on which was whether or
24       not statements by Ryan Thao, Mikey Thao and Watou Lee
25       should -- for what the scope of their permissible
```

164

1      testimony would be in court in light of the
2      destruction of evidence.  That's really what I have
3      filed my motion on, took the opportunity of a motion
4      hearing to -- let me just say that this event of
5      recording -- destroying these tapes altered my
6      perception of whether or not I was always being given
7      a hundred percent accurate information regarding
8      discovery, as well as the provision of reports now
9      for interviews that took place almost two years ago.
10     So having seen some things missing and not being
11     quite sure about what occurred, I thought it was a
12     good opportunity to ask about these issues and try to
13     resolve these outstanding matters.
14              THE COURT:  Okay.
15              ATTORNEY VISHNY:  But the issue remains
16     before the court as to what remedy the court should
17     fashion for what we are saying, no matter how
18     somebody testified, was the intentional destruction
19     of evidence in this case.  So I have filed a motion.
20     I think we have a factual basis to proceed with the
21     motion, and we have begun doing some of the
22     additional legal research.
23              THE COURT:  And what time frame -- with
24     that, what time frame would you like for further
25     briefing and then we can go from there?

165

```
1              ATTORNEY VISHNY:  Right.  I hate to do
2    this, but I'm not sure I can have something ready
3    before November 5th.  I have quite a bit -- I'll try
4    to get it in earlier, but I also have another
5    homicide between now and then, as well as --
6              THE COURT:  We have November 5th and then
7    we have November 24th.
8              ATTORNEY VISHNY:  If I can get it done
9    sooner, I will.
10             THE COURT:  Let me ask that.  Can we have
11   -- well, I don't know that Attorney Schneider would
12   then be able to respond.  What I'm wondering, if we
13   couldn't just argue it on the 5th and provide case
14   law at that point in time.
15             ATTORNEY VISHNY:  That would be fine.
16             THE COURT:  And then have a decision for
17   the 24th.
18             ATTORNEY VISHNY:  That would be fine.  If I
19   can put something in writing before then, I'll do it
20   and just e-mail it.
21             ATTORNEY SCHNEIDER:  I -- if she's not
22   going to file anything before then, I don't know how
23   I'm going to respond.
24             ATTORNEY VISHNY:  I'll try to file
25   something, I just --
```

```
1              THE COURT:  Why don't we do this.  We'll
2    file on the 5th.  Miss Schneider, I'll give you ten
3    days or thereabouts to respond.  And then what I will
4    do is I'll have a decision for you on it -- for both
5    of you on the 24th.
6              ATTORNEY SCHNEIDER:  That works.
7              ATTORNEY VISHNY:  That's fine.
8              ATTORNEY SCHNEIDER:  So if we do defense
9    filing on the 5th, I'll file my response on the 16th,
10   which is a Monday?
11             THE COURT:  That's fine.
12             ATTORNEY SCHNEIDER:  As opposed to Sunday.
13   And then we'll take it up on the 24th.
14             THE COURT:  Very good.
15             ATTORNEY SCHNEIDER:  Judge, just -- I'll
16   plant this seed now, and maybe if Attorney Vishny
17   wants to make a suggestion, in the hallway we were
18   just thinking of other housekeeping things.  I
19   explained normally we get a pool of anywhere from 70
20   to 80 or 90 for this specific trial date.  We had
21   previously asked the court to, the morning of, and I
22   think I'm going to move that back to maybe like 1:00
23   the day before, have the court give us that in an
24   unrandom order.  I think originally the clerk will
25   give us it to us alphabetical by last name, but then
```

1    the day before we'll get the list in the order

2    they're going to be called, and I explained we

3    normally call up however many we have that will sit

4    with our strikes, we voir dire just that group of

5    people, the rest are in the same room we are

6    listening to additional questions.

7              THE COURT:  Correct.

8              ATTORNEY SCHNEIDER:  And Attorney Vishny

9    may have some concerns about that, so I don't know if

10   she just wants to submit a letter on that and we can

11   discuss it on November 5th, but we were just talking

12   about trying to get ready and other things we'll need

13   to do that day.

14             THE COURT:  Anything else, Attorney Vishny?

15             ATTORNEY VISHNY:  Not at this time.

16             THE COURT:  Attorney Schneider?

17             ATTORNEY SCHNEIDER:  No.

18             THE COURT:  All right.  Then we are

19   adjourned for today's proceedings.

20             ATTORNEY VISHNY:  Thank you.

21             ATTORNEY SCHNEIDER:  Thank you.

22             (Proceedings concluded.)

23

24

25

```
1

2

3                    C E R T I F I C A T E

4

5    STATE OF WISCONSIN      )
                             ) ss.:
6    COUNTY OF OUTAGAMIE     )

7

8

9            I, JOAN BIESE, RMR/CRR, do hereby certify that I
     am the official court reporter for Branch IV of the
10   Circuit Court of Outagamie County;

11           That as such court reporter, I made full and
     correct stenographic notes of the foregoing proceedings;
12
             That the same was later reduced to typewritten
13   form;

14           And that the foregoing proceedings is a full and
     correct transcript of my stenographic notes so taken.
15

16           Dated this 15th day of October, 2015.

17

18

19                                    _____

20                                    JOAN BIESE, RMR/CRR

21

22

23

24

25


                                169
```