1    STATE OF WISCONSIN        CIRCUIT COURT        OUTAGAMIE COUNTY

2    ─────────────────────────────────────────────────────────────

     STATE OF WISCONSIN,

3                                     JAN 2 0 2016

                         Plaintiff,

4    v.                                        Case No. 13-CF-1074

5    CHONG LENG LEE,                   ORIGINAL

6                         Defendant.

7    ─────────────────────────────────────────────────────────────

                           MOTION HEARING

8    ─────────────────────────────────────────────────────────────

9

     BEFORE:          **HONORABLE GREGORY B. GILL, JR.**
10                    Circuit Court Judge, Branch IV
                      Outagamie County Justice Center
11                    Appleton, WI  54911

12

     DATE:            **January 8, 2016**
13

14   APPEARANCES:     **CARRIE SCHNEIDER**
                      District Attorney
15                    Appearing on behalf of the State

16                    **ALEX DUROS**
                      Assistant District Attorney
17                    Appearing on behalf of the State

18                    **DEBORAH VISHNY** and **EVAN WEITZ**
                      Attorneys at Law
19                    Appearing on behalf of the Defendant

20                    **CHONG LENG LEE**
                      Defendant
21                    Appearing in person

22

23

24   Joan Biese
     Official Reporter, Branch IV
25   Outagamie County

                              1                    **Exhibit 14**

Case 2:22-cv-00620-WCG    Filed 11/11/22    Page 1 of 52    Document 26-15

331-1

1                          I N D E X

2

3    **WITNESS**                                      **PAGE**

4    **CHUE LEE THAO**

          Examination by Attorney Schneider.................  15
5         Examination by Attorney Vishny....................  27
          Examination by Attorney Schneider................  41
6         Examination by Attorney Vishny....................  43

7

8

9    **EXHIBITS**                                     **PAGE**

10   1 - Email from Sergeant Rabas to Investigator Holdorf   5
     2 - APD Electronic Recording Policy..................   5
11   3 - Attorney Schneider Affidavit....................   6

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1          **TRANSCRIPT OF PROCEEDINGS**

2               THE COURT:   We are on the record in

3          13CF1074, *State of Wisconsin v. Chong Lee.*

4               Mr. Lee appears in person, along with his

5          counsel, Attorney Evan Weitz and Attorney Deja

6          Vishny.   Representing the State of Wisconsin is

7          Outagamie County District Attorney Carrie Schneider.

8          Also seated at counsel table with Miss Schneider is

9          Outagamie County Assistant District Attorney Alex

10         Duros.

11              This matter is scheduled today for a motion or,

12         rather, to address various motions that are existing.

13         In anticipation of the proceeding today, the court is

14         advising the parties it would be my expectation that

15         we will take some testimony, take some other evidence

16         that may come into play, and then ultimately what I

17         will do is allow a short briefing schedule or a short

18         briefing by the parties and I'll issue a decision

19         subsequent to today's date.

20              So, with that, and I know we had -- to summarize

21         the motions that we have outstanding, we have a

22         motion to suppress evidence perhaps categorized as a

23         motion to dismiss or alternatively suppress evidence.

24         That we've already begun to take testimony on.   In

25         addition, we also have a motion to compel discovery

3

1     that is outstanding.  Both parties have submitted
2     some documentation in support of their respective
3     positions, and then additionally it was my
4     understanding that we may either at this point or in
5     the subsequent submissions discuss some information
6     related to defense's expert.

7         And so, Attorney Schneider, is that your
8     understanding and expectation as to the items that we
9     would be addressing today?

10              ATTORNEY SCHNEIDER:  Yes, Your Honor.

11              THE COURT:  And, Attorney Vishny, the same
12    question for you.

13              ATTORNEY VISHNY:  Yes.  But I also thought
14    that the court was going to enter an order that none
15    of the attorneys in this matter post any comments on
16    social media while this case is pending.

17              THE COURT:  Absolutely.  And it will be --
18    I apologize, I had forgotten that.  One would hope it
19    would go without saying, but it is the order of the
20    court that during the pendency of this case that
21    attorneys for the respective parties and their staff
22    within the office refrain from any communications as
23    it relates to this case, including but not limited to
24    items such as Twitter, Facebook, Instagram, and any
25    other media sources that are well beyond my

4

1    understanding and comprehension.

2              ATTORNEY VISHNY:  Thank you, Your Honor.

3              THE COURT:  With that, Miss Schneider, do

4    you have any additional witnesses today?

5              ATTORNEY SCHNEIDER:  We do.  And prior to

6    calling them, there is a couple exhibits that I'm

7    going to introduce, some kind of in lieu of having

8    actual testimony.  The first one -- and they're not

9    marked, but the first one I'd introduce that we have

10   marked Exhibit 1 would just be an e-mail that is an

11   e-mail addressed to Neal Rabas from Officer Holdorf

12   with the Appleton Police Department.  It's dated

13   September 23rd, 2015.

14             THE COURT:  That was to -- just for my note

15   taking purposes, that was to Investigator Rabas from

16   Investigator Holdorf?

17             ATTORNEY SCHNEIDER:  Correct.  And it just

18   relates to some prior testimony Investigator --

19   Sergeant Rabas gave, as well as the basis for why he

20   testified to a specific answer that's been made issue

21   of in the filings.

22        The next -- I'll just do all three and then --

23   the next would be a copy of the Appleton Police

24   Department's policy on electronic recordings of

25   interrogations, and for the record, I'll just count,

5

1     it's seven pages in length.

2          Then last would be a two-page affidavit from

3     myself.  At one time in the proceedings when it was

4     called into question what I was aware of or what I

5     had done, I think I was going to make an offer of

6     proof.  I've never done that.  There's been some

7     filings since that relate to the motion to suppress

8     or dismiss where there's been references to the State

9     or our duty or obligation.  I think it's my belief

10    from Attorney Vishny, in talking to her yesterday,

11    she may object to this.  I still want it part of the

12    record because to me, whether it plays into how you

13    decide this case or whether it plays into someone

14    questioning me ten years from now on something I did

15    or didn't do, I just want it part of the record.  I

16    think Assistants Maier and Hahn want it part of the

17    record if anybody ever calls into question what they

18    were aware of or may or may not have done as well.

19         So, Attorney Vishny does have copies of these

20    all, Judge, so I would move them in at this time.

21              THE COURT:  Let me just --

22              ATTORNEY VISHNY:  Before the court receives

23    them, I'd like to be heard.

24              THE COURT:  Okay.  Attorney Vishny, as to

25    Exhibit 1, any objection?

6

```
 1                ATTORNEY VISHNY:  No.

 2                THE COURT:  Okay.  As to Exhibit 2, any

 3       objection?

 4                ATTORNEY VISHNY:  Judge, I don't object,

 5       but I have a question as to its relevancy because

 6       this policy was revised on May 29th, 2015, and the

 7       applicable period here really occurs in 2013 and '14

 8       and prior to May 29th, 2015.

 9            I brought this to Miss Schneider's attention.

10       She told me that she would obtain a copy of the

11       previous policy as well and supplement the record,

12       and under those circumstances, I have no problem.  I

13       would ask that she just file that by the end of next

14       week and provide me a copy by e-mail.  That would be

15       fine.

16                ATTORNEY SCHNEIDER:  That's not a problem.

17       My guess is when the new chief came in probably a lot

18       of the policies and procedures were looked at.

19       You'll see all of them at the end were signed by him,

20       so that may be why this one is a 2015 date, but we'll

21       provide any and all that were in existence from the

22       date this case existed through today.

23                ATTORNEY VISHNY:  I do want to point out

24       one other thing.  I do to some degree have a

25       different relevancy objection depending on what the
```

7

1      prior policy says, because under Roman numeral one it
2      identifies the purpose of the policy is to establish
3      guidelines for electronic recording of all custodial
4      interviews and interrogations, and the tape
5      recordings that we have talked about and the
6      destruction of those recordings were not custodial at
7      all, they were interviews of witnesses who were
8      certainly not in custody and were not suspects in
9      this case either. So I don't know if the Appleton
10     Police Department does have a written policy
11     regarding recording noncustodial interviews of
12     witnesses or not, but I think that would be the
13     relevant policy. There's never really been any issue
14     here that there's been a failure to record any
15     custodial interrogation.
16            ATTORNEY SCHNEIDER: And I was just asking
17     Sergeant Rabas, we'll go back and review that as
18     well, but I -- at least as I sit here today, when I
19     had asked for a policy about this, this is what I was
20     provided. So I'll go back. I don't know that they
21     have a written policy about witness interrogations,
22     other than children, but we'll go back and file
23     anything, and we'll file all versions that existed
24     from the date through today.
25            THE COURT: So -- and I -- I think this may

8

1      have already been understood, what I would expect
2      would be any policies related to the recording of any
3      types of interrogations, whether it's custodial or
4      non.

5           At this point I'll receive Exhibit 2
6      understanding that its relevancy may be marginal
7      depending upon what we see; again, with the
8      expectation those would be filed by the end of next
9      week.

10          ATTORNEY VISHNY:  That's fine.

11          As far as Miss Schneider's affidavit, I
12     appreciate Miss Schneider's concerns regarding the
13     potential for a complaint in this case.  Certainly I
14     have never had any intention of making any complaint,
15     and still don't, and I -- I understand and appreciate
16     her wanting to file with this court.  I don't believe
17     that this exhibit is relevant to the issues that the
18     court has to decide in terms of dismissal and
19     suppression, and the reason that this is not relevant
20     is the law is quite clear that it's the issues of law
21     enforcement officers that are -- that the court is to
22     concern itself with.  So I'm not alleging any
23     misconduct whatsoever by Attorney Schneider or any
24     member of her staff.  I think if she wants to file
25     this simply so it's in the court record that's filed,

9

1    but I'd ask for it not to really be a part of the
2    court's decision here as to the motions before the
3    court because it's just not relevant.  But I -- I
4    appreciate and I'm sensitive to her personal
5    concerns.

6         THE COURT:  Sure.  And, Miss Schneider,
7    your response to that, with my initial thoughts being
8    I don't think (a) it would be appropriate for me to
9    consider this for purposes of deciding my motion,
10   again without being subject to examination, but there
11   again, I think largely my analysis is limited to what
12   the law enforcement did.  That said, I also have no
13   problems -- I will tell you, your integrity is not in
14   question with me, but I can also appreciate, as
15   Attorney Vishny has noted, why you may want it to
16   remain part of the record.  So I would certainly have
17   no problems having it be part of the court file.  I
18   don't know if it needs to be an exhibit for that
19   purpose, and I don't know if that changes how you
20   want me to have it be brought into the file, again.

21        ATTORNEY SCHNEIDER:  Well, my only initial
22   quick thought on that is there are claims about Brady
23   violations and were things turned over or not, and a
24   lot of the case law does talk about prosecution or
25   what this -- the State, and sometimes it doesn't

10

1 always say the State meaning law enforcement

2 specifically or the State meaning law enforcement and

3 the prosecution or prosecutor combined, and I know

4 there are cases on point where they talk about Brady

5 violations or violations related to discovery and

6 specifically focus on the prosecutor and what they

7 did or did not do. So at this point I'm going to ask

8 that it be an exhibit. If the court decides or

9 determines it's not going to use it for purposes of

10 your evaluation, that's your decision, but I do want

11 it part of the record just for all, as I mentioned,

12 those three attorneys.

13          THE COURT: What I'll do then -- I

14 apologize for interrupting you. I'll receive it as

15 an exhibit, that's fine, with the understanding,

16 Attorney Vishny, I don't expect -- in fact, I'm not

17 going to consider it in part of my analysis because

18 I -- for the reasons I've stated, without it being

19 subject to further examination or questions, I think

20 that the record I have before me is sufficient for

21 what I need.

22          ATTORNEY VISHNY: Okay.

23          THE COURT: But I certainly will receive it

24 as an exhibit within the -- within the file.

25          ATTORNEY SCHNEIDER: Then, briefly, before

11

1     I call the witness, the other thing we were going to

2     discuss today was a defenses expert.

3                    THE COURT:   Yes.

4                    ATTORNEY SCHNEIDER:   I know we had gotten

5     that report, and I think the court -- I don't know

6     that the court has a copy, but we've gotten a copy of

7     that report late last week.   I don't have -- and

8     Attorney Vishny and I were able to discuss this

9     yesterday and then again today with the court

10    briefly.   I don't necessarily have an objection as

11    to, and I'm going to say his name wrong, Mr. Trainum

12    or Trainum?

13                   ATTORNEY VISHNY:   That's correct.

14                   ATTORNEY SCHNEIDER:   In terms of I think

15    under the *Daubert* analysis does he have the

16    qualifications and is he staying within his field of

17    expertise.   I agree that he appears to do both of

18    those in this report in what it's being offered for.

19         The area that I think Attorney Vishny and I are

20    going to try to narrow down, and maybe it just comes

21    up when he testifies, might be the scope of how far

22    or to what extent or if I feel -- what I'll

23    specifically probably do is if I feel in any of his

24    impressions, or however he worded it, I can't

25    remember, that I want to raise relevancy, then I will

1     file -- analysis and findings, I'll file specific

2     objections as to that, but I think in terms of the

3     first prong, is he qualified to give this and does he

4     have the appropriate qualifications, I don't think we

5     object under that, just might be more on the scope

6     issue.

7               THE COURT:  Sure.

8               ATTORNEY VISHNY:  That's correct.  We did

9     have a conversation by telephone yesterday as well as

10    some off the record conversation, and actually I

11    don't think that Miss Schneider and I really have

12    many differences on what the appropriate scope of the

13    testimony should be.  We'll continue to discuss that.

14         Mr. Trainum has filed a report in connection

15    with this matter.  I may ask for his report to be

16    entered as an exhibit, but that doesn't mean that the

17    jurors get to see it.

18               ATTORNEY SCHNEIDER:  Right.

19               ATTORNEY VISHNY:  And so I certainly don't

20    think it would be appropriate for the jury to be able

21    to review this report, and it does contain material

22    that I would agree should not go in front of the

23    jury, but it was to -- you know, there is other

24    purposes for doing a report.  So I -- I'll be

25    surprised if we really have much in the way of

```
 1       differences on that.

 2               THE COURT:  Very good.  And I -- for the

 3       record, I have received a copy of the -- the report.

 4       I understand it may be preliminary, there may be some

 5       addendums to it.  I've had a chance to review that.

 6       I may have already disclosed this to the parties.  To

 7       the extent that this would ultimately be marked as an

 8       exhibit, probably consistent with many other judges,

 9       my objection would be even if it's received, before

10       it would go back to the jury room there is a

11       consultation with the attorneys to make sure that

12       that is appropriate.  Typically the only thing that I

13       would send back would be copies of my jury

14       instructions to go back at the outset.

15               ATTORNEY VISHNY:  Okay.

16               THE COURT:  So that's -- it seems like

17       we're all on the same page then.

18               ATTORNEY SCHNEIDER:  Okay.  Then, with

19       that, at this point I would call Sergeant Thao.

20               THE COURT:  Okay.  Sergeant Thao, if you

21       would please come to the witness stand, we'll swear

22       you in.

23               (Oath administered to witness.)

24               THE WITNESS:  I do.

25               THE CLERK:  Please state your name and
```

```
 1          spell it for the record please.
 2                     THE WITNESS:  Chue Lee Thao, C-H-U-E,
 3          L-E-E, last name is Thao, T-H-A-O.
 4                  EXAMINATION OF CHUE LEE THAO
 5     BY ATTORNEY SCHNEIDER:
 6     Q    And I know you testified before, but just briefly,
 7          for the record, how are you employed?
 8     A    Police officer for the City of Appleton.
 9     Q    And are you familiar with a party named Jack Thao?
10     A    Yes, I am.
11     Q    And how do you know Jack Thao?
12     A    Jack Thao attends my church, as well as his family
13          owns a grocery store on West Wisconsin Avenue, and
14          also his parents and I serve together at church and
15          also in other capacity in the community.
16     Q    And did that type of contact exist back in December
17          of 2013?
18     A    Yes.
19     Q    And has it continued through today's date?
20     A    Yes.
21     Q    And just to assist the court, the Jack Thao that
22          you're referring to, about how old is he?  If you had
23          to guess.  Sorry.
24     A    I would say maybe like around 24, 25.
25     Q    Are you aware of any educational or intelligence
```

```
 1          issues as it relates to Jack?

 2    A     Not specifically, other than I know that he has not

 3          been employed for a while.  He help his parents with

 4          the store.  And I know that he has some health issue.

 5          As a matter of fact, there was an episode at

 6          church --

 7                     ATTORNEY VISHNY:  I'm going to -- well, let

 8          me just say this.  If he's testifying from his

 9          personal knowledge --

10                     ATTORNEY SCHNEIDER:  He is.

11                     ATTORNEY VISHNY:  Okay.  -- I don't have an

12          issue with it, but otherwise there could be a

13          foundational objection.

14                     THE COURT:  Sure.

15    A     And there was a health issue episode at church that I

16          also assist him with it.

17    Q     And specifically, and I don't mean to lead, but Jack

18          suffered a seizure while at church and you provided

19          some assistance to him and his family, correct?

20    A     Yes.

21    Q     In relation to this case, did you ever talk to Jack

22          Thao?

23    A     No, not -- not specifically about this -- this

24          particular case.

25    Q     Did there come a time in January of 2014 where you
```

```
 1          had contact with his parents related to their grocery
 2          store?
 3    A     Yes.  The parents contacted me about a counterfeit
 4          situation or incident happened at their store and
 5          asked me to make contact with them to discuss that
 6          investigation.
 7    Q     And did that occur with that business on one day or
 8          multiple days?
 9    A     Multiple day.  The investigation lasted
10          approximately, I would say, almost a year, and I have
11          several contact -- attempted contact with both the
12          parents.
13    Q     On those occasions would you travel to the grocery
14          store to do that?
15    A     Yes, I did.
16    Q     Would there have been times where you might have seen
17          Jack while you were there?
18    A     I believe so in regards to that investigation as well
19          also on social off-duty type of contact.
20    Q     When you were there and talking to his parents about
21          the counterfeit bill situation, might have Jack been
22          present during those conversations?
23    A     I -- it's a decent size store.  Not that I recall in
24          the immediate area that I was talking to his parents.
25          If he was in the back or he was in other part of the
```

17

| | | |
|---|---|---|
| 1 | | store, I wasn't aware of it. |
| 2 | Q | Okay. But based upon your recollection, you never |
| 3 | | had any specific conversation or discussion or |
| 4 | | interview with Jack Thao about the Luna case? |
| 5 | A | No. |
| 6 | Q | As part of your work on this case, did you ever feel |
| 7 | | you needed to go talk to him to try to verify any |
| 8 | | facts or information? |
| 9 | A | No, not after the three party that we interview back |
| 10 | | in December, we decide it was sufficient with the |
| 11 | | information and the concern that they expressed that |
| 12 | | there was really no need to go back to -- to talk to |
| 13 | | Jack about the case. |
| 14 | Q | The -- I want to shift gears now a little bit, just |
| 15 | | to give you a heads up on that. |
| 16 | | The -- at first -- first time when you spoke |
| 17 | | with Ryan Thao, Mikey Thao and Watou Lee, I think in |
| 18 | | some previous testimony they expressed some concerns |
| 19 | | to you about providing information. |
| 20 | A | Yes, they did. |
| 21 | Q | And did each one of them express concerns to you? |
| 22 | A | Yes. |
| 23 | Q | What were the -- some of their concerns? |
| 24 | A | Concerned about their safety, safety for the family, |
| 25 | | concern about the people that involved in the |

18

```
 1        shooting, how they have some, I guess, prior
 2        knowledge of their associations in terms of violent
 3        crimes.

 4                ATTORNEY VISHNY:  Judge, in the interest of
 5        time I'm going to object.  I believe this was all
 6        previously testified to at other hearings and it is
 7        part of the record, so unless there is something new
 8        that hasn't been testified to before, I'd object.

 9                ATTORNEY SCHNEIDER:  There is, I was just
10        trying to lay a little foundation and then it will --
11        it will get to why some additional questions I have
12        for him on this topic.

13                THE COURT:  I'll give a slight bit of
14        latitude.  I think Attorney Vishny is correct we've
15        covered much of this, but if it's a precursor to a
16        new subject, I'll give a slight bit of latitude.

17                ATTORNEY SCHNEIDER:  Okay.
18    Q   (BY ATTORNEY SCHNEIDER)  So you said the parties had
19        some prior knowledge, and I missed you because I was
20        trying to take a note.  Sorry.
21    A   Yes.  Of the party involved in the incident, Luna, as
22        their associates or friends, prior incidents as well
23        that they were aware of.

24                ATTORNEY VISHNY:  Again, I'm going to
25        object on different grounds now which is I'm assuming
```

```
 1        not every witness said the exact same thing, and
 2        different witnesses had different knowledge of the
 3        parties involved, so if he's going to make a claim
 4        that a witness told him something, I think that
 5        witness should be specifically identified by name and
 6        what that individual told Sergeant Thao, not just a
 7        general comment, they said this, they said that.
 8                   THE COURT:  And if we can, let's -- we'll
 9        break it down by the individual witnesses.
10                   ATTORNEY SCHNEIDER:  Okay.
11   Q    (BY ATTORNEY SCHNEIDER)  So Ryan Thao, did he express
12        having concern about getting information about
13        Chong?
14   A    Yes, he did.  Very specific about concern for his
15        safety, concern for his family, and how the people
16        involved would be able to find him or retaliate with
17        information he -- if he provided.
18   Q    Did he mention having any information about Chong's
19        background or his family background that was part of
20        his belief?
21   A    Not specifically names, but he's aware of the family
22        and the brothers and the concern about their safety
23        because of that.
24   Q    Okay.  And then at the time then do you remember if
25        Mikey Thao expressed having concerns about sharing
```

1    information about Chong?

2  A  Yes, to the point where I actually have to meet him

3     outside his home so that we can at least have a good

4     conversation between two of us.

5  Q  Did he share anything specific about why he was

6     afraid?

7  A  Again, he -- he had more knowledge of Paul and his

8     brothers and has some knowledge about some of the

9     activity they were involved in in terms of violent

10    incidents, beatings, fights.

11 Q  And then finally Watou, did he have some specific

12    concerns?

13 A  I think just through his relationship with -- with

14    Ryan and Mikey that he also expressed concern.  I

15    don't recall any specific in terms of that he's aware

16    of Paul Lee or Chong or other brothers' activities,

17    but he expressed concern about his safety, that these

18    are dangerous people in that general term.

19 Q  When these concerns were expressed to you, did they

20    appear to be -- well, let me ask you this.  When they

21    expressed those concerns to you and they were talking

22    about being aware of his family or his brother or the

23    history, based upon your information and knowledge

24    you knew at the time, were those legitimate

25    concerns?

21

```
1   A    Yes.

2            ATTORNEY VISHNY:  Objection.  I don't see
3   what the relevance is.

4            ATTORNEY SCHNEIDER:  Judge, part of the
5   argument is that the -- she's arguing the officers
6   are either disingenuous when they say these people
7   had this significant fear and they made certain
8   choices because of what was expressed to them about
9   their fear, or that in some way, shape or form they
10  acted in bad faith.  I think Sergeant Thao should be
11  allowed to explain I believe this or I know this,
12  when in his experience or his knowledge did he know
13  or agree or was aware of those past instances with
14  Chong's family.  It's going to his belief and his
15  knowledge and the decisions that were made whether
16  those fears they expressed were so significant or
17  were legitimate.

18           THE COURT:  I think, if I understood the
19  question correctly, you're asking Sergeant Thao to
20  surmise whether or not he was aware of the incidents
21  which would legitimize the fear, and I think that
22  causes him to go into the mindset of Mikey and Watou
23  and Ryan, and so I think he could answer, based on
24  what they told you, did they appear legitimate, but I
25  don't think whether or not they actually took place,
```

22

```
1          I don't think we can go into.

2                    ATTORNEY SCHNEIDER:  Okay.  Then I'll --

3                    THE COURT:  I'm going to sustain it as to

4          how it's been phrased.

5                    ATTORNEY SCHNEIDER:  Okay.

6     Q    (BY ATTORNEY SCHNEIDER)  Could you see when the three

7          of them were expressing their fears that they had an

8          emotional reaction when they were talking about

9          that?

10    A    Yes, obviously.

11    Q    Okay.  So they -- I'm going to try to -- my question

12         is going to be a little long, but I'm going to try to

13         direct him a little bit.

14              So they express these fears and they say we're

15         aware of the family history.  Were you aware of a

16         family history relating to violence or fighting in

17         the Chong Lee family?

18    A    Yes.

19                   ATTORNEY VISHNY:  Objection.  Relevance.

20                   ATTORNEY SCHNEIDER:  That goes to whether

21         or not he believed theirs fears and how he acted.

22         You can have a lot of people say I'm afraid of Alex

23         Duros because I think he's a bad person, and then you

24         want to maybe take action about Alex or take action

25         to protect that person, but when this officer, his
```

23

1       decisions in needing to protect those people or keep
2       their names out of reports, and when that's based
3       upon him telling them he was afraid and now you have
4       to weigh whether they were acting in bad faith, and
5       defense I think is trying to argue they've come up
6       with this fear argument, it's disingenuous, I think
7       what he knows about that family comes into his
8       mindset when he decides do we really need to protect
9       these people or is there an amount or a level of fear
10      when he weighs what he should do.

11              ATTORNEY VISHNY:  Judge, first of all, the
12      prior testimony is that Sergeant Thao didn't make
13      this decision on his own to destroy these reports,
14      this was a collective decision that was made with the
15      entire law enforcement team who discussed these
16      particular witnesses and what to do.  So I don't
17      believe it's relevant for that reason.

18              Number two, let's say hypothetically speaking
19      that Sergeant Thao is aware of some prior violent
20      incidents, what justification does that give to
21      destroy previous reports.  There are remedies such as
22      telling the prosecutor about the witnesses, telling
23      the prosecutor about the fears, asking for reports to
24      be redacted, asking for in camera inspections, asking
25      for protective orders.  I don't frankly see the

24

```
 1       relevance to what the issues are that the court has
 2       to decide, which is were reports intentionally
 3       destroyed and what evidence did these reports
 4       contain.  Those are the issues before the court, not
 5       whether or not Sergeant Thao is aware that these
 6       witnesses were afraid.
 7            THE COURT:  Miss Schneider.
 8            ATTORNEY SCHNEIDER:  There's a prong to
 9       that though that talks about did they act in bad
10       faith, and so when the officers have previously
11       talked about -- and if she wants me to call every CRU
12       officer to come in and talk about their awareness of
13       the Lee family and the brothers and all the other
14       instances, I can, but I think Sergeant Thao is aware
15       of all of those because of his length of time and his
16       investigation in cases.  When they say these people
17       expressed fear to us and because of that we felt the
18       need to protect them, when they talked about the
19       Monfils, and I know Attorney Vishny thinks they're
20       interpreting it wrong, but when they have to make
21       that decision, I think if you have a witness say,
22       well, I'm afraid of John because he's got a bad
23       reputation, that officer knows nothing about it, he
24       then has to make decisions, should I protect this
25       person, you know, should I ask him more about their
```

25

1    fears because I think they're talking off the wall, I
2    think that is relevant. It's relevant to why he did
3    what he did, and it's relevant to the prong of did
4    they act in bad faith.

5                 ATTORNEY VISHNY: And again, bad faith
6    doesn't mean that the fears were or were not
7    legitimate. Bad faith is really the issues regarding
8    what was the appropriateness of the actions taken by
9    the police officers.

10                THE COURT: Yeah. I'm going to allow the
11   officer to testify, and I think he has, unless,
12   Attorney Schneider, you think I'm incorrect, as to
13   whether or not he felt that Watou and Ryan and Mikey,
14   whether their expressed fears appeared legitimate. I
15   think the -- the knowledge of the officer I'm not
16   entirely certain is germane. I'm going to sustain it
17   on that point. Again, if you want to -- if you feel
18   that the question that I am going to allow hasn't
19   been answered, I'll allow that to be asked.
20   Q    (BY ATTORNEY SCHNEIDER) So I think, Sergeant Thao,
21   what I'm going to ask you at this point then is when
22   they expressed these fears to you, did it appear to
23   you that their fears were being expressed in a way
24   where they weren't trying to make up something about
25   their fears?

26

1    A    No, they were real.

2    Q    Did they talk about specifics, if you know?

3    A    I don't recall specific incident they provided, but

4         for example, like Mikey and Ryan talk about how they

5         are familiar with the Lee's brother and things that

6         they have done in terms of some of the violent

7         situations, particularly Mikey had talked about how

8         he more familiar with Paul and his brothers and some

9         of the things that they have done.  As you recall in

10        the second interview they talk about some of the

11        fights they involved in in some of the taverns in

12        downtown.

13   Q    When they talked about those things, were those

14        things you were aware of?

15   A    Yes.  And I have obviously more knowledge in terms of

16        what the Lee brothers have done in regard to some

17        crimes that are committed in the past or beatings or

18        weapon related situation, investigation that I

19        personally involved in.

20   Q    Okay.

21             ATTORNEY SCHNEIDER:  Then I don't have any

22        other questions.

23             THE COURT:  Attorney Vishny.

24             ATTORNEY VISHNY:  Okay.

25             **EXAMINATION OF CHUE LEE THAO**

**BY ATTORNEY VISHNY:**

2   Q   First of all, as to Jack Thao, you were aware that

3        Jack Thao was in a vehicle that was stopped with

4        Mikey Thao and Watou Lee after being at Luna lounge,

5        correct?

6   A   I was aware of that, I believe was sometime after we

7        interviewed Ryan and Jack and Watou.

8   Q   No.  You were aware -- I mean you became aware later

9        after the interviews that they had been in the car

10       stopped by you and another police officer?

11  A   I believe so, yes, I believe so.

12  Q   But you were aware before December -- before your

13       contacts with Jack Thao and his parents about the

14       store that Jack Thao had been in that car, right?

15  A   I -- I don't recall.  I don't believe so because

16       the -- the parents talked to me in January of 2014,

17       and it was kind of by that time that there was no

18       need to conduct additional interview with those

19       three.  And then Ryan names -- I mean Jack name came

20       up but I don't recall what time frame that came up.

21  Q   Okay.  And did you ever talk to Jack Thao

22       specifically at the Appleton Asian Market on College

23       Avenue?  That's his parents' store?

24  A   It's on Wisconsin Avenue.

25  Q   Wisconsin.  Excuse me.  Did you ever talk

```
 1        specifically with Jack Thao whether or not Jack Thao
 2        had heard rumors that Chong Lee was the alleged
 3        shooter in this case?
 4    A   No, I did not, not specific about this case.  I might
 5        have stopped by to talk about the counterfeit and
 6        just to ask some questions about what his parents but
 7        not about Luna.
 8    Q   Did you not, during the course of whatever your
 9        purpose was, actually have a conversation with him
10        where he told you he had heard rumors that Chong Lee
11        was the shooter and didn't you have that conversation
12        with him regardless of your purpose for going to the
13        store?
14    A   No.
15    Q   Okay.  And didn't you have a conversation with him at
16        all about whether or not he knew Chong Lee?
17    A   No.
18    Q   Okay.  All right.  Turning away from the Jack Thao
19        issue, I'm going to talk to you about Ryan, Mikey and
20        Watou.  What was the date that you interviewed these
21        people?
22    A   With Jack -- I mean with Ryan it would be sometime
23        the afternoon, I believe it was on December 11th,
24        2013.
25                  THE COURT:  And that was whom?  I'm
```

29

```
 1        sorry.

 2                   THE WITNESS:  That was Ryan Thao.

 3                   THE COURT:  Okay.

 4   Q    (BY ATTORNEY VISHNY)  Okay.  So you think -- you said

 5        which one was the afternoon of December 11th?

 6   A    Ryan Thao.

 7   Q    And what about Mikey?

 8   A    Mikey was after we interview Paul Lee at Norka, so

 9        something -- sometime around eleven p.m. to around

10        midnight.

11   Q    And what about Watou?

12   A    Watou I believe was about six p.m., between six and

13        seven p.m. on that same day, December 11, 2013.

14   Q    Now the suspect at the time of the shooting was Paul

15        Lee, right?

16   A    He was considered somewhat of a person of interest at

17        the time.

18   Q    Well he was more than a person of interest because at

19        the end of interrogating him at Norka, he was put

20        under arrest, wasn't he?

21   A    He was taken into custody.

22   Q    And he didn't have a hold for any other matter, he

23        was arrested for this particular homicide, right?

24   A    Yes, he was taken into custody.

25   Q    And when he was interrogating while at Norka it was
```

```
 1        made quite clear to him that it was believed he was

 2        the person involved in this shooting, correct?

 3    A   I did not believe -- at least I did not draw the

 4        conclusion myself personally, but I know the other

 5        officer that have investigated two or three days,

 6        four days prior to my involvement have shared some --

 7        some I guess conclusion or some assumption that he

 8        made because he was physically involved with Josh in

 9        terms of the fighting that he was potentially the

10        suspect.

11    Q   Okay.  Let's try to just stick to answering my

12        question.

13    A   Sure.

14    Q   Trying to make the hearing short.  You were there

15        with Sergeant Rabas and you interrogated him,

16        correct?

17    A   Yes.

18    Q   And it was that Paul Lee was the suspect, correct?

19        It was stated explicitly, wasn't it?

20    A   Yes.

21    Q   And it was told to him explicitly, you had a gun in

22        your hand when you were there, right?

23    A   Based on the photo that they observed.

24    Q   My question is was it told to him explicitly.

25    A   To Paul?
```

31

1   Q   Yes.

2   A   He was told he was a suspect in the shooting, yes.

3   Q   Well he was told more than he was a suspect, he was

4       told that they believed he was guilty, correct?

5           ATTORNEY VISHNY:  Judge, you know what, I'm

6       going to ask this hearing be adjourned.  I have a lot

7       of material that I could impeach Sergeant Thao with.

8       I didn't expect him to be called as a witness today

9       based on my conversation with Miss Schneider

10      yesterday.  I believed that Sergeant Rabas was going

11      to be called potentially but that he was ill, wasn't

12      going to be here.  I could spend about a good two or

13      three hours cross-examining Sergeant Thao and what he

14      just said, so I suggest that we do one of two things,

15      we either strike the entire record or we reset this

16      for a day where I can come in with the impeachment

17      materials.

18          This court has previously reviewed the

19      transcripts of these interrogations.  This court -- I

20      mean, I have the reports that he has written.  I

21      don't think that these gentlemen were interviewed

22      even on the 11th, I think it was the 10th.  Pretty

23      clear that Paul Lee was a suspect.  So I'm not

24      prepared to impeach him based on what's happened

25      here.  I can ask some other questions about this, but

32

1     in order to do a full impeachment, I simply can't
2     prove it today.
3             ATTORNEY SCHNEIDER:  I would dispute
4     because I know we specifically talked yesterday
5     about, and I told her Sergeant Thao had not talked to
6     Jack Thao, there was this counterfeit grocery store
7     thing with his parents.
8             ATTORNEY VISHNY:  Correct.
9             ATTORNEY SCHNEIDER:  So I don't know why
10    she says she's surprised by Sergeant Thao's
11    testimony.
12            THE COURT:  I think now we're talking about
13    Paul Lee.
14            ATTORNEY VISHNY:  I'm not surprised about
15    the testimony about Jack Thao at all.  I wasn't
16    surprised, it's exactly what I expected.  But this
17    other stuff about interviewing Ryan, Mikey, Watou,
18    and, you know, I --
19            ATTORNEY SCHNEIDER:  Well, it -- maybe I'll
20    say this.  My point of today was having him further
21    express their fears and his basis and his knowledge.
22    If we're going to argue over the dates and when they
23    interviewed them and in what order, I want to -- I
24    guess I'd object because her cross is beyond the
25    scope.  I don't know what she's trying to get to

33

```
 1          through cross, but the purpose of why I recalled him

 2          on that was my thought that I needed to further

 3          express to the court his belief when it goes to the

 4          argument on bad faith.

 5                    ATTORNEY VISHNY:  Let me try a few more

 6          questions, maybe I can handle this without the

 7          impeachment material.

 8    Q     (BY ATTORNEY VISHNY)  Let's talk first about Ryan.

 9          We're going to talk about each one specifically.

10          Okay?

11    A     Yes.

12    Q     Focusing on Ryan, what did Ryan tell you the shooter

13          wore in that interview?

14    A     He -- he did describe the person coming from which

15          directions and a description of the clothing, and

16          you're asking me to describe specifically what color

17          in terms of -- I can't -- I don't have --

18    Q     Because you don't remember, right?

19    A     Correct.

20    Q     And you can't refer to any notes because you've

21          destroyed the reports?

22    A     It was decided not to retain, yes.

23    Q     And you didn't show him any photographs at the time

24          at that interview, or did you?

25    A     I don't recall showing photograph to him.
```

34

```
 1   Q   Paul Lee was a suspect at that time, the main suspect
 2       of the Appleton Police Department investigation,
 3       correct?
 4   A   I'm telling you in my mind --
 5   Q   I'm not asking about your mind, I'm asking about what
 6       the suspect was that the team was working to develop,
 7       it was Paul Lee, wasn't it?
 8   A   No.  At the time it was not in my mind that Paul Lee
 9       was the suspect.
10   Q   It was in your mind that somebody else was?
11   A   No.  It's an open investigation to determine who have
12       done the shooting.
13   Q   When Ryan Lee told you he was afraid of people in the
14       Lee family, he didn't even mention Chong Lee's name
15       during that interview on December 10th or 11th,
16       whichever day it occurred, he didn't even mention
17       Chong Lee's name to you.
18   A   Right.  His name is Ryan Thao.  He did not.
19   Q   Excuse me.  He did not mention Chong Lee, we're
20       absolutely clear about that, correct?
21   A   No, he did not mention.
22   Q   The person he mentioned being afraid of was Paul
23       Lee?
24   A   I don't recall he mentioned Paul Lee, but he
25       expressed concern about the brothers, the family,
```

35

```
1              because he's familiar with them.

2    Q    He told you he knew Paul Lee, right?  That's who he

3         was familiar with, right?

4    A    I recall -- believe that, but the person that we

5         actually have a better relationship or knowledge or

6         interaction was Mikey Thao, that he --

7    Q    I'm asking you about Ryan.  We're sticking to Ryan.

8         Okay?

9    A    I don't recall him saying Paul Lee that he knew, I

10        don't recall that.

11   Q    Okay.  So if he talked about the Lee brothers,

12        though, we are 100 percent positive the name Chong

13        Lee never came up, correct?

14   A    From Ryan Thao, no.

15   Q    No.  And he didn't even know Chong Lee, you found out

16        later when you reinterviewed him, right?

17   A    Correct.

18   Q    So now that we established the name Chong Lee was in

19        no way involved in the Ryan Thao discussion, let's

20        talk about Mikey Thao.  Mikey Thao also did not

21        mention Chong Lee as somebody he was specifically

22        afraid of, correct?

23   A    Not names but just association with brothers.

24   Q    Did he name specifically any specific brothers?

25   A    That he's aware of all of them.
```

36

| | | |
|---|---|---|
| 1 | Q | Did he name names? |
| 2 | A | I didn't -- I don't recall exactly names, but he |
| 3 | | mentioned that he's familiar with Paul Lee. |
| 4 | Q | Okay. Did he tell you what his description of the |
| 5 | | shooter's clothing was? |
| 6 | A | Yeah, he did provide a description. |
| 7 | Q | What did he tell you it was at the time? |
| 8 | A | Again, I don't recall, but it was more of a jacket |
| 9 | | and some type of two-tone color or different color, |
| 10 | | and I can't give you precisely the color that he |
| 11 | | described. |
| 12 | Q | And of course you can't remember because you didn't |
| 13 | | write it down. |
| 14 | A | It was decided not to retain, yes. |
| 15 | Q | And you didn't retain the tapes, right? |
| 16 | A | Right. |
| 17 | Q | And clearly this was the most important thing of this |
| 18 | | investigation was to get a description of who did the |
| 19 | | shooting when you're talking to these witnesses a few |
| 20 | | days before it -- after it occurred, excuse me. |
| 21 | A | Taking into consideration the express for their |
| 22 | | safety, we decided not to retain the tape. |
| 23 | Q | I didn't ask you that. What I asked you was, clearly |
| 24 | | the focus of the investigation, whether it's two, |
| 25 | | three, four days after this shooting, is to find out |

37

| 1 | | who did it, right? |
| 2 | A | Correct. |
| 3 | Q | A description would be a crucial thing to find out, |
| 4 | | correct? |
| 5 | A | Correct. |
| 6 | Q | Clothing would be a crucial thing, right? |
| 7 | A | Yes. |
| 8 | Q | Height and weight would be a crucial thing, right? |
| 9 | A | Correct. |
| 10 | Q | Showing photos could be a crucial thing, correct? |
| 11 | A | Yes. |
| 12 | Q | And you didn't show him any photographs either during |
| 13 | | that? |
| 14 | A | I don't recall showing photo. |
| 15 | Q | Okay. And he didn't specifically ever mention Chong |
| 16 | | Lee as somebody he was afraid of? |
| 17 | A | Again, I did not give names other than have been |
| 18 | | expressed concern, so the answer to your question |
| 19 | | would be no. |
| 20 | Q | All right. Watou Lee. He didn't know Chong Lee |
| 21 | | either, right? |
| 22 | A | No, he did not. |
| 23 | Q | Chong Lee's name never came up in the interview, |
| 24 | | correct? |
| 25 | A | Yes. |

```
 1    Q    Did you ask him for a description of what the shooter

 2         wore?

 3    A    Yes.

 4    Q    Height and weight?

 5    A    Yes.

 6    Q    You destroyed the tapes, right?

 7    A    Correct.

 8    Q    You knew at the time what other witnesses had told

 9         the police in terms of descriptions of the shooter,

10         right?

11    A    Yes.

12    Q    In fact one of the most crucial witnesses was Daniel

13         Kersten who was the bouncer.  You weren't aware of

14         any of his statements?

15    A    No.

16    Q    Or any of the other witness statements as to what the

17         shooter wore?

18    A    No.

19    Q    You were just aware that the police believed that

20         Paul Lee had a gun in his hand as he was fleeing

21         Luna?

22    A    It was expressed to me in that fashion, that he may

23         have something in his hand similar to a gun.

24    Q    And when Watou Lee said he was afraid of people in

25         the Lee family, did he specifically mention Paul
```

| 1 | | Lee's name? |
| 2 | A | Watou, he did not know the brothers. |
| 3 | Q | Then how could he have said he was afraid of the Lee |
| 4 | | brothers if he didn't know them? |
| 5 | A | Just through his socialization with Mikey Thao and |
| 6 | | with Ryan Thao and the fact that he's aware of the |
| 7 | | gang or the association with friends in that group. |
| 8 | Q | Now, you said that you're aware of prior violent acts |
| 9 | | by what I characterize as the Lee brothers, correct? |
| 10 | A | Yes. |
| 11 | Q | Actually, the prior violent acts you were aware of |
| 12 | | were those of Paul Lee. |
| 13 | A | No, his other brothers too. |
| 14 | Q | But it wasn't Chong Lee. |
| 15 | A | Not -- he was a victim of a shooting. |
| 16 | Q | Chong, yes, well, being a victim is not considered to |
| 17 | | be a violent act by the Appleton Police Department, |
| 18 | | is it? |
| 19 | A | Depending on what circumstance that caused it, but to |
| 20 | | answer your question, I would say no. |
| 21 | Q | Okay.  So aside from Chong Lee being a victim, you |
| 22 | | weren't aware of him being involved in any other |
| 23 | | incidents that were violent that you're describing |
| 24 | | when you say that you were certainly aware these were |
| 25 | | legitimate concerns, correct? |

40

```
 1   A    Not specifically with him.

 2   Q    But with Paul Lee you were aware of those, right?

 3   A    Yes.

 4   Q    And you were aware of that Paul Lee had been involved

 5        in a prior shooting, correct?

 6   A    Yes.

 7   Q    And you had personally been involved in investigating

 8        it, right?

 9   A    Yes.

10   Q    And he was never charged with it, right, or was he?

11   A    He was referred to the DA, and there's some issue

12        with communication between the office.

13   Q    In other words, the charges weren't issued,

14        regardless of the reason?

15   A    At the end of the day, yes.

16   Q    Okay.  And any other violent incidents you're talking

17        about would either be Paul Lee, Hu Lee, Teng Lee,

18        other -- other brothers, but not Chong Lee, correct?

19   A    Not specifically him, yes.

20   Q    Okay.  All right.

21               ATTORNEY VISHNY:  Nothing further.

22               THE COURT:  Attorney Schneider.

23               ATTORNEY SCHNEIDER:  Just briefly.

24          **EXAMINATION OF CHUE LEE THAO**

25   **BY ATTORNEY SCHNEIDER:**
```

41

```
 1   Q   Ryan, Watou and Mikey all described the location the
 2       shooter came from, correct?
 3   A   Of course.
 4           ATTORNEY VISHNY:  Objection.  Relevancy.
 5       This has already been discussed.
 6           ATTORNEY SCHNEIDER:  Something she asked
 7       about, did they provide descriptions of A, B, C or D,
 8       so that wasn't asked, that's why I'm asking it.
 9           THE COURT:  I'll allow it.  Go ahead.
10   A   Yes.  All three provided directions or the location
11       where the shooter have come from.
12   Q   Other than Chong and Paul Lee, because defense asked
13       about it, when there was at least expressed about
14       concerns about the family, are you aware or were you
15       involved in investigations relating to the other
16       brothers that were violent where they were --
17           (Brief recess.)
18   Q   I think I asked you if you were aware of other
19       offenses where the Lee brothers were committing
20       offenses that you would consider to be violent.
21   A   Yes.
22   Q   Other offenses that involved firearms.
23   A   Yes.
24           ATTORNEY SCHNEIDER:  I have nothing further
25       then.
```

```
 1                    ATTORNEY VISHNY:  Just very quickly.

 2               EXAMINATION OF CHUE LEE THAO

 3    BY ATTORNEY VISHNY:

 4    Q    When you interviewed these three individuals, Ryan,

 5         Mikey and Watou, the first time, did you have them

 6         draw maps of where the shooter came from?

 7    A    Yes.

 8    Q    And so those were destroyed too?

 9    A    Yes.

10                    ATTORNEY VISHNY:  Nothing further.

11                    ATTORNEY SCHNEIDER:  I don't have any

12         additional follow up, Judge.

13                    THE COURT:  All right.  I don't have any

14         questions for you, sir.

15              Any additional witnesses?

16                    ATTORNEY SCHNEIDER:  No.

17                    ATTORNEY VISHNY:  You don't want to put in

18         anything about the fact that this jump drive is

19         missing?

20                    ATTORNEY SCHNEIDER:  I just -- there's just

21         a couple other discovery issues we're dealing with,

22         I'm providing some reports, and so I think we'll just

23         file by stipulation, because I'll make sure she

24         doesn't have an objection to what I file, and we'll

25         do that next week.
```

```
 1                    THE COURT:  All right.

 2            Anything else then, Miss Schneider?

 3                    ATTORNEY SCHNEIDER:  No.

 4                    THE COURT:  Miss Vishny?

 5                    ATTORNEY VISHNY:  No.

 6                    THE COURT:  All right.  Then we are -- what

 7       I'll expect is I'll expect filings by next week

 8       Friday.

 9                    ATTORNEY SCHNEIDER:  Can we make it Monday?

10       I know it's Martin Luther King Day, but by the end of

11       the day, it just gives me an extra day with nothing

12       else on my plate.

13                    THE COURT:  Attorney Vishny.

14                    ATTORNEY VISHNY:  Okay.  No problem.

15       Neither one of us object.  But are we going to

16       discuss the discovery stuff next, the motion to

17       compel?

18                    ATTORNEY SCHNEIDER:  I think he wanted more

19       time.

20                    ATTORNEY VISHNY:  You want more time on the

21       motion to compel?

22                    THE COURT:  I was of the impression we

23       were -- you were supplementing that as well, so if

24       that's not the case, I'll still -- why don't I just

25       review everything at the same time, if everyone's
```

44

1          okay with that.

2                    ATTORNEY VISHNY:  All right.  That's fine.

3          We'll do that.  I just want the record to reflect

4          that, you know, we will definitely include the fact

5          that diagrams were destroyed as well as reportings.

6          We weren't aware of that until now.

7                    THE COURT:  Understood.

8                    ATTORNEY VISHNY:  Okay.

9                    THE COURT:  So we'll submit everything by

10         Monday, January 18th.

11                   ATTORNEY SCHNEIDER:  My suggestion is, I

12         know the court doesn't know if it wants to just give

13         us a written decision, do that telephonically where

14         they can appear --

15                   THE COURT:  I'll do it -- I will do it

16         telephonically.  I anticipate I'll do it during that

17         week.

18                   ATTORNEY SCHNEIDER:  Of the 18th or the

19         25th?  Potentially, if you're going to give your

20         decision the week of the 25th, we could arrange for

21         that to occur, if you need a little more time.

22                   THE COURT:  I'm going to double-check

23         with -- I'm going to double-check with my staff.  As

24         I had -- I think I've mentioned, I've started looking

25         at the issues, so I don't think it will take an

```
 1          excess or extensive amount of time once I get the

 2          final briefings, it's more fine tuning things.

 3                  ATTORNEY VISHNY:  Now, Judge, just a couple

 4          other housekeeping matters.

 5                  THE COURT:  Sure.

 6                  ATTORNEY VISHNY:  So you're going to issue

 7          a written decision.  We have another court date which

 8          is -- I'm trying to look at our next court date here

 9          for before the trial.  I think we have a final

10          pretrial date.

11                  THE COURT:  Yes.

12                  ATTORNEY VISHNY:  One minute.  I hope we

13          have a final pretrial date.

14                  ATTORNEY SCHNEIDER:  We should.  I don't

15          know whether it's not listed.

16                  ATTORNEY VISHNY:  I am trying to find that

17          myself.

18                  THE COURT:  Let me take a look here.

19                  ATTORNEY SCHNEIDER:  Does the clerk have

20          it?

21                  ATTORNEY VISHNY:  I'm not seeing it.  I

22          don't have it on my calendar, but I think we should

23          have another date because --

24                  ATTORNEY SCHNEIDER:  Actually you probably

25          don't because my secretary would have posted it.
```

46

```
 1                    ATTORNEY VISHNY:  I really don't think we
 2      do have another date, so I'm going to suggest -- I
 3      don't know if the court has time on February 9th,
 4      10th, 11th or 15th or 16th.  No, I'm sorry, that week
 5      isn't good for Mr. Weitz.
 6                    THE COURT:  We'll look at that 9th, 10th,
 7      11th.  That was okay for you, Attorney Weitz?
 8                    ATTORNEY VISHNY:  The 9th and 10th I have
 9      wide open, the 11th I have some stuff in Milwaukee in
10      the morning.
11                    ATTORNEY VISHNY:  I would prefer the 9th
12      between the two days, and then the afternoon
13      obviously, but I don't know if this is relevant, but
14      Wednesday the 10th is Ash Wednesday.
15                    ATTORNEY SCHNEIDER:  The morning of the 9th
16      from nine until eleven I have the evidence based
17      decision making meeting.  If you can get an excuse
18      pass from Judge DesJardins for me, I'll --
19                    ATTORNEY VISHNY:  I should go to that.
20                    ATTORNEY SCHNEIDER:  They always complain
21      when I miss them, it's because everybody always sets
22      things on these types of cases in the middle of those
23      meetings.
24                    THE COURT:  What time works on the 9th,
25      afternoon?
```

```
 1                    ATTORNEY VISHNY:  Anytime.

 2                    ATTORNEY SCHNEIDER:  Anytime after 1:30.  I

 3          could be here at 1:15 even.

 4                    THE COURT:  We'll just set it at 2:00.

 5                    ATTORNEY SCHNEIDER:  The other thing, I

 6          think the 15th we had agreed filings for witness

 7          lists, I think jury instruction verdict forms we

 8          file, which would be next Friday.

 9                    ATTORNEY VISHNY:  Next Friday?

10                    ATTORNEY SCHNEIDER:  Yup.  That's what we

11          talked about when I sent some e-mails about that.

12                    THE COURT:  Do you want to put that out one

13          more week?  Because we've got the briefings due

14          next -- well --

15                    ATTORNEY SCHNEIDER:  That might not be a

16          bad idea, or to have them due Wednesday the 20th or

17          Friday the 22nd.

18                    THE COURT:  Why don't we make it, Attorney

19          Vishny -- unless there is a strong objection, we'll

20          move it out to Friday the 22nd.

21                    ATTORNEY VISHNY:  That's fine.  So it's

22          witness lists --

23                    ATTORNEY SCHNEIDER:  Jury instructions,

24          verdict forms.

25                    ATTORNEY VISHNY:  Jury instructions,
```

1          verdict forms.

2                    ATTORNEY SCHNEIDER:  My plan is still next

3          Friday we are going to provide the prior convictions

4          of witnesses that we can.  If there is new names I

5          get from their witness list, we'll have to do that.

6                    ATTORNEY VISHNY:  There are none.

7                    ATTORNEY SCHNEIDER:  And then what my past

8          practice is, I'll probably do a summary to the court.

9          I'm not going to provide you with all the

10         documentation behind that.

11                   THE COURT:  That's fine.  We may --

12         understanding, I think as we discussed, we may need

13         to then supplement that, quite frankly, up until the

14         day of trial.

15                   ATTORNEY SCHNEIDER:  Right.  And if there's

16         juvenile records, I may include the whole packet

17         under seal if that's what we find.

18                   THE COURT:  That's fine.

19                   ATTORNEY VISHNY:  No problem.  Just the one

20         last matter I want to -- we're set for trial.  Now

21         this is my understanding.  We're going to start

22         picking the jury or we're going to pick the jury on

23         February 24th.

24                   THE COURT:  Correct.

25                   ATTORNEY VISHNY:  We have the remainder of

49

```
1      that week, the following next week set for trial.
2                THE COURT:  Correct.
3                ATTORNEY VISHNY:  We expect the trial to be
4      done, but we know sometimes these things can happen
5      where they don't get done, but I just want to inform
6      everybody that on the afternoon of the 10th and the
7      11th that I'm not available.  Of March.  Now I'm
8      assuming we're going to be done, but if for some
9      reason we're still trying the case, I would need us
10     to take a break for a day-and-a-half because I'm not
11     going to be in town, and if it's just a matter of --
12               THE COURT:  Did you say the 10th and the
13     11th?
14               ATTORNEY VISHNY:  Of March.  I mean this
15     is -- we cleared a week-and-a-half, so this is the
16     Thursday afternoon, Friday of the following week.
17               ATTORNEY SCHNEIDER:  It would be like
18     two-and-a-half weeks, or almost, by that point.
19               THE COURT:  What we'll do is we'll do sort
20     of a spot check on where we are after, you know,
21     three or four days, and if it looks like what we'll
22     need to do to accelerate things is go into the later
23     hours of the day or even the early evening, we'll do
24     that.
25               ATTORNEY VISHNY:  Okay.
```

50

```
 1                    THE COURT:  So we'll make it work.  I don't
 2       want to do a day-and-a-half break.
 3                    ATTORNEY VISHNY:  I understand that.
 4                    THE COURT:  So we'll --
 5                    ATTORNEY VISHNY:  Okay.
 6                    THE COURT:  We'll work around it.
 7                    ATTORNEY VISHNY:  I just wanted to inform
 8       everyone, though.  The last thing I wanted to do was
 9       all of a sudden be stuck and then gotta go.
10                    THE COURT:  We'll make it work.
11                    ATTORNEY VISHNY:  All right.  Thank you.
12                    ATTORNEY SCHNEIDER:  Okay.
13                    THE COURT:  We are adjourned.
14                    (Proceedings concluded.)
15
16
17
18
19
20
21
22
23
24
25
```

```
 1

 2

 3                    C E R T I F I C A T E

 4

 5    STATE OF WISCONSIN       )
                               ) ss.:
 6    COUNTY OF OUTAGAMIE      )

 7

 8

 9            I, JOAN BIESE, RMR/CRR, do hereby certify that I
      am the official court reporter for Branch IV of the
10    Circuit Court of Outagamie County;

11            That as such court reporter, I made full and
      correct stenographic notes of the foregoing proceedings;
12
              That the same was later reduced to typewritten
13    form;

14            And that the foregoing proceedings is a full and
      correct transcript of my stenographic notes so taken.
15

16            Dated this 20th day of January, 2016.

17

18

19                                _____

20                                JOAN BIESE, RMR/CRR

21

22

23

24

25
```

52