FILED
02-13-2019
Clerk of Circuit Court
Outagamie County
2013CF001074

1    STATE OF WISCONSIN    CIRCUIT COURT    OUTAGAMIE COUNTY
_____

2    **STATE OF WISCONSIN,**

3                    Plaintiff,

4    v.                              **Case No. 13—CF—1074**

5    **CHONG LENG LEE,**

6                    Defendant.
_____

7                    **JURY TRIAL — DAY ONE**

8    _____

9

    BEFORE:          **HONORABLE GREGORY B. GILL, JR.**
10                     Circuit Court Judge, Branch IV
                     Outagamie County Justice Center
11                     Appleton, WI  54911

12

    DATE:            **February 24, 2016**
13

14   APPEARANCES:     **CARRIE SCHNEIDER**
                     District Attorney
15                     Appearing on behalf of the State

16                     **ANDREW MAIER** and **ALEXANDER DUROS**
                     Assistant District Attorneys
17                     Appearing on behalf of the State

18                     **DEBORAH VISHNY** and **EVAN WEITZ**
                     Attorneys at Law
19                     Appearing on behalf of the Defendant

20                     **CHONG LENG LEE**
                     Defendant
21                     Appearing in person

22

23

24   Joan Biese
    Official Reporter, Branch IV
25   Outagamie County

                              1

                                        Exhibit 16

1                          **I N D E X**

2

3    VOIR DIRE BY THE COURT............................    3

4    VOIRE DIRE BY MS. SCHNEIDER......................  119

5    HEARING RE:  PAUL LEE, represented by Attorney Groh  226

6    CONTINUED VOIR DIRE BY MS. SCHNEIDER..............  233

7    VOIR DIRE BY MS. VISHNY..........................  266

8    JURY CHOSEN AND ANNOUNCED........................  367

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **TRANSCRIPT OF PROCEEDINGS**

2              THE COURT:  Good morning, everyone.  My

3     name is Gregory Gill.  I am the circuit court judge

4     for Outagamie County Branch IV.  It is my pleasure to

5     be able to welcome you here today.  Likewise, I'd

6     like to welcome you on behalf of the parties, the

7     county, and all the individuals associated with this

8     matter.

9              You are here as members of the potential jury in

10    this case, and -- and quite frankly, you are the most

11    important part of this process.  You are the most

12    important part of our legal system.  Because without

13    you, ladies and gentlemen of the jury, we would not

14    be able to have the legal system that we have.  And

15    I'm not understating it when I say that -- that it is

16    truly individuals such as yourselves that allow us to

17    have the system of jurisprudence that we have.  And

18    so, at the outset, I do want to again express my

19    sincere appreciation as well as the appreciation on

20    behalf of the parties for your willingness to be here

21    and to serve as potential members of the jury.

22             One of the first matters that we will have today

23    is to swear you in, and then we will begin the actual

24    process of voir dire, and I will explain that a

25    little bit more in detail to you as you go forward.

1        However, what I want you to understand is as we go

2        through the questioning, first and foremost, if at

3        any point in time you're not able to hear myself, or

4        ultimately we will have the attorneys asking

5        questions, please let us know immediately because it

6        is -- it is your responses which will help the

7        parties to formulate who would be appropriate for

8        service on -- on this particular panel.

9            On that same token, as you are aware, we do have

10       several people in the jury box.  As we start out, you

11       will be the individuals of whom the questions will be

12       directed at and we will ask for responses to the

13       various questions.  For those in the gallery, that

14       does not mean that you are able to pick up your

15       favorite novel or read or chat to pass the time

16       because what may happen, and what does happen from

17       time to time, is I may release a member of this

18       initial panel or this initial group in which case it

19       is possible that you would be called up.  My first

20       question to you will then be, have you heard the

21       questions I've asked up to this point and is there

22       any question that you would have answered in the

23       affirmative.  And then we'll take our questions from

24       there.  So I would ask that all people keep their

25       eyes and ears open to the questioning.

4

1          That said, even though I'm only expecting at

2     least responses from this initial group as we go

3     forward, if the individuals in the -- in what I will

4     call the gallery are unable to hear, please let us

5     know because even though I won't be expecting, or we

6     won't be expecting responses from you at the outset,

7     it is important that you're able to hear the

8     questions.  So if you need us to speak up, or we do

9     have microphones that we can utilize, please raise

10    your hand and let us know.  Because, again, you are

11    -- are the most important part of this process that

12    we have.

13         With that said, the first thing that I'd like to

14    do is ask that all of the potential jurors or all the

15    jurors stand and we will swear you in at this time.

16              THE CLERK:  Please raise your right hands.

17              (Clerk administers oath to jury panel.)

18              THE COURT:  All right.  And you may be

19    seated.

20         Then at this time, even though we have seated

21    many of you in the jury box and in the seats in front

22    of the same, what I'm going to do is ask my clerk to

23    formally call you.  If you hear your name and you are

24    out of place, please let us know because we're trying

25    to keep -- keep track so that we're able to, when we

5

1     do have a question for you, we call on the right

2     person.  So if there is out of placement, please let

3     us know and it will be easy enough that we can

4     shuffle around.  So, Melissa.

5          THE CLERK:  No. 7009, Joshua Nieman; No.

6     6572, Christ Elkendier; No. 7421, John Peterson; No.

7     6869, Michael Van Deurzen; No. 7138, Steven Kosinski;

8     No. 7362, Gregory Calmes; No. 403, Chris Parker; No.

9     6987, Kim Hankemeier; No. 622, Mary Steffen; No. 249,

10    Janneen Meyer; No. 7102, Jason Wells; No. 7262, Dean

11    Managan; No. 390, Nicholas Van Dalen; No. 7187, John

12    Eggers; No. 180, Dale Daelke; No. 6575, Patricia

13    Erickson; No. 6688, Cassandra Lee; No. 626, Garret

14    Green; No. 7164, Frank Bloomer; No. 488, Cassie

15    Micke; No. 6750, Jonathan Nichols; No. 7366, Kenneth

16    Keleske; No. 34, Emily Vandenberg, No. 7450, Jason

17    Webster; No. 7481, James Buza; No. 6708, Gary

18    Manderscheid; No. 7032, Christine Naumann; No. 352,

19    Gina Paul; first alternate, No. 7355, Nora Hermus;

20    second alternate, 6968, Adam Schueller.

21         THE COURT:  Okay.  And it appears that

22    everyone is still seated in the same order in which

23    they initially were sat so that at least we've done

24    our first thing right.  So that's good.

25         At this time I would formally call to order the

6

1  case of *State of Wisconsin v. Chong Lee*.

2    And Mr. Lee does appear in person, along with

3  his attorneys, Attorneys Deja Vishny and Evan Weitz.

4  And the State likewise appears in person by Outagamie

5  County District Attorney Carrie Schneider and

6  Outagamie County Assistant District Attorney Andrew

7  Maier.

8    Now, at this point what will happen is we will

9  begin the questioning, and I will start out asking

10  the initial questions.  And I -- I may ask from time

11  to time the attorneys to -- to chime in and assist in

12  questioning, and then, eventually, the attorneys will

13  ask their own questions of you.  Now, while we will

14  need you to be attentive, if you need to stand up and

15  stretch, if at some point in time -- and we'll try to

16  -- I'll try to pay attention as best I can, but if

17  there gets to be a time where we need to take a break

18  for restrooms or things of that nature, we will take

19  those measures because we certainly don't need this

20  to be a test in mental or physical fortitude for you.

21  So we'll do our best to make those accommodations for

22  you.  And again, if you need to stand or stretch,

23  feel free to do so.  You don't need my permission.

24  And you may see the attorneys through the course of

25  this, we may be going up and down as well.

1          So, with that, what I'd ask to begin with is I'd

2     ask Attorney Schneider to please read the

3     information.  And the purpose of this is simply to

4     give you a very generalized idea of what this case is

5     about.

6          Now, in reading the information, what I want you

7     to understand is that the information is nothing more

8     than written formal charges.  You're not to consider

9     this as evidence.  It does not raise any inference of

10    guilt.  The simple purpose is to give you a very

11    generalized idea of what the subject matter is today.

12         And so, Attorney Schneider, at this time I would

13    ask that you read the information please.

14              ATTORNEY SCHNEIDER:  Thank you.

15         I, Carrie Schneider, District Attorney in and

16    for Outagamie County, Wisconsin, do hereby inform the

17    court that:

18         Count 1:  The above named defendant, Chong Lee,

19    on or about Sunday, December 8th, 2013, in the City

20    of Appleton, Outagamie County, Wisconsin, did cause

21    the death of Joshua J. Richards with intent to kill

22    that person.

23         As to Count 2, the above named defendant, Chong

24    Lee, on or about Sunday, December 8th, 2013, in the

25    City of Appleton, Outagamie County, Wisconsin, did

8

1   possess a firearm as a –– subsequent to the

2   conviction for a crime.

3     As to Count 3, the above named defendant, Chong

4   Lee, on or about December 12th, 2013, through

5   February 12th, 2014, Outagamie County, Wisconsin, as

6   a party to the crime, knowingly and maliciously did

7   attempt to prevent and dissuade a witness, Paul Lee,

8   from attending or giving testimony at a trial,

9   proceeding or inquiry authorized by law where the act

10   is committed by a person who is charged with a crime

11   in connection with a trial, proceeding or inquiry for

12   that crime.

13     Count 4:  The above named defendant, Chong Lee,

14   on December 12th, 2013, through February 12th, 2014,

15   Outagamie County, Wisconsin, as a party to the crime,

16   knowingly and maliciously did attempt to prevent or

17   dissuade a witness, Joe Thor, from attending or

18   giving testimony at a trial, proceeding or inquiry

19   authorized by law where the act is committed by a

20   person who is charged with a crime in connection with

21   a trial, proceeding or inquiry for that crime.

22     Count 5:  The above named defendant, Chong Lee,

23   on or about December 12th, 2013, through February

24   12th, 2014, Outagamie County, Wisconsin, as a party

25   to a crime, knowingly and maliciously did attempt to

9

1    prevent or dissuade a witness, Melanie Thao, from

2    attending or giving testimony in a trial, proceeding

3    or inquiry authorized by law where the act is

4    committed by a person who is charged with a crime in

5    connection with a trial, proceeding or inquiry for

6    that crime.

7         Count 6:  The above named defendant, Chong Lee,

8    on or about December 12th, 2013, through February

9    12th, 2014, Outagamie County, Wisconsin, as a party

10   to the crime, knowingly and maliciously did attempt

11   to prevent or dissuade a witness, Stephanie Thao,

12   from attending or giving testimony at a trial,

13   proceeding or inquiry authorized by law where the act

14   is committed by a person who is charged with a crime

15   in connection with a trial, proceeding or inquiry for

16   that crime.

17        Count 7:  The above named defendant, Chong Lee,

18   on or about Saturday, January 25th, 2014, in the City

19   of Appleton, Outagamie County, Wisconsin, under oath

20   or affirmation advised another to orally make a false

21   material statement which the person believed not to

22   be true in an action or proceeding before a judge, to

23   wit:  as related to Stephanie Thao.

24        THE COURT:  Thank you very much, Attorney

25   Schneider.

10

1          At this point we're now beginning the formalized

2     process of voir dire, and to simply let you know,

3     voir dire is the selection of the jury.

4          Now, as I've mentioned, I'll be asking you some

5     generalized questions about your qualifications and

6     then the attorneys will have an opportunity to do the

7     same.  Now, the questions are not meant to -- to pry

8     into your personal affairs or most intimate details,

9     they're not designed to embarrass you, they're simply

10    to ensure that you have no personal vested interest

11    in the outcome of this case and that you can be fair

12    and impartial in reaching a verdict.  If your

13    truthful answer to a question is of a very personal

14    or embarrassing nature, I'd ask that you simply let

15    me know and we can deal with that in an

16    individualized voir dire.

17         On that same token, just so that you understand,

18    after all of the attorneys have asked their

19    questions, I will come back with a follow-up question

20    indicating is there any question that has been asked

21    that you felt uncomfortable answering in a group

22    setting; and if there is such a scenario, we can

23    again address that in an intimate and a one-on-one or

24    with just the attorneys and myself.

25         It is important that you listen carefully, as I

11

1    have mentioned.  I may be required to excuse one or

2    more of you, in which case members of the jury who

3    are not seated in the panel at this point in time,

4    you may be called forward.  And as I have mentioned,

5    my first question will then be, have you heard the

6    questions to this point and are there any questions

7    you would have then answered yes to.

8        Now, are there any -- any questions about

9    anything that I've said up to this point?

10       (No response.)

11       THE COURT:  Okay.  Very good.

12       What I'm going to start out with is the

13   formalized questions, and the first question that I

14   have for you, is there anyone here who is not a

15   resident of Outagamie County?

16       (No response.)

17       THE COURT:  Is there anyone in the panel

18   who has been convicted of a felony offense and has

19   not had their civil rights restored?

20       (No response.)

21       THE COURT:  Now, as I've mentioned, Mr. Lee

22   is the defendant in this case.  Is there anyone who

23   is familiar with Mr. Lee or his family?

24       (No response.)

25       THE COURT:  Now, I've introduced the

12

1    prosecutors who are directly handling this case, but

2    I'd also ask, Miss Schneider, if you could identify

3    the other attorneys in your office, and perhaps if

4    there are some instrumental staff that you feel would

5    be appropriate to identify as well.

6         ATTORNEY SCHNEIDER:  So now if I don't name

7    everyone they're going to think that they're not

8    instrumental to my staff I guess.

9         Assisting us during the proceedings, and I'm

10   going to ask him to stand because he's seated behind

11   me, is Alex Duros.  He is a prosecutor in my office

12   as well.  My name is Carrie Schneider.  I am the

13   District Attorney.  Assisting me during this trial

14   also will be Andy Maier.  He is also an Assistant

15   District Attorney in our office.

16        The other members of my staff include our Deputy

17   District Attorney, Melinda Tempelis, Robert Sager,

18   who is an Assistant District Attorney.  I'm going

19   through the offices here.  Kyle Sargent, an Assistant

20   District Attorney, Zak Buruin, an Assistant District

21   Attorney, Chuck Stertz, an Assistant District

22   Attorney, Margaret or Maggie Delain, who is also a

23   prosecutor and Assistant DA in my office.  Darrin

24   Glad, an Assistant District Attorney, and then Daniel

25   Tombasco is an Assistant District Attorney in my

13

1    office.

2        I'm going to name my investigators because

3    they're the ones I think that are out and about in

4    the community, so if -- just -- the court is probably

5    going to ask if you've had any interaction with us.

6    We have two investigators in our office.  They are

7    Paul Black and Bill Flood.  The other more public

8    faces of my office would include Stephanie Jens, she

9    is my victim witness coordinator, and Carrie Kuepper,

10   our office manager.

11       THE COURT:  Thank you.  And is there anyone

12   who is either a close family friend or a relative of

13   any of the individuals who Attorney Schneider has

14   identified?

15       (No response.)

16       THE COURT:  Okay.  Is there anyone who has

17   had frequent or regular interaction with the District

18   Attorney's office such that it has formed any opinion

19   for you on whether or not you could be fair and

20   impartial in this case?

21       (No response.)

22       THE COURT:  Okay.  Attorney Vishny, briefly

23   I'm going to ask that you introduce yourself and then

24   Attorney Weitz and then any members of your staff

25   that you feel are appropriate.

14

1           ATTORNEY VISHNY:  Thank you.

2       Actually, I'd like to first introduce what I

3   think is one of the most important people.  This is

4   Chong Lee.

5           THE COURT:  I apologize.  That was not

6   intended as an intentional oversight.

7           ATTORNEY VISHNY:  Okay.  This is Mr. Chong

8   Lee.  I'm Attorney Deja Vishny.  This is my

9   co-counsel --

10          UNIDENTIFIED JUROR:  We're having trouble

11  hearing back here.

12          ATTORNEY VISHNY:  I'm Attorney Vishny.

13  This is Chong Lee, Mr. Chong Lee.  Why don't you

14  introduce yourself.

15          ATTORNEY WEITZ:  I'm Attorney Evan Weitz.

16          ATTORNEY VISHNY:  Evan Weitz.

17          MR. GATTON:  I'm Solomon Gatton, intern

18  with Deja.

19          ATTORNEY VISHNY:  And this is Mr. Charles

20  Valdes who is an investigator.

21          THE COURT:  And once we get into the more

22  formal questioning when I turn it over to the

23  attorneys, they'll have a microphone directly in

24  front of them.

25      So did everyone at least recognize visually the

15

1     individuals that Attorney Vishny has introduced?

2              (No response.)

3              THE COURT:  Okay.  Very good.  And is there

4     anyone --

5              UNIDENTIFIED JUROR:  Judge, he's behind the

6     post so none of us could actually see him.

7              THE COURT:  I'm sorry.  We'll have you come

8     out center stage.  All right.

9         Is there anyone who recognizes anyone, either

10    Attorney Vishny or alternatively Attorney Weitz or --

11    or their staff?

12              (No response.)

13              THE COURT:  Okay.  Very good.

14        Now, through the course of this matter it is

15    likely in fact we will hear from various witnesses,

16    and what I'm going to do for you, in no particular

17    order, is I'm going to let you know who the parties

18    believe may be witnesses.  Now this is simply a

19    potential witness list.  It may mean that we hear

20    from all of these identified individuals, we may hear

21    from some of them.  But I'm going to go through the

22    list, and again I'll ask a similar question; and what

23    I'll do is because I have several names, I'll go

24    through groups of about five to six each time, ask a

25    question, and then continue to proceed in that

16

1    fashion.

2         The first potential witnesses or names that I'm

3    identifying are Kyle Anderson, Donte Beatty, Sara

4    Besaw, Alyson Blom, Daniel Campbell, Sarah Clemens,

5    Kasie Coel, C-O-E-L, Taylor Collar, Samantha

6    Delfosse, Officer Mallory DePetro.

7         Is there anyone from that list who believes they

8    may recognize one or more of those individuals as

9    either family members, close friends, or someone with

10   whom you've had regular interaction?

11        Okay.  And, Mr. Nieman?

12             JUROR NIEMAN:  Yes.

13             THE COURT:  And of that list, whom was

14   that?

15             JUROR NIEMAN:  Sara Besaw.

16             THE COURT:  Okay.  Miss Besaw.  And do you

17   -- do you have a regular interaction with Miss Besaw?

18             JUROR NIEMAN:  I met her a couple times.

19   Friend of a friend.

20             THE COURT:  Okay.  And give -- even though

21   that you may not have regular interaction with Miss

22   Besaw, do you have any concerns given that Miss Besaw

23   may testify about your ability to be fair and

24   impartial in this case?

25             JUROR NIEMAN:  No.

17

1              THE COURT:  Okay.  Very good.  Anyone else

2      who recognized any of those names?

3              (No response.)

4              THE COURT:  Then what I'll do is I'll

5      continue on with the next listing of individuals.

6          Officer Lori Duven, Marissa Emenecker, Talisa

7      Farias, Lieutenant Michael Gostisha, Taylor Grady,

8      Dalinda Guzman, Dr. Douglas Kelley, Charles Kersten,

9      Daniel Kersten, Officer Joanna Kolosso.

10         Of that group is there anyone again who

11     recognizes a name as being a close family friend, a

12     relative, or someone with whom you've had regular

13     interaction?

14             (No response.)

15             THE COURT:  The next list, Amanda Krohn,

16     Officer Sean Kuether, Sergeant Wang Lee, Hu Lee,

17     Jenny Lee, Nhia Lee, Paul Lee, Phong Lee, Seng Lee,

18     and Teng Lee.

19         From that group, again, the same question, is

20     there anyone who recognizes any of those names as

21     being close family friends, relatives, or individuals

22     with whom you've had regular interaction?

23             (No response.)

24             THE COURT:  Tom Lee, Tong Lee, Tou Shoua

25     Lee, Watou Lee, Xeng Lee, Xia Lee, Sergeant Brian

18

```
1       Leitzinger, Sergeant Matt McQuaid, Sergeant Michael
2       Medina, Sergeant Cary Meyer.
3            And again the same question for you, from that
4       group is there anyone who recognizes any names as
5       being family friends, relatives, or regular
6       acquaintances?
7                 (No response.)
8            THE COURT:  Peter Moua, Officer Adam Nagel,
9       Jonathan Nielsen, Brittany Olson, Sergeant Todd
10      Peters, James Phimmachack, Jackie Pische, Officer
11      Larry Potter, Sergeant Chad Probst, Sergeant Neal
12      Rabas.
13           And again, from that group does anyone recognize
14      any names as being relatives, close family friends,
15      or regular acquaintances?
16                (No response.)
17           THE COURT:  Jared Randall, Adam Richardson,
18      Sergeant Chad Riddle, Alex Schilling, Sergeant John
19      Schira, Officer Jay Steinke, Bobby Jo Stutzman,
20      Lisa Stutzman, Sergeant Daniel Tauber, Sergeant Chue
21      Thao.
22           And again, the same question for you from that
23      group, does anyone recognize anyone as being friends,
24      relatives, or close acquaintances?
25                (No response.)
```

19

1                    THE COURT:  Johnny Thao, Melanie Thao,

2     Mickey Thao, Ryan Thao, Stephanie Thao, Xai Thao,

3     Trent Thomas, Sergeant Kevin Thompson, Joe Thor,

4     Michael Thor.

5          Is there anyone who recognizes any names as

6     friends or relatives or acquaintances from that

7     grouping?

8                    (No response.)

9                    THE COURT:  Officer Blaine VanderWielen,

10    Dia Vang, Keng Joseph Vang, Kong Vang, Noah Vang,

11    Michael Verheyden, Sergeant James Wall, Michael Wall,

12    Letty Xiong, Trooper Ryan Zukowski.

13         Anyone from that group recognized as a family

14    friend, relative, or close acquaintance?

15                   (No response.)

16                   THE COURT:  Amber Serwe, Avery Schneider,

17    Ellyn Thern, Jeffrey Decoster, Michael Xiong,

18    Mitchell Roepcke, Nicholas Almanza, Phillip Moore,

19    Tori Thern, William Peotter, James Trainum.

20         Does anyone recognize any of those names again

21    as being friends, relatives, or close acquaintances?

22                   (No response.)

23                   THE COURT:  Now, you have heard me mention

24    several officers who may be involved as potential

25    witnesses in this case.  Is there anyone who is

20

1          related by blood or marriage to an individual

2          associated with any law enforcement agencies?

3               Okay.  And that would be?

4                    JUROR PARKER:  Chris Parker.

5                    THE COURT:  Mr. Parker?  Okay.  And, Mr.

6          Parker, whom is it that you have a relationship with?

7                    JUROR PARKER:  My son works for Brillion

8          Police Department.

9                    THE COURT:  Okay.  And understanding that

10         the Brillion Police Department is not involved in

11         this case, do you believe that the fact that your son

12         is involved in law enforcement would have an ability

13         -- have an effect on your ability to be fair and

14         impartial in this case, sir?

15                   JUROR PARKER:  No.

16                   THE COURT:  Okay.  And, Mr. Kosinski?

17                   JUROR KOSINSKI:  My wife works for Appleton

18         Police Department.

19                   THE COURT:  Okay.  And you may have

20         recognized some of the names as Appleton police

21         officers.  Do you feel that the fact that your wife

22         works for the Appleton Police Department would have

23         an effect on your ability to be fair and impartial in

24         this case?

25                   JUROR KOSINSKI:  No, sir.

21

1           THE COURT:  And I suppose I should ask,

2    because I imagine the parties would ask, in what

3    capacity does your wife work for the Appleton Police

4    Department?

5           JUROR KOSINSKI:  She's a crossing guard.

6           THE COURT:  Okay.  Very good.  I apologize.

7      And that would be Mr. -- is it Bloomer?

8           JUROR BLOOMER:  Yes.  I'm not sure if it --

9    my wife works for the office of corrections.

10          THE COURT:  Okay.  And what does she do

11   with that office?

12          JUROR BLOOMER:  She -- she's handled a lot

13   of paperwork.  She's not a -- an agent or anything.

14   She's handled paperwork.

15          THE COURT:  And do you feel that that

16   relationship would affect your ability to be fair and

17   impartial in this case?

18          JUROR BLOOMER:  No.

19          THE COURT:  Okay.  All right.

20      Now, expanding the scope of the question a

21   little bit more, and I've asked about -- about family

22   or relatives, is there anyone who has a very close

23   friendship with someone who is involved in law

24   enforcement?

25          (No response.)

22

 1                    THE COURT:  Okay.  And I see -- I see your
 2        hand raised.  I thank you for paying attention.  If
 3        you get called, I will certainly ask you about that.
 4             Now, on that -- on that same question,
 5        understanding that we have potential law enforcement
 6        individuals testifying, is there anyone who feels
 7        that they would, simply because of the profession of
 8        the individuals testifying, that they would give more
 9        credibility to that witness simply because they are
10        law enforcement officers?
11                    (No response.)
12                    THE COURT:  Okay.  Now, is there anyone who
13        has been a victim of a crime?
14             Okay.  And that would be Mr. Schueller?
15                    JUROR SCHUELLER:  Yup.
16                    THE COURT:  Okay.  And what was the nature
17        of that offense, sir?
18                    JUROR SCHUELLER:  Can -- it's personal.
19                    THE COURT:  Sure.  Sure.  Let me ask the
20        first question.  Do you feel that that would affect
21        your ability to be fair and impartial in this case?
22                    JUROR SCHUELLER:  Not at all.
23                    THE COURT:  And so what we may do is we may
24        follow up then with you in an individual voir dire
25        situation, but I -- I thank you for that disclosure.

23

1          Did I miss anyone else?  That would be Miss

2     Meyer?

3               JUROR MEYER:  Yes.

4               THE COURT:  And do you feel comfortable

5     disclosing that or would you like to do that again in

6     a more personal --

7               JUROR MEYER:  Yup.  Personal.

8               THE COURT:  Okay.  First -- first question

9     I have for you, however, is do you feel that you

10    would be able to be fair and impartial and listen to

11    the facts of this case based simply on the facts of

12    the case?

13              JUROR MEYER:  Yes.

14              THE COURT:  Okay.  Did we miss anyone?

15              (No response.)

16              THE COURT:  Okay.  Now -- and I suppose I

17    should expand that question.  Is there anyone who has

18    had a close family friend or a close relative who's

19    been a victim of a crime such that you feel it would

20    affect your ability to be fair and impartial in this

21    case?

22              (No response.)

23              THE COURT:  Okay.  Now, you've heard a

24    little bit about this case from -- from Attorney

25    Schneider who read the information to you.  There may

24

```
 1          have been -- at some point in time there may have
 2          been some news coverage in the form of the newspaper
 3          or television.  You've heard me identify the case.
 4          Is there anyone who has any information about this
 5          case that they have garnered outside of this case?
 6          Have you read any newspaper articles, have you
 7          watched any television stories about this?  And
 8          that's not to suggest that there have been or haven't
 9          been, I'm simply asking have any of you seen
10          anything, read anything that has -- has caused you to
11          go, oh, I think I know a little bit about this case?
12               Okay.  Let me just hold on.  Mr. Kosinski.
13          Okay.  And then I also had Mr. Buza?
14                    JUROR MANDERSCHEID:  No.  Manderscheid.
15                    THE COURT:  I'm sorry, Mr. Manderscheid.
16          My apologies.
17               All Right.  Mr. Eggers?
18                    JUROR EGGERS:  Yup.
19                    THE COURT:  And Mr. Van Dalen?
20                    JUROR VAN DALEN:  Yes.
21                    THE COURT:  Anyone else that we have
22          missed?
23               Oh, okay.  Mr. Daelke.
24               Okay.  Now, what I'm going to do at this time,
25          because of that, just so that you understand, is I'm
```

25

1    going to ask that we conduct individual voir dire;

2    and the reason is because in a group setting, I'll be

3    asking questions, and I don't want the answers to

4    have anyone else go, oh, wait a minute, this now

5    gives me information about the case.  So what we're

6    going to do is I'm going to ask the attorneys and

7    myself, what we will do is we're going to go into a

8    separate jury room.

9         I'd ask that you, as members of the jury, that

10   you stay in the courtroom but feel free to stand up.

11   For those in the jury, just make sure you find your

12   seats again.  Okay?  And then what we'll do is we'll

13   call you one at a time back, ask our individual

14   questions, have you come back into the courtroom, and

15   then eventually we will then resume as our group

16   setting again.  Okay?

17             ATTORNEY SCHNEIDER:  Are we going to take

18   the two -- both topics of prior victim of a crime and

19   the second?

20             THE COURT:  I think that's the most

21   efficient way to do it, yes.

22        Okay.  And what I'll do -- what I'm going to ask

23   is, because it's logistically easier, why don't we

24   have the parties, we'll go out through this back door

25   and that way we can go directly into the courtroom.

26

1          And I'll lead the group out here.

2                    (Proceedings held outside the presence of

3          the jury panel.)

4                    (Mr. Schueller enters.)

5                    THE COURT:  Mr. Schueller, you had

6          identified a subject that you were the victim of a

7          crime that you felt uncomfortable answering in a

8          group setting.  This is at least a smaller group.

9                    JUROR SCHUELLER:  Yeah.

10                    THE COURT:  So what would you -- what would

11          you like to share with us, sir?

12                    JUROR SCHUELLER:  When I was younger I was

13          sexually abused as a child.

14                    THE COURT:  Okay.

15                    JUROR SCHUELLER:  And that was in

16          Washington County.

17                    THE COURT:  Okay.  And was that case

18          ultimately prosecuted?

19                    JUROR SCHUELLER:  It was outside of the

20          courtroom.  They made a deal.

21                    THE COURT:  Okay.  And would that

22          experience, understanding that these types of charges

23          are entirely different from that, do you feel that

24          you would be able to be fair and impartial in this?

25                    JUROR SCHUELLER:  I do.

27

1                    THE COURT:  Okay.  What I'm going to do

2          simply, so that even though I've been asking the

3          questions up to this point, I'm going to give each of

4          the attorneys an opportunity if there is any

5          follow-up questions that you have.

6                    ATTORNEY SCHNEIDER:  I don't have any.

7          Thank you.

8                    THE COURT:  Attorney Vishny?

9                    ATTORNEY VISHNY:  Were you satisfied with

10         the way that case was handled?

11                   JUROR SCHUELLER:  To be honest, no.

12                   ATTORNEY VISHNY:  Okay.  And -- and that's

13         fine, the fact that ultimately you were not happy

14         with the way it got resolved.  How, if any way, would

15         that impact on you as a juror in a criminal case?

16                   JUROR SCHUELLER:  I don't think it would.

17         Nothing went to jury or anything like that.

18                   ATTORNEY VISHNY:  Right.

19                   JUROR SCHUELLER:  I don't think honestly it

20         would affect me.

21                   ATTORNEY VISHNY:  Okay.  All right.  Thank

22         you very much.

23                   JUROR SCHUELLER:  No problem.

24                   THE COURT:  Thank you, Mr. Schueller.

25                   (Mr. Schueller exits; Miss Meyer enters.)

28

1              THE COURT:  All right.  Miss Meyer, how are

2        you?

3              JUROR MEYER:  Good.

4              THE COURT:  So you had raised your hand to

5        a question that you wanted to answer in a smaller

6        setting?

7              JUROR MEYER:  Yes.  About 2014 my

8        children's father had choked my husband in the

9        hallway, and I believe you were -- now that I think

10       back, you were on the case for that.

11             THE COURT:  And that experience -- first

12       I'll ask about just the experience itself.  Do you

13       feel that -- and again, understanding that those --

14       those charges are much different than what we have

15       today --

16             JUROR MEYER:  Yes.

17             THE COURT:  -- do you feel that you would

18       be able to look at this case fairly and impartially?

19             JUROR MEYER:  Yes.

20             THE COURT:  And the next question, because

21       if I understood correctly, the Outagamie County

22       District Attorney did prosecute the case?

23             JUROR MEYER:  Yes.

24             THE COURT:  Do you feel that that would

25       affect your ability to look at this case fairly and

29

1      impartially?

2              JUROR MEYER:  Yes -- well, no.  I shouldn't

3      say that wouldn't affect me at all.  No.

4              THE COURT:  Okay.  All right.  Okay.

5      Attorney Schneider?

6              ATTORNEY SCHNEIDER:  It's a case that was

7      handled by Assistant DA Duros?

8              JUROR MEYER:  I believe so, yes.

9              ATTORNEY SCHNEIDER:  And that's his, I

10     think, recollection too.  That case did not proceed

11     to trial though, correct?

12             JUROR MEYER:  It did not.

13             ATTORNEY SCHNEIDER:  Is there anything

14     about that experience, whether it's because you

15     likely got court notices, you probably had to come,

16     we probably canceled your subpoenas for trial at

17     times, is there anything about that process --

18             JUROR MEYER:  Yeah.  There are things that

19     were missed.  He was supposed to have certain

20     counseling and other things.  He got basically a slap

21     on the wrist considering he had done that to me in

22     the past and it got dismissed back in '97, '96.

23             ATTORNEY SCHNEIDER:  Okay.  But is there

24     anything about that that's going to impact your

25     ability to sit --

30

```
 1                    JUROR MEYER:  No.

 2                    ATTORNEY SCHNEIDER:  That's all we ask.

 3          Thanks, Miss Meyer.

 4                    THE COURT:  Attorney Vishny?

 5                    ATTORNEY VISHNY:  Nothing.

 6                    THE COURT:  All right.  Thank you very

 7          much.

 8                    (Miss Meyer exits; Mr. Kosinski enters.)

 9                    THE COURT:  Mr. Kosinski?

10                    JUROR KOSINSKI:  Yes.

11                    THE COURT:  You had raised your hand about

12          having some familiarity with the case.  What can you

13          tell us that you're familiar with?

14                    JUROR KOSINSKI:  It's mostly what I read in

15          the newspaper.

16                    THE COURT:  Okay.

17                    JUROR KOSINSKI:  I remember reading about

18          -- I believe it was the Luna Lounge, that he went in

19          and shot a guy.  Or I don't remember all the details

20          of it, but that's what I --

21                    THE COURT:  And when did you read those

22          articles or see --

23                    JUROR KOSINSKI:  There was just one

24          recently that I read last week I think, but mostly it

25          was from around the time when it happened.
```

31

1                    THE COURT:  Okay.  And having -- having

2          read those articles, has that formulated any opinion

3          for you on how you think you would view this case?

4                    JUROR KOSINSKI:  Yeah.  Probably.

5                    THE COURT:  Do you -- and again,

6          understanding that a newspaper only has part of the

7          story, do you think you would be able to set aside

8          those ideas and look at this fairly and impartially

9          and with an open mind?

10                   JUROR KOSINSKI:  I think I could.  Yes.

11                   THE COURT:  Attorney Schneider.

12                   ATTORNEY SCHNEIDER:  So you kind of -- to

13         summarize, there were probably some articles closer

14         to when it happened that you recall reading?

15                   JUROR KOSINSKI:  Yes.

16                   ATTORNEY SCHNEIDER:  And then you said one

17         recently?

18                   JUROR KOSINSKI:  Yeah.

19                   ATTORNEY SCHNEIDER:  Do you remember

20         anything about the content of it other than Luna

21         Lounge shooting that you previously mentioned?

22                   JUROR KOSINSKI:  No.  I knew that the trial

23         was coming up.

24                   ATTORNEY SCHNEIDER:  Okay.

25                   JUROR KOSINSKI:  But beyond that, not

32

1     really.

2                    ATTORNEY SCHNEIDER:  I don't think any

3          follow-up.

4                    THE COURT:  Attorney Vishny?

5                    ATTORNEY VISHNY:  Yeah.  You said that you

6          thought it had an impact on your opinion, and I want

7          to ask what that is.

8                    JUROR KOSINSKI:  Well, I mean, judging by

9          what I read, I would say that I think that he's -- he

10         did the crime and so therefore, I guess, he's rightly

11         been arrested.

12                   ATTORNEY VISHNY:  Okay.  So -- I'm going to

13         ask you a little bit more about that, but I just want

14         to make it clear, because I know you're really trying

15         to be tactful and I so appreciate that, but there are

16         just no right or wrong answers here.  The only wrong

17         answer is to not say what you feel, and nobody is

18         judging you for anything.  Okay?

19            So what I'm hearing you say, if I'm getting it

20         right, is basically you feel the right person was

21         arrested and you feel he's guilty?

22                   JUROR KOSINSKI:  Yes.

23                   ATTORNEY VISHNY:  Okay.  And there is

24         nothing wrong with your feeling, I just want to say

25         that.  Okay?  And, you know, people come to this

33

1    world with opinions, and because you believe that, is

2    it fair to say that that is an opinion you've held

3    for quite some time, you know, since the original

4    arrest?

5            JUROR KOSINSKI:  I would say yes, that's

6    fair to say.

7            ATTORNEY VISHNY:  And did the recent

8    article you read in the newspaper, did that make your

9    opinion stronger that he's guilty?

10           JUROR KOSINSKI:  It didn't really change

11   it.

12           ATTORNEY VISHNY:  Okay.  All right.  But do

13   you remember the details about what you read recently

14   in the newspaper?

15           JUROR KOSINSKI:  The recent one?

16           ATTORNEY VISHNY:  Yes.

17           JUROR KOSINSKI:  No, just that it's when --

18   it said when he was going to be on trial and it just

19   kind of -- I just kind of read it and --

20           ATTORNEY VISHNY:  So given that you think

21   that he's guilty, is it your feeling that that's the

22   lens you're going to look at this trial through, you

23   know, I think the guy did it and I'm going to watch

24   them prove it.  And again, there's nothing wrong with

25   that.

34

1          JUROR KOSINSKI:  To be completely fair to

2     him, I would have to say probably yes.

3          ATTORNEY VISHNY:  Okay.  If you were in

4     this situation and it was your loved one who was on

5     trial, okay, and I'm just going to be real out there

6     with this, do you think it would probably be better

7     if you weren't on that jury with those views?  Do you

8     see what I'm trying to ask you?

9          JUROR KOSINSKI:  I do.

10          ATTORNEY VISHNY:  Yeah.  Would you want

11     yourself on the jury for --

12          JUROR KOSINSKI:  Probably not.

13          ATTORNEY VISHNY:  Probably not.  And given

14     your feelings about this, is it your opinion that it

15     is probably more fair to Mr. Lee that you don't sit

16     on the jury?

17          JUROR KOSINSKI:  I would say yes.

18          ATTORNEY VISHNY:  Okay.  And, you know,

19     it's okay to have a deeply held belief, but the fact

20     that we tell you to change your mind, I know that --

21     that's not going to make you change your mind, right?

22          JUROR KOSINSKI:  Right.

23          ATTORNEY VISHNY:  Thank you so much for

24     sharing your feelings with us.  I appreciate it.

25          THE COURT:  And just to follow up, sir, and

1          I -- I know I asked you, and I -- and again, I'm glad

2      Attorney Vishny clarified that, I think everybody

3      says I really want to be fair and impartial and

4      open-minded; as we've asked a few more questions,

5      what is your honest sentiment about you're able to --

6      your ability to look at this case essentially with a

7      clean slate?

8              JUROR KOSINSKI:  I would probably say that

9      I can't.

10             THE COURT:  Okay.

11             JUROR KOSINSKI:  I mean to be completely

12     fair to him, which I want to do, I would say that I

13     probably would not be a good choice for that.

14             ATTORNEY SCHNEIDER:  And there is nothing

15     wrong with that, we just want you to be open and

16     honest about what your feeling is.  My brother would

17     never be a good juror, so I just -- that's fine.

18             THE COURT:  And there is -- and again, I'm

19     glad the attorneys have mentioned this, there is no

20     wrong answer.  We -- so there is nothing to feel bad

21     about your answers.  The honest answers are the right

22     answers.  So that is perfectly fine.  Okay?  All

23     right.  Thank you.

24             (Mr. Kosinski exits.)

25             ATTORNEY VISHNY:  Okay.  So here's what my

36

1          feeling is, I'm going to move to strike him for

2          cause.

3                    ATTORNEY SCHNEIDER:  I don't --

4                    THE COURT:  I was going to do it sua

5          sponte.

6                    ATTORNEY VISHNY:  I know, but what I would

7          like to do is to not have that told to anybody.  Is

8          there a possibility that we can not do that until

9          after we ask them about Luna, because I'm worried

10         jurors will say I'd like to be on that trial.

11                   THE COURT:  I think what we do, and I

12         should have told -- Melissa doesn't know this.  We're

13         going to sit him back down and then what we'll do is

14         after we're done asking all the questions, then I'll

15         say, at this point in time I'm going to release A, B,

16         C and D.

17                   ATTORNEY VISHNY:  So that's going to be

18         after we're done, something --

19                   THE COURT:  No, after I'm done asking about

20         the Luna questions.  We'll do Luna, we'll bring

21         everybody back, and we'll figure out all the group

22         that we need to remove.

23                   ATTORNEY VISHNY:  All right.

24                   ATTORNEY SCHNEIDER:  Got it.

25                   (Mr. Parker enters.)

37

1                    THE COURT:  Mr. Parker, how are you, sir?

2                    JUROR PARKER:  Good.

3                    THE COURT:  So, Mr. Parker, you had

4          answered yes to a question about some familiarity

5          with this case, and can you share with us what that

6          -- what that knowledge is?

7                    JUROR PARKER:  Actually, I did not.  I

8          answered the question that my son was a police

9          officer.

10                    THE COURT:  I apologize.

11                    ATTORNEY SCHNEIDER:  See, I didn't think he

12          flinched.  You both said you thought he did.

13                    ATTORNEY VISHNY:  I wrote the word news

14          down.

15                    THE COURT:  I had my X circled.

16                    JUROR PARKER:  I think there was a guy in

17          front of me that did.

18                    ATTORNEY SCHNEIDER:  There is.

19                    THE COURT:  Yes.  Okay.

20                    ATTORNEY SCHNEIDER:  Well we got you a few

21          steps in for the day.

22                    JUROR PARKER:  Facial expression I should

23          have made?

24                    ATTORNEY VISHNY:  No.  We can't see all the

25          way back there.

38

1                    ATTORNEY SCHNEIDER:  I think we can send

2        him back then.

3                    THE COURT:  Okay.  Thanks.

4                    (Mr. Parker exits; Mr. Van Dalen enters.)

5                    THE COURT:  Mr. Van Dalen, how are you,

6        sir?

7                    JUROR VAN DALEN:  Good.

8                    THE COURT:  So you had -- you had answered

9        yes to the question that you had some familiarity

10       about the case?

11                   JUROR VAN DALEN:  Yup.

12                   THE COURT:  And can you let us know what is

13       it -- what information do you believe you've garnered

14       through the media and where the source of that was?

15                   JUROR VAN DALEN:  I probably heard it on

16       the radio.  I listen to a lot of radio, news radio.

17       I believe it had -- I heard about the incident

18       happened on College Avenue, I think it was the

19       nightclub Wet, the parking lot; and then I heard this

20       morning that the trial was going to start today and

21       be about an eight-day trial.  I heard that on the

22       news this morning.

23                   THE COURT:  And any -- any other specifics

24       that you can recall about this case?

25                   JUROR VAN DALEN:  No, not that I can think

39

1      of, no.

2                  THE COURT:  Now, you did identify some of

3      the -- some familiar aspects or what you felt were

4      familiar aspects of it.  Do you feel that that is in

5      any way going to affect your ability to be fair and

6      impartial in this case?

7                  JUROR VAN DALEN:  No, I don't think so.

8                  THE COURT:  Have you formed any

9      preconceived ideas about this case or the outcome?

10                 JUROR VAN DALEN:  No, not really, no.

11                 THE COURT:  Attorney Schneider.

12                 ATTORNEY SCHNEIDER:  Do you think you heard

13     some of those news stories when it happened or more

14     recently or both?

15                 JUROR VAN DALEN:  Probably both.  I do

16     remember it when it happened.  I do remember hearing

17     about it then, yeah.

18                 ATTORNEY SCHNEIDER:  Okay.  I don't have

19     anything else.

20                 THE COURT:  Attorney Vishny?

21                 ATTORNEY VISHNY:  Since you've heard about

22     it both, is there any feeling that you're -- and I

23     just want to make sure, there is no right or wrong

24     answers here.

25                 JUROR VAN DALEN:  Sure.

40

1                    ATTORNEY VISHNY:  So was there any feeling
2          like, yeah, they caught the guy, they got the right
3          guy?  Do you have any feeling like that?
4                    JUROR VAN DALEN:  No.  I guess I couldn't
5          really say that because I wouldn't know if they have
6          the right guy.
7                    ATTORNEY VISHNY:  Okay.  All right.  Very
8          good.  Thanks.
9                    THE COURT:  Thank you, sir.
10                    (Mr. Van Dalen exits; Mr. Eggers enters.)
11                    THE COURT:  Mr. Eggers, how are you, sir?
12                    JUROR EGGERS:  Good.  How are you?
13                    THE COURT:  Great.
14          You had answered yes to the question about
15          feeling like you had some familiarity based on media
16          coverage or something of that nature?
17                    JUROR EGGERS:  Yes.
18                    THE COURT:  And can you share with us what
19          you -- what you believe you heard and sort of where
20          and when you heard those things as well?
21                    JUROR EGGERS:  I remember the incident.
22          I'm an avid listener of the news so I watch all the
23          time.  I grew up a half a block from here, which is
24          now a parking lot, but I used to go to that place
25          that used to be the Viking Theatre, which was a

41

1    theatre at the time, so I used to always go there,

2    and I just remembered it that way.  And -- and, you

3    know, I just felt bad that it happened because so

4    close to Christmas.

5         THE COURT:  Sure.

6         JUROR EGGERS:  And I guess that's all I

7    really have to say.

8         THE COURT:  Okay.  Have you seen anything

9    recently in the media or was it largely early on

10   or --

11        JUROR EGGERS:  I did hear from someone at

12   work that there's a case coming up, that you remember

13   that murder case at the old Viking Theatre, and that

14   was the last I've heard of it.

15        THE COURT:  Okay.  Have you -- have you,

16   based on what you've heard and perhaps seen, have you

17   formulated any opinions about this case?

18        JUROR EGGERS:  No.  I can honestly say that

19   I understand that the defendant is innocent until

20   proven guilty, and I don't feel that this would cause

21   my judgment to sway any way.

22        THE COURT:  Okay.  Attorney Schneider.

23        ATTORNEY SCHNEIDER:  I don't have any

24   follow-up.  Thank you.

25        THE COURT:  Attorney Vishny?

42

```
 1              ATTORNEY VISHNY:  Okay.  So I'm gathering
 2      you didn't like say, oh, good, they got the guy, it's
 3      the right guy.  Did you feel that way when you read
 4      about the arrest or about it?
 5              JUROR EGGERS:  If I recall it took a few
 6      days, and I was hoping at least -- at least a few
 7      days to apprehend an individual, but I was hoping
 8      that it would -- he would be caught and brought to
 9      justice.
10              ATTORNEY VISHNY:  Okay.  So since you're
11      hoping the person who did it -- I mean we all -- by
12      the way, I want to just tell you there is no right or
13      wrong answers here at all.  I mean we all hope when
14      something horrible happens that the right person is
15      brought to justice, so obviously the police made an
16      arrest and a crime has been charged.
17              JUROR EGGERS:  Um-hum.
18              ATTORNEY VISHNY:  Do you come into this
19      feeling like you know they got the right guy, I'm
20      really glad, I think he's guilty at all?
21              JUROR EGGERS:  No.
22              ATTORNEY VISHNY:  Okay.  So, all right.
23      Thank you.  Just thought I'd mention that.  Thank you
24      very much.
25              THE COURT:  Thank you, sir.
```

43

```
1                    ATTORNEY SCHNEIDER:  Thank you.
2                    (Mr. Eggers exits; Mr. Daelke enters.)
3                    THE COURT:  Mr. Daelke, how are you, sir?
4                    JUROR DAELKE:  Oh, not too bad.
5                    THE COURT:  We had seen that you raised
6          your hand on being familiar with some of the media
7          coverage.
8                    JUROR DAELKE:  Yup.
9                    THE COURT:  And can you let us know what
10         you've seen and when you've seen it and any specifics
11         about that.
12                   JUROR DAELKE:  I thought I saw it when it
13         first happened on the television and later reports on
14         it, so, you know, what happened there.
15                   THE COURT:  Anything -- have you seen
16         anything recently or is this largely when it
17         happened?
18                   JUROR DAELKE:  This morning when I was
19         coming in here they had it on the radio that there
20         was going to be a jury selection today.
21                   THE COURT:  And now, based on what you've
22         heard and what you may have seen, have you formulated
23         any opinions about this case?
24                   JUROR DAELKE:  Yup.
25                   THE COURT:  And what opinions have you
```

44

1    formulated?

2              JUROR DAELKE:  Well, according to what I

3    heard, he's guilty.

4              THE COURT:  And let me -- let me ask you --

5    let me preface this.  Attorney Vishny has often

6    mentioned this and I'll steal some of her thunder,

7    there is no wrong answer here, so you -- all -- the

8    only right answer is an answer you give, and so I

9    don't want you to feel that I'm expecting you to

10   answer one way or the other.  All we want is an

11   honest answer.  That's the only answer.

12       Now, you had mentioned that you thought you've

13   already formulated an opinion.

14              JUROR DAELKE:  Yup.

15              THE COURT:  And it is -- and so can you

16   expand on what -- what are your thoughts right now?

17              JUROR DAELKE:  Right now I think he did,

18   according to what, you know, what I all heard on the

19   television and read in the paper about it.

20              THE COURT:  Okay.  And do you -- do you

21   think that you would be able to set that aside and

22   look at this with a clean slate or do you think that

23   would be pretty difficult for you to do based on what

24   you've seen and heard?

25              JUROR DAELKE:  Be kind of difficult.

45

1          THE COURT:  Okay.  Attorney Schneider.

2          ATTORNEY SCHNEIDER:  Is it something, Mr.

3    Daelke, that when you first heard some of the news

4    reports you formed that opinion or has that developed

5    only recently?

6          JUROR DAELKE:  Right away when I first

7    heard it, the information that they gave, you know,

8    they caught him or whatever.

9          ATTORNEY SCHNEIDER:  And is it something

10   that even if the court were to instruct you you

11   should ignore those news articles or the TV, do you

12   think you would still hold that opinion if you had to

13   go back and deliberate?

14         JUROR DAELKE:  Well, I don't know how I

15   could, but, you know, once you hear it, it's kind of

16   hard to forget it or, you know, say something

17   different.

18         ATTORNEY SCHNEIDER:  That's perfect.  We

19   just want you to answer us honestly rather than not

20   and get up there and think of something else.

21         ATTORNEY VISHNY:  Judge, do I need to ask

22   any questions?

23         THE COURT:  No.  I think Attorney Schneider

24   has covered most of them.

25         ATTORNEY VISHNY:  All right.

46

1                    THE COURT:  Thank you very much.

2                    ATTORNEY SCHNEIDER:  Thank you.

3                    ATTORNEY VISHNY:  Yeah.  I'll ask you that.

4        If I already think that you think for cause, I'm not

5        going to ask anymore questions.

6                    THE COURT:  I appreciate that.

7                    (Mr. Daelke exits; Mr. Manderscheid

8        enters.)

9                    THE COURT:  Mr. Manderscheid, how are you,

10       sir?

11                   JUROR MANDERSCHEID:  Good.

12                   THE COURT:  Good.  So we had asked the

13       question about whether you had some familiarity based

14       on media or television, and what we'd like to know --

15       and I'll preface this; and again, I only know the

16       question to ask because counsel has asked this before

17       me, but the only answer -- the only thing you have to

18       worry about is being honest.  There is no wrong

19       answer as long as it's honest.  That's all we ask.

20       Don't -- don't have any -- I don't want you to have

21       any notion that we expect a certain answer one way or

22       the other.

23                   JUROR MANDERSCHEID:  Okay.

24                   THE COURT:  So can you start out by telling

25       us what the media is you've seen and when you've seen

47

1        the media?

2                    JUROR MANDERSCHEID:  Okay.  This is the

3        case from -- that happened at the Luna Lounge?

4                    THE COURT:  Yes, sir.

5                    JUROR MANDERSCHEID:  Basically covered it

6        in the newspaper, all the articles, kind of

7        fascinated by it, read through basically all of them

8        that were in the paper and anything I seen on the TV

9        news.

10                    THE COURT:  Have you seen anything

11        recently?

12                    JUROR MANDERSCHEID:  Not very recently, no.

13        Been a while.

14                    THE COURT:  Okay.  And so you have a

15        general idea of what the case is about.  Have you --

16        have you formulated an opinion at this point the

17        police have arrested the right person, whether they

18        have the wrong person, do you have a clean slate,

19        where do you feel?

20                    JUROR MANDERSCHEID:  Based on everything I

21        read and seen, yes, he did.

22                    THE COURT:  And do you think you would be

23        able to set that aside and look at this with a clean

24        slate or do you think that, by way of example, if we

25        were to begin, or you were to begin deliberations,

48

1       that in the back of your mind you would already be

2       started with the idea of I think he's guilty?

3               JUROR MANDERSCHEID:  I -- I think I have

4       kind of a strong feeling on what I feel.

5               THE COURT:  Okay.

6               JUROR MANDERSCHEID:  So I do think it would

7       be hard.

8               THE COURT:  It would be hard for you to

9       overcome that sentiment?

10              JUROR MANDERSCHEID:  I don't -- I can't

11      say, obviously, until it starts, but I -- I did

12      follow quite closely and I did form an opinion.

13              THE COURT:  Okay.  And even if I were to

14      instruct you and say, Mr. Manderscheid, I want you to

15      set all that aside --

16              JUROR MANDERSCHEID:  I mean I can't say

17      that I couldn't, but I -- I can't say that I could.

18              THE COURT:  Okay.  And again, I'll -- I'll

19      steal counsel's thunder on this.  If, by way of

20      example, someone you loved and cared about were on

21      trial, understanding that -- that you have opinions,

22      would you want you to be on that jury panel?  Does

23      that question make sense?

24              JUROR MANDERSCHEID:  Yeah.  You're saying

25      if my family member were in the -- were on trial and

49

```
1    somebody in the jury had -- had already formed an

2    opinion?

3              THE COURT:  Or knowing your opinions as you

4    have, would you feel comfortable saying, okay, I'd

5    want someone just like me on the panel?

6              JUROR MANDERSCHEID:  Probably not.

7              THE COURT:  Okay.  Very good.  And again,

8    those are all right answers.  There is no wrong

9    answer here.

10        Attorney Schneider, do you have any questions?

11             ATTORNEY SCHNEIDER:  And, Mr. Manderscheid,

12   it might just be that you read the paper and are

13   interested in the local news.  Was it -- was there

14   any particular reason why you were reading the

15   articles; or I think you said you were kind of

16   fascinated by it?

17             JUROR MANDERSCHEID:  Just I watch a lot of

18   court shows and, you know, interested in that sort of

19   thing.

20             ATTORNEY SCHNEIDER:  Okay.  I don't have

21   any other questions.  Thank you.

22             THE COURT:  Okay.

23             ATTORNEY VISHNY:  I don't have anything.

24             THE COURT:  Okay.

25             ATTORNEY VISHNY:  Thank you very much, sir.
```

50

1             ATTORNEY SCHNEIDER:  I think that's it.  So
2     I think what we do is go back and say I'm just going
3     to give you a little bit of more information that may
4     give you some more facts and details about what
5     you're going to hear about, you'll hear the shooting
6     happened at the Luna Lounge, downtown Appleton.
7             THE COURT:  Right.
8             ATTORNEY SCHNEIDER:  And give them a little
9     bit and say, now, having given you that information,
10    is there anyone else.  I don't know if you have a
11    different way you want it phrased but --
12            ATTORNEY VISHNY:  What were you going to
13    say?
14            ATTORNEY WEITZ:  I was just thinking, after
15    giving them some additional facts, rather than go,
16    now does anyone feel like they already know about
17    this case.
18            THE COURT:  I think that's a good way.
19            ATTORNEY VISHNY:  But I think he's going to
20    mention Luna.
21            ATTORNEY WEITZ:  I know.
22            THE COURT:  That's the tie-in.
23            ATTORNEY WEITZ:  But after that just --
24            ATTORNEY SCHNEIDER:  And then just say,
25    having said that, does that -- does anyone now have a

51

```
1        memory of reading or hearing anything about this
2        case.
3                    THE COURT:  All right.  That's fine.
4                    (In open court.)
5                    THE COURT:  Again, I appreciate everyone's
6        patience.
7             The next question is -- it seemed a little more
8        appropriate to give a little more information about
9        the case.  You heard Attorney Schneider give you some
10       generalized information about the case, but it may be
11       helpful for you to know this -- the incident for
12       which we are here today took place at the Luna Lounge
13       which is in downtown Appleton.  It is -- I believe it
14       is now Nakashima's restaurant is what I believe it
15       is.  Oh, Katsu Ya.  I hope it's the same owner.
16       Katsu Ya.  But in any event, I thought that that
17       might be helpful for you because you heard the date,
18       which was in early of -- late 2013, early 2014, but
19       hearing the name of the location may be able to give
20       you some more insight into whether or not you
21       recalled the incident in any capacity, and so now
22       having that little bit of detail, does that shed any
23       additional light for you in terms of whether you
24       recall any media information or whether you recall
25       any specifics about this case?
```

52

1          Okay.  Let me get my pen out here.  So we have

2     Miss Hermus?

3               JUROR HERMUS:  Yes.

4               THE COURT:  And then Mr. Elkendier and Miss

5     Hankemeier, correct?

6               JUROR HANKEMEIER:  Correct.

7               THE COURT:  Anyone else?

8          Okay.  And that would be Mr. Van Deurzen,

9     correct?

10              JUROR VAN DEURZEN:  Yes.

11              THE COURT:  Wonderful.  Anyone --

12              JUROR PARKER:  I saw it on the news.

13              THE COURT:  Okay.  Mr. Parker.  So we have

14     Mr. Elkendier, Mr. Van Deurzen, Mr. Parker, Miss

15     Hankemeier, correct, and Miss Hermus.  Did I miss

16     anyone?

17              (No response.)

18              THE COURT:  Okay.  Wonderful.  So what

19     we're going to do is we're going to conduct the same

20     type of individual inquiry.  I should mention, and I

21     apologize I did not mention this before, if anyone

22     needs to use a restroom break, that's absolutely

23     fine.  So feel free to do that.  Feel free to get up

24     and stretch.  We'll continue with our individual

25     discussions and then we should be back momentarily.

53

1     Okay.

2               (Proceedings held outside the presence of

3     the jury panel.)

4               (Miss Hermus enters.)

5               THE COURT:  Hi, Miss Hermus.  How are you

6     today?

7          So once I had given the reference to the

8     location, that may have triggered some familiarity

9     with the case.  And what can you -- what do you

10    believe you recall or -- and then can you let us know

11    when you may have seen this in print or paper or --

12              JUROR HERMUS:  I just remembered a couple

13    of years ago I remember seeing the things on TV and

14    in the newspaper; and the name of the lounge is what

15    triggered my memory about it.

16              THE COURT:  And do you -- based on that

17    coverage, have you formed any particular opinions

18    about this case?

19              JUROR HERMUS:  I don't even remember any of

20    the details about it, I just remember the Luna

21    Lounge.

22              THE COURT:  Okay.  Do you have -- have you

23    formulated any -- now that you know where it took

24    place and things, have you formulated any specific

25    opinions about this case, meaning did the police

54

1          arrest the right person?

2                    JUROR HERMUS:  No.

3                    THE COURT:  Okay.  All right.  Very good.

4            Miss Schneider, any questions?

5                    ATTORNEY SCHNEIDER:  And, Miss Hermus, all

6          your recollection is to articles or TV that you saw

7          around the time it happened?

8                    JUROR HERMUS:  Um-hum.

9                    ATTORNEY SCHNEIDER:  Okay.  Nothing more

10         recent?

11                   JUROR HERMUS:  Actually, I -- and I don't

12         know if it said that in the paper, but about some

13         evidence that was maybe -- witnesses, evidence that

14         was destroyed.  My husband was telling me, he said he

15         saw it in the paper.  I don't know if it had to do

16         with this or not.

17                   ATTORNEY SCHNEIDER:  Okay.

18                   JUROR HERMUS:  But other than that --

19                   ATTORNEY SCHNEIDER:  And you didn't read

20         that article?

21                   JUROR HERMUS:  I skimmed over the paper.  I

22         didn't really pay that much attention to it.

23                   ATTORNEY SCHNEIDER:  Okay.

24                   JUROR HERMUS:  I don't read the paper like

25         he does.

55

```
1                    ATTORNEY SCHNEIDER:  I don't have any other

2           questions then.

3                    THE COURT:  Attorney Vishny, any questions?

4                    ATTORNEY VISHNY:  Okay.  Based on the

5           totality, stuff from the past, where it happened,

6           anything your husband told you, you know, do you have

7           any feeling like, well, the police got the right guy,

8           he must be guilty?

9                    JUROR HERMUS:  I don't really have an

10          opinion on it.  I don't know.  I didn't really know

11          that much about it.  I just heard about it.

12                   ATTORNEY VISHNY:  Sure.  Okay.  Thank you.

13                   THE COURT:  Thank you.

14                   ATTORNEY VISHNY:  One minute.  All right.

15          I don't mean to be prying, but -- and just, there is

16          no right or wrong answer, but do you mind sharing

17          with us what the conversation was with your husband

18          about whatever it was he read in the paper?

19                   JUROR HERMUS:  He just knew that I was

20          coming up for jury duty and he says, well this says

21          that it might be starting this week and it's going to

22          take a week-and-a-half and that's how long you're on

23          jury duty, so he's like, you know, I don't know if

24          this is it or not but --

25                   ATTORNEY VISHNY:  Okay.  All right.  That
```

56

1         would be it.

2                 THE COURT:  Any other questions?

3                 ATTORNEY VISHNY:  No.

4                 THE COURT:  All right.  Thank you.

5                 (Ms. Hermus exits.)

6                 ATTORNEY VISHNY:  I have a question about

7         that that just brought it up.  So they're all called

8         in for a week-and-a-half.  Is that -- is that what

9         she said, a week-and-a-half?  So are you -- maybe you

10        did it and I missed it, but are you going to ask them

11        if the trial goes longer if that poses --

12                THE COURT:  Yes.

13                ATTORNEY VISHNY:  Okay.  What I -- because

14        we're going to go longer.

15                THE COURT:  I've already cleared my

16        calendar a full two weeks.

17                ATTORNEY VISHNY:  I'm supposed to be in

18        court March 10th and 11th in Milwaukee.

19                THE COURT:  I'm supposed to fly out March

20        10th.

21                ATTORNEY SCHNEIDER:  I have different

22        courts do different things.  I've gone until 8:00 at

23        night, I've sometimes had the judge ask the jury, to

24        avoid us going into a second week do you want to

25        start going later some nights, would you have that

57

```
1          ability, and kind of let the jury decide.  They came

2          back and said they wanted to start going until seven

3          at night.

4                    ATTORNEY VISHNY:  I don't know if I have

5          the stamina.  I'm going to be -- I'm being serious

6          about that.

7                    THE COURT:  That's fine.

8                    (Mr. Elkendier enters.)

9                    THE COURT:  So, Mr. Elkendier, the question

10         is you had raised your hand about some familiarity

11         based on the case, and can you -- can you let us know

12         what have you seen, whether it's print, television,

13         what -- what if any opinions you formed on the case?

14         And I also want you to know, and I know that the

15         attorneys have fully endorsed this idea, is there is

16         no wrong answer.  The --

17                   JUROR ELKENDIER:  Sure.

18                   THE COURT:  We just want you to be honest

19         and so don't think we have any expectations.

20                   JUROR ELKENDIER:  Okay.

21                   THE COURT:  The floor is yours.

22                   JUROR ELKENDIER:  Okay.  So you want me to

23         start talking?

24                   THE COURT:  Sure.

25                   JUROR ELKENDIER:  Okay.  I'm familiar with
```

58

1      the case.  I read about it, familiar with it.  Saw it
2      on television.  And have basically formed an opinion,
3      and my opinion being that I didn't want to say
4      anything to taint any of the other jurors, but I felt
5      that the suspect is definitely guilty, and I feel
6      that in his best interest, I don't see why he did not
7      cop a plea and hope for possibly getting down the
8      road an opportunity of getting parole instead of
9      going through a trial process.  That's my opinion.
10             THE COURT:  Okay.  And would it be fair to
11     say that even if I were to instruct you and say, look
12     at this with a clean slate, is it fair to say that
13     you would have a very difficult time if impossible
14     time doing that?
15             JUROR ELKENDIER:  Your Honor, I would say
16     it would not be impossible, but deep down inside of
17     me in my heart, it's -- there is no question that --
18     in my mind that the suspect is guilty; but, yes, I
19     would do my best to sit in the jury box with an open
20     mind, even though it would be difficult.
21             THE COURT:  And let me ask this, and again
22     I'm borrowing the question from counsel, if someone
23     you loved were on trial today and there was the
24     possibility of you serving on that jury, having the
25     sentiment that you feel, do you feel that you would

59

1     be a good person for this jury or would you prefer

2     not to have someone with sort of your ideas on that

3     jury panel?

4               JUROR ELKENDIER:  Probably someone not.

5               THE COURT:  Thank you very much.  Those are

6     the only questions that we have.

7               ATTORNEY SCHNEIDER:  No.  I don't have any

8     questions.  Thank you for just being open and honest

9     and very frank with us.

10               THE COURT:  Thank you.

11               ATTORNEY VISHNY:  Thank you.

12               JUROR ELKENDIER:  Thank you for your time.

13               (Mr. Elkendier exits.)

14               THE COURT:  I'm assuming nobody felt

15     strongly on asking more questions?

16               ATTORNEY VISHNY:  No.  He was right out

17     there.

18               (Ms. Hankemeier enters.)

19               THE COURT:  Miss Hankemeier, I think?

20               JUROR HANKEMEIER:  Yes.

21               THE COURT:  Miss Hankemeier, you had raised

22     your hand to the question about some familiarity, and

23     all we'd like, first of all, is there is no wrong

24     answer.

25               JUROR HANKEMEIER:  Um-hum.

60

1                    THE COURT:  There is no right answer.  It's

2           whatever -- we want you to simply let us know what is

3           on -- on your heart and your experiences.

4                And can you let us know what -- first of all,

5           what media or what information --

6                    JUROR HANKEMEIER:  The newspaper.

7                    THE COURT:  Okay.  And is that recent

8           readings, is it old readings?

9                    JUROR HANKEMEIER:  When it first

10          happened.

11                   THE COURT:  Okay.  Based on that, have you

12          -- have you formulated any opinions on this case?

13                   JUROR HANKEMEIER:  So -- I think that he

14          might be guilty because of not wanting witnesses,

15          witness tampering.

16                   THE COURT:  And understanding that it is --

17          the burden is on the State, it is the State's

18          obligation to prove someone guilty, and understanding

19          that the paper does not always get the full story --

20                   JUROR HANKEMEIER:  Um-hum.

21                   THE COURT:  Do you feel that -- are you

22          very strong in your sentiments at this point?  I mean

23          are you -- do you feel -- have you already made up

24          your mind?

25                   JUROR HANKEMEIER:  50/50.  Is that a fair

                                   61

1          enough answer?

2                          THE COURT:  Sure.  And do you think you

3          could be fair and impartial in this case?

4                          JUROR HANKEMEIER:  I see the mother out

5          there, so I would have a real hard time.

6                          THE COURT:  Okay.  And so seeing --

7          understanding that --

8                          JUROR HANKEMEIER:  Yeah.

9                          THE COURT:  -- that there is a mother of

10         someone, and understanding that --

11                         JUROR HANKEMEIER:  I'd want to be fair to

12         him too, so, I mean, it's a big decision, you know.

13                         ATTORNEY SCHNEIDER:  There is nothing right

14         or wrong, we just want you to tell us exactly what

15         you feel.

16                         JUROR HANKEMEIER:  That's exactly what I'm

17         feeling.

18                         THE COURT:  Okay.  And, Miss Schneider, do

19         you have any questions?

20                         ATTORNEY SCHNEIDER:  No.

21                         THE COURT:  Attorney Vishny?

22                         ATTORNEY VISHNY:  Yes.

23                         THE COURT:  Okay.

24                         ATTORNEY VISHNY:  So when you say 50/50,

25         can you explain what you mean by that?

62

1              JUROR HANKEMEIER:  I don't know all the

2       details of it, I'm just going on the fact of what I

3       read in the newspaper and what I heard in the

4       courtroom.

5              THE COURT:  Okay.

6              JUROR HANKEMEIER:  And the mother, you

7       know.

8              ATTORNEY VISHNY:  The mother of the

9       deceased?

10             JUROR HANKEMEIER:  I see how much pain

11      she's in.

12             ATTORNEY VISHNY:  Yeah.  And we all do.

13             JUROR HANKEMEIER:  Um-hum.

14             ATTORNEY VISHNY:  So I'm going to ask a few

15      questions about that.  So, first of all, you know,

16      you got your jury summons, you know the case is going

17      on, you walk in the courtroom and you're like, this

18      is the one.  Can I ask you what came to your mind

19      right away when you realized that?

20             JUROR HANKEMEIER:  The case or when I saw

21      everyone?

22             ATTORNEY VISHNY:  When you thought, oh, my

23      God, this is the one I'm being called for.  Since you

24      read about it, what were you thinking?

25             JUROR HANKEMEIER:  Well, again, I -- there

63

```
1         is witnesses that he didn't want here so I kind of
2         think that there is a reason.
3                   ATTORNEY VISHNY:  Right.  So is it fair to
4         say that because of that you came in -- and as the
5         judge said, absolutely no right or wrong answers here
6         at all.
7                   JUROR HANKEMEIER:  Um-hum.
8                   ATTORNEY VISHNY:  Nothing you say is going
9         to offend anyone.  But did you say, well, this guy
10        must be guilty, I think he's guilty?
11            And to be perfectly fair, if you had a loved one
12        who was on trial, would you want somebody with your
13        thinking to be on the jury for your loved one?  Do
14        you understand my question?
15                  JUROR HANKEMEIER:  Yeah.  No, I wouldn't.
16                  ATTORNEY VISHNY:  You wouldn't.  So
17        probably it's better you think that you wouldn't sit
18        on the case?
19                  JUROR HANKEMEIER:  Yeah.
20                  ATTORNEY VISHNY:  Okay.  All right.  Thank
21        you.
22                  THE COURT:  Thank you very much.
23                  JUROR HANKEMEIER:  Thank you.
24                  (Ms. Hankemeier exits.)
25                  ATTORNEY VISHNY:  Judge, I figured I needed
```

64

1    to keep going.

2                    THE COURT:  I should have cleared up on

3    that 50/50.  That's my fault.

4                    (Mr. Van Deurzen enters.)

5                    THE CLERK:  Michael Van Deurzen.

6                    THE COURT:  Mr. Van Deurzen, how are you?

7                    JUROR VAN DEURZEN:  Fine.

8                    THE COURT:  Good.  And so we had a couple

9    questions for you.  You had raised your hand on the

10   question about the -- being familiar with the case.

11                   JUROR VAN DEURZEN:  Um-hum.

12                   THE COURT:  And what we'd like to know is

13   can you tell us, you know, what -- what you've seen

14   in terms of media coverage, television, paper, and

15   then when did you see that, is it recently, is it --

16                   JUROR VAN DEURZEN:  At the time.  It was on

17   TV.  I don't remember all the specifics, but I

18   believe like shot in the hallway or the stairway or

19   something.

20                   THE COURT:  And based on your familiarity

21   with that case, have you formulated any sorts of

22   opinions about this case?

23                   JUROR VAN DEURZEN:  I don't know.  I didn't

24   really think about it that much for the last year or

25   whatever -- however long it's been.

65

```
1                    THE COURT:  And do you -- do you think that
2          -- and again, you had heard me ask, do you think you
3          could be fair and impartial on this case?  Do you
4          think, understanding I'm going to give you an
5          instruction that says, essentially, come in with a
6          clean slate, do you think even though you've seen
7          media reports that you'd be able to make any
8          decisions should you be called to make a decision
9          based on just the evidence that you hear in the
10         courtroom?
11                   JUROR VAN DEURZEN:  Yeah.  I would think
12         so.
13                   THE COURT:  One of the -- and again, this
14         isn't my original thought, it's been asked, but if
15         someone you loved and cared about were on trial
16         today, do you think that you or someone with your
17         sentiments would be a good person for this panel?
18                   JUROR VAN DEURZEN:  Yeah.
19                   THE COURT:  Okay.  Miss Schneider, any
20         questions?
21                   ATTORNEY SCHNEIDER:  I just want to ask you
22         a little bit, Mr. Van Deurzen, so you read about it
23         or saw it on TV?
24                   JUROR VAN DEURZEN:  Yes.
25                   ATTORNEY SCHNEIDER:  Kind of around the
```

66

1      time it happened?

2                 JUROR VAN DEURZEN:  Yes.

3                 ATTORNEY SCHNEIDER:  What do you remember,

4      other than you said it happened -- shooting maybe in

5      the hallway?

6                 JUROR VAN DEURZEN:  Yes.  I think white

7      male got shot in the hallway or the stairway, one of

8      the two, I don't remember what it was.

9                 ATTORNEY SCHNEIDER:  And you don't remember

10     anything more recent than things you heard right

11     after?

12                JUROR VAN DEURZEN:  No.

13                ATTORNEY SCHNEIDER:  Okay.  And when you

14     got your summons for jury duty, you didn't try to do

15     any looking around to see what case you were going to

16     come in on?

17                JUROR VAN DEURZEN:  No, actually, I

18     didn't.

19                ATTORNEY SCHNEIDER:  Okay.  I don't have

20     any other questions then.

21                THE COURT:  Okay.

22                ATTORNEY VISHNY:  When you walked in the

23     courtroom and, you know, or whatever moment it was

24     that it came that you realized this is the case that

25     I've read about, what were your thoughts?

67

1          JUROR VAN DEURZEN:  I was kind of surprised

2     actually.

3          ATTORNEY VISHNY:  Do you have any feeling,

4     you know, when you read about what happened, oh, I'm

5     really glad they got the guy, they've got the right

6     guy, they have the right person on trial?

7          JUROR VAN DEURZEN:  Again, that was a while

8     ago.  I don't know.

9          ATTORNEY VISHNY:  I just noticed before,

10    you know, before you answer, it just might be your

11    personality because I don't know you, that sometimes

12    you hesitate a little bit.

13         JUROR VAN DEURZEN:  Um-hum.

14         ATTORNEY VISHNY:  And I do that sometimes

15    myself too, maybe not enough, but, you know, so I was

16    just wondering if there is something you're feeling

17    that you might feel uncomfortable saying?  Because

18    it's okay, anybody can say anything in here.

19         JUROR VAN DEURZEN:  Yeah.  I have a -- I

20    had a son.  He died -- Sunday it will be a year and

21    five months ago.  And it's pretty hard to bury your

22    kid.

23         ATTORNEY VISHNY:  Right.

24         JUROR VAN DEURZEN:  So I don't know if that

25    would influence me at all that somebody out there

68

1    buried their kid.

2                   ATTORNEY VISHNY:  Right.  Yeah.

3                   JUROR VAN DEURZEN:  So that's the only

4    thing.

5                   ATTORNEY VISHNY:  And I -- I really

6    appreciate that you brought up what is clearly such a

7    painful subject, and it really doesn't matter if your

8    child was a victim of a crime or car accident or

9    whatever.

10                  JUROR VAN DEURZEN:  He wasn't.  He had

11   cystic fibrosis.

12                  ATTORNEY VISHNY:  I'm very sorry.

13                  JUROR VAN DEURZEN:  Yeah.

14                  ATTORNEY VISHNY:  But, you know, there is

15   going to be somebody sitting in this courtroom who

16   buried their son, and, you know, obviously everybody

17   empathizes with that person, so my question is, you

18   know, are there any feelings that you have because

19   you know you lost a child, this person lost a child,

20   that you might be disappointing this person and you

21   just could not bear to ever say anything because of

22   it?

23                  JUROR VAN DEURZEN:  I don't know that now.

24   I don't know -- like I say, I haven't heard any

25   evidence.  I haven't heard anything really.

69

1                    ATTORNEY VISHNY:  Okay.  And then the other
2          thing is given your recent loss, is there any feeling
3          that you have that maybe going through a trial where
4          somebody lost their life is too emotional an
5          experience for you at all?
6                    JUROR VAN DEURZEN:  I'm thinking it may be
7          emotional, but I'm thinking I can be impartial
8          because I -- I don't think -- I think I can be.
9                    ATTORNEY VISHNY:  Okay.
10                   JUROR VAN DEURZEN:  Yeah.  It would be --
11         it can be emotional.
12                   ATTORNEY VISHNY:  And it would be normal.
13         I mean we all tune out sometimes and have other
14         thoughts, and, you know, going through trauma can
15         make it worse, you know, and I'm -- and it's hard to
16         sit in a courtroom and listen to all of us all day,
17         so, you know, if you feel uncomfortable with that,
18         feel you couldn't handle it, it's just better to tell
19         us, that's all.
20                   JUROR VAN DEURZEN:  Yeah.  I mean I was
21         fine so far today, but again, it hasn't been a whole
22         trial so --
23                   ATTORNEY VISHNY:  Okay.  All right.  So you
24         would be okay with doing it you think?
25                   JUROR VAN DEURZEN:  I think.

70

1                   ATTORNEY VISHNY:  If not, just make sure to
2         raise your hand and say, Judge, there's something I'd
3         like to tell you, and I'm sure the judge can always
4         have you come back in here.  Because the process is
5         going to take a while.
6                   JUROR VAN DEURZEN:  Right.  Right.
7                   ATTORNEY VISHNY:  Thank you.
8                   THE COURT:  Okay.
9                   (Mr. Van Deurzen exits; Mr. Parker enters.)
10                  ATTORNEY SCHNEIDER:  You're back.
11                  JUROR PARKER:  I'm back.  Didn't ring a
12        bell until I heard you say the rest of it.
13                  THE COURT:  No.  Nice to have you back.
14            So now my question is, now that you -- you know
15        a little bit more, does the -- can you let us know
16        what -- what television, what newspapers, what media
17        you've seen, and then when you saw it, and then has
18        it caused you to formulate any opinions.
19                  JUROR PARKER:  I just recall seeing the
20        incident that had happened on the news and that was
21        way back when.  I don't remember any names or
22        anything, I just remember that the incident
23        happened.
24                  THE COURT:  And has -- have you -- now, you
25        understand that there's been an arrest made

71

1          obviously.  Based on your recollection of the
2          newspaper or media and then understanding that we're
3          here today, have you formulated any opinion that the
4          police officers have the right person or have you --
5          have you come to any opinions or conclusions on that
6          end?
7                    JUROR PARKER:  I have not.  I really
8          haven't thought about it since then, so no.
9                    THE COURT:  Okay.  You've heard me ask this
10         before, any concerns about your ability to be fair
11         and impartial and make any decisions that you might
12         be called to make based solely on the evidence that
13         you would hear?
14                   JUROR PARKER:  None.
15                   THE COURT:  Okay.  Attorney Schneider?
16                   ATTORNEY SCHNEIDER:  And you don't think
17         anything was anymore recent than around the time it
18         happened?
19                   JUROR PARKER:  No.  It was -- it was a long
20         time ago; and I -- it might have been one or two
21         times on the news that I saw.
22                   ATTORNEY SCHNEIDER:  I don't have anything
23         else then.
24                   THE COURT:  Attorney Vishny?
25                   ATTORNEY VISHNY:  Is there any feeling when

72

1              you heard someone was arrested, good, I'm glad they
2              have the guy, or any feeling like the right guy is on
3              trial?
4                        JUROR PARKER:  No.  I just was kind of
5              like, oh, my gosh, it was downtown Appleton kind of
6              thing.  That was about it.  And like I said, I really
7              didn't think anymore about it even after.
8                        ATTORNEY VISHNY:  All right.  Thank you.
9                        JUROR PARKER:  Yup.
10                       THE COURT:  Thank you, sir.
11                       (Mr. Parker exits.)
12                       THE COURT:  So I think that's everybody.
13             So can we just confirm before we go back in there,
14             and Melissa has probably got notes, it would be No.
15             2, Mr. Elkendier; No. 5, Kosinski; No. 8, Hankemeier;
16             No. 15, Daelke?
17                       ATTORNEY SCHNEIDER:  No. 26,
18             Manderscheid.
19                       THE COURT:  Yes.  So we have those five.
20             So then -- so we move Hermus and Schueller into --
21             Hermus will go into Elkendier.  Okay.  So Elkendier
22             will be Nora Hermus, then Mr. Schueller will become
23             Mr. Kosinski.  Then do you have the -- I don't have
24             it with me.
25                       THE CLERK:  One thing.

73

1                    ATTORNEY SCHNEIDER:  I do.  I have it in a

2          different way.  I am sorry.  It's right here.  Steven

3          Fleming.

4                    THE COURT:  Steven Fleming is going to

5          become Miss Hankemeier.  Steven Fleming did you say?

6                    ATTORNEY SCHNEIDER:  F-L-E-M-I-N-G.  Then

7          Dennis Shea, S-H-E-A.

8                    THE COURT:  Will become Mr. Daelke, right?

9                    ATTORNEY SCHNEIDER:  Um-hum.

10                   ATTORNEY WEITZ:  Yes.

11                   THE COURT:  What was his first name?

12                   ATTORNEY SCHNEIDER:  Dennis.

13                   ATTORNEY VISHNY:  How do you spell Shea?

14                   ATTORNEY SCHNEIDER:  S-H-E-A.  And the next

15         one is female, Jo Anne, spelled J-O capital A-N-N-E,

16         Elbe, E-L-B-E is the last name.

17                   THE COURT:  That's Mr. Manderscheid?

18                   ATTORNEY SCHNEIDER:  Yes.

19                   ATTORNEY VISHNY:  Wait.  I've got -- I'm

20         totally messed up.

21                   ATTORNEY SCHNEIDER:  No.  I don't think so.

22         Okay.

23                   ATTORNEY WEITZ:  What's Schueller's first

24         name?

25                   ATTORNEY SCHNEIDER:  No. 26 is Jo Anne

74

1           Elbe.  The on deck, the next person, would be Laurie,

2           spelled L-A-U-R-I-E, Dey, D-E-Y.  And then the next

3           on deck, Mannie, M-A-N-N-I-E, Maas, M-A-A-S.

4                     ATTORNEY VISHNY:  Okay.  Do we have a third

5           one of these yet?  We're going to do one when we get

6           in court.  It's too many.  I got too many cross outs

7           now so --

8                     ATTORNEY SCHNEIDER:  If you want a blank

9           one at lunchtime.

10                    THE COURT:  Do we have --

11                    ATTORNEY VISHNY:  Do we have another blank

12          one?

13                    THE CLERK:  One thing the bailiff Wendy

14          mentioned to me, she said Juror John Peterson

15          mentioned to her that he thinks he knows the

16          defendant's mother, so he just wanted to --

17                    ATTORNEY VISHNY:  John Peterson?  Maybe we

18          should just bring him in while we're here.

19                    ATTORNEY WEITZ:  So I have another

20          question.  These new people that are going to be

21          filling in for who we excused, they haven't been

22          asked the question about the media, so are we going

23          to have to come back with them, is there an easier

24          way to --

25                    THE COURT:  I think what we're -- I mean,

75

1          unfortunately, what we're going to -- they'll come
2          out -- what they'll do is come out, I will --
3                    ATTORNEY SCHNEIDER:  Fill the spots.
4                    THE COURT:  -- fill the spots, say you've
5          heard my questions up to this point, are there any
6          questions you would have answered to, and then if
7          it's -- with the exception of the media question.
8          Then I'll ask them --
9                    ATTORNEY VISHNY:  What about Mr. Peterson,
10         that he knows my client's mother?  We just realized
11         that.
12                   THE COURT:  Do you want to just bring him
13         back here since we're all here?
14                   (Mr. Peterson enters.)
15                   THE COURT:  Mr. Peterson, how are you, sir?
16                   JUROR PETERSON:  I'm all right.
17                   THE COURT:  Good.  The -- it was our
18         understanding that you may have mentioned to the
19         bailiff that you thought you may have known the
20         mother; is that correct?
21                   JUROR PETERSON:  Pretty sure.
22                   THE COURT:  And how do you think you know
23         that person?
24                   JUROR PETERSON:  I worked with her for
25         several years.

76

1                    THE COURT:  Okay.

2                    JUROR PETERSON:  I believe.

3                    THE COURT:  Do you think that will affect

4          your ability to judge this case and to be fair and

5          impartial?

6                    JUROR PETERSON:  Not at all.  I just wanted

7          to make sure.  One of the nicest ladies you ever want

8          to meet.

9                    THE COURT:  Very good.  I appreciate you

10         sharing that.  And that's exactly the types of things

11         that we want you to feel comfortable going, well, if

12         it's close and you think you should disclose it, we

13         would rather hear that.

14              Attorney Schneider, any questions?

15                   ATTORNEY SCHNEIDER:  Do you remember her

16         first name?

17                   JUROR PETERSON:  I don't.

18                   ATTORNEY SCHNEIDER:  Okay.

19                   JUROR PETERSON:  But I'm just seeing her, I

20         think that's her sitting there out there, so I just

21         kind of put it together so I kind of know about the

22         case then.

23                   ATTORNEY SCHNEIDER:  You think it's Mr.

24         Lee's mom?

25                   JUROR PETERSON:  Yes.

77

```
 1                 ATTORNEY SCHNEIDER:  And where was that
 2        that you worked with her?
 3                 JUROR PETERSON:  McCain Foods.
 4                 ATTORNEY SCHNEIDER:  Did you ever have any
 5        kind of role where you were a supervisor to her or
 6        vice versa?
 7                 JUROR PETERSON:  No.
 8                 ATTORNEY SCHNEIDER:  Do you think it would
 9        be hard for you to sit on this jury -- I mean I'm
10        just going off your comment, Mr. Peterson, you said
11        one of the nicest ladies you ever worked with, and
12        obviously this is a very significant matter and her
13        son's on trial, do you think it would be hard for you
14        to hold those or take those personal feelings and put
15        them aside when you're serving as a juror?  And there
16        is no right or wrong answer, we just want you to tell
17        us what your gut is telling you.
18                 JUROR PETERSON:  If I was chose, I would be
19        able to a hundred percent proceed with it.  But she
20        was always talkative, got along with everybody, so
21        it's -- just a nice little lady.
22                 THE COURT:  Now, you had -- Attorney
23        Schneider, I apologize if I'm interrupting.
24                 ATTORNEY SCHNEIDER:  No, that's fine.
25                 THE COURT:  You mentioned you knew a little
```

78

1          bit about the case, is that from media or is it --

2                    JUROR PETERSON:  Just like different rumors

3          from -- through the plant.

4                    ATTORNEY SCHNEIDER:  The McCain rumor mill?

5                    JUROR PETERSON:  Correct, that the mother

6          of one -- that, and I do remember hearing things

7          about that on TV.

8                    THE COURT:  And have you -- have you

9          formulated any opinions based on what you heard, you

10          know, through work or --

11                    JUROR PETERSON:  Absolutely not.

12                    THE COURT:  Okay.  Attorney Vishny.

13                    ATTORNEY VISHNY:  Yeah.  I have a question

14          which is this.  If the State proves this case to you

15          beyond a reasonable doubt, okay, and after hearing

16          all the evidence you think beyond a reasonable doubt

17          that Mr. Lee is guilty, will you be able to vote

18          guilty even though you used to work with his mother?

19                    JUROR PETERSON:  Yes.

20                    ATTORNEY VISHNY:  Okay.  All right.  Thank

21          you.

22                    THE COURT:  Thank you, sir.

23                    (Mr. Peterson exits.)

24                    ATTORNEY SCHNEIDER:  So we'll go in.

25                    THE COURT:  At this time -- what I'll do is

79

1          I'll say, at this time I'd ask, you know, Mr.

2      Elkendier, Mr. Kosinski, et cetera, please stand,

3      I'll thank them for their service, let them know that

4      they're excused, we'll call up our next five people

5      and ask that.

6                  ATTORNEY WEITZ:  And then are you

7      specifically going to ask them about the media thing?

8      I know you said you were going to just ask them

9      general.

10                 THE COURT:  Are there any questions that

11     you would have answered yes to; and then I'll -- and

12     then I'll say, other than the media question, can you

13     tell us what question you would answer to, and then

14     if it's the media question, we'll come back.  I wish

15     there was a more efficient way, but I think this is

16     as good as it gets.

17                 ATTORNEY SCHNEIDER:  I think if you say

18     yes, which topic is it.

19                 (In open court.)

20                 THE COURT:  Okay.  Again, I appreciate

21     everyone's patience.

22         At this time, Mr. Elkendier, I'd like to thank

23     you for your service, sir, and you are excused at

24     this time.

25                 JUROR ELKENDIER:  Thank you, Your Honor.

80

```
1                    THE COURT:  Thank you, sir.

2                    THE CLERK:  No. 7355, Nora Hermus.

3                    THE COURT:  So, Miss Hermus, if you'll take

4          Mr. Elkendier's spot please.

5              Mr. Kosinski, likewise, I would like to thank

6          you for your service today, sir, and you are excused

7          at this time.

8                    THE CLERK:  No. 6968, Adam Schueller.

9                    THE COURT:  Mr. Schueller, if you would

10         please take Mr. Kosinski's spot.

11             Mrs. Hankemeier, at this time you are excused

12         from your duty.  I thank you for your service.

13                   THE CLERK:  No. 472, Steven Fleming.

14                   THE COURT:  Actually, Mr. Fleming, if you

15         would take the second row.

16             Mr. Daelke, sir, at this point in time, I

17         appreciate your service and you are excused.

18                   JUROR DAELKE:  Thank you.

19                   THE CLERK:  No. 6831, Dennis Shea.

20                   THE COURT:  Mr. Manderscheid, at this point

21         in time, sir, you are relieved of your duties.  I

22         thank you for your service.

23                   JUROR MANDERSCHEID:  You're welcome.

24                   THE CLERK:  No. 430, Jo Anne Elbe.

25             First alternate, 6559, Laurie Dey; second
```

81

1          alternate, 6947, Mannie Maas.

2                    THE COURT:  And this first series of

3          questions is directed to our newest additions to the

4          group.  And you have heard me ask various questions

5          of the panel up to this point, and the first question

6          I'd asked, or I will ask of you, are there any

7          questions that I have asked up to this point that you

8          would have answered in the affirmative to?

9                    (No response.)

10                   THE COURT:  And again, on that same

11         subject, is there anyone who has, after having heard

12         my questions, after having had additional time to

13         reflect, is there anybody who's had more time to

14         think about this case and say, well, I do recall

15         maybe hearing or reading or seeing something about

16         this case?

17                   (No response.)

18                   THE COURT:  Okay.  Very good.

19             Now, the next subject matter, and again now we

20         return to the group in its entirety, is there anyone

21         who has formed an opinion about this case and what

22         the outcome should be?

23                   (No response.)

24                   THE COURT:  Is there anyone who feels that

25         they may have some -- some inherent biases in this

```
1          case?  We will -- we will hear from males and

2          females, and we have different racial compositions in

3          terms of potential witnesses, is there anyone who is

4          concerned that they may have some inherent biases

5          that will prevent them from being able to be fair and

6          impartial today?

7                    (No response.)

8               THE COURT:  Now, is there anyone who has

9          such a strong feeling about this type of case, and

10         again, understanding that the burden of proof is on

11         the State, is there anyone who has such a strong

12         feeling about this type of case that they are of the

13         opinion that it would simply be impossible for them

14         to render a verdict regardless of what that verdict

15         would be?

16                   (No response.)

17              THE COURT:  Is there anyone who has any --

18         and I won't expect you to disclose the specifics of

19         this, but is there anyone who has any physical

20         conditions, mental conditions or cognitive conditions

21         that makes you be of the opinion, Judge, I just don't

22         know that I could sit on this panel?

23            Okay.  And that would be Mr. Bloomer?

24              JUROR MANAGAN:  Managan.

25              THE COURT:  Managan.  My apologies.  And is
```

83

1          that -- let me ask you this.  Is this something that

2          you would like to discuss in back in a more intimate

3          setting or do you feel comfortable disclosing at this

4          point?

5                    JUROR MANAGAN:  I think I'd rather discuss

6          it in private.

7                    THE COURT:  Okay.  And so we can retake

8          that issue up momentarily.

9               And did anyone else raise their hand?

10                   (No response.)

11                   THE COURT:  Okay.  Now, as you've been made

12         aware, this jury trial is expected to last

13         approximately -- approximately eight days.  Now we

14         will do everything in our power to be as efficient as

15         possible, but it's always better that we expect the

16         unexpected, and so the trial may go a little bit

17         longer, it may go right on time.  In an effort to

18         keep it on track, if it means we go a little bit

19         later, again, assuming that it's acceptable to you,

20         ladies and gentlemen of the jury, we will look at

21         doing that.  We will do everything we can, and I

22         would not expect this, but we will -- I'm not

23         anticipating that we would use our weekends.

24              Is there anyone who says, Judge, I absolutely

25         have a commitment that I have to be there for, I

84

```
1          can't make it for the entire week or eight days, two
2          weeks.  Is there anyone who is of that opinion?  And
3          just so that you're understanding sort of the level
4          of commitment I'm thinking, if you have -- if you
5          have, by way of example, an appointment to wash your
6          dog, that's not what I want to hear about.  What I'm
7          interested in is, Judge, I have a ticket to the
8          Bahamas tomorrow and I won't be able to be here and
9          it's a non-refundable ticket.  So that's -- to give
10         you a frame of reference as to the level of
11         commitment that we're talking about, is there anyone
12         who has that type of a commitment that they say,
13         Judge, I got to let you know about this because it's
14         a commitment I can't adjust?
15              Okay.  Fortunately, we're already going to be
16         speaking.
17                   JUROR MANAGAN:  Yeah.
18                   THE COURT:  All right.  Anyone else?
19                   JUROR HERMUS:  Are you talking past eight
20         days?
21                   THE COURT:  And again, I'm hoping we'll
22         stay on track, but to be safe, I'm saying let's look
23         at two weeks and even maybe a couple --
24                   JUROR HERMUS:  My daughter gets married
25         March 12th.
```

85

1                    THE COURT:  Who gets married March 12th?

2                    JUROR HERMUS:  My daughter.

3                    THE COURT:  We'll be done by March 12th.

4                    JUROR HERMUS:  I just wanted to let you

5          know.

6                    THE COURT:  Although my congratulations in

7          advance.

8               Okay.  Very good.  Is there anyone -- let me ask

9          this -- and again, I want you to understand I will do

10         my best to give you routine breaks, to allow to you

11         take lunches.  We will -- we will do everything to

12         make this as accommodating as possible so that you

13         are able to devote all of your attention to the

14         matters at hand.  Understanding that, is there anyone

15         who, again, may be going through something in their

16         life where they say, Judge, this has got me

17         distracted?  And again, we can deal with this in an

18         intimate setting.  Is there anyone who says, Judge,

19         there is something, and it's been on my mind, it's

20         eating at me, that you'd like to share with us,

21         again, in a more private setting?

22              Okay.  Mr. Peterson.  Okay.  And then, Mr.

23         Managan, we're already going to be speaking.  All

24         right.  Very good.

25              That is, by and large, all of the questions that

86

1     I have for you.  What we will do -- and I think what

2     may be a good time is we will meet with Mr. Managan

3     and then Mr. Peterson briefly, and then I believe --

4     and so what we'll do is I'll ask you to stay here,

5     but I'm expecting that we will have lunch for you,

6     and so when we come back what we'll be able to do is

7     we'll be able to I think break at which point in time

8     then I'm going to turn the questioning over to the --

9     to the attorneys for our continuation.

10          Okay?  We all set?

11          All right.  We'll take a --

12               (Proceedings held outside the presence of

13     the jury panel.)

14               (Mr. Managan enters.)

15               THE COURT:  Mr. Managan, I appreciate you

16     raising your hand.  Again, there is no right or wrong

17     answers.

18               JUROR MANAGAN:  Sure.

19               THE COURT:  But you wanted to share with us

20     some additional concerns that you had and so please

21     feel free to do so.

22               JUROR MANAGAN:  Well, I sometimes have a

23     hard time hearing soft voices and particularly female

24     voices.  I got like tinnitus.

25               THE COURT:  Okay.

87

```
1            JUROR MANAGAN:  So I don't know if I could
2       hear everything, you know, that goes on.
3            THE COURT:  And we do have -- and today is
4       not a good example because we've had to rearrange the
5       courtroom.  We will -- and we do have the ability to
6       have all of us utilize microphones.  We can -- I
7       think we do have -- I don't know that it's a hearing
8       aid but something that would be able to magnify if
9       necessary.  Understanding those potential options, do
10      you feel that you would be able to, you know, listen
11      and to hear things?  And again, if at any point in
12      time say, Judge, we just need to make an adjustment,
13      we can do that.
14           JUROR MANAGAN:  Okay.
15           THE COURT:  Do you -- do you think under
16      those circumstances that it would be okay?
17           JUROR MANAGAN:  Yeah.  I just don't want to
18      delay, you know, saying could you repeat that, you
19      know, because I didn't quite hear it.
20           THE COURT:  Sure.
21           JUROR MANAGAN:  I just, you know --
22           THE COURT:  Understandable.
23        Attorney Schneider, do you have any questions?
24           ATTORNEY SCHNEIDER:  We can also do -- I'm
25      thinking of we could sit you in a spot closest to the
```

88

1    witness that would be on the witness stand too, so

2    there is some things about the logistics of the

3    courtroom we could do.  Is it something that like

4    recordings are easy for you to hear or does that make

5    it difficult as well?

6              JUROR MANAGAN:  I struggle probably more

7    with recordings, and, you know, like even when I

8    called in I had my wife, you know, put it on speaker,

9    can you please listen to this with me so I can make

10   sure that I got everything down.  I heard it clearly.

11             THE COURT:  Okay.  Good.

12             ATTORNEY SCHNEIDER:  I don't have any other

13   questions for that topic.

14             THE COURT:  Okay.  Attorney Vishny?

15             ATTORNEY VISHNY:  Should I ask questions?

16   I do have one but --

17             THE COURT:  You can ask.  Go ahead.  You

18   can ask the question.

19             ATTORNEY VISHNY:  I'm going to get up for a

20   minute here.  Mr. Managan, can you hear me right now?

21             JUROR MANAGAN:  Yeah.

22             ATTORNEY VISHNY:  Okay.  Thank you.

23             THE COURT:  So let me ask you this, Mr.

24   Managan, is it -- now is it something that the --

25   that the -- sometimes you're able to hear, sometimes

89

1    you're not, or is it --

2                    JUROR MANAGAN:  Yeah.  It's more, you know,

3    and I -- I've never been in a courtroom so I don't

4    know, but like I know like if I go out and there's a

5    lot of people talking or whatever that I have a hard

6    time with that, and I have a hard time, you know,

7    where there is other, you know, like papers rustling

8    or something like that, that's where it's probably

9    the worst.

10                   THE COURT:  Okay.  All right.  Do you think

11   -- and let me -- and again, there is no -- there is

12   no right or wrong answer.

13                   JUROR MANAGAN:  Yes.

14                   THE COURT:  Understanding there will be

15   audio recordings, understanding there will be

16   testimony, and we do have microphones, but the --

17   understanding that you may be one of twelve people

18   making a very significant decision, and we will

19   accommodate you however we can, understanding we have

20   certain limitations, but what is your opinion, do you

21   feel that you could do this or do you not feel that

22   you could do it?  And again, I appreciate your

23   service no matter what.  So there is no wrong answer.

24   What is your sentiment?

25                   JUROR MANAGAN:  I just -- you know, and I

90

```
1      appreciate the opportunity or whatever, I think this
2      -- but I just think there would be probably more
3      qualified people that could maybe hear better and,
4      you know, maybe help the trial go.  I don't, you
5      know, want to have to burden, you know, the plaintiff
6      or the defendants.  I just want everything to be --
7                ATTORNEY SCHNEIDER:  And we appreciate your
8      openness and your honesty, and I think if you want to
9      ask him the question that we've been using, like if
10     this was his family member, because then he may --
11               THE COURT:  I think that's a great -- I
12     didn't think of this question, but I get to ask it
13     now.  But -- so if someone you loved and cared about
14     were on trial today, would you or someone sitting in
15     your shoes, would you want them to be on this panel
16     today?
17               JUROR MANAGAN:  You mean if I had a loved
18     one would I want somebody like myself sitting on a
19     panel?
20               ATTORNEY SCHNEIDER:  With the hearing
21     issues, would you feel confident about having that
22     person sit on the jury?
23               JUROR MANAGAN:  I'd say yeah, you know, I
24     don't know what -- how much of this case is going to
25     be --
```

91

1           THE COURT:  And let me -- I probably didn't
2      ask that as clear as I could.  I'm not -- I'm not
3      concerned about from you being able to look at this
4      saying I can be fair and impartial, that's not the
5      issue to me, what I want -- the way I'm asking you
6      that question is you've told us -- and only you know
7      the extent of how the hearing would affect you.  If
8      -- if there were someone that had the identical
9      condition as you and a loved one was on trial, would
10     you feel comfortable with that person being on the
11     jury panel or would you rather have someone else on
12     that jury panel?
13          JUROR MANAGAN:  I think if I was sitting
14     where Mr. Lee, I think I would go with somebody
15     else.
16          THE COURT:  Okay.
17          JUROR MANAGAN:  Just, you know, so that
18     they got every aspect of the trial.  I wouldn't want
19     something to be missed or something and that's why I
20     wanted to kind of bring that up.
21          THE COURT:  And I greatly appreciate that.
22     And -- and again, the issue to me here, it has
23     nothing to do with whether or not you could be fair
24     and impartial.
25          JUROR MANAGAN:  Yeah.

92

1                    THE COURT:  I -- that's really not at

2          issue, it's just a matter of you need to feel

3          comfortable and that's the most important thing

4          because you -- if you were chosen you would be tasked

5          with a very substantial decision.  And so I

6          appreciate your candor, very much so.  Okay?

7              All right.  Thank you very much.  And then if

8          you could just go sit in the jury room then I'll come

9          back and address everyone in a moment.

10                   ATTORNEY SCHNEIDER:  Thank you, Mr.

11         Managan.

12                   (Mr. Managan exits.)

13                   ATTORNEY SCHNEIDER:  And we're paying

14         attention --

15                   ATTORNEY VISHNY:  He's gone?

16                   THE COURT:  He's gone.  That last question,

17         he's gone.

18                   (Mr. Peterson enters.)

19                   THE COURT:  Mr. Peterson, how are you?

20                   JUROR PETERSON:  I'm all right.

21                   THE COURT:  All right.  So I did see you

22         raised your hand, and we've already touched on kind

23         of a sensitive subject and maybe you've had more time

24         to think or maybe there was something additional, but

25         feel free to share with us what you would like to.

93

1              JUROR PETERSON:  All right.  Thank you.

2        And I apologize and thanks for the time.

3              THE COURT:  No need to apologize.

4              JUROR PETERSON:  Brought it up when I was

5        in here, but when you asked the next question, last

6        Tuesday -- I got two older children, 22, 20.  My

7        boy's in Waupaca County right now serving some time,

8        some new charges.  I got a daughter that is actually

9        due back in court in Outagamie tomorrow.  She's

10       facing a lot of different charges.  So, I guess, just

11       happened in the last couple weeks so I just -- my

12       mind and my focus is just -- it's -- the timing is

13       just -- that's all I've been thinking of.  I will,

14       you know, if chosen do a hundred percent I can,

15       but --

16             THE COURT:  And I greatly appreciate that.

17       And I'm -- I -- I'll formally announce it when we go

18       outside so I would ask that you be quiet until I

19       formally announce it.  I greatly appreciate your

20       candor.  I think that, quite frankly, Mr. Peterson,

21       under those circumstances anyone would have a

22       difficult time paying attention, and that is not to

23       suggest that on a different panel at a different time

24       you may not be a wonderful candidate, but I think

25       that in fairness to you and in fairness to this trial

94

1          I think that it is certainly more than appropriate to

2          release you from your duty, and so I appreciate your

3          -- first of all your willingness to serve today and

4          equally if not more so your candor with us.  So thank

5          you very much, sir.  Certainly.  And I know I speak

6          on behalf of everyone, our sympathies to you and wish

7          you the best of luck.

8              So what I'll do is we're going to, just like we

9          do before, I'll have you go in, I'll release you

10         individually, so I ask that you just not say

11         anything, and then we'll go from there.

12             JUROR PETERSON:  All right.  Thank you

13         everybody.

14             (Mr. Peterson exits.)

15             ATTORNEY SCHNEIDER:  The next one is Susan

16         Giesen, G-I-E-S-E-N.

17             THE COURT:  So then what would happen is

18         we'll just make sure, Melissa, we have this right.  I

19         think --

20             ATTORNEY VISHNY:  G-I-E-S-E-N?

21             ATTORNEY SCHNEIDER:  So Laurie Dey would

22         move into No. 3 where Mr. Peterson was.

23             THE COURT:  So we're just worried about the

24         two alternates.

25             ATTORNEY SCHNEIDER:  And then Mannie Maas

95

1     would go into No. 12.

2           THE COURT:  So Dey is now Mr. Peterson?

3           ATTORNEY SCHNEIDER:  Yup.

4           THE COURT:  Mannie becomes -- Mannie Maas

5     becomes No. 12?

6           ATTORNEY WEITZ:  So who fills Dey?

7           ATTORNEY SCHNEIDER:  Dey is Bridget

8     Plamann.  Bridget, B-R-I-D-G-E-T, P-L-A-M-A-N-N.

9           THE COURT:  And then Susan Giesen,

10    G-I-E-S-E-N, becomes Alternate No. 2.  And what were

11    the first names of those?

12          ATTORNEY SCHNEIDER:  Bridget Plamann, Susan

13    Giesen.  And I can forecast if Bridget Plamann makes

14    it into the pool we'll need to come back.  She -- her

15    sister-in-law was a victim of a homicide that I

16    handled.  I can't foresee -- and it went on for

17    several years.

18          THE COURT:  We're going to have to because

19    she's already going to be part of the questioning.

20          ATTORNEY SCHNEIDER:  But I'm just telling

21    everyone that my guess is if she moves back into the

22    bigger pool or when you ask her that --

23          ATTORNEY WEITZ:  Should we do it now?

24          THE COURT:  Why don't we just do it right

25    now rather than have us go back in for one person and

```
1          then bring her back.  In fact, why don't we bring

2          them both back.

3                    ATTORNEY SCHNEIDER:  That might not be a

4          bad thought because then we -- Bridget Plamann.

5                    THE COURT:  They're the only two that we

6          have -- haven't been in the pool to ask questions

7          of.

8                    ATTORNEY VISHNY:  Oh, okay.

9                    ATTORNEY SCHNEIDER:  Sure.  That makes

10         sense.

11                   THE COURT:  I'd rather do that than go out,

12         find out and come back.  So can you bring back

13         Bridget Plamann.

14                   THE CLERK:  Somebody in the back of the

15         courtroom is texting.

16                   THE COURT:  Is it Alyson Derr from the

17         Post-Crescent?  She's sitting in the back.  From

18         where I'm seated, back far right corner.

19                   THE CLERK:  I'm not sure.  I can check.

20                   THE COURT:  Get on who that is.

21                   ATTORNEY VISHNY:  Find out if it's Holly

22         Yamahiro.  If so, it's my daughter and I forgot.

23                   (Ms. Plamann enters.)

24                   THE COURT:  Okay.  You can have a seat

25         here.
```

97

1                  Miss Plamann, how are you?

2                        JUROR PLAMANN:  Fine, thanks.

3                        THE COURT:  So you are ultimately going to

4            be seated for questioning.

5                        JUROR PLAMANN:  Okay.

6                        THE COURT:  And so in an effort to expedite

7            that, I thought we would have you come back and you

8            could answer some questions for us.

9                  Now, you've -- have you been able to hear all of

10           my questions?

11                       JUROR PLAMANN:  Yes.

12                       THE COURT:  Okay.  Are there any questions

13           that you would have answered yes to?

14                       JUROR PLAMANN:  Yes.  The knowing District

15           Attorney and some of the office staff.

16                       THE COURT:  Okay.  And would that affect

17           your ability to be fair and impartial in this case?

18                       JUROR PLAMANN:  No.

19                       THE COURT:  Do you believe that you would

20           be able to look at this case based solely on the

21           evidence, and if you were tasked with making a

22           decision, make a decision based solely on that

23           evidence?

24                       JUROR PLAMANN:  Yes.

25                       THE COURT:  Okay.  I'd also asked, and I --

98

```
1         I'll single this question out over the other ones,
2         but have you seen any media coverage on this case in
3         any capacity that you're aware of?
4              JUROR PLAMANN:  Not that I recall.
5              THE COURT:  Okay.  Are there any other
6         questions that I asked that maybe would have caused
7         you to think or to take a pause?
8              JUROR PLAMANN:  Not that I recall.
9              THE COURT:  Okay.  I'll turn it over to the
10        attorneys, they can ask some things.
11             ATTORNEY SCHNEIDER:  Miss Plamann, because
12        I know the facts behind your case, and it's a
13        question I will ultimately ask in front of the larger
14        pool, I just think it's fair to share that it was
15        your sister-in-law, but I do not know if you were
16        married to Casey at the time.
17             JUROR PLAMANN:  Yes.
18             ATTORNEY SCHNEIDER:  So your sister-in-law
19        was killed, and obviously you heard this case
20        involves a death too, and I know your family spent a
21        lot of time going through your own experiences with
22        the loss of Laura.  Do you think because you're going
23        to hear about that, do you think you would be able to
24        keep a fair mind, impartial, and serve as a juror in
25        this case?
```

99

1              JUROR PLAMANN:  Yes.

2              ATTORNEY SCHNEIDER:  Okay.

3              THE COURT:  Any other questions, Attorney

4        Schneider?

5              ATTORNEY SCHNEIDER:  No.  And probably the

6        other staff you would know would be Stephanie Jens,

7        my victim/witness coordinator?

8              JUROR PLAMANN:  Yes.

9              ATTORNEY SCHNEIDER:  But I don't think you

10       had any interaction with my investigators.

11             JUROR PLAMANN:  No, not the names

12       mentioned.

13             ATTORNEY SCHNEIDER:  Deputy DA Tempelis too

14       would have been in hearings at times?

15             JUROR PLAMANN:  Yes.  Okay.

16             ATTORNEY SCHNEIDER:  Mindy.

17             JUROR PLAMANN:  Yes.

18             THE COURT:  Attorney Vishny.

19             ATTORNEY VISHNY:  Okay.  I'm going to ask,

20       were you disappointed in the outcome of that case as

21       it exists to date with what happened with that

22       prosecution?

23             JUROR PLAMANN:  It never completely made it

24       to trial and that was a family decision.

25             ATTORNEY VISHNY:  Okay.  I don't know

1     anything really about the case.  Everyone knows way

2     more than me.  It was a family decision that your

3     family decided?

4              JUROR PLAMANN:  Due to circumstances that

5     arose, the family chose at this point in time to, I

6     don't know if that's a correct terminology, to not.

7              ATTORNEY VISHNY:  There is no right or

8     wrong answers or terminology or anything, just

9     whatever you say.

10             JUROR PLAMANN:  It didn't go all the way,

11    there was never a full trial, it never made it to the

12    jury selection process, that part never happened.

13             ATTORNEY VISHNY:  Right.

14             JUROR PLAMANN:  So --

15             ATTORNEY VISHNY:  Were you upset about that

16    at all?

17             JUROR PLAMANN:  It wasn't --

18             ATTORNEY VISHNY:  Just -- you're not going

19    to hurt anybody's feelings.

20             JUROR PLAMANN:  No.  I just want to make

21    sure I answer truthfully and correctly.  I -- it's

22    not the outcome we were hoping for, but at this time

23    it still is an opportunity that we have saved as a

24    family to attempt another day if it presents itself

25    that way.

101

1          ATTORNEY VISHNY:  Right.  If there is other
2     evidence.
3          JUROR PLAMANN:  Correct.
4          ATTORNEY VISHNY:  So one of the things, you
5     know, sometimes when somebody has had a loss like
6     that which is so traumatic, and it's a murder case,
7     and it can -- you know, my question is will it have
8     you thinking about the loss you have suffered, you
9     know, and that your family has suffered if you were
10     to be sitting on this trial?
11          JUROR PLAMANN:  I think after the fact I
12     think I would be able to pay attention.
13          ATTORNEY VISHNY:  Okay.
14          JUROR PLAMANN:  Due to it being not very
15     recent.
16          ATTORNEY VISHNY:  Okay.  So it's clear to
17     me that -- if I'm wrong, you tell me, okay, but I'm
18     surmising that even though the case didn't proceed
19     against some people, you know, when your loved one
20     was killed, that, you know, your opinion is that they
21     were guilty and did it, maybe it just -- maybe
22     someday in the future there will be more evidence or
23     something like that.  Am I reading that right?
24          JUROR PLAMANN:  Correct.
25          ATTORNEY VISHNY:  So given that you felt,

102

1          you know, that the right people were prosecuted in

2          that particular case, I have no comment on that or

3          opinion one way or the other, but is there a feeling

4          that you have coming into this trial, well, they

5          caught the guy, they have the right person, he must

6          be guilty?

7                    JUROR PLAMANN:  I don't know an answer to

8          that until I know what evidence is presented.

9                    ATTORNEY VISHNY:  Okay.  And as you know,

10         there is this requirement that a case has to be

11         proven beyond a reasonable doubt, and apparently in

12         that other case there was some feeling there wasn't

13         evidence beyond a reasonable doubt, you know, in that

14         case, which of course is totally separate from this

15         case, but is there any feeling you would have like,

16         you know, I definitely think it's the right guy, you

17         know, other jurors might say no, there's reasonable

18         doubt, that you would just say no, gotta be it, this

19         person is guilty, not based on what goes on in the

20         jury room or in the courtroom but based on your own

21         personal experiences or, you know, contacts with the

22         District Attorney's office or the police?

23                    JUROR PLAMANN:  I feel that I would be able

24         to be objective to the information presented.

25                    ATTORNEY VISHNY:  Okay.  Thank you.

103

1             JUROR PLAMANN:  But without the information

2        being presented --

3             ATTORNEY VISHNY:  No.  No.  No.  Right.

4        We're not going to give a summary of the trial here

5        or anything, but we're just trying to explore your

6        feelings because it's an unusual situation.

7             JUROR PLAMANN:  Agreed.

8             ATTORNEY VISHNY:  So -- okay.  Thank you.

9             THE COURT:  All right.  Thank you very

10       much.

11             (Ms. Plamann exits; Ms. Giesen enters.)

12             THE CLERK:  This is Susan Giesen.

13             THE COURT:  Hi, Miss Giesen.  How are you?

14             JUROR GIESEN:  Okay.

15             THE COURT:  Good.  So have you been able to

16       hear all the questions that I asked up to this point?

17             JUROR GIESEN:  Yup.

18             THE COURT:  And are there any questions

19       that you would have raised your hand to answer?

20             JUROR GIESEN:  I can't remember them now.

21             THE COURT:  Okay.  Well let me -- I can ask

22       you some of them.  So have you ever been convicted of

23       a felony?

24             JUROR GIESEN:  No.

25             THE COURT:  All right.  You do live in

104

1      Outagamie County?

2                  JUROR GIESEN:  Yup.

3                  THE COURT:  You heard me -- you heard me

4      introduce all of the parties?

5                  JUROR GIESEN:  Yup.

6                  THE COURT:  And did you recognize any of

7      them?

8                  JUROR GIESEN:  No.

9                  THE COURT:  Okay.  Did you recognize any of

10     the witnesses who I named?

11                 JUROR GIESEN:  No.

12                 THE COURT:  Now, are you related by blood

13     or marriage or do you have any close friends who are

14     involved in law enforcement?

15                 JUROR GIESEN:  No.

16                 THE COURT:  Okay.  Have you ever -- have

17     you ever been a victim of a crime?

18                 JUROR GIESEN:  No.

19                 THE COURT:  Have you ever had a close

20     friend who's been a victim of a crime that you're

21     aware of?

22                 JUROR GIESEN:  No.

23                 THE COURT:  Now, I had -- I had mentioned

24     to you that, you know, this -- where this incident

25     took place was at the Luna Lounge which is in

105

1    downtown Appleton, and do you recall seeing any media

2    about this case or seeing any press conference?

3              JUROR GIESEN:  Two years ago, but then I

4    seen it again in Sunday's paper.

5              THE COURT:  Okay.  And did you read those

6    articles?

7              JUROR GIESEN:  Yes, because my husband

8    says, Sue, I think you want to read this.

9              THE COURT:  Okay.  And because you've read

10   that, have you formulated any opinions about this

11   case?

12             JUROR GIESEN:  I was thinking about --

13   well, I read it last night, because it takes us a

14   while to read the Sunday paper, and I was thinking

15   about it, but like I always was taught, you can't

16   judge it until you hear everything.

17             THE COURT:  Okay.  And so do you have any

18   opinions right now that the police have arrested the

19   right guy or the wrong guy or do you have any

20   opinions on that subject?

21             JUROR GIESEN:  No.

22             THE COURT:  Do you -- do you think that

23   you'll -- do you have any biases in this case, and by

24   that it could be, well there is a police officer

25   that's going to testify and the police are always

106

1    right and so I'm going to believe what they say or,

2    you know, we might have male witnesses and you might

3    say, well I would never believe what a male says

4    because they lie.  Do you think you have any biases

5    there?

6                THE JUROR GIESEN:  No.

7                THE COURT:  Okay.  You've heard what the

8    charges are?

9                JUROR GIESEN:  Yes.

10               THE COURT:  And what's being alleged.  Do

11   you have any -- any strong feelings about this type

12   of crime that it would prevent you from being able to

13   make a decision if you had to?

14               JUROR GIESEN:  Can you run that by me

15   again?

16               THE COURT:  Sure.  So these are -- and

17   these are serious charges, and even though they're

18   serious charges, do you think you would be able to

19   listen to the evidence and make a decision based on

20   the evidence as you hear it?

21               JUROR GIESEN:  Yes.

22               THE COURT:  Okay.  Do you -- do you have

23   any -- any conditions, whether it's a medical

24   condition, a physical condition or a cognitive

25   condition, that you think would make it difficult for

107

1     you to be a part of this jury if you were selected?

2          JUROR GIESEN:  Only if they're -- you know,

3     in the beginning people were raising hands saying

4     they couldn't hear what was going on, but then you

5     said that they're going to be speaking with a

6     microphone.

7          THE COURT:  Yup.

8          JUROR GIESEN:  Then I would be able,

9     because once in a while I can't hear if somebody is

10    talking really low.

11         THE COURT:  Okay.  And was part of the

12    problem because you were in back?

13         JUROR GIESEN:  Well, I was in the middle.

14         THE COURT:  Okay.  Do you think if you were

15    up front and in the jury box you would be able to

16    hear better?

17         JUROR GIESEN:  Yeah.

18         THE COURT:  Okay.  Do you have any -- any

19    big obligations in the next couple weeks that you

20    go --

21         JUROR GIESEN:  Only the Friday I have The

22    Price Is Right.

23         THE COURT:  Tickets for the PAC?

24         JUROR GIESEN:  But that's at night at

25    7:30.

108

```
1                  THE COURT:  Okay.  We'll have you out of
2         here by 7:30.
3                  JUROR GIESEN:  And then on the weekend of
4         March -- starting like March 4th, that nighttime,
5         until March 7th, we're a get-away weekend.
6                  THE COURT:  So you would be back Monday
7         morning?
8                  JUROR GIESEN:  No, I'll be back Tuesday
9         morning.
10                 THE COURT:  Okay.  And where is -- where is
11        that?
12                 JUROR GIESEN:  Wherever my husband wants to
13        go for his birthday.
14                 THE COURT:  So is that something that could
15        be rescheduled if you had to?
16                 JUROR GIESEN:  Yeah.  We could.
17                 THE COURT:  Okay.
18                 JUROR GIESEN:  If we had to.
19                 THE COURT:  Attorney Schneider, any
20        questions?
21                 ATTORNEY SCHNEIDER:  In the news articles
22        you heard, you think that was a long time ago but
23        then something more recent?
24                 JUROR GIESEN:  Well, I remember hearing
25        about it two years ago, and then when it came in --
```

109

1     my husband showed me the article in the paper from

2     Sunday, he said this is what you're going to be

3     doing.  I said really.  So --

4          ATTORNEY SCHNEIDER:  What do you remember

5     from Sunday's article, Miss Giesen?

6          JUROR GIESEN:  Just about some witness

7     tapes were being deleted.  That's about it.  And then

8     where the place was, I always thought it was at what

9     used to be -- right across from PC building, was it

10    -- wasn't it that place?

11         ATTORNEY SCHNEIDER:  Over by the

12    Post-crescent?

13         THE COURT:  No, not the --

14         ATTORNEY SCHNEIDER:  The PAC?

15         JUROR GIESEN:  Yeah, the PAC.  That used to

16    be that lounge or not?

17         ATTORNEY SCHNEIDER:  Yes.  You are thinking

18    of the right corner, the right intersection.

19         JUROR GIESEN:  That's the only thing I -- I

20    told my husband, well, that's that place.

21         THE COURT:  Okay.

22         JUROR GIESEN:  That's the only thing I

23    thought about.

24         ATTORNEY SCHNEIDER:  Okay.  I don't have

25    any other follow-up.

110

1                    THE COURT:  Okay.

2                    ATTORNEY VISHNY:  So I want to ask, so you

3          read the articles, you read about tapes being

4          deleted, how does that affect your opinion of this

5          case?

6                    JUROR GIESEN:  I have to hear -- listen to

7          everything, you know, that was involved in it, not --

8          why did they delete them and what was the purpose of

9          it.

10                   ATTORNEY VISHNY:  Okay.

11                   JUROR GIESEN:  I know it said so in the

12         papers, but what they say in the paper is one thing

13         compared to what people say is another.

14                   ATTORNEY VISHNY:  Okay.  So is there any

15         feeling like, oh, gee, you know, what was deleted

16         must mean that the person on trial, the accused is

17         guilty?  Do you feel that way?

18                   JUROR GIESEN:  No, because I don't know

19         what -- I would have to hear everything, you know,

20         why he deleted it.  See, I don't know what was in

21         those tapes.

22                   ATTORNEY VISHNY:  Right.  Well, does it

23         give you any negative feelings towards police?

24                   JUROR GIESEN:  No.

25                   ATTORNEY VISHNY:  Okay.  So I'll just be

111

1          honest and say, what if you can't hear why it was

2          deleted?  What if it's never brought up in the trial?

3          Okay?  So if you're listening to a trial and nobody

4          says a word about it, all right, when you go into the

5          jury room to make a decision, are you going to be

6          thinking, you know --

7                    JUROR GIESEN:  Why didn't they bring it up?

8                    ATTORNEY VISHNY:  Yeah.  Why didn't they

9          bring it up, something is missing.

10                   JUROR GIESEN:  Isn't that what I'm supposed

11         to be asking?

12                   ATTORNEY VISHNY:  So the rule is you can

13         only decide based on what actually happens in the

14         courtroom.

15                   JUROR GIESEN:  Yup.

16                   ATTORNEY VISHNY:  So -- and just so you

17         know, there is no right or wrong answer here, nothing

18         is right or wrong and the only wrong answer is a

19         dishonest answer.  Okay?  So, I mean, I just want you

20         to be honest, because if it's never brought up at all

21         in the courtroom and you go back and you have this

22         extra piece of information, you know, do you think

23         you'll base your decision then partly on the fact

24         that you have an extra piece of information that you

25         read about in the paper?

1              JUROR GIESEN:  I don't know what to say to
2       that.
3              ATTORNEY VISHNY:  Okay.  Well, tell me why
4       you don't know what to say to that.
5              JUROR GIESEN:  Well, sometimes, you know,
6       people will say something and they didn't really mean
7       to say it and somebody else can interpret it the
8       wrong way or the right way.
9              ATTORNEY VISHNY:  Okay.  And if you're on
10      the jury and you're thinking about that, you know,
11      you might get an instruction that you can't tell
12      anyone else on the panel about it, right, because
13      everybody is supposed to only decide on the court and
14      a lot of people don't know about it.  How do you feel
15      about that?  Would you be able to keep it to yourself
16      because that's the rule?  People can only decide
17      based upon what happens in court.
18             JUROR GIESEN:  No.  Because if I have to
19      keep it to myself, I would keep it to myself.
20             ATTORNEY VISHNY:  Okay.  All right.  So the
21      fact that you've read about this, you think you can
22      only base this on what happens in the courtroom?
23             JUROR GIESEN:  I think so.
24             ATTORNEY VISHNY:  Okay.  When you say you
25      think so --

113

```
 1                    JUROR GIESEN:  No, I believe so.
 2                    ATTORNEY VISHNY:  I'm going to ask you are
 3          you sure.  Okay?  Still saying believe.  I know I'm
 4          really hard on you there, and I don't mean to be
 5          rude, I'm just kind of a probing person, but I just
 6          want to make sure, because if you're not, it's
 7          perfectly okay.
 8                    JUROR GIESEN:  Yup.  I'm sure I can.
 9                    ATTORNEY VISHNY:  Okay.  All right.  Thank
10          you.
11                    THE COURT:  Any additional questions?
12                    ATTORNEY VISHNY:  No.
13                    ATTORNEY SCHNEIDER:  No.
14                    THE COURT:  All right.  Miss Giesen, thank
15          you very much.
16                    (Ms. Giesen exits.)
17                    ATTORNEY SCHNEIDER:  I just want to talk
18          about timing.  Yeah.  We're going to go to lunch
19          until one I'm assuming for us.
20                    THE COURT:  That's fine.
21                    ATTORNEY SCHNEIDER:  Okay.  He's done.  I
22          probably have -- and I will probably way
23          underestimate, I don't know, I'm going to say I have
24          at least an hour I'm thinking, and it depends, I
25          don't know.
```

114

1          ATTORNEY VISHNY:  Depends how much they

2     talk.

3          THE COURT:  Right.

4          ATTORNEY SCHNEIDER:  But some of the topics

5     I'm going to ask I'm expecting to get responses from.

6     How -- so I'm thinking at least an hour, I don't know

7     what you're thinking.

8          ATTORNEY VISHNY:  We'll go the rest of the

9     afternoon because I've got some pretty probing

10    subjects, and unless they're very quiet --

11         ATTORNEY SCHNEIDER:  For planning purposes,

12    I have people -- I know she probably thought I was

13    crazy, but I had people on hold for this afternoon

14    because I just want to if we get that far.

15         THE COURT:  I like your optimism.

16         ATTORNEY SCHNEIDER:  I'm going to cancel

17    them I think at this point because we can go through

18    the prior crimes, the charts, I know Alex has come up

19    with a new chart.  I don't think we sent it to you

20    yesterday because you guys would not have gotten

21    it.

22         ATTORNEY VISHNY:  We'll get everything by

23    e-mail.

24         ATTORNEY SCHNEIDER:  And I hadn't thought

25    to tell him that.

115

1              ATTORNEY VISHNY:  We have laptops.

2              ATTORNEY SCHNEIDER:  I'm just in -- then my

3      preference would be not to do openings.  I don't

4      think we'd even have the time for that.

5              THE COURT:  Let's just plan on openings at

6      8:30 tomorrow.

7              ATTORNEY VISHNY:  All right.

8              THE COURT:  We'll finish up voir dire.  No

9      matter where we finish it up, it may very well go to

10     the end of the day.  We'll take care of the criminal

11     charges, priors, and then that will be it today.

12             ATTORNEY SCHNEIDER:  And then we probably

13     should bring Mr. Paul Lee down at some point.  They

14     did locate him so he is now upstairs.

15             THE COURT:  Okay.

16             ATTORNEY VISHNY:  Okay.  So let me ask this

17     first of all.  Do I need to call my office to tell

18     them they need to get a lawyer for Paul Lee?

19             ATTORNEY SCHNEIDER:  I don't know.

20             ATTORNEY VISHNY:  I mean they are prepared

21     to appoint a private lawyer.

22             ATTORNEY SCHNEIDER:  Probably a good idea

23     to get a hold of Padgham and ask him.  Jon.

24             ATTORNEY VISHNY:  I'll get a hold of

25     somebody.  Should they send -- because they have to

1    appoint a private bar lawyer.

2              ATTORNEY SCHNEIDER:  Right.  That's right.

3              ATTORNEY VISHNY:  They have some people on

4    call, I mean --

5              ATTORNEY SCHNEIDER:  Yup.  We had this

6    happen in July.  I would have --

7              ATTORNEY VISHNY:  What time do we want to

8    say, because that will be the first call I make.

9    Well, could we do this --

10             THE COURT:  Why don't we do it after we

11   select the jury.  We can do it on our afternoon

12   break.

13             ATTORNEY SCHNEIDER:  Then at least for

14   courtesy sake that attorney is not sitting.

15             ATTORNEY VISHNY:  But they also might need

16   time to call somebody.

17             ATTORNEY SCHNEIDER:  So do we want to say

18   4:00?

19             THE COURT:  I was thinking what we would do

20   is we'll come back at one, start up at one, let's

21   break at around three because we're two hours in.

22             ATTORNEY VISHNY:  So 3:00 have counsel?

23             ATTORNEY SCHNEIDER:  Yup.

24             ATTORNEY VISHNY:  I don't want to prejudge

25   anything, but if this is in Milwaukee the guy would

117

1     be staying in jail until he testified, so assuming

2     that that occurs here, that means you would probably

3     call him tomorrow, right, or not?

4             ATTORNEY SCHNEIDER:  Well, we have people

5     we have to get on tomorrow.  That's what I have to

6     assess.

7             ATTORNEY VISHNY:  We can ask in the

8     afternoon.

9             ATTORNEY SCHNEIDER:  I got to check with

10     Stephanie on that.

11             THE COURT:  So we're letting -- let me just

12     make sure.  We're letting Mr. Peterson go, we're

13     letting Mr. Managan go.  Okay.

14             THE CLERK:  Just those two.

15             THE COURT:  So then we'll just do it the

16     same way we did, and then we'll call up our last two.

17             (In open court.)

18             THE COURT:  Again, I appreciate everyone's

19     indulgence.

20         Mr. Peterson, at this time I thank you very much

21     for your service, sir.  Your service is completed.

22             THE CLERK:  No. 6559, Laurie Dey.

23             THE COURT:  Mr. Managan, likewise, I thank

24     you very much for your service today, sir.  You are

25     excused.

118

```
1              JUROR MANAGAN:  Thank you.

2              THE CLERK:  No. 6947, Mannie Maas; No.

3    6775, Bridget Plamann; No. 571, Susan Giesen.

4              THE COURT:  And, ladies and gentlemen, at

5    this time I have completed my questioning.  As I have

6    indicated to you previously, there will be questions

7    asked by both sets of counsel.

8         However, at this time I'd like to break for

9    lunch.  We do have food for you in Branch III, which

10   is the courtroom where you had initially gathered

11   prior to coming in.  We will be then in recess until

12   1:00.  I would ask that you return at 1:00.

13        As for those members who are part of the panel,

14   I would ask that when you return that you take the

15   same seats as you are currently located in.  Okay?

16        And with that, then, we will be in recess until

17   1:00.

18              (A lunch recess was taken.)

19              THE COURT:  As I'd indicated, I completed

20   my initial questioning for you so at this time I'd be

21   turning it over to the respective parties.

22        Attorney Schneider, are you prepared to proceed

23   at this time?

24              ATTORNEY SCHNEIDER:  I am, Judge.

25        We have a little different configuration than
```

119

1          we're used to in this courtroom, so bear with us,

2          we're trying to do the best with all of us on this

3          side of the room and not block anybody's view.

4               If anyone has any difficulty at any time hearing

5          me, please let me know.  And that still continues for

6          those of you in the back because, as you've seen,

7          just because you had a seat in the back doesn't mean

8          we're not going to have some musical chairs here and

9          you might get called up.  So please, again, listen to

10         all the questions.  If you can't hear me, please let

11         me know.

12              Judge has already kind of indicated to you this

13         process, it's called voir dire, and he kind of used

14         words I often use.  We're not trying to pry into your

15         lives, we're not going to try to ask a question

16         that's going to make you uncomfortable, but we're

17         really trying to find out about your life experiences

18         and how those life experiences might relate to your

19         service as a juror in this case.

20              For example, and obviously you know this is not

21         the case, if this was a car accident where someone

22         was injured and we were going to have a trial over

23         that, I would want to know if any of you had been in

24         a car accident or if you had been injured so I do

25         have some -- a series of questions related to some of

1          the facts and some of the items that you'll hear over

2          the next few days as we continue this case.

3               I want to also tell you, if I ask a question and

4          you don't understand me, please raise your hand.

5          It's likely I asked a bad question, and I'd rather

6          have you ask me to clarify or rephrase it than not

7          get the meaning of what I was trying to get to.

8          Okay?

9               Same thing, if you're in the middle of

10         something, I'm talking about Luna Lounge, which we're

11         going to talk about, and you remember something

12         either the judge asked early this morning or

13         something I brought up earlier and you remember it,

14         interrupt me.  I'd much rather have us make sure we

15         address that thing you remember or that item you want

16         to talk about than you think, oh, I'll wait, and then

17         later you forget what it was you wanted to bring up.

18         So please feel free to interrupt me.  We just want to

19         kind of try to get all the answers out.

20              You will see we also have a court reporter, so

21         try not to talk on top of me if you can.  I promise I

22         will try not to talk on top of you, but it's also why

23         we always identify you by your name before I get an

24         answer from you, just to assist the court reporter in

25         her duties.

121

1          The judge has indicated to you that this case is

2     currently set for the balance of this week and all of

3     next week.  And I know there was an opportunity when

4     you were sent your original voir dire paperwork and

5     packet from the clerk's office to fill out if you had

6     vacation or some other issue, but now that you're

7     actually here, I just want to ask anyone whether you

8     have something, whether it's a work related item, a

9     project that, you know, you think you have to get due

10    or that is due, or something in a personal life.  We

11    know, Miss Hermus, March 12th is yours.  Okay?  But

12    it can be anything.  I had a man whose wife was ten

13    months pregnant, didn't think to mention anything --

14    I'm sorry, she was seven months pregnant, didn't

15    think to mention anything, we picked him, went out,

16    his wife started labor early.  So anything like that,

17    we would much rather have you talk about so we can

18    try to assess your schedules.  It could be that

19    you're thinking, oh, I can probably get back to work

20    next Wednesday or Thursday.  We can't guarantee that.

21    And we might have to go into that Monday, March 7th

22    or Tuesday the 8th.  So does anyone right now as I

23    ask that think of anything either in your work,

24    personal life, some issue that either you feel like

25    you have to attend to or, on the other side,

122

1          something that's going to distract you because you're

2          going to be thinking about whatever that other item

3          is?

4                    (No response.)

5                    ATTORNEY SCHNEIDER:  Okay.  We will take

6          our best to take breaks and to accommodate you, but I

7          also often ask jurors this question, because

8          sometimes when we get in the courtroom it's afternoon

9          and it's getting warmer, it gets hot, sometimes

10         people get drowsy.  Some people might be on

11         medications where that might be a side effect.  Is

12         there anyone on a medication or have some other issue

13         where you have concerns about that at all?

14                   (No response.)

15                   ATTORNEY SCHNEIDER:  We're in the middle of

16         the cold and flu season and sometimes those things

17         don't work too well if you're trying to pay attention

18         as opposed to stay focused.

19             Has anyone on the panel ever served on a jury

20         before?

21             Okay.  And raise your hands and then I'll

22         identify everybody for the record and then I'll come

23         back to you.  So it's Mr. Shea?  And just let me

24         finish up.  And then Ms. Elbe?

25                   JUROR ELBE:  I didn't have to do the jury.

123

1       We got there but then they canceled it out.  So --
2                   JUROR PAUL:  Yeah.  Same here.
3                   ATTORNEY SCHNEIDER:  Let me go back to Mr.
4       Shea first and then I'll come to you ladies here in
5       the front row.
6           Mr. Shea, when was that?
7                   JUROR FLEMING:  Actually I'm Steve
8       Fleming.
9                   ATTORNEY SCHNEIDER:  I'm sorry.  I'm in the
10      wrong row.  Mr. Shea, you're looking at me like,
11      hello.  Sorry.  That's one of those raise your hands,
12      say wrong guy.
13          Mr. Fleming, when was that?
14                  JUROR FLEMING:  I don't remember the exact
15      time, probably eight years ago, eight or ten years
16      ago.
17                  ATTORNEY SCHNEIDER:  Okay.  Was it here in
18      Outagamie County?
19                  JUROR FLEMING:  Yes.
20                  ATTORNEY SCHNEIDER:  Did you actually serve
21      on the jury?
22                  JUROR FLEMING:  Yes.
23                  ATTORNEY SCHNEIDER:  Do you remember what
24      kind of case it was?
25                  JUROR FLEMING:  It was an industrial

124

1     accident.

2          ATTORNEY SCHNEIDER:  Did it get to the

3     point where the jury had to reach a verdict?

4          JUROR FLEMING:  Yes.

5          ATTORNEY SCHNEIDER:  Do you remember who

6     you -- who the verdict was reached for?

7          JUROR FLEMING:  It was awarded to the

8     plaintiff.

9          ATTORNEY SCHNEIDER:  The plaintiff.  The

10    moving party.

11         JUROR FLEMING:  (Nodding.)

12         ATTORNEY SCHNEIDER:  Did you serve as the

13    foreperson at all?

14         JUROR FLEMING:  No.

15         ATTORNEY SCHNEIDER:  And that's your one

16    time for jury experience, Mr. Fleming?

17         JUROR FLEMING:  Yes.

18         ATTORNEY SCHNEIDER:  Okay.  Thank you.

19       Then I'm going to move to what I'd call the

20    third row and then I'm going to come to the front

21    row.  I'll come to you, Miss Giesen, in just a

22    second.

23       So it's Miss Elbe?

24         JUROR ELBE:  Um-hum.

25         ATTORNEY SCHNEIDER:  Am I saying that

125

1    right?

2              JUROR ELBE:  Yes, correct, thank you.

3              ATTORNEY SCHNEIDER:  So you were called for

4    jury duty, and I think you said that you didn't

5    actually have to serve?

6              JUROR ELBE:  That's right.  They had taken

7    and did the outstanding, you know, prior to going in

8    to the point of jury.

9              ATTORNEY SCHNEIDER:  Okay.  Was that here

10   in Outagamie County?

11             JUROR ELBE:  Yes.

12             ATTORNEY SCHNEIDER:  And do you remember

13   when, if you know?

14             JUROR ELBE:  It would have been at least

15   four years ago.  Um-hum.

16             ATTORNEY SCHNEIDER:  Thank you.

17        And then I'm going to forget from this morning,

18   is it Giesen or Giesen?

19             JUROR GIESEN:  Giesen.

20             ATTORNEY SCHNEIDER:  Miss Giesen, when did

21   you have jury duty?

22             JUROR GIESEN:  About 15, 17 years ago.

23             ATTORNEY SCHNEIDER:  Where?

24             JUROR GIESEN:  Here.

25             ATTORNEY SCHNEIDER:  Do you remember what

126

1          type of case it was?

2                    JUROR GIESEN:  It was a house party.

3                    ATTORNEY SCHNEIDER:  Were there criminal

4          charges because of the party?

5                    JUROR GIESEN:  Apparently somebody hit

6          somebody's car and two hours within the trial we were

7          called out and it was settled.

8                    ATTORNEY SCHNEIDER:  Do you remember if it

9          was criminal charges were brought in that case?

10                   JUROR GIESEN:  After we got into the trial,

11         they called us out and --

12                   ATTORNEY SCHNEIDER:  It settled so you

13         don't know?

14                   JUROR GIESEN:  No.

15                   ATTORNEY SCHNEIDER:  All right.  Thank you.

16         Anyone else prior jury experience?

17         Okay.  Miss Paul.  When was that and where?

18                   JUROR PAUL:  Winnebago County about 25

19         years ago.  I don't remember the case.

20                   ATTORNEY SCHNEIDER:  Okay.

21                   JUROR PAUL:  I never got to serve.  They

22         didn't choose me.

23                   ATTORNEY SCHNEIDER:  Okay.  Anyone else?

24         Okay.  Mr. Keleske?

25                   JUROR KELESKE:  Correct.

127

```
1                   ATTORNEY SCHNEIDER:  When was that, sir?

2                   JUROR KELESKE:  Twice, once in Racine

3        County probably, I'm just guessing, back in the early

4        '90s, and then four to six years ago here.  I didn't

5        get chosen for either place.

6                   ATTORNEY SCHNEIDER:  Neither one.  Thank

7        you, Mr. Keleske.

8             I have started asking this question, the next

9        question I'm going to ask, based on an experience I

10       had where, unbeknownst to me, I had a mother-in-law

11       on the panel with her son-in-law.  Different last

12       names; would not have known that.  But one of the

13       things we will ask you to do if you're selected as a

14       juror is at the end you go back and deliberate.  So

15       just the group up here, look around amongst

16       yourselves, does anyone recognize anyone else?

17            So -- it always comes up someone does.  Mr. Van

18       Dalen?

19                  JUROR VAN DALEN:  Yup.

20                  THE COURT:  Who else do you know?

21                  JUROR VAN DALEN:  Gentlemen on the end.  I

22       don't know his name but our kids go to the same

23       school.  He jump started my car one time.

24                  ATTORNEY SCHNEIDER:  You call him jumper

25       cable guy already or something?
```

128

```
1                    JUROR VAN DALEN:  Okay.

2                    ATTORNEY SCHNEIDER:  And it's Mr. Nieman?

3                    JUROR NIEMAN:  Nieman.

4                    ATTORNEY SCHNEIDER:  Obviously you didn't

5          recognize Mr. Van Dalen until --

6                    JUROR NIEMAN:  Now I do.

7                    ATTORNEY SCHNEIDER:  It sounds like - I'll

8          keep my questions on Mr. Nieman - kids just go to the

9          same school.  Would that cause you any concern if you

10         had to serve on the jury with Mr. Van Dalen?

11                   JUROR NIEMAN:  No.

12                   ATTORNEY SCHNEIDER:  Same question to you

13         Mr. Van Dalen.

14                   JUROR VAN DALEN:  No.

15                   THE COURT:  Anyone else in the group of you

16         up here.

17                   (No response.)

18                   ATTORNEY SCHNEIDER:  Okay.  Thank you.

19             Judge has kind of started to talk about the

20         different types of witnesses you're going to hear in

21         this case, and I know he asked about experience, if

22         anyone had a family member or a close friend who was

23         employed in law enforcement.

24             I think, Mr. Parker, you talked about your son

25         who is in Brillion?
```

1              JUROR PARKER:  Yes.

2              ATTORNEY SCHNEIDER:  How long has he been

3      an officer?

4              JUROR PARKER:  He started out as --

5              ATTORNEY SCHNEIDER:  Like a CSO?

6              JUROR PARKER:  Right.

7              ATTORNEY SCHNEIDER:  Community service

8      officer.

9              JUROR PARKER:  For a few years, and I'd say

10     probably four years now.

11             ATTORNEY SCHNEIDER:  Do you talk to him

12     about his work?

13             JUROR PARKER:  Not too often.  He's pretty

14     tight-lipped about everything.  He was like that

15     since he was a kid.

16             ATTORNEY SCHNEIDER:  Okay.  Now, you're

17     obviously going to hear from several officers who are

18     witnesses in this case, and what the judge is going

19     to instruct you is you should weigh their testimony

20     as equal as anyone else who comes in.  Having a son

21     who is an officer, do you think you're going to apply

22     that principle of law that the judge gives to you?

23             JUROR PARKER:  Yes.

24             ATTORNEY SCHNEIDER:  Okay.  I think judge

25     asked about close family members or friends but I

130

1    don't think he asked if anyone on the panel had

2    anyone ever themselves been employed in law

3    enforcement.  I want to make sure I cover that in

4    case that wasn't clear in the questions the judge had

5    asked.

6          (No response.)

7          ATTORNEY SCHNEIDER:  No one has a family

8    member or friend other than Mr. Parker?

9          (No response.)

10         ATTORNEY SCHNEIDER:  Judge has instructed

11    you, and I want to just remind you of this and make

12    sure I ask the question again, the first charge I

13    read to you in this case is a charge of a homicide.

14    It is a very significant case and a very significant

15    request we make of you to come in and serve as

16    potential jurors.  There are other charges I also

17    read to you about other crimes we will elicit

18    testimony about that the defendant committed, but as

19    a juror, I just want to make sure you understand your

20    role is to act ultimately as the judge and return a

21    verdict in this case.  It's one of the reasons you'll

22    see when you come in and out of the courtroom, but

23    for this morning, because we're kind of in an odd

24    layout, we rise for you because we give you that same

25    respect that we give the judge when he enters the

1          courtroom.  Sometimes people have personal reasons,

2          sometimes people have moral or religious reasons

3          about judging another.  I'd rather have you raise

4          those now than think, well, I'm one of how many, I

5          might not get picked.  So does anyone at this time

6          think you would have any concerns about being asked

7          to return a verdict in a homicide case?

8                    (No response.)

9                    THE COURT:  Okay.  Mr. Fleming.  I'm going

10         to get it right this time.  Is it something you want

11         to talk about in private or are you comfortable

12         talking about it here?

13                    JUROR FLEMING:  Probably in private.

14                    ATTORNEY SCHNEIDER:  In private.  Okay.

15               Anyone else have those same kind of concerns or

16         issues you'd like to discuss with us?

17                    (No response.)

18                    ATTORNEY SCHNEIDER:  Okay.  I don't know if

19         you want me to continue and see if there is anyone

20         else or if we want to take a break and take Mr.

21         Fleming back now.

22                    THE COURT:  Why don't we take just -- we'll

23         take a couple more questions just to make sure that

24         you don't have anyone else that would like to go back

25         and then we'll take a short break.

132

1             ATTORNEY SCHNEIDER:  Okay.  I also want to

2      just explain to you that because this is a homicide

3      case you will learn that the victim Mr. Richards was

4      shot in the head.  We're going to limit graphic

5      images, photographs, but you're still going to hear

6      that testimony.  Does anyone think it would be

7      difficult for them to be a juror when that type of

8      testimony or those types of matters are discussed?

9             (No response.)

10            ATTORNEY SCHNEIDER:  Judge has already

11     talked about the location of where the incident

12     occurred back in December of 2013.  I just want to

13     talk a little bit about that area.  It is now, as the

14     court reporter corrected the judge, it's a location

15     that's now at the corner of College and Division,

16     across from the Performing Arts Center, the PAC.

17     That business has been, I'm going to go back, and

18     some of you will remember, Viking Theatre at one

19     point, then it was a bar I think called Route 66 for

20     a while.  I think for a while it might have been a

21     bar called Wet.  Most recently it was a bar called

22     Luna Lounge, and then above it was another bar that

23     was Drinks Incorporated.  Anyone on the panel, I'm

24     going to ask it this way, not familiar with that area

25     of Appleton or College Avenue at all?

133

1                    (No response.)

2                    JUROR KELESKE:  I'm not.

3                    ATTORNEY SCHNEIDER:  That's okay.  So, Mr.

4       Keleske, just not familiar with that area at all?

5                    JUROR KELESKI:  No.

6                    ATTORNEY SCHNEIDER:  Okay.  That's

7       perfectly fine.

8            Anyone else on the panel?  Okay.  I'm going to

9       come to you.  Mr. Green?

10                   JUROR GREEN:  Yes.

11                   ATTORNEY SCHNEIDER:  Not familiar with the

12      Avenue, downtown Appleton?

13                   JUROR GREEN:  No.

14                   ATTORNEY SCHNEIDER:  Now I'm going to ask

15      the reverse question but a little bit more

16      specifically.  For those of you who are familiar with

17      that area, how many have ever went to the

18      establishment when it was Luna Lounge?

19           Okay.  So in the back it's Mr. Nieman.  I'll ask

20      you this.  About how many times in a month, in a

21      year, do you think you might have went there?

22                   JUROR NIEMAN:  Probably two times total.

23                   ATTORNEY SCHNEIDER:  Oh, okay.  And when

24      was the last time you might have visited there?

25                   JUROR NIEMAN:  Three years ago maybe.

134

```
1                    ATTORNEY SCHNEIDER:  Okay.  Thank you, Mr.

2          Nieman.

3               And then in the back row, Mr. -- is it Calmes?

4                    JUROR CALMES:  Yes.

5                    ATTORNEY SCHNEIDER:  Familiar from -- with

6          just going out downtown Appleton?

7                    JUROR CALMES:  Yes.

8                    ATTORNEY SCHNEIDER:  Okay.  Same kind of

9          questions I asked Mr. Nieman about how often, when?

10                   JUROR CALMES:  Twice.  And the last time

11         was exactly three years ago.

12                   ATTORNEY SCHNEIDER:  Okay.  Thank you, Mr.

13         Calmes.

14              Then anyone else in the back row?

15                   (No response.)

16                   ATTORNEY SCHNEIDER:  Okay.  Then, in the

17         second row, is there anyone who raised their hand?

18                   (No response.)

19                   ATTORNEY SCHNEIDER:  All right.  And then

20         in the row starting with Mr. Shea, anyone familiar or

21         have visited Luna Lounge?

22              Okay.  First it's Miss Erickson?

23                   JUROR ERICKSON:  Yes.

24                   ATTORNEY SCHNEIDER:  When would have you

25         visited there?
```

135

1              JUROR ERICKSON:  About three years ago,
2       like the other gentlemen said, and just a few times a
3       year, just pop in usually.
4              ATTORNEY SCHNEIDER:  And then anyone else
5       in that row?  Okay.  So I'm going to pop up, I'm
6       going to move my sheet here.  Mr. Webster?
7              JUROR WEBSTER:  Yes.
8              ATTORNEY SCHNEIDER:  When would have that
9       been?
10             JUROR WEBSTER:  Probably like four years
11      ago, used to go there every weekend.
12             ATTORNEY SCHNEIDER:  Was there a group of
13      friends that you would typically visit that
14      establishment with?
15             JUROR WEBSTER:  That was our hangout back
16      in the day.
17             ATTORNEY SCHNEIDER:  Okay.  So you're
18      familiar with kind of the layout and how there is a
19      lower bar and then I would say like the upper bar
20      area?
21             JUROR WEBSTER:  Yeah.  Usually remodel --
22      remodel like every two years.
23             ATTORNEY SCHNEIDER:  Yeah.  They go quite a
24      bit.
25             Okay.  And then anyone else in the front row?

136

1    Okay.  Miss Vandenberg?

2                    JUROR VANDENBERG:  Um-hum.

3                    ATTORNEY SCHNEIDER:  Just from going out

4    downtown?

5                    JUROR VANDENBERG:  Yeah.  I was there once

6    two years ago.

7                    ATTORNEY SCHNEIDER:  All right.  Thank you

8    all.

9            Anyone work in a capacity or in a job where you

10    might have had contact with Luna in that capacity?

11                    (No response.)

12                    ATTORNEY SCHNEIDER:  And you have to bear

13    with me.  If I see somebody kind of move or I'm going

14    to try to see, I want to make sure I don't miss a

15    hand.  But I just saw you, Mr. Keleske, so I had to

16    quick look at you.

17            How many people -- so I'm going to expand it

18    from Luna to just kind of the general downtown

19    College Avenue area.  How many people frequent that

20    to either go out to the drinking establishments, many

21    of the eating restaurants we have downtown or the

22    PAC?  How many people would say they do that on a

23    monthly basis?

24            Okay.  So Mr. Parker?

25                    JUROR PARKER:  Yes.

137

1          ATTORNEY SCHNEIDER:  Just to go downtown;

2     is there a particular restaurant that's of interest?

3          JUROR PARKER:  We go to the Bad Badger bar

4     for Badger games and stuff like that.  And then The

5     Bar on occasion and Katsu Ya occasionally and the

6     PAC.

7          ATTORNEY SCHNEIDER:  Have you been to the

8     new Katsu Ya or the old?

9          JUROR PARKER:  No, not yet.

10          ATTORNEY SCHNEIDER:  Okay.

11      And then anyone else before I get in front of

12     the bar?  Was it you, Miss Paul?

13          JUROR PAUL:  (Nodding.)

14          ATTORNEY SCHNEIDER:  And where do you

15     typically go when you go out downtown?

16          JUROR PAUL:  Restaurants, Katsu Ya, Cena.

17          ATTORNEY SCHNEIDER:  There is another

18     establishment on College Avenue as well that you will

19     hear referenced during the course of this trial, and

20     it's had a series of names, much like Luna has.  I'm

21     going to not get the first name when it was a pool

22     hall, but for a while it was known as Sharks

23     Billiards or Sharks Pool Hall.  I think right now

24     it's KK Billiards is the name of it.  But it's always

25     been in the same area.  It's within Park Central.  If

138

1    I say that, some of you might know that.  Has anyone
2    ever been at Sharks Pool Hall before?
3        Okay.  I'm going to start in the back and then
4    work my way up.  Mr. Calmes?  Just a lot, a little,
5    sometimes they have leagues, so that's why I'm just
6    wondering.
7            JUROR CALMES:  Yeah.  I've probably been
8    there ten times in my life.
9            ATTORNEY SCHNEIDER:  And when do you think
10   the last time was that you were there?
11           JUROR CALMES:  I was there this November.
12           ATTORNEY SCHNEIDER:  Okay.  All right.
13   Thank you.
14       And then anyone else in the back row?
15           (No response.)
16           ATTORNEY SCHNEIDER:  And I'm going to move
17   up a row.  I thought I saw a hand.  Was it Mr. Wells?
18           JUROR WELLS:  Yup.
19           ATTORNEY SCHNEIDER:  Okay.  How often do
20   you think you have been to Sharks?
21           JUROR WELLS:  Two or three times maybe.
22   I've been when it was Route 66, I was there as
23   well.
24           ATTORNEY SCHNEIDER:  Okay.
25           JUROR WELLS:  I've been in there one time

139

1      upstairs.

2                  ATTORNEY SCHNEIDER:  Thank you, Mr. Wells.

3          Anyone else in that row or the question about

4      Sharks?

5                  (No response.)

6                  ATTORNEY SCHNEIDER:  Then the row in front

7      of the bar.  I thought I saw a few hands.  Miss

8      Erickson?

9                  JUROR ERICKSON:  Went there too many times

10     to count about three to five years ago.

11                 ATTORNEY SCHNEIDER:  Were you in a pool

12     league?

13                 JUROR ERICKSON:  No.  Just went there a

14     lot.

15                 ATTORNEY SCHNEIDER:  Is it something where

16     you and friends would go?

17                 JUROR ERICKSON:  Correct.

18                 ATTORNEY SCHNEIDER:  On a somewhat

19     consistent basis?

20                 JUROR ERICKSON:  Correct.

21                 ATTORNEY SCHNEIDER:  And then, Miss Lee,

22     did you raise your hand as well?

23                 JUROR LEE:  Yes.

24                 ATTORNEY SCHNEIDER:  Okay.  How often do

25     you think you've been to Sharks?

140

```
1                    JUROR LEE:  Very little, but very long ago.

2          I'm thinking maybe like nine years ago.

3                    ATTORNEY SCHNEIDER:  What did you say?

4                    JUROR LEE:  Like ten years ago.

5                    ATTORNEY SCHNEIDER:  All right.  Thank you,

6          Miss Lee.

7               Anyone else in that row?  I thought I did see

8          your hand.  Micke?

9                    JUROR MICKE:  Yeah.  Cassie Micke.

10                   ATTORNEY SCHNEIDER:  Micke.  Okay.  Miss

11         Micke, when was that?

12                   JUROR MICKE:  About 15 years ago once or

13         twice.

14                   ATTORNEY SCHNEIDER:  Thank you.

15              Mr. Nichols?

16                   JUROR NICHOLS:  Yeah.  I was there once

17         with some friends.  Would have been like ten, twelve

18         years ago.

19                   ATTORNEY SCHNEIDER:  Thank you, Mr.

20         Nichols.

21              Anyone else in anyone in the front row?  Mr.

22         Webster?

23                   JUROR WEBSTER:  About four years ago.

24                   ATTORNEY SCHNEIDER:  Okay.  Do you think

25         you went to Sharks more or Luna more?
```

141

1          JUROR WEBSTER:  Bar hopping around that
2     area.
3          ATTORNEY SCHNEIDER:  Okay.  Thank you.
4     Anyone else that I might have missed?
5          (No response.)
6          ATTORNEY SCHNEIDER:  You will also hear at
7     one point in this case a reference to the 1700 block
8     of North Harriman Street in the City of Appleton.  I
9     sometimes mention that because if people live in that
10     area you might be more familiar with it or if you
11     work in that area.  Anyone ever now or in the past
12     live or work in that area?
13          Okay.  Mr. Schueller?
14          JUROR SCHUELLER:  Yes.  I deliver for Fed
15     Ex so I'm through there quite often.
16          ATTORNEY SCHNEIDER:  Okay.  But no
17     particular familiarity with that area probably than
18     any of the other spots you deliver to?
19          JUROR SCHUELLER:  No.
20          ATTORNEY SCHNEIDER:  Okay.  Thank you, Mr.
21     Schueller.
22          Anyone else?
23          (No response.)
24          ATTORNEY SCHNEIDER:  You will learn through
25     testimony that the day of the incident the defendant

142

1     went and visited a Hilton hotel in Milwaukee.  Has

2     anyone ever stayed at a Hilton in Milwaukee before?

3     Everyone is trying to think, I see that.

4                (No response.)

5                ATTORNEY SCHNEIDER:  Okay.  No one's -- I'm

6     going to assume no one has recently stayed at this

7     Hilton in Milwaukee by the responses.

8          As you've already heard, the incident with the

9     defendant and Mr. Richards, the victim, occurred at

10    Luna and it occurred at approximately 1:50 in the

11    morning.  Has anyone ever worked at a bar or worked

12    as a bouncer, a bartender at a bar?

13         Okay.  So, Miss Meyer, yes or no?

14                JUROR MEYER:  I didn't work as a bouncer or

15    bartender.  I ran volleyball.

16                ATTORNEY SCHNEIDER:  Okay.  Did you ever

17    have an occasion where you were running that program

18    where any -- hopefully not volleyball was that

19    competitive, but where any fights or issues started?

20                JUROR MEYER:  Not with volleyball, no.

21                ATTORNEY SCHNEIDER:  Thank you.

22         And then it's Mr. Maas?

23                JUROR MAAS:  Um-hum.

24                ATTORNEY SCHNEIDER:  Okay.  Mr. Maas, did

25    you work at a bar?

143

1                    JUROR MAAS:  I leased a bar for two
2        years.
3                    ATTORNEY SCHNEIDER:  For two weeks?
4                    JUROR MAAS:  Two years.
5                    ATTORNEY SCHNEIDER:  Two years.  That's
6        what I thought.  Two weeks.  What bar was that?
7                    JUROR MAAS:  (Unintelligible) in Oneida.
8                    ATTORNEY SCHNEIDER:  Was it something, Mr.
9        Maas -- I'm going to assume that you were there
10       probably almost every day?
11                   JUROR MAAS:  I was.
12                   ATTORNEY SCHNEIDER:  Was the bar large
13       enough that you had other staff also?
14                   JUROR MAAS:  Yes.
15                   ATTORNEY SCHNEIDER:  Was it a situation,
16       Mr. Maas, where you ever had fights or had to address
17       fights that were occurring in the bar?
18                   JUROR MAAS:  I did, yes.
19                   ATTORNEY SCHNEIDER:  Did you ever have to
20       call the police for assistance?
21                   JUROR MAAS:  Yes.
22                   ATTORNEY SCHNEIDER:  And then is it a
23       situation, Mr. Maas, from that where you ever had to
24       provide testimony about what you saw?
25                   JUROR MAAS:  No, ma'am, I didn't.

144

1                    ATTORNEY SCHNEIDER:  Okay.  Thank you, Mr.

2       Maas.

3            Anyone else then ever work at a bar?

4            Okay.  I'm going to come to the middle row.

5       Miss Lee?

6                    JUROR LEE:  Yes.

7                    ATTORNEY SCHNEIDER:  What bar was that,

8       Miss Lee?

9                    JUROR LEE:  The Bar on Lynndale.

10                    ATTORNEY SCHNEIDER:  And when did you work

11       there?

12                    JUROR LEE:  Late '90s, '97, '98 or

13       something like that.

14                    ATTORNEY SCHNEIDER:  Were you working there

15       full-time or part-time?

16                    JUROR LEE:  Part-time.  Just bartended.

17                    ATTORNEY SCHNEIDER:  Had you had the

18       occasion where there were fights that broke out while

19       you were bartending?

20                    JUROR LEE:  Not -- not when I worked.

21                    ATTORNEY SCHNEIDER:  Okay.  Did The Bar on

22       some of the occasions, maybe more on the weekends,

23       have extra security staff that would work?

24                    JUROR LEE:  Yeah.  They had bouncers.

25                    ATTORNEY SCHNEIDER:  Thank you, Miss Lee.

1              And then anyone else in that row?

2              Okay.  First Mr. Nichols, then I'll get to you,

3      Miss Paul.

4              JUROR NICHOLS:  I worked as a

5      doorman/bouncer at a bar in southern Wisconsin.

6              ATTORNEY SCHNEIDER:  Okay.  When was that,

7      Mr. Nichols?

8              JUROR NICHOLS:  What was that?

9              ATTORNEY SCHNEIDER:  When was that?

10             JUROR NICHOLS:  That would have been around

11     '99, 2000, somewhere in there.

12             ATTORNEY SCHNEIDER:  Part-time?

13             JUROR NICHOLS:  Yeah.

14             ATTORNEY SCHNEIDER:  Okay.  Worked probably

15     most weekends?

16             JUROR NICHOLS:  Um-hum.

17             ATTORNEY SCHNEIDER:  Not knowing where it

18     was, and you don't need to disclose, but was it a

19     situation where you would have fights at the bar

20     occasionally?

21             JUROR NICHOLS:  There were a couple, yeah.

22     I never had to deal with jury duty.  We did call the

23     police after.  We escorted them out though.

24             ATTORNEY SCHNEIDER:  So you did call the

25     police at times but never had to come in and testify?

146

1          JUROR NICHOLS:  Correct.

2          ATTORNEY SCHNEIDER:  Ever have a situation

3    where someone had a gun in the bar and you didn't

4    know?

5          JUROR NICHOLS:  Not a gun.

6          ATTORNEY SCHNEIDER:  Other weapons, though,

7    I'm guessing by your answer?

8          JUROR NICHOLS:  A pruner.

9          ATTORNEY SCHNEIDER:  A pruner.  Okay.  Now

10   I have to know what bar it was.  Threw me off there.

11   And that was the only bar you had worked at?

12         JUROR NICHOLS:  Yes, I believe so.

13         ATTORNEY SCHNEIDER:  Okay.  Thank you, Mr.

14   Nichols.

15      And then finally the front row.  Is there

16   anyone?

17      Miss Paul.  What bar was that?

18         JUROR PAUL:  Fox Valley Lanes in Neenah.

19         ATTORNEY SCHNEIDER:  Sure.  And how long

20   did you work there?

21         JUROR PAUL:  Only a few months.

22         ATTORNEY SCHNEIDER:  And when was that?

23         JUROR PAUL:  Last year, last winter,

24   2015.

25         ATTORNEY SCHNEIDER:  Bowling ever get so

147

1     feisty --

2               JUROR PAUL:  No.

3               ATTORNEY SCHNEIDER:  -- that you had any

4     fights break out?

5               JUROR PAUL:  Not really.

6               ATTORNEY SCHNEIDER:  Anyone ever work in a

7     profession in the past where you worked security?

8     I'm going to use that word broadly, it could be a

9     bouncer at a different type of facility, it could be

10     at some of our community events where you're there

11     kind of as security kind of watching what's going on,

12     we have a lot of church festivals where some of the

13     members have to take on that role, or it could be a

14     security at a different type of facility or event.

15     Anyone ever have a job where they worked in that kind

16     of capacity or volunteered, I should say, too.

17          Okay.  So I'm going to come to you.  Mr.

18     Bloomer?

19               JUROR BLOOMER:  Correct.

20               ATTORNEY SCHNEIDER:  When was that?

21               JUROR BLOOMER:  I've worked security a good

22     part of my life so it could be -- I worked for

23     Securitas, Pinkerton.

24               ATTORNEY SCHNEIDER:  Sure.

25               JUROR BLOOMER:  So you see quite a bit of,

148

```
 1          I'm not sure you mean fights, yes, you -- you just
 2     bring a calm to that sort of thing.
 3               ATTORNEY SCHNEIDER:  Is it your role in
 4     those situations, Mr. Bloomer, where you're kind of
 5     always paying attention or looking out for that in
 6     those roles?
 7               JUROR BLOOMER:  Yes, that's -- yes.
 8               ATTORNEY SCHNEIDER:  And I'm guessing you
 9     probably weren't always able to be that calming force
10     and had to call the police at some point?
11               JUROR BLOOMER:  I've called the police a
12     few times, but not -- well, yes, I did call for once
13     shots fired and once fight.
14               ATTORNEY SCHNEIDER:  I want to explore that
15     shots fired.  Do you remember where you were working
16     at the time?
17               JUROR BLOOMER:  Modesto, California.
18               ATTORNEY SCHNEIDER:  And what type of
19     establishment was that at?
20               JUROR BLOOMER:  A coffee shop was being
21     robbed.
22               ATTORNEY SCHNEIDER:  And were you providing
23     some security near that coffee shop or was this just
24     you as a citizen heard that?
25               JUROR BLOOMER:  Yeah.  There was a -- there
```

149

```
1        was a -- a grocery store that was being renovated and

2        so the back of it was open, and around the corner was

3        a coffee shop and someone robbed it, and then the

4        girl was on the phone calling and he came out and

5        told her stop.  She ran down the alley, and we -- me

6        and one other person grabbed her and brought her

7        inside.

8                ATTORNEY SCHNEIDER:  When did that happen,

9        Mr. Bloomer, if you know?

10               JUROR BLOOMER:  It was --

11               ATTORNEY SCHNEIDER:  Twenty years ago, 15,

12       10, more than that?

13               JUROR BLOOMER:  That was '98, a long time.

14               ATTORNEY SCHNEIDER:  And is this a

15       situation, Mr. Bloomer, based upon how you're

16       describing it, you can still kind of close your eyes

17       and remember a lot of what happened; is that correct?

18               JUROR BLOOMER:  Correct.

19               ATTORNEY SCHNEIDER:  Okay.  Is that a

20       situation where you ever saw or encountered the

21       person who fired the shots or who robbed her?

22               JUROR BLOOMER:  (Shaking head back and

23       forth.)

24               ATTORNEY SCHNEIDER:  No.  We just have to

25       say yes or no for the court reporter.
```

150

1           JUROR BLOOMER:  No.

2           ATTORNEY SCHNEIDER:  She's pretty good at

3    picking it up but in case she missed it.  All right.

4    And then you said you also called for just random

5    fights at times?

6           JUROR BLOOMER:  Backup.  Somebody -- I was

7    threatened so -- they threatened me then so I called

8    the police.  And they were always real good about

9    it.

10          ATTORNEY SCHNEIDER:  How -- and again, I

11   don't mean to pry, how were you threatened?

12          JUROR BLOOMER:  Once again, back at that

13   same place, the whole back of the grocery store was

14   wide open pretty much, except for (unintelligible).

15   There was people that came in and said that I

16   shouldn't do this or shouldn't do that, and so I'm

17   not going to listen to that, and so then there was a

18   -- an officer that was coming by and I got a hold of

19   him and he said he would swing by more often.  They

20   never came back.

21          ATTORNEY SCHNEIDER:  Is it a situation, Mr.

22   Bloomer, where you were ever threatened with an item

23   at all?  When I say item, because it could be a

24   pruner now, but I mean a gun, a pipe, anything where

25   you were threatened or was it more just verbal?

151

```
1                    JUROR BLOOMER:  I think it's always pretty
2          much verbal.
3                    ATTORNEY SCHNEIDER:  Verbal.  Thank you,
4          Mr. Bloomer.
5                    JUROR BLOOMER:  You're welcome.
6                    ATTORNEY SCHNEIDER:  Anyone else then I
7          have been asking the question about working in
8          security or in that role?
9               Okay.  Mr. Nichols.
10                   JUROR NICHOLS:  Like I said I was a
11         bouncer/doorman at the bar.
12                   ATTORNEY SCHNEIDER:  Thank you.
13              Anyone else then in the front row?
14              Okay.  Mr. Webster first.
15                   JUROR WEBSTER:  I used to do cage
16         fighting.
17                   ATTORNEY SCHNEIDER:  Cage fighting.  And so
18         would you have to work security at some of those
19         events?
20                   JUROR WEBSTER:  Yeah.  Usually the other
21         opponent loses, their friends kind of altercate with
22         us, the other side of the room.
23                   ATTORNEY SCHNEIDER:  So like Round 2 of the
24         fight maybe?
25                   JUROR WEBSTER:  Yes.
```

152

1              ATTORNEY SCHNEIDER:  And is that a

2      situation where you ever had to call the police?

3              JUROR WEBSTER:  No.  Usually take care of

4      it ourselves.

5              ATTORNEY SCHNEIDER:  Thank you.  And then

6      Mr. -- is it -- we haven't said your last name yet,

7      buza, Mr. Buza?

8              JUROR BUZA:  For a couple weeks when I was

9      in the Army I had security duty at the Army prison

10     and I had to be up in the guard tower, that was my MO

11     and all that good stuff.

12             ATTORNEY SCHNEIDER:  Ever have an encounter

13     where you had to call for other assistance?

14             JUROR BUZA:  Not there.

15             ATTORNEY SCHNEIDER:  Any other security

16     jobs or roles you've had?

17             JUROR BUZA:  No.

18             ATTORNEY SCHNEIDER:  Okay.  Thank you, Mr.

19     Buza.

20          As you can imagine, the -- Mr. Shea?

21             JUROR SHEA:  I have a -- a situation that's

22     not exactly security.  I'm an EBD teacher, emotional

23     behavioral disability, and I have had to restrain

24     students and I have had to call the police.

25             ATTORNEY SCHNEIDER:  Okay.  No.  Thank you.

153

1     That's all informative for us to know.

2          Is that something, Mr. Shea, because of that

3     experience and uniqueness of that, kind of not only

4     are you teaching and trying to engage the students

5     but you're always kind of probably scanning to see if

6     something is building up, would that be correct if I

7     said that?

8               JUROR SHEA:  That would be very correct.

9               ATTORNEY SCHNEIDER:  I was starting to say

10    that the offense happened Saturday night at Luna,

11    people were out drinking.  Is there anyone on the

12    panel, for personal reasons, sometimes it's medical

13    reasons, at times it might be your age, does not

14    consume alcohol at this time?

15         I expected Mr. Green to raise his hand, and

16    that's because of your age?

17              JUROR GREEN:  Yes.

18              ATTORNEY SCHNEIDER:  And then was it Miss

19    Steffen?  Okay.

20              JUROR STEFFEN:  You're asking if you don't?

21              ATTORNEY SCHNEIDER:  Do not drink alcohol.

22    And is that a personal choice?

23              JUROR STEFFEN:  Not really, more medical.

24              ATTORNEY SCHNEIDER:  Okay.  Is it something

25    where it developed that at one point in your life you

154

1          could drink but just now you can't?

2                    JUROR STEFFEN:  Right.

3                    ATTORNEY SCHNEIDER:  Okay.  So maybe this

4          is a good time for us to take Mr. Fleming back for a

5          question, and then we can let --

6                    THE COURT:  I think that is a good idea.

7                    (Proceedings held outside the presence of

8          the jury panel.)

9                    (Mr. Fleming enters.)

10                    THE COURT:  Mr. Fleming, you had -- if I

11         understood correctly, there was a question asked by

12         Attorney Schneider about your comfort level in making

13         a decision in this case or being required to stand in

14         judgment.  Could you expand on that for us?

15                    JUROR FLEMING:  Yeah.  I -- I guess I have

16         a son very near that age that experienced a very

17         traumatic time in his life a couple years ago, and I

18         guess as far as when it comes right down to the

19         verdict, I might have trouble making a decision.

20                    THE COURT:  Okay.  And is it something as

21         it relates to your son that you feel comfortable

22         sharing with us?

23                    JUROR FLEMING:  Our son is doing really

24         well now.

25                    THE COURT:  Okay.

155

1          JUROR FLEMING:  He didn't go to jail, not

2     that he didn't do anything illegal to go to jail,

3     let's put it that way, but I guess my thing is he was

4     given a lot of support and a lot of help and now he's

5     in a real good direction.

6          THE COURT:  Okay.  And -- would I be

7     correct, and I certainly don't mean to jump to

8     conclusions, but was it mental health issues --

9     related issues, is that --

10          JUROR FLEMING:  Yes, mental health, and

11     there was drug and alcohol involved, but he's very --

12     he's on a great path now and I think it was the

13     support back then.

14          THE COURT:  Sure.  And let me ask this.

15     Your -- your job, if you were selected, would be to

16     render a verdict as to guilty or not guilty.  That

17     would be the extent of your job.  In terms of -- in

18     terms of what any sort of sentence would be as a

19     byproduct of that verdict, if we were to get to that

20     point, that is my responsibility.  That is not --

21     that is not something or a burden that we place upon

22     you.  And I would -- I would use the criterion that

23     I'm to use to determine what is -- what if any result

24     is appropriate.  And so with that understanding,

25     understanding that your job is not to determine what

1    if any punishment is appropriate, your job would

2    simply be again to listen to the evidence and listen

3    to my instructions on how to weigh that evidence,

4    make a determination as to, again, whether or not a

5    verdict of guilty or not guilty is appropriate.  And

6    with that understanding, do you feel that you would

7    be able to sit in that position and listen to the

8    evidence and make a -- or be a vote, you wouldn't

9    make that decision solely, but make a vote towards a

10   verdict in this case?

11          JUROR FLEMING:  That's what I'm questioning

12   myself.

13          THE COURT:  Okay.  Attorney Schneider, do

14   you have any questions?

15          ATTORNEY SCHNEIDER:  And, Mr. Fleming,

16   again, what I said at the beginning, we don't mean to

17   pry but we do appreciate you being very open about

18   this.  Is this something -- I can kind of tell, based

19   on your reaction, it's something that you put a lot

20   of time and effort into addressing in your own life

21   and your son's life, correct?

22          JUROR FLEMING:  Yes.

23          ATTORNEY SCHNEIDER:  That's a yes.  And

24   it's something do you think that you would be

25   thinking about some of those things during the course

157

1      of this trial?

2                  JUROR FLEMING:  Possibly, you know, that's,

3      I guess, kind of that's why I'm bringing this up

4      now.

5                  ATTORNEY SCHNEIDER:  So we have used this

6      question in a variety of ways to try to get a good

7      assessment, and I'll use your son as an example

8      because you might understand.  Let's assume your son

9      was on trial and he was the person charged with a

10     crime.  If there was someone like you that holds this

11     feeling about working with your son and getting

12     through issues that was on the jury, would you want

13     that person to be on the jury or do you think they

14     would have hesitation, if your son was the one that,

15     you know, they're deliberating on your son's case?

16                 JUROR FLEMING:  I'm sorry.  I did not

17     understand your question.

18                 ATTORNEY SCHNEIDER:  Okay.  You have this

19     feeling that you spent a lot of time addressing your

20     son's issues, okay, and that's giving you pause,

21     right?  So we're trying to ask you in a roundabout

22     way, I'm not going to make it your son, make it a

23     different family member, a loved one, okay, and there

24     was a juror on that panel who had the same kind of

25     beliefs you have, where they've helped and supported

158

1    their son and kind of struggled maybe with the

2    criminal justice system as a whole.  Would you want

3    that person to sit on the jury for your loved one or

4    do you think that person might have hesitation about

5    doing it where they shouldn't serve?

6             JUROR FLEMING:  In a case like that, yes

7    yeah, I would, but I guess my point is I'm kind of

8    struggling in my mind about the whole -- the whole

9    process I guess.  I mean that's what it is.

10            ATTORNEY SCHNEIDER:  And that's okay.  Some

11   people, you can't explain it.  It's a very

12   significant, serious thing we ask.  And so you're

13   just telling us you have some gut reaction to having

14   to potentially sit in that room and render a

15   verdict.

16            JUROR FLEMING:  Possibly.  You know, I'm

17   not afraid to, you know, hear things, and it's not

18   like I'm going to have flashbacks or anything like

19   that, that's not what I'm going through, but I guess

20   my thing is just -- I'm thinking, boy, I'm glad it's

21   not my son.

22            ATTORNEY SCHNEIDER:  Okay.  All right.  I

23   don't have any other questions right now, Judge.

24            THE COURT:  Attorney Vishny, any questions?

25            ATTORNEY VISHNY:  Yeah.  I have a few

159

1    questions.

2         All right.  I know that you've been through this

3    really traumatic period with your child, but, you

4    know, my question is this, what's going on in this

5    case really has nothing to do with that, obviously we

6    all know that, so are you able to judge what's

7    happening in this case, and your decision is did the

8    prosecutor prove beyond a reasonable doubt that Mr.

9    Lee committed the crimes he's been accused of.  So

10   that's -- that's the function of a jury.  Do you

11   think that you can be fair in making that decision?

12              JUROR FLEMING:  I think so.

13              ATTORNEY VISHNY:  Based upon the facts of

14   the case.  And you could be fair to both sides

15   whether your verdict has to be either guilty beyond a

16   reasonable doubt or not guilty beyond a reasonable

17   doubt, either side you could be fair?

18              JUROR FLEMING:  Yes, I guess -- I mean,

19   beyond a reasonable doubt, excuse me, a reasonable

20   doubt.

21              ATTORNEY VISHNY:  That's the legal

22   standard.  The judge -- I'm not going to go through

23   jury instructions, the judge does that.

24              JUROR FLEMING:  Yeah.

25              ATTORNEY VISHNY:  Okay.  All right.

160

1          Nothing further.

2                    THE COURT:  Okay.

3                    ATTORNEY SCHNEIDER:  Is there --

4                    THE COURT:  So --

5                    ATTORNEY SCHNEIDER:  You're hesitating.  Is

6          there more?

7                    JUROR FLEMING:  No.  I mean, I'm just -- I

8          definitely wanted to bring that up.  I'm not saying I

9          don't want to necessarily do my duty or the

10         process.

11                   THE COURT:  No.  And we don't --

12                   JUROR FLEMING:  I just wanted to bring it

13         up that there might be -- I just, you know, I don't

14         want my mind to be straying from what I'm hearing in

15         the courtroom either.

16                   THE COURT:  And we -- and there is, just so

17         that you're aware, there is no right or wrong answer

18         here, and we would rather have too much information

19         and have you come forward and say these are my

20         concerns than have you sitting in the jury box and

21         wondering and dwelling and then thinking about it

22         more, and so it is greatly appreciated that you've

23         taken this time to -- to let us know these things.

24                   JUROR FLEMING:  Thanks.

25                   THE COURT:  All right.  Thank you, sir.

1                    JUROR FLEMING:  Thank you.

2                    THE COURT:  I don't know that --

3                    ATTORNEY VISHNY:  I don't see any reason to

4          strike him.

5                    ATTORNEY SCHNEIDER:  At this point.  You

6          know, if he has more concerns I think he'll raise

7          them with us.

8                    ATTORNEY VISHNY:  I do too.

9                    THE COURT:  That's exactly what I'm

10         feeling.

11                   ATTORNEY VISHNY:  Right.

12                   (Ms. Giesen enters.)

13                   THE COURT:  Okay.  And, Miss Giesen, I

14         understand that there were a couple questions.

15                   JUROR GIESEN:  The first two.

16                   THE COURT:  Okay.  And so what would you

17         like to share with us?

18                   JUROR GIESEN:  Could you run by me again so

19         I can --

20                   ATTORNEY SCHNEIDER:  Was it the first two

21         that the judge asked you?

22                   JUROR GIESEN:  You.

23                   ATTORNEY SCHNEIDER:  That I asked.

24                   JUROR GIESEN:  Yup.

25                   ATTORNEY SCHNEIDER:  First two.  Okay.  Do

162

1    I have my note?  I asked about anything this week in

2    your personal life, in your work life that might

3    distract you.

4              JUROR GIESEN:  No.  No.  It wasn't that

5    one.

6              ATTORNEY SCHNEIDER:  I told you to go ahead

7    and interrupt me if you needed to.  I asked about any

8    medications.

9              JUROR GIESEN:  No.

10             ATTORNEY SCHNEIDER:  Okay.  Prior jury

11   experience.

12             JUROR GIESEN:  No.  I did that one.  I

13   think it was after that.

14             ATTORNEY SCHNEIDER:  Okay.  I talked about

15   police officers, if you have been employed in that

16   capacity.

17             JUROR GIESEN:  No.

18             ATTORNEY SCHNEIDER:  Family or friend.

19             JUROR GIESEN:  No.

20             ATTORNEY SCHNEIDER:  I talked then about a

21   homicide case and this being very significant and if

22   anyone has pause or for reasons think that --

23             JUROR GIESEN:  I think that -- that one and

24   the one right after that.

25             ATTORNEY SCHNEIDER:  Okay.  Then I asked --

163

1     started asking about Luna Lounge.

2              JUROR GIESEN:  No.

3              ATTORNEY SCHNEIDER:  I talked about we

4     might see -- we're going to try to limit any graphic

5     images.

6              JUROR GIESEN:  Yeah.

7              ATTORNEY SCHNEIDER:  I talked about --

8              JUROR GIESEN:  I think it was the

9     combination of both of those together.

10             ATTORNEY SCHNEIDER:  Okay.

11             JUROR GIESEN:  And I'm kind of nervous

12     about it, and I want to make the right decision when

13     I hear everything, and I don't want to make the wrong

14     decisions, you know --

15             THE COURT:  Sure.

16             JUROR GIESEN:  So I'm kind of concerned

17     about it.

18             THE COURT:  Let me ask -- and I think that

19     those are very -- those are very real concerns, and I

20     think -- I appreciate you bringing them forward.

21        Now, at the end of the trial I'm going to give

22     you instructions on, by way of example, what the

23     burden of proof is, and that's beyond a reasonable

24     doubt.  That's a very high burden.  I'll give you

25     instructions on what -- how you consider evidence and

164

1    what different things mean or what you're to consider

2    and how you're to deliberate, and I will give you all

3    these instructions on how, and your -- so you will

4    have very, very clear instructions on how you -- how

5    you look at this.  And your job will then be to take

6    the evidence that you've heard --

7    JUROR GIESEN:  Yup.

8    THE COURT:  -- and to look at it against

9    those instructions, and your job would be to

10   determine whether or not it is appropriate to render

11   a finding of guilty or not guilty.  And with that

12   understanding, does that -- does that give you a

13   little more sense of peace, does it -- does it still

14   cause you concern?

15   JUROR GIESEN:  Yes, it still does.

16   THE COURT:  And do you think -- and

17   certainly it is probably very normal that you would

18   feel --

19   JUROR GIESEN:  Nervous.

20   THE COURT:  -- a sense of nervousness and a

21   sense of responsibility.  It is a big deal.

22   JUROR GIESEN:  Because this is just a big

23   responsibility.

24   THE COURT:  Sure.  And let me ask you this.

25   If you heard the evidence and all of the evidence led

165

1    you to conclude that it was appropriate to render a

2    finding of not guilty, do you think you could do

3    that?

4              JUROR GIESEN:  (Nodding.)

5              THE COURT:  Yes?

6              JUROR GIESEN:  Yes.

7              THE COURT:  Okay.  And if you heard all of

8    the evidence and all of the evidence led you to

9    conclude that a verdict of guilty was appropriate, do

10   you think you could do that?

11             JUROR GIESEN:  Yes.

12             THE COURT:  Okay.  And that is all we ask

13   of you.

14             JUROR GIESEN:  Then why do I feel so

15   worried and concerned and nerved up right now?

16             THE COURT:  I think it is because you care

17   and you want to make the right decision.

18             JUROR GIESEN:  Yeah.

19             THE COURT:  And the -- the good news is

20   that we have very good attorneys and they're going

21   to -- through witnesses and questioning, they're

22   going to put a lot of evidence out there so that

23   you're not just guessing.  We don't want you to

24   guess.  That's not --

25             JUROR GIESEN:  I don't want to either.

166

1              THE COURT:  No.  And so your job is to look

2       at the evidence, and the burden of proof is on the

3       State, so the State has to prove their case, and so

4       all -- all we ask of you is that you listen to the

5       evidence, and that after you hear the evidence, if

6       you -- if you feel that the State has met their

7       burden, then you render a decision that way.  And if

8       you don't feel that the State has met their burden,

9       then you issue a decision the other way.  Does that

10      make sense?

11             JUROR GIESEN:  Yes.

12             THE COURT:  And is that something that you

13      feel you are able to do?

14             JUROR GIESEN:  Yes.  And I think that's why

15      I want to talk about it now before we get going

16      instead of having me doubt later.

17             THE COURT:  That's okay.  And I'm happy to

18      know that you care.

19         Miss Schneider, any questions?

20             ATTORNEY SCHNEIDER:  Miss -- it's Giesen,

21      right?

22             JUROR GIESEN:  Yes.

23             ATTORNEY SCHNEIDER:  Miss Giesen, is it

24      something where you have concerns because you don't

25      think you should judge other people?

167

```
1                    JUROR GIESEN:  No.

2                    ATTORNEY SCHNEIDER:  Okay.

3                    JUROR GIESEN:  I think I want to make the

4          right decision and I don't want to make the wrong

5          one, and I'm scared, afraid of doing that.

6                    ATTORNEY SCHNEIDER:  Okay.  But you take

7          your role very seriously, correct?

8                    JUROR GIESEN:  Yes.

9                    ATTORNEY SCHNEIDER:  I don't have any other

10         questions.

11                   ATTORNEY VISHNY:  I don't have any

12         questions.

13                   THE COURT:  Okay.  And, Miss Giesen, I

14         don't have any additional questions.  Thank you very

15         much.

16                   JUROR GIESEN:  Okay.  I don't want to waste

17         anybody's time, and that's why I have these doubts

18         and questions.

19                   THE COURT:  It is not a waste of time at

20         all.

21                   JUROR GIESEN:  Okay.

22                   THE COURT:  So don't worry.

23                   JUROR GIESEN:  All right.  Thank you.

24                   (Miss Giesen exits.)

25                   (In open court).
```

168

```
 1                    THE COURT:  Okay.  And, Attorney Schneider,
 2          I believe you still had some additional questions and
 3          so please continue whenever you're ready.
 4                    ATTORNEY SCHNEIDER:  Okay.
 5              I was in the middle of asking Miss Steffen, I
 6          think, and you said it was a situation where at one
 7          point in your life you were able to drink alcohol but
 8          now something has just happened where you do not
 9          drink anymore.
10                    JUROR STEFFEN:  Call it age.
11                    ATTORNEY SCHNEIDER:  Okay.  And then I
12          thought someone else had raised their hand.  Mr.
13          Green did.  I remember that.  Mr. Fleming, did you
14          raise your hand?
15                    JUROR FLEMING:  Yup.
16                    ATTORNEY SCHNEIDER:  So has it been a
17          personal choice for you not to consume alcohol?
18                    JUROR FLEMING:  Yes.  It was a personal
19          choice.  I did up until better than a
20          year-and-a-half -- less than a year-and-a-half ago.
21                    ATTORNEY SCHNEIDER:  Okay.  Thank you, Mr.
22          Fleming.
23              And, Mr. Green, you're 19 or 20?
24                    JUROR GREEN:  I'm 18.
25                    ATTORNEY SCHNEIDER:  Even younger yet.
```

1                     And then in the front row it was Miss Elbe?

2                     JUROR ELBE:  Um-hum.

3                     ATTORNEY SCHNEIDER:  Was that a medical

4        reason, personal choice?

5                     JUROR ELBE:  No.  Personal choice.

6                     ATTORNEY SCHNEIDER:  Have you ever consumed

7        alcohol?

8                     JUROR ELBE:  Oh, many, many years ago, and

9        then you learned your lesson.  That's the truth.

10                    ATTORNEY SCHNEIDER:  You did say you wanted

11       honest answers.

12                    THE COURT:  That is true.

13                    ATTORNEY SCHNEIDER:  And then Miss Naumann?

14                    JUROR NAUMANN:  Yes.

15                    ATTORNEY SCHNEIDER:  Has it been a personal

16       choice?

17                    JUROR NAUMANN:  Personal choice.

18                    ATTORNEY SCHNEIDER:  Did you ever consume

19       alcohol?

20                    JUROR NAUMANN:  Yeah.  It's been 15 years

21       or so.

22                    ATTORNEY SCHNEIDER:  And did I miss anyone

23       else on the panel?

24                    (No response.)

25                    ATTORNEY SCHNEIDER:  Okay.  Thank you.

1              Because of TV and news media and various social

2       media, I need to ask some questions of you.  There

3       was recently a series on Netflix called *Making of a*

4       *Murderer*.  Is there anyone on the panel familiar with

5       that series?

6              Okay.  I'm going to start in the back row, and

7       then I'll start -- I'll walk through the back row and

8       then I'll come up to the front row.

9              Mr. Nieman.

10              JUROR NIEMAN:  Yes.

11              ATTORNEY SCHNEIDER:  And is it something

12       that you watched the series?

13              JUROR NIEMAN:  Seen a couple episodes.

14              ATTORNEY SCHNEIDER:  You didn't DVR it?

15              JUROR NIEMAN:  No.

16              ATTORNEY SCHNEIDER:  Is it something that

17       you talked about with family or friends?

18              JUROR NIEMAN:  Friends.

19              ATTORNEY SCHNEIDER:  But something, it

20       seems to me, that you haven't been so concerned to

21       make sure you've seen every episode.

22              JUROR NIEMAN:  No.

23              ATTORNEY SCHNEIDER:  Do you think you got a

24       fair presentation of both sides of the story when you

25       watched it?

171

1              JUROR NIEMAN:  From what I saw, yeah.

2              ATTORNEY SCHNEIDER:  Did you ever hear or

3       watch any item or any news items related to the

4       Halbach family?  That was the victim in that case.

5              JUROR NIEMAN:  No, just whatever I saw in

6       the first couple episodes.

7              ATTORNEY SCHNEIDER:  Just what you saw on

8       Net --

9              JUROR NIEMANN:  Nothing on the news, no.

10             ATTORNEY SCHNEIDER:  Do you feel that

11      media, or in a series such as that, they can put in

12      what they want and leave out what they want, it's

13      entertainment?

14             JUROR NIEMANN:  I believe it, yeah.

15             ATTORNEY SCHNEIDER:  All right.

16         Then is it Miss Hermus?

17             JUROR HERMUS:  Yes.

18             ATTORNEY SCHNEIDER:  So --

19             JUROR HERMUS:  I have heard of it, I've

20      seen TV about it, but I have not watched any of it.

21             ATTORNEY SCHNEIDER:  Okay.  So you probably

22      also haven't seen any accounts or anything from the

23      Halbach family?

24             JUROR HERMUS:  No.

25             ATTORNEY SCHNEIDER:  Miss Dey, did you

172

1       raise your hand?

2                  JUROR DEY:  Yes.  It's Dey.

3                  ATTORNEY SCHNEIDER:  Dey.  I'm sorry.  We

4       haven't called on you yet.  Have you watched the

5       entire series, a portion of it?

6                  JUROR DEY:  All of it.

7                  ATTORNEY SCHNEIDER:  Talk to family or

8       friends about it?

9                  JUROR DEY:  Yeah.

10                 ATTORNEY SCHNEIDER:  Do you think you were

11      presented with both sides of the story in that

12      series?

13                 JUROR DEY:  Yeah.

14                 ATTORNEY SCHNEIDER:  Have you ever watched

15      any of the details or accounts or watched anything

16      from the Halbach family?

17                 JUROR DEY:  Just what was on there.

18                 ATTORNEY SCHNEIDER:  Just what was on the

19      series?

20                 JUROR DEY:  (Nodding.)

21                 ATTORNEY SCHNEIDER:  Do you feel that the

22      media always gets it right when they report on a

23      story?

24                 JUROR DEY:  No.

25                 ATTORNEY SCHNEIDER:  Thank you, Miss Dey.

173

1              JUROR DEY:  Dey.

2              ATTORNEY SCHNEIDER:  Dey.  I'm going to

3       rewrite it.  I'm going to spell your name D-I-E on my

4       sheet so I say it right.

5           And then in the back row continuing on.  Mr. Van

6       Deurzen, you've seen all of it, some of it?

7              JUROR VAN DEURZEN:  Some of it.

8              ATTORNEY SCHNEIDER:  Is it something you

9       taped or you just happened -- it was on and you

10      watched it?

11             JUROR VAN DEURZEN:  It was on and I watched

12      it.

13             ATTORNEY SCHNEIDER:  Something you haven't

14      cared to try to go back and watch the portions you

15      haven't yet seen?

16             JUROR VAN DEURZEN:  No.

17             ATTORNEY SCHNEIDER:  Did you ever hear or

18      see any of the information that the Halbach family

19      put out?

20             JUROR VAN DEURZEN:  Yes.

21             ATTORNEY SCHNEIDER:  Would you agree with

22      me that at times media can put out one side of a

23      story but they might not present all of the facts?

24             JUROR VAN DEURZEN:  Yes.

25             ATTORNEY SCHNEIDER:  Thank you.

174

1                   Mr. Schueller, did you raise your hand?

2                        JUROR SCHUELLER:  No.

3                        THE COURT:  Mr. Calmes -- Mr. Parker then?

4                        JUROR PARKER:  Yes.

5                        ATTORNEY SCHNEIDER:  Sorry.  I was getting

6           you mixed up.  Have you seen all of it, some of it?

7                        JUROR PARKER:  I haven't seen any of it,

8           just from what I seen on the news.

9                        ATTORNEY SCHNEIDER:  So you just heard

10          other stories about it?

11                       JUROR PARKER:  Yes.

12                       ATTORNEY SCHNEIDER:  In that have you heard

13          other stories or comments from the Halbach family at

14          all?

15                       JUROR PARKER:  No, I haven't.

16                       ATTORNEY SCHNEIDER:  Thank you.

17                  Then I'm going to continue.  Mr. Fleming's row,

18          anyone else in that row have seen the series at all

19          or familiar with it?  Mr. Maas?

20                       JUROR MAAS:  I've been put through the

21          whole thing, yes.

22                       ATTORNEY SCHNEIDER:  Okay.  Saying it that

23          way, is it something someone in else in your life

24          wanted to watch and you were in the living room when

25          it was on?

175

1                   JUROR MAAS:  Yes.

2                   ATTORNEY SCHNEIDER:  We won't tell her you

3          said that.  Is it something where you've ever seen

4          any of the items that the Halbach family put out

5          about the series?

6                   JUROR MAAS:  Not really, no.

7                   ATTORNEY SCHNEIDER:  Okay.  Do you think

8          that the media at times can present only one side of

9          a story and not both sides?

10                  JUROR MAAS:  I guess, yes.

11                  ATTORNEY SCHNEIDER:  Thank you, Mr. Maas.

12            And then Mr. Van Dalen?

13                  JUROR VAN DALEN:  Yup.

14                  ATTORNEY SCHNEIDER:  Okay.  All of it, some

15         of it?

16                  JUROR VAN DALEN:  I chose not to watch it

17         because I was friends with Theresa Halbach.  She was

18         a photographer at my wedding.  I went to her wake.

19         And so I discussed it a lot with my friends and

20         family but I chose not to watch it.

21                  ATTORNEY SCHNEIDER:  Okay.  And you're

22         getting to a topic, Mr. Van Dalen, that I have not

23         yet started to talk about.  Okay?

24            So one of the things when I started talking to

25         you all is that one of the reasons why we ask these

176

1    questions is we want to know about what life

2    experiences you have and how that may impact us.

3        And, Mr. Van Dalen, are you familiar with, know

4    her siblings then too?

5        JUROR VAN DALEN:  Yeah.

6        ATTORNEY SCHNEIDER:  Obviously in this case

7    it is a homicide.  Mr. Richards is no longer with us.

8    Do you think having the experience where you knew

9    Teresa and what that loss has caused for you, would

10   that cause you any concerns in serving as a juror?

11       JUROR VAN DALEN:  It would be hard but I

12   think I could still do it.

13       ATTORNEY SCHNEIDER:  And I'm going to play

14   on something.  It's going to be hard for anyone,

15   okay, to serve as a juror.  Okay?  But you said you

16   think you can.  Do you think you can be fair and

17   impartial and listen to the evidence and testimony in

18   this case and decide it solely upon what you hear in

19   the courtroom?

20       JUROR VAN DALEN:  I think I can, yes.

21       ATTORNEY SCHNEIDER:  Okay.  Thank you, Mr.

22   Van Dalen.

23       Mr. -- is it Eggers?

24       JUROR EGGERS:  Eggers.

25       ATTORNEY SCHNEIDER:  Did you raise your

177

```
1        hand at all?

2                JUROR EGGERS:  No, ma'am.

3                ATTORNEY SCHNEIDER:  No.  You've just been

4        sitting there.  No movement.

5            And then Mr. Shea's row.

6            I'm sorry, Mr. Wells, I missed you.

7                JUROR WELLS:  Yup.

8                ATTORNEY SCHNEIDER:  Okay.  Watched some of

9        it, part of it?

10               JUROR WELLS:  All of it.

11               ATTORNEY SCHNEIDER:  Was it something you

12       taped?

13               JUROR WELLS:  No, I just saw Netflix.

14               ATTORNEY SCHNEIDER:  Something you talked

15       about with friends?

16               JUROR WELLS:  Yup.

17               ATTORNEY SCHNEIDER:  Have you ever watched

18       any of the Halbach's comments or accounts?

19               JUROR WELLS:  Just what was on there.

20               ATTORNEY SCHNEIDER:  Just what was in the

21       series?

22               JUROR WELLS:  Yup.

23               ATTORNEY SCHNEIDER:  Do you agree that

24       sometimes the media may only present what they know?

25               JUROR WELLS:  Yeah.
```

178

1                    ATTORNEY SCHNEIDER:  Or one side of things?

2                    JUROR WELLS:  Yes.

3                    ATTORNEY SCHNEIDER:  And now I'm going to

4          move to the third row.  Anyone there have watched the

5          series?

6              Okay.  Mr. Shea.

7                    JUROR SHEA:  I didn't watch it.  Before you

8          asked were we aware of it, familiar with it.  I'm

9          aware of it, familiar with it, I didn't watch it.

10                   ATTORNEY SCHNEIDER:  You didn't watch it at

11         all?  Not sitting in the living room like Mr. Maas

12         when it was on?

13                   JUROR WELLS:  No.

14                   ATTORNEY SCHNEIDER:  And then Miss

15         Erickson?

16                   JUROR ERICKSON:  Didn't watch it.

17                   ATTORNEY SCHNEIDER:  Just familiar with it,

18         hearing it?

19                   JUROR ERICKSON:  Yes.

20                   ATTORNEY SCHNEIDER:  Is it a situation,

21         Miss Erickson, based upon your response that you

22         could have and you just chose not to?

23                   JUROR ERICKSON:  Correct.

24                   ATTORNEY SCHNEIDER:  Thank you.

25              Then Miss Lee?

179

1            JUROR LEE:  I'm familiar with it.  I chose

2        not to watch it.  My babysitter, her father-in-law is

3        the District Attorney on that case.

4            ATTORNEY SCHNEIDER:  Okay.

5            JUROR LEE:  My heart just goes out to the

6        Halbach family so I just refuse to watch it.

7            ATTORNEY SCHNEIDER:  Okay.  Thank you, Miss

8        Lee.

9          Anyone else then in that row?  Mr. Green?

10            JUROR GREEN:  I watched a few episodes of

11        it.

12            ATTORNEY SCHNEIDER:  Okay.  Did you ever

13        see any of the accounts that the Halbach family --

14            JUROR GREEN:  Just what was on the few

15        shows I watched.

16            ATTORNEY SCHNEIDER:  Okay.  Probably,

17        though, I'm guessing in your age group was something

18        that was talked about with friends?

19            JUROR GREEN:  Yes.

20            ATTORNEY SCHNEIDER:  Do you or would you

21        agree that at times media may present what they know

22        but that may not be all the facts in the case?

23            JUROR GREEN:  Yes.

24            ATTORNEY SCHNEIDER:  Thank you, Mr. Green.

25          Anyone else then in that row?

180

1          Okay.  And I will move.  Miss Micke – some of

2     you are hiding – have you seen some of it, part of

3     it?

4          JUROR MICKE:  Just part of it.

5          ATTORNEY SCHNEIDER:  Was it something that

6     you chose not to watch the rest?

7          JUROR MICKE:  I just -- well I never got

8     around to watching the rest.  I plan on watching the

9     rest.

10          ATTORNEY SCHNEIDER:  Did you ever see any

11     of the accounts from the Halbach family on it?

12          JUROR MICKE:  No.

13          ATTORNEY SCHNEIDER:  And would you agree

14     that at times the media may report what they know but

15     that may not be the full story?

16          JUROR MICKE:  Yes.

17          ATTORNEY SCHNEIDER:  Okay.  Thank you.

18        Mr. Nichols at all?

19          JUROR NICHOLS:  No.  I have no account of

20     it.

21          ATTORNEY SCHNEIDER:  Then in the front row

22     finally.  I'll get to you Miss Plamann one second.

23     So Miss Vandenberg.

24          JUROR VANDENBERG:  Yes.

25          ATTORNEY SCHNEIDER:  Have you seen all of

181

1    it, some of it?

2         JUROR VANDENBERG:  Some of it.

3         ATTORNEY SCHNEIDER:  And have you just

4    chosen not to watch anymore or just haven't gotten

5    around to it?

6         JUROR VANDENBERG:  Didn't -- wasn't very

7    significant.

8         ATTORNEY SCHNEIDER:  Okay.  Did you ever

9    see any of the accounts from the Halbach family?

10        JUROR VANDENBERG:  No.  And I was pretty

11   young when it happened so --

12        ATTORNEY SCHNEIDER:  Have you -- would you

13   agree that sometimes media reports what they know but

14   that may not be all the facts behind this?

15        JUROR VANDENBERG:  Yes.

16        ATTORNEY SCHNEIDER:  Mr. Webster, did you

17   watch it?

18        JUROR WEBSTER:  No.

19        ATTORNEY SCHNEIDER:  Okay.  Anyone else

20   then in the front row?  Thank you.  Miss Plamann.

21   I'm sorry.

22        JUROR PLAMANN:  No, it's okay.  I've heard

23   of it.  Chose not to watch it.

24        ATTORNEY SCHNEIDER:  Thank you.

25        This likely may be a situation where, and this

182

1            is typical in any case that lasts longer than one

2            day, the judge kind of gives you the instructions

3            that for the time period and the length of the jury

4            you're not to really talk to your family about what

5            specifically is going on.  You can tell them you're

6            in a trial and you have jury duty.  He will probably

7            put some limitations and tell you not to watch the

8            news, not to read the paper.  He'll probably let you

9            watch ESPN if you want to.  But it's a situation

10           where -- so we can have a jury that comes in and

11           decides based upon what you hear here in the

12           courtroom, if you follow those conditions.  I once

13           had a juror who because of their work had to go

14           through the paper every day and they raised that.  Is

15           there anyone who thinks you could not forego reading

16           the paper or watching the news while you serve as a

17           juror on this case?

18                    (No response.)

19                    ATTORNEY SCHNEIDER:  Okay.  Thank you.

20           And, again, these are questions we don't mean to pry

21           or get into your personal life, but has anyone on the

22           panel ever been charged with a crime?

23                    (No response.)

24                    ATTORNEY SCHNEIDER:  Anyone on the panel

25           ever have a family member or a close friend that was

183

```
1          charged with a crime where you would have talked to

2          them or learned about what they went through in that

3          process?

4               Okay.  Start in the back.  Mr. Van Deurzen.

5                    JUROR VAN DEURZEN:  Yes.

6                    ATTORNEY SCHNEIDER:  Who was that?

7                    JUROR VAN DEURZEN:  My son.

8                    ATTORNEY SCHNEIDER:  And what -- if I can

9          ask, and if you prefer in private we can do that,

10         what type of offense was that.

11                   JUROR VAN DEURZEN:  Armed robbery.

12                   ATTORNEY SCHNEIDER:  Was it here?

13                   JUROR VAN DEURZEN:  No.

14                   ATTORNEY SCHNEIDER:  Did his case go to

15         trial?

16                   JUROR VAN DEURZEN:  Yes.

17                   ATTORNEY SCHNEIDER:  And did the jury

18         return a verdict?

19                   JUROR VAN DEURZEN:  No.  It was plea

20         bargained after it went to trial.

21                   ATTORNEY SCHNEIDER:  Okay.  Is it a

22         situation, Mr. Van Deurzen, at the time when that was

23         going on, was your son living close to you?

24                   JUROR VAN DEURZEN:  Fond du Lac.

25                   ATTORNEY SCHNEIDER:  Fond du Lac.  Having
```

184

1          that life experience and going through that component

2          of the criminal justice system, do you think you

3          would be able to, I don't want to say put that aside,

4          but for intents and purposes be fair and impartial

5          when you listen and weigh evidence and decide this

6          case?

7                    JUROR VAN DEURZEN:  I guess.

8                    ATTORNEY SCHNEIDER:  Thank you.

9               Anyone else on the panel?

10              Okay.  Miss Micke?

11                   JUROR MICKE:  Okay.  My brother is actually

12         in prison right now so, I mean, I don't know if --

13                   ATTORNEY SCHNEIDER:  Okay.  So you said

14         your brother, he's actually in prison for it?

15                   JUROR MICKE:  Yes.

16                   ATTORNEY SCHNEIDER:  Again, we don't mean

17         to pry, but what type of offense was he involved in?

18                   JUROR MICKE:  Disorderly conduct, I do

19         believe, or battery.  I honestly don't know the --

20                   ATTORNEY SCHNEIDER:  So you don't know much

21         about it?

22                   JUROR MICKE:  No.

23                   ATTORNEY SCHNEIDER:  When did it happen?

24                   JUROR MICKE:  A year or two years ago.

25                   ATTORNEY SCHNEIDER:  Was he living near you

185

1     when it happened?

2               JUROR MICKE:  He's about 45 minutes away.

3               ATTORNEY SCHNEIDER:  Okay.  Is it a

4     situation where you ever talked to him about his case

5     or what was going on?

6               JUROR MICKE:  No.

7               ATTORNEY SCHNEIDER:  Is it a situation,

8     Miss Micke, having that as a life experience, do you

9     think you could come in and be fair and impartial and

10    decide this case upon what you hear in the courtroom?

11              JUROR MICKE:  Yeah.

12              ATTORNEY SCHNEIDER:  Thank you so much.

13         Anyone else?

14         Okay.  Mr. Keleske?

15              JUROR KELESKE:  Yes.

16              ATTORNEY SCHNEIDER:  Who was involved in an

17    offense?

18              JUROR KELESKE:  I'd rather talk in private

19    about that.

20              ATTORNEY SCHNEIDER:  We can kind of do the

21    same thing unless you want to take a break now.

22              THE COURT:  We'll continue for a little bit

23    and then we'll make sure that we then do that in a

24    private setting.

25              ATTORNEY SCHNEIDER:  Just making a note so

186

1    I remember.

2         Judge has asked a couple questions, and I

3    brought this out with some of you before, but have

4    any of you ever had to call 911 for assistance?

5         Okay.  We're going to start in the back row.

6    It's Miss Dey?

7              JUROR DEY:  Um-hum.

8              ATTORNEY SCHNEIDER:  When was that, ma'am?

9              JUROR DEY:  It was at work.  I had to call

10   for somebody that fainted.

11             ATTORNEY SCHNEIDER:  Fainted?

12             JUROR DEY:  Yes.  And then another time

13   there was a car accident and there was a car rolled

14   over in the ditch and there was nobody there.

15             ATTORNEY SCHNEIDER:  And did police respond

16   in both situations?

17             JUROR DEY:  Um-hum.

18             ATTORNEY SCHNEIDER:  Probably the worker

19   fainting you never had to provide any testimony

20   about, but the car accident, did you ever have to

21   provide a statement?

22             JUROR DEY:  No.

23             ATTORNEY SCHNEIDER:  Okay.  Thank you, Miss

24   Dey.

25        Anyone else then in the back row?

187

1              Mr. Schueller?

2                    JUROR SCHUELLER:  I did also for a car

3      accident.

4                    ATTORNEY SCHNEIDER:  Did you witness it or

5      come upon it?

6                    JUROR SCHUELLER:  I was part of it.

7                    ATTORNEY SCHNEIDER:  Okay.  And is it a

8      situation where you were injured in any way?  Was

9      anyone else in the other vehicle injured?

10                   JUROR SCHUELLER:  No.

11                   ATTORNEY SCHNEIDER:  Thank you, Mr.

12     Schueller.

13             Mr. Calmes.

14                   JUROR CALMES:  Car accident.  Witnessed

15     it.

16                   ATTORNEY SCHNEIDER:  Witnessed it?

17                   JUROR CALMES:  Yup.

18                   ATTORNEY SCHNEIDER:  How long ago was that?

19                   JUROR CALMES:  1996.

20                   ATTORNEY SCHNEIDER:  Do you still remember

21     some of the facts about what you saw?

22                   JUROR CALMES:  Yes.

23                   ATTORNEY SCHNEIDER:  Thank you.

24             Mr. Parker, at all?

25                   JUROR PARKER:  No.

1                    ATTORNEY SCHNEIDER:  Okay.

2              Then in the middle row, anyone ever have to call

3         911?  Miss Steffen?

4                    JUROR STEFFEN:  Once I hit a deer and once

5         my mother went into diabetic shock and I had to

6         call.

7                    ATTORNEY SCHNEIDER:  Both situations, are

8         they ones that you can still remember pretty vividly

9         components of it?

10                   JUROR STEFFEN:  Um-hum.

11                   ATTORNEY SCHNEIDER:  Did your mom survive

12        that incident?

13                   JUROR STEFFEN:  Yes.

14                   ATTORNEY SCHNEIDER:  Thank you.

15             And then continuing on in that row.  Mr. -- go

16        back over first.  Mr. Fleming?

17                   JUROR FLEMING:  Yes.  Couple times when my

18        dad was going through ailments with his heart and a

19        couple times where trauma in the family.

20                   ATTORNEY SCHNEIDER:  Okay.  And probably

21        most of those situations law enforcement was able to

22        respond and provide assistance?

23                   JUROR FLEMING:  Yes.

24                   ATTORNEY SCHNEIDER:  Okay.  All right.

25        Thank you.

189

1           Then I'm going to continue down.  Mr. Wells, you

2      had your hand up?

3                JUROR WELLS:  Yup.

4                ATTORNEY SCHNEIDER:  Okay.  What kind of

5      situation was that?

6                JUROR WELLS:  I ran into an intoxicated

7      driver on the -- on Highway 41.  He was all over the

8      road and I had to call 911 and then kind of followed

9      him until the police took over.

10                ATTORNEY SCHNEIDER:  How long ago was that?

11                JUROR WELLS:  I'd say eight or nine

12      years.

13                ATTORNEY SCHNEIDER:  Okay.  Any other

14      situations where you had to phone 911?

15                JUROR WELLS:  No.

16                ATTORNEY SCHNEIDER:  Okay.  Anyone else

17      then in that row?  Mr. Maas?

18                JUROR MAAS:  Too many times to count.

19                ATTORNEY SCHNEIDER:  Okay.  Well you didn't

20      say you had a pruner at your bar, but was it because

21      of incidents that occurred at the bar?

22                JUROR MAAS:  Bar, and I'm a truck driver

23      too, I see --

24                ATTORNEY VISHNY:  I'm sorry?

25                ATTORNEY SCHNEIDER:  He's a truck driver.

190

1          Right?

2                     JUROR MAAS:  Yes.

3                     ATTORNEY SCHNEIDER:  So probably witnessed

4          a lot of different things on the roadways and you

5          would call?

6                     JUROR MAAS:  Um-hum.

7                     ATTORNEY SCHNEIDER:  Thank you.

8               Then in the next row?

9               Okay.  Mr. Shea.

10                    JUROR SHEA:  My house was struck by

11         lightning, called 911.  High school reunion, guy

12         collapsed, called 911.  That was it.

13                    ATTORNEY SCHNEIDER:  The situation where a

14         friend collapsed at the high school reunion,

15         something you still remember pretty vividly?

16                    JUROR SHEA:  Sure.

17                    ATTORNEY SCHNEIDER:  Thank you.

18              Miss Erickson.

19                    JUROR ERICKSON:  Couple times at work for

20         work-related injuries from fellow employees, couple

21         of rowdy customers, and a couple times DUI people,

22         couple times then basically acts of God stuff like

23         lightning and stuff like that.

24                    ATTORNEY SCHNEIDER:  Anyone else then in

25         that row ever have to call 911?

1              Okay.  I'm going to start with Mr. Bloomer.

2                   JUROR BLOOMER:  I called 911 approximately

3        about three or four times for heart attacks and other

4        injuries work related at work.

5                   ATTORNEY SCHNEIDER:  Okay.

6                   JUROR BLOOMER:  And the incident I

7        discussed earlier, I called for that.  And being

8        witness to accidents twice.

9                   ATTORNEY SCHNEIDER:  Thank you.

10             And then, Mr. Nichols, did you have your hand

11       up?

12                  JUROR NICHOLS:  Yeah.  I had came across a

13       lady that ran through a construction zone where they

14       moved all of the road next to a railroad tracks and

15       got her car stuck on the railroad tracks.

16                  ATTORNEY SCHNEIDER:  Okay.

17                  JUROR NICHOLS:  So I waited for the police

18       to come and get everything taken care of.

19                  ATTORNEY SCHNEIDER:  Okay.  Thank you, Mr.

20       Nichols.

21             Anyone then in the front row?

22             Okay.  Miss Elbe.

23                  JUROR ELBE:  The question was?

24                  ATTORNEY SCHNEIDER:  Have you ever had to

25       call 911?

192

1          JUROR ELBE:  I am 911.  And yes.  Yes.
2     Neighbors, girlfriends, things like that got cut or
3     they've had an accident, and of course it's me, and
4     then I tell them, no, we're going to call and take
5     them in.
6          ATTORNEY SCHNEIDER:  Thank you, Miss Elbe.
7          JUROR ELBE:  Um-hum.
8          ATTORNEY SCHNEIDER:  Anyone else then.
9     Miss Plamann, did you have your hand raised?
10          JUROR ELBE:  Yes.  I had to call for I
11     think two traffic accidents that I witnessed and then
12     one the neighbor lady had fallen on the ice and we
13     couldn't get her up.
14          ATTORNEY SCHNEIDER:  Okay.  Anyone else
15     that I missed?
16     Okay.  Miss Giesen?
17          JUROR GIESEN:  Giesen.  I had a car
18     accident.  One time we were witness to a car
19     accident, so we talked to the officer.  By the time
20     we got to the other end of the road who caused
21     multiple accidents, we talked to him, and from my
22     illness.
23          ATTORNEY SCHNEIDER:  Okay.  Thank you, Miss
24     Giesen.
25     Anyone ever on the panel, might be a situation

1    where you didn't call 911 but where you were a

2    witness to an incident where you would have talked to

3    law enforcement about what you saw?  Anyone have that

4    situation?

5        Okay.  I'm going to start in the back row with

6    Mr. Schueller.

7            JUROR SCHUELLER:  I had to testify once for

8    a work incident where someone had fallen and broke

9    her ankle.

10            ATTORNEY SCHNEIDER:  And is that a

11    situation when you spoke to the law enforcement

12    officers you told them what you could remember and

13    what you knew?

14            JUROR SCHUELLER:  And then a lawyer after

15    that.

16            ATTORNEY SCHNEIDER:  Okay.  Thank you.

17        Mr. Calmes?

18            JUROR CALMES:  Two different occasions,

19    accidents, had to tell the officers both times.

20            ATTORNEY SCHNEIDER:  And told them what you

21    knew, what you saw?

22            JUROR CALMES:  Yeah.

23            ATTORNEY SCHNEIDER:  Anyone then?

24        Okay.  Miss Meyer.

25            JUROR MEYER:  The incident at my duplex we

194

```
1        had to call a police officer, we discussed earlier.
2              ATTORNEY SCHNEIDER:  Okay.  That something,
3        Miss Meyer, that you can still remember parts of what
4        occurred that day?
5              JUROR MEYER:  Definitely.
6              ATTORNEY SCHNEIDER:  Is it something that
7        during the course of that you were upset when you
8        were talking to them?
9              JUROR MEYER:  Yes, I was upset.
10             ATTORNEY SCHNEIDER:  And you still told
11       them what you could remember?
12             JUROR MEYER:  Yes.
13             ATTORNEY SCHNEIDER:  As best you could?
14             JUROR MEYER:  Yes.
15             ATTORNEY SCHNEIDER:  Okay.  Thank you.
16          Anyone else then?
17          Okay.  Mr. Eggers.
18             JUROR EGGERS:  Domestic dispute in front of
19       my mother's house between a couple.
20             ATTORNEY SCHNEIDER:  So you phoned law
21       enforcement and they spoke to you?
22             JUROR EGGERS:  No.  Well, I just gave my
23       statement what I saw.
24             ATTORNEY SCHNEIDER:  Okay.  Told them what
25       you saw, what you knew?
```

195

```
 1                    JUROR EGGERS:  Yup.
 2                    ATTORNEY SCHNEIDER:  Did you know the
 3         people that were involved?
 4                    JUROR EGGERS:  Nope.
 5                    ATTORNEY SCHNEIDER:  Anyone then as I
 6         continue up?
 7              Okay.  We'll start with Mr. Shea.
 8                    JUROR SHEA:  I got subpoenaed to court for
 9         my account of how the traffic accident in front of my
10         house.
11                    ATTORNEY SCHNEIDER:  And when you spoke
12         with law enforcement or went into court, did you tell
13         them what you could remember?
14                    JUROR SHEA:  Yes.
15                    ATTORNEY SCHNEIDER:  Thank you.
16              Miss Erickson, did you have your hand up?
17                    JUROR ERICKSON:  Yes.  Just a couple times
18         just the police taking my statements, nothing more
19         than that.
20                    ATTORNEY SCHNEIDER:  Anyone else then in
21         the back row?
22              So then, Mr. Webster, did you have your hand up?
23                    JUROR WEBSTER:  Yup.
24                    ATTORNEY SCHNEIDER:  What was that
25         situation?
```

196

1              JUROR WEBSTER:  A fight.

2              ATTORNEY SCHNEIDER:  A fight?

3              JUROR WEBSTER:  Yeah.  Back in the alley of

4      Route 66, and it's something where law enforcement

5      came and took a statement.  We gave our statement but

6      it never went -- it just went away.

7              ATTORNEY SCHNEIDER:  Is it something that

8      when you talked to them you told them what you could

9      remember?

10             JUROR WEBSTER:  I told them what I saw.

11             ATTORNEY SCHNEIDER:  Okay.

12             JUROR WEBSTER:  But it didn't go any

13     further to court.

14             ATTORNEY SCHNEIDER:  Okay.

15        Miss Elbe then?

16             JUROR ELBE:  Yes.  Just beside medically,

17     outside of that, yes, had to stop and give some

18     information to the policeman in regard to people that

19     are either drinking and driving or things like that

20     that was available to give them information.

21             ATTORNEY SCHNEIDER:  Okay.  Perfect.  Thank

22     you.

23        Anyone else I missed on that question?

24        I'm sorry.  Miss Vandenberg?

25             JUROR VANDENBERG:  My friend tried to

197

1       overdose so I had to fill out an incident report.

2               ATTORNEY SCHNEIDER:  Is this something

3       where you -- male or female friend?

4               JUROR VANDENBERG:  Female.

5               ATTORNEY SCHNEIDER:  Is it something where

6       you found her after?

7               JUROR VANDENBERG:  No.  She told me right

8       after.

9               ATTORNEY SCHNEIDER:  So in that situation,

10      your friend tried to overdose, she talked to you

11      about it, and then did you contact law enforcement?

12              JUROR VANDENBERG:  No.  I called her mom

13      and they took her to the ER and I had something to

14      fill out.

15              ATTORNEY SCHNEIDER:  And then you filled

16      out what you knew?

17              JUROR VANDENBERG:  Yes.

18              ATTORNEY SCHNEIDER:  A situation, Miss

19      Vandenberg, where you knew something that a friend

20      had done but yet wanted to share that information,

21      correct?

22              JUROR VANDENBERG:  Yeah.

23              ATTORNEY SCHNEIDER:  Wanted to get her

24      help?

25              JUROR VANDENBERG:  Yes.

198

1              ATTORNEY SCHNEIDER:  And even though it was
2       your friend and you were saying something that wasn't
3       putting her in the best light, it was something you
4       felt was important to say?
5              JUROR VANDENBERG:  Right.
6              ATTORNEY SCHNEIDER:  Okay.  Thank you.
7         Anyone else that I missed?
8         Okay.  Miss Plamann, that --
9              JUROR PLAMANN:  The situation we discussed
10      earlier, and then we had a break-in at our house so
11      the police officers came, and then for the traffic
12      accidents, the reports on those.
13             ATTORNEY SCHNEIDER:  And in all those
14      situations tried to explain and tell the officers
15      what you knew or what you could remember?
16             JUROR PLAMANN:  Correct.
17             ATTORNEY SCHNEIDER:  Okay.  Thank you, Miss
18      Plamann.
19         Anyone ever been involved in a situation, Miss
20      Steffen has talked about her mom, when your mom went
21      into diabetic shock, anyone else ever involved in a
22      situation where, whether it be someone you knew or a
23      stranger, had a serious emotional issue or was
24      seriously injured and you had to call law
25      enforcement?  Anyone ever have that life experience?

199

1     Mr. Nichols?

2               JUROR NICHOLS:  I saw a guy get

3     electrocuted.

4               ATTORNEY SCHNEIDER:  Okay.  And obviously

5     contacted law enforcement for that situation?

6               JUROR NICHOLS:  Ambulance.

7               ATTORNEY SCHNEIDER:  Thank you, Mr.

8     Nichols.

9          Mr. Maas?  I thought that was a movement there.

10    What kind of situation or just at the bar?

11              JUROR MAAS:  No.  I've seen multiple

12    accidents.

13              ATTORNEY SCHNEIDER:  Okay.

14              JUROR MAAS:  That kind of thing.

15              ATTORNEY SCHNEIDER:  Ones where parties

16    were injured?

17              JUROR MAAS:  Were killed, yes.

18              ATTORNEY SCHNEIDER:  Okay.  Thank you, Mr.

19    Maas.

20         You will learn that as part of this case Luna

21    Lounge, back in December of 2013, did have some video

22    cameras installed at the business, and during the

23    course of this case and trial you will see images

24    from those video cameras, and primarily I think two

25    camera angles.  You will learn, for those of you who

200

1    know Luna, one shows the front door area from inside

2    looking kind of out of the door, and the other one is

3    a camera angle that shows into what we will refer to

4    as like the main bar, it's the upper bar area.

5        Anyone at their employment have a security

6    camera or a security system where you've ever had to

7    go and watch or look at any of that kind of

8    surveillance?

9        Okay.  We're going to start in the back row.

10   Mr. Schueller?

11            JUROR SCHUELLER:  I'm an assistant manager

12   at my place of employment.

13            ATTORNEY SCHNEIDER:  Okay.

14            JUROR SCHUELLER:  And I help with AP, Asset

15   Protection, to catch individual people.

16            ATTORNEY SCHNEIDER:  Is it a situation,

17   because I remember looking at your sheet, your video

18   camera system is in color, correct, or is it black

19   and white?

20            JUROR SCHUELLER:  Black and white

21   unfortunately.

22            ATTORNEY SCHNEIDER:  Is it a situation, Mr.

23   Schueller, where you've ever been asked by law

24   enforcement to kind of go back and find a particular

25   area of the video?

201

1          JUROR SCHUELLER:  Yup.

2          ATTORNEY SCHNEIDER:  Okay.  Anyone else

3     then in that back row before I move up?

4          (No response.)

5          ATTORNEY SCHNEIDER:  And then in the second

6     row, anyone?  Mr. Maas?

7          JUROR MAAS:  I've got cameras.

8          ATTORNEY SCHNEIDER:  At the bar you owned?

9          JUROR MAAS:  Yes.

10         ATTORNEY SCHNEIDER:  Probably because you

11    were the one running it, responsible at different

12    times for going back and trying to find things on

13    those cameras?

14         JUROR MAAS:  Yes, ma'am.

15         ATTORNEY SCHNEIDER:  Thank you, Mr. Maas.

16       Then, Miss Erickson?

17         JUROR ERICKSON:  Yes.  With my employment

18    I'm manager so I check the cameras for theft or other

19    incidences in the store.

20         ATTORNEY SCHNEIDER:  Where do you work

21    again?

22         JUROR ERICKSON:  I work at Woodman's.

23         ATTORNEY SCHNEIDER:  Okay.  Thank you.

24    Ever asked by law enforcement to look for something

25    particular on that?

202

1              JUROR ERICKSON:  Yes.

2              ATTORNEY SCHNEIDER:  Okay.  Anyone else in

3      that row?  Mr. Bloomer?

4              JUROR BLOOMER:  I've watched as many as

5      probably 15 different cameras, and I -- I have in one

6      place I worked, Kimberly Clark, where they wanted to

7      review.  It's not really too hard to do.

8              ATTORNEY SCHNEIDER:  Thank you, Mr.

9      Bloomer.

10          And in the front row?

11              (No response.)

12              ATTORNEY SCHNEIDER:  Okay.  You will learn

13      and see as part of this case that the camera system

14      Luna had, because of, in essence, the lighting

15      inside, which is set up to be with many black lights,

16      that it's almost -- the images are almost going to be

17      like a night vision camera.  Okay?  And I know those

18      are popular with hunters and popular in different

19      fields.  Does anyone have such a type of a camera?

20          Okay.  Mr. Calmes?

21              JUROR CALMES:  Yes.

22              ATTORNEY SCHNEIDER:  Is it something where

23      you've set it up to see if wildlife come I'm

24      guessing?

25              JUROR CALMES:  Exactly.

203

1                ATTORNEY SCHNEIDER:  Is the type of camera

2        you have such where the colors that you see on those

3        images are not consistent with what is actually out

4        there?

5                JUROR CALMES:  Absolutely.

6                ATTORNEY SCHNEIDER:  Anyone else ever have

7        any of those types of cameras or watch, whether it be

8        shows or I think there is even some local live feeds

9        where they have these cameras set up here in our

10       area?

11               (No response.)

12               ATTORNEY SCHNEIDER:  In this case you are

13       going to hear testimony from people that the

14       defendant spoke to after the offense, so I want to

15       ask you if you've ever had the situation where

16       someone told you that they were involved in an

17       offense, it could be, hey, last night I hit the

18       neighbor's tree because I was so drunk on the phone,

19       or it could be something more significant like I got

20       in a significant fight with my loved one and I beat

21       her up.  Has anyone ever had the experience where a

22       family member or friend ever disclosed or talked to

23       you about something they had done?

24               (No response.)

25               ATTORNEY SCHNEIDER:  Part of the case -- at

204

1    some point you're going to also hear phone calls that

2    come from a jail recording system.  Has anyone ever

3    received a call from anyone and talked to them on a

4    system where that person might have been

5    incarcerated?

6         Okay.  Mr. Shea.  When was that?

7              JUROR SHEA:  Year ago.

8              ATTORNEY SCHNEIDER:  Okay.  And was it the

9    type of recording system where it would tell you at

10   the start that it was being recorded or monitored?

11             JUROR SHEA:  I think they say it's from an

12   inmate.

13             ATTORNEY SCHNEIDER:  Okay.  And it sounds

14   like it was probably limited calls?

15             JUROR SHEA:  It's time limited because I

16   had to pay for the phone call with my son.

17             ATTORNEY SCHNEIDER:  But you had multiple

18   calls -- multiple conversations with him?

19             JUROR SHEA:  Yes.

20             ATTORNEY SCHNEIDER:  Okay.  Thank you.

21        Miss Erickson?

22             JUROR ERICKSON:  Yeah.  Just a few family

23   and friends if they got put up in the jail or

24   something like that.  And it always states that.

25             ATTORNEY SCHNEIDER:  That these calls are

1     being recorded or monitored?

2          JUROR ERICKSON:  As long as I can remember.

3     I've always heard that.

4          ATTORNEY SCHNEIDER:  Anyone else I'm

5     missing?

6        Miss Micke?

7          JUROR MICKE:  My brother.

8          ATTORNEY SCHNEIDER:  Okay.  And then I

9     think, Mr. Van Deurzen, did you raise your hand?

10          JUROR VAN DEURZEN:  Yup.

11          ATTORNEY SCHNEIDER:  What kind of situation

12     was that?

13          JUROR VAN DEURZEN:  My son.

14          ATTORNEY SCHNEIDER:  Okay.

15        You will likely hear recordings or as part of

16     those calls at times people were speaking in the

17     Hmong language.  Does anyone on the panel read or

18     speak that language or any version that may be out

19     there of that language?

20          (No response.)

21          ATTORNEY SCHNEIDER:  Just let me grab my

22     notes real quick here.

23        Miss Steffen, on your paperwork you listed that

24     you were retired.  What did you do for a career?

25          JUROR STEFFEN:  I was a teacher at one

206

1    time.  And then I owned my own business.  I did craft
2    shows.

3          ATTORNEY SCHNEIDER:  Thank you.

4       Mr. Buza, what did you do for a career?

5          JUROR BUZA:  I was a mailman for 23 years.
6    Before that I worked on the railroad for 20 years.

7          ATTORNEY SCHNEIDER:  Okay.  Was that always
8    here in the Fox Cities or Outagamie County or
9    different parts?

10         JUROR BUZA:  I worked in Menasha for 23
11    years as a mailman.  Railroad, I was all over.

12         ATTORNEY SCHNEIDER:  Okay.

13       Sometimes questions, depending upon the time of
14    the year, I'm not sure which way to ask this, but
15    this is a social media type question, so I'm going to
16    ask it in what I think will elicit the fewest number
17    of responses.

18       How many of you do not have a Facebook account?

19       Okay.  Just -- I'm going to take notes.  Miss
20    Hermus, Miss Dey, Mr. Van Dalen, Mr. Eggers, Miss
21    Steffen.  And then Miss Micke?  And Miss Elbe.

22       For those of you who do --

23         JUROR WEBSTER:  I don't have a Facebook.

24         ATTORNEY SCHNEIDER:  Mr. Webster, you do
25    not?  Sorry.  I missed your hand.  Mr. Keleske?

1              JUROR KESLESKE:  Correct.

2              ATTORNEY SCHNEIDER:  Now I'm going to look

3       at any little flinch everybody makes.

4          For those of you who do have an account, have

5       you ever had a situation where you've had to

6       deactivate or take it down for any reason?

7          Okay.  Just Miss Giesen?

8              JUROR GIESEN:  Giesen.

9              ATTORNEY SCHNEIDER:  What kind of situation

10      was that?

11             JUROR GIESEN:  My nephews were putting some

12      naughty things on there and I didn't care to see

13      them.

14             ATTORNEY SCHNEIDER:  Okay.  Thank you, Miss

15      Giesen.

16             JUROR GIESEN:  Sure.

17             ATTORNEY SCHNEIDER:  As part of this case,

18      and we've already kind of discussed the fact that the

19      victim was shot in the head, so I need to ask some

20      questions about firearms, and those of you that own

21      firearms, if you just hunt with them, if it's

22      something you collected them, and then I will

23      probably ask if it's something as any part of an

24      occupation have you ever had to have – I know I'll

25      get one response to that – a firearm.  So who on the

208

1    panel either you've owned them or they've been in

2    your home?  Firearms this would be.

3          Okay.  So I'm going to start in the back row.

4          Miss Hermus, is it something that they are your

5    guns?

6                JUROR HERMUS:  They are my husband's and he

7    uses them for hunting.

8                ATTORNEY SCHNEIDER:  Hunting.

9                JUROR HERMUS:  Yes.

10               ATTORNEY SCHNEIDER:  Have you ever shot any

11   of them?

12               JUROR HERMUS:  (Shaking head back and

13   forth.)

14               ATTORNEY SCHNEIDER:  No?  Thank you.

15         Miss Dey?

16               JUROR DEY:  My husband's.

17               ATTORNEY SCHNEIDER:  For hunting or --

18               JUROR DEY:  Hunting.

19               ATTORNEY SCHNEIDER:  Have you ever fired

20   any of them?

21               JUROR DEY:  No.

22               ATTORNEY SCHNEIDER:  Mr. Van Deurzen?

23               JUROR VAN DEURZEN:  Yes.  For hunting.

24               ATTORNEY SCHNEIDER:  So primarily shotguns?

25               JUROR VAN DEURZEN:  Rifles.

209

```
1                    ATTORNEY SCHNEIDER:  Rifles.

2              Mr. Schueller, it was no response, okay.

3              Mr. Calmes.

4                    JUROR CALMES:  Hunting, rifle and

5         shotgun.

6                    ATTORNEY SCHNEIDER:  Mr. Parker?

7                    JUROR PARKER:  Hunting, rifle and shotgun.

8                    ATTORNEY SCHNEIDER:  Then the middle row.

9         Mr. Fleming?

10                    JUROR FLEMING:  Handguns from my dad.

11                    ATTORNEY SCHNEIDER:  Sure.

12                    JUROR FLEMING:  They're mostly pistols.

13                    ATTORNEY SCHNEIDER:  Okay.

14                    JUROR FLEMING:  But there are a couple

15         rifles.

16                    ATTORNEY SCHNEIDER:  Okay.  Is it something

17         where you just keep them and collect them or do you

18         take them out to a range and ever shoot them?

19                    JUROR FLEMING:  Sometimes -- we used to

20         shoot them when my dad was younger and still alive.

21         When I was younger, yeah, we did, we would go to the

22         target range and go target shooting.

23                    ATTORNEY SCHNEIDER:  Thank you.

24              Miss Steffen?  No?  Okay.

25              Then Miss Meyer?  Yes?
```

210

```
1                    JUROR MEYER:  My husband's for hunting.
2                    ATTORNEY SCHNEIDER:  And then Mr. Wells?
3                    JUROR WELLS:  Shotgun.  My grandpa gave it
4         to me.
5                    ATTORNEY SCHNEIDER:  Wanted to make you a
6         hunter.
7                    JUROR WELLS:  Yeah.  I don't really keep
8         doing it though.
9                    ATTORNEY SCHNEIDER:  Mr. Maas.  Hunting?
10                   JUROR MAAS:  No.  Personal.
11                   ATTORNEY SCHNEIDER:  Okay.  You own a .25
12        caliber?
13                   JUROR MAAS:  At one time I did, yes.
14                   ATTORNEY SCHNEIDER:  Okay.  Mr. Van Dalen?
15                   JUROR VAN DALEN:  No.
16                   ATTORNEY SCHNEIDER:  Firearms, no.
17              Mr. Eggers?
18                   JUROR EGGERS:  Hunting, personal
19        protection.  I own numerous guns, shotguns, rifles,
20        pistols.
21                   ATTORNEY SCHNEIDER:  Thank you, Mr. Eggers.
22                   JUROR EGGERS:  With a concealed carry
23        permit.
24                   ATTORNEY SCHNEIDER:  You do have a CC with
25        permit?
```

211

1                    JUROR EGGERS:  Yes.

2                    ATTORNEY SCHNEIDER:  Thank you.

3          Then anyone in the third row?

4          Okay.  Mr. Shea.

5                    JUROR SHEA:  Hunting.  I have a rifle and a

6       shotgun.

7                    ATTORNEY SCHNEIDER:  Okay.

8          Miss Erickson?

9                    JUROR ERICKSON:  Collecting, hunting and

10      personal.

11                   ATTORNEY SCHNEIDER:  Do you have a .25?

12                   JUROR ERICKSON:  No.

13                   ATTORNEY SCHNEIDER:  Miss Lee.  Firearms?

14                   JUROR LEE:  Just growing up as a kid my dad

15      and my brother with hunting.

16                   ATTORNEY SCHNEIDER:  And then, Mr. Green,

17      any firearms?

18                   JUROR GREEN:  Shotgun and rifle.

19                   ATTORNEY SCHNEIDER:  And then anyone else

20      in that row?

21          Okay.  Miss Micke?

22                   JUROR MICKE:  We have -- my fiance owns

23      ones for hunting and then we also have handguns for

24      birding.

25                   ATTORNEY SCHNEIDER:  Okay.  And then Mr.

212

1    Nichols?

2             JUROR NICHOLS:  I've got a rifle, shotgun

3    and handguns.

4             ATTORNEY SCHNEIDER:  Ever own a .25

5    caliber?

6             JUROR NICHOLS:  No.

7             ATTORNEY SCHNEIDER:  Okay.  I'll get to you

8    in one second, Miss Plamann.

9        Mr. Keleske?

10            JUROR KELESKE:  Just rifles.  Hunting.

11            ATTORNEY SCHNEIDER:  Anyone else in the

12   front row then?

13       Okay.  Mr. Buza, and you had mentioned you had a

14   job when you worked security at the Army prison?

15            JUROR BUZA:  Army.

16            ATTORNEY SCHNEIDER:  So you had --

17            JUROR BUZA:  I got rifles and shotguns but

18   mostly hunting.

19            ATTORNEY SCHNEIDER:  Okay.  Other than your

20   work in the Army, did you ever have any other

21   profession where you had to carry a firearm or a gun?

22            JUROR BUZA:  No.

23            ATTORNEY SCHNEIDER:  Anyone else in the

24   front row?  Miss Elbe?

25            JUROR ELBE:  Yes.  My husband had an old,

213

1          old gun, don't ask me what it is, he's deceased, and

2          so it's up in the deer antlers and it's older than

3          old.

4                    ATTORNEY SCHNEIDER:  Layers of dust

5          probably.

6                    JUROR ELBE:  Yeah.  Pretty much.

7                    ATTORNEY SCHNEIDER:  And then Miss Plamann?

8                    JUROR PLAMANN:  We have -- my dad gave us,

9          it's either -- it's for hunting.  I don't use it.

10         But then I grew up with them with my dad.  I used to

11         hunt when I was younger.  I don't anymore.

12                   ATTORNEY SCHNEIDER:  Does anyone on the

13         panel have -- I'm sorry, Miss Giesen.  I missed you

14         over there.

15                   JUROR GIESEN:  That's all right.  Hunting

16         for my sons and my husband and shotguns.

17                   ATTORNEY SCHNEIDER:  Does anyone on the

18         panel -- Mr. Bloomer?

19                   JUROR BLOOMER:  I wasn't sure whether you

20         were asking for military experience.

21                   ATTORNEY SCHNEIDER:  Yes.  That --

22                   JUROR BLOOMER:  Okay.  Yeah.  I -- you do

23         that in the military.

24                   ATTORNEY SCHNEIDER:  What branch did you

25         serve in?

214

1           JUROR BLOOMER:  The Army Reserve and the

2     Air Force.

3           ATTORNEY SCHNEIDER:  Thank you.

4        Anyone on the panel have strong personal beliefs

5     that there should be more gun – I'll come to you,

6     Miss Erickson, one second – more gun restrictions or

7     sanctions or laws related to gun use?

8        Mr. Shea, feel we're lax in some areas?

9           JUROR SHEA:  Maybe I misunderstood the

10    question.  I feel like there should be more gun

11    control.  I have a rifle and a shotgun, but I feel

12    that there's too many handguns out there.

13          ATTORNEY SCHNEIDER:  And that's kind of one

14    of those examples if I ask something and you confuse

15    me, clarify.  That's what I was asking for is if

16    anyone has a personal opinion, not all types because

17    if you hunt, but if there should be restrictions

18    placed on certain types of weapons or firearms, so

19    thank you, Mr. Shea.

20       Miss Erickson, you raised your hand and I just

21    kept going.

22          JUROR ERICKSON:  No problem.  The military

23    experience.

24          ATTORNEY SCHNEIDER:  Okay.  And what branch

25    did you serve in?

215

1              JUROR ERICKSON:  Army, ten years.

2              ATTORNEY SCHNEIDER:  Okay.  Thank you.

3    Miss Steffen?

4              JUROR STEFFEN:  There should be more gun

5    control.

6              ATTORNEY SCHNEIDER:  Okay.  Thank you.

7    Anyone -- Mr. Fleming?

8              JUROR FLEMING:  I agree that there should

9    be a little bit more.  Not take them away, little bit

10   more.

11             ATTORNEY SCHNEIDER:  Okay.  Thank you.

12        I think we would have touched on this if it

13   happened already, but I need to ask.  Has anyone ever

14   had a situation where a gun was pulled out, displayed

15   or used or threatened to be used against you?

16             (No response.)

17             ATTORNEY SCHNEIDER:  Anyone have that

18   situation with a family member or a friend where you

19   would have talked to them about that experience?

20             (No response.)

21             ATTORNEY SCHNEIDER:  Miss Erickson?

22             JUROR ERICKSON:  Family friend.

23             ATTORNEY SCHNEIDER:  Can you please

24   describe for us what happened?

25             JUROR ERICKSON:  Suicidal tendencies.

216

1            ATTORNEY SCHNEIDER:  So you were present
2       when this person would have --
3            JUROR ERICKSON:  Correct.
4            ATTORNEY SCHNEIDER:  -- displayed a gun?
5            JUROR ERICKSON:  Displayed it.
6            ATTORNEY SCHNEIDER:  Thank you, Miss
7       Erickson.
8          Mr. Bloomer?
9            JUROR BLOOMER:  It was a -- the officer
10      made a mistake.  My brother and I were young, I was
11      only 17 at the time, I was in Colorado and we were
12      hiking in some hills, and he came up to us and pulled
13      his gun and said stop because we -- we saw him, we
14      turned around, we were going to walk, and so -- but
15      he told us right away.
16           ATTORNEY SCHNEIDER:  It was calmed down?
17           JUROR BLOOMER:  Yeah.  It was a mistake.
18           ATTORNEY SCHNEIDER:  Okay.  Thank you, Mr.
19      Bloomer.
20         We locally have many services that provide
21      assistance to crime victims.  We have programs such
22      as Harbor House which is our local domestic violence
23      shelter, we have the Sexual Assault Crisis Center
24      which by its name supports victims who have been
25      involved in sexual offenses, we have programs like

217

1          our Child Advocacy Center which provides assistance

2          to child victims or witnesses, we have programs like

3          MADD, Mothers Against Drunk Driving, some of the high

4          schools have SADD, which is Students Against Drunk

5          Driving.

6                Anyone ever volunteer or contribute to any of

7          those type of programs, sometimes it's through United

8          Way through work?

9                     Okay.  Mr. Schueller.

10                    JUROR SCHUELLER:  During high school I

11         participated in a group called Peers for Fears which

12         was done through the Washington County Alcohol

13         System.

14                    ATTORNEY SCHNEIDER:  And that was while you

15         were in high school and you were assisting other high

16         school students?

17                    JUROR SCHUELLER:  Yeah.

18                    ATTORNEY SCHNEIDER:  Thank you, Mr.

19         Schueller.

20               Anyone else?  Mr. Shea?

21                    JUROR SHEA:  Harbor House.

22                    ATTORNEY SCHNEIDER:  That through work or

23         personal donation?

24                    JUROR SHEA:  My wife and I made --

25                    COURT REPORTER:  I didn't hear his answer.

218

1              ATTORNEY SCHNEIDER:  He said his wife and

2      him made meals and dropped off the meals.

3              ATTORNEY SCHNEIDER:  Anyone else on the

4      panel?

5          Do we want to take Mr. Keleske?

6              THE COURT:  Unless you're very close to

7      being finished, and that's not meant to be a

8      pressure.

9              ATTORNEY SCHNEIDER:  No.  That's okay.  We

10     can.

11         Okay.  I'm just going to double-check my notes

12     here.

13         For those of you who were witnesses to

14     accidents, and we have a lot of you who describe that

15     situation who might have seen that accident or been

16     involved in an accident, were there ever any times

17     where another party requested you not talk to the

18     police about what you saw?

19             (No response.)

20             ATTORNEY SCHNEIDER:  No one had that

21     experience.

22         Again, I just want to ask this question.  Is

23     there anything anyone's thought of from my questions

24     that now you think of something you would want to

25     provide an answer to?

219

1                    (No response.)

2                    ATTORNEY SCHNEIDER:  And again, going back

3          to the charges in this case, you've had time to learn

4          more about the facts or different components that

5          might come out, is there anyone as you sit here now

6          for personal or religious reasons or just any other

7          reasons -- and, Miss Giesen, is it the same issue we

8          talked about in the back?

9                    JUROR GIESEN:  No.  It's about people being

10         shot.  I -- my brother shot his leg when I was about

11         five-years old.

12                   ATTORNEY SCHNEIDER:  Okay.

13                   JUROR GIESEN:  And I had a friend -- my

14         brother's friend shot himself in the wrist

15         accidentally when I was about twelve, I mean, twelve

16         years old.

17                   ATTORNEY SCHNEIDER:  Okay.  Thank you.

18         Okay.  Miss Dey.

19                   JUROR DEY:  My brother-in-law committed

20         suicide, and I -- my sister called me right after it

21         happened so I arrived there about the same time the

22         cops did.

23                   ATTORNEY SCHNEIDER:  Did you have an

24         occasion to see him?

25                   JUROR DEY:  No, but we had to clean up the

220

1          garage and stuff like that after.

2                    ATTORNEY SCHNEIDER:  Okay.  All right.

3          Thank you, Miss Dey.

4              Mr. Fleming?

5                    JUROR FLEMING:  My brother committed

6          suicide.

7                    ATTORNEY SCHNEIDER:  Was it something where

8          you went to the home or where that occurred after?

9                    JUROR FLEMING:  Yeah.

10                   ATTORNEY SCHNEIDER:  Okay.  Having that

11         situation -- and you will hear some of the witnesses

12         try to provide some support and assistance, and

13         ultimately officers did as well, to Mr. Richards, is

14         that going to cause you any concern in weighing or

15         being a juror in this case?

16                   JUROR FLEMING:  It was a while back.  I

17         think -- I can't say I've overcome it, but I think

18         pretty okay with it.

19                   ATTORNEY SCHNEIDER:  Thank you, Mr.

20         Fleming.

21             Anyone else have a situation where a family

22         member or loved one committed suicide or injured

23         themselves because of a firearm?

24             More, Miss Giesen?

25                   JUROR GIESEN:  It was a close friend's son

221

1    committed suicide.

2              ATTORNEY SCHNEIDER:  Okay.  Thank you.

3         So the question then, knowing the facts and

4    knowing more about what you know and thinking about

5    your life experiences, does anyone think right now

6    for personal or religious reasons you could not sit

7    in judgment of another and serve as a juror in this

8    case?

9              (No response.)

10             ATTORNEY SCHNEIDER:  Okay.  That's all.

11   Miss Giesen?

12             JUROR GIESEN:  Yes.

13             ATTORNEY SCHNEIDER:  Okay.  For the same

14   reasons we talked about.

15             JUROR GIESEN:  (Nodding.)

16             ATTORNEY SCHNEIDER:  Okay.  Thank you.

17   That's all I have at this point.

18        Mr. Keleske, I think we're going to take you

19   back at some point and ask you a few follow-up

20   questions, but I thank you all for your time and your

21   patience and your attention this afternoon and all

22   day.

23             THE COURT:  Okay.  What we're going to do

24   is we'll go in back, talk to Mr. Keleske, then we're

25   going to return, and we'll have about a ten-minute

222

```
1       break so that you can get up, stretch if you need to,
2       walk around a little bit or get something to drink or
3       utilize the restroom.  So we'll be just a moment and
4       then we'll go on about a ten-minute break.
5                  (Proceedings held outside the presence of
6       the jury panel.)
7                  (Mr. Keleske enters.)
8                  THE COURT:  Mr. Keleske, to one of Attorney
9       Schneider's questions you had indicated that you had
10      a family member or a friend who had been involved in
11      a crime and wanted to talk about it in a more
12      intimate setting.
13                 JUROR KELESKE:  Yeah.
14                 THE COURT:  What would you like to share?
15                 JUROR KELESKE:  My wife was convicted of
16      forgery two years ago.  She's still on probation.
17      During the previous two years I've been battling
18      anxiety and depression.  Right now I'm having a mild
19      anxiety attack because of the questions she asked.
20      And it's not your fault.  I thought I was strong
21      enough and ready to do something like this for the
22      community.  I really don't think I am.
23                 THE COURT:  Okay.
24                 JUROR KELESKE:  I'm being honest with
25      you.
```

223

```
1                    ATTORNEY SCHNEIDER:  No.  That's okay.
2                    THE COURT:  No.  That's absolutely fine.
3          And I -- just so that I'm clear, it's -- you
4          understand this may take seven, eight, nine days.
5                    JUROR KELESKE:  Yes.
6                    THE COURT:  And the subject matter,
7          although the questions will not be directed at you
8          per se, meaning you'll be asked the questions, it may
9          be of a subject matter that may be challenging for
10         you; is that a fair statement?
11                   JUROR KELESKE:  Be very challenging for me
12         right now.  I thought I was further along in my
13         treatment with anxiety and depression, and clearly
14         I'm not.  Right now I'm a basket case.
15                   THE COURT:  No.  There's no shame in that.
16         And is it fair to say that your -- and the only thing
17         I ask is that you be honest.  Is it fair to say that
18         you truly and sincerely feel that you would not be
19         able to listen to the case, listen to the evidence
20         and make a decision?
21                   JUROR KELESKE:  I don't want to jeopardize
22         the last two years, excuse my language, but the last
23         two years was living hell in my household.  I've
24         worked very hard to get to the point where I'm at
25         now, because it was bad at my house because of what
```

224

1     happened in my household.  I -- I just can't take it,

2     Your Honor.

3               THE COURT:  And it -- I guess I surmise

4     that it would be a fair statement to say that if you

5     were on the panel you would be distracted, to say the

6     least.  Would that be a fair statement?

7               JUROR KELESKE:  Yeah, now.  I was doing

8     real good until she asked the question if anybody was

9     convicted or something like that.  It brought up a

10    lot of bad memories over the last two years.

11              THE COURT:  Got it.  Well, Mr. Keleske,

12    thank you.  Those are the only questions I have for

13    you at this time.  What I'd like to you do is, why

14    don't you take the break with the group and then come

15    back and then we'll address everything when you come

16    back.  Okay?

17              JUROR KELESKE:  Okay.

18              THE COURT:  All right.

19              ATTORNEY SCHNEIDER:  Thank you, Mr.

20    Keleske.

21              (Mr. Keleske exits.)

22              ATTORNEY SCHNEIDER:  Should we just strike

23    her for cause?

24              ATTORNEY VISHNY:  I think she's right

25    there.  After the last thing she's gone.

225

```
1              THE COURT:  We went through a long colloquy
2         and --
3              ATTORNEY SCHNEIDER:  I don't think we
4         should bring her back.
5              THE COURT:  She thought she could do it and
6         she raised her hand again.  I think we can strike
7         her.
8              ATTORNEY SCHNEIDER:  Then she's only in the
9         on deck circle, but she is --
10             ATTORNEY VISHNY:  She doesn't know it, but
11        she's going to be one closer now because, right, so
12        believe me, when we get to voir dire, there is going
13        to be more people who go.  I'm sure of it.
14             THE COURT:  All right.
15             (Following proceedings held outside the
16        presence of the jury panel.)
17             THE COURT:  We are again on the record in
18        State of Wisconsin v. Chong Lee.
19        And we have before us Mr. Paul Lee, along with
20        his counsel, Attorney Jonathan Groh.  We also have
21        Outagamie County Assistant District Attorney Andrew
22        Maier, along with Outagamie County District Attorney
23        Carrie Schneider.
24        The purpose of today's proceedings is this
25        morning the court was advised that there was a reason
```

226

1          to believe that Mr. Lee -- Mr. Paul Lee would not

2          appear pursuant to a subpoena.  My understanding is

3          that there was contact with the District Attorney's

4          office and that communication did come from Mr. Paul

5          Lee.  As such, the court did authorize a warrant to

6          be issued.  That was issued and subsequently Mr. Paul

7          Lee was detained and he is currently again with his

8          counsel and before us today.

9              It does appear that the issue that needs to be

10          addressed is that under Wisconsin statute section

11          969.01(3).  And, Attorney Schneider, what

12          additionally would you like to say on the matter?

13                  ATTORNEY SCHNEIDER:  In -- in some ways I

14          think I probably made a record of this -- I don't

15          know that I mentioned it when we had our hearing on

16          February 10th, but I do know on February 18th I

17          referenced that the State may have to file a motion

18          because we were concerned about the nonappearance of

19          potentially Paul Lee.  I think I had also mentioned

20          Joe Thor at the time.  This morning then, it was

21          probably even close to nine a.m. by the time we had

22          finished discussing other issues in the jury room,

23          when I was advised that Paul Lee had not made an

24          appearance pursuant to the subpoena.  I know he was

25          served, I know law enforcement had discussions with

227

1    him after that fact about the date and the start date

2    and the time he was needed to report.  I told him

3    such when I met with him and gave him some copies of

4    his police statements.  But contrary to that, we had

5    also -- he had also at one point swore at my

6    victim/witness staff in the last week-and-a-half and

7    told her he didn't care if a warrant was issued.  I

8    think he had shared the same with officers, he wasn't

9    going to come, he didn't care if a warrant was

10   issued.

11        So, based upon that, I had asked the court this

12   morning to issue the warrant.  I don't think you

13   specifically said yet, but I think I -- I think you

14   can add to the record that based upon my request

15   there is a case, *State v. Brady* at 130 Wis.2d 443,

16   where the court should support the warrant by

17   probable cause to believe the testimony of the person

18   is material and that it may be impractical to secure

19   the person's presence by subpoena.  And I think based

20   upon the motion hearings we've had and your awareness

21   of his testimony, I think that was -- I'm going to

22   infer from you ordering it that you found that there

23   was probable cause to believe those things existed.

24        So we are now at the point of do we set bail,

25   what do we do for bail, what do we set bail at.

228

1    There are provisions within 969.01(3) that reference

2    bail for witness.  There are provisions that talk

3    about even if the person fails to give bail you can

4    hold the person for up to 15 days to allow for a

5    deposition to occur.  Well, in this situation we're

6    not going to need that.  I'm going to ask that the

7    court order he be held until his testimony.  I'm

8    trying to work out schedules, but I think at the

9    present time, and I had just a brief discussion with

10   Attorney Groh who is here with Mr. Lee, because my

11   thought would be that he would continue to represent

12   him until the time at which he would testify, I

13   guess, because if he refuses, I don't know if the

14   court can find -- make other findings of contempt or

15   impose other sanctions, but I had talked to him about

16   what his schedule might look like on Friday so

17   Attorney Groh could be here.  At this point my plan

18   would be to have Paul Lee testify Friday afternoon,

19   but I'm going to ask that you set a very significant

20   bail, if you set bail at all, to require and mandate

21   his appearance here.

22           THE COURT:  Attorney Groh.

23           ATTORNEY GROH:  Thank you, Your Honor.  I

24   was able to meet with my client earlier this

25   afternoon.  We certainly talked about the subpoena

229

1     requirements as well as the -- basically the

2     expectation of having him testify, I guess the other

3     rights that would go along with that, and it is my

4     understanding at this time that Mr. Lee is willing to

5     testify at the trial, so I -- I think -- I think that

6     issue has been resolved as a result of our

7     conversations.

8          We -- we would suggest a minimal amount of cash

9     bail.  Once again, I believe Mr. Lee intends to

10     testify.  I don't think he would have the ability to

11     post anything beyond a minimal amount of cash, so we

12     would ask the court to consider that request.  Thank

13     you.

14          THE COURT:  Thank you, Attorney Groh.

15          And to be clear, Attorney Schneider has

16     indicated that this may be a potential issue.  The

17     court has been aware of at least some of the

18     substance of Mr. Paul Lee's anticipated testimony, as

19     well as what would appear to be his potential

20     significance to the -- to the overall case, and so it

21     would appear that -- that at a minimum it would be

22     categorized that Mr. Paul Lee would be a material

23     witness.

24          Additionally, there has been an indication based

25     on representations by the District Attorney's office

230

1    that there has been, for lack of a better term, an

2    ebb and a flow to Mr. Paul Lee's willingness to

3    testify.  There have been times where Mr. Paul Lee

4    had indicated that he would be willing to testify,

5    even a short time later that would be a -- a change

6    of heart, so to speak.  And so, under the

7    circumstances, I certainly think that there is a

8    basis and there has been an adequate showing.  What I

9    would ask, Attorney Schneider, is that at some point,

10   perhaps today or tomorrow, that it be codified in an

11   affidavit format, simply the representations you've

12   -- you have made because it does appear that that

13   would be necessary ultimately for the compliance with

14   969.01(3).

15        That said, when I look at the bond

16   considerations under (4), the court is to look at

17   conditions which are only necessary to assure the --

18   the appearance, in this case it is of the defendant

19   but I think that it is fair to say that some of those

20   same considerations we would look at when dealing

21   with the bail for a witness, and in this case,

22   certainly given the indications up to this point, as

23   well as even yet as recent as this morning, Mr. Paul

24   Lee's failure to appear pursuant to a subpoena, that

25   a cash bond is appropriate.  The court is going to

231

1    order a $25,000 cash bond.

2        Anything else, Attorney Schneider?

3            ATTORNEY SCHNEIDER:  And I know Attorney

4    Groh has some question whether he continues.  I'm

5    just going to ask that the court order he continue to

6    represent Paul Lee until the time at which he

7    testifies.

8            THE COURT:  Absent any sort of conflict of

9    interest, I will order, Mr. Groh, that you remain on

10    the case --

11            ATTORNEY GROH:  Sure.

12            THE COURT:  -- until Mr. Paul Lee has

13    completed his testimony.

14            ATTORNEY GROH:  Okay.  Thank you.

15            THE COURT:  Thank you, sir.

16        Anything else, Attorney Schneider?

17            ATTORNEY SCHNEIDER:  No.  If we can just

18    have five minutes so we can take a restroom break.

19            THE COURT:  Fine.

20        Mr. Groh, anything further?

21            ATTORNEY GROH:  No.

22            THE COURT:  We'll be in recess for about

23    five minutes and then we will --

24            ATTORNEY VISHNY:  Are we reconvening in the

25    jury room or in the courtroom?

1          THE COURT:  Let's reconvene in the jury

2   room because we'll have some questions in there, and

3   so, Attorney Vishny, if you want to either relax in

4   here or alternatively in the jury room, wherever is

5   more comfortable.

6          ATTORNEY VISHNY:  Doesn't matter.

7          (Ms. Stockwell enters.)

8          THE COURT:  Miss Stockwell, how are you?

9          JUROR STOCKWELL:  Okay.

10          THE COURT:  All right.  So you have --

11   you've heard lots of questions today.

12          JUROR STOCKWELL:  Yeah.

13          THE COURT:  And are there any questions

14   that you would have answered yes to that you can

15   think of?

16          JUROR STOCKWELL:  There was so many, I

17   can't remember all of them.

18          THE COURT:  Okay.  And so I had asked you

19   questions if you knew of the attorneys.

20          JUROR STOCKWELL:  No.

21          THE COURT:  Okay.  Did you know any of the

22   witnesses or recognize any of the witness's names?

23          JUROR STOCKWELL:  No.

24          THE COURT:  Okay.  Have you -- have you

25   ever been a victim of a crime?

```
1              JUROR STOCKWELL:  Well, kinda.
2              THE COURT:  Okay.  What does that mean?
3              JUROR STOCKWELL:  Well, 7th grade people
4       were trying to bust me and I managed to get away from
5       them before they could do too much, and I told my mom
6       about it and they pretty much kicked them out of the
7       house, like get the hell out of there, and that's
8       about as far as it got.
9              THE COURT:  Okay.  And do you think that
10      would affect your ability to be fair in this case?
11             JUROR STOCKWELL:  Yeah, I think so.
12             THE COURT:  You think you could be fair or
13      you couldn't be fair?
14             JUROR STOCKWELL:  I think I could be
15      fair.
16             THE COURT:  Okay.  Good.
17          And now how about -- I had also asked about the
18      incident for which we're here for took place at a bar
19      called the Luna Lounge, and have you ever been there?
20             JUROR STOCKWELL:  No, I haven't.
21             THE COURT:  Okay.  Do you recall seeing any
22      media reports about this incident?
23             JUROR STOCKWELL:  Vaguely I remember
24      hearing something about it on the news, and it was so
25      long ago, I kind of forgot about it until I came in
```

234

1     today, but, oh, yeah, I think I did hear something

2     about that.

3            THE COURT:  Okay.  And now even though you

4     -- you know a little bit about it, do you think that

5     would affect your ability to be fair in this case?

6            JUROR STOCKWELL:  I think I will be able to

7     be fair.

8            THE COURT:  Okay.  Do you think you could

9     -- any decisions you would have to make, you think

10    you could make it based just on the evidence?

11           JUROR STOCKWELL:  Yeah.

12           THE COURT:  Okay.  And then do you have any

13    -- do you have any -- any commitments in the next two

14    weeks that you say, oh, my gosh, I just couldn't

15    reschedule that or anything like that?

16           JUROR STOCKWELL:  I can't think of any,

17    except for work, but hopefully they'll be cool and

18    let me have off for the next two weeks.

19           THE COURT:  Okay.  And have you -- now, do

20    you -- what type of job do you work in?

21           JUROR STOCKWELL:  Well, I just started with

22    a temp service.  Well, I worked for them before like

23    maybe a year-and-a-half ago.

24           THE COURT:  Okay.

25           JUROR STOCKWELL:  And in between time I had

1          another job, and I quit that job, went back to them

2          just like in between until I can find more steady

3          job.

4                    THE COURT:  Got it.

5                    JUROR STOCKWELL:  And they just put me at

6          R.R. Donnelley in Menasha on Midway Road.

7                    THE COURT:  Okay.

8                    JUROR STOCKWELL:  Just started Monday, and

9          it was like -- then I had to call them about this,

10         called about them coming in, I got to go for jury

11         selection.

12                   THE COURT:  Got it.  And now do you -- I

13         know Attorney Schneider had asked, do you -- do you

14         own any guns?

15                   JUROR STOCKWELL:  No, I don't.

16                   THE COURT:  Okay.

17                   JUROR STOCKWELL:  I don't like guns.

18                   THE COURT:  Got it.  Do you think our gun

19         laws should be stricter?

20                   JUROR STOCKWELL:  Yeah.

21                   THE COURT:  Okay.

22                   JUROR STOCKWELL:  With all the crap that's

23         going on lately, I think it should be.

24                   THE COURT:  Okay.  And, Attorney Schneider,

25         I'm going turn it over to you.  I'm trying to think

236

1          of --

2                    ATTORNEY SCHNEIDER:  We would have also

3          asked you, Miss Stockwell, if you had any friends,

4          family members who are employed in law enforcement.

5                    JUROR STOCKWELL:  Well, my step-grandfather

6          used to be a deputy sheriff of Marinette County.

7                    ATTORNEY SCHNEIDER:  Okay.

8                    JUROR STOCKWELL:  But he retired like 30

9          years ago.

10                    ATTORNEY SCHNEIDER:  Sure.  Is it something

11          where you lived with him when he did that work?

12                    JUROR STOCKWELL:  When I was little, little

13          I used to live with them, him and my mother, until my

14          ma and I could find our own place, but most of the

15          time I did not live with my grandparents while my

16          grandfather was with the sheriff's department.

17                    ATTORNEY SCHNEIDER:  Okay.  Is there

18          anything about having him in that role and now you're

19          going to be asked to listen to jurors (sic), do you

20          think you would be able to give officers the same

21          weight and weigh their testimony the same as anyone

22          else?

23                    JUROR STOCKWELL:  Yeah.

24                    ATTORNEY SCHNEIDER:  Perfect.  That was one

25          of the things we had talked about.

237

1                    JUROR STOCKWELL:  Oh, yeah.  Then I have

2          like another cousin who works with the Racine

3          County --

4                    ATTORNEY SCHNEIDER:  Okay.

5                    JUROR STOCKWELL:  -- Police Department, but

6          he retired.  And another cousin, he was a secret

7          service guy and he was with Marinette County

8          Sheriff's Department too.

9                    ATTORNEY SCHNEIDER:  Did you ever talk to

10         them at all about their work?

11                   JUROR STOCKWELL:  No.

12                   ATTORNEY SCHNEIDER:  Okay.  And having them

13         as cousins, would that give you any pause in weighing

14         the testimony of officers?

15                   JUROR STOCKWELL:  No.  And I hardly ever

16         see either one of them.

17                   ATTORNEY SCHNEIDER:  Okay.  Do you -- have

18         you ever served as a juror before?

19                   JUROR STOCKWELL:  No.  I got a letter in

20         the mail like a few years ago, and every time I

21         called they said don't show up.  I was like, okay,

22         I'm cool.

23                   ATTORNEY SCHNEIDER:  I talked a couple

24         times, and I think judge kind of led with this, that

25         this is a very significant case and we want jurors

238

1     who feel that they can serve.  Do you have any

2     personal reasons or religious reasons, anything that

3     gives you pause in wondering whether you could serve

4     as a juror?

5               JUROR STOCKWELL:  Can't think of anything

6     -- why I shouldn't be.

7               ATTORNEY SCHNEIDER:  Okay.  Have you

8     visited Luna Lounge or familiar with where it is on

9     College?

10              JUROR STOCKWELL:  I went past there before

11    and never actually went in there.

12              ATTORNEY SCHNEIDER:  Okay.  What about

13    Sharks, the pool hall?

14              JUROR STOCKWELL:  Long, long, long time

15    ago, probably like ten years ago.

16              ATTORNEY SCHNEIDER:  And then I had asked

17    about like 1700 North Harriman.  Do you know where

18    that is in the City of Appleton?

19              JUROR STOCKWELL:  Not really.

20              ATTORNEY SCHNEIDER:  Okay.

21              JUROR STOCKWELL:  I kind of know where the

22    street is but not that part of it.

23              ATTORNEY SCHNEIDER:  Then we kind of talked

24    about working at a bar being security, anything in

25    that capacity, do you have any of that experience?

239

1             JUROR STOCKWELL:  Well I used to work at
2       the Raddison.
3             ATTORNEY SCHNEIDER:  Okay.
4             JUROR STOCKWELL:  And as a cook, and they
5       had me in the Clubhouse cooking, and that's about the
6       closest I have got into working in a bar.
7             ATTORNEY SCHNEIDER:  Okay.  Do you -- for
8       personal, religious reasons do you not consume
9       alcohol?
10            JUROR STOCKWELL:  Personally I don't.
11            ATTORNEY SCHNEIDER:  Okay.  Have you ever?
12            JUROR STOCKWELL:  Yeah.
13            ATTORNEY SCHNEIDER:  Okay.
14            JUROR STOCKWELL:  But I prefer not to.
15            ATTORNEY SCHNEIDER:  I had asked about the
16      series *Making of a Murderer*.  Have you watched any of
17      that?
18            JUROR STOCKWELL:  No, I didn't.  I just
19      heard about it and I never watched it.
20            ATTORNEY SCHNEIDER:  Are you the kind of
21      person that's going to be able to stop reading the
22      paper, watching the news, if judge orders you to do
23      so?
24            JUROR STOCKWELL:  Yeah.
25            ATTORNEY SCHNEIDER:  Okay.  Have you ever

240

1          been charged with a crime?

2                    JUROR STOCKWELL:  No.

3                    ATTORNEY SCHNEIDER:  What about a close

4          family member or friend?

5                    JUROR STOCKWELL:  My brother has been.

6                    ATTORNEY SCHNEIDER:  When was that?

7                    JUROR STOCKWELL:  The first time was back

8          in '93 or right around that time frame.

9                    ATTORNEY SCHNEIDER:  Was it something where

10         you ever had to go in and assist him at all?

11                   JUROR STOCKWELL:  No.

12                   ATTORNEY SCHNEIDER:  Or go to hearings

13         even?

14                   JUROR STOCKWELL:  Nope.  And I think the

15         last time was maybe ten years ago, something like

16         that.

17                   ATTORNEY SCHNEIDER:  Having that

18         experience, is that going to give you any pause or

19         any concern in serving as a juror?

20                   JUROR STOCKWELL:  No.

21                   ATTORNEY SCHNEIDER:  Okay.  Did you ever

22         call 911?

23                   JUROR STOCKWELL:  Yeah.

24                   ATTORNEY SCHNEIDER:  Okay.  Can you tell us

25         when?

241

1              JUROR STOCKWELL:  One time I was –– worked

2        for a cleaning service, they had me over at St. E's

3        and I was ready to go to the bus stop to catch the

4        bus and I saw, what is it, like a Chevy S10 hit a guy

5        on a bike, and so I turned around and went back into

6        the gas station, said, hey, call 911 because there's

7        been an accident right at the corner.

8              ATTORNEY SCHNEIDER:  Did you stay and talk

9        to the officers?

10             JUROR STOCKWELL:  Yeah.

11             ATTORNEY SCHNEIDER:  Did you ever have to

12       go to court for that?

13             JUROR STOCKWELL:  No.  Nothing ever

14       happened with it as far as I know.  And then

15       different times I would have to call for my mother

16       because she was getting –– well, in her 70s, started

17       having health problems and I would have to call,

18       like, send an ambulance, help her out here.

19             ATTORNEY SCHNEIDER:  Okay.  Have you ever

20       been a witness other than the bicycle accident you

21       described to anyone who was seriously injured or

22       hurt?

23             JUROR STOCKWELL:  Well there ended up being

24       another accident at the same intersection.  I didn't

25       hear it, I just heard boom and I knew right away

1              there was an accident.  I turned around.

2                        ATTORNEY SCHNEIDER:  Did you have to give

3              any aid to any of the people?

4                        JUROR STOCKWELL:  No.  And so I called 911

5              on that one too and said, hey, there's an accident at

6              an intersection.

7                        ATTORNEY SCHNEIDER:  Do you own any

8              firearms?

9                        JUROR STOCKWELL:  No, I don't.

10                       ATTORNEY SCHNEIDER:  I had asked about ever

11             working at a place where there were video cameras or

12             video images.  Do you remember -- have you worked in

13             such a place?

14                       JUROR STOCKWELL:  Yeah.

15                       ATTORNEY SCHNEIDER:  Is it a situation

16             where you ever had to go and look at those?

17                       JUROR STOCKWELL:  No.

18                       ATTORNEY SCHNEIDER:  I think you already

19             said no guns, right?

20                       JUROR STOCKWELL:  Yeah.

21                       ATTORNEY SCHNEIDER:  Okay.  Do you have a

22             Facebook account?

23                       JUROR STOCKWELL:  Yeah, but I haven't been

24             on it for a while.

25                       ATTORNEY SCHNEIDER:  Have you ever been a

1          victim of a crime?

2                    JUROR STOCKWELL:  I think just that little

3          one that we just talked about.

4                    ATTORNEY SCHNEIDER:  Okay.  And then I

5          think I asked if you donated time or volunteered with

6          like Harbor House or Sexual Assault Crisis Center,

7          Child Advocacy Center.

8                    JUROR STOCKWELL:  No, but when I was in

9          high school we had a SADD chapter.

10                   ATTORNEY SCHNEIDER:  Okay.

11                   JUROR STOCKWELL:  And peer review, so we

12         would go in the grade school and talk to like sixth

13         graders or whatever grade we were in talking, kind of

14         help them -- talk to them about different things that

15         could happen in life, how to say no to drugs and all

16         that lovely stuff.

17                   ATTORNEY SCHNEIDER:  Okay.  I think that

18         was everything then.

19                   THE COURT:  Attorney Vishny, any questions?

20                   ATTORNEY VISHNY:  No.

21                   THE COURT:  Okay.  And thank you, I don't

22         have any questions for you.  And so we will -- we'll

23         be out in a few moments.  Okay?

24                   JUROR STOCKWELL:  Okay.

25                   THE COURT:  Thank you.

244

1                    JUROR STOCKWELL:  Thanks.

2                    (Ms. Stockwell exits; Ms. Blom enters.)

3                    THE CLERK:  This is Linda Blom.

4                    JUROR BLOM:  Hi.

5                    THE COURT:  Miss Blom, how are you?

6                    JUROR BLOM:  I'm fine.

7                    THE COURT:  So you have heard a full

8          morning of questions and a little bit of an afternoon

9          and hopefully you remember the questions, but are

10         there any questions that to the best of your

11         recollection you would have answered yes to or raised

12         your hand to?

13                   JUROR BLOM:  I think that I am probably --

14         would probably hold law enforcement in a stronger

15         light.

16                   THE COURT:  Okay.  And is there any

17         particular reason for that?

18                   JUROR BLOM:  I have friends involved in law

19         enforcement.  I also just think they need to be held

20         to a higher standard so --

21                   THE COURT:  And let me ask this.  When you

22         say "held to a higher standard", do you mean --

23                   JUROR BLOM:  Ethically.

24                   THE COURT:  -- that you would inherently

25         believe them more because they're law enforcement or

245

```
 1          would you say that because they're law enforcement
 2          they have to do things, I guess, more according to
 3          the book than average citizen?  How do you mean that?
 4                    JUROR BLOM:  Probably a little of both.
 5                    THE COURT:  Okay.  The -- the most
 6          important question I guess that I can ask on that
 7          subject is, understanding we all have our experiences
 8          and opinions, but do you feel that you would be able
 9          to look at this case based on the evidence as you see
10          it and make your -- any decisions you would have to
11          make based solely on the evidence as you see it?
12                    JUROR BLOM:  I would hope that I could.
13          Yes.
14                    THE COURT:  Okay.  That -- let me ask this.
15          So if someone that you had -- someone that you love
16          and care about, if they were on trial --
17                    JUROR BLOM:  Um-hum.
18                    THE COURT:  -- and knowing you only as you
19          know you, do you think that you would want you to be
20          on that jury or would you not want you to be on that
21          jury?
22                    JUROR BLOM:  Oh, geez.  I would probably
23          want me to be on that jury because I think that the
24          right thing is the right thing regardless.
25                    THE COURT:  Okay.  And then -- now I've
```

246

```
1        also -- and I had asked questions about being

2        familiar with any media coverage.  Do you remember

3        reading anything about this case or seeing any --

4             JUROR BLOM:  I do remember it, and the

5        reason that I remember it is because the day after

6        the incident, my son came home and said, did you hear

7        about that -- what happened last night, and we had

8        not at that point, and he said, I -- I work out with

9        that guy, the guy who was killed.

10            THE COURT:  Okay.  And either -- let me

11       first ask you, from any media reports you have seen,

12       have you formulated any opinions on this case?

13            JUROR BLOM:  I have not.

14            THE COURT:  Okay.  Now, your son was

15       someone who was familiar with, if I understood

16       correctly, the victim in this case?

17            JUROR BLOM:  Correct.

18            THE COURT:  Do you believe that that would

19       sway your ability to be fair and impartial in this

20       case?

21            JUROR BLOM:  I do not.

22            THE COURT:   I know Attorney Schneider had

23       asked questions about -- let me back up.  I had asked

24       questions about whether or not you had any close

25       friends or family in law enforcement, you just told
```

247

1          us that you have friends in law enforcement, are any

2          of them with the Appleton Police Department?

3                    JUROR BLOM:  They are not.  Although in my

4          job I have worked with some of them.  I don't know

5          them personally, but I've worked with them with bank

6          security.

7                    THE COURT:  And are you in the banking

8          industry?

9                    JUROR BLOM:  I am.

10                    THE COURT:  And I know Attorney Schneider

11          had asked this, but since you mentioned bank

12          security, have you had an opportunity to have to

13          review security cameras or security footage?

14                    JUROR BLOM:  Yes.

15                    THE COURT:  Okay.  Have you had an

16          opportunity or an instance where you've had to call

17          911?

18                    JUROR BLOM:  I have not.

19                    THE COURT:  And have you ever been the

20          victim of a crime?

21                    JUROR BLOM:  I have not.

22                    THE COURT:  Have you ever had to be

23          involved where you've had to be a witness or testify

24          to -- it could be a civil matter, meaning a car

25          accident, it could be a criminal matter?

1          JUROR BLOM:  I have not.  And I shouldn't

2     say that.  I was a victim.  We had a break-in in a

3     cottage years ago, but no one was there, it was

4     just --

5          THE COURT:  And did you have to talk to

6     police as a byproduct of that?

7          JUROR BLOM:  I did not; my husband did.

8          THE COURT:  Okay.  Did that experience or

9     do you think that experience shaped you in any way in

10     terms of how you would approach this case?

11          JUROR BLOM:  No.

12          THE COURT:  I know Attorney Schneider had

13     asked about firearms, do you have any firearms in the

14     home, either you, yourself personally?

15          JUROR BLOM:  My husband was a hunter, so

16     there are, I don't know what they are, I don't even

17     know where they are.

18          THE COURT:  So from that answer is it safe

19     to assume that you do not shoot the firearms?

20          JUROR BLOM:  I have not.

21          THE COURT:  Okay.  Do you have any -- any

22     strong opinions one way or the other as it relates to

23     the regulations of firearms?

24          JUROR BLOM:  No.

25          THE COURT:  Okay.  Attorney Schneider, I'm

249

1      sure I'm forgetting a few, but go ahead.

2              ATTORNEY SCHNEIDER:  Are you familiar with

3      the bar Luna at all?

4              JUROR BLOM:  Just where it is, just know

5      where it is.

6              ATTORNEY SCHNEIDER:  Is there anything --

7      and I don't know, Judge, if you covered this, so I

8      apologize, Miss Blom.  Is there anything this week,

9      next week or even leading into that other week on

10     your personal schedule, work schedule that's going to

11     make it difficult?

12            JUROR BLOM:  I have a pretty stressful job

13     so that will be difficult for me, but --

14            ATTORNEY SCHNEIDER:  Is it such that when

15     you're not there, no one else is really covering your

16     work so you're going to come back to --

17            JUROR BLOM:  Correct.  No one does my work

18     when I'm not there.

19            ATTORNEY SCHNEIDER:  Okay.  Have you ever

20     served on a jury before?

21            JUROR BLOM:  I have not.

22            ATTORNEY SCHNEIDER:  I asked, given the

23     significance of the homicide charge and the other

24     charges, if you would have any personal or religious

25     reasons that would cause you pause in serving as a

1    juror.

2                    JUROR BLOM:  I don't think so.

3                    ATTORNEY SCHNEIDER:  Sharks Pool Hall --

4                    JUROR BLOM:  I have not.

5                    ATTORNEY SCHNEIDER:  Okay.  Have you

6    watched any of the Netflix series?

7                    JUROR BLOM:  I have not.

8                    ATTORNEY SCHNEIDER:  Do you drink alcohol?

9                    JUROR BLOM:  Yes.

10                   ATTORNEY SCHNEIDER:  Have you ever donated

11   to like Harbor House, MADD, Sexual Assault Crisis

12   Center?

13                   JUROR BLOM:  Not personally.  Through

14   United Way, through donations, but nothing

15   personally.

16                   ATTORNEY SCHNEIDER:  I think that was it.

17                   THE COURT:  Attorney Vishny, any questions?

18                   ATTORNEY SCHNEIDER:  No.  That's okay.  Go

19   ahead.

20                   ATTORNEY VISHNY:  My only question is just,

21   you know, you heard about this right after it

22   happened because of your son.  Did you ever read

23   stories in the paper, anything recent?

24                   JUROR BLOM:  I did not.

25                   ATTORNEY VISHNY:  Okay.

251

1              JUROR BLOM:  I'm not a big newspaper

2        reader.

3              ATTORNEY VISHNY:  I do have questions about

4        law enforcement, but I can simply do them when I'm up

5        there.  I don't have to do them individually.

6              THE COURT:  No.  If it's part of your

7        normal questioning.

8              ATTORNEY VISHNY:  Part of my normal

9        questioning.  I don't think we need to do it right

10       now.

11             ATTORNEY SCHNEIDER:  One other thing though

12       that Mr. Duros reminded me of.  There is a witness

13       that may come up.  Her name is Alyson Blom.

14             JUROR BLOM:  She spells her name

15       differently, does she not?

16             ATTORNEY SCHNEIDER:  No.  It's B-L-O-M.

17       Blom is your married name, correct?

18             JUROR BLOM:  Does Alyson live in Milwaukee?

19             ATTORNEY SCHNEIDER:  She does now.

20             JUROR BLOM:  Alyson is my niece.

21             ATTORNEY SCHNEIDER:  Okay.  You'll hear

22       testimony -- do you want me to follow up?

23             ATTORNEY VISHNY:  Well, yeah.

24             ATTORNEY SCHNEIDER:  So you're going to

25       hear testimony that Alyson was at Luna on the night

252

1          of the shooting with Mr. Lee, there is going to be

2          video images of that, and she will have to come in

3          and testify.  Do you think it will cause you concern

4          having her as your niece and having to then

5          potentially serve on the jury?

6                    JUROR BLOM:  I honestly can't say.  I don't

7          know.  Never dealt with anything like that before.  I

8          just honestly don't know.

9                    ATTORNEY SCHNEIDER:  No.  That's okay.  Do

10         you talk to her at all, I mean other than family

11         events?

12                   JUROR BLOM:  On Facebook and -- and family

13         events, yes.

14                   ATTORNEY SCHNEIDER:  Okay.  Let me give you

15         this example, I'm sure Attorney Vishny may have

16         others.  If Alyson comes in and says, I saw this, I

17         saw A, and a different witness came in and might say,

18         no, I saw B, and you had to weigh credibility, who

19         would you give it to, Alyson because you're related

20         to her, would you weigh it equally, would you say --

21                   JUROR BLOM:  I can honestly say I think I

22         would weigh that equally.

23                   ATTORNEY SCHNEIDER:  Okay.  I don't have

24         any other questions.

25                   ATTORNEY VISHNY:  How often do you see

253

1     Alyson Blom?

2                JUROR BLOM:  Every holiday.

3                ATTORNEY VISHNY:  Does that mean twice a

4     year, like Christmas and Easter?

5                JUROR BLOM:  Mother's Day, Father's Day,

6     everything.  She comes home for every holiday.

7                ATTORNEY VISHNY:  Has she ever talked about

8     the fact --

9                JUROR BLOM:  She has not.

10                ATTORNEY VISHNY:  -- that she was at Luna

11     when the shooting has happened?

12                JUROR BLOM:  She has not.

13                ATTORNEY VISHNY:  Do you have any opinion

14     about her about whether or not she's a truthful

15     person?

16                JUROR BLOM:  I would believe her to be a

17     truthful person.

18                ATTORNEY VISHNY:  Okay.  Do you -- have you

19     ever had any opinions about her friends, associates?

20                JUROR BLOM:  I don't know her friends and

21     associates.  She's a different age than my children

22     are.  My children grew up in Little Chute, she grew

23     up in Appleton.  I've met several of her boyfriends

24     throughout the years, but other than that, I have

25     never gotten to know them well or would not have an

254

1       opinion.

2                   ATTORNEY VISHNY:  Have you ever met any guy

3       she's dated who were Hmong?

4                   JUROR BLOM:  Yes.

5                   ATTORNEY VISHNY:  How many?

6                   JUROR BLOM:  Every guy she's dated has been

7       Hmong.

8                   ATTORNEY VISHNY:  Okay.  I didn't know that

9       but --

10                  JUROR BLOM:  Yes.

11                  ATTORNEY VISHNY:  Do you remember their

12      names at all?

13                  JUROR BLOM:  I do not.

14                  ATTORNEY VISHNY:  Okay.  If I say a name,

15      I'm just going to ask you --

16                  JUROR BLOM:  I probably would not remember.

17      Probably not.

18                  ATTORNEY VISHNY:  Okay.

19                  JUROR BLOM:  They come and go and you see

20      them at Christmas.  And I have children and

21      grandchildren, so the chaos, and truthfully I've

22      never had any serious conversations with them.

23                  ATTORNEY VISHNY:  Okay.  Do you have any

24      opinions because she has dated people of Hmong

25      descent?

255

1                    JUROR BLOM:  Racially, no.  Alyson is a
2          very little person, and I think that that's why she
3          tends to be with that type of person.
4                    ATTORNEY VISHNY:  Meaning she's short?
5                    JUROR BLOM:  She's short and little and
6          tiny, she's -- yes.  She's just a sweet little
7          person.
8                    ATTORNEY VISHNY:  Okay.  Got you.  Okay.
9          I'll ask the law enforcement questions when we're
10         in.
11                   JUROR BLOM:  Okay.  And I apologize.  When
12         you mentioned the name I never even put that
13         together.  There is an Alyson, actually B-L-O-O-M,
14         that went to school with my children and I just
15         assumed that's who that was.
16                   ATTORNEY VISHNY:  We have heard that there
17         were two Alyson's with almost the same last name in
18         Appleton.  So thanks.
19                   JUROR BLOM:  Sure.  Am I done?
20                   (Ms. Blom exits.)
21                   ATTORNEY VISHNY:  I don't know.  What do
22         the statutes say if somebody is related, somebody
23         who's a witness?
24                   THE COURT:  It's got to be -- there's got
25         to be some degree of kinship where the statutes speak

256

```
1         to it.  I don't know what it is though.
2                  ATTORNEY SCHNEIDER:  It might be in a
3         benchbook more so than a statute book.
4                  ATTORNEY VISHNY:  Do you have a position on
5         it?
6                  ATTORNEY SCHNEIDER:  I would move for
7         cause, to strike for cause.
8                  THE COURT:  Here's my take, unless you say
9         I want her on the panel.
10                 ATTORNEY VISHNY:  No, I don't.  I think
11        it's too close for comfort.
12                 THE COURT:  I don't want to give any reason
13        for there to be an issue.  Okay?  We're fine with
14        that.
15                 (Ms. O'Brien enters.)
16                 THE COURT:  Miss O'Brien, we have some
17        questions for you.  And have you had -- do you -- did
18        you have any trouble remembering the questions that
19        we've asked today up to this point?
20                 JUROR O'BRIEN:  They're all kind of a blur,
21        but I think I've got them all.
22                 THE COURT:  Okay.  So let me first ask, and
23        then I'll ask some of the specifics.  Is there any
24        question that you recall us asking that jumped out at
25        you that you said, oh, I need to -- I need to make
```

1          sure that I'd answer that one?

2                    JUROR O'BRIEN:  Well in your question

3          regarding firearms, my husband did collect guns.  He

4          passed away in June.  I've been working with Fox

5          Valley Firearms to sell them, so the majority of them

6          are out of the house.

7                    THE COURT:  And do you have any strong

8          positions one way or the other as it relates to --

9                    JUROR O'BRIEN:  I don't like them, but

10         that's why I'm getting rid of them.

11                   THE COURT:  Got it.  And is it safe to

12         assume then that you did not shoot the guns?

13                   JUROR O'BRIEN:  That's true.

14                   THE COURT:  Okay.  Now I had also asked

15         about whether or not you had any friends or family or

16         close acquaintances who were involved in law

17         enforcement.

18                   JUROR O'BRIEN:  No.

19                   THE COURT:  Did you recognize any of the

20         names of either the attorneys or the witnesses?

21                   JUROR O'BRIEN:  Just Carrie Schneider.

22                   THE COURT:  Okay.  And how do you know Miss

23         Schneider?

24                   JUROR O'BRIEN:  I don't know her, I just

25         know the name.

258

1          THE COURT:  Okay.  All right.  And, now,
2     have you ever been a victim of a crime?
3          JUROR O'BRIEN:  No.
4          THE COURT:  Have you -- obviously we've
5     talked about this case involves the Luna Lounge and
6     that's where this took place, and there has been some
7     media coverage of it at various points, and do you
8     recall any of the media coverage on it?
9          JUROR O'BRIEN:  No.
10          THE COURT:  Okay.  Are you familiar with
11     the Luna Lounge?
12          JUROR O'BRIEN:  I know where it was.
13          THE COURT:  Okay.  I take it based on that
14     answer that you were not a regular frequenter?
15          JUROR O'BRIEN:  No.  I never went there but
16     I knew where it was.
17          THE COURT:  Okay.  Now, do you -- do you
18     feel that if you were selected to be on this jury
19     that you could be fair and impartial?
20          JUROR O'BRIEN:  Yes.
21          THE COURT:  Okay.  Ultimately, if you were
22     asked to be on this jury, you would be asked to
23     ultimately partake in a decision which would
24     ultimately be either a decision of guilty or not
25     guilty, and do you feel that you would be able to --

1    to make such a decision?

2          JUROR O'BRIEN:  Yes.

3          THE COURT:  Okay.  There were some -- I'm

4    going to let you ask your questions.

5          ATTORNEY SCHNEIDER:  Do you have anything,

6    Miss O'Brien, we kind of already laid out the primers

7    this week, next week, but then it may spill over to

8    the following.  Do you have anything personal or work

9    schedule that we should know about or that might

10    cause you concern?

11          JUROR O'BRIEN:  Just regular work schedule,

12    but the weekend of the 11th and 12th I have a retreat

13    I was supposed to go to.

14          ATTORNEY SCHNEIDER:  When would you need to

15    leave for that?  We'll be done by then.

16          THE COURT:  We won't go into the weekend.

17          ATTORNEY SCHNEIDER:  Would you leave

18    Friday?

19          JUROR O'BRIEN:  It's a Thursday and a

20    Friday, like the 11th and 12th.

21          ATTORNEY SCHNEIDER:  So you're not

22    available on Thursday the 11th or Friday the 12th?

23          JUROR O'BRIEN:  It was like a Thursday,

24    Friday, Saturday.

25          ATTORNEY SCHNEIDER:  Okay.  Have you ever

1          served on a jury before?

2                    JUROR O'BRIEN:  Yes.

3                    ATTORNEY SCHNEIDER:  When?

4                    JUROR O'BRIEN:  I have no idea.  It was

5          here a few years ago.  It was for like a bar fight,

6          but I don't -- I don't remember the timing.

7                    ATTORNEY SCHNEIDER:  Did the jury come back

8          with a verdict?

9                    JUROR O'BRIEN:  Yes, but I honestly don't

10         remember what it was.

11                   ATTORNEY SCHNEIDER:  Okay.  That's okay.

12         Family, friends employed in law enforcement at all?

13                   JUROR O'BRIEN:  No.

14                   ATTORNEY SCHNEIDER:  Ever visit Sharks Pool

15         Hall?

16                   JUROR O'BRIEN:  No.

17                   ATTORNEY SCHNEIDER:  Ever work at a bar?

18                   JUROR O'BRIEN:  No.

19                   ATTORNEY SCHNEIDER:  Security at any type

20         of business?

21                   JUROR O'BRIEN:  No.

22                   ATTORNEY SCHNEIDER:  Have you or are you

23         familiar or did you watch any of the Netflix series

24         that we talked about?

25                   JUROR O'BRIEN:  No.  I'm familiar with it

261

1          just via the news but not the Netflix series.

2                    ATTORNEY SCHNEIDER:  Was that a personal

3          choice not to watch it?

4                    JUROR O'BRIEN:  I had no desire to watch

5          it.

6                    ATTORNEY SCHNEIDER:  Could you give up

7          reading the paper or watching the news?

8                    JUROR O'BRIEN:  Absolutely.  I don't do it

9          now so -- I watch the weather and that's about it.

10                   ATTORNEY SCHNEIDER:  He'd probably allow

11         you to watch The Weather Channel for your weather.

12              Family member, friend or yourself charged with a

13         crime or you have any thoughts or want to share

14         anything?

15                   JUROR O'BRIEN:  My brother is currently in

16         prison for more drug related crime.

17                   ATTORNEY SCHNEIDER:  Is it something where

18         you had to participate?

19                   JUROR O'BRIEN:  No.

20                   ATTORNEY SCHNEIDER:  Or attend?  Is it

21         something, having that as a life experience, going to

22         cause you any concern?

23                   JUROR O'BRIEN:  No.

24                   ATTORNEY SCHNEIDER:  Okay.  Ever call 911?

25                   JUROR O'BRIEN:  I think so.  I was in a car

262

1    accident in a blizzard.  I think I dialed 911 just to

2    report it.

3            ATTORNEY SCHNEIDER:  Okay.  Ever been a

4    witness where you had to give statements to law

5    enforcement?

6            JUROR O'BRIEN:  Un-hun.

7            ATTORNEY SCHNEIDER:  Do you have a Facebook

8    account?

9            JUROR O'BRIEN:  I do.

10           ATTORNEY SCHNEIDER:  Did you ever ask

11   anybody to deactivate it or take it down for you?

12           JUROR O'BRIEN:  No.

13           ATTORNEY SCHNEIDER:  Ever donate time or

14   volunteer at any of the crime prevention programs we

15   have in the community?

16           JUROR O'BRIEN:  I do a lot of volunteering

17   through my church, and we do reach out sometimes to

18   those facilities, but not --

19           ATTORNEY SCHNEIDER:  Kind of an indirect --

20           JUROR O'BRIEN:  Not regular.

21           ATTORNEY SCHNEIDER:  Indirect back to those

22   programs.  I don't have anything else then.

23           ATTORNEY VISHNY:  I'm gathering you haven't

24   read or heard about this case before coming in here

25   today, you didn't know anything about it?

263

1          JUROR O'BRIEN:  No.

2          ATTORNEY VISHNY:  Okay.

3          JUROR O'BRIEN:  I mean I've heard of things

4     that had happened at Luna Lounge, but I don't

5     remember this one.

6          ATTORNEY VISHNY:  All right.  Nothing

7     further.

8          THE COURT:  All right.  Thank you very

9     much.

10          (Ms. O'Brien exits.)

11          (In open court.)

12          THE COURT:  I appreciate everyone's

13     patience.  Hopefully you were able to get a little

14     bit of a stretching break.

15       At this time, Mr. Keleske, I would like to thank

16     you for your service, sir.  Your duty is completed,

17     and again, I appreciate it.  So you are excused at

18     this time.  I should mention, however, it's my

19     understanding, and some of you may have gone out into

20     the parking lot and seen this, my understanding is

21     that if you parked on the street there is a

22     possibility that the Appleton city has ticketed you.

23     Please bring those tickets in and the County will

24     take care of those.  What we will need -- the only

25     thing we'll need to have you do, bring those down to

264

1     the clerk's office, all we'll need to do is make sure

2     you have your name on the ticket so that we can

3     correspond it with our jury list.  So don't panic on

4     that, County will take care of those.  And my

5     apologies for that inconvenience.

6         But there again, Mr. Keleske, thank you for your

7     service.

8              JUROR KELESKE:  Thank you, Your Honor.

9              THE COURT:  No. 6775, Bridget Plamann.  If

10    you would take his seat please.

11        Miss Giesen, likewise, you are excused.  I thank

12    you for your service today.

13             JUROR GIESEN:  Thank you.

14             THE CLERK:  No. 7209, Samantha Stockwell;

15    No. 6984, Victoria O'Brien.

16             THE COURT:  And, Miss Blom, likewise, you

17    are excused today.  Thank you for your service.

18        Attorney Schneider, my understanding is that you

19    have completed your voir dire; is that correct?

20             ATTORNEY SCHNEIDER:  It is, Your Honor.

21    Thank you very much.

22             THE COURT:  And with that then, Attorney

23    Vishny, whenever -- whenever you are ready.

24             ATTORNEY VISHNY:  I'm ready, Judge.  Thank

25    you.

265

1                THE COURT:  Very good.

2           While Attorney Vishny is walking to the podium,

3       I know we're getting late in the day but I would ask

4       that to the best of your ability try to talk loudly

5       because I don't want to get reprimanded by my court

6       reporter.

7                ATTORNEY VISHNY:  Sorry.  I'm just too

8       short to stand behind that.

9           All right.  I know it's been a long day, and I'm

10      sorry because unfortunately the rules say I have to

11      go last.  And I don't really want to keep you here

12      any -- anybody here longer than necessary, but I do

13      have a number of questions I want to ask so let's

14      just start with the easy ones.

15          Does anybody here have a hobby of photography?

16      If you do, just raise your hand.

17                (No response.)

18                ATTORNEY VISHNY:  Okay.  Apparently not.

19      Either that or you're like super shy now that I've

20      gotten up here.

21          All right.  And then I'm going to just ask one

22      more question that may seem a little odd, but who

23      watched the Super Bowl?  All right.  I probably

24      should say who didn't watch the Super Bowl.

25          But what I really want to ask about is the

266

1        halftime show.  Who watched the halftime show?  Okay.

2            And who hated the halftime show?  Okay.

3            So that's Miss Elbe, you hated the halftime

4        show.

5            JUROR ELBE:  Yes.

6            ATTORNEY VISHNY:  Why did you hate it?

7            JUROR ELBE:  Because of the fact that when

8        they brought on that halftime show, I did not like

9        their dress that they came out in.

10            ATTORNEY VISHNY:  Are you talking about

11        Beyonce in particular?

12            JUROR ELBE:  Yes.

13            ATTORNEY VISHNY:  Because?

14            JUROR ELBE:  Because of the fact that we

15        have younger children that watch these things and I

16        just didn't feel it appropriate.

17            ATTORNEY VISHNY:  So it was like too sexy?

18            JUROR ELBE:  Yes.

19            ATTORNEY VISHNY:  Is that all right if I

20        use that word?

21            JUROR ELBE:  You can use that word.

22            ATTORNEY VISHNY:  Too -- she should have

23        had more clothes on?

24            JUROR ELBE:  That's right.  Because of

25        young -- young people that are watching this.  It was

267

1          just not correct.

2                    THE COURT:  Okay.

3                    ATTORNEY VISHNY:  Okay.  Is that the only

4          thing that bothered you about it?

5                    JUROR ELBE:  Yeah, really.

6                    ATTORNEY VISHNY:  How about somebody else?

7          Who else really didn't like the halftime show?

8              Okay.  That's in the back.  I think your name is

9          Miss Dey if I remember correctly.

10                   JUROR DEY:  Yup.

11                   ATTORNEY VISHNY:  Miss Dey, why didn't you

12         like the halftime show?

13                   JUROR DEY:  Just couldn't understand it,

14         the words and stuff.  I mean, it was --

15                   ATTORNEY VISHNY:  The music just wasn't

16         clear enough.  Okay.

17             How about the dancing and the other parts?

18                   JUROR DEY:  I didn't really pay

19         attention.

20                   ATTORNEY VISHNY:  Anybody else hate the

21         halftime show at all?  Or felt offended by it in any

22         way?

23                   (No response.)

24                   ATTORNEY VISHNY:  Okay.  All right.

25             Now I'm just going to go right into who has ever

268

1     had a time in their life where you had to judge if

2     somebody is telling the truth or not?

3               (No response.)

4               ATTORNEY VISHNY:  All right.  Has anybody

5     -- and maybe -- I mean I'll be very surprised if

6     people don't raise their hands.  Has anyone ever had

7     a time where they haven't had to judge if someone is

8     telling the truth?  Maybe I should put it that way.

9          Okay.  So I'm not going to go down row by row

10    because I think that's a little much.  I'm going to

11    ask different people.

12         Mr. Nieman.  Did I get that right.

13              JUROR NIEMAN:  (Nodding.)

14              ATTORNEY VISHNY:  Mr. Nieman, tell me about

15    how you've been able to determine or decide if

16    somebody is telling you the truth or not.

17              JUROR NIEMAN:  Maybe hearing it from

18    somebody else too, the same story, and stories don't

19    line up.

20              ATTORNEY VISHNY:  Their stories don't line

21    up is something important.

22         I'm going to ask you all to speak a little bit

23    loud because, you know, I did survive the rock music

24    era in the '60s and '70s, and I do have an iPod so I

25    probably need you to talk a little bit louder.

269

1          So you want to see if their stories line up or

2     not.

3               JUROR NIEMAN:  Yeah.

4               ATTORNEY VISHNY:  Well what if they do line

5     up, what do you think then?

6               JUROR NIEMAN:  Well, I mean, maybe the body

7     language or how they told it.

8               ATTORNEY VISHNY:  I'm sorry?

9               JUROR NIEMAN:  Maybe their body language

10    and how they say it.

11              ATTORNEY VISHNY:  But if they don't line

12    up, does that cause you to have some concerns?

13              JUROR NIEMAN:  Yes.

14              ATTORNEY VISHNY:  What about you, Mr. Buza,

15    what do you think about that?

16              JUROR BUZA:  I look for body language also,

17    and the eyes and the mannerisms, you kind of, you

18    know, weigh things out, I guess, in your mind from

19    what you hear and what you see.

20              ATTORNEY VISHNY:  All right.  What about

21    you, Miss Lee, what do you think?

22              JUROR LEE:  Well, I know I can't lie

23    because I look like a deer in headlights, but I just

24    had a situation yesterday where I -- I caught a girl

25    lying to me, and I -- I -- to be honest with you, she

270

1          was oblivious to the fact that she was lying.

2                    ATTORNEY VISHNY:  You mean she was lying

3          and she didn't even know it?

4                    JUROR LEE:  She didn't think -- she didn't

5          think that I knew is what it was.

6                    ATTORNEY VISHNY:  So how were you able to

7          tell she was lying?

8                    JUROR LEE:  Body language.

9                    ATTORNEY VISHNY:  All right.

10               And what about you, Mr. Maas, how do you tell?

11                   JUROR MAAS:  Same way.  Body language.

12                   ATTORNEY VISHNY:  Okay.  What about if

13         people change their story?  How important is that to

14         you?

15                   JUROR MAAS:  Well, I'd want to hear both

16         sides of the story and how they changed it.

17                   ATTORNEY VISHNY:  Okay.  Well, what if, you

18         know, one day somebody says well A happened and gives

19         you all the details about A, and the next day they

20         say B happened and they give you all the details

21         about B.  How does that impact on what you think?

22                   JUROR MAAS:  It all depends if it all lines

23         up or not.

24                   ATTORNEY VISHNY:  Okay.  What about you,

25         Mr. Eggers?

271

1          JUROR EGGERS:  Eye contact is a big one
2     with me.
3          ATTORNEY VISHNY:  I'm sorry?
4          JUROR EGGERS:  Eye contact is a big one
5     with me.
6          ATTORNEY VISHNY:  So if people look them in
7     the eye, you tend to find them believable, is that
8     what you're saying?  Because I'm not sure what it
9     means.
10          JUROR EGGERS:  When someone's lying I can
11     kind of get the feeling they're lying is because they
12     look away from you, they look away.
13          ATTORNEY VISHNY:  All right.
14          JUROR EGGERS:  And then go back to you and
15     talk to you and then they look away from 'ya.  That's
16     how I feel I can tell.
17          ATTORNEY VISHNY:  What about the substance
18     of what they say, their actual story, what if their
19     stories change over time?  How do you feel about
20     that?
21          JUROR EGGERS:  If I get that opportunity,
22     if I can remember that -- which way he said it the
23     first time compared to the second time.
24          ATTORNEY VISHNY:  Okay.
25          What about you, Mr. Calmes, what do you -- how

272

1         do you tell if somebody is telling the truth or not?

2                   JUROR CALMES:  Reaction, really, how

3         they're telling the story.  If it sounds believable.

4         If it's not believable.  I mean obviously eye contact

5         is big.

6                   ATTORNEY VISHNY:  Who thinks it's important

7         that somebody's story make sense?  Okay.  How can you

8         tell if a story doesn't make sense?

9              Mr. Bloomer, was that your name?

10                  JUROR BLOOMER:  Well, I -- I draw on my own

11        life experiences a lot of times, and if somebody says

12        something that just doesn't -- doesn't add up for me,

13        you know, I could be wrong in my judgment.  If they

14        say something that just doesn't add up, then you

15        check the facts, you know, check the facts.  I try to

16        hold back on the actual judgment itself until I feel

17        I have the facts.

18                  ATTORNEY VISHNY:  Okay.  What about you,

19        Mr. Green?

20                  JUROR GREEN:  Same thing.

21                  ATTORNEY VISHNY:  Now you really have to

22        talk louder.

23                  JUROR GREEN:  I'm sorry.  Pretty much the

24        like the same thing he said, you want to hear

25        everything and then you just, you know, if it's

1    believable or not.

2                ATTORNEY VISHNY:  All right.  Has anybody

3    ever been in a situation where you thought somebody

4    was not telling the truth and then later you found

5    out they were telling the truth?  Has anyone -- has

6    that ever happened where first you said, oh, my God,

7    this person is so lying, and then later on you find

8    out they are telling you the truth?  Has anyone ever

9    experienced that?  If you have, raise your hand.

10       Yes.  Okay.  Mr. Buza, you've experienced that?

11   Can you -- how did you feel about the fact that your

12   first take on it was not accurate?

13               JUROR BUZA:  Pretty low.  Pretty cheap, I

14   guess.  Rush to judgment.

15               ATTORNEY VISHNY:  Rush to judgment.  And

16   has anybody else felt that they were in a situation

17   like that where you rushed to judgment about

18   something?

19       Yes?  That's Miss Elbe?

20               JUROR ELBE:  Um-hum.

21               ATTORNEY VISHNY:  How did you feel in that

22   particular situation?

23               JUROR ELBE:  Very sad and apologetic.

24               ATTORNEY VISHNY:  All right.  How did you

25   happen to find out that you were wrong?

274

```
 1                    JUROR ELBE:  They're twins.
 2                    ATTORNEY VISHNY:  Got you.  Anybody else in
 3          the front row here?
 4                    (No response.)
 5                    ATTORNEY VISHNY:  We'll take the next row.
 6          Anybody else in the next row have that experience?
 7                    (No response.)
 8                    ATTORNEY VISHNY:  What about the -- I know
 9          I saw more hands out there.  Like I -- I don't
10          memorize them, but I did see them in this row over
11          here, the row that begins with, oh, my gosh, I'm
12          forgetting your name, sir.
13                    JUROR FLEMING:  Fleming, Steve Fleming.
14                    ATTORNEY VISHNY:  That's it.  The row that
15          starts with Mr. Fleming and ends with Mr. Eggers I
16          think.  Anybody there?  Any of you folks ever had
17          that situation?
18                    (No response.)
19                    ATTORNEY VISHNY:  And the back row?  It
20          looks to me like Mr. Parker?
21                    JUROR PARKER:  Well I got to use my kids
22          and my grandkids as an example.  Same thing, right
23          away you think they're not telling you the truth but
24          really shocked you when you find out that they are
25          but then you really feel bad about it afterwards.
```

1              Rush to judgment, especially your kids.

2                        ATTORNEY VISHNY:  Anybody else?

3                        (No response.)

4                        ATTORNEY VISHNY:  What about -- how are you

5              going to decide in a criminal trial if a witness is

6              telling the truth or not?

7                        (No response.)

8                        ATTORNEY VISHNY:  Okay.  Let's take it out

9              of our lives as parents and supervisors and friends

10             or frenemies or whatever we are and just kind of get

11             into the situation you may be called on, how are you

12             going to decide if somebody is being truthful or not.

13                 Miss Elbe?

14                       JUROR ELBE:  My thought is always to pay

15             attention, to listen both ways, because everything

16             has more than one side, and you need to have both

17             sides and you need to weigh those sides and listen to

18             what's being said.

19                       ATTORNEY VISHNY:  What about you, Miss

20             Erickson?

21                       JUROR ERICKSON:  It is a hard one, isn't

22             it, to decide, but all you can do is just be -- be

23             what we're there to be, pay attention and to hear out

24             both sides of the story.

25                       ATTORNEY VISHNY:  Okay.  Mr. Shea, what

276

1     about you?

2              JUROR SHEA:  Repeat the question please?

3              ATTORNEY VISHNY:  Yeah.  How are you going

4     to decide in a criminal trial whether -- there's

5     going to be a lot of witnesses who come and testify,

6     and you're going to have to make a decision are they

7     telling the truth or not.  How are you going to

8     decide that?

9              JUROR SHEA:  I guess you look in their

10    background and look at if -- which side there're on

11    and what's to be gained.

12             ATTORNEY VISHNY:  Okay.  What if you don't

13    know anything about their background, I mean other

14    than that they came in to testify?

15             JUROR SHEA:  I would assume you're going to

16    give us some idea of a witness's background.

17             ATTORNEY VISHNY:  Okay.  All right.  What

18    about you, Mr. Webster?

19             JUROR WEBSTER:  I think that if it's caught

20    on camera that something happened, what we have to

21    look at.

22             ATTORNEY VISHNY:  Okay.  So what a camera

23    shows is very important to you.

24             JUROR WEBSTER:  Yes.

25             ATTORNEY VISHNY:  Sometimes things aren't

277

1      on camera and we just have to rely on people's word

2      about what they think they saw.

3                 JUROR WEBSTER:  Listen to both

4      directions.

5                 ATTORNEY VISHNY:  Okay.  What about you,

6      Miss Meyer?

7                 JUROR MEYER:  Listen to the details and try

8      to piece together what went on that night.

9                 ATTORNEY VISHNY:  How important is it to

10     you that a witness might have an interest in what

11     happens here, like they care about the outcome of the

12     trial?

13                JUROR O'BRIEN:  Very important.

14                ATTORNEY VISHNY:  Very important you're

15     saying, and just for the record, that's Miss O'Brien,

16     right?

17                JUROR O'BRIEN:  Right.

18                ATTORNEY VISHNY:  Okay.  Why is that very

19     important to you, Miss O'Brien?

20                JUROR O'BRIEN:  That the witness care about

21     their testimony?

22                ATTORNEY VISHNY:  Or care about how the

23     trial comes out.

24                JUROR O'BRIEN:  I mean if they're called to

25     witness it or they saw it, then it is -- it should be

278

1    important to them to see how it out comes because

2    they're a part of it.

3            ATTORNEY VISHNY:  Okay.  How about when a

4    witness is originally a suspect in a case and manages

5    to get themselves out of being a suspect and into

6    being a witness, how do you judge whether you're

7    going to believe their testimony or not?  Does

8    everyone understand my question?

9        Okay.  Are you Mr. Nichols?

10           JUROR NICHOLS:  Yes.

11           ATTORNEY VISHNY:  Mr. Nichols.

12           JUROR NICHOLS:  Try and go by the evidence,

13   the details that's by scientific evidence, video

14   camera, fingerprints, stuff like that may go through.

15   And as I recall at the beginning of an investigation

16   isn't pretty much everyone a suspect, so it could be

17   or could not be character.

18           ATTORNEY VISHNY:  Do you think that's fair

19   that in the beginning everyone is a suspect?

20           JUROR NICHOLS:  Yes.

21           ATTORNEY VISHNY:  Does anyone disagree with

22   Mr. Nichols about that, that everyone can be a

23   suspect in the beginning of an investigation?

24       All right.  Let's ask some other people's

25   opinion.  What about you -- is it Plamann?

279

1                 JUROR PLAMANN:  Plamann.

2                 ATTORNEY VISHNY:  I wasn't sure if it was

3       Plamann or Plamann.  What is your feeling about that

4       if somebody is initially a suspect and then later

5       claims, no, I saw somebody else commit the crime.

6       What do you think about that?

7                 JUROR PLAMANN:  I feel if -- if everybody

8       is being looked at equally and asked questions and

9       given a chance to discuss and share their side and

10      then the evidence doesn't present itself that they

11      continue to be part of that suspect pool due to the

12      job that's done by investigators, attorneys, lawyers,

13      as evidence presents itself.  I don't have a problem

14      with that because I feel it would be better to have

15      evenly asked the questions and put everybody in the

16      same playing field and then it's okay to rule out

17      based on the findings.

18                ATTORNEY VISHNY:  Okay.  Thank you.

19           Mr. Wells, what do you think about that?

20                JUROR WELLS:  Could you repeat the question

21      please?

22                ATTORNEY VISHNY:  Yeah.  If somebody starts

23      out -- somebody is being questioned as being a

24      suspect and then they give statements that get

25      themselves to no longer being a suspect, how do you

280

```
1        feel about that, about whether you're going to find

2        them truthful, not truthful?  I mean what are you

3        going to use to decide?

4                    JUROR WELLS:  The evidence, kind of judge

5        if they're -- I guess everybody -- if all the other

6        stories line up.

7                    ATTORNEY VISHNY:  Okay.  How many people

8        think it's important if witnesses have had chances to

9        talk to other witnesses before they give their

10       statements to the police?  Does that raise suspicions

11       or concerns for anybody?

12                   JUROR LEE:  Um-hum.

13                   ATTORNEY VISHNY:  Yes, it does?

14          Okay.  Why is that, Miss Lee, that that raises

15       -- I think you --

16                   JUROR LEE:  Well, I think they could be

17       talking amongst themselves and trying to put a story

18       together as to what's going to benefit them or the

19       person on trial and try to get their stories straight

20       so they all line up.

21                   ATTORNEY VISHNY:  Okay.  Mr. Green, you

22       nodded for that?

23                   JUROR GREEN:  Yeah.  Pretty much the same

24       thing too.  Seeing if their stories match up or

25       not.
```

281

1               ATTORNEY VISHNY:  Okay.  Miss Micke?

2               JUROR MICKE:  Um-hum.

3               ATTORNEY VISHNY:  I haven't had a chance to

4    talk to you.  Is that something that concerns you at

5    all?

6               JUROR MICKE:  Yes.  For the same reasons.

7               ATTORNEY VISHNY:  For the same reason,

8    which is?

9               JUROR MICKE:  That they should -- by them

10    being able to talk to one another they can

11    collaborate, I mean, what they get out of it.

12             ATTORNEY VISHNY:  Okay.  Sometimes

13    witnesses lie to the police in the beginning and then

14    later tell the truth.  If somebody lies to the

15    police, how does that affect whether or not you would

16    believe them as a witness in the trial?  How does

17    that impact your thinking?

18      Miss Steffen.  Did I get that right?

19             JUROR STEFFEN:  Yes.

20             ATTORNEY VISHNY:  How does that impact your

21    thinking?

22             JUROR STEFFEN:  If -- repeat that.

23             ATTORNEY VISHNY:  If a witness lies to the

24    police and says I wasn't there, don't know anything

25    about it, you know, at first, and it's not true,

1     okay?

2                JUROR STEFFEN:  To me I'd be a little

3     suspicious about that.  They're being dishonest right

4     away, you know, how reliable is their testimony.

5                ATTORNEY VISHNY:  Okay.

6                JUROR STEFFEN:  I don't think I'd trust

7     them as much.

8                ATTORNEY VISHNY:  All right.  What about

9     you, Miss Hermus?

10               JUROR HERMUS:  I guess I would be

11    suspicious too, but, you know, when something happens

12    everybody is afraid, they're scared, you know, and

13    maybe that's why they didn't tell the truth in the

14    first place.

15               ATTORNEY VISHNY:  Okay.  Does -- is there

16    anybody who it doesn't bother?

17               (No response.)

18               ATTORNEY VISHNY:  Let's flip it, you know,

19    who would say I don't care about that or is that an

20    issue of concern for everybody?

21          What about you, Miss Paul?

22               JUROR PAUL:  Say it again.  Please.

23               ATTORNEY VISHNY:  If a person lies at first

24    to the police, you know, claims they weren't there in

25    a certain place, you know, where a crime happened but

283

1          in fact they were near where the crime happened, does

2          that concern you whether or not you're going to

3          believe them in court?

4                    JUROR PAUL:  Yeah.  It makes them look like

5          a liar and you don't believe that they're going to

6          tell the truth in court.

7                    ATTORNEY VISHNY:  Okay.  One minute please.

8          I haven't talked to some of the people in the back.

9              Mr. Van Deurzen, why don't I ask you.  How do

10         you decide if people are telling the truth or not?

11                   JUROR VAN DEURZEN:  I usually can tell by

12         body language I think.

13                   ATTORNEY VISHNY:  What about changing the

14         story, how important is that to you?

15                   JUROR VAN DEURZEN:  That's important, makes

16         them less reliable.

17                   ATTORNEY VISHNY:  Okay.  What about if

18         somebody is a suspect in the beginning, does that

19         impact on whether you think that you'll believe them

20         or not?

21                   JUROR VAN DEURZEN:  Not necessarily.

22                   ATTORNEY VISHNY:  Okay.  Mr. Schueller,

23         what about you?

24                   JUROR SCHUELLER:  Which question are we

25         asking?

284

1            ATTORNEY VISHNY:  I guess I'm going to ask

2       how do you decide if somebody is being truthful or

3       not.

4            JUROR SCHUELLER:  I would take all the

5       evidence, whether it just be them or the other

6       stories, combine them all and then see what makes

7       sense of it.

8            ATTORNEY VISHNY:  And if they're a suspect

9       is that important to you or not?

10            JUROR SCHUELLER:  I guess yes and no.  No,

11       it wouldn't affect my thought process because as we

12       said before, everyone is a suspect, so no.

13            ATTORNEY VISHNY:  Okay.  How about you, Mr.

14       Van Dalen?  Did I get that right?

15            JUROR VAN DALEN:  Van Dalen.  Same

16       question, how --

17            ATTORNEY VISHNY:  Yes.

18            JUROR VAN DALEN:  I'd say eye contact, body

19       language, whether their story makes sense or not,

20       collaborates with the other story that's being told.

21            ATTORNEY VISHNY:  How many people here

22       think that the police are better than ordinary people

23       at telling -- at making decisions about who's telling

24       the truth or not?

25            Okay.  Does anybody think the police are

285

1    better or that they're kind of, it's a level playing

2    field, us as regular people have about the same

3    ability to say if somebody is being truthful or not.

4        Okay.  Miss Steffen?

5        JUROR STEFFEN:  I kind of think they can

6    read body language a lot better than we.  They're

7    trained for that.

8        ATTORNEY VISHNY:  Okay.  Yes.  Mr. Shea?

9        JUROR SHEA:  They have more training.  It's

10   like I as a teacher, I feel like I -- I'm better at

11   reading people.  I would think they have more

12   experience.

13       ATTORNEY VISHNY:  Okay.  Now, I guess what

14   I want to ask kind of to follow up on that is -- I

15   guess I lost my thought.

16       How many of you have ever felt that a police

17   officer has made a judgment and made an arrest but

18   that they are wrong about it?  Has anybody ever

19   encountered a situation like that, where you think

20   police did -- made an arrest and they were wrong?

21       Yes?  Miss Elbe?

22       JUROR ELBE:  Actually it happened to my

23   grandson.

24       ATTORNEY VISHNY:  Okay.

25       JUROR ELBE:  And they did not believe what

286

1         he stated to them happened, and they went just like
2         that, and a little while later another police officer
3         came up and said to the other one you were in error.
4         And he was --
5              ATTORNEY VISHNY:  So I guess there were no
6         really horrible consequences that occurred.
7              JUROR ELBE:  No, not at that point, but
8         there again, we don't have that truth.  You're just
9         assuming something happened, it wasn't right, you
10        shouldn't be assuming that, you should have looked at
11        the situation, figured it out, talked to that person
12        and said, okay, we can look at this and see where
13        we're at.  Not just all of a sudden it's there, I'm
14        making this major decision, which was in error.
15             ATTORNEY VISHNY:  Thank you.
16        Mr. Nieman, what do you think about what Miss
17        Elbe said?
18             JUROR NIEMAN:  Can you repeat the question
19        please?
20             ATTORNEY VISHNY:  Well, she's talking about
21        how, you know, she knows somebody who got arrested
22        and it turned out to be a wrong decision and she
23        thinks that more judgment should have been used, more
24        investigation before that happened.
25             JUROR NIEMAN:  I agree with what she said.

287

1           ATTORNEY VISHNY:  Okay.  I'm going to ask a
2      question that I think is a really difficult question.
3      I'm going to ask each one of you to search deep
4      inside when I ask this question, and I'm really -- I
5      really want to know what your truthful answer is.  So
6      if you need a minute to think about it, and it's kind
7      of even a scary question for me to ask, but I want to
8      know what you're more worried about if you get picked
9      for this jury.  Are you more worried about letting a
10     killer go or are you more worried about convicting an
11     innocent person?  Which one is the biggest concern
12     for you?
13          This might be the most important question I ask
14     here.  And I know that this -- that you didn't like
15     wake up today and say, oh, my gosh, I want to be a
16     juror on a murder trial, and you probably didn't
17     think about it last week, but it's going to happen to
18     some of you and I need to ask this question.  Okay?
19     And I think I'm going to ask this particular question
20     what your responses are, so I might as well just
21     start in the front.
22          Miss Paul, what do you think?
23          JUROR PAUL:  I think I would be more
24     worried about letting a killer go.
25          ATTORNEY VISHNY:  And why is that?

288

 1               JUROR PAUL:  Safety of others.

 2               ATTORNEY VISHNY:  Okay.

 3               JUROR PAUL:  Worrying that they're going to

 4          go kill someone else.

 5               ATTORNEY VISHNY:  Given that that worries

 6          you more, I mean you're going to hear if you're on

 7          this jury panel a lot of evidence, and the judge is

 8          going to tell you that you cannot find somebody

 9          guilty unless the prosecutor proves it beyond a

10          reasonable doubt.  Given that that's the law, and

11          also given your concerns, how do you deal with that?

12          I know.  It's a tough question.

13               JUROR PAUL:  It is.  I have no clue how to

14          answer it.

15               ATTORNEY VISHNY:  Okay.  I might come back

16          to you, though, if that's okay.

17            Okay.  Miss Naumann, what do you think?

18               JUROR NAUMANN:  I would say having --

19          finding an innocent person guilty.

20               ATTORNEY VISHNY:  You're more concerned

21          with that?

22               JUROR NAUMANN:  Because you would ruin

23          their life, you know, forever.

24               ATTORNEY VISHNY:  All right.  Fair

25          enough.

```
1                    JUROR NAUMANN:  And I just say that if he
2          were guilty and you let them go that they would do
3          anything again, but if they were innocent and then
4          they were confined, their whole life would be
5          ruined.
6                    ATTORNEY VISHNY:  Okay.  What about you,
7          Miss Elbe?
8                    JUROR ELBE:  Same thing.  Same thing.
9          Innocent -- if they're innocent and you say, oh, my
10         gosh, you know, we're putting him off to jail or
11         whatever and this person is innocent, that's a lot to
12         live with that that person is going to be in jail or
13         whatever for their lifetime.
14                   ATTORNEY VISHNY:  Okay.  Mr. Buza.
15                   JUROR BUZA:  I'm going to say the same
16         thing.
17                   ATTORNEY VISHNY:  So you're more concerned
18         about convicting an innocent person.
19                   JUROR BUZA:  Yup.
20                   ATTORNEY VISHNY:  Okay.
21                   JUROR VANDENBERG:  I agree with those three
22         people.
23                   ATTORNEY VISHNY:  So that's the side you
24         come down on?  I know your name is Vander something.
25                   JUROR VANDENBERG:  Vandenberg.
```

1          ATTORNEY VISHNY:  I'm sorry.  I sometimes

2     can't remember them all.  So, okay.

3        Miss Vandenberg, where are you -- where do you

4     fall on that question?

5          JUROR VANDENBERG:  Convicting someone who

6     is innocent.

7          ATTORNEY VISHNY:  You're more worried about

8     that.

9        Miss Plamann, what about you?

10          JUROR PLAMANN:  Convicting someone who is

11     innocent.

12          ATTORNEY VISHNY:  All right.  And you don't

13     all have to think alike, I just want to make sure,

14     like everything we've already said, there is no right

15     or wrong answers here, the only wrong answer is to

16     not tell what you're really thinking.  We're not

17     judging anybody.

18        Mr. Shea.

19          JUROR SHEA:  Convicting an innocent

20     person.

21          ATTORNEY VISHNY:  Okay.  Wow.  I know I'm

22     going to get your name.  I know it.

23          JUROR ERICKSON:  Erickson.

24          ATTORNEY VISHNY:  Erickson.  Don't let me

25     waste your time.  Miss Erickson.  Which concerns you

291

1          more?

2                    JUROR ERICKSON:  Innocence.

3                    ATTORNEY VISHNY:  And what about you, Miss

4          Lee?

5                    JUROR LEE:  You know, it's kind of a toss

6          up.  My stomach just turns because I don't want to

7          convict someone who is innocent, but I also don't

8          want a killer out on the street.

9                    ATTORNEY VISHNY:  Right.

10                   JUROR LEE:  I mean, as a mother, I sure

11         don't want a killer out there; as a citizen, I don't

12         want to put somebody away because he shouldn't be, so

13         I -- I don't know if there is a right answer there

14         for you.

15                   ATTORNEY VISHNY:  Okay.  And again, given

16         that the judge has to -- you know, that you have to

17         make this decision beyond a reasonable doubt, in

18         other words, you know, somebody sitting over here at

19         the table doesn't have to prove their innocence.

20         Okay?  Really the State has to prove it beyond a

21         reasonable doubt.  Does that trouble you given kind

22         of your 50/50 thoughts on that?

23                   JUROR LEE:  Well, you know, I don't know, I

24         -- I hear -- so many times you hear things on media

25         but then you hear none of that stuff in the

292

1     courtroom, it's very confusing, and being that this

2     is my first trial ever, I just -- I really don't know

3     if there is a right answer.

4              ATTORNEY VISHNY:  Okay.  All right.  Thank

5     you for sharing that with us.

6          Mr. Green.

7              JUROR GREEN:  I'd probably have to say the

8     same thing as her.  I don't know what there is, but

9     if I had to tell you the truth, I wouldn't want to

10     see a killer let go.

11              ATTORNEY VISHNY:  That concerns you more.

12          I think the court reporter is having a hard time

13     hearing you.  Can you --

14              JUROR GREEN:  I'm just saying that, you

15     know, if that person were to go out and kill again,

16     it would probably weigh more on me than if he went to

17     jail.  Just my opinion.

18              ATTORNEY VISHNY:  Than an innocent person

19     was convicted of something they didn't do?

20              JUROR GREEN:  Yes.

21              ATTORNEY VISHNY:  And again, I'm going to

22     ask that question for you.  You know, the law says it

23     has to be proven to you beyond a reasonable doubt,

24     and so you're in the jury room and you're not a

25     hundred percent positive but you're also really

293

1    worried about what if I letter a killer go.  How are

2    you going to reconcile that?

3            JUROR GREEN:  I'm not sure on that.

4            ATTORNEY VISHNY:  That's fair.

5        Mr. Bloomer.

6            JUROR BLOOMER:  I think that people are

7    innocent until proven guilty, and so they -- you

8    know, to me that's -- that's why I'm going to pay a

9    lot of attention to what's happening because they are

10    innocent until proven guilty.

11            ATTORNEY VISHNY:  Okay.  So which one of

12    these two things would concern you more, you know,

13    when you're -- when you're in the jury room?

14            JUROR BLOOMER:  Putting away an innocent

15    person.

16            ATTORNEY VISHNY:  Okay.  Okay.

17        Miss Micke?

18            JUROR MICKE:  Putting away an innocent

19    person.

20            ATTORNEY VISHNY:  That's the greater

21    concern to you?

22        Mr. Nichols.

23            JUROR NICHOLS:  Letting a killer on the

24    loose.

25            ATTORNEY VISHNY:  Okay.  And again, when it

294

1          comes to that in the law beyond a reasonable doubt
2          and the fact that you have to follow that jury
3          instruction and you -- you know, what if you're --
4          when you're sitting in a situation you think, you
5          know what, I think this person probably did it but it
6          hasn't been proven beyond a reasonable doubt, is the
7          fact that you're concerned about potentially putting
8          a killer back out there, something like that, is that
9          a situation where you say, you know, I'm just going
10         to have to go with my feelings of I'm too concerned
11         about a killer being found not guilty?
12                    JUROR NICHOLS:  Actually, that was the
13         reason why I chose that one because, as you said, you
14         need without a reasonable doubt to convict, so if
15         he's innocent by innocent, he should be proven
16         innocent, where if he's convicted or if he was the
17         killer, he should be found guilty.  Having said that,
18         the rules are rules, law is that without a reasonable
19         doubt, so if he's found not guilty, he's found not
20         guilty.
21                    ATTORNEY VISHNY:  Okay.  And would you be
22         worried, like, gee, I don't know if I could find this
23         person not guilty because I think he might have done
24         it but it just hasn't been, you know, I'm just not
25         sure beyond a reasonable doubt so I think I better

                                    295

1           vote guilty.  Is that how you would be at all?

2                     JUROR NICHOLS:  If that's how it comes out

3           in court, then he's found not guilty.

4                     ATTORNEY VISHNY:  And what -- how do you

5           feel about you personally participating in that?

6                     JUROR NICHOLS:  Like I said, if that's what

7           has to be done, that's what has to be done.  If you

8           guys -- like I said, if it's the way it's supposed to

9           be done, if I have to vote not guilty, I have to vote

10          not guilty.

11                    ATTORNEY VISHNY:  And I'm going to just ask

12          another question.  I'm going to come back around this

13          with more people, but just kind of come up now, which

14          is an accused person has an absolute right to not

15          testify, and that could be very disturbing to people

16          on a jury, you know, gee, I really want to hear him

17          but he decides to not testify.  Would that bother

18          you?

19                    JUROR NICHOLS:  Not necessarily.  Some

20          people just don't really like speaking.

21                    ATTORNEY VISHNY:  Okay.  All right.  I'm

22          coming back to that later because I want to finish

23          this with everybody here.

24               Okay.  Is it Stockwell?

25                    JUROR STOCKWELL:  Yes.

1                ATTORNEY VISHNY:  You came late up here so
2        I wasn't sure if I had your name right.  All right.
3        Miss Stockwell.  Going back to the original question,
4        which one are you more afraid of, you know, finding a
5        person who is a killer not guilty and what the
6        consequences of that could be or convicting an
7        innocent person?
8                JUROR STOCKWELL:  Maybe letting a murderer
9        go back out on the street not knowing if he's going
10       to do that same thing again.
11               ATTORNEY VISHNY:  Okay.  And same question
12       comes to you then, the judge, you know, when he
13       instructs the jury is going to explain that the
14       prosecutor has to prove it beyond a reasonable doubt,
15       and that's why -- and, you know, and you have this
16       concern.  So if you're sitting there and you say, you
17       know, I think he probably did it, I'm not sure if
18       it's beyond a reasonable doubt but I'm really
19       concerned about letting a killer go, you know, how
20       are you going to deal with that?
21               JUROR STOCKWELL:  Hopefully all the
22       evidence will say, yeah, he did it, then I can make
23       my --
24               ATTORNEY VISHNY:  Hopefully what?
25               JUROR STOCKWELL:  All the evidence will

```
1          say, yeah, he did it, and then I would be more

2          comfortable like, okay, convicting him, say, yeah, he

3          did it.

4                    ATTORNEY VISHNY:  Some things aren't that

5          cut and dried though.

6                    JUROR STOCKWELL:  I know.

7                    ATTORNEY VISHNY:  So what if you have to

8          deal with that situation, then how are you going to

9          deal with it?

10                   JUROR STOCKWELL:  Probably just something I

11         would have to deal with knowing I did this.

12                   THE COURT:  Miss O'Brien, same question,

13         you know, about the -- and if you need to me to

14         repeat the question, let me know.

15                   JUROR O'BRIEN:  Probably condemning an

16         innocent person.

17                   THE COURT:  That's a bigger concern for

18         you?  Okay.

19             I'm going to go to the next row, start with Mr.

20         Eggers.  I'm kind of zigzagging.

21                   JUROR EGGERS:  Definitely letting a

22         murderer back out on the street.

23                   ATTORNEY VISHNY:  Is a greater concern?

24                   JUROR EGGERS:  Because obviously the

25         prosecution hasn't done its job.
```

```
1                    ATTORNEY VISHNY:  Okay.  And, you know, if
2         you feel that the -- you know, the law says you have
3         to find somebody guilty beyond a reasonable doubt, so
4         how do you handle that if you think someone has
5         probably done it or -- but it hasn't been proven
6         beyond a reasonable doubt and you're very concerned
7         about putting a killer back out on the street as you
8         said.  How are you going to deal with that as a
9         juror?
10                   JUROR EGGERS:  The evidence that has been
11        placed in front of basically all of us, I mean we can
12        all talk about it in the jury room.
13                   ATTORNEY VISHNY:  Okay.
14                   JUROR EGGERS:  And we come up with the best
15        scenario.
16                   ATTORNEY VISHNY:  Okay.  All right.  Thank
17        you.
18            Mr. Van Dalen.
19                   JUROR VAN DALEN:  Dalen.
20                   ATTORNEY VISHNY:  I knew I'd get something
21        wrong here.  What about you?
22                   JUROR VAN DALEN:  More concerned with
23        putting an innocent man away.
24                   ATTORNEY VISHNY:  You're more concerned
25        about that.  And why is that?
```

299

```
1                    JUROR VAN DALEN:  Because if through the
2         trial we decide whether he was guilty or not, like
3         you said, without a reasonable doubt, so I would feel
4         confident I guess after having all the evidence on my
5         decision.  I would hate to see somebody that's
6         innocent in jail for something they didn't do.
7                    ATTORNEY VISHNY:  Okay.  Mr. Maas.
8                    JUROR MAAS:  I would say I'm kind of 50/50
9         on it.
10                   ATTORNEY VISHNY:  Okay.
11                   JUROR MAAS:  I haven't seen the facts,
12        haven't heard anything, but I would really hate to
13        put an innocent --
14                   ATTORNEY VISHNY:  You would really hate to
15        what?
16                   JUROR MAAS:  Put an innocent person away.
17                   ATTORNEY VISHNY:  And we don't talk about
18        the facts in jury selection, that's for when we get
19        to the trial, but, you know, I just -- it's a probing
20        question that needs to be asked.
21             So, Mr. Wells.
22                   JUROR WELLS:  I have a problem with both if
23        one of them was wrong.
24                   ATTORNEY VISHNY:  Right.
25                   JUROR WELLS:  I mean, I -- same with him,
```

300

1    I'd have to look at all the facts and decide.  I'd

2    have a problem doing both, but I would sooner not put

3    an innocent away.

4              ATTORNEY VISHNY:  Okay.  All right.

5         Oh, I'm just blanking on your name.  Meyer?

6              JUROR MEYER:  Yes.

7              ATTORNEY VISHNY:  I knew I had it before.

8              JUROR MEYER:  Convicting an innocent

9    person.

10              ATTORNEY VISHNY:  Pardon me?

11              JUROR MEYER:  Convicting an innocent

12    person.

13              ATTORNEY VISHNY:  Miss Steffen?

14              JUROR STEFFEN:  I think I would -- there

15    again, 50/50, but I wouldn't want to put a killer

16    back out in the street.

17              ATTORNEY VISHNY:  Okay.  And that,

18    obviously, any human being would have that as a

19    legitimate concern, right, but what -- given that the

20    way the law is beyond a reasonable doubt, would -- do

21    you feel that that's like too high a burden given

22    your concerns?

23              JUROR STEFFEN:  It's a big responsibility,

24    that's for sure.

25              ATTORNEY VISHNY:  Yes.

301

1              JUROR STEFFEN:  But as a jury, I think we
2        do the best we can to listen to what you guys tell us
3        and we have to weigh it, and whatever decision we
4        make, that's the way it's got to be I guess.
5              ATTORNEY VISHNY:  Okay.
6              JUROR STEFFEN:  Yeah.  You wouldn't want to
7        put an innocent person away, very definitely, but --
8              ATTORNEY VISHNY:  Okay.  All right.  Thank
9        you very much for that.
10          Mr. Fleming.
11             JUROR FLEMING:  Yeah.  I would not be able
12       to put an innocent person away.
13             ATTORNEY VISHNY:  Right.  Well none of us
14       want to do that.
15             JUROR FLEMING:  No.  My conscience, that's
16       my -- if I find out later on in life that --
17             ATTORNEY VISHNY:  So that's your greater
18       concern in sitting --
19             JUROR FLEMING:  My greater concern, yes.
20             ATTORNEY VISHNY:  Okay.  Mr. Nieman?
21             JUROR NIEMAN:  Convicting an innocent
22       person.
23             ATTORNEY VISHNY:  That's a greater concern
24       for you.
25          Miss Hermus?

302

```
1                 JUROR HERMUS:  Convicting an innocent
2         person.
3                 ATTORNEY VISHNY:  That's a greater concern.
4            Okay.  What about you, Miss Dey?
5                 JUROR DEY:  Convicting an innocent
6         person.
7                 ATTORNEY VISHNY:  And, Mr. Van Deurzen?
8                 JUROR VAN DEURZEN:  Van Deurzen, yeah.
9         Letting a guilty man go free.
10                ATTORNEY VISHNY:  And why is that?
11                JUROR VAN DEURZEN:  Like I say, you would
12        have to look at all the evidence and everything else,
13        but I just wouldn't want to see that happen again.
14                ATTORNEY VISHNY:  Mr. Schueller.
15                JUROR SCHUELLER:  Well, I'd prefer to do
16        our job correctly and not have this happen, but I
17        think convicting an innocent person.
18                ATTORNEY VISHNY:  That's a greater worry
19        for you?
20                JUROR SCHUELLER:  Yeah.
21                ATTORNEY VISHNY:  Okay.  And so since it's
22        a great worry for you, you know, some of the same
23        questions I've said, judge says beyond a reasonable
24        doubt but you think, you know, I think he probably
25        did it but I'm just not sure, he maybe could be
```

303

1          innocent, just might be a small chance but he could

2          be, are you willing to vote not guilty under those

3          circumstances?

4                    JUROR SCHUELLER:  That's what we're here to

5          do, yes.

6                    ATTORNEY VISHNY:  Okay.  And Mr. Calmes?

7                    JUROR CALMES:  Convicting an innocent

8          person.

9                    ATTORNEY VISHNY:  Okay.  And last but not

10         least, Mr. Parker.

11                   JUROR PARKER:  Yeah.  I'm torn just like

12         everybody else, but I -- I guess I got to side, for

13         me it would be the innocent man being convicted.

14                   ATTORNEY VISHNY:  Okay.  All right.

15             So I'm going to -- and I want to thank you all

16         for really looking deep inside and answering that

17         because I think it's a really hard question to

18         answer.

19             I want to ask, you know, some other questions,

20         one of which I think is really important.  I'm going

21         to go back to something that the prosecutor said

22         which she asked you about *Making a Murderer*, and some

23         of you watched it and some of you won't, and I don't

24         want to belabor the documentary, I only want to ask

25         really one question about it, and I would like you to

304

```
1          answer how you feel about this, whether you watched

2          it, watched part of it, or just read about it in the

3          paper.  How many of you feel that the documentary

4          Making a Murderer was unfair to law enforcement?

5                Okay.  We have one gentleman.

6                And I -- I just want to say, you know, and my

7          condolences about knowing Miss Halbach, but I thought

8          you might feel that way given your real closeness to

9          this case.  So this gentleman, and that's Mr. Van

10         Dalen?

11                    JUROR VAN DALEN:  Right.

12                    ATTORNEY VISHNY:  And in the back I saw a

13         hand.

14                Okay.  We'll go -- start in the back.  Mr. Van

15         Deurzen?

16                    JUROR VAN DEURZEN:  Yup.

17                    ATTORNEY VISHNY:  Yes.  So you felt that it

18         was unfair to the police?

19                    JUROR VAN DEURZEN:  Yes.

20                    ATTORNEY VISHNY:  Did you actually watch

21         it?

22                    JUROR VAN DEURZEN:  I watched some of it.

23                    ATTORNEY VISHNY:  Okay.

24                Miss Dey?

25                    JUROR DEY:  I watched all of it.
```

305

```
1                    ATTORNEY VISHNY:  Is your opinion it was

2        unfair to law enforcement?

3                    JUROR DEY:  Yeah.  It was a lot

4        one-sided.

5                    ATTORNEY VISHNY:  Okay.

6            And Miss Hermus?

7                    JUROR HERMUS:  I didn't.

8                    ATTORNEY VISHNY:  Mr. Nieman?

9                    JUROR NIEMAN:  I watched a couple episodes,

10       and I thought it was one-sided.

11                   ATTORNEY VISHNY:  But in terms of

12       one-sidedness, did you feel it was unfair to the

13       police?

14                   JUROR NIEMAN:  Yes.

15                   ATTORNEY VISHNY:  How about in the middle?

16           Okay.  That's Mr. Wells?

17                   JUROR WELLS:  Yeah.  I felt it was

18       one-sided.  I watched the whole thing.

19                   ATTORNEY VISHNY:  Okay.  And unfair to the

20       police?

21                   JUROR WELLS:  Yeah.

22                   ATTORNEY VISHNY:  Why is that?

23                   JUROR WELLS:  You didn't get both sides of

24       the story.  I felt like there was some things missing

25       out.  I felt that there was -- both sides had
```

306

```
1          arguments, but you didn't see one side of the
2          arguments in the documentary.
3                    ATTORNEY VISHNY:  Okay.  All right.
4          Anybody else in that row?
5                    (No response.)
6                    ATTORNEY VISHNY:  Okay.  The next row down?
7          Anybody else here feel that it was unfair to law
8          enforcement?
9                    (No response.)
10                   ATTORNEY VISHNY:  I shouldn't even say the
11         police, because it was actually the Manitowoc County
12         Sheriff's Department who the documentary was critical
13         of, not the police department.  But anybody -- okay.
14             How about the front row, anybody feel it was
15         unfair to law enforcement?
16                   (No response.)
17                   ATTORNEY VISHNY:  Okay.  Kind of coming off
18         of that topic, I'm going to ask one of the things,
19         and it was an issue in the Making of a Murderer case,
20         and I want to get away from anybody thinking about
21         whether or not Steven Avery was guilty or not.
22         That's not my purpose here at all.  But one of the
23         things that the documentary focused about, and it's
24         been the subject of articles, is the interrogation
25         methods that the police used when they were
```

307

```
1        questioning Avery's nephew, Dassey, or just you may
2        know something about police interrogation methods
3        period.  Is anybody here familiar with police
4        interrogation methods at all?
5            Yes.  Mr. Schueller, what do you know about
6        those?
7                    JUROR SCHUELLER:  As a victimI was
8        interrogated; well, not interrogated but
9        questioned.
10                    ATTORNEY VISHNY:  How did you feel about
11       that?
12                    JUROR SCHUELLER:  It was quite a lengthy
13       process.
14                    ATTORNEY VISHNY:  At any point were you
15       feeling like that you were being accused of
16       something?
17                    JUROR SCHUELLER:  Yes.
18                    ATTORNEY VISHNY:  And when you felt that
19       way, how did -- what was your opinion of how that was
20       or how did you feel?
21                    JUROR SCHUELLER:  Uncomfortable.
22                    ATTORNEY VISHNY:  Okay.  And do you -- are
23       you -- do you think that's a good interrogation
24       method, bad interrogation method?
25                    JUROR SCHUELLER:  It got what was needed so
```

1          I -- I don't know either way.

2                    ATTORNEY VISHNY:  Okay.  Other people, did

3          anyone else raise their hands for that?  Is anybody

4          else concerned about how the police interrogate

5          people?

6              Yes?  I'm sorry.  I should have mentioned your

7          name.  Vandenberg?

8                    JUROR VANDENBERG:  Yes.  I think that

9          people can feel pressured into saying something that

10         they don't really believe.

11                   ATTORNEY VISHNY:  Okay.  I saw another

12         hand.  That's Miss Micke?

13                   JUROR MICKE:  Yeah.  I had -- I don't have

14         any experience with it, I have based off of what I

15         saw.

16                   ATTORNEY VISHNY:  Can you talk up just a

17         little louder?

18                   JUROR MICKE:  I don't have experience with

19         it, but based on what I saw through the *Making a*

20         *Murderer*, I wholeheartedly disagree with the way the

21         interrogation happens.  I don't have any personal

22         experience with it though.

23                   ATTORNEY VISHNY:  Why did you disagree with

24         it?

25                   JUROR MICKE:  Because when they were

309

1       interrogating the boy, it was clear to -- to me it

2       was clear that his educational level, like he didn't

3       understand what they were talking to him about and he

4       should have had somebody there with him to explain

5       things.

6               ATTORNEY VISHNY:  Okay.  Miss Elbe?

7               JUROR ELBE:  Yeah.  And my thoughts were

8       exactly what she said.  He did not have anybody there

9       with him, and some of the documentation, I saw about

10      this much only, and what I saw of it was

11      horrendous.

12              ATTORNEY VISHNY:  Okay.

13              JUROR ELBE:  He was not capable mentally

14      even to -- to be saying things or drawing things.

15      Un-hun.

16              ATTORNEY VISHNY:  Okay.  All right.  And I

17      want to ask you then, kind of still on this police,

18      you know, I want to focus on that right now, police

19      questioning, police interrogation, and I'm going to

20      ask a series of questions and try to shortcut this a

21      little bit.  We'll -- actually, I have a bunch of

22      questions, but let me come back to police

23      interrogation.

24          I'm going to ask somebody to scale themselves on

25      one to seven, okay, one meaning you strongly agree

310

1        with what I'm saying, okay, seven being you strongly

2        disagree with what I'm saying.  All right?

3        Everybody's got that?  Okay.  So if you're four,

4        you're kind of smack in the middle.

5            How many of you feel that you are a number one

6        and you strongly agree with the following statement:

7        Police are more believable as witnesses than

8        non-police.

9            If you're number one, raise your hand.  Okay.

10           If you're a number two, raise your hand.  All

11       those strongly agree.

12           If you're number three, raise your hand.  You're

13       more on the agree side.

14           Okay.  And so that would be -- let me just get

15       that.  Mr. Parker and - I'm having these senior

16       moments - Mr. Calmes, Mr. Eggers.  Now, see, when I

17       have to do this really fast I start failing.  But I

18       have to -- I'm going to have to check the chart.  Mr.

19       Fleming has his hand up.  Okay.  Nobody else in the

20       middle.  Miss Lee, you have your hand up.  Mr. Green,

21       you have your hand up.  Mr. Webster, Mr. Buza.  Okay.

22       So that you are all threes.  I missed somebody.  Mr.

23       Shea.  Four.  You're smack in the middle.  You don't

24       strongly agree or you're completely neutral.

25           So the people who are completely neutral on this

1           are Miss Plamann, Miss Stockwell, Mr. Nichols, Mr.

2           Bloomer, Miss Steffen, Miss Meyer, Mr. Wells, Mr.

3           Maas, Mr. Van Dalen, Mr. Van Deurzen, Miss Dey, Miss

4           Hermus.

5                    JUROR HERMUS:  Hermus.

6                    ATTORNEY VISHNY:  I'm getting it bad

7           because I'm thinking of that food hummus which I

8           really like.  Sorry, I just couldn't help myself.

9           I'm probably getting hungry.

10              And Mr. Nieman.

11              Now we're going to keep going down the other

12          side of the scale.  How many of you are a five?  If

13          you're a five, raise your hand.  That would be Miss

14          Micke and Miss Elbe and Mr. Schueller are fives.

15              If you're a six, okay, getting very close to

16          strongly disagree.  That's Erickson.  You're probably

17          going to hate me because I forgot your name three

18          times.

19              And a seven?  Strongly disagree.  Okay.  And

20          that's Miss Vandenberg.

21              Okay.  So how are you going to judge if police

22          have done a good investigation in a case?  What kind

23          of things are you going to look for?  Just think

24          about it for a second, take a second to think.  What

25          -- Mr. Bloomer, you've got your hand up.

312

1          JUROR BLOOMER:  Who, what, where, when and

2      why.

3          ATTORNEY VISHNY:  So if they've answered

4      those questions?

5          JUROR BLOOMER:  If they answer those

6      thoroughly, you'll know, if it's possible.

7          ATTORNEY VISHNY:  Anybody else have any

8      ideas in the front two rows.

9          (No response.)

10          ATTORNEY VISHNY:  How about in the back,

11      Miss Steffen?  How would you decide?

12          JUROR STEFFEN:  He said it very well, look

13      at all the evidence and then just -- I think he did a

14      good explanation.

15          ATTORNEY VISHNY:  Okay.  Who thinks it's

16      important to have corroborating evidence to a witness

17      statement?  Does anybody feel that that's important?

18          Okay.  That would be Mr. Nichols.  Why do you

19      think that?

20          JUROR NICHOLS:  It just backs up his

21      story.

22          ATTORNEY VISHNY:  Mr. Shea?

23          JUROR SHEA:  Makes a stronger case.

24          ATTORNEY VISHNY:  In the back two rows.

25      That's Mr. Schueller?

313

1                    JUROR SCHUELLER:  The same reason, it gives

2        you a second backup.

3                    ATTORNEY VISHNY:  Okay.  Anybody else?

4             Yup.  And Miss Elbe?

5                    JUROR ELBE:  Absolutely.  You need to have

6        the basic facts, that backup, um-hum.

7                    ATTORNEY VISHNY:  Mr. Buza, were you also

8        agreeing with that?

9                    JUROR BUZA:  Yes.

10                    ATTORNEY VISHNY:  And, Mr. Calmes, why do

11       you think that?

12                    JUROR CALMES:  Just helps decide -- make a

13       decision.

14                    ATTORNEY VISHNY:  Okay.  Judge, can I

15       approach the bench?

16                    THE COURT:  You may.

17                    (Bench conference.)

18                    ATTORNEY VISHNY:  How many of you actually

19       live in Appleton itself?  Just raise your hand.

20       Okay.  So most of you.  I'm going to tell you,

21       without getting into the facts, that the level of the

22       quality of the police investigation is going to be an

23       issue in this case.  It's going to be challenged by

24       the defense.  I'm not going to get into any facts

25       beyond that, okay, but I'm just going to put that

314

1    right out there.

2         What I want to know is, because of that, does

3    anybody here who lives in Appleton and depends on the

4    Appleton Police Department as your police department

5    for protection, does that make you worried about

6    sitting on the jury where that might be questioned?

7         (No response.)

8         ATTORNEY VISHNY:  And does anybody feel,

9    you know, I -- I would not feel comfortable ever

10   saying not guilty because the Appleton police might

11   think I'm questioning them and, you know, they're my

12   police department and I have to rely on them and

13   trust them?  Is that a problem for anybody here?

14        (No response.)

15        ATTORNEY VISHNY:  Okay.  Has anybody ever

16   had an experience where you think police have done a

17   poor investigation of a crime?  Whether you've been a

18   victim, somebody you know was arrested, just some

19   friends told you about it, doesn't really matter.

20   Has anybody ever felt that way about something you

21   know about or read about?

22        (No response.)

23        ATTORNEY VISHNY:  No.  No one has ever felt

24   that way.  Okay.  All right.

25        I'm going to go -- I'm going to come back to

315

1    some police issues, but I'm going to go to some other

2    things.  Let's hit a light topic now after all this

3    heavy stuff.

4         Does anybody have any friends who are or

5    frenemies or people you know at work who are

6    braggers, who just like to boast a lot?  Anybody know

7    people like that?

8         Now, if you all don't raise your hand, I'm going

9    to say that we're not living in the same world.

10                UNIDENTIFIED JUROR:  I'll admit it.  I have

11    one.

12                ATTORNEY VISHNY:  And they don't have to be

13    your friend, it could be your coworker who you

14    couldn't stand.

15                UNIDENTIFIED JUROR:  It's a coworker.

16                ATTORNEY VISHNY:  All right.  And are there

17    people who just brag a lot who you don't believe what

18    they say?  Has anybody ever encountered that?

19         Let's -- okay.  Yes, Mr. Nichols, you're raising

20    your hand.

21                JUROR NICHOLS:  I work with a couple people

22    that always, they've done everything and they've done

23    it better.

24                ATTORNEY VISHNY:  Right.  And they know it

25    all.

316

1          JUROR NICHOLS:  And they've got blogs to

2      prove it.

3          ATTORNEY VISHNY:  Do they have book deals

4      too?

5          JUROR NICHOLS:  I don't know.  I didn't get

6      into that part.

7          ATTORNEY VISHNY:  Okay.  Anybody you know

8      see where people claim they have a lot more money

9      than they have?

10          (No response.)

11          ATTORNEY VISHNY:  No?  Or drive fancy cars

12      or have more girlfriends or boyfriends?  Yes.  Has

13      anybody known anybody who's ever bragged about

14      something that's not true but it's negative because

15      they want to impress somebody, like they're bragging

16      like they're a big time criminal?  I know this is

17      very odd, but has that ever -- have you ever run

18      across that?

19          (No response.)

20          ATTORNEY VISHNY:  Okay.  So fortunately you

21      haven't met those kind of people.

22          What I want to ask about that is do you believe

23      that there are people out there in this world who are

24      like that, who are just, you know, compulsively brag

25      even about doing bad stuff but it's not true?

317

1    I hear -- I see people nodding their head.  I'm

2  going to start in the back row.

3    Mr. Schueller, you said that --

4      JUROR SCHUELLER:  Yes.

5      ATTORNEY VISHNY:  You believe there are

6  people like that?

7      JUROR SCHUELLER:  Yes.

8      ATTORNEY VISHNY:  Does anybody in the back

9  row believe there are never people like that?

10    Okay.  Let's hit the second row.  I saw several

11  of you nodding your head.  Mr. Maas, you just raised

12  your hand.

13      JUROR MAAS:  Yes.

14      ATTORNEY VISHNY:  You know people to be

15  like that?

16      JUROR MAAS:  Oh, yeah.

17      ATTORNEY VISHNY:  It's pretty unusual but

18  it exists.  And, let's see, who else was nodding

19  their head?  Mr. Eggers, you were?

20      JUROR EGGERS:  Yeah, I would think there is

21  people out there like that.

22      ATTORNEY VISHNY:  And Mr. Van Dalen?

23      JUROR VAN DALEN:  Dalen.

24      ATTORNEY VISHNY:  Finally.

25      JUROR VAN DALEN:  Yeah.  Definitely I would

1     think that.

2               ATTORNEY VISHNY:  Again in this row, do any

3     of you believe there are people not like that, I mean

4     even crazy stuff like claiming they killed somebody

5     when they didn't or claiming they committed some

6     other horrible crime when they didn't do it?

7               (No response.)

8               ATTORNEY VISHNY:  All right.  What about in

9     the next row?  Anybody feel that there are just not

10    people like that in this world?

11              (No response.)

12              ATTORNEY VISHNY:  Front row?

13              (No response.)

14              ATTORNEY VISHNY:  Okay.  Now, in this case

15    -- just a second.  Just kind of look at my notes here

16    real quickly, because of course I didn't ask the

17    questions in order that I wrote them down.  I mean I

18    couldn't probably do something that logical.

19         Do you think men ever brag more to women?  Does

20    anybody think that?  Yes?  No?

21              (No response.)

22              ATTORNEY VISHNY:  You know one of my

23    friends was saying, yeah, but they don't realize that

24    women don't fall for that stuff.  Anybody disagree

25    with that?

319

1          (No response.)

2          ATTORNEY VISHNY:  Okay.  Now, you're going

3     to hear a lot of testimony and the prosecutor

4     referred to that about things that Chong Lee said.

5     It's going to be part of the evidence in this case.

6     Okay?  You're going to hear some phone calls and

7     you're going to, you know, maybe letters, things like

8     that were written and oral statements.  And it's

9     going to be up to you as jurors to decide, just

10    because somebody said something, is it believable or

11    not.  Does anybody have a problem with that?

12         (No response.)

13         ATTORNEY VISHNY:  Okay.  And is anybody

14    afraid to have to make that decision?

15         (No response.)

16         ATTORNEY VISHNY:  All right.  And is it

17    important to you that there be corroborating evidence

18    even of bragging or statements that people make on a

19    telephone or in a letter?  Is that important to you?

20    Is there any -- let me flip that.  Is there anybody

21    who it's not important to?

22         (No response.)

23         ATTORNEY VISHNY:  Okay.  Will anybody here

24    say, you know what, just because somebody made

25    statements on a phone and, you know, it could mean if

320

1      they made certain statements on a phone they might be

2      guilty of one thing but not another.  Okay?  So there

3      is a lot of, you know, you heard the charges read

4      when you walked in the courtroom, right, and you all

5      know that there are a lot of different charges here,

6      they're not all the same, and you're going to have to

7      make individual decisions as a group, I mean you're

8      going to make a group decision but you're going to

9      have to decide on each and every count separately.

10     All right?

11          So I want to ask you if you feel, you know, I've

12     heard these statements on the phone about witnesses

13     and can you independently judge from those statements

14     whether or not somebody has been proven guilty beyond

15     a reasonable doubt of killing somebody or do you

16     think, well, this person is guilty of one, they must

17     be guilty of the other?  How many of you think if

18     they're guilty of one, you know, or more of the

19     counts they must be guilty of all of the counts?  Is

20     there anybody who feels that way?  And, again, it's

21     okay if you feel that way, we just want to know.

22               (No response.)

23               ATTORNEY VISHNY:  Okay.  Some of you have

24     talked about scientific evidence.  Is scientific

25     evidence important in your opinion?  Yes?  Yes.

321

1          And Mr. Shea?

2               JUROR SHEA:  It's certainly helpful.

3               ATTORNEY VISHNY:  Yeah.  It's not always

4     available but it's certainly helpful.

5          Is it important that the police do everything

6     early in an investigation to get whatever scientific

7     or physical evidence might be available right from

8     the beginning?

9          Okay.  How many of you agree with the statement

10    time is of the essence in an investigation?  Is there

11    anybody who disagrees with that?

12               (No response.)

13               ATTORNEY VISHNY:  Has anybody here ever

14    said something out of frustration, you know, or let's

15    -- like you or somebody you know, let's say that,

16    have you ever -- have any of you said something out

17    of frustration or anger or being upset that you

18    really didn't mean?  Like, okay, like I'd like to

19    kill my husband, or let's try something milder,

20    you're still married, I'd like a divorce.  Okay?  I

21    mean have there ever been where you have verbalized

22    thoughts or know people who verbalize thoughts even

23    though you don't mean it, you don't want to kill

24    them, you love them, or you don't want a divorce, you

25    want to commit to your marriage, you know, but has

322

1          anybody ever been in a situation like that where you
2          have said things because you're frustrated but you
3          may not mean them?
4                    (No response.)
5                    ATTORNEY VISHNY:  Okay.  And has anybody
6          not ever been in a situation like that?  Or not know
7          people like that?
8                    (No response.)
9                    ATTORNEY VISHNY:  It's okay if you haven't
10         done it.  We won't think you're odd or anything.
11                   (No response.)
12                    ATTORNEY VISHNY:  Okay.  All right.  Just
13         thought I'd ask.
14              So, as I've said, you know, you're going to hear
15         a lot of things that Chong Lee said over the phone,
16         and they may not be the way you personally would
17         react, they can be different, and how do you feel
18         about people who do things or say things differently
19         than you do in your life?
20                   (No response.)
21                   ATTORNEY VISHNY:  Okay.  Nobody wants to
22         raise their hand right now.  Which is okay.  You guys
23         getting tired?
24                   UNIDENTIFIED JUROR:  Um-hum.
25                   ATTORNEY VISHNY:  We're only going to go a

323

1          few more minutes before break.  That's what I was

2          asking the judge about before.

3              Mr. Schueller.

4              JUROR SCHUELLER:  I manage 30 plus people

5          with all different attitudes and everything, so I

6          understand people have different personalities and

7          it's just the way the world works.

8              ATTORNEY VISHNY:  Okay.  Anybody else want

9          to comment on that?

10             (No response.)

11             ATTORNEY VISHNY:  Will you find Chong Lee

12         guilty of a murder charge just because he reacted

13         differently than you might react?  That's what I

14         really want to know.  Okay?  Because I know that we

15         each think, you know what, if it was me, I would do

16         this, I would react that way, but we all know

17         different people react differently.  Is there anybody

18         who feels, and it's perfectly fine if you do, he

19         didn't react the way I would react or my mother would

20         react or my husband would react or wife, and

21         therefore I'm going to -- I think he's guilty just

22         because of that fact alone.  Anybody?

23             (No response.)

24             ATTORNEY VISHNY:  Okay.  How many of you

25         know a person who was convicted of a felony?

324

```
1            Okay.  You can just raise your hands for a
2       minute.  So we have one gentleman in the back -- two
3       people.  That's Mr. Schueller and Mr. Van Deurzen in
4       the back, you two know people convicted of a felony.
5       Mr. Wells.  Anybody else in the second row?  Mr.
6       Maas, Mr. Fleming.  Right.  Did I get that one right
7       this time?  Okay.  That's Miss Stockwell, Mr.
8       Nichols, Miss Micke, Miss Erickson.  And Miss
9       Vandenberg and Miss Plamann.  Okay.  So all of you
10      know people who have been convicted of a felony.
11           Is the fact that somebody has been previously
12      convicted of a felony, do you feel that if they are
13      accused of a different crime at a later date that
14      that means they're guilty because they committed a
15      felony once before?  Does anybody feel that way?
16               (No response.)
17           ATTORNEY VISHNY:  I'm just going to come
18      straight out and say it.  You're going to hear one of
19      the charges that Mr. Lee is accused of is possession
20      of a firearm by a convicted felon.  And we agree --
21      we are going to agree, we're not going to contest the
22      fact that at a point in his life in the past he was
23      convicted of a felony.  I'm just going to put that
24      right out there.  All right?  Now that I've said
25      that, you know, with all these things we've been
```

325

1          talking about, is there anybody who says, you know

2          what, this guy was convicted of a felony before and

3          therefore I think he is guilty of what he's being

4          accused of in this case?

5                    (No response.)

6                    ATTORNEY VISHNY:  You know, meaning murder,

7          first and foremost.  So is there anybody -- if you

8          think it, it's okay, we just want to know.  Okay?

9               Does the fact that I have told you this now,

10         that he's been convicted of a felony, change your

11         opinion at all about any of the things that we've

12         talked about in this trial so far.

13                   (No response.)

14                   ATTORNEY VISHNY:  No?  Doesn't make any

15         difference to you?

16              Then I guess the next question I have is about

17         Mr. Lee and whether or not he testifies in this case.

18         Okay?  And, you know, the judge will instruct you,

19         and again, I'm not trying to be the judge, but I

20         think we all know that an accused person has a right

21         to not have to take the stand.  Right?  Can anybody

22         here think of a reason why an innocent person would

23         not want to testify in the case?

24                   JUROR O'BRIEN:  They're scared.

25                   ATTORNEY VISHNY:  That is Miss O'Brien says

326

1    they're scared.  I have to repeat your name for the

2    court reporter.  Miss O'Brien says because they're

3    scared.

4        What's another reason that people can think of?

5            JUROR PARKER:  Communication skills.

6            ATTORNEY VISHNY:  I'm sorry.  Mr. Parker?

7            JUROR PARKER:  Communication skills.

8            JUROR WELLS:  Get nervous, stumble over

9    words.

10           ATTORNEY VISHNY:  Mr. Wells says that.

11       Okay.  Anybody else?  Can anybody else think of

12   a reason an innocent person might not want to take

13   the stand?

14           ATTORNEY VISHNY:  Okay.  Mr. Schueller?

15           JUROR SCHUELLER:  Don't want any inferences

16   on what he says for someone to take the wrong point

17   of it.

18           ATTORNEY VISHNY:  Okay.  Mr. Bloomer, you

19   raised your hand?

20           JUROR BLOOMER:  Cross-examination can

21   create a lot of doubt.

22           ATTORNEY VISHNY:  Okay.  Cross-examination.

23       Miss Micke, you raised your hand?

24           JUROR MICKE:  I was just going to say --

25           ATTORNEY VISHNY:  I really do need you to

327

1      talk up.

2                  JUROR MICKE:  Sorry.  He could say

3      something that could potentially make him look guilty

4      when he's not.

5                  ATTORNEY VISHNY:  That could make him look

6      guilty even if he's not.

7                  JUROR MICKE:  Yes.

8                  ATTORNEY VISHNY:  Anybody else?

9                  JUROR ELBE:  I think --

10                 ATTORNEY VISHNY:  I'm sorry, I have to put

11     your name down for the record.  Elbe?

12                 JUROR ELBE:  Yup.

13                 ATTORNEY VISHNY:  Okay.

14                 JUROR ELBE:  When -- when you get up there

15     to give your information, the nervousness alone can

16     put you into mentally trying to figure out what I'm

17     going to say and say it correctly, and so it could

18     come across wrong even though they're saying or

19     trying very hard to give that information, it can

20     just be turned around in the wrong way.

21                 ATTORNEY VISHNY:  Okay.  Does anybody know

22     anyone -- first, can anybody -- any other reasons

23     anyone can think of?

24                 (No response.)

25                 ATTORNEY VISHNY:  All right.  Does anybody

328

1    know anyone who might not want to testify because

2    they don't want to point the finger at another

3    person?

4              (No response.)

5              ATTORNEY VISHNY:  Okay.  Now , I'm going

6    to flip this question.  Who here thinks that if he

7    doesn't take the stand and doesn't want to testify

8    that if people don't take the stand it means they're

9    guilty and that's the reason why they don't get up

10   there and tell their story?  Nobody thinks that?

11             (No response.)

12             ATTORNEY VISHNY:  Did any of you walk in

13   the courtroom today and say, gee, I wonder what Chong

14   Lee is innocent of?

15             (No response.)

16             ATTORNEY VISHNY:  Okay.  Not one of you has

17   raised your hand.  And if you did raise your hand, I

18   would think there was something really unusual going

19   on here because that's just not how we think.  We

20   wonder what did this guy do.  All right?  So is it

21   fair that we all kind of wondered and said, you know,

22   what's he here for, or you learned pretty quickly

23   what it was all about, but, you know, if I'm -- there

24   is an accused person, what did he do?

25             UNIDENTIFIED JUROR:  Um-hum.

1           ATTORNEY VISHNY:  So we've got that out of
2      the way.  We all think like that, right?  I pick up
3      the newspaper, I think the same thing as everyone
4      else thinks, right?  So, thinking that and knowing
5      that you walked in here saying that and, you know,
6      does that at all affect you thinking, well, gee, if
7      he didn't take the stand then he must be a guilty
8      person?
9           (No response.)
10          ATTORNEY VISHNY:  Okay.  Or, you know, how
11     do you feel then about, well, I came in here, I
12     wondered what he did, some people like say where
13     there's smoke there's fire, it's like a super old
14     cliche, and then so therefore, you know, I'm not
15     sure, or now that you know that the prosecutor has to
16     prove this to you beyond a reasonable doubt, the
17     burden of proof is completely on the prosecution
18     side, the defense doesn't have to question witnesses,
19     but believe me we will, okay, we don't have to call
20     witnesses but we will call somebody, okay, does
21     anybody say, you know, well, I walked in thinking,
22     you know, he's probably guilty, he probably did
23     something, and now this lawyer is here saying, well
24     they've got to prove it beyond a reasonable doubt and
25     I'm committed to not finding somebody guilty.  Does

330

```
1           that cause any problems for anyone but --
2                     JUROR ELBE:  That's --
3                     ATTORNEY VISHNY:  Miss Elbe?
4                     JUROR ELBE:  That's where we come right
5           back around, we just came right back around, we're
6           back to this.  We need to hear what happened, where
7           they were, what was going on, we need facts.
8                     ATTORNEY VISHNY:  Right.
9                     JUROR ELBE:  That's what we need.  We went
10          right around to go back to let's get the facts on
11          this, what happened.  We need that.
12                    ATTORNEY VISHNY:  Right.  And that's why
13          we're all sitting here.
14                    JUROR ELBE:  Um-hum.
15                    ATTORNEY VISHNY:  And I would be really
16          worried if you didn't need facts.  Okay?  So anybody
17          have any disagreements with that?
18                    (No response.)
19                    ATTORNEY VISHNY:  Does anybody think it's
20          just really not fair that the prosecution has to
21          prove a case beyond a reasonable doubt?  That just --
22          it shouldn't be like that, it should be like more
23          likely than not, you know, because this is really
24          different, right, this is a lot more?
25               How many of you are Packers fans?  Okay.  How
```

331

```
1       many of you are not Packer fans?  Okay.  Well I

2       didn't become one.  I grew up in a different state,

3       but I did become a Wisconsinite so it's like the old

4       football thing, you have to carry the ball all the

5       way down the goal line.  That's kind of like what

6       beyond a reasonable doubt is.  Does anybody say, you

7       know, that's just not right, that's not fair?

8                 (No response.)

9                 ATTORNEY VISHNY:  Anybody have a problem

10      with that?

11                JUROR NICHOLS:  I said everyone who watches

12      football.

13                ATTORNEY VISHNY:  Mr. Nichols.  Yes.

14      Everybody does watch football, but, you know, but

15      we're not really here to watch football.  We started

16      out with the Super Bowl and the halftime show, but

17      what about, you know, kind of -- I'm just using it as

18      a pretty bad analogy for reasonable doubt, you know,

19      pretty bad, pretty cliche, I'll totally cop to that,

20      so -- but -- but I'm really trying to explore your

21      views.  You know, for those of you who said you're

22      more concerned, you know, you're more concerned about

23      whether or not a guilty person would go free, you

24      know, and what could the ramifications of that be,

25      you know, again, I'm kind of coming back in many ways
```

332

1          to that question, is this a problem.  I don't want to

2          beat a dead horse, but it's something I got to be

3          sure about.  Okay.

4              Judge, I'm kind of at a natural point where I

5          would completely change topics.  I don't have that

6          much left, but I do have some other topics.

7                    THE COURT:  Sure.  And we are -- it may not

8          be here quite yet.  We are providing -- we have some

9          pizzas that are being brought in for you so we will

10         have that provided you in a moment.  It will be in

11         the Branch III jury room, which is where we had

12         initially met, and so at this time why don't we begin

13         our break with the understanding pizza may not quite

14         be here yet, and then let's reconvene at -- let's say

15         6:15 -- six.

16                    UNIDENTIFIED JUROR:  Everybody stay in the

17         building?

18                    ATTORNEY VISHNY:  And I don't have that

19         much more left.  I just wanted to let you know that.

20                    THE COURT:  We'll reconvene at 6:00.

21                    (Court in recess.)

22                    THE COURT:  Attorney Vishny, whenever you

23         are ready, please resume your questioning.

24                    ATTORNEY VISHNY:  Thank you, Your Honor.

25              Okay.  I don't have too much more, but you were

333

1          -- people were asked earlier whether you speak Hmong,

2          and nobody here does who is in this group of people

3          here.  Do any of you speak a language other than

4          English?

5                    (No response.)

6                    ATTORNEY VISHNY:  No.  Okay.

7             And does anybody here feel that English should

8          be the official language of the United States?  Okay.

9          So I'm going to start in the back, and I think I --

10         Mr. Parker?

11                   JUROR PARKER:  Um-hum.

12                   ATTORNEY VISHNY:  Yes.  So, I mean, it kind

13         of is in a way anyway, but we're talking about

14         whether there should be a law passed.  Why do you

15         feel that way?

16                   JUROR PARKER:  I guess that's just what I

17         grew up with and that's what -- I know it's changed

18         now and there is a lot of diversification in this

19         area too, but I just believe that if you live here

20         you should learn English and try to speak that

21         language.

22                   ATTORNEY VISHNY:  How do you feel when

23         people are speaking in another language?

24                   JUROR PARKER:  I don't know.  I -- I don't

25         want to say it bothers me, I just don't know what

334

1       they're saying.  Like if I'm in line at the grocery

2       store and I hear something, you kind of wonder what

3       they're talking about, but I can't say it bothers me,

4       but I guess deep down I wish that everybody would

5       learn English and -- if they're living here.

6              ATTORNEY VISHNY:  Okay.  Mr. Calmes, did

7       you raise your hand?

8              JUROR CALMES:  I did.

9              ATTORNEY VISHNY:  Okay.  Why don't you tell

10      me how you feel.

11             JUROR CALMES:  About the English language?

12             ATTORNEY VISHNY:  Well, we all love English

13      because we all speak it here, but, you know, it's all

14      of our language of course, but about -- would you --

15      whether you think it should be the official language

16      or how you feel when you hear people speaking in a

17      different language, whether it's Hmong, Spanish?

18             JUROR CALMES:  Doesn't bother me at all.

19      English language is what I'm accustomed to because

20      that's what's on TV, I guess, but it doesn't bother

21      me.

22             ATTORNEY VISHNY:  Did anybody else raise

23      their hand in the back row?  Yes?  Okay.  Mr. Van

24      Deurzen.

25             JUROR VAN DEURZEN:  Yes.

335

1              ATTORNEY VISHNY:  Okay.  Why don't you tell

2         us what you think.

3              JUROR VAN DEURZEN:  It's because we're in

4         America and that's what we speak here so I think

5         everybody should speak it.

6              ATTORNEY VISHNY:  Do you feel negative when

7         you hear people speaking in a foreign language?

8              JUROR VAN DEURZEN:  I don't know if I feel

9         negative, you can do what you want, but it should be

10        the official language.

11             ATTORNEY VISHNY:  Miss Dey.

12             JUROR DEY:  I feel it should be because if

13        you went and lived in their country, you would learn

14        to speak their language if you stayed there, so I

15        feel it should be.

16             ATTORNEY VISHNY:  Do you feel negative when

17        you hear people speaking in a foreign language?

18             JUROR DEY:  I guess it depends on their

19        body actions and stuff like that.

20             ATTORNEY VISHNY:  Their body actions?

21             JUROR DEY:  Like how they're acting at the

22        time.  Like if they're looking at you or something,

23        it might make you wonder if they're talking about you

24        or something.

25             ATTORNEY VISHNY:  Are you suspicious when

336

1      you hear people speaking in a foreign language?

2              JUROR DEY:  Not necessarily.  It depends on

3      the situation.

4              THE COURT:  Next row.  Was there anybody

5      who raised their hand?  All right.  Mr. Eggers.  Go

6      ahead.

7              JUROR EGGERS:  English should be the

8      official language.

9              ATTORNEY VISHNY:  I guess I won't ask you

10     that, because if you don't think that, what I want to

11     ask is how do you feel about when you hear speaking

12     in a foreign language?

13             JUROR EGGERS:  Doesn't really bother me.  I

14     can live with it.

15             ATTORNEY VISHNY:  Okay.  Mr. Van Dalen?

16             JUROR VAN DALEN:  Doesn't bother me when I

17     hear other languages, I just think they should --

18     other cultures should learn English if they're going

19     to come and live in America.

20             ATTORNEY VISHNY:  Did anybody else raise

21     their hand?  Miss Meyer.

22             JUROR MEYER:  Yes.  It doesn't bother me at

23     all, I just think it's better if they could learn it

24     so that we could communicate, understand the

25     English.

337

1          ATTORNEY VISHNY:  Anybody else in that row?
2     Okay.  Mr. Shea.
3          JUROR SHEA:  I don't think there is any
4     reason to make it a law or -- just if you want to get
5     a job and live in America, eventually you get around
6     to learning the language and it happens and it
7     happened 20 years ago, 150 years ago, hundred years
8     ago, Germans start speaking English.  It's going to
9     happen.  We don't need a law.
10         ATTORNEY VISHNY:  Anybody else in that row?
11    Mr. Green?
12         JUROR GREEN:  I think they should learn
13    English, but I don't care if they speak a different
14    language.
15         ATTORNEY VISHNY:  Don't bother you.
16         JUROR GREEN:  No.
17         ATTORNEY VISHNY:  Mr. Nichols?
18         JUROR NICHOLS:  I agree with them.  I don't
19    really have a problem with them as long as they're
20    not like body language kind of insinuating they're
21    talking about you.
22         ATTORNEY VISHNY:  That was the only way you
23    feel offended by someone speaking a different
24    language.
25         Miss O'Brien.

```
1                    JUROR O'BRIEN:  I don't feel offended if

2          they're speaking a different language but by coming

3          here I think they should take the effort to learn the

4          English language.

5                    ATTORNEY VISHNY:  In the front row, anybody

6          raise their hand?

7                    (No response.)

8                    ATTORNEY VISHNY:  No.  All right.  So how

9          many of you are friends with someone who is of a

10         different race or ethnicity than yourself?

11             Okay.  Quite a few of you.

12             Are there people here on this jury panel who are

13         friends with people who are Asian or Hmong?

14             Okay.  So there are several people who are.

15             Is there anybody here who feels resentful, like

16         Hmong people, you know, they come to this country,

17         they don't follow our ways, they're -- you know, they

18         live differently, they talk in a strange language,

19         they eat different food, you know, anybody feel that

20         way at all?

21             Again, there's nothing wrong, nobody is judging

22         you, but if you feel that way, we just need to know

23         about it now.  Is there anyone who feels that way?

24                   (No response.)

25                   ATTORNEY VISHNY:  Is there anyone who feels
```

339

1    negative about Hmong people, like the people have

2    large families, they live lots of people in one

3    house, you know, people don't have jobs, anything

4    like that?

5              (No response.)

6              ATTORNEY VISHNY:  All right.  Has anybody

7    here ever been involved in helping Hmong refugees

8    settle in the United States through your church or

9    civics group?

10             (No response.)

11             ATTORNEY VISHNY:  Does anybody here feel

12   that you are familiar with traditional Hmong cultural

13   or religious beliefs, ever learn anything about it?

14   Curious about it?

15        Yes?  Mr. Van Dalen.

16             JUROR VAN DALEN:  Yeah.  I'm curious,

17   interested about it, yeah.

18             THE COURT:  Anybody else?  Miss Plamann?

19             JUROR PLAMANN:  A friend in high school, I

20   interviewed him for a paper and a work-up that

21   learned about his culture and his background.  He's

22   Hmong.

23             ATTORNEY VISHNY:  Okay.  Miss Vandenberg,

24   you were going to say something.

25             JUROR VANDENBERG:  Yeah.  Just interested I

340

1          guess.  No problem learning about different
2          cultures.
3                    ATTORNEY VISHNY:  Miss Erickson, you raised
4          your hand?
5                    JUROR ERICKSON:  I just talk to my friends
6          about random stuff about that.  Just a little --
7          little bit different than that from various talks,
8          nothing too deep.
9                    ATTORNEY VISHNY:  Okay.  Immigration has
10         changed our communities, and it's probably changed
11         Appleton just like it's changed other communities,
12         whether immigrants are from a Latin American country
13         or from an Asian country.  Is there anybody who feels
14         negative about this and thinks it was better when it
15         was the old days and there weren't a lot of
16         immigrants here?
17                    (No response.)
18                    ATTORNEY VISHNY:  On the flip side, does
19         anybody think, you know, this is better, it's a more
20         diverse community, I like it more?
21              Yes.  Mr. Schueller?
22                    JUROR SCHUELLER:  I like it.  That's what
23         the country is formed on.
24                    ATTORNEY VISHNY:  Okay.  Miss Vandenberg?
25                    JUROR VANDENBERG:  I agree.

341

```
 1                    ATTORNEY VISHNY:  Okay.  And Mr. -- I'm
 2          losing it now.
 3                    JUROR FLEMING:  Fleming.  I agree.  Because
 4          nationalities are sometimes I think (unintelligible).
 5                    ATTORNEY VISHNY:  Anyone else wanted to
 6          raise their hand?  Yes, Miss Stockwell?
 7                    JUROR STOCKWELL:  I think it's interesting
 8          having like Hmongs and Mexicans and they can meet new
 9          kind of people and learn their cultures and
10          traditions and stuff.
11                    ATTORNEY VISHNY:  Okay.  Anybody else?
12          Yes, Miss Erickson?
13                    JUROR ERICKSON:  I'm just used to it
14          growing up with it.
15                    ATTORNEY VISHNY:  Growing up in a more
16          diverse society?
17                    JUROR ERICKSON:  Yeah.  If you're younger,
18          it's just how you grew up.
19                    ATTORNEY VISHNY:  Okay.  All right.
20              Now, there's five people here, I'm going to go
21          back to asking questions, and I'm going to ask the
22          five of you some specific questions because of what
23          you identified about yourself when it came to whether
24          the *Making a Murderer* documentary was overly critical
25          of the police.  I don't want to talk about the
```

1    documentary at all.  At all.  What I want to talk

2    about is the fact that in the defense in this case

3    there's going to be criticism from the defense about

4    how the police investigated this case, and you may,

5    after feeling -- after watching that documentary,

6    think, you know what, they're just doing what the

7    defense did in the *Making a Murderer* case, you know,

8    they're just criticizing the police.  And I will tell

9    you there is even going to be somebody who is an

10   expert in police practices who is going to come and

11   talk about police practices in this trial.  So I'm

12   going to ask, Mr. Nieman, you're one of the people

13   who had raised your hand about that, and I -- I just

14   want your honest answer.  Do you feel it's unfair

15   that part of the defense in this case is going to be

16   critical of the investigation methods of the Appleton

17   Police Department?

18              JUROR NIEMAN:  No.

19              ATTORNEY VISHNY:  Okay.  And, you know, do

20   you -- do you think it's appropriate to question

21   investigation methods?

22              JUROR NIEMAN:  If the defense feels

23   necessary, yes.

24              ATTORNEY VISHNY:  Okay.  And is your

25   opinion when you hear that, oh, my God, that's just a

343

1          lot of hooey, they're just blowing smoke, or is that

2          something you think should be seriously questioned in

3          terms of whether or not the right person is on trial

4          here today?

5                    JUROR NIEMAN:  It depends on the evidence

6          and the facts.

7                    ATTORNEY VISHNY:  Okay.

8                    JUROR NIEMAN:  As to what you're trying to

9          point out.

10                   ATTORNEY VISHNY:  Okay.

11         Miss Dey, I think you were one of the people who

12         had raised your hand to that question too, and I have

13         the same questions to you.  This is what's going to

14         happen in this trial.  There is going to be some

15         pretty aggressive questioning here about the methods

16         that the Appleton Police Department used, including,

17         you know, some critique of it, and the purpose of

18         that isn't to, again, put anybody down but to talk

19         about whether or not there in fact -- whether the

20         right person is sitting here at the defense table and

21         on trial.  How do you feel about that?

22                   JUROR DEY:  Can you restate the question?

23                   ATTORNEY VISHNY:  Yes.  Okay.  So when I

24         talked to you about the documentary, you said you

25         thought it was unfair to law enforcement.

344

1              JUROR DEY:  Um-hum.

2              ATTORNEY VISHNY:  And just, you know,

3      nobody here is saying anybody planted evidence or is

4      lying, but there's going to be some vigorous

5      criticism of how this case was investigated and

6      whether it has led to a person who is innocent being

7      prosecuted.  Okay?  That's what's going to be talked

8      about in this trial.  And, you know, given -- and I

9      kind of use the documentary not to talk about that

10     but as kind of a weather vane or a way to measure

11     your feelings on that.  Okay?  So given what you

12     said, are you feeling like, you know, that's not --

13     that's not fair or they're just blowing smoke?  Do

14     you understand what I'm saying?

15             JUROR DEY:  Yeah.  I'm -- I could -- I

16     guess I could be fair.  It depends on the evidence

17     that is presented and the facts and stuff.

18             ATTORNEY VISHNY:  Is it appropriate to

19     question police and the way they question people, the

20     way they interrogate people?

21             JUROR DEY:  Sure.  Yes.

22             ATTORNEY VISHNY:  Okay.  Does it concern

23     you at all that the way police interrogate somebody

24     might get false statements?

25             JUROR DEY:  If the evidence shows that.

345

1                    ATTORNEY VISHNY:  Okay.  Mr. Van Deurzen,
2           same -- I think you're also one of the people who
3           raised your hand for that question.
4                    JUROR VAN DEURZEN:  Yes.
5                    ATTORNEY VISHNY:  Okay.  So why don't you
6           tell me, do you need me to rephrase my question or
7           are you prepared to comment?
8                    JUROR VAN DEURZEN:  No.  I think it's fair
9           to question police actions.
10                   ATTORNEY VISHNY:  Okay.
11                   JUROR VAN DEURZEN:  And the way they do
12          things.
13                   ATTORNEY VISHNY:  Okay.  And if you're
14          concerned about those tactics, would that lead you to
15          concern about whether a prosecution has proved its
16          case beyond a reasonable doubt?
17                   JUROR VAN DEURZEN:  I think the facts will
18          come out that if they show that they used wrong
19          tactics or whatever that we'll see that.
20                   ATTORNEY VISHNY:  Okay.  Let's see.  The
21          other people, I think it was Mr. Wells, you had
22          raised your hand for that too.  Okay?  I have kind of
23          the same questions.  How do you feel about the fact
24          that this is going to be an issue in this trial, how
25          the Appleton Police Department investigated this case

346

1      and whether they went about it the wrong way?

2                JUROR WELLS:  I'm fine with that, just make

3      sure they did their job correctly.

4                ATTORNEY VISHNY:  Okay.  Do you think that

5      that is a proper thing for us to be asking in our

6      defense here?

7                JUROR WELLS:  Yes, I do.  If that's what

8      makes your case, I -- you have to do what has to be

9      done if that's the way you prove your innocence,

10     beyond a reasonable doubt for the prosecutor, you can

11     use that as a --

12               ATTORNEY VISHNY:  If you have doubts about

13     the methods that they used, will that impact how

14     you're going to decide the case?

15               JUROR WELLS:  Yes.

16               ATTORNEY VISHNY:  Okay.  And, Mr. Van

17     Dalen, same questions.  You're the other person.  I

18     think I've got everybody now when I come around to

19     you.

20               JUROR VAN DALEN:  I wouldn't have a problem

21     with it as long as law enforcement is here to defend

22     themselves.  With the documentary I don't think law

23     enforcement had a chance to defend themselves, it was

24     all one-sided.

25               ATTORNEY VISHNY:  Okay.  So it was more

347

1          about the documentary as opposed to --

2                    JUROR VAN DALEN:  That was the beginning of

3          your question.  That's why I brought that up.

4                    ATTORNEY VISHNY:  Okay.  All right.  So,

5          you know, it comes down to that, and I'm going to

6          tell you that we are calling a witness who is -- I'm

7          not going to get very deeply into it, but it is a

8          retired detective who is a consultant from out of

9          state to talk about the methods that were used here,

10         and without getting into the substance, I -- you

11         know, I'm just going to be frank that, you know, this

12         is the defense here, and does anybody feel, you know

13         what, I don't want to hear that?  I think it's

14         unfair, you know, I think the police did the best

15         they could and they got the right guy and I'm going

16         to find him guilty?  Does anybody feel that way at

17         this point?

18                    (No response.)

19                    ATTORNEY VISHNY:  And because we are

20         raising this, does anybody feel, you know what, I

21         don't think anybody should be on this jury?  If it

22         was my loved one -- I want to ask you all to put

23         yourself in this situation.  If your loved one were

24         on trial today, is there any reason why you would

25         think you would not want somebody who thinks about

348

1          these issues we've talked about to be on the jury?
2          Is that question clear enough for people?  Because if
3          it's not, I can clarify it.  I know it's a little
4          complicated.  If my brother, my sister, my son, my
5          daughter was on trial and a juror walked in kind of
6          thinking the way I'm thinking, I would not be
7          comfortable with that juror sitting on my loved one's
8          case.  Is there anybody who feels that way and feels
9          that because of it you probably cannot be fair to Mr.
10         Lee in this trial and that it would just be better if
11         you didn't sit on it?
12                   (No response.)
13                   ATTORNEY VISHNY:  Anybody at all.
14                   JUROR O'BRIEN:  I don't really
15         understand.
16                   ATTORNEY VISHNY:  Understand the question.
17                   JUROR O'BRIEN:  Yeah.
18                   ATTORNEY VISHNY:  Is there anyone else who
19         doesn't understand the question?
20                   (No response.)
21                   ATTORNEY VISHNY:  Okay.  What I'm asking
22         you is this.  You've come in, you have a certain set
23         of beliefs, they're not right or wrong.  And if
24         somebody you know is accused of a serious crime, like
25         murder, like what we have here, would you be

1  comfortable with someone who has your beliefs and

2  your thoughts walking into the courtroom making a

3  decision whether your loved one was guilty or not

4  guilty?  Did I clarify that?

5        JUROR O'BRIEN:  No.  Maybe I'm just really

6  slow but I'm not understanding.

7        JUROR NICHOLS:  I have a question.  We

8  don't know everything, we don't know the evidence, so

9  it's hard to know what I feel coming in without

10  hearing all the evidence.

11        ATTORNEY VISHNY:  And I'm not asking what

12  you feel about this case, what I'm saying is we all

13  -- we just -- we walk through life, we are the

14  product of our experiences, right?  We have certain

15  beliefs.  I have certain beliefs, you have certain

16  beliefs, right?  Each one of you go into the voting

17  booth and in the privacy of the booth you pull the

18  lever or mark the thing for who you think is right to

19  lead the country, right?  And I'm not getting in or

20  asking you about that by the way.  Not at all.  But

21  you do.  And what I'm saying is, given the kind of

22  beliefs you have, walking into a courtroom, seeing

23  the gentleman here who has been accused, seeing the

24  lawyers, the judge, knowing the police are going to

25  testify, that they spent a lot of time investigating,

350

1      that it's being criticized, do you think your set of

2      beliefs, if it was your -- someone you loved who was

3      on trial, do you think you would be a fair juror if

4      they were a stranger?  You know, somebody with your

5      beliefs would be fair to your loved one.  Does that

6      help clear it up for you?

7              JUROR O'BRIEN:  Yeah.

8              ATTORNEY VISHNY:  Okay.  All right.  I'm

9      going to take two people have their hands up.  One

10     was first, Mr. Nichols, and I do see you, Mr. Eggers.

11     So, Mr. Nichols.

12             JUROR NICHOLS:  You keep talking about if

13     we could take and make a verdict off of the evidence

14     if it was improperly handled.  Now that raises a

15     question, if it's improperly handled, is it valid,

16     can it even be provided in court then?

17             ATTORNEY VISHNY:  If things aren't allowed

18     in court, then you never hear about them.  Right.

19     You only hear about things that are allowed in

20     court.

21             JUROR NICHOLS:  Exactly.  That's why I was

22     wondering.  If there is evidence provided, this

23     should be substantiated and not just something that's

24     hearsay.

25             ATTORNEY VISHNY:  Right.  Yeah.  You have

351

1      to --

2                    JUROR NICHOLS:  So you should be able to

3      take that evidence and make a verdict according to

4      it.

5                    ATTORNEY VISHNY:  Right.  Anything that

6      you're going to hear, it's proper, it belongs in a

7      courtroom, it's just a matter of how you judge it.

8                    JUROR NICHOLS:  Right.

9                    ATTORNEY VISHNY:  So did I answer your

10     question?

11                   JUROR NICHOLS:  Yes.

12                   ATTORNEY VISHNY:  Did you have any other

13     comments on that?

14                   JUROR NICHOLS:  No.

15                   ATTORNEY VISHNY:  Mr. Eggers, you had your

16     hand up before.

17                   JUROR EGGERS:  When I walked into this

18     courtroom, it's not my intention to get out of this

19     chosen jury field here, but what you stated earlier

20     was that he is a convicted felon already.

21                   ATTORNEY VISHNY:  Yes.

22                   JUROR EGGERS:  I'm not against a felon

23     getting a second chance, but he's here again, so it's

24     kind of like a pattern which gives me a little bit of

25     a gray area.

1                    ATTORNEY VISHNY:  Okay.  So my question is,
2         you know -- and I'm really glad you brought this up.
3         Thank you very much for doing that.  You know,
4         because of that fact, do you feel, you know what, I
5         really think he's guilty and I just think it would be
6         better if I didn't judge this trial because I'm
7         biased given that fact?  There is nothing wrong with
8         that answer, I just want to know what you think.
9                    JUROR EGGERS:  I'm torn.
10                   ATTORNEY VISHNY:  Okay.  All right.  And
11        that's okay to be torn, but do you think under that
12        -- let me just say this.  Okay?  You know judge's
13        give instructions, they talk about being fair, but if
14        you say, you know what, he's a felon, did something
15        before, something -- I mean there is lots of things
16        that can be felonies from minor to major, right?
17                   JUROR EGGERS:  Yes.
18                   ATTORNEY VISHNY:  So did something before
19        so, you know, here's this guy again and, you know, I
20        really think he's guilty and it just -- it just
21        really influences me to think he's guilty of these
22        charges, you know, murder, having a gun when he
23        shouldn't have, you know, intimidation of witnesses,
24        et cetera, et cetera.  Is it better that you not sit
25        on this jury because of that?  I mean, let me ask

353

```
1      this.  Is it a strongly held belief that somebody who
2      has done something wrong in the past is more likely
3      to do something wrong in the future?
4            JUROR EGGERS:  No.
5            ATTORNEY VISHNY:  Okay.  And is it your
6      belief that because you know this person has done
7      something wrong in the past in their life that they
8      are more likely to be guilty?
9            JUROR EGGERS:  Yes.
10           ATTORNEY VISHNY:  Given that that's your
11     belief, do you think, since you believe that, I'm not
12     going to be able to change your mind, right?  And I'm
13     not trying to, by the way.
14           JUROR EGGERS:  No.  You won't.
15           ATTORNEY VISHNY:  All right.
16           JUROR EGGERS:  I'm sorry.  You won't.
17           ATTORNEY VISHNY:  You won't.  Okay.  Good.
18     I like that.  I like strong people.  You know, nobody
19     is trying to change your mind or anything, but given
20     that that is your belief, is it better -- do you
21     think it's more fair to Mr. Lee given that you think
22     that that perhaps you not be on this jury?
23           JUROR EGGERS:  I'm leaning to that fact.  I
24     want to be here, but I'm leaning towards that fact
25     that I might not be able to be fair.
```

354

1          ATTORNEY VISHNY:  Okay.  And, you know, so

2     what everybody is out after here is a fair trial.

3     Okay?  We don't know what the result is going to be,

4     but everybody wants a fair trial here.  So -- and

5     that's why we ask all these questions.  And I bet you

6     if you guys are feeling like, I mean it's getting

7     pretty tedious, right, and late and -- but, you know,

8     if -- do you feel that because of that that it's just

9     something you can't be fair and it's better you not

10    sit on the jury?  I mean, it's okay to say that.

11    Nobody is going to think badly of you.

12         JUROR EGGERS:  Like I said, I'm torn right

13    now between both sides.  I want to and yet there's

14    always that doubt in my mind now that seems to be a

15    pattern.

16         THE COURT:  Let me ask this, Mr. Eggers.

17    At the end of the day, the -- the big question is --

18    unfortunately, you haven't heard any evidence so it's

19    difficult to really come to concrete conclusions, but

20    at the end of the day do you believe that you would

21    be able to, notwithstanding any preconceived ideas

22    you may have, to set that aside and to say I will

23    judge this case based just on the evidence as I hear

24    it?

25         JUROR EGGERS:  Yes.

355

1              THE COURT:  And do you believe that you
2      would be able to, if the evidence showed that a
3      verdict of not guilty was appropriate, could you
4      render a not guilty verdict?
5              JUROR EGGERS:  Yes.
6              THE COURT:  And vice versa, if the evidence
7      showed the other the other way, would you be able to
8      render a guilty verdict?
9              JUROR EGGERS:  Yes.
10             THE COURT:  Attorney Vishny, you may
11     continue.
12             ATTORNEY VISHNY:  Okay.  Does anybody have
13     the same concerns that Mr. Eggers has raised?
14             (No response.)
15             ATTORNEY VISHNY:  All right.  Let me move
16     on to a different question then.  And it's totally
17     different area.
18         How many of you think sometimes maybe the police
19     might pick on somebody because they do have a prior
20     felony conviction and make assumptions that that
21     means somebody's guilty?
22         Okay.  Miss Micke, you think that.  Miss
23     O'Brien, you think that.  Mr. Parker, you think that.
24         Anybody who says, nah, that never happens?
25             (No response.)

356

1              ATTORNEY VISHNY:  How many of you have ever

2      heard that people give false confessions?

3          Okay.  And I'm not saying that that's what this

4      case is about, but is there anybody who believes that

5      that never happens, you know, nobody would ever give

6      false statements or false -- okay.  All right.

7          Then I'm really getting close to the end here.

8      We're all getting excited about it.  All right.

9      Here's my question.  When we come to the end of the

10     trial, for those of you who are sitting on the jury

11     panel, you're in the jury room and you don't agree,

12     and it -- one by one eleven people want to vote one

13     way and you want to vote the other way, and I don't

14     care which it is so I'm not going to say guilty or

15     not guilty, but you're the one, it's very emotional.

16     The other eleven people want to get out of there and

17     go home and put this behind them, but you have this

18     different belief.  Can you agree to stand on your own

19     analysis and opinion and not be swayed by the emotion

20     of the situation?  In other words, you can certainly

21     be swayed by arguments of the jurors about the facts,

22     but not be swayed by the emotion of, you know, gosh,

23     everyone is against me, everyone is mad at me, you

24     know, I'm sticking out like a sore thumb, I'm holding

25     everybody's life up.  Is there anybody who feels that

357

1          that would just be too much pressure for them?

2                    (No response.)

3                    ATTORNEY VISHNY:  Does everybody on the

4          jury understand that if you think there is something

5          wrong going on in the jury room, you know, people are

6          talking about evidence that wasn't in the trial or

7          you're being pressured to vote one way or another,

8          that you have a right to send a note to the judge and

9          let them know that there's a problem?  Everybody

10         knows that?  You do have that right.

11                   (No response.)

12                   ATTORNEY VISHNY:  Okay.  All right.  I have

13         a final question, and I want an honest answer just

14         like everything else.  Has anything that I have asked

15         or said today bothered you so much that it's like,

16         oh, my God, I can't stand that lawyer and I don't

17         want to be -- you know, I don't like her, I don't

18         like her client, you know, and I'm biased.  Does

19         anybody feel that way at all?

20                   (No response.)

21                   ATTORNEY VISHNY:  All right.  Thank you

22         very much.

23                   THE COURT:  Thank you, Attorney Vishny.

24             As I had promised, the last question that would

25         be asked of you would come from me, and the question

1     being as follows:  Is there any question that either

2     I, Attorney Schneider, Attorney Vishny have asked

3     that you have formed an opinion where you say I just

4     didn't feel comfortable saying that in a group

5     setting, I'd like to -- to address it at this time,

6     or perhaps you've had additional time to reflect and

7     you say, Judge, you know, I just -- I need to get

8     this off my chest, I got to tell you something.  Is

9     there anybody who feels that they fit into that

10    category?

11         And if so, number one, that's perfectly

12    acceptable, and we would go through the same type of

13    format where we would do an individual discussion.

14    Is there anyone who -- who falls into that category?

15         Okay.  And that would be Mr. Green.  Correct?

16              JUROR GREEN:  Yup.

17              THE COURT:  Okay.  And so is there anyone

18    else?

19              (No response.)

20              THE COURT:  Okay.  Then what we'll do is

21    why don't we convene in the jury room one more time,

22    and, Mr. Green, then we'll be with you momentarily.

23    Okay.

24              (Proceedings held outside the presence of

25    the jury panel.)

359

1                    (Mr. Green enters.)

2                    THE COURT:  Mr. Green, you had raised your

3          hand at the end, and certainly I appreciate that.  I

4          don't know if it was a specific question or just

5          something you wanted to share.  What would you like

6          to share with us?

7                    JUROR GREEN:  It was like your question

8          what would I feel like if I would let a murderer out

9          or a guilty -- not guilty man in jail, and it just

10         kind of dawned on me that I think I'm probably the

11         youngest one in there and I think it kind of -- I

12         don't think I like having that power of having to put

13         this man in jail.  I don't think I have -- feel

14         comfortable with that much power on me right now.

15                    THE COURT:  Okay.  And with that

16         understanding, let me ask this, do you feel that you

17         would be unable to listen to the evidence and make a

18         decision one way or the other?

19                    JUROR GREEN:  No, I think I would be able

20         to listen to it, but I think, I don't know, I think

21         it would just kind of bother me a little bit

22         though.

23                    THE COURT:  And, certainly, it's a big

24         burden to be --

25                    JUROR GREEN:  Yeah.

360

1           THE COURT:  -- to be charged with this

2     task.  The -- I would not be asking you to -- I will

3     give -- I would give you instructions, I would --

4     among other things, I would say that the State has

5     the burden of proof and they would have to prove

6     their case beyond a reasonable doubt, and if they

7     couldn't prove it that you must render a verdict of

8     not guilty, and I'd have various instructions such as

9     that.  Okay?  And so I would -- I would be giving

10     instructions on how you should analyze this case.

11     And do you feel -- at the end of the day the big

12     question is if the -- if the evidence came in and the

13     evidence said this is how the decision should come

14     down, do you feel that you could make that decision?

15           JUROR GREEN:  I feel like -- if I'm in with

16     the other jurors and they all of agreed with my

17     opinion, then yeah, but it would be like 50/50 or a

18     few, I think it would slightly bother me.

19           THE COURT:  Let me ask this another way.

20     If the jury were to -- if eleven of the jurors said

21     this is the way we should come down and this is the

22     right decision, and you -- you in your heart felt

23     that that was the wrong answer, would you be able to

24     stand strong and say I don't agree with you or would

25     you feel that you would give in to the eleven

361

1        because -- for whatever reason?

2                 JUROR GREEN:  I probably would give in to

3        the eleven.

4                 THE COURT:  Okay.  Attorney Schneider, do

5        you have any questions for Mr. Green?

6                 ATTORNEY SCHNEIDER:  No.

7                 THE COURT:  Attorney Vishny?

8                 ATTORNEY VISHNY:  No.

9                 THE COURT:  Okay.  All right.  Mr. Green,

10       thank you very much, sir.

11                JUROR GREEN:  Thank you.

12                (Mr. Green exits.)

13                THE COURT:  So my take is let him go for

14       cause.

15                ATTORNEY VISHNY:  Um-hum.

16                THE COURT:  The -- the question that then

17       we get to is we've got our -- we don't really need to

18       do another one because we --

19                ATTORNEY SCHNEIDER:  Put Victoria O'Brien,

20       Samantha Stockwell in his spot and then we don't have

21       to.

22                ATTORNEY VISHNY:  Right.  I agree.

23                THE COURT:  Okay.  So we're okay with that?

24                ATTORNEY VISHNY:  And we don't even need to

25       change the seat, right, I mean because is there some

362

1          reason we would have to tell him he's let go?

2                    ATTORNEY WEITZ:  I mean are we going to go

3          into strikes right away, so I mean you might as well

4          just have him sit there and --

5                    THE COURT:  I mean we could.

6                    ATTORNEY SCHNEIDER:  Yeah.  And if she --

7          if you just change the chart.

8                    THE COURT:  I don't know, you were in or

9          out, did you catch that?

10                   THE CLERK:  No.

11                   THE COURT:  So Mr. Green is going to be

12         taken off the panel, but rather than doing additional

13         shifting, Miss Stockwell becomes part of the panel,

14         we're not going to move seats because we don't have

15         anymore questions, then we'll just go right into our

16         strikes.

17                   THE CLERK:  Okay.

18                   THE COURT:  Everybody is fine with that

19         approach?  You're fine with that approach?

20                   ATTORNEY VISHNY:  Yes.

21                   THE COURT:  Okay.  So we won't shift

22         seats.

23                   ATTORNEY VISHNY:  We end at Stockwell, we

24         each get seven strikes, the DA goes first.

25                   THE COURT:  Right.  And then I suppose we

363

1          can just do this right now since we're dealing with

2          it, rather than stay a lot later and go through all

3          the witnesses in terms of strikes, we had briefly

4          asked this idea, we'll start the jury at 9:00

5          tomorrow, we'll come in at 8:30, we'll do tomorrow's

6          witnesses in terms of --

7                    ATTORNEY VISHNY:  You're not going to swear

8          the jury until tomorrow either, right?

9                    THE COURT:  The only reason I was going to

10         swear in the jury tonight is because I was going to

11         give them a brief order that says no media, no

12         newspapers.

13                   ATTORNEY VISHNY:  Do they have to be sworn

14         for that?

15                   THE COURT:  I don't know.  I mean I can do

16         it either way.  I don't have a strong preference.

17                   ATTORNEY MAIER:  I mean I don't think you

18         need to swear them to do that, just as a multiday

19         voir dire.

20                   THE COURT:  We'll swear them in first thing

21         in the morning.

22                   ATTORNEY VISHNY:  Are you okay with that?

23                   ATTORNEY SCHNEIDER:  Yes.  And tomorrow we

24         have, I looked, at least I think, I looked quickly, I

25         think we only have three witnesses tomorrow that

364

1          might have prior convictions, the other --

2                    ATTORNEY VISHNY:  We're not going to have a

3          problem.

4                    ATTORNEY SCHNEIDER:  The other ones have

5          zero.

6                    THE COURT:  So it should be short.

7                    ATTORNEY SCHNEIDER:  Yeah.

8                    THE COURT:  So --

9                    ATTORNEY VISHNY:  Because I don't get this.

10         We'll figure that out tomorrow.  We'll probably come

11         to an agreement like that, right?

12                   ATTORNEY SCHNEIDER:  I would think so.

13                   ATTORNEY VISHNY:  We basically agree on the

14         same principles.  I'm not worried about that.

15                   ATTORNEY SCHNEIDER:  I just -- when I said

16         that, there's three people I think -- or no, there

17         might be four, I have to double-check, that have

18         anything so it's not going to be 15 we have to talk

19         about.

20                   THE COURT:  Then do we want to do this, do

21         we want to start at 8:45 if it's only a couple

22         minutes?

23                   ATTORNEY SCHNEIDER:  With the jury?  Might

24         as well.

25                   THE COURT:  I'll tell them to be here at

365

1    8:40 because jurors are notoriously slow here.  In

2    fact, when we -- I'm going to dismiss everybody, have

3    them stay, Wendy is going to show them where to go

4    tomorrow morning.

5            (In open court.)

6            THE COURT:  Ladies and gentlemen, at this

7    time we are -- have completed the questioning today,

8    and so what we will do is the parties will partake in

9    a process of it's called striking the jurors; and

10    simply what that means is they will make a

11    determination as to who collectively they feel would

12    be the most appropriate panel.

13        And while I will have some brief comments after

14    the selection is done, I want to, first and foremost,

15    again, on behalf of myself and the parties, thank you

16    so very much.  I know this has been a long day, but

17    your attention has been exemplary; and on that same

18    token, I want you to know that regardless of whether

19    or not you are selected, you have served an

20    invaluable service today.  And so, again, it is with

21    great appreciation that I'm able to say thank you

22    today.

23        Also, for those who will need, and I imagine I

24    will give this instruction again as well, for those

25    of you who may need work excuse slips, we will have

366

1    those for you.

2         So at this time we will begin that process.

3              (Attorneys making selections.)

4              THE CLERK:  When I call your name, please

5    stand.

6         Adam Schueller, Chris Parker, Mary Steffen,

7    Mannie Maas, John Eggers, Dennis Shea, Patricia

8    Erickson, Cassandra Lee, Frank Bloomer, Jonathon

9    Nichols, Emily Vandenberg, James Buza, Christine

10    Naumann, and Gina Paul.

11         The fourteen of you have been selected to serve

12    on this jury panel.

13              THE COURT:  Miss Schneider, is this your

14    jury panel?

15              ATTORNEY SCHNEIDER:  Yup.  The notes

16    reflect it would be accurate, Judge.

17              THE COURT:  Miss Vishny, is this your jury

18    panel?

19              ATTORNEY VISHNY:  Yes.

20              THE COURT:  All right.  Then, for those

21    individuals who have been selected, I'd ask that you

22    please be seated, I'll have some additional comments

23    for you.  For those of you who did not have your name

24    called, I would like to again, on behalf of myself

25    and the parties, express my sincere appreciation.  It

367

1      has been a pleasure and a privilege to be with you

2      today, and I do wish you the best.  Again, thank you

3      for your time and for your service.

4           Likewise, if you do need excuse from work slips,

5      please come forward, we have those.  And lastly, if

6      you did get a parking ticket, don't forget that those

7      can be dropped off with our clerk's office but be

8      sure to place your name on that ticket so that we can

9      measure it against our jury list.

10          So again, thank you, and at this time you are

11     excused with the exception of those who are still

12     part of our pool -- or panel.

13              (Court in recess.)

14              THE COURT:  Just a couple items of

15     housekeeping.  Number one is I will be expecting for

16     us to be able to start at nine a.m. tomorrow, so what

17     I would ask is that you be here about five to ten

18     minutes early so that we are able to start promptly

19     at that time.

20          Additionally, and as the parties had indicated,

21     there are a few beginning arguments or beginning

22     orders that I would be issuing.  The first is that

23     you not read any of the newspapers or watch any of

24     the local media stations.  Additionally, you should

25     not do any research that you think may be helpful to

368

1        you in the issues presented.  That is the job of the

2        attorneys and the parties to present the evidence.

3        On that same token, you are not to investigate this

4        case, to go to any of the locations discussed.  As

5        I've already indicated, do not read any newspaper

6        reports or listen to any news reports.  Do not

7        consult dictionaries, computers or the Internet.  And

8        the purpose of that is because any of that

9        information may be incomplete, it may be unreliable,

10       and the parties would not have the opportunity to

11       address those items.  And so I will not -- I will be

12       issuing those orders, and those orders are to be

13       considered issued.

14            Also, while you are serving on the jury, and

15       again I will reiterate some of these rules to you,

16       but do not communicate with anyone about this case.

17       Once the case is completed you will have the

18       opportunity to discuss it as you desire, but while we

19       are in the process of trial, I would ask that you not

20       communicate with anyone about this case.

21            On that same token, and I'm issuing an order to

22       you as well as to the parties, you should not

23       communicate with them.  And I say that because,

24       again, we want to preserve the integrity of the

25       process.  And more importantly, I want you to

1    understand that I give these orders to the attorneys

2    so that if you by chance see them and you engage in

3    them with a pleasantry, which is normal and

4    customary, I don't want you to think they are being

5    rude, I'm instructing them not to interact with you

6    just as I'm asking you not to interact with the

7    parties.

8        With that, as I've indicated, we will begin at

9    9:00 tomorrow.  What I would ask -- and you are free

10   to leave at this time.  However, before you leave, my

11   wonderful bailiff Wendy here, she is going to take

12   you and show you what is actually my courtroom, so we

13   will be there tomorrow.  Wendy, would you show them

14   where the courtroom is and where they should be

15   meeting tomorrow morning please?

16           THE BAILIFF:  Okay.

17           THE COURT:  And they can -- Attorney

18   Schneider, you're okay if our jury is excused at this

19   time?

20           ATTORNEY SCHNEIDER:  Yes.

21           THE COURT:  Attorney Vishny?

22           ATTORNEY VISHNY:  Yes, Your Honor.

23           THE COURT:  Okay.  Very good.  And again,

24   thank you.  I know it's been a long day.  I look

25   forward to hearing you tomorrow.

370

```
 1                    (The jury was escorted out of the
 2          courtroom.)
 3                    THE COURT:  The parties can be seated.  The
 4          -- we had discussed initially starting at 8:45.
 5          Attorney Schneider -- I'm sorry, sir.  Your name is?
 6                    MR. GATTON:  Solomon.
 7                    THE COURT:  And then, Solomon, I was
 8          informed that there needs to be looking at some of
 9          the exhibits beforehand and I thought we'd start it
10          at 9:00.  I'll be here by 8:00, and what we would do
11          is I'll allow the parties to do what they need to do,
12          just let me know, and then we can go on the record
13          beforehand.  So we'll have five or ten minutes to do
14          that.  I don't know that we'll need more time than
15          that.
16              Once the jury comes in, we'll swear them in,
17          I'll give them a few brief opening instructions which
18          I'll discuss with you in the morning.  I know it's
19          been a long day, so I'd just as soon not keep you
20          here any longer, and then we should be all set.
21              Anything else, Attorney Schneider?
22                    ATTORNEY SCHNEIDER:  The only thing I
23          request is that you make the -- give the fair warning
24          to the spectators and people who come that they
25          shouldn't be using any of their electronic devices in
```

371

1    court.

2              THE COURT:  I knew I forgot to tell the

3    jury something too.  Yes.  I will absolutely.  And

4    I'm sure everyone -- I heard a few buzzings, but I

5    didn't want to disrupt what we were doing, so I will

6    make that instruction or admonishment tomorrow

7    morning certainly, and that will hold true to the

8    gallery.  I'll make sure we have a sign up as well,

9    although those aren't usually read.

10         Attorney Vishny, anything more this evening?

11              ATTORNEY VISHNY:  No.  I just need to tell

12    something to Miss Schneider.

13              THE COURT:  Okay.  Very good.  Then we are

14    adjourned for the evening; and I will see everyone

15    tomorrow morning.

16              (Proceedings concluded.)

17

18

19

20

21

22

23

24

25

372

1

2

3                     C E R T I F I C A T E

4

5   STATE OF WISCONSIN      )
                           ) ss.:
6   COUNTY OF OUTAGAMIE     )

7

8

9            I, JOAN BIESE, RMR/CRR, do hereby certify that I
    am the official court reporter for Branch IV of the
10   Circuit Court of Outagamie County;

11            That as such court reporter, I made full and
    correct stenographic notes of the foregoing proceedings;
12
             That the same was later reduced to typewritten
13   form;

14            And that the foregoing proceedings is a full and
    correct transcript of my stenographic notes so taken.
15

16            Dated this 12th day of July, 2016.

17

18

19                              _____

20                              JOAN BIESE, RMR/CRR

21

22

23

24

25

373