FILED
02-13-2019
Clerk of Circuit Court
Outagamie County
2013CF001074

1    STATE OF WISCONSIN     CIRCUIT COURT     OUTAGAMIE COUNTY
     _____

2    **STATE OF WISCONSIN,**

3                    Plaintiff,

4    v.                                    **Case No. 13-CF-1074**

5    **CHONG LENG LEE,**

6                    Defendant.
     _____

7                        **JURY TRIAL – DAY TWO**

8    _____

9

     BEFORE:        **HONORABLE GREGORY B. GILL, JR.**
10                  Circuit Court Judge, Branch IV
                    Outagamie County Justice Center
11                  Appleton, WI  54911

12
     DATE:          **February 25, 2016**
13

14   APPEARANCES:   **CARRIE SCHNEIDER**
                    District Attorney
15                  Appearing on behalf of the State

16                  **ANDREW MAIER** and **ALEXANDER DUROS**
                    Assistant District Attorneys
17                  Appearing on behalf of the State

18                  **DEBORAH VISHNY** and **EVAN WEITZ**
                    Attorneys at Law
19                  Appearing on behalf of the Defendant

20                  **CHONG LENG LEE**
                    Defendant
21                  Appearing in person

22

23

24   Joan Biese
     Official Reporter, Branch IV
25   Outagamie County

                               1

                                            Exhibit 17

1                              **I N D E X**

2

3                                                                    **PAGE**

4       **IN CHAMBERS**..........................................   4

5       **OPENING STATEMENT BY MS. SCHNEIDER**...................  23

6       **OPENING STATEMENT BY MR. WEITZ**.......................  47

7       **WITNESSES:**

8       **BLAINE VANDER WIELEN**
            Examination by Attorney Schneider................  61
9           Examination by Attorney Vishny....................  80
            Examination by Attorney Schneider................  89
10
        **DANIEL J. KERSTEN**
11          Examination by Attorney Schneider................  94
            Examination by Attorney Weitz.................... 115
12          Examination by Attorney Schneider................ 121

13      **BRITTANY M. OLSON**
            Examination by Attorney Schneider................ 125
14          Examination by Attorney Vishny................... 136

15      **SEAN KUETHER**
            Examination by Attorney Maier.................... 138
16
        **ALYSON BLOM**
17          Examination by Attorney Schneider................ 156
            Examination by Attorney Vishny................... 185
18          Examination by Attorney Schneider................ 207
            Examination by Attorney Vishny................... 211
19
        **TOU SHOUA LEE**
20          Examination by Attorney Schneider................ 216
            Examination by Attorney Vishny................... 236
21          Examination by Attorney Schneider................ 286

22

23

24

25

1   **EXHIBITS**                                              **PAGE**

2   1 -  White Board-Luna Lounge......................... 66
    2 -  White Board-Luna Lounge-Mark for Victim......... 71
3   6 -  Appleton City Map............................... 64
    7 -  Photo........................................... 72
4   8 -  Photo........................................... 72
    9 -  Photo........................................... 72
5   10-  Photo........................................... 72
    11-  Photo........................................... 72
6   12-  Photo........................................... 72
    13-  Photo........................................... 72
7   14-  Photo........................................... 72
    15-  Photo........................................... 74
8   16-  Photo........................................... 74
    17-  Photo........................................... 74
9   18-  Photo........................................... 74
    19-  Photo........................................... 74
10  20-  Photo........................................... 76
    21-  Photo........................................... 76
11  22-  Photo........................................... 76
    23-  Photo........................................... 76
12  24-  Photo........................................... 76
    31-  Surveillance Camera Video Flash Drive........... 80
13  32-  Photo Board-Photos 32A-32K...................... 175
    33-  Photo Board-Photos 33A-33L...................... 112
14  34-  Photo Board-Photos 34A-34L...................... 134
    35-  Photo Board-Photos 35A-35L...................... 149
15  97-  Disk 10 of 16 HEMS #60-62,71.................... 83
    99-  Alyson Blom Drawing............................. 187
16  100- Transcript-Interview of Alyson Blom............. 197
    102- Tou Shoua Lee Drawing........................... 229
17  103- Jacket (Dark)................................... 253
    104- Vest (White).................................... 254
18  105- Coat (White/Gray) Patterned..................... 254
    106- Transcript-Interview of Tou Shoua Lee.......... 257
19

20

21

22

23

24

25

3

1            **TRANSCRIPT OF PROCEEDINGS**

2                (Proceedings held in chambers.)

3                THE COURT:  So we are on the record in

4       *State of Wisconsin v. Chong Lee.*

5                We do have Outagamie County District Attorney

6       Carrie Schneider, along with Assistant District

7       Attorneys -- Attorney Andrew Maier.  We have with us

8       representing Mr. Lee is Attorney Deja -- Attorneys

9       Deja Vishny and Evan Weitz.

10               There are a few preliminary matters that we

11      needed to address.  The first issue pertains to

12      yesterday there was a hearing which pertained to a

13      warrant and the appearance of Mr. Paul Lee.  That was

14      addressed on the record; however, I did ask that the

15      doors be marked as a closed hearing.  The purpose for

16      that was because the parties were in the middle of

17      jury selection and the court did not want to create

18      any issues for the parties and so, in that vein,

19      thought that there was good cause to close the

20      windows.  I would note that the doors were not

21      locked.  However, that fact notwithstanding, I would

22      also note that nobody attempted to enter the

23      courtroom.

24               ATTORNEY VISHNY:  Judge, you know what?  I

25      apologize.  And I don't think this part that you just

4

1    read was relevant to the defense at all, but I feel

2    like I probably need to ask Mr. Lee about waiving his

3    appearance when it comes to objections on his

4    trials.

5            THE COURT:  That's perfectly fine.  If you

6    want -- and if Mr. Lee wants to come back, I don't

7    care.

8            (Brief recess.)

9            THE COURT:  Okay.  So we are -- so I did

10    indicate we were addressing the issue related to the

11    Paul Lee hearing and, again, I found good cause for

12    that.

13        The next issue is there was a call itemized as

14    No. 13.  There is reference made to, quotes, my

15    lawyer.  I'm ordering that the reference to the term

16    "my lawyer" be taken out in both the English

17    translation as well as the original Hmong

18    transcription.  It will then be replaced with the

19    word, quote, inaudible.

20        The next issue pertains to Item 199.  This is a

21    letter which the State has proposed to introduce in

22    its opening argument.  The defense has raised an

23    objection.  My understanding is that -- was this a

24    hearsay or other acts?

25            ATTORNEY SCHNEIDER:  This is the family

5

1     one.

2          ATTORNEY VISHNY:  Yeah.  It's a relevancy

3     objection, Judge.  Our position is that --

4          THE COURT:  My bigger concern is other

5     acts.

6          ATTORNEY VISHNY:  Right.  I mean, remember

7     you told me when you and Steph and them and then --

8     our belief is that that whole reference there is to a

9     previous occasion and other acts, that it's an issue,

10    irrelevancy, other acts, there's also some hearsay

11    contained in it.

12         ATTORNEY SCHNEIDER:  Well, and my thinking

13    is it becomes relevant because this all comes down to

14    his belief that his brother has betrayed him or said

15    things that are going to put him in a bad light, so

16    it's a letter written by the defendant to his brother

17    referencing, you know, talking about having your

18    family's back or not.  I'm not offering the, you

19    know, when you tell Mao and stuff, and I'm arguing

20    you said if you don't got family back then don't even

21    consider us family.  I'm not offering that for the

22    truth of the matter asserted, but he's referencing

23    having your family's back and having each other's

24    back because the next line is, well I had your back.

25    I wouldn't let no one touch you.

6

1              THE COURT:  And my concern -- my concern

2      with that -- and I'm not -- really where my position

3      comes down to on 199, if I can look at that again -

4      No, that's okay - is at least in the opening

5      statement before we've had any ability to get any

6      context, I have some concerns about this in terms of

7      (a) other acts, because this is sent to Paul,

8      correct?

9              ATTORNEY SCHNEIDER:  Yes.  They're talking

10     about arguing, so somehow just people arguing falls

11     in the realm of other acts?

12             THE COURT:  No.  No.  What concerns me is

13     he said, well, I had your back.  I wouldn't let no

14     one touch you.  That's my concern is my suggestion is

15     that he's implying that there was another incident.

16             ATTORNEY SCHNEIDER:  That's exactly this

17     shooting.

18             THE COURT:  We don't know that.

19             ATTORNEY SCHNEIDER:  I don't know that --

20             THE COURT:  I mean, that's my problem.  I

21     don't have any context to it for opening argument

22     without -- without Paul Lee being able to give me

23     some context.  That's my --

24             ATTORNEY VISHNY:  Right.  You're calling

25     him, he can comment on that.  We believe it actually

7

1    refers to a prior incident where Paul Lee was shot.

2              THE COURT:  I think it may ultimately come

3    in, but I think I need some -- Paul Lee to give me

4    some context to explain that, and that's my problem

5    with it at this point.

6              ATTORNEY SCHNEIDER:  But if other people

7    come in and testify that Paul and our victim were

8    potentially fighting or engaged in arguments or that

9    Paul might have taken a swing at our victim, then I

10   want to argue that this is completely relevant to

11   that fight.

12             THE COURT:  I'm simply making this ruling,

13   just so that the parties understand, as it relates to

14   the opening argument portion.  I don't have enough of

15   a frame of reference.  So this is not dispositive of

16   how I would look at it at trial, it's simply in

17   opening argument I don't have enough context.  That's

18   my difficulty.

19             ATTORNEY SCHNEIDER:  Okay.

20             THE COURT:  204.  204, I'm looking at the

21   defendant -- the defense had objected to the

22   following language:  Know your boys, I always told

23   you that, I don't look for trouble, but when trouble

24   comes, I will end it.  I will end it.  That's why I

25   really don't want to hang out with trouble seeking

8

1     people because I know myself, no -- I think it's

2     hesitating, and then it goes on to say --

3              ATTORNEY SCHNEIDER:  Hesitation in a bigger

4     letter.

5              THE COURT:  Okay.  The -- I think it's

6     permissible.  The only part that I have concern about

7     is the first sentence that says, know your boys, I

8     always told you that.  I think when we're talking

9     about present sense where he says, I don't look for

10    trouble but when trouble comes, I will end it, I will

11    end it, that's why I don't want to really hang out

12    with trouble seeking people, I think that's very much

13    present context.  The first sentence, I always told

14    you that, again, if you -- if you include that within

15    the overall context, it suggests that in the past and

16    in the present he's of the opinion that, hey,

17    whenever trouble has come my way, I've taken care of

18    it, as opposed to this incident, and so that's my

19    concern there.

20             ATTORNEY SCHNEIDER:  Okay.

21             THE COURT:  The second sentence I'd allow

22    you to read.

23             ATTORNEY SCHNEIDER:  I will end it, that's

24    why I didn't really want to hang out with trouble

25    seeking people because I know myself, no

9

1    hesitation.

2           ATTORNEY VISHNY:  Okay.  So for the record

3    the defense did object to that as other acts

4    evidence.

5           THE COURT:  And I did -- I should have

6    noted that.  I understood that it was.

7           ATTORNEY VISHNY:  Well, there is a sentence

8    in the middle that we think lays the context for it

9    that he's referring to things that happened in

10    Wausau, Oshkosh, anywhere, and, you know, I

11    understand why the State is not going to read that

12    because that -- but I think that when you look at

13    that sentence, it puts in Oshkosh that he's talking

14    about other acts, so that's what our objection is.

15           ATTORNEY SCHNEIDER:  And I understand that,

16    but I think he's also saying --

17           THE COURT:  The way that I look at it is

18    there is two parts to this.  I'm going to -- if there

19    is trouble here, I'm going to solve it, just like I

20    solved trouble elsewhere, and so I don't think

21    reference to the -- and the State has excluded the

22    Wausau, Oshkosh, anywhere.  I don't know about those

23    incidents, I'm not -- that's not what's at issue, but

24    I think he's also -- as I read this statement,

25    there's -- it's somewhat a part and parcel where he's

10

1     saying, I'm not only going to solve the problem here,

2     I've done it in the past.

3          ATTORNEY VISHNY:  Okay.  We understand the

4     court's ruling.

5          THE COURT:  I'm going to X out that first

6     part.  So those are Items 199 and 204.  I wasn't

7     certain whether --

8          ATTORNEY SCHNEIDER:  She wasn't -- there

9     was no objection to the bottom chunk.

10          THE COURT:  Okay.  There were also --

11          ATTORNEY VISHNY:  Yeah.  We don't object to

12     the bottom.

13          ATTORNEY SCHNEIDER:  We came to agreement

14     on some of the other ones.

15          ATTORNEY VISHNY:  Okay.

16          ATTORNEY SCHNEIDER:  I think that was all

17     the ones.

18          ATTORNEY VISHNY:  I think the only issue

19     that's left is the issue of the phone call, right?

20     The other stuff, the revocation of the PO you took

21     out.

22          ATTORNEY SCHNEIDER:  Right.

23          THE COURT:  I should note that we did -- I

24     should note we did go on the record in this matter.

25     Mr. Lee was not present.  However, before going on

11

1          the record, Attorney Vishny did consult with Mr. Lee.

2          I will confirm with Attorney Vishny, but Mr. Lee did

3          waive his appearance for purposes of addressing these

4          pretrial matters and objections.  That fact

5          notwithstanding, certainly Mr. Lee will have every

6          right to be included in all portions of the

7          proceedings hereafter.  Is that a --

8                    ATTORNEY VISHNY:  Yes, that's correct,

9          Judge.

10                   THE COURT:  Very good.

11                   ATTORNEY SCHNEIDER:  You now have the list

12         of prior convictions.

13                   THE COURT:  Yes.

14                   ATTORNEY SCHNEIDER:  I think for the people

15         coming today there is an agreement.

16                   ATTORNEY VISHNY:  Yes, we agree.

17                   ATTORNEY SCHNEIDER:  And we'll just address

18         the other ones as we need to.

19                   THE COURT:  The last thing I wanted to

20         discuss with the parties, typically, and I say

21         typically because usually we finish voir dire in the

22         morning and then we go directly into opening.  My

23         typical practice is to read at the outset before we

24         start No. 50 which is the preliminary instructions.

25         I do read No. 55, note taking permitted; No. 57,

12

1     instruction on jury questioning of witnesses; and

2     then I would read No. 101 which is opening

3     statements.  Is everyone okay with that?  If you want

4     to look at what exactly the verbiage is in those, I

5     have them right here.

6          ATTORNEY VISHNY:  Okay.  Let me just ask,

7     57, note taking is being permitted?

8          THE COURT:  Note taking is permitted as is

9     questioning.

10         ATTORNEY VISHNY:  So -- well, one minute.

11    Okay.  The practice in Milwaukee for whatever it's

12    worth is to read the substantive instructions and

13    140, so to help the jurors know what they have to

14    decide.

15         THE COURT:  I have to see what 140 is.

16    That's lengthy because there is a lot of counts here.

17    140 is burden of proof, reasonable doubt instruction.

18    So, you know, I think the jurors know what the

19    charges are, you know, in this case.  I don't know

20    what position the State's going to take, even

21    though -- this is typically how I have done this is

22    I'll -- after everyone is done questioning, I'll

23    receive a question.  I'll ask Attorneys Vishny and

24    Weitz or -- and of course the State's attorneys.

25    Then what I do is I will have you come up, I'll show

13

1        you the question, we don't -- what do you think, and

2        then, if it's appropriate, I ask it, and then if not,

3        I don't.  And I -- I think I also give the

4        instructions in here saying I will determine if your

5        question is legally proper.  No adverse inference

6        should be drawn.  So I included that.  So I can read

7        -- I can read 50, 140, explain to them what the

8        burden of proof is, note taking, questions, and then

9        opening -- opening arguments.

10              ATTORNEY VISHNY:  So it's the defense

11       position that the substantive instructions should be

12       read here, but if you're not going to, you're not

13       going to.  I'm not going to argue the point.  I mean

14       I think the jury should know what they have to decide

15       and -- but I realize that means four separate jury

16       instructions, you know.

17              THE COURT:  I mean I've never done it

18       before.

19              ATTORNEY VISHNY:  Okay.  I'm prepared for

20       the quick rule.

21              THE COURT:  I'm satisfied we can address it

22       at closing and final instructions.

23           Anything else, Attorney Schneider?

24              ATTORNEY SCHNEIDER:  No.  After opening

25       then I think our game plan is we may need a little

14

1     bit of time to set up tech stuff in the room so we

2     can make sure to take some stuff --

3              THE COURT:  We'll do --

4              ATTORNEY WEITZ:  I think we can get

5     openings done by lunch and a lunch break.

6              ATTORNEY SCHNEIDER:  See where we finish.

7              THE COURT:  I don't see any reason why as

8     soon as I give the instructions we can't go right to

9     openings, finish openings, and that will probably be

10    right around lunchtime, or we'll make it around

11    lunchtime.

12             (In open court outside the presence of the

13    jury.)

14             THE COURT:  We are on the record in *State*

15    *of Wisconsin v. Chong Lee.*

16        Mr. Lee does appear with his counsels, Attorney

17    Evan Weitz and Deja Vishny.  The State of Wisconsin

18    is also present and in court represented by Outagamie

19    County District Attorney Carrie Schneider, as well as

20    Assistant District Attorneys Andrew Maier and Alex

21    Duros.

22        And at this time, Attorney Schneider, are we

23    prepared to bring in the jury?

24             ATTORNEY SCHNEIDER:  I think we are,

25    Judge.

15

1          THE COURT:  Attorney Vishny, are we

2     prepared to bring in the jury?

3          ATTORNEY VISHNY:  Yes.

4          THE COURT:  Okay.  Before do I bring in the

5     jury, I would make one comment to those in the

6     gallery.  I would ask that you please have your cell

7     phones turned off.  Certainly we're very happy to

8     have you here, but anything can -- additional noises

9     or sounds can cause a disruption, and so I would ask

10    as mentioned that you do please turn off your cell

11    phones at this time.

12         Likewise, to the extent that you're able to, I'd

13    ask that you minimize your in and out movements.  I

14    understand sometimes you do need to leave, but as

15    little as possible would certainly be appreciated.

16         And with that, I'll ask that we please rise, we

17    will bring in the jury.

18              (The jury was escorted into the courtroom.)

19         THE COURT:  Good morning everyone.  The

20    first thing we will need to do is at this time we

21    will need to swear you in, so I would ask that you

22    please raise your right hand.

23              (Clerk administers oath to jury panel.)

24         THE COURT:  You may be seated.

25         And as I may have explained to you yesterday, we

16

1     begin with the opening statements presented by -- by

2     each party.  However, before I do that, or before

3     they do that and I turn the trial over to the

4     attorneys and the parties, I'd like to give you some

5     brief instructions to assist you in -- and in guiding

6     you through the process.  That said, these are only

7     the preliminary instructions.  I will give you more

8     thorough discussions and more thorough instructions

9     at the end of the proceedings, but I did want to give

10    you at least some initial brief instructions and so I

11    will do so at this time.

12         Now, it is your job to decide the case based

13    solely on the evidence presented at trial and the law

14    given to you by this court.  Anything that you see or

15    hear outside the courtroom is not evidence.

16         You should not let any personal feelings about

17    race, religion, national origin, sex or age affect

18    your consideration of the evidence.

19         You are not to begin your deliberations and

20    discussion of this case until all of the evidence is

21    presented and I have instructed you on the law.  Do

22    not discuss this case amongst yourselves or with

23    anyone until your final deliberations in the jury

24    room.

25         As I had told you yesterday, we will stop from

17

1    time to time to recess.  Additionally, there may be

2    times where I need to excuse you from the room for me

3    to address legal arguments from the attorneys.

4        If you come in contact with the lawyers or

5    witnesses, as I mentioned to you yesterday, you are

6    not to speak with them.  For their part, I've also

7    instructed the lawyers and the witnesses to not speak

8    with you.

9        You should not listen to any conversations about

10   this case.

11       As I had told you last night, you are not to do

12   any research that you personally think might be

13   helpful to you in understanding the issues presented.

14   Do not investigate this case on your own or visit any

15   scene.  Do not read any newspaper reports or listen

16   to any news reports on radio or television about this

17   trial.  Do not consult dictionaries, computers,

18   websites or other reference materials for additional

19   information.  Do not seek information regarding the

20   public records of any party or witnesses in this

21   case.  As I had told you last night, any information

22   you obtain outside the courtroom could be misleading,

23   inaccurate or incomplete.  Relying on this

24   information is unfair because the parties would not

25   have the opportunity to refute, explain or correct

18

1          it.

2                  Do not communicate with anyone about this trial

3          or your experience as a juror while you are serving

4          on this jury.

5                  Do not use a computer, cell phone or other

6          electronic device with communication capabilities to

7          share any information about this case.  For example,

8          you are not to communicate by blog, e-mail, text

9          message, Twitter, or in any other way on or off the

10         computer.

11                 Do not permit anyone to communicate with you,

12         and if anyone does, despite so -- despite you telling

13         them not to, you should report that to me.

14                 I can appreciate that it is tempting that when

15         you go home tonight you would desire to discuss this

16         with another individual, but do not do so.  This case

17         must be decided solely by you, the jurors, based on

18         the evidence presented in this courtroom.  People not

19         serving on this jury have not heard the evidence and

20         it is improper for you to influence your

21         deliberations and decisions in this case.

22                 After this trial is completed, you are free to

23         communicate with anyone in any manner.

24                 And again, these rules are designed to assure

25         that you remain impartial throughout the trial.

19

1          If any of you have a reason to believe that

2     another juror has violated these rules, please

3     immediately report that to me.

4          You are to decide the case based solely on the

5     evidence offered and received at trial.

6          Now, I also think that it is fair for you to

7     understand the burden of proof and the presumption of

8     innocence.  Now, in doing so, and in performing your

9     functions, you are to act with judgment, reason and

10    prudence.

11         Defendants in a case such as this are not

12    required to prove their innocence.  The law presumes

13    every person charged with the commission of an

14    offense to be innocent.  This presumption requires a

15    finding of not guilty unless in your deliberations

16    you find it is overcome by evidence which satisfies

17    you beyond a reasonable doubt that the defendant is

18    guilty.

19         The burden of establishing every fact necessary

20    to constitute guilt is upon the State.  Before you

21    can return a verdict of guilty, the evidence must

22    satisfy you beyond a reasonable doubt that the

23    defendant is guilty.

24         If you can reconcile the evidence upon any

25    reasonable hypothesis consistent with the defendant's

20

1    innocence, you should do so and return a verdict of

2    not guilty.

3         Now the term reasonable doubt means a doubt

4    based upon reason and common sense.  It is a doubt

5    for which a reason can be given, arising from a fair

6    and rational consideration of the evidence or lack of

7    evidence.  It means such a doubt as would cause a

8    person of ordinary prudence to pause or hesitate when

9    called upon to act in the most important affairs of

10   life.

11        A reasonable doubt is not a doubt which is based

12   on mere guesswork or speculation.  A doubt which

13   arises merely from sympathy or from fear to return a

14   verdict of guilt is not reasonable doubt.  A

15   reasonable doubt is not a doubt such as may be used

16   to escape the responsibility of a decision.  While

17   your duty is to give the benefit of every reasonable

18   doubt, you are not to search for doubt, you are to

19   search for the truth.

20        Additionally, throughout this case I do allow

21   note taking.  That will be during the evidentiary

22   portions of the proceedings only.  That said, you are

23   not required to take notes.  You may do so, except as

24   I've indicated during the opening and closing

25   arguments.  The court will provide you with

21

1    materials.  However, in taking notes I ask and I

2    direct you to be careful that your note taking does

3    not distract you from carefully listening to and

4    observing the witnesses.

5        You may rely on your notes to refresh your

6    memory during your deliberations, otherwise keep them

7    confidential.  After the trial the notes will be

8    collected and destroyed.

9        Additionally, you will be given the opportunity

10    to ask written questions of the witnesses called to

11    testify in this case.  That said, you are not

12    encouraged to ask a large number of questions because

13    that is primarily the responsibility of counsel.

14        Questions may be asked in the following manner.

15    After both lawyers have finished questioning a

16    witness, and only at that time, if there are

17    additional questions you would like to ask a witness,

18    you may then seek permission to ask that witness a

19    written question.  Should you desire to ask a

20    question, simply raise your hand and the bailiff will

21    collect your question.  Questions must be directed to

22    the witness and not to the lawyers or to myself.

23    After I've had an opportunity to consult with

24    counsel, I will determine if your question is legally

25    proper.  If I determine that your question may be

22

1      properly asked, I will ask it.  If I do not allow the

2      question to be asked, you should not draw any adverse

3      inference about the refusal to ask that question.

4           Now, at this point in time the lawyers will be

5      making their opening statements.  The purpose of the

6      opening statement is to outline for you what each

7      side expects to prove so that you will better

8      understand the evidence as it is introduced during

9      the trial.

10          I must caution you, however, opening statements

11     are not evidence.

12          With that, Attorney Schneider, are you prepared

13     to proceed with your opening statement?

14               ATTORNEY VISHNY:  I am, Your Honor.

15               THE COURT:  Very good.  You may do so, and

16     please feel free to adjust the podium if need be.

17               ATTORNEY SCHNEIDER:  Okay.  Thank you.

18          Good morning to each of you.  First, again, as I

19     said yesterday, I do want to thank you for your time

20     and attention in this case over the next few days.

21          Your job is to act as the judge of the facts and

22     the testimony that you're going to hear during these

23     days of trial.  It's an important job and it's one

24     that I know you will give your full attention to.

25          Opening statements, Judge has kind of already

23

1    informed you, I say they're kind of like previews for

2    movies.  They kind of give you an explanation of

3    what's coming up, what witnesses you're going to hear

4    from, what evidence and testimony is going to be

5    presented to you.  Your job is to listen and examine

6    the evidence and the testimony as it comes in from

7    the witnesses in this case.

8         As you were instructed yesterday, the State in

9    this case has charged this defendant with several

10   crimes.  They include a crime of first-degree

11   intentional homicide for causing the death of Joshua

12   Richards on December 8th, 2013.  There is an

13   additional charge for possession of a firearm by a

14   felon for December 8, 2013.  There are then four

15   counts of intimidation of a witness.  They relate to

16   different people in the case.  One relates to Paul

17   Lee, one relates to Joe Thor, one relates to

18   Stephanie Thao, and the last one relates to Melanie

19   Thao.  And then the last charge is a count of

20   solicitation of perjury.  So before I start talking

21   to you about the evidence and the testimony that

22   you're going to hear, I want to talk about those

23   crimes and what the State must prove to you in this

24   case.

25        A lot of TV shows out there, you hear a lot of

24

1          phrases, but the court's going to give you a set of
2          jury instructions at the very end of this case that
3          will give you the law that you are to be guided by.
4          First-degree intentional homicide contains two
5          elements.  The first element that the State must
6          prove to you is that the defendant caused the death
7          of Joshua Richards.  The second is that he acted with
8          the intent to kill Joshua Richards.
9               Acted with the intent.  You'll hear instructions
10         about it, but it means did he have the mental purpose
11         to kill or was he aware that his conduct was
12         practically certain to cause the death of another.
13         You're also going to hear further instructions about
14         intent.  Intent does not require that it exist for
15         any length of time.  It need not be planned or
16         considered for a day, a week or even a minute.  It
17         can be formed at the instant before the act is
18         committed.  So the State will tell you that the
19         evidence and testimony you will hear is that the
20         intent in this comes when he raises his arm with that
21         loaded gun, points it at Joshua Richards' head, pulls
22         the trigger and sends a bullet into his head.
23              Count 2 in this case, possession of firearm by a
24         felon.  December 8th, 2013, that the defendant
25         possessed a firearm and that he had been previously

25

1    convicted of a felony prior to that date.

2        Then we get to the counts of intimidation of a

3    witness.  Again, there is four charges of -- they're

4    all the same but they relate to different people.  So

5    the first element is that each person was a witness,

6    a person who has been called or is -- who is expected

7    to be called to testify; second, that the defendant

8    attempted or pre -- attempted to prevent or dissuade

9    that person from attending or giving testimony at a

10   proceeding authorized by law; third, that he acted

11   knowingly and maliciously; that he knew the person

12   was a witness and acted with the purpose to prevent

13   them from attending or testifying; and last, that he

14   did commit this act in connection with a trial,

15   proceeding or inquiry in a felony case in which he

16   was charged.  You're going to hear about intimidation

17   of a witness as it relates to his conduct to Paul

18   Lee, Joe Thor, Stephanie Thao and Melanie Thao.

19       The last count is solicitation of perjury, and

20   the State has charged that to have occurred on

21   January 25th, 2014.  Solicitation is kind of a weird

22   word, but Judge will give you a further instruction

23   on it.  But it as it relates to solicitation of

24   perjury, it relates to asking or advising another to

25   commit the offense of perjury.  So asking or advising

26

1        another to – there is five elements for perjury –

2        make a statement under oath, the statement would be

3        false when it was made, the witness knows that it's

4        false when it's made, the statement would have been

5        made in a proceeding before a court, and the

6        statement was material to the proceeding.

7             At the conclusion of the case, I'm going to ask

8        you to examine those seven crimes again, and I will

9        ask you based upon the evidence and testimony to

10       return a guilty verdict for each of those crimes.

11            I want to talk just briefly about burden of

12       proof.  The State bears the burden of proof in a

13       criminal action.  It is the State that brings forth

14       the charges.  It's our proof and our burden to prove

15       to you beyond a reasonable doubt that the defendant

16       committed the offenses of first-degree intentional

17       homicide for intentionally firing a firearm and

18       causing the death of Joshua Richards, for possessing

19       a firearm, for the four counts of intimidation.

20            What is reasonable doubt?  The judge will give

21       you further instructions at the end, but you'll be

22       instructed that it's really a doubt for which you can

23       give a reason.  You're not asked to guess or

24       speculate on remote possibilities.  You use your

25       common sense and your life experiences.  You bring

27

1      those with you.  As the court will instruct you, your

2      job is to search for truth.

3           You're going to hear about this offense, these

4      offenses, and you're going to hear, for many intents

5      and purposes, January 8 -- December 8th, 2013, was a

6      normal Saturday night in Appleton, Wisconsin.  It's

7      what you would normally expect downtown Appleton.

8      People were out at Luna Lounge, they were having a

9      good time, the evidence and testimony will show.

10     You'll hear from evidence and testimony that it was

11     just another Saturday night like many others where

12     different groups of people who don't even know each

13     other are at the bars together.

14          Evidence and testimony will tell you it's just

15     another bar closing time, people are getting ready to

16     leave, but the evidence and testimony will tell you

17     that changes and it was only a normal Saturday night

18     until.

19          Evidence and testimony will tell you that there

20     was a series of intentional acts and choices made by

21     this defendant that caused the death of Joshua

22     Richards.  Evidence and testimony to show that he

23     intentionally had a firearm on his person, that he

24     intentionally walked to the area where his brother

25     Paul Lee was standing with others, that he

28

1    intentionally walked to that area where Paul may have

2    been arguing or fighting with Josh Richards, that he

3    intentionally raised his right hand, held out his

4    arm, he then intentionally aimed the gun at Joshua's

5    left side of his face, and the evidence and testimony

6    will tell you that he then intentionally pulled the

7    trigger sending a .25 caliber bullet into Josh's

8    head, evidence and testimony will show you, right by

9    his left ear.

10        Evidence and testimony will show you that he

11    then intentionally turned and ran away, intentionally

12    ran back to Shark's Pool Hall.  Evidence and

13    testimony we believe will show you that he then

14    intentionally dumped six more .25 caliber bullets

15    into the toilet at Shark's Pool Hall.  Evidence and

16    testimony that he continued to run.  Evidence and

17    testimony that that morning, very early, he was

18    heading to Milwaukee and stayed at a Hilton.

19        You will learn, the evidence and testimony, that

20    the actions after that offense form the basis for the

21    intimidation of witness and the solicitation of

22    perjury charges.  Evidence and testimony the State

23    believes also allow you to consider did he commit the

24    offense of first-degree intentional homicide and

25    possession of a firearm.

1          You will hear evidence and testimony and

2    discussions about Paul and Joe, both who were

3    witnesses, not showing up for court, disappearing,

4    discussions about Melanie and Stephanie Thao who were

5    witnesses, not having them show up for court,

6    discussions and -- about and with Paul Lee on January

7    25th of 2014 where this defendant was telling Paul

8    what to come in and say at a court hearing.

9          You're going to hear more about that Saturday

10   night.  You'll hear from Brittany Olson.  Brittany

11   was Josh's girlfriend at the time you will find out.

12   You'll learn from Brittany that Josh was friends with

13   a gentleman who had kind of started one of these bus

14   tour companies where they get a group of people

15   together in Green Bay, they bring the bus down to

16   Appleton for a night, and they can go out downtown

17   and then they go back to Green Bay at the end of the

18   night.  You'll learn that that's the group Josh and

19   Brittany came with others.

20        You'll learn from Brittany they went to

21   Anduzzi's bar in Appleton, then they went to Luna.

22   You'll learn she's not really familiar with Appleton

23   downtown.  I think this was -- you'll hear from her

24   this was the first time she'd ever been at Luna.

25   You'll hear from Brittany there weren't any issues,

30

1     arguments or fights with anyone when she was out with

2     Josh that night, there wasn't anybody they had any

3     issues with or anything that caused any troubles,

4     that is, until the last 13 seconds of Josh's life.

5          You'll hear from Brittany and from others it was

6     getting to be closing time, about 1:50 a.m., and

7     Brittany will tell you they were at the dance floor

8     area of Luna.  And you're going to hear, for those of

9     you who aren't familiar, many different exhibits of

10    Luna and drawings and diagrams which help form the

11    layout, because there is a couple bar areas.

12    Evidence and testimony will show you, actually

13    through an exhibit made by a Wisconsin state trooper,

14    how that bar goes up and down and there's different

15    levels throughout.  But Brittany will tell you that

16    she was walking up in this area, going to go to the

17    bathroom, getting to be bar close, and in an area you

18    may hear through testimony it may be referred to as

19    like a landing area at the top of a set of stairs or

20    like a foyer area or a hallway, but you'll learn that

21    there is an area at Luna where to get to the bathroom

22    you have to go down steps, and when you come up those

23    steps, there's kind of an entry area.  You'll learn

24    through diagrams that's really the pathway to get

25    into the bar from the front door.

31

1              Brittany will tell you that they were in this

2        area, there was a group of other people standing in

3        that area, many of them were Asian she will tell you.

4        She will tell you they stopped.  She didn't really

5        have any concerns.  You'll learn from Brittany that

6        Joshua is part Asian so it wasn't any issue for her.

7        She wasn't feeling there was going to be any issues

8        going on.

9              You'll learn that at some point during that

10       time, through witness -- witnesses, that some words

11       might have been exchanged.  You're going to learn

12       from Dan Kersten who is a security person at Luna

13       stationed by that front door that this was an area he

14       even at the front door could look and see over to his

15       left down around.  You'll learn from Dan Kersten it

16       wasn't anything that drew his attention where he felt

17       he had to go in, stop what was going on, call for

18       extra security, do anything of that nature at all.

19             You'll also hear from Mike Verheyden, and Mike

20       is someone who came on that bus trip with Josh and

21       Brittany, had just met them that night, but Mr.

22       Verheyden will tell you it was getting about bar

23       closing time, he was finishing his beer and going to

24       go out and have a cigarette, and when he went to do

25       that and went through the entry that goes from the

32

1     bar to this landing area or this hallway or foyer, he

2     could see Josh was there and there was a group of

3     Asians.  And Mr. Verheyden will tell you he didn't

4     really know what was going on, but he walked to that

5     area just to make sure nothing was happening, wanted

6     to stand by, wasn't sure -- nothing where he felt he

7     had to run up there to help, but he just wanted to go

8     stand by in case there was anything.  And Mr.

9     Verheyden will tell you there might have been some

10    words, but then, from his perspective, things were

11    really calming down, there was nothing to it, he

12    thought everybody was separated.  So he turned to go

13    walk out and have his cigarette.  And Mr. Verheyden

14    will tell you when he turned, he did that, he then

15    heard a boom, a noise, and he will tell -- Mr.

16    Verheyden will tell you he turned and looked around

17    and Josh was now down on the floor.

18          You will learn from other witnesses, including a

19    gentleman named Tou Shoua Lee, that he knew this

20    defendant, Chong Lee, he knew Paul Lee, Joe Thor,

21    some others who were out with this defendant, that he

22    saw this group standing in that landing or that foyer

23    area, that he didn't really feel he needed to run up

24    but he just wanted to go check.  So Mr. Lee will tell

25    you he went up to that area, if something was going

33

1    to happen, just to be kind of like, hey, calm things

2    down maybe, but nothing so concerned where he felt he

3    had to get up there right away or that he saw

4    anything significant.  Mr. Lee will likely tell you

5    that he saw Paul Lee try to take a swing at Josh, and

6    then you will hear in a split second in time, no

7    reason, without any warning, the life of Joshua

8    Richards was changed forever.  Mr. Lee will tell you

9    that he saw Chong Lee come into that area, he saw

10   Chong Lee's hand go up as if he was going to punch or

11   strike at Josh, and then boom and he sees smoke.  He

12   then sees Josh down on the ground.

13        You will learn from many people at that point it

14   was chaotic.  You will learn and hear and see through

15   video evidence people started running out that door,

16   like trains of people running out that door.

17        You will learn and hear that officers arrived

18   probably a very quick response time because Appleton

19   this night has foot patrols, so they have groups of

20   officers you'll learn that literally walk College

21   Avenue on different nights, most likely the weekends,

22   and 911 calls start coming in, two officers across

23   the street come over, and they found a bar, a front

24   foyer area that was extremely dark, it's only lit,

25   you will learn through evidence and testimony,

34

1    through black lights, the lights that like reflect

2    the color white, reflect other colors and clothing,

3    that the music was still on, it was loud.

4        They got there, tried to see what was going on

5    with Josh.  Others who were there were trying to call

6    out to him, trying to see what was happening.  And

7    you will learn and hear that there was no response

8    from Josh at all.

9        You will hear testimony and see testimony about

10   where people were; and you're going to learn about

11   the video system that Luna had at the time, and

12   you'll learn that they had one camera that I commonly

13   refer to as Camera 1 that is the area that is the

14   camera looking at the front doors of Luna, so it --

15   you will see images of the front door area, you'll

16   see at times people coming in and out of those front

17   doors, you'll see people standing there talking.

18       Some of the images you're going to see Mr.

19   Kersten standing in kind of his post, security is on

20   the back of his shirt, he's looking at areas watching

21   what's going on.

22       You're also going to see then what I refer to as

23   Camera 2.  There is a camera that shows the bar area,

24   the upper bar, but you will learn and see that there

25   is a void and there is no camera in this foyer

35

1    landing area.  But you'll learn through the bar

2    camera and Camera 1 you can kind of determine when

3    someone leaves the bar area, they go right into this

4    foyer area.

5        So you will see evidence and testimony that

6    shows in about a 13-second span of time is when

7    Josh's life changed forever, and you will see that it

8    is about a 13-second span of time from when Mr. Lee

9    goes off of view from the bar camera, he's then in

10   the foyer area, and about 13 seconds later you see

11   Dan Kersten and others at that front door turn and

12   react to hearing that shot.

13       As I previously said, you're going to see then

14   masses of people exit.  You will hear through

15   evidence and testimony we're going to identify who

16   those people were, going to identify them by

17   clothing.  You're going to see, though, in this night

18   vision camera mode, colors are either black, white or

19   gray.  There is really nothing else.  And even a

20   striped or polka dot shirt may come up as one solid

21   color because it's a different type of camera and how

22   the light absorbs.

23       You will see in that video, though, following

24   there is a sequence where Chong Lee runs out the

25   door.  Immediately behind him is a woman named Alyson

36

1          Blom who was a friend of Chong's, with him all night,
2          and immediately following is Brittany, Brittany
3          Olson, Josh's girlfriend.  And you will see as they
4          go out the door Brittany start to reach out for
5          Alyson, and you will hear testimony from witnesses
6          who saw one girl just outside of Luna tackle another
7          girl and start yelling and punching and fighting, and
8          you will hear that this young woman was in a state of
9          high emotion, terror, she starts striking Brittany --
10         starts striking Alyson.  You will hear comments that
11         were made, your boyfriend shot my boyfriend.  You
12         will hear from males who were standing by outside who
13         saw this fight, heard comments, started pulling the
14         girls apart, kind of asking what -- what's going on,
15         what's that about.
16             You'll learn that Brittany then went back inside
17         the bar, Luna, to try to go see how Josh was doing.
18             The video will show you, and testimony will
19         confirm, Joe Thor, Paul Lee and Phong Lee run out in
20         one sequence, and you can see them turn to the right,
21         and evidence and testimony will show you can see them
22         going up North Division Street.  You'll learn that
23         they ultimately went all the way back to Josh's house
24         -- Joe's house, I'm sorry, which is at 1745 North
25         Harriman Street.

37

1          Video will also show you that when Chong, this

2     defendant, exits, he exits the door and turns to the

3     left.  You'll hear testimony from witnesses then, a

4     woman named Talisa and another woman named Marissa,

5     who were at Sharks who remember around closing time

6     someone coming in, person who went into the bathroom

7     for a period of time, someone who had asked them

8     could they give him a ride; and the girls will tell

9     you they gave this person a ride to a location he

10    said he needed to go to his mom's house.  And Officer

11    Nagel will tell you that he met with those women, he

12    determined that they went and drove a witness they

13    later identified as the defendant to an address on

14    North Harriman that was one house just to the south

15    of where Joe Thor lives.

16          You will learn that Joe Thor, Paul Lee, Phong

17    and this defendant then all met up back at Joe's

18    house.  You will learn Joe, Paul and Phong were

19    surprised by what had just happened at Luna.

20          You'll learn officers at the scene of Luna

21    locate a .25 caliber shell casing on that stairs that

22    they describe, this landing is kind of at the top of

23    the landing.  You're going to see some cell phone

24    video at some point that shows you how dark this

25    landing area is, you'll see how much light, I'll say

38

1     the black lights provide or don't provide.  You'll
2     also see how chaotic it was.
3          You'll hear testimony that over the next few
4     days Chong talked to people about what had happened.
5     You'll hear that he talked to Joe Thor, that he
6     talked to his brother Paul.  You'll hear that Paul
7     heard a comment Chong said to him, I fucked up, I
8     shot that guy.  You'll hear from Joe Thor that on
9     that Sunday morning, within a few hours after the
10    shooting at Luna, he and Chong were heading down to
11    Milwaukee.  They went there, they checked into a
12    Milwaukee Hilton.  Ended up going to a party at some
13    friend's house down at Milwaukee, and you're going to
14    hear from those witnesses.  There is a series of
15    witnesses, Peter Moua, Xai Thao, Kong Vang, Xai --
16    I'm sorry, Dia Vang, and Joseph Vang, and some of
17    those witnesses will tell you while they were down in
18    Milwaukee, they know Chong, some of them are
19    originally from Appleton area, but while there this
20    defendant told them he had shot a person, shot
21    someone at Luna.  They had talked about -- and you
22    will learn that he stayed in Milwaukee one night and
23    then he returned home.
24         You will learn that over the next couple of days
25    Chong met up with his friend, Stephanie Thao, and her

39

1     sister Melanie Thao, and you will learn that on one

2     night they went out to eat at a sushi restaurant, and

3     this is in the days immediately after, and Chong

4     tells them that he was involved in the shooting, he

5     did it.  You will learn from the girls that the next

6     night they went out to eat at Buffalo Wild Wings.

7     And I didn't ask this in voir dire, but you'll also

8     hear that referred to as BW3s or B-dubs, kind of a

9     nickname for Buffalo Wild Wings.  But while they're

10    there, Chong again says and tells them that he was

11    involved in the shooting.

12         You will learn that in the days following the

13    incident officers tried to follow leads, they looked

14    at that video, and you will hear described for you,

15    and in many ways almost recreated by the evidence in

16    this case, through that Luna video they were able to

17    capture still images and they started printing out a

18    series of still images trying to identify who is in

19    this picture, who is this, what's this person's name.

20    They were able to break down that sequence of

21    everybody running out the door to establish who was

22    in that landing or that foyer area when the shot went

23    off, able to establish from that bar video who had

24    entered that foyer area at what time.  And they

25    developed this series of photos.

40

1           You will hear that for all intents and purposes
2       most of the witnesses you're going to hear from the
3       State were not people who in the day after, the day
4       of, few days later, a week later, months later,
5       picked up the phone to call the police and say I have
6       information I want to share about that shooting.
7       You'll learn one exception to that was a woman named
8       Dalinda Guzman, and you'll learn Dalinda is Alyson's
9       friend, Alyson Blom, who knew Chong was out with his
10      friends.  Dalinda calls the police and tells them she
11      was out the night before, there was a shooting at
12      Luna, she starts telling them who she was with.
13      Dalinda tells them that she was in that foyer area
14      but did not see who did the shooting but starts to
15      tell them who she was with, gives Alyson's name.

16          And you will learn that the officers then start
17      following up on leads and trying to identify the
18      people in the boards and try to find them and speak
19      with them.  You'll learn through the evidence and
20      testimony that for almost everyone, when officers
21      contacted them, they don't want to get involved, they
22      don't want to be part of the case.  You'll hear some
23      of them say I don't want to be the snitch, I don't
24      want to be the one that talks about this.  And you'll
25      learn in all intents and purposes many of the people

41

1        who had the information about what happened were
2        friends or family of Chong Lee.
3             Police begin these interviews, and you will
4        learn that in many of the interviews at the start
5        they would ask the person have you -- were you at
6        Luna, we want to talk to you about Luna.  And you
7        will learn through the evidence and testimony of
8        these people denied, no, I wasn't there.  Officers
9        would then say, you will learn, we have photographs
10       of you there, we have video of you there, and you
11       will learn some of the people then might start to
12       say, well I was there, but, and maybe they say more,
13       maybe they didn't, and some people, even when they
14       said we have photos of you, they said, well I -- I
15       wasn't there.  They still deny it.  But you will
16       learn through the series of interviews the officers
17       are able to identify more people and who was directly
18       around that area of Josh at the time the shot came
19       out.
20            Some of the officers you will learn on one night
21       traveled down to Milwaukee to talk to Alyson to get
22       information from her.  Alyson lives in Milwaukee then
23       and still lives there now you will learn.
24            You will learn at the same time other officers
25       tracking down Paul Lee.  You will learn and see that

42

1          in one of the images as Paul's running out it appears

2          that there is something in his hand from this night

3          camera and reflective colors, and so officers want to

4          track him down and they talk to him on December 11th,

5          you will learn.  He was asked, who did the shooting,

6          was he involved in the shooting, and he says he

7          wasn't in the shooting, he didn't do the shooting.

8          You will learn officers confront him, there is this

9          object in your hand, we know it was this group of

10         people only that could be in that area at the time.

11         You will know and hear Paul says it wasn't Joe, it

12         wasn't Phong.  You will ultimately learn that when

13         officers spoke to him, and Sergeant Chue Thao was

14         involved in the interview, Chue asks him at one time,

15         was Chong there, he brings up his name, and

16         ultimately that leads to, did Chong do this, was

17         Chong involved.  And you will hear testimony that

18         Paul was very emotional at this point.  Paul makes a

19         comment to the officer, my brother is going to hate

20         me for this, and then tells the officers that Chong

21         was involved, he did the shooting, and tells the

22         officers what he knew and what he had heard and what

23         he had seen.

24             He also learned one of the things -- the officer

25         still followed up on what was in his hand, and you'll

43

1    learn Paul's comments and you'll see photographs of

2    him holding an e-cigarette, and you can draw your own

3    conclusions and inferences from what it looks like in

4    his hand compared to what that video image at Luna

5    shows, but the evidence and testimony, and I think

6    from Paul that's his statement, will be that they're

7    very consistent.  You'll learn that even after Paul

8    shared this information, officers then went and

9    talked to other people.

10    They didn't yet know about this trip to

11    Milwaukee, so they hadn't talked to those people.

12    They didn't yet know about Stephanie and Melanie

13    eating dinner and Chong making statements to them,

14    but over the next several days they talked to Joe

15    Thor again, they get from Joe that trip to Milwaukee

16    and Chong telling him on that trip to Milwaukee that

17    he was involved, that he had done this.

18    You'll learn that on December 12th of 2013,

19    Chong Lee was in jail, and after that point starts to

20    make a series of jail phone calls, and that's where

21    you will hear the testimony about the intimidation of

22    the witness or the solicitation of perjury.  You'll

23    hear that same day, on December 12th, 2013, he makes

24    a comment, the defendant, if mom didn't tell me to

25    stay, I would have disappeared already, you know.

44

1          You'll hear continuing in December in discussions

2     about Paul or Joe the defendant makes a comment, tell

3     them to disappear.  Continuing into January, comments

4     from Chong, if Joe and Paul come, then I am dead.

5     Hey, you mean, you, Phong, don't have it, they did

6     not give Phong an inaudible to come.  Chong's

7     response, oh, because I received my papers and they

8     said the witness is Phong.  Chong:  Phong, Paul and

9     Joe, if the three of them do not come, then I get

10    out.  Continues to make comments.  When you are with

11    Joe, tell Joe he needs to say something different

12    because the only way I could win is if they -- if

13    they say something different you know.  Inaudible.

14    When you arrive you tell them that you -- you were

15    scared and not sure what to say and say you were

16    inaudible and that you just said whatever because

17    inaudible said that is the only way I could win.  And

18    you will learn that call was with Paul.  Chong:  Can

19    you tell Paul that Paul -- so that Paul -- if they

20    bring Paul, that he is someone who is nervous

21    inaudible, that he is nervous and scared and that's

22    why he said that you know.  Yes.  But even if they

23    said they lie it won't work you know.

24         You will learn as part of this case officers

25    collected letters written by the defendant that I

45

1    believe evidence and testimony will show he never
2    expected anybody to find.
3         You will learn one of the first calls that he
4    makes when he's in jail is to his family saying take
5    down my Facebook account, deactivate it, gives them a
6    password so they can deactivate it and take it down.
7    There is comments that he needs to talk to Paul and
8    Joe.  A letter to his brother Nhia.  He writes:  Joe
9    and Paul supposed to recant.  If they recant at the
10   prelims, then the case is going to be dropped.  He
11   writes a letter to Michael Thor.  I don't look for
12   trouble, but when trouble comes I end it.  I will end
13   it.  That's why I didn't really want to hang out with
14   trouble seeking people because I know myself.  No
15   hesitation.  I do everything the smart way.  I made
16   sure I have a way out.  I just never thought family
17   would do this to me.  A letter he writes to Teng Lee
18   who is a brother:  Phong, Paul and Joe are -- be
19   subpoena for it.  It's scheduled for 10:30 February
20   25th -- 10:30 a.m. February 25th.  The only people
21   that will be allowed to come is the witnesses which
22   is Paul, Joe and Phong along with the cops.  For
23   evidence they only have the testimony of Paul and
24   Joe.  No physical evidence.  So that means no prints,
25   guns, et cetera.  I can't have Paul and Joe show up.

46

1      If they do, then I would lose.

2           The autopsy of Joshua Richards will tell you

3      that a single gunshot wound to the head is what

4      caused his death.  Dr. Kelley will tell you his death

5      was pretty much instantaneous; and you will hear from

6      officers who came to respond within two minutes and

7      who literally saw Josh die there at Luna, his breath

8      became labored.

9           You will hear evidence and testimony over the

10     next several days about how the intentional actions

11     of -- and choices of this defendant tie him to each

12     of the crimes the State has charged in this matter.

13     I'm going to ask that you pay attention to the

14     witnesses and the facts of the case, listen to

15     statements that come from different sources, that

16     don't know each other, examine his actions through

17     the evidence and testimony, and at the conclusion of

18     the case I will ask you to return a guilty verdict on

19     each of these charges.  Thank you very much.

20               THE COURT:  Thank you, Attorney Schneider.

21          And is the defense prepared with their opening

22     at this time?

23               ATTORNEY WEITZ:  We are, Your Honor.

24               THE COURT:  Very good.

25               ATTORNEY WEITZ:  Good morning.  It was a

47

1     Saturday night in a crowded bar and everyone was

2     having a good time.  A shot rang out and tragically

3     Joshua Richards lost his life.

4          This wasn't supposed to happen, not here, not in

5     Appleton.  The police were under a lot of pressure

6     that night to solve this crime and to do so quickly;

7     unfortunately, though, they got it wrong.  Chong Lee

8     was not the shooter.  Chong Lee did not kill Joshua

9     Richards.

10          You'll hear in this case that the police

11     investigation really has two parts to it.  There is

12     the initial investigation where they act very quickly

13     to secure evidence, to talk to eyewitnesses, and

14     based upon all that they develop Paul Lee as an

15     initial suspect in this case.  Then you'll hear about

16     a shift in their focus, and from that point forward

17     Chong becomes the suspect and they work on building

18     the case against Chong.

19          In the initial investigation there is a few key

20     pieces of evidence that suggest that Paul Lee is the

21     suspect in this matter.  Paul Lee is wearing white,

22     he travels to the right when he exits Luna, and he's

23     seen on traffic cameras running down the road.  Very

24     early on in the case, the police talked to a few

25     eyewitnesses who were standing very close to the

48

1    shooting when it happened.  Daniel Kersten is one of

2    those.  He's the bouncer who is tasked with kind of

3    surveying the crowd and making sure that if there is

4    any trouble he's paying attention to it, can go get

5    over there, break it up.  He tells the police when

6    they first arrive that the suspect is wearing a white

7    hat and a white vest.  He says that that suspect is

8    taking his hat and vest off as he's getting out the

9    door, and he goes out the door westbound on College

10    which is to the right of the front doors of Luna.

11        Another person the police talked to early on is

12    Mike Verheyden.  He is the friend or acquaintance of

13    Mr. Richards.  He's walking to the front when he sees

14    this confrontation between Mr. Richards and an Asian

15    male so he kinds of stops and is paying attention to

16    this to see if there's going to be some sort of fist

17    fight.  He feels like it's deescalating, the parties

18    kind of stepping apart, the situation is over, so

19    that's when he turns his attention.  He hears a pop

20    and he looks back and sees Mr. Richards fall to the

21    ground.  He tells police that the person that they

22    need to look for, the suspect, is wearing a plaid

23    shirt and has a beanie hat on.

24        Adam Richardson is also a person who is standing

25    very close to the shooting when it happens.  He's

49

1          just to the left of the front doors waiting for a

2          ride when the shooting happens.  He tells police that

3          the suspect he saw was wearing a white beanie hat,

4          but most importantly what stands out to Adam

5          Richardson is the fact that this guy as he's running

6          down the street is running with his hands in his

7          pockets like he's trying to conceal something.

8              So these are the -- the initial descriptions

9          that the police have to go off of.  So based upon

10         that they realize that another key piece of evidence

11         that they need to analyze is the surveillance video

12         from Luna itself.  The shooting itself isn't on

13         video, but there is surveillance video showing those

14         front doors.  The police look at this videotape and

15         analyze it very carefully.  They even go so far as to

16         go frame by frame and watch every step of the action

17         as people run out the door.  In reviewing this video,

18         you can see that there is an initial group of three

19         guys that, as soon as the pop happens, as soon as the

20         shot happens, they're immediately pushing people out

21         of the way, they throw open the doors and they're

22         running out the door.  All three of those people go

23         to the right or westbound on College Avenue.  The

24         first person out the door is identified as Joe Thor,

25         the second person is Paul Lee, and the third person

50

1    is Phong, P-H-O-N-G, not to be confused with the

2    defendant Mr. Chong Lee.  When the police slow down

3    this video and look at it frame by frame, the second

4    person out the door, Paul Lee, they're convinced that

5    that object in his hand that the State described to

6    you is a gun.  They believe that that's a gun in his

7    hand.  You can only see it in one frame because

8    immediately after that his hands go into his pocket

9    as he exits the bar, goes to the right and around the

10   corner and down the street.

11       There is a second group of people that leave the

12   bar.  That group leaves much slower.  They're there

13   for a couple of seconds behind these first three guys

14   who are out the door like that.  And that group of

15   people, you will see the defendant, Mr. Chong Lee.

16   Unlike Paul, though, his hands are visible as he

17   exits Luna.  He's leaving slower.  He's not running

18   out or pushing people out of the way.  He's kind of

19   walking quickly out the door.  Unlike the first

20   group, he also -- or he goes to the left, eastbound

21   on College Avenue.  That's a description that doesn't

22   match what -- what the eyewitnesses told initially.

23   Daniel Kersten says that the suspect goes westbound

24   to the right.

25       Police seize the traffic cameras, which in

51

1      Appleton there is cameras on various intersections
2      that show traffic accidents or situations like this,
3      so they pay very close attention to these cameras as
4      well.  And down the block on the corner of Division
5      and Washington there is a traffic camera that shows
6      the side of Luna as you go northbound on Division.
7      They see on these traffic cameras that first group of
8      three suspects running down the street.  Again, the
9      first one is Joe Thor, he's running very fast.  These
10     cameras, unlike the ones in the Luna Lounge, show
11     relatively true color.  They're -- they don't have
12     the same problems with not depicting things in the
13     appropriate color because they show the lighting and
14     they show what's going on on the street.  So you can
15     tell that Joe's wearing a medium colored jacket.
16     He's also wearing a baseball cap.  The second person
17     again is Paul, and the whole way down the street he
18     is running with his hands in his pockets.  He's
19     wearing a white jacket.  Phong Lee, P-H-O-N-G, is the
20     third person that -- in that group, and he is wearing
21     a white puffy vest as he runs northbound on Division.
22     He's also wearing a plaid shirt.  Police track the
23     route that these three guys run and see them go north
24     on Division, they cut across the parking lot behind
25     the parking ramp, and they head over towards the

52

1     Post-Crescent building.  So based upon that officers

2     look at some additional security footage and they see

3     some movement by a dumpster in that area.  They feel

4     like this is very important so they want to go check

5     that dumpster and see if there is any potential

6     evidence that was discarded in that dumpster.  They

7     find a hat and a white vest that were thrown away,

8     you'll learn, from Joe Thor and Phong Lee.

9          Based upon that the police go and they initially

10    interview Joe and Phong in this matter, and in both

11    interviews the police made it abundantly clear that

12    they believe that Paul Lee, the guy with what looks

13    like a gun in his hand and running with his hands in

14    his pocket, is the shooter.  Joe Thor tells the

15    police that the shooter wasn't him, it wasn't Phong,

16    but he leaves open the possibility that it could have

17    been Paul.  Phong Lee is much more uncooperative with

18    the police.  He tells the police that he doesn't want

19    to be a snitch and he -- he basically denies any

20    knowledge of what went on other than naming the two

21    people that he was with as he ran out of the bar when

22    confronted with the fact that they were on video.

23         Based upon the evidence that the police have

24    gathered up until this point and Paul Lee that is

25    their primary suspect, they go to his work and they

53

1          interview him.  In that interview they repeatedly

2          tell him that they're -- they know he's the shooter,

3          that they have training in firearms, they know that's

4          a gun in his hands, and that he's going away for the

5          rest of his life.  Paul doesn't admit to the crime,

6          and after that he's arrested.  At that point he knows

7          that they're -- they're serious.

8              He's taken to the Appleton Police Department

9          where they again interrogate him.  And again, one of

10         those same themes, they tell him repeatedly, you're

11         the shooter, we know you're the shooter, we've got

12         you, you're going away for the rest of your life.

13         And then they give him two choices, either you name

14         who the shooter was or it was you.  Sergeant Thao is

15         the one who suggests to him that it was Chong, that

16         it was his brother.  That comes from Sergeant Thao,

17         not from Paul.  He says, it's your brother, wasn't

18         it.  Looking at life in prison, Paul takes that.  He

19         says, yeah, reluctantly, it was my brother.  The

20         story that Paul Lee tells them is that the reason he

21         knows it was Chong that did the shooting is because

22         Chong came over to his house and admitted it on the

23         Monday after the shooting.  Later on you'll hear that

24         Paul changes his story and says, actually, it was

25         also Sunday morning that he came over a few hours

1           after the shooting and also admitted it to me.  And

2           both of those stories, though Paul never says that he

3           saw Chong do it, he says the reason he knows is

4           because Chong told him.  Paul admits to being right

5           there in the confrontation with the victim, he admits

6           that he punched Mr. Richards, he says that he punched

7           him, but he says he doesn't see who the shooter is

8           because he turned his back after punching Mr.

9           Richards.  Sergeant Rabas pointed out to Paul that

10          that doesn't make any sense.  You don't punch a guy

11          and then turn around, especially a guy who is much

12          bigger than you.  Sergeant Rabas mentions to him that

13          the only way that you turn around after punching a

14          guy is if you put a bullet in his head.  In this

15          trial the evidence will show that Paul doesn't tell

16          the truth, so at this point, this is when the

17          investigation shifts in focus and Chong becomes the

18          suspect.

19              Sergeant Schira tells Paul after he has said

20          that it was his brother that we've built this great

21          case against you and now all we got to do is we got

22          to get rid of that case and we got to show that it

23          wasn't you, that it was your brother.  He says that

24          he needs some -- to get people's help.

25              At that point Chong is arrested, and when he's

55

1    arrested they recover his jacket that he was wearing

2    the night of the shooting.  It's black.  It's not

3    white.

4        After Chong is arrested, the police work on

5    building their case against him.  They go back and

6    they reinterview Joe Thor and Phong Lee, part of that

7    first group of three that ran out after the shooting.

8    They tell both of them they need to help Paul, that

9    Paul is in jail and they need to help him.  They also

10    interview other people that Chong may have talked to

11    after the fact.

12        You'll hear in this case from James Trainum who

13    is a police practices expert.  He was a homicide

14    detective for 17 years with the Washington D.C.

15    Metropolitan Police Force.  He'll tell you that in

16    this case some mistakes were made.  Some of the

17    techniques that were used in this case are known for

18    producing false statements.

19        The State told you about Chong and the fact that

20    some people will come to court and say that he told

21    them that he admitted to it.  The other thing that

22    you'll hear from these people, though, is that

23    Chong's a bragger, that he's the type of person who

24    tells tall tales.  He says that he has fancy cars

25    when he doesn't.  He's a bragger.  You'll also hear

56

1    from these witnesses that when Chong told them that

2    he was part of this shooting that they didn't believe

3    him.  They thought he was joking.

4         As far as Stephanie and Melanie Thao, after he

5    told them that he was the shooter, they continued to

6    have contact with him.  They went out to dinner a

7    second night, they continued having phone contact

8    with him, writing letters.

9         After Chong's arrested, it's no longer time to

10   brag though.  He's in jail, he's feeling frustrated,

11   he knows that he doesn't want to have to face a trial

12   for something that he didn't do, so he says some

13   things in phone calls and letters.  He talks about

14   wanting people to come to court and tell the truth,

15   to say that they lied, he talks about not wanting

16   people to come to court at all because he's

17   frustrated and knows he didn't do this, he doesn't

18   want to have to face the trial.

19        The State will tell you a lot about Chong's

20   communication in those phone calls and letters, but

21   the other thing in this case is that the other

22   witnesses also had an opportunity to communicate.

23   Many of the witnesses in this case are related either

24   by blood or by marriage or they're good friends with

25   each other.  For example, the bullets that the State

57

1          told you were found at Sharks club, Joe Thor is the
2          one that tells the police this story about that Chong
3          flushed things down the toilet at Sharks club, says
4          it's actually the gun but the gun is never recovered.
5          In that interview Joe Thor tells the police this, he
6          goes into his house for an unknown period of time,
7          it's when he comes out that he tells the police that
8          Chong flushed the gun down the toilet at Sharks.
9          Bullets were found at Sharks club, but they were
10         found four nights after the shooting.  You'll hear
11         from the bar manager and the owner of Sharks that
12         they find them not on Sunday night, not on Monday
13         night, not on Tuesday night, but Wednesday night
14         after the shooting.  Sharks club is open daily.  It's
15         open all of those days, Sunday, Monday, Tuesday.  The
16         bar manager says that it's cleaned daily.  Every
17         night before they close they clean the bathrooms.  In
18         fact, the bar manager also will say that they had a
19         cleaning crew that came through that Tuesday but the
20         bullets are not seen until four nights later.
21              As I said at the outset of this case, the
22         initial investigation contained eyewitness statements
23         that the police verified through video footage from
24         the security camera and the traffic cameras.  At that
25         point they believed that Paul Lee was the suspect in

58

1     this case.  Then they shift the focus to Chong Lee

2     based largely upon statements.  Paul Lee was wearing

3     white, he goes to the right, Chong Lee is wearing

4     black, he goes to the left.

5          The State will present a lot of evidence in this

6     case, but at the end of the day they got it wrong.

7     They shifted their focus to only Chong Lee and they

8     got it wrong.  Chong Lee is an innocent man, and at

9     the close of this case, we'll come back before you

10    and ask you to return a verdict of not guilty.  Thank

11    you.

12              THE COURT:  Thank you, Attorney Weitz.

13         And does the State need a few moments or is the

14    State prepared to call its first witness?

15              ATTORNEY SCHNEIDER:  We would have to get

16    some exhibits up so we might need some time to bring

17    those up, Judge.

18              THE COURT:  Why don't we recess -- we'll

19    recess for about ten minutes.  And, members of the

20    jury, I didn't see if when you were walking in if you

21    brought water, but you are more than welcome to bring

22    water in with you, so if while on your break you want

23    to bring some in, you're more than welcome to do so.

24         Please rise for the jury.

25              (The jury was escorted out of the

59

```
1        courtroom.)

2                THE COURT:  You may be seated.  We'll be in

3        recess for about ten minutes.

4                (Court in recess.)

5                THE COURT:  We can bring in the jury.

6        Please rise.

7                (The jury was escorted into the courtroom.)

8                THE COURT:  Please be seated.

9            Miss Schneider, at this time is the State

10       prepared to call its first witness?

11               ATTORNEY SCHNEIDER:  We are.

12               THE COURT:  Very good.

13               ATTORNEY SCHNEIDER:  We would call Officer

14       Blaine Vander Wielen.

15               THE COURT:  Sir, If you would please come

16       to the witness stand and remain standing, we'll have

17       you sworn in.

18               (Oath administered to witness.)

19               THE WITNESS:  I do.

20               THE CLERK:  Please state your full name an

21       spell it for the record please.

22               THE WITNESS:  Blaine Vander Wielen,

23       B-L-A-I-N-E.  Last name V, as in Victor, A-N-D-E-R

24       space W-I-E-L-E-N.

25               THE COURT:  Your witness, Miss Schneider.
```

60

1                    ATTORNEY SCHNEIDER:  Thank you.

2                **EXAMINATION OF BLAINE VANDER WIELEN**

3    **BY ATTORNEY SCHNEIDER:**

4    Q    How are you employed?

5    A    I'm a police officer for the City of Appleton.

6    Q    How long have you been employed in law enforcement?

7    A    I've worked for the City of Appleton since October of

8         2009, and I also held a part-time officer position

9         for about eleven months prior to that in the Village

10        of Fall River, Wisconsin.

11   Q    What are your current duties for the Appleton Police

12        Department?

13   A    I'm an investigator assigned to our school resource

14        unit.

15   Q    Have you held previous duties during your time with

16        the Appleton Police Department?

17   A    Yes.  I was previously assigned to our patrol

18        division.

19   Q    What was your assignment back in December of 2013?

20   A    I signed up to work our College Avenue detail which

21        was a foot patrol detail in the bar district of

22        College Avenue.

23   Q    Can you explain for the jury a little bit what it

24        means when you have that assignment?

25   A    Sure.  When you sign up for that particular detail,

61

```
1         you go through the bars and handle any calls for

2         service that come up related to bars or bar

3         activity.

4     Q   Are you doing that alone or with another officer?

5     A   Each person is typically partnered up with another,

6         and we usually have anywhere between two to four

7         total people involved at that.

8     Q   Does that -- were those duties weekend duties

9         primarily or week nights?

10    A   Those were Friday and Saturday night duties.

11    Q   And did you have such an assignment back on December

12        8th of 2013?

13    A   I did.

14    Q   What hours did you work then for that foot patrol

15        assignment?

16    A   That particular night we were -- we started on

17        December 7th at 11 p.m. and we typically worked

18        through three a.m. or whenever things had dispersed

19        to a reasonable level.

20    Q   Do you remember which officer was assigned to work

21        that patrol with you?

22    A   It was Lieutenant Peters.

23    Q   Do you recall, Officer Vander Wielen, a dispatch that

24        came in at about 1:50 a.m.?

25    A   I do.
```

62

1   Q   And where were you at the time of the dispatch?

2   A   At the time of the dispatch Lieutenant Peters and I

3       were at Sal's Pizzeria doing a business check.

4   Q   What information was provided through dispatch?

5   A   The dispatch was that there was a possible gunshot at

6       Luna Lounge.

7   Q   Where did you then go?

8   A   We immediately walked to Luna Lounge to

9       investigate.

10  Q   Okay.  And just to help the jury, everyone might not

11      know, Sal's Pizza, to get to Luna Lounge, what did

12      you have to do?

13  A   Sal's Pizza is across the street and partially into

14      the 400 block, so we needed to walk down College and

15      cross the street to get to Luna.

16  Q   Did you immediately head that way?

17  A   We did.

18  Q   About how long do you think it took you to get

19      there?

20  A   I would say probably about a minute or two.

21  Q   Okay.

22              ATTORNEY SCHNEIDER:  Your Honor, may I

23      approach?

24              THE COURT:  You may.

25  Q   (BY ATTORNEY SCHNEIDER)  While you were en route,

63

1     were there any updates given?

2  A   Not that I recall.

3  Q   I'm going to show you, Officer, what's been marked as

4     State's Exhibit No. 6.  First if you want to just

5     confirm that's the exhibit number?

6  A   It is.

7  Q   Are you familiar with what's depicted here on Exhibit

8     6?

9  A   Yes, I am.

10         ATTORNEY SCHNEIDER:  Judge, may I publish

11     for the jury to see?

12         THE COURT:  You may.

13  Q   (BY ATTORNEY SCHNEIDER)  Officer, what is depicted

14     here in Exhibit 6?

15  A   This is showing the 300 block of West College Avenue.

16     The location here is Luna Lounge, or was Luna

17     Lounge.

18  Q   And when you do that, just to assist because the

19     reporter can't take it down, when you said "here" you

20     were pointing to an area that is the southwest corner

21     and it's marked with a street address; is that

22     correct?

23  A   Correct.  It's marked with 344 West College.

24  Q   So that would be Luna Lounge?

25  A   Correct.

64

1    Q    Okay.

2    A    The building on the left side of the page is the

3         Performing Arts Center.  The address labeled as 318

4         West College Avenue is the Sharks club.

5    Q    Okay.  Is Sal's Pizza on this Exhibit 6?

6    A    It is not labeled, but it would be roughly in this

7         bottom left corner somewhere in this region.

8    Q    Okay.  And so you and Lieutenant Peters heard the

9         dispatch and then walked to Luna Lounge?

10   A    Correct.

11   Q    And as part of those foot patrol duties, did you have

12        responsibilities to go into Luna Lounge either on

13        this night or on other occasions?

14   A    Yes, we did.

15   Q    Were you familiar with somewhat of the layout of Luna

16        Lounge?

17   A    Yes, I am.

18   Q    Okay.  Just generally describe it for the jury.

19   A    When you walk in through the main doors, there was

20        kind of an entrance area that opened up that had a

21        few different kind of corners and angles built into

22        the wall, and then eventually as you got into the

23        entrance further, there was a stairway that led to a

24        lower level where the restrooms were located, and

25        then there was a threshold that then opened up into

65

1       the main bar portion.

2   Q   Okay.  Officer, I'm going to show you, and can you

3       confirm the yellow sticker is Exhibit 1?

4   A   Yes, it is.

5   Q   Are you familiar with what is depicted here?

6   A   Yes.  That is the layout of Luna Lounge.

7               ATTORNEY SCHNEIDER:  Your Honor, may I

8       publish to the jury?

9               THE COURT:  Any objection?

10              ATTORNEY VISHNY:  No.

11              THE COURT:  You may.

12              ATTORNEY WEITZ:  Can we approach?

13              THE COURT:  You may.  If you can take it

14      down, Miss Schneider, just while counsel approaches.

15              (A bench conference was held.)

16  Q   (BY ATTORNEY SCHNEIDER)  Let me get Exhibit 1 flipped

17      around for you, Officer.

18  A   Um-hum.

19  Q   And actually, if you don't mind, I'm going to go back

20      to you talked about Exhibit 6 which is depicted

21      here?

22  A   Yup.

23  Q   Can you write Luna in the area where Luna Lounge is

24      or above maybe the street address?

25  A   (Witness complying.)

66

1    Q    And then can you do the same for Sharks?

2    A    (Witness complying.)

3    Q    And I think the other building you identified on here

4         is the Performing Arts Center, if you could just

5         initial it with PAC?

6    A    (Witness complying.)

7    Q    Thank you.  And, Officer, you don't have a pointer,

8         do you?  Exhibit 1 is Luna Lounge again?

9    A    Yup.

10   Q    And the main entrance doors are labeled; is that

11        correct?

12   A    That is correct.

13   Q    Are those the entrance doors you would have used when

14        you entered with Lieutenant Peters?

15   A    That is correct.

16   Q    Is all of Luna Lounge displayed here or just a

17        portion of it?

18   A    Just a portion.

19   Q    Okay.  And there is an area marked bar, correct?

20   A    Correct.

21   Q    Is there a second bar area to Luna Lounge as well?

22   A    There is.  What would be further up on the page not

23        being depicted is a lower bar.

24   Q    At one point Luna Lounge was the Viking Theatre,

25        correct?

67

```
1    A    That I --
2    Q    You don't know that?  Okay.
3              When you arrived at Luna Lounge, did you
4         immediately enter?
5    A    We did.
6    Q    What do you remember when you entered?
7    A    I remember that it was -- it was very loud.  It was
8         very dark.  There was a lot of commotion going on
9         within the entrance area, and it seemed that the
10        majority of the lighting was done by the different
11        entertainment lights that Luna had at the time.
12   Q    Do you remember sometimes lights are referred to as
13        like black lights where white is reflective,
14        sometimes either lighter colors are reflective, is
15        that the type of lighting they had?
16   A    They did have some black lighting.  They also had
17        other design lighting that was moving around kind of
18        displaying different circular or different types of
19        patterns on the walls and floor.
20   Q    And after you entered, where did you go?
21   A    We immediately entered in and walked toward the
22        threshold and stairs area of the, I guess, entrance
23        area.
24   Q    Okay.  So you pointed to an area from what's the main
25        entrance to kind of you called it the threshold in
```

68

```
1              front of the area marked stairs; is that correct?
2      A    That's correct.
3      Q    What did you find there?
4      A    We found that there was a male individual laying on
5              the ground.  He appeared to have blood to the left
6              side of his head.
7      Q    When you went into this area, was it still very
8              dark?
9      A    It was very dark.
10     Q    Did you assess for any areas of injury?
11     A    We did.  Lieutenant Peters handled most of the first
12             aid and assessment piece, but we did check and found
13             that there appeared to be an injury on the left side
14             of his face.
15     Q    Do you remember -- did you try to communicate with
16             him?
17     A    I don't remember myself specifically trying to
18             communicate with him, but I believe others did.
19     Q    Do you remember how his body was positioned in
20             relation to anything that it was a part of Luna?
21     A    Yes.  His head was facing toward the south.  If I may
22             stand?
23                  THE COURT:  You may, sir.
24     A    Kind of in this region here.  The edge of this
25             particular wall was kind of near his upper chest area
```

69

```
1            and his feet were pointed toward the main bar and
2            threshold area.
3       Q    Okay.  Did you get any initial information from
4            staff?
5       A    I did have a security guard tell me that there were
6            two Asian individuals that had left the scene.  He
7            didn't know if they were involved or not, but they
8            were wearing white vest and white hat.
9       Q    Were there still a large number of patrons in the bar
10           when you arrived?
11      A    There were.
12      Q    Was it pretty packed?
13      A    I would say so.
14      Q    At that point after you and Officer Vander Wielen
15           (sic) entered, were other officers also responding?
16      A    Yes.  I had made a radio broadcast to have officers
17           respond, emergency, to assist us due to the size of
18           the scene and what was all taking place.
19      Q    Did you at that point set up -- either you or the
20           lieutenant set up some restrictions so that parties
21           weren't allowed to leave?
22      A    Yes.  I -- I also made the request that we have
23           officers posted at every exterior door of the
24           business to try to ensure that no one came into the
25           scene or left the scene.
```

70

```
 1                    ATTORNEY SCHNEIDER:  Your Honor, may I
 2          approach?
 3                    THE COURT:  You may.
 4    Q     (BY ATTORNEY SCHNEIDER)  I'm going to show you what's
 5          been previously marked as State's Exhibit No. 2.  Are
 6          you familiar with that exhibit, Officer Vander
 7          Wielen?
 8    A     Yes, I am.
 9    Q     And Exhibit 1 and 2 are very similar, correct?
10    A     They are very similar.
11    Q     What's the difference?
12    A     The presence of the red X.
13    Q     And that would be as you testified in the approximate
14          area of what?
15    A     That would be the approximate area of where the
16          victim was laying.
17    Q     Okay.  He was identified in some fashion?
18    A     Yes, he was eventually identified.
19                    ATTORNEY SCHNEIDER:  Your Honor, I don't
20          know that I have, but I would move 1, 2 and 6 into
21          evidence at this time.
22                    THE COURT:  Any objection, counsel?
23                    ATTORNEY WEITZ:  No, Your Honor.
24                    THE COURT:  Exhibits 1, 2 and 6 shall be
25          received.
```

1                          ATTORNEY SCHNEIDER:  Can you help me?

2                          THE WITNESS:  Absolutely.

3     Q     (BY ATTORNEY SCHNEIDER)  I'm going to actually ask

4           you to stay standing, Officer Vander Wielen.  I'm

5           going to show you a board and just confirm the

6           exhibit numbers range from 7, 8, 9, 10, 11, 12, 13

7           and 14?

8     A     That is correct.

9     Q     Okay.  So we're going to start top left as we look at

10          it is Exhibit 7, correct?

11    A     Yes.

12    Q     What area is depicted there?

13    A     That picture is showing the main entrance for Luna

14          Lounge.  It would be facing to the north.

15    Q     Okay.  And then continuing upper right, Exhibit No.

16          8?

17    A     That is the main entrance that we entered.

18    Q     And then continuing on, Exhibit 9, which would be the

19          second one in the row on the left column?

20    A     That appears to be just within the main course.

21    Q     And pretty fair and accurate as to what you recall

22          about when you were there on December 8th of 2013?

23    A     Correct.

24    Q     Moving then to Exhibit 10.

25    A     That would be now panning to the east toward the

72

1         threshold of the main bar.

2    Q    Continuing then Exhibit 11.

3    A    This would be showing a back corner to what would be

4         here.

5    Q    And you said Exhibit 10; is that correct?

6    A    In Exhibit 10, yes.

7    Q    And Exhibit 12 then?

8    A    Exhibit 12 is just another pan toward the main

9         threshold to the -- I'm sorry, the threshold to the

10        main bar.

11   Q    And the doorway to get into the bar, it's an arched

12        doorway, correct?

13   A    Yes.

14   Q    So it's actually -- I shouldn't call it a doorway,

15        there is no door?

16   A    Yes.

17   Q    It's just an opening?

18   A    Correct.

19   Q    And if you're in the bar, what can you use to see

20        into that foyer area?  Is there any area other than

21        that open arched --

22   A    From the main bar?

23   Q    Correct.

24   A    No.  That is the only area.

25   Q    And then continuing at the bottom, Exhibit 13?

73

1   A    Exhibit 13 is I guess what would be more to the right
2        over here, just kind of showing --
3   Q    And then Exhibit 14?
4             ATTORNEY VISHNY:  I'm sorry.  I couldn't
5        hear, his voice dropped.
6   A    I'm sorry.  This is just a further depiction of what
7        would be tilted to the right or more eastern
8        facing.
9   Q    And then 14?
10  A    And 14 is just a little bit further into the corner
11       there.
12  Q    So there is some restrooms marked here in 13 and 14.
13       Those are not public use restrooms?
14  A    Correct.  Those were for the employees only.
15  Q    Okay.
16            ATTORNEY SCHNEIDER:  And then I would move
17       7 through 14 in at this time.
18            THE COURT:  Any objection?
19            ATTORNEY WEITZ:  No.
20            THE COURT:  7 through 14 shall be
21       received.
22  Q    (BY ATTORNEY SCHNEIDER)  I'm going to show you
23       exhibits marked 15 through 19.  Is that the correct
24       numbers?
25  A    Those are correct.

74

1   Q    Okay.  Starting at the top, Exhibit 15, what's
2        depicted there?
3   A    Those would be the main doors leading out to College
4        Avenue.
5   Q    And Exhibit 16?
6   A    Just another depiction of that main entrance area.
7   Q    And would that be the view as if you were standing
8        near the front doorway looking to that landing area
9        as you called it?
10  A    That is correct.
11  Q    And Exhibit 17, what's depicted there?
12  A    That would be the main -- or the threshold into the
13       main bar, just a little bit further in from Exhibit
14       16.
15  Q    And Exhibit 18?
16  A    Just, again, a little bit further in with the main
17       threshold to the main bar.
18  Q    And then, finally, Exhibit 19?
19  A    This would be the half wall stairway and threshold of
20       the main bar.
21  Q    And using Exhibit 19, you said when you found Mr.
22       Richards -- the victim, did you ultimately learn his
23       name?
24  A    Yes.  Joshua Richards.
25  Q    So when you found Mr. Richards you kind of identified

75

1      this half wall shown in Exhibit 19 as was related to
2      his body?  What was that again?
3   A  His body was positioned with his head just past the
4      half wall here, his body was perpendicular, I'm
5      sorry, parallel to the half wall with his feet down
6      in this general region.
7   Q  Okay.
8            ATTORNEY SCHNEIDER:  And then I move 15
9      through 19.
10           THE COURT:  Any objection?
11           ATTORNEY WEITZ:  No, Your Honor.
12           THE COURT:  15 through 19 shall be
13      received.
14  Q  (BY ATTORNEY SCHNEIDER)  Finally, Officer, Exhibits
15      20 through 24.  Are you familiar with what is
16      depicted in each of those?
17  A  Correct.
18  Q  And starting with Exhibit 20, what's shown there?
19  A  That again is the threshold to the main bar and the
20      area where the victim was laying.
21  Q  Ultimately did medical providers come to provide
22      assistance for Josh?
23  A  Yes.  Gold Cross and the fire department responded.
24  Q  Exhibit 21, what's depicted there?
25  A  That would be a very similar picture to the last one

76

1          of the threshold and half wall.

2    Q    From your past experience when medical people come

3          and provide assistance, when they leave do they

4          always pick up everything that they brought or used

5          when they were on scene?

6    A    Not all the time.

7    Q    Okay.  Exhibit 22, what's shown there?

8    A    That would be the half wall and stairs to the lower

9          level.

10   Q    Exhibit 23?

11   A    This would be the area where the victim was laying

12         with the blood that we had observed when we initially

13         arrived.

14   Q    And then, finally, Exhibit 24?

15   A    This would be a picture taken kind of from this area

16         back toward the main doors.

17   Q    And you were saying Exhibit 22, the area kind of the

18         top of the landing looking to the front doors?

19   A    Generally in that area.

20              ATTORNEY SCHNEIDER:  Okay.  I would move 20

21         through 24.

22              THE COURT:  Any objection, counsel?

23              ATTORNEY WEITZ:  No, Your Honor.  Thank

24         you.

25              THE COURT:  20 through 24 shall be

77

```
1    received.
2                   ATTORNEY SCHNEIDER:  You can grab a seat.
3    Q   (BY ATTORNEY SCHNEIDER)  When you arrived, had
4        employees or security personnel tried to limit or
5        restrict that front area so no one but Josh was
6        there?
7    A   It is my understanding that they tried.
8    Q   But were there other citizens in that area coming in
9        and out?
10   A   There were.
11   Q   Okay.  As part of your work, did you review any
12       traffic camera footage?
13   A   Yes, I did.
14   Q   Specifically did you review any footage or
15       intersections that would be associated with Luna?
16   A   I did.  I reviewed two different intersections on
17       Division Street that were just north of Luna.
18   Q   Okay.  Can you remember, when you reviewed North
19       Division, did you review it where it intersected with
20       Washington?
21   A   That was one of the intersections.
22   Q   And do you recall anything that you observed on that
23       traffic camera?
24   A   For the traffic camera at Division and Washington, I
25       -- I did observe that there were three individuals
```

78

1          running northbound on Division from what appeared to
2          be College and Division, that corner.
3     Q    Okay.  I'm going to approach just one more time and
4          we're going to utilize Exhibit 6.
5               The traffic camera you reviewed, is that general
6          area where that is located depicted here on Exhibit
7          6?
8     A    It is.
9     Q    Okay.  I'm going to give you a purple marker.  If you
10         just want to put TC for traffic camera in the area
11         where that traffic camera is located?
12    A    I believe the traffic camera was positioned on that
13         northwest corner of the intersection.
14    Q    Okay.  And is there any unique features about this
15         traffic camera, meaning is it a stationary one-view
16         camera or does it have some other capabilities?
17    A    That intersection had two different types of cameras
18         attached to it.  It had what is labeled as a
19         detection camera and it also had a pan-tilt-zoom
20         camera for it.
21    Q    So what's the difference?
22    A    The detection cameras were stationary and depicted
23         each offshooting area of that intersection, and the
24         pan-tilt-zoom was one that was able to move, zoom in
25         and be manipulated.

79

1    Q    Okay.

2         ATTORNEY SCHNEIDER:  I don't have any other

3         questions then at this time.

4         THE COURT:  Very good.  And, defense, any

5         questions?

6         ATTORNEY WEITZ:  Yes, Your Honor.

7              **EXAMINATION OF BLAINE VANDER WIELEN**

8    **BY ATTORNEY WEITZ:**

9    Q    All right.  Officer Vander Wielen, you and Lieutenant

10        Peters were basically across the street at the time

11        that you got the call for the shooting, right?

12   A    Yes, sir.

13   Q    So you were very -- on the scene very quickly, got

14        across the street and were there within a matter of

15        minutes.

16   A    Correct.

17   Q    Okay.  I'm going to show you what's been marked as

18        Exhibit 31.

19        THE COURT:  And is it -- let me just ask,

20        members of the jury, do you need me to turn the

21        lights down, and the same question I'll ask of you,

22        Officer, is everyone able to see it all right?

23        THE WITNESS:  I'm fine with it.

24        ATTORNEY WEITZ:  And for the record, I'm

25        starting this video at 13:52:48.

80

```
 1   Q     (BY ATTORNEY WEITZ)  Officer Vander Wielen, this is
 2         the front door area that you were describing of Luna,
 3         correct?
 4   A     Yes, it is.
 5   Q     Okay.  Do you recognize the person coming in the
 6         doors?  Is that you?
 7   A     That would be Lieutenant Peters.
 8   Q     That's Lieutenant Peters?  Okay.
 9               ATTORNEY WEITZ:  I'm just going to play a
10         little bit of this video.  I'm going to 13:52:48.
11   Q     (BY ATTORNEY WEITZ)  Now Lieutenant Peters, he was
12         wearing a uniform that night when you were working
13         the traffic detail or the College Ave. detail?
14   A     Yes, we were in uniform with our uniform jackets
15         on.
16   Q     And that's your standard blue uniform, dark navy?
17   A     Yes, sir.
18   Q     So this video right here, he wasn't wearing a white
19         uniform that night?
20   A     Correct.  He was in dark blues.
21   Q     Okay.  So the camera does not depict the actual
22         color --
23   A     Correct.
24   Q     -- of his attire.
25               And when you got to Luna, you were able to see
```

81

1           Mr. Richards laying on the floor?

2    A      Yes, sir.

3    Q      But you didn't know whether or not he had been moved

4           at all before you arrived on the scene?

5    A      Correct.

6    Q      And you said that the initial info that you received

7           was that the suspects were two Asian males wearing

8           white hats and white vests, right?

9    A      I believe that's what I said, yes.

10   Q      Running north on Division?

11   A      The information -- I don't recall if I was told that

12          they were north on Division, but we were told that

13          they had left out the doors.

14   Q      To the right, westbound on College Ave.?

15   A      Yes, sir.

16   Q      And that came from Daniel Kersten?

17   A      I never identified who provided that information.  I

18          know it was a security --

19   Q      The bouncer standing at the front door?

20   A      It was one of their security personnel.

21   Q      Okay.  After your initial duties on the scene, one of

22          the things that you did after that was you went back

23          and reviewed the traffic cameras, right --

24   A      Correct.

25   Q      -- as you described.

82

1    A    Yes.

2    Q    And the specific one that was referenced was the

3         Division and Washington Street camera, right?

4    A    Yup.

5    Q    Okay.  And in that footage you saw that there was

6         three individuals running north on Division Street?

7    A    Yes.

8    Q    Okay.  And there was two cameras, right, there was

9         the pan-tilt-zoom and then also what you described as

10        a detection type camera?

11   A    Yes.

12   Q    Okay.  All right.  Officer Vander Wielen, I'm going

13        to show you what's been marked as Exhibit 97.  On

14        that disk there is a file, it's Item No. 71, and I'm

15        going to be playing a portion of that video at

16        1:50:29 a.m.  And do you recognize that video?

17   A    Yes, I do.

18   Q    And would that be one of those traffic cameras?

19   A    Yes.  That appears to be the pan-tilt-zoom.

20   Q    Okay.  And on that video, you observed three

21        individuals running up the street?

22   A    Yes.

23   Q    Correct?

24   A    Yes.

25   Q    And I'm going to play a portion here.  And I can

83

1          describe the video.  So the top right corner is

2          approximately the corner of Luna Lounge, College and

3          Division?

4     A    Yes.  The -- just beyond the row of cars there is the

5          corner.

6     Q    Okay.  And then as you come down and towards the

7          left, that would be northbound along Division.

8     A    That's correct.

9     Q    Okay.  So the individuals you saw running are going

10         to follow that path.

11    A    Correct.

12    Q    Again, playing the video starting at 1:50:29.  I'm

13         going to stop it at 1:50:37.

14             That individual that you see by the parking

15         ramp, that was one of those individuals that you saw?

16    A    That's correct.

17    Q    Okay.  Did you identify that individual?

18    A    I believe he was later identified as Joe.

19    Q    Joe Thor?

20    A    Thor, correct.

21    Q    Okay.  Now playing the video, stopping at 1:50:44,

22         and see two individuals again near the parking ramp,

23         correct?

24    A    That is correct.

25    Q    And I guess the second individual or the one who is

84

1           further ahead as you're traveling north, that would

2           be Paul Lee?

3   A       That is my understanding, yes.

4   Q       Okay.  And then the third individual, that's Phong

5           Lee?

6   A       I'm sorry?

7   Q       Phong Lee, P-H-O-N-G?

8   A       Yes, that's my understanding.

9   Q       Playing the video again, stopping it at 1:50:54 when

10          they begin to go out of view, that entire time you

11          observe that Paul Lee is running down the street with

12          his hands in his pockets, right?

13  A       That is correct.

14  Q       Okay.  And you also notice that the third individual

15          was wearing a white vest.

16  A       A white or light colored vest.

17  Q       And that would be consistent with that initial

18          description that you were given?

19  A       That is correct.

20  Q       Okay.  You checked some other cameras and you saw

21          these people, same individuals on the other cameras

22          as well?

23  A       For the traffic cameras, yes, I did.

24  Q       So you were able to determine a route that they

25          traveled?

85

```
 1    A    Yes.

 2    Q    Okay.  And one of the areas that you saw them on was

 3         the area near the Post-Crescent parking lot, near the

 4         Post-Crescent building?

 5    A    That is correct.

 6    Q    Okay.  And based upon that you made the decision to

 7         check and see if there was any additional

 8         surveillance video of that area?

 9    A    Yes.  What I did was from the pan-tilt-zoom I

10         utilized the detection camera for that intersection,

11         and they ran in a kind of northeastern direction from

12         there, through the Post-Crescent parking lot, and

13         then I checked Division and Franklin's cameras.

14    Q    Did you also view the video from the actual parking

15         ramp?

16    A    From the parking ramp itself?  I don't believe I --

17         I've looked at.

18    Q    Okay.  All right.  So on those other videos that you

19         described, you observed some movement near a dumpster

20         area in that area?

21    A    Yeah.  When -- when I checked the cameras for

22         Division and Franklin Street, which is just one block

23         further north from that video --

24    Q    If I show you the map, Exhibit 6, would that help you

25         describe?
```

86

1   A   Yes, that would help.

2   Q   All right.  Show you what's been marked as Exhibit 6.

3   A   So they -- if I may stand.  They took a path

4       generally in this direction, and Franklin Street is

5       the next one up.

6   Q   So that would be northeast was the direction you were

7       describing?

8   A   Correct.  Northeast, and they ultimately crossed

9       Franklin Street continuing north to northeast and

10      went to a dumpster area which is behind our -- what

11      is now called the Homeless Connections.

12  Q   Okay.  And based upon that movement that you saw in

13      that dumpster area, you made the decision then to go

14      see if any evidence had been discarded or if you

15      could find anything, correct?

16  A   That is correct.

17  Q   And when you looked in that area, you found a

18      baseball hat between those dumpsters.

19  A   Yeah.  Between one set of the dumpsters that were in

20      that area.

21  Q   Okay.  And then, after that, you didn't collect it

22      yourself but you asked other officers to come out and

23      kind of look for additional evidence in that area?

24  A   Correct.  And to photograph everything.

25  Q   And one additional piece of evidence that you found

87

1       actually in the dumpster was a white vest.

2    A  Correct.  In a different set than where the hat was

3       located.

4    Q  Okay.  And that would be consistent with the vest

5       that you saw Phong Lee wearing in that video that I

6       just played for you earlier?

7    A  Correct.

8    Q  I think one of your other responsibilities in this

9       case a little bit later was that you were tasked with

10      collecting evidence at Chong Lee's residence when he

11      was arrested?

12   A  That is correct.

13   Q  Okay.  And one of those -- the items that you

14      collected was a black and gray jacket?

15   A  I collected multiple items.  I have to review my

16      report to know specifics.

17   Q  Okay.  If I show you --

18   A  If I may.

19   Q  If I showed you your report, would that refresh your

20      recollection?

21   A  Yes, that would help.  Thank you.  This one.

22   Q  Does that help you remember?

23   A  Yup.

24   Q  So did you collect a black and gray jacket?

25   A  I did.

1    Q    Okay.  And there was also two baseball caps that you

2         recovered?

3    A    If I may?

4    Q    Would you need to see your report?

5    A    I collected a gray with black Brewers logo baseball

6         cap as well as a dark brown baseball cap with a Sox

7         logo in black.

8    Q    Thank you.

9              ATTORNEY WEITZ:  No further questions.

10        Thank you, Your Honor.

11             THE COURT:  Any redirect, Attorney

12        Schneider?

13        **EXAMINATION OF BLAINE VANDER WIELEN**

14   **BY ATTORNEY SCHNEIDER:**

15   Q    I didn't establish, and I don't know if the jury

16        would understand, Officer Vander Wielen, but the City

17        of Appleton is actually multiple counties, correct?

18   A    Correct.

19   Q    So what counties are all encompassed by the City of

20        Appleton?

21   A    We have Outagamie County, Winnebago County and

22        Calumet County.

23   Q    And the portion of Appleton that this offense

24        occurred in, which county is that?

25   A    Outagamie County.

89

```
 1    Q    You did not do any comparison of that black and gray

 2         jacket found at Chong's home with the video, did

 3         you?

 4    A    No.

 5    Q    Okay.  And you're aware from watching the video

 6         somewhat that different fabric reflects in different

 7         ways, correct?

 8    A    Correct.

 9              ATTORNEY SCHNEIDER:  Nothing further.

10              THE COURT:  Any follow-up, Attorney Weitz?

11              ATTORNEY WEITZ:  No, Your Honor.  Thank

12         you.

13              THE COURT:  Officer, you are excused.

14              ATTORNEY SCHNEIDER:  Could we approach

15         please?

16              THE COURT:  You may.

17              (A bench conference was held.)

18              THE COURT:  Ladies and gentlemen, at this

19         time, lest we have another witness, it may create for

20         an unusual lunchtime, so this is as close to twelve,

21         so this is as logical of a breaking point as we -- as

22         we could possibly have.  So what I would ask, you are

23         relieved for lunch at this time.  Again, remember my

24         instructions.

25              And then what I would ask is that you be here
```

90

1    ready to again resume at 1:00.

2         Wendy, if you could escort our jury out.  Please

3    rise.

4              (The jury was escorted out of the

5    courtroom.)

6              THE COURT:  Anything else we need to

7    address, Attorney Schneider?

8              ATTORNEY SCHNEIDER:  No.  Maybe we just put

9    on we had a sidebar.

10             THE COURT:  I was going to put that on.

11             ATTORNEY SCHNEIDER:  Yeah.  I want to make

12   sure we always do those.

13             THE COURT:  Attorney Vishny, aside from the

14   sidebar, anything else?

15             ATTORNEY VISHNY:  Aside from the sidebar.

16        Well, are you talking about the sidebar where we

17   said we could just publish?

18             THE COURT:  Yes.

19             ATTORNEY VISHNY:  I was also going to

20   suggest that maybe, Miss Schneider, we don't always

21   have to ask to approach the witness.

22             ATTORNEY SCHNEIDER:  That is just habit.

23   I'm not even realizing I do it.

24             THE COURT:  We'll address both those

25   issues.

91

1              We did have a sidebar approximately 11:35,

2       parties had approached, had asked whether it would be

3       acceptable if they, unless there is an objection,

4       that they -- that they be allowed to publish without

5       constantly asking for permission.  I certainly have

6       no objection or no problems with that approach.

7              Likewise, it's just been brought to my

8       attention, permission has been requested to allow

9       parties to go back and forth to the witness, and

10      again, provided the other side has been shown

11      whatever exhibit or is aware of what would be

12      presented, constant permission is not necessary.

13                   ATTORNEY VISHNY:  Okay.

14                   THE COURT:  I'll treat it as permission has

15      been asked and it's been granted on an ongoing

16      basis.

17                   ATTORNEY VISHNY:  Thank you.

18                   THE COURT:  Is that an accurate reflection

19      of our discussions, Attorney Schneider?

20                   ATTORNEY SCHNEIDER:  Yes.

21                   THE COURT:  Attorney Vishny?

22                   ATTORNEY VISHNY:  Yes.

23                   ATTORNEY WEITZ:  Your Honor, I just have

24      one question that just dawned on me as far as the

25      jury questions.

92

```
1                    THE COURT:  Yes.
2                    ATTORNEY WEITZ:  We just going to address
3          that if they submit a question?
4                    THE COURT:  Normally I ask.  I forgot.
5                    ATTORNEY WEITZ:  Okay.
6                    THE COURT:  That's why usually I do ask.  I
7          apologize.  I can -- I suppose at this point we can
8          leave it be or we can just follow up with the next
9          witness.  Any preference?
10                   ATTORNEY SCHNEIDER:  I think we just leave
11         it be with Officer Vander Wielen and we can start
12         with the next witness.
13                   THE COURT:  Are you okay with that,
14         Counsel?
15                   ATTORNEY VISHNY:  Sure.  Yeah.
16                   THE COURT:  I apologize.  I will -- I'll
17         take the lead on that.  That was my error.
18                   (A lunch recess was taken.)
19                   (The jury was escorted into the courtroom.)
20                   THE COURT:  Be seated.  Attorney Schneider,
21         are you prepared to call your next witness?
22                   ATTORNEY SCHNEIDER:  We are.  We would call
23         Dan Kersten.
24                   THE COURT:  Sir, if you would please come
25         to the witness stand, remain standing.
```

93

1                    THE WITNESS:  Yes.

2                    THE COURT:  We'll swear you in.  Please

3          raise your right hand.

4                    (Oath administered to witness.)

5                    THE WITNESS:  Yes, ma'am.

6                    THE CLERK:  Please state your full name and

7          spell it for the record please.

8                    THE WITNESS:  Daniel J. Kersten,

9          K-E-R-S-T-E-N.

10                   THE COURT:  Thank you, sir.  You may be

11         seated.

12             And then, Attorney Schneider, your witness.

13                   ATTORNEY SCHNEIDER:  Thank you.

14             **EXAMINATION OF DANIEL J. KERSTEN**

15     **BY ATTORNEY SCHNEIDER:**

16     Q    Mr. Kersten, are you familiar with an establishment

17          here in Appleton called Luna Lounge?

18     A    Yes, ma'am.

19     Q    And how or why are you familiar with Luna Lounge?

20     A    I was priorly (sic) employed there when it was

21          open.

22     Q    Do you remember when you started working there?

23     A    Approximately December of 2012.

24     Q    And did -- were you still working there in December

25          of 2013?

94

1   A    Yes, ma'am.

2   Q    And what was your job or your position at Luna?

3   A    Security, bar back, everything and anything needed

4        from the bar area and maintaining crowd control, I

5        guess.

6   Q    Had you ever been employed in any other position

7        where you were doing those kinds of tasks?

8   A    Yes, ma'am.

9   Q    Just to give the jury some framework, when did you

10       ever first start working, like, security at a bar?

11  A    That would have been about 2011 time frame working in

12       Neenah for Green Valley Investments.

13  Q    And do you -- you no longer work at Luna because it's

14       changed, correct?

15  A    Correct.

16  Q    But do you still work in a capacity where you're at a

17       bar performing security?

18  A    Yes, ma'am.

19  Q    When you worked at Luna, were you responsible to work

20       most weekends?

21  A    Yes, ma'am.

22  Q    And on a typical Friday or Saturday night, thinking

23       back to December of 2015, would the bar be pretty

24       busy, pretty empty or did it vary?

25  A    It would vary between Friday to Saturday.  Friday

95

```
1            would be busy, Saturday night would be by far

2            busier.

3     Q      Mr. Kersten, I'm going to direct your attention back

4            to what would be Saturday, December 7th into the

5            early morning hours of Sunday, December 8th, 2013.

6            Do you remember working at Luna that shift?

7     A      Yes, ma'am, I do.

8     Q      And specifically do you remember something that

9            happened just prior to bar close?

10    A      Yes, ma'am.

11                 ATTORNEY SCHNEIDER:  I'm going to do it on

12           accident.  I'm going to ask to approach.

13                 THE COURT:  You may.

14                 ATTORNEY SCHNEIDER:  Thank you.

15    Q      (BY ATTORNEY SCHNEIDER)  I'm going to show you a

16           couple diagrams, Mr. Kersten.  This one has been

17           already introduced.  It's Exhibit 1.  Are you

18           familiar with what's depicted here in Exhibit 1?

19    A      Yes, ma'am.

20    Q      And what area is that?

21    A      That's the main entrance into the lobby and then also

22           it depicts the bar area.

23    Q      Okay.  And -- of Luna Lounge, correct?

24    A      Yes, ma'am.

25    Q      The stairs that are marked on the right-hand side of
```

96

1          Exhibit 1, what do they lead to?

2     A    The lower level there is bathrooms and a janitor

3          closet down there.

4     Q    So other than going to the bathroom, there is not

5          another bar area or anything like that?

6     A    On that level, no, ma'am.

7     Q    And is Exhibit 1 only truly a partial display of Luna

8          Lounge as it was back in 2013?

9     A    Yes, ma'am.

10    Q    Okay.  So if we would continue up, literally off the

11         diagram, what would be next then at Luna?

12    A    If you're going to continue going towards the top of

13         the page, there was another sub-level with a dance

14         floor and another complete bar.

15    Q    Okay.  Were there also some other elevated areas

16         where there were chairs or couches?

17    A    There was a balcony that went up there as well as two

18         balcony raised areas that were not connected to the

19         balcony that went across the entire front over the

20         stage area.

21    Q    And then is there a separate bar completely that is

22         on a second level?

23    A    Yes, ma'am.

24    Q    And what was the name of that establishment?

25    A    Drinks Inc.

1   Q   Can you access Drinks from inside Luna?

2   A   Yes, ma'am, you can.

3   Q   But they were operated as separate businesses?

4   A   Correct.

5   Q   But if people needed to leave Drinks, was there a

6       separate exit or did they have to come back through

7       Luna?

8   A   There was a separate exit.

9   Q   They could choose to come through Luna, correct?

10  A   Not every night, just most nights.

11  Q   Okay.  All right.  I'm just going to leave Exhibit 1

12      up here.

13          And back to December 8th, so Sunday morning,

14      right prior to bar close, do you remember where in

15      the bar you were working?

16  A   Earlier in the night prior, about a half hour to bar

17      close time frame, I was walking around the bar, and

18      after that then I had got moved up to the door so

19      that the others could get cleaning up and getting

20      ready to shut down and have people moving out.

21  Q   When you were at that front door area, were there bar

22      patrons that were sometimes waiting in that area?

23  A   Usually there were people coming in and going --

24      waiting for someone outside smoking, not sitting

25      there drinking or anything like that, but yes, there

98

1      were other patrons in that area.

2  Q   And you brought up the smoking issue.  Can you

3      explain to the jury, back in December of 2013, were

4      patrons allowed to smoke inside of Luna?

5  A   No, ma'am.

6  Q   So did that mean that main entrance had a lot of

7      traffic at times?

8  A   Yes, ma'am, it did.

9  Q   And for people who were at Luna, is that the only way

10     they could get in or out to smoke?

11 A   For Luna as far as customers, yes.

12 Q   As you were at that front door area, were you just

13     focused on the front door, was your focus kind of

14     that whole front lobby area?

15 A   Mainly on the front door making sure underage people

16     were not coming in.  However, you do kind of watch

17     over your shoulder to see what's going on.  I mean,

18     there -- there were fights occasionally that would

19     happen up there, and you had to be ready to jump in

20     and kind of break it up before it happened.

21 Q   On this night, prior to the incident we're going to

22     talk about in a little bit, had there been any

23     disturbances or things you had to get involved in or

24     break up that you recall?

25 A   I don't recall really having any major issues that

99

1      night, but to say no, I cannot.

2   Q  Okay.  That's fine.

3          And so you're kind of at the front door waiting

4      for the bar to finish closing.  What do you remember

5      first that caught your attention?

6   A  Prior to me moving up there, I did see the group of

7      people talking surrounding Josh.  I later found out

8      who his name was.  And it wasn't anything really to

9      draw attention to, like a fight or anything like

10     that, it looked like they were just standing talking.

11     Otherwise the night was just winding down and getting

12     to the point where you're tired and ready to close

13     up.

14  Q  Okay.  And so I'm going to skip ahead and then I'm

15     going to go back.  Ultimately you provided some

16     assistance to a gentleman named Joshua Richards,

17     correct?

18  A  Yes, ma'am.

19  Q  So when you just testified saying that you saw some

20     people near Josh, first I want to just clarify, the

21     area where Josh ultimately was, is that the same area

22     where you saw him and this group of people?

23  A  Yes, ma'am.

24  Q  But you said they were just talking, there was

25     nothing coming too loud?

1   A    Yes, ma'am, that's correct.

2   Q    Nothing that was causing you any concern?

3   A    At that time, no, ma'am.

4   Q    Then what do you remember after that, Mr. Kersten?

5   A    I ended up hearing what sounded to me at the time

6        like a party popper going off, a little firework or

7        something, and ultimately turned my head and it was

8        not, it ended up being a very small caliber

9        gunshot.

10  Q    Do you have any military background?

11  A    Yes, ma'am.

12  Q    And what is that?

13  A    I'm United States Marine Corps, Huey door gunner.

14  Q    So you would have a lot of experience with firearms

15       because of that?

16  A    Yes, ma'am.

17  Q    Did you in that experience handle guns such as .25

18       caliber?

19  A    No, ma'am.  That was very, very small.  After it

20       ended up going off and I realized it was not, I knew

21       it was a small caliber.  I told one of the responding

22       officers that it sounded like a .22 caliber.

23  Q    And that's based upon your training and your

24       experience with firearms?

25  A    Yes, ma'am.

101

```
 1    Q    So at the time you hear this pop, do you remember
 2         what direction you were looking?
 3    A    When it first happened, I was looking at the door,
 4         and I ultimately looked to my left towards the
 5         stairs, and that's when the noise and the direction
 6         that it had come from.
 7    Q    What do you remember next at that point?
 8    A    Chaos, people running out the door.
 9    Q    Did it seem like a lot of people, a few people, or
10         what do you remember?
11    A    I remember people that were standing around Josh
12         bolting out the door.  There were some females that
13         had ran out the door.  Another gentleman who I still
14         work with, Adam, I had him kind of block it off so
15         people would get out of the area and prevent anything
16         from getting kicked around or taken off that wasn't
17         supposed to be.
18    Q    And when these people tried to run out the door, Mr.
19         Kersten, did you try to stop them at all?
20    A    Not at all.
21    Q    And were they moving fast or slow?
22    A    They were running.
23    Q    Were you able to pay attention to exactly how many
24         went out the door or whether -- how many males or how
25         many females?
```

1    A    I paid attention to who was standing around him.  I

2         noted the direction that they ran.  I can tell you

3         for certain that there was two females, and after

4         that it just kind of blurred.  There was probably

5         about a total of ten people that ran out the door,

6         and that was all subsequent afterwards.

7    Q    So you had seen Josh by some people in that landing

8         area, and you remember them running out?

9    A    Yes, ma'am.

10   Q    Do you remember which direction they ran to?

11   A    They ran out the door towards the right, so they

12        would be heading towards West College.

13   Q    After the people started leaving, were you able to

14        see where Josh was then?

15   A    Yes, ma'am.

16   Q    And it seems like an odd question, I'm sorry, Mr.

17        Kersten, how was his body positioned or where was

18        he?

19   A    Should I point it on the diagram?

20   Q    If you recall, yes.

21   A    His feet were almost parallel here, with his head

22        almost right there at the top of the stairs.

23   Q    Okay.  So you -- when you first -- and I'm just doing

24        this for the record, you said his feet were here, you

25        put his feet closer to the doorway that would get you

103

1          into the bar, correct?

2    A    Yes, ma'am.  Approximately, I would say, within a

3          foot-and-a-half.

4    Q    And you said his -- his head then was near the

5          stairwell or that --

6    A    That partial wall there.  It was about another, I'd

7          say, just a little past center point.

8    Q    Okay.  Did you and other employees try to assist?

9    A    Yes, ma'am.

10   Q    Do you remember going up to try to make an assessment

11         on him?

12   A    Yes, ma'am, I do.

13   Q    Part of your military training did you have that

14         experience as well?

15   A    Yes, ma'am.

16   Q    What do you remember when you went up to Josh, Mr.

17         Kersten?

18   A    First thing was push people back, get them away.

19         Second thing was I directed Adam towards the door to

20         block more people from trying to come in.  Next thing

21         I did is I tried to take a pulse on him, and he was

22         just completely nonresponsive.  He did have, as I was

23         telling the 911 dispatcher, it was a gunshot wound to

24         his left ear, entered directly in the canal.  And I

25         could not find an exit wound whatsoever, and his eyes

1          were kind of rolled in the back of his head at that
2          point.  I just stopped.  There was no
3          resuscitation.
4     Q    To help the jury understand, what was the lighting
5          like in this area back on this night?
6     A    Very dim.
7     Q    Did Luna have, in this area, and I might not use the
8          right word you would call them, but I would call them
9          like black lights where it's -- the white is more
10         reflective?
11    A    In that area, no.  It was, I want to say, maybe a
12         total of four can lights in the upper area for that,
13         and then towards the front entrance there was more
14         lighting for IDs and such.  That was kind of a dark
15         point between the main door and the entrance into the
16         bar area.
17    Q    When you heard that pop and then saw Josh, did it
18         surprise you?
19    A    Yes, ma'am.  It's not something I was ready for.
20    Q    Did you try to -- even though you said you couldn't
21         provide additional assistance to Josh, did you try to
22         make sure he stayed where he was?
23    A    Yes, ma'am.
24    Q    Did other employees come to where you were to try to
25         provide assistance?

105

```
 1   A   I had Adam, who at the time was not an employee,

 2       blocking the doorway, and Chris Vanden Heuvel, he was

 3       the owner of Luna, he was in the main office on the

 4       phone, Adam was on the phone, and I had been as well,

 5       and I ended up hanging up because there was already

 6       two on there, and I got a phone call back.  I would

 7       say within a matter of minutes we had Appleton police

 8       there and we just shut it down.

 9   Q   When you're working these shifts, Mr. Kersten, are

10       you allowed to drink?

11   A   No, ma'am.

12   Q   Did you ever see, Mr. Kersten, the person who fired

13       the shot?

14   A   I cannot say with 100 percent certainty who fired the

15       shot.  However, I was able to recognize the two

16       people that would have been on Josh's left-hand side,

17       and ultimately there is no other way that it could

18       have came from with the close proximity that they

19       were surrounding him, yes.

20   Q   Okay.  So did you provide a description of those two

21       people to officers if you could?

22   A   Yes, ma'am, I did.

23   Q   The area that would have been -- if I'm looking at

24       the stairs on that diagram, I'm facing the stairs,

25       the area to my left would be that opening to the bar,
```

106

```
1        correct?
2    A   Yes, ma'am.
3    Q   From where you were positioned in that front
4        entrance, were you able to see directly into -- if
5        people could or were passing in and out from that
6        opening?
7    A   If you looked over and had to actually turn your
8        head, yes, you could, but peripheral vision, no.
9    Q   Were there other people in that area besides Josh and
10       the people you had named?
11   A   Yes, ma'am.
12   Q   You had mentioned Adam.  Adam is someone you now are
13       more acquainted with?
14   A   Yes, ma'am, that's correct.
15   Q   Do you know where Adam was when this happened?
16   A   When it first happened, Adam was standing just to --
17       well, my left of the door on the inside with his back
18       to the wall.  He would have been looking straight
19       over at that area and have almost a clean line of
20       sight.
21   Q   So you have Adam.  Were there people near him?
22   A   Yes, ma'am, there were a few people.  I want to say
23       they were the two females that had ran out the
24       door.
25   Q   And then there's people by Josh?
```

107

1    A    Yes, ma'am.

2    Q    People could have been going up or down the stairs as

3         well?

4    A    Yes, ma'am, there was.

5    Q    And then you have the opening in -- where people

6         could have entered that area from the bar.

7    A    Yes, ma'am.

8    Q    When officers arrived, did you tell them about the

9         people and the people you saw running to the -- I'm

10        going to say out the doors and to the right?

11   A    Yes, ma'am.

12   Q    And that's because you remembered seeing those people

13        near Josh earlier in the night.

14   A    Yes, ma'am.  From the earlier time that I had seen

15        them until the time of the shooting, yes, they were

16        -- they really do not move from that area.

17   Q    Okay.  And as people were running out the door, was

18        your focus trying to pay attention to them or was

19        your focus on Josh?

20   A    My focus shifted onto Josh.

21   Q    When officers arrived, did you go anywhere with

22        them?

23   A    I ended up going and directing one of the officers to

24        the upstairs portion of Luna - well, it would have

25        been Drinks Inc. - to conduct the interview areas,

108

```
 1          giving an initial statement to them.  I had to stick
 2          around, obviously, for -- throughout the night, and
 3          then at that point we went down and I showed officers
 4          on the security footage who I was referring to
 5          running out the door.
 6    Q     Okay.  And just to help the jury understand, it
 7          wasn't bar closing yet?
 8    A     Correct.
 9    Q     Was the bar pretty full at this time?
10    A     Yes, ma'am.
11    Q     And was that a happy group that they had to stay
12          after this happened?
13    A     No, ma'am.
14    Q     Had you prior to this night ever watched any of that
15          video that was at Luna?
16    A     I'm sorry.  Can you rephrase?
17    Q     Sure.  Probably a bad question.
18              So prior to December 8th of 2013, had you ever
19          gone and watched any of the video cameras that are
20          available at Luna?
21    A     No, ma'am.
22    Q     For the jury's sake, it's taken in not a color frame
23          image, correct?
24    A     Correct.  Black and white.
25    Q     The bar is very dark, correct?
```

1    A    Yes, ma'am.

2    Q    So when you went to watch some of those images with

3         the officers, that's what you did this night,

4         right?

5    A    Yes, ma'am.

6    Q    Is there any colors that are seen at all?

7    A    No, ma'am.  Black and whites, grays.

8    Q    Shades of gray?  Okay.

9              Is there a camera that covers that front door

10        area where you were positioned?

11   A    Yes, ma'am.

12   Q    Are you aware of a camera by the bar area?

13   A    There's one in the bar, but it did not cover that

14        little archway into the front foyer, I guess you

15        would call it.

16   Q    So there's no camera that captured this image where

17        Josh was?

18   A    No, ma'am.

19             ATTORNEY SCHNEIDER:  May I -- I'm going to

20        do it every time.  I won't ask to approach anymore,

21        but I'm going to do it.

22             THE COURT:  And just so the jury knows,

23        I've told counsel they don't have to ask me for

24        permission to approach.  If they do, it's fine; if

25        they don't, it's fine.

110

1                    ATTORNEY SCHNEIDER:  Thank you.

2                    THE COURT:  We've already covered that

3          issue.

4     Q    (BY ATTORNEY SCHNEIDER)  Mr. Kersten, showing you

5          some photographs that are Exhibits 20, 21, 22, 23 and

6          24, are you familiar with all that is depicted

7          here?

8     A    Yes, ma'am.

9     Q    And I don't know which one you want to use, but is

10         the area where you were standing at the time this

11         happened depicted here on one of the exhibits?

12    A    Yes, ma'am.  The very bottom photo is where.  Pretty

13         much the chair and table here, I was just on the

14         other side of that.

15    Q    Is that an area where people came in, you could check

16         IDs?

17    A    Yes, ma'am.

18    Q    And you said -- was there extra lighting in that area

19         for you to do that?

20    A    Yes, ma'am.

21    Q    But is it what we would call like a normal, you go in

22         your bedroom, you turn on the lights, is it that

23         much?

24    A    No, ma'am.  It's more of an ambient light.

25                   ATTORNEY VISHNY:  I'm sorry.  What exhibit


                              111

1          number was that that he pointed to?

2                    ATTORNEY SCHNEIDER:  24.

3                    ATTORNEY VISHNY:  Okay.  Thank you.

4     Q    (BY ATTORNEY SCHNEIDER)  I'm going to show you a

5          board that's been previously marked Exhibit 33.

6              Starting with the top image that's marked 33A,

7          are you familiar with what's there, Mr. Kersten?

8     A    Yes, ma'am.

9     Q    And what's depicted there?

10    A    That would be myself with my back facing the camera,

11         and then it would be Adam over there with the two

12         females that I was referring to.

13    Q    Okay.  And just -- is there anything about your

14         clothing that tells us which one you --

15    A    The security wording on the back.

16    Q    Okay.  And then is there a time stamp?  And I -- it's

17         odd for you to get up, but that's okay.  Is there a

18         time stamp on that photograph?

19    A    Yes, ma'am, there is.

20    Q    What time stamp is there?  You can get up if you need

21         to.

22    A    1:50:17.

23    Q    And then continuing, 33B, we still see those same

24         three people, correct?

25    A    Yes, ma'am.

112

1    Q    And which direction are you looking at that time?

2    A    At that point my head would have been directed almost

3         straight over looking at Josh, seeing still those

4         four people, looking around, paying -- surveying the

5         area.

6    Q    But nothing that -- was there anything that caught

7         your attention where you needed to go in this area?

8    A    No, ma'am, not at that point.

9    Q    And what's the time on 33B?

10   A    That would be 01:50:23.

11   Q    And then continuing, 33C --

12             ATTORNEY VISHNY:  I'm sorry.  I couldn't

13        hear the last answer.

14             ATTORNEY SCHNEIDER:  1:50:23.

15             ATTORNEY VISHNY:  Okay.

16             ATTORNEY SCHNEIDER:  Just give me one

17        second.

18   Q    (BY ATTORNEY SCHNEIDER)  And then moving to 33C, I

19        don't remember if I asked you which direction you

20        were looking, but where are you looking in this

21        one?

22   A    For 33C still looking at the door for patrons coming

23        in and out.

24   Q    And then do you mind standing and tell us what time

25        stamps on that one?

113

1    A    01:50:24.

2    Q    Why don't you stay right here.  33D, where is your

3         attention drawn to now, Mr. Kersten?

4    A    That would be straight over at where I just heard the

5         gunshot come from.

6    Q    And the time stamp?

7    A    01:50:25.

8    Q    Why do you believe that that's the point at which you

9         heard that gunshot?

10   A    Because that's -- well, depicted straight in the

11        picture, everything that was going on with Adam just

12        now turned, everybody's attention is right there, and

13        prior to that my head was looking at the door.

14   Q    Okay.  So at some point between 1:50:24 to 1:50:25 is

15        your best recollection of when that -- you heard that

16        shot?

17   A    Yes, ma'am.

18   Q    And then you went basically off camera and went to

19        assist, correct?

20   A    Yes, ma'am.

21   Q    And that's -- is that what we see in 33E, 33F to

22        33G?

23   A    Yes, ma'am.

24   Q    And then continuing in 33H, what do we see then?

25   A    Those would be the gentlemen I seen standing around

114

```
1        him exiting the door along with a bunch of other
2        people down here in 33J, I believe it is.
3    Q   It's I and then J.
4    A   Yup.
5              ATTORNEY SCHNEIDER:  I would just move 33
6        into evidence; and I have no other questions then at
7        this time.
8              THE COURT:  Any objection to receipt of
9        Exhibit 33?
10             ATTORNEY WEITZ:  No objection, Your Honor.
11             THE COURT:  And just so that I'm clear for
12       record purposes, there were multiple images, it's all
13       considered Exhibit 33, correct?
14             ATTORNEY SCHNEIDER:  Correct.  That's why
15       we can kind of subdesignated them as 33A, 33B --
16             THE COURT:  Very good.
17          Defense, any questions for Mr. Kersten?
18             ATTORNEY WEITZ:  Yes, Your Honor.  Thank
19       you.
20             **EXAMINATION OF DANIEL J. KERSTEN**
21    **BY ATTORNEY WEITZ**:
22    Q   Mr. Kersten, you were working as a bouncer, security
23       the night of this incident, right?
24    A   Correct.
25    Q   And as you testified earlier, towards the end of the
```

115

```
1          night you moved up to the front door and that's where
2          you were working in that capacity?
3     A    Yes, sir.
4     Q    Okay.  And as a bouncer, part of your job is to check
5          IDs, kind of watch out for trouble, all those sorts
6          of things?
7     A    Yes, sir.
8     Q    And you testified that Luna is kind of a dimly lit or
9          darker bar, right?
10    A    Yes, sir, that's correct.
11    Q    But when you're in there for a while, it's not like
12         going from a very sunny day into a very dark room,
13         you're able to kind of adjust?
14    A    Correct.  You can see pretty fairly decent but not
15         enough to where you could make out something in, you
16         know, pockets per se.
17    Q    But you certainly can distinguish things such as like
18         between black and white?
19    A    Yes, sir.
20    Q    Okay.  You may not be able to say exactly what shade
21         of red someone was wearing, but you can make those
22         types of determinations?
23    A    Yes, sir.
24    Q    And as I said earlier, part of your job is that you
25         kind of are watching out, just constantly being on
```

116

```
 1        alert, surveying for -- to make sure there is no
 2        problems, right?
 3   A    Yes, sir.
 4   Q    Okay.  And I think you also testified that
 5        occasionally there are fights that happen in that
 6        area so you knew that that was a potential concern.
 7   A    Yes, sir.
 8   Q    Okay.  So you kind of -- you're standing at the front
 9        door, you're keeping an eye on things, you said that
10        earlier you may have seen some people standing around
11        Mr. Richards, right?
12   A    Yes, sir.
13   Q    But it wasn't anything that necessarily caught your
14        attention or seemed like it would be a potential
15        problem.
16   A    Correct.
17   Q    Okay.  And at some point when you're not looking in
18        that area, you heard what you described as like a
19        party popper or a firework.
20   A    Yes, sir.
21   Q    And that's when you immediately kind of turn your
22        attention to what's going on --
23   A    Yes, sir.
24   Q    -- to the left of there.
25             And as soon as you hear that pop, I believe you
```

1       described it was like a first group of guys that are

2       out the door like that.

3    A   Yes, sir.

4    Q   Very quickly after the gunshot.

5    A   Very.

6    Q   And they're kind of pushing their way out the door,

7       throw the doors open.

8    A   Yes, sir, that's correct.

9    Q   And the second guy in that group, I believe you gave

10      the description that as soon as he got out the door,

11      it looked like he was kind of taking off his hat and

12      coat?

13   A   Yes, sir.

14   Q   Okay.  And then after that first group, there was

15      more people that left but not quite as quickly as

16      those first guys --

17   A   Correct.

18   Q   -- that ran out the door.  Okay.

19          In this area where you saw the group of people

20      standing and talking, you didn't see any sort of

21      fight happen, right?

22   A   No, sir.

23   Q   You didn't see any punches thrown?

24   A   No, sir.

25   Q   No pushing or anything like that?

118

1    A    No signs of an altercation at all.

2    Q    But you would be looking for those kind of things

3         working security?

4    A    Yes.

5    Q    So you would have noticed if that would have

6         happened?

7    A    It's a big area, you can't watch everybody, but yes,

8         you are trying to scan the area and make sure.

9    Q    Turning back then to this group that you saw run out,

10        I believe on direct you described that those were the

11        people that you saw in the area of Mr. Richards --

12   A    Yes, sir.

13   Q    -- earlier on that evening.

14             And when police initially arrived, you give them

15        a description of those individuals as being the

16        suspects in this case.

17   A    Yes, sir.

18   Q    And I believe the description that you gave was that

19        it was a short male Asian?

20   A    Yes, sir.

21   Q    And you thought he was quite short, four foot five,

22        four foot six?

23   A    Somewhere in that vicinity.

24   Q    Okay.  And you described that person as wearing a

25        white hat with a straight brim?

```
1    A    Yes, sir.

2    Q    You said it was a white jacket or a puffy vest?

3    A    White vest, gray undershirt was my exact words.

4    Q    And that was the guy that was pushing people out of

5         the way?

6    A    Making a beeline for the door, yes.

7    Q    And removing his jacket as he's going out the door?

8    A    Correct.

9    Q    Okay.  And that was the same guy again that you saw

10        by Josh's left side?

11   A    One of them, yes, sir.

12   Q    Okay.  And he goes to the right when you go -- if

13        you're standing like you were, looking at the front

14        doors, he would be going to the right or westbound on

15        College Avenue?

16   A    Correct.

17   Q    And that's actually the direction that the other guy

18        went too, right?

19   A    Yes, sir, I believe so.

20   Q    And then a little time after officers arrived and

21        kind of secured the scene, you also went up then to

22        that interview area that you described earlier and

23        talked to Sergeant Tauber, right?

24   A    To an officer, yes, sir.  I'm not a hundred percent

25        of the name, but yes, that does sound familiar.
```

```
 1   Q   But it was in the area where they were conducting
 2       interviews.
 3   A   Yes, sir.
 4   Q   Okay.  And he was recording it in that area?
 5   A   I believe so, yes, sir.
 6   Q   Okay.  And that description that I just went through
 7       with you, you told him that exact same description --
 8   A   Yes, sir.
 9   Q   -- that you're giving here today.
10   A   That's correct.
11   Q   Okay.  Just one last thing I wanted to confirm with
12       you.  You said that before this night you had never
13       had an occasion to look at this security video
14       before.
15   A   Never had a reason to.
16   Q   Okay.
17           ATTORNEY WEITZ:  Thank you.  That's all I
18       have.
19           THE COURT:  Any redirect, Attorney
20       Schneider?
21           ATTORNEY SCHNEIDER:  A few follow-ups.
22           **EXAMINATION OF DANIEL J. KERSTEN**
23   **BY ATTORNEY SCHNEIDER:**
24   Q   Mr. Kersten, since this event have you had the
25       opportunity to see some cell phone video that was
```

1       taken at Luna?

2    A  No, ma'am, I have not.

3    Q  Okay.  Do you remember making any comments when

4       officers first got there?

5    A  The comments that I made was giving the description,

6       the direction, that sort of thing.  To my exact

7       comments and words, no, I'm sorry, I can't say.

8    Q  And again, when you were giving that description of

9       the people, you weren't identifying them as the

10      shooter but people who had been around Josh.

11   A  Correct.

12   Q  And is it true that in the time when you had looked

13      there, you go look straight again, you then hear the

14      shot, someone could have come from that bar area.

15            ATTORNEY WEITZ:  Your Honor, I'm going to

16      object at this point.

17            THE COURT:  Why don't you come on up.

18      Approach.

19            (A bench conference was held.)

20   Q  (BY ATTORNEY SCHNEIDER)  Exhibit 33B, which direction

21      are you looking?

22   A  I would be looking directly at the stair area that

23      was over there.

24   Q  And then Exhibit 33C, which direction are you

25      looking?

122

```
1    A    Out towards College Avenue.

2    Q    So at this point your focus is not at all back in the

3         area where Josh was.

4    A    Correct.

5    Q    Was your focus in that time at all in that opening

6         from the bar to that landing area?

7    A    When you look over towards Josh, you would see it,

8         but no, my focus at that time was straight out the

9         door, not at that area.

10   Q    Okay.  So people could have came up the steps or came

11        from the bar and you might not have seen them.

12   A    Yes, ma'am, that's correct.

13             ATTORNEY WEITZ:  Your Honor?

14             THE COURT:  Approach.

15             (A bench conference was held.)

16   Q    (BY ATTORNEY SCHNEIDER)  And you are confident that

17        in reviewing these photos you're confident by your

18        reaction when the shot happened?

19             ATTORNEY WEITZ:  Your Honor, I'm going to

20        object again for the same reason.

21             ATTORNEY SCHNEIDER:  I'll just say this.

22   Q    (BY ATTORNEY SCHNEIDER)  Looking at these photos,

23        when did the shot happen?

24   A    The shot would have happened at -- right between 33C

25        and 33D when my attention was at College Avenue.  No,
```

123

1        I was not looking at the time when the shot went off.

2        Hearing the shot is what directed my attention over

3        back to that area.

4              ATTORNEY SCHNEIDER:  Okay.  Then I have

5        nothing further.

6              THE COURT:  Attorney Weitz, any follow-up?

7              ATTORNEY WEITZ:  No.

8              THE COURT:  Ladies and gentlemen, any

9        questions you wish to submit for consideration?

10             (No response.)

11             THE COURT:  Okay.  Very good.

12          Mr. Kersten, I thank you for your testimony,

13       sir.  You are excused.

14             ATTORNEY SCHNEIDER:  Is he released?

15             ATTORNEY VISHNY:  We might recall him, so

16       we need -- Mr. Valdes can talk to him and get a phone

17       number where we can reach you.

18             ATTORNEY SCHNEIDER:  Did I move that?

19             THE COURT:  That's fine.  And then you have

20       someone getting your next witness or are we all set?

21             ATTORNEY SCHNEIDER:  Yes.  She should be.

22       I just need to make sure with Miss Jens.

23          We'll do Brittany Olson next then, Your Honor.

24             THE COURT:  Okay.

25             ATTORNEY SCHNEIDER:  I think I threw her

124

1           off a little bit, but she said she's right up here.

2                    THE COURT:  And if you would please come to

3           the witness stand.  If you would remain standing, we

4           will have the clerk swear you in.

5                    THE WITNESS:  Okay.

6                    THE CLERK:  Raise your right hand please.

7                    (Oath administered to witness.)

8                    THE WITNESS:  I do.

9                    THE CLERK:  Please state your full name and

10          spell it for the record please.

11                   THE WITNESS:  Brittany Olson,

12          B-R-I-T-T-A-N-Y, O-L-S-O-N.

13                   THE COURT:  All right.  You may be seated.

14                   THE WITNESS:  Okay.

15                   THE COURT:  And then, Attorney Schneider,

16          your witness.

17                   ATTORNEY SCHNEIDER:  Thank you.

18                   **EXAMINATION OF BRITTANY OLSON**

19     **BY ATTORNEY SCHNEIDER:**

20     Q    Miss Olson, what's your current occupation?

21     A    A social worker for Brown County Child Protection.

22     Q    Did you know someone named Joshua Richards?

23     A    I did.

24     Q    How did you know him?

25     A    He was my boyfriend.

```
1   Q   When did you remember first meeting him?

2   A   On my brother's birthday, June 16th, 2013.

3   Q   When did you -- there's probably always a gray line,

4       but when do you start dating him or seeing him?

5   A   We started seeing each other pretty much after that

6       night.

7   Q   What city was he living in?

8   A   Green Bay.

9   Q   And what city were you living in?

10  A   Green Bay.

11  Q   What type of work did Josh do?

12  A   He was a mechanic.

13  Q   Do you remember where if you know?

14  A   A place in DePere.

15  Q   And did he hold that job the entire time you knew

16      him?

17  A   Yes.

18  Q   Was it a full-time job?

19  A   Yes.

20  Q   Miss Olson, I want to direct your attention to a

21      night in December of 2013, December 8th, which --

22      actually the 7th, Saturday, into the morning of

23      December 8th.  Did you have specific or special plans

24      for that night?

25  A   We did.
```

126

1   Q    What were those plans?

2   A    To go on a bus to Appleton.

3   Q    How did it come or how was it arranged that you were

4        going to go on this bus?

5   A    The owner of the bus, Galen Sherbon, was taking two

6        of his buses to Appleton.

7   Q    Was he someone you knew?

8   A    Yes.

9   Q    Was he someone that knew Josh?

10  A    Yes.

11  Q    Do you remember where the bus left from?

12  A    Stadium View in Green Bay.

13  Q    And you might have said this, Miss Olson, I

14       apologize, was there one or two buses?

15  A    Two.

16  Q    And what was going to be the plan then when the buses

17       arrived in Appleton?

18  A    To go bar hopping.

19  Q    Did you know everyone that was on the bus?

20  A    No.

21  Q    So was it just anyone could sign up for this bus trip

22       or was it a party or anything like that?

23  A    From my understanding it sounded like Josh and Galen

24       invited people, friends.

25  Q    When you arrived, did everyone in the bus stay

127

```
 1        together?

 2   A    No.

 3   Q    Where do you remember going?

 4   A    I don't remember.

 5   Q    Do you remember -- let me ask you this, Miss Olson.

 6        Prior to that night had you ever really been downtown

 7        Appleton at all?

 8   A    Never.

 9   Q    Then I might ask it this way.  Do you remember going

10        to more than one location or just one location?

11   A    More than one.

12   Q    You just don't know the name.

13   A    Right.

14   Q    If I said the name Luna Lounge, do you recall that

15        location?

16   A    Yes.

17   Q    Were you ever there on this evening?

18   A    I was.

19   Q    And who were you with?

20   A    I was with Josh.

21   Q    Was Josh drinking that night?

22   A    He was.

23   Q    Do you remember how much he might have had?

24   A    I don't remember.

25   Q    You'd been with Josh for several months by that
```

128

1       point.  On this night, even with his drinking, was he

2       able to talk to you?

3   A   Yes.

4   Q   Did you understand him?

5   A   Yes.

6   Q   Any concerns about how much he had to drink that

7       night?

8   A   Not at all.

9   Q   When you were out that night at, I'll just say it

10      this way, other places and Luna, because you don't

11      know where else, the names, was there ever any

12      issues, fights or anything that you were concerned

13      about?

14  A   No.

15  Q   Any arguments, you know, not maybe you and Josh but

16      other people from the bus that you saw or

17      witnessed?

18  A   No.

19  Q   Miss Olson, I want to show you an exhibit, and it's

20      marked Exhibit 32.  I'm going to have you look at

21      just the top pictures, 32A and 32B.  Do you recognize

22      anyone in those photos?

23  A   Yes.  I recognize myself and Josh.

24  Q   And which image is that?

25  A   32A I recognize myself in the doorway, and then 32B

129

1         Josh.

2    Q    So in 32A there is someone that's not yet into the

3         bar but in the door opening, is that who you're

4         identifying as yourself?

5    A    Yes.

6    Q    Okay.  Do you mind — I'm just giving you a blue

7         marker — just writing your name underneath where

8         you're shown in 32A?  Like right in the white area

9         would be fine.

10   A    Okay.  (Witness complying.)

11   Q    And then in 32B can you write Josh's name underneath

12        where he is?

13   A    (Witness complying.)

14   Q    Does 32A on the upper portion have a time stamp

15        noted?

16   A    Yes.

17   Q    And what's that time stamp?

18   A    11:06 a.m.

19   Q    Okay.  11:06:29 is the time stamp?

20   A    Yes.

21   Q    Do you remember -- you can grab a seat.

22   A    Okay.

23   Q    After you arrived at Luna, was that the last -- did

24        you and Josh go anywhere else after?

25   A    No.

130

```
 1   Q   Were you familiar at all with Luna?

 2   A   No.

 3   Q   Had you ever been there before?

 4   A   No.

 5   Q   What generally do you remember about kind of like the

 6       layout of Luna?

 7   A   There was a dance floor and a bar area.  The

 8       bathrooms were downstairs.  That's about it.

 9   Q   Where in the bar did you and Josh go?

10   A   We went to the bar area and the dance floor.

11   Q   Miss Olson, I want to direct your attention to the

12       end of the night.  Do you remember when it was

13       getting to be bar close where you might have been?

14   A   We were on the dance floor up until that time.

15   Q   And where did you go then?

16   A   We were headed out leaving.

17   Q   Where did you walk to?

18   A   We walked towards the doorway.

19   Q   Did you make it to the doorway with Josh?

20   A   No.

21   Q   Where if anywhere did you stop along the way?

22   A   Well, yes, I guess we did make it to -- up to the

23       doorway.

24   Q   Okay.  Do you remember anything related to the

25       bathrooms on your way out?
```

131

```
 1   A    I don't remember.
 2   Q    Okay.  On your way heading towards the door, was
 3        there any issues that occurred?
 4   A    There were a group of people that came up to us.
 5   Q    Do you remember where in the bar you were?
 6   A    It was kind of in the doorway on our way out.
 7   Q    So not in an area where there is a bar where you
 8        could walk up and get a drink?
 9   A    No.
10   Q    Do you remember anything about the group, was it
11        males, females?
12   A    It was males and one female.
13   Q    Do you remember anything about their race?
14   A    They were Asian.
15   Q    Do you know anything about Josh's race or
16        nationality?
17   A    He's part Korean.
18   Q    When the people or the group approached you, I think
19        is what you said, do you remember anything that
20        occurred then?
21   A    There was an altercation with the guys were pushing
22        him, and I remember trying to get in between to break
23        them up, and the next thing I remember was that he
24        was laying on the ground.
25   Q    Do you remember hearing anything prior to that?
```

```
1    A    Just arguing, but I don't know what it was about.

2    Q    Do you remember seeing these people at all earlier in

3         the night?

4    A    I don't remember.

5    Q    When you then saw Josh on the ground, how did you

6         feel?

7    A    I can't even describe it.

8    Q    Shocked?

9    A    Shocked.  Yeah.  Scared.  Angry.

10   Q    Do you remember what you did then?

11   A    I started yelling for people to call 911.

12   Q    Do you remember, Miss Olson, the people that had been

13        around Josh, what if anything they did after he was

14        then on the ground?

15   A    After he was on the ground, then the people started

16        leaving, and I remembered that I ran after -- outside

17        I ran after the girl that was with them.

18   Q    Do you remember why you ran after her?

19   A    Because she was with them who did this.  And I don't

20        know what I was thinking.

21   Q    At that point were you still shocked and angry?

22   A    Yes.

23   Q    Do you remember what if anything you did then?

24   A    I remember running after her and taking her on the

25        sidewalk and yelling at her saying that I know she
```

```
1              knows who they are and where they went and trying to
2              find out where -- where they are.
3     Q        Miss Olson, I'm going to show you an exhibit board
4              that is marked 34 and then we have a series of
5              exhibits with 34 and then a letter designation.
6              Okay?  Do you recognize yourself in any of these
7              photographs?
8     A        I do in the bottom, 34I I can start -- I can see
9              myself.
10    Q        What portion of your body do we see in 34I?
11    A        My arm.
12    Q        And then is there any other image where you see
13             yourself?
14    A        In 34J, 34K and 34L.
15                       ATTORNEY VISHNY:  I'm sorry.  I couldn't
16             hear the answer.  34J and --
17    A        34K and 34L.
18    Q        Is there anything on your person that we can somewhat
19             see in all of those photographs?
20    A        I remember I was wearing that jacket and my purse.
21    Q        Okay.  I'm going to give you a blue marker.  In 34K
22             why don't you write your name below and then draw a
23             line literally so the line connects to your body.
24    A        (Witness complying.)
25    Q        Thank you.  You're outside, you had tackled the girl
```

134

1      and you were saying things to her.  Do you remember

2      where you were or what happened after that?

3  A   I don't completely remember what happened after

4      that.

5  Q   Were you concerned for Josh?

6  A   Yes.

7  Q   Do you ever remember being back inside of Luna?

8  A   Yes.  I remember after that I did go back inside and

9      there were people blocking me and I kind of fought to

10     get back in.

11  Q   Were you able to, after you got back inside, go near

12     Josh at all?

13  A   I can't remember.  I remember at one point I was

14     kneeling down by him.

15  Q   Miss Olson, was he able to respond at all?

16  A   No.

17  Q   Do you remember the police arriving?

18  A   I remember seeing them there.

19  Q   What was your concern at that point then?

20  A   I didn't think that he was still alive.

21  Q   You did not think he was still alive?

22  A   Un-hun.

23  Q   Do you remember talking to the police, Miss Olson?

24  A   I do.

25  Q   And where did that happen, if you know?

```
1    A    I know I talked to Detective Cary Meyer in his police
2         car outside of the bar.
3    Q    Did you speak with him anywhere else?
4    A    At the police station.
5    Q    And did you tell him -- did you answer his
6         questions?
7    A    I did.
8    Q    Did you tell him what you could remember back then?
9    A    I did.
10             ATTORNEY SCHNEIDER:  I don't have any other
11        questions.
12             THE COURT:  Defense?
13             ATTORNEY WEITZ:  Can I have one moment,
14        Your Honor?
15             THE COURT:  Absolutely.
16             ATTORNEY WEITZ:  Thank you.
17             THE COURT:  Absolutely.
18             EXAMINATION OF BRITTANY OLSON
19   BY ATTORNEY WEITZ:
20   Q    Miss Olson, Saturday night going into Sunday morning,
21        you came down that night intending to have a good
22        time, right?
23   A    Right.
24   Q    That was the plan.  And you had gone to a number of
25        bars on that trip?
```

136

```
 1   A   Yes.

 2   Q   You were doing some dancing?

 3   A   Yes.

 4   Q   Drinking, those types of things?

 5   A   Right.

 6   Q   And you certainly didn't expect something like this

 7       was going to happen.

 8   A   No.

 9   Q   As far as that night, you have some memory lapses

10       from just the fact that you had been drinking all

11       night?

12   A   That and probably shock.

13   Q   Okay.

14            ATTORNEY WEITZ:  I don't have any further

15       questions.

16            THE COURT:  Any follow-up, Attorney

17       Schneider?

18            ATTORNEY SCHNEIDER:  No.

19            THE COURT:  Members of the jury, do you

20       wish to submit any questions for consideration?

21            (No response.)

22            THE COURT:  Okay.  Miss Olson, I thank you

23       for your testimony.

24            ATTORNEY MAIER:  Your Honor, the State's

25       next witness is Sean Kuether.
```

137

1                    ATTORNEY VISHNY:  Can we approach again?

2                    THE COURT:  Sure.

3                    (A bench conference was held.)

4                    THE CLERK:  Please raise your right hand.

5                    (Oath administered to witness.)

6                    THE WITNESS:  I do.

7                    THE CLERK:  Please state your full name and

8          spell it for the record please.

9                    THE WITNESS:  Sean Kuether, S-E-A-N,

10         K-U-E-T-H-E-R.

11                   THE COURT:  You may be seated, sir.

12             Attorney who?

13                   ATTORNEY MAIER:  I am.

14                   THE COURT:  All right.  Attorney Maier.

15                   **EXAMINATION OF SEAN KUETHER**

16         **BY ATTORNEY MAIER:**

17    Q    Mr. Kuether, how are you employed?

18    A    As a police officer for the City of Appleton.

19    Q    And how long have you worked as an officer for the

20         City of Appleton?

21    A    Approximately five-and-a-half years.

22    Q    In that five-and-a-half years, have you been assigned

23         to a particular unit or division of the Appleton

24         Police Department?

25    A    Yes, I've been assigned to two different units.

1   Q   In 2013, specifically December, what was your

2       assignment?

3   A   Patrol unit.

4   Q   And were you assigned to a particular area of the

5       city on the shift that started December 7th and went

6       into December 8th of 2013?

7   A   Yes, that was I was in the northern district.

8   Q   Around 1:51 a.m. on the 8th, did you hear a call come

9       out for an incident that occurred downtown?

10  A   I did.

11  Q   And what was the nature of that call?

12  A   Possible shots fired at the Luna nightclub.

13  Q   Where were you when the call came out?

14  A   I was sitting in the parking lot at the police

15      department.

16  Q   How far from Luna Lounge is the Appleton Police

17      Department?

18  A   Two-and-a-half to three blocks.

19  Q   What did you do when you heard the call come out?

20  A   I immediately drove to the scene.

21  Q   When -- on the way in that two-and-a-half blocks, did

22      you receive any instruction about what you were to do

23      when you arrived?

24  A   Yeah.  The initial call over the radio was that they

25      wanted arriving officers to secure the exterior of

139

```
1         the building and not let anybody exit.
2    Q    Did you do that?
3    A    I did.
4    Q    Where were you at the bar in order to keep people
5         from leaving?
6    A    Well, when I initially got there I parked my squad
7         car on the southwest corner of the building partially
8         into College Avenue and partially on Division Street,
9         and then I kind of moved back and forth between the
10        corner of the building there and the emergency doors
11        maybe 20 feet north against the building wall
12        there.
13   Q    And I'm assuming that as you're doing this other
14        officers are arriving on scene as well?
15   A    Correct.  Officers were coming from all over the
16        city.
17   Q    Officer Vander Wielen would have been one of them?
18   A    Yes.
19   Q    At some point did you hear Officer Vander Wielen
20        engage in some activity with someone?
21   A    I did.
22   Q    And can you describe what was going on and what you
23        did?
24   A    As officers were arriving, another officer took up a
25        position to cover the side of the building and I
```

140

```
1          moved towards the front doors at which time I heard
2          Officer Vander Wielen arguing with a female.
3     Q    What did you do then?
4     A    It appeared that she was very agitated and excited so
5          I moved towards him to help calm her down.
6     Q    What about her -- as you go from securing the door,
7          making sure nobody leaves, to helping Officer Vander
8          Wielen calm this person down, what about her actions
9          and demeanor caused you to believe that she was
10         agitated?
11    A    She was screaming and yelling and Officer Vander
12         Wielen was having to raise his voice to try to get
13         her attention to calm her down.
14    Q    Are you able to estimate how long it is after the
15         shots fired call goes out that you're first arriving
16         on scene?
17    A    I was probably on scene within a minute or roughly, I
18         would say, I mean I was only a few blocks -- few
19         blocks away, and as soon as it was verified that we
20         heard what we heard over the radio, I began moving
21         that direction immediately.
22    Q    Okay.  And then from the time that you arrive on
23         scene and you're securing the entrance to the time
24         that you're going to help Officer Vander Wielen with
25         this agitated woman inside, roughly how long is
```

141

1    that?

2  A  No longer than a few more minutes.

3  Q  Okay.  Was this female crying?

4  A  Yes.

5  Q  What's the scene like at Luna as this is all

6     happening?

7  A  It was extremely chaotic.  They still had not turned

8     on the lights or shut the music off and there were

9     several hundred intoxicated people inside the bar.

10    It was very close to bar close.

11 Q  Were you able, when you went to assist Officer Vander

12    Wielen with the woman who was upset inside the bar,

13    were you able to recall anything that she was

14    saying?

15 A  Yeah.  I -- in attempting to calm her down --

16         ATTORNEY WEITZ:  Your Honor, I'm going to

17    object at this point.

18         THE COURT:  Approach.

19         (A bench conference was held.)

20         THE COURT:  Mr. Maier, whenever you're

21    ready.

22         ATTORNEY MAIER:  All right.  Thank you.

23 Q  (BY ATTORNEY MAIER)  Do you recall what the question

24    was?

25 A  Vaguely.

142

1   Q    What it was that this woman said while she was upset

2        and dealing with you and Officer Vander Wielen.

3   A    I asked her her name and she stated her name and then

4        stated that her boyfriend had been shot in the

5        head.

6   Q    She continued to be upset and agitated or did she

7        calm down?

8   A    It was up and down.  She would have moments of very

9        calm where she would just basically sit there and

10       cry, and then there were moments that she was very

11       agitated and aggressive.

12  Q    Define what you mean by "aggressive".

13  A    There were multiple points where she tried to get up

14       to move closer to the victim, to move near a bag -- a

15       purse that she claimed that was hers that was

16       scattered on the ground, but due to the entire area

17       being a crime scene at that point, I needed to

18       physically restrain her from doing those things.

19  Q    So your concern once you're inside then, and Officer

20       Vander Wielen, has changed to keeping people away

21       from the person who is on the floor of the bar; is

22       that correct?

23  A    Correct.

24  Q    And she wanted to get into an area that she just was

25       not going to be allowed to get into?

143

```
 1   A    Correct.
 2   Q    And again, I'm assuming that as this is happening
 3        more officers are responding and investigators,
 4        correct?
 5   A    Correct.  Officers were continuing to pour in from
 6        all over.
 7   Q    And did your role change as more people arrived on
 8        scene?
 9   A    Yes.
10   Q    What did it become?
11   A    Once we were comfortable with the security level of
12        the immediate area of the lobby, I then basically
13        became kind of the gate keeper for the door to make
14        sure that nobody entered from outside and then
15        continued to stay with the few staff and people that
16        were kind of cordoned off in the area that I was
17        standing.
18   Q    And did you have another role then as more people
19        arrived?
20   A    Yes.  Once the victim's girlfriend and others were
21        being interviewed, I -- one of the bouncers made
22        mention of a video camera system, and I was then
23        asked to go and watch that to see if we could locate
24        a video of the incident.
25   Q    Were you able to do that?
```

144

```
1    A    Yes.
2    Q    The surveillance cameras inside the bar, I'm assuming
3         they didn't have a projector or anything like we have
4         in the courtroom today?
5    A    Correct.
6    Q    What were you viewing the camera on, I guess, is it
7         just a simple monitor or display?
8    A    Yeah.  It was a small video monitor, might have even
9         been just a computer screen.
10   Q    Who -- who actually manipulated the camera controls
11        to see what you were looking for?
12   A    Initially the owner did as I had no idea how to
13        operate the system.  However, once I got the gist of
14        it, I may have also manipulated the controls to fast
15        forward or rewind.
16   Q    How far back did you go, do you recall, before you
17        started watching?
18   A    We went back to roughly the time the call came out,
19        maybe a minute or two before just to see if we could
20        tell when and where the incident occurred.
21   Q    Okay.  You weren't able to actually see the shooting
22        occur captured on camera though, correct?
23   A    No.
24             ATTORNEY MAIER:  Can we -- I think it might
25        help to have at least the -- I don't know how the
```

145

1     lights divide, but it may help to have the lights

2     reduced in here a little bit.  That's fine.

3               ATTORNEY SCHNEIDER:  Judge, just for the

4     record, this would be the same disk we utilized

5     earlier with Officer Vander Wielen.  It's a disk

6     numbered Item 31.

7               ATTORNEY WEITZ:  While we're on that topic,

8     Your Honor, I guess at this time this is a good time

9     to move 31 and 97 into evidence.

10              THE COURT:  Very good.  Any objection?

11              ATTORNEY SCHNEIDER:  No.

12              THE COURT:  Very good.  31 and 97 will be

13     received.

14              ATTORNEY MAIER:  And, Officer Kuether and

15     everyone else, we're going to show you a portion of

16     video, the time stamp is 1:50:17, and we'll play

17     through 1:52:48 and then I'll have a couple

18     questions.

19              (Video played.)

20              ATTORNEY MAIER:  Thank you.  I think it

21     it's okay.  I think, if it's okay with everyone, we

22     can keep the lights down.

23              THE COURT:  That's fine.

24  Q   (BY ATTORNEY MAIER)  Officer Kuether, understanding

25     that may not have been the exact moment you started

146

1        watching the video and it may not have been the exact

2        moment you stopped watching the video that night, is

3        that a fair and accurate depiction of what you recall

4        seeing?

5     A  Yes, it is.

6     Q  Are you able to identify any of the people who came

7        through the camera view during the portion we just

8        used today?

9     A  There is two that I recognized immediately.

10    Q  And who is that?

11    A  Dan Kersten the bouncer and then Brittany Olson.

12    Q  And it's Brittany Olson that came back in and was

13       struggling with the bouncer near the end of the

14       portion?

15    A  Correct.

16    Q  The bouncer she's struggling with was not Dan

17       Kersten, he was another person seen on the video?

18    A  Correct.  Dan was the one standing at the very front

19       of the video who was scanning the area.

20    Q  All right.  Thank you.

21           Officer, this is a board that has a number of

22       displays -- number of images, twelve of them.  It's

23       marked Exhibit 33.  And feel free to come off the

24       stand if you would like, but can you just tell me if

25       these represent still images from the portion of

147

1      video that we just watched?

2   A   Yes, they are still images.

3          ATTORNEY MAIER:  I'd move in Exhibit 33 at

4      this time.

5          ATTORNEY WEITZ:  I think it's already been

6      moved, Your Honor.

7          THE COURT:  I believe 33 was received

8      through witness Kersten, but -- so we're all set.

9          ATTORNEY MAIER:  All right.

10  Q   (BY ATTORNEY MAIER)  I'll show you what's been marked

11     as Exhibit 34.  Are you able to describe what that

12     is, Officer?

13  A   It's more still shots of the video.

14  Q   Are you able to tell -- this is labeled 34.  In 34A,

15     which is the upper left corner, is there a time stamp

16     on that still image?

17  A   There is.

18  Q   What is that?

19  A   The time.

20  Q   Yes?

21  A   1:50:30.

22  Q   Okay.  And on the lower right, is there a time

23     stamp?

24  A   There is.

25  Q   What is the time stamp?

```
 1   A    1:50:34.

 2   Q    And are these still images that capture a period of

 3        time depicted in the video that you watched that

 4        night?

 5   A    They are, yes.

 6             ATTORNEY MAIER:  I would move in Exhibit 34

 7        at this time.

 8             THE COURT:  Any objection?

 9             ATTORNEY WEITZ:  No.

10             THE COURT:  Exhibit 34 shall be received.

11   Q    (BY ATTORNEY MAIER)  Exhibit 35 is of similar design.

12        Can you explain what that is to the jury please?

13   A    Has twelve more still shots on it.

14   Q    Is there a time stamp on the image on the upper

15        left?

16   A    There is.  It's 1:50:34.

17   Q    And that's labeled 34A, correct?

18   A    Correct.

19   Q    On the image labeled 35L in the lower right, can you

20        tell me what the time stamp is?

21   A    1:52:48.

22   Q    And these are, again, still images depicting portions

23        or, I'm sorry, still shots of the video portion we

24        just watched?

25   A    They are.
```

149

```
1                    ATTORNEY MAIER:  I'd move in 35 at this
2          time.
3                    THE COURT:  Any objection?
4                    ATTORNEY WEITZ:  No.
5                    THE COURT:  35 will be received.
6     Q    (BY ATTORNEY MAIER)  Officer Kuether, what were you
7          wearing that night?
8     A    I was in a uniform similar to what I have on here
9          minus the tie as well as a jacket.
10    Q    Can you describe the jacket?
11    A    The jacket is made specifically for a patrol uniform.
12         It cuts off right around the belly button so it
13         leaves your tool belt available, and it's two -- it's
14         one color but it's two fabrics.  The top is kind of a
15         rain resistant nylon or some similar fabric and the
16         bottom half is like any other felt zip jacket.
17    Q    So it would be maybe a fleece?
18    A    Or fleece.  Sorry.  Yes.  Not felt.
19    Q    Fleece starts, what, at the bottom of your rib cage
20         maybe?
21    A    It's like basically the shoulder -- like the chest,
22         basically, up is the, like, water resistant material,
23         and from, like, maybe the nipple line down is the
24         fleece.
25    Q    Okay.  And I apologize sort of for this.  You just
```

150

1          had your hands held parallel to the floor.  That's --

2          the dividing line is a horizontal one across your

3          chest?

4     A    Yes, that's correct.

5     Q    Is it a zipper or snaps up and down?

6     A    It's a zip jacket.

7     Q    And then it has patches and logos and that sort of

8          thing that say Appleton Police?

9     A    It does.

10    Q    Does it have wording on the back?

11    A    No, it does not, that I recall.  It's been a while

12         since I've worn it.

13    Q    What color is that jacket?

14    A    It's navy blue.

15    Q    All portions?

16    A    The entire jacket.

17    Q    Navy blue similar to what you're wearing, a dark

18         navy?

19    A    Yes.  It would match the uniform.

20              ATTORNEY MAIER:  Officer Kuether and

21         members of the jury and everyone else, I'm going to

22         show a portion of what has previously been received

23         as 31.  This is starting at a time stamp of 1:58:05.

24    Q    (BY ATTORNEY MAIER)  Officer Kuether, before we

25         start, do you recognize anyone that's on the screen

151

1        right now?

2    A    Yeah.  That's me coming in the door.

3    Q    So you're sort of in the process of coming through

4         the doorway?

5    A    Correct.

6    Q    And at that time is that your first arrival at Luna

7         that night?

8    A    Yeah.  Well, it's my first entrance into Luna but I'd

9         been there for several minutes on the outside.

10   Q    All right.  We'll just play a few seconds of this

11        video.

12                 (Video played.)

13   Q    (BY ATTORNEY MAIER)  We stopped it at 1:58:11  That

14        shows the jacket you were wearing that night?

15   A    It does.

16   Q    Officer Kuether, the video we just showed, did it

17        show you wearing a dark colored jacket?

18   A    It does not appear so in the video that it's a dark

19        jacket.

20   Q    How does it appear?

21   A    It appears that I have a jacket with dark shoulder

22        and white sleeves and lower portion of the jacket.

23   Q    And that's not accurate, is it?

24   A    Not in the least, no.

25   Q    Do you have any idea why it would show those -- that

152

1          image that way instead of maybe blue?

2    A     The night vision of the security camera distorts the

3          color, I would assume.

4    Q     And that's something that you've experienced in the

5          past?

6    A     Yes, I've seen that before.

7    Q     Okay.

8                    ATTORNEY MAIER:  I have no further

9          questions.

10                   THE COURT:  Defense?

11                   ATTORNEY WEITZ:  No questions, Your Honor.

12                   THE COURT:  And, ladies and gentlemen of

13         the jury, do you have any questions you wish to

14         submit to this witness?

15                   (No response.)

16                   THE COURT:  Very good.

17              Then, sir, you are excused.

18              I'll turn on the lights.

19              Why don't we take just about a ten-minute break.

20              Please rise for the jury.

21                   (The jury was escorted out of the

22         courtroom.)

23                   THE COURT:  Okay.  Just -- just briefly for

24         the record, during this early afternoon session we

25         did have three sidebars.

153

1            The first sidebar was an objection to the form

2      of the question made by defense counsel.  Counsel

3      agreed to rephrase, so in essence the court didn't

4      sustain on it but directions were received.

5            Second of all there was a sidebar to discuss

6      concerns related to the potential testimony in terms

7      of what may be objectionable material or not as it

8      related to Officer Kuether.  The parties discussed

9      that and resolved that amongst themselves.

10           Subsequently, there was an objection made, it

11     was in particular to the hearsay -- hearsay testimony

12     of Officer Kuether.  The court overruled that,

13     concluding that that portion of the testimony

14     constituted an excited utterance.

15           Anything else then until we take a short break,

16     Attorney Schneider?

17                ATTORNEY SCHNEIDER:  No.

18                THE COURT:  Attorney Vishny?

19                ATTORNEY VISHNY:  Yeah.  I have something

20     anticipatory that we could do either now or right

21     after the break that regards the next witness's

22     testimony.

23                THE COURT:  Why don't we do this.  We'll

24     have you come back at about 2:40, maybe a few minutes

25     after, that's fine, and then we'll take up the issue

154

1        before the jury comes in.

2                    ATTORNEY VISHNY:  Thank you.

3                    (Court in recess.)

4                    THE COURT:  State's all ready then?

5                    ATTORNEY SCHNEIDER:  Yes.

6                    THE COURT:  Defense all right?

7                    ATTORNEY VISHNY:  Yes.

8                    THE COURT:  The gallery has been absolutely

9        wonderful up to this point.  As we get into

10       testimony, the only thing I would ask is just

11       continue to exhibit the good judgment that you've had

12       in terms of controlling emotions and sentiments and

13       things.  And I don't know where everybody falls on

14       this, but I just want to make sure because we want

15       the jury to be able to focus on the issues they have.

16            And, again, you've been wonderful up to this

17       point, it just dawned on me that I should probably

18       reiterate that.  And so that will be the last I -- I

19       mention of it today.

20            Wendy, if we could bring in the jury.

21                    (The jury was escorted into the courtroom.)

22                    THE COURT:  Please be seated.  Is the State

23       prepared to call its next witness?

24                    ATTORNEY SCHNEIDER:  We would.  We would

25       call Alyson Blom.

155

1              THE COURT:  If you would please come to the

2      witness stand, remain standing, we'll swear you in.

3              THE CLERK:  Please raise your right hand.

4              (Oath administered to witness.)

5              THE WITNESS:  I do.

6              THE CLERK:  Please state your full name and

7      spell it for the record please.

8              THE WITNESS:  Alyson, A-L-Y-S-O-N, Blom,

9      B-L-O-M.

10             THE COURT:  Miss Schneider, your witness.

11             ATTORNEY SCHNEIDER:  Thank you.

12                 **EXAMINATION OF ALYSON BLOM**

13     **BY ATTORNEY SCHNEIDER:**

14  Q    Good afternoon, Miss Blom.  Where were you raised?

15  A    In Appleton.

16  Q    Where are you currently living?

17  A    In Milwaukee.

18  Q    How long have you lived in Milwaukee?

19  A    For about seven years.

20  Q    Miss Blom, that mic will slide down a little bit.

21       There you go.  Then you don't feel like you always

22       have to twist to answer.

23          And it was seven years you lived in Milwaukee?

24  A    Yes.

25  Q    Are you working down there right now?

156

```
1    A    Yes.

2    Q    Do you know an individual named Chong Lee?

3    A    Yes.

4    Q    And how do you know him?

5    A    I was friends with him in Appleton.

6    Q    Is the Chong Lee that you knew from being friends

7         here in Appleton, is he here in the courtroom

8         today?

9    A    Yes.

10   Q    Could you identify him by some clothing that he's

11        wearing please?

12   A    He is on my right-hand side in a green button-up

13        shirt.

14   Q    No suit coat?

15   A    No suit coat.

16             ATTORNEY SCHNEIDER:  I would ask the record

17        reflect identification.

18             THE COURT:  The record shall so reflect.

19   Q    (BY ATTORNEY SCHNEIDER)  Do you also, Miss Blom, know

20        some of his family members?

21   A    Yes.

22   Q    And who do you know?

23   A    I know his older brother -- or his brother Tong, his

24        brother Hu, his brother Paul, and his brother Nhia

25        and his sisters.
```

157

1   Q    Is -- in terms of Chong and Paul, who is older?

2   A    I think Chong is.

3   Q    Did it come time over the last seven years though

4        even living in Milwaukee that you've come up to

5        Appleton?

6   A    Yes.

7   Q    Do you come up on weekends at times?

8   A    Yes.

9   Q    Is your parents or family still up here?

10  A    Yes.  My dad is.

11  Q    Miss Blom, I want to direct your attention back to

12       December of 2013, actually Saturday, December 7th

13       into Sunday, December 8th, 2013.  Do you remember

14       being in Appleton that weekend?

15  A    Yes.

16  Q    And did you have plans to come up for the whole

17       weekend or what brought you here?

18  A    I -- I just had off of work and so I came home.

19  Q    Did you make any plans for Saturday night?

20  A    Just to go out.

21  Q    And who were those plans with?

22  A    I had plans with Xung to go out, and he had picked me

23       up and we went to City Limit.

24  Q    And that's miss -- when you say -- can you spell

25       Xung?

158

1   A   X-U-N-G.

2   Q   And that a male or female?

3   A   A male.

4   Q   Do you know his last name?

5   A   Xiong, X-I-O-N-G.

6   Q   Did you have plans to meet up with anyone else?

7   A   Once we got to City Limits, then everybody else had

8       come.

9   Q   And who do you remember?

10  A   I remember Chong, Phong, Michael, Paul and Joe and my

11      friend Dalinda.

12  Q   Okay.  Paul.  Paul Lee?

13  A   Paul Lee.

14  Q   And Phong?

15  A   Lee.

16  Q   And how is -- is Phong related to Paul or Chong that

17      you know?

18  A   I think they're just related like cousins.

19  Q   And then you said Michael?

20  A   Yes.

21  Q   What was his last name?

22  A   Thor.

23  Q   And you also said Joe?

24  A   And his last name is also Thor.

25  Q   Is there any relation that you know between Joe and

159

```
 1        Michael?
 2   A    No.
 3   Q    And you said your friend Dalinda?
 4   A    Yes.
 5   Q    Do you know her last name?
 6   A    It's Melo, M-E-L-O.
 7   Q    Was she ever known as Dalinda Guzman?
 8   A    Yes.
 9   Q    And all the people you named were at City Limits
10        then?
11   A    Yes.
12   Q    Do you remember what time you got there?
13   A    No.
14   Q    Did you stay at City Limits?
15   A    No.  We stayed there and then we left to go to Luna
16        in Appleton.
17   Q    If you even know, Miss Blom, did you drive yourself
18        or what vehicle did you travel in?
19   A    No.  Dalinda drove myself and Phong.
20   Q    Do you remember where you parked?
21   A    We parked in the parking lot behind the structure
22        that's behind Luna Lounge.
23   Q    And behind structure, do you mean behind a parking
24        ramp structure?
25   A    Yes.
```

160

```
1   Q    Was the plan for any of those other parties to go to
2        Luna also?
3   A    Yes.
4   Q    Was it pretty much the whole group was going to go?
5   A    Yes.
6   Q    I'm going to ask you, Miss Blom, it might seem like
7        an odd question, do you remember anything about what
8        you were wearing on this night?
9   A    Yes.  I was wearing very high boots.  They were
10       gray.
11  Q    Below or above your knee did they end, if you
12       remember?
13  A    Above.
14  Q    Did they have a high heel on them as well?
15  A    Yes.
16  Q    Do you remember when you got to Luna did everyone
17       arrive at the same time?
18  A    Dalinda and Michael had went to go get a hot dog or a
19       brat, but I believe everybody else was with us at the
20       same time.
21  Q    Did you ever stop or go to the establishment known as
22       Sharks at all?
23  A    I don't -- I didn't, no.
24  Q    And when you got to Luna, where did you go?
25  A    We went through the first bar area down the stairs
```

161

```
 1        and we were by the second bar and a table was over
 2        there.
 3    Q   Who was with you at that location?
 4    A   Myself, Dalinda, Michael, Chong, Phong, Paul and
 5        Joe.
 6    Q   Did the group stay together the whole night or did
 7        people -- sorry, did people kind of split off at
 8        times?
 9    A   There were sometimes that we were split because at
10        one point it was just me and Dalinda by our table.
11    Q   Were there times where you were with Chong and
12        Dalinda?
13    A   Yes.
14    Q   During that time when you're with these people at
15        Luna, prior to getting ready to leave, was there any
16        fights or arguments among your group of friends?
17    A   Not within us.  The only altercation that I remember
18        was coming back inside to smoke, the bouncer had told
19        Phong that he could not come inside because he was
20        too drunk, but -- and there was a minor altercation,
21        but then the bouncer had let him back inside and we
22        all went back inside.
23    Q   And that included Phong being able to go in?
24    A   Yes, Phong was included.
25    Q   I want to direct your attention towards the end of
```

162

1      the night, towards bar closing.  Where were you in

2      the bar prior to getting ready to leave?

3   A   Me and Dalinda were still downstairs by the table

4      that we were at by the second bar.

5   Q   Was anyone else down there?

6   A   Just me and Dalinda.

7   Q   And where did you go from there?

8   A   We walked up the stairs and towards the first bar.

9   Q   Could you see at that point as you were walking up to

10     that area anyone else with your group that was near

11     you other than Dalinda?

12  A   I saw a group of people.  The only person that I

13     could point out was Paul.

14  Q   Okay.  Did you know at all at that point where Chong

15     was?

16  A   No.

17  Q   And when you said you could see where Paul was, where

18     in the bar was that?

19  A   It wasn't in the bar, it was in the foyer, and I was

20     still by the bar.

21  Q   So just to kind of describe, you're in still what

22     would be the upper bar, the first bar when you

23     enter?

24  A   Yes.

25  Q   And you could see into the foyer area?

163

1   A   Yes.

2   Q   What do you remember about the lighting, Miss Blom?

3   A   That it was dark.

4   Q   Was there anything specific because of the lighting

5       that you remember seeing Paul?

6   A   It reflected -- there was black light and it

7       reflected off his jacket.

8   Q   Could you see who else was near Paul at that time?

9   A   No.

10  Q   Were there other people near him?

11  A   Yes.

12  Q   Was it because of the lighting you couldn't see who

13      else it was or just another reason?

14  A   I just don't know.

15  Q   As you're walking up to that area, was there anything

16      that caused you to focus on Paul or the other people

17      who might have been near him?

18  A   No.  I was just scanning the area and his jacket

19      caught my eye.

20  Q   Did it -- did he look upset at all?

21  A   I don't know.

22  Q   Did you continue walking to leave then?

23  A   No.

24  Q   Okay.  So you're still in by the bar?

25  A   Yes.

164

1   Q    And then what do you remember next?

2   A    I remember seeing a flash and it was just a bright

3        flash and then I remember running.

4   Q    Did the flash surprise you?

5   A    Yes, I -- yeah.  I thought it was -- it almost looked

6        like a camera.

7   Q    I was just going to ask you that.  Has it been your

8        experience with cell phones that people often take

9        cell phone photographs when they're out at night?

10  A    Yes.

11  Q    So you see flashes at times from cell phone flash?

12  A    Yes.

13  Q    Okay.  Was the flash, when it occurred, if you know,

14       Miss Blom, can you give us any direction, was it in

15       front, to your right, left?

16  A    I can't remember.

17  Q    Wasn't behind you obviously?

18  A    No, it was not behind me.

19  Q    What do you remember doing after you saw the flash?

20  A    I remember pushing Dalinda and then running after

21       her.

22  Q    Do you remember seeing anybody else in the immediate

23       area where you were?

24  A    No, just Dalinda in front of me.

25  Q    Did you see -- after that flash did you see anything

1      that caught your attention in the foyer area?

2   A   No.  I thought there was an alteration (sic) or a

3      fight, and I thought somebody maybe got hit, but I

4      didn't know what had happened.

5   Q   Did you ever see anyone on the ground?

6   A   No.

7   Q   Do you remember, Miss Blom -- so you pushed Dalinda

8      towards the door?

9   A   Yes.

10  Q   What happened as you went through the door?

11  A   As I went through the door, I ran, and when I got

12     around the corner, I was tackled.

13  Q   If I can ask you, Miss Blom, when you exited did you

14     go right, left or straight, if you know?

15  A   I went right.

16  Q   And if you know, do you know where the area was you

17     were tackled in relation to the front door of Luna or

18     in relation to anything else?

19  A   It was around the corner.

20  Q   Did you actually -- tackle can mean a lot of

21     different things, but did you actually go down to the

22     ground?

23  A   I did.

24  Q   What happened then?

25  A   I was getting hit in the face.

166

```
1    Q    Could you tell anything about the person who was
2         hitting you?
3    A    Just that it was a female.
4    Q    Do you remember anything that was said?
5    A    There was a lot of the word bitch being said and that
6         I knew who did it.
7    Q    Did you try to defend yourself in some way?
8    A    I blocked my face.
9    Q    Just going to show you an exhibit that's been marked,
10        Miss Blom, and I'll let you take a second to get
11        acquainted.  It's Exhibit 6.  So College Avenue is at
12        the end running right to left on the exhibit, there
13        is an area that's been previously marked as Luna and
14        Sharks and a building marked PAC.  Are you familiar
15        with that?
16   A    Yes.
17   Q    And is the area that's marked Luna consistent with
18        what you know about it being on a corner across from
19        the PAC?
20   A    Yes.
21   Q    Where about did the incident occur with the girl
22        tackling you?
23   A    Like right over here.
24   Q    Just for the record, the street you were pointing to
25        is North Division Street, correct?
```

167

```
 1    A    (Witness nodding.)

 2    Q    If you even know, Miss Blom, and I don't know that

 3         you know this, was -- were you on the sidewalk, in

 4         the street or do you not even know?

 5    A    I believe it was the sidewalk.

 6    Q    Okay.  I'm going to give you a red marker, and I know

 7         you may not know exactly, but why don't you draw a

 8         line kind of generally at the top or the bottom of

 9         the area where you think that might have happened.

10    A    Like this is the sidewalk?

11    Q    Um-hum.  Oops.  Sorry.  Okay.  So you drew a red

12         line?

13    A    (Witness nodding.)

14    Q    Can you just write over here your last name?

15    A    (Witness complying.)

16    Q    Okay.  Thank you.  Do you know how long that

17         altercation with that other girl took?

18    A    No.

19    Q    Do you know, Miss Blom, even how it came to end?

20    A    There was a male who had stopped it, and he had

21         picked me up off the ground.

22    Q    When you were getting hit, did it surprise you?

23    A    Yes.

24    Q    Were you struck once or more than once?

25    A    More than once.
```

168

```
 1    Q    Do you remember it hurting?

 2    A    No.

 3    Q    After you got up, do you remember any injuries you

 4         had?

 5    A    My face was bloody.

 6    Q    Were you upset?

 7    A    Yes.

 8    Q    Had you been drinking on this night, Alyson?

 9    A    Yes.

10    Q    Was Chong drinking?

11    A    Yes.

12    Q    Maybe instead of asking everybody, was there anybody

13         not drinking?

14    A    No.

15    Q    The guys that picked you up, did you stay with them,

16         where did you go at that point?

17    A    No.  A male picked me up, and I don't know his name,

18         and he said that he was going to get somebody to help

19         me, and he walked away and then I proceeded to walk

20         home.

21    Q    Did you talk to the people -- the male that was in

22         the area at all as best you can recall?

23    A    I told him my name, and I just said that I just got

24         into a fight, and he said he was going to go get

25         somebody, and I -- when he walked away, then I walked
```

169

```
 1        home or started to walk home.
 2    Q   I'll ask you this, you may or may not know, Miss
 3        Blom.  Did he ever give you his name?
 4    A   I don't know.
 5    Q   Did you -- where did you ultimately go at that
 6        point?
 7    A   I walked through the parking structure towards
 8        Superior Street because I walked the opposite way and
 9        then I proceeded to walk towards Oneida Street and
10        over the Skyline Bridge.
11    Q   And ultimately where did you go that -- after that
12        point?
13    A   I was on the Skyline Bridge and a car had stopped
14        with somebody that I had knew and they drove me to my
15        father's house.
16    Q   And did you stay there?
17    A   I did not.
18    Q   Where did you go?
19    A   Xung had picked me up and we had went to Lisa's
20        house.
21    Q   How did you happen to make contact with Xung?
22    A   Once I got home and I had charged my phone, he -- I
23        don't know who called who.
24    Q   Was there a reason you didn't stay at your house?
25    A   I'm not sure.
```

170

1    Q    And what is Lisa's last name?

2    A    Stutzman.

3    Q    And is there some relationship between Lisa and Chong

4         that you know of?

5    A    Lisa was dating Chong's brother Hu.

6    Q    They have children together?

7    A    Yes.

8    Q    You went to Lisa's home then?

9    A    Yes.

10   Q    When you -- I'm going to just ask this question this

11        way.  When did you first become aware that there had

12        been a shooting at Luna?  When?  Like where were you

13        when you became aware of that?

14   A    I don't know.

15   Q    Was there any discussion -- did you mention to

16        Lisa what happened to you at Luna?

17   A    Yes.

18   Q    And in some ways, Miss Blom, were you -- were your

19        injuries apparent?

20   A    Yes.

21   Q    At some point, though, you learned there had been a

22        shooting, correct?

23   A    Yes.

24   Q    You're at Lisa's early morning hours.  How long did

25        you stay there?

171

1   A   I'm not sure.

2   Q   Other than seeing Lisa and Xung, who else might have

3       been at the house?

4   A   Her son Caden had been awake because he opened the

5       door.

6   Q   What time do you think it was when you got to Lisa's

7       house?

8   A   It had to be after bar close, I want to say around

9       three or 3:30.

10  Q   Had you had any other plans earlier in the night to

11      end up at Lisa's?

12  A   No.

13  Q   Lisa, was she out with the group at all that night?

14  A   No.

15  Q   When you got to Lisa's, was she awake?

16  A   She was awake but she was in bed.

17  Q   That day, so now it would be Sunday, Sunday morning,

18      did you learn there was a shooting on that day?

19  A   I learned -- well, I learned there was a shooting

20      when we were fighting previously because she said

21      somebody -- somebody had gotten shot, and I knew that

22      because when I had talked to the male he had said --

23      I had said somebody got shot.  I just don't know

24      exactly when I was told that.

25  Q   Okay.

```
1                    ATTORNEY SCHNEIDER:  Give me one second.

2    Q   (BY ATTORNEY SCHNEIDER)  So when the female is saying

3        things to you, she said something about shot or

4        getting shot?

5    A   Yes.

6    Q   Do you remember what that was?

7    A   No, just that somebody got -- somebody was shot or --

8        and then she said that I had no -- I knew who did

9        it.

10   Q   Later that week did you talk to the police at all?

11   A   Yes.

12   Q   And where did that happen?

13   A   That happened in Milwaukee at my job.

14   Q   And is your job located in a mall?

15   A   It is.  It's at Mayfair Mall.

16   Q   Do you remember, Miss Blom, if that was December

17       11th?

18   A   I don't remember the date.

19   Q   If I told you the reports indicate that that's the

20       date, would that seem accurate to you?

21   A   Yes.

22   Q   Do you remember what time?

23   A   It was close to closing so between 8:30 and 8:45.

24   Q   Where did you speak to officers?

25   A   First I was speaking to them in our back stockroom,
```

173

```
 1          but then I needed to close the store so I had asked

 2          them to step out and then I continued the

 3          conversation in the mall.

 4     Q    Did you tell the officers that you had a conversation

 5          with Lisa after the shooting?

 6     A    Yes.

 7     Q    And without saying anything, did you tell them what

 8          you had learned, without saying what you learned, did

 9          you tell them more specifically what Lisa had said?

10     A    Yes.

11     Q    During that morning when you were at Lisa's house,

12          how long did you stay?

13     A    I'm not sure.

14     Q    So you talked about Lisa was there, Xung was there, a

15          boy named Caden, anyone else arrive while you were

16          there?

17     A    No.

18     Q    After seeing the flash in Luna, why did you run

19          out?

20     A    I thought it was a gunshot, but I didn't know, and my

21          first instinct was to run.

22     Q    Were other people near you running?

23     A    I don't remember.

24               ATTORNEY SCHNEIDER:  One second.

25     Q    (BY ATTORNEY SCHNEIDER)  Did you know, Alyson, that
```

174

1           Luna had a security camera system?

2      A    No.

3      Q    But since that time you've seen some photos from that

4           security camera?

5      A    Yes.

6      Q    Did you recognize any of the people in some of those

7           photos?

8      A    Yes.

9      Q    Okay.  We'll walk through some of those, but

10          generally who did you recognize?

11     A    I recognized myself, Dalinda.

12               ATTORNEY VISHNY:  I need her to speak

13          louder.

14     A    I recognized myself, Dalinda, Chong, Paul, and I

15          think that's the only pictures that I saw.

16     Q    Do you also know someone named Tom Lee?

17     A    Yes.

18     Q    And is Tom Lee related to Chong?

19     A    I don't -- they might be cousins.

20     Q    Okay.  Do you remember Tom Lee being at Luna?

21     A    Yes.

22     Q    I'm going to give you a blue marker, Miss Blom, and

23          I'm going to show you what's been marked State's

24          Exhibit No. 32.  And go ahead and look through, there

25          are eleven photos here.

```
1                Do you recognize yourself in any of the photos?

2          Yeah.  Please.

3     A    I'm right here.

4     Q    You're going to have to speak up.

5     A    I'm right here.

6     Q    And you're pointing to someone in the photo 32E?

7     A    Yes.

8     Q    And the door is open, correct?

9     A    Yes.

10    Q    Why don't you on the side write your first name in

11         the white area and then I'm going to have you

12         actually draw a line to yourself.

13    A    (Witness complying.)

14    Q    And is there a time stamp on that photograph?

15    A    Yes.

16    Q    What time is that?

17    A    1:12:26.

18    Q    Do you recognize anyone else in that photograph?

19    A    Yes.

20    Q    Who else?

21    A    Chong Lee.

22    Q    Can you write his name on the bottom of the

23         photograph?

24    A    (Witness complying.)

25    Q    And then can you draw a line to him please?
```

176

1    A    (Witness complying.)

2    Q    Are there any other photos of Chong in this Exhibit

3         32 that you recognize?

4    A    Yes.  This one.

5    Q    And that would be 32D?  Write his name and then draw

6         a line.

7    A    (Witness complying.)

8    Q    You mentioned Dalinda was there.  Are there any

9         photographs on this board of Dalinda that you

10        recognize?

11   A    No.

12   Q    And she and Michael came in after you?

13   A    Yes.

14   Q    Is there anyone else that you recognize in any of

15        these photos?

16   A    Yes.

17   Q    And who is that?

18   A    Phong is right here.

19   Q    And that's 32F?

20   A    Yes.

21   Q    Below him, same thing, can you write Phong and then

22        draw a line?  Sorry.  Just not a hard surface.  Then

23        I'll hold it up a little bit.

24   A    Paul is right here.

25   Q    And that's in 32J?

177

1   A   Yes.

2   Q   I'm going to -- just wait one second.  Go ahead and

3       write his name below and then draw a line to him.

4   A   Tom is right here.  I can tell by his blonde hair.

5   Q   Okay.  So in 32J to the left of the photograph we see

6       kind of the back of someone, and you're saying that's

7       Tom Lee?

8   A   (Witness nodding.)

9   Q   Why don't you go ahead and write to the side the name

10      Tom and then draw a line to him.

11  A   (Witness complying.)  Those are the clearest.

12  Q   Okay.  Thank you.

13      And the photographs show everyone wearing gray,

14      white or black or shades of gray clothing.  People

15      had colorful clothing on that night, correct?  I mean

16      it wasn't all just black and gray or white as we're

17      seeing?

18  A   Yeah.

19  Q   Meaning the colors on here aren't accurate?

20  A   (Witness nodding.)

21  Q   You said your boots were gray?

22  A   Yes.

23  Q   And in the photograph of you, what color does it

24      appear your boots are?

25  A   White.

178

```
1    Q    Okay.  I'm going to show you a board that's marked
2         33, and there are twelve photographs on this board.
3         Go ahead and take your time, Miss Blom, and see if
4         you recognize anyone in any of the photographs.
5    A    This is Dalinda.
6    Q    That's in 33H?
7    A    Yes.
8    Q    Okay.  You want to write her name below and then draw
9         a line like as you've been doing?
10   A    (Witness complying.)  This is Dalinda.
11   Q    33L?  Go ahead and draw a line again.
12   A    (Witness complying.)  This is Phong.
13   Q    And that's in 33L again.
14   A    This is Dalinda.
15   Q    33K?
16   A    That's Phong.
17   Q    If you can write his name again.  And that's again in
18        33K?
19             ATTORNEY VISHNY:  I'm sorry.  What's in
20        33K?
21             ATTORNEY SCHNEIDER:  33K is Phong and she's
22        marked Dalinda.
23             ATTORNEY VISHNY:  Okay.
24   A    This is also Dalinda.
25   Q    So we see her in several pictures.  Why don't you
```

```
1              just put a D.  I think she's the only person with the
2              name D.  That makes it easier for you.
3    A    That's also her.
4    Q    I'm going to show you another photo board.  This one
5              is marked 34.  Do you recognize anyone in these
6              photos?
7    A    Yes.  This is Dalinda.  Do I have to mark them all?
8    Q    Yeah, why don't you, if you don't mind.
9    A    This is Tom.
10   Q    And the first D you put was in 34A?
11   A    Yes.
12   Q    Why don't you write Tom's name then in 34B.  Okay.
13   A    This is Dalinda.
14   Q    A D again would suffice in 34D -- or 34B.  I'm sorry.
15   A    Again, this is Tom, that's Dalinda.
16   Q    Okay.  Do you want to just mark a T and a D, that
17              would be --
18   A    (Witness complying.)
19   Q    And that was in 34C.
20   A    This is Dalinda, this is Tom and this is Chong.
21   Q    Okay.  So you can mark T and D.
22   A    (Witness complying.)
23   Q    And then can you write the name Chong on this one
24              please?  And that's in 34D?
25   A    Yes.
```

180

```
 1   Q   Okay.

 2   A   This is Dalinda, this is Tom, this is Chong.

 3   Q   34E, that was the photograph?

 4   A   Yes.

 5   Q   So if you want to do D --

 6   A   (Witness complying.)

 7   Q   -- T and C would suffice for Chong.

 8   A   (Witness complying.)  This is Dalinda, this is Tom,

 9       this is Chong.

10   Q   Okay.  If you can mark those in 34F?

11   A   (Witness complying.)

12   Q   Continuing in 34G.

13   A   This is Tom, this is Chong, this is me.

14   Q   Okay.  So why don't we do a D for -- I mean a T,

15       sorry, for Tom, a C for Chong, and then because this

16       is the first time, can you write your full name?

17   A   (Witness complying.)

18   Q   That was in 34G?

19   A   (Witness nodding.)

20   Q   Continuing in 34H?

21   A   This is Tom, this is Chong, this is me.

22   Q   So now you can just use first letters?

23   A   (Witness complying.)

24   Q   34H that photograph was.  34I?

25   A   This is Tom, this is Chong, this is me.
```

181

```
1    Q    You can just do the T, C and A again.

2    A    (Witness complying.)

3    Q    And then in 34J?

4    A    This is Tom, this is Chong, this is me.

5    Q    Again, T, C and A.

6    A    (Witness complying.)

7    Q    And then that was in 34J.  34K?

8    A    This is me.

9    Q    Okay.

10   A    That's Chong.

11   Q    Okay.  And --

12   A    And Tom.

13   Q    And then that was in 34L.  Can you make out

14        anybody?

15   A    No.  I know -- I know that's me because of my

16        boots.

17   Q    Okay.  Why don't you just put an A there and draw it

18        to the boot, Alyson.

19   A    (Witness complying.)

20   Q    Thank you.

21             And then is a board marked 35.  Just see if you

22        recognize any of the people in these photographs.

23   A    This is Phong.

24   Q    You think that's Phong?

25   A    I think so, with his hat.
```

182

1   Q    Phong had a hat on that night?

2   A    (Witness nodding.)

3   Q    Okay.  If you think it's Phong, go ahead and write

4         his name either on 35H or 35G?

5             And then a P is fine.

6   A    (Witness complying.)

7             ATTORNEY VISHNY:  I'm just going to step

8         over so I can see the pictures.

9             THE COURT:  That's fine.

10  A    And that's all that I can see.

11  Q    I'm going to ask you to look at 35B again.  Do you

12        recognize anyone else in that photograph?

13  A    I just see my shoe.

14  Q    Okay.  So your boot again?

15  A    Yup.

16  Q    There is -- that's okay.  Why don't you just draw an

17        A and write it to your boot again, Alyson.

18  A    (Witness complying.)

19  Q    And I've had you make all these markings with a blue

20        marker, correct?

21  A    Yes.

22  Q    And it -- to your recollection, this is the best

23        recollection of who was where in these photographs,

24        correct?

25  A    Yes.

183

1    Q    Okay.  You can grab a seat then, Miss Blom.

2         After leaving the bar you went to -- went home,

3         went to Lisa's.  Did you have any contact with Chong

4         after that?

5    A    With Chong?

6    Q    Correct.

7              ATTORNEY VISHNY:  Judge, I'd like to

8         approach the bench.

9              THE COURT:  You may.

10             (A bench conference was held.)

11   Q    (BY ATTORNEY SCHNEIDER)  Miss Blom, after this -- it

12        seems like a silly question for most people these

13        days.  Back in December of 2013 did you own a cell

14        phone?

15   A    Yes.

16   Q    Was Chong's number in your cell phone?

17   A    Yes.

18   Q    So if your phone would receive a call from Chong's

19        phone, would that show up by the same name?

20   A    Yes, it would have showed up as Chong.

21   Q    So after this night and after you leave Luna, did it

22        ever appear that there were calls being placed from

23        Chong's phone to your phone?

24   A    Not until Sunday morning.

25   Q    Okay.  Was there one or more than one call?

1    A    There was more than one.

2    Q    Did you answer any of the calls?

3    A    No.

4    Q    And by Sunday morning, you mean like later that same

5         day after you had been at Lisa's?

6    A    Yes.

7    Q    After that morning, did you ever make any calls back

8         to his phone?

9    A    I didn't call him.

10   Q    Okay.

11             ATTORNEY SCHNEIDER:  I don't have any other

12        questions then.

13             THE COURT:  And whoever from the defense is

14        covering the questioning, whenever you're ready.

15            **EXAMINATION OF ALYSON BLOM**

16   **BY ATTORNEY VISHNY:**

17   Q    Miss Blom, you didn't see the actual shooting,

18        right?

19   A    Correct.

20   Q    So you didn't see who -- when I say you didn't see

21        the actual shooting, what you saw was a flash from a

22        gun --

23   A    Yes.

24   Q    -- correct?  But you didn't see who was holding the

25        gun or who did the shooting?

185

```
1    A    Correct.

2    Q    And no matter how many times somebody would ask you

3         have you seen this, there's no way you could tell

4         them because you simply didn't see it.

5    A    Correct.

6    Q    When the police came to your job at Mayfair Mall on

7         the few days later, what has been described as

8         December 11th, they talked to you for quite a period

9         of time, right?

10   A    Yes.

11   Q    And at that time you drew a map?

12   A    Yes.

13   Q    Okay.  I'm showing you -- I don't think this was

14        marked, actually.

15             ATTORNEY SCHNEIDER:  And actually, here --

16             ATTORNEY VISHNY:  You have one that's

17        marked?

18             ATTORNEY SCHNEIDER:  Do you want me to just

19        highlight her name?

20             ATTORNEY VISHNY:  Yeah.  It was highlighted

21        on this.  Why don't we use that one then.

22   Q    (BY ATTORNEY VISHNY)  So I'm going to go back -- I'm

23        sorry for the little technical glitch here.  I'm

24        going back to showing you again this diagram.  This

25        looks familiar to you, right?
```

186

1   A   Yes.

2   Q   All right.  And when the police came, they showed you

3       that diagram and had you mark things on it, right?

4   A   Yes.

5   Q   Did you mark things on it or did they write things on

6       it?

7   A   We both did.

8   Q   All right.  So this particular diagram, and it's –

9       for the record it's marked as Exhibit No. 99 – and

10      you recognize this and the fact that your name is on

11      the diagram, right?

12  A   Yes.

13  Q   Okay.  So looking at this diagram, if you -- I'm

14      going to move it out for a minute.  If you look at

15      it, this is a rough drawing of Luna, it's not to

16      scale at all, right?

17  A   Correct.

18  Q   And when the police talked to you, they were asking

19      you to show yourself leaving at the time, right?

20  A   No, they were asking me to show what -- what I saw

21      when I recognized Paul's jacket.

22  Q   Okay.  So when you recognized Paul's jacket, there is

23      a mark down here.  What's that?

24  A   That's where me and Dalinda were standing.

25  Q   Okay.  And over here where it says Paul?

187

1    A    That's where Paul was standing.

2    Q    And right next to there, that's the word flash or

3         what word is that?

4    A    I don't know.

5    Q    You want to come down and take a look where you might

6         be able to see it a little better?

7    A    (Witness complying.)

8    Q    I'm sorry.  It doesn't say flash.  Why don't you take

9         a look just so you can see it yourself.  It says

10        bright light?

11   A    Okay.

12   Q    Is that right?

13   A    Yeah.  Because there was a bright light in front of

14        me somewhere.  I can't tell you where.

15   Q    Okay.  You can have a seat again.

16             ATTORNEY SCHNEIDER:  I don't know that that

17        was --

18   Q    (BY ATTORNEY VISHNY)  Miss Blom, you said there was a

19        bright light in front of you somewhere but you can't

20        tell where?

21   A    I can't -- I can't give the exact description, but

22        going back to what you said, it was not behind me.

23   Q    Okay.  But when you wrote bright light on this, you

24        were talking about the flash that you saw from the

25        gun, correct?

188

1    A    Yes.

2    Q    So at the time when you talked to the police about

3         three, four days after this happened, this is where

4         you put the bright light?

5    A    Yes.

6    Q    And you put it pretty close to where Paul was,

7         right?

8    A    Yes.

9    Q    And that's the only person that you saw?

10   A    Yes.

11   Q    All right.

12             ATTORNEY VISHNY:  I'm going to move Exhibit

13        99 into evidence.

14             THE COURT:  Any objection?

15             ATTORNEY SCHNEIDER:  No.

16             THE COURT:  99 will be received.

17             ATTORNEY VISHNY:  How do I shut this off

18        again?  Oh, there?  Okay.

19   Q    (BY ATTORNEY VISHNY)  Now, as far as Chong Lee goes,

20        you know, you didn't like particularly go to Luna

21        with him that night, he was just part of a crowd that

22        you were going out with, right?

23   A    Yes.  We were all together before and then we were

24        all together there.

25   Q    And certainly he's not anybody you've ever dated,

189

```
1          right?

2     A    No.

3     Q    You dated Xung at some time in the past?

4     A    Yes.

5     Q    Xung, X-U-N-G, who we were talking about earlier,

6          right?

7     A    Yes.

8     Q    You weren't dating him at that time, he had a

9          different girlfriend by then, right?

10    A    Correct.

11    Q    And when you drove over from City Limits to Luna, you

12         went in a car with Phong and Dalinda?

13    A    Yes.

14    Q    Not with Chong?

15    A    Yes.

16    Q    And if Chong was a part of a group or if there were

17         other people who went to Sharks, you weren't part of

18         that group of people, right?

19    A    Right.

20    Q    So you and this particular group of people, you're

21         kind of more loosely related in terms of going over

22         to Luna to have a fun time together, right?

23    A    Can you repeat or --

24    Q    Well, you're together as a group but it's not like

25         you made specific plans with Chong or Paul or with
```

190

1    people, your plans were Xung and then other people

2    got together with you guys, right?

3  A  Yes.  We all planned to go to Luna though.

4  Q  Okay.  And Chong was a friend of yours at the time,

5    right?

6  A  Yes.

7  Q  As were the other people at the time.

8  A  Yes.

9  Q  After the shooting happened, you haven't talked to

10    any of the people who were there since then except

11    for Dalinda, correct?

12  A  No.  I've talked to -- directly after the shooting,

13    no.

14  Q  Directly after the shooting.  You have talked to

15    Dalinda directly since the shooting, right?

16  A  Yes.

17  Q  But you didn't talk directly, you've never talked

18    directly to any of the other people who were there,

19    right?

20  A  In --

21  Q  Since the shooting.

22  A  From now until the shooting?

23  Q  Well, between let's say after the shooting to when

24    you talked to the police, you didn't directly talk to

25    people then.

191

1   A   I spoke to Lisa on the phone.

2   Q   Lisa wasn't there, right?

3   A   Right.

4   Q   Lisa Stutzman is not -- you know her as the

5       girlfriend of one of Chong's brothers, right?

6   A   Yes.

7   Q   And neither Lisa nor her boyfriend, whose name is Hu,

8       H-U, were at Luna that night, right?

9   A   Correct.

10  Q   And so would not have any personal knowledge of what

11      occurred, right, they weren't there to witness

12      anything?

13  A   They were not there.

14  Q   Okay.  So you -- so my question, if I understand it,

15      is you have not talked to anybody who was directly

16      there.

17  A   Right.

18  Q   Okay.  So, now, it was dark in Luna but you could

19      still see because you got used to the low lighting

20      there.

21  A   Yes.

22  Q   All right.  So it's not like walking -- you know how

23      you walk from bright sunlight into a dark room and

24      you can't see squat, you know what I mean?

25  A   Yes.

```
1    Q    It wasn't like that?

2    A    No.

3    Q    Your eyes were adjusted to what was going on?

4    A    Yes.

5    Q    Now, when -- so you really didn't see a fight, per

6         se, right?

7    A    No.

8    Q    Okay.  Now, when this happened and the guy got hit,

9         you saw the bright light, everything happened super

10        fast at that point.

11   A    Yes.

12   Q    And you're just focusing on getting out of there,

13        right?

14   A    Yes.

15   Q    So you don't remember who was right in front of you

16        right at the time of the bright light, right?

17   A    Correct.

18   Q    And you couldn't tell the police that, right?

19   A    No.  The only person I remember being in front of me

20        was Dalinda.

21   Q    Okay.  And -- so whatever you've seen in these

22        pictures is just what the pictures show, not your own

23        independent memory?

24   A    Correct.

25   Q    Chong Lee was not wearing a white coat that night,
```

```
1           right?  Do you remember?

2      A    I remember him wearing black sleeves.  I don't know

3           what color his coat was.

4      Q    A black center and dark sleeves, does that ring a

5           bell?

6      A    Yeah.  It was dark sleeves, but I don't know what the

7           center was.

8      Q    So you just don't recall anymore at this time?

9      A    Right.  Just the dark sleeves.

10     Q    Now, when you talked to Dalinda at one point, Dalinda

11          Guzman -- was her name Guzman or Melo at the time?

12     A    It is both combined, sometimes she goes by both of

13          them.

14     Q    So she has a hyphenated name?

15     A    Yes.

16     Q    So when Miss Melo-Guzman called you, you actually

17          talked to her and she was asking you some questions,

18          right?

19     A    Yes.

20     Q    And were you aware that she called you and that the

21          police were actually listening in on the phone?

22     A    No.

23     Q    That's something you became aware of later?

24     A    Yes.

25     Q    All right.  So a call is placed to you by Dalinda and
```

194

1          she sounds pretty upset, right?

2     A    Yes.

3     Q    And she is asking you for some help to find out who

4          the shooter is, right?

5     A    Yes.

6     Q    And she's telling you, look, I need you to find out

7          because the police are putting pressure on her and

8          she might lose her job and that's why she's pleading

9          with you to try to find out, correct?

10    A    Yes.

11    Q    And when she tells you the police are putting

12         pressure on her and potentially threatening that she

13         could lose her job, you said, look, I don't know who

14         did it, right?

15    A    Yes.

16    Q    And I don't want to find out who did it, right?

17    A    Yes.

18    Q    And that you hadn't talked to any of the people who

19         had been there, right?

20    A    Yes.

21    Q    And that was all true, you hadn't talked to any of

22         the people who were there?

23    A    Yes.

24    Q    And she kept kind of begging and pleading with you on

25         this phone call, but there was nothing you could

195

1    really do to help her because you didn't want to get

2    anymore involved, you just wanted to stay away from

3    the whole thing?

4  A  Correct.

5  Q  Now, of course, despite your desire to never be

6    involved, the police came to talk to you, right?

7  A  Yes.

8  Q  And is it fair to say that when police detectives

9    came to you, it wasn't a real surprise to you,

10   right?

11 A  Right.

12 Q  In fact, you had told Dalinda on the phone, look, I'm

13   sure they're going to come talk to me, right?

14 A  I don't remember saying that but --

15 Q  All right.  I'll come back to that.

16 A  Okay.

17 Q  But you certainly weren't trying to avoid talking to

18   the police when they came to see you, right?

19 A  No.

20 Q  Or -- and you were trying to be cooperative when they

21   came.

22 A  Yes.

23 Q  And do you remember the names of the police who came

24   to talk to you at all?

25 A  No.  I have their cards but I don't remember their

196

```
1          names.

2    Q     Does the name Sergeant Meyer, does that ring a

3          bell?

4    A     I have -- I have no idea what -- no idea who it

5          was.

6    Q     Okay.  Or Sergeant Tauber, you don't remember that

7          name?

8    A     No, I don't remember their names.

9    Q     All right.  So I'm just going to show you --

10                   ATTORNEY VISHNY:  I'm going to get this

11         marked.  I'm not going to be moving this into

12         evidence, but I'm going to get it marked for now.

13   Q     (BY ATTORNEY VISHNY)  Okay.  I'm going to show you,

14         this has been marked as Exhibit No. 1 (sic).  Okay?

15         And I'm just going to show it to you, and I'm just

16         going to state for the record that this has been

17         stipulated by the defense and the State that this is

18         a transcript, maybe not a hundred percent accurate,

19         but a transcript of your discussion with the police

20         when they came and questioned you at Mayfair Mall.

21   A     Okay.

22   Q     And you can see the names Q and Q1 on that?

23   A     Um-hum.

24   Q     And the A.  The A is you, right?

25   A     Okay.
```

197

```
1    Q    What are the names of Q and Q1?

2    A    Q is Sergeant Tauber and Q1 is Sergeant Meyer.

3    Q    Does that refresh your memory at all about names of

4         the people who came to talk to you?  And if the

5         answer is no, it's no.

6    A    No.

7    Q    Okay.  Thanks.

8             Now, when the police came to talk to you about

9         what happened, you told them exactly what you knew,

10        right?

11   A    Yes.

12   Q    You told them really the exact same things that you

13        have testified to under oath here today.

14   A    Yes.

15   Q    And -- but the police weren't believing you when you

16        told them that, were they?

17             ATTORNEY SCHNEIDER:  Objection.  Calls for

18        speculation.

19   Q    (BY ATTORNEY VISHNY)  You felt -- I'll rephrase this.

20             You felt the police were not accepting what you

21        had to say, right?

22   A    Sometimes.

23   Q    Okay.  They were putting a lot of pressure on you to

24        try to change what you had to say?

25             ATTORNEY SCHNEIDER:  I'm going to object.
```

198

1                That calls for speculation.

2                        ATTORNEY VISHNY:  I will rephrase the

3        question.

4                        THE COURT:  Go ahead.

5    Q    (BY ATTORNEY VISHNY)  Did you feel at times that they

6        were putting a lot of pressure on you to change what

7        you had to say?

8    A    Maybe not to change but they weren't necessarily

9        accepting of my answer.

10   Q    Okay.  Do you remember being told by the police --

11       well I'm going to show you Page 10.  This -- just so

12       you know, Page 10, so it's pretty early in your

13       interview.  I can bring it back if you need me to

14       bring earlier pages.  All right?  Do you remember

15       fairly early in the interview being asked by either

16       Tauber or Meyer when you saw the gun?  Do you

17       remember saying that?

18   A    Yes.

19   Q    Them saying that, I'm sorry.  And you said, because I

20       didn't, I didn't see the gun at all.  I never saw a

21       gun, I just saw the flash.

22   A    Yes, I remember saying that.

23   Q    And that it looked like a white light?

24   A    Yes.

25   Q    And they asked you some questions about whether or

199

1      not you saw a fight, right?

2    A    Yes.

3    Q    And you told them you didn't really see a fight?

4    A    Yes.

5    Q    The only person you remembered was Paul, right?

6    A    Yes.

7    Q    And you remember them asking you whether or not the

8         woman who beat you up was saying you know who did it

9         and telling them -- you were telling that woman I

10        don't know who did it, right?

11   A    Yes.

12   Q    Does that help remind you at all, did that -- when

13        that woman said to you, you know who did it, were you

14        telling her, look, I don't know who did it?

15   A    I just remember saying I don't know and putting my

16        hands over my face.

17   Q    Okay.  But when you talked to the police, they asked

18        you this question, do you remember what the girl was

19        saying that grabbed you and jumped you, and you said,

20        I was like, no, I don't, I don't know who did it?

21   A    Yes.

22              ATTORNEY SCHNEIDER:  What page was that

23        please?

24              ATTORNEY VISHNY:  I'm sorry.  Page 14.

25   Q    (BY ATTORNEY VISHNY)  All right.

200

```
1              Now, do you remember the police early in the
2        interview after explaining that you and -- what was
3        going on with Dalinda, saying to you that they wanted
4        to help you out as much as they could with the whole
5        situation?
6    A   Yes.
7    Q   And that you were probably scared.  Do you recall
8        that?
9    A   Yes.
10   Q   And telling you they had exactly on video where you
11       were standing?
12   A   Yes.
13   Q   And that -- what you interpreted that to mean was
14       that they had you on video exactly where you were
15       standing when the shot went off, right?
16   A   Yes.
17   Q   Page 12, 531.  Do you recall the police officer
18       saying, so I don't want to jam you up with any of
19       that stuff?
20   A   I don't remember that.
21   Q   You don't remember it.  Okay.
22            I'm going to show you again, this will be Page
23       12, Exhibit 100, see if that helps refresh your
24       memory of the police saying this.
25   A   (Witness reading.)
```

201

```
1    Q    No, you don't have to read it out loud, just read it
2         to help refresh your memory.
3    A    I remember them saying that they had the video, I
4         don't remember the jam you up.
5    Q    What they said is that they needed your help,
6         right?
7    A    Yes.
8    Q    And they said, I need you to be a hundred percent
9         honest with me, I will walk you through the whole
10        entire thing, like, whatever you tell me has to be
11        100 percent, you have to tell me 100 percent, excuse
12        me, those are the exact words.  And you said okay?
13             ATTORNEY SCHNEIDER:  What page again?
14             ATTORNEY VISHNY:  12.  Line 527 is where
15        I'm going next.
16   Q    (BY ATTORNEY VISHNY)  Do you remember that's what was
17        said?  Even if you don't remember it, it's okay that
18        you don't remember, we're just going to go over what
19        it is.
20             And then he said, okay, because I have on video
21        exactly where you're standing, and then there is
22        something that can't be heard on the tape, right?
23   A    Um-hum.
24   Q    That's what it says, right?
25   A    Yes.
```

202

1    Q    And you say okay, right?

2    A    Yes.

3    Q    And the police officer or detective says, so I don't

4         want to jam you up with any of that stuff, correct?

5    A    Correct.

6    Q    And then you tell him you're honestly telling him to

7         the best of your knowledge, right?

8    A    Yes.

9    Q    And it continues on and you're telling him that and

10        he's urging you to try to remember and you keep

11        telling him again and again you don't really

12        remember, correct?

13   A    Yes.

14             ATTORNEY VISHNY:  Page 15.

15   Q    (BY ATTORNEY VISHNY)  Now I'm going back to Exhibit

16        100, Page 15.  Starting at line 641.  If you want to

17        just read that and remind -- see if that reminds you

18        of the police conversation.

19             Does that remind you at all?

20   A    Yes, a little.

21   Q    And so the police officer is saying to you, you have

22        to have said something to somebody about what

23        happened, words to that effect, correct?

24   A    Yes.

25   Q    And they tell you, look, a lot of people's lives are

203

```
 1        at risk right now, right?
 2   A    Yes.
 3   Q    And then they say to you, because I don't think, and
 4        correct me if I'm wrong, I don't think you told
 5        anybody kill someone.
 6   A    Right.
 7   Q    And they say, okay, I don't think you're that kind of
 8        person, I don't think you'd tell them you need to
 9        shoot that person or anything.  Right?
10   A    Right.
11   Q    So when they are saying that to you, do you have a
12        memory of that now, of them talking to you like
13        that?
14   A    Yeah.
15   Q    Suggesting that you could be part of some kind of
16        conspiracy to kill somebody?
17   A    Yes.
18   Q    And you felt pressured when they were saying things
19        like that to you, right?
20   A    Yes.
21   Q    Your interpretation was they were trying to infer
22        that somehow you were part of a murder, right?
23   A    Yes.
24   Q    And it got to the point as they questioned you over
25        and over, and you kept telling them I didn't see
```

204

1    this, right?

2  A    Yes.

3  Q    And it even got to the point where you felt so

4        horrible about how they were questioning you that you

5        started crying?

6              ATTORNEY SCHNEIDER:  Objection to

7        "horrible".  She can ask her how she feels, but I

8        think that is a mischaracterization until it comes

9        from the witness.

10             ATTORNEY VISHNY:  I will change -- I

11       will --

12             THE COURT:  I'll order that the word

13       horrible be stricken.  Please rephrase.

14  Q    (BY ATTORNEY VISHNY)  So you were feeling some

15       emotion to the point where you started crying,

16       right?

17  A    Yes.

18  Q    What emotion was that?

19  A    I was frustrated.

20  Q    And is it fair to say that the reason you were

21       frustrated was because you were telling the truth and

22       the police were acting like they didn't believe

23       you?

24  A    Yes.

25  Q    Is it fair to say that it seemed that they were

```
 1          trying to imply if you didn't tell them who did it,
 2          you must be a part of the whole thing?
 3    A     Yes.
 4    Q     Now, you said that you talked to Lisa, or you went
 5          over to Lisa Stutzman's house that night, correct?
 6    A     Yes.
 7    Q     And when you went there, you told her that evening
 8          that you thought Paul Lee had done the shooting.
 9    A     I don't -- do you have it written?
10    Q     Yes.  I'm showing you again Exhibit 100.  If you need
11          me to bring a prior page to orientate yourself, I
12          will, but just take a look real quickly.
13    A     This sentence right here.
14    Q     All right.  And this is again a transcript of you
15          talking to the police, right?
16    A     Yes.  I remember saying that.
17    Q     And you told the police that when you went to Lisa's
18          house that night, you remembered saying I think Paul
19          did it?
20    A     Yes.
21    Q     And because you said that -- because that's what you
22          were thinking at the time?
23    A     Yes.
24                ATTORNEY VISHNY:  I don't have any further
25          questions at this time.
```

```
 1                    THE COURT:  Any redirect, Attorney
 2      Schneider?
 3                    ATTORNEY SCHNEIDER:  Yes.
 4                  EXAMINATION OF ALYSON BLOM
 5      BY ATTORNEY SCHNEIDER:
 6      Q    Okay.  The only person you remember recognizing in
 7           that area when you saw the flash was Paul, correct?
 8      A    Yes.
 9      Q    Is that why you said to Lisa, I think Paul did it?
10      A    That would make sense.
11      Q    You didn't -- you couldn't recognize where anyone --
12           who anyone else was?
13      A    Correct.
14      Q    You didn't know where Chong was at the time?
15      A    Correct.
16      Q    So that's the -- that's the only reason why you said
17           to her I think Paul did it because you remember --
18                    ATTORNEY VISHNY:  Objection.  Leading.
19                    THE COURT:  Please rephrase.
20      Q    (BY ATTORNEY SCHNEIDER)  What was the reason you told
21           her that you thought Paul did it?
22      A    Because he was the only person that I saw.
23      Q    That you recognized?
24      A    That I recognized in the group.
25      Q    But there were other bodies there, you just didn't
```

207

1        really pay attention?

2   A    Yes.

3   Q    The people in the area where you saw Paul, were they

4        staying still or moving?

5   A    I don't remember.  I remember them standing still.

6   Q    And during cross the phone call with Dalinda was

7        referenced and she asked for your help, correct?

8   A    Yes.

9   Q    Do you remember how you responded?

10  A    No.

11  Q    Do you ever remember telling her you were scared to

12       find out?

13  A    I remember saying something about how I didn't want

14       to know, and I do remember telling her to tell her --

15       to just say what had happened if she knew.

16  Q    And, Miss Blom, it's fair to say that you really

17       didn't want to become involved or talk with the

18       police.

19  A    Correct.

20  Q    And you didn't really want to find out who did

21       this?

22  A    Correct.

23  Q    Why was that?

24  A    Because I could have possibly knew the person and I

25       didn't want to know.

1   Q   Do you remember when the police came to talk to you
2       on December 11th, did they tell you why they were
3       there?
4   A   Yes, they said regarding the incident that had
5       happened at Luna.
6   Q   And do you remember if you initially told them that
7       you were at Luna?
8   A   Yes.  I told them later, I don't remember how the
9       conversation played out though, but I did say that I
10      was there.
11  Q   Do you remember initially telling them that you saw
12      it on the papers?
13  A   Well I did see it in the paper, yes.
14  Q   I want to go back to something that you stated.  When
15      you talked to the police, you drew the drawing that
16      we had seen, Exhibit 99, correct?
17  A   Yes.
18  Q   And your testimony here today is that you remember
19      the light being somewhere in front of you?
20  A   Yes.
21  Q   Do you remember telling them the light could have
22      been on the right side of you as you were walking
23      out?
24  A   I don't remember.
25  Q   And your testimony today is it's somewhere in front

209

```
 1          of you, but you can't give any distance to that?
 2    A     I can't.  I can't give any direction of where it was.
 3          I just know that it was in front of me.
 4    Q     And by in front of you, do you mean, Miss Blom, like
 5          not directly in front of you but somewhere in your
 6          range of vision in front?
 7    A     Yes.  If you could go like this, like --
 8    Q     Kind of at an angle out from your eyes?
 9    A     Yes.
10    Q     Miss Blom, this is again the copy of the transcript,
11          your name is on there, date is December 11th, 2013?
12    A     Yes.
13    Q     I want to direct your attention to Page 10.
14              On cross you were asked questions, and I think
15          if you look at 432 you were asked a question because
16          the officer said to you:  When did you see the gun.
17    A     Yes.
18    Q     And your answer was, like I didn't see a gun.
19    A     Correct.
20    Q     I want you to look up at line 417, same page.  That's
21          an answer you provided, correct?
22    A     Yes.
23    Q     Can you read that answer please?
24    A     And I ran out -- I -- well, she ran first because I
25          don't know.  Immediately I was just like, oh, my God.
```

210

```
 1          Gun.  Like, go.

 2     Q    So you mention in that answer to them, gun?

 3     A    Yes.

 4     Q    And then in follow-up, the officer asked you when did

 5          you see a gun?

 6     A    Yes.

 7     Q    And when you talked with the officers, did you

 8          describe knowing Chong and Paul and his family?

 9     A    Yes.

10               ATTORNEY SCHNEIDER:  I don't have any other

11          questions.

12               ATTORNEY VISHNY:  Very brief recross.

13               THE COURT:  Very good.  Thank you.
```

**EXAMINATION OF ALYSON BLOM**

**BY ATTORNEY VISHNY:**

```
16     Q    So when the police officer -- when you were saying

17          oh, my God, gun, you were referring to the reaction

18          that what you heard was -- and the light and putting

19          together was a gunshot, right?

20     A    Yes.

21     Q    Never because you actually saw a gun?

22     A    I didn't see it.  I -- that was what was going on in

23          my head when I was explaining that to them.

24     Q    Okay.  And if I get this correctly -- by the way, you

25          were shown a police report before coming to court
```

1    today written by an officer that is kind of a summary

2    of what you said to help remind you, right?

3  A  Yes.

4  Q  But you were never given a copy of your actual tape

5    recording before you were called by the State to go

6    over that, right?

7  A  Correct.

8  Q  And you were never shown a transcript of what you had

9    said?

10 A  Correct.

11 Q  Okay.  Now, the very last thing I want to say is when

12    you remember this flash and the people around you,

13    what you remember right at that time is they were

14    standing still, right?

15 A  Yes.

16 Q  Just like you were standing still, right?

17 A  Yes.

18 Q  Because everybody froze for a second, right, you

19    froze for a second when you heard this?

20 A  I don't know.

21 Q  You're not sure.  But whatever you did, you then ran

22    out?

23 A  Yes.

24             ATTORNEY VISHNY:  Nothing further.

25             THE COURT:  Attorney Schneider, does that

212

1        prompt any clarification questions?

2                    ATTORNEY SCHNEIDER:  Just one second.  No.

3                    THE COURT:  Ladies and gentlemen of the

4        jury, do you have any questions you wish to submit

5        for consideration?

6                    (No response.)

7                    THE COURT:  Very good.

8            Miss Blom, thank you very much.  You are

9        excused.

10           If I could get the attorneys to come up for just

11       a second.

12                   (Bench conference.)

13                   THE COURT:  Ladies and gentlemen, we were

14       -- I was figuring out where we are witness-wise.  We

15       are going to have another witness, but what I'd like

16       to do is complete that witness today, and -- I don't

17       expect that it will -- we'll be done before 6:00 is

18       what I'm greatly expecting, and it may be well in

19       advance of that, but why don't we take a restroom

20       break now, take five minutes, and that way we can get

21       into the witness, we don't have to take a break, and

22       then we'll be able to get you on your way.

23           If you could please rise for the jury.

24                   (The jury was escorted out of the

25       courtroom.)

213

```
 1                    THE COURT:  And just briefly, during Miss
 2          Blom's testimony we did have a single sidebar related
 3          to certain telephone calls.  It was agreed that it
 4          would be recognized that the telephone calls came
 5          from a number belonging to Mr. Lee but that would be,
 6          by and large, the extent of --
 7                    ATTORNEY VISHNY:  I just want to clarify
 8          something about the record.  I used the transcripts
 9          for purposes of refreshing recollection and read
10          things into the record.  Does that mean I need to
11          provide a copy of this transcript to the court?
12          Because these have my notes all over it so I don't
13          want to do that.
14                    ATTORNEY SCHNEIDER:  We probably have a
15          clean copy if you want.
16                    THE COURT:  I would expect --
17                    ATTORNEY VISHNY:  I wasn't going to move
18          this in because it's really not an exhibit.
19                    ATTORNEY SCHNEIDER:  Our clerk has a weird
20          rule about it though.
21                    THE COURT:  Attorney Vishny, we were just
22          talking, if it's being simply used to refresh
23          recollection, we won't mark it as an exhibit.
24                    ATTORNEY VISHNY:  Her recollection was
25          exhausted, and I read from it, you know, I mean
```

214

1          there --

2                    THE COURT:  Let's get a clean copy then.

3                    ATTORNEY VISHNY:  All right.

4                    THE COURT:  Okay.  All right.  So about

5          five minutes.

6                    ATTORNEY SCHNEIDER:  Thank you.

7                    (Court in recess.)

8                    (The jury was escorted into the courtroom.)

9                    THE COURT:  Attorney Schneider, are you

10         prepared with your next witness?

11                   ATTORNEY SCHNEIDER:  We are.  We would call

12         Tou Shoua Lee.

13                   THE COURT:  Sir, if you would please come

14         to the witness stand, remain standing and the clerk

15         will swear you in.

16                   THE CLERK:  Please raise your right hand.

17                   (Oath administered to witness.)

18                   THE WITNESS:  Yes.

19                   THE CLERK:  Please state your full name and

20         spell it for the record please.

21                   THE WITNESS:  Tou Shoua Lee, T-O-U,

22         S-H-O-U-A, and Lee.

23                   THE COURT:  Thank you, sir.  You may be

24         seated.

25              Miss Schneider, your witness.

215

1                    ATTORNEY SCHNEIDER:  Thank you.

2                 **EXAMINATION OF TOU SHOUA LEE**

3    **BY ATTORNEY SCHNEIDER:**

4    Q    Good afternoon, Mr. Lee.  May I call you Tou Shoua?

5    A    Yeah.

6    Q    Or is it just Tou?

7    A    You can call me Tou.

8    Q    Tou.  Thank you.  How old are you, Tou?

9    A    I'm 25 years old.

10   Q    Where were you raised?

11   A    I was raised in Appleton, Wisconsin.

12   Q    And are you working now?

13   A    Yes, I am.

14   Q    Full-time?

15   A    Yeah.

16   Q    Tou, I want to direct your attention back to

17        Saturday, December 7th of 2003 (sic), Saturday

18        evening until the early -- 2013, into the early

19        morning hours of December 8th.  Do you remember if

20        you had to work back on that day?

21   A    I don't remember.

22   Q    Okay.  Do you remember where you were in the evening,

23        I'm going to say after, around dinnertime?

24   A    I was at home.

25   Q    What were you doing?

216

```
 1   A   I believe I was watching the Big 10 football
 2       championship game.
 3   Q   And did you have plans for the night?
 4   A   I did not.
 5   Q   Ultimately did you have some plans?
 6   A   No.
 7   Q   Okay.  Did anyone contact you?
 8   A   Yes.  My cousin did.
 9   Q   And who was that?
10   A   Phong.
11   Q   And after talking with Phong, were plans made for the
12       night?
13   A   Yeah.
14   Q   And what were those plans?
15   A   To go meet up at the bar.
16   Q   Was there a -- a particular bar you were going to
17       meet up at?
18   A   City Limits in Menasha.
19   Q   Okay.  Okay.  One second.
20           And did you end up meeting up with Phong?
21   A   Yes, I did.
22   Q   How did you get to City Limits?
23   A   I drove.
24   Q   Was anyone with you?
25   A   My buddy.
```

1    Q    Did you stay at City Limits or did you go anywhere

2         else?

3    A    We were there and then we left.

4    Q    Where did you go?

5    A    We went downtown Appleton.

6    Q    Who else was at City Limits besides yourself, you

7         said a buddy, was Phong there?

8    A    Yes, he was.

9    Q    Anyone else you knew?

10   A    Chong, Paul and Xung and Alyson.

11   Q    And is Xung X-U-N-G?

12   A    Yup.

13   Q    Alyson?

14   A    Yup.

15   Q    Alyson, do you know her last name?

16   A    I do not.

17   Q    Is she a Caucasian girl?

18   A    Yes.

19   Q    The Chong that you referred to, Chong Lee, correct?

20   A    Correct.

21   Q    Is he here today in the courtroom?

22   A    Yes, he is.

23   Q    Can you identify him by some clothing that he's

24        wearing?

25   A    Green.

1    Q    Long sleeve or short sleeve shirt?

2    A    Long.

3              ATTORNEY SCHNEIDER:  Your Honor, I'd ask

4         the record reflect identification.

5              THE COURT:  The record shall so reflect.

6    Q    (BY ATTORNEY SCHNEIDER)  You said Paul Lee was there.

7         Do you know how Paul and Chong are related?

8    A    I believe they are brothers.

9    Q    So after City Limits you went downtown Appleton?

10   A    Correct.

11   Q    Did you go directly downtown or did you go somewhere

12        else?

13   A    I went home first.

14   Q    Why did you go home?

15   A    Because I live down the road so to drop off the

16        car.

17   Q    Did you not want to drive after you'd been out

18        downtown?

19   A    Correct.

20   Q    Were you going to be drinking that night?

21   A    Yes.

22   Q    Do you remember where you went first?

23   A    We went to Sharks.

24   Q    And that's the pool hall?

25   A    I believe so.

1   Q    How many entrances are there to Sharks?

2   A    I believe there are two.

3   Q    The -- what I might call the main entrance, what

4         street does that face?

5   A    College.

6   Q    And can you get out or in another way?

7   A    I believe so, yeah.

8   Q    When you exit through the other door, or enter,

9         what's in that area?

10   A    The alley.

11   Q    Is there a big parking structure there too?

12   A    Yes, there is.

13   Q    When you went there, do you remember which entrance

14         or -- you used, either the College Avenue one or the

15         alley?

16   A    I believe the alley.

17   Q    How long do you think you were at Sharks?

18   A    Possibly maybe 20, 30 minutes.

19   Q    The group you had mentioned before, Chong, Paul,

20         Xung, Alyson, Phong, were they at Sharks as well?

21   A    Yes, they were.

22   Q    After leaving Sharks after about 20 to 30 minutes,

23         where did you go?

24   A    We went down to Luna.

25   Q    Did you all go as a group if you recall?

```
 1    A    If I remember, yes, we did.

 2    Q    Were there any other girls other than Alyson with

 3         your group?

 4    A    I don't think so.

 5    Q    At Luna, where did you go to?

 6    A    Just the bar to drink.

 7    Q    Okay.  Luna has both -- couple bars, correct?

 8    A    Correct.

 9    Q    Does it have a dance floor?

10    A    Yes, it does.

11    Q    Okay.  So did you stay by the bar, move around?

12    A    Move around.

13    Q    Okay.  Was anyone particularly with you while you

14         were at Luna or were they just there and doing their

15         own thing as well?

16    A    Everybody is doing their own thing.

17    Q    And at the end of the night, you didn't -- you could

18         walk home, correct?

19    A    Correct.

20    Q    You didn't need to wait for a ride or wait to give

21         anyone a ride?

22    A    Correct.

23    Q    Do you remember around bar closing time where you

24         were?

25    A    I believe I was by the entrance.
```

221

1    Q    The entrance of Luna?

2    A    Correct.

3    Q    Prior to getting to the entrance, do you remember,

4         were you on the dance floor by the bar or were you

5         just walking through?

6    A    I think I was walking from the dance floor.

7    Q    Anyone with you?

8    A    I don't think so, if I remember.

9    Q    As you were walking through Luna past the bar into

10        the entranceway, do you remember seeing anyone?

11   A    Yes.

12   Q    What did you see, Tou?

13   A    I remember seeing Paul and Phong and them, they were

14        like standing there talking.

15   Q    Could you see who they were talking to?

16   A    I don't remember.

17   Q    Were they talking just among themselves or to anyone

18        else, if you know?

19   A    I believe they were talking to somebody else.

20   Q    What did you do at that point?

21   A    I stopped.

22   Q    Was that in the area by the entrance or in by the bar

23        still?

24   A    By the bar.

25   Q    Did you ever then go into that entranceway?

222

```
1    A    Yes, I did.

2    Q    What do you remember seeing when you went into the

3         entranceway?

4    A    I remember seeing them talking to somebody.

5    Q    Who is them?

6    A    Phong and Paul and them.

7    Q    Did you see or know where Chong was at that time?

8    A    I did not.

9    Q    What did it look like to you when you saw Phong and

10        Paul talking to this other person?

11   A    It looked like they were gonna -- they were

12        arguing.

13   Q    What did you think or do at that time?

14   A    I just thought I would stop there, just make sure

15        that they don't do nothing stupid or fight or

16        something.

17   Q    Do you think you could have tried to keep it calm?

18   A    Yes.

19   Q    The person that they were arguing with or about to

20        argue with, male or female?

21   A    Male.

22   Q    Do you remember anything about his race?

23   A    He was Caucasian.

24   Q    What do you remember then, Tou?

25   A    I remember arguing, saying stuff back and forth, and
```

223

1       then I remember seeing Paul like throw a punch at
2       him.
3    Q  Did he actually strike him?
4    A  From what I remember, I think he did.
5    Q  What happened then?
6    A  And then we all like stepped back, and then I was
7       trying to make sure that it doesn't continue on.
8    Q  Do you remember the area where this was, was it
9       brightly lit, dark, in the middle?
10   A  I believe it was in the front foyer so that's -- I
11      believe that area is like dark.
12   Q  And with the people that were in that area, was it a
13      big area or were there a lot of people in the area?
14   A  There was a lot of people.
15   Q  So you see Paul throw a punch, what do you remember
16      then?
17   A  Then I remember just hearing something that sounded
18      like a gunshot.
19   Q  Did you see anything before that?
20   A  I don't remember.
21   Q  How long do you think you watched what happened?
22   A  Five, ten seconds.
23   Q  When you heard that noise, did it seem like that was
24      close to you?
25   A  Fairly, I guess.

224

```
1    Q    Do you remember seeing anything?

2    A    No.

3    Q    Up to this point, Tou, had you seen Chong at all?

4    A    I remember seeing him walk past like he was leaving

5         the area.

6    Q    Did he continue walking or did you see him do

7         anything after that point?

8    A    I remember seeing him like punch the guy that Paul

9         punched.

10   Q    What do you remember around that time?

11   A    I remember seeing the guy drop.

12   Q    Okay.  If you know, Tou, in relation to when you

13        heard that gunshot and saw Chong, you see him punch

14        the guy that Paul had punched, is what you said, and

15        then you saw the guy drop, correct?

16   A    Correct.

17   Q    Do you remember where in there, before, after or

18        during, the noise was?

19   A    It was I think after he punched him.

20   Q    So you see the punch, then you hear the boom?

21   A    Correct.

22   Q    And then the guy drops?

23   A    Correct.

24   Q    Could you see or do you remember seeing anyone

25        walking near or with Chong at that point?
```

225

1    A    I believe Alyson was.

2    Q    After this sequence and then the man's on the ground,

3         what did the people in the area do?

4    A    Everybody, like, scattered.

5    Q    Did you stay in the area for any length of time?

6    A    I did not.

7    Q    Do you remember or can you remember anything about

8         Chong's clothing?

9    A    I remember it was a dark color.

10   Q    Okay.  Probably not a thing guys pay attention to as

11        much as ladies, would you agree with me, Tou?

12   A    Correct.

13   Q    Do you remember if he had any hat on?

14   A    I don't remember.

15   Q    Okay.  I thought that might have been more of a guy

16        kind of thing than a lady thing.  After the guy

17        dropped, did you look at him at all?

18   A    I looked at him when I was leaving.

19   Q    What do you remember seeing?

20   A    I remember just seeing a guy laying on the ground.

21   Q    Did it surprise you?

22   A    Yes, it did.

23   Q    Did it shock you?

24   A    Yes, it did.

25   Q    I just want to clarify one thing.  Just one second

226

1      please.

2              After Paul threw the punch, did you see what he

3      did?

4   A   I don't remember.

5   Q   Okay.  Was there any amount of time between when Paul

6      threw the punch to when then you saw Chong throw a

7      punch?

8   A   Five or ten seconds, I think.  I don't remember.

9   Q   Do you remember anything -- so you left Luna then,

10     correct?

11  A   Correct.

12  Q   Were you paying attention to who was near you when

13     you left?

14  A   I didn't, I was not.

15  Q   Let me ask you this, Tou.  Was there -- were there

16     plans that anybody was going to crash at your place

17     after the night was done?

18  A   No, there was not.

19  Q   So you didn't need to wait for anybody or wait for

20     anybody to catch up?

21  A   Correct.

22  Q   After you went outside of Luna, you left, did you go

23     to the right or to the left?

24  A   I went to the right.

25  Q   Okay.  And which direction did you go to then walk

227

1     home?

2  A  I just walked down Division Street.

3  Q  Do you remember seeing anything as you walked down

4     Division Street?

5  A  I remember just right outside of Luna Alyson and some

6     female was fighting, and then there was a guy saying,

7     hey, help me split them up.

8  Q  Did you try to help?

9  A  Yes, I did.

10 Q  Could you hear anything that was being said at that

11    time?

12 A  I don't remember what was being said.

13 Q  And after that kind of help me split them up with the

14    girls, did you stop anywhere or did you continue to

15    walk home?

16 A  I just walked home.

17 Q  When you were outside at the time you saw the girls

18    fighting, did you hear anything else other than the

19    girls arguing or fighting?

20 A  I remember hearing police sirens.

21 Q  Did you hear any other noises that sounded like

22    gunshots at all?

23 A  I don't think so.

24 Q  Other than -- do you remember the girls, the area

25    where they were fighting, were other people

228

1      watching?

2   A   There was a lot of people.

3   Q   Okay.  Did you really pay attention to what those

4      people were doing other than just standing by and

5      watching?

6   A   No.

7   Q   And at some point, Tou, the police came and spoke

8      with you, correct?

9   A   Correct.

10  Q   And do you remember them asking you to draw

11     something?

12  A   Yes, I do remember.

13  Q   Okay.  And was it Sergeant Thao that spoke to you?

14  A   Correct.

15          ATTORNEY SCHNEIDER:  Are we at 101?

16          THE CLERK:  102.

17  Q   (BY ATTORNEY SCHNEIDER)  Just give me one second.

18          And then, Tou, if you want to turn that way --

19     actually, I'm probably going to have to do this in

20     spots.

21          First, just to confirm, I'm showing you Exhibit

22     102.  I'm going to turn it sideways.  It may look a

23     little funny, but that's the best way I can get it

24     all in right now.

25          Do you recognize your name in where it would be

229

```
1          kind of the upper left-hand corner of this drawing?

2     A    Yes.

3     Q    And there is a date below that, and I can zoom in on

4          it, but it's - I'll flip it this way - 12/18/13?

5     A    Correct.

6     Q    And did you draw some of this or did the officers

7          draw this?

8     A    I think the officer did.

9     Q    Was it based upon what you were describing to him?

10    A    Correct.

11    Q    And is there an area on here where you marked where

12         you were?

13    A    Yes, there is.

14    Q    And how is that marked, Tou?

15    A    With an X.

16    Q    Okay.  Is your -- is there any other -- is your name

17         near it?

18    A    Yes, there is.

19    Q    So as I look at what's drawn as a box, in the upper

20         left there is an X and then the name Tou Shoua Lee?

21    A    Correct.

22    Q    Okay.  Did you -- I don't know --

23              ATTORNEY SCHNEIDER:  Can I approach, Judge?

24         Sorry.  I know I don't have to ask permission, but I

25         probably still will.
```

230

```
 1                    THE COURT:  That's okay.  I won't punish
 2         you if you do.
 3    Q    (BY ATTORNEY SCHNEIDER)  Tou Shoua, I want to just
 4         walk through this.
 5             So I'm pointing to the X in the upper left
 6         corner.  That's where you wrote Tou Shoua Lee.
 7    A    Correct.
 8    Q    And then as we go across that area, there is another
 9         X?
10    A    Yes.
11    Q    Who was located in that spot?
12    A    Phong.
13    Q    Phong.  And that's what's written next to that X?
14    A    Correct.
15    Q    And then going to the right further, there is the
16         word Paul, correct?
17    A    Correct.
18    Q    Where -- and I'm going to have you do this with the
19         -- and go ahead and stand up.  I know it's a little
20         odd, but watch out, there's a step.
21             Which X represents Paul?
22    A    I believe this one.
23    Q    So it would be the X that's immediately below his
24         name?
25    A    Correct.
```

```
 1   Q   As we continue over, there's additional X's that I
 2       would say are just to the left of a line going up and
 3       down, correct?
 4   A   Correct.
 5   Q   And over to the side is -- did you know who these
 6       three X's were?
 7   A   I did not.
 8   Q   Okay.  Joe Thor's name is over to the right.  Do you
 9       remember Joe being in the area?
10   A   Yes, I do.
11   Q   Do you remember where he was?
12   A   I believe he was -- he's one of those X's.  I don't
13       remember exactly which ones.
14   Q   Is there an area on here where you drew for the man
15       that fell, the victim?
16   A   I think so.
17   Q   Okay.  I'm going to give you the pointer.  And let me
18       just shift the image a little bit.
19           Now, is that a better representation where you
20       put the X for the victim?
21   A   Correct.
22   Q   Where is that?
23   A   I believe it was right there.
24   Q   Okay.  Is there any -- there's an X.  Is there any
25       letters near the X that would be representation for
```

232

1        the victim?

2    A   VC.

3    Q   Okay.  There's writing on here about Chong Lee.  Do

4        you see that?

5    A   Correct.

6    Q   Did you write that or did the officer?

7    A   I believe the officer did.

8    Q   And was that based upon what you described to him?

9    A   Yes.

10   Q   Okay.  So the names Chong Lee and then Alyson and

11       Michael Thor are written?

12   A   Correct.

13   Q   Okay.  I'm going to have you use the pointer, and I

14       know this is hard because they're up so high, but can

15       you point out for the jury the direction that you

16       remember seeing Chong as he walked through that

17       area?

18   A   I believe he was coming from the bar area, which

19       would be this way.

20   Q   Okay.  So he would be going from the left to the

21       right?

22   A   Correct.

23   Q   And then what -- did you write on here some words

24       written on here about what Chong Lee then did?

25   A   I don't remember.

```
 1   Q    Okay.  There is words on this drawing, I'm going to
 2        assume they say approaches VC, hears boom.  Does that
 3        seem to be what they are?
 4   A    I believe so.
 5   Q    And is that consistent with what you told Sergeant
 6        Thao?
 7   A    Correct.
 8   Q    Were there any other people near the man that
 9        ultimately fell to the ground?
10   A    There were some other people.
11   Q    Okay.  I just want to show you.  This is kind of
12        written going up and down the page.  There is the
13        word Luna foyer.  Do you see that?
14   A    Yes.
15   Q    Okay.  And there is some other words written there.
16        Can you read those?
17   A    I cannot.
18   Q    Okay.  And this -- you completed this with Sergeant
19        Thao?
20   A    Correct.
21   Q    And were these -- any notes on here based upon what
22        you told him?
23             ATTORNEY VISHNY:  Objection.  Lack of
24        personal knowledge.
25   A    I don't know.
```

```
 1                    THE COURT:  Foundation, counsel.
 2   Q   (BY ATTORNEY SCHNEIDER)  You were present when this
 3       drawing was made, correct?
 4   A   Correct.
 5   Q   Did you actually sign in the corner?
 6   A   I don't remember.
 7   Q   Okay.  And what is written on here, what we've talked
 8       about so far is fair and accurate as you recall where
 9       people were?
10   A   As far as I can remember.
11                    ATTORNEY VISHNY:  I'm sorry.  I couldn't
12       hear the answer.  He's facing away.
13   A   As far as I can remember.
14   Q   And the words where it says, approaches victim, hears
15       boom, that would be consistent with what you told
16       Sergeant Thao --
17   A   Correct.
18   Q   -- about Chong Lee?
19   A   Correct.
20   Q   Do you remember, Tou, that Sergeant Lee (sic) asked
21       if you would write a written statement as well?
22   A   I believe so.
23   Q   And when that was written, did you write it out
24       yourself?
25   A   Yes, I did.
```

235

```
 1   Q    Was Sergeant Thao even in the area when you were
 2        writing it out?
 3   A    Yes, he was.
 4   Q    Do you remember him leaving for a period of time?
 5   A    No.
 6   Q    Okay.
 7                  ATTORNEY SCHNEIDER:  Then at this point I
 8        don't have any other questions.  I move -- would move
 9        102 in.
10                  THE COURT:  Any objection to the receipt of
11        Exhibit 102?
12                  ATTORNEY VISHNY:  No.
13                  THE COURT:  Exhibit 102 shall be received.
14                  ATTORNEY VISHNY:  May I approach?
15                  THE COURT:  You may.
16                  (A bench conference was held.)
17                  ATTORNEY VISHNY:  Now -- where is the
18        diagram, Exhibit 102?
19                  ATTORNEY SCHNEIDER:  Up by the clerk.
20                  **EXAMINATION OF TOU SHOUA LEE**
21   **BY ATTORNEY VISHNY:**
22   Q    Mr. Lee, right after hearing that boom, you left the
23        bar, right?
24   A    Correct.
25   Q    You didn't wait around to see what was gonna happen.
```

236

```
1    A    Correct.

2    Q    You didn't wait around to see what had happened to

3         the victim, right?

4    A    Correct.

5    Q    And your mind was set on getting out of there,

6         right?

7    A    Correct.

8    Q    Now, if I look at this diagram, if I understand it

9         correctly -- let me just -- everybody, as I

10         understand it, that was around there was in a big

11         hurry to get out, right?

12    A    Correct.

13    Q    And so if I -- I'm going to actually turn the diagram

14         back a little bit.

15              So the door to get out of Luna, do you know

16         where that is on that diagram?

17    A    I believe it's --

18    Q    You're going to have to talk louder, unfortunately,

19         though?

20    A    I believe it's like in the middle to the right kind

21         of.

22    Q    The middle to the right?  So you don't really see it

23         drawn on the diagram?

24    A    I see it, but I'm not sure if that's the right --

25    Q    Okay.  I'm going to show you a different exhibit.
```

237

1          Maybe this will be a little bit more helpful.

2                        ATTORNEY VISHNY:  This is No. 2.  Actually,

3          you've used No. 1 before.  They're identical, right?

4                        ATTORNEY SCHNEIDER:  Two has the red X, one

5          does not.

6                        ATTORNEY VISHNY:  All right.  I'll use one.

7            I'm trying to get it out without ruining it.

8    Q     (BY ATTORNEY VISHNY)  Okay.  I'm just going to show

9          you what's been marked as Exhibit No. 1.

10            Now, just to kind of orient you, this is the

11         main door of Luna.  Do you understand that?

12   A     Yes.

13   Q     Okay.  And what you're saying, if you look at -- do

14         you want to look at your diagram while I do this?

15                       ATTORNEY SCHNEIDER:  It's actually still

16         above you, Attorney Vishny.

17   Q     (BY ATTORNEY VISHNY)  You can look at both at the

18         same time.

19                       ATTORNEY VISHNY:  Exhibit 1, as I

20         understand it, is drawn to scale, right?

21                       ATTORNEY SCHNEIDER:  Yes.

22   Q     (BY ATTORNEY VISHNY)  But the one up there is not

23         drawn to scale, Exhibit No. 102, this is just a rough

24         sketch.  Okay?

25   A     Okay.

1   Q   All right.  So when you see -- when you hear the

2       shot, everybody runs out, right?

3   A   Correct.

4   Q   And so the person who is the closest to the door when

5       everybody has run out, according to your sketch, is

6       Chong Lee, right?

7   A   Correct.

8   Q   Okay.  Because the door is over here, and that helps

9       you kind of visualize -- even though the door isn't

10      on Exhibit 102 up on the screen, that kind of helps

11      you show where the door would be, right?

12  A   Correct.

13          ATTORNEY VISHNY:  Where is that pointer?

14          ATTORNEY SCHNEIDER:  It's on the other side

15      of him against the wall.

16          ATTORNEY VISHNY:  Okay.

17  Q   (BY ATTORNEY VISHNY)  So utilizing the pointer and

18      trying to be, you know, the door would be somewhere

19      right about where I'm pointing, right?

20  A   Correct.

21  Q   So everybody starts running, so the purpose -- you

22      put Chong Lee, according to what you think, is here

23      at the time of the shooting, right --

24  A   Correct.

25  Q   -- according to this diagram.  So he's the closest to

239

1          the door, right?

2     A    Right.

3     Q    And then after him closest to the door would either

4          be Michael Thor or Paul, right?

5     A    Right.

6     Q    And then Phong would be closer, right?

7     A    Right.

8     Q    And then Alyson, right?

9     A    Right.

10    Q    And they're all running out, right?

11    A    Right.

12    Q    So Chong Lee is the first person out the door as far

13         as you know because he's in front of you, right?

14    A    Right.

15    Q    And of course it's going to take you longer because

16         you're way up at the corner --

17    A    Right.

18    Q    -- right?

19             I'd like to play Exhibit No. 31.  Okay.  We're

20         going to go frame by frame.

21             Now, when you -- you didn't actually draw that

22         diagram, right?

23    A    Right.

24    Q    And even when it's based on what you said, you were

25         being interviewed by Sergeant Thao, right?

240

```
 1    A    Right.

 2    Q    And it's fair to say he was leading you quite a bit

 3         during that interview, right?

 4    A    Right.

 5    Q    Trying to get you to say what he wanted you to say?

 6    A    I don't know if he was.

 7    Q    Okay.  You knew that Chong Lee had already been

 8         arrested for this at the time that Sergeant Thao came

 9         to talk to you, right?

10    A    Correct.

11    Q    So it had been about a week or so since Chong had

12         been arrested?

13    A    I don't remember.

14    Q    Okay.  And Sergeant Thao obviously told you that he

15         believed that Chong had committed the crime --

16    A    Correct.

17    Q    -- right?

18    A    Correct.

19    Q    And he told you that before you said anything,

20         right?

21    A    Right.

22    Q    And when he came and talked to you -- actually, when

23         he first showed up, one of the things you said was,

24         boy, you were glad to see Sergeant Thao, right?

25    A    Right.
```

241

1    Q    Because you're a little worried about problems with

2         the Appleton police, right?

3    A    Right.

4    Q    And it's fair to say, because Sergeant Thao is Hmong

5         and you are Hmong, you felt more comfortable talking

6         to him?

7    A    Correct.

8    Q    You thought he would understand you more?

9    A    Correct.

10   Q    But even though you said that, you expressed some

11        concerns about whether or not you would be perceived

12        as being involved in this shooting, right?

13   A    Correct.

14   Q    And Sergeant Thao expressed some concerns that you

15        could be involved in this, right?

16   A    I don't remember.

17   Q    Okay.  He told you -- did he tell you that if you

18        were helpful you really wouldn't have much to worry

19        about, right?

20   A    I don't remember.

21   Q    Okay.  We'll get back to that.  All right.

22             I'm going to show you what's been marked as

23        Exhibit No. 31.

24                  THE COURT:  You want the lights brought

25        down?

242

```
1                    ATTORNEY VISHNY:  You know, I can see it
2        perfectly well if people can see it.
3                    UNIDENTIFIED JUROR:  I would like it.
4                    ATTORNEY VISHNY:  Okay.  Well then we're
5        going to do it.
6    Q   (BY ATTORNEY VISHNY)  All right.  So we're going to
7        play this -- we're going to play this slowed down.
8        All right?
9    A   Okay.
10   Q   Can you see it okay?
11   A   Yes.
12   Q   All right.  We're starting at 13:50:25.
13           (Video played.)
14           Can you see who the first person is going out
15       the door?
16   A   The female?
17   Q   No, there's a guy.  Now can you see the very first
18       person going out the door?
19   A   Yes.
20   Q   That's not Chong Lee, correct?
21   A   I don't think so.
22   Q   That's Joe Thor?
23   A   I don't know.  I can't tell.
24   Q   Okay.  And then there's a woman who has on, what
25       looks like in the video, blonde hair and a white
```

243

1          coat, right?

2     A    Right.

3     Q    Do you know who she is?

4     A    I can't tell.

5     Q    Okay.

6               ATTORNEY SCHNEIDER:  Well, I guess I just

7          want some clarification on that question because I

8          think I see what I would say are two women.

9               ATTORNEY VISHNY:  I'm going to clarify it.

10         I'm about to clarify it.

11    Q    (BY ATTORNEY VISHNY)  There's two women going out

12         what looks like the left side of the door.  They're

13         not people who you know who are with your group at

14         all, right?

15    A    Right.

16    Q    So we have the man going -- pushing the door on the

17         right, you believe that's Joe Thor, right?

18    A    I don't know.

19    Q    You're not sure.  Okay.  So then we'll go to the next

20         frame, right?  You see a girl right behind Joe Thor

21         kind of more in the foreground and it looks like a

22         white coat?

23    A    Yes.

24    Q    Do you know who she is?

25    A    I do not.

244

1    Q    Okay.  Play another frame.

2              Now, the next person you see behind -- I'm going

3         to get that pointer.

4              ATTORNEY SCHNEIDER:  Evan, do you want to

5         put on the record what frame we're looking at?

6              ATTORNEY WEITZ:  Sure.

7    Q    (BY ATTORNEY VISHNY)  We're at 13:50:29.  All right.

8              So this is the man who you're not sure who it

9         is, right?

10   A    Right.

11   Q    And this is a woman, you're not sure who it is,

12        right?

13   A    Right.

14   Q    And then this is Paul Lee, correct?

15   A    Looks like, yes.

16   Q    Looks like Paul Lee?  And you can see there's

17        something in his hand, right?  Can you see that or

18        you can't tell?

19   A    I can't tell.

20   Q    Okay.  That's fine.  Let's go to the next frame.

21             Okay.  And now, when you see Paul Lee, does it

22        appear to you that he's putting his hand in his

23        pocket.

24   A    Looks like it.

25   Q    Okay.  And that would be at 13:50:30.

245

1          Next frame.  And then there's somebody behind
2      Paul Lee now, are we -- wait --
3              ATTORNEY VISHNY:  Did I say that right?
4              ATTORNEY WEITZ:  Yes.
5   Q   (BY ATTORNEY VISHNY)  We're still at 13:50:30.  You
6      can see somebody here is now in the next frame behind
7      Paul Lee, right?
8   A   Right.
9   Q   And does -- do you recognize that person as Phong
10     Lee?
11  A   Looks to be, yes.
12  Q   Okay.  And we'll go to the next frame.
13          All right.  And then we kind of have a gap after
14     Phong Lee, right?
15  A   Right.
16  Q   Next frame?
17             ATTORNEY SCHNEIDER:  I think we should
18     identify each play point when she says a frame and
19     she asks a question.
20             ATTORNEY VISHNY:  It's still 13:50:30.
21             ATTORNEY SCHNEIDER:  If he's going at one
22     pause, we would be able to recreate the record.
23             ATTORNEY VISHNY:  I will do that.  I would
24     like the record to reflect the last two frames were
25     at 13:50:30.  Now we'll do the next frame.

246

```
1    Q    (BY ATTORNEY VISHNY)  And now we're still at
2         13:50:30.  You still can see kind of a gap, right?
3    A    Right.
4    Q    Next frame.  Next frame.  We're still at 13:50:30.
5         This is also 13:50:30.
6              So right now we have a gap, we're still at
7         13:50:30, and Phong is the last guy out, right?
8    A    Correct.
9    Q    So the first guy, who you say might be Joe but you're
10        not sure, Paul and Phong are the first people out,
11        right?
12   A    Right.
13   Q    And then there's this woman who is right there as
14        well, correct?
15   A    Correct.
16   Q    Next frame.  And we are now at 13:50:31.  You don't
17        see any new people coming in yet, right?
18   A    Right.
19   Q    Next frame, also 13:50:31, no people coming?
20   A    Right.
21   Q    13:50 -- next frame, 13:50:31, no people coming,
22        right?
23   A    Right.
24   Q    Next frame, 13:50:31, no people coming?
25   A    Right.
```

247

```
1   Q    Next frame.  Now at 13:50:31 you're starting to see
2        somebody come into the very lower left-hand corner,
3        right?
4   A    Correct.
5   Q    Next frame.  13:50:31, the woman who we talked about
6        before, she's going out the door now, right?
7   A    Right.
8   Q    Okay.  Next frame, 13:50:31, we see a person coming
9        in, right?
10  A    Right.
11  Q    And next frame, 13:50:32, you can see this person
12       better now, right?
13  A    Right.
14  Q    This is Tom Lee, isn't it?
15  A    Yes.
16  Q    All right.  Next frame.  That's 13:50:30.  Next
17       frame.  13:50:32.  Next frame.  13:50:32.  You see
18       another person coming in, right?
19  A    Right.
20  Q    And that -- do you recognize that person?
21  A    Appears to be Chong.
22  Q    Appears to be Chong.  Okay.  Next frame.  13:50:32.
23       Next frame.  13:50:32 as well.  You still see Tom Lee
24       and Chong, right?
25  A    Right.
```

248

```
1   Q    And now you see a hand right behind Chong Lee?

2   A    Yup.

3   Q    Okay.  Next frame.  13:50:32.  Next frame.  13:50:33.

4        See this woman with the hands -- where you saw the

5        hand sticking out before?

6   A    Yup.

7   Q    Do you recognize her?

8   A    Possibly Alyson.

9   Q    Possibly Alyson.  Okay.  We'll go to the next frame,

10        see if it's easier for you to tell.

11            Does it look like Alyson to you more now at

12        13:50:33?

13  A    Yes, it does.

14  Q    Okay.  Let's keep playing the frames.  Next frame.

15        Okay.

16            By the way, at 13:50:33 here, you see Chong

17        here, you can see both of his hands, right?

18  A    Correct.

19  Q    No hands in the pockets, right?

20  A    Right.

21  Q    Not holding a gun in his hand?

22  A    Right.

23  Q    Next frame.  13:50:33.  Next.  Still at 33.  I'm just

24        going to do the seconds now.  All right.  Next frame.

25        Still 33.  Next frame.  Still 33.  Next frame.
```

1         And you see a woman here kind of reaching

2    towards Alyson?  Do you see that?

3  A  Yes.

4  Q  Do you know who she is?

5  A  I do not.

6  Q  Okay.  Next frame.  Next frame.  Okay.  Now we're at

7    34.

8         Do you know who this person is?

9  A  I do not.

10  Q  You do not know.  This man appears to have like a

11    stocking cap on or something or winter hat?

12  A  Like a beanie, yeah, correct.

13  Q  And can you see that he's holding something in his

14    hand?

15  A  Appears to be something.

16  Q  Like does it appear to be beer to you at all?  Or you

17    can't tell?

18  A  I can't tell.

19  Q  All right.  Next frame.  We're at 34.  Next frame.

20    Next frame.  34.  Next frame still at 34.  Next

21    frame.  Next frame.  Next frame.  We're at 35 now.

22         Do you know who this person is?

23  A  I do not.

24  Q  You do not know.  Okay.

25         Next frame.  Next frame.  Next frame.  We're

1           still at 35.  Next frame.  Okay.  We're at 36 now.

2                Do you know who this person is?

3    A    I do not.

4    Q    Okay.  But it's not you?

5    A    Correct.

6    Q    Okay.  Next frame.  I'll tell you what we're going to

7         do.  Do you recognize either of these two people who

8         are leaving?

9    A    That possibly might be me.

10   Q    This -- is that where I'm putting the pointer right

11        here?

12   A    Correct.

13   Q    So the second guy, you think that's you?

14   A    Correct.

15   Q    Okay.  I'm going to do the next frame to help clarify

16        that, and this was at 36 by the way, and this is also

17        36.  Do you now feel that that's you?

18   A    I can't tell.

19   Q    You can't tell.  Okay.  Will it help you identify

20        yourself if we play it fast or not, like -- by fast I

21        mean normal speed?

22   A    You can try, but I'm not going to be able to tell, I

23        don't think, because it's black and white.

24   Q    Okay.  We won't play it then.

25                ATTORNEY VISHNY:  We can put the lights

251

```
 1          back on, Judge.

 2    Q     (BY ATTORNEY VISHNY)  Now you had been drinking that

 3          night, right?

 4    A     Yes.

 5    Q     With Tom Lee?

 6    A     Correct.

 7    Q     And you were pretty intoxicated that night, weren't

 8          you?

 9    A     Yeah, I would say so.

10    Q     Would it be fair to say you were drunk that night, if

11          I use that word?

12    A     Yes.

13    Q     And have you smoked marijuana as well?

14    A     No.

15    Q     Okay.  Just alcohol.

16    A     Correct.

17    Q     No weed?

18    A     Yeah.

19              ATTORNEY SCHNEIDER:  Judge, I'm going to

20          ask to approach.

21              THE COURT:  You may.

22              (A bench conference was held.)

23    Q     (BY ATTORNEY VISHNY)  All right.  Now, and you had

24          been drinking for several hours by this point,

25          right?
```

252

```
 1   A    Correct.

 2   Q    Now you know that Chong was wearing a dark jacket,

 3        right?

 4   A    Right.

 5   Q    But you don't remember exactly what it looked like.

 6   A    Right.

 7   Q    I'm going to show you what's been marked as Exhibit

 8        No. 103.  Does this look like the jacket Chong was

 9        wearing that night to you?

10   A    That does not.

11   Q    It does not?

12   A    It does not.

13   Q    Okay.  So you don't think it was?

14   A    I don't think so.

15   Q    Okay.  But you're not positive, right?

16   A    Right.

17   Q    Now, when you look at this jacket, one of the things

18        that you can see is that it has two different

19        fabrics, right?

20   A    Right.

21   Q    It's got a dark black with some kind of a fabric with

22        a sheen in the middle, right?

23   A    Right.

24   Q    And it has what looks like dark gray sleeves for the

25        sleeve, right?
```

1    A    Right.

2    Q    And they're made out of a different material?

3    A    I believe so.

4    Q    And there's stripes on the cuff?

5    A    Yeah.

6    Q    Do you remember that Phong was wearing a white

7         vest?

8    A    I don't remember.

9    Q    You can't recall?

10            ATTORNEY VISHNY:  What was that?  That was

11        103 before?

12            THE COURT:  Yes.

13   Q    (BY ATTORNEY VISHNY)  While she's marking that, I'm

14        going to show you what's been marked as Exhibit 104.

15        This is a white vest, right?

16   A    Yes, it is.

17   Q    You don't remember if Phong Lee was wearing that that

18        night or not?

19   A    I don't remember.

20   Q    It could be but it might not be?

21   A    Correct.

22   Q    Okay.  I'm showing you what's been marked as Exhibit

23        No. 105.  Do you recognize this coat?

24   A    I do not.

25   Q    You do not.  So you don't remember seeing Paul Lee in

254

```
 1        this coat that night, correct?
 2    A   I don't -- correct.  I don't remember.
 3    Q   So you really don't remember what coats people were
 4        wearing that night, right?  It wasn't of any
 5        particular importance to you?
 6    A   Right.
 7    Q   Now, when you were interviewed with Sergeant Thao,
 8        you never mentioned seeing Tom Lee at the time of the
 9        shooting, did you?
10    A   Correct.
11    Q   Even though he was apparently walking out of Luna
12        just several people and a couple seconds before
13        you?
14    A   Correct.
15    Q   You just didn't remember that you saw him at that
16        time, right?
17    A   Correct.
18    Q   Now, when you saw -- I think as you mentioned you
19        knew Chong -- when Sergeant Thao came to talk to you,
20        you knew Chong had been arrested, right?
21    A   Right.
22    Q   And you told Sergeant Thao that you had seen a post
23        to all your friends on Facebook that Chong had been
24        arrested, right?
25    A   Right.
```

1   Q    And had been in the newspaper?

2   A    Right.

3   Q    And when you talked to Sergeant Thao, what you told

4        him was that you told him where you were and said it

5        was hard to remember where people were, right?

6   A    I believe so.

7   Q    And you told him that Paul Lee threw a punch and then

8        there was a bang, right?

9   A    I don't remember.

10  Q    You don't recall.  And then do you recall Sergeant

11       Thao telling you that other people were claiming that

12       Chong Lee was the shooter?

13  A    I don't remember.

14  Q    Okay.

15            ATTORNEY VISHNY:  I'm sorry that people

16       have to bear with me here.

17            THE COURT:  That's okay.

18            ATTORNEY VISHNY:  I'm looking for it and

19       I'm not finding it right now.

20            THE COURT:  Take a moment if you need to.

21  Q    (BY ATTORNEY VISHNY)  Do you remember telling

22       Sergeant Thao that you didn't know who the shooter

23       was?

24  A    I don't remember.

25  Q    You don't remember.

256

```
 1   A   Right.

 2   Q   Okay.  Now do you remember Sergeant Thao telling you

 3       -- you telling him you didn't know who did it and him

 4       saying that this was serious, it's not like a fight

 5       where people just go punch each other, that they were

 6       -- you were talking about a murder.  Do you have any

 7       recall of that?

 8   A   I don't remember.

 9   Q   Okay.  And if I showed you -- I'm going to show you

10       what's an agreed upon transcript between --

11               ATTORNEY VISHNY:  Judge, I'm sorry, there

12       have been different versions of this transcript

13       floating around, so I'm a little concerned about

14       this.

15               THE COURT:  Take a moment if you need.

16               ATTORNEY VISHNY:  Okay.  Okay.  Have this

17       marked.  106.

18   Q   (BY ATTORNEY VISHNY)  I'm going to show you what's

19       been marked as Exhibit No. 106, and I'm just going to

20       let you know that it's -- this is a transcript that

21       was prepared of your interview.  Okay?

22   A   Okay.

23   Q   Now, before you came to court today, when you met

24       with the District Attorney they gave you a copy of a

25       police report prepared by Sergeant Thao to review,
```

257

1        right?

2    A    I believe so, yeah.

3    Q    But that police report was just a summary, wasn't

4         it?

5    A    Correct.

6    Q    It didn't have everything in there that you said,

7         right?

8    A    Right.

9    Q    You weren't allowed -- you weren't provided, rather,

10        with a copy of the tape to listen to, right?

11   A    Right.

12   Q    Or given a copy of the transcript to listen to?

13        Okay?  And so I'm just going to ask you to read this.

14            So, you know, it starts out with you just saying

15        your name, date of birth, your phone number, things

16        like that, right?

17   A    Right.

18   Q    Okay.  And right from the start Sergeant Thao tells

19        you you have to be -- he wants you to be totally

20        honest, right?

21   A    Right.

22   Q    And right in the beginning -- and you know at this

23        point Chong's been arrested, right?

24   A    Right.

25   Q    And right in the very beginning he says to you that

258

```
 1            we've talked to Phong, we've talked to Joe, other
 2            people, even Paul.  Everybody is very honest, so I
 3            come here knowing pretty much what happened.  So he
 4            tells you he already knew what occurred, right?
 5      A     Correct.
 6      Q     And then he starts telling you or asking you some
 7            questions, right?
 8      A     Right.
 9      Q     And, you know, you're describing what you did, right,
10            that night, watching the Big 10 game, going downtown,
11            et cetera, et cetera.  Fair?
12      A     Yup.
13      Q     Fair enough?  Okay.  And I'm just saying this not to
14            repeat your testimony but to just kind of orient you.
15      A     Okay.
16      Q     Okay.  And, you know, you start telling him
17            everything that you did and that you see a fight,
18            right?
19      A     Right.
20      Q     Okay.  And you told him you saw -- I'm going to turn
21            your attention to Page 8, very bottom of the page.
22            Does that help remind you you told him what you told
23            him?
24      A     Yes.
25      Q     Okay.  And what is it that you said?
```

259

```
1    A    I remember seeing just like Paul like punch -- throw
2         a punch at something.
3    Q    Okay.  And then the next -- what you told him after
4         that was the next thing there was a bang, right?
5    A    Yup.
6    Q    Right.  You don't say anything here about then seeing
7         Chong Lee throw a punch and then a bang, you just
8         said the next thing you knew after Paul threw the
9         punch is there was a bang, right?
10   A    Yup.
11   Q    And that everybody was leaving?
12   A    Correct.
13             ATTORNEY SCHNEIDER:  What page are you on?
14             ATTORNEY VISHNY:  That was Page 9.  I
15        apologize, counsel.
16   Q    (BY ATTORNEY VISHNY)  I'm just going to kind of move
17        this ahead.  You're talking about -- and then at that
18        point, looking to Page 10, Sergeant Thao starts
19        drawing a diagram, right?
20   A    Like --
21   Q    You never draw that diagram yourself, right?
22   A    Right.
23   Q    Had you seen the diagram before you came into court
24        today?
25   A    I think I've seen a copy.
```

```
1    Q    When?  Was that when the District Attorney met with
2         you?
3    A    I believe so.
4    Q    Okay.  Did you see a copy that night when Sergeant
5         Thao drew it, do you know?
6    A    I don't remember.
7    Q    Okay.  Fair enough.  All right.  And then when he
8         talks to you about leaving, asks you if you've had
9         any alcohol in your hands, right?
10   A    Right.
11   Q    And you tell him no, you had nothing in your hands,
12        right?
13   A    Right.
14   Q    And then you mention that who you saw over there was
15        Phong and Paul and maybe Joe, right?
16   A    Right.
17   Q    And you think that they were all standing by a wall,
18        right?
19   A    Correct.
20   Q    Now going back to your diagram, just to interrupt
21        this a minute, going back to Exhibit 102 where you
22        placed the victim in this case, he wasn't standing by
23        a wall, right?
24   A    Right.
25   Q    He's kind of in the area where these two foyers
```

261

```
1          occur, where these two foyers meet each other, right?
2     A    Correct.
3     Q    So if you go to the scale diagram, he's not over
4          here, from what you recall, by the stairs, he's more
5          out in this area, right?
6     A    Right.
7     Q    And this is where he's standing right here when --
8          and when you hear the pop, right?
9     A    Right.
10    Q    And so where he falls, from what you remember, he
11         falls right here kind of in the middle where you have
12         him right at the point where these two foyers meet,
13         right?
14    A    Right.
15    Q    That would be a fair statement?
16              ATTORNEY SCHNEIDER:  Can I just ask that
17         she try to identify on the record where she had the
18         pointer because otherwise --
19              ATTORNEY VISHNY:  Yes.
20              ATTORNEY SCHNEIDER:  On the bottom drawing.
21         You were holding it on the bottom drawing for quite a
22         while.
23              ATTORNEY VISHNY:  I'm going to actually
24         have him mark it.
25    Q    (BY ATTORNEY SCHNEIDER)  Okay.  So I'm going to ask
```

262

1      you to mark this drawing.

2                  ATTORNEY SCHNEIDER:  Can I just see if I

3      have a different copy so we don't continue to have

4      that marked on by several people?

5                  ATTORNEY VISHNY:  Nobody's marked on it at

6      all at this point, so I don't see a problem with the

7      record being confused.  I'm going to have -- put on

8      the record the color and have him put his initials.

9                  THE COURT:  Do you have another one?

10     Otherwise --

11                 ATTORNEY SCHNEIDER:  Not of that size, and

12     that's why.  I have another one that's like this

13     which is a representation of the area where he was

14     indicating the victim was, so I think she could use

15     this which is a portion of that drawing.

16                 ATTORNEY VISHNY:  Well, Judge, I think it

17     would be better, I mean other witnesses have marked

18     on other large drawings so far.

19                 THE COURT:  I'm going to allow it.

20                 ATTORNEY VISHNY:  Okay.  Thanks.

21  Q  (BY ATTORNEY VISHNY)  I'm going to ask you to come

22     off the witness stand here.  All right?  And I'm

23     going to ask you now if it's fair to say, you know,

24     based on looking where you have the guy who fell, if

25     you would put him on -- where you have him on Exhibit

1       102, can you tell where it corresponds on Exhibit No.

2       1?

3    A   Like right around here.

4    Q   Okay.  And could you put the word V for victim right

5       there?

6    A   (Witness complying.)

7    Q   Okay.  And can you put -- draw a little arrow and put

8       your name?

9    A   Initials or name?

10   Q   Put Tou Shoua.  How's that?

11   A   (Witness complying.)

12   Q   Okay.  All right.  Thank you.

13           THE COURT:  I don't know if you mentioned

14       it, the record should reflect this was a blue -- blue

15       pen that was utilized by Mr. --

16           ATTORNEY VISHNY:  Yeah.  I was just about

17       to do that.  That's a blue Sharpie that was used by

18       Tou Shoua, and he has placed where he believes the

19       victim was and where he thinks he was standing -- not

20       where Tou Shoua was standing but where he believes

21       the victim was standing at the time he was shot.

22   Q   (BY ATTORNEY VISHNY)  Okay?  All right.  Now I'm

23       going to go back over here.  And you're talking again

24       with -- with Sergeant Thao.  Right now we're on Page

25       12, right?

264

```
 1   A    Right.

 2   Q    Okay.  And going to Page 13, right?

 3   A    Right.

 4   Q    All right.  Still no mention of Chong Lee here,

 5        right?

 6   A    Right.

 7   Q    Going to Page 14.  All right?  And now, again, you're

 8        starting to talk about seeing the fight, seeing Paul

 9        swing at him, right?

10   A    Right.

11   Q    No mention of Chong Lee.

12   A    Right.

13   Q    Page 15, no mention of Chong Lee, right?

14   A    Right.

15             ATTORNEY SCHNEIDER:  These pages are quite

16        long.  Unless he's a speed reader, I'd like to ask

17        her to give him a little bit of time.

18   Q    (BY ATTORNEY VISHNY)  Are you able -- have I given

19        you enough time or would you like to go back and look

20        at that?

21   A    I'm just skimming through it.

22   Q    Are you skimming for the word Chong?

23   A    Yeah.

24   Q    To make sure we're looking for the same thing?

25   A    Correct.
```

265

```
 1                    THE COURT:  Sir, just take what time you
 2           need.  If you need additional time, and I know
 3           Attorney Vishny will give you that time, take what
 4           time you need and look at it carefully.
 5      Q    (BY ATTORNEY VISHNY)  I tend to kind of get going
 6           fast, so just say slow down please.  You don't even
 7           have to put the please in there.
 8                All right.  Now, Page 16.  Okay?  Still nothing.
 9           Okay?  Right?
10      A    Right.
11      Q    All right.  And again on Page 17, again I'm not
12           asking you to read what's on here, just, again, you
13           don't see anything about Chong Lee, right?
14      A    Right.
15      Q    Okay.  All right.  Now I'm going to get to the point
16           all the way where I was asking you about Sergeant Lee
17           (sic) saying to you that, you know, we're not just
18           talking about a fight or a car break-in, they're
19           talking about a murder, right?
20      A    Right.
21      Q    And at that point Sergeant Thao says to you, look,
22           it's important for you to be honest, right?
23      A    Right.
24      Q    So are you feeling at that point when he says that
25           like maybe he's not believing you?
```

266

1    A    I don't remember.

2    Q    Okay.  Not a problem.

3            Now, then he suggests to you on the bottom of

4         Page 18, doesn't he tell you at this point that where

5         the bang went on that he thinks you know who caused

6         the bang, right?

7    A    Right.

8    Q    And this is after you have told Sergeant Thao you're

9         glad it's him because you're worried about generally

10        dealing with police officers, right?

11   A    Right.

12   Q    Okay.  I'm just going to leave that up there for a

13        second.  I didn't mean to do that.

14           Now, do you recall later on telling Sergeant

15        Thao that you don't know who the shooter is?

16   A    I don't remember.

17   Q    Okay.  So we'll have to keep going through this.  Do

18        you remember saying that as people are leaving the

19        shooter could be anyone in the area?

20   A    I don't remember.

21   Q    Okay.  All right.  So we're going to go -- we're on

22        Page 19, right?

23   A    Right.

24   Q    Okay.  And again Sergeant Thao is -- again, on Page

25        20 you don't see any mention of the word Chong, do

267

1         you?

2    A    Correct.

3    Q    Okay.  And then on Page 21 he says to you, I want you

4         to be honest, you're not here to snitch, you're here

5         to tell the truth, right?

6    A    Right.

7    Q    And then he says to you, why do you think that person

8         is in jail right now, correct?

9    A    Correct.

10   Q    And you knew when he said, why do you think that

11        person is in jail right now, that he was referring to

12        Chong Lee, correct?

13   A    Correct.

14   Q    And you knew that he wanted you to say that Chong Lee

15        was involved in this shooting, right?

16   A    Right.

17   Q    And you told him that eventually, right?

18   A    I believe so.

19   Q    Okay.  All right.  So he says to you, I think you

20        know who that person is, right?

21   A    Right.

22   Q    And then you say, uh-huh, I do.  Right?

23   A    Correct.

24   Q    Okay.  That's Page 21.  Still no -- okay.

25             Now, on Page 22 do you see the word Chong

1          finally appear in the transcript of your
2          interrogation by Sergeant Thao?
3     A    Yes, I do.
4     Q    Okay.  Who is it who mentions -- does this help
5          refresh your memory about who first brings Chong
6          Lee's name into this discussion?
7     A    Officer Thao.
8     Q    Okay.  And it's not you, right?
9     A    Right.
10    Q    And what he says to you is, obviously the person to
11         talk about is Chong, right?
12    A    Right.
13    Q    And then he tells you, you saw him coming from this
14         area, right?
15    A    Correct.
16    Q    And when Sergeant Thao said to you, you saw him
17         coming from this area, he was referring to the
18         diagram that he had drawn, right?
19    A    Right.
20    Q    And you went along with what he was saying.
21    A    Right.
22    Q    And what you said to him as he's asking you about
23         walking is, you respond to him and you say, I just
24         see him, and then there's something inaudible, I
25         didn't know he was a gunman, I didn't know he was the

269

1      shooter, I just don't know.  Everything was just like

2      happening.  And then he -- Sergeant Thao says right.

3      Right?

4    A  Correct.

5    Q  And then you say, everything was just happening, you

6      go back to your sentence, so quickly, and then there

7      was a bang, right?

8    A  Right.

9    Q  And then he starts to ask you some questions about

10     who Chong Lee was with?

11   A  Right.

12   Q  Do you remember telling him that Chong Lee was with

13     Alyson and Michael Thor?

14   A  It appears to say so.

15   Q  Okay.  That's Page 23.

16         And that -- do you then see him saying, Page 24,

17     right before the 20:14, that you see them walking

18     through and then later, and he suggests to you it's

19     ten seconds, 14 seconds, 15 seconds, that later

20     that's when you hear the boom, right?

21   A  Correct.

22   Q  Okay.  And what you said then is you saw what

23     happened, you didn't know it was the shooter, you

24     didn't know who the shooter was, there's a lot of

25     people walking by and it just went boom and you

270

1        didn't see who it was, right?

2    A   Right.

3    Q   You don't say anything about Chong punching the

4        victim at that time.

5    A   Right.

6    Q   All right.  But what you do say is that you didn't

7        know who the gunman was but, yeah, it's been all over

8        the news and Facebook, right?

9    A   Right.

10   Q   So of course by the time you're talking to Sergeant

11       Thao, because it's been all over the news and

12       Facebook, you're assuming it's Chong Lee, right?

13   A   Correct.

14   Q   It's not because you saw it.

15   A   I don't remember.

16   Q   You don't remember.  That's fine.

17           Okay.  I'm just going to keep going page by

18       page.  I'm not going to ask you a question about

19       every single page, okay, because it's going to be way

20       too tedious.

21           Now, Page 25 don't see any -- you're on a

22       discussion about something else at that point about

23       the victim, about Josh and where you saw him?

24   A   Right.

25   Q   Are you -- you have enough time to look?

271

1   A   Yeah.  I'm just skimming through it.

2   Q   Page 26, same thing?

3   A   Yup.

4   Q   Okay.  Page 27 you're now talking -- he then

5       interviews you about what you see when you go

6       outside, you know, the things you testified here

7       about seeing a fight, walking home?

8   A   Right.

9   Q   Okay.  And then he starts to ask you some questions

10      about people you saw and who you thought did it,

11      right?

12  A   Right.

13  Q   Do you remember him asking you if you thought Alyson

14      did it?

15  A   I don't remember.

16  Q   Okay.  You don't remember, but now that you see the

17      transcript, you can see that Sergeant Thao says to

18      you, go back in time, do you think Alyson did it.

19      And you say, pulled the gun.  And he says yeah.  And

20      you say no.

21  A   Yes.

22  Q   Correct?

23  A   Correct.

24  Q   Okay.  And then later on, you know, there is some

25      discussion about other matters, and on Page 29 then

272

1       you say, it could have been Chong, could have been

2       Michael, I don't know, right?

3   A   Right.

4   Q   And what you tell him is you had no idea who it was

5       at the time, right?

6   A   Right.

7   Q   And on the bottom of Page 29, the last thing you say

8       then is, yeah, it could have been, like, anybody,

9       like you had said, correct?

10  A   Correct.

11  Q   And again, you repeat on Page 30, it could have been

12      anybody who was in that area because there were so

13      many people there, right?

14  A   Right.

15  Q   And that you didn't know at the time?

16  A   Right.

17  Q   But when the boom came, it was, as far as you knew,

18      after the three of them had walked past you, correct?

19  A   Correct.

20  Q   So -- and again, going back up to Exhibit 102, you

21      are all the way up in the very top corner, right?

22  A   Right.

23  Q   And if these people are walking past you, all you

24      know is you hear the boom sometime right after,

25      right?

273

1    A    Right.

2    Q    So of course there is an association in your mind

3         between those people and the boom?

4    A    Right.

5    Q    But you don't see Chong shoot him?

6    A    Right.

7    Q    Okay.  Now -- now going to Page 31, okay, this keeps

8         going on, and, Tou, he's encouraging you, continuing

9         to encourage you to name Chong as the shooter, right?

10   A    Right.

11   Q    And the way he does it is he says, look, you're not

12        the first person to name him as the shooter, right?

13        He tells you that?

14   A    Right.

15   Q    And so in other words, in your mind you realize,

16        okay, I can say this, Chong is in jail, right?

17   A    Right.

18   Q    It's okay to say this?

19   A    Right.

20   Q    But you didn't see him do the shooting?

21   A    I don't know.

22   Q    You don't know.  Okay.  All right.

23            Then there is some continued discussion looking

24        at Page 32, right?

25   A    Right.

274

1   Q   And at this point you say you didn't see him when he
2       pulled out the gun or shot him or anything like that,
3       right?
4   A   Right.
5   Q   And what you mean isn't that that you saw him pull out a
6       gun and that you didn't see it, just that you never
7       saw a gun, period, at this point, right?
8   A   Right.
9   Q   Okay.  So you don't really know if he pulled out the
10      gun or not, right?
11  A   Right.
12  Q   Okay.  Now, I'm going to Page 33.  So this discussion
13      is still going on, and now Sergeant Thao talks to you
14      about -- he tells you you had a great view, right?
15  A   Right.
16  Q   And what he tells you is whether you like it or not,
17      whether you want to or not, you really don't have a
18      choice at this point of going down the road.  33.  Do
19      you remember that?
20  A   I don't remember.
21  Q   Okay.  Do you recall him saying to you, the court is
22      going to subpoena you to testify, right?
23  A   Right.
24  Q   And that he doesn't want -- he wants to be honest and
25      up front, he doesn't want to lead you on, and, you

275

1        know, down the road say I don't have to testify

2        because you were right there watching, and he tells

3        you it's better to let him know now than play around,

4        right?

5   A   Right.

6   Q   And you say yes.  And then Sergeant Thao says to you,

7        I think I'm easier to you, and the other thing, if

8        the court have that information or the DA have that

9        information, they may or may not need you.  You know

10       what I'm saying?  Rather than, yeah, he's been giving

11       me anything but he's leaving this out, they might

12       just, you know what I'm saying, other people have

13       been honest so I don't want you to think you're the

14       only one.  So I am saying is that you saw who

15       approached, and you're shaking your head yes,

16       right?

17  A   Right.

18  Q   Okay.  And then he says, well, I'm not saying that

19       you knew it was gonna happen, because I would be

20       shocked too, right?

21  A   Right.

22  Q   So Sergeant Thao is leading you into making this

23       statement about Chong Lee, right?

24  A   Right.

25  Q   And you pretty much felt you had no choice but to say

276

1          this, didn't you?

2    A     Correct.

3    Q     And then you continue to talk, and on Page 34 it's

4          Sergeant Thao who says, what I'm saying is you saw

5          who approached Josh, whether he was gonna fight him,

6          help Chong, Paul was there or not, but you saw him,

7          and then you go, um-hum, right?

8    A     Right.

9    Q     And so he's continuing to lead you to say you saw

10         Chong, right?

11   A     Right.

12   Q     Now I'm asking you some leading questions too,

13         right?

14   A     Right.

15   Q     But when Sergeant Thao was leading you, there wasn't

16         like another lawyer to object or a judge to say that

17         was unfair, right?

18   A     Right.

19   Q     Just you and Sergeant Thao?

20   A     Correct.

21   Q     Okay.  Next page, we're on 35, and you said, after it

22         happened we all just froze for a second, right?

23   A     Right.

24   Q     And then you talk about it being smoky, like maybe

25         from the gun, and that you leave, right?

277

1    A    Right.

2    Q    Okay.  And then Sergeant Thao tells you he would like

3         to take your jacket, right?

4    A    Right.

5    Q    Just to see if maybe there is some physical evidence

6         on it like just about ten days after this has

7         happened or twelve days after this has happened,

8         right?

9    A    Right.

10   Q    Okay.  And you give it to him.

11            Okay.  And then you say you didn't want to have

12        anything to do with it, right?

13   A    Right.

14   Q    And you hope nothing would come back to you, Page 37,

15        or anything, right?

16   A    Right.

17   Q    And he says, no, from his standpoint as an officer, I

18        don't think so, and you just need to tell the truth,

19        that's what he tells you, right?

20   A    Right.

21   Q    Okay.  And then again he says, you're not making

22        anything up, you're not creating things, and again he

23        mentions Chong's name, correct?

24   A    Correct.

25   Q    Okay.  Page 37, turning to Page 38.  Do you remember

278

1       him saying to you that when Chong approached Josh,

2       did you notice where Alyson or Michael Thor were at

3       the time.  Do you remember that?

4    A  I don't remember.

5    Q  Okay.  Do you remember you saying, no, you thought

6       they were just like blocking, it kind of looked like

7       they were just gonna leave Luna, right?

8    A  Correct.

9    Q  And, again, it's Sergeant Thao who says, did you see

10      -- you say Chong approach Josh and that's when things

11      go boom.  And he starts to ask you, did you see his

12      hand, did he have anything in his hand, did he do

13      anything with his hand.  Right?

14   A  Right.

15   Q  And then for the first time getting near the end of

16      this interview that's when you say you thought Chong

17      was going to punch the victim, right?

18   A  Right.

19   Q  Hadn't said it until this point, right?

20   A  Right.

21   Q  Because you hadn't seen it, right?

22   A  Right.

23   Q  Sergeant Thao led you to say that, correct?

24   A  Correct.

25   Q  And you had some fear that if you didn't say this,

```
1          something bad might happen to you with the police,
2          right?
3                    ATTORNEY SCHNEIDER:  I'm going to object.
4          It calls for speculation.
5                    ATTORNEY VISHNY:  He just --
6                    ATTORNEY SCHNEIDER:  Unless he specifically
7          said it in the transcript.
8                    THE COURT:  You're calling him to speculate
9          as to his own state of mind.
10                   ATTORNEY SCHNEIDER:  Her question calls for
11         speculation, unless he specifically said that in a
12         transcript.  She can ask him how were you feeling or
13         what did you think.
14                   ATTORNEY VISHNY:  Actually, this is
15         cross-examination, I think I'm allowed to use leading
16         questions.
17                   THE COURT:  I think it's -- can you read --
18         can you read back the question please?
19                   (Question read back.)
20                   THE COURT:  She's asking about his own
21         state of mind.  I'll allow it.  It can be clarified
22         on direct or redirect.
23    Q    (BY ATTORNEY VISHNY)  And you had answered the
24         question when I asked you that?
25    A    Yes.
```

1    Q    And what was your answer?

2    A    Yes.

3    Q    You did have some fear that if you didn't name Chong

4         something bad would happen to you, right?

5    A    Right.

6    Q    And then there is some more discussion looking at

7         Page 38?

8    A    Yup.

9    Q    Okay.  About this punch.  Right?

10   A    Right.

11   Q    39, right?

12   A    Right.

13            ATTORNEY SCHNEIDER:  What is he saying

14        right to because I don't think there was a

15        question.

16            ATTORNEY VISHNY:  Okay.

17            ATTORNEY SCHNEIDER:  There is lot of

18        uh-huhs and rights.

19   Q    (BY ATTORNEY VISHNY)  Page 39 there is no discussion

20        of Chong, right?

21   A    Right.

22   Q    But Sergeant Thao does ask you if there is anything

23        else you would like to add, right?

24   A    Yes.

25   Q    Okay.  And you talk about how shocking it is when you

281

```
 1         see something happen with your own two eyes, right?
 2    A    Right.
 3    Q    Kind of comparing, it's not like a shooting game,
 4         it's real life.
 5    A    Right.
 6    Q    Okay.  Then Sergeant Thao says that he wants to give
 7         you an opportunity to write a statement at the top of
 8         Page 40.  Right?
 9    A    Yes.
10    Q    Okay.  And he says, I always give a statement, an
11         opportunity to write, okay, and then you ask him
12         whether or not you need him -- whether Sergeant Thao
13         needs you to write it, right?
14    A    Correct.
15    Q    Okay.  And Sergeant Thao tells you he prefers that
16         you write it because if you write it you might have
17         the choice to not have to come to court?
18    A    Right.
19    Q    Okay.  And he tells you he's recorded what he's
20         talked to you about, right?
21    A    Right.
22    Q    And then I'm going to ask you to just read the
23         paragraph where Sergeant Thao, right here in the
24         middle of the page, kind of a long paragraph, where
25         he talks to you about the statement, right?
```

282

1    A    Um-hum.

2    Q    Is he telling you what to write in the statement?  Do

3         you remember?

4    A    I don't remember, but --

5    Q    You don't remember.  Okay.

6              So what he says is, because first of all, I

7         can't promise you -- I can't guarantee, but the more

8         -- the all -- if they have all the information from

9         you, they may then give them the choice to decide

10        whether they need you to be in court or not.  Okay?

11        Because what we talked about and what you told me,

12        obviously recorded.  I will put that statement in my

13        report, but then if -- and also from your perspective

14        what you saw, what you were trying to do, which was

15        to stop the fight before him -- before the shoo -- it

16        looks like he's going to say shooting but he stops

17        and says before the boom, and then what happened and

18        what you saw Chong, Alyson and Michael Thor walking

19        from that bar, and you saw, you know, with Chong you

20        thought he was going to punch the guy with his right

21        hand, and that's when the boom goes off.  These

22        things are important to put on paper as supposed to

23        tell what happened.  And you're not trying to point

24        the finger at anybody who didn't do anything, right?

25   A    Right.

283

```
1    Q    Okay.  And at this point you hadn't expressed
2         anything to Sergeant Thao about being afraid because
3         of your culture or your religious beliefs or anything
4         like that?
5              ATTORNEY SCHNEIDER:  Judge, I'm going to
6         ask to approach then at this time.
7              THE COURT:  You may.
8              (Bench conference.)
9              ATTORNEY VISHNY:  Question is withdrawn.
10   Q    (BY ATTORNEY VISHNY)  Now after this you write the
11        statement, right?  Okay?
12   A    Yup.
13   Q    You remember that?  And you remember -- do you
14        remember -- recall at all whether or not Sergeant
15        Thao asked you what color jacket Chong Lee had on?
16   A    I don't remember.
17   Q    Okay.  You don't recall.  But going over to Page 43,
18        do you remember him saying, do you remember that
19        night what Chong was wearing?  Do you remember him
20        asking you that?
21   A    I don't remember.
22   Q    Okay.  Then -- but in the transcript it says, do you
23        remember that night what Chong was wearing, and you
24        said, um, a gray jacket and like a gray hat?
25   A    Yes.
```

284

```
 1   Q   Okay.  And then you tell him you don't remember if it
 2       was a sports jacket, whether it was Brewers, Lions or
 3       inaudible, right?
 4   A   Right.
 5   Q   And then Sergeant Thao asked you, was it gray all
 6       over or is there some different color in it?
 7   A   Right.
 8   Q   And what you say, it was like gray and you think the
 9       sleeves were dark, you don't remember anymore,
10       right?
11   A   Right.
12   Q   Like a dark color, like maybe brown, you just don't
13       know, right?
14   A   Right.
15   Q   And Sergeant Thao ask you if the sleeves are
16       different than the jacket?
17   A   Right.
18   Q   Okay.  And he actually shows you a picture, right?
19   A   Correct.
20   Q   And mentions that Chong Lee has on a Milwaukee
21       Brewers hat?
22   A   Right.
23   Q   Correct?
24   A   Right.
25   Q   Okay.  And it's after this then you write the
```

1     statement, correct?

2  A   Correct.

3  Q   And Sergeant Thao is present the entire time,

4     right?

5  A   Right.

6  Q   But in fact, regardless of what you wrote, you didn't

7     see a boom simultaneously with Chong Lee punching the

8     victim, right?

9  A   I don't know.

10  Q   You don't know.  And Sergeant Thao led you into

11     making the statements you made, right?

12  A   Right.

13              ATTORNEY VISHNY:  Nothing further.

14              **EXAMINATION OF TOU SHOUA LEE**

15  **BY ATTORNEY SCHNEIDER:**

16  Q   You hesitated, Tou.  You told Sergeant Thao what you

17     saw, right?

18  A   I don't remember.

19  Q   You don't remember?  Did you tell Sergeant Thao what

20     you saw at Luna?

21  A   From what I remember, yes.

22  Q   Okay.  So when you talked to him, you told him what

23     you remembered or saw?

24  A   Correct.

25  Q   And that's kind of what you drew on this map,

286

```
1        correct, or he drew, but he was drawing based upon
2        what you were telling him?
3    A   Correct.
4    Q   And what you told us here today is what you
5        remembered happening at Luna?
6    A   Yes.
7    Q   No doubt about that?
8    A   As far as I know, yes.
9    Q   Okay.  You're not related in any way to Josh
10       Richards?
11   A   No.
12   Q   And after this incident, Tou, did you talk to anybody
13       about what you saw prior to talking to Sergeant
14       Thao?
15   A   I did not.
16   Q   Did anybody talk to you and share what they saw?
17   A   They did not.
18   Q   So you hadn't talked to Paul Lee from the time of the
19       incident until you talked to Sergeant Thao?
20   A   Correct.
21   Q   Hadn't talked to Joe Thor?
22   A   Correct.
23   Q   Phong Lee?
24   A   Correct.
25   Q   Michael Thor?
```

287

```
1    A    Correct.

2    Q    So from the time it happened, you walked home by

3         yourself, didn't talk to anybody about what you saw

4         until you talked to Sergeant Thao?

5    A    Right.

6    Q    And what you testified about today is what you

7         remember happening?

8    A    Yes.

9              ATTORNEY SCHNEIDER:  Nothing further.

10             ATTORNEY VISHNY:  I have nothing further.

11             THE COURT:  Any of the members of the jury

12        have any questions they wish to submit for

13        consideration?

14             (No response.)

15             THE COURT:  Very good.  Sir, you may be

16        excused.

17             ATTORNEY SCHNEIDER:  I'm just going to turn

18        some of the equipment off if that's okay.

19             THE COURT:  Please rise.  At this time,

20        ladies and gentlemen, we will conclude for the

21        evening.  I would ask that you be here ready -- be

22        here so that you're ready promptly at nine a.m.

23        Okay?  At this time you are excused.

24             (The jury was escorted out of the

25        courtroom.)
```

1              THE COURT:  We did have -- recapping during

2       this later afternoon session, we did have several

3       sidebars.  One was with request to Sergeant Thao to

4       be excused based upon the nature of questioning.

5       That request was granted.

6              There was a question brought up about marijuana

7       or usage.  In the future, if there's going to be any

8       reference to any sort of illegal substances in

9       conjunction with the question, I'd ask that you

10      approach beforehand so that I can make a

11      determination as to whether or not that should

12      conclude -- include other acts evidence.  I do

13      understand that the purpose was not to introduce

14      other acts, but in the future, to err on the side of

15      caution, that is how that be prepared.

16             There was a question related to religious and

17      concern about religious or cultural beliefs and

18      whether that would open the door to further

19      questioning based upon previous rulings.  Ultimately

20      the question was withdrawn and so, in light of that

21      fact, it did not open any subsequent doors for

22      further questioning.

23             And so those would be the summation of the three

24      sidebars and the rulings associated with the same.

25             Is that your understanding of the content of

1          those sidebar discussions, Attorney Schneider?

2                    ATTORNEY SCHNEIDER:  Yes, Judge.

3                    THE COURT:  Attorney Vishny?

4                    ATTORNEY VISHNY:  Yes.

5                    THE COURT:  Okay.  Are we going to have

6          sufficient time if the parties are here at 8:30 to

7          address any pretrial issues that we need to address,

8          Attorney Schneider, from your vantage point?

9                    ATTORNEY SCHNEIDER:  I'm just trying to

10         look quickly who we might have in our lineup

11         tomorrow.

12                    ATTORNEY VISHNY:  That would be helpful.

13         Thanks.

14                    ATTORNEY SCHNEIDER:  Well, I don't know

15         that I can tell you that, but I --

16                    ATTORNEY VISHNY:  I know you have Paul Lee

17         at two p.m.

18                    ATTORNEY SCHNEIDER:  I know tomorrow I

19         don't have any jail calls that we play, because I

20         think that's something we still need to ferret out.

21                    THE COURT:  Correct.

22                    ATTORNEY SCHNEIDER:  There may be the

23         letter to Paul that we need to address.  We reviewed

24         it a little bit this morning.

25                    THE COURT:  And we're expecting Mr. Lee to

290

1      testify in the afternoon, correct?

2              ATTORNEY SCHNEIDER:  Yeah.  And I have to

3      check with Mr. Groh because he might be able to be

4      here earlier.  He had something at 8:45 in --

5              ATTORNEY VISHNY:  Mister who?

6              ATTORNEY SCHNEIDER:  Attorney Jonathan

7      Groh.  He had something at 8:45 in Winnebago, but I

8      thought now he thought he could be done by 10:30 or

9      11 so I just have to check with him.

10            THE COURT:  We may be able to address the

11     issues related to Mr. Paul Lee in the latter part of

12     the lunch hour.

13            ATTORNEY SCHNEIDER:  Yes, yes.

14           THE COURT:  So counsel and myself could

15     come back early.

16           ATTORNEY SCHNEIDER:  I'm going to give you

17     just a copy of that letter we looked at this morning

18     so you have it to review.

19            THE COURT:  Okay.

20           ATTORNEY VISHNY:  So in the morning do you

21     expect to call Phong Lee then?

22           ATTORNEY SCHNEIDER:  Yes.  I need to check

23     with my victim witness person.  We don't have to do

24     this on the record.

25           ATTORNEY VISHNY:  No, we don't.

1              ATTORNEY SCHNEIDER:  Is available and when.

2      I don't know what promises she made.

3              ATTORNEY VISHNY:  I understand.  If we can

4      -- she's not here.

5              ATTORNEY SCHNEIDER:  She is but it -- we

6      don't have to do it --

7              (An off-the-record discussion was held.)

8              (Proceedings concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3                      C E R T I F I C A T E

 4

 5    STATE OF WISCONSIN      )
                              ) ss.:
 6    COUNTY OF OUTAGAMIE     )

 7

 8

 9            I, JOAN BIESE, RMR/CRR, do hereby certify that I
      am the official court reporter for Branch IV of the
10    Circuit Court of Outagamie County;

11            That as such court reporter, I made full and
      correct stenographic notes of the foregoing proceedings;
12
              That the same was later reduced to typewritten
13    form;

14            And that the foregoing proceedings is a full and
      correct transcript of my stenographic notes so taken.
15

16            Dated this 26th day of July, 2016.

17

18

19                             _____

20                             JOAN BIESE, RMR/CRR

21

22

23

24

25
```

293