FILED
02-13-2019
Clerk of Circuit Court
Outagamie County
2013CF001074

1    STATE OF WISCONSIN        CIRCUIT COURT        OUTAGAMIE COUNTY
     _____
2
     **STATE OF WISCONSIN,**
3
                    Plaintiff,
4    v.                                    **Case No. 13-CF-1074**

5    **CHONG LENG LEE,**

6                   Defendant.
     _____
7
                        **JURY TRIAL - DAY THREE**
8    _____

9
     BEFORE:          **HONORABLE GREGORY B. GILL, JR.**
10                    Circuit Court Judge, Branch IV
                      Outagamie County Justice Center
11                    Appleton, WI  54911

12
     DATE:            **February 26, 2016**
13

14   APPEARANCES:     **CARRIE SCHNEIDER**
                      District Attorney
15                    Appearing on behalf of the State

16                    **ANDREW MAIER** and **ALEXANDER DUROS**
                      Assistant District Attorneys
17                    Appearing on behalf of the State

18                    **DEBORAH VISHNY** and **EVAN WEITZ**
                      Attorneys at Law
19                    Appearing on behalf of the Defendant

20                    **CHONG LENG LEE**
                      Defendant
21                    Appearing in person

22

23

24   Joan Biese
     Official Reporter, Branch IV
25   Outagamie County

                                    1                              Exhibit 18

1                              **I N D E X**

2                                                                    **PAGE**

3    **PROCEEDINGS OUTSIDE THE PRESENCE OF THE JURY**.........   4

4    **WITNESSES:**

5    **JOHNNY THAO**
          Examination by Attorney Schneider.................   10
6         Examination by Attorney Vishny....................   15
          Examination by Attorney Schneider.................   24
7         Examination by Attorney Vishny....................   25
          Examination by Attorney Schneider.................   26
8         Examination by Attorney Vishny....................   26

9    **VIA XAI THAO**
          Examination by Attorney Schneider.................   27
10        Examination by Attorney Weitz.....................   38
          Examination by Attorney Schneider.................   44
11        Questions from Jury...............................   45

12   **KENG JOSEPH VANG**
          Examination by Attorney Maier.....................   47
13        Examination by Attorney Weitz.....................   51

14   **PETER MOUA**
          Examination by Attorney Maier.....................   54
15        Examination by Attorney Vishny....................   61
          Examination by Attorney Maier.....................   65
16        Question from Jury................................   67
          Examination by Attorney Vishny....................   68
17        Examination by Attorney Maier.....................   68

18   **KONG VANG**
          Examination by Attorney Maier.....................   70
19        Examination by Attorney Weitz.....................   75

20   **TODD PETERS**
          Examination by Attorney Schneider.................   77
21        Examination by Attorney Vishny....................   89
          Examination by Attorney Schneider.................   94
22
     **MICHAEL J. VERHEYDEN**
23        Examination by Attorney Schneider................. 110
          Examination by Attorney Weitz..................... 117
24        Examination by Attorney Schneider................. 122

25

                                      2

**PHONG LEE**
    Examination by Attorney Maier...................... 123
    Fifth Amendment Discussion-Attorney William Ackel. 157
    Continued Examination by Attorney Maier........... 174
    Examination by Attorney Vishny.................... 185
    Examination by Attorney Maier.................... 205
    Examination by Attorney Vishny.................... 210

**JAMES PHIMMACHACK**
    Examination by Attorney Schneider................ 213

<u>**EXHIBITS**</u>                                                    <u>**PAGE**</u>

2 –   White Board-Luna Lounge-Mark for Victim......... 80
25–  Photo............................................ 86
26–  Photo............................................ 86
27–  Photo............................................ 86
28–  Photo............................................ 86
29–  Photo............................................ 86
30–  Photo............................................ 86
31–  Surveillance Camera Video Flash Drive........... 188
32–  Photo Board-Photos 32A-32K...................... 7
97–  Disk 10 of 16 HEMS #60-62,71.................... 18
98–  Disk 15 of 16 HEMS #77, 83, 85.................. 21
103– Jacket (Dark)................................... 7
104– Vest (White)................................... 7
105– Coat (White/Gray) Patterned.................... 7
107– Transcript-Interview of Xai Thao.............. 43
112– APD Report.................................... 146
113– Transcript-Interview of Phong Lee............. 150
114– Transcript-Interview of Phong Lee............. 202

3

1                   **TRANSCRIPT OF PROCEEDINGS**

2              THE COURT:  Are we all set to proceed,

3      Attorney Schneider?

4              ATTORNEY SCHNEIDER:  Yes, Judge.

5              THE COURT:  Attorney Vishny?

6              ATTORNEY VISHNY:  Just about.

7              THE COURT:  All right.  We're on the record

8      in *State of Wisconsin v. Chong Lee*.

9          We have the same appearances as yesterday.

10             ATTORNEY VISHNY:  Thank you.

11         Judge, the State's first witness is going to be

12     a gentleman by the name of Johnny Thao.  Johnny

13     Thao's role in the case is that he observed the fight

14     between Brittany Olson and Alyson Blom, and I believe

15     the State is going to elicit testimony from Johnny

16     Thao that he believes that Brittany Olson said words

17     to the effect of, your boyfriend shot my boyfriend,

18     or something similar to that.  I know the State --

19     the defense has a hearsay objection.  The State is

20     saying it's an excited utterance.  We've previously

21     visited this act issue.  The court has ruled it's an

22     excited utterance, but I didn't make objection to

23     this specific context so I'm doing so at this time.

24             THE COURT:  Understood.  And you have

25     correctly outlined the issue.

4

1          Having been aware of Miss Olson's testimony
2     before, I'm satisfied that it is considered to be an
3     excited utterance and so I would allow it under that
4     exception.
5               ATTORNEY SCHNEIDER:  Okay.  The only other
6     thing, and it depends upon how his testimony is, is
7     he also then did have conversations with Miss Blom
8     because he separated the parties, he and another
9     friend had contact with her after she had just been
10    beaten up by Miss Olson.
11              THE COURT:  Is this within the same -- is
12    this within the same proximity in terms of time?
13              ATTORNEY SCHNEIDER:  Yes.  I mean the fight
14    gets over and he's talking to her and basically says
15    to her, what was that about, and she makes some
16    comments to him.  I think given the fact she was just
17    beaten up and her emotional state, I would argue that
18    that's also an excited utterance.
19              ATTORNEY VISHNY:  What are those comments?
20    Can you refresh my memory?
21              ATTORNEY SCHNEIDER:  He remembers Alyson
22    saying, my boyfriend shoot that guy, the -- she said
23    her boyfriend is Asian guy who shot that guy or
24    something like that.  I don't know what he remembers
25    more specifically.

5

1              ATTORNEY VISHNY:  Now that I think is a
2       different objection because, you know, my argument
3       here is that Brittany Olson is very traumatized
4       because her boyfriend is shot right in front of her
5       and I think there is a basis for an excited
6       utterance, but as far as Alyson Blom goes, I -- I
7       don't think that the foundation is laid to say that
8       this is necessarily an excited utterance,
9       particularly when we look at her demeanor and her
10      testimony here about what happened in terms of the
11      fight.  So my objection is different on that.
12              THE COURT:  And if it were --
13              ATTORNEY VISHNY:  Hearsay of course.
14              THE COURT:  And I would still consider --
15      we did have the testimony of --
16              ATTORNEY SCHNEIDER:  Miss Blom.
17              THE COURT:  Thank you.  Of Miss Blom.  She
18      did indicate that, you know, she had exited rapidly,
19      she did indicate that as she was leaving she was then
20      involved in a physical altercation which included her
21      being thrown to the -- placed on the ground.  There
22      was -- I don't know if there were -- how many
23      punches, but my understanding is that this was
24      physical, and so I think that for different reasons
25      perhaps, meaning her trauma may have been a byproduct

6

1       for the excited utterance which led to the motion

2       might have may have been a byproduct of what had

3       happened outside the bar, I'm still satisfied that it

4       would fall within the excited utterance exception.

5                ATTORNEY VISHNY:  Okay.  Thank you, Judge.

6          I don't remember the exhibit numbers right now.

7       I do want to move in the three coats at this time.

8                THE COURT:  Three coats were -- I --

9                ATTORNEY VISHNY:  I think they were 103, 4

10      and 5.

11               THE COURT:  Three, four and five.  That's

12      correct.

13               ATTORNEY VISHNY:  Transcript I'm not moving

14      in, the two transcripts.  32 wasn't moved in.

15         Miss Schneider, do you want to move it in?  Just

16      thought we'd try and get some business done.

17               ATTORNEY SCHNEIDER:  Sure.

18               THE COURT:  That was a photo board?

19               ATTORNEY SCHNEIDER:  Sure.  Yes.

20               ATTORNEY VISHNY:  All right.  Now, the

21      transcript of Tou Shoua Lee, but because what really

22      came in was the writing itself because his

23      recollection was exhausted, so I don't know if that

24      means I need to move it in even though I read from

25      it.

1          ATTORNEY SCHNEIDER:  The only thing I know

2     at one time from Miss Bocik was that if it's

3     utilized, they prefer to have -- unless somebody

4     doesn't have a copy, if they --

5          ATTORNEY VISHNY:  We're going to print

6     copies for the court.  We're going to make copies.

7          ATTORNEY SCHNEIDER:  I don't remember what

8     case it was, but she made it clear to me that if we

9     use it she would prefer that it gets put in.

10          THE COURT:  That's fine.

11          ATTORNEY SCHNEIDER:  Unless it's something

12     that --

13          THE COUT:  Especially since we weren't just

14     using it to refresh recollection, you were --

15          ATTORNEY VISHNY:  Right.  It was past

16     recollection recorded.

17          THE COURT:  Let's mark that one as an

18     exhibit.

19          ATTORNEY VISHNY:  I'm going to have to

20     provide the court with a copy at a later time.  We're

21     going to have to print.

22        I don't know that it needs to be moved in, but I

23     will provide copies of the transcripts that we've

24     used.

25          THE COURT:  Okay.  That's fine.

8

1          We all set?  Miss Schneider, we're all set?

2               ATTORNEY SCHNEIDER:  Yes.

3               THE COURT:  Attorney Vishny, we're all set?

4               ATTORNEY VISHNY:  Yes.  We're all set.  I

5     apologize for the delay.

6               THE COURT:  Please rise for the jury.

7               (The jury was escorted into the courtroom.)

8               THE COURT:  Be seated.

9          Miss Schneider, are you prepared to call your

10    first witness at this time?

11              ATTORNEY SCHNEIDER:  We are, Your Honor.

12    We would call Johnny Thao.

13              THE COURT:  If you would please remain

14    standing, sir, the clerk will swear you in.

15              THE CLERK:  Please raise your right hand.

16              (Oath administered to witness.)

17              THE WITNESS:  I do.

18              THE CLERK:  Please state full name and

19    spell it for the record please.

20              THE WITNESS:  My name is Johnny Thao,

21    J-O-H-N-N-Y, T-H-A-O.

22              THE COURT:  Mr. Thao, you may be seated.

23    If at any point in time you do need a water, that is

24    a new bottle of water for you.

25              THE WITNESS:  Okay.  Sounds good.

9

1                    THE COURT:  Miss Schneider, your witness.

2                    **EXAMINATION OF JOHNNY THAO**

3    **BY ATTORNEY SCHNEIDER:**

4    Q    Good morning, Mr. Thao.  How are you?

5    A    I'm good.

6    Q    Can you tell us where you grew up?

7    A    I grew up in the Appleton area and Little Chute

8         area.

9    Q    How old are you, Mr. Thao?

10   A    I am 24.

11   Q    I want to direct your attention, Mr. Thao, back to

12        what would have been a Saturday night, December 7th,

13        2013, into the early Sunday morning hours.  Were you

14        out that evening?

15   A    Yes.  I was with my girlfriend and some friends.

16   Q    And do you remember where you went out to that

17        night?

18   A    I went to the Luna Lounge on College Avenue in

19        downtown Appleton.

20   Q    Do you remember that night ever seeing a disturbance

21        at all?

22   A    Yes.  I -- there was a fight between two females that

23        I broke up with my friends.

24   Q    I want to talk a little bit about that with you, Mr.

25        Thao.  Do you remember, if you know, about what time

10

```
 1        that happened?

 2    A   I would say approximately 1:45 a.m.

 3    Q   So close to bar close?

 4    A   Yes.

 5    Q   And did that happen outside or inside of Luna

 6        Lounge?

 7    A   Outside, just outside the doors.

 8    Q   So can you just explain to us how or why were you

 9        outside prior to seeing that?

10    A   Well, I wanted to gather my friends and my girlfriend

11        so we could leave a little early, and we were just

12        standing by the corner waiting for some more people

13        to come out.

14    Q   So you were kind of just getting ready to leave?

15    A   Yes.

16    Q   Do you remember that night, was it warm, cold, what

17        do you remember about that night?

18    A   That night was -- it was okay weather, probably

19        sweater weather, not too cold.

20    Q   So you're standing outside of Luna.  Who was with you

21        of your friends, if you know?

22    A   I was standing out there with my brother-in-law, my

23        girlfriend and about two friends.

24    Q   And can you describe for us what you remember

25        seeing?
```

11

```
 1   A   We were standing out there waiting for I think my
 2       other friend to come outside, and then we saw two
 3       females fighting near the door, and that's when we
 4       stepped in and broke up the fight.
 5   Q   Do you remember anything about the different -- the
 6       girls' color hair, anything they were wearing?
 7   A   Yes.  One girl had blonde hair and a white jacket on
 8       and some high boots, and the other female had brown
 9       hair and I believe black shirt.
10   Q   And if you can describe for us, Mr. Thao, in the best
11       way you can, were they both hitting each other, what
12       was going on?
13   A   It looked like the girl with the black shirt was more
14       attacking the other one with the white jacket.  I
15       guess she was trying to hold her down as if to not
16       let her go somewhere or run away.
17   Q   So if I reference them by their hair colors, the girl
18       with the brown hair was the one that was, I think
19       your word was, attacking or holding down the girl
20       with the blonde hair?
21   A   Yes.
22   Q   About how far away were you when you saw this?
23   A   I would say approximately 30 feet.
24   Q   Did -- at some point did you approach and get
25       closer?
```

```
 1    A    Yup.

 2    Q    And during the time when you were approaching, did

 3         the girl with the brown hair, was she still trying to

 4         hold down the other girl?

 5    A    Yes.

 6    Q    Was she actually hitting her?

 7    A    It was happening so fast it looked like they were

 8         just struggling to, you know, get away from each

 9         other, but she was trying to hold her.

10    Q    And I don't think I asked you this, were they

11         standing up, were they on the ground?

12    A    They were standing up.

13    Q    As you got closer, do you remember the girl with the

14         brown hair, seeing what she was like?

15    A    She seemed kind of hysterical, almost crying, and

16         also angry.

17    Q    Do you remember anything she was saying?

18    A    Yes.  She stated something along the lines of your

19         friend shot my friend.

20    Q    Do you remember hearing that?

21    A    Yes.

22    Q    Was that said once or more than once if you know?

23    A    I believe it was only said once.

24    Q    At some point were you able to split them up?

25    A    Yes, we were.
```

13

```
 1   Q   Did other people have to help you?

 2   A   No, it was just me and my two friends.

 3   Q   And by splitting them up, what did you do?

 4   A   We pretty much just stepped in between them and

 5       grabbed their hands so they couldn't hold each other

 6       anymore and then got them away from each other.

 7   Q   Did you continue to have contact with either of the

 8       parties?

 9   A   Yes.

10   Q   Which one?

11   A   The one -- the blonde hair.

12   Q   What do you remember seeing about her when you had

13       contact with her?

14   A   She had a bloody nose and her nose appeared to have

15       been broken.

16   Q   Was she emotional?

17   A   Yes, she was.

18   Q   Was she crying?

19   A   Yes, she was crying.

20   Q   Did you talk to her or ask her how she was?

21   A   Yes.  I -- I actually asked her, you know, what

22       happened, and then she stated that my boyfriend shot

23       that guy.

24   Q   And that's when you were directly having contact with

25       her?
```

14

1   A   Yes.

2   Q   Did she tell you anything else about her boyfriend at

3       that time?

4   A   We asked her who her boyfriend was and she said that

5       he was an Asian guy.  That was all she said.

6               ATTORNEY SCHNEIDER:  I don't have any other

7       questions.

8               THE COURT:  Defense prepared to ask

9       questions?

10              ATTORNEY VISHNY:  Yes.

11              **EXAMINATION OF JOHNNY THAO**

12  **BY ATTORNEY VISHNY:**

13  Q   Now, Mr. Thao, prior to this happening you had been

14      at Luna, right?

15  A   Yes.

16  Q   And some other bars before then or only Luna?

17  A   Just Luna.

18  Q   And it's fair to say that while at Luna -- well, what

19      time did you get to Luna?

20  A   I would say approximately probably 11:30.

21  Q   Had you had any alcohol that evening before going to

22      Luna?

23  A   Yes.

24  Q   And do you mind if I ask how much?  Well, whether you

25      mind, I hate to be rude, but I am going to ask.

15

```
1    A    I had two beers.

2    Q    How about after you were at Luna?

3    A    At Luna I probably had about another two.

4    Q    Okay.  So you had had four beers that evening.  Is it

5         fair to say that you were buzzed?

6    A    At the time I do not believe I was during the

7         incident, but at some point that night I probably

8         was, yes.

9    Q    All right.  When -- just so it's clear, you did not

10        see the shooting happen at Luna, right?

11   A    No, I did not.

12   Q    And you weren't even aware of it at the time.

13   A    No.

14   Q    You did not hear gunshots from the inside before

15        seeing this fight or people run out.

16   A    I did not, no.

17   Q    You said you were 30 feet away, if I heard you

18        right --

19   A    Yes.

20   Q    -- when the fight started.  Were you on the corner at

21        that point?

22   A    Yup.

23   Q    Right in front of Luna?

24   A    Yes.

25   Q    You saw a lot of people run out?
```

16

1    A    Yes, I did.

2    Q    And you saw three guys run out who ran around the

3         corner and to the right or west from Luna.  Did you

4         see them run up Division Street?

5    A    I saw a lot of people run out.  I couldn't tell you

6         exactly.

7    Q    After the fight was done -- let me say this.  These

8         women, did you notice whether or not they appeared to

9         be drunk to you at all?

10   A    I couldn't tell you, to be honest.

11   Q    All right.  After the fight, did -- when you talked

12        with the girl who had the high boots on, where were

13        you while you were talking to her?

14   A    We were walking her towards the parking ramp on I

15        believe Division.

16   Q    How far did you walk her?

17   A    Just to the parking ramp.

18   Q    To the exact entrance of the parking ramp you walked

19        her?

20   A    Yup, approximately that area.  I had to go back to

21        find my other friends.

22   Q    Did you walk in the parking ramp slightly with her?

23   A    I do not believe so.

24   Q    But to the entrance of the parking ramp, that's what

25        you remember?

17

```
 1   A    Yes.

 2   Q    All right.  I'm going to play a video.  This is

 3        Exhibit 97.  When you say "we were walking her", do

 4        you mean you and your friend?

 5   A    I believe so, yes.

 6   Q    Was his name Jared?

 7   A    Yes.

 8   Q    All right.  Exhibit 97 starting at 1:50:38.  You will

 9        not have seen this before, so I want to orient you

10        towards this.  Do you -- are you okay where you're

11        sitting or would you prefer to come over here?

12   A    I think it would be better if I come up there.

13             ATTORNEY VISHNY:  Is that all right, Judge,

14        for the witness to come here?

15             THE COURT:  No.  That's fine.  Please.

16             ATTORNEY VISHNY:  Okay.

17             THE COURT:  And, members of the jury,

18        you're able -- your view is okay?

19   Q    (BY ATTORNEY VISHNY)  Okay.  When I ask you

20        questions, though, I would like you to turn around so

21        the jury can hear you.

22   A    Sure.  Okay.

23   Q    Now, just to orient you, this is Division Street.

24        Let me get the pointer.

25             THE COURT:  What exhibit is this, Attorney
```

18

1    Weitz?

2                    ATTORNEY WEITZ:  97.

3                    THE COURT:  Thank you.

4    Q    (BY ATTORNEY VISHNY)  This is Division Street.  Is

5         this the parking ramp you're talking about?

6    A    Yes, yes, it is.

7    Q    I don't know if you want to stand a little sideways,

8         but we want to make sure the jury can hear

9         everything.

10                   ATTORNEY SCHNEIDER:  Here.  Otherwise, Mr.

11        Thao, just come stand in between us if that's okay.

12        Watch the cords on the floor.

13   Q    (BY ATTORNEY VISHNY)  The girls who were fighting,

14        that was over in this area, fair, right on the side

15        of Luna?

16   A    Yup.

17   Q    Right near the corner of Division and College.  We're

18        going to play this video for you.  All right?

19                   (Video played.)

20   Q    Now you see these three people running, right?

21   A    Okay.

22   Q    Can you see the fight going on over here?

23   A    No, I can't really see that.

24   Q    All right.  What's the -- the time stamp here, is it

25        15:21:423.

19

1            Did you see this guy walking this girl alone
2       from where the fight was over to the entrance of the
3       parking ramp?  Can you see that?
4    A  Which girl is that?
5    Q  You might not be able to see from here.
6            ATTORNEY WEITZ:  Do you want to go ahead a
7       frame?
8            ATTORNEY VISHNY:  What?
9            ATTORNEY WEITZ:  Should we go ahead a
10      couple of frames?
11           ATTORNEY VISHNY:  Yeah, let's just --
12   Q  (BY ATTORNEY VISHNY)  Can you see a man and a woman
13      here?
14   A  Yes.
15   Q  Can you tell from this if this is the same woman?
16   A  The one that was attacking the other one or --
17   Q  No, the one who was attacked.
18   A  Oh, I don't think that's her.
19   Q  Okay.  You can't tell.  All right.
20          We're going to run it back a little bit, and we
21      stopped at 1:51:136.
22           ATTORNEY VISHNY:  Mr. Weitz, can you just
23      run it back a little bit to when they first appear?
24   Q  Okay.  So at 1:51:122.236 you see these two people,
25      right?

20

1  A  Yes, I do.

2  Q  Okay.  We're going to switch now to Exhibit No. 98.

3          ATTORNEY VISHNY:  Just going to take us a

4      second to get this in the right place, Your Honor.

5          THE COURT:  Not a problem.

6  Q  (BY ATTORNEY VISHNY)  While he's cueing that up, what

7      you did see is the two figures walk from going up

8      Division Street, in other words northbound from

9      College, and then turn into the parking ramp,

10     right?

11 A  Yes, I did see that.

12 Q  And it was a male and a female even though you can't

13     identify the people?

14 A  Yeah.

15         ATTORNEY VISHNY:  Are we at this right

16     place?

17 Q  (BY ATTORNEY VISHNY)  Okay.  We're going to play

18     Exhibit 98 starting at 1:51:30.412, and just so you

19     get oriented, this is a camera from inside that

20     parking ramp that we were talking about.  All right?

21     Now do you see the man and the woman?

22         ATTORNEY VISHNY:  Can you run that back

23     just slightly, Mr. Weitz, when they turn in?  I'll

24     put the time on.

25 Q  Okay.  The time here is 1:51:28.117.  All right.

21

```
 1           We're just going to show that from this point.
 2               Do you see this woman with high boots on?
 3      A    Yes, I do.
 4      Q    Okay.  And she's the woman who was walking in with
 5           the man from before, right?
 6      A    Yes.
 7      Q    Okay.  And you are not in this video at all as she
 8           walks up from the corner of College and Division,
 9           right, the previous video?
10      A    Yes.
11      Q    You didn't see yourself, and you are not this person
12           right here walking her in either, right?
13      A    No.
14      Q    Okay.  That's your friend Jared?  Or you can't tell.
15      A    I can't tell.  It doesn't look like the girl.
16      Q    Okay.  You don't think it is, but you can see the
17           high boots, right?
18      A    Yes.
19      Q    All right.  You can have a seat.
20               All right.  Now, as far as what happened -- let
21           me wait until the lights are back on.
22               Okay.  As far as what happened that night, you
23           weren't expecting to see a fight at all, right?
24      A    No.
25      Q    And your memory of what happened, it's been a couple
```

22

```
 1          of years, right?

 2     A    Yup.

 3     Q    And the -- you were given a copy of the police report

 4          to refresh your memory about what happened, right?

 5     A    Yes.

 6     Q    But you weren't shown any videos, right?

 7     A    Yup.  No videos.

 8     Q    No pictures.

 9     A    No.

10     Q    Didn't listen to any tape recording of when you

11          talked to the police.

12     A    No.

13     Q    You remember talking to the police.  Did you know you

14          were being recorded at that time?

15     A    Yes, yes, I did know.

16     Q    So all you had to review was a summary of what

17          happened.

18     A    Yes.

19     Q    And otherwise it's just from your memory that night

20          after having a fun evening at Luna with friends and

21          having four beers?

22     A    Yes.  I wouldn't call it fun though.

23     Q    Because of what happened.

24     A    Yes.

25     Q    Well, fun up until that point?
```

23

1    A    Sure.

2              ATTORNEY VISHNY:  Nothing further.

3              THE COURT:  Any redirect, Attorney

4    Schneider?

5              ATTORNEY SCHNEIDER:  Yes.

6                 **EXAMINATION OF JOHNNY THAO**

7    **BY ATTORNEY SCHNEIDER:**

8    Q    Mr. Thao, how many hours were you out that night?

9    A    Let's see, 11:30 to 1:45, I would say two hours.

10   Q    And the people you saw, the woman defense

11        characterized her clothing as gray boots, do you know

12        whether they're boots or just pants with a long

13        coat?

14   A    I couldn't tell.

15   Q    Do you remember the color hair it appeared she had in

16        that video?

17   A    In that video it looked like she had brown hair.

18   Q    And you remember the woman that you walked or someone

19        walked had blonde hair?

20   A    Yes.

21   Q    Do you know a person named Paul Lee?

22   A    No, I don't.

23   Q    What about Joe Thor?

24   A    No.

25   Q    Phong Lee?

24

```
 1   A    No.

 2              ATTORNEY SCHNEIDER:  Nothing further.

 3              ATTORNEY VISHNY:  I'm going to do a very

 4        brief redirect.  We're going to get this up again,

 5        but I'm going to ask Mr. Thao to look at it on the

 6        computer screen knowing the jury can't see it because

 7        the resolution is so poor here.

 8              THE COURT:  That's fine.

 9              ATTORNEY VISHNY:  All right.

10              THE COURT:  And so you'll ask Mr. Thor to

11        approach?  Mr. Thao.  My apologies.

12              THE WITNESS:  That's okay.

13              THE COURT:  Although you will also,

14        Attorney Vishny, you'll also show it on the screen

15        just so that the jury knows what Mr. Thao is looking

16        at.

17              ATTORNEY VISHNY:  Okay.
```

18                    **EXAMINATION OF JOHNNY THAO**

19   **BY ATTORNEY VISHNY:**

```
20   Q    I'm going to have you come up to the computer screen,

21        why don't you take it off, and this is at

22        1:51:39.141, Exhibit 98.  All right.

23             Now that you're looking at it on a small screen

24        with better resolution, does the woman look like she

25        has blonde hair to you?
```

25

1   A    Possibly, yes.

2   Q    Okay.  And boots?

3   A    Yes.

4             ATTORNEY VISHNY:  All right.  Nothing

5        further.  You can be seated.

6                 **EXAMINATION OF JOHNNY THAO**

7   **BY ATTORNEY SCHNEIDER:**

8   Q    You're seeing just a reflection even as you look

9        closely, right, Mr. Thao?

10  A    Yes.

11  Q    So you can't say with any definitive that those are

12       boots or pants or a reflection off her knee.

13  A    I mean it's poor here or there.

14            ATTORNEY SCHNEIDER:  Okay.  Nothing

15       further.

16            THE COURT:  Any recross?

17                 **EXAMINATION OF JOHNNY THAO**

18  **BY ATTORNEY VISHNY:**

19  Q    But you do agree the hair is blonde?

20  A    From this angle, yes, it looks blonde.

21            ATTORNEY VISHNY:  Okay.  Nothing further.

22            THE COURT:  All right.

23       Ladies and gentlemen of the jury, any questions

24       that you wish to submit for consideration?

25            (No response.)

26

1           THE COURT:  Very good.

2           Then, Mr. Thao, I thank you, sir, for your

3      testimony.  You are excused at this time.

4           THE WITNESS:  Thank you.

5           THE COURT:  And if you would please come to

6      the witness stand.

7           ATTORNEY SCHNEIDER:  This is Xai Thao, or

8      Xai Thao, I'm sorry.

9           MR. XAI THAO:  No.  Xai.

10          THE COURT:  Sir, if you please remaining

11     standing the clerk will swear you in.

12          (Oath administered to witness.)

13          THE WITNESS:  Yes.

14          THE CLERK:  Please state your full name and

15     spell it for the record please.

16          THE WITNESS:  My full name is Via Xai Thao.

17     V-I-A, X-A-I, T-H-A-O.

18          THE COURT:  All right, sir.  You may be

19     seated.

20          And, Miss Schneider, your witness.

21          ATTORNEY SCHNEIDER:  Thank you.

22          **EXAMINATION OF VIA XAI THAO**

23     **BY ATTORNEY SCHNEIDER:**

24     Q   Mr. Thao, where do you currently live?

25     A   Milwaukee.

27

```
 1    Q    How long have you lived in Milwaukee?

 2    A    Six plus years.

 3    Q    Are you currently employed?

 4    A    Yes.

 5    Q    What do you do for work?

 6    A    I'm a nurse.

 7    Q    Are you assigned a specialty or just general practice

 8         at where you work?

 9    A    Just general.

10    Q    Okay.  And in Milwaukee, does anyone live with you?

11    A    Yes.

12    Q    Who lives with you?

13    A    Peter, Dia and Joseph.

14    Q    Okay.  And we're going to talk a little bit just to

15         help the jury out.  Peter would be Peter Moua?

16    A    Yes.

17    Q    And Dia Vang?

18    A    Yes.

19    Q    And Joseph Vang?

20    A    Yes.

21    Q    Dia and Joseph are related how?

22    A    They're siblings.

23    Q    Brother and sister?

24    A    Yes.

25    Q    And how long have you known Dia?
```

28

1    A    Seven years.

2    Q    And currently she's your girlfriend, correct?

3    A    Yes.

4    Q    How long have you been dating her, if you even know.

5         She might know exactly.

6    A    She might but -- seven years.

7    Q    Okay.  Do you know someone named Chong Lee?

8    A    Yes.

9    Q    How do you know Mr. Lee?

10   A    Through friends in Appleton.

11   Q    Is the Chong Lee that you know here in the courtroom

12        today?

13   A    Yes.

14   Q    Can you identify him by some clothing that he's

15        wearing?

16   A    He's wearing black.

17   Q    Okay.  Does his shirt have a collar or no collar?

18   A    Collar.

19   Q    Does he have a suit coat on?

20             ATTORNEY VISHNY:  I would agree this is the

21        right identification.

22             THE COURT:  Record shall reflect the

23        identification.

24             ATTORNEY SCHNEIDER:  Thank you.

25   Q    (BY ATTORNEY SCHNEIDER)  Mr. Thao, did you know Mr.

29

```
 1          Lee growing up at all?
 2     A    No.
 3     Q    When do you think you first met him?
 4     A    Probably couple years ago.
 5     Q    Did Dia -- where did Dia and Joseph grow up?
 6     A    Appleton.
 7     Q    Have you seen Mr. Lee when you've been up here in
 8          Appleton?
 9     A    No.
10     Q    Have you seen him when he's been down in Milwaukee?
11     A    Yes.
12     Q    I want to direct your attention, Mr. Thao, to what
13          would have been Sunday, December 8th, 2013.  Do you
14          remember if you had to work that day?
15     A    On the 8th?
16     Q    Yes.
17     A    I can't recall.
18     Q    Do you remember -- well let me ask you this.
19              Do you have a friend whose nickname is the
20          letter Q?
21     A    Yes.
22     Q    And his first name might be Phonesay?
23     A    Yes.
24     Q    Most often he's referred to as Q?
25     A    Yes.
```

1   Q   Do you remember on that Sunday did you go to his
2       house?
3   A   Yes, we did.
4   Q   And why did you go to the house?
5   A   Watch football.
6   Q   Do you remember who else was at his house?
7   A   There was quite a few, but a lot of us was just
8       regular friends.
9   Q   Did you see the defendant that night?
10  A   Yes.
11  Q   Was anyone with him?
12  A   Joe.
13  Q   Do you know Joe's last name?
14  A   Thor.
15  Q   When you saw him, did it surprise you to see that he
16      was hanging out down in Milwaukee with some of your
17      friends?
18  A   Not really.
19  Q   He -- had he come down before?
20  A   Yes.  Randomly.
21  Q   Did you speak to him?
22  A   That night, yes.
23  Q   Talk about the football game?
24  A   Football game, just catching up.
25  Q   Was there ever a time -- let me ask you this.  Can

31

```
 1        you smoke in Q's house?
 2    A   No.
 3    Q   Okay.  So where do you go if you want to go have a
 4        cigarette?
 5    A   Outside.
 6    Q   Were you ever outside smoking when the defendant was
 7        also outside?
 8    A   Yes.
 9    Q   Was anyone else outside with the two of you?
10    A   Yes.
11    Q   Who?
12    A   Keng.
13    Q   Keng?
14    A   Keng, or Jesus.
15    Q   Okay.  So you have a friend, could his full name be
16        Kong Vang?
17    A   Yes.
18    Q   And you guys refer to him as Jesus?  Is there a
19        reason why you call him Jesus?
20    A   No particular.
21    Q   Okay.  And where would have this been, you just like
22        go stand outside or is there a certain area?
23    A   Just outside.
24    Q   Do you remember what you -- what was talked about
25        outside?
```

32

1    A    Yes.

2    Q    What was talked about?

3    A    It first started, you know, see what -- what they

4         came down, they just said just to hang out.

5    Q    And you were asking Chong this?

6    A    Yes.

7    Q    Was Joe outside too or was he not outside?

8    A    I can't recall.

9    Q    Okay.  And what did he say when you asked him, hey,

10        what -- why did you pop down or why did you come

11        down?

12   A    He just said that we stopped by.

13   Q    Was there anything else that you talked about

14        outside?

15   A    Yes.

16   Q    What was that?

17   A    Eventually then he mentioned about a fight in

18        Appleton.

19   Q    Did he tell you where with any specificity?

20   A    He just said downtown.

21   Q    What did he tell you about the fight?

22   A    Bunch of his guys got -- they were in a fight, got

23        caught in a corner, and then -- and then they

24        couldn't -- there was too many guys so he pulled out

25        a gun.

33

```
 1   Q    Did you ask him what he did with the gun or did he
 2        tell you?
 3   A    No.
 4   Q    Did he tell you what he did with the gun?
 5   A    No.
 6   Q    Did he ever tell you that he used the gun?
 7   A    He said he shot the gun.
 8   Q    He shot a guy?
 9   A    Yeah.  A guy.
10   Q    Sorry.  I was talking on top of you.  He said he shot
11        a guy?
12   A    Yes.
13   Q    When he said that, what were his emotions like?
14   A    Kind of scared.
15   Q    Did you ask him if he was scared?
16   A    No.
17   Q    After he said that, did you respond at all to him?
18   A    Yes.
19   Q    Do you remember what you might have asked or said?
20   A    Just say if the guy was still alive or if -- where he
21        shot him.
22   Q    So on the -- did he respond at all when you said is
23        he alive or where did you shoot him?
24   A    No.
25   Q    Did it seem from your discussion that he knew
```

34

1    anything about how the guy was doing?

2  A  No.

3          ATTORNEY WEITZ:  Objection.

4          THE COURT:  You can approach.

5          (Bench conference.)

6  Q  (BY ATTORNEY SCHNEIDER)  Did he ever tell you that he

7     knew how the guy was doing?

8  A  No.

9  Q  Did you express any concern about if the guy was okay

10    or not?

11 A  I said that if, you know, if he was shot, he would

12    have, you know, it would be -- it would affect his

13    record.

14 Q  Meaning Chong's?

15 A  Yes.

16 Q  Did you tell anybody -- well let me ask you this, Mr.

17    Thao.  How long do you think you were outside?

18 A  Maybe ten minutes.

19 Q  And Kong was also there?

20 A  Yes.

21 Q  Was Kong part of that conversation at any time?

22 A  I don't remember so.

23 Q  Okay.  After this day, do you remember if you stayed

24    until the end of the football game or do you not

25    know?

1    A    I think I did.

2    Q    Okay.  And let me ask you this.  Now, with Sunday we

3         have football games that pretty much run from noon up

4         until 10:00 on Sundays.  Was it one of the first

5         games, the afternoon game or the night game, if you

6         know?

7    A    No.

8    Q    Okay.  So it was just one of the games on Sunday?

9    A    Yes.

10   Q    After you left Q's house, did you go back -- where

11        did you go?

12   A    Went back to my place.

13   Q    Okay.  Did you see Chong anymore after that?

14   A    No.

15   Q    Did you ever tell anybody about this conversation

16        that Chong had with you?

17   A    To my girlfriend.

18   Q    And when did you tell her?

19   A    Probably after we have saw it on Facebook.

20   Q    Was it the same day or later in the week?

21   A    Later during the week.

22   Q    Prior to that did you know there had been a shooting

23        in Appleton?

24   A    No.

25   Q    After you saw that information, did you tell -- I'm

36

```
 1          sorry.  I might have said Di.  It's Dia, right?
 2     A    Yes.
 3     Q    Did you tell Dia --
 4               ATTORNEY WEITZ:  Objection.
 5               THE COURT:  Counsel approach.
 6               (Bench conference.)
 7     Q    (BY ATTORNEY SCHNEIDER)  So that later after that at
 8          some point you saw something on Facebook?
 9     A    Yes.
10     Q    And it wasn't until then that you knew there had been
11          a shooting?
12     A    Yes.
13     Q    At some point did law enforcement come to talk to you
14          about this?
15     A    Yes.
16     Q    And you told them what -- about that conversation
17          with Chong?
18     A    Yes.
19     Q    I'm just going to ask, because I don't know if you
20          do, how did you know Joe Thor?
21     A    Friend as well.
22     Q    And did you see him a lot?
23     A    Sometimes.
24     Q    Okay.  What about a person named Phong Lee, do you
25          know who that is?
```

37

1    A    No.

2    Q    What about Paul Lee?

3    A    No.

4         ATTORNEY SCHNEIDER:  I don't have any other

5    questions then.

6         THE COURT:  Attorney Weitz?

7         ATTORNEY WEITZ:  Thank you.

8    **EXAMINATION OF VIA XAI THAO**

9    **BY ATTORNEY WEITZ:**

10   Q    Joe Thor, do you know whether he's related at all to

11        Dia or any of the people that you live with?

12   A    No.

13   Q    So getting back to then December 8th of 2013 and the

14        time frame that you were just talking about, before

15        you go over to Q's house, you were working that day,

16        right?

17   A    Yes.  I believe so.

18   Q    And you typically work until?

19        UNIDENTIFIED JUROR:  Could you use the mic?

20   Q    You typically work until about eight p.m., that was

21        kind of your regular schedule at that time?

22   A    Yes.

23   Q    Okay.  So you think it was probably after work around

24        that 8:00 time frame that you got over to Q's

25        house?

38

```
1    A    Yes.

2    Q    Okay.  And you said that that was to watch a football

3         game that night, right?

4    A    Yes.

5    Q    And those later football games usually start around

6         7:30, something like that?

7    A    Yes.

8    Q    Okay.  And when you got to Q's house, Chong and Joe

9         Thor were already there, right?

10   A    Yes.

11   Q    Okay.  You watched the game and then after the game

12        you go back to your own house?

13   A    Yes.

14   Q    And was that a house or an apartment?

15   A    It's an apartment.

16   Q    So it's not a very big space, right?

17   A    Correct.

18   Q    Okay.  And when you got back there, you don't

19        remember seeing Chong, right?

20   A    Correct.

21   Q    You don't remember seeing Joe Thor again?

22   A    No.

23   Q    Did you see Mindy or Go Go, two girls from

24        Milwaukee?

25   A    I can't recall.
```

39

```
 1   Q    And you went to sleep.

 2   A    Yes.

 3   Q    Now turning back to your time at Q's house, you said

 4        you were out on the porch smoking, right?

 5   A    Yes.

 6   Q    And you know that Kong was out there at the same

 7        time.  You remember that?

 8   A    Yes.

 9   Q    Okay.  You know that Chong was out there.

10   A    Yes.

11   Q    But you -- you said that you're not sure whether Joe

12        was out there or not?

13   A    Correct.

14   Q    When you were asked on direct, you said that the

15        conversation started just kind of talking about why

16        they came down, right?

17   A    Yeah.

18   Q    Okay.  And you said that they said that they -- they

19        just came down to hang out, right?

20   A    Yup.

21   Q    So is it likely that Joe was probably out there for

22        that conversation then?

23   A    Maybe.  There were, you know, couple guys out there,

24        but again, I was just talking to Chong.

25   Q    Okay.  So there is a few other people besides Kong
```

40

1        and Chong out there?

2    A   Yes.

3    Q   Okay.  And Joe could have been one of those people?

4    A   Could be.

5    Q   Okay.  So eventually it came around to talking about

6        a fight, right?

7    A   Yup.

8    Q   Okay.  And you remember Chong saying that some guys

9        got cornered, right?

10   A   Yup.

11   Q   And you said that Chong said something about how

12       there was too many guys so he pulled out a gun is

13       what you remember?

14   A   Yes.

15   Q   And then at that point you said that Chong said that

16       he shot a guy, right?

17   A   Yes.

18   Q   And Chong said that it was a black guy that he shot.

19   A   Yes.

20   Q   You don't know where he shot him, right?

21   A   Right.

22   Q   He didn't tell you that?

23   A   No.

24   Q   Okay.  He also -- you didn't hear anything about

25       whether the guy lived or died?

41

```
 1    A     Correct.

 2    Q     He didn't really give you any details about what

 3          exactly happened, right?

 4    A     No.

 5    Q     Okay.  As far as where this happened, you knew it was

 6          in Appleton, right?

 7    A     Yup.

 8    Q     But you were under the impression that it happened

 9          kind of in an alleyway?

10    A     No, just downtown.

11    Q     Do you remember talking to the police officers in

12          this case?

13    A     In Milwaukee?

14    Q     Yes.

15    A     Okay.

16    Q     Okay.  And this was approximately December 18th of

17          2013, right?

18    A     I believe so.

19    Q     Okay.  So this was shortly after you had this

20          conversation with Mr. Lee, right?

21    A     Yes.

22    Q     Okay.  And that was with Detectives Tauber and

23          Meyer?

24    A     Yes.

25    Q     Okay.  And as you said earlier, this happened at your
```

42

1          workplace, right?

2     A    Yes.

3     Q    Okay.  And you recounted this conversation that you

4          had with Chong and told them about what you

5          remembered that you said, right?

6     A    Yes.

7     Q    Okay.  If I showed you a transcript from that

8          interview with the police officers, would that help

9          refresh your recollection?

10    A    Yeah, that wouldn't hurt.

11              ATTORNEY WEITZ:  I'm just going to have it

12         marked.

13    Q    I'm going to show you what's been marked Exhibit 107,

14         Page 18.  Okay?

15    A    Okay.

16    Q    Does that refresh your recollection as to what was

17         said?

18    A    Yes.

19    Q    Okay.  So now do you remember that you said that you

20         were under the impression that it happened in an

21         alley?

22    A    Yes, downtown.

23    Q    Okay.  So after you saw this on the news on Facebook

24         or however you learned about the shooting, right?

25    A    Yup.

43

```
1    Q    At first you didn't think that it was really
2         connected to what Chong had told you about, right?
3    A    Correct.
4    Q    Because he had told you that it was a black guy that
5         got shot, right?
6    A    Correct.
7    Q    And a lot of times Chong says things to you that
8         aren't necessarily true, right?
9    A    Correct.
10   Q    He'll kind of say things to be the center of
11        attention?
12   A    That I don't know.
13   Q    Okay.  But you feel like in the past you've been told
14        things by Chong that are not true.
15   A    Yeah.  Joke.
16   Q    And some of it deals with bragging, he's kind of a
17        bragger?
18   A    I don't know him that well.
19             ATTORNEY WEITZ:  Nothing further.
20             THE COURT:  Any redirect, Attorney
21        Schneider?
22            EXAMINATION OF VIA XAI THAO
23   BY ATTORNEY SCHNEIDER:
24   Q    Mr. Thao, I apologize, I couldn't tell because I
25        think Attorney Weitz, did you say he's a jokester or
```

44

1          a prankster?

2     A    You know, when we talk, he jokes around.

3     Q    Saying you shot someone is pretty serious, right?

4     A    Yes.

5     Q    Would you joke about something like that?

6     A    No.

7               ATTORNEY WEITZ:  Objection.

8               THE COURT:  Overruled.

9     Q    (BY ATTORNEY SCHNEIDER)  You thought he said it was

10         in an alley, correct?

11    A    Yes.

12    Q    But you clearly remember him making reference to

13         shooting a man.

14    A    Yes.

15              ATTORNEY SCHNEIDER:  Nothing further.

16              THE COURT:  Recross, Attorney Weitz?

17              ATTORNEY WEITZ:  Nothing further, Your

18         Honor.

19              THE COURT:  Ladies and gentlemen of the

20         jury -- okay.  And so we have a written question.

21         Wendy, if you would please collect that.  I'd ask the

22         attorneys to please come forward.

23              (Bench conference.)

24              THE COURT:  Sir, the first question for you

25         is:  Was there drinking at Q's house?

45

```
 1                    THE WITNESS:  Yes.

 2                    THE COURT:  The next question for you, sir:

 3         When Chong talked about the shooting, what were his

 4         exact words?

 5                    THE WITNESS:  I can't tell you the exact

 6         words because that's couple years ago.

 7                    THE COURT:  All right.

 8              Thank you, sir.

 9              Does that prompt any follow-up questions,

10         Attorney Schneider?

11                    ATTORNEY SCHNEIDER:  None from the State.

12                    THE COURT:  Attorney Weitz?

13                    ATTORNEY WEITZ:  None from the defense.

14                    THE COURT:  Thank you, very much, sir.  You

15         are excused.

16              Attorney Schneider, are you prepared with your

17         next witness?

18                    ATTORNEY MAIER:  Your Honor, the State

19         calls Keng Joseph Vang.

20                    THE COURT:  If you would please remain

21         standing, sir, the clerk will swear you in.

22                    THE CLERK:  Please raise your right hand.

23                    (Oath administered to witness.)

24                    THE WITNESS:  I do.

25                    THE CLERK:  Please state your full name and
```

46

1        spell it for the record please.

2                    THE WITNESS:  Keng Joseph Vang.  First name

3        K-E-N-G, middle name J-O-S-E-P-H, last name

4        V-A-N-G.

5                    THE COURT:  All right.  Sir, you may be

6        seated.

7                    ATTORNEY SCHNEIDER:  Judge, I want to

8        approach.

9                    THE COURT:  Okay.

10                   (Bench conference.)

11                   THE COURT:  Attorney Maier.

12            **EXAMINATION OF KENG JOSEPH VANG**

13   **BY ATTORNEY MAIER**:

14   Q    Hi, Mr. Vang.

15   A    Hello.

16   Q    You indicated that your name is Keng Joseph Vang, you

17        go by Joseph, correct?

18   A    Yes.

19   Q    What city do you live in?

20   A    Milwaukee, Wisconsin.

21   Q    And how long have you lived in Milwaukee?

22   A    Almost ten years now.

23   Q    Do you know someone named Chong Lee?

24   A    Yes.

25   Q    And is he the defendant seated in court today?

47

```
 1   A   Yes.

 2   Q   Do you know someone named Joe Thor?

 3   A   Yes.

 4   Q   Would you consider Chong Lee and Joe Thor friends of

 5       yours?

 6   A   One more than the other.

 7   Q   Who more than the other?

 8   A   Joe Thor.

 9   Q   Joe more than Chong?

10   A   Yeah.

11   Q   Okay.  What do you do in Milwaukee?

12   A   I'm attending -- well I was attending school and

13       work.

14   Q   What were you attending school for?

15   A   IT.

16   Q   So that's information technology?

17   A   Correct.

18   Q   What school did you go to?

19   A   UW- Milwaukee.

20   Q   And you're a recent graduate; is that correct?

21   A   Yup.

22   Q   That's a yes?

23   A   Yes.

24   Q   In December of 2013, December 8th, you -- I'm sorry,

25       the night of the 7th into the 8th, you were with a
```

48

```
1          friend of yours, another friend who goes by Q; is

2          that correct?

3    A     Yes.

4    Q     And what's Q's first name?

5    A     I'm not sure if I'm pronouncing it right but I think

6          it's Phonesay.

7    Q     Okay.  Q also lives in Milwaukee, correct?

8    A     Correct.

9    Q     And the 7th into the 8th, was there a gathering at

10         Q's house?

11   A     Yes.

12   Q     And what was that for?

13   A     It was for a friend's birthday.

14   Q     At some point did you go back to -- on Sunday that

15         is, on Sunday did you go back to your place?

16   A     Yes.

17   Q     Was anyone with you when you went back to your

18         place?

19   A     Yes.

20   Q     Who?

21   A     Joe Thor and Chong Lee.

22   Q     How did you get there?

23   A     They drove me there.

24   Q     Who was driving the car?

25   A     Chong.
```

49

```
 1   Q    Did they come into your apartment when you got

 2        there?

 3   A    Yes, they did.

 4   Q    And what happened there?

 5   A    We ate and then sat around for a little bit and then

 6        I went to sleep because I had to work in the

 7        morning.

 8   Q    Okay.  Was anyone else there besides you and Chong

 9        and Joe?

10   A    Yeah, my sister and my cousin and my sister's two

11        friends.

12   Q    Your sister is -- what's her name?

13   A    Dia.

14   Q    And who were the other -- what are the names of the

15        other people that were there?

16   A    Mindy and Go Go.

17   Q    Go Go?

18   A    Yeah.

19   Q    That's a nickname I'm assuming?

20   A    Yeah.  I don't know her real name.

21   Q    Okay.  And then you said that there were some other

22        people, a cousin maybe, who is that?

23   A    It's my roommate.

24   Q    What's that person's name?

25   A    Peter Moua.
```

50

```
1    Q    Okay.
2              ATTORNEY MAIER:  I believe that's all the
3         questions I have for you, Joseph.  Thank you.
4              THE COURT:  Defense?
5              ATTORNEY WEITZ:  One moment.
6              ATTORNEY VISHNY:  We want to approach.
7              (Bench conference.)
8              THE COURT:  Attorney Weitz.
9              ATTORNEY WEITZ:  Thank you.
10             EXAMINATION OF KENG JOSEPH VANG
11   BY ATTORNEY WEITZ:
12   Q    Mr. Vang, you know Joe Thor, right?
13   A    Yes.
14   Q    Okay.  And I think you know him from growing up in
15        Appleton?
16   A    Correct.
17   Q    Okay.  And would you say that you consider Joe Thor
18        as kind of a cousin to you?
19   A    Yes.
20   Q    Okay.  And the only way that you knew Chong Lee was
21        through Joe Thor.
22   A    Yes.
23   Q    Okay.  Going back to December 7th, that night going
24        into the morning of the 8th, you said that you spent
25        that night at Q's house?
```

51

```
 1   A    Correct.

 2   Q    And you remember when you woke up that morning that's

 3        when you saw Joe Thor and Chong Lee?

 4   A    Yes.

 5   Q    Okay.  And you stayed there for a while and then you

 6        eventually went back to your place later that

 7        evening, right?

 8   A    Correct.

 9   Q    And you thought that that was around seven or 8:00

10        that night?

11   A    Yeah.

12   Q    And when you went back to your place, you said that

13        it was yourself, Peter Moua was also there.  Is Peter

14        Moua also kind of a cousin of Joe Thor?

15   A    No.

16   Q    No.  Okay.  Dia Vang --

17   A    Yes.

18   Q    -- was also there.  And that's another roommate of

19        yours?

20   A    Yeah.  That's my sister.

21   Q    That's your sister.  So she's also related to Joe

22        Thor?

23   A    Yes.

24   Q    And then your other roommate, Xai Thao, he was

25        there?
```

52

```
 1   A    Yes.

 2   Q    And that's your sister's boyfriend, fiance?

 3   A    Fiance.

 4   Q    Okay.  And then two of your sister's friends, Mindy

 5        and Go Go were all there, right?

 6   A    Correct.

 7   Q    You were there for a little bit, and then eventually

 8        you ended up going to bed, right?

 9   A    Yes.

10   Q    When Chong came down to Milwaukee that time, he --

11        you thought he was driving a Lexus?

12   A    Yes.

13   Q    Okay.  And that's because that's something he told

14        you?

15   A    No.

16   Q    Okay.  That's your memory?

17   A    Yes.

18   Q    Okay.

19             ATTORNEY WEITZ:  Nothing further.

20             THE COURT:  Attorney Maier, any follow-up

21        questions?

22             ATTORNEY MAIER:  No.  Thank you.

23             THE COURT:  Ladies and gentlemen of the

24        jury, any questions for consideration?

25             (No response.)
```

53

```
1                    THE COURT:  All right.  Sir, thank you very

2        much.

3            Mr. Maier, will you be handling the next witness

4        as well, sir?

5                    ATTORNEY MAIER:  Yes.  The State calls

6        Peter Moua.

7                    THE COURT:  Sir, if you would please remain

8        standing, the clerk will swear you in.

9                    THE CLERK:  Please raise your right hand.

10                   (Oath administered to witness.)

11                   THE WITNESS:  I do.

12                   THE CLERK:  Please state your full name and

13       spell it for the record please.

14                   THE WITNESS:  Peter, P-E-T-E-R, Moua,

15       M-O-U-A.

16                   THE COURT:  Mr. Maier, your witness, sir.

17                   EXAMINATION OF PETER MOUA

18  BY ATTORNEY MAIER:

19  Q    Mr. Moua, what city do you live in?

20  A    Currently?

21  Q    Currently.

22  A    Milwaukee.

23  Q    And how long have you lived there?

24  A    I'd say about maybe five years.

25  Q    Do you have a roommate?
```

54

1   A   Yup.

2   Q   What's your roommate's name?

3   A   I have three, they're Joseph, Keng, Dia and Xai.

4   Q   And that's -- Dia Vang and Keng Joseph Vang and then

5       what's Xai's last name?

6   A   Thao.

7   Q   Okay.  Back in December of 2013 did you – and I

8       realize I'm being a little vague, but you're going to

9       know what I'm talking about – did you have some

10      visitors from Appleton, including someone named Chong

11      Lee?

12  A   Yup.

13  Q   Is that someone that you knew before December 8th of

14      2013?

15  A   Yup.

16  Q   Is that the defendant who's seated in court today?

17  A   Yup.

18  Q   How do you know Chong?

19  A   I know through mutual friend.

20  Q   Who is that person?

21  A   Joe Thor.

22  Q   And was there a time on December 8th of 2013 where

23      Chong Lee and Joe Thor came to your apartment?

24  A   Yes, they did.

25  Q   Do you recall what time of day it was?

55

1   A   I'd say like in the evening probably around six or
2       7:00.
3   Q   Could it be 8:00?
4   A   Seven or eight, yeah, one of those.
5   Q   Dark outside?
6   A   Yeah.  It was dark outside already.
7   Q   Who else came with them?
8   A   They took Joseph home and that was it.
9   Q   And at the time that they arrived at your place, who
10      else was there?
11  A   It was me, Dia, Mindy, and a girl named Go Go.
12  Q   And the Go Go is a nickname for someone, right?
13  A   Yeah.  But I don't know her real name so --
14  Q   Okay.  What happened when they all got to your
15      apartment?
16  A   Well, we were drinking earlier and then they came --
17      they had like a few beers, and then I know Joe went
18      to sleep and then that was -- that was it.  We were
19      just continue drinking.
20  Q   And at some point Joe -- Joe and you are in your
21      room, right?
22  A   Yup.
23  Q   And is there a point where Chong came in?
24  A   I was trying to wake up Joe, and then, yeah, Chong
25      came in.

56

1   Q   Were you able to wake up Joe during that time?

2   A   No, I wasn't.

3   Q   And what happened when Chong came in?

4   A   He just talked to me.

5   Q   What did he say?

6   A   Just asked me if I knew anything about Luna.

7   Q   About Luna?

8   A   Yup.

9   Q   Did you know what he meant when he said Luna?

10  A   Well, he talked to me, he messaged me online already

11      on Facebook so I -- I read it online too.

12              ATTORNEY WEITZ:  Object.

13              THE COURT:  Counsel approach.

14              (Bench conference.)

15  Q   (BY ATTORNEY MAIER)  Mr. Moua, so you had heard --

16      I'm sorry.  Let me ask it this way.  You knew that

17      Luna was a club or a bar in Appleton, right?

18  A   Yup.

19  Q   Yes?

20  A   Yup.

21  Q   And so Chong comes in and asks if you -- I'm sorry.

22      What was it Chong asked when he came into your

23      room?

24  A   Just if I knew anything about what happened there.

25  Q   Okay.  And what was your response?

57

1   A    I just told him I read about it.

2   Q    Okay.  And when you said that, what did -- did you

3        ask him anything?

4   A    No.  I don't recall asking him anything.

5   Q    Okay.  What did Chong say after you indicated you

6        were somewhat familiar with what happened?

7   A    Just told me that there was a fight there.

8   Q    Anything else?

9   A    And that a shooting occurred, but I read about that

10       online so --

11  Q    Did Chong say anything about details about the

12       shooting?

13  A    Not that I remember.

14  Q    So then after this -- what happens after this little

15       bit of conversation, is there more talk between you

16       and Chong?

17  A    No.  I remember I just went back to the living room,

18       we just hung out with the girls.

19  Q    You eventually spoke with the police, correct?

20  A    Yup.

21  Q    And that would have been about a week later?

22  A    Yeah, probably about a week.

23  Q    And it was Appleton detective that -- two Appleton

24       detectives came down and talked with you, right?

25  A    Yup.

58

1    Q    How would you describe the detectives that talked to

2         you?

3    A    Aggressive.

4    Q    Are they black, white, Asian?

5    A    They're white.

6    Q    Male, female?

7    A    Both males.

8    Q    Both males.  What do you recall about them

9         physically, can you describe them?

10   A    They were tall.  One had slicked back hair and the

11        other one had darker hair.  That's all I remember.

12   Q    Do you recall what they were wearing?

13   A    No, I don't.  I don't remember.

14   Q    Okay.  Nothing -- they weren't in -- they were not in

15        blue police uniforms though, right?

16   A    No.

17   Q    Like --

18   A    They were dressed up like --

19   Q    -- suits and ties?

20   A    Yeah.  Suits and tie.

21   Q    And you know -- did you know when you were talking

22        with them you were being recorded?

23   A    No, I did not know.

24   Q    Okay.  And you know that they prepared reports after

25        they spoke with you, right?

59

```
 1   A    Yup.

 2   Q    You've had a chance to look at that report?

 3   A    No, they didn't show me.

 4   Q    So you didn't indicate to the detectives that Chong

 5        said, I got him, I shot him?

 6   A    I didn't say he shot him.  I remember that he said he

 7        just got him.  He didn't say he shot him.

 8   Q    Chong said I got him?

 9   A    Yup.  He just said he got him.

10   Q    When he said that, what -- what was the -- was that

11        in your room?

12   A    I believe so, yeah.

13   Q    And it's during the course of this conversation that

14        he starts with you about a shooting that happens at

15        Luna in Appleton?

16   A    Pretty much after.

17   Q    Like it's during the time that Joe is asleep in your

18        room and he comes in --

19   A    Yeah.

20   Q    -- right?  This isn't something you're real

21        comfortable talking about, is it?

22   A    Oh, I --

23             ATTORNEY VISHNY:  Judge, I'm going to

24        object to leading questions at this point.

25             THE COURT:  Mr. Maier, if you could please
```

60

1          rephrase the question.

2                         ATTORNEY MAIER:  I guess I'd ask to be able

3          to impeach him given I think the statement that he

4          gave and some reluctance that we've had today.

5                         ATTORNEY VISHNY:  I would like to approach

6          the bench.

7                         (Bench conference.)

8                         ATTORNEY MAIER:  Mr. Moua, thank you, I

9          don't have any further questions.

10                        THE COURT:  Who from the defense is

11         handling questions?

12                        ATTORNEY VISHNY:  I will.

13                        THE COURT:  Attorney Vishny.

14                   **EXAMINATION OF PETER MOUA**

15    **BY ATTORNEY VISHNY:**

16    Q    Mr. Moua, is Joe Thor related to you at all?

17    A    I'd say like distant cousin.

18    Q    Okay.  You kind of call each other cousins

19         sometimes?

20    A    Yes.

21    Q    Even though he's not like a first cousin?

22    A    No, he's not.

23    Q    And you said that you met Chong Lee through Joe Thor,

24         right?

25    A    Yup.

61

```
 1   Q    So you've known Joe longer?

 2   A    Yup.

 3   Q    And he's more of a closer friend of yours?

 4   A    Yup.

 5   Q    Somebody you communicate with more?

 6   A    Correct, yup.

 7   Q    All right.  And somebody who where Chong is more of a

 8        casual acquaintance?

 9   A    Yup.

10   Q    Not somebody you know as well?

11   A    Yup.

12   Q    And certainly your kind of level -- personal

13        conversations are a lot greater with Joe Thor than

14        with Chong Lee.

15   A    Yup.

16   Q    Now, when the police -- I'm going to ask you some

17        questions now about when the police came to talk to

18        you.

19   A    All right.

20   Q    You said they were aggressive when they came?

21   A    Yup.

22   Q    Can you explain to the jury what you mean by

23        aggressive?

24   A    Well, they asked me what I was majoring in, and they

25        said that they could like ruin my career if I don't
```

62

```
 1          give them any information.
 2   Q      Okay.
 3   A      So that's about it.
 4   Q      Now, can you elaborate on that a little bit, what
 5          they meant when they said they could ruin your
 6          career?
 7   A      I told him I was going to radiology.
 8   Q      I'm sorry.  I can't hear you.
 9   A      I told him I was majoring in radiology, and they said
10          they have connections to radiology that can mess me
11          up.  And I just said okay.  That's about it.
12   Q      Did they say that to you more than once?
13   A      I'd say they only said it once.
14   Q      All right.
15   A      Yeah.
16   Q      How did you feel when they said that?
17   A      Well, it's my career that I want to go to so I kind
18          of felt, like, helpless maybe.
19   Q      All right.  And so what you remember actually telling
20          them after they said they were, you know, they could
21          threaten your career was that Chong Lee said I got
22          him?
23   A      Yeah.
24   Q      You don't remember saying I shot him, that Chong Lee
25          said that?
```

63

1    A    Yeah.

2    Q    Just that he said I got him?

3    A    Yup.

4    Q    That's your memory?

5    A    Yup.

6    Q    And you were pretty scared, and at that point, after

7         being threatened by the police, you wanted to tell

8         them what you knew, right?

9    A    Yup.

10   Q    Because you absolutely didn't want them trying to do

11        anything to ruin your career?

12   A    That's -- yup.

13   Q    And is it fair to say that that's a threat you took

14        seriously?

15   A    Yeah.  That's serious because it's what I want to go

16        for.

17   Q    And did you go for it?

18   A    I'm still pursuing it so --

19   Q    But you've gotten your four-year bachelor degree?

20   A    Not yet.

21   Q    I thought you said you got your degree.  I

22        misunderstood.

23   A    No.

24   Q    But you're in college?

25   A    Yup.  I'm still in college.

64

1    Q    Okay.

2              ATTORNEY VISHNY:  Thank you so much.

3         Nothing further.

4              THE COURT:  Mr. Maier.

5              **EXAMINATION OF PETER MOUA**

6    **BY ATTORNEY MAIER:**

7    Q    Despite -- Mr. Moua, despite what the detective said

8         to you, is that what Chong said to you that night?

9    A    Yeah.  That's what he said.

10             ATTORNEY MAIER:  Thank you.  That's all.

11             THE COURT:  Any recross?

12             ATTORNEY VISHNY:  Nothing further.

13             THE COURT:  Any questions from members of

14        the jury?

15          Okay.  And if you could please submit the

16        question in writing.  Wendy, we do have a question.

17        If I could have counsel approach.

18             (Bench conference.)

19             ATTORNEY SCHNEIDER:  Hey, Judge, can we

20        approach real quick?

21             (Bench conference.)

22             THE COURT:  What we're going to do, I do

23        have the question that I need to look at, why don't

24        we take a ten-minute break, we just need to do some

25        things and then we will come back.

65

1           Please rise for the jury.

2               (The jury was escorted out of the

3    courtroom.)

4               THE COURT:  And please be seated if need

5    be.

6               (Court in recess.)

7               THE COURT:  We're on the record.  Please be

8    seated.  I mean the attorneys can stand up here, I

9    just didn't want the gallery having to stand.  Are we

10    all set?

11        So what we'll ask, Mr. Moua, and we'll ask when

12    the jury comes back in as well, but the message --

13    the question is:  What was messaged by Facebook about

14    the night at Luna Lounge?

15               THE WITNESS:  What was messaged, like, did

16    someone message me or like what are they trying to --

17               ATTORNEY VISHNY:  I can't even hear him.  I

18    can't --

19               THE WITNESS:  Did someone try messaging me

20    or what do they mean by just a message?

21               THE COURT:  Did you receive a message?

22               THE WITNESS:  I received a message from

23    Chong, yeah.

24               THE COURT:  And what was the message you

25    received on Facebook?

66

1               THE WITNESS:  He just asked me what I was

2        doing and if I heard anything about Luna.

3               THE COURT:  And that was the extent of

4        the --

5               THE WITNESS:  Yeah.

6               THE COURT:  -- communication.  Okay.

7          And just to clarify, Mr. Moua, all -- all -- in

8        that question, all I want to know is the content of

9        it, not who sent it or when it was sent.  Okay?  Is

10       that -- the parties are in agreement with that?

11              ATTORNEY VISHNY:  Yeah.  I'm just going to

12       ask one follow-up question, you know, that he said he

13       was coming and staying at the Hilton.

14              THE COURT:  Mr. Maier, are we all set to

15       bring in the jury?

16              ATTORNEY MAIER:  Yes.

17              THE COURT:  All right.  Please rise.

18              (The jury was escorted into the courtroom.)

19              THE COURT:  Please be seated.

20         And, Mr. Moua, there is a question that's been

21       submitted.

22         The question is:  What was messaged by Facebook

23       about the night at Luna Lounge?

24              THE WITNESS:  They just wanted to know if I

25       knew about it, if I knew anything about what happened

1          there.
2                    THE COURT:  Okay.  Very good.  Thank you.
3               And the parties do stipulate that the message
4          came from Chong Lee's account?
5                    ATTORNEY SCHNEIDER:  Yes.
6                    THE COURT:  Correct, Attorney Vishny?
7                    ATTORNEY VISHNY:  Yes.
8                    THE COURT:  Any follow-up questions,
9          Attorney Maier?
10                   ATTORNEY MAIER:  No.  Thank you.
11                   **EXAMINATION OF PETER MOUA**
12         **BY ATTORNEY VISHNY:**
13    Q    Mr. Moua, the other thing in the message from this
14         account was that Chong Lee was coming to Milwaukee
15         and staying at the Hilton?
16    A    Yes.
17                   ATTORNEY VISHNY:  Okay.  Nothing further.
18                   THE COURT:  Anything else, Mr. Maier?
19                   ATTORNEY SCHNEIDER:  One second please.
20                   ATTORNEY MAIER:  I do have one and maybe
21         two questions.
22                   THE COURT:  Okay.
23                   **EXAMINATION OF PETER MOUA**
24         **BY ATTORNEY MAIER:**
25    Q    Did you know that -- were you expecting Chong or

68

1          anyone else to come down from Appleton then?

2     A    No, I wasn't.

3     Q    This was sort of a last minute thing?

4     A    Yup.

5               ATTORNEY MAIER:  That's all the questions I

6          have.

7               THE COURT:  Attorney Vishny?

8               ATTORNEY VISHNY:  Nothing further.

9               THE COURT:  Okay.  And, sir, I thank you

10         for your testimony.  You are excused at this time.

11              ATTORNEY MAIER:  Your Honor, the State

12         calls Kong Vang.

13              THE COURT:  Okay.  Very good.  Thank you,

14         sir.

15            And, Mr. Maier, will you be questioning?

16              ATTORNEY MAIER:  I will be.

17              THE COURT:  Very good.

18              THE COURT:  And, sir, if you would please

19         come to the witness stand, remain standing and the

20         clerk will swear in.

21              (Oath administered to witness.)

22              THE WITNESS:  Yup.

23              THE CLERK:  Please state your full name and

24         spell it for the record please.

25              THE WITNESS:  Kong Vang, K-O-N-G,

69

1          V-A-N-G.

2                    THE COURT:  Sir, you may be seated.

3              Mr. Maier, your witness.

4                    ATTORNEY MAIER:  Thank you.

5                  **EXAMINATION OF KONG VANG**

6     **BY ATTORNEY MAIER:**

7     Q    Mr. Vang, you live in Milwaukee, correct?

8     A    Yup.

9     Q    And we've had some witnesses this morning who I think

10         you know who have been students.  You -- you're not a

11         student, correct?

12    A    No, not a student.

13    Q    You run a business, correct?

14    A    Yup.

15    Q    Was there a time -- I want to ask you about some

16         things that happened a couple years ago where you had

17         a conversation in Milwaukee with someone named Chong

18         Lee.  Do you know someone named Chong Lee?

19    A    Yup.

20    Q    And is that the defendant seated in court today?

21    A    Yes, it is.

22    Q    When -- when you talked with them -- I'm sorry, with

23         Chong, where were you?

24    A    In the backyard by the porch at Q's house.

25    Q    At Q's house?

                              70

```
 1   A    Yup.

 2   Q    And was this -- and you don't know this, but there's

 3        been some testimony about kind of a gathering at Q's

 4        to watch football?

 5   A    Yup.  For football, yup.  Packers game.

 6   Q    That's what this was?

 7   A    Yup.

 8   Q    So you're in the backyard at Q's house.  How did --

 9        what conversation happens?

10   A    He just told me that he shot somebody.  And I just

11        took it as a joke.

12   Q    Chong told you that?

13   A    Yup.

14   Q    Yes?

15   A    Correct.

16              THE COURT:  And, Mr. Vang, I don't know if

17        the microphone is on, but if you could move it a

18        little closer to you it might -- it might help.

19   Q    (BY ATTORNEY MAIER)  Could you tap the mic?

20   A    (Witness complying.)

21   Q    Thank you.

22        Do you know, do you recall what time of day it

23        was that this conversation happened?

24   A    Maybe afternoon.

25   Q    Was it still light outside while you were outside?
```

71

```
 1   A   Yup.

 2   Q   And this would have been in December of 2013,

 3       right?

 4   A   I know that it's in the wintertime.  That's all.

 5   Q   Okay.  Time of year where it gets dark kind of

 6       early?

 7   A   Yup.  During football season, so yup.

 8   Q   And you indicated that at first you thought that

 9       Chong was joking, correct?

10   A   Yup.

11   Q   What did you -- did you ask Chong anything?

12   A   I didn't really care to ask.  Just went inside the

13       house afterwards.

14   Q   Did he say anything besides that he had shot someone

15       that afternoon?

16   A   I can't remember.  Can't -- maybe -- I remember him

17       saying he shot to protect his brother.

18   Q   I'm sorry.  Could you say that again?

19   A   He told me that he was shot protecting his brother.

20       That's all I remember; but I don't remember much.

21       It's been two years.

22   Q   Who else was outside when this discussion happened?

23   A   I believe maybe a friend of mine, Xai maybe.

24   Q   Okay.  Could Joe Thor have been outside too?

25   A   I don't think so.
```

72

1    Q    Okay.  So to your recollection it's you, Chong and
2         Xai?
3    A    Yup.
4    Q    When you went back inside after hearing Chong say he
5         shot someone, was Xai still outside with Chong?
6    A    I believe so.  I came first, I came inside first.
7    Q    Do you recall after you come back inside how long it
8         is before either of them come back inside?
9    A    I don't recall, I don't remember.
10   Q    Is it safe to say they weren't right behind you?
11   A    I don't think they was behind me.  Maybe a while
12        maybe, maybe like four minutes maybe, I'm just gonna
13        guess.  I'm not quite sure.
14   Q    You said maybe four minutes but you're not sure?
15   A    Yeah.  I came outside to smoke a cigarette, so maybe
16        -- it might take four, five minutes to smoke a
17        cigarette.
18   Q    Okay.  Did Chong say -- I'm -- actually, let me ask
19        you this.  How well do you know Chong?
20   A    Only know him through Joe.
21   Q    Okay.  Do you know if he has one brother or more than
22        one brother?
23   A    Two -- I heard maybe a few maybe.
24   Q    Did he say which brother it was he was trying to
25        protect?

73

1   A   The only one I know is Paul so I'm just going to

2       guess maybe Paul.

3   Q   Okay.  Have you ever met Paul?

4   A   Few times here and there.

5   Q   And his last name is Lee also, correct?

6   A   Yeah.

7   Q   How would you describe Paul?

8   A   I don't know much about him.  When I see him I

9       already shake his hand, say hi, that's it.

10  Q   Maybe you misunderstood me.  I don't mean anything

11      about his personality, just physically what does he

12      look like?

13  A   Short, stocky.

14  Q   Okay.  Thank you.

15          Prior to this, you know, going to Q's to hang

16      out and watch the football, did you have any -- did

17      you notice anything -- I'm sorry.  Just one second.

18          Mr. Vang, I just have a couple more questions

19      for you.  Do you go by a nickname?

20  A   Yes.  They called me Jesus because I'm the only one

21      that go to church.

22  Q   Okay.

23          ATTORNEY MAIER:  I believe that's all the

24      questions I have for you, sir.  Thank you very much.

25          THE COURT:  Defense prepared for

74

1       questioning?

2                       ATTORNEY WEITZ:  Yes, Your Honor.

3                       THE COURT:  Mr. Weitz, go ahead.

4                    **EXAMINATION OF KONG VANG**

5    **BY ATTORNEY WEITZ**:

6    Q    You've known Joe for a long time, right?

7    A    Yeah.

8    Q    So you consider him a pretty good friend of yours?

9    A    Yeah, but I haven't keep in touch with him for maybe

10        like five years.

11   Q    Okay.  But you've known him for a significant --

12   A    I know, yeah, we used to hang out.

13   Q    Okay.  And he was also over at Q's house that night,

14        right?

15   A    Yup.

16   Q    And you -- but you are not sure whether he was out

17        there for this conversation that was referenced?

18   A    I don't -- I don't remember much.

19   Q    Okay.  As far as this conversation, you said that

20        it's your memory that you believe Chong said

21        something about shooting a guy, right?

22   A    Yup.

23   Q    Okay.  But you thought that he was joking about

24        that?

25   A    Yup.

75

1  Q    And police came and talked to you about this
2       conversation at some point a week after or two weeks
3       after?
4  A    Yup, I believe so.
5  Q    Okay.  And you told the police several times that you
6       thought that Chong was joking, right?
7  A    Yup.
8  Q    You told them you thought he was joking about it,
9       right?
10 A    Yup.
11 Q    You said that to me it was just a joke.
12 A    Yup.
13 Q    You said at one point you were just like, oh,
14      whatever?
15 A    Yup.  Because I don't want -- I just take it as a
16      joke.  I didn't know if he was serious or not.
17 Q    Another time you said I thought it was just a joke?
18      And you didn't say anything back to him, you just
19      went back inside?
20 A    I didn't say much, just went back inside.
21 Q    Okay.  Again because you didn't really think he was
22      serious at that time?
23 A    Yup.
24              ATTORNEY WEITZ:  Okay.  Nothing further.
25              THE COURT:  Any follow-up?

76

```
 1                    ATTORNEY MAIER:  No.
 2                    THE COURT:  Ladies and gentlemen of the
 3          jury, any questions you wish to submit for
 4          consideration?
 5                    (No response.)
 6                    THE COURT:  Very good.  Sir, I don't have
 7          any questions.  You may be excused.
 8                    THE WITNESS:  Thank you.
 9                    THE COURT:  Please raise your right hand.
10                    (Oath administered to witness.)
11                    THE WITNESS:  I do.
12                    THE CLERK:  Please state your full name and
13          spell it for the record please.
14                    THE WITNESS:  Sure.  Todd Peters,
15          P-E-T-E-R-S.
16                    THE COURT:  Attorney Schneider.
17                    ATTORNEY SCHNEIDER:  Thank you.
18                    **EXAMINATION OF TODD PETERS**
19     **BY ATTORNEY SCHNEIDER:**
20     Q    Good morning.
21     A    Good morning.
22     Q    How are you employed?
23     A    I'm a patrol lieutenant with the City of Appleton
24          Police Department.
25     Q    How long have you been employed in law enforcement?
```

77

1    A    About 26 years.

2    Q    Has that entire time been with the Appleton Police

3         Department?

4    A    No.

5    Q    Okay.  How long have you worked for the APD?

6    A    It will be 23 years June 1st of this year.

7    Q    What -- and your current duties are as a patrol

8         lieutenant?

9    A    Yes.

10   Q    Did you hold those same duties back in December of

11        2013?

12   A    Yes, I did.

13   Q    Lieutenant, I want to direct your attention to what

14        would be Saturday night, December 7th, 2013, into the

15        early Sunday morning hours.  Were you working those

16        hours?

17   A    Yes.

18   Q    Were you on a special assignment?

19   A    Yes, I was.

20   Q    And can you describe that for the jury please?

21   A    I was on what's referred to as the Avenue detail.

22        It's a specialized assignment.  It's an overtime

23        assignment that you can sign up for, and our primary

24        responsibility is in a uniform capacity providing

25        additional visibility in the entertainment district,

78

```
 1          College Avenue.
 2    Q     And when you have this assignment, are you literally
 3          walking the Avenue?
 4    A     Yes.
 5    Q     Maybe in summer you're on bicycles?
 6    A     Yes.
 7    Q     And are you partnered up with someone when you have
 8          that assignment?
 9    A     Generally we're partnered, yes.
10    Q     On this night, who was with you?
11    A     Officer Vander Wielen.
12    Q     Do you recall, Lieutenant Peters, a dispatch that
13          came in at about 1:51 a.m.?
14    A     Yes.
15    Q     And where were you at the time the dispatch came
16          in?
17    A     We were at -- had gone inside of Sal's Pizza.
18    Q     And where is that located?
19    A     The -- it would be the 400 block of West College
20          Avenue on the south side of the street.
21    Q     And what was the dispatch information that was
22          provided?
23    A     That there was a shots fired or a shooting that had
24          occurred inside of Luna nightclub.
25    Q     What did you do in response to hearing that?
```

79

1    A    Immediately ran across the street to the entrance of

2         the establishment.

3    Q    And where is Luna Lounge located?

4    A    Don't have the exact address, but it's at the corner

5         of College Avenue and Division Street in downtown

6         Appleton.

7    Q    Right across from what's the Performing Arts Center,

8         that would also be accurate?

9    A    Yes.

10   Q    And that's in Outagamie County?

11   A    Yes.

12   Q    When you arrived, what do you remember about the

13        bar?

14   A    It was very low light conditions.  I was approached

15        by a -- an adult male who I believed at that time was

16        an employee of the Luna nightclub or lounge that

17        directed us inside of the business.

18   Q    Okay.  Lieutenant Peters, I'm going to show you

19        what's been previously marked as State's Exhibit No.

20        2.  Do you recognize what's depicted here in Exhibit

21        2?

22   A    Yes.

23   Q    What is that?

24   A    It appears to be a schematic of sorts of the Luna

25        Lounge.

80

1   Q   And from this schematic, Luna actually has two bar
2       areas, correct?
3   A   Yes.
4   Q   Is the -- the layout somewhat unique to Luna in terms
5       of the steps or the different levels?
6   A   Yes.
7   Q   Okay.  What -- in your 23 years then, was this
8       previously a movie theatre?
9   A   Yes.
10  Q   Okay.  When you came to that location, where did you
11      go?  You can stand.
12  A   I entered through the front entrance here.  There was
13      staff here.  There was a coat check area here, and I
14      was directed over to this direction right over here
15      in the foyer, what would be the entrance of the foyer
16      area to the bar.
17  Q   And you've been inside of Luna as part of your
18      professional duties before?
19  A   Yes.
20  Q   What's in the basement?
21  A   The area that I'm most familiar with when I think of
22      the basement down this stairs is there are some
23      restroom areas.  I haven't spent much time if there
24      is other caverns of the building.
25  Q   That's where customers would need to go if they

81

1      wanted to use the bathroom?

2    A    Yes.

3    Q    And I just want to -- you said this area here.  So

4         immediately in the area in the front, that's where

5         you were met by some employees?

6    A    Yes.

7    Q    And then further back along this wall you said

8         there's like an ID check area?

9    A    Coat check area in this general region right here.

10   Q    And then you were directed to the area of the

11        stairs?

12   A    Yes.

13   Q    Okay.  You can grab a seat then.

14            That area where you went to, what was the

15        lighting conditions like?

16   A    Low light, very low light conditions.  In fact, I --

17        I would need a flashlight in order to navigate and to

18        look at IDs or that type of thing in that general

19        area.

20   Q    What about the noise level?

21   A    Music in the adjoining bar.  The music is very loud.

22        I wear an earpiece, I don't have one in today, but I

23        wear an earpiece so when walking through the doors we

24        can still hear dispatch information, other officers

25        on the radio, and that's required when you go into

```
1         the bars, otherwise you can't hear your shoulder mic
2         when you're in there.
3    Q    What do you remember after being directed to that
4         area?
5    A    I observed that there was an adult male that was
6         lying on his back.  His head was closest to the
7         Division Street side or the bottom portion of that
8         wall there where the red X is was consistent where
9         about the person was.  His arms were extended
10        outward.  And as I approached and saw that he was
11        lying on the ground, I saw that there was a pool of
12        blood on the left side of his head on the floor.
13   Q    Is it something, Lieutenant Peters, in your 26 years
14        in law enforcement you've had to come to situations
15        where other people have been seriously injured?
16   A    Yes.
17   Q    Is there kind of a set -- I don't know if I want to
18        say protocol or a set practice you take then when
19        you're one of the first officers that responds?
20   A    Yes.
21   Q    And what is that?
22   A    Well, this was a shooting call initially.  We were
23        unaware whether there was continuing or an active
24        shooter going on inside the building.  My first
25        concern was there continuing to be an active shooter
```

83

1   inside.  Had there been an active shooter, we would

2   have been forced to confront the shooter to stop that

3   before we begin to render aid.  When I enter the

4   building, because of the noise, because of what was

5   going on inside the immediate area, I didn't hear

6   anymore shooting but was directed to the adult male

7   that was on the ground, so my priority then became

8   the preservation of life and to attend to the -- to

9   the subject that was on the ground.

10  Q   What did you do in that regard?

11  A   I put on latex gloves first; I saw that there was

12      blood.  I immediately knelt down and established an

13      airway.  I was aware from where the blood was on the

14      ground that I could also see blood on the left side

15      of his head and I immediately applied direct pressure

16      to that area.  I opened up his airway and wanted to

17      ensure that he could continue to breathe.

18  Q   As you were providing him that assistance, were other

19      officers arriving?

20  A   Yes.

21  Q   Do you remember Officer Duven arriving?

22  A   Yes.

23  Q   And ultimately did an ambulance also arrive?

24  A   Yes.

25  Q   As you stayed there -- and you now know that man's

84

1    name, right?

2  A    Yes.  Mr. Richards.

3  Q    Okay.  So as you were there with Mr. Richards, what

4       -- what did you see or note about his condition?

5  A    His breathing was labored.  I noted that he was

6       foaming at the mouth, agonal breathing, sounds like

7       somebody is snoring, consistent with a head trauma.

8  Q    And when other medical professionals arrive, did they

9       then take over treatment for Mr. Richards?

10  A    Yes.

11  Q    What was your focus then at that time?

12  A    Once Mr. Richards was taken from the building and

13       transferred to the ambulance, I immediately went

14       inside and there had other -- there were other

15       officers that had arrived as well just prior to that,

16       so my concern was to maintain and establish the crime

17       scene and preserve it.

18  Q    Were other patrons still in the bar?

19  A    Yes.

20  Q    A few, a lot, what do you remember?

21  A    I estimated at the time between a hundred and 150

22       remained inside the bar area.

23  Q    And were they being allowed to leave?

24  A    No.

25  Q    Did you stay at the scene then and continue to assist

1      in processing the scene?

2   A   Yes.

3   Q   And at some point was any item relevant to the

4      shooting discovered?

5   A   Yes.

6   Q   And what was that item?

7   A   It was a shell casing.

8   Q   Do you remember where that was found?

9   A   I believe it was on the descending staircase going to

10      the lower level.

11  Q   And ultimately that was collected?

12  A   Yes.

13  Q   All right.  Can you just hold this for me one second?

14          I'm going to show you some photographs,

15      Lieutenant, that are Exhibits 25, 26, 27, 28, 29 and

16      30.  Are you familiar with what's depicted here?

17  A   Yes.

18  Q   Okay.  Starting first, upper left, Exhibit 25, what's

19      depicted in that area?

20  A   That would be the upper landing area.  There is a

21      half wall.  To the right of that is an opening where

22      the stairs then descend to the lower level.

23  Q   Okay.  And there are several markers on Exhibit 25,

24      correct?

25  A   Yes.

86

1   Q   Can you explain for the jury what those markers are
2       meant to be or do?
3   A   Those markers would be items of significant or
4       evidence that would have been observed at the time or
5       later found to be important as they are managing the
6       crime scene.
7   Q   So evidence techs actually come and photograph, place
8       these markers, correct?
9   A   Yes.
10  Q   You've seen them or probably directed them to do that
11      in your 26-year career?
12  A   Yes.
13  Q   And at a scene such as this do they collect anything
14      and everything they find?
15  A   Yes.
16  Q   Why?
17  A   Because something that one may think is insignificant
18      at the time may become very important and very
19      relevant to the case later on.
20  Q   And in this photograph, Exhibit 25, does that depict
21      the area where Mr. Richards was found?
22  A   Yes.
23  Q   Moving on to Exhibit 26, what's depicted there, that
24      is the upper right photograph?
25  A   It would be a different angle of the same general

87

1    area with those same markers.

2  Q  Is that where we see an area of some blood?

3  A  Yes.

4  Q  Then moving to Exhibit 27, middle photograph on the

5     left, what's depicted there?

6  A  Again, a different angle, same but now an additional

7     marker that I would see in the lower or the first

8     landing of the stairway.

9  Q  On the right side of the photograph we see kind of

10    the wall extends out further.  Is that where those

11    stairs are that go to the bathroom?

12 A  Yes.

13 Q  And then Exhibit 28, what's depicted there?

14 A  It would appear to be the first landing that exists.

15    The wall there would be the outside curved wall.

16 Q  And is that marking an item?

17 A  Yes.

18 Q  What item was that?

19 A  That would be where the shell casing was located.

20 Q  Exhibit 29, the left column bottom picture?

21 A  Again, the same location, a closer in zoomed in

22    photograph of a marker with now what I see is a shell

23    casing.

24 Q  And then Exhibit 30?

25 A  A close-up shot, again, with an indication of the

88

```
1        shell casing.

2    Q   Okay.  And these are all fair and accurate depictions

3        of what you remember from being on the scene that

4        night?

5    A   Yes.

6                    ATTORNEY SCHNEIDER:  I would move 25

7        through 30 in.

8                    THE COURT:  Any objection?

9                    ATTORNEY VISHNY:  No.

10                   THE COURT:  25 through 30 shall be

11       received.

12   Q   (BY ATTORNEY SCHNEIDER)  Did several officers respond

13       that night?

14   A   Yes.

15   Q   In addition, ultimately were some additional

16       supervisors called out to assist?

17   A   Yes.

18   Q   Okay.

19                   ATTORNEY SCHNEIDER:  I don't have any other

20       questions then at this time.

21                   THE COURT:  Defense?

22                   ATTORNEY VISHNY:  Yup.

23                   **EXAMINATION OF TODD PETERS**

24   **BY ATTORNEY VISHNY:**

25   Q   Lieutenant Peters, it was a very cold night that
```

89

1       night, wasn't it?

2    A   I don't know what the temperature would have been,

3        but on December 8th I would have been wearing a

4        jacket.

5    Q   Okay.  So you don't have a specific memory of it

6        being cold, like how cold?

7    A   Right.  I don't know what the temperature was that

8        night.

9    Q   Okay.  Not a problem.

10           You were in Sal's Pizza.  I gather Sal's Pizza

11       is not dimly lit like Luna is?

12   A   No, it is not.

13   Q   It's bright?

14   A   Yes.

15   Q   And it's across the street or kitty corner from

16       Luna?

17   A   It would be across the street.  It's in the 400 block

18       but kitty corner in line of sight of Luna Lounge.

19   Q   When you had to go because you got the call of the

20       shooting, I'm gathering this is a run don't walk

21       situation?

22   A   Correct.

23   Q   You want to get there quickly, especially if there

24       would be an active shooter on the premises?

25   A   Yes.

90

1    Q    You have very little information, you don't know
2         what's happened?
3    A    Correct.
4    Q    So you ran from the bright lights of Sal's in the
5         dark of the street and then into the dark of Luna,
6         right?
7    A    Yes.
8    Q    And then of course it's going to take your eyes a
9         while to adjust once you get into a dark place if
10        you've been in a brighter place, so you had to adjust
11        as you're running and into Luna, right?
12   A    Yes.
13   Q    Yeah.  And then eventually -- so it's really dark
14        there.  Eventually of course as you're there you can
15        start seeing a little bit better?
16   A    And using a flashlight.
17   Q    Right.  So when you were at Luna, there are a lot of
18        duties that happen at the scene of a shooting or the
19        scene of a homicide, and there are different officers
20        who have to be assigned to different responsibilities
21        as an investigation develops, correct?
22   A    Yes.
23   Q    And it's fair to say that usually in a police
24        department, the uniform people arrive first and case
25        investigators or people might -- I think in APD

91

1    they're called sergeants, or detectives some people

2    call them, they come a little bit later, right?

3  A  Generally that's correct.

4  Q  Okay.  But one of the things that even patrol

5    officers, you know, even though they're not

6    investigators do need to do is that, if you have the

7    occasion, you want to figure out who important

8    witnesses might be, right?

9  A  Yes.

10  Q  And you want to make sure that you want to try to get

11    in a situation where these witnesses don't talk to

12    each other so that when they're interviewed later,

13    the investigator can get their individual memory of

14    what occurred?

15  A  You make that effort to do that, yes.

16  Q  It's not always possible of course, right?

17  A  That's true.

18  Q  But to the best of your ability, you want to separate

19    witnesses so they don't influence each other's

20    memories?

21  A  Yes.

22  Q  And you want to separate them so they can't

23    collaborate and talk about what they saw, right?

24  A  Yes.

25  Q  And if they're potentially suspects, you don't want

92

1          them to have contact with each other because that way

2          they could make up a story, right?

3    A     Correct.

4    Q     All right.  Now, you talked about finding casings in,

5          I think you said it was the lower stairs on the

6          stairs?

7    A     I didn't find the casing.

8    Q     Okay.  Somebody else did?

9    A     That's correct.

10   Q     But you're aware of where it was found?

11   A     Yes.

12   Q     And you know that when you use a gun that's a

13         semi-automatic weapon a casing discharges from the

14         gun, right?

15   A     Yes.

16   Q     Doesn't do that in a revolver of course?

17   A     Correct.

18   Q     Then the casing stays in the gun.

19   A     Yes.

20   Q     And when a casing flies out of a gun, it really --

21         there is no exact set pattern about where it goes,

22         right?

23   A     I'm not aware of an exact pattern.

24   Q     Right.  It can be two feet, three feet, ten feet from

25         where it was fired, right?

93

1    A    Again, I'm not a -- I'm not a ballistics, a forensic

2         person, but it can go in various directions.

3    Q    And various distances as well?

4    A    Yes.

5    Q    And because a casing is found down the stairs, in

6         fact, it's unknown if there was some movement that

7         kicked it down those stairs, you know, we just know

8         where it's found?

9    A    All I know is that it was brought to my attention

10        that it was on the landing.

11    Q    Okay.

12           ATTORNEY VISHNY:  Thank you.  Nothing

13        further.

14           THE COURT:  Attorney Schneider, any

15        follow-up?

16             **EXAMINATION OF TODD PETERS**

17  **BY ATTORNEY SCHNEIDER:**

18    Q    Even after you were inside Luna for a bit, was it

19         still dark?

20    A    Yes.

21    Q    You mentioned in cross needing your flashlight?

22    A    Yes.

23           ATTORNEY SCHNEIDER:  Nothing further.

24           ATTORNEY VISHNY:  Nothing, Your Honor.

25           THE COURT:  Very good.

94

1          Any questions from members of the jury?

2               (No response.)

3               THE COURT:  Very good.

4          Thank you, Lieutenant.  You are excused.

5               ATTORNEY SCHNEIDER:  Probably a good place

6     for lunch.

7               THE COURT:  Okay.  Ladies and gentlemen,

8     this is probably as good of a breaking point as we're

9     going to have for lunch.  Why don't we break for

10    lunch.  I would ask however that you be back and

11    ready to go at 12:45.

12              (The jury was escorted out of the

13    courtroom.)

14              THE COURT:  The gallery, you're welcome to

15    be seated or excused, whatever you need to do.

16         Just a couple of housekeeping matters we need to

17    take care of.

18         Mr. Maier, you're okay if I just recap the

19    sidebars?

20              ATTORNEY SCHNEIDER:  Yes.  We had a note.

21    We were just talking about that.

22              THE COURT:  So we had, as best as I can

23    gather today, we had -- under Xia Thao we had a

24    sidebar, there was an objection to foundation, there

25    was an agreement to rephrase.  There was a second

95

1 objection related to hearsay, the court did sustain

2 that objection.

3  When Mr. Keng Vang was testifying, there was a

4 discussion of what needed to be disclosed to the

5 defense as it relates to investigator's notes.  I

6 think we're still addressing that issue.  That may be

7 revisited.

8  During Mr. Moua there was a sidebar.  There was

9 a mention of Facebook.  Mr. Maier agreed to move on

10 rather than attempt to correct it.  That said, it was

11 not to be construed as a waiver for future

12 foundational arguments of Facebook items.  There was

13 also an objection related to leading questions, Mr.

14 Maier explained his basis for proceeding in said

15 fashion.  Once it was explained, it was certainly

16 deemed an acceptable protocol so that was -- we moved

17 on without further issue.

18  Finally there was a sidebar during Mr. Peter

19 Moua's testimony related to a question posed by the

20 jury.  That jury -- outside of the presence of the

21 jury, Mr. Moua did give what would be his answer to

22 the question.  It was allowed to be asked, and then

23 additionally there was a stipulation that the message

24 came from Mr. Chong Lee's account, but obviously

25 there was no discussion as to the specific author of

96

1        that communication.

2            Does that sufficiently encompass our sidebars,

3        Mr. Maier, Miss Schneider?

4                ATTORNEY SCHNEIDER:  Yes.

5                ATTORNEY VISHNY:  Yes.

6            But, Judge, we did a little looking at research

7        while kind of in between here, and --

8                THE COURT:  That's fine.

9                ATTORNEY VISHNY:  -- what I discovered was

10       on March 19th of 2015, right?

11               ATTORNEY WEITZ:  Yeah.

12               ATTORNEY VISHNY:  That's the day that we

13       argued the *Hereford* issues.  And I have a searchable

14       transcript.  On April 8th of 2015 -- and we don't

15       have a transcript as far as I know.

16               ATTORNEY WEITZ:  We might.

17               ATTORNEY VISHNY:  We may not.  April 8th of

18       2015, I'm reading from my notes --

19               THE COURT:  Hold on.

20               ATTORNEY VISHNY:  -- that I took on that

21       date.  We may not have -- that's the day that you

22       denied the Paul Lee motion.  We didn't take any

23       testimony on that day so I may not have ordered a

24       transcript.

25               THE COURT:  I have an April 10th, 2015.

97

1          Did we also have an April 8th?

2                    ATTORNEY VISHNY:  I wrote April 8th, of

3          course it could be the 10th.

4                    ATTORNEY SCHNEIDER:  April 8th.  We also

5          had April 10th, Judge.  We took testimony on the

6          10th.

7                    ATTORNEY VISHNY:  Well I have the 8th.

8          And what I have -- I'm going to read you all my notes

9          from that day.  On that day the DA wanted more time

10         to respond and call Officer Medina and Sara Besaw and

11         the court said it would hear testimony on the 10th.

12         There was -- the motion was denied as to suppressing

13         Paul Lee's statements, is what I wrote down.  I just

14         wrote motion denied.  No. 3, I have the following

15         notes.  Reciprocal discovery.  Court orders

16         investigative reports of independent witnesses and

17         experts to the State.  So there had been a very

18         lengthy discussion on March 19th of the *Hereford*

19         case, the court had actually cited the citation to

20         the *Hereford* case at that time.  I talked about what

21         it meant and about not having to turn over

22         investigative reports, but the court didn't actually

23         rule on that day, it ruled on the 8th.  I am very

24         confident that what the *Hereford* case says is that if

25         a witness is going to be called by the defense, the

98

1          defense has to turn over any written or recorded
2          statements of that witness.  It further states that
3          investigator notes are privileged under the work
4          product doctrine, and, however, that investigator
5          notes or reports can be made discoverable if the
6          defense questions a witness and says to the witness,
7          did you tell investigator so and so such and such,
8          and then, over a 906.13(2), that at that time as an
9          evidentiary rule it has to be provided to the State
10         at that time.  So that was what was argued on March
11         19th.  And ultimately the court ruled that our
12         investigator reports, even if they were summaries,
13         not written or recorded statements of witnesses, but
14         if they were summaries of what witnesses told the
15         investigator and the defense was going to call those
16         witnesses to the stand that we had an obligation to
17         turn them over, and we have done so.
18              THE COURT:  Attorney Schneider, any
19         further --
20              ATTORNEY SCHNEIDER:  Yeah.  I want to see
21         the transcript.  And my concern about this is under
22         971.23, defendant is obligated to turn over reports.
23         And it talks about people named on a witness list.
24         She asked not to list all her witnesses but only list
25         the additional witnesses in addition to the State's

99

```
1     witnesses they may call.  So, with that, I'm -- I
2     have concerns about, well, but I didn't put him on my
3     witness list, or if -- and I think in our sidebar she
4     said, well if the State calls him I don't need to
5     provide them.  I thought the court wanted if there
6     was anything additional that was going to be elicited
7     that defense had in their knowledge, whether it's
8     they had a report, they had a summary of it, prior to
9     cross they needed to provide that.  And I don't think
10    the court limited it to whether it was the State
11    called the witness or the defense called the
12    witness.
13              THE COURT:  What we may need to do is --
14              ATTORNEY VISHNY:  This might be it.  I
15    can't tell.  It would have to be April 8th.
16              ATTORNEY SCHNEIDER:  Some dates we had --
17              ATTORNEY WEITZ:  The date says March
18    19th.
19              ATTORNEY SCHNEIDER:  Some dates we had
20    multiple court reporters.  They're looking at one,
21    but the title page on both is March 19th.
22              ATTORNEY VISHNY:  April 8th is the date of
23    my notes, they are dated April 8th, and it's the same
24    day that you denied the motion to suppress the Paul
25    Lee statement.  That's what my notes say.  Perhaps
```

100

1     the *Hereford* case should be revisited by the court

2     because it's really clear, and the State is not

3     entitled to investigator notes of witnesses unless we

4     ask the witness, did you tell this to the

5     investigator.  That's the law.  So --

6                    (Discussion off the record.)

7                    THE COURT:  Back on the record.

8                    ATTORNEY SCHNEIDER:  Yesterday I made an

9     objection during the questioning of Tou Shoua Lee

10    because she asked about if he had smoked marijuana, I

11    think she -- he said no, and two questions later she

12    asked if he smoked weed and he said no again.  I

13    objected because it was other acts, she thought there

14    was references in the transcript.  We reviewed those

15    last night, there is no references, so I'm going to

16    ask before they want to elicit something like that of

17    any nature that they at least identify for us or ask

18    for a sidebar because I just don't want that type of

19    question to be asked, especially in this case when

20    there was an absence of it anywhere.  I know it might

21    have been a mistake, I get that, but I'm just putting

22    the court on notice that I think before it does again

23    we should address that.

24                    THE COURT:  I think I had actually

25    mentioned that in passing during a sidebar if I'm not

101

1    mistaken.

2          ATTORNEY VISHNY:  Right.  The defense asked

3    because it's a -- it's not in my opinion an other

4    crimes action.  I did review the transcript and it's

5    not in the transcript, Miss Schneider is accurate.

6    There was a good faith basis because marijuana was

7    found at his house, and I do believe that we are

8    entitled to ask witnesses about things that can

9    affect their perception such as being under the

10   influence of drugs without giving notice to the

11   State, but if the court says that we need to say

12   that, we will do that.  That being said, I don't

13   think a single one of these people are going to admit

14   that they smoked marijuana, and although I don't

15   believe the truthfulness of their answers, it's kind

16   of pointless for me to keep asking them and then say

17   no.

18         THE COURT:  And I -- I understood the

19   purpose to be for, I think you had indicated this

20   during the sidebar, was to talk about its effect on

21   memory as opposed to --

22         ATTORNEY VISHNY:  And perception as opposed

23   to show an other act.

24         THE COURT:  That said, I would ask that if

25   you are going to utilize, even for that purpose, that

102

1      you let -- put the State on notice.

2                ATTORNEY VISHNY:  I will do so.

3                ATTORNEY SCHNEIDER:  The other thing I want

4      to bring up, I think Mr. Duros has found a case he

5      would like the court to look at, *State v. Dribble*,

6      D-R-I-B-B-L-E.

7                THE COURT:  What does that pertain to?

8                ATTORNEY SCHNEIDER:  Should they disclose

9      reports before or not.  So we have an extra set.

10     We'll provide it to the defense too so they don't

11     have to try to look it up.

12               ATTORNEY DUROS:  I guess the -- what

13     *Dribble* says is that if the defenses lists a witness

14     then they're required to disclose the reports to the

15     prosecution.  I think it would be our argument that

16     they essentially adopted our witness list by

17     indicating that --

18               THE COURT:  I'll read *Dribble* and *Hereford*.

19     We'll --

20               ATTORNEY VISHNY:  Okay.

21               THE COURT:  We'll get this squared away.

22               ATTORNEY VISHNY:  Let me just say this.  We

23     did, number one, our investigator, we made this very

24     clear at the time, that we were putting on the

25     investigator for impeachment or rebuttal purposes

103

1    only.  Disclosure is not required under 971.23 for

2    impeachment and rebuttal, so therefore investigative

3    reports do not have to be disclosed for the State and

4    that's why we made that very clear.

5        No. 2, as far as the witness list, that is true

6    that we would say -- and the reason we did that is

7    because we did not want to rename every police

8    officer in the Appleton Police Department.  We had

9    some other witnesses we intended to call, but the --

10   we have never ever intended to call witnesses who

11   were going to say that Chong Lee told them the

12   shooting.  So even though we adopted the witness

13   list, I do not believe that this argument is really

14   that we would have called witnesses that were going

15   to say that Chong Lee admitted the shooting or that

16   they observed the shooting, and I ask the record to

17   reflect that.

18            THE COURT:  Very good.

19            ATTORNEY DUROS:  I'll direct the court's

20   attention to Paragraphs 26 and 27.  That's the

21   important parts of *Dribble*.

22            ATTORNEY SCHNEIDER:  And then, I'm sorry, I

23   have one last thing.  We talked about how we were not

24   going to get into references of Facebook or comments

25   or questions about Facebook.  I just want to put them

104

1          on notice because in follow-up to Mr. Moua, she asked

2          more questions about generally what were those

3          messages, and if that's going to be done, then I'm

4          going to want to get into other messages because

5          there's one within this section between Mr. Moua and

6          the defendant where when he's asking about their

7          plans, and the reference is, like when did they plan,

8          and at least the Facebook account message from Chong

9          Lee is it was a last minute thing, did you hear about

10         that shooting at Luna.  She may not have known that,

11         but when she asked a follow-up about generally about

12         what else were the messages, then I think that opens

13         the door to us to get into that sequence with that

14         person.

15              ATTORNEY VISHNY:  I didn't ask what

16         generally were the messages, I said were there

17         messages about staying at a hotel and at the Hilton,

18         and he said yes, nor did I object then when Mr. Maier

19         in redirect asked about other messages.  It was fine.

20         So I understand that, but I didn't ask that

21         open-ended question, I asked a very specific question

22         and so --

23              ATTORNEY SCHNEIDER:  So then she's allowed

24         to pick and choose which message in a sequence she

25         wants to refer to, then I think it opens the door to

105

1    us asking about anything else.

2                THE COURT:  I understand.  The way we'll

3    address it is just as I indicated we'd address it

4    before.  If there are specific instances, I'm not

5    creating a generalized rule right now, just as

6    Attorney Vishny did not waive, we'll look at it on a

7    case-by-case basis.

8                ATTORNEY SCHNEIDER:  Okay.  Thank you.

9                THE COURT:  That's how we'll have to deal

10   with it.

11               (Lunch recess.)

12               THE COURT:  We had -- before going off the

13   record it was brought to the court's attention that

14   there was some concern about -- maybe not concern but

15   some clarification ruled on some previous court

16   rulings as it related to investigators' notes and

17   things of the like.  The court did have an

18   opportunity to go back and review the transcript from

19   I believe it was the April 8th proceedings, and the

20   subject matter was discussed somewhat substantively

21   between the parties, although the court does need to

22   fill in the blanks a little bit, and by and large

23   this becomes an issue of what was the stipulation and

24   expectations amongst the parties.  And so the court

25   is, based upon its review of the same, is issuing the

106

1           following order, that if there is an expectation or

2           belief following direct examination that the witness

3           will be questioned on things that were either (a)

4           inconsistent with prior police or with police

5           interviews or alternatively subject matters that were

6           not addressed in the police interviews but that will

7           subsequently be questioned on, that those be turned

8           over to the State.  I understand that the defense

9           will attempt to make written summations of those, and

10          this was even notified at the -- the April 8th

11          proceedings, that oftentimes notes are not taken and

12          is a summary of arguments, and so the court, at least

13          in its initial reaction, is that should not be a

14          subject required for the investigator.  In specific

15          instances, Miss Schneider, you may be able to request

16          a sidebar for purposes of revisiting that issue, but

17          that is the generalized order.  Is that your

18          understanding of our discussion, Attorney Schneider?

19                    ATTORNEY SCHNEIDER:  Yes.  Thank you.

20                    THE COURT:  Attorney Vishny, that's your

21          understanding of the order?

22                    ATTORNEY VISHNY:  It is.  If I can just

23          supplement the record?

24                    THE COURT:  Okay.

25                    ATTORNEY VISHNY:  Just for the record, the

107

1    defense position is that because these witnesses are

2    not and were never intended to be called by the

3    defense ever, that those notes are privileged and do

4    not have to be given to the State unless the defense

5    specifically asks the witness, did you tell

6    Investigator Valdes that, you know, A, B and C, and

7    once the witness has done that, then under 906.13(2)

8    the defense must turn those over, and I believe that

9    our position to this point has been consistent with

10   what occurred on April 8th and what was stated at

11   April 8th, because my reading of what Miss Schneider

12   said was that she also understood that at that time.

13   Notwithstanding that, the defense has every intention

14   of complying with the court's order.

15        THE COURT:  Very good.  Thank you, Attorney

16   Vishny.

17        With that, is there anything else that we need

18   to address from a preliminary standpoint?

19        ATTORNEY SCHNEIDER:  No.  We would

20   anticipate probably going into at least three or four

21   witnesses, but there will be a witness later where

22   I'll need to take a break just to test some

23   equipment, but I don't anticipate that probably until

24   the second half of our afternoon.

25        THE COURT:  Okay.  Attorney Vishny, take

108

1    five minutes?

2              ATTORNEY VISHNY:  Yeah.  Oh, we didn't move

3    98 in.  I'll move 98 in.

4              THE COURT:  98 will be received.

5              ATTORNEY SCHNEIDER:  No objection.

6              THE COURT:  All right.  So we'll be ready

7    to go, Counsel, in about five minutes.

8              (Brief recess.)

9              THE COURT:  Counsel ready at this time?

10             ATTORNEY SCHNEIDER:  Yes.

11             THE COURT:  Wendy, could you please bring

12   in the jury.

13             (The jury was escorted into the courtroom.)

14             THE COURT:  Please be seated.  Is the State

15   prepared to call its next witness?

16             ATTORNEY SCHNEIDER:  Yes.

17             THE COURT:  Go ahead.

18             ATTORNEY SCHNEIDER:  We would call Mike

19   Verheyden.

20             THE COURT:  Sir, if you would please come

21   to the witness stand and remain standing.

22             THE CLERK:  Please raise your right hand.

23             (Oath administered to witness.)

24             THE WITNESS:  I do.

25             THE CLERK:  Please state your full name and

1      spell it for the record please.

2              THE WITNESS:  Mike Verheyden, M-I-K-E,

3      V-E-R-H-E-Y-D-E-N.

4              THE COURT:  You may be seated, sir.

5                **EXAMINATION OF MIKE VERHEYDEN**

6  **BY ATTORNEY SCHNEIDER:**

7  Q    Good afternoon.  May I call you Mike?

8  A    Yeah.

9  Q    Okay.  Mike, where do you live, what city?

10 A    Green Bay.

11 Q    How long have you lived in Green Bay?

12 A    Seven years.

13 Q    And what do you do for an occupation?

14 A    I'm a mason.

15 Q    I want to direct your attention back to December of

16     2013.  At that time you were still living up in Green

17     Bay?

18 A    Yup.

19 Q    Do you remember, Mr. Verheyden, Saturday, December

20     7th of 2013 coming to Appleton?

21 A    Yes.

22 Q    And how did you end up coming to Appleton that day?

23 A    A friend invited me on a bus that was going down

24     there.

25 Q    Did you make plans before the weekend to do that or

110

1       was it the day of, if you even know?

2  A   I don't remember.

3  Q   And what was the plan for that bus when it got to

4      Appleton?

5  A   To bar hop and then bring us back home at bar

6      close.

7  Q   And did you, along with friends, travel on that

8      bus?

9  A   Yes.

10  Q   Were there specific plans for the people on the bus,

11      by that I mean was it like we were going to be here

12      at this time and here at that time?

13  A   No.

14  Q   Was everybody just free to go wherever they wanted?

15  A   Yes.

16  Q   Do you remember any clothing that you had on that --

17      that night?

18  A   I was wearing a plaid shirt and a black hat.

19  Q   Do you remember having a sweatshirt on at all?

20  A   Yeah.  My Affliction, black, wings on the back most

21      likely.

22  Q   Wings on the back you said?

23  A   Yup.

24  Q   Does it have crosses on it?

25  A   Yeah, right here, two of them I think, pretty sure.

```
1    Q    During the time when you were here in Appleton, do

2         you remember what bars you might have visited?

3    A    There was probably four or five.  I don't really know

4         the names.

5    Q    Have you visited downtown Appleton previous to that

6         night?

7    A    Yes.

8    Q    If I give you the name Luna Lounge, do you remember

9         that bar?

10   A    Yeah.

11   Q    Were you at Luna at closing time?

12   A    That night?

13   Q    Yes.

14   A    Yes.

15   Q    Did you know someone named Josh Richards?

16   A    I had just met him that night on the bus.

17   Q    Did you talk to him at all?

18   A    Not really, just we introduced ourselves and that was

19        kind of it.

20   Q    Did anyone else that you were with know Josh?

21   A    No.

22   Q    I'm going to direct your attention to that time

23        period around closing at Luna.  Do you remember where

24        you were around closing time in the bar?

25   A    I was --
```

```
 1   Q   In the bar?

 2   A   Yeah.

 3   Q   Do you remember where within Luna you were?

 4   A   I was going to go have a cigarette.  I was all over

 5       inside the bar the whole time I was there.

 6   Q   Okay.  Maybe I can direct you a little bit, Mr.

 7       Verheyden, and then we'll walk backwards.

 8   A   Okay.

 9   Q   There was a point in time when you were in kind of

10       that front entryway with Josh, right?

11   A   Yes.

12   Q   And that was close to closing time?

13   A   Yes.

14   Q   Okay.  So walk me backwards.  Prior to being in that

15       area with Josh, where had you been?

16   A   Probably by the dance floor.

17   Q   And then you mentioned at some point you were going

18       to go have a cigarette?

19   A   Yes.

20   Q   Where did you have to go if you wanted a cigarette

21       when you were at Luna?

22   A   Outside to College Avenue.

23   Q   So prior to getting into that entryway or that foyer,

24       do you remember noticing anything?

25   A   An argument.
```

113

1    Q    And where was that taking place?

2    A    In that entryway kind of by the stairs to go to the

3         bathrooms.

4    Q    Do you remember seeing anyone that you recognized in

5         that area?

6    A    Josh.

7    Q    Do you remember how many other people might have been

8         in that area?

9    A    Six or seven.

10   Q    Do you remember what the lighting was like that

11        night?

12   A    Pretty dark.

13   Q    Was -- was this something where the argument was so

14        loud many others were noticing?

15   A    Possibly, yes.

16   Q    You then -- do you go to have your cigarette?

17   A    No.

18   Q    What did you do?

19   A    I just stood kind of in the corner just listening.

20   Q    Why did you go in that area?

21   A    Just to maybe break it up if there was a

22        confrontation -- well, there was confrontation, but

23        physical.

24   Q    So there might have been some words being said?

25   A    Yeah, there was arguments.

114

1    Q    Was Josh yelling?

2    A    Voice raised.  I don't know about yelling.

3    Q    How long do you think you stayed in that area?

4    A    Ten minutes.

5    Q    What did -- did you stay in that area or did you move

6         from that spot?

7    A    I stayed pretty much in the same spot.

8    Q    Did the argument continue to escalate or what

9         happened?

10   A    I -- it sounded like it was being resolved and then

11        that's when I left or turned to walk out and then

12        heard a shot, a loud pop.

13   Q    Okay.  So you're standing there and you said it

14        sounded like it was being resolved?

15   A    Yes.

16   Q    Were people still all staying in that area?

17   A    Some people were leaving, I guess.

18   Q    But from your perspective, it wasn't escalating at

19        all?

20   A    No.

21   Q    And so based upon what you saw and heard, then you

22        turned to go have your cigarette?

23   A    Yes.

24   Q    And then what do you remember?

25   A    Hearing a pop, and I pretty much knew it was a

```
 1        gunshot because I shoot guns too.
 2   Q    Do you hunt?
 3   A    Yes.
 4   Q    Do you use other firearms other than rifles or
 5        shotguns?
 6   A    No.
 7   Q    But you clearly recognized the noise as a gunshot?
 8   A    Yeah.  My friends have handguns and every -- we all
 9        have guns.
10   Q    What did you do after you heard the pop?
11   A    Looked over and seen Josh fall, and I kind of knew
12        what happened, and I just stood there.  I don't
13        really remember what happened after that.
14   Q    Did it surprise you?
15   A    Yes.
16   Q    Did it shock you?
17   A    Yes.
18   Q    Do you remember seeing what the people who were in
19        that same area as you were, do you remember seeing
20        what they did if anything?
21   A    Ran out.
22   Q    After you -- you heard the pop, you turned, then you
23        saw Josh on the ground.  Where was your focus then?
24   A    On him, I guess.  I kind of just stood there in
25        shock.
```

```
1   Q    Do you remember anybody else becoming aware that Josh

2        was on the ground or what had happened?

3   A    Yeah.  There was many people running up at that

4        point.

5   Q    And were they running to Josh?

6   A    Yes.

7   Q    And did you stay at Luna then?

8   A    Yes.

9   Q    Do you remember officers arriving?

10  A    Yes.

11            ATTORNEY SCHNEIDER:  I have nothing

12       further.

13            THE COURT:  Defense?

14            ATTORNEY WEITZ:  Thank you, Your Honor.
```

**EXAMINATION OF MIKE VERHEYDEN**

**BY ATTORNEY WEITZ:**

```
17  Q    So, Mr. Verheyden, at Luna, you're walking up from

18       the dance floor and your intention is to go out and

19       have a cigarette; is that fair to say?

20  A    Yes.

21  Q    Okay.  And as was stated earlier, you can't smoke

22       inside Luna, right?

23  A    Correct.

24  Q    So if you're going to have any sort of cigarette or

25       smoke of any type, you got to go out the front
```

117

```
1         doors?
2    A    Yes.
3    Q    So you're making your way up to the front doors and
4         that's when you saw Mr. Richards, right?
5    A    Yes.
6    Q    And you -- you'd only talked to him those couple
7         words that you mentioned, like you recognized him
8         from the party?
9    A    He was a pretty big guy, I could recognize him.
10   Q    Okay.  Would you say he's much bigger than you?
11   A    Yeah.  Maybe same height but bigger built.
12   Q    Okay.  And you saw him in a confrontation with an
13        Asian guy, right?
14   A    Yes.
15   Q    And the reason that you stopped there is because you
16        saw this confrontation and you heard some arguing,
17        right?
18   A    Yes.
19   Q    And in your assessment you thought that it had the
20        potential to escalate into some sort of actual like
21        physical fight.
22   A    Yeah.
23   Q    Okay.  And if -- if that would have happened, you're
24        not really a fighter but you wanted to step in and
25        just kind of break things up and --
```

118

```
1    A    Yes.

2    Q    Okay.  So you stopped in that area and you're focused

3         on this argument or altercation that's happening?

4    A    Yes.

5    Q    Okay.  So you're paying close attention to make sure

6         that if you see any signs of something that looks

7         like it's going to be pushing, fighting or whatever,

8         that's when you're going to step in, right?

9    A    Yes.

10   Q    And you're standing there for a while when at some

11        point you felt like the confrontation was over?

12   A    Yes.

13   Q    In your mind you thought people were walking away or

14        they were dispersing?

15   A    Yes.

16   Q    And at that moment, that's when your attention turned

17        away, right?

18   A    Yup.

19   Q    And -- and that's when you heard the shot, right?

20   A    Yes.

21   Q    Okay.  And you looked back and that's when you saw

22        Mr. Richards fall to the floor.

23   A    Yes.

24   Q    Okay.  And after the shot, you saw a group of Asian

25        guys run out the door, right?
```

119

1    A    Yes.

2    Q    But up until that point, you never saw any physical

3         fighting, right?

4    A    Not that I can recall, no.

5    Q    Okay.  You never saw any punches being thrown?

6    A    No.  Maybe.

7    Q    You were paying very close attention to this because

8         you were watching to see if there is some sort of

9         physical fight?

10   A    I wasn't looking right at it, I was kind of turned

11        away, just didn't want people to know that I was

12        standing there paying attention, but I was close,

13        yes.  I don't --

14   Q    You were paying attention because if you -- if you

15        needed to, you were going to get involved, right?

16   A    Yes.

17   Q    And you never had to get involved.

18   A    No.

19   Q    Okay.  So after this group of Asian guys went out the

20        door, at some point police officers arrived, right?

21   A    Yes.

22   Q    Do you remember a girl running back in when you were

23        standing in that front area?

24   A    No.

25   Q    Or a girl that you recognized from the party bus?

120

```
 1   A    No.

 2   Q    Did you know if Josh or Mr. Richards had a

 3        girlfriend?

 4   A    No, I didn't.

 5   Q    Okay.  So when the police come, you give them a

 6        statement, right, and you tell them who you believe

 7        the suspect to be?

 8   A    No names.

 9   Q    But you give them a description of what that person

10        was wearing, right?

11   A    Yes.

12   Q    And what you remembered was that one guy was wearing

13        a plaid shirt, right?

14   A    Button-up, yeah.  I think that's what I thought,

15        yes.

16   Q    Okay.  And you specifically used the word plaid

17        though, right?

18   A    Yes.

19   Q    And then the other thing that you were able to recall

20        is that another person was wearing a -- a beanie type

21        hat?

22   A    Yes.

23   Q    That would be kind of like a stocking cap?

24   A    Yes.

25   Q    Or winter cap.  Okay.  And that was the description
```

121

1      that you were able to recall of who you believe the

2      suspect was?

3  A   Yes.

4  Q   Okay.

5            ATTORNEY WEITZ:  Nothing further, Your

6      Honor.  Thank you.

7            THE COURT:  Any redirect?

8            ATTORNEY SCHNEIDER:  Yes.

9            **EXAMINATION OF MIKE VERHEYDEN**

10 **BY ATTORNEY SCHNEIDER:**

11 Q   You didn't see the shooting, correct?

12 A   No.

13 Q   So when you're giving a description to officers, it's

14     not this is who did the shooting.

15 A   Correct.

16 Q   It was these are people I saw in the area?

17 A   Yes.

18 Q   And you stayed and you were willing to talk to the

19     police?

20 A   Yes.

21 Q   Wanted to try to maybe help Josh by telling them what

22     you saw?

23 A   Yes.

24            ATTORNEY SCHNEIDER:  Nothing further.

25            THE COURT:  Recross?

1              ATTORNEY WEITZ:  Nothing, Your Honor.

2              THE COURT:  Ladies and gentlemen of the

3     jury, any questions you wish to submit?

4              (No response.)

5              THE COURT:  All right, sir.  I thank you

6     for your testimony today.

7          Miss Schneider, your next witness whenever

8     you're ready.

9              ATTORNEY MAIER:  Your Honor, the State

10    calls Phong Lee.

11             THE COURT:  Sir, if you would please come

12    to the witness stand and remain standing.

13             THE CLERK:  Please raise your right hand.

14             (Oath administered to witness.)

15             THE WITNESS:  I swear.

16             THE CLERK:  Please state your full name and

17    spell it for the record please.

18             THE WITNESS:  My name is Phong Lee.

19    P-H-O-N-G, L-E-E.

20             THE COURT:  And then, Mr. Maier, your

21    witness.

22         Mr. Lee, if you need to, that microphone does

23    move a little bit so that you can be heard.  Okay?

24         Go ahead, Mr. Maier.

25                  **EXAMINATION OF PHONG LEE**

123

1    **BY ATTORNEY MAIER**:

2    Q    Mr. Lee, do you know someone named Chong Lee?

3    A    Yes, I do.

4    Q    Is that person related to you?

5    A    Yes.

6    Q    How so?

7    A    Through a last name which is Lee's together.

8              ATTORNEY VISHNY:  I'm sorry.  I didn't hear

9         the answer.

10             ATTORNEY MAIER:  Could you repeat that?

11   A    Through we're Lee's because through our last names.

12   Q    Mr. Chong Lee is in court today, correct?

13   A    Yes.

14   Q    That's the individual several people to my left in

15        the black shirt, right?

16   A    Yup.

17   Q    How long have you known Chong?

18   A    Since childhood.

19   Q    Since childhood?

20   A    Yeah.

21   Q    How old are you now?

22   A    I'm 28.

23   Q    You've known the defendant for as long back as you

24        can remember then --

25   A    Yes.

124

```
 1   Q    -- growing up in Appleton?

 2   A    Since '97, yes, yeah.

 3   Q    In -- I need to ask you some questions about some

 4        things that happened a couple years ago.

 5   A    Okay.

 6   Q    In December of 2013 was there a night that you went

 7        to Luna Lounge with Chong?

 8   A    Yes.

 9   Q    Do you remember -- do you remember what time it was

10        that you guys arrived at the bar?

11   A    No, I don't remember that.

12   Q    Had you been anyplace before?

13   A    Yes.

14   Q    Where were you before?

15   A    We were at City Limits in Menasha.

16   Q    Who -- who was in the group that was at City

17        Limits?

18   A    I think it was me, Paul, Joe, Chong, Michael Thor,

19        Noah.  I think that's it.

20   Q    I just want to walk you through those people a little

21        bit.  You said Paul, that's Paul Lee?

22   A    Yes.

23   Q    Is he related to you?

24   A    Yes.  He's Chong's brother.

25   Q    Okay.  And then he would be related to you also
```

125

```
1            through --
2     A     Yes.
3     Q     -- being a Lee?
4     A     Yes.
5     Q     You said Joe, correct?
6     A     Yes.
7     Q     That's Joe Thor?
8     A     Yes.
9     Q     And then I think you said Noah?
10    A     Yes.
11    Q     Who is that?
12    A     Noah Vang.
13    Q     Okay.  And people may know him as Noah?
14    A     Yes.
15    Q     So you went -- you were at City Limits in Menasha.
16          Were there any girls with you at City Limits?
17    A     Yes.
18    Q     Who was that?
19    A     Alyson Kristy and Dalinda.
20    Q     And that would be -- Dalinda might be Dalinda
21          Guzman?
22    A     I don't know her last name, but yeah.
23    Q     Okay.  Alyson, do you know her last name?
24    A     Kristy, yeah.
25    Q     So Alyson Kristy is what you knew the person as?
```

126

1    A    Yeah.

2    Q    Was -- was Alyson -- are these girls just friends,

3         did they hang out with you?

4    A    They're just friends.

5    Q    Nothing more than that?

6    A    No, nothing more than that.

7    Q    So you leave City Limits, where do you go next?

8    A    Went downtown.

9    Q    In Appleton?

10   A    Yes.

11   Q    And where did you go to in Appleton?

12   A    We went to -- don't remember, but I think we went to

13        Sharks first.

14   Q    That's a pool hall, right?

15   A    Yes.

16   Q    You had come in off College and go down some steps

17        and there is a bunch of pool tables and a bar?

18   A    Yes.

19   Q    And it's the same group of people that are at -- that

20        were at City Limits are at Sharks?

21   A    Yes.

22   Q    Okay.  What happens next, where do you go?

23   A    We went down to Luna.

24   Q    How far is Luna from Sharks?

25   A    Not that far.

127

```
1    Q    Did you drive or walk?

2    A    I walked.

3    Q    Right.  When -- are you able to estimate what time of

4         the night it was when you got to Luna that night?

5    A    I don't remember.

6    Q    Was it fairly late into the night compared to when

7         things started?

8    A    Yes.

9    Q    After midnight?

10   A    Yes.

11   Q    And it's the same group?

12   A    Yes.

13   Q    So it's you and the defendant and Paul and Joe,

14        right?

15   A    Yes.

16   Q    Is Noah inside Luna?

17   A    Yes, he was.

18   Q    And the girls too?

19   A    Yes.

20   Q    What did the -- what are you guys doing as a group

21        then when you get into Luna?

22   A    Just drink.

23   Q    Anybody dancing?

24   A    Yes, some of us were.

25   Q    Were you?
```

128

```
 1    A    Yes.

 2    Q    Okay.  Is that something that you -- was that unusual

 3         for you to do at Luna?

 4    A    No, we do that all the time.

 5    Q    All right.  You're familiar with the layout of the

 6         place?

 7    A    Yep.

 8    Q    So when you went in, you know, you go into kind of a

 9         little entryway, right?

10    A    Yes.

11    Q    And there's a security person there who would have

12         checked IDs and that sort of thing?

13    A    Yes.

14    Q    And then where would you go if you were going to go

15         to the bathroom?

16    A    By the stairs.

17    Q    And that's -- how far is that from the front door?

18         You don't have to be exact, but from the front door

19         where you're getting your ID checked, if you had to

20         go to the bathroom, how far away is that?

21    A    Probably just five feet away.

22    Q    And then that's steps to go up or down?

23    A    Down.

24    Q    If you wanted to go to the bar, would you go past

25         those steps then from the front door?
```

129

```
 1    A    Yeah, kinda.

 2    Q    What do you mean by "kinda"?

 3    A    Well, it's just right there, maybe three feet away.

 4    Q    Is the bar?

 5    A    Yeah.

 6    Q    And then where is the dance floor relative to the

 7         bar?

 8    A    That's kind of far.  Two different bars up in there

 9         so it depends on which one you want to drink.

10    Q    From the point where the steps are, you walk through

11         kind of an archway, that's the first bar almost right

12         away, right?

13    A    Yes.

14    Q    And then there's a second bar that's kind of farther

15         in and --

16    A    Yes.

17    Q    -- I think up, right?

18    A    Yes.

19    Q    So the dance floor is in this area past the first

20         bar.

21    A    Yes.

22    Q    Was there a point that the group was going to leave

23         that night?

24    A    Some of us -- some of them were planning to leave,

25         yes.
```

1    Q    And were you part of a group that then went back into

2         that kind of entranceway area by the steps?

3    A    Yes.

4    Q    Who else was with you when you were in that area on

5         the -- sort of the end of the night?

6    A    I don't remember, but all I remember is me and Mikey

7         Thao that was there.

8    Q    Was Joe with you there at some point at the end of

9         the night?

10   A    Yes, he was there at some point, yes.

11   Q    Paul?

12   A    Yes.

13   Q    And was there a time in this time period, you know,

14        near the end of -- the end of things where either you

15        or Paul were near kind of a bigger white guy?

16   A    Yes.

17   Q    Did something happen with that -- with that guy?

18   A    Yes.

19   Q    What happened?

20   A    He pretty much threatened me and all that.

21   Q    Threatened you?

22   A    Yes.

23   Q    How far away were you when -- when this started with

24        the taller guy?

25   A    What do you mean by "how far away"?

131

1    Q    Well, were you from me to you, 20 feet away?

2    A    He was pretty close up to my face, yeah.

3    Q    Okay.  What caused this?

4    A    Well, I don't know what I did wrong, but what

5         happened was -- what I saw was that him and his girl

6         got into an argument or whatever, and then this other

7         white guy that was by the bar, he was laughing, so I

8         was asking him if he knew what was happening.  We

9         were just talking.  And then they walked away.  And

10        then he came back, he came at me starting to say

11        stuff to me and all that.

12   Q    Not the guy that you were asking about what happened

13        but the -- the bigger guy?

14   A    Yeah, the bigger guy, yes.

15   Q    You don't know their names?

16   A    No, I don't know them.

17   Q    How tall are you?

18   A    Five one.

19   Q    Okay.  And how -- he's quite a bit taller than you?

20   A    Yes.

21   Q    So this sounds like a misunderstanding?

22   A    Yes, pretty much.

23   Q    At some point is Paul involved?

24   A    Yes.

25   Q    What -- what gets -- at what point does Paul get

132

```
 1        involved?
 2   A    When he started threatening me and all that, calling
 3        us names pretty much.
 4   Q    So is Paul nearby too?
 5   A    Yes.
 6   Q    Just in the same, you know, I don't know, five or six
 7        foot group; is that fair to say?
 8   A    Yeah.
 9   Q    So it's at that point -- I just want to make sure
10        I've got this right.  It's the bigger white guy, the
11        other white guy who you were talking to, you and
12        Paul?
13   A    Yes.
14   Q    Is there anybody else from your group that's in that
15        little group when this first starts?
16   A    Yes.  Mikey was behind me.
17   Q    Mikey is behind you?
18   A    Yeah.
19   Q    When Paul gets involved, do things calm down or get
20        worse?
21   A    It kind of calmed down, but then it just got more
22        worse after that.
23   Q    How did it get worse?
24   A    Because he wouldn't stop saying -- the other big guy
25        wasn't stop saying stuff, and then it just escalated
```

133

1    from there.

2    Q    What happened after the big guy was saying stuff that

3         made it escalate?

4    A    Then they just started fighting.

5    Q    Who is they?

6    A    People.

7    Q    And so Paul is fighting?

8    A    Yes.

9              ATTORNEY VISHNY:  At this point, Judge, I

10        haven't objected to leading, but I would ask that we

11        go with open-ended questions.

12             THE COURT:  Please rephrase.

13   Q    (BY ATTORNEY MAIER)  Which of the people in the group

14        were fighting?

15   A    All I know Paul was fighting.

16   Q    Who was Paul fighting?

17   A    The bigger guy.

18   Q    And were you involved in a fight at all?

19   A    No.

20   Q    How about what was the -- I'll say the other white

21        guy, what was he doing?

22   A    He just -- he left the scene pretty much.

23   Q    What about the other person you talked about, Mikey

24        Thao?

25   A    He just stood there, just same as I did.

134

```
1   Q   So fair to say that the fight is really Paul and the
2       bigger of the two white guys?
3   A   Yes.
4   Q   What happens next?
5   A   I started walking towards the door.  I didn't want
6       nothing part of it.
7   Q   And then what?
8   A   And then I saw Joe ahead of me by the door, and then
9       after that I saw Paul running past me, and then I was
10      about to leave the door and then that's when I heard
11      the gunshot came from behind me.
12  Q   So you're saying today that the -- by the time the
13      gunshot happened you were at the door?
14  A   I was by the door, yes.
15  Q   During the time that -- during the time this
16      escalates and things are going on, do you know where
17      Chong is?
18  A   No, I do not.
19  Q   Now, Mr. Lee, you talked with a couple detectives a
20      couple times, right?
21  A   Yes.
22  Q   And do you recall where you were the first time you
23      talked to them?
24  A   I was here at court.
25  Q   In the courthouse?
```

135

1    A    Yes.

2    Q    And in fact the -- the detectives that talked to you

3         spoke with you in one of the rooms right in the

4         hallway here, right?

5    A    Yes.

6    Q    So it's a little -- a room about the size of the

7         witness stand to the edge of the jury box?

8    A    Yes.

9    Q    A little bit bigger than that?

10   A    Yes.

11   Q    When they spoke with you, was the door open or

12        closed?

13   A    It was open.

14   Q    And so people here for courthouse business, they

15        could be walking past, there's nothing to stop you

16        from getting out and leaving or anything like that,

17        right?

18   A    Yeah.

19   Q    There was two detectives that spoke with you,

20        correct?

21   A    Yes.

22   Q    About -- and I know you weren't keeping a clock going

23        or anything, but was it a long time or a fairly short

24        talk?

25   A    I don't remember, but I would say probably kind of

136

```
1        long.

2    Q   What do you define as long?

3    A   Maybe like 20 minutes.

4    Q   Okay.  You -- when you spoke with them, you indicated

5        that you went out of Luna with Joe Thor and Paul Lee

6        after the shot was fired?

7    A   Yes.

8    Q   Today you're saying that you left before the shot was

9        fired?

10   A   Yes.

11   Q   So I just want to make sure I'm clear on this because

12       I think there might be some differences, and I don't

13       want to get into something too deep with you if

14       there's not.  Okay?  So I just want to make sure

15       we're clear.  You're saying today that in the middle

16       of this fight that Joe -- Joe starts to go and you're

17       right behind him?

18   A   I was right behind Paul.

19   Q   Right behind Paul?

20   A   Yeah.

21   Q   So Paul is in front of you at the time you hear the

22       shot?

23   A   Yes.

24   Q   All right.  So -- I apologize for this.  My -- you've

25       got Joe first, then Paul, then you?
```

137

```
 1   A    Yes.

 2   Q    And you are in this entryway still, in the doorway or

 3        out of the bar at the time you hear the shot?

 4   A    I was by -- just about to leave the door, yes.

 5   Q    And it's one shot?

 6   A    Yes.

 7   Q    And it's from behind you?

 8   A    Yes.

 9   Q    And you're familiar with how Luna is laid out?

10   A    Yes.

11   Q    And there's -- where -- what sort of area would the

12        shot have come from?

13   A    What do you mean by that?

14   Q    Well, was it -- are you able to say whether it was

15        back on the dance floor?

16   A    No.

17   Q    Was there music playing in that front entryway?

18   A    Yes.  You could hear music playing, yes.

19   Q    And could you hear the shot over that?

20   A    Yes.

21   Q    Now, you also spoke with the police a couple days

22        after the first time at your house, right?

23   A    Yes.

24   Q    Was that a house or an apartment?

25   A    House.
```

138

```
 1   Q   I just want to make sure I don't call it the wrong
 2       thing.
 3   A   Yup.
 4   Q   And that was one of the same officers that spoke to
 5       you the first time but also Sergeant Thao, correct?
 6   A   Yes.
 7   Q   And they -- they wanted to follow up with some things
 8       based on the information you provided in your first
 9       statement; fair to say?
10   A   Yes.
11   Q   Was the interview that you gave with them that second
12       time, would you say it was a short statement or a
13       long statement?
14   A   Short statement.
15   Q   So give or take the same amount of time as the first
16       time, 20 minutes?
17   A   Yes.
18   Q   Actually, let me -- I got to back up a little bit.
19       When they talked with you in the hallway at the
20       courthouse, were those detectives polite to you?
21   A   Yes.
22   Q   They weren't -- I mean they weren't --
23                 ATTORNEY VISHNY:  Objection.  Leading.
24                 THE COURT:  Sustained.
25   Q   (BY ATTORNEY MAIER)  What was their -- the tone of
```

139

```
 1        their voice like?
 2   A    Just normal.
 3   Q    More or less how we are now?
 4   A    Yes.
 5   Q    I mean obviously I'm speaking loud so everybody can
 6        hear me.
 7   A    Right.
 8   Q    And you're speaking into the mic loud.
 9   A    Yeah.
10   Q    That second interview at your house, similar?
11   A    No, not really.
12   Q    Okay.  How was it different?
13   A    I felt more that I was harassed.
14   Q    And you talked a little bit about where certain
15        people were that second interview, right?
16   A    Yeah.
17   Q    I mean where people were located during this
18        incident.  Would you say that when Paul is fighting
19        the -- the bigger of the two white guys, are you
20        facing toward him or away from him?
21   A    Away.
22   Q    From Paul?
23   A    Yes.
24   Q    Are you facing toward or away from the bigger of the
25        -- the bigger white guy?
```

1    A    Away.

2    Q    So your back is to them?

3    A    Yes, pretty much.

4    Q    Didn't you tell the police that you saw Paul and Joe

5         on your left-hand side while you were facing the

6         bigger white guy and that he, the bigger white guy,

7         was directly in front of you?

8    A    Yes, that was before the fight happened, yes.

9    Q    Okay.  Paul is to your left then?

10   A    Yes, when that happened, yes.

11   Q    And the bigger white guy is --

12   A    Right in front of me.

13   Q    -- right in front of you?

14   A    Yes.

15   Q    Is he facing toward you?

16   A    Who, Paul or the white guy?

17   Q    The bigger white guy.

18   A    Yes, he was facing towards me.

19   Q    And then at some point he must face towards Paul when

20        the fight starts?

21   A    Yes.

22   Q    And are you -- there's like a half wall between the

23        bar and the steps that go down to the bathroom?

24   A    Yes.

25   Q    Right?

```
 1   A    Yes.

 2   Q    This is kind of where this all happens?

 3   A    Yes.

 4   Q    Are you between them and the half wall or are you on

 5        the other side of them?

 6   A    I was on the other side.

 7   Q    More towards the door?

 8   A    More towards the door, yes.

 9   Q    Okay.  Thank you.  All right.  I want to talk to you

10        about some things that happened after this, after you

11        leave the bar.

12   A    Okay.

13   Q    All right?  You leave the bar with -- and you're

14        following Paul and Joe.  Which direction do you go,

15        right or left?

16   A    We made a right on the corner.

17   Q    Okay.  And then almost immediately another right,

18        correct?

19   A    No, we went straight.

20   Q    Okay.  So you're -- I just want to make sure I got

21        this right.  You go out the doors and go right?

22   A    Yes.

23   Q    And if -- what are you looking at, like what would be

24        across from you when you come out the doors and turn

25        right?
```

142

```
 1   A    If I was to turn right, it would be like the dumpster
 2        and all that on the side over there.
 3   Q    On the side of the building?
 4   A    Because the alley in the back, yeah.
 5   Q    And that's after -- you're not on College Avenue?
 6   A    No.
 7   Q    And so what you're talking about, your back would be
 8        to College Avenue?
 9   A    Yes.
10   Q    Okay.  Do you know what street that is?
11   A    No, I do not.
12   Q    All right.  What do you guys do then after you're
13        running up with your back towards College Avenue?
14   A    Which is away past the parking lot.
15   Q    And then what?
16   A    And then we head towards the dumpster which is where
17        I threw away my vest.
18   Q    After you ditch -- and those other two, did they
19        ditch things in the dumpster also?
20   A    No.
21   Q    Just you?
22   A    Yes.
23   Q    So now where do you go?
24   A    Then we head toward the train track by the post
25        office and then went straight to Joe's house.
```

143

```
 1   Q    Where does Joe live?
 2   A    Don't remember street he lives on, but I think it's
 3        by Franklin Street or something like that.
 4   Q    The -- the vest you were wearing, what color was it?
 5   A    It was white.
 6   Q    When you get to Joe's, who is with you?
 7   A    Me, Paul and Joe.
 8   Q    And at some point did anybody else come to the
 9        house?
10   A    I don't remember.
11   Q    Someone came to the house, correct?
12   A    To pick me up, yes.
13   Q    Who came to the house to pick you up?
14   A    Letty.
15   Q    Letty Xiong?
16   A    Yes.
17   Q    And Letty is L-E-T-T-Y?
18   A    Yes.
19   Q    When you spoke to the police at your house, you told
20        them something different though, correct?
21   A    Repeat that.
22   Q    You told them something different, though, correct,
23        about someone coming to the house after you and Joe
24        and Paul got there?
25   A    Don't remember.
```

144

1    Q    When did you see Chong next?

2    A    What do you mean by that?

3    Q    After you left the bar that night and ended up at

4         Joe's house with Paul, when did you see Chong?

5    A    Don't remember.

6    Q    When did you talk to Chong next?

7    A    Don't remember either.

8    Q    Did you see him that night?

9    A    Just -- what do you mean by that night?

10   Q    After you left the bar.

11   A    After I left the bar?  I don't remember seeing him.

12   Q    Did you see him the next morning?

13   A    No.

14   Q    So you know that for sure.

15   A    Yes.

16   Q    But you don't remember if you saw him between leaving

17        the bar and morning?

18   A    Yes.

19   Q    Okay.  When you talked to the police at your house,

20        you gave an answer that maybe could refresh your

21        recollection.  Do you think looking at the police

22        report might help you remember whether you saw Chong

23        that night?

24   A    I don't remember.

25   Q    Mr. Lee, I'm going to show you what's been marked as

145

```
 1          Exhibit 112.  Do you see that?

 2     A    Yes.

 3     Q    What I'm asking you to do is take a look, and it's

 4          the second page, and you can see in this police

 5          report some information at the bottom of the first

 6          paragraph.  Could you take a look at that and let me

 7          know whether that refreshes your recollection as to

 8          whether you saw Chong that night after you left the

 9          bar.

10     A    Just this part?

11     Q    Yes.

12     A    No, I don't remember saying that.

13     Q    Mr. Lee, have you been convicted of a crime?

14     A    Yes.

15     Q    How many times?

16     A    Three.

17     Q    Since all of this happened, have you spoken with your

18          brother Teng?

19     A    Yes.

20     Q    About this case?

21     A    No.

22     Q    Have you talked with Chong at all about this case

23          after it happened?

24     A    No.

25     Q    You talked with Paul about this after it happened?
```

146

```
 1   A    No.
 2   Q    Have you spoken with Joe Thor about this case after
 3        it happened?
 4   A    No.
 5   Q    Not even including at Joe's house right after it
 6        happened?
 7   A    Well, we just pretty much just talked about what
 8        happened, that's about it.
 9   Q    Is it safe to say that at the time this happens back
10        in December of 2013 you're fairly close with these
11        people that you were out with that night?
12   A    Yes.
13   Q    I mean some -- some are basically family to you?
14   A    Yes.
15   Q    And you don't want anything bad to happen to any of
16        the people that are like family to you; fair to
17        say?
18   A    Yes.
19   Q    You, when the police came and talked to you at the
20        courthouse, didn't really want to talk to them; is
21        that also fair to say?
22   A    Yes.
23             ATTORNEY VISHNY:  At this point I'm going
24        to object to leading.
25   Q    (BY ATTORNEY MAIER)  How did you feel about --
```

147

1              ATTORNEY VISHNY:  Excuse me, Mr. Maier.

2       You probably didn't hear me because I was so quiet.

3       I was objecting to leading.

4              THE COURT:  I think Mr. Maier was

5       rephrasing the question, so thank you, Mr. Maier.

6              ATTORNEY MAIER:  I guess I'll withdraw the

7       question and ask to reask it.

8   Q   (BY ATTORNEY MAIER)  How did you feel about the

9       police talking to you here at the courthouse?

10  A   Okay, I guess.

11  Q   And you said that it was different when they spoke

12      with you at your house?

13  A   Yes.

14  Q   But you -- you -- I mean how willing were you to talk

15      to them anyway?

16  A   Well, because I could tell it was coming, I was being

17      harassed at my house, I didn't like that.

18  Q   But it's at your house, right?

19  A   Yeah.

20  Q   They -- you let them into your house?

21  A   No, we weren't inside, we were outside.

22  Q   Outside?

23  A   Yes.

24  Q   The sidewalk?

25  A   Our front porch.

148

```
 1    Q    And you talked to them for about as long as the
 2         officers that were -- you were okay with talking to
 3         at the courthouse?
 4    A    Just a little bit shorter than that.
 5    Q    You didn't say get off my porch, get off my lawn?
 6    A    Well, after they asked me questions I told them to
 7         leave so they left pretty much, yeah.
 8    Q    With the interview with Sergeant Thao, what did the
 9         other detective look like at your house?
10    A    He's not in the room, I know that, middle age,
11         probably late 40s.
12    Q    White guy, black guy?
13    A    White guy.
14    Q    What was his hair like?
15    A    Pretty much like yours.
16    Q    It wasn't me though?
17    A    No.
18    Q    So short, dark?
19    A    Yes.
20    Q    Graying?
21    A    Yeah, kind of.
22    Q    When you speak with them on the front porch of your
23         house for, you know, you say about 15 minutes or so,
24         you gave them some information about some things that
25         happened at Joe's house after you left the bar,
```

149

```
1            right?

2      A     Yes.

3      Q     Things that you now are saying you don't remember.

4      A     Yes.

5      Q     You think looking at a transcript of that interview,

6            which was recorded, would help you remember the

7            things that happened at Joe's house after you left

8            the bar that night?

9      A     I would say yeah.

10     Q     All right.  Mr. Lee, I'm going to show you what's

11           been marked Exhibit 113.  Do you see that?

12     A     Yup.

13     Q     And as I mentioned, this is a transcript of the

14           recorded interview that you had with Sergeant Thao

15           and the other detective.

16     A     Yeah.

17     Q     Why don't you take a look at the top of Page 10 and

18           just read through that, even through the next page,

19           and then let me know if that helps refresh your

20           memory about what happened after you left Luna that

21           night in December of 2013 and went to Joe Thor's

22           house.

23     A     Just this page?

24     Q     That page and the next.

25     A     (Witness complying.)  I plead the fifth.
```

150

1    Q    I'm sorry.  That's not the question that I have for

2         you, Mr Lee.

3                   ATTORNEY VISHNY:  Judge, can we approach?

4                   (Bench conference.)

5                   THE COURT:  We'll take our mid-afternoon

6         break, come back in about ten minutes.  Please rise

7         for the jury.

8                   (The jury was escorted out of the

9         courtroom.)

10                  THE COURT:  Please be seated.

11            All right.  Mr. Lee, I -- I have some brief

12        questions for you.  I understand to the last question

13        you have just indicated that it is your desire to

14        plead the fifth; is that correct?

15                  THE WITNESS:  Yes.

16                  THE COURT:  And what is the basis for doing

17        so, sir?

18                  THE WITNESS:  I don't want to incriminate

19        myself or anybody else.

20                  THE COURT:  Pardon me?

21                  THE WITNESS:  I don't want to incriminate

22        myself.

23                  THE COURT:  Okay.  And the -- you do

24        understand that in this you swear to tell the truth

25        and --

151

1                    THE WITNESS:  Yes.

2                    THE COURT:  And are you refusing to tell

3          the truth at this point in time?

4                    THE WITNESS:  No, I'm not refusing, I'm

5          just -- I just don't remember.

6                    ATTORNEY VISHNY:  Judge -- well, actually,

7          I want to approach the bench.

8                    (Bench conference.)

9                    THE COURT:  We're back on the record.

10              Mr. Lee, I wanted to go over with you again, now

11         you had indicated that you had desired to plead the

12         fifth, correct?

13                   THE WITNESS:  Yes.

14                   ATTORNEY VISHNY:  I'm just coming over

15         because I can't hear him.

16                   THE COURT:  That's fine.  I don't have a

17         microphone.

18              Now, again, what is your basis for doing so,

19         sir?

20                   THE WITNESS:  Because I don't remember.

21                   THE COURT:  Okay.  And now you had also

22         said that you don't want to, if I understood

23         correctly, and please correct me if I'm wrong, you

24         said you don't want to incriminate yourself or

25         someone else, correct?

1                    THE WITNESS:  Yes.

2                    THE COURT:  What I want to explain to you

3        is that the fifth amendment right applies to

4        self-incrimination, so if you don't want to

5        incriminate yourself and that's the basis, that's one

6        issue.

7                    THE WITNESS:  Yes.

8                    THE COURT:  However, the right -- if your

9        concern is I don't want to incriminate someone else,

10       the invocation of the fifth amendment is not the

11       appropriate means to do that.  Okay?  That is not a

12       valid basis to refuse to answer.  Okay?  Does that

13       make sense to you?

14                   THE WITNESS:  Yes.

15                   THE COURT:  Okay.  And so what I want to

16       know is what is your -- with that understanding, what

17       is your -- your basis for refusing to answer?

18                   THE WITNESS:  I don't want to incriminate

19       myself, just for me only, yes.

20                   THE COURT:  Okay.  And is there reason to

21       believe that --

22                   ATTORNEY VISHNY:  Judge --

23                   THE COURT:  Let me back up.

24                   ATTORNEY VISHNY:  Yeah, I'm -- I'm ready to

25       make a phone call.

153

1                    THE COURT:  Please make the call.

2                    ATTORNEY VISHNY:  I'm going to step out in

3          the hallway.

4                    ATTORNEY SCHNEIDER:  I think we sent Alex

5          around too.

6                    (Court in recess.)

7                    THE COURT:  We're back on the record in

8          *State of Wisconsin v. Chong Lee*.

9               At this time I'd ask that we please swear in the

10         interpreter.

11                   THE CLERK:  Raise your right hand.

12                   (Oath administered to interpreter.)

13                   THE INTERPRETER:  Yes.

14                   THE CLERK:  Please state your name and

15         spell it for the record please.

16                   THE INTERPRETER:  Lee, L-E-E, last name

17         Thao, T-H-A-O.

18                   THE COURT:  Mr. Thao.

19                   THE INTERPRETER:  Yes.

20                   THE COURT:  I'd ask that you please go

21         behind defense counsel, and then, Attorney Vishny, if

22         you could direct Mr. Thao to whom he will be

23         speaking.

24              It was recently brought to my attention that Mr.

25         Chong Lee's mother had been discussing with her other

154

1    children, most particularly Hu Lee, about the events

2    that were happening in the courtroom.  It is my

3    instruction that Mrs. Lee not have any communication

4    about these proceedings and, most particularly, what

5    takes place during the testimony of the proceedings

6    with any of her children or potential witnesses.  And

7    the particular children who -- and witnesses I am

8    referring to include Joe Thor, Hu Lee, Tong Lee, Paul

9    Lee, and Teng Lee.  And although this instruction is

10   directed at Mrs. Lee, the same holds true for any

11   members of the gallery, that they should not

12   communicate with any witnesses about the substance of

13   what takes place during the testimonial phase of

14   these proceedings.

15        Are there any questions, Mrs. Lee?

16             THE INTERPRETER:  (Inaudible.)

17             THE COURT:  Can you speak up a little

18   louder, sir?

19             THE INTERPRETER:  I was talking to my son

20   yesterday, Tong Lee, about the case.  I was trying to

21   look it up on the computer and nothing came up.  And

22   then I asked Phong with assistance with that, and

23   they -- Phong said -- typed in the last name and

24   still couldn't find him.

25             THE COURT:  Okay.

155

1                    THE INTERPRETER:  And that was all that
2        they were talking about.
3                    THE COURT:  Okay.  And she may look at the
4        Internet, but I don't want any discussions with,
5        again, Joe Thor, Hu Lee, Tong Lee, Paul Lee or Teng
6        Lee about the substance of these proceedings.
7             Any questions with that instruction, Mr. Maier?
8                    ATTORNEY MAIER:  Related to that
9        instruction, no.
10                   THE COURT:  Okay.  Attorney Vishny, any
11       questions with respect to that instruction?
12                   ATTORNEY VISHNY:  No.
13                   THE COURT:  All right.  Any additional
14       questions, Mrs. Lee?
15                   THE INTERPRETER:  I don't have any kind of
16       understanding of any English so I'm just here for my
17       kid just to be here for him and I'll do my part about
18       it.
19                   THE COURT:  All right.  Thank you.  Then as
20       it relates to that issue --
21                   ATTORNEY VISHNY:  Judge, my client, Mr.
22       Chong Lee, said that if you could just say just tell
23       mom not to talk at all with Hu Lee, Tong Lee and Paul
24       Lee until the case is over it would be clearer.
25                   THE COURT:  Okay.

1                    ATTORNEY SCHNEIDER:  One second.

2                    THE INTERPRETER:  She says she won't talk

3          to them.

4                    ATTORNEY VISHNY:  Okay.  I think now it

5          sounds to me like now it's been clarified.

6                    THE COURT:  All right.  Then I'll consider

7          that issue resolved.

8                    ATTORNEY VISHNY:  Okay.

9                    ATTORNEY SCHNEIDER:  I just need, I'm

10         sorry, I know, just two minutes to talk to Mr. Maier

11         if that's okay.

12                   (Court in recess.)

13                   THE COURT:  All right.  We are back on the

14         record.

15            And we had, to recap, Mr. Phong Lee had

16         previously plead the fifth after which point in time

17         I did excuse the jury.  It was ultimately -- after I

18         -- although I did have an opportunity to briefly

19         discuss with him the potential implications and

20         questions associated with the same, he indicated it

21         was -- he still had some concerns.

22            Fortunately, Mr. Ackel was able to be contacted.

23         Mr. Ackel has subsequently been appointed as counsel

24         for Mr. Lee.  Mr. Ackel, have you had an opportunity

25         to speak with Mr. Lee about this case?

157

1               ATTORNEY ACKEL:  I have, Your Honor.

2               THE COURT:  What is your client's position

3        at this point in time?

4               ATTORNEY ACKEL:  I'm going to be advising

5        my client that he should continue to plead the fifth

6        amendment.

7               THE COURT:  Okay.  Attorney Schneider, with

8        that understanding, how --

9               ATTORNEY SCHNEIDER:  Judge, and this is one

10       we're not going to agree on, but I think at this

11       point we would request the ability to take a --

12       continue trial but at this point stop the direct

13       examination of Phong Lee and continue it on Tuesday.

14       Mr. -- why I say Tuesday, Mr. Ackel is out of town

15       and is back very late Monday morning but he could be

16       present.  It would just allow us to assess some

17       things.  I think Attorney Vishny wants to just go

18       today, go right now, so my request though would be to

19       stop the testimony at this point and bring him back

20       in on Tuesday morning.

21              THE COURT:  I guess the question -- the

22       question is two-fold, I'll start with Attorney

23       Vishny, how do we continue to proceed if he is

24       asserting his right to the fifth amendment?

25              ATTORNEY VISHNY:  Well the defense position

158

1    is this, number one, that we should proceed.  He's

2    had an opportunity to consult with counsel, counsel

3    has given Mr. Lee his advice, and the next step is,

4    after advising him that, you know, whether he (a)

5    still takes the fifth, then the second issue becomes,

6    in my opinion, and I think, I don't want to read the

7    State's mind, but I'm guessing they want to assess

8    whether or not they want to offer Mr. Lee immunity.

9    Although I appreciate and understand they want to do

10   it, I'm opposed to it.  I think that all people have

11   to prepare for contingencies in trial.  There was a

12   definite lack of cooperation by this witness

13   initially talking to the police, and I think the

14   State should make its decision forthwith and we

15   should continue with the testimony.  I am not

16   comfortable with the direct hanging out there where

17   it stood with some potential impeachment by the State

18   with a witness who does not appear demeanor-wise to

19   be very truthful with what the inferences might be

20   that the jury will think.  So I think that the State

21   needs to make its decision.  If they do not offer

22   immunity, I believe that the court has contempt

23   powers that are available to the court, and

24   ultimately, if Mr. Phong Lee decides to not testify,

25   notwithstanding a finding of contempt, the defense

```
 1    has to make a decision as to whether or not it wants

 2    to seek a mistrial in this case.  We don't need the

 3    weekend to think about it, you know, even though it's

 4    as big of a decision as the State's decision about

 5    immunity, we're prepared to go ahead and we want to

 6    move this trial promptly.  So that's the defense

 7    position.

 8              THE COURT:  How much time do you anticipate

 9    you would need, Attorney Schneider?  I understand you

10    would like several days.  My concern is then we have

11    multiple witnesses going out of order and having to

12    come back and revisit that.  What I'd --

13              ATTORNEY SCHNEIDER:  And I -- go ahead.

14    Sorry.

15              THE COURT:  What my inclination would be is

16    at a minimum at this point in time would be able to

17    -- would be to summarily find Mr. Lee in contempt.

18    That would be my inclination.  And quite frankly, Mr.

19    Ackel, if you would like to inform him of what my

20    conclusions would be, that's fine, and then the next

21    -- the next step is, you know, what would be

22    subsequent remedies as a byproduct of that.  But

23    that's my initial reaction.  You know, I certainly,

24    and you can advise him of this, Mr. Ackel, Mr. Lee

25    knew what his position was and where he would be well
```

160

1    in advance of this, he knew what circumstances were

2    under his control, he elected to come in and testify.

3    He began his testimony and -- and I don't know the

4    circumstances which led him to plead the fifth, but

5    that certainly causes -- and it is during the trial,

6    it causes a disruption, it causes a hindrance to the

7    prosecution's ability to prosecute as well as the

8    defense's ability to engage in effective defense and

9    so I do find that that is grounds for contempt.  I

10   would find him in said contempt.  If you want to talk

11   to him beforehand, advise him of what my decision

12   would be, and then subsequent to that I would have to

13   make a decision on its overall impact on this trial.

14           ATTORNEY ACKEL:  Your Honor, quick

15   question, would that finding of contempt be made

16   notwithstanding the State's offer of immunity or only

17   if the State is refusing to offer immunity.

18           THE COURT:  Well, I don't know what the

19   State wants to do, you know, and they may need more

20   time to consider that.  What I'd be inclined to do is

21   that finding of contempt goes into effect

22   immediately, and he can change his mind -- he -- if

23   he wants to change his mind on his own or if there is

24   an offer of immunity, that's his decision.

25           ATTORNEY ACKEL:  Okay.

1                    THE COURT:  Attorney Schneider, any

2        additional input?

3                    ATTORNEY SCHNEIDER:  No.  No.  I just think

4        there is other remedies for the court short of

5        mistrial if that's the route this even gets to.

6                    ATTORNEY VISHNY:  Let's see if we go

7        there.

8                    THE COURT:  And one of the other available

9        options is, you know, to simply order that that

10       testimony be stricken from the record.  I'm aware of

11       that as a possible avenue.  The long and the short of

12       it, I don't want to delay this.  This trial is in all

13       likelihood going to go beyond what we've already

14       anticipated, and I don't want to delay it any

15       further.

16           So, Mr. Ackel, if you could let -- please go

17       talk to your client, and then, Attorney Schneider, if

18       you want to consider the -- what I assume would be

19       use immunity issue, you certainly may.  I don't know

20       if you'll have enough time, but at a minimum we'll

21       have to wait until Mr. Ackel comes back.

22                    ATTORNEY SCHNEIDER:  Yeah.

23                    (Court in recess.)

24                    THE COURT:  All right.  We are back on the

25       record.  I have -- there's been a discussion as it

162

1    relates to the testimony of Mr. Phong Lee.  Mr. Phong

2    Lee had indicated his desire to offer some -- had

3    indicated a refusal to testify.  He had asserted a

4    blanket fifth amendment assertion.  Initially his

5    response was he was concerned to incriminate himself

6    and/or others, subsequently modified his answer upon

7    further questioning.  Subsequent to that time counsel

8    was appointed.  The court has indicated to counsel,

9    who I ascertain has relayed that message to Mr. Lee,

10    that there is the potential for contempt based upon

11    his conduct.  My understanding in reading 972.08 is

12    that there would need to be a request to compel the

13    testimony.

14        Attorney Schneider, are you making said request?

15    And I can show you --

16        ATTORNEY SCHNEIDER:  Yes, I am, Judge.  I'm

17    sorry.  I was talking to Attorney Maier.  Can you

18    repeat your question?

19        THE COURT:  Sure.  My reading of 972(1)(a)

20    indicates that.

21        ATTORNEY SCHNEIDER:  At this point, maybe

22    I'll get to the short of it.  At this point I think

23    I'm going to ask for a further offer of proof to

24    compel him to explain why he thinks this question

25    would self -- would be one in which he has the right

163

1    to invoke.  I think there has to be a real and
2    appreciable fear identified through an offer of
3    proof, otherwise you could have anyone do this and
4    circumvent the entire process.
5            THE COURT:  I would tend to concur, and so
6    what I would indicate is that I'm -- I'm construing
7    that you are asking me to order the testimony to be
8    compelled.
9            ATTORNEY SCHNEIDER:  I am.  And at this
10    point I would also say that if it's -- I might
11    perjure myself, there is no fifth amendment right
12    against that.
13            THE COURT:  Understood.  And, Mr. Ackel,
14    I'm confident that you have spoken to Mr. Lee about
15    that.
16            ATTORNEY ACKEL:  Yes, Your Honor.  And I
17    would just like to object to any -- and I did
18    indicate this to the court beforehand, I don't
19    believe that 972.08 leaves open the door for asking
20    about an offer of proof.
21            THE COURT:  Well, Mr. Ackel, I'm doing it.
22    I'm ordering you to give me an offer of proof as to
23    what would be said because that will have an effect
24    on whether or not I determine that there is the
25    potential for contempt, because if there is an

164

1         appreciable fear and I order him to answer, even
2         without an offer of immunity, then there is no reason
3         for me to find him in contempt.  If it is simply for
4         purposes of wanting to avoid telling the story which
5         does not implicate him, that's a different story.
6         And so I'm really doing it as a means to, I guess,
7         assist your client.  And so even though there may not
8         be authority, you can appeal me if I'm wrong, I'm
9         ordering to you give me an offer of proof as to what
10        you anticipate would be Mr. Lee's basis for refusing
11        to testify.
12             ATTORNEY ACKEL:  Well, Your Honor, from my
13        understanding, once defense -- I was only appointed
14        on this -- well I guess now a full hour ago, the
15        situation here -- first of all, I would like to note
16        that if the court wishes to compel testimony of my
17        client and the State has made the motion, my client
18        will acquiesce to that demand.  So I don't anticipate
19        any contempt proceedings --
20             THE COURT:  Okay.
21             ATTORNEY ACKEL:  -- going on today, and I
22        do believe that 972.08 attaches in that situation.
23        The State has already made that motion, so actually
24        we can move on from there.  I don't think the offer
25        of proof is necessary.  However, if the court does

165

1          want an offer of proof, the situation is this.

2                    THE COURT:  Let me ask this before I -- is

3          your understanding that, Attorney Schneider, and, Mr.

4          Ackel, I'll ask, is if I'm compelling testimony does

5          that automatically trigger an immunity?

6                    ATTORNEY SCHNEIDER:  I still have to make

7          the motion.

8                    THE COURT:  I thought you did.  To

9          compel.

10                   ATTORNEY SCHNEIDER:  One second.  No.  I'm

11         making a motion right now that you identify if he has

12         a real and appreciable fear, because I think if he

13         doesn't, I shouldn't be forced to give him

14         immunity.

15                   THE COURT:  I guess the question is can I

16         compel the testimony without there being an offer of

17         immunity or do I create an immunity simply by

18         compelling it.

19                   ATTORNEY VISHNY:  I don't want to answer

20         for Miss Schneider, but I just saw 972.08 does not

21         permit a judge to give immunity.

22                   THE COURT:  I don't see that in my reading

23         of -- I've got -- I don't have that.

24                   ATTORNEY VISHNY:  You don't have annotated,

25         I'm looking online, but it's not really my issue, I

166

1          don't even know if I should be speaking.

2                    ATTORNEY ACKEL:  Your Honor, from my review

3          of it, and I was looking at the same materials I

4          believe the court is looking at now, the -- the judge

5          is not allowed to compel testimony without an order

6          -- a -- without a request from the District

7          Attorney.

8                    THE COURT:  And we read that the same so

9          far.

10                   ATTORNEY ACKEL:  However, my reading is as

11         soon as that request is made by the District Attorney

12         and the judge then compels testimony, then immunity

13         automatically attaches, and I think that's a plain

14         reading of the statute and goes with all of the notes

15         -- the noted cases underneath the statute.  And I

16         think asking for an offer of proof is almost exactly

17         the same thing.

18                   THE COURT:  I do -- I do see no person who

19         testifies or produces evidence in obedience to the

20         command of the court in that case may be liable to

21         any forfeiture or penalty on behalf of the -- or on

22         account of testifying, so it does appear that it

23         almost creates an automatic immunity.  Now, if Mr.

24         Lee would again refuse to testify, that -- that --

25         then we create the contempt issue.

167

1                    ATTORNEY ACKEL:  And he does plan to if he
2          is ordered to testify.
3                    ATTORNEY SCHNEIDER:  One second.  At this
4          point I'm going to ask that you compel the testimony.
5                    THE COURT:  Okay.  And so under 972.08 I am
6          going -- Mr. Lee, I am going to order you to answer
7          any questions that are asked of you by both District
8          Attorney Schneider and Attorney Vishny.  I don't know
9          if Attorney Weitz is asking --
10                   ATTORNEY VISHNY:  No.  It's my witness.
11                   THE COURT:  Attorney Vishny.  You do
12         understand that, sir?
13                   THE WITNESS:  Yes.
14                   THE COURT:  You understand I will not
15         accept a further invocation of your fifth amendment
16         rights, this is -- I am ordering you to testify based
17         upon the motion of the State, and that is my
18         understanding as to what the motion is, correct?
19                   THE WITNESS:  Yes.
20                   ATTORNEY SCHNEIDER:  Yes, Judge.
21                   THE COURT:  You do understand, sir,
22         furthermore that that having been sworn in that you
23         will be required to answer truthfully.
24                   THE WITNESS:  Yes.
25                   THE COURT:  And correct me if I'm wrong,

168

1          Attorney Schneider, is that notwithstanding what

2          becomes tantamount to immunity, usage immunity, is

3          that if he perjures himself, that is not an

4          exception.

5                    ATTORNEY SCHNEIDER:  Absolutely.

6                    THE COURT:  Okay.  I want you to understand

7          that.  You do understand that, sir?

8                    THE WITNESS:  Yes.

9                    THE COURT:  Do you have any questions or do

10         you need any additional time to discuss this matter

11         with Attorney Ackel?

12                   THE WITNESS:  May I talk to my lawyer?

13                   THE COURT:  You may talk to your lawyer for

14         a moment.

15                   ATTORNEY ACKEL:  I can walk up there.

16                   ATTORNEY VISHNY:  While he's talking to his

17         lawyer, can I ask a question because I'm a little bit

18         confused now.  The witness's testimony has been

19         compelled, therefore he has been given immunity and

20         he can be asked that by me or the State?  Because my

21         reading of the statute is that if it's going to be

22         compelled, it means that he's received immunity, he

23         can't be prosecuted.  I mean, virtually it's happened

24         so that I should be able to say, now you didn't want

25         to testify but now you have immunity and it's okay to

169

1    testify.  I don't want to overly draw attention, you

2    know, attention to the fifth, I'm not going to use

3    the words the fifth, but I think, you know, or the

4    jury can be instructed that he now has immunity and

5    he's been compelled to testify.  I don't feel like I

6    need to ask him.

7            ATTORNEY SCHNEIDER:  I think it's almost as

8    if you can make an offer on appeal in some hearing

9    case, you can reference it, so I think you can.

10           ATTORNEY VISHNY:  All right.  I just don't

11   want to get in a bigger can of worms than we need

12   to.

13           ATTORNEY SCHNEIDER:  Now, as a practical

14   matter, okay, it's 4:00.  Mr. Ackel is not available

15   on Monday, he is not in the state, so I just want to

16   make everybody know that.

17           THE COURT:  He's now at the point where

18   he's -- he's been ordered to compel and he

19   understands.

20           ATTORNEY ACKEL:  And, Your Honor, after

21   discussing this ahead of time with my client, I mean

22   honestly now that immunity does attach I feel like my

23   work here is done, the only situation now is possible

24   perjury, but then this is a situation where I don't

25   have all the materials he's going to be questioned

170

1        about because it was not practicable to give it to

2        me.

3                THE COURT:  Here's what I want you to do,

4        Mr. Ackel.  You've been ordered on the case.  I would

5        like you to request for substitution of counsel.  I

6        want that filed today with the public defender's

7        office so that they can assign new counsel

8        immediately.

9                ATTORNEY ACKEL:  I'll call my secretary so

10       she'll have it ready.

11               THE COURT:  I don't say that because I'm

12       expecting your services, I don't want to create

13       another delay if we have an issue.  Is that --

14               ATTORNEY SCHNEIDER:  Yup.  And I think we

15       allow them to talk, I think, you know, now that

16       that's happened so he can go through the scenario

17       this is what you now have to do so in the middle of

18       questioning he doesn't ask for that clarification.

19               THE COURT:  Right.

20               ATTORNEY VISHNY:  Are we going to be able

21       to finish this today?

22               ATTORNEY SCHNEIDER:  We're not done now.

23               ATTORNEY VISHNY:  He's got some -- he's got

24       to impeach him, I get that.  It's almost done.  I

25       thought we were right at the point where he was going

1    to impeach him on a crucial matter.

2            THE COURT:  Right.  So then the next

3    question is, Mr. Lee has invoked a fifth amendment,

4    is it best just to ignore that issue at this point?

5    I know it says that when practical that invocation

6    should be made outside --

7            ATTORNEY VISHNY:  I'm not going to say

8    anything about the fifth.  I'm going to say he has

9    immunity.  That's all.

10           THE COURT:  I understand that.

11           ATTORNEY VISHNY:  That's already been said.

12   I think the record should remain as it is.  It was a

13   situation absolutely nobody anticipated.

14           ATTORNEY SCHNEIDER:  No.

15           ATTORNEY VISHNY:  And the record should

16   remain as it is but I will not use those words again

17   and I don't think the State will either.

18           ATTORNEY SCHNEIDER:  No.

19           THE COURT:  Okay.  Do -- Mr. Lee, do you

20   need any additional time to talk to Mr. Ackel before

21   we bring in the jury?

22           THE WITNESS:  No.  I should be fine.

23           THE COURT:  You do understand, sir, that

24   now the expectation and the order is that you will

25   answer all questions that are asked between now and

172

1          the end of your testimony.

2                    THE WITNESS:  Yes.

3                    THE COURT:  Mr. Ackel, you've had a chance

4          to adequately convey that with Mr. Lee?

5                    ATTORNEY ACKEL:  I have, Your Honor.  I'm

6          just asking if I'm excused now to go prepare that

7          substitution.

8                    THE COURT:  Perfect.  Mr. Lee, I'm going to

9          excuse your counsel at this time.  You're okay?

10                   THE WITNESS:  Yes.

11                   THE COURT:  Okay.  Any additional questions

12         before we resume?

13                   THE WITNESS:  No.

14                   THE COURT:  Mr. Ackel, do you agree with

15         that approach on the substitution?

16                   ATTORNEY ACKEL:  Yes, Your Honor.

17         Obviously I would be more comfortable if I could be

18         here for the testimony, but I mean I explained to the

19         court ahead of time I have to be out of the city by

20         four.

21                   THE COURT:  I'm more concerned -- I don't

22         think that something will happen on Monday or

23         whatnot, but that's really what I'm more concerned

24         about is I don't know when something would come up if

25         you would be gone and Mr. Lee would get recalled or

173

1     something.  I don't know.

2                ATTORNEY ACKEL:  I'll hand in the

3     substitution.

4                THE COURT:  Okay.  Thank you.

5          Now we can bring in the jury.

6                (The jury was escorted into the courtroom.)

7                THE COURT:  Please be seated.  I apologize

8     for the delay.  I appreciate your indulgence, but now

9     you may understand why my wife gets frustrated when I

10    say I'll be home in ten minutes.

11         Mr. Maier, you may resume your questioning.

12               **CONTINUED EXAMINATION OF PHONG LEE**

13    **BY ATTORNEY MAIER**:

14    Q    All right.  Mr. Lee, where we left off, I had asked

15         you to review Pages 10 and 11 of Exhibit 113,

16         correct?

17    A    Yes.

18    Q    And you did that, right?

19    A    Yes.

20    Q    Your memory is better now about what was said then?

21    A    No, I still don't remember saying that.

22    Q    Okay.  So you don't recall talking about Chong coming

23         to your house with the detective that night?

24    A    No, Chong was not there at my house.

25    Q    I'm sorry.  To Joe's house?

174

```
 1   A   Joe's house?  No, I don't remember seeing him
 2       there.
 3   Q   Okay.  And you don't recall telling the police that
 4       after Chong came you guys went in the basement at
 5       Joe's house?
 6   A   I don't recall that.
 7   Q   Okay.  It was in the transcript.  I'm going to have
 8       you look about halfway down.  You can see there's a
 9       line that says Thao, and that's Sergeant Thao,
10       correct?
11   A   Yes.
12   Q   And you guys went in the basement.  Correct?
13   A   Yes.
14   Q   Your response is under Phong.  What is that?
15   A   Yeah.
16   Q   And then Sergeant Thao says, Chong told you what
17       happened, and you said what?
18   A   I don't remember what happened.
19   Q   Sergeant Thao said, just be honest, okay.  And you
20       said yeah; is that correct?
21   A   Yeah.
22   Q   Sergeant Thao said, I got that information already.
23       And you said yeah; is that correct?
24   A   Yeah.
25   Q   Sergeant Thao says, what did he say to you, your
```

175

1       answer, he just said he popped the guy, correct?

2                    ATTORNEY MAIER:  Your Honor, given that

3       it's words on a page, I would ask you to direct the

4       witness to answer the question.

5   A   I don't remember say that, but, yeah, I don't

6       remember saying that.

7   Q   Sergeant Thao replied to that, okay.  Correct?

8   A   Don't remember that.

9   Q   And you indicated in response to that, so that's what

10      it is, correct?

11  A   Don't remember it.

12  Q   Turning to the next page, Sergeant Thao says, was --

13      was he like remorseful, was he sorry or he just say I

14      fucked up, I messed up.  What's your response here?

15  A   I was kind of drunk.

16  Q   Sergeant Thao says, okay.  And you say?

17  A   Don't remember saying that either.

18  Q   So you don't recall saying, I just say yeah, all he

19      said he popped the guy?

20  A   Yeah.

21  Q   Sergeant Thao replying he popped the guy and you

22      saying yeah, correct?

23  A   Yeah.

24  Q   Sergeant Thao then says, okay.  What did he do with

25      the gun.  Do you recall what your answer is?

176

```
 1   A    No.
 2   Q    You replied, I have no idea.  Sergeant Thao says, did
 3        he say -- did you ask.  You replied, I did not ask
 4        anything, correct?
 5   A    I don't remember.
 6   Q    Sergeant Thao asked, how did he, meaning Chong, get
 7        to the house.  You replied, I have no idea, correct?
 8   A    Yeah.
 9   Q    Sergeant Thao says, but -- okay, but was anybody else
10        with him.  You replied no.  Correct?
11   A    No.  Don't remember saying that.
12   Q    Sergeant Thao said, just him.  You replied, yup, just
13        him, correct?
14   A    Don't remember saying that.
15   Q    Sergeant Thao asked you, so how long were you guys in
16        Joe's house.  You replied, probably about for an
17        hour?
18   A    Yes.
19   Q    Correct?
20   A    Yes.
21   Q    And that is correct?
22   A    Yes, that is correct.
23   Q    And then you indicated in response to a question from
24        Sergeant Thao that you got a ride from Letty?
25   A    Yes.
```

177

1   Q    That's correct, right?

2   A    Yes, that's correct.

3   Q    All right.  Mr. Lee, I want to go back a little bit

4        and I want to talk about the first time that you

5        talked to the officers.  You know that that interview

6        was also recorded, correct?

7   A    Yes.

8   Q    One of your concerns when you were talking to the

9        officers on this floor of this building is that you

10       didn't want to be seen as a snitch; is that

11       correct?

12  A    Yes, that's correct.

13  Q    You recall telling them that, right?

14  A    Yes, somewhat, yeah.

15  Q    What's a snitch?

16  A    You rat.

17  Q    Okay.  What does that mean though?

18  A    I don't know how to say it because I word -- just

19       don't tell people pretty much.

20  Q    Like you don't want to -- I don't want to use like a

21       little kid term, but you don't want to be a

22       tattletale, right?

23  A    Yeah, pretty much.

24  Q    You got a friend, you don't want to say something

25       that hurts them, even if it's the truth?

178

```
 1   A    Yes.
 2   Q    And if it's somebody who's close to you like family,
 3        you really don't want to do something that's going to
 4        hurt them.
 5   A    No.
 6   Q    Even if that means that you don't tell the truth?
 7   A    Yeah.
 8   Q    And in fact at first when you talked with Sergeant
 9        Tauber and Sergeant Schira in the courthouse here,
10        you first told them that you just walked home and not
11        to Joe Thor's house, right?
12   A    Yeah.
13   Q    And only after being confronted with the fact that
14        they had seen video that showed you going other
15        directions did you actually say that you went to Joe
16        Thor's house?
17   A    Yeah.
18   Q    So when you were confronted with the truth, that is,
19        what really happened, what was really said, then you
20        would tell the truth, but until then you didn't want
21        to snitch, you didn't want to hurt your buddy
22        Chong?
23   A    No, it was not like that.
24             ATTORNEY VISHNY:  Objection.  He was being
25        interrogated about Paul Lee at that point, not about
```

179

1     Chong Lee.

2                    ATTORNEY MAIER:  I'll withdraw that

3     question.

4                    THE COURT:  You withdraw?

5                    ATTORNEY MAIER:  Actually, I guess what I

6     would ask to do is rephrase.

7                    THE COURT:  The question as phrased will be

8     stricken from the record.  Please rephrase it.

9                    ATTORNEY MAIER:  Thank you.

10    Q    (BY ATTORNEY MAIER)  You don't want to tell the truth

11         until you have to to help out your buddy.

12    A    Yes.

13    Q    Whether that's Paul or Chong?

14    A    Just Paul.

15    Q    Another concern that you've got, and I want to talk

16         about this a little bit, is -- with the snitching is

17         - and I think you said it in the first interview - is

18         you have to protect yourself, right?

19    A    Yeah.

20    Q    What's the saying about snitches?

21    A    What's the what?

22    Q    What's the saying about snitches?

23    A    What do you mean by that?

24    Q    Well, snitches get stitches.  Have you ever heard

25         that?

1   A   Yeah.

2           ATTORNEY VISHNY:  Okay.  Judge, I do think

3       that leading questions are permitted to impeach the

4       witness with this prior statement but not through the

5       whole questioning by the district attorney.

6           THE COURT:  I'll order that the question be

7       stricken, please, and certainly you may impeach and

8       lead, that's fine.  If they're more general

9       questions, I would ask that they be phrased as open

10      ended.

11  Q   (BY ATTORNEY MAIER)  You heard that phrase before?

12  A   Yes.

13  Q   What does that mean?

14  A   It means you get -- get what you get.

15  Q   What do you mean by "get what you get"?  Who gets

16      what they get?

17  A   If you snitch, you die.

18  Q   Okay.  So what that means then -- that's not

19      something you just learned between December 13th --

20      December of 2013 and now, right?

21  A   No.

22  Q   So December of 2013 when you're talking to the two

23      cops in the interview room in the courthouse, that's

24      something that you're thinking, that's a filter or a

25      lens you're looking at the world through, right?

181

1    A    Yes.

2    Q    So as they're asking you to tell them the truth about

3         what happened at Luna that night, you're thinking, if

4         I tell the truth, something bad might happen to me

5         from the person who really did this.

6    A    Yes.

7    Q    Even if I know who really did it or I can help the

8         police in some way get the person?

9              ATTORNEY VISHNY:  Okay.  Again, I'm sorry,

10        but it's leading.  We have to hear open-ended

11        questions.

12             ATTORNEY MAIER:  My response is that he's

13        demonstrated today he's about as hostile to the State

14        as he can be.

15             ATTORNEY VISHNY:  I agree he's hostile to

16        the State, but that's not the statute, hostile

17        witnesses in a criminal case.

18             THE COURT:  I'll -- I'll give some latitude

19        on this question, but I -- I'd ask that you watch it,

20        Mr. Maier, and then in the future if there is issues,

21        certainly don't hesitate to make that objection.

22             ATTORNEY MAIER:  Just a couple more

23        questions, and I think these will be easy.

24   Q    (BY ATTORNEY MAIER)  When -- when the officers talked

25        to you in the courthouse, they walked up to you in

182

1          the hallway, right?

2     A    Yes.

3     Q    And how did you get to the room where they talked to

4          you?

5     A    They came and grabbed me.

6     Q    They grabbed you?

7     A    Yeah.

8     Q    By the -- how did they grab you?

9     A    No, they just came up to me and told me I need to go

10         and talk to the investigator.

11    Q    Okay.  And then you went in one of the rooms here?

12    A    Yes.

13    Q    When you talked with the two investigators, Sergeant

14         Schira, I'm sorry, Sergeant Tauber and Sergeant Thao

15         at your house, how did they arrange to come to your

16         house at the time they were there?

17    A    I don't know.  They just showed up.

18    Q    Showed up where?

19    A    My house.

20    Q    Nowhere else first?

21    A    No.

22    Q    So it's not true that they came to where you worked

23         and asked to talk to you first?

24    A    That's what happens after they came to my house.

25    Q    So they came to your work and talked to you and then

183

1          talked to you at your house?

2     A    Yeah.

3     Q    And you made a -- you asked them to come back at a

4          time that was more convenient when you weren't at

5          work, right?

6     A    Yes.

7     Q    And when they came and talked to you, conversational

8          tone?

9     A    Not Sergeant Thao, but the other one, yeah, he

10         talking pretty nicely.

11    Q    So Sergeant Tauber standing on your porch talking?

12    A    Yes.

13    Q    Like normal people talk?

14    A    Yes.

15    Q    And Sergeant Thao is doing what?

16    A    More -- more towards of harassing me.

17    Q    Like yelling?

18    A    No, just like in a harassing tone.

19    Q    Was that before or after you didn't want to tell them

20         the truth about things that he was harassing you?

21    A    Repeat that again?

22    Q    Was it before or after you didn't want to be truthful

23         with them that he was using a harassing tone?

24    A    It was after.

25    Q    So first you don't want to be truthful, Sergeant Thao

184

1        gets a little bit more what you say is harassing and

2        then you're truthful?

3              ATTORNEY VISHNY:  I'm objecting again, I

4        think it's leading.

5              THE COURT:  Go ahead.  I'll allow it.  Go

6        ahead.

7   Q    (BY ATTORNEY MAIER)  Is that correct?

8   A    Yes.

9   Q    After this all happened, the shooting at Luna, you

10       didn't leave town, right?

11  A    No.

12  Q    Where were you working at the time the shooting

13       happened?

14  A    I was production manager at McDonald's.

15  Q    Is that the job you've continued to have since

16       then?

17  A    Yes, part-time, yes.

18  Q    At the same location?

19  A    Yes.

20             ATTORNEY MAIER:  Your Honor, at this point

21       I have no further questions of the witness.  Thank

22       you.

23             THE COURT:  Attorney Vishny.

24             ATTORNEY VISHNY:  All right.

25                   **EXAMINATION OF PHONG LEE**

185

1    **BY ATTORNEY VISHNY:**

2    Q    Mr. Lee, you were at Luna bar early in the morning on

3         December 8th, like, you know, one, two in the

4         morning, right?

5    A    Yes.

6    Q    And a shot rang out, right?

7    A    Yes.

8    Q    And you say that you had already started leaving and

9         you were at the door at the time that shot happened,

10        right?

11   A    Yes.

12   Q    Okay.  And that's your memory.

13            Now, I'm going to ask you something.  I'm

14        showing you what was previously marked as Exhibit No.

15        104.  This is your vest, right?

16   A    Yes.

17   Q    You were wearing that at Luna.

18   A    Yes.

19   Q    You ran out the door wearing this white vest and a

20        plaid shirt, right?

21   A    Yes.

22   Q    And a hat.

23   A    Yes.

24   Q    And the kind of hat you had on, it wasn't a baseball

25        cap.

186

1    A    It was a baseball cap.

2    Q    It was a baseball cap with a very short brim?

3    A    Yes.

4    Q    When you ran out after the shot, you turned the

5         corner and you kept running down the street, right?

6    A    No.  Well, I turned the corner of Luna and ran all

7         the way down.

8    Q    Division Street?

9    A    Yes.

10   Q    And eventually you ran to a garbage can where you

11        took this vest off and threw it away?

12   A    Yes.

13   Q    And the reason you threw this vest away was because

14        you didn't want to be caught?

15   A    Yes.

16            ATTORNEY VISHNY:  Judge, at this time I

17        would move Exhibit No. 104 into evidence.

18            THE COURT:  Any objection?

19            ATTORNEY MAIER:  No.

20            THE COURT:  All right.  104 will be

21        received.

22   Q    (BY ATTORNEY VISHNY)  And when you didn't want to be

23        caught, Joe Thor to your knowledge didn't want to be

24        caught either.  Right?

25   A    Yes, yes.

187

```
 1    Q    And he had on a hat that he threw in a different
 2         garbage area.
 3    A    I don't recall that, but yes.
 4    Q    And Paul Lee was running with you too, wasn't he?
 5    A    Yes, he was.
 6    Q    He didn't throw away his coat?
 7    A    No.
 8    Q    But he was with you guys, right?
 9    A    Yes.
10    Q    Joe Thor was running the fastest?
11    A    Yes.
12    Q    Paul Lee was medium fast?
13    A    Yes.
14    Q    And you were in the back of the three of you guys?
15    A    Yes.
16    Q    Chong Lee didn't run with you, did he?
17    A    No, he did not.
18              ATTORNEY VISHNY:  Can we turn down the
19         lights please?
20              THE COURT:  Certainly.
21    Q    (BY ATTORNEY VISHNY)  Now, I'm going to show you what
22         was previously noted to be exhibit number something
23         or other.  31.  Can you see it?  If you can't see it,
24         you can come here.
25    A    I can see it pretty good.
```

188

1    Q    All right.  I'm just going to tell you that we are

2         starting this at 13:50:24  All right?  And we're

3         going to play this.  And I'm going to have you stop

4         -- okay?  All right.  We're going to start playing it

5         right now.

6              (Video played.)

7              ATTORNEY VISHNY:  Stop.  We're at 13:50:29.

8    Q    (BY ATTORNEY VISHNY)  That's Joe Thor, right?

9    A    I'm not sure.

10   Q    Do you know who this person is?

11   A    No.

12   Q    Does that look like Dalinda Guzman?

13   A    No.

14   Q    I'm going to tell you what everybody else in the

15        court has said, which is that this doesn't show true

16        colors so something can be black and it can show up

17        as white, including hair can show up as blonde when

18        it's black.

19   A    Okay.

20   Q    Or dark.  And a red hat can look like a white hat.

21   A    Yeah.

22   Q    Now, is this Paul Lee?

23   A    Yes.

24   Q    Paul Lee's got something in his hand right here,

25        right?  Can you see that?

189

1   A   No.  Kind of I do, but yeah.

2   Q   Well, let's talk about when the police came to

3       interview you.  The police came to interview you, I'm

4       talking about the first time now at the courthouse,

5       right?

6   A   Yes.

7   Q   Do you remember the police telling you -- or let me

8       ask this.  When the police interviewed at the

9       courthouse, was it your feeling that they were trying

10      to get you to say that you were with the shooter?

11  A   Yes.

12  Q   And did they tell you at all or did you believe they

13      told you who they thought the shooter was?

14  A   They told me that, yeah.

15  Q   Who were they saying?

16  A   They were saying maybe Paul.

17  Q   All right.  And do you remember at all or did they

18      say anything about Paul having anything in his

19      hands?

20  A   No, I don't recall that.

21  Q   Okay.  Now, I'm going to go ahead, we'll advance this

22      very quickly frame by frame.

23              ATTORNEY VISHNY:  And rather than go

24      through each frame, Judge, if we change from

25      13:50:29, I'll just state where we're at then.

190

```
1                    THE COURT:  That's fine.

2    Q    (BY ATTORNEY VISHNY)  Let's just go slow frame by

3         frame.  All right.  Stop.  This person right here,

4         that's you, right?

5    A    Yes.

6    Q    Okay.  And we're still at 13:50:30.  And you have a

7         hat on, right?

8    A    Yes.

9    Q    What color hat is the real hat that you were wearing

10        that day?

11   A    I don't remember.

12   Q    Okay.  But you have on, even though it doesn't show

13        plaid sleeves and you can't quite see that's a vest,

14        that's the case, right?

15   A    Yes.

16   Q    And your hands are on Paul, right?

17   A    Yes.

18   Q    Paul's hand looks like it's going to his pocket,

19        right?

20   A    Yes.

21   Q    And the person you're not sure who it is is the first

22        person out the door, right?

23   A    Yes.

24   Q    Okay.

25                    ATTORNEY VISHNY:  We're done with No. 31.
```

191

1       We can bring the lights back on.

2  Q  (BY ATTORNEY VISHNY)  Now, it was pretty clear that

3       the police were trying to ask you about Paul Lee the

4       first time they talked to you, right?

5  A  Yes.

6  Q  And you told them that Paul Lee and Joe and yourself

7       weren't involved in this at all.

8  A  No.

9  Q  You didn't tell them that?

10  A  I did tell them that I was not involved in this.

11  Q  Okay.  And you told them Joe and Paul weren't

12       involved, right?

13  A  Um-hum, yes.

14  Q  You remember getting mad and yelling at the police

15       while you were talking to them then?

16  A  Yes.

17  Q  Now -- and you didn't want to tell the truth in order

18       to just help Paul, right?

19  A  Yes.

20  Q  That's what you said here too --

21  A  Yes.

22  Q  -- right?  So you're pretty good friends with Paul

23       Lee.

24  A  Yes, I am.

25  Q  Better friends than you are with Chong Lee, right?

192

```
 1    A    Yes.
 2    Q    You said you and Chong Lee and Paul Lee are cousins.
 3         They're not -- you're not first cousins, right?
 4    A    No, we're not.
 5    Q    You have the same last name, that's why you're
 6         cousins?
 7    A    Yes.
 8    Q    In other words, you're kind of a member of a large
 9         group in the Hmong community called a clan.
10    A    Yes.
11    Q    But you're not like first, second, third cousins?
12    A    No.
13    Q    Now, when you were done talking to the police the
14         first time, they took your phone away from you,
15         didn't they?
16    A    Yes, they did.
17    Q    And they had a search warrant for your phone,
18         right?
19    A    Yes, they did.
20    Q    And before they took your phone, even before that,
21         you had done a factory reset on your phone so data
22         couldn't be obtained from it, hadn't you?
23    A    I'm not sure.
24    Q    So your answer is maybe you could have done it,
25         right?
```

193

1    A    Yeah.

2    Q    And that -- the day they took your phone was now on

3         Monday afternoon or morning?

4    A    It was Monday afternoon.

5    Q    Okay.  So some 36 hours had gone by since the

6         shooting at Luna until the police got a hold of your

7         phone, right?

8    A    Yeah.

9    Q    But actually, when they got your phone, they didn't

10        completely get your phone because you had two phones,

11        didn't you?

12   A    No, I only had one phone.

13   Q    Well, the phone they got, was that 920-636-8362?

14   A    No, that's my mom's phone.

15   Q    Okay.  What about 920-659-1043?

16   A    That's my phone.

17   Q    That's the one that they got?

18   A    Yup.

19   Q    Okay.  And then so the other phone belongs to your

20        mother.

21   A    Yes.

22   Q    And you use it sometimes.

23   A    Yes.

24   Q    Now, when the police next talked to you, that was on

25        December 12th, right, they came to your job?

194

1   A   Yes.

2   Q   McDonalds?

3   A   Yes.

4   Q   So if the 8th was Sunday, 9 Monday, 10 Tuesday, 11

5       Wednesday, 12, now it's Thursday, right?

6   A   Yes.

7   Q   At this point in time they came to your job and you

8       didn't want to talk to them there?

9   A   No.

10  Q   You told them they should meet you at your house?

11  A   Yes.

12  Q   And then they came to your house later, right?

13  A   Yes.

14  Q   You remember the police -- you don't seem to remember

15      much about that interview, but the -- you know, do

16      you remember at all the police offering you a ride

17      home as soon as you got off work?

18  A   No.

19  Q   And do you remember telling the police, well, I'm

20      going to get a ride from somebody else, I'll meet up

21      at the house?

22  A   Yeah.

23  Q   And you had about an hour between the time you -- or

24      you had some time, I don't know if it was an hour,

25      but you had some time between the time you got off

195

1       work and the time the police arrived at your house,

2       right?

3   A   Right.

4   Q   And you knew when the police arrived at your house

5       that at this point Chong Lee was arrested, right?

6   A   I'm not sure.

7   Q   Now, that exhibit number, what was it, 1 -- 113,

8       where is that?

9           ATTORNEY SCHNEIDER:  Up by the clerk.

10  Q   (BY ATTORNEY VISHNY)  All right.  Now when they

11      came -- I'm going to show you what's previously been

12      marked as No. 113.  You don't remember the specifics

13      of what you and Sergeant Thao talked about, right?

14  A   No.

15  Q   You just kind of remember a general feeling that you

16      were being harassed by him; is that what you're

17      saying?

18  A   Yes.

19  Q   All right.  And do you remember Sergeant Thao saying

20      to you that you had to be honest?  This isn't written

21      on the paper.  Why don't you -- I'm going to go back

22      a page -- to Page 2.  Okay.  Okay.  Why don't you

23      read at the very bottom of Page 2 what the words are

24      that you don't recall that Sergeant Thao said to you.

25  A   On Page 2, bottom of the page right here?

1    Q    Yeah.  Just go ahead and read to the jury.

2    A    The whole thing?

3    Q    Yeah.  Unless you want me to read it for you.

4    A    But we now -- but we know that, you know, you were

5         there with, uh, after what happened, you guys went to

6         Joe's house and all that.  Okay.  So, obviously, you

7         know, we talk to Chong for -- for we talk to Paul.

8         We, we, we, we pretty much -- pretty much got the

9         information, that's where we come back here again.

10        It's a matter of just showing how corrupted he can

11        be.

12   Q    No, that's actually cooperative.

13   A    Cooperative you can be, how truthful you can be.  I'm

14        not here to jam you up.

15   Q    He says, I'm not here to jam you up, I would not.

16        Right?

17   A    Yes.

18   Q    And then you say, yes, right?  I'm just going to read

19        it for you.  And so then Sergeant Thao says, but the

20        thing is you have to be honest though.  And you say

21        yes.  Right?

22   A    Yeah.

23   Q    And Sergeant Thao says, okay, that's the only thing

24        that you're going to get yourself jammed is if you

25        lie.  Okay?  Now I could care less the last couple

197

1     times that they talk to you you kind of give them the

2     run around, that's, that's, we're not here about

3     that.  Okay?  And then you say yup?

4  A  Yup.

5  Q  All right.  And you're not remembering this, this is

6     just written on the paper here?

7  A  Yeah.  Just what's written on the paper here.

8  Q  And he says, Sergeant Thao says, we're just here,

9     this is, you know, pretty much like the final time.

10    Okay?  And you say yup.  All right?

11 A  Yup.

12 Q  Is that correct?

13 A  Yes.

14 Q  And then there's some conversation with him about

15    what happened, right?

16       And I'm going to skip it over and going to go in

17    my notes to save time.

18       Now, and I think Attorney Maier went over this

19    too, at this point you said that -- I'm going to look

20    at Page 8 about the middle of the page, right?  And

21    Sergeant Thao says, where the boom came from.  You

22    were right there.  Okay?  So that's what's written

23    here, right?

24 A  Yup.

25 Q  And you said, the people behind me, like I was going

198

```
 1        like this and all of the sudden I heard the boom, oh,
 2        shit, excuse my language everybody, and you say okay,
 3        right?
 4   A    Yup.
 5   Q    And then you said, so I just left, right?
 6   A    Yes.
 7   Q    And you said -- and Sergeant Thao says, so Paul was
 8        over there and the boom came from this way, and you
 9        say yes.
10   A    Yeah.
11   Q    Correct?
12   A    Yes.
13   Q    All right.  And you said it came from like behind
14        you.
15   A    Yes.  It came from behind me.
16   Q    All right.  And then Sergeant Thao says, after the
17        boom then you guys start running?
18   A    Yes.
19   Q    Correct?
20   A    Yes.
21   Q    And then you say, yeah, then he starts running and
22        that's -- that's what you say on this page?
23   A    Yeah.
24   Q    Sergeant Thao, you the slow.  And you say, I was the
25        last one, yeah.  That's the top of Page 9.
```

199

```
1   A   Yes.

2   Q   Right?

3   A   Yes.

4   Q   Okay.  And then as they continue to question you,

5       that's when the part that Mr. Maier read about Chong

6       showing up in the basement and saying he popped the

7       guy, that's what happened, right?

8   A   Yeah.

9   Q   Okay.  So at the end of that interview -- by the way,

10      you'd been drinking that night at Luna, right?

11  A   Yes.

12  Q   And you had quite a bit to drink?

13  A   More than just quite a bit.

14  Q   Were you drunk?

15  A   Yes.

16  Q   All right.  And after that, turning to Page 14,

17      Sergeant Tauber was just talking to you kind of wrap

18      up the conversation, and -- and then Sergeant Thao

19      says, or do you remember Sergeant Thao saying,

20      anybody else I need to talk to, and you saying no?

21  A   Yeah.  I remember saying that.

22  Q   Okay.  Sergeant Thao says, okay, do I need to go talk

23      to Tou Shoua?  Do you remember that?

24  A   Yes, I remember that.

25  Q   And you said no?
```

200

```
 1   A    Yes.

 2   Q    Right?

 3   A    Yes.

 4   Q    So you didn't want Sergeant Thao to go talk to Tou

 5        Shoua Lee, did you?

 6   A    No.

 7   Q    Now, the first time you talked to the police when you

 8        were in court you first started telling him you

 9        didn't know anything, right?  Right?

10   A    Yes.

11   Q    And what the police told you is that -- and they

12        weren't yelling at you, right?

13   A    No, they weren't.

14   Q    They had a nice tone of voice.

15   A    Yes.

16   Q    But even though they had a very nice tone of voice,

17        what they said to you was they didn't want you to be

18        caught up as party to a crime or a conspiracy, or it

19        doesn't look like you're part of it because they

20        didn't want you to go to prison for the rest of your

21        life.  Right?

22   A    Yeah, they did say that.

23   Q    That was pretty scary, wasn't it?

24   A    Kind of, yes.

25   Q    And they said to you that they had the guy with the
```

201

```
1         gun and they had -- you're in the picture, and that's

2         when you said I don't care, I'm going to tell you

3         they're not the ones who did it, right?

4    A    Repeat that?

5    Q    They said, where is Exhibit No. 114?

6              ATTORNEY SCHNEIDER:  They're all up there.

7              ATTORNEY VISHNY:  Okay.  Very good.

8              ATTORNEY SCHNEIDER:  114.

9              ATTORNEY VISHNY:  114 please.  Thank you.

10        Page 44, Line 29.

11   Q    (BY ATTORNEY VISHNY)  Do you remember Sergeant Schira

12        saying -- or did Sergeant Schira say you can't get

13        over the fact that we got a guy with a gun in his

14        hand and you're in the picture, and you say, I don't

15        care, I'm going to tell you they're not the ones who

16        did it, right?

17   A    Yes.

18   Q    And then Sergeant Schira saying, well you don't have

19        to convince us, buddy, you have to convince the DA's

20        office that's going to charge you and you've got to

21        convince the jury that's going to look at this stuff

22        and say of course he knows.  Just like Dan said, you

23        guys bolted from the scene before anybody else, you

24        hid your clothing, you lied to us when you first got

25        here about that you weren't down there and you were
```

202

```
 1        with some girl and nothing was going on, right?
 2    A   Yeah.
 3    Q   All right.  And then after you say yeah, the police
 4        sergeant says, well what do you think a jury is going
 5        to look at that, they're going to say guilty, guilty,
 6        guilty.  Okay.  You can shrug.  And then you say –
 7        excuse my language please – fuck it then.
 8    A   Yeah.
 9    Q   And then they say, yeah, but don't say fuck it, dude,
10        this is your life -- excuse my language again.  Maybe
11        I should just apologize in advance for all the F
12        bombs here.  Never say fuck about your life, right?
13    A   Yup.
14    Q   And then he tells you, why I'm telling you is you're
15        not a snitch, and then he starts talking about the
16        video; is that right?
17    A   Yes.
18    Q   Okay.  And then continuing to Page 46, starting at
19        Line 4, Sergeant Tauber says -- actually Line 7, or
20        Line 8, that's us because right now we're the guys
21        who have to go get the truth and present it to the
22        District Attorney's office, right?
23    A   Yes, that's what it says.
24    Q   It says that?
25    A   Yeah.
```

```
1    Q    And do you think -- and then the other detective
2         says, do you think the shooter cares, do you know
3         (sic) he cares that you're going to go to prison with
4         him.  And you said I don't know.  Do you remember
5         that?
6    A    Right.
7    Q    Okay.  And then he continues, page -- Line 19, you're
8         in separate prisons and you've got no life left and
9         you're sitting here the rest of your life.  Freedom
10        is gone.  Is that what you want?  Is that what you
11        want for your life?  He asked you that, right?
12   A    Yes, something like that, yes.
13   Q    And it kind of went on and continued in that vein,
14        right?
15   A    Yes.
16   Q    Now -- so they're telling you all this, and on that
17        day they're out after Paul, right, as far as you
18        know?
19   A    As far as I know, yes.
20   Q    And then three days later they come talk to you and
21        now they're out after Chong, right?
22   A    Yes.
23   Q    It was only three days, three days after the police
24        talked to you the first time, you hadn't forgotten
25        what they had said to you, had you?
```

204

1    A    No.

2    Q    You hadn't forgotten that they had basically told you

3         in your mind if you didn't tell them what they wanted

4         to hear, you could be going to prison the rest of

5         your life, right?

6    A    Yes.

7    Q    And when they came and they talked to you on December

8         12th, you were sure to tell them what they wanted to

9         hear, right?

10   A    Yes.

11   Q    And that was after you bolted out of Luna and put

12        your white vest in a garbage can, right?

13   A    Yes.

14   Q    And that was after you bolted with two other people

15        and went to somebody's house and had some time to

16        talk about what happened, right?

17   A    Yes.

18   Q    And that was after you erased your phone and did a

19        factory reset on it, correct?

20   A    No, I did not.

21                   ATTORNEY VISHNY:  No further questions.

22                   THE COURT:  Attorney Maier.

23                   **EXAMINATION OF PHONG LEE**

24   **BY ATTORNEY MAIER:**

25   Q    And in your group, you and Paul, Chong, Joe, some of

205

```
1          the others, that you guys all kind of hung out and
2          went out to City Limits and then came to Luna Lounge
3          that night?
4     A    Yeah.
5     Q    How many smoke?
6     A    All of us.
7     Q    Okay.  Smoke cigarettes?
8     A    Yes.
9     Q    All of you?
10    A    Yes.
11    Q    Paul smokes cigarettes?
12    A    Yes.
13    Q    Paul doesn't smoke an e-cig?
14    A    I'm not sure at that time.  I don't remember.
15    Q    Okay.  Possible he did?
16    A    I don't remember.
17    Q    But it's possible?
18    A    Yes.
19    Q    You just may not have noticed?
20    A    No.
21    Q    In the normal flow of guys doing guy things, right?
22    A    Yeah.
23    Q    You know what I'm talking about when I say an e-cig,
24         right?
25    A    Yeah.
```

```
 1   Q    About how -- about how big are those in your mind?
 2        If you just hold your hands up.
 3   A    It depends on what size you get.  It comes in all
 4        sizes.
 5   Q    Something -- I'm going to hold my hand up.  Something
 6        that's, you know, four, six inches long maybe?
 7   A    About as big as your palm, yeah.
 8   Q    Okay.  It would fit in a jacket pocket?
 9             ATTORNEY VISHNY:  Again, I'm going to ask
10        that the district attorney not lead.  This is direct
11        examination.
12   Q    (BY ATTORNEY MAIER)  Would it fit in a jacket
13        pocket?
14   A    Yes.
15   Q    Would it be the kind of thing that you -- do you know
16        about e-cigs, have you held one before?
17   A    Yes, I held one before.
18   Q    They've got a little bit of heft, right?
19   A    It depends on what kind of brand you get.
20   Q    But it's fair to say it would weigh more than a pen
21        let's say?
22   A    Yes.
23             ATTORNEY VISHNY:  Again, this is -- he's
24        crossing his witness.
25             THE COURT:  Can you try to keep the
```

207

```
1         questions open ended, Mr. Maier?

2    Q    (BY ATTORNEY MAIER)  How would a person carry an

3         e-cig in the wintertime?

4    A    Put it in their pockets.

5    Q    Like a jacket pocket?

6    A    Whatever works.

7    Q    How concerned would you be about putting an e-cig

8         let's say the size of the palm of my hand and with

9         some heft in your jacket pocket if you were going to

10        run?

11   A    I wouldn't put it there.

12             ATTORNEY VISHNY:  I'm going to object.

13        That calls for speculation.

14             ATTORNEY MAIER:  I'm asking him.

15             ATTORNEY VISHNY:  Then I have a question

16        about whether it's relevant what he would do with an

17        e-cigarette.  Object to relevancy.

18             THE COURT:  Sustained.

19   Q    (BY ATTORNEY MAIER)  At the time that you're on the

20        way out of the door when this pop goes off, do you

21        know where Tou Shoua Lee is?

22   A    No.

23   Q    Now, you indicated back during cross that you ditched

24        your jacket because you didn't get -- want to get

25        caught.  Is that correct what you said?
```

208

1   A   Yes.

2   Q   What had you done that was wrong that night besides

3       run from a bar when a fight was about to kick off?

4   A   I was just there.  That's all.

5   Q   Is it safe to say, or better to say, fairer to say,

6       that you just didn't want to be involved with what

7       was going to happen in the aftermath of that?

8   A   Yeah.  I just didn't want to be involved.

9   Q   So not so much not get caught as not want to have to

10      talk about it?

11  A   Yes.

12  Q   Or involve other people in getting talked to about

13      it?

14  A   Yes.

15  Q   Do you know somebody named Johnny Thao?

16  A   No.

17  Q   Do you know someone named Kong -- Kong Vang sometimes

18      known as Jesus?

19  A   Yeah, I know him.

20  Q   How well?

21  A   Not that well.

22  Q   Do you know somebody named Xai Thao?

23  A   No.

24  Q   Do you know someone named Peter Moua?

25  A   Yeah.

209

1    Q    How well do you know Peter?

2    A    Not that well.

3    Q    Through other people?

4    A    Yeah.

5    Q    Is it kind of the same with Jesus then?

6    A    I'm not sure.

7    Q    But I mean like through other people?

8    A    Yes.

9    Q    Okay.

10            ATTORNEY MAIER:  That's all the questions I

11        have.  Thank you.

12            THE COURT:  Briefly.

13            ATTORNEY VISHNY:  Briefly.

14            THE COURT:  Recross.

15                    **EXAMINATION OF PHONG LEE**

16    **BY ATTORNEY VISHNY:**

17    Q    So you didn't want to talk to the police because you

18        were just there, right?

19    A    Yes.

20    Q    And that's of course why you never called the police

21        after this happened, right?

22    A    Yes.

23    Q    You didn't want to talk about it, right?

24    A    Yes.

25    Q    You didn't have a microphone in your jacket recording

1          it, did you?

2     A    No.

3     Q    You threw your jacket away so you wouldn't be

4          identified on the street as having been right there

5          with the shooter, right?

6     A    Yes.

7                    ATTORNEY VISHNY:  Nothing further.

8                    ATTORNEY MAIER:  No.

9                    THE COURT:  All right.  Any questions for

10         consideration from the jury?

11                   (No response.)

12                   THE COURT:  Very good.

13              Then, Mr. Lee, you are excused at this time.

14                   THE WITNESS:  Thanks.

15                   ATTORNEY SCHNEIDER:  The next witness I

16         just need to test one thing, and he is a short

17         witness so at most I need four minutes if they want

18         to take a quick bathroom break.

19                   THE COURT:  To prepare or to question?

20                   ATTORNEY SCHNEIDER:  With questioning I

21         need to play something, and I want to just check

22         volume and make sure it's up and ready.

23                   THE COURT:  Okay.  I want -- I want --

24         Attorney Vishny or --

25                   ATTORNEY VISHNY:  We're not going

211

1           anywhere.

2                    THE COURT:  I know that.  I want the jury

3           out of here by no later than 5:30 today.

4                    ATTORNEY SCHNEIDER:  No.

5                    THE COURT:  I leave it to the group's

6           discretion.

7                    ATTORNEY VISHNY:  I think we'll be out of

8           here by five then.

9                    THE COURT:  Oh.  Well then let's excuse the

10          jury and let's set this up.

11                   (The jury was escorted out of the

12          courtroom.)

13                   (Court in recess.)

14                   (The jury was escorted into the courtroom.)

15                   THE COURT:  Please be seated.  Attorney

16          Schneider, your next witness please.

17                   ATTORNEY SCHNEIDER:  Thank you.  The State

18          would call James Phimmachack.

19                   THE COURT:  If you would please remain

20          standing, the clerk will swear you in.

21                   THE CLERK:  Please raise your right hand.

22                   (Oath administered to witness.)

23                   THE WITNESS:  I do.

24                   THE CLERK:  Please state your full name and

25          spell it for the record please.

212

1                          THE WITNESS:  James Phimmachack.

2          J-A-M-E-S, P-H-I-M-M-A-C-H-A-C-K.

3                          THE COURT:  Attorney Schneider, your

4          witness.

5                    **EXAMINATION OF JAMES PHIMMACHACK**

6    **BY ATTORNEY SCHNEIDER:**

7    Q    May I call you James?

8    A    Yes.

9    Q    Okay.  Thank you.  James, where do you live?

10   A    I live in Green Bay.

11   Q    How long have you lived up in Green Bay?

12   A    I want to say ten years.

13   Q    I want to direct your attention, James, to Saturday,

14        December 7th of 2013, and actually kind of into the

15        early morning hours of Sunday.  Did you have plans

16        for that Saturday night?

17   A    We just planned to go downtown Appleton.

18   Q    How did you come to get to be in downtown Appleton?

19   A    We took a party bus from Stadium View in Green Bay.

20   Q    Do you know a party named Josh Richards?

21   A    I do.

22   Q    How do you know him?

23   A    I just met him that night actually.

24   Q    Did you talk to him?

25   A    I did.

213

```
 1   Q   Prior -- did you become aware if any of your other
 2       friends that were on the bus knew him before that
 3       night?
 4   A   Yes.
 5   Q   And do you remember where you went out in Appleton on
 6       that night?
 7   A   We first went to The Bar, and then we went to club
 8       Luna right after that.
 9   Q   Has it -- have you visited downtown Appleton a lot
10       back at that time?
11   A   Not so much as a lot.
12   Q   Do you remember where you were around bar closing
13       time?
14   A   I was inside, probably by the bar.
15   Q   At Luna?
16   A   At Luna.
17   Q   Did you ever go back to the bus?
18   A   I did.
19   Q   Okay.  And was -- what time was that?
20   A   I don't know.  I'm not sure.
21   Q   What do you remember when you went back to the bus?
22   A   I noticed that some of the party members weren't in
23       there.
24   Q   What did you do as a result?
25   A   So I went back into the club to find them.
```

```
 1   Q   When you walked back into Luna, what do you
 2       remember?
 3   A   A lot of chaotic going on, a lot of people screaming,
 4       yelling.
 5   Q   What do you remember about the lighting in that area,
 6       James?
 7   A   Very dim.
 8   Q   Could you see what was going on after you got
 9       inside?
10   A   Not really.  There was a lot of crowding of people
11       so --
12   Q   Okay.  Do you remember if you saw Joshua after
13       that?
14   A   What do you mean?
15   Q   So you're back inside, it's chaotic, the lighting is
16       dim, did you see Josh at all after that?
17   A   Yeah.
18   Q   Where was he?
19   A   He was on the ground.
20   Q   Were there any people near him?
21   A   There was.
22   Q   Do you know what they were trying to do?
23   A   They were trying to tell people to move away from
24       him, trying to talk to him, trying to get him to be
25       aware of anything.
```

1    Q    Was Josh able to respond at all?

2    A    No.

3    Q    What did you do at that time, James?

4    A    I -- I screamed his name.  I tried to get anything

5         from him basically.  I -- I felt like I needed to

6         document it so I pulled out my phone and recorded

7         it.

8    Q    Are you someone who has your cell phone with you

9         probably every day?

10   A    Yes.

11   Q    Everywhere you go?

12   A    Yes.

13   Q    And did you -- do you remember officers arriving?

14   A    Yes.

15   Q    Had you still been recording?

16   A    Yes.

17   Q    And officers spoke with you on that night?

18   A    Yes.

19   Q    Did you tell them you had these videos?

20   A    Yes.

21   Q    And did you provide them to the officers?

22   A    Yes, I did.

23             ATTORNEY SCHNEIDER:  Judge, at this time

24        I'd like to play what's been marked State's Exhibit

25        No. 57.

216

1                    THE COURT:  Very good.

2                    ATTORNEY SCHNEIDER:  And just for the

3           reference, we'll be starting it at play point of

4           00:00.

5                    THE COURT:  Thank you.

6                    (Video played.)

7                    ATTORNEY SCHNEIDER:  So we played it

8           through the play point of 01:36.

9    Q      (BY ATTORNEY SCHNEIDER)  And, James, is that a fair

10          and accurate depiction at least of the first part of

11          what you remember recording?

12   A      Yes.

13                   ATTORNEY SCHNEIDER:  I have nothing

14          further.  I would move 57 in.

15                   THE COURT:  Any objection?

16                   ATTORNEY VISHNY:  No.  I have no objection.

17                   ATTORNEY SCHNEIDER:  Actually, I'm sorry,

18          Judge, I do have a question.

19   Q      (BY ATTORNEY SCHNEIDER)  When you were at Luna

20          earlier that night before going back to the bus, were

21          there any issues or concerns you had about yourself

22          or anybody else from the bus?

23   A      Un-hun.

24   Q      Is that a no?

25   A      No.

217

1                 ATTORNEY SCHNEIDER:  Okay.  Thank you.

2                 THE COURT:  All right.  Any questions from

3         the defense?

4                 ATTORNEY VISHNY:  No, Your Honor.  I don't

5         have any questions.

6                 THE COURT:  Any questions from members of

7         the jury?

8                 (No response.)

9                 THE COURT:  All right.  Thank you, sir.

10        You may be excused.

11             My understanding is the State is not calling

12        anymore witnesses today.

13                ATTORNEY SCHNEIDER:  Not today.  We've had

14        a full week I think already.

15                THE COURT:  Thank you, Attorney Schneider.

16             Ladies and gentlemen of the jury, as the

17        attorneys have indicated, we will not be taking

18        anymore testimony today.  You are completely free the

19        weekend.

20             However, I would reiterate to you that you are

21        not to look at any media, watch any television, do

22        any investigation.  I am going to order that you

23        refrain from any social media during this weekend,

24        and predominantly the concern is you get those pop-up

25        ads and things of that nature.  So I apologize to you

218

1           for that request, but to preserve the integrity of

2           the process, I would ask that you refrain from that.

3                   Additionally, we will be starting at 9:30 on

4           Monday, so that way I'm not telling you to be here at

5           nine and then you show up at nine and we don't start

6           until 9:30.  So I'm sort of figuring this out.  So we

7           will be starting at 9:30.  We will be set to go.

8                   And other than that, have a very good weekend.

9                   Please rise for the jury.

10                  (The jury was escorted out of the

11          courtroom.)

12                  THE COURT:  And please be seated.

13                  Just going over, we did have -- during the later

14          afternoon session we did have -- outside the presence

15          of the jury we had an interpreter come in for

16          purposes of essentially an admonishment of the

17          gallery and/or Mrs. Lee.  The court did issue an

18          order related to communications with certain

19          witnesses.

20                  Additionally there was then a subsequent and

21          lengthy sidebar which related to the immunity issue

22          and compelling testimony of Mr. Phong Lee.

23          Ultimately, an order to compel or a motion to compel

24          was requested, an order to compel was thereby

25          granted.  That thus attached immunity for purposes of

219

1          testimony alone.

2                    I believe that encompasses the sidebars that we

3          addressed in the late afternoon session.

4                Is that your recollection, Attorney Schneider?

5                    ATTORNEY SCHNEIDER:  Yes.

6                    THE COURT:  Attorneys Vishny and Weitz?

7                    ATTORNEY VISHNY:  Yes.

8                    THE COURT:  And then additionally we did

9          have an opportunity to speak just briefly, given that

10         it's been a long week my understanding is that we are

11         going to forego any other legal discussions for the

12         evening, we will be ready to discuss things at 8:30

13         on Monday morning.

14               Is that your understanding, Attorney Schneider?

15                   ATTORNEY SCHNEIDER:  Yes, Judge.

16                   THE COURT:  Attorney Vishny?

17                   ATTORNEY VISHNY:  Yes.

18               Just very quickly, I have no recollection of

19         whether or not I had put an objection to -- what was

20         that, 57 that we just played.  I know we had

21         extensive discussions in chambers.  If I didn't

22         object on the record, I just have the record reflect

23         I objected to showing Mr. Richards' body back at the

24         time of the --

25                   THE COURT:  That is correct.  So your

220

1        objection is dually noted.

2                (Proceedings concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1

2

3                          C E R T I F I C A T E

4

5      STATE OF WISCONSIN      )
                               ) ss.:
6      COUNTY OF OUTAGAMIE     )

7

8

9              I, JOAN BIESE, RMR/CRR, do hereby certify that I
       am the official court reporter for Branch IV of the
10     Circuit Court of Outagamie County;

11             That as such court reporter, I made full and
       correct stenographic notes of the foregoing proceedings;
12
               That the same was later reduced to typewritten
13     form;

14             And that the foregoing proceedings is a full and
       correct transcript of my stenographic notes so taken.
15

16             Dated this 28th day of July, 2016.

17

18

19                                    _____

20                                    JOAN BIESE, RMR/CRR

21

22

23

24

25
```

222