**FILED**
**02-13-2019**
**Clerk of Circuit Court**
**Outagamie County**
**2013CF001074**

1   STATE OF WISCONSIN     CIRCUIT COURT     OUTAGAMIE COUNTY

2   _____

   **STATE OF WISCONSIN,**

3

                Plaintiff,

4   v.                       **Case No. 13‑CF‑1074**

5   **CHONG LENG LEE,**

6                Defendant.

7   _____

                **JURY TRIAL – DAY FOUR**

8   _____

9

   BEFORE:       **HONORABLE GREGORY B. GILL, JR.**

10              Circuit Court Judge, Branch IV

               Outagamie County Justice Center

11              Appleton, WI  54911

12

   DATE:         **February 29, 2016**

13

14   APPEARANCES:   **CARRIE SCHNEIDER**

               District Attorney

15              Appearing on behalf of the State

16              **ANDREW MAIER** and **ALEXANDER DUROS**

               Assistant District Attorneys

17              Appearing on behalf of the State

18              **DEBORAH VISHNY** and **EVAN WEITZ**

               Attorneys at Law

19              Appearing on behalf of the Defendant

20              **CHONG LENG LEE**

               Defendant

21              Appearing in person

22

23

24   Joan Biese

   Official Reporter, Branch IV

25   Outagamie County

1                              I N D E X

2                                                              PAGE

3    PROCEEDINGS OUTSIDE THE PRESENCE OF THE JURY.........  5

4    WITNESSES:

5    ADAM J. RICHARDSON
         Examination by Attorney Schneider.................   9
6        Examination by Attorney Weitz....................  20
         Examination by Attorney Schneider................  25
7
     PHILIP DOUGLAS KELLEY
8        Examination by Attorney Schneider................  26
         Examination by Attorney Weitz....................  54
9
     MARISSA ANN EMENECKER
10       Examination by Attorney Duros....................  62
         Examination by Attorney Weitz....................  73
11       Examination by Attorney Duros....................  78

12   TALISA M. FARIAS
         Examination by Attorney Duros....................  82
13       Examination by Attorney Weitz....................  89
         Examination by Attorney Duros....................  94
14
     ADAM NAGEL
15       Examination by Attorney Duros....................  96
         Examination by Attorney Vishny................... 106
16       Examination by Attorney Duros.................... 121
         Examination by Attorney Vishny................... 122
17       Question from Jury............................... 123
         Examination by Attorney Vishny................... 124
18
     JAMES WALL
19       Examination by Attorney Maier.................... 125
         Examination by Attorney Weitz.................... 137
20       Question from Jury............................... 141
         Examination by Attorney Maier.................... 141
21
     PAUR LEE
22       Examination by Attorney Schneider................ 144
         Fifth Amendment Discussion-Attorney Jonathon Groh. 180
23       Continued Examination by Attorney Schneider...... 181

24   KYLE ANDERSON
         Examination by Attorney Maier.................... 240
25       Examination by Attorney Vishny................... 247

2

1   **SAMANTHA DELFOSSE**
         Examination by Attorney Maier..................... 249
2        Examination by Attorney Vishny................... 258

3

4   **EXHIBITS**                                              **PAGE**

5   2 –   White Board-Luna Lounge-Mark for Victim......... 11
    15–   Photo............................................ 12
6   32–   Photo Board-Photos 32A-32K...................... 153
    33–   Photo Board-Photos 33A-33L...................... 18
7   36–   Photo............................................ 98
    37–   Photo............................................ 98
8   38–   Photo............................................ 98
    39–   Photo............................................ 98
9   40–   Photo............................................ 98
    41–   Photo............................................ 98
10  42–   Photo............................................ 98
    43–   Photo............................................ 98
11  44–   Letter........................................... 231
    45–   Photo............................................ 128
12  46–   Photo............................................ 128
    47–   Photo............................................ 128
13  48–   Photo............................................ 128
    49–   Photo............................................ 128
14  50–   Photo............................................ 128
    51–   Photo............................................ 130
15  52–   Photo............................................ 130
    53–   Photo............................................ 130
16  54–   Photo............................................ 130
    55–   Photo............................................ 130
17  56–   Photo............................................ 130
    58–   Dr. Philip Kelly CV............................. 28
18  59–   Autopsy Report.................................. 37
    60–   Death Certificate............................... 53
19  61–   Photo............................................ 49
    62–   Photo............................................ 50
20  63–   Photo............................................ 50
    64–   Photo............................................ 51
21  65–   Photo............................................ 51
    66–   Photo............................................ 51
22  67–   Photo............................................ 51
    68–   Photo............................................ 51
23  69–   Photo............................................ 52
    70–   Photo............................................ 48
24  71–   Photo............................................ 48
    80–   Cartridges-Four Rounds.......................... 133
25  81–   Two Shell Casings............................... 134

3

1    **EXHIBITS**                                                    **PAGE**

2    82-  Spent Shell Casing................................ 135
     83-  Photo............................................. 194
3    84-  Photo............................................. 194
     85-  Photo............................................. 194
4    103- Jacket (Dark)..................................... 258
     116- Melissa Emenecker Statement.......................  70
5    117- Talisa Farias Statement...........................  85
     118- Officer Nagel Report............................. 114
6    122- Paul Lee Statement............................... 190
     123- Paul Lee Drawing.................................. 187
7    124- Jail Call Transcript-2/12/13-18:23............... 200
     125- Jail Call Transcript-2/12/13-19:31............... 205
8    126- Jail Call Transcript-1/25/14-17:57.............. 217
     127- Jail Call Transcript-1/21/14-16:18.............. 226
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    **TRANSCRIPT OF PROCEEDINGS**

2              THE COURT:  Okay.  We're on the record in

3    *State of Wisconsin v. Chong Lee.*

4         Mr. Lee appears in person, along with his

5    counsel, Attorney Evan Weitz and Deja Vishny.

6         I should also note that also present at counsel

7    table is Mr. Solomon Gatton.  Mr. Gatton is appearing

8    under the student practice rule.  Mr. Gatton, I

9    understand you may be questioning a witness today?

10             MR. GATTON:  I will.

11             THE COURT:  And appearing on behalf of the

12   State, Outagamie County District Attorney Carrie

13   Schneider.  Also seated at counsel table is Assistant

14   District Attorney Andrew Maier, and while not present

15   currently, Mr. Duros, Alex Duros, also appears on

16   behalf of the State.

17        We did have an opportunity to meet this morning.

18   We discussed some items of potential evidentiary

19   issues with respect to call numbered Priority No. 4.

20   There was a discussion about a potential hearsay

21   issue.  The court concluded it was not offered for

22   the matter of the truth and so that portion will be

23   allowed.

24        There was also, I believe it was an issue

25   related to item number or Page No. 5 of that same

5

1    call log.  The court -- I'm sorry.  On Call 4 the

2    court concluded that the prejudice did not outweigh

3    the potential impact.  The court will allow.

4    Additionally the court did clarify its order as it

5    relates to what I'll call the Hereford issue, and

6    that issue was further clarified for counsel.

7    Counsel will be expected to, if there are summaries

8    or items that are inconsistent with what police

9    investigations had said, the court will order those

10   be --

11              ATTORNEY VISHNY:  And if I examine the

12   witness about it.

13              THE COURT:  And if that -- if you examine.

14   That's correct.  Additionally, and the court at this

15   time is going to address an issue that came to the

16   court's attention just recently, if we could please

17   swear in our interpreter.

18              (Clerk administers oath to interpreter.)

19              THE INTERPRETER:  Yes.

20              THE CLERK:  Please state your name for the

21   record please.

22              THE WITNESS:  Thao Lee, T-H-A-O, L-E-E.

23              THE COURT:  Mr. Thao, I would ask that you

24   go by Mrs. Lee again.

25        On Friday this court had issued an order

6

1     directing that Mrs. Lee not have any communications

2     with any potential witnesses in this case, and in

3     particular that she be directed to not have any

4     communication related to the contents of this trial.

5     Subsequently the court has learned that Mrs. Lee has

6     had communications.  And while the communications or

7     the information the court has in and of itself does

8     not lead me to believe that there was a direct

9     violation, the communications raise enough of a

10    concern that the court is going to expand on its

11    order.

12         Accordingly, it is the order of the court, for

13    purposes of preservation of the integrity and the

14    process, that Mrs. Lee not be allowed in court for

15    the testimony of Mr. Paul Lee, Mr. Teng Lee, Mr. Tong

16    Lee, Mr. Tom Lee, Miss Lisa Stutzman, and Miss Bobby

17    Jo Stutzman.  If Mrs. Lee has any questions about the

18    court's order, she may contact the public defender's

19    office.  I have apprised the public defender's office

20    that said contact may be forthcoming.  We will

21    provide Mrs. Lee with a copy of that telephone

22    number.

23         ATTORNEY SCHNEIDER:  There is one other

24    witness, Joe Thor.  I would also ask for the same.  I

25    might not have mentioned that in the back.

7

1                    THE COURT:  I believe Joe Thor may have
2          been mentioned.  That may have been an oversight on
3          my part.  That ruling will also pertain to Mr. Joe
4          Thor.  And I'd ask my clerk to please provide that
5          number to Mrs. Lee.
6              Any questions, Mrs. Lee?
7                    THE INTERPRETER:  No questions.
8                    THE COURT:  Okay.  Is the State prepared to
9          proceed at this time then?
10                   ATTORNEY SCHNEIDER:  Yes.
11                   THE COURT:  Attorney Vishny?
12                   ATTORNEY VISHNY:  Yes.
13                   THE COURT:  Then at this time please rise
14         for the jury.
15                   (The jury was escorted into the courtroom.)
16                   THE COURT:  Good morning everyone, please
17         be seated.
18             And, Attorney Schneider, your first witness
19         please.
20                   ATTORNEY SCHNEIDER:  Thank you.  We would
21         call Adam Richardson this morning.
22                   THE COURT:  If you would please remain
23         standing, sir, the clerk will swear you in.
24                   THE CLERK:  Please raise your right hand.
25                   (Oath administered to witness.)

8

1                    THE WITNESS:  I do.

2                    THE CLERK:  Please state your full name and

3          spell it for the record please.

4                    THE WITNESS:  Adam J. Richardson, A-D-A-M,

5          J, R-I-C-H-A-R-D-S-O-N.

6                    THE COURT:  All right.  Sir, you may be

7          seated.

8             Attorney Schneider, you're first -- feel free to

9          begin.

10                   ATTORNEY SCHNEIDER:  Thank you.

11              **EXAMINATION OF ADAM J. RICHARDSON**

12     **BY ATTORNEY SCHNEIDER:**

13     Q    Good morning, sir.  What is your first name?

14     A    Adam Richardson.

15     Q    May I call you Adam?

16     A    Yes.

17     Q    Adam, where do you currently live, what city?

18     A    I live in Appleton.

19     Q    Back in 2013 did you live in Appleton?

20     A    I did not live in Appleton.

21     Q    Where did you live then?

22     A    I lived in Greenville.

23     Q    Were you born and raised here in what we call the Fox

24          Cities area?

25     A    Yes.

9

1   Q   How old are you Adam?

2   A   I am 24 years old.

3   Q   I want to direct your attention back to Saturday,

4       December 7th of 2013 into the early morning hours of

5       Sunday, December 8th.  Do you recall where you were

6       that night?

7   A   I do.

8   Q   Where were you?

9   A   I was in Appleton, Wisconsin downtown on College Ave.

10  Q   Were you out with some friends?

11  A   I was.

12  Q   And who were they?

13  A   I was with Trent Thomas and a few other friends of

14      ours that were in a group.

15  Q   Was there a reason you were out that night?

16  A   Just out with friends, there was no reason.

17  Q   Just a Saturday night?

18  A   Correct.  Yes.

19  Q   Do you remember, Mr. Richardson, where you were at

20      about two a.m. or just prior to two a.m.?

21  A   I do.

22  Q   Where was that?

23  A   I was at Luna Lounge at the time.  It's now under

24      different ownership.  But I was at Luna Lounge.

25  Q   And do you recall what you were doing?

1   A    I was -- I do, yes.

2   Q    And what was that?

3   A    I was standing by the front door with Trent Thomas

4        waiting for a ride to come pick us up.

5   Q    Was there anyone else with you?

6   A    Yes, there were.

7   Q    Other than you and Trent, do you remember the other

8        parties' names?

9   A    Offhand, I do not.

10  Q    Okay.  Males or females?

11  A    Females.

12  Q    You said you were waiting for a ride?

13  A    Yes.

14             ATTORNEY SCHNEIDER:  Your Honor, may I

15       approach?

16             THE COURT:  You may.  And again --

17             ATTORNEY SCHNEIDER:  I know.

18             THE COURT:  -- it's not necessary, although

19       you're not going to be admonished if you do.

20             ATTORNEY SCHNEIDER:  Thank you.

21  Q    (BY ATTORNEY SCHNEIDER)  Mr. Richardson, I want to

22       show you an exhibit that's been marked State's

23       Exhibit No. 2.  Are you familiar with what's depicted

24       here?

25  A    I am.

11

1    Q    What is that?

2    A    This is a map of the inside layout of Luna.

3    Q    And the front doors that you referenced, if you want

4         to get up, please do so, can you point out where

5         those are?

6    A    Front doors would be right here.

7    Q    And that would be an area above what is written main

8         entrance?

9    A    Yes.

10   Q    And where about were you prior to becoming aware of

11        some incident?  We're going to talk about that first,

12        but were you waiting with Trent and your friends?

13   A    I was waiting right here by the front door.

14   Q    So literally right in front of or very near to the

15        front doors?

16   A    Yes.

17   Q    Okay.  Show you what's marked as -- we're going to

18        look just at the top photo, Exhibit 15.  Are you

19        familiar with that photograph?

20   A    I am familiar.

21   Q    And what does that photograph show?

22   A    That shows the inside looking out towards College

23        Ave., inside of Luna looking out towards College.

24   Q    Would have those been the doors that you were

25        standing near?

1    A    Yes.

2    Q    Okay.  You can grab a seat, Mr. Richardson.

3              How long do you think you and Trent and the

4         others were by those front doors?

5    A    If I had to -- if I had to imagine, I would say

6         around ten to 15 minutes.

7    Q    And while you were there was there anything of

8         concern that you saw initially while you were

9         there?

10   A    Absolutely not.

11   Q    What's the lighting like at this time?

12   A    At this time the lighting is -- where I was standing

13        was poor.  Yeah.  It was just -- it was very poor.

14   Q    Is it a situation where Luna, maybe it's because the

15        name Luna, the moon, is it lit by some black lighting

16        inside the business?

17   A    There are black lights inside, yes.

18   Q    In the area where you were, can you still hear the

19        music that's playing inside the bar?

20   A    I could still hear the music, yes.

21   Q    So you're there waiting for a few minutes talking

22        with your friends, I'm going to assume?

23   A    Yes.

24   Q    What do you remember then, Adam?

25   A    The series of events was basically I was standing at

13

```
1          the front door, I heard what sounded like a loud --
2          like a balloon pop.  A group of people rushed past, a
3          few people were screaming, and the front doors had
4          opened up and people were running out and as well as
5          people standing by the front doors not knowing what
6          was going on.  That was -- I mean it was all a matter
7          of seconds.  That was basically everything.
8    Q     Okay.  So I want to walk you back through that again.
9          You said you heard a noise like a balloon pop?
10   A     Yes.
11   Q     So was it something extremely loud?
12   A     No, it was not.
13   Q     Do you hunt at all?
14   A     I do hunt, yes.
15   Q     When you heard the noise, you thought it might have
16         been a balloon pop?
17   A     When I initially heard the noise, I had assumed that
18         it was something like that.  After the sights and
19         smells, I guess, of gunpowder, I kind of imagined
20         that it was a smaller caliber gun, so in my mind I
21         thought it was a .22 caliber through some hunting.
22   Q     And you said you could smell the odor of gunpowder?
23   A     Yes.
24   Q     Is that as you were standing by those front doors?
25   A     Yes.
```

14

```
 1   Q    So you hear the noise.  Which way did your attention
 2        then focus?
 3   A    To my -- well, it would have been basically towards,
 4        using the map earlier, towards the inside bar area.
 5   Q    Okay.  And what do you remember seeing in that
 6        area?
 7   A    I remember seeing somebody laying down, a few people
 8        crowded around, and people rushing towards me.
 9   Q    Do you remember was it a few people, a lot of
10        people?
11   A    The group that initially passed me was about ten --
12        at least ten people, I would say, maybe eight, but
13        probably ten.
14   Q    Do you remember anything about the people?
15   A    I do.  Yes, I do.
16   Q    And what do you recall?
17   A    I remember the initial group that passed me were of
18        Asian descent, and I had just glanced up, and then at
19        that point there were so many other people that ran
20        out it was kind of like chaos, chaotic.
21   Q    Okay.  At the time of the noise, of the pop noise,
22        which way were you focused or where were you looking
23        if you remember?
24   A    I was looking at Trent, at my -- at Trent Thomas,
25        obviously, who was standing to my left, I believe.
```

15

```
 1   Q   Did you see any flash at all?

 2   A   I did not see a flash.

 3   Q   And did you see anyone who had a gun in their hand?

 4   A   I did not see anybody with anything in their hand,

 5       no.

 6   Q   Was your attention focused in the direction of where

 7       you heard the pop when the pop noise -- when you

 8       heard it?

 9   A   Absolutely, yes, it was.

10   Q   Okay.  Do you remember anything about -- you said

11       they were Asians.  Do you remember males or females

12       or was it some of it you couldn't tell?

13   A   There was some I couldn't tell.  For the most part I

14       would say male, majority of males.

15   Q   After you look over and you see a person down on the

16       ground, what did you do then, Adam?

17   A   At that point I remember people rushing out.  I knew

18       it probably wasn't a good idea to go towards that

19       person, so at that point I stepped outside and got on

20       my phone and called 911.

21   Q   Did you do anything else other than just step outside

22       and start calling 911?

23   A   I did not.  I believe I called 911, and at that point

24       they told me, if I remember correctly, to stay there

25       and that people were on their way.
```

16

1    Q    Do you remember officers arriving?

2    A    I do remember officers arriving, yes.

3    Q    Was it a long period of time, a short period of time,

4         if you even know?

5    A    Very short period of time.

6    Q    The people that you saw pass by when they were going

7         out the door, do you remember anything specific about

8         any of them?

9    A    The only thing I recall was that there were -- there

10        was one individual wearing a white beanie cap who

11        seemed to be concealing something as he was running.

12        It could have been his cell phone for all I know.

13        That's the one thing that was in my head.

14   Q    And by a beanie cap, do you mean kind of like a

15        stocking cap?

16   A    Yes.

17   Q    Okay.  Maybe old terminology versus the new

18        terminology?

19   A    Right.

20   Q    You provided that information to law enforcement?

21   A    Yes.

22   Q    But did you have any idea if that person was involved

23        in any way, shape or form?

24   A    I had no idea, no.

25   Q    Could have been somebody putting a beer in their

17

1      pocket?

2    A   It could have, yes.

3    Q   And when you went -- when law enforcement arrived,

4        did you go back inside?

5    A   I was not allowed back inside at that point.

6    Q   You stayed to speak to them?

7    A   I did, yes.

8    Q   I just want to show you, Adam, a couple more photos.

9        Prior to this back in 2013 what were you doing for

10       employment?

11   A   I was working at Funset Boulevard.

12   Q   Okay.  Have you ever worked in a capacity at a bar

13       prior to 2013 or when this happened?

14   A   I have not, no.

15   Q   Okay.  One too many.  Adam, I'm going to show you a

16       photo board, Exhibit 33, and then what's on Exhibit

17       33, there are several pictures.  Starting like at

18       Exhibit 33A, and if you need to get up that's

19       perfectly fine, do you recognize anyone in that

20       photograph?

21   A   I do.

22   Q   Okay.

23   A   Okay.  So -- you want me to point out?

24   Q   Yes, please.

25   A   That's me.

1                        ATTORNEY VISHNY:  I'm sorry, but we can't

2            hear over here.

3      Q    (BY ATTORNEY SCHNEIDER)  You still have to try to

4            talk like you're talking to the back of the room.

5      A    That's myself, that's me.  That's somebody I don't

6            recognize.

7      Q    Does it look like if I'd say you had a hooded shirt

8            on?

9      A    Yes, absolutely.

10     Q    And then as you continue 33B, 33C, 33D, we continue

11           to see you in those frames, correct?

12     A    Yes.

13     Q    And even continuing then down 33E, 33F, 33G and 33H,

14           we can still continue to see you?

15     A    Yes.

16     Q    Is 33H when it appears that like people are now

17           starting or trying to exit?

18     A    Yes.

19     Q    And even, Adam, as you continue down the last row,

20           33I, J, K and L, you're still in that same kind of

21           spot; is that correct?

22     A    Yes.

23     Q    And then it would be after that point when you went

24           outside to make your 911 call?

25     A    Yes.

19

```
1   Q   You can have a seat then.  Thank you.
2           When you went outside, you said law enforcement
3       didn't let you back in --
4   A   Correct.
5   Q   -- the bar?
6   A   Yes.
7   Q   Do you remember anything about the weather that
8       night?
9   A   I -- offhand, I remember it being cold.  I do not
10      remember anything other than that.
11  Q   And when you -- so you were outside making that 911
12      call, were there until law enforcement came, did you
13      ever hear anything else concerning while you were
14      outside?
15  A   I did not.  I do not remember anything.
16  Q   Okay.
17          ATTORNEY SCHNEIDER:  Nothing further.
18          THE COURT:  Defense.
19          ATTORNEY WEITZ:  Thank you, Your Honor.
20          EXAMINATION OF ADAM J. RICHARDSON
21  BY ATTORNEY WEITZ:
22  Q   So, Mr. Richardson, that night at Luna around the
23      time of this incident, you're standing by the front
24      door you said waiting for a ride, right?
25  A   Yes.
```

20

1    Q    And you're standing there with your friend Trent who
2         I believe you said was to your left, right?
3    A    I believe so, yes.
4    Q    And as far as the lighting in Luna, certainly within
5         the bar it's darker and there is black lights and
6         entertainment style lights, right?
7    A    Yes, correct, yes.
8    Q    But towards that front area it's a little bit better,
9         I mean still not real great but there's some
10        additional lighting in addition to just black lights,
11        right?
12   A    Yes.
13   Q    So that like the bouncer can check people's IDs and
14        things of that nature?
15   A    Correct.
16   Q    Okay.  So you're talking to Trent who is to your
17        left, and that's when you heard a -- what you
18        described as a balloon pop, right?
19   A    Yes.
20   Q    And you just said that at the time that you heard
21        that balloon pop, you were focused in the direction
22        that you heard that sound coming from, right?
23   A    Yes.
24   Q    Okay.  And immediately after that, that's when you
25        see a group of people of Asian descent rushing

21

```
 1        towards the door, right?

 2   A    Yes.

 3   Q    Okay.  And they were the first ones out the door

 4        immediately after that shot?

 5   A    I believe so.  I'm not a hundred percent positive.

 6   Q    And you told police officers when you talked to them

 7        the night of the incident that that was suspicious to

 8        you that group was the first out the door, right?

 9   A    Yes.

10   Q    Okay.  And you, after a few seconds after that

11        initial group runs out, you actually leave Luna

12        yourself, right?

13   A    Yes.

14   Q    Okay.  And that's when you were able to observe that

15        this same group of people, you saw them running

16        northbound on Division Street, right?

17   A    Correct.

18   Q    And one person you told police officers when you

19        talked to them that night -- and going back, you

20        actually talked to police officers I believe twice in

21        this case, right?

22   A    Correct.

23   Q    You talked to Sergeant Meyer that night in his squad

24        car, yes?

25   A    Yes.
```

22

1  Q    And then later I believe there is a follow-up phone
2       call with Sergeant Rabas.  Does that sound
3       familiar?
4  A    Yes.
5  Q    Okay.  And you told both of them that one person
6       stood out in your mind, this person that you
7       described as first pushing his way past you out the
8       door, right?
9  A    Yes.
10 Q    The doors flew open as soon as he gets to the door
11      and he ran out, right?
12 A    Correct, yes.
13 Q    And that's one of the people that you saw run around
14      the corner and north on Division, right?
15 A    Correct.
16 Q    And you told police officers that the reason he stood
17      out in your mind is because he was running like he
18      had something in his pocket, right?
19 A    Correct, yes.
20 Q    And actually the description that you gave to both
21      Sergeant Meyer and Sergeant Rabas was that you
22      thought that it could have been a gun or something,
23      right?
24 A    Correct.
25 Q    And again, the description you gave was that he was,

23

1          quote, concealing something.

2     A    Correct.

3     Q    And you differentiated this guy from the other people

4          that you saw running north on Division because you

5          said everyone else was kind of flailing, I am

6          assuming, their arms as they ran, but he had

7          something in his pockets?

8     A    Correct.

9     Q    Okay.  And you were interviewed, as I said, twice in

10         this matter by both Meyer and Rabas, right?

11    A    Correct, yes.

12    Q    And both times you told them about this guy that was

13         running with his hands in his pockets.

14    A    Yes.

15    Q    And you told them to you it appeared that it could

16         have been a gun?

17              ATTORNEY SCHNEIDER:  Objection.  Asked and

18         answered already.

19              THE COURT:  Sustained.

20              ATTORNEY WEITZ:  Okay.

21    Q    (BY ATTORNEY WEITZ)  You additionally told the

22         officers that he was running with something that

23         wasn't just his hands I guess?

24    A    Correct, yes.

25              ATTORNEY WEITZ:  Nothing further.  Thank

24

1          you.

2                     THE COURT:  Any redirect, Attorney

3          Schneider?

4                **EXAMINATION OF ADAM J. RICHARDSON**

5    **BY ATTORNEY SCHNEIDER:**

6    Q    But again, other than that observation of that

7          person, you don't know if he was involved in any way,

8          shape or form?

9    A    I do not.

10   Q    Have you shot a .22?

11   A    I have, yes.

12   Q    Have you shot a .25?

13   A    I have not.

14   Q    How big or how small is a .22?

15   A    If I could hold up -- size?  It's about that big.

16   Q    You mean the bullet?

17   A    Yeah.

18   Q    The gun?

19   A    Depending on if it's a handgun or a rifle it's a

20         different size.

21                    ATTORNEY SCHNEIDER:  Nothing further then.

22                    THE COURT:  Recross?

23                    ATTORNEY WEITZ:  No.

24                    THE COURT:  Ladies and gentlemen of the

25         jury, do you have any questions you wish to submit?

25

1              If counsel could approach.

2                   (A bench conference was held.)

3                   THE COURT:  Thank you, sir.  You may be

4       seated.  I'm sorry.  You may be excused.  You're

5       already seated.

6                   THE WITNESS:  Thank you.

7                   ATTORNEY SCHNEIDER:  Thank you, Adam.

8          The State would then call Dr. Douglas Kelley.

9                   (Oath administered to witness.)

10                  THE WITNESS:  I do.

11                  THE CLERK:  Please state your full name and

12      spell it for the record please.

13                  THE WITNESS:  My name is Philip Douglas

14      Kelley, K-E-L-L-E-Y.

15                  THE COURT:  Attorney Schneider, your

16      witness.

17              **EXAMINATION OF PHILIP DOUGLAS KELLEY**

18      **BY ATTORNEY SCHNEIDER:**

19      Q    Good morning, Doctor.  How are you employed?

20      A    I'm the chief medical examiner of the Fond du Lac

21           County Medical Examiner's Office.

22      Q    How long have you been employed in that capacity?

23      A    Since 2006.

24      Q    And do you hold any degrees currently?

25      A    Yes.  I have a medical degree.

26

1   Q   Where did you obtain that?

2   A   That was from Southern Illinois University School of

3       Medicine.

4   Q   And what year?

5   A   1992.

6   Q   And do you currently hold any licenses in the State

7       of Wisconsin?

8   A   Yes, I do.  I have a medical license.

9   Q   Can you explain what your -- what pathology is to the

10      jury?

11  A   Sure.  Pathology is the field of medicine that

12      addresses disease and trauma in people, and forensic

13      pathology is a subspecialty of pathology.

14          I should explain that pathology has two -- two

15      facets to it, one is clinical pathology, another is

16      anatomic pathology.  The clinical pathologists are

17      the ones that run the lab and do the blood bank and

18      everything like that, and the anatomic pathologists

19      are the ones that would do biopsies and autopsies and

20      things like that.  So forensic pathology is a

21      subspecialty of pathology in which the principles of

22      medicine are applied to problems in the field of law.

23  Q   And as part of your duties, do you maintain

24      curriculum vitae?

25  A   Yes.

27

1    Q    Doctor, I'm going to show you what's been previously
2         marked Exhibit 58.  First, for the record, can you
3         confirm that it's three pages in length?
4    A    Yes, it is.
5    Q    And are you familiar with what Exhibit 58 is?
6    A    Yes.
7    Q    What is it?
8    A    This is a copy of my curriculum vitae.
9    Q    So you said since 2006 you served as the Fond du Lac
10        County Medical Examiner?
11   A    That's correct.
12   Q    Do you have experience in other medical examiners'
13        offices prior to 2006?
14   A    Yes.  Before coming to -- well, go the other
15        direction.  After I finished my training in 1999 I
16        stayed with the Milwaukee County Medical Examiner's
17        Office as staff.  I spent a short time, ten months or
18        so, as a private forensic pathologist in Illinois,
19        and then worked with the District 21 Medical
20        Examiner's Office down in Fort Myers, Florida.
21        That's -- when I came back after that is when I came
22        back to Wisconsin and I went to work as an associate
23        medical examiner for the Waukesha County Medical
24        Examiner's Office.  That was from 2004 to 2006.  And
25        then of course the Fond du Lac office came open and I

28

1          took this job.

2     Q    And do you belong to any memberships or organizations

3          related to your work as a medical examiner?

4     A    Yes.

5     Q    What is that?

6     A    Well, I belong to the National Association of Medical

7          Examiners and the American Academy of Forensic

8          Sciences and the Wisconsin Coroners and Medical

9          Examiners Association, College of American

10         Pathologists.

11                   ATTORNEY SCHNEIDER:  I move Exhibit 58 into

12         evidence at this time, Your Honor.

13                   THE COURT:  Any objection?

14                   ATTORNEY WEITZ:  No.

15                   THE COURT:  58 will be received.

16    Q    (BY ATTORNEY SCHNEIDER)  Can you talk about your work

17         as a medical examiner to the jury?

18    A    Sure.  As I said, the -- you know, medical examiner,

19         or forensic pathologist, I should say, applies the

20         principles of medicine to issues in the field.  So

21         it's a medical legal field.  And basically what my

22         job is is to determine what the cause and manner of

23         death is in cases which fall under my jurisdiction.

24         So that obviously involves the performance of

25         autopsies but also the investigation of cases for the

29

1       collection of information to combine with the

2       autopsy.  So basically as a medical examiner that's

3       my job.  It's a -- it's a statutory job.  There is a

4       state statute that guides us in which cases need to

5       be investigated and the cause and manner of death

6       determined by a medical examiner.

7   Q   Okay.  And you're with the Fond du Lac County Medical

8       Examiner's Office.  Do you work exclusively just with

9       Fond du Lac County?

10  A   No.  Yeah.  I -- I should have mentioned how that

11      works.  In Wisconsin all 72 counties decide for

12      themselves whether they have a coroner or medical

13      examiner, and in Fond du Lac it's a medical examiner.

14      Now, you don't have to be a doctor to be a medical

15      examiner or a coroner.  As a matter of fact, there is

16      only four counties that have forensic pathologists,

17      medical examiners.  So what the other counties have

18      to do when they need an autopsy is they have to go to

19      one of the counties that do have a forensic

20      pathologist medical examiner and contract with them

21      to do their autopsies for them.  So there is -- in

22      addition to the four counties, there's the University

23      of Wisconsin, so there is basically five places in

24      the State of Wisconsin that -- that actually do the

25      autopsies.  Does that make sense?

30

```
 1   Q   So is it a situation where Outagamie County law
 2       enforcement or the coroner's office will contact you
 3       when they need an autopsy performed?
 4   A   That's right.
 5   Q   Do you have another medical examiner assisting you in
 6       your office?
 7   A   Yes.
 8   Q   And how long have you had an assistant medical
 9       examiner?
10   A   She has been with me for three years now.
11   Q   Prior to that were there others who filled the role
12       of an assistant ME or medical examiner?
13   A   Yes.
14   Q   If you know, and however you want to estimate this,
15       Doctor, how many autopsies do you yourself perform,
16       whether it's in a year or in a month, whatever
17       estimate is easier for you?
18   A   We -- you know, I probably average about 250 a year,
19       which -- which is the recommendation by the National
20       Association of Medical Examiners, so I would say -- I
21       would say between 220 and 250 a year.
22   Q   So almost one a day every Monday through Friday on
23       average?
24   A   Pretty much, yes.
25   Q   How do you normally become involved in a case from a
```

```
1         county other than Fond du Lac?
2    A    Well, really it's just as simple as you -- as you put
3         it a minute ago.  It's a -- they will call or contact
4         us by phone or e-mail and just let us know that they
5         have a case that's going to require postmortem
6         examination, and then -- excuse me, and then what we
7         will do is we'll have somebody call them back and
8         schedule it.  So each day we have a number of cases
9         that we'll be scheduling from perhaps a variety of
10        different counties.  So that's basically how it --
11        how it works.  It's pretty informal.
12   Q    Can you explain to the jury generally what's the
13        purpose when you do an autopsy?
14   A    Well, the -- the purpose of an autopsy is to
15        determine what the cause of death is and to answer
16        any questions that exist in -- with regards to the
17        person's death or maybe even their life.  You know,
18        you can -- you can determine some things from looking
19        at someone's body that might explain some things that
20        happened in life.  So that's basically the purpose.
21   Q    So when a person comes to you and you're to perform
22        an autopsy on them, and, please, there is a bottle of
23        water though.  I don't think that's been used yet
24        today so feel free if you need it.
25   A    Okay.  Thank you.  Actually, I'll take you up on
```

32

1         that.

2    Q    When someone, a body, comes in to you to do an

3         autopsy, is there kind of a standard checklist you

4         follow in performing an autopsy?

5    A    Okay.  Sorry.  I'm fighting a very nasty virus here.

6              Typically the cases that come in, you're never

7         entirely sure what -- what you're dealing with, and

8         so I think it's best to just treat every case the

9         same.  So yes, there is a checklist, so to speak,

10        there's a routine or a procedure that we would follow

11        to -- to perform a postmortem examination.

12             And typically what we'll do is the person will

13        come to us and they'll come in a transport pouch

14        that's sealed, and I'll open that pouch and I'll look

15        at the person and take photographs as needed, collect

16        evidence as needed, and then -- and then remove them

17        from the pouch and again examine the person with

18        their clothes on without cleaning anything up, doing

19        the same thing over again.  Then those -- those

20        clothes will be removed and then we'll do the same

21        thing again.  And then we'll clean off any --

22        anything that's -- any dirt or fluid or anything like

23        that that's on the body and we'll do it again.  So,

24        you know, just doing an external examination is a

25        layering effect.  It's -- we're documenting

33

  
1      everything from the very beginning all the way to the

2      point in which we do an internal examination, which

3      is probably what most people think of when they think

4      of an autopsy, and that's making incisions so that we

5      can examine the organs and tissues and look for

6      evidence of disease and trauma.  But that's -- that's

7      pretty typical.

8          Now, also, when we're going through this

9      process, we're collecting not just evidence if we see

10     it but, you know, we'll also collect specimens for

11     toxicological analysis, so the blood, urine, things

12     like that.  And in the end, the -- the idea is that

13     we've documented everything and we've gone through

14     this methodical way of examining the body and we're

15     going to put it all together at the end and hopefully

16     have a cause of death.

17  Q   Is it something, Doctor, where let's assume you have

18     an obvious area of injury to the abdominal area, is

19     that the only area you examine then when you do your

20     internal examination?

21  A   No.  No.  Every autopsy is a full autopsy.  Because,

22     again, we're not just looking for just cause of

23     death, we're looking to answer all the questions.

24     You can't answer the questions if you don't look at

25     everything.  So every -- every autopsy that's

34

1          performed in our office is complete, beginning to

2          end.  Because we're as interested in whether a person

3          has colitis or, you know, or a prostate problem as we

4          are that they have injuries from a motor vehicle

5          accident because, you know, the questions that come

6          up may be with regards to the prostate problem and

7          not the injuries to the vehicle accident.

8               So anyway, the -- you know, every autopsy is

9          complete and it involves a -- an examination of all

10         of the organs and tissues of the body.

11    Q    Are the organs actually removed during the process of

12         an autopsy?

13    A    They are.

14    Q    And what other than removing them is done?

15    A    Other than removing them?

16    Q    Yup.

17    A    Well, I mean, they are -- they are examined as is,

18         and then when they are removed they are dissected and

19         then they're placed -- they're placed back.

20    Q    Okay.  And is it part of your practice then to

21         prepare a report on your autopsy?

22    A    Yes.

23    Q    And ultimately, as part of that autopsy, do you

24         prepare or come to a conclusion as to the cause of

25         death?

35

1    A    Yes.

2    Q    And the parts that you have noted about doing the

3         external and then moving to the internal examination,

4         anything you note along that process also put into

5         your report?

6    A    Well, yes.  We -- I mean we'll document everything

7         from, you know, identifying marks and scars to the --

8         the medical intervention, you know, whether they have

9         EKG patches and a breathing tube and things like

10        that.  So we document everything.  It really should

11        be a report that allows you to visualize what we're

12        seeing at autopsy.

13   Q    Is it something where even on that external exam you

14        note any bruises or scrapes or scratches a person

15        has?

16   A    We will do that, yes.

17   Q    Is that something where the notation of that

18        sometimes is connected to the cause of death?

19   A    Sometimes it is, yes.

20   Q    And is it your practice though, even if someone had a

21        bruise on their shin, you would still note it, even

22        if it may not be any part of the cause of death?

23   A    Yes.

24   Q    Do you recall if you were working back on December

25        10th of 2013, Dr. Kelley?

36

1    A    Yes.

2    Q    And were you asked to assist in a case involving the

3         Appleton Police Department?

4    A    Yes.

5    Q    And was a call made to your office as you've

6         described related to an autopsy that they needed

7         assistance with?

8    A    Yes.

9    Q    And did you perform an autopsy on an individual named

10        Joshua Richards?

11   A    I did.

12   Q    I'm going to show you what's been marked Exhibit 59,

13        and I think after the cover sheet the pages are

14        numbered one through ten.  Would that be correct,

15        Doctor?

16   A    Yes.

17   Q    Okay.  And what is Exhibit 59?

18   A    Exhibit 59 is a copy of my autopsy report.

19   Q    And does it note the time that the autopsy was

20        performed?

21   A    Yes.

22   Q    And what time was that?

23   A    The date of the autopsy on the face page is Tuesday,

24        December 10th, 2013, at 9:45.

25   Q    And did it -- did anyone from law enforcement attend

37

1    the autopsy?

2  A  Yes.  Detective Meyer, Detective Cary Meyer from the

3     Appleton Police Department was present.

4  Q  Is it common to have law enforcement attend

5     autopsies?

6  A  Yeah.  Especially in cases in which there's traumatic

7     death or non-natural death.  It's not uncommon to

8     have law enforcement witnessing the procedure.

9  Q  Do they sometimes come and take their own

10     photographs?

11  A  They do sometimes, yes.

12  Q  As you began your autopsy, and please refer to

13     Exhibit 59 if you need to, Doctor, on Mr. Richards,

14     was there anything you were aware of prior to

15     starting the autopsy about him or what had happened

16     prior to him coming to you?

17  A  Yes.  Let's see.  Best way to explain this is

18     everyone is -- every family is offered to be a -- an

19     organ or tissue donor, so he -- he was in the

20     hospital and that was offered and the family did

21     decide to allow his organs to be donated.  So that --

22     that's something that has to take place when a person

23     still has blood pressure, organs have to be perfused,

24     so before he came to me he actually had undergone the

25     procedure to have his -- many of his organs donated

38

1            for transplantation.

2       Q    And was that apparent when you began your external

3            examination?

4       A    Yes, it was.

5       Q    What areas of note did you first observe during that

6            external examination on Mr. Richards?

7       A    Well, the most notable area was to the left side of

8            the head, just -- just in front of the lower left

9            ear.  There was a -- a -- a wound there which I

10           identified as a gunshot wound, and he had a little

11           bit of bruising around his -- his right eye that is

12           consistent with a fracture to the base the skull,

13           but for the most part -- for the most part that's the

14           extent of the external injury.

15      Q    Is it something based upon your examination of Mr.

16           Richards you could tell that that was a gunshot

17           wound?

18      A    Yes.

19      Q    And what was that, what characteristics might have it

20           had?

21      A    Well, it's a perforation, it was a perforation with

22           some small tears or lacerations around the edges.

23           There was a distribution of soot around the -- the

24           wound, the entrance wound.  There was some abrasion

25           there from the bullet passing through the skin.  So

39

1        all -- all these features are very typical of a
2        gunshot wound.
3    Q   Is it something that you took measurements of this
4        area?
5    A   Yes.
6    Q   You note -- you mentioned that there was soot near
7        the gunshot wound.  What if anything did that tell
8        you?
9    A   Well, okay, more comes out of the end of the gun than
10       the bullet.  Flame comes out of the end of the gun,
11       soot or basically smoke from the burning gunpowder
12       comes out of the end of the gun, unburned gunpowder
13       particles come out of the end of the gun, and some
14       burning particles too.  You can even have, you know,
15       small pieces of metal from the bullet come out of the
16       end of the gun.  So there's a lot of things that come
17       out of the end of the gun other than the bullet.
18           Now, as you increase the distance between the
19       end of the gun and the skin, as you might imagine,
20       those elements will -- they'll strike the skin at
21       closer distances, but as you move away they'll fall
22       away.  Okay?  So when the soot -- when the soot exits
23       the end of the gun, it can distribute itself around
24       the wound, and as you get farther away, that soot
25       pattern, you know, starts to dissipate and become not

40

1        just wider but also fainter.  So that's something
2        that you can look at to determine the range.  The
3        other thing is that there are small abrasions around
4        the edge of the wound.  Sometimes those little
5        gunpowder particles can hit the skin and cause little
6        abrasions if the gun is -- is within a certain
7        distance, and that's called gunpowder stippling.
8        Also called tattooing.  And that also gives you some
9        idea about the range of the firing.  And at some
10       point you're far enough away that nothing strikes the
11       -- the skin except for the bullet.  So that's a more
12       distant wound.  So those are the characteristics that
13       we're looking for.
14            In this particular instance there was -- there
15       was soot around the -- around the wound which
16       indicates that you're in close range.  Now, having
17       said that, the -- the only way to know exactly how
18       far is to have the gun and to test fire it at
19       different distances and look for the same -- the same
20       width of soot deposition and that will tell you what
21       the exact distance is.  So I can only -- I can only
22       give you generalities if I don't have information
23       about the -- about the weapon or if we weren't able
24       to test fire the weapon.
25    Q   Was there any gunfire stippling you noted?

41

1    A    There was a little bit.  And by the way, that can

2         begin fairly close to the skin, depending on the

3         weapon.  It can -- you can see some gunpowder

4         stippling out for quite a distance, but in this

5         particular instance there was only a few little --

6         little particles.  It was mostly soot.  So that told

7         me that this was a relatively close range wound.

8    Q    And you haven't been given any information that there

9         was any testing done on a gun in this case, correct?

10   A    No.  I -- no, I didn't ask either.

11   Q    Okay.  When you say "close range", I know you can't

12        give an exact number, but is there a range that you

13        typically find that in or that you're comfortable

14        saying based upon your opinion and your practice and

15        your experience that it might have been?

16   A    Well, for handguns, typically soot is pretty well

17        dissipated beyond a foot, but when you see the -- the

18        soot deposition really dense and small around the

19        edges of the wound, that tells you you're closer.  So

20        while I can't say, I would have to say that, you

21        know, this is anything from mere contact out to a few

22        inches.  That would be my estimation.

23   Q    You said near contact to a few inches?

24   A    Yeah.  In other words close to the skin but not

25        touching the skin.

42

```
 1    Q    So I'm assuming during the external exam then you
 2         looked at the area of injury to the wound near the
 3         left ear.  Did you notice anything else when you did
 4         an examination on his head?  You talked about the
 5         bruising by the right eye.  Was there anything else
 6         on the right side of his head that you noted?
 7    A    Yeah.  There was -- you could palpate or feel
 8         something underneath the skin on the right side,
 9         which later in doing the examination later that
10         represented the -- the fracture site and the
11         underlying bullet to the right superior portion of
12         the -- of the scalp.
13    Q    And photographs were taken of Mr. Richards' left ear
14         and the area of injury?
15    A    Yes.
16    Q    During the external exam, did you note any other
17         areas of trauma or injury?
18    A    No, no, I didn't.
19    Q    And then when you began your internal exam, can you
20         describe, we'll focus just when you examined the head
21         and skull of Mr. Richards, what you found?
22    A    Well, there -- the wound path -- well, as you might
23         imagine, the entrance wound is right in front of the
24         lower left ear, and the wound path passed upwards
25         left to right and slightly front to back.  So it
```

43

1    enters the -- the left lateral base of the skull and

2    damages the brain obviously and then exits to the

3    right superior or right upper portion of the side of

4    the -- of the skull.  It doesn't have enough energy

5    to -- to break the skin and leave the -- leave the

6    head, so it -- it perforated the skull but it didn't

7    get out of the skin.  So on this side what we had was

8    a -- an exit wound from the skull and a projectile or

9    bullet sitting right inside of that exit site.

10   Q    So meaning the skin of Mr. Richards wasn't perforated

11        and there wasn't an exit of the bullet?

12   A    That's right.

13   Q    And when you talk about wound path, you're talking --

14        do you want to explain to the jury a little bit about

15        what you mean when you say someone is in an anatomic

16        position?

17   A    Yes.  We -- when we talk about these things, we need

18        to -- we need to speak the same language obviously,

19        so what we talk about is the body in anatomic

20        position which means the body standing straight up

21        and down with the palms forward.  That's the anatomic

22        position.  So when we say, you know, front to back --

23        I'm sorry.  Let me back up a second.  So when you

24        look at the body that way, front is front, back is

25        back, left -- their left is their left and right is

44

1          right and up and down, so that gives us a reference
2          point that we can -- we can share but keeping in mind
3          that we're describing in the anatomic position but
4          we're not necessarily saying that that's the position
5          the body was in when it received the gunshot wound
6          because the body moves, you know, in many different
7          ways, so -- so in other words, that's just a
8          reference that we can use to understand what we're
9          saying when we write reports.
10    Q    And were you able to, in essence, and I think you
11         somewhat described this, track this wound path from
12         Mr. Richards, the entrance wound by his left ear you
13         said then to the top upper right of his head?
14    A    That's correct.
15    Q    Area of hemorrhage and bleeding within the brain I'm
16         assuming extensively because of the wound?
17    A    Yes.
18    Q    And you noted that you were able to recover the
19         bullet?
20    A    Yes.  I recovered the bullet from underneath that
21         exit site.
22    Q    You talked about his right eye during the external
23         exam, there being bruising around the right eye.  Can
24         you explain what that was caused by?
25    A    Yeah.  That's not uncommon.  That's actually a very

45

1    common sign of a basilar skull fracture, so if you

2    see somebody who has -- actually referred to as

3    raccoon eyes, if you see somebody like that, you --

4    in an emergency department, for instance, you would

5    be concerned that they have a basilar skull fracture

6    because what happens is that the fractures at the

7    base of the skull create hemorrhage that gets into

8    the -- the tissues around the eyes and of course the

9    eyelids will display that -- that purple blood that's

10   collecting in the soft tissues.  So he had it to the

11   right eye so -- and he does have a basilar skull

12   fracture to that right side by the way.

13   Q   One second, Doctor.  The bullet that was found in Mr.

14       Richards' skull, that was collected?

15   A   Yes.

16   Q   Is that a process, Doctor, when you do that that you

17       mark that in some fashion?

18   A   Yes.

19   Q   And what is ultimately done after it's collected?

20   A   Ultimately it's turned over to -- usually to --

21   Q   And you can talk that way it's maybe a louder.

22   A   Usually what we'll do is we'll turn this over to the

23       law enforcement agent that's present, so the

24       detective will sign it over using, you know, proper

25       chain of custody, we'll make a sheet.  So that's how

46

1          we do it.

2     Q    Is there sometimes, based upon what you locate, in

3          terms of the bullet you can make, maybe not an exact

4          estimate, but some estimate as to what caliber that

5          was?

6     A    Well, I -- admittedly, I try not to do that.  I can

7          tell the difference between a small caliber and a

8          large caliber, a .50 caliber bullet and a .22 caliber

9          bullet, the difference is pretty obvious, but going

10         further than that to say that that's a .38 caliber, I

11         don't typically do that.  If it's going to get

12         examined by a firearms examiner, that's the person to

13         do it anyway.

14    Q    And even with some of the organs that Mr. Richards

15         had gone through the donation process, were there

16         other organs you still examined and took out and

17         weighed?

18    A    Yes.  You know, certainly, you know, they had done an

19         evaluation of those organs and had removed them, so I

20         could -- couldn't examine them obviously other than

21         to receive a report that says everything looked good,

22         but yes, anything that's left, we continue on with

23         the autopsy as if they were there.  That doesn't

24         change the -- the completeness of the rest of the

25         autopsy.

47

1    Q    Okay.  I'm going to bring this a little bit close to

2         you and then I'm going to show you Exhibit 70 and

3         then 71.  Are you familiar with what's depicted

4         there, Doctor?

5    A    Yes.

6    Q    Okay.  I'm going to put it over here actually.  And

7         that might -- what's shown in exhibit -- first the

8         top exhibit, Exhibit 70?

9    A    Well this is -- this is our label and our container

10        or box, and this is the bullet that was recovered,

11        and this is just a close-up of that bullet.

12   Q    So 71 would be a close-up?

13   A    Correct.

14   Q    Okay.  Based upon -- is everything in your office

15        then assigned a case number that might be

16        collected?

17   A    Yes.  Every case gets a new unique case number.

18        That's up here.

19   Q    And is that also then utilized in any measurements

20        taken of items, the case number?

21   A    Oh, you mean the -- the scale here, yes, this is the

22        case number here with its adhesive strip that's

23        attached to a scale, both centimeters and inches.

24   Q    So the reference 13-0982 has nothing to do with the

25        bullet or the item we're seeing here, it's your case

48

1      number?

2   A   That's correct.

3   Q   Based upon the bullet that you found, can you give an

4       approximation whether it was a large caliber or small

5       caliber?

6   A   It looks small caliber to me.

7   Q   Okay.

8            ATTORNEY SCHNEIDER:  I'd move 70 and 71

9       into evidence.

10           THE COURT:  Any objection?

11           ATTORNEY WEITZ:  No.

12           THE COURT:  70 and 71 shall be received.

13  Q   (BY ATTORNEY SCHNEIDER)  Then, Doctor, I'm going to

14      show you -- and for purposes with the jury I'm going

15      to show you a folder.  Please open it.  We're going

16      to talk about a series of photographs.  On the back

17      of each photograph will have an exhibit number on it.

18           ATTORNEY SCHNEIDER:  Do you want to come up

19      while he's doing this?

20  Q   So you're first looking at Exhibit 61; is that

21      correct?

22  A   Yes.

23  Q   What is depicted there in Exhibit 61, Doctor?

24  A   Exhibit 61 is a photograph of the left side of the

25      head and shows the gunshot wound, and this is

49

1        obviously before anything's been cleaned up.

2    Q   Then moving on to Exhibit 62?

3    A   62 also shows the left side of the head.  It's a

4        little closer, and it's after the wound has been

5        cleaned.

6    Q   Then moving on to Exhibit 63?

7    A   Exhibit 63 is just a -- a -- an even closer view of

8        the same wound.

9    Q   And are you taking a measurement in that exhibit,

10       Doctor?

11   A   Well, I mean, I'm -- the scale is there to show the

12       dimensions of the wound, but, yeah, just showing that

13       plus all the other features of the skin surrounding

14       the wound.

15   Q   So previously on Exhibit 61, 62 or 63, are those some

16       of those where you could see that soot or that

17       stippling?

18   A   Yeah.  I think you can see in exhibit -- in Exhibit

19       61 you can see that there's some -- some black or

20       dark gray material immediately surrounding the wound.

21       It's been cleaned off in the next two photographs

22       though.  You can actually see a little bit of -- of

23       soot and searing at the edges of the wound that I

24       didn't quite get cleaned off, so you can still see it

25       in the closest view, but it's -- it's there.

50

1   Q   And you were just looking at Exhibit 63 for the
2       record, correct?

3   A   63, correct.

4   Q   And then moving on, Exhibit 64, what's depicted
5       there?

6   A   Exhibit 64 is the right side of the head.  This is
7       the -- this is that bony plate that the bullet is
8       sitting underneath.

9   Q   Then moving on to Exhibit 65?

10  A   And then Exhibit 65 depicts if you were to remove
11      that piece of bone you can see -- clearly see the --
12      the projectile underneath.

13  Q   And that would have been the bullet that you
14      ultimately then recovered from Mr. Richards?

15  A   Yes.

16  Q   And then moving on to Exhibit 66?

17  A   Exhibit 66 is a photograph of the right hand.

18  Q   Say the top of the hand?

19  A   Yes.

20  Q   Okay.  And then moving on to Exhibit 66 or 67 is the
21      -- which, right or left?

22  A   67 is the right hand.

23  Q   And we say that was the palm view?

24  A   It is the palm view.

25  Q   Okay.  And then moving on to 68?

51

1    A    68 is the left hand, the back of the left hand.

2    Q    Okay.  And then 69?

3    A    69 is kind of a palm view of the left hand.

4    Q    Okay.  And Exhibit 61 through 69, fair and accurate

5         as you recall during that autopsy?

6    A    Yes.

7    Q    Okay.  And ultimately, Doctor, after your examination

8         and collecting of the items and the evidence, were

9         you able to come to a conclusion as to the cause of

10        death for Mr. Richardson?

11   A    Yes.

12   Q    And what was that cause of death?

13   A    I -- I indicated his cause of death to be a gunshot

14        wound to the head.

15   Q    And is there a process whereby -- and that's included

16        in your report, Exhibit 59?

17   A    Yes.  It's on the front page.

18             ATTORNEY SCHNEIDER:  I would move Exhibit

19        59 into evidence at this time, Your Honor.

20             THE COURT:  Any objection?

21             ATTORNEY WEITZ:  No.

22             THE COURT:  59 shall be received.

23   Q    (BY ATTORNEY SCHNEIDER)  Further then, Doctor -- I'll

24        wait for you to finish.

25   A    Sorry.

52

1    Q    That's okay.

2         Is that cause of death then communicated back to

3         the coroner's office for the county in which you

4         perform the autopsy?

5    A    Yes, it is.

6    Q    And does that doctor or does the coroner then use

7         that determination in the death certificate?

8    A    Yes.

9    Q    I'm going to show you what's been marked Exhibit No.

10        60.  It's a certified death certificate, correct?

11   A    Yes.

12   Q    And for Joshua J. Richards?

13   A    Yes.

14   Q    And is your cause of death listed on this in -- I

15        think it's Item No. 41?

16   A    Yes, it is.

17   Q    And what is that?

18   A    Gunshot wound to head.

19             ATTORNEY SCHNEIDER:  I would move Exhibit

20        60 into evidence at this time, Your Honor.

21             THE COURT:  Any objection?

22             ATTORNEY VISHNY:  No.

23             THE COURT:  Exhibit 60 shall be received.

24             ATTORNEY SCHNEIDER:  Thank you.  I don't

25        have any other questions.

53

1               THE COURT:  Attorney Weitz?

2               ATTORNEY WEITZ:  Thank you, Your Honor.

3        **EXAMINATION OF PHILIP DOUGLAS KELLEY**

4   **BY ATTORNEY WEITZ:**

5   Q   First of all, Dr. Kelley, you said that in a typical

6       year you do somewhere in the neighborhood of

7       approximately 250 autopsies per calendar year,

8       right?

9   A   Yes.

10  Q   And those autopsies that you do, that's -- that's not

11      all for homicide cases, right?

12  A   No, that's right.

13  Q   Okay.  So autopsies can be done for things that are

14      other than a homicide such as like an accident or

15      death by natural causes, suicide, things of that

16      nature?

17  A   Yes, that's right.

18  Q   Okay.  Turn -- and very few of those actually are

19      homicide cases.

20  A   That's correct.

21  Q   Okay.  Turning your attention to the autopsy that you

22      performed in this case, one of the things that you

23      look at as part of kind of your overall examination

24      and examination of this case is toxicology, correct?

25  A   Yes.

54

1    Q    Okay.  And in this case there was some blood that was
2         collected and sent to a lab for toxicology testing.
3    A    That's right.
4    Q    And that was collected on December 8th at 2:27 a.m.?
5    A    I believe so.  I received the admission specimens.
6    Q    If you need to refer to your report.
7    A    Yeah.  Yes, you're --
8    Q    Page 9 may help refresh your recollection.
9    A    Yes, you're correct.
10   Q    Okay.  And in this case that blood was collected at
11        the hospital, right, that wasn't something that you
12        collected?
13   A    That's correct.
14   Q    Okay.  And as you describe in your report, this would
15        have been blood that was collected antemortem or, in
16        other words, before death?
17   A    That's right.
18   Q    And according to the toxicology results of that
19        testing, those samples showed a blood alcohol level
20        of .083?
21   A    That's right.
22   Q    But in this case, because it was collected at the
23        hospital, administration of any sort of fluids or
24        blood transfusions or things of that effect could
25        dilute the concentration or alter that blood alcohol

55

1        level.

2    A    That's a possibility.

3    Q    Okay.  So it's possible that Mr. Richards' blood

4         alcohol could have been higher at the time of the

5         shooting?

6    A    That's a possibility.

7    Q    Okay.  Turning now to the cause of death, you

8         declared that to be a single gunshot wound to the

9         head, correct?

10   A    Yes.

11   Q    Okay.  And as far as the trajectory of this gunshot,

12        it was a -- a straight trajectory, right?

13   A    Yes.

14   Q    Okay.  And it entered just in front of the lower ear,

15        so would that be fair to say, kind of by your ear

16        lobe, that little kind of soft area?

17   A    Right.  Right.  Right in front of the left ear.

18   Q    Okay.  And the trajectory it traveled from the left

19        side of the head to the right side of the head?

20   A    It did.

21   Q    And it was slightly front to back, so from the front

22        of the head towards the back slightly?

23   A    Yes, slightly.

24   Q    And the most notable thing was that it was sharply

25        upward, so it enters near the left ear but actually

56

```
1         ends up, the bullet comes to rest just below the
2         scalp towards the top, the right head?
3    A    That's right.
4    Q    And again there was no exit wound, the bullet
5         actually didn't have enough velocity to exit the
6         head?
7    A    Correct.
8    Q    You testified earlier that there was some bruising to
9         the right eye that was observed.  That would have
10        been a result of that skull fracture that you
11        discussed?
12   A    Yes.
13   Q    And the fracture was a result of the gunshot itself,
14        right?
15   A    Yes.
16   Q    So that wouldn't be from any sort of trauma or
17        injuries, it was from the gunshot?
18   A    That's right.
19   Q    Besides that and the gunshot, you didn't observe any
20        other injuries in your examination of Mr. Richards'
21        body, right?
22   A    No.
23   Q    Okay.  And as far as the wound, you said that there
24        was soot and stippling observed and that's what
25        allowed you to say that it wasn't a direct contact
```

57

```
1              but certainly a close range when the shot was fired.
2    A    Yes.
3    Q    Okay.  So the gun could have been as close as a
4              fraction of an inch all the way up to a few inches
5              away at the time it was fired?
6    A    Yeah.  You know, you can start seeing some --
7              obviously you can see soot with a contact all the way
8              out to a distance, but stippling usually begins, I
9              would say, somewhere around a half an inch or so and
10             then continues outwards, so yeah, I think -- I think
11             that's a -- that's a -- that's a good estimation, but
12             again, the only way to know for sure is to test fire
13             the weapon.
14   Q    Sure.  But in your estimation it would be anywhere
15             from a fraction of an inch, half an inch, all the way
16             up to a few inches?
17   A    Sure.  Yes.
18   Q    Okay.  Now, as far as this wound, it's possible that
19             the gun made contact with the head before or after
20             the shot, right?
21   A    That's possible.
22   Q    Okay.  And if there were contact between the gun
23             itself and the head, typically you would see some
24             sort of abrasion to the -- the skin, right?
25   A    Well, I mean, if you mean -- if you mean that the gun
```

58

1           hit the skin?

2    Q      If someone is struck with the gun itself?

3    A      Oh, okay.  Well, it depends, but yes, if you -- if

4           you strike somebody with a portion of the gun, you

5           definitely can get an abrasion or a scrape or a

6           bruise.  The abrasions and everything that I've been

7           describing though were from the energy of the -- of

8           the actual interaction of the gun with the skin

9           though.

10   Q      So in this circumstance, if the gun made contact with

11          the head in that exact same location where there was

12          the wound, you wouldn't be able to see that abrasion

13          or anything because it would be obscured by the

14          actual wound itself from the bullet entry?

15   A      No, I didn't.  I mean if -- if you're referring to,

16          you know, a pattern abrasion from the muzzle of the

17          gun, I -- that's something I didn't see.  I'm not

18          sure if that's what you're referring to.  When the

19          gun is in contact with the skin when it fires, the

20          skin, it slams against the front of the gun, so to

21          speak, and you get abrasions that are patterned and

22          actually will show the pattern of the muzzle of the

23          gun.  That's not something I saw in this case.

24   Q      And that would be if the gun is actually pressed up

25          against the skin when it's fired?

59

1  A    That's a contact wound.

2  Q    So what I'm trying to get at here is if the gun made

3       contact with the head either immediately before or

4       after the shot but not right when the shot is fired,

5       that would be consistent with what you observed?

6  A    Could you say that one more time?  I'm sorry.

7  Q    If the gun strikes the head -- by way of example,

8       let's say that it's before the shot is fired and then

9       the shot is fired as the gun is kind of traveling

10      away from the head, that would be consistent with

11      what you observed because the -- the shot itself

12      would not be fired when it's in contact with the head

13      but it may have made contact before or after the

14      shot?

15  A   I see what you mean.  Yes.  If the bullet passes

16      through an area that has a previous injury, that

17      would be -- I wouldn't be able to see that.

18  Q   Okay.  And then just to clarify again, Dr. Kelley,

19      you didn't see any other injuries to the body besides

20      the -- the hemorrhaging to the eye and the wounds

21      directly from the gunshot itself, right?

22  A   That's correct.

23  Q   Okay.  So no evidence that he was punched or struck.

24  A   That's correct.

25  Q   Okay.

60

1                    ATTORNEY WEITZ:  Nothing further.  Thank

2        you.

3                    THE COURT:  Attorney Schneider?

4                    ATTORNEY SCHNEIDER:  No follow-up.

5                    THE COURT:  Members of the jury, do you

6        have any questions you wish to submit for

7        consideration?

8                    (No response.)

9                    THE COURT:  Thank you, sir.  You'll be

10       excused.

11                    ATTORNEY SCHNEIDER:  We do have a few more

12       witnesses we would like to get through possibly

13       before the lunch hour.

14                    THE COURT:  That would be fine.

15                    ATTORNEY SCHNEIDER:  Mr. Duros is taking

16       over the questioning of the next witness.

17                    THE COURT:  Very good.  Mr. Duros?

18                    ATTORNEY DUROS:  State calls Marissa

19       Emenecker.

20                    THE COURT:  Would you please come to the

21       witness stand and remaining standing, the clerk will

22       swear you in.

23                    THE CLERK:  Please raise your right hand.

24                    (Oath administered to witness.)

25                    THE WITNESS:  Yes.

1                    THE CLERK:  Please state your full name and

2          spell it for the record please.

3                    THE WITNESS:  Marissa Ann Emenecker,

4          M-A-R-I-S-S-A, A-N-N, and then E-M-E-N-E-C-K-E-R.

5                    THE COURT:  Mr. Duros, your witness.

6                    ATTORNEY DUROS:  Thank you.

7          **EXAMINATION OF MARISSA ANN EMENECKER**

8   **BY ATTORNEY DUROS**:

9   Q    Where do you currently live?

10  A    In Menasha.

11  Q    Did you ever live in Appleton?

12  A    When I was like ten or eleven.

13  Q    So you've been living in Menasha for quite some

14       time?

15  A    About a year or so.

16  Q    Have you ever been to downtown Appleton?

17  A    Yeah.

18  Q    Do you come to downtown Appleton frequently?

19  A    Yeah.

20  Q    Back in late 2013, did you tend to come to downtown

21       Appleton?

22  A    What was that?  Sorry.

23  Q    Sorry.  You were a little distracted.

24            Back in late 2013 did you tend to come to

25       downtown Appleton every once in a while?

62

1   A   Yeah.  I would go to Sharks every once in a while.

2   Q   Sharks.  Is that a bar?

3   A   Pool hall, bar, however you want to put that.

4   Q   Where is that located?

5   A   It's under Park Central in the basement next to

6       Subway right on College Ave.

7   Q   So it's right on the Avenue?

8   A   Yup.

9   Q   Are you familiar with an establishment called Luna?

10  A   Yeah.

11  Q   Have you been there in the past?

12  A   Yeah.  For one of their dry nights that they had.

13  Q   Now, is Sharks close to the Luna location?

14  A   It's on the same block, it's probably like three

15      businesses over, two or three.

16  Q   So it's pretty close?

17  A   Yeah.

18  Q   I want to direct your attention to December 8th,

19      2013, the night of December 7th going into the early

20      morning hours of December 8th.  Do you know where you

21      were that night?

22  A   I was down at Sharks.

23  Q   Who were you there with?

24  A   A bunch of friends.

25  Q   At around 12:15, 12:30, around that time, did you

63

1        hear about anything that happened down at Luna?

2    A   Someone came in saying that there was cops all over

3        the place.  I didn't know exactly what happened until

4        later on when Sharks made us stay there until we got

5        the okay to leave.

6    Q   Now, I said 12:15, but I mean 2:15.  Was it close to

7        bar close when you heard that something happened at

8        Luna?

9    A   Yeah.  I got down there at about 1 -- it was about 1,

10       1:30 when I got to Sharks.

11   Q   So approximately what time do you think you heard

12       that something was happening at Luna?

13   A   I honestly couldn't even tell you.  I don't

14       remember.

15   Q   Okay.  Now, while you were at Sharks at some point

16       did you see an Asian male walk into the

17       establishment?

18   A   Yes.

19   Q   Do you see him in the courtroom today?

20   A   Yes.

21   Q   Is he sitting at the table to my left?

22   A   Yes.

23   Q   Now, when you saw him walk into -- just for the

24       record, he's already been identified, could you point

25       out a color of clothing he's wearing, the color shirt

1        he's wearing?

2    A   Maroon.

3            ATTORNEY DUROS:  I'll ask that the record

4        reflect identification.

5            THE COURT:  The record shall so reflect.

6    Q   (BY ATTORNEY DUROS)  What entrance did you see the

7        Asian male come into the establishment?

8    A   I saw him come in the front, so from College Ave.

9        then he walked down the stairs.

10   Q   Were you downstairs or were you upstairs?

11   A   I was downstairs at the time.  I was standing close

12       to the bar.

13   Q   Do you remember what he was wearing that night?

14   A   It was like a gray sweatshirt, I think it was like a

15       darker gray sweatshirt, jeans, white T underneath.

16   Q   Was he wearing a winter coat?

17   A   No.

18   Q   Just a sweatshirt?

19   A   Yeah.

20   Q   Do you remember what he looked like, for example,

21       anything on his face, any facial hair?

22   A   He did have some facial hair.  I don't exactly

23       remember exactly how it was, but I know he had facial

24       hair.

25   Q   Okay.  That's fine.

65

1              Prior to that date, had you ever seen that --

2        the defendant before?

3    A   No.

4    Q   You didn't know who he was?

5    A   No.

6    Q   At some point in the night, specifically around bar

7        close, did you decide to go home?

8    A   Once Sharks said that we could leave, he asked me if

9        I could bring him to his mom's house down the street,

10       and it was cold out so I said yeah.

11   Q   Were you talking to him before I asked you that?

12   A   No, not really.  I was just standing in the hall with

13       a group of friends that were there.

14   Q   So he just walked up to you randomly and said can you

15       give me a ride home?

16   A   Pretty much, yeah.

17   Q   At around approximately what time did he ask you to

18       give him a ride home, if you remember?

19             Let me ask you this.  Was it close to bar close?

20   A   Yeah.

21   Q   What time is bar close?

22   A   I think it was two that night.

23   Q   Okay.  Could it have been 2:30?

24   A   It could have been.  It could be between 2 and 2:30.

25       I don't really remember.

1   Q   Were you with anyone when the defendant came up and
2       asked for a ride home?
3   A   I was with a lot of people, but Talisa was the main
4       one.
5   Q   What's her last name?
6   A   Talisa Farias.
7   Q   Were you planning on giving her a ride home as
8       well?
9   A   Yeah.  She came down there with me.
10  Q   When the defendant asked for a ride home, how do you
11      respond?
12  A   I said yeah.
13  Q   That was fine with you.
14  A   Yeah.  I drive a lot of people home so it wasn't a
15      big deal.
16  Q   Did he tell you where he wanted to be dropped off?
17  A   He just said his mom's house at that time.
18  Q   Did he give you an address or did he just tell you
19      where to go?
20  A   No, he just told me where to go.
21  Q   At that point did you exit Sharks?
22  A   Yeah.  We went up into the alley, so the back of
23      Sharks.
24  Q   Where was your car located at that time?
25  A   Parked right -- I don't know what the building is

67

```
1           called but it was parked right behind pretty much
2           Sharks, right in that back alley.
3     Q     So you, Talisa and the defendant got into your
4           vehicle?
5     A     Yup.
6     Q     Where was everybody sitting?
7     A     I was driving, Talisa was passenger, and then he was
8           sitting passenger side in the back seat.
9     Q     Okay.  And again, you started driving and he gave you
10          directions on where he wanted you to go?
11    A     Yup.
12    Q     Do you remember where he told you to go?
13    A     I think it was down Division Street.  I couldn't tell
14          you what street we ended up on.
15    Q     Was he telling you take a left, take a right?
16    A     Yeah.
17    Q     Things like that?
18    A     Yeah.
19    Q     Did you eventually get to the place where he wanted
20          to be dropped off?
21    A     Yeah.
22    Q     Did he get out of the car?
23    A     Yeah.  He got out right away.
24    Q     Did you see him do anything when he got out of the
25          car?
```

68

1   A   He walked up to the house and he was like leaning

2       over the garbage cans that were like in front of --

3       I'm pretty sure it was a door, and I just left after

4       that.  I didn't see if he went in or anything.  I

5       just left.

6   Q   Was -- was he acting weird or suspiciously at all to

7       you?

8   A   Not to me.

9   Q   What about when he was out by the garbage cans, did

10      you -- what were you thinking?

11  A   I was wondering if he was trying to get in the house,

12      because I think there was two garbage cans, if I can

13      remember.  The two garbage cans were in front of the

14      door to get into the garage, and it looked like he

15      was just trying to open the door.  So --

16  Q   At some point did you and Talisa then leave?

17  A   Yeah.

18  Q   Now, I want to take you back to Sharks just for a

19      second.  Did you have any conversation with the

20      defendant while you were at Sharks?

21  A   I honestly don't remember.

22  Q   Do you remember telling police that you -- you did

23      have some conversation with him while at Sharks,

24      specifically about what happened at Luna?

25  A   The only thing that -- I don't think it was him that

69

1          told me that somebody got shot at Luna, I think
2          somebody else told me.  He didn't really say anything
3          at all the whole time.
4     Q    Do you remember writing a -- a witness statement in
5          this case when you were at the police department?
6     A    Yes.
7     Q    If I showed you that statement, do you think that
8          could refresh your memory?
9     A    Maybe.  Hopefully.
10    Q    I'm handing you what was just marked as Exhibit 116.
11         Do you recognize that?
12    A    Yeah.
13    Q    Is your name on that document?
14    A    Yup.
15    Q    Is that the statement that you wrote when you went to
16         the police department to tell them about what you saw
17         that night?
18    A    Yeah.
19    Q    Is that a yes?  Does that appear to be your
20         handwriting?
21    A    Yeah.
22    Q    And your signature?
23    A    Yup.
24    Q    If you could, just to refresh your recollection,
25         could you read the first four or five lines

70

1          specifically to see if that refreshes your memory on

2          whether you said anything about what the defendant

3          said to you?

4     A    Oh.  (Witness complying.)

5     Q    Before that, did -- does that refresh your memory?

6     A    A little bit, yeah.

7     Q    So on that -- on that night, what did you tell the

8          police what the defendant said to you?

9     A    That he said that someone was shot at Luna.

10    Q    Did he indicate to you that someone was shot or that

11         someone was shot in the head?

12    A    I'm pretty sure that it was just somebody got shot.

13         I don't know.

14    Q    Can I show you this again to refresh your memory?

15    A    Yeah.  He said some guy shot someone in the head is

16         what it says.

17    Q    You didn't talk to police that night, is that

18         correct, on the night of the shooting?

19    A    No.

20    Q    When did you eventually go into the police

21         department?

22    A    I saw his picture in the newspaper and went in pretty

23         much right after that.

24    Q    So when you saw his picture, you realized that that's

25         the person who you drove home on the night of that

71

```
 1        shooting?

 2   A    Yup.

 3   Q    When you dropped him off at a location in Appleton,

 4        approximately how long did it take you to get from

 5        Sharks to that location?

 6   A    Maybe like --

 7   Q    If you remember.

 8   A    -- five minutes.  It wasn't that far away.

 9   Q    When you wrote this statement at the police

10        department, you included everything that you

11        remembered about that night; is that correct?

12   A    Yeah.

13   Q    Do you remember what day you went to the police

14        department?

15   A    The next day, so what was that, the 8th?  Or was it

16        the 9th.  I don't remember.

17   Q    Do you remember if it was December 13th of 2013?

18   A    I guess.  Sure.  I don't know.

19   Q    Now when you wrote the statement, you signed it,

20        correct?

21             ATTORNEY WEITZ:  Your Honor, we would

22        stipulate that it's the 13th.

23             THE WITNESS:  Okay.

24             ATTORNEY DUROS:  I have nothing further.

25             THE COURT:  Attorney Weitz?
```

72

```
1                    ATTORNEY WEITZ:  Thank you.
2              EXAMINATION OF MARISSA ANN EMENECKER
3   BY ATTORNEY WEITZ:
4   Q    So, Miss Emenecker, on the night of December 7th
5        going into the 8th, you and your friend Talisa were
6        hanging out at Sharks and you were only at Sharks
7        that night, right?
8   A    Yup.
9   Q    Okay.  And when you're at Sharks, there's a guy that
10       comes up to you and asks you for a ride home,
11       right?
12  A    Um-hum.
13  Q    And he said that he wanted to go to his mom's house,
14       that was the plan as far as where you were going to
15       take him?
16  A    Yeah.
17  Q    And you had never met this guy before, so this is the
18       first time you've seen him, right?
19  A    Yes.
20  Q    As far as what you remember and what you told the
21       police, you believed that he was wearing a gray
22       sweatshirt or a hoodie that zipped up, right?
23  A    Yeah.
24  Q    But it's also possible that could have been like a
25       lighter type jacket?
```

73

1    A    I'm pretty positive that it was gray, just --

2    Q    I understand the color, I'm just talking about the

3         weight of -- let me put it this way.  It's not a big

4         puffy, like, down winter jacket, right?

5    A    No.  It's just a regular hoodie.  It wasn't like

6         super baggy, it was kind of tighter.

7    Q    Sure.

8    A    So --

9    Q    So something that's of a thinner material, not a

10        heavy down jacket?

11   A    Yeah.

12   Q    And it looked pretty plain, there was no writing or

13        designs on it?

14   A    No.

15   Q    And underneath that you said that he was wearing a

16        white t-shirt?

17   A    Yeah.

18   Q    And you believe that he had some -- some facial hair,

19        right?

20   A    Yeah.

21   Q    Okay.  And the reason that you came in to the police

22        department is because you saw a photo on the news,

23        correct?

24   A    Yup.

25   Q    And you saw that photo in relation to a story about

74

1        the Luna shooting?

2    A    Um-hum.

3    Q    And you thought that that may have been the same guy

4        that you gave the ride to?

5    A    I'm pretty positive that it was him.  I remembered

6        from that night.

7    Q    Well, initially you weren't sure and you actually

8        contacted your friend about whether it was the same

9        guy, right?

10   A    She actually sent me the picture, Talisa sent me the

11        picture and I said, yeah, that's him.

12   Q    So you guys had a conversation --

13   A    Yeah.

14   Q    -- in regards -- okay.  And actually when you're

15        talking to the police officers at some point you told

16        them that you were pretty sure but all Asians kind of

17        look alike to you?

18   A    Yeah.

19   Q    Which is not necessarily a bad thing, just certain

20        facial features and things like that --

21   A    Yeah.

22   Q    -- are harder for you to distinguish.

23   A    I --

24   Q    So at this point, by the time you come in and you

25        talk to the police, you had already seen this on the

75

1          news, right, you had read an article about it?

2     A    Yup.

3     Q    Okay.  So you knew a lot of the details about the

4          Luna homicide?

5     A    Yeah.

6     Q    Okay.  And at that point you had already known then

7          that the victim had been shot in the head because

8          that was in the news article?

9     A    Yeah.

10    Q    Okay.  When you came in and talked to police, one of

11         the big things the police wanted you to do is

12         identify what house you took this person to, right?

13    A    Yup.

14    Q    But as you are today, you were uncertain about

15         exactly what street it was?

16    A    When I brought the cops to find the house, I was

17         having issues remembering exactly where it was too,

18         but then we finally found it so --

19    Q    And how long did it take you to find it?

20    A    We were driving around for a -- at least an hour

21         looking for the house.  And then I finally spotted it

22         and knew that it was that house.

23    Q    So even then it still took you a while to find this

24         house?

25    A    Yeah.  Because I was -- the last time I was probably

76

```
1           going to see him and dropped him off.  I didn't pay
2           attention to where I was really going.
3    Q      Okay.  And at that time nothing really stood out in
4           your mind as to I really need to remember this house.
5    A      No.
6    Q      Okay.  When you go with the officers to try and
7           locate the house, how -- how did that play out?  Were
8           you driving with the officer, were you driving
9           separately?
10   A      No.  My mom was actually driving, and I was in the
11          passenger seat, Talisa was in the back.  We were
12          driving in my car and the cop followed us all around
13          until I found it.
14   Q      And you said that took you a while.  Did you guys
15          ever have to stop and --
16   A      We pretty much went down every street possible until
17          it just popped out at me.
18   Q      Okay.  And you said that that was about an hour?
19   A      Yeah, about that.
20   Q      Going back to recognizing the person when you came in
21          to talk to the police after you saw the photo on the
22          news, they never showed you any photographs to see if
23          you could pick out that person from like a lineup?
24   A      No.
25   Q      Okay.  And in that same vein, going back to what you
```

77

1          said earlier, you saw on the news about this

2          shooting, right?  And you knew at that point from the

3          news that the person at Luna had been shot in the

4          head, right?

5    A     Yeah.

6    Q     Okay.  So when you're at the police department, you

7          already know all this information, right?

8    A     Yeah.

9    Q     Okay.

10                 ATTORNEY WEITZ:  Nothing further.  Thank

11         you.

12                 THE COURT:  Mr. Duros, any redirect, sir?

13                 ATTORNEY DUROS:  Briefly.

14         **EXAMINATION OF MARISSA ANN EMENECKER**

15   **BY ATTORNEY DUROS:**

16   Q     You drove with a police officer to find the house; is

17         that correct?

18   A     Yes.

19   Q     Were you in the same vehicle as the police officer?

20   A     No.

21   Q     Was he following you?

22   A     Yup.

23   Q     Do you remember if that was Officer Nagel?

24   A     I couldn't tell you his name.

25   Q     Okay.  But when he took you to find that house, did

78

```
1        he tell you where to go?
2    A   I don't think so.  I don't remember.
3    Q   So he didn't give you any hints or direction as to
4        where to go?
5    A   No.
6    Q   No?
7    A   No.
8    Q   You took him to where you remembered dropping the
9        defendant off that night; is that correct?
10   A   Yeah.  We drove up and down every street until I
11       found it.
12   Q   Now you indicated that you drive everyone home,
13       right?
14   A   Yup.
15   Q   How old are you right now?
16   A   I'm 22.
17   Q   So back on this date you would have been how old?
18   A   20.
19   Q   Does that mean you -- you weren't drinking that
20       night?
21   A   Nope.
22   Q   And is that why you tend to or at least tended to be
23       everyone's driver?
24   A   Yup.
25   Q   When you went in to speak with police, why did you do
```

1         it?  Why did you go in to talk to them?

2    A    Because I --

3              ATTORNEY WEITZ:  Objection, Your Honor.

4              THE COURT:  Approach.

5              (A bench conference was held.)

6              THE COURT:  I'll allow you to answer the

7         question.  Do you need to -- do you need it read back

8         to you?

9              THE WITNESS:  Yeah, please.

10             (Question read back.)

11   A    Because that's the first thing I'm going to do when

12        I'm involved in something like that.  I don't know.

13   Q    So you just had information that you thought they

14        might want to know?

15   A    Yeah.

16   Q    Is what you wrote what you remember from that

17        night?

18   A    Most of it, yeah.

19             ATTORNEY DUROS:  I have nothing further.

20             THE COURT:  Attorney Weitz?

21             ATTORNEY WEITZ:  Nothing.

22             THE COURT:  Ladies and gentlemen, any

23        questions for consideration?

24             (No response.)

25             THE COURT:  Thank you.  You may be excused.

80

1                    ATTORNEY SCHNEIDER:  Judge, just to

2          complete the record, I'm going to move 116 in just so

3          that we're not missing a number later.

4                    THE COURT:  Any objection to the receipt of

5          116?

6                    ATTORNEY WEITZ:  No.

7                    THE COURT:  Actually, can I get -- I

8          just -- counsel for one second.

9                    (Bench conference.)

10                    ATTORNEY DUROS:  Your Honor, at this time

11          the State will call Talisa Farias.

12                    THE COURT:  Mr. Duros, will you be

13          questioning again, sir?

14                    ATTORNEY DUROS:  Yes.

15                    THE COURT:  If you would please come to the

16          witness stand, remaining standing and the clerk will

17          swear you in.

18                    THE CLERK:  Please raise your right hand.

19                    (Oath administered to witness.)

20                    THE WITNESS:  Yes.

21                    THE CLERK:  Please state your full name and

22          spell it for the record please.

23                    THE WITNESS:  Talisa M. Farias,

24          T-A-L-I-S-A.

25                    THE COURT:  You may be seated.

81

1                    <u>**EXAMINATION OF TALISA M. FARIAS**</u>

2    **BY ATTORNEY DUROS:**

3    Q    Where do you currently live?

4    A    In Little Chute.  1718 Buchanan Ave.

5    Q    If you could, speak up so everybody in the courtroom

6         can hear you.

7    A    Do you need me to repeat that?

8    Q    Yes, please.

9    A    In Little Chute.  1718 Buchanan Ave.

10                   THE COURT:  And, Miss Farias, if need be,

11        that microphone does move.  There you go.

12   Q    (BY ATTORNEY DUROS)  How long have you lived there?

13   A    About two months.

14   Q    Where did you live prior to that Little Chute

15        address?

16   A    Schaefer Street in Appleton.

17   Q    So you used to live in Appleton?

18   A    Yes.

19   Q    Were you living in Appleton back in late 2013?

20   A    Yes.

21   Q    Back around late or early December 2013, did you tend

22        to go downtown Appleton every once in a while?

23   A    Yes.

24   Q    Did you go downtown with your friend Marissa

25        Emenecker every once in a while?

82

```
1    A    Yes, um-hum.

2    Q    I'm going to direct your attention to the night of

3         December 7th, 2013, into the early morning hours of

4         December 8th, 2013.  Do you remember where you were

5         that night?

6    A    At Sharks.

7    Q    Is Sharks a bar?

8    A    Yes.

9    Q    Were you there with your friends?

10   A    Yes.

11   Q    Were you there with your friend Melissa Emenecker?

12   A    Yes.

13   Q    At some point do you remember if an Asian male walked

14        into Sharks?

15   A    Yes.

16   Q    What entrance did he walk in?

17   A    The one coming down from the street off College Ave.

18   Q    So right off College Ave.

19   A    Yes.

20   Q    Do you recognize the person who walked in as someone

21        who is in the courtroom today?

22   A    Yes.

23   Q    Can you describe what color shirt he's wearing for

24        the record?

25   A    Maroon shirt.
```

83

```
 1                    ATTORNEY DUROS:  I'll ask that the record
 2         reflect identification.
 3                    THE COURT:  The record shall so reflect.
 4    Q    (BY ATTORNEY DUROS)  So you said you walked in the
 5         front entrance, meaning the College entrance?
 6    A    Um-hum, yes.
 7    Q    Into Sharks.  Do you remember what he was wearing?
 8    A    Jeans and I believe it was like a brown jacket.
 9    Q    Do you remember telling police officers that he was
10         wearing a gray sweatshirt?
11    A    Yeah.  Underneath it, I would believe underneath the
12         coat it was.
13    Q    Okay.  Now, when you spoke with officers, do you
14         remember writing a written statement?
15    A    Yes.
16    Q    In that written statement do you remember writing
17         down what he wore?
18    A    Yes.
19    Q    And that's what you remembered at the time, right?
20    A    Correct.
21    Q    If I showed you a copy of your written statement,
22         could that probably refresh your memory as to what
23         you thought he was wearing that night?
24    A    Yes.
25                    ATTORNEY DUROS:  May I approach the
```

84

1      clerk?

2              THE COURT:  You may.

3   Q   (BY ATTORNEY DUROS)  I'm handing you what was just

4       marked as Exhibit 117.  Do you recognize that

5       document?

6   A   Yes.

7   Q   Is your name on that document?

8   A   Yes.

9   Q   Is that the written statement that you wrote after

10      going to the police department?

11  A   Yes.

12  Q   What date was that drafted?  Does it say on there?

13  A   December 13th.

14  Q   December 13th?

15  A   Yes.

16  Q   Now, if you could, could you briefly scan that to see

17      if it refreshes your memory as to what you told

18      police officers the defendant was wearing that

19      night?

20  A   A gray sweatshirt.

21  Q   Does that say anything about a brown jacket?

22  A   No.

23  Q   So at least on December 13th you told officers he was

24      wearing just a gray sweatshirt?

25  A   Yes.

1                    ATTORNEY DUROS:  I'll move Exhibit 117.

2                    THE COURT:  Any objection?

3                    ATTORNEY WEITZ:  No.

4                    THE COURT:  117 shall be received.

5    Q   (BY ATTORNEY DUROS)  Do you remember when the

6        defendant entered Sharks, did he go to any specific

7        place --

8    A   Towards --

9    Q   -- in the bar?

10   A   Yeah.  Towards like the back area by like where the

11       bathrooms are.

12   Q   And where were you seated at the time?

13   A   Seated right by the bar like with my back towards

14       that.

15   Q   So you saw him walk in and you saw him go back to the

16       bathrooms?

17   A   Yes.

18   Q   Did he go in the area of the bathrooms or did you see

19       him actually go in the bathroom?

20   A   The area of the bathroom.

21   Q   How long -- to your best estimation, how long was he

22       back in that area?

23   A   15, 20 minutes.

24   Q   So he didn't come out of there for about 15 to 20

25       minutes?

86

```
 1   A   Correct.
 2   Q   At some point did the defendant approach you and
 3       Marissa?
 4   A   Yes.
 5   Q   Did he tell you anything about what was going on that
 6       night?
 7   A   Just that there was like stuff happening outside and
 8       that's really all we knew until somebody else
 9       different came downstairs and told us that there was
10       a shooting at a different bar.
11   Q   Had you ever met the defendant before?
12   A   No.
13   Q   He just randomly walked up to you and started
14       talking?
15   A   Yes.
16   Q   At some point did he ask you or Marissa for a ride
17       home?
18   A   Yes.
19   Q   At that point did it appear to you that he really
20       wanted to leave?
21   A   Yes.
22   Q   Once you got out to the parking lot, do you remember
23       if the car was in the alley?
24   A   In the alley, yes.
25   Q   Is that when he directed you to the location where he
```

1    wanted to get dropped off?

2  A   Yes.

3  Q   Did he tell you whose house that was?

4  A   He told us it was his mother's house.

5  Q   So when you dropped him off and he got out of the

6      vehicle, did he explain what he was doing at that

7      time?

8  A   He -- the house was connected to the garage and he

9      walked up to the garage and we thought there was

10     maybe like a code number thing to get into the garage

11     and he kind of stood there.  There was a bigger

12     garbage can outside, and me and Marissa thought like

13     something's wrong, why would you stand outside, so we

14     just drove off because we weren't sure what was

15     really going on.

16 Q   Okay.  I want to clarify something.

17 A   Sure.

18 Q   Sharks is a bar, right?

19 A   Yeah.  A billiards hall, whatever.

20 Q   Billiards.  Is it still called Sharks, do you know?

21 A   I have no idea.

22 Q   You have no idea?

23 A   No clue.

24 Q   Did you have to be 21 to enter the bar?

25 A   I don't believe so, I think you had to be 18.

88

1   Q   You had to be 18.  Okay.

2           When you were interviewed by police, that was on

3       December 13th, right?

4   A   Correct.

5   Q   Were you in the same room as your friend Marissa when

6       police were interviewing you?

7   A   Not together, no.

8   Q   And you just told police exactly what you remembered

9       about that night?

10  A   Yes.

11          ATTORNEY DUROS:  I have nothing further.

12          THE COURT:  Attorney Weitz?

13          ATTORNEY WEITZ:  Thank you, Your Honor.

14              **EXAMINATION OF TALISA M. FARIAS**

15  **BY ATTORNEY WEITZ:**

16  Q   I may be pronouncing this way -- is it Farias?

17  A   Farias.

18  Q   Okay.  Miss Farias, you and your friend Marissa were

19      at Sharks that night, right?

20  A   Yes.

21  Q   And that was the only place that you guys went on

22      College Ave. that night?

23  A   Correct.

24  Q   You weren't at Luna?

25  A   No.

89

1   Q   So you're at Sharks and you said that you saw an
2       Asian guy come in from the College Ave. entrance?
3   A   Yes.
4   Q   And you said he went to the area of the bathrooms,
5       right?
6   A   Correct.
7   Q   You didn't see him go into the bathroom, right?
8   A   Correct.
9   Q   And at that time you were still having a conversation
10      with your friend Marissa, right?
11  A   Yes.
12  Q   And you guys probably had some other friends that you
13      were talking with?
14  A   Correct.
15  Q   So your attention wasn't focused on this guy, what
16      he's doing the whole time, right?
17  A   Correct.
18  Q   So the 15 to 20 minutes, that's just the next time
19      you saw him, right?
20  A   Correct.  Coming from that area.
21  Q   Okay.  But you don't know what he was doing that
22      whole time?
23  A   Correct.
24  Q   And the reason you saw him coming from that area is
25      because that's when he came up to the bar by you,

90

1          right?

2    A     Correct.

3    Q     And you had never met him before so this was the

4          first time that you saw this --

5    A     Correct.

6    Q     -- this guy.

7             And the description you gave of this individual,

8          you said that actually when you talked to the police

9          it was a gray and brown hooded sweatshirt, right?

10   A     Correct.

11   Q     So you remember that it was two different colors?

12   A     Correct.

13   Q     Okay.  And there wasn't any sort of crazy pattern or

14         anything on the sweatshirt, right, it was pretty

15         plain?

16   A     Not that I recall.

17   Q     Okay.  And the other thing that you recall is that he

18         did have some facial hair?

19   A     Correct.

20   Q     Okay.  I think specifically you said it was somewhere

21         on his chin?

22   A     Correct.

23   Q     Okay.  Shortly before you come in to talk to police,

24         your friend Marissa had sent you a picture from a

25         news article, right?

```
1   A    Correct.

2   Q    Okay.  And you guys had a conversation about whether

3        that might be the same guy?

4   A    Correct.

5   Q    Okay.  And you thought that maybe it was the same

6        guy, but you weren't a hundred percent sure.

7   A    Correct.

8   Q    Okay.  So you come in and you talk to the police

9        officer at the police department, right?

10  A    Yes.

11  Q    And one of the things that they are really focused on

12       is this house and where -- where you dropped him off

13       at, right?

14  A    Yes.

15  Q    They wanted you to identify where that house was?

16  A    Yes.

17  Q    But you weren't really paying much attention to the

18       direction that you guys drove that night, right?

19  A    Correct.

20  Q    Actually, I think you were -- said that you were

21       texting on your phone kind of as Marissa drove?

22  A    Yes.

23  Q    So you really don't know the route for certain?

24  A    Correct.

25  Q    And police show you on like a laptop Google street
```

92

1       view --

2   A   Yes.

3   Q   -- and Google maps, and you guys kind of look through

4       that for a little while, and you thought that maybe

5       there was a couple houses that looked like it could

6       have been the house?

7   A   Yes.

8   Q   Right?  And those were on Brewster and Parkway?

9   A   I don't recall the name of the streets, but off of

10      Wisconsin Ave.

11  Q   So there was a few different ones that you thought

12      maybe --

13  A   Could have been, yes.

14  Q   -- could have been it.

15          And actually one of them you kind of thought was

16      -- was the house when you were looking at that

17      laptop, right?

18  A   Yes.

19  Q   But that actually when you went and drove past it,

20      that ended up not being the one?

21  A   I don't recall if it was or not.

22  Q   Okay.  When you went and drove the route, that took

23      quite a while for you guys to find the house,

24      right?

25  A   I believe so.

93

1    Q    Around an hour?

2    A    Yes.

3    Q    Okay.  When you were at the police department, you

4         and Marissa weren't interviewed in the same room,

5         right?

6    A    Correct.

7    Q    But between those interviews, you guys had an

8         opportunity to kind of talk to each other --

9    A    No.

10   Q    -- before?

11   A    Yeah.

12   Q    Okay.  While you were waiting?

13   A    Yeah.

14   Q    Okay.  And the police, when you were at the police

15        department, they never showed you a lineup of

16        pictures to see if you recognized --

17   A    No.

18   Q    -- the person?

19   A    No.

20   Q    No?  Okay.

21             ATTORNEY WEITZ:  Nothing further at this

22        point, Your Honor.

23             THE COURT:  Any redirect, Mr. Duros?

24        **EXAMINATION OF TALISA M. FARIAS**

25   **BY ATTORNEY DUROS:**

94

1    Q    You just indicated on cross that the defendant was in

2         the bathroom area at Sharks for about 15 minutes; is

3         that right?

4    A    Yes.

5    Q    Can you describe what's back in the bathroom area?

6    A    There's men's and women's bathrooms with a garbage in

7         between the bathrooms and pool tables like in that

8         area and like chairs and stuff, like bar stools.

9    Q    Okay.  So there is a pool table back in the bathroom

10        area?

11   A    Like kind of -- like the bathrooms are here and it's

12        over this way more.

13   Q    Okay.  Now is it fair to say that when you were

14        driving, Melissa (sic) was probably paying more

15        attention -- Marissa was paying more attention as to

16        where you were going?

17   A    Yes.

18   Q    And when you went to the police department you went

19        there because you thought you could have information

20        that could help them?

21   A    Yes.

22                 ATTORNEY DUROS:  I have nothing further.

23                 THE COURT:  Any redirect?

24                 ATTORNEY WEITZ:  No.

25                 THE COURT:  Recross.  I apologize.

95

1            Ladies and gentlemen of the jury, any questions

2       for consideration?

3                 (No response.)

4                 THE COURT:  Thank you.  You may be excused.

5                 ATTORNEY SCHNEIDER:  We probably have about

6       a 15 to 20 minute witness we thought we would take up

7       for lunch.

8                 ATTORNEY DUROS:  The State calls Officer

9       Nagel.

10                THE CLERK:  Please raise your right hand.

11                (Oath administered to witness.)

12                THE WITNESS:  I do.

13                THE CLERK:  Please state your full name and

14      spell it for the record please.

15                THE WITNESS:  Adam Nagel.  Last name is

16      spelled N-A-G-E-L.

17                THE COURT:  Mr. Duros, your witness.

18                ATTORNEY DUROS:  Thank you.

19                **EXAMINATION OF ADAM NAGEL**

20      **BY ATTORNEY DUROS:**

21      Q    What's your current occupation?

22      A    I'm a police officer with the City of Appleton.

23      Q    How long have you been a police officer?

24      A    Approximately seven years.

25      Q    Have you always been with APD?

```
 1   A   I have.

 2   Q   What's your current position?

 3   A   I'm a school resource officer at Appleton West High

 4       School.

 5   Q   How long have you held that position?

 6   A   Approximately a year.

 7   Q   What was your position back in December of 2013?

 8   A   I was a patrol officer in downtown -- in the downtown

 9       district working from three p.m. to three a.m.

10   Q   In December did you hear about an incident that

11       occurred at Luna?

12   A   I did.

13   Q   Specifically a shooting that happened?

14   A   I did.

15   Q   Were you involved in that investigation at all?

16   A   I was.

17   Q   Can you describe your duties investigating that

18       case?

19   A   On 12/13 of 2013 at approximately seven p.m. I was

20       asked to assist in the Appleton Police Department

21       lobby.  One of my supervisors had two people in the

22       lobby that had seen the person arrested for the

23       shooting at Luna and believed that they gave him a

24       ride home.

25   Q   From where?
```

97

1   A    From Sharks Club in downtown Appleton.

2   Q    Were you familiar with Sharks?

3   A    I am.

4   Q    Is it still Sharks?

5   A    It is not.  It was -- turned into KK Billiards.  Now

6        I believe it's closed.

7   Q    You're familiar with Luna, I'm guessing?

8   A    I am.

9   Q    How close is Sharks to Luna?

10  A    I'd say approximately a half a block.

11  Q    Okay.  Officer, I'm going to show you a board with

12       various pictures on it starting with Exhibit 36 going

13       to Exhibit No. 43.  Do you see that?

14  A    I do.

15  Q    And if you need to, you can step off to take a look

16       at what's in those photos, but I want to go through

17       these photos with you just to get a visual of where

18       these locations are.  Starting with Exhibit 36, do

19       you recognize that photograph?

20  A    I'm just going to stand up so I can see.

21  Q    Sure.

22  A    Image 36 would be the building where Luna was.

23  Q    Does it look like it's in the middle of a

24       construction phase?

25  A    It does.

98

```
 1   Q    What roads are surrounding Luna at that point?

 2   A    West College Avenue goes from east to west and north

 3        of that location is North Division Street.

 4   Q    When we're looking at the picture, are we looking at

 5        Luna from College Avenue?

 6   A    Correct.  You're looking at Luna from College

 7        Avenue.

 8   Q    Moving on to Exhibit 37, can you describe what's in

 9        that photograph?

10   A    That's the same building, what was Luna, and again on

11        College Avenue facing north towards Luna.

12   Q    Okay.  Moving on to Exhibit 38, do you recognize that

13        photograph?

14   A    I do.

15   Q    What is that?

16   A    That is going to be about the 300 block of West

17        College Avenue.  In this photograph you'll see it's

18        KK Billiards, which is what Sharks Club used to be,

19        and then approximately a half block to the west of

20        that location underneath this overpass would be where

21        Luna is located.

22   Q    So on Exhibit 38, can you almost see Luna from

23        Sharks?

24   A    Yes.

25   Q    And could you point that out?  You can use this
```

99

1      stick.

2   A   All right.  I'll use this stick I guess.  KK

3      Billiards is here.  This is where Sharks Club was.

4      You see the over passage right here.  Right on the

5      other side of the overpass is where Luna was

6      located.

7   Q   Moving on to Exhibit 39, do you recognize that

8      picture?

9   A   Yes.

10   Q   And what is that?

11   A   That is going to be the side of Luna in the 100 block

12      of North Division Street.

13   Q   So could you -- on Exhibit 36 could you point out

14      where Exhibit 39 is depicting?

15   A   This would be the area that Exhibit 39 is depicting.

16      Right here just off the screen is North Division

17      Street, this would be about the 100 block in this

18      area.

19   Q   So this was the other side of Luna?

20   A   Correct.

21   Q   Moving to Exhibit 40, does -- is that simply the same

22      picture as 39, just a little farther back?

23   A   Correct.

24   Q   And that shows the Luna Lounge or what was formerly

25      the Luna Lounge?

100

```
 1    A     Correct.

 2    Q     All right.  Moving on to Exhibit 41, can you

 3          describe --

 4    A     41 is going to be the west alley just north of West

 5          College Avenue, about the 300 block of the west

 6          alley.

 7    Q     When you walk down that alley, is there an entrance

 8          to Sharks?

 9    A     There is.  Actually, I show another image, there is

10          also a parking area back there.

11    Q     Now if you go to Exhibit 42, can you describe what's

12          in that picture?

13    A     Exhibit 42 is this image, correct?

14    Q     Correct.

15    A     This again is going to be about the 100 block of

16          North Division Street, what was Luna is right here,

17          the west alley is right in this location here between

18          the building and the parking ramp.

19    Q     And you just mentioned an alley.  Can you see the

20          alley from Exhibit 43?

21    A     43?  Yes.  This is the alley here.  This is the back

22          entrance for what was Sharks Club.  These doors here

23          open up and they actually go downstairs into the -- I

24          guess the pool hall.

25    Q     So if you wanted to go into Sharks you could go down
```

101

1       the alley and enter from where Exhibit 43 has a sign

2       saying Park Central?

3   A   Correct.

4   Q   And do these photographs all appear to be accurate

5       depictions of this area to the best of your

6       knowledge?

7   A   Correct.

8                   ATTORNEY DUROS:  I'll move for the

9       admissions of Exhibits 36 through 43?

10                  THE COURT:  Any objection?

11                  ATTORNEY WEITZ:  No.

12                  THE COURT:  36 through 43 shall be

13      received.

14  Q   (BY ATTORNEY DUROS)  When these two individuals came

15      in to speak with you, did you interview them

16      together?

17  A   No.

18  Q   Did you interview them separately?

19  A   I did.

20  Q   And when they spoke to you, did they indicate that

21      they gave who they thought was a suspect a ride

22      home?

23  A   They did.

24  Q   Did you attempt to find the location where these two

25      individuals said they dropped the defendant off?

102

1    A    We did.  I had a mother by the name of Tina

2         VanderLoop, mother of Marissa Emenecker, actually

3         drive to the location that they believed was where

4         they dropped him off.  Both Talisa and Marissa, I

5         believe that they drove on North Division Street but

6         did not know the exact address they had dropped him

7         off without seeing it.

8    Q    Did you attempt to look at Google maps or anything to

9         see if that refreshed your memory?

10   A    We did.

11   Q    And ultimately what you decided to do was drive them

12        out there?

13   A    That's correct.

14   Q    Were they in your vehicle when you drove out there?

15   A    No.

16   Q    Did you follow them?

17   A    I did.

18   Q    So you were in your police vehicle and they were

19        driving their own vehicle?

20   A    That's correct.

21   Q    Do you remember if it took a long time for them to

22        find the location?

23   A    I would say, with travel time, ten to fifteen minutes

24        tops.

25   Q    Tops?

103

1              Now if -- did it take them a little bit to

2        actually find it though?

3    A   It did take them, yes.

4    Q   So were you going on various roads trying to find

5        it?

6    A   Yes.

7    Q   If you knew exactly where it was, how long do you

8        think it would have taken for you and the two girls

9        to drive there from APD?

10   A   From the police department to the address, between

11       five and ten minutes.

12   Q   And you indicated you found it with them between 10

13       and 15?

14   A   Correct.

15   Q   Okay.  What address did they ultimately determine was

16       the place where they dropped off the defendant?

17   A   1739 North Harriman Street.

18   Q   I'm showing you what was previously marked as Exhibit

19       72.  Do you recognize this document?

20   A   I do.

21   Q   Or this exhibit?

22   A   I do.

23   Q   And what is this?

24   A   It is a map of part of Appleton.

25   Q   We were talking about Luna today.  Do you see Luna or

```
1          at least the location of Luna on this map?
2      A   That's correct.  Luna is located here at the
3          intersection of West College Avenue and North
4          Division Street, 344 West College Avenue.
5      Q   If you could I'm going to have you circle this with a
6          red marker and you could just write Luna under it.
7      A   Circle building and write Luna?
8      Q   Correct.
9      A   (Witness complying.)
10     Q   And we also talked about Sharks.  Do you see the
11         location of where Sharks was on this exhibit?
12     A   I do.  Approximately half a block away at 318 West
13         College Avenue.
14     Q   Could you circle it and put Sharks please.
15     A   (Witness complying.)
16     Q   So they indicated that they drove the defendant from
17         Sharks back to a location on Harriman Street?
18     A   That's correct.
19     Q   And what was the address again?
20     A   1739 North Harriman Street.
21     Q   When you look at this exhibit, do you see Harriman
22         Street?
23     A   I do.
24     Q   And could you point it out with that stick?
25     A   So Harriman Street runs here, and this would be I
```

```
 1        guess one house or two houses south of West Parkway
 2        Boulevard.
 3   Q    That's where they indicated they dropped the
 4        defendant off?
 5   A    That's correct.
 6   Q    Could you circle that location and put the address?
 7        You can just put the number.  You don't have to write
 8        Harriman down again.
 9   A    Okay.  (Witness complying.)
10   Q    Take a seat.
11             Prior to meeting with these two females, were
12        you involved in the investigation at all?
13   A    I was not.
14   Q    Was this your only duty as part of this Luna shooting
15        investigation?
16   A    It was.
17   Q    At the time the girls drove you around to try to find
18        that address, were you aware or did you know the
19        address of an individual named Joe Thor?
20   A    No.
21   Q    Okay.
22             ATTORNEY DUROS:  Nothing further.
23             THE COURT:  Defense?
24             ATTORNEY VISHNY:  Thank you, Your Honor.
25                  **EXAMINATION OF ADAM NAGEL**
```

1    **BY ATTORNEY VISHNY:**

2    Q    You said you're a school resource officer?

3    A    I am.

4    Q    Were you asked to come talk to these two women

5         because of that, because they were high schoolers?

6    A    No, this was before I was assigned to the school

7         resource officer unit.

8    Q    So -- but even though you're a school resource

9         officer right now, you have done other general police

10        work?

11   A    I have.

12   Q    And does that include interviewing witnesses?

13   A    It does.

14   Q    You've had training in interviewing witnesses?

15   A    I have.

16   Q    And as part of that training, one of the things you

17        have learned as you did here is to separate

18        witnesses, right?

19   A    That's correct.

20   Q    And that's so you can get their individual memory.

21   A    That's correct.

22   Q    And you're aware that witnesses can sometimes relate

23        information that they've read in the newspaper and

24        then kind of incorporated it to what they think,

25        right?

1    A    Correct.

2    Q    And so sometimes a witness may tell you something,

3         but they actually are remembering something they saw

4         in the news, right?

5    A    That is possible, correct.

6    Q    All right.  Now, when you interviewed these two

7         people, they told you they had never met this Asian

8         male before, right?

9    A    That's correct.

10   Q    And they told you that the Asian male had on a hooded

11        sweatshirt, right?

12   A    Correct.

13   Q    They didn't say anything about a baseball cap,

14        correct?

15   A    I don't believe so.

16   Q    They didn't say anything about a vest, right?

17   A    Correct.

18   Q    And you weren't aware yet that the photographs that

19        show Mr. Chong Lee in Luna don't show him in a hooded

20        sweatshirt, right?

21   A    I don't -- I guess I don't know that.

22   Q    You still don't know that to this day, right?

23   A    Yeah.

24   Q    So clearly it wasn't something you knew to ask about,

25        right?

108

```
1    A    Correct.

2    Q    And, you know, you didn't know anything about

3         descriptions being given to the police, a shooter

4         either wearing a white puffy coat or white vest,

5         right?

6    A    No.

7    Q    And you didn't know anything about descriptions being

8         given to the police about the shooter running to the

9         right of Luna and up Division which would be the

10        opposite direction of Sharks.

11             ATTORNEY SCHNEIDER:  Your Honor, I think

12        I'm going to object as to the clarification of her

13        question.  She's saying "the shooter", so far through

14        testimony -- maybe we should approach.

15             THE COURT:  Please come up.

16             (A bench conference was held.)

17             ATTORNEY VISHNY:  Okay.

18   Q    (BY ATTORNEY VISHNY)  You didn't know anything about

19        the suspect at that time, about police having had

20        information that the suspect at that time had run the

21        opposite direction of Sharks and northbound on

22        Division Street, right?

23   A    Correct.

24   Q    Okay.  So these were clearly not things you knew to

25        ask these young women when they came in and talked to
```

109

1          you, right?

2     A    Correct.

3     Q    Now, have you been trained in eyewitness

4          identification procedures?

5     A    I guess I don't know any formal training besides the

6          academy.

7     Q    Do you know what a photo array is?

8     A    Yes.

9     Q    So why don't you tell the jury what a photo array is.

10    A    A photo array would be a lineup of photographs

11         usually consisting of six photos that you would show

12         a witness to help them determine who they had seen, I

13         guess my best way to explain it.

14    Q    Okay.  And a photo array just -- what you do with the

15         pictures is you get pictures of people who kind of

16         look alike to see if somebody can really pick someone

17         out when they don't really know the person, right?

18    A    Correct.

19    Q    So you wouldn't use a photo array with witnesses who

20         have known each other for a long time because that's

21         kind of silly?

22    A    That's correct.

23    Q    But when a witness is a stranger to somebody and

24         identifies them, the photo array can help you figure

25         out if this is the right person or not.

```
 1    A    Correct.
 2    Q    Or not figure out if it's the right person or not but
 3         if they can identify the right person.  Let me --
 4         right?
 5    A    Yes.
 6    Q    And there is a very specific way you're supposed to
 7         do that in Wisconsin, where you show the pictures one
 8         at a time to the witness, right?
 9    A    Correct.
10    Q    And the officer who shows them isn't even supposed to
11         know where the suspect is in the pictures so that we
12         make sure that nobody's memory is contaminated by a
13         police officer, right?
14    A    Correct.
15    Q    And this is an investigative tool that can be used by
16         the Appleton Police Department, right?
17    A    That's correct.
18    Q    And so you, although you didn't use it, you at least
19         had some training and you know how to do that,
20         correct?
21    A    Correct.
22    Q    And that wasn't done in this case with these two
23         young women?
24    A    Correct.
25    Q    Nobody showed them a photo array to see whether or
```

111

1      not they were sure or could make an identification

2      saying that this is the same person, right?

3  A   That's correct.

4  Q   And we all know that when you come into a courtroom,

5      you know, obviously the witness always knows the

6      accused person sitting at counsel table, right?

7  A   I would say generally.

8           ATTORNEY SCHNEIDER:  Calls for speculation.

9      He can testify what he knows, but I don't know that

10     he can testify as to what other people know.

11         THE COURT:  Sustained.

12  Q   (BY ATTORNEY VISHNY)  Okay.  Now, when you

13     interviewed the -- Marissa Emenecker, I hope I'm

14     getting that right, she told you that she thought all

15     Asian people looked alike to her, right?

16  A   She did make that statement, correct.

17  Q   So her memory wasn't tested by giving her a photo

18     array of six Asian males of approximately same weight

19     and height to see if she could make the

20     identification in a photo array of the same person

21     she said --

22  A   It was not.

23  Q   -- that she saw at Luna.

24      Okay.  And Miss Emenecker, she never said

25     anything about this guy going in the area of the

1         bathrooms, that was just Talisa, right?

2    A    That's correct.

3    Q    And she -- both young women told you that they were

4         talking with other friends at Sharks the whole time,

5         right?

6    A    I would imagine they were.

7    Q    You don't --

8    A    I guess I don't remember that specifically.

9    Q    Okay.  Now, when you talked to them before you went

10        out on the streets following them in your -- you

11        followed them in the car, right?

12   A    Correct.

13   Q    Okay.  So before you -- and this only took ten to

14        fifteen minutes, not an hour --

15   A    Correct.

16   Q    -- to find this place, right?

17   A    Correct.

18   Q    So if somebody said it took an hour, that would be an

19        inaccurate memory of what occurred?

20   A    Correct.

21   Q    And before you did that, you showed them a computer

22        program to try and pick out the house?

23   A    That's correct.

24   Q    And they looked at a house and they said it looked

25        like the house, right?

113

1    A    I believe so.

2    Q    But that house that they picked out wasn't at 1739

3         West Harriman, correct?

4    A    I guess I'd have to look at that.  I'm not sure.

5    Q    Would looking at your report refresh your memory?

6    A    I imagine it would.

7    Q    Okay.  Okay.  This is Exhibit No. 118.  Is this a

8         copy of your report that you wrote in connection with

9         this case?

10   A    It is.

11   Q    Okay.  And I'm going to ask you to turn to the last

12        page.  Do you see where you noted bringing a computer

13        map?

14   A    Correct.

15   Q    Does that help to refresh your memory that they

16        determined the address was somewhere off Parkway?

17   A    Correct.

18   Q    Okay.

19   A    That's not exactly what it says.

20   Q    Okay.  Well, they were trying to locate the address

21        where they dropped Chong.  I want to make sure I get

22        this right.

23   A    Yup.  Nope.

24   Q    Correct?  And then you say you brought a computerized

25        map?

114

1   A    Correct.

2   Q    Okay.  And they determined the address was somewhere

3        off Parkway in the City of Appleton, correct?

4   A    Correct.

5   Q    And then it was after that when they -- is that

6        because they saw the house on a tape -- I'm sorry.

7        This was recorded, correct?

8   A    That's correct.

9   Q    And was there -- the reason they thought it was a

10       house because they thought the house was similar and

11       is that why they thought it was that location?

12  A    I guess I couldn't speculate to why they would think

13       that.

14  Q    Okay.

15  A    What they thought.

16  Q    All right.  Is Parkway and Harriman right next to

17       each other?

18  A    They are.

19  Q    So they're fairly close but not the same street?

20  A    Correct.

21  Q    Okay.  Now, they also gave a description of the house

22       as being light blue with a one-car attached garage,

23       correct?

24  A    I believe one of them said it was white and the other

25       one said it was light blue, correct.

115

1    Q    Okay.  So there were two different descriptions by
2         the two people?
3    A    Correct.
4    Q    And they described the one car -- Talisa described a
5         one-car attached garage?
6    A    That sounds correct.
7    Q    Okay.  And one or two steps leading to a front door
8         with a white awning over that door, correct?
9    A    Correct.
10   Q    And there's quite a few houses in Appleton that meet
11        that description, right?
12   A    I would say I wouldn't want to speculate to how many
13        houses have that.
14   Q    But certainly more than one?
15   A    I would imagine so.
16   Q    There is a lot of common architectural styles in
17        Appleton, aren't there?
18   A    I would imagine there are, yes.
19   Q    Now, after you located that address with them, you
20        went back and talked to the owner of the house,
21        right?
22   A    That's correct.
23   Q    And at that time you asked to take a look around and
24        look at the garbage cans, right?
25   A    That's correct.

116

1  Q    And area in front of her house?

2  A    Correct.

3  Q    And you didn't find anything of any importance

4       related to the case.

5  A    That's correct.

6  Q    So obviously -- let me ask this.  Were you looking

7       for bullets or guns or anything of that nature?

8  A    I was looking for any kind of evidence.

9  Q    Okay.  And you didn't find any.

10 A    No.

11 Q    You're familiar with different bullets, right,

12      different calibers of bullet?

13 A    I would say yes.

14 Q    And you know what a .22 or a .25 caliber bullet is,

15      correct?

16 A    Correct.

17 Q    And that's a very common caliber?

18 A    .22 caliber is very common.

19 Q    .25s are common too?

20 A    I would say they're more of the uncommon.

21 Q    Okay.  And -- but there are many firearms that use a

22      .25 caliber bullet?

23 A    There are firearms that use them, I would not put the

24      term of many compared to -- compared to a .22 or a

25      nine-milliliter.

117

```
1    Q    .22 or nine millimeters are more common?

2    A    Absolutely.

3    Q    .25 are less common but they're also available for

4         sale in the City of Appleton at the gun store,

5         right?

6    A    I don't think I've ever bought a .25.

7    Q    You don't use them at the Appleton Police

8         Department?

9    A    I do not.

10   Q    Okay.  You -- the Appleton Police Department uses a

11        different caliber?

12   A    Correct.

13   Q    Okay.

14             (Bench conference.)

15             THE COURT:  Ladies and gentlemen, it -- the

16        -- the questioning may take yet a little while and so

17        rather than prolong your break, what I think we're

18        going to do is we will be in recess, get your lunch,

19        and if you can be back ready at 1:15, we'll be set to

20        continue with this witness.  Okay?

21          Please rise for the jury.

22             (The jury was escorted out of the

23        courtroom.)

24             THE COURT:  All right.  And please be

25        seated.
```

118

1             Just briefly, before we recess, during this
2       morning session we did have two sidebars.  The first
3       sidebar was during the testimony of Miss Emenecker.
4       There was an objection to the questioning, the court
5       did give some latitude, overruled the objection.
6             During Officer Nagel's testimony there was a
7       brief sidebar related to the usage of the term
8       shooter.  Defense counsel agreed to utilize the term
9       suspect.  Other than that I believe those were the
10      only sidebars that we had.
11            Anything else we need to address briefly,
12      Attorney Schneider?
13                  ATTORNEY SCHNEIDER:  No, Judge.
14                  THE COURT:  Attorney Vishny?
15                  ATTORNEY VISHNY:  No.
16                  THE COURT:  Then I will see everybody a
17      little before one.
18                  (Lunch recess.)
19                  THE COURT:  All rise for the jury please.
20                  (The jury was escorted into the courtroom.)
21                  THE COURT:  Are we ready to continue with
22      the questioning?
23                  ATTORNEY VISHNY:  Yes.
24                  THE COURT:  Very good.
25            **CONTINUED EXAMINATION OF ADAM NAGEL**

1    **BY ATTORNEY VISHNY:**

2    Q    Before the lunch break I was asking you about photo

3         arrays and how they're -- and whether you're familiar

4         with them, right?

5    A    Correct.

6    Q    And it's my understanding that when you do a photo

7         array, you're supposed to get people who look

8         somewhat alike but obviously they're not identical,

9         right?

10   A    I would say that's not necessarily true.  I mean it's

11        not really my choice I guess in who I pick out.

12   Q    Okay.  If like a person tells you somebody has a

13        distinguishing characteristic on their face, would

14        you try to do a photo array of people who all had the

15        same distinguishing characteristic?

16   A    I would believe so, yes.

17   Q    So if someone told you, well, a person has a tattoo

18        on their face, you would try and get people with

19        facial tattoos, correct?

20   A    That's correct.

21   Q    And if one told a person had a mole next to their

22        nose, you would try to get a photo array of people

23        with that if you could?

24   A    Yes.

25   Q    Or a scar if you could, correct?

120

```
 1    A    Yes.

 2    Q    Now, Talisa told you that the person she saw had a

 3         mole on their nose, the guy that they give a ride to,

 4         do you remember that?

 5    A    I do.

 6    Q    And it would be hard to get a photo array of somebody

 7         with a mole, right?

 8    A    On their nose or face?

 9    Q    On the Asian male with a mole on -- near their nose

10         or on their face?

11    A    I guess I've never tried.

12    Q    Okay.

13              ATTORNEY VISHNY:  I don't have any further

14         questions.

15              THE COURT:  Any redirect?

16              ATTORNEY DUROS:  Briefly.

17              EXAMINATION OF ADAM NAGEL

18    BY ATTORNEY DUROS:

19    Q    When you looked at Google map, did that take quite

20         some time?

21    A    I think it took a few minutes, correct.

22    Q    And then you had to drive out there?

23    A    Correct.

24    Q    So the total process of that, do you think that took

25         around an hour or something?
```

121

```
 1    A    Probably about accurate.
 2    Q    Okay.  Now, when these two females came to the police
 3         department, they had already seen a photograph of
 4         Chong Lee; is that correct?
 5    A    That's correct.
 6    Q    They saw a photograph of Chong Lee in the news?
 7    A    That's correct.
 8    Q    So when they showed up, would it have actually been
 9         bad police practice to have shown them a photo
10         lineup?
11    A    I believe so.  Once someone sees the picture, I don't
12         think that that's something that would be good to
13         show a photo lineup after the fact.
14    Q    They had already identified him, right?
15    A    That's correct.
16    Q    And the picture that would have been used in the
17         photo lineup might have been the picture that they
18         saw.
19    A    Correct.
20    Q    So that would have actually been suggestive?
21    A    Correct.
22              ATTORNEY DUROS:  I have nothing further.
23              THE COURT:  Recross?
24                   EXAMINATION OF ADAM NAEL
25    BY ATTORNEY VISHNY:
```

```
1    Q    Well there were other previous pictures of Chong Lee,

2         right, at the Appleton Police Department?

3    A    I don't know that.

4    Q    Okay.  But you never investigated to see if there

5         were different pictures, right?

6    A    Correct.

7    Q    And you're not an expert on police practices, are

8         you?

9    A    I guess I would not consider myself one.

10   Q    Okay.

11             ATTORNEY VISHNY:  Thank you.  Nothing

12        further.

13             ATTORNEY DUROS:  Nothing further.

14             THE COURT:  All right.  Any questions for

15        consideration from the jury?

16          If I could have counsel please approach.

17             (Bench conference.)

18             THE COURT:  Officer Nagel, do you know what

19        the general garbage pickup schedule was for the

20        Harriman Street address?

21             THE WITNESS:  I know from my experience

22        that garbage pickup is done five days a week in the

23        City of Appleton.  I could tell you the amount of

24        time that was between the incident and the time I

25        interviewed her was a full five business days.
```

123

1                    THE COURT:  But you don't know the

2        specifics as to that.

3                    THE WITNESS:  Not the exact date, no.

4                    THE COURT:  Does that prompt any follow-up,

5        Attorney Duros?

6                    ATTORNEY DUROS:  No.

7                    THE COURT:  Attorney Vishny?

8                    **EXAMINATION OF ADAM NAGEL**

9        **BY ATTORNEY VISHNY:**

10   Q    You don't have any clue whether the homeowner had put

11        their garbage out just before, just after or when in

12        relationship --

13   A    I do not.

14   Q    Okay.  I was going to finish my sentence though.  I'm

15        sorry.  In relationship to the dates, the relevant

16        dates in this case?

17   A    I do not, correct.

18   Q    And you never interviewed the homeowner about whether

19        she wheels the garbage out or waits until it's full

20        and skips a week here and there?

21   A    I did not.

22                    THE COURT:  Officer Nagel, thank you,

23        sir.

24                    ATTORNEY DUROS:  Mr. Maier has the next

25        witness.

124

```
 1                    ATTORNEY VISHNY:  Excuse me.  I want to
 2          approach please.  Or maybe I'll just --
 3                    ATTORNEY MAIER:  Your Honor, the State's
 4          next witness is Jim Wall.
 5                    THE COURT:  Did counsel need to approach
 6          or --
 7                    ATTORNEY VISHNY:  No.  We're good.  It was
 8          just a technical thing that we straightened out.
 9                    THE COURT:  Okay.  Got it.
10                    ATTORNEY MAIER:  He'll be right up.
11                    THE COURT:  And, sir, if you would please
12          come to the witness stand, remain standing and the
13          clerk will swear you in.
14                    (Oath administered to witness.)
15                    THE WITNESS:  I do.
16                    THE CLERK:  Please state your full name and
17          spell it for the record please.
18                    THE WITNESS:  Jim Wall, J-I-M, W-A-L-L.
19                    THE COURT:  And, Mr. Maier, your witness,
20          sir.
```

21                    **EXAMINATION OF JAMES WALL**

22          **BY ATTORNEY MAIER:**

```
23     Q    Mr. Wall, how are you employed?
24     A    With the Outagamie County Sheriff's Department.
25     Q    And you're a deputy sheriff with that department?
```

125

```
1   A    Correct.

2   Q    How long have you worked as a deputy with the

3        Outagamie County Sheriff's Department?

4   A    Approximately seven years.

5   Q    Are you assigned to a particular unit or division

6        within the sheriff's department?

7   A    Yes.

8   Q    Can you describe what that is and explain what your

9        roles are?

10  A    It is a joint unit with the Appleton Police

11       Department.  We do drugs, gangs, prostitution, any

12       violent crimes in the area.

13  Q    And it's a unit that's called a Community Resource

14       Unit?

15  A    Correct.

16  Q    You're one of two sheriff's investigators assigned to

17       that unit, correct?

18  A    Yes.

19  Q    Along with four Appleton investigators?

20  A    Yes.

21  Q    Were you assigned in your role with that unit to

22       assist in a search for evidence related to a shooting

23       that had happened at the Luna Lounge in December of

24       2013?

25  A    Yes, I was.
```

126

1   Q   Specifically where did you conduct your search?

2   A   Sharks pool hall on College Avenue.

3   Q   Were you working alone or was there someone with

4       you?

5   A   There was someone with me.

6   Q   Can you describe what you did when you were searching

7       for evidence at Sharks pool hall?

8   A   We were advised of evidence that might have been

9       disposed of there, contacted the owner of Sharks

10      Club; but prior to going there, Lieutenant Elliott,

11      who was the supervisor of our unit at the time, was

12      advised that some ammunition was found a day or so

13      prior to us going there.

14  Q   So you and another investigator go to Sharks.  Who do

15      you meet with?

16  A   Met with Mitch Roepcke who is I believe the owner at

17      the time.

18  Q   And was there an effort made to see down and I guess

19      through the toilet to determine if any evidence was

20      disposed of in a toilet in the men's room?

21  A   Yes.

22  Q   Did they find anything?

23  A   Yes.

24  Q   What was found?

25  A   I believe it was two rounds of .25 auto that were

```
 1          found in the toilet.

 2     Q    And did you also search the -- the rest of the pool

 3          hall given the additional information you had that

 4          the staff there may have found some ammunition?

 5     A    Yes.

 6     Q    And what did you find?

 7     A    Found in the garbage behind the bar, which was

 8          consistent with what they had told Lieutenant

 9          Elliott, was a plastic bag that was folded up that

10          contained four more of the similar rounds.

11     Q    Okay.  Deputy, I'm going to show you a board with six

12          photos on it, and these are Exhibits 45 through 50.

13          Just starting with the upper left, are you able to

14          identify what that image depicts?

15     A    Yes.

16     Q    What is that?

17     A    More or less that's looking -- from the College

18          Avenue entrance it would be looking due north through

19          the length of Sharks pool hall.

20     Q    Okay.  And so -- let me just make sure I'm clear on

21          this.  If you come down the steps from College Avenue

22          into Sharks, that's more or less where you walk in,

23          that's what you would see?

24     A    Yeah.

25     Q    Yes?
```

```
 1   A    Yes.  Sorry.

 2   Q    Exhibit 46, can you tell the jury what that is

 3        please.  That's the upper right?

 4   A    That is the bathrooms on the north end of Sharks pool

 5        hall.  So this image would be way in the back right

 6        corner.

 7   Q    So the back right corner of 45 is what we would see

 8        when we get to where we can see what 46 shows?

 9   A    Yes.

10   Q    Exhibit 47, which is the middle left, can you tell

11        the jury what that is?

12   A    That is looking in the men's bathroom, which I

13        believe is one of those two doors, I don't remember

14        if it's the left or right one, I think it's the left

15        one.

16   Q    Okay.  And then 48, the middle right, what does that

17        depict?

18   A    Just once you're in the door of the same picture

19        here.

20   Q    Looking at 48 there appear to be a couple areas

21        typical for a men's room that would be used.  There's

22        two urinals.  How many toilets are there in that

23        picture?

24   A    Just one.

25   Q    And is that how many there are in that bathroom?
```

129

1    A    Yes.

2    Q    Exhibit 49, which is the lower left, what does that

3         depict?

4    A    That one toilet.

5    Q    And then 50 in the lower right?

6    A    Same toilet just closer.

7    Q    Closer.  Okay.

8              ATTORNEY MAIER:  At this point I'd move in

9         45 through 50.

10             THE COURT:  Any objection?

11             ATTORNEY WEITZ:  No.

12             THE COURT:   45 through 50 will be received.

13   Q    (BY ATTORNEY MAIER)  Deputy, I'm going to show you

14        another board with six photos that's been marked as

15        Exhibits 51 through 56.  51 is the upper right -- I'm

16        sorry, upper left.  Could you tell the jury what that

17        photo depicts please?

18   A    That was the unfolded bag of the ammunition that was

19        discarded by the employee that was taken by myself

20        out of the trash can behind the bar.

21   Q    Okay.  And 52 is the upper right.  Can you tell the

22        jury what that is please?

23   A    Same bag, just different view from the different

24        side.

25   Q    Right.  Now in 52, looking at image -- or Exhibit 52,

130

1     are you able to tell where that bag was located at

2     the time the photo was taken?

3  A  On a pool table.

4  Q  On a pool table?

5  A  Yeah.

6  Q  Exhibit 53, middle left, could you tell the jury what

7     that is please?

8  A  Same bag, just appears maybe a different angle.

9  Q  Now, 51, 52, 53 are the bag that you took out of the

10     garbage.  Is that what those bullets and that bag

11     looked like that day?

12  A  Yes.  Like I said, they were just unfolded when they

13     took the pictures.

14           ATTORNEY MAIER:  Okay.  I would move in 51,

15     52 and 53 at this time.

16           THE COURT:  Any objection?

17           ATTORNEY WEITZ:  No.

18  Q  (BY ATTORNEY MAIER)  Exhibit 54 is the middle right.

19     Can you tell the jury what that is please?

20  A  Those are the two bullets that Officer Medina

21     recovered from the toilet.

22  Q  So there were two rounds recovered from the toilet?

23  A  Correct.

24  Q  And they were then placed on the same pool table as

25     the bag with the four you found?

131

1   A   Yes.

2   Q   Bottom left is 55.  Can you tell the jury what that

3       is please?

4   A   It's just comparison of the two different ammunitions

5       that were located.

6   Q   Okay.  To your recollection, was there any difference

7       in the six rounds -- six unfired rounds that were

8       found at Sharks pool hall?

9   A   They appeared to be similar in both caliber and

10      size.

11  Q   Okay.  56 is the lower right.  Can you tell the jury

12      what that is please?

13  A   That's a close-up of the rear of the cartridge, one

14      of the two bullets found in the toilet by Officer

15      Medina.

16  Q   You have some familiarity with firearms and

17      ammunition, correct?

18  A   Correct.

19  Q   Is it true it's fairly common to place the caliber of

20      the particular cartridge on the -- the primer end of

21      the casing?

22  A   Yeah.

23  Q   And were you able to see from the cartridges that

24      were recovered at Sharks if that had been done, if

25      the caliber was imprinted on the casing?

132

1   A   Yes, it appeared so.

2   Q   And what was it?

3   A   .25 auto.

4   Q   There are also some other markings commonly put on

5       the primer end of the casing, correct?

6   A   Yes.

7   Q   Maybe a manufacturer logo or a stamp, something like

8       that, right?

9   A   Yes.

10  Q   Was there one on the cartridges that were recovered

11      from Sharks that day?

12  A   Yes.

13  Q   And what was that marking?

14  A   FC.

15          ATTORNEY MAIER:  I'd move in Exhibits 54,

16      55 and 56 at this time.

17          THE COURT:  Any objection?

18          ATTORNEY WEITZ:  No.

19          THE COURT:  54 through 56 will be received

20      as well.

21  Q   (BY ATTORNEY MAIER)  Deputy, I'm going to show you

22      what has been marked as Exhibit 80.  Could you take a

23      look at that and let me know if you are familiar with

24      the contents?

25  A   Yes.

133

1   Q    What are those individual packages that make up

2        Exhibit 80?

3   A    These are the four separated rounds from the garbage

4        that were recovered.

5   Q    And they're packaged by the Appleton Police

6        Department, correct?

7   A    Correct.

8             ATTORNEY MAIER:  I'd move in Exhibit 80 at

9        this time.

10            THE COURT:  Any objection?

11            ATTORNEY WEITZ:  No.

12            THE COURT:  80 will be received.

13  Q    (BY ATTORNEY MAIER)  Exhibit 81, are you able to tell

14       what those items are please?

15  A    The two separate casings that were found in the

16       toilet.

17  Q    Again, those are packaged by the Appleton Police

18       Department?

19  A    Yes.

20            ATTORNEY MAIER:  Move in Exhibit 81.

21            THE COURT:  Any objection?

22            ATTORNEY WEITZ:  No.

23            THE COURT:  81 will be received.

24  Q    (BY ATTORNEY MAIER)  Deputy Wall, you're aware that

25       at the scene of the shooting at Luna officers found a

134

```
1              -- a casing, a fired -- part of a fired cartridge
2              from a gun, correct?
3         A    Correct.
4         Q    Have you had a chance to look at it?
5         A    Yes.
6         Q    I'm showing you -- I'm sorry.  This is Exhibit 82.
7                        ATTORNEY WEITZ:  82?
8                        ATTORNEY MAIER:  82.
9         Q    (BY ATTORNEY MAIER)  Can you tell the jury what that
10             is, Deputy?
11        A    That is a spent casing.
12        Q    Is there a -- to your knowledge is that consistent
13             with the appearance of the casing that was recovered
14             from Luna Lounge the night of the shooting --
15        A    Yes.
16        Q    -- based on the information you've received from
17             other investigators?
18        A    Yes.
19        Q    If you look at the primer end of that casing, are you
20             able to make out, excuse me, any markings related to
21             the caliber that that cartridge or that casing
22             contained?
23        A    Yes.
24        Q    What is that?
25        A    It appears to be a .25 auto.
```

```
1    Q    And are there any other markings on the primer end of

2         the casing, something like a manufacturer's mark or

3         something else?

4    A    It appears so, yeah.

5    Q    And what is that?

6    A    It's very faint but I think it's JC.

7    Q    Could be it FC?

8    A    Yeah.  It could be.

9              ATTORNEY MAIER:  Thank you.  I would move

10        in Exhibit 82 at this time.

11             THE COURT:  Any objection?

12             ATTORNEY MAIER:  No.

13             THE COURT:  82 will be received.

14   Q    (BY ATTORNEY MAIER)  The -- do you know specifically

15        how it was that the two -- I'll say the two loose

16        rounds for the bathroom, do you know specifically

17        where they were located or how they were

18        discovered?

19   A    They were in the toilet bowl.  I believe when we went

20        there, the intention was to see if there was anything

21        else in the toilet, and when Officer Medina and I

22        think the plumber were in there, they located those

23        two in the bowl.

24   Q    The -- the individual who ran the snake, you were

25        present when that was done?
```

136

```
 1    A    Nope, I was still dealing with the bartender at that
 2         time.
 3    Q    Okay.  Are you aware of any subsequent searches that
 4         were done between I'll say the toilet and the sewer
 5         end of things?
 6    A    I guess I don't understand that.
 7    Q    Okay.  You were there with Officer Medina, and you
 8         recovered -- you recovered bullets from the waste
 9         basket, Officer Medina and the other individual
10         recovered the two loose bullets from the toilet.  Are
11         you aware of any searching that was done past the
12         toilet end towards the city sewer?
13    A    Yes.
14    Q    And are you aware of whether anything of, I'll say
15         evidentiary value, any firearms or ammunition or
16         anything like that was recovered from that search?
17    A    No.
18    Q    It was not?
19    A    There was nothing recovered.  Sorry.
20               ATTORNEY MAIER:  That's all the questions I
21         have for you, Deputy.  Thank you.
22               THE COURT:  Attorney Weitz.
23               ATTORNEY WEITZ:  Thank you.
24         **EXAMINATION OF JAMES WALL**
25    **BY ATTORNEY WEITZ:**
```

137

```
1    Q    Deputy Wall, the reason that you went to Sharks Club,
2         you had received information that a handgun had
3         possibly been flushed down the toilet, correct?
4    A    I don't believe it was that specific, no.
5    Q    Okay.  You're just going to look for evidence?
6    A    Correct.
7    Q    All right.  So it was you and Officer Medina,
8         right?
9    A    Yes.
10   Q    And there was also arrangements made for an Appleton
11        plumber to meet you guys there?
12   A    Yes.
13   Q    And he was the one that was working with Officer
14        Medina in analyzing the toilet and that type of
15        stuff, right?
16   A    Correct.
17   Q    Okay.  And actually, I believe he borrowed or used
18        Appleton Police Department snake camera, right?
19   A    He might have, yes.
20   Q    Okay.  You weren't involved in that?
21   A    No, he had -- he had a bunch of his equipment.  I
22        don't know what they ultimately used.
23   Q    Okay.  You became aware of that though, right, that
24        there was an attempt to look in all the drain
25        lines?
```

138

1    A    Correct.

2    Q    Okay.  And nothing was found in those, right?

3    A    Other than the loose rounds, no.

4    Q    Okay.  And as far as the loose rounds that were found

5         by Officer Medina, those were actually found when the

6         plumber took the toilet apart and laid it on its

7         side, right?

8    A    I believe so.

9    Q    Okay.  So they weren't just sitting in the bowl, it

10        wasn't until the toilet was taken apart that they

11        were found?

12   A    Correct.  It's when the toilet came off is when they

13        were located.

14   Q    Okay.  While at the pool hall, you were the one that

15        recovered the plastic bag with the four cartridges,

16        right?

17   A    Yes.

18   Q    And those were actually previously found by the owner

19        of Sharks, Mitch Roepcke?

20   A    Yes.

21   Q    And he directed you guys where to find them because

22        the Sharks' employees were the ones that placed them

23        in the garbage?

24   A    Yes.

25   Q    Okay.  And those cartridges were found the prior

139

```
1          evening, that would have been December 11th?

2    A     I believe that's the date.

3    Q     Okay.  While at Sharks, you and officer Medina did a

4          more systematic search of the pool hall even looking

5          in the dumpster and alleys and areas around the pool

6          hall, right?

7    A     Correct.

8    Q     And you didn't find anything else --

9    A     No, we did not.

10   Q     -- of evidentiary value.

11             And in fact you also came back later on the 16th

12         of December to search again and again nothing was

13         located?

14   A     Correct.

15   Q     And that -- at that occasion, you also, in addition

16         to searching around the area, you checked the

17         overhang above the sidewalk, right?

18   A     I believe so, yes.

19   Q     Okay.  And again, nothing found.

20   A     Correct.

21             ATTORNEY WEITZ:  Nothing further, Your

22         Honor.  Thank you.

23             THE COURT:  Any redirect, sir?

24             ATTORNEY MAIER:  No.  Thank you.

25             THE COURT:  Ladies and gentlemen of the
```

140

1           jury, any questions for consideration?

2                   And if counsel could approach.

3                       (Bench conference.)

4                       THE COURT:  Question for you is were the

5           rounds found in the plastic bag or placed there by

6           someone?

7                       THE WITNESS:  They were found and then

8           placed in the plastic bag before being thrown in the

9           garbage.  From my understanding they were found

10          loose, placed in the plastic bag from the toilet and

11          then thrown in the garbage.

12                      THE COURT:  Does that prompt any follow-up

13          questions, Attorney Maier?

14                      ATTORNEY MAIER:  Yes.

15                      **EXAMINATION OF JAMES WALL**

16          **BY ATTORNEY MAIER:**

17      Q   Found by staff and placed in the bag, not found by

18          you and placed in the bag?

19      A   Correct.  Found by staff.

20                      ATTORNEY MAIER:  That's all I have.

21                      THE COURT:  Attorney Weitz?

22                      ATTORNEY WEITZ:  Nothing, Your Honor.

23                      THE COURT:  All right.  Thank you, sir.

24          You may be excused.

25                      All right.  Fine.

141

1          I apologize.  In my timing, I see we're almost

2     at two.  I've got to take care of something that's

3     going to take about five minutes.  I will let --

4     we'll have the jury go back to the jury room.  We

5     should be back in just about five or so minutes as

6     soon as I'm done.

7               (The jury was escorted out of the

8     courtroom.)

9               THE COURT:  Be seated.  Just a couple

10    housekeeping, and then I'll be on my way.

11         I forgot to mention there was a -- a question

12    during the early morning session on the sidebar

13    related to the smell of the gun powder.  I did not

14    allow that question to be answered.

15         Subsequently there was a sidebar related to

16    Deputy Wall's testimony -- I'm sorry, there was a --

17    a sidebar during Officer Nagler's question related to

18    the garbage pickup.  It was allowed as modified.

19         There was also a question related to the

20    significance of the house which was referenced by

21    Miss Emenecker.  The court did not allow that

22    question to be asked.

23         Finally, there was questions just asked related

24    to fingerprints.  The court did not allow that

25    question; and then, additionally, there was a

142

1    question pertaining to whether or not the casings

2    were the same as found in Mr. Richards, and I did not

3    allow that question to be asked.  For confusion

4    purposes.

5         Is that a fair summary of the sidebars we've

6    had, Attorney Schneider?

7                   ATTORNEY SCHNEIDER:  Yes.

8                   THE COURT:  Attorney Weitz, Attorney

9    Vishny?

10                  ATTORNEY WEITZ:  Yes.

11                  THE COURT:  I'll be back in just a few

12   moments.

13                  (Court in recess.)

14                  (The jury was escorted into the courtroom.)

15                  THE COURT:  All right.  And then the jury

16   may be seated and the gallery.

17        And, Mr. Lee, if you'll remain standing, we'll

18   swear you in just briefly.

19                  THE CLERK:  Please raise your right hand.

20   There you go.

21                  (Oath administered to witness.)

22                  THE WITNESS:  Yes.

23                  THE CLERK:  Please state your full name and

24   spell it for the record please.

25                  THE WITNESS:  My full name is Paur Lee,

143

1          P-A-U-R, L-E-E.

2                    THE COURT:  Mr. Lee, you may be seated,

3          sir.

4                    Attorney Schneider.

5                    **EXAMINATION OF PAUR LEE**

6    **BY ATTORNEY SCHNEIDER:**

7    Q    Your first name is Paur, P-A-U-R?

8    A    Yes.

9    Q    Do you also go by Paul?

10   A    That's what everybody calls me by, yes.

11   Q    Okay.  May I call you Paul or do you prefer Paur?

12   A    It's up to you.  Doesn't matter.

13   Q    Okay.  Mr. Lee, how old are you?

14   A    As of now I'm 27.

15   Q    And were you born and raised here in Appleton?

16   A    Yes.

17   Q    Do you have any brothers or sisters?

18   A    Yes, I do.

19   Q    Both brothers and sisters?

20   A    Yup.

21   Q    How many brothers do you have?

22   A    Four brothers and three sisters.

23                    ATTORNEY VISHNY:  Judge, I'm going to ask

24         that the witness please speak into the microphone.

25                    THE COURT:  I was just going to ask that.

1              Mr. Lee, if can you pull the microphone closer

2         to you it will help everyone.

3    A    Four brothers and three sisters.

4    Q    Thank you.  Is one of your brothers named Chong?

5    A    Yes.

6    Q    Is he here in the room today?

7    A    Yes.

8              ATTORNEY SCHNEIDER:  Your Honor, I'd ask

9         the record to reflect identification.

10             THE COURT:  Can you describe him by an

11        article of clothing that he's wearing?

12             THE WITNESS:  He's in a maroon flannel.

13             THE COURT:  Record shall reflect the

14        identification.

15   Q    (BY ATTORNEY SCHNEIDER)  Paul, back in 2013, where

16        were you living in December of that year?

17   A    In Menasha.

18   Q    Were you living with relatives?

19   A    My mom.

20   Q    At some point did you ever live with your sister

21        Xeng?

22   A    Yes.

23   Q    And Xeng also goes by the name Mou?

24   A    Yes.

25   Q    Who else lived with you when you were living with

145

```
 1        your sister Xeng?

 2   A    My sister's boyfriend Michael.

 3   Q    And his last name is Xiong?

 4   A    Yes.

 5   Q    And at that time, Mr. Lee, were you working?

 6   A    Yes, I was.

 7   Q    Where were you working?

 8   A    Norka.

 9   Q    And was that a full-time job?

10   A    Temporary.

11   Q    I want to ask you about some names, Mr. Lee, just to

12        help us understand.  Do you know someone named Joe

13        Thor?

14   A    Yes, I do.

15   Q    And how do you know Joe?

16   A    Childhood friend.

17   Q    Is he older, younger or about the same age?

18   A    Same age.

19   Q    What about someone named Phong Lee?

20   A    Childhood friend.

21   Q    Older, younger?

22   A    Same.

23   Q    And what about Tou Shoua Lee, do you know that

24        person?

25   A    Yes.
```

146

```
 1   Q   And how do you know Tou Shoua?

 2   A   Another childhood friend, cousin.

 3   Q   Is Tou Shoua older or younger than you?

 4   A   Younger.

 5   Q   One of your brother's name's Hu?

 6   A   Yes.

 7   Q   And is Hu older than you?  Actually, this might even

 8       be better, Mr. Lee.  Among the brothers, where do you

 9       fall in line?

10   A   I'm the youngest brother.

11   Q   Okay.  That's what I had thought.  So Hu is a

12       brother?

13   A   Yes.

14   Q   Chong is?

15   A   Yes.

16   Q   Nhia spelled N-H-I-A?

17   A   Yes.

18   Q   And then your final brother is?

19   A   Tong.

20   Q   Do you know someone named Teng Lee?

21   A   Yes, I do.

22   Q   And how do you know Teng?

23   A   That's Phong's younger brother.

24   Q   Do you know a man named Xung Xiong, first name is

25       X-U-N-G?
```

147

```
 1    A    Yes, that's my cousin.

 2    Q    Older or younger than you?

 3    A    Older.

 4    Q    What about a woman named Stephanie Thao?

 5    A    Yes.

 6    Q    And how do you know Miss Thao?

 7    A    Friend.

 8    Q    And what about Melanie Thao?

 9    A    Yes.

10    Q    Friend also?

11    A    Yup.  Sister of Stephanie's.

12    Q    Do you know someone named Tom Lee?

13    A    Yes.

14    Q    And how do you know him?

15    A    My cousin.

16    Q    Do you know someone named Xai Thao who lives in

17         Milwaukee?

18    A    No.

19    Q    What about someone who's named by Kong Vang, they

20         call him Jesus, he lives in Milwaukee?

21    A    You said Jesus, yes.

22    Q    You know him by his nickname?

23    A    Yes.

24    Q    Do you know a Peter Moua who lives in Milwaukee

25         now?
```

148

```
 1    A    Peter Moua who lives in Milwaukee, no.
 2    Q    Mr. Lee, I want to direct your attention to what
 3         would have been a Saturday night, Saturday, December
 4         7th of 2013.  Did you have plans to go out that
 5         night?
 6    A    On what night?
 7    Q    Saturday, December 7th of 2013?
 8    A    I don't remember that night.
 9    Q    Okay.  Mr. Lee, do you remember a night when you were
10         at Luna -- Luna Lounge in Appleton?
11    A    There was many times.
12    Q    Okay.  Do you remember an evening when the police
13         wanted -- that the police spoke to you about?
14    A    Oh, yeah.  Okay.  That.  Yes.
15    Q    So you might not remember the exact date, but do you
16         remember a Saturday in December a few years ago being
17         out at Luna, downtown Appleton?
18    A    Yes.
19    Q    And that's the night the officers spoke to you
20         about?
21    A    I guess, yes.
22    Q    Okay.  Maybe if I say it this way.  We're going to
23         talk about a man whose name was Josh.  Do you know
24         who I'm referring to when I say that?
25    A    Okay.  Yes, I do.
```

149

```
1   Q   Okay.  So I want to talk about that night, Mr. Lee.
2       I know you might not remember the exact date.  That
3       night, before -- and the first time you ever had any
4       contact with Josh was at Luna Lounge?
5   A   Yes.
6   Q   Never saw him before?
7   A   No.
8   Q   So I want to back up a little bit.  Before you were
9       at Luna, where had you been earlier that night?
10  A   Earlier that night I was at another bar near my mom's
11      house in Menasha.
12  Q   Do you remember the bar name?
13  A   City Limits.
14  Q   Do you remember, Mr. Lee, who was with you?
15  A   Not entirely.
16  Q   Do you remember some of them people?
17  A   Yes.
18  Q   Who?
19  A   Joe, Phong and Xung.
20  Q   And that's Xung Xiong?
21  A   Yes.
22  Q   Do you remember any girls being out with you guys?
23  A   Not that I can recall.
24  Q   Do you remember Chong being at City Limits?
25  A   Didn't see him at the time.
```

150

1    Q    Where did you go after you were at City Limits?

2    A    After City Limits my -- me and my friends, Phong,

3         Joe, for us to go to downtown so we went downtown.

4    Q    Where did you go first?

5    A    I believe we went to Luna, or I don't know, or Sharks

6         maybe.

7    Q    And Sharks is a place where you can go and play pool,

8         right?

9    A    Yes.

10   Q    So you think you might have went to Sharks first?

11   A    Yes.

12   Q    Who was with you at Sharks, if you recall?

13   A    At the time it was just me, Phong and Joe.

14   Q    Do you remember seeing Chong there at all?

15   A    No.

16   Q    Do you remember seeing Tom Lee there?

17   A    Yes.

18   Q    What about Michael Thor?

19   A    Not until I was in Luna.

20   Q    Okay.  How did you get from City Limits to downtown

21        Appleton?

22   A    If I can remember, might have -- could have been

23        Michael Thor was the one that drove us there, but I'm

24        not too sure.

25   Q    Were you driving?

151

```
1   A    No.

2   Q    Do you remember some girls being with you that

3        night?

4   A    No.

5   Q    If I tell you the name -- because I apologize, these

6        are names I did not say earlier, Mr. Lee, Alyson

7        Blom, or Alyson Kristy Blom?  Do you know that

8        woman?

9   A    Who?

10  Q    Alyson Blom or Alyson -- sometimes she goes by Alyson

11       Kristy, she lives in Milwaukee now?

12  A    Oh, yes.  I know her.

13  Q    Do you remember seeing Alyson that night?

14  A    No.

15  Q    So if she was out, she -- if she was out that night

16       at Luna, she wasn't hanging out by you?

17  A    No, not that I can remember.

18  Q    Okay.  She wasn't hanging out by Joe or Phong?

19  A    I didn't remember -- I don't remember seeing her at

20       all that night.

21  Q    Do you know a girl named Dalinda?

22  A    One of Alyson's friends, yes.

23  Q    You answered my next question.  Do you remember

24       seeing Dalinda out that night?

25  A    No.
```

152

1    Q    So if Dalinda was out at Luna, it wasn't somebody you

2         were hanging out with.

3    A    No.

4    Q    Mr. Lee, this seems like an odd question but I got to

5         ask it.  When you were at Luna, were you out on the

6         dance floor dancing or were you by the bar or both?

7    A    We were everywhere.

8    Q    Okay.

9    A    By the dance floor, outside smoking, bathroom,

10        everywhere.

11   Q    Was it a situation back then where you could not

12        smoke inside the bars in Luna, correct?

13   A    Yes.

14   Q    Okay.  You couldn't smoke inside any bars in Appleton

15        at that time?

16   A    Yes.

17   Q    Did you smoke like traditional cigarettes at that

18        time or did you smoke something else?

19   A    Both traditional and e-cigarettes.

20   Q    And did you have your own e-cigarettes on that night

21        when you went out?

22   A    Yes.

23   Q    Mr. Lee, why don't you stand up.  These are photos,

24        they're marked No. 32, that's why they're 32A and

25        then letters.

153

1           Looking at the picture 32D, do you recognize
2      who's in that photograph?
3    A    No.
4    Q    Okay.  32E, do you recognize who's in that
5      photograph?
6    A    No.
7    Q    32F?
8    A    No, not really.  It's blurry.
9    Q    Hard to see?  What about down here, 32J, the person
10     walking in the door?
11   A    That's me.
12   Q    That's you?  So if I remove this post-it and it says
13     Paul there, that would be you?
14   A    Yes.
15   Q    But the other ones, you can't really make them out?
16   A    No.
17   Q    I'm kind of going to skip around a little bit, Mr.
18     Lee.
19           I'm going to show you a photo board marked 33.
20     Okay?  Down here in 33J, doesn't look like a J but
21     it's supposed to be a J, do you recognize anyone in
22     that photograph?  And if you need to step down and
23     take a look, please do.
24   A    (Witness indicating.)
25   Q    And you pointed to a person kind of in the middle.

154

```
 1          Why don't you put -- I'm going to give you a green
 2          marker, Mr. Lee, if you can just put your name
 3          underneath yourself please.
 4     A    (Witness complying.)
 5     Q    Thank you.  Recognize anyone in 33K?
 6     A    Me.
 7     Q    Okay.  Same picture, again, you kind of have a hood
 8          on the back of your coat; is that correct?  I'm
 9          sorry.  We went through this.  You got to say yes or
10          no instead of using your head.  I'm sorry.  I should
11          have -- that was you with the hood on your coat?
12     A    Yes.
13     Q    And 33K, recognize anyone?
14     A    Yes.
15     Q    Again, kind of still in the middle?
16     A    (Inaudible.)
17               THE REPORTER:  I didn't hear him.
18               ATTORNEY SCHNEIDER:  He said I guess it's
19          Phong's because Phong's name is on there.
20     Q    (BY ATTORNEY SCHNEIDER)  Does it look like Phong?
21     A    I can't really tell, it's blurry.  Dark.
22     Q    Okay.  You can grab a seat then.
23               ATTORNEY VISHNY:  You're done then, can I
24          go back to my seat?
25               ATTORNEY SCHNEIDER:  Yes.
```

```
 1    Q    (BY ATTORNEY SCHNEIDER)  How -- how well do you know
 2         Alyson?
 3    A    I know her pretty good but not all that good.
 4    Q    Okay.  How much older -- how much age difference is
 5         between you and Chong?
 6    A    I would say two, three years.
 7    Q    Okay.  So having a sibling that close in age,
 8         sometimes you all have the same friends, correct?
 9    A    Yes.
10    Q    Okay.  Was Alyson someone you knew better or someone
11         that your brother knew better, Chong?
12    A    Probably say Chong because I only knew her but never
13         really kicked it, hang around with her.
14    Q    Would Chong hang out with her?
15    A    Maybe more than I did.
16    Q    Okay.  And Alyson knew Phong?
17    A    Yes.
18    Q    And she knew you as well?
19    A    Yes.
20    Q    Did she know Joe Thor?
21    A    Yes.
22    Q    Okay.  Did she know Tom Lee?
23    A    Yes.
24    Q    Mr. Lee, I want to direct your attention to a time --
25         and I expect this long having passed you might not
```

156

```
 1        know exactly.  Do you remember what time you got
 2        downtown Appleton that night?
 3   A    Not that I remember, no.
 4   Q    Okay.  So you think you went to Sharks for a little
 5        bit and then went to Luna?
 6   A    We didn't go to Sharks for a little bit.  We only --
 7        we went through Sharks to go to Luna maybe.
 8   Q    Okay.  Is it sometimes that you would park in that
 9        ramp or the alley behind Sharks?
10   A    Yes.
11   Q    Do you remember what the weather was like that
12        night?
13   A    Cool.
14   Q    I want to direct your attention now to the time when
15        you're at Luna and it's close to closing time or bar
16        time.  Do you remember where you were in the bar?
17   A    During what?
18   Q    It's getting close to closing time.  Okay?  Do you
19        remember being in what I want to call -- I'll start
20        over, Mr. Lee.  This might be easier.
21            How do you get to the bathrooms at Luna?
22   A    Go down -- gotta go downstairs.
23   Q    Okay.  So I'm going to direct your attention kind of
24        to that area where the stairs come up and you're on
25        the main level.  You understand what I'm
```

157

```
1         describing?

2    A    Yes.

3    Q    Do you remember a time when you were in that area?

4    A    When I came back from the bathroom.

5    Q    Okay.  And who was with you?

6    A    Me and Phong.

7    Q    Did you see anyone else that you knew in that area at

8         that time?

9    A    Joe was probably to my left.

10   Q    What happened when you came up from the bathroom?

11   A    I came up from the bathroom and saw a guy sweating my

12        friend Phong.

13   Q    And just to help the jury, you said sweating your

14        friend Phong?

15   A    Yeah.

16   Q    So kind of maybe looking at him odd or looking at him

17        funny?

18   A    Talking trash.

19   Q    Okay.  So are you facing that person then?

20   A    Yes, I was.

21   Q    So you had just come up from the stairwell and would

22        be facing kind of away from the stairs looking out?

23   A    I don't know what you mean.

24   Q    Bad description.

25             ATTORNEY VISHNY:  Judge, at this point I'm
```

158

```
1           going to ask that Miss Schneider ask open-ended
2           questions, not leading questions.
3                     THE COURT:  Request granted.
4    Q   (BY ATTORNEY SCHNEIDER)  You were facing the man
5           named Josh, you previously said that, correct?
6    A   After talking to Phong, yes.
7    Q   And as you're facing that man, where is Phong, to
8           your left?
9    A   He would be to my right.
10                    ATTORNEY VISHNY:  Again, objection.
11          Leading.
12                    THE COURT:  You can rephrase, Counsel.
13   Q   (BY ATTORNEY SCHNEIDER)  Where was Phong?
14   A   To my right.
15   Q   And where was Joe?
16   A   Maybe behind me to my left.
17   Q   And where was the man you now know whose name was
18          Josh?
19   A   In front of me.
20   Q   Do you remember what words -- you used the term
21          "sweating", but do you remember any words that were
22          said?
23   A   If I can recall, I told him -- he was yelling at
24          Phong.  I told him back up, I don't know who you are,
25          we don't want trouble.
```

1    Q    What do you remember next, Mr. Lee?

2    A    Next I remember he told me to shut fuck -- fuck up

3         and called me a gook, and I said, okay, now you're

4         gonna cross the line.

5    Q    And I should tell you, Mr. Lee --

6                   ATTORNEY VISHNY:  I'm going to object to

7         Miss Schneider's telling him anything if they're

8         doing anything -- other than asking questions.

9                   ATTORNEY SCHNEIDER:  If she let's me

10        finish.

11   Q    (BY ATTORNEY SCHNEIDER)  If you have to say a swear

12        word, that's okay if that's literally the word you

13        remember.  I know you kind of paused when you had to

14        say the word fuck, but if that's what you remember,

15        please use whatever words it was.  Okay?

16   A    Yup.

17   Q    So after he says these words to you, what do you

18        remember happening?

19   A    I told Phong that he's going to the dance floor, and

20        then Phong wouldn't go no more, and then he came up

21        to me, started talking smack, more trash to me, and

22        then I told him, you know, why don't you just back

23        up.  We don't want no problem.  I don't know who the

24        hell you are so --

25   Q    And when you say "he came up to me", you mean the man

```
 1          who we've identified as Josh.
 2     A    Yes.
 3     Q    Was Phong still to your right?
 4     A    Yes.
 5     Q    And Joe to your left?
 6     A    Yes.
 7     Q    What happened then?
 8     A    Then me and Josh went face-to-face, had face-to-face
 9          contact, and then he was talking trash and I punched
10          him.
11     Q    Just to help the jury out, Mr. Lee, was this man
12          taller than you?
13     A    I don't remember.
14     Q    Okay.  After you punched him, do you remember if you
15          made contact?
16     A    Yes, I -- I knicked him in the chin.
17     Q    What happened then, Mr. Lee?
18     A    And then I backed up, and then 30 seconds everybody
19          heard a big bang and then I thought he had shot or
20          something and I ran out.
21     Q    Okay.  I'm sorry.  You thought he had shot or
22          something and then you ran?
23     A    He had shot, like pulled a gun on me or something,
24          and I ran out.
25     Q    You didn't have a gun?
```

161

```
1    A    No.
2    Q    At that point, I'm just kind of trying to direct you,
3         you had thrown the punch and you said you backed up.
4         Where was Joe and Paul at that point, meaning to your
5         right or to your left?
6    A    You mean Phong?
7    Q    I'm sorry.  Phong and Joe.
8    A    Joe was -- I don't know where Joe was at the time,
9         but I remember Phong was still to my right.
10   Q    Were you in front of him or shoulder-to-shoulder?
11   A    Yes, we were directly in front of him.
12   Q    So you were in front of Phong or were you
13        side-by-side?
14   A    What are you talking about?
15   Q    You throw your punch at Josh, you knick his chin, you
16        said you stepped back?
17   A    Yeah.
18   Q    Is Phong still to your right?
19   A    Yes.
20   Q    Were you in -- were you standing closer to Josh than
21        him or were you and he at kind of equal distance to
22        Josh?
23   A    We were distance after I punched him.
24   Q    Okay.  And then you said some time passed, and what
25        do you remember happening?
```

162

```
 1    A    Maybe like 20 to 30 seconds passed and then we heard
 2         a big loud bang and then I freaked out and we ran
 3         out, and what the fuck happened, I said I don't
 4         know.
 5    Q    Did it surprise you when you heard the bang?
 6    A    Yup, because I already heard it once and I got shot
 7         once and, like I said, when you hear a bang you
 8         run.
 9    Q    Okay.  And to you it was very loud.
10    A    No.  I don't know.  Just what people said gunshot and
11         we all scattered.
12    Q    And at that time when you heard the bang, you
13         believed Phong was still to your right?
14    A    Yes.
15    Q    Did you see him do anything prior to the bang?
16    A    I don't know.
17    Q    What about Joe?
18    A    Joe was already out the door.  He booked.
19    Q    Mr. Lee, I'm going to ask you this, and I'm not sure
20         if you're going to remember or not, you hear the
21         bang, was Josh still in front of you?
22    A    Yes.
23    Q    Did you see what happened to him when you -- after
24         the bang or at the time of the bang?
25    A    Not for -- not after the -- after that 30 seconds
```

163

```
 1        when we heard the bang, when we already backed up he
 2        fell in front of me, I said, oh, what the fuck, and
 3        then Phong started pushing me outside and I'm like,
 4        what the hell is going on, and then they said
 5        gunshot, and I was like, oh, shit, and I ran out.
 6   Q    Okay.  And does it -- from the way you describe it,
 7        did you and Phong run out the door together?
 8   A    From what other people told me, Phong was pushing me
 9        out the door.
10   Q    Okay.  Do you remember where Joe was at that time as
11        you're going out the door?
12   A    Like I said, when Phong was pushing me out the door,
13        Joe already booked like probably a block away.
14   Q    Joe much faster than you?
15   A    You could say that, yes.
16   Q    Okay.  Back in December of this time he was?
17   A    (Witness nodding.)
18   Q    Do you remember prior to that and hearing the bang
19        seeing Chong at all?
20   A    No.  I didn't see Chong at all that time.
21   Q    Okay.  Do you remember when you were at Luna ever
22        seeing Chong?
23   A    No.  I was -- I was around Tom and Phong and Joe and
24        I'll say outside smoking most of the time.
25   Q    So you were around Tom, Joe and who else did you
```

1        say?

2    A    Phong.

3    Q    Phong?

4    A    We were outside smoking cigarettes most of the

5        time.

6    Q    Did you even know if Chong was at Luna?

7    A    Not that I could recall.

8    Q    When you went out that night, did you make specific

9        plans with him or with the other people you

10       mentioned?

11   A    Other people.

12   Q    Because if Alyson had been in town, it wasn't

13       somebody you would have planned to meet up with or --

14            ATTORNEY VISHNY:  Your Honor, object,

15       leading.

16   A    I don't really hang around Alyson.  They're just

17       around.

18            THE COURT:  Just, Mr. Lee, next time if

19       there is an objection, just hold off on your answer

20       until I make my ruling.

21   Q    (BY ATTORNEY SCHNEIDER)  So you run out the door.

22       Did you -- which direction did you turn, if you

23       remember?

24   A    If I remember correctly, the corner street of Luna is

25       Division.  Yeah.  Right up Division.

165

1    Q    If I said the Performing Arts Center is at that

2         corner, does that make sense to you?

3    A    Yeah.

4    Q    And which direction did you go?

5    A    I went up Division.

6    Q    As you're going up Division, do you -- do you

7         remember seeing anybody that you recognize near

8         you?

9    A    Phong was behind me running too.  Phong said, go,

10        just keep going, and I was like, for what.

11   Q    Did it surprise you what you had heard?

12   A    Yes.  After a while Phong told me, yes, I was

13        surprised.  I didn't know what was happening until

14        then.

15   Q    That night did you -- you said you smoked regular

16        cigarettes.  Did you have your e-cigarette with you

17        too?

18   A    Yes, I did.

19   Q    Did you -- and Joe's ahead of you as far as you knew

20        at that time?

21   A    Way ahead.

22   Q    Okay.  Did you ever catch up to him?

23   A    Not until we crossed Franklin and passed another

24        street.

25   Q    Do you remember or know what business is on the

166

1           corner there at Franklin?

2      A    Nope.

3      Q    Do you know where the post office is in Appleton?

4      A    Yes.

5      Q    Is that -- did you go near that area?

6      A    Yes.

7      Q    What do you remember about the weather when you were

8           running that night away from Luna?

9      A    Like I said, it was cold.

10     Q    You kept your coat with you?

11     A    Yes.

12     Q    Do you remember if you had your hands in your pockets

13          or out of your pockets?

14     A    I don't remember.

15     Q    Where did you end up going?

16     A    Me, Phong, Joe walked to Joe's house.

17     Q    Do you know -- and I don't always remember the name,

18          the addresses of my friends, but I know how to get

19          there.  Do you know Joe's address?

20     A    No, I don't.

21     Q    Was it like -- well, I'll ask you this, Mr. Lee, if

22          you can guess, how long do you think it took you to

23          walk to get to Joe's?

24     A    I don't know.

25     Q    Was it like two hours, an hour?

1   A   I don't know.

2   Q   Okay.  And when you arrived at Joe's house, was

3       anyone else there?

4   A   No.

5   Q   So tell me who -- who was at Joe's house, yourself?

6   A   Me, Joe and Phong.

7   Q   Did anyone else arrive at the house?

8   A   Probably later on Chong maybe arrived.

9   Q   Did you know how he got there?

10  A   No.

11  Q   When you got -- when you first got back to Joe's

12      house, were you pretty shocked by what had

13      happened?

14  A   I didn't know nothing happened until then, until

15      later.

16  Q   When Chong came to Joe's house, did you go anywhere

17      specific in the house that you recall?

18  A   We were in Joe's basement.  Chong had came there and

19      then me and Phong had left.

20  Q   Does Joe's basement kind of get a rec room area or --

21  A   I don't know.  I was in his room.

22  Q   His room is in the basement.

23  A   Yes.

24  Q   Okay.  Sorry, Mr. Lee.  I did not know that.

25          When you were down in Joe's room, when Chong is

168

1          there, did he say anything?

2    A    He said where did everybody go.  And I said me, Phong

3          and Joe walked here.  And then me and Phong called a

4          ride, we got our ride and went home.

5    Q    Did Chong say anything when he was at Joe's, anything

6          else?

7    A    Nothing much.

8    Q    Okay.  Did he say anything about what had happened

9          back at Luna?

10   A    No.

11   Q    Did he talk about -- when Chong got back to the

12         house, did you talk about the shooting at all?

13   A    Back to what house?

14   Q    Joe's house.

15   A    No.  Chong just said that, oh, I need to go grab my

16         car.

17   Q    I need to go grab my car?

18   A    Yeah.  And then me and Phong already walked out of

19         Joe's house, went home, and that was it.

20   Q    You and Phong then left from what you're

21         describing?

22   A    Yes, me and Phong left Joe's house.

23   Q    Mr. Lee, when you were at Joe's house, Chong never

24         talked about the shooting is what you're telling

25         me?

```
 1   A    He didn't talk about no shooting whatsoever.  He --
 2        all he said was, oh, I need to go and grab my car.
 3        That was it.
 4   Q    And you spoke to officers about this night, right?
 5   A    What?
 6   Q    Bad question.  Okay?  At some point you spoke to the
 7        police officers about what happened at Luna.
 8   A    Yes.
 9   Q    Do you remember telling them comments Chong made?
10   A    No.  I don't remember.
11   Q    Okay.  Do you remember telling officers Chong said
12        he – and I'm going to – fucked up and shot the
13        dude?
14   A    No, I don't remember saying that.
15   Q    When Chong said he needed to get his car, did he tell
16        you why?
17   A    No, he just said he needed to get the car, and at the
18        time me and Phong's ride already arrived so me and
19        Phong went home.
20   Q    Did Letty Xiong come to give you a ride?
21   A    Yes, that's correct.
22   Q    When's the next time you remember seeing Chong?
23   A    Maybe couple days, maybe like a couple of days after
24        that night Chong came to the apartment.
25   Q    And on that -- that day after or the day of, because
```

170

1       it was early morning hours, would have been a Sunday,

2       did you have to work on Sundays?

3    A  Sometimes, yes.

4    Q  And as it continued into Monday, Tuesday or

5       Wednesday, did you continue to have to work?

6    A  Yes.

7    Q  And you continued to go to work, correct?

8    A  Yes.

9    Q  Kept the coat that you had this night?

10   A  Yes.

11              ATTORNEY VISHNY:  Objection.  Leading.  I

12       would really ask Miss Schneider to not require me to

13       make this objection every few questions.

14              THE COURT:  Please work at keeping the

15       questions open ended.

16   Q  (BY ATTORNEY SCHNEIDER)  So now it's a few days

17       later, Chong is at your house or your apartment?

18   A  My sister's apartment.

19   Q  Okay.  And that would be Xeng?

20   A  Yes.

21   Q  Did you talk to him then about the shooting?

22   A  No.

23   Q  You were -- at that point did he ever tell you he had

24       been at Luna?

25   A  He didn't say nothing much.  He just said what are

171

```
 1          you doing and I said about to go to work.  That was
 2          it.
 3     Q    Up to that point, did you know if he had or had not
 4          been at Luna on this night?
 5     A    Like I said, I don't know, I didn't see him that
 6          night.
 7     Q    So a few days later you're at your house, your
 8          brother comes over, did you talk about the Luna
 9          shooting at all?
10     A    No.
11     Q    Probably, Mr. Lee, something would you say that was
12          pretty surprising to you?
13     A    What?
14     Q    Being at Luna and having this bang go off, was that
15          something that was pretty surprising to you?
16     A    Well, you would be if you got shot once, you know.
17     Q    Something pretty significant to you, correct?
18     A    No.
19     Q    Not meaning being there and having a bang go off.
20     A    No.
21     Q    And you never said to Chong, hey, I was at Luna when
22          the shooting happened?
23     A    Not that I can remember, like I said.  I don't
24          remember much.  I already put all this behind me.
25          Like I said, I moved on.
```

172

```
 1   Q   Okay.  Mr. Lee, do you remember when you spoke with
 2       officers telling them that Chong told you certain
 3       things when he came to your house?
 4   A   Like I said, I don't remember.
 5   Q   Okay.  Do you remember telling officers that Chong
 6       came to your house and said he fucked up and shot the
 7       guy?
 8   A   No, I don't remember.
 9   Q   You -- you spoke to officers about this.  You
10       remember where they came to find you?
11   A   I believe it was at Norka, my workplace.
12   Q   If I told you it was on a Wednesday, December 11th,
13       does that sound correct?
14   A   I don't know.
15   Q   Don't know the date but it was a day you were
16       working?
17   A   Yes.
18   Q   What back then -- if you know, Mr. Lee, what hours
19       did you have to work?
20   A   A ten-hour shift, two twelve-hour shift.
21   Q   Did anyone else you know normally work your shift
22       with you?
23   A   My brother-in-law Michael.
24   Q   And that would be Xeng's --
25   A   Yes.
```

1    Q    -- boyfriend?

2    A    Yes.

3    Q    Do you remember at work meeting with Sergeant Rabas

4         and Sergeant Thao?

5    A    Yes.

6    Q    And they asked you -- do you remember what they asked

7         about?

8    A    Yeah.

9    Q    Do you remember when they brought up the topic of

10        Luna what you said?

11   A    The what?

12   Q    When they talked about a shooting at Luna, did you

13        tell them if you had been at Luna that night?

14   A    Yes, they did.

15   Q    And did you tell them you had been at Luna?

16   A    Yes.

17   Q    And did you tell them who was with you?

18   A    Yes.

19   Q    And the same people you're telling us here today?

20   A    Yes, Joe and Phong.

21   Q    And during that interview, Paul, you got upset with

22        the officers, right?

23   A    Yes, because like Officer Thao always does is accuse

24        my family.  Who wouldn't be pissed about it.

25   Q    At one point do you remember raising your voice?

174

```
 1   A    Yes, because he raised his voice at me, yeah.
 2   Q    Do you remember telling them that you were not the
 3        shooter?
 4   A    Yes, I do remember that.  Because I wasn't.
 5   Q    Do you remember them asking that same thing about Joe
 6        and Phong?
 7   A    Yes.
 8   Q    What did you tell them?
 9   A    That I don't know if they are the shooter, and I
10        don't -- I didn't see nobody.
11   Q    Do you remember telling them at one point that it
12        wasn't your boys or wasn't who you were with?
13   A    Yes.
14   Q    Did you tell them about whether or not you had a gun
15        at Luna?
16   A    I didn't have a gun.
17   Q    Okay.  Do you remember them asking about something
18        you might have had in your hand?
19   A    Yes, I remember them asking me that.
20   Q    Did they ever show you any photos of that at any
21        point when you were talking with the officers?
22   A    Not a clear picture.
23   Q    Kind of, for better or worse, kind of a little bit
24        fuzzy like the ones I showed you?
25   A    Yes.
```

175

1    Q    What do you remember having in your hand at Luna?

2    A    Could have been my e-cigarette, I don't know, a

3         bottle, a bottle of Bud Light.

4    Q    Did you show them your e-cigarette?

5    A    Yes.

6    Q    Do you remember, Mr. Lee, when you were speaking with

7         them, was that something they knew that you smoked

8         e-cigarettes?

9    A    Yes.

10   Q    And that was after you told them that you did?

11   A    What?

12   Q    You brought -- you brought up the subject of

13        e-cigarettes, do you recall that?

14   A    Yeah.

15   Q    And then you showed -- you actually showed them your

16        e-cigarette?

17   A    No.  They asked me what did I need, and I asked them

18        could I get my e-cigarette.  So they had given me my

19        e-cigarette to smoke before the interrogation.

20   Q    Okay.  That was something you had at work maybe in

21        like a locker or an area where you kept your personal

22        things?

23   A    I always had it with me.

24   Q    You can keep it with you on the floor?

25   A    Yes, but you couldn't smoke it.

176

```
 1   Q    Okay.  And during that time when you spoke to the
 2        officers, they asked you more than once if you were
 3        the shooter?
 4   A    Yes.
 5   Q    And every time you said what?
 6   A    No.
 7   Q    Did they ask you who was the shooter?
 8   A    Yes, they did.
 9   Q    Did you indicate a name to them at all?
10   A    I don't know who.  No.
11   Q    And then at some point did you go to the Appleton
12        Police Department?
13   A    Probably after the interrogation at Norka.
14   Q    And when you were at the Appleton Police Department,
15        do you remember Sergeant Schira?
16   A    No.
17   Q    Was it the same two people you spoke to at Norka that
18        you spoke to at the police department?
19   A    I don't remember.  That was a while back.
20   Q    You don't remember who you talked to?
21   A    No.
22   Q    Do you remember if they asked you again if you were
23        the shooter?
24   A    I don't remember.
25   Q    And when you got to the Appleton Police Department,
```

177

```
 1          you agreed to speak to them?
 2     A    Yes.
 3     Q    And I think at some point during that time you were
 4          speaking with them, they had your coat.  Do you
 5          remember that?
 6     A    Yes.
 7     Q    And do you remember them asking you if you knew
 8          anything more about what happened at Luna?
 9     A    No.
10     Q    Do you remember talking to them about what happened
11          at Luna?
12     A    After a long while, yes.
13     Q    Was it hard to talk about what you knew?
14     A    Nothing that I didn't know.  Something they forced me
15          into saying.
16     Q    Mr. Lee, at some point you get asked if Chong was at
17          Luna.  Do you remember that?
18     A    What?
19     Q    At some point do they bring up your brother's name
20          Chong?
21     A    Yes.
22     Q    Prior to that, had you talked about Chong at all?
23     A    No.
24     Q    Do you remember telling the officers that Chong came
25          to Joe's, this is when you were at the Appleton
```

178

1          Police Department, after you and Joe and Phong had

2          gotten there?

3    A     What?

4    Q     Do you remember telling the officers that Chong ended

5          up at Joe's house on this night after you and Chong

6          and Phong had been there?

7    A     Yes.  Like I said, Chong came there, he said he

8          needed a ride, go grab the car.

9    Q     During that time when you were at the Appleton Police

10         Department, do you remember telling them that Chong

11         made the comment he fucked up and shot a guy?

12   A     I don't remember.

13   Q     Do you remember at some point saying to the officers

14         there was a comment or comment by Chong that he point

15         blanked him?

16   A     Look.  I'm gonna plead the fifth.  Okay?  I don't

17         remember saying all that.  Okay?

18                    ATTORNEY SCHNEIDER:  We should take a

19         break.

20                    THE COURT:  Take a brief recess.

21              Please rise for the jury, Mr. Lee.

22                    (The jury was escorted out of the

23         courtroom.)

24                    THE COURT:  All right.  Please be seated.

25              And, Mr. Lee, you do have your counsel, Attorney

179

1          Groh, here.

2                    ATTORNEY SCHNEIDER:  Why don't we -- we can

3          have Attorney Groh and Mr. Lee go back to where they

4          were, it's just a little more private, and speak for

5          a minute or two.

6                    THE COURT:  That's fine.

7                    ATTORNEY SCHNEIDER:  Okay.

8                    (Court in recess.)

9                    THE COURT:  All right.  Attorney Groh,

10         you've had a chance to talk to Mr. Lee?

11                    ATTORNEY GROH:  I have, Your Honor.  We

12         were able to speak for a few minutes, and we've also

13         spoken before about fifth amendment issues.  I think

14         we're determined that the fifth amendment protections

15         would not apply at this immediate time.

16                    THE COURT:  Okay.

17                    ATTORNEY GROH:  So I believe that -- I

18         believe my client is willing to continue testifying.

19                    THE COURT:  Okay.  And, Mr. Lee, you have a

20         better understanding now that you've had a chance to

21         talk to Mr. --

22                    THE WITNESS:  Yes.

23                    THE COURT:  Very good.  Then we can -- we

24         can all rise.  We'll bring the jury back in.

25                    (The jury was escorted into the courtroom.)

180

```
1                    THE COURT:  All right.  Please be seated.
2               And if I recall correctly, Attorney Schneider,
3          you still had some additional questions, correct?
4                    ATTORNEY SCHNEIDER:  Thank you.
5               CONTINUED EXAMINATION OF PAUR LEE
6     BY ATTORNEY SCHNEIDER:
7     Q    Mr. Lee, I think the last question I asked you is if
8          you remembered telling the officers that Chong said
9          to you I point blanked him.
10    A    Like I said, I -- like I said, that was two years ago
11         or so.  I don't really remember.
12    Q    If there would be a recording of you saying Chong
13         told me or said to me I point blanked him, might
14         there be such a recording?
15    A    Like I said, I don't remember.
16    Q    Do you remember telling the officers you learned from
17         Chong more about what he did when he came to visit
18         your house a few days after the incident?
19    A    No.
20    Q    Do you remember telling the officers that you felt
21         like Chong was going to hate you?
22    A    No.  I don't remember saying none of that.
23    Q    Do you remember telling the officers you didn't know
24         Chong had a gun that night?
25    A    What?
```

181

```
 1   Q   Do you remember telling the officers that you didn't
 2       know Chong had a gun that night?
 3   A   I don't remember that.
 4   Q   Do you remember being upset when you were talking to
 5       the officers?
 6   A   What about?
 7   Q   Do you remember being upset that you were talking
 8       about what Chong had done?
 9   A   Only because they forced me to say it.
10   Q   You weren't worried about how Chong would feel when
11       you told what you knew?
12   A   No.
13   Q   Do you remember telling the officers that you were --
14       you had been having trouble sleeping since the
15       incident?
16   A   Who wouldn't.
17   Q   You remember telling sergeants at the Appleton Police
18       Department that from the time when the shooting
19       happened to when you were meeting with them you had
20       been having trouble sleeping?
21   A   And I said who wouldn't.
22   Q   Oh, who wouldn't.  I'm sorry, Mr. Lee.
23           And that came over days when you continued to
24       talk to your brother about what happened?
25   A   I'm sorry.  Can you repeat that?
```

182

```
 1   Q    The times when you were having trouble sleeping came

 2        after your brother met back up with you at Joe's

 3        house?

 4   A    I don't remember.

 5   Q    Okay.

 6   A    What are you -- what was the question?

 7   Q    Sure.  From the time of the shooting to when you

 8        talked to the officers you said you'd been having

 9        trouble sleeping, and you said who wouldn't, right?

10   A    Yes.

11   Q    I mean, in essence, Mr. Lee, Paul (sic) got shot

12        right in front of your eyes -- Josh got shot right in

13        front of your eyes, correct?

14   A    Yes.  Not knowing that he was shot but he was.

15   Q    But he fell?

16   A    Fell.

17   Q    Do you remember smelling anything?

18   A    No.

19   Q    Just do me one favor, Mr. Lee.  The court reporter

20        has to take down everything you say, so sometimes,

21        even when you know your answer to my question, can

22        you just wait for me to finish?

23   A    Okay.

24   Q    Okay.  Otherwise she'll start to yell at us or the

25        judge will.
```

183

1    A    Okay.

2    Q    Do you remember what kind of coat or jacket Chong had

3         on on this night?

4    A    No.

5    Q    Do you remember describing it for the officers as a

6         jacket with darker sleeves?

7    A    I don't remember.  I don't recall or remember saying

8         that.

9    Q    Do you remember telling the officers that Chong had

10        told you he was going to run?

11   A    He didn't say he was going to run but he said he was

12        -- he wanted to live with my brother in California.

13        Yes.  I remember that.

14   Q    So in the days after this Chong just brought up the

15        subject that he wanted to go visit your brother in

16        California?

17   A    Yes, because my brother always wanted to go live

18        there because he owns his own business.

19   Q    Which brother is that?

20   A    My half brother.

21   Q    Okay.  Do you remember telling one of the officers at

22        the Appleton Police Department that you were gonna --

23        weren't gonna go down for something someone else had

24        done?

25   A    Yes, I remember saying that.

184

```
1    Q    Do you remember the officers showing you a series of
2         photographs at the Appleton Police Department?
3    A    Not really.
4    Q    Do you remember picking Chong out of one of those
5         photographs?
6    A    No.  I don't remember.
7    Q    Were you bothered by the fact that Paul (sic) had
8         been shot in front of you?
9    A    Why do you keep saying I've been shot?
10   Q    I'm sorry.  Were you bothered by the fact that Josh
11        had been shot in front of you?
12   A    After I found out that he was shot, yes.
13   Q    Did you talk to Sergeant Thao about like Josh's
14        spirit and how you felt?
15   A    No, I never talked about that, but I -- I did tell
16        him that it's kind of hard to sleep after seeing
17        somebody, yeah.
18   Q    It's even harder when your brother is involved, isn't
19        it?
20             ATTORNEY VISHNY:  Objection.
21   A    I don't know.  Like I said, I don't know.
22             THE COURT:  Sustained.  Again, Mr. Lee, if
23        there is an objection then you don't have to answer
24        until -- sustained.  Question will be stricken.
25   Q    (BY ATTORNEY SCHNEIDER)  Did Chong talk to you about
```

185

1          what he had done with the gun?

2     A    Not that I know of.

3     Q    Don't remember telling the officers that Chong stated

4          he ditched the gun?

5     A    No.  I don't remember saying that.

6     Q    Did you know where Chong had parked his car that

7          night downtown?

8     A    No.  Like I said, I came with somebody else.  I

9          didn't see Chong there that night or remember seeing

10         him.

11    Q    So if someone had talked about Alyson hanging around

12         with somebody, it wouldn't have been you?

13    A    No.

14    Q    And it wouldn't have been Phong?

15    A    No.

16    Q    Wouldn't have been --

17              ATTORNEY VISHNY:  Again, objection.

18         Leading.

19              THE COURT:  Sustained.

20    Q    (BY ATTORNEY SCHNEIDER)  Was Alyson by Joe that you

21         saw at all?

22    A    Not that I recall.  I didn't see Alyson or the other

23         girl there.

24    Q    Mr. Lee, I'm going to show you something closer to

25         you and then with some technology we have we're going

```
 1          to show it up on the screen.
 2               I'm going to show you a drawing, it's marked
 3          Exhibit 123.  Your name, Paul, not Paur, but Paul Lee
 4          is here at the top, correct?
 5     A    Yes.
 6     Q    Do you remember writing or talking to the officers at
 7          the Appleton Police Department and them making this
 8          drawing based upon what you said?
 9     A    Kinda, yes.
10     Q    And at that time did you tell them what you could
11          remember?
12     A    Just what they wanted me to tell them, yeah.  What
13          they -- the story that they made me say, yeah.  I
14          remember that.
15     Q    There were other people in the bar that night,
16          right?
17     A    Yeah, like me, Phong and Joe, yeah.
18     Q    And Tom Lee?
19     A    Yes, and Tom Lee maybe.  And maybe I think Noe.
20     Q    Someone, maybe Noah might be his first name?
21     A    Yeah.  Noah, Noe.
22     Q    Call him maybe N-O-E, Noe?  What about Tou Shoua?
23     A    Tou Shoua, I don't remember Tou Shoua being by me or
24          near.
25     Q    Michael Thor?
```

187

1   A    Michael Thor, he was in the dance floor.

2              ATTORNEY SCHNEIDER:  And, Judge, the

3        bailiff has been so kind to tell me that sometimes

4        when we utilize this in the best way, it's shining in

5        the juror's eyes, so I might have to ask you to turn

6        the lights off.  Just if you don't mind doing that

7        then I might not have to turn the side lights on.

8              THE COURT:  Why don't we err on the side of

9        caution.  Ladies and gentlemen of the jury, if

10       there's a glare, we'll look at what adjustments we

11       can make.  Everyone okay?

12             (No response.)

13             THE COURT:  All right.  Excellent.

14  Q    (BY ATTORNEY SCHNEIDER)  On this diagram, Mr. Lee,

15       your name is where my finger is pointing, correct?

16  A    Yes.

17  Q    And this is something you went through with the

18       Appleton officers when you were at the police

19       department?

20  A    Yes.

21  Q    And it's something where you indicated people were

22       standing at the time; is that correct?

23  A    If that's the correct diagram, yes.

24  Q    Okay.  Pointing to an X, I'm going to zoom in on it,

25       spin it around actually.  You see your name Paul

                                188

```
 1        written on this exhibit?
 2   A    Yes.
 3   Q    And then what would have been to your right, the name
 4        Phong?
 5   A    Yes.
 6   Q    And is that how you remember Phong standing?
 7   A    No.  I had told him that Phong was to my right.
 8   Q    I understand, and you might be looking at this in the
 9        opposite way.  These would indicate the stairs.  Does
10        that make sense to you in terms of the layout of
11        Luna?
12   A    Yeah, I guess.
13   Q    Okay.  Was the -- what was the V for, the victim?
14   A    I don't know what the V is.
15   Q    And then over here there is the name Chong.  Do you
16        see that?
17   A    Not really, not -- not that good of handwriting but
18        sure.
19   Q    Maybe like a doctor's handwriting, not the
20        clearest --
21   A    Sure.
22   Q    -- correct?
23        So when you were describing for sergeants and
24        officers where people were in this diagram, you told
25        the officers about these facts, right?
```

189

```
 1   A    Yes.

 2   Q    And described for them where people were?

 3   A    Yes.

 4   Q    And at one point you described that you thought Chong

 5        had come from the bar; isn't that correct?

 6   A    Yes.

 7             ATTORNEY SCHNEIDER:  I'd move 123 into

 8        evidence at this time.

 9             THE COURT:  Any objection?

10             ATTORNEY VISHNY:  No.

11             THE COURT:  123 will be received.

12   Q    (BY ATTORNEY SCHNEIDER)  Mr. Lee --

13             ATTORNEY SCHNEIDER:  And I'm going to go

14        right to another exhibit, Judge.

15             THE COURT:  That's fine.

16   Q    (BY ATTORNEY SCHNEIDER)  I'm going to show you what's

17        marked Exhibit 122.  Do you see that number?

18   A    Yes.

19   Q    And your name, although it's hard to see the P, Paul

20        Lee, does that appear at the top, and that's your

21        address on Kensington?

22   A    Yes.

23   Q    And this is dated December 12th, 2013; is that

24        correct?

25   A    Yes.
```

190

```
 1   Q   At 12:30 p.m.; is that correct?

 2   A   Yes.

 3   Q   And you signed this, correct, that's your

 4       signature?

 5   A   Yes, that's my signature.

 6   Q   Okay.  Is this your handwriting in the middle of the

 7       form?

 8   A   Yes.

 9   Q   And that's what you wrote at the Appleton Police

10       Department?

11   A   Something Officer Thao wanted me to write, yes.

12   Q   He asked you what happened?

13   A   Huh?

14   Q   Officer Thao asked you what happened?

15   A   What tapped it?

16   Q   What happened.  Sorry, I have a cold.  Sergeant Thao

17       asked you what happened at Luna, right?

18   A   Yes.

19   Q   And at one point he asked you to write a statement

20       about what happened.

21   A   No.  He forced me to say that it was Chong because

22       Chong's less -- Chong's name was brought up last.

23   Q   It's pretty significant to say your brother was

24       involved in something like this, correct?

25   A   Yup, because his name was brought up last and then he
```

191

```
 1        tried blaming everything on my brother.
 2    Q   Okay.  Well I just want to show and have -- I'm going
 3        to read a sentence at a time, Mr. Lee.  I'm going to
 4        start here with the first line.  See the word while?
 5        Do you see that, Mr. Lee?
 6    A   See what?
 7    Q   Do you see this word that starts while?
 8    A   Yes.
 9    Q   So what you wrote here was:  While I was in Luna
10        coming back from the bathroom me and Josh got into an
11        argument.  Those are the first two lines you wrote,
12        correct?
13    A   Yes.
14    Q   Next line continues:  When it got physical, Chong
15        came from Josh's left side and point blanked Josh.
16        That's what you wrote, correct?
17    A   Yes.
18    Q   After leaving Luna, me, Joe and Phong walked to
19        Joe's.  That's what you wrote?
20    A   Yes.
21    Q   Roughly an hour later, Chong shows up and told us he
22        had fucked up and shot Josh.  That's what you
23        wrote?
24    A   Yes.
25    Q   Chong told me, Joe and Phong that he ditched the gun
```

1    and planned on leaving town.  Correct?

2  A  Yes.  I maybe wrote that, but I don't remember Chong

3     saying he ditched the gun though.

4  Q  Okay.  Do you remember Chong saying he point blanked

5     him?

6  A  Like I said, not that I remember.  But if I did write

7     that, maybe.

8  Q  Maybe?  Okay.

9  A  Like I said, I'm not sure.  I don't remember.  I've

10    already put this all behind my past and I moved on.

11 Q  I know, Mr. Lee, and I do appreciate you coming in

12    here, but I do have a few more questions.

13        This is something where you and your other

14    friends were right in the immediate area when this

15    happened, correct?

16 A  Yes.

17 Q  Was Sergeant Thao in the room when you wrote that

18    written statement?

19 A  Not that I remember.

20 Q  So he wasn't there at the time as best you

21    remember?

22 A  Best I can remember, yes, I don't remember if he was

23    there or not.

24 Q  Do you remember telling officers at some point that

25    you didn't want to be known as a snitch?

193

```
 1   A    No, I don't remember saying that.

 2   Q    Do you remember telling them that Chong was going to

 3        hate you for what you were saying?

 4   A    Like I said, we already went through that earlier, I

 5        don't remember saying that.

 6   Q    You don't remember that, Mr. Lee?

 7   A    Yes, I don't remember that.

 8   Q    Okay.  Do you remember telling officers from where

 9        Phong was he couldn't have reached around you and

10        shot Josh on the left side of his head?

11   A    Like I said, Phong was to my right.  That's all I

12        remember was Phong said he was pushing me out the

13        door.  That was it.

14   Q    Mr. Lee, I'm going to show you a couple pictures

15        starting with 83, 84 and 85.  First the top picture

16        in 83, that's you, correct?

17   A    Yes.

18   Q    And this is your coat?

19   A    Yes.

20   Q    And we had earlier seen some pictures where you had

21        like a hood to your coat?

22   A    Yes.

23   Q    Okay.  Did the officers at the Appleton Police

24        Department ask you to see your e-cigarette?

25   A    Yes.
```

194

1   Q   Okay.  And did you pull it out of your pocket or you
2       asked --
3   A   They already had all my stuff.
4   Q   They had it.  Okay.
5   A   Yes.
6   Q   And in this top photograph, Exhibit 83, they ask you
7       to put it in your hand?
8   A   They asked me if they can -- if I can put it in my
9       hand and we take picture, see if -- to match it with
10      that picture there -- on there.
11  Q   Because you had told you didn't have a gun?
12  A   Yes, I did say that.
13  Q   You thought maybe an e-cigarette or beer bottle?
14  A   Yes, it was one of the two.
15  Q   And then picture 84 is you still holding that object
16      in your right hand?
17  A   Yeah, either the bottle or the e-cigarette.
18  Q   And then 85 is just kind of a close-up picture of
19      that e-cigarette?
20  A   Yup.
21  Q   And that was the one you would have had a few nights
22      earlier when you were at Luna?
23  A   I always had it on me.
24  Q   Okay.  What I mean by that is you didn't buy a
25      different one in between or you didn't have two?

195

```
1    A    No.

2    Q    Okay.

3                 ATTORNEY SCHNEIDER:  I'd move 83 through 85

4         into evidence.

5                 THE COURT:  Any objection?

6                 ATTORNEY VISHNY:  No.

7                 THE COURT:  83 to 85 will be received.

8    Q    (BY ATTORNEY SCHNEIDER)  And after you wrote that

9         written statement at about 12:30 p.m., where did you

10        go after you left the Appleton Police Department?

11   A    I went to my apartment.

12   Q    Do you remember when you left the police department

13        thanking the officers?

14   A    About what?

15   Q    Do you remember telling them you could feel better?

16   A    Not that I can remember.

17   Q    Do you remember crying at any point during the

18        interview?

19   A    No.

20   Q    Mr. Lee, do you remember back in -- around this time

21        did Chong have a Facebook account?

22   A    I don't remember him having one, but people say he

23        did, but I don't know.  He was never my friend on

24        Facebook, but whatever.

25   Q    Okay.  If I told you he might have had the account
```

196

```
 1            Little Lee, would that --
 2    A      No.
 3    Q      No?  Do you remember after this time when you talked
 4            to the officers Chong making any requests of you or
 5            asking you to do anything about his Facebook
 6            account?
 7    A      No.
 8    Q      Okay.  After the Luna shooting, in the next few days,
 9            did you go back to Sharks at all?
10    A      No.
11    Q      Did -- are you aware if Joe ever went back to Sharks
12            at all?
13    A      I don't know.  I'm not -- I can't speak for them.
14    Q      Okay.  Did you still talk to Joe and Phong over the
15            next few days?
16    A      No, not until maybe like three, four months after.
17    Q      Okay.  Do you remember talking to Chong after he was
18            here at the Outagamie County Jail?
19    A      About what?
20    Q      Well, we're going to talk about that.  Do you
21            remember talking to him about what you said to the
22            police?
23    A      No, not that I can remember.
24    Q      Do you remember telling him that you told the police
25            that he was involved?
```

197

1   A   Not that I can remember.

2   Q   Do you remember telling him that you looked at

3       pictures or a video with the police?

4   A   No pictures.

5   Q   Pictures?  Do you remember Chong trying to give you

6       like his password for his account for his Facebook?

7   A   Maybe to my sister, but I don't know, not me.

8   Q   Okay.  During these next few weeks did you talk to

9       Teng?

10   A   Teng Lee?

11   Q   Yes.

12   A   I don't know.  I always talk to Teng.

13   Q   Okay.  So even after this time you always spoke to

14       Teng?

15   A   Yes.

16   Q   And Teng was Phong's younger brother?

17   A   Yes.

18   Q   Do you remember talking to Paul about a letter -- or

19       talking to Chong about a letter he wrote you?

20   A   No.

21   Q   Do you remember getting a letter from Chong after he

22       was in jail?

23   A   Yes, about Christmas, yeah.

24   Q   Okay.  And what did you do with the letter?

25   A   Threw it away.  That was it.  Why?

1    Q    Do you remember tearing it up?

2    A    No.

3    Q    Do you remember talking to Chong about having to come

4         to court?

5    A    No, not that I can remember.

6    Q    Do you ever remember talking to Chong and talking

7         about what you should say if you came to court?

8    A    No.

9    Q    Mr. Lee, have you ever talked -- I think you said

10        yes.  At some point after Chong was in jail, you

11        might have talked to him, right?

12   A    Maybe here and there, yes.

13   Q    Okay.  I'm sorry.  I couldn't hear the answer.

14             THE COURT:  Could you repeat?

15   A    Here and there, yes.

16   Q    And when you talk to someone who calls from the jail,

17        you get this like long recording at the beginning of

18        the call.  Do you remember that?

19   A    Yes.

20   Q    And the recording basically tells you that the call

21        is being recorded or monitored.

22   A    Yes.

23   Q    And every time there's a call, that playing comes on.

24   A    Yes.

25   Q    Okay.  So if you would talk to him, you were aware

199

1      the call was being recorded?

2  A   Yes.

3  Q   Do you ever remember saying that, you know, you were

4      concerned or didn't want to say too much because it

5      was being recorded?

6          ATTORNEY VISHNY:  Again, I'm going to

7      object to leading.  And I don't think the question is

8      does he remember, the question is did this happen,

9      and if he doesn't remember, she can use what she has

10     available.

11         THE COURT:  Briefly if I could have counsel

12     approach.

13         (Bench conference.)

14 Q   (BY ATTORNEY SCHNEIDER)  I'm going to show you, Mr.

15     Lee, an exhibit that's called Exhibit 124; is that

16     correct?  That's the number on there?

17 A   Yes.

18 Q   Actually, she marked the one with my notes.  I've got

19     to do this one.

20         And at the top it says it's a jail phone call.

21     Is there a date listed?

22 A   12/12.

23 Q   Of what year?

24 A   '13.

25 Q   And is there a time listed?

```
1    A    18:23.

2    Q    And --

3    A    P.m.

4    Q    So that would be 6:23 p.m.?

5    A    Sure.  Whatever.  Yeah.

6    Q    I'm going to tell you this is a transcript of a jail

7         phone call and you're referenced in the call.  Okay?

8    A    Okay.

9    Q    Do you remember talking to Chong in Hmong at times?

10   A    Like I said, I don't remember.

11   Q    Some of this was a long time ago, correct?

12   A    Yes, but like I said, I don't remember much about

13        it.

14   Q    And again, the date of this transcript is - just got

15        to let it adjust - 12/12/2013; is that correct, Mr.

16        Lee?

17   A    What was that?

18   Q    The date of this is 12/12/13?

19   A    Yes.

20   Q    I'm going to kind of go line-by-line.  Sometimes we

21        could not make out what was being said, that's why

22        the word -- do you know what the word inaudible

23        means?

24   A    Yes.

25   Q    Okay.  It means you can't understand it.
```

201

```
 1                    THE COURT:  It's blurred, Attorney
 2        Schneider.
 3                    ATTORNEY SCHNEIDER:  I've got to get this
 4        down.
 5   Q    (BY ATTORNEY SCHNEIDER)  The first line represented
 6        by the initials CL would be Chong Lee.  Okay?  And
 7        you'll be referred to as PL.  So the first line we
 8        just have inaudibles; is that right?
 9   A    Yes.
10   Q    Next line you say hello, correct?
11   A    Yes.
12   Q    And then Chong says yeah or yeah.  Is that what's on
13        this transcript?
14   A    Yes.
15   Q    Your response, first word is inaudible and then you
16        say is fucked and shit, correct?
17   A    Yeah.
18   Q    And again, Mr. Lee, I'm just going to walk you
19        through what the transcript shows.
20             Next line from Chong is, whatever you do, then
21        you tell me; is that correct?
22   A    I guess, yes.
23   Q    I'm just trying to do this, Mr. Lee, instead of
24        having you read it so I'll read it to you.  Okay?
25        Then you respond back saying huh?  Is that correct?
```

202

1   A   Yes.

2   Q   And the next line Chong says you tell me.  Correct?

3   A   Yes.

4   Q   Again you say huh?  Is that correct?

5   A   Yes.

6   Q   Chong questions, you tell me.  Is that correct?

7   A   Yes.

8   Q   Then you respond, no, before they got me mad, so I

9       got too angry and I -- and I yelled inaudible.

10      That's what it says the next line is?

11  A   Yes.

12  Q   Chong responds, what did you say.  Correct?

13  A   Yes.

14  Q   Shift this up just a little bit.  We'll let it focus.

15      I want to read it in two lines at the time.

16          During that time they kept asking if it was you.

17      I said no, it is not you.  They kept saying we have

18      -- he is the one that is inaudible that was not

19      caught.  That's all.  So then I said you were there.

20      Then they said it was (sic) him.  I said, hell, no,

21      it is not him.  Do you remember that?

22  A   I don't remember saying all that, but yeah, whatever,

23      it's on paper, yeah.

24  Q   Okay.  And then the next line is Chong saying, tell

25      -- and we can't make out the next word, inaudible, to

```
1        put money on the phone.  I will call back.  That's

2        correct?

3    A   Yeah.

4    Q   And you respond by saying yes?  Is that correct?

5    A   Yes.

6    Q   Chong says to you, tell him to do it right away.  Is

7        that correct?

8    A   Yes.

9    Q   You respond by saying yes?

10   A   Yes.

11   Q   And Chong says, like right away.  Correct?

12   A   Yes.

13   Q   And you say yes.

14   A   Yes.

15   Q   Correct?

16           Then Chong says, so I can call back.  Why did

17       you say -- say that to them.  Is that what Chong

18       said?

19   A   If it's on paper, yes.

20   Q   According to this.  Okay.

21           And the next line is, fucking the, and then the

22       call ends; is that correct?

23   A   I guess.  Whatever's on the paper.  I don't remember

24       though.

25   Q   I understand, and we've had transcripts made of these
```

204

1           calls, Mr. Lee.

2                   ATTORNEY SCHNEIDER:  I'd move 124 in at

3           this time.

4                   THE COURT:  Any objection?

5                   ATTORNEY VISHNY:  No.

6                   THE COURT:  124 will be received.

7               Is there going to be another exhibit or shall I

8           turn on the lights?

9                   ATTORNEY SCHNEIDER:  No.  There's three

10          more phone calls.

11                  THE COURT:  Okay.  So I'll keep the lights

12          off until I'm directed otherwise.

13    Q     (BY ATTORNEY SCHNEIDER)  Mr. Lee, I'm going to show

14          you a transcript of a call, No. 125; is that

15          correct?

16    A     Yes.

17    Q     And the date on this call is 12/12/13 again?

18    A     Yes.

19    Q     At 19:31 p.m.?

20    A     Yes.

21    Q     So about an hour after that first call?

22    A     I guess, yes.

23    Q     Okay.  And this call starts by Chong saying hello?

24    A     Yes.

25    Q     You respond yes?

205

```
1   A    Yes.

2   Q    So you took -- you answered the second call when

3        Chong called?

4   A    Not that I remember, but yes.

5   Q    Change says, hey, what happened.  Is that correct?

6   A    Yes.

7   Q    Your response was, they said -- they said they

8        inaudible they caught inaudible.  Correct?  That's

9        how you responded?

10  A    Yes.  Whatever the papers say, yes.

11  Q    And then next Chong says you?  Asking you like a

12       question?

13  A    Yes.

14  Q    You say yes.  Is that correct?

15  A    Yes.

16  Q    Next line Chong says, they said that you said it's

17       me.  Is that what Chong said to you?

18  A    Like I said, I don't remember, but whatever the

19       papers say, just yeah.

20  Q    And, Mr. Lee, the difficulty is that when these

21       conversations are in Hmong, to play them, many people

22       wouldn't understand them, that's why we had to have

23       them transcribed, okay?  So that's why it's a little

24       more painful to go line-by-line, but that's why we're

25       going through this process.  Okay?
```

206

1    A    Okay.

2    Q    Do you -- when you would normally talk to Chong, do

3         you talk in English or Hmong?

4    A    Both.

5    Q    Okay.  Next line for you.  You say, no because they,

6         and then it's inaudible.  Correct?

7    A    Yes.

8    Q    And Chong asks you, what did you say.  That's what

9         the next line reads?

10   A    Yes.

11   Q    And you say, they fucking kept saying, saying,

12        saying, and I got angry, I said it isn't anyone, not

13        us, not you, it is inaudible.  Then I got mad.  Then

14        they said if it's no one, then who would it be.  I

15        said I don't fucking know.  And then inaudible.

16        That's how you responded?

17   A    Yes.

18   Q    Chong's response back is what, correct, according to

19        the transcript?

20   A    Yes.

21   Q    And you then say, and then they -- they said ask if

22        Chong was the one who inaudible.  No.  Inaudible.

23        Like heck yeah.  Inaudible.  That's your response

24        according to the transcript?

25   A    Sure.  Yeah.

1    Q    And Chong responds back, stupid.  Correct?

2    A    Yeah.

3    Q    And then you say, inaudible, finished saying that

4         then he kept inaudible.  Sound like you're talking

5         about the interview and when you were talking to the

6         police?

7              ATTORNEY VISHNY:  Now I'm going to object.

8         If she wants to ask him what it is it's one thing but

9         not to suggest an answer.

10             THE COURT:  Sustained.

11   Q    (BY ATTORNEY SCHNEIDER)  Do you know what you were

12        talking about when you were talking to Chong?

13   A    Like I said, I don't remember much about this or

14        whatsoever.

15   Q    Okay.  And then Chong's response back to you was, as

16        long as -- as when you just tell them again that it

17        was not me.  That was his response?

18   A    Yes.

19   Q    And you say huh.  Correct?

20   A    Yes.

21   Q    And he says, as long as you say it is not me, I don't

22        care, according to the transcript?

23   A    Yes.

24   Q    The next line, but they already got me.  Is that what

25        you told your brother according to the transcript?

208

```
 1    A    Yes, according to the transcript, but I don't
 2         remember, yes.
 3    Q    And then he says, they caught, correct?
 4    A    Yes.
 5    Q    And you respond what.  Is that the next line?  Is
 6         that the next line?
 7    A    Yeah.
 8    Q    And then Chong says, they caught you on the camera,
 9         correct?
10    A    Yes.
11    Q    And you respond by saying yes.
12    A    I guess, yes.
13    Q    Chong says, they actually saw you?
14    A    Yes.
15    Q    And you respond by saying yes.
16    A    Yes.
17    Q    Chong's response to you is, but they didn't see me.
18         Is that what's on the transcript?
19    A    Yes.
20    Q    And you respond by saying what?
21    A    Yes.
22    Q    And Chong asks, but how come they didn't see me,
23         correct?
24    A    Yes.
25    Q    And you respond, they did not give you the DVD to
```

1        look at yet.  Is that correct?

2    A   I guess, yes.

3    Q   And Chong says no, correct?

4    A   Yes.

5    Q   You respond by saying oh.  Is that correct?

6    A   Yes.

7    Q   And Chong then says, you saw the whole thing.  Is

8        that correct?

9    A   Yes.

10   Q   You respond by saying yes.

11   A   Yes.

12   Q   He then asks you, how did it look.  Correct?

13   A   Yes.

14   Q   And you respond, when you hit him, then inaudible,

15       then you see the gun right away inaudible.  Is that

16       how you responded?

17   A   According to the transcript, yes.

18   Q   And Chong's response back is, I know, they did not

19       see anyone.  Is that correct?

20   A   Yes.

21   Q   Then you say, but inaudible they gave you.  I don't

22       want to talk a lot because right now they are

23       recording.  Is that your response back?

24   A   Yes.

25   Q   Chong then says, I know.  I need you guys to visit

1      me, uh, uh, on Monday at 6:00 inaudible.  Is that how

2      he responded?

3   A   Yes.

4   Q   And you ask him, what day?

5   A   Yes.

6   Q   Chong says, Monday at 6:45.  I don't know because I'm

7      getting moved.  Just put money on the phone and I'll

8      call you guys to visit me.  Is that correct?

9   A   Yes.

10  Q   And then you respond by saying yes.  Is that

11      correct?

12  A   Yes.

13  Q   I'm going to walk through another section of that

14      call with you, Mr. Lee.  There's a line in here,

15      Chong saying, you asked Mao if Mao deleted my thing

16      yet.  Do you see that?

17  A   Yes.

18  Q   Who is Mao?

19  A   My sister.

20  Q   Do you know what he's referring to?

21  A   No.

22  Q   And you respond by saying, inaudible don't know.  We

23      don't know what is needed to get in there.  Is that

24      correct?

25  A   Yes.

1   Q   Then Chong says, the number one. Do you hear me. Is

2        that correct?

3   A   Yes.

4   Q   You respond by saying yes. Is that correct?

5   A   Yes.

6   Q   The next comment from Chong is, the number one, the

7        letter L, then the O, the V, the E, then the T, the

8        H, the I, the S, the L, the I, then the F, the E. Is

9        that how he responded --

10   A   Yes.

11   Q   -- according to the transcript? And you say,

12       inaudible the what. Is that correct?

13   A   Yes.

14   Q   Then Chong responds back saying, love this life. Do

15       you see that?

16   A   Yes.

17   Q   Then you respond, the I, the L, the O or the one; is

18       that correct?

19   A   Yes.

20   Q   And at this point you're talking with him in Hmong as

21       best you can recall?

22   A   I don't remember.

23   Q   Okay.

24   A   But yeah.

25   Q   You didn't know any password Chong had at the time?

```
 1   A    No.
 2   Q    Then Chong says, the L, the O, the V after the one,
 3        then one, then love then the T, the H.  That's what
 4        he said next; is that correct?
 5   A    Yes.
 6   Q    And you respond, so the one and the L-O-V-E.  Is that
 7        what you said in response?
 8   A    Yes.
 9   Q    And he says, yes, it is just my life, just this then
10        -- or it's just T-H-I-S then L-I-F-E.  Is that how he
11        responded?
12   A    Not that I can remember, but yes.
13   Q    And then you say, wait, T-H-I-F.  Is that how you
14        responded?
15   A    Yeah, whatever that means, but yes.
16   Q    And then Chong says, S; is that correct?
17   A    Yes.
18   Q    And then you say, oh, X.  Does is it seem like you
19        didn't understand him --
20   A    Yes.
21   Q    -- when he was giving you this password?  Did you
22        understand what he was trying to spell out?
23   A    I had no idea what the hell he was trying to say or
24        what the hell this is about, but yeah.
25   Q    Okay.  And then he says, it is S.  Do you remember
```

213

1       that's what's on the transcript?

2    A   Yes.

3    Q   And you say, oh, T-H-I-X.  Is that what the

4        transcript says?

5    A   Yes.

6    Q   And he says, S, correct?

7    A   Yes.

8    Q   And you say, yes, like this.  Is that what you said

9        next?

10   A   Yes.

11   Q   And his response was yeah.  Is that correct?

12   A   Yes.

13   Q   And you say, oh.  Did it take you a while to figure

14       out what he was trying to spell to you?

15   A   I don't remember none of this, but yeah, whatever --

16       I don't know how that what the hell that was about.

17   Q   Chong then says, then just life, correct?

18   A   Yes.

19   Q   And you say what.  Is that correct?

20   A   Yes.

21   Q   And Chong says what.  Is that correct?

22   A   Yes.

23   Q   And you say, life like, according to the transcript;

24       is that correct?

25   A   Yes.

214

1    Q    And he says, life, stupid; is that correct?

2    A    Yes.

3    Q    And you say oh.  Correct?

4    A    Yes.

5    Q    Next Chong, you know.  That's what he said?

6    A    Yes.

7    Q    Then you say, one what, one day.  Is that correct?

8    A    Yes.

9    Q    Chong says, one then L-O-V-E; is that correct?

10   A    Yes.

11   Q    You then say, oh, okay.  Do you see that reference?

12   A    Yes.

13   Q    Chong says, read it back.  Do you see that reference?

14   A    Uh-huh.

15   Q    You then say huh; is that correct?

16   A    Yes.

17   Q    Supposed to be a C there but it said read it back.

18        Do you see that?

19   A    Yes.

20   Q    You say, I love then life.  Is that how you

21        responded?

22   A    Yes.

23   Q    Chong says, I love life, yeah.  Is that the next

24        line?

25   A    Yes.

215

1   Q   And you say what.  Is that correct?

2   A   Yes.

3   Q   And Paul says, I love this life.  I love this life.

4       That's what it is.  Is that what he said back to

5       you?

6   A   Yes.

7   Q   And then you say, one love, one love, what.  Is that

8       correct?

9   A   Yes.

10  Q   Chong says, one then love then this life.  Is that

11      how -- what he said?

12  A   Yes.

13  Q   And you say oh.  Is that correct?

14  A   Um-hum.

15  Q   And then Chong says, just like in English; is that

16      correct?

17  A   Yes.

18  Q   And your response back to him was, just say it in

19      English; is that correct?

20  A   Yes.

21  Q   Chong then says, I told you the number one, then the

22      number one, then the L, the O, the V, then the H, the

23      HT, then the H-I-S-L-I-F-E.  Is that the next line?

24  A   Yes.

25  Q   And then you say, hold on.  Let go get Mao.  I can't

216

1    really hear.  Is that correct?

2  A    Yes.

3  Q    And then there is a reference to you say, I can't

4       really hear at that point.  Did you go get Mao

5       then?

6  A    Yes, I did.

7  Q    And then did Paul and Mao continue to talk, if you

8       know?

9  A    If who?

10 Q    If Mao -- and I am sorry, Mr. Lee, Mao and Chong

11      continued to talk?

12 A    Like I said, I don't remember much, but I give her

13      the phone and I didn't care for that.

14 Q    Do you remember, Mr. Lee, as December led into

15      January if there were court hearings for Chong?

16 A    No.  When?

17 Q    Into January.  Do you remember any court hearings

18      that Chong was having?

19 A    No, not that I can recall.

20 Q    Okay.  I'm going to show you a transcript where it

21      states Exhibit No. 126, correct?

22 A    Yes.

23 Q    And the date of this is January 25th, 2014?

24 A    Yes.

25 Q    At 17:57 p.m.?

217

```
1    A    Yes.

2    Q    Which would be like 5:57 or almost 6:00?

3    A    Yes.

4    Q    What's a three-way call when a three-way call is made

5         from the jail phone?

6    A    To call another person.

7    Q    So how does that work?

8    A    You press flash on your phone.

9    Q    Okay.  So if I would call you from the jail --

10   A    Yeah.

11   Q    -- and I would want you to do a three-way call, what

12        would you do?

13   A    I would then press the talk button --

14   Q    Okay.

15   A    -- and dial in the phone, wait until they pick up and

16        then press the talk button again.

17   Q    So then I could be talking to you and whoever else

18        you connected --

19   A    Yes.

20   Q    -- into the call?

21   A    Yes.

22   Q    Do you remember ever talking to Chong on calls like

23        that?

24   A    Only when he wanted to talk to his girlfriend,

25        yeah.
```

218

1                    ATTORNEY VISHNY:  I'm sorry.  I couldn't
2          hear the answer.  Repeat it.
3                    THE WITNESS:  Only when he told me to
4          three-way his girlfriend, yes.
5     Q    (BY ATTORNEY SCHNEIDER)  So there were times when
6          Chong called you and then you three-wayed in his
7          girlfriend?
8     A    Yes.
9     Q    Were there times where someone else was on the phone
10         and then you got three-wayed into the call?
11    A    Not that I can remember.
12    Q    And your brother, one of your brother's names is Hu,
13         correct?
14    A    Yes.
15    Q    And it's spelled H-U?
16    A    Yes.
17    Q    Okay.  Then I'm referring to that transcript we just
18         talked about, January 25th, 2014.  The first line of
19         this transcript reads, your brother Chong, I know,
20         call Jenny, call Jenny to see if she is with Mao and
21         them.  Is Paul around.  Do you see that reference?
22    A    Yes.
23    Q    And Hu's response is, hold on, correct?
24    A    Yes.
25    Q    And then Chong says, call and do a three-way.  Call

219

1           from your cell phone.  Is that what the transcript

2           reads?

3    A      Yes.

4    Q      Next line we have is your brother Hu saying, here is

5           Paul.  Is that what the transcript reads?

6    A      Yes.

7    Q      Again this is January 25th, 2014.  Chong then says

8           what.  Is that what the transcript shows?

9    A      Yes.

10   Q      And then Hu says, here's Paul.

11   A      Yes.

12   Q      Do you remember getting a call from Hu and then he

13          had three-wayed you in to talk to Chong?

14   A      Not that I can remember.

15   Q      Chong then says, call three-way then I'll talk.  Is

16          that correct?

17   A      Yes.

18   Q      And Hu says what.  Is that correct?

19   A      Yes.

20   Q      Chong says, do a three-way, then I will talk,

21          correct?

22   A      Yes.

23   Q      Hu says, hold on, correct?

24   A      Yes.

25   Q      And then you're on the phone, the reference is to

220

1        Paul.  Talk, dude, you are -- you so gay.  Is that
2        what you said?
3   A    Yes.
4   Q    And Chong says, Paul, Paul?
5   A    Yes.
6   Q    You respond by saying yes?
7   A    Yes.
8   Q    This call occurs again, the header is January 25,
9        2014?
10  A    Yes.
11  Q    So then on January 25th, you've now -- according to
12       the transcript you're talking, Chong says, inaudible.
13       When you arrive you tell them that you -- you were
14       scared and not sure what to say.  Do you see that
15       reference in the transcript?
16  A    Yes.
17  Q    Chong then says, and say you were inaudible and that
18       you just said whatever.  Is that what the next line
19       reads?
20  A    Yes.
21  Q    And you say yes.  Is that what the transcript
22       shows?
23  A    Yes.
24  Q    The next line is Chong saying, because inaudible said
25       that is the only way I could win.  Do you see that

221

1          reference?

2     A    Yes.

3     Q    And you respond back by saying yes; is that

4          correct?

5     A    Yes.

6     Q    Chong next line says, and then they did not talk to

7          you again; is that correct?

8     A    Yes.

9     Q    And you respond by saying, they did not talk to me.

10         They talked mostly to Joe.  Inaudible.  Is that the

11         next line?

12    A    Yes.

13    Q    And Chong responds back by saying, they talked mostly

14         to Joe only?

15    A    Yes.

16    Q    You respond by saying yes; is that correct?

17    A    Yes.

18    Q    He then in the next line asks or makes the comment

19         where, correct?

20    A    Yes.

21    Q    And you say, I don't know, after all that shit.  Is

22         that the next line?

23    A    Yes.

24    Q    I'm sorry.  Thank you.  And Chong responds back by

25         saying really, correct?

1    A    Yes.

2    Q    And you then say yes; is that correct?

3    A    Yes.

4    Q    And then Chong says, the letter I wrote to you, they

5         took it; is that correct?

6    A    Yes.

7    Q    And you respond by saying, I tore it up -- I tore it

8         and threw it away.  Then two days after I ripped it

9         up and threw it away, when they got here, they

10        couldn't found it inaudible.  They cannot read it

11        because it's all dirty.  Is that what you said?

12   A    Yes.

13   Q    Was there a time in January when law enforcement came

14        to your house?

15   A    Yes, for the second, yes.

16   Q    And they were looking for letters?

17   A    Yes.

18   Q    And was that when they found a letter you had torn up

19        in the garbage?

20   A    Yes.

21   Q    And you thought it was all dirty?

22   A    I don't know.  Like I said, yeah, nothing much to do

23        with this, but yes.

24   Q    And Chong's response was, okay, that's all I wanted

25        to say.  Correct?

```
 1   A    Yes.
 2   Q    And then you respond by saying, what about the trial
 3        because if inaudible I don't have it so I will take
 4        time.  Is that what you said in response?
 5   A    Yes.
 6   Q    And Chong says, no, if you don't come then they will
 7        give you one year, no, yes, one year, then -- then
 8        they will inaudible to you.  Is that how he
 9        responded?
10   A    On the transcript, yeah.
11   Q    And then you said oh.  Is that the transcript?
12   A    Yes.
13   Q    His response is, but if you come.  That's the next
14        line?
15   A    Yes.
16   Q    And you respond by saying?
17   A    You want me to come and say that only.
18   Q    Is that correct?
19   A    Yes.
20   Q    And Chong says to you, yes.  When you come you just
21        say that, then what theirs won't match anymore.  Is
22        that what he said back in response?
23   A    Yes.
24   Q    And you respond by saying yes?
25   A    Yes.
```

224

1    Q    And Chong says, but I don't know what -- what that

2         jerk inaudible going to say.  Is that true?

3    A    I don't know if it's true or not, but according to

4         the transcript, yes.

5    Q    And you say, I don't know about them, correct?

6    A    Yes.

7    Q    And Chong responds, oh, okay.  That is it.  Is that

8         correct?

9    A    Yes.

10   Q    So in that call you specifically asked him about

11        coming to trial, correct?

12             ATTORNEY VISHNY:  I object again.  She has

13        to ask what he meant.

14             ATTORNEY SCHNEIDER:  I asked if he talked

15        about coming to trial.  There is a specific

16        reference.  I can read it again if you would like me

17        to.

18             ATTORNEY VISHNY:  Judge, my objection is

19        leading.

20             THE COURT:  Sustained.

21   Q    (BY ATTORNEY SCHNEIDER)  Did you talk to Chong about

22        the trial in that call?

23   A    Like I said, not that I remember.

24   Q    Okay.  But you're not disputing that the transcript

25        may be accurate?

225

1    A    Like I said, I don't know.

2    Q    I'm going to show you, Mr. Lee, a call -- sorry.

3    A    That's all right.

4    Q    A call, Exhibit 127; is that correct?

5    A    Yes.

6    Q    And the date of this is 1/21/14?

7    A    Yes.

8    Q    So this is actually a few days before the last call

9         we just listened to?

10   A    Okay.

11   Q    Or heard about, correct?

12   A    Yes.

13   Q    And the time 16:18 means like 4:18 p.m.?

14   A    Yes.  Okay.

15   Q    Who is Jenny?

16   A    My youngest sister.

17   Q    Okay.  You have a sister Xeng, correct?

18   A    Yes.

19   Q    She sometimes goes by Mao?

20   A    Yes.

21   Q    And Jenny, does Jenny have a nickname?

22   A    Yes.

23   Q    What's that?

24   A    Kounou.

25   Q    And the court reporter -- do you know how to spell

226

```
 1        that?
 2   A    Yes.
 3   Q    How is that spelled?
 4   A    K-O-U-N-O-U.
 5   Q    Do you have a sister that's sometimes referred to as
 6        Bao?
 7   A    That's my other sister, yes.
 8   Q    And that would be B-A-O?
 9   A    Yes.
10   Q    If we wrote your name in Hmong, how would you spell
11        that?
12   A    P-A-O.
13   Q    And how do you spell Chong in Hmong?
14   A    I don't know.  I don't know how to spell Hmong.
15   Q    Okay.  For this transcript from January 21st, 2014,
16        first line of that is Chong saying where is he.  Do
17        you see that?
18   A    Yes.
19   Q    And your sister Jenny responds, right there; is that
20        correct?
21   A    Yes.
22   Q    Chong then says, don't say anything, let me talk to
23        him.  Is that correct?
24   A    Yes.
25   Q    And Jenny's response is okay.
```

227

```
 1    A    Yes.
 2              ATTORNEY SCHNEIDER:  And, Judge, I actually
 3         think I did this twice now, I marked the one with my
 4         notes so I'm going to mark the clean copy.
 5              THE COURT:  Thank you.
 6    Q    (BY ATTORNEY SCHNEIDER)  So we were at the point of
 7         Jenny saying back okay.
 8    A    Yes.
 9    Q    And then you say what.  Correct?
10    A    Yes.
11    Q    And Chong says, inaudible fat.  Uh, earlier they --
12         you were home earlier when they came to see your
13         home.  Is that what he says?
14    A    Yes.
15    Q    Your response, of course, I was inaudible when they
16         came.  Is that correct?
17    A    Yes.
18    Q    Chong's response, what did they say?
19    A    Yes.
20    Q    And you respond, according to the transcript?
21    A    You're stupid.  You keep talking to him about what.
22    Q    Is that correct?
23    A    Yes.
24    Q    Chong responds by saying, I have not talked to
25         anybody; is that correct?
```

228

1   A   Yes.

2   Q   And you respond, for writing letters; is that

3       correct?

4   A   Yes.

5   Q   And on this date, January 21st, 2014, is that when

6       they came to your house looking for letters?

7   A   I don't remember the exact date.

8   Q   Okay.  But was it -- do you remember what month?

9   A   No.

10  Q   Okay.  And Chong responds, I have not written to

11      anybody.  I wrote, uh, one Christmas letter to Mao

12      and you guys.  Did you get the Christmas letter?

13  A   Yes.

14  Q   And then you respond back saying, yes, we got the

15      Christmas letter.  Is that correct?

16  A   Yes.

17  Q   And then Chong says, okay, I wrote one Christmas

18      letter to you guys and then, um, I wrote one letter

19      to Stephanie to, um, but then Stephanie sent me only

20      a picture.  And then I wrote one letter to Chee.  And

21      that's it.  Whether he -- is that correct to the

22      transcript?  I haven't finished the line.  Is that

23      correct so far?

24  A   Yes.

25  Q   Who is Chee?

1  A    I don't know who Chee is.

2  Q    Okay.  Chong continues by saying, and then I wrote

3       to.  Is that correct according to this transcript?

4  A    Yes.

5  Q    And Chong finishes by saying Nhia, correct?

6  A    Yes.

7  Q    And Nhia is one of your brothers?

8  A    My oldest brother, yes.

9  Q    And you respond back saying, oh, T's house was first

10      raided then ours.

11  A    Yes.

12  Q    Who is T?

13  A    Teng.

14  Q    And T-E-N-G, right?

15  A    Yes.

16  Q    And Teng would be Phong's younger brother?

17  A    Yes.

18  Q    Chong responds back, is that right.

19  A    Yes.

20  Q    And you say yes, correct --

21  A    Yes.

22  Q    -- according to the transcript?

23       And then Chong says, can you call T to see if he

24      picks up his phone because I want to talk to him.  Is

25      that correct?

1    A    Yes.

2    Q    Mr. Lee, I want to show you exhibit stickers No. 44;

3         is that correct?

4    A    Yes.

5    Q    Okay.  Exhibit 44 is two pages in length, correct?

6    A    Yes.

7    Q    If you need a little time to review it.  Do you

8         recognize what Exhibit 44 is?

9    A    No, but yes.

10   Q    Does it look like the letter?

11   A    The letter, yes.

12   Q    So you received a letter from Chong but you ripped it

13        up at some point?

14   A    Yeah, because I didn't really care to read it.

15   Q    Okay.  And the title on this page was written to Pao,

16        P-A-O, which is your name in Hmong, correct, Mr.

17        Lee?

18   A    Yes.

19   Q    And the letter reads:  I ain't even mad at you, 'lil

20        bro, is that correct, the first sentence?

21   A    Yes.

22   Q    And then it says:  Don't worry about nothing.  Is

23        that correct?

24   A    Yes.

25   Q    I'll be all good in the end.  Is that correct?

231

1    A    Yes.

2    Q    You live to die anyways.  Is that correct?

3    A    Yes.

4    Q    It's what you do in the end that's what counts.

5    A    Yes.

6    Q    And this would have been a -- a letter -- where was

7         Paul -- where was Chong when he sent this letter?

8    A    I don't know.

9    Q    It came to your house?

10   A    To my sister's apartment.

11   Q    Okay.  But that's where you were living at the

12        time?

13   A    Yes.

14             ATTORNEY VISHNY:  Okay.  I'd like to

15        approach.

16             (Bench conference.)

17   Q    (BY ATTORNEY SCHNEIDER)  The letter then reads:  Also

18        remember what you told me when Mao and Steph and them

19        arguing.  Is that correct?

20   A    Yes.

21   Q    You said, if you don't got family back, then don't

22        even consider us family.  Do you recall that?

23   A    Yes.

24   Q    And he writes:  Well I had your back.  Is that

25        correct?

232

1    A    Yes.

2    Q    He writes:  I wouldn't let no one touch you.

3    A    Yes.

4    Q    Letter continues:  But remember your words.  You

5         didn't have my back, 'lil bro.  Is that what's

6         there?

7    A    Yes.

8    Q    And that's the only thing that you failed me.

9    A    Yes.

10   Q    Did he -- that Christmas, did he send you or leave a

11        Christmas gift at all do you remember?

12   A    Yes.

13   Q    What was that?

14   A    A keyboard.

15   Q    And the letter signed, love you, Coob; is that

16        correct?

17   A    What?

18   Q    Love you or love 'ya, Coob, is how the letter is

19        signed?

20   A    Yeah, I guess.

21   Q    And is -- do you know that this was a letter you

22        received from Chong?

23   A    Yeah.

24             ATTORNEY SCHNEIDER:  You can turn the

25        lights back on, Judge.

233

1  Q    (BY ATTORNEY SCHNEIDER)  You remember talking to the

2       officers?

3  A    Yes.

4  Q    But you don't remember -- do you remember telling

5       them on more than one date Chong told you he shot the

6       guy?

7  A    Like I said, I don't remember much.

8  Q    Okay.

9            ATTORNEY SCHNEIDER:  I don't have any other

10      questions.

11           THE COURT:  Okay.  And let me ask, Attorney

12      Vishny, before you begin, would it -- would it be

13      appropriate to have a five- or ten-minute break for

14      the jury?

15           ATTORNEY VISHNY:  Yes.

16           THE COURT:  Okay.  Why don't we give you a

17      ten-minute afternoon break, and then, again,

18      hopefully you know this by now, bring in water if you

19      would like or if there is other drinks that you have

20      in there.

21        Please remain standing while the jury is

22      excused.

23           (The jury was escorted out of the

24      courtroom.)

25           THE COURT:  Okay.  Gallery may be seated.

234

1          We did have -- likewise, Mr. Lee, you can sit if
2     you want.  We did have a sidebar after Mr. Lee's
3     invocation of the fifth amendment.  After that
4     Attorney Groh did have an opportunity to speak with
5     his client.  Subsequent to that Mr. Lee did agree
6     that he would be testifying.
7          Attorney Schneider, there was a -- I don't know
8     if it was a sidebar, but argumentative question.  The
9     court did sustain that objection and strike it.
10          Then there was a sidebar related to the final
11     letter.  Objection to foundation.  Overruled.  But
12     for record preservation, it is dually noted for the
13     record.
14          Anything else?  I believe that addresses the
15     sidebars we had during this session.
16               ATTORNEY VISHNY:  That's correct.
17               THE COURT:  Okay.  Did counsel have a
18     question for me?
19               ATTORNEY SCHNEIDER:  Just for scheduling.
20     We do have -- after we finish with the cross of Mr.
21     Lee, we do have two people from the lab we would like
22     to do tonight.  Each of them will be short.  I
23     understand it's going to push us past five, but
24     they're from Madison and I don't know if they've held
25     other dates for us.

1              THE COURT:  Okay.  I was guessing, and I

2       could be wrong, I was thinking you'd be a couple

3       hours.

4              ATTORNEY VISHNY:  I don't know how long

5       it's going to take, but I don't understand why the

6       State didn't put on two short witnesses before this,

7       and, you know, I don't know what time I'm going to

8       finish.  I might finish at five, and if it's between

9       five and 5:30 fine, but if it's after six, I don't

10      really foresee --

11             THE COURT:  I'll have to see where it goes,

12      I guess, Attorney Schneider.  If we get them in,

13      great, but if we get to 6:00, that's already keeping

14      the jury here quite long, and so we'll do everything

15      we can to make it, but likewise, Attorney Vishny, you

16      conduct your cross as you see fit.

17             ATTORNEY VISHNY:  Thank you.

18             THE COURT:  That's not meant to be a

19      pressure.

20             ATTORNEY VISHNY:  Thank you.  I want to ask

21      one other thing as long as we're here rather than

22      interrupt.  I don't think the witness should be here,

23      though, or I think we should approach the bench.

24             THE COURT:  Why don't we do this.  Why

25      don't we excuse the witness then if he needs a

236

1    restroom break.  I know he --

2              (Bench conference.)

3              ATTORNEY SCHNEIDER:  The parties have

4    stipulated that the preliminary hearing in this case

5    was February 12th, 2014, if that's --

6              THE COURT:  Let's just enter it as a

7    stipulation.  I think that's the easiest.

8              ATTORNEY VISHNY:  That's fine.  I don't

9    care how we do it, but I'm going to then make mention

10   of it with him.

11             THE COURT:  That's fine.  Why don't --

12   before you start questioning, just enter it as a

13   stipulation.

14             ATTORNEY VISHNY:  Okay.  I'm doing it

15   because I'm just assuming he's going to say I don't

16   know and I don't remember based on what we've seen.

17             ATTORNEY SCHNEIDER:  Do we want to,

18   preplanning, because not knowing when you'll be

19   finished, we need -- there will be phone calls

20   tomorrow, we'll need to meet like we did, but I don't

21   know that it will take us so -- you were almost done

22   by 9:15.  If we eliminated the excessive chatter, I

23   think a half hour is all we probably need.  Tell them

24   at nine.  If we get through some of them we could

25   always do some during the lunch hour too.

237

```
1              THE COURT:  Let's -- I mean at the latest
2         let's start at 9:15, that way if it starts us 15
3         minutes earlier then we have a little extra time if
4         we need it.
5              ATTORNEY SCHNEIDER:  Okay.  All right.
6              (Court in recess.)
7              ATTORNEY SCHNEIDER:  Can we ask something
8         real quick?  And she would have done it regardless
9         who it was.  There are times when there is no more
10        room and people have been trying to come in in back
11        of the courtroom and there is no more standing room
12        so Stephanie told, and I think it was LaKeisha, there
13        is no room, I don't know where to put you, can't
14        crawl across the row of people to get to the open
15        side, and I think you found out or might have been
16        upset.
17             ATTORNEY VISHNY:  I hope she doesn't feel
18        like I was rude to her.  I told her I knew she was
19        just doing her job, but I didn't think she really had
20        the right to say that to people, and if this is a
21        problem it should be brought to the court's
22        attention.
23             THE COURT:  What I'll probably I'll do is
24        just try to slide people down.
25             ATTORNEY SCHNEIDER:  Usually there is no
```

238

1    room to do that.

2              THE COURT:  If there's no room, just let me

3    do it, that way I can be --

4              ATTORNEY SCHNEIDER:  All right.  Then I'll

5    tell her to approach me if that happens.

6              THE COURT:  Yes.  That's fine.  And again,

7    it's not -- I'm not upset, it's just it's easier if I

8    just do it for -- that's fine.

9              (Court in recess.)

10             (The jury was escorted into the courtroom.)

11             THE COURT:  All right.  Please be seated.

12        We -- what I'm going to do is I'm going to,

13    because I'd still like to have you be able to get out

14    this evening at a reasonable hour, we're going do it

15    a little bit out of order.  We have some witnesses

16    that are going to testify this evening and then we'll

17    have Mr. Lee come back for his cross-examination

18    tomorrow morning.  And again, it's not a logical

19    break, but I wanted to allow for you to again get

20    home at a reasonable time.

21        So, Mr. Maier, do you have your witness, sir?

22             ATTORNEY MAIER:  I do.  Your Honor, the

23    State calls Kyle Anderson.

24             THE COURT:  If you would please remain

25    standing at the witness stand, we'll --

239

1                    (Oath administered to witness.)

2                    THE WITNESS:  I do.

3                    THE CLERK:  Please state your full name and

4          spell it for the record please.

5                    THE WITNESS:  Kyle Anderson.  K-Y-L-E,

6          A-N-D-E-R-S-O-N.

7                    THE COURT:  Mr. Maier, your witness.

8                    ATTORNEY MAIER:  Thank you, Your Honor.

9                    **EXAMINATION OF KYLE ANDERSON**

10    **BY ATTORNEY MAIER:**

11    Q    Mr. Anderson, how are you employed?

12    A    I am the supervisor at the State Crime Laboratory in

13         Milwaukee and I'm also a forensic firearms

14         examiner.

15    Q    How long have you worked as a forensic firearms

16         examiner?

17    A    Since 2003.

18    Q    Mr. Anderson, if you could, could you just test that

19         to make sure it's on?

20    A    Test.

21    Q    Thank you.  And I missed the end of that answer.

22    A    Since 2003, June of 2003.

23    Q    Can you tell the jury what your relevant educational

24         background is as far as becoming a firearms

25         examiner?

                                    240

```
 1   A   I have a Bachelor's in Science from University of
 2       Wisconsin Platteville, 22 years in the military.
 3       Seven of that I was a company armorer.  I've attended
 4       numerous civilian armory schools and military armory
 5       schools, certified in several different manufacturers
 6       as far as weapons maintenance.  In addition, I
 7       completed approximately a two-and-a-half year
 8       apprenticeship type training program at the State
 9       Crime Lab in Milwaukee.
10   Q   Are you able to estimate the number of firearms that
11       you've examined in your professional duties since
12       2003?
13   A   Thousands.  I couldn't put a number on it.
14   Q   Okay.  And you said that you have -- you worked in
15       the military as an armorer and then also taking
16       courses put on by firearms manufacturers to become a
17       certified armorer with that particular company,
18       correct?
19   A   Yes, that's correct.
20   Q   Can you describe what -- what sort of activities you
21       would perform, you know, related to those
22       manufacturers but then also in the military?
23   A   Basically, whether civilian or military, an armorer
24       is responsible for maintaining all the weapons in a
25       company.  In the military it's in a company.  If
```

241

1          you're a civilian and you're certified, you can

2          basically repair any weapon that anybody brings to

3          you.  So the armorer schools teach you how the

4          firearms work, how it functions, what the parts are,

5          how to diagnose it if something is damaged and then

6          how to repair it.

7     Q    So this goes way beyond like something like breaking

8          a weapon down for cleaning and ordinary maintenance

9          an end user might have, correct?

10    A    That's correct.

11    Q    You're able to do the things that the instruction

12         manual says not to do?

13    A    Yes, that's correct.

14    Q    Can you explain the sort of activity that you would

15         perform in determining the identifying

16         characteristics of a particular bullet, a fired

17         bullet, I should say?

18    A    How we do an examination on a fired bullet?

19    Q    Yes.

20    A    When we receive a fired bullet in the crime

21         laboratory, the first thing we're going to do is

22         we're going to determine the class characteristics of

23         that bullet.

24              THE WITNESS:  Your Honor, I have some --

25         some large plastic demonstration models that might

242

1          help the jury understand a little bit.

2                    THE COURT:  Okay.

3     A    So what I'm holding up here is just basically a very

4          large bullet and a large plastic cut away of a barrel

5          really.  So the first thing we look for is caliber of

6          bullet.  Caliber, for all intents and purposes, is

7          just the size of the bullet.  That's the easiest way

8          to explain it.  And then the other class

9          characteristic we look for are the number of lands

10         and grooves present on that fired bullet.  So

11         firearms manufacturers, depending on the

12         manufacturer, the majority of them make their barrels

13         with what we call lands and grooves, so the raised

14         portion of this model would be the land impression,

15         and the recessed would be the groove.  These are

16         usually made at some sort of an angle, either right

17         or left.  As you look at this, it goes off to the

18         left.  What that does is it imparts the spin on the

19         bullet when the bullet is traveling so it gives it

20         stability similar to a football thrown by a

21         quarterback.  If it's not spinning, it doesn't fly

22         straight.  So the class characteristics of each

23         barrel -- barrel are specific to a manufacturer.  So

24         if we just have a bullet, really the only thing I can

25         tell you is the caliber and the number of lands and

```
 1          grooves of the barrel that it was fired through.
 2     Q    That narrows it down in a, I'll say, universal sense
 3          but not necessarily a very specific sense; is that
 4          correct?
 5     A    That's correct.  If -- let's just say for example
 6          this was a nine-millimeter and it was fired through a
 7          Glock firearm barrel, that was six right, it would
 8          narrow it down to every 9mm Glock on the planet.  So
 9          it can specifically narrow it down to a manufacturer
10          maybe but still there is an awful lot of those on the
11          planet.
12     Q    Okay.  Did you perform an analysis of a fired bullet
13          sent to you from the Appleton Police Department and
14          related to a homicide case involving a victim named
15          Joshua Richards?
16     A    Do you have a lab case number?
17     Q    It is M15-37?
18     A    Yes, I did.
19     Q    When you -- and you received that fired bullet from
20          the Appleton Police Department?
21     A    That's correct.
22     Q    When you received the bullet, what did you do?
23     A    The first thing I do when I receive any evidence into
24          the laboratory is we mark the packaging.  So the
25          packaging would be marked with date, initials, case
```

244

```
1          number and item designation letter are typically the

2          marks that get put on there.  Then when the bullet or

3          the piece of evidence is open from the packaging,

4          that evidence itself is also marked.

5     Q    I'm sorry.  I may have missed this.  Were you able to

6          determine the caliber of that bullet?

7     A    Yes, I was.

8     Q    And what was that?

9     A    .25 auto.

10    Q    What about the specific other class characteristics,

11         the lands and grooves?  What sort of barrel did that

12         bullet come from?

13    A    It was fired through a 6/right conventional barrel.

14    Q    Now, I'm going to ask you a question, and I don't

15         know if you know the answer, but with .25 autos, is

16         there a typical size associated with that type of

17         firearm specific to a handgun?

18    A    I'm not sure I understand the question.

19    Q    Okay.  Are there full frame .25 auto handguns out

20         there?

21    A    I don't know for sure.  There could be though.

22    Q    Have you ever seen one?

23    A    No.

24    Q    The .25 auto handguns that you've seen throughout

25         your career, would you characterize them as typically
```

245

1      large weapons or compact weapons?

2  A   No, they're typically compact, smaller framed

3      weapons.

4  Q   In fact, compact enough they might even be --

5              ATTORNEY VISHNY:  Objection.  Leading.

6  Q   (BY ATTORNEY MAIER)  How big could they be, how small

7      could they be?

8  A   Smaller than your hand.

9  Q   Okay.  Were you able -- and this is what -- all that

10     you were asked to do is determine essentially caliber

11     and the -- determine the number of lands and grooves

12     from this bullet, correct?

13 A   Yes, that's correct.

14             ATTORNEY MAIER:  Could I have just one

15     moment please?

16             THE COURT:  Not a problem, sir.

17             ATTORNEY MAIER:  I guess just one more

18     question and that's --

19 Q   (BY ATTORNEY MAIER)  All right.  Mr. Anderson, when

20     you were done examining that bullet, what would you

21     have done with it?

22 A   Would have repackaged it in State Crime Laboratory

23     plastic packaging.

24 Q   And then done what?

25 A   And then it goes back to our -- well, then it would

246

1      have been our vault.  Now we move evidence to

2      somewhere else.  It would have been in our vault --

3      stored in our vault until the agency came and picked

4      it up.

5  Q   And in this case did the Appleton Police Department

6      then come pick the bullet back up?

7  A   Yes.

8              ATTORNEY MAIER:  That's all the questions I

9      have for this witness.  Thank you.

10             THE COURT:  Any cross-examination?

11             ATTORNEY VISHNY:  Yeah.  Just real briefly.

12             **EXAMINATION OF KYLE ANDERSON**

13  **BY ATTORNEY VISHNY:**

14  Q   So you took a look at a bullet and you -- and that's

15      it, right?

16  A   Essentially, yes.

17  Q   Right.  And you said it's a .25 caliber and you

18      didn't examine any other evidence, correct?

19  A   That is correct.

20  Q   And the bullet you looked at was fired, had been

21      fired, right?

22  A   That's correct, it was fired.

23  Q   And it was deformed, is that --

24  A   It was in relatively good shape, yes.

25  Q   But it's not the same as a bullet that's been

247

```
 1        unfired, I mean there is some -- but it wasn't -- let
 2        me -- let me rephrase that.  It had some slight
 3        deformity to it, right?
 4    A   Well, a fired bullet will show those land and groove
 5        impressions that I talked about whereas an unfired
 6        would not.
 7    Q   Right.  So it wasn't like sometimes when a bullet has
 8        been fired and it has landed against an object it can
 9        be so deformed or split into different pieces, that
10        wasn't the situation here?
11    A   That's correct.
12    Q   It was pretty easy for you to tell what it is?
13    A   Yes.
14    Q   And so you looked at the one bullet, determined it
15        was a .25, and that was it, that was the extent of
16        your work in this case?
17    A   Yes, that's correct.
18               ATTORNEY VISHNY:  Nothing further.
19               THE COURT:  Redirect?
20               ATTORNEY MAIER:  None.  Thank you.
21               THE COURT:  Ladies and gentlemen of the
22        jury, any questions to submit for this witness?
23               (No response.)
24               THE COURT:  Very good.  Thank you, sir.
25               THE WITNESS:  Thank you.
```

248

1                    THE COURT:  You are excused.

2                    ATTORNEY MAIER:  Your Honor, the next

3          State's witness is Samantha Delfosse.

4                    THE COURT:  If you would please come to the

5          witness stand, remain standing and the clerk will

6          swear you in.

7                    THE CLERK:  Please raise your right hand.

8                    (Oath administered to witness.)

9                    THE WITNESS:  I do.

10                   THE CLERK:  Please state your full name and

11         spell it for the record please.

12                   THE WITNESS:  Samantha Delfosse.

13         S-A-M-A-N-T-H-A, D-E-L-F-O-S-S-E.

14                   THE COURT:  You may be seated.  Mr. Maier,

15         your witness, sir.

16                   ATTORNEY MAIER:  Thank you.

17              **EXAMINATION OF SAMANTHA DELFOSSE**

18         **BY ATTORNEY MAIER:**

19    Q    Miss Delfosse, how are you employed?

20    A    I am a DNA analyst at the State Crime Lab in

21         Madison.

22    Q    How long have you worked there?

23    A    I have been there since June of 2007.

24    Q    Can you tell the jury a little bit about your

25         educational and professional training background?

249

1   A   Sure.  I have a Bachelor of Science degree with

2       molecular biology from the University of Wisconsin in

3       Madison.  As it applies to forensics specifically, I

4       did partake in a ten-month extensive training course

5       where we did multiple mock samples for casework

6       analysis, including any kind of statistics or

7       screening tests and actually DNA profiling as well.

8   Q   Did you work in any forensic capacity prior to

9       becoming employed in the DNA analysis unit of the

10      Wisconsin State Crime Lab?

11  A   In a forensic capacity, no.

12  Q   There may have been some internships or something

13      like that as you were going through educational

14      training?

15  A   Prior to my job with the lab, I was actually a

16      research specialist at the University of Wisconsin in

17      Madison and then actually did my training for

18      forensic analysis while I was employed with the

19      lab.

20  Q   Thank you.  When -- in the course of investigation,

21      I'll just say criminal investigations, either pre- or

22      post-charge, you receive items from law enforcement

23      agencies for analysis, correct?

24  A   Correct.

25  Q   They seek, I guess, analysis but then also some

250

1          information from you about what types of biological
2          and trace evidence might be found on a particular
3          item, correct?
4    A     Correct.
5    Q     Do you always find things?
6    A     No, we do not.
7    Q     Why is that?
8    A     There could be multiple different variables.  One
9          could be what kind of environment a certain item was
10         in.  If it was exposed to high heat, for example, it
11         may be very possible that any kind of touch DNA might
12         be destroyed.  If something -- for example, in a
13         sexual assault, you take a shower, it's very possible
14         that you are going to wash away any potential
15         biological or DNA evidence.
16   Q     So it's not quite like people might think based on TV
17         shows like CSI, correct?
18   A     No, it is not.
19   Q     Can you describe, excuse me, what the process is --
20         I'll just give you as an example an item of clothing,
21         a vest like you might wear outside a sweatshirt or
22         something like that.  What would you do in performing
23         your professional duties in looking for biological or
24         trace evidence on that vest?
25   A     When we are examining items, particularly clothing,

251

```
 1          what we will do is once we've taken custody of the
 2          item, we will visually examine them.  So we will
 3          literally turn on our extra light sources at our
 4          benches and go over every surface of that clothing
 5          with just visual observations.  Anything that
 6          resembles a possible biological, we'll make note of.
 7          Once we finish the screening, that's when we will
 8          actually look at presumptive or indicative tests for
 9          the different biological fluids.
10     Q    And if you find nothing?
11     A    If there was nothing present, it's usually no further
12          analysis scenario.
13     Q    Okay.  Are there items -- again, using first a vest,
14          are there items that in your experience you might be
15          -- one might be more likely to find something like
16          DNA evidence than in other parts of that item?
17     A    Certain areas of clothing will usually have a higher
18          chance or a higher probability of DNA.  For example,
19          if you're wearing an undershirt, I'm more likely to
20          find the DNA around the interior neck than I am on
21          the outside front.
22     Q    So you look at inside and outside of a clothing
23          item?
24     A    Correct.
25     Q    What about hats?
```

252

1    A    Primarily would be the same situation where we would

2         examine the entire surface, and if there was any

3         potential DNA on there, for example, the wearer, we

4         would swab the inner brim or the inner rim of the

5         hat.

6    Q    Excuse me.  Have you examined fired shell casings for

7         DNA?

8    A    Several years ago, yes, I did.

9    Q    What are some of the obstacles that you find in

10        examining a shell casing from a bullet that's been

11        fired when looking for DNA?

12   A    The biggest obstacle with a fired case is that it was

13        exposed to extreme heat.  This heat will utterly

14        destroy any cellular material or any DNA that is on

15        the surface.  In addition, they're usually smooth.

16        There is nothing for your cells to actually adhere or

17        get stuck into.

18   Q    So you say it would be difficult if not -- I'm sorry,

19        rare if not almost impossible to find something --

20        DNA from touch on something like that, a fired shell

21        casing?

22   A    Correct.  In my experience I have not had success

23        with it.

24   Q    In the early part of or late part of 2014, early part

25        of 2015, were you the analyst for a number of items

253

```
 1          submitted, Case M15-37, by the Appleton Police

 2          Department for DNA analysis?

 3     A    Yes, I was.

 4     Q    Do you have your report handy?

 5     A    Yes, I do.

 6     Q    Okay.  Appleton police sent a vest, a black

 7          sweatshirt, a Miami Heat logoed baseball cap -- I'll

 8          wait for you to catch up.  Sorry.

 9     A    It's all okay.

10     Q    A Milwaukee Brewers baseball cap, a baseball cap with

11          I'm assuming a White Sox logo, it just says Sox, a

12          jacket, two shoes and a coat; is that correct?

13     A    Correct.

14     Q    Can you tell the jury what you did with each of those

15          items?

16     A    With each of these items I actually did the visual

17          examination, so I looked over the entire surface both

18          inside and outside.  If there was anything that could

19          possibly be biological, I made note of it and I did

20          do a presumptive test.

21     Q    Did you find anything when you examined those items,

22          which are labeled Items A through I, where the shoes

23          are H1 and H2, to indicate the presence of blood on

24          any of the items?

25     A    All of my indicative tests came back as no potential
```

254

1           blood.

2    Q      Did you find any other indications that there may be

3           biological or other trace evidence located on any of

4           those items submitted by the police department?

5    A      No, I did not.

6    Q      And so this was a situation like we mentioned in what

7           amounts to a hypothetical about the other vest, this

8           is a -- what you referred to as a no further analysis

9           situation?

10   A      Correct.

11   Q      And what does that mean?

12   A      Primarily if we do not locate any biological fluids

13          or any potential DNA source, we will actually stop

14          analysis with the DNA section.

15   Q      And when that happens, what do you do?

16   A      Once that is finished, we will actually reseal any

17          evidence and either give it to another discipline, if

18          they're also to look at it, or we return it to the

19          agency.

20   Q      So it might be something that gets sent on to maybe

21          the firearms examiners like Mr. Anderson, correct?

22   A      Correct.

23   Q      But he wouldn't be looking at a baseball cap?

24   A      No.

25   Q      So in this case what did you do?

255

```
 1    A    With these items, basically, they were repackaged and
 2          they were returned to the agency.
 3    Q    Okay.  I just have a couple more questions for you. I
 4          want to ask you a little bit more about touch DNA and
 5          how difficult it is to obtain.
 6               One of the things that you talked about, and you
 7          talked about it in general first but then also
 8          specifically to a fired shell casing, is heat.  What
 9          are some of the other environmental factors that can
10          make it difficult to or impossible to retrieve
11          biological material from an item?
12    A    The two biggest factors are going to be heat and also
13          any type of water would be very inhibiting.  If it's
14          exposed to any other elements such as cold
15          temperatures, a lot of times if it gets frozen and
16          thaws, frozen and thaws, it will break down any kind
17          of cellular material that's there.
18    Q    So that's -- the cell's literally bursting open and
19          sort of dissolving right there on the surface of
20          whatever they may be on, correct?
21    A    Correct.
22    Q    Because of this, and I suppose partly in response to
23          shows like CSI and those sorts of things, the State
24          Crime Lab has a set of protocols, or I'll say rules,
25          I guess, for the submission of items for DNA
```

256

1        analysis; is that correct?

2    A   Correct.  We do have some guidelines that we request

3        agencies to consider.

4    Q   And agencies are free to contact the State Crime Lab

5        to seek an exception or at least an explanation of

6        what a particular item -- whether a particular item

7        might meet or not meet the analysis standard; is that

8        correct?

9    A   That's correct.  Absolutely.

10   Q   Have you responded to requests for that or is that

11       something that someone farther up the chain does?

12   A   I am not the primary contact, but I have been

13       contacted by agencies that I'm already working some

14       of their cases.

15   Q   Okay.  Or maybe something like you come and testify

16       in court on a case in Outagamie County so people

17       think they can call you all the time now?

18   A   Correct.  Actually, it has happened.

19   Q   Okay.  Something that's been sitting in a toilet tank

20       for four days, is that likely to meet the threshold

21       for DNA analysis by the lab given those guidelines?

22   A   In my opinion, no, that would not be accepted.

23   Q   And similarly within the p-trap of a toilet, so under

24       the water line, pre-sewer system, I guess, but

25       exposed to water for that period of time, same

1      problems with water causing cell breakdown?

2   A   Correct.

3                ATTORNEY MAIER:  Thank you, Miss Delfosse.

4       That's all the questions I have, Your Honor.

5                THE COURT:  Any cross-examination?

6                ATTORNEY VISHNY:  Yeah.

7              **EXAMINATION OF SAMANTHA DELFOSSE**

8   **BY ATTORNEY VISHNY:**

9   Q   So the bottom line here is you looked at a bunch of

10      items and you didn't find any blood on any of them,

11      right?

12  A   Correct.

13  Q   And one of the items that you looked at that there

14      were a bunch of articles of clothing, correct?

15  A   Yes, there was.

16  Q   And there were a couple of jackets you looked at,

17      right?

18  A   Correct.

19  Q   And I'm showing you what was previously marked as

20      Exhibit 103, this black jacket, that was something

21      you didn't find any blood on -- black or gray jacket

22      rather.  Do you need to look at it up close?

23  A   If I could please.

24  Q   Of course.

25  A   Correct.  Yes.

258

1    Q    Okay.  Now, as far as examining for touch DNA, I mean

2         basically what you're saying is the crime lab can

3         look at things like cartridge casings but it's not

4         very fruitful because you've gotten negative results

5         for so many times, right?

6    A    Correct.

7    Q    So an agency has to do -- request that specially,

8         right?

9    A    Correct.

10   Q    And that does happen sometimes from time to time,

11        notwithstanding the fact that getting results is very

12        unlikely.

13   A    It does happen from time to time, yes.

14   Q    And when an agency does ask for that, then the lab go

15        ahead -- does go ahead and test as requested,

16        correct?

17   A    Correct.

18   Q    And it would be more likely to happen in a very

19        serious case like a homicide than a -- just a

20        shooting where nobody -- the bullet didn't hit

21        anybody or, you know, nobody died, right?

22   A    Potentially, yes.

23   Q    Okay.  Now, as far as items sitting in water,

24        there's -- or submerged in water, you said it's very

25        unlikely to get DNA evidence when an item has been

259

1          submerged in water for several days, correct?

2     A    Primarily, yes, when there is a smooth item,

3          correct.

4     Q    Yes.  And what about when it's been submerged in

5          water for one day, do you have a better chance of

6          getting DNA from it then or is it pretty much the

7          same as four days?

8     A    Pretty much the same.

9     Q    What if an item is floating on top of water and not

10         submerged so that part of it is untouched by water,

11         you know, sometimes objects float, there's water on

12         the bottom and no water on the top, right?

13    A    Correct.

14    Q    All right.  What if that happens, is it worth trying

15         to look for DNA under those circumstances or is that

16         the same as a submerged object?

17    A    Unless the item was completely prohibited from

18         turning or rotating at all, it would be pretty much

19         the same results.

20    Q    Okay.  So you don't really know because if something

21         is sitting in a toilet for a day, you don't know if

22         it's rotated or been exposed to water on all sides or

23         not?

24    A    No, I do not.

25              ATTORNEY VISHNY:  Nothing further.

260

1                    THE COURT:  Any redirect?

2                    ATTORNEY MAIER:  No, Your Honor.  Thank

3        you.

4                    THE COURT:  And do any members of the jury

5        have a question for consideration?

6                    (No response.)

7                    THE COURT:  Thank you very much.  You may

8        be excused.

9                    ATTORNEY SCHNEIDER:  We would then propose

10       breaking for the day.

11                   THE COURT:  Very good.

12            Ladies and gentlemen, we have concluded the

13       evidentiary portion of the proceedings today.  I

14       would ask that you be here and ready to go by 9:15

15       tomorrow.

16            Wendy, if you could please escort our jury out

17       please.

18                   (The jury was escorted out of the

19       courtroom.)

20                   THE COURT:  Anything else we need to

21       address from the State's perspective?

22                   ATTORNEY SCHNEIDER:  No.  Could we plan to

23       meet again at 8:30 so we can go through any calls,

24       letters?

25                   THE COURT:  That was my -- my plan, so

261

1          that's absolutely fine.

2               Attorney Vishny, anything else for today?

3                    ATTORNEY VISHNY:  8:30 a.m.?

4                    THE COURT:  8:30.

5                    ATTORNEY VISHNY:  I will be here.

6                    THE COURT:  Very good.  We are adjourned.

7                    (Proceedings concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

262

```
1

2

3                        C E R T I F I C A T E

4

5   STATE OF WISCONSIN      )
                            ) ss.:
6   COUNTY OF OUTAGAMIE     )

7

8

9           I, JOAN BIESE, RMR/CRR, do hereby certify that I
    am the official court reporter for Branch IV of the
10  Circuit Court of Outagamie County;

11          That as such court reporter, I made full and
    correct stenographic notes of the foregoing proceedings;
12
            That the same was later reduced to typewritten
13  form;

14          And that the foregoing proceedings is a full and
    correct transcript of my stenographic notes so taken.
15

16          Dated this 2nd day of August, 2016.

17

18

19                              _____

20                              JOAN BIESE, RMR/CRR

21

22

23

24

25
```

263