FILED
02-13-2019
Clerk of Circuit Court
Outagamie County
2013CF001074

1   STATE OF WISCONSIN      CIRCUIT COURT      OUTAGAMIE COUNTY
    _____

2   **STATE OF WISCONSIN,**

3              Plaintiff,

4   v.                                    **Case No. 13-CF-1074**

5   **CHONG LENG LEE,**

6              Defendant.
    _____

7                   **JURY TRIAL – DAY SIX**

8   _____

9

    BEFORE:          **HONORABLE GREGORY B. GILL, JR.**
10                   Circuit Court Judge, Branch IV
                     Outagamie County Justice Center
11                   Appleton, WI  54911

12
    DATE:            **March 2, 2016**
13

14  APPEARANCES:     **CARRIE SCHNEIDER**
                     District Attorney
15                   Appearing on behalf of the State

16                   **ANDREW MAIER** and **ALEXANDER DUROS**
                     Assistant District Attorneys
17                   Appearing on behalf of the State

18                   **DEBORAH VISHNY** and **EVAN WEITZ**
                     Attorneys at Law
19                   Appearing on behalf of the Defendant

20                   **CHONG LENG LEE**
                     Defendant
21                   Appearing in person

22

23

24  Joan Biese
    Official Reporter, Branch IV
25  Outagamie County

                              1

Exhibit 21

1                          I N D E X

2

3  **WITNESSES**                                          **PAGE**

4  **STEPHANIE T. THAO**
       Examination by Attorney Maier..................... 5
5      Examination by Attorney Weitz.................... 17
       Voir Dire Examination by Attorney Weitz.......... 18
6      Continued Examination by Attorney Weitz.......... 21
       Examination by Attorney Maier.................... 31
7      Continued examination by Attorney Weitz.......... 36

8  **JARED B. RANDALL**
       Examination by Attorney Schneider................ 39
9      Examination by Attorney Weitz.................... 50
       Examination by Attorney Schneider................ 53

10

11 **JONATHON J. NIELSEN**
       Examination by Attorney Schneider................ 57
       Examination by Attorney Weitz.................... 68
12     Examination by Attorney Schneider................ 71

13 **DANIEL K. TAUBER**
       Examination by Attorney Maier.................... 75
14     Examination by Attorney Vishny................... 115
       Examination by Attorney Maier.................... 160
15     Examination by Attorney Vishny................... 164
       Examination by Attorney Maier.................... 166
16     Continued Examination by Attorney Maier.......... 202
       Examination by Attorney Vishny................... 205

17

18 **RYAN JOSEPH ZUKOWSKI**
       Examination by Attorney Maier.................... 174
       Examination by Attorney Weitz.................... 196
19

20 **LISA MARIE STUTZMAN**
       Examination by Attorney Maier.................... 198
       Examination by Attorney Vishny................... 201
21

22

23

24

25

2

1     **EXHIBIT**                                            **PAGE**

| Exhibit | Description | Page |
|---|---|---|
| 1 – | White Board-Luna Lounge | 195 |
| 2 – | White Board-Luna Lounge-Mark for Victim | 195 |
| 6 – | Appleton City Map | 41 |
| 73– | Jump Drive | 107 |
| 74– | Partial Transcript of Recording-Phong Lee | 113 |
| 75– | Hilton Receipt | 102 |
| 76– | Photos | 106 |
| 77– | Hilton Receipt | 103 |
| 78– | Photos | 107 |
| 79– | Receipts | 111 |
| 92– | Letter | 26 |
| 104– | Vest (White) | 85 |
| 114– | Transcript-Interview of Phong Lee | 143 |
| 133– | Hat (Red) | 85 |
| 136– | Jail Call Transcript-1/4/14-17:01 | 27 |
| 138– | Jail Call Transcript-1/11/14-19:35 | 6 |
| 139– | Jail Call Transcript-1/15/14-19:29 | 9 |
| 140– | Jail Call Transcript-1/28/14-16:15 | 10 |
| 146– | Transcript-Interview of Stephanie Thao #1 | 32 |
| 147– | Transcript-Interview of Stephanie Thao #2 | 32 |
| 148– | Thumb Drive | 56 |
| 149– | Sergeant Tauber Report-Pgs. 67-68 | 70 |
| 150– | Photo Board-Photos 150A-150D | 86 |
| 151– | Photo Board-Photos 151A-151C | 87 |
| 152– | Phong Lee Recording | 95 |
| 153– | Sergeant Tauber Report-Pg. 40 | 117 |
| 154– | Transcript-Interview of Daniel Kersten | 118 |
| 155– | Transcript Excerpt-Interview of Dalinda Guzman | 133 |
| 156– | Transcript Excerpt-Interview of Dalinda Guzman | 137 |
| 157– | Transcript Excerpt-Interview of Dalinda Guzman | 138 |
| 158– | Transcript Excerpt-Interview of Tom Lee | 153 |
| 159– | Thumb Drive | 181 |

3

1               **TRANSCRIPT OF PROCEEDINGS**

2        THE COURT:  We're on the record in *State of*

3    *Wisconsin v. Chong Lee*.

4        Mr. Lee appears in person, along with his

5    counsel, Attorney Evan Weitz and Deja Vishny.  Also

6    seated at counsel table appearing under the student

7    practice rule is Mr. Solomon Gatton.  Representing

8    the State of Wisconsin, Outagamie County District

9    Attorney Carrie Schneider.  Also representing the

10   State are Assistant District Attorneys Andrew Maier

11   and Alex Duros.

12       We did take up some pretrial issues in back

13   related to exhibits.  There was an issue taken up

14   with what would be blacked -- the court will

15   reference as Item 204.  It was a letter to a Mr.

16   Thor.  The court received objections related to

17   certain portions of the State proposed section being

18   more prejudicial than probative.  The court did

19   conclude that while there was some prejudice, it did

20   not conclude that the probative value was outweighed

21   by the prejudice, and accordingly those objections to

22   that correspondence were overruled.

23       Attorney Schneider, anything else from this

24   morning's discussions?

25       ATTORNEY SCHNEIDER:  No, Judge.

4

1                THE COURT:  Attorney Vishny, anything

2        further from the morning's discussions?

3                ATTORNEY VISHNY:  No.

4                THE COURT:  Very good.  All right.

5            Miss Thao, you are still under oath from

6        yesterday, so the oath where you swore to tell the

7        truth and all those things still apply.

8            Are we prepared to bring in the jury?

9                ATTORNEY MAIER:  Yes.

10                THE COURT:  All right.  Please rise.

11                (The jury was escorted into the courtroom.)

12                THE COURT:  Please be seated.

13            Mr. Maier, I know you were in the midst of

14        questioning when we recessed for the evening.

15            The one thing, Miss Thao, I know there were a

16        few times where things got a little quiet.  I would

17        ask that you make an extra effort to be loud and

18        clear for our jurors so they can hear you.

19            Mr. Maier, you may continue, sir.

20            **EXAMINATION OF STEPHANIE T. THAO**

21    **BY ATTORNEY MAIER:**

22    Q    Miss Thao, I'm going to attempt to do something.

23                THE COURT:  Most importantly, members of

24        the jury, let me know if we need to bring the lights

25        down.

5

1    Q    Miss Thao, this may actually short circuit a lot of

2         things.  Are you able to see the screen right now and

3         see the words that are on the screen?

4    A    Yes.

5    Q    And you're able to read the words that are on

6         there?

7    A    No.

8    Q    No?

9              THE COURT:  If you need to move, Miss Thao,

10        to see more clearly, that's fine.

11             THE WITNESS:  Okay.

12             THE COURT:  And for members of the jury, is

13        this lighting okay or would you like the lights down

14        okay?

15             (No response.)

16             THE COURT:  And again, if things change,

17        just raise your hand, let me know and we can bring

18        the lights down.  That's not a problem.

19   Q    (BY ATTORNEY MAIER)  I'm going to show you what's

20        been marked as Exhibit 138.  Much like yesterday, I'm

21        going to ask you some questions about a jail call

22        that you received?

23   A    Okay.

24   Q    Take a look at 138.  On the top there is a header and

25        it indicates that there was a call made.  You see

6

1     where it says January 11th, 2014, and then 19:35?

2   A   Yes.

3   Q   And that would be 7:35 p.m., correct?

4   A   Yes.

5   Q   There's a listing, and the next line down it says

6       call to?

7   A   920-378-8315.

8   Q   And whose number is that?

9   A   Mine.

10  Q   So again, similar to yesterday, I'm going to ask you

11      to turn -- we'll turn to page -- this will be Page

12      10.  I'll put it up on the screen.

13  A   Okay.

14  Q   What I'd ask you to do is answer some questions about

15      that.  You can see that okay?

16  A   Yes.

17  Q   All right.  C would be, again, Chong Lee, S is you.

18          So Chong says:  What did Mel say?

19  A   Mel said what is going on with your case.

20  Q   Chong says:  They tried to find stuff against me.

21  A   Oh, so did they try to find stuff against you.

22  Q   Chong says:  Yes.  Because they had nothing else

23      besides Paul and Joe.  Two stupid guys.

24          Miss Thao, Mel would be your sister Melanie?

25  A   Yes.

7

1    Q    And do you have any independent recollection of that

2         phone call?

3    A    No.

4    Q    Simply relying on the transcript of the recorded

5         call?

6    A    Yes.

7    Q    I'm going to turn -- this will be from page -- you

8         can see Page 14.

9              Chong says:  I deleted my Facebook.

10   A    Your what.

11   Q    Chong says:  My thing.  I deleted it.

12   A    Oh, you deleted it.

13   Q    Chong says:  Yes.

14   A    You mean you -- wait.  How do you do that -- or do

15        it.  How did you erase or deactivate it.

16   Q    Chong says:  I'm good.  Don't worry.

17   A    You asked T to do it, right.

18   Q    Chong says:  Yeah.

19              T, this mention in there, do you know who that

20        is?

21   A    Yes.

22   Q    Who is that?

23   A    Teng.

24   Q    And that's Teng Lee?

25   A    Yes.

8

1    Q    Miss Thao, again show you an exhibit marked 139.

2         This is a transcript of a jail phone call.  Can you

3         tell me the date and time that it was made?

4    A    1/15/14, 19:29.

5    Q    So that's 7:29 p.m.?

6    A    Yes.

7    Q    It says call to?

8    A    920-378-8315.

9    Q    Whose phone number is that?

10   A    Mine.

11   Q    I'm going to ask you some questions about some

12        content that's on Page 11.  Do you have any

13        recollection of that call?

14   A    No.

15   Q    During this call Chong says to you:  I said I hate

16        them so much.

17   A    Oh.

18   Q    And then Chong says:  I'll never forgive him.

19   A    Yeah.  I have not -- I have not talked to them as

20        well.

21   Q    Chong says:  For real.

22   A    Yup.  I haven't seen them inaudible.  We don't hang

23        out at all.  Tou Shoua does not hang out with them

24        too.

25   Q    Chong says:  Tou Shoua is not with them too.

9

```
 1    A    No.

 2    Q    Chong says, wow.  I know, like --

 3    A    Inaudible.

 4    Q    And then Chong says:  I know, like nobody wants to be

 5         with them.  I think they are all scared.  Ha ha.

 6    A    Yeah.  Nobody hangs out with them so I have not

 7         talked to anybody, I have not -- well, I have not

 8         talked to any one of them since Phong's birthday I

 9         think.

10    Q    All right.  Miss Thao -- okay.  All right.

11              Miss Thao, I'm going to show you what's been

12         marked Exhibit 140.  Do you see that?

13    A    Yes.

14    Q    Another jail call transcript, correct?

15    A    Yes.

16    Q    And what are the dates -- what is the date and time

17         of this one?

18    A    1/28/14, 16:15.

19    Q    You said 1/28/14, correct?

20    A    Yes.

21    Q    And 16:15 would be 4:15?

22    A    Yes.

23    Q    Again, I'll ask you to look on the screen and I'll

24         have some questions.

25              Do you have any recollection of this phone call?
```

10

```
 1    A    No.

 2    Q    And the last one that we asked about as well, did

 3         you -- even after reading the lines of dialogue, did

 4         you recall that conversation?

 5    A    No.

 6    Q    Okay.  This is from Page 2.  And this time we don't

 7         -- we don't have S or C, we actually have Stephanie

 8         Thao, Chong Lee.  What do you see there?

 9    A    Yeah.  And then when they came they said that

10         inaudible talk and then like she got scared and he

11         told them what you told us.

12    Q    Chong says:  Really.  And you say?

13    A    Yes, because she was scared, because she told me she

14         was scared, um, she said she does not know about what

15         they kept questioning her and she got scared so she

16         told them.  And then so I had to tell them too

17         because she said we have to say the same thing.  She

18         said she saw the pictures, when we were together back

19         then, they're like they know you told us.

20    Q    Chong says -- and there's a typo in there.  Stupid.

21         Stupid.  And you say?

22    A    I told them everything.

23    Q    Chong says:  I didn't tell you guys.

24    A    So I had to say the same thing that Melanie said to

25         them too.
```

11

```
 1   Q    Chong says:  Yes.
 2   A    Yes, so, sorry, I didn't mean to.  It just been
 3        Melanie.
 4   Q    Chong said:  It didn't.
 5   A    Melanie told us to tell.
 6   Q    Melanie told you to tell.
 7   A    No, Mel said that because Mel said we keep having it
 8        together and then, um, that, um, like what you told
 9        us.  So I was like, I had to tell the same thing
10        Melanie told them too.  Otherwise they will say I
11        lied.
12   Q    Chong said:  Yeah.  What the hell.  Say that if they
13        talk to Melanie already it's okay, that's okay.
14   A    Yup.  Then Melanie said that she was really scared
15        and like she didn't want to say anything but they
16        kept asking so she had to say it.
17   Q    And then Chong says:  No, she did not have to say it.
18        She got scared and just said it.
19   A    Yeah.  She got scared and said it.
20   Q    And Chong says:  She's stupid.  How come she's not
21        strong like you?
22   A    So when they ask me I was like shit, I know Melanie
23        said it.
24   Q    Chong says:  Yes.
25             The conversation continues, this is just the
```

1           next page.  What do you say?

2      A    And then I -- I said you and then Melanie's like,

3           what did they say to you.  They said that she's,

4           like, yeah.  She's like, I was scared and I said it.

5           I said I know you because they said they already knew

6           about all that.

7      Q    Chong says:  Oh, so gay.

8      A    Yeah, that's why I was like I felt bad too.

9      Q    Chong says:  So maybe they will bring you guys to

10          court.

11     A    What.

12     Q    Chong says:  Maybe they will try to bring you guys to

13          court.

14     A    They're going to try to bring us to court.

15     Q    Chong says:  Yeah.  Make you guys witnesses against

16          me.

17     A    Oh, yeah, to testify against you.

18     Q    Chong says:  So if you guys come then.  Then a short

19          time later you say?

20     A    So yes, she said if I talk to you then that she's

21          sorry because she's -- that she got scared.  I was

22          like yeah.

23     Q    Chong says:  Yes.  And then a short time later Chong

24          says:  I know.  Oh, no.  They used Melanie against

25          me.  So fake.

13

1   A   What did you say.

2   Q   Chong says:  I said they will use Melanie against me.

3   A   They will use Melanie against you.

4   Q   Chong says:  Yes.  And you.

5   A   And me.

6   Q   Chong says:  Yes.  And you.  Then a short time later

7       in the conversation Chong says:  Yeah, I know, you

8       know, but then I did not say anything about you and

9       Melanie so I don't care.

10  A   Yes.  Because, you know, Melanie was like what if

11      Phong told them already, that's why they know, and

12      they said.  I was like, no, I know Phong didn't say

13      anything.

14  Q   Chong says:  Yeah.  Melanie's scared and just said

15      it.  Melanie gay.

16  A   Yes.  But she said she's sorry.  She didn't mean to.

17      She's just scared.

18  Q   Chong says:  I know.  I knew how it's going to be

19      because they tried to do that to all of my friends.

20  A   What.

21  Q   They tried to do that -- I'm sorry.  Chong said:

22      They tried to do that for all my friends.

23  A   Oh, yes.  I think to show us that all of us were

24      giving -- were coming.

25  Q   Chong says:  What.

14

```
 1   A    I think to show us that we all might have to testify
 2        against you.
 3   Q    Chong says:  I know.  I know they're using all my
 4        friends against me.  Then Chong says?  So I had
 5        already known.
 6   A    And that's stupid.  They shouldn't because, you know,
 7        why -- why they are going to.
 8   Q    It continues to the next page.  You can finish that
 9        statement.
10   A    Use someone's friend against him.  You know.
11   Q    Chong says:  Because that's what they do.  But then
12        like they don't have anything.  It is my friends
13        words so that's fine.  If they win the case, then
14        it's because all my friends say things against me.
15        And then it's like.
16   A    Yes.
17   Q    And then Chong says:  And like what if my friends
18        don't like me, you know, like Alyson and Joe, they're
19        mad at me so they do not like me.
20             And then later in the conversation, Miss Thao,
21        Chong says:  Yes, so I'm pretty sure, excuse me, he
22        will take you guys to testify against me in court.
23   A    Yes.  Well never mind.  Let's not talk about this
24        because I know they are listening to us still.
25   Q    Chong says:  I don't care if they listen.  I don't
```

15

1       talk about anything.  You know.  Have they talked to

2       -- it says Tou Sher.  And you said?

3    A  Yes, they did talk to him already.

4    Q  Chong says:  What did they say?  Do you know?

5    A  What.

6    Q  Thank you.  Chong then says:  Do you know what they

7       said.

8    A  What.

9    Q  Chong says:  Do you know what he said.

10   A  Do I know what he said.

11   Q  Chong says:  Yes.

12   A  Nope, I don't know.

13   Q  Chong says:  Oh, no.

14   A  I don't know.  They told me that they talked to him,

15      and then I think I know that they took his jacket.

16   Q  Chong says:  Oh, no inaudible.

17   A  Yes.

18   Q  Now, on the prior page this name came up, Tou Sher.

19      You think that's referring to Tou Shoua?

20   A  Yes.

21              ATTORNEY MAIER:  Thank you, Miss Thao.

22      Your Honor, that's all the questions I have for this

23      witness.

24              THE COURT:  Defense?

25              ATTORNEY WEITZ:  Thank you, Your Honor.

16

1              **EXAMINATION OF STEPHANIE T. THAO**

2    **BY ATTORNEY WEITZ:**

3    Q    Now, Miss Thao, you remember testifying yesterday,

4         right, you were here at the end of the afternoon?

5    A    Yes.

6    Q    Okay.  And yesterday you said that Chong mentioned

7         that he was the shooter first at Jet Sushi, right?

8    A    Yes.

9    Q    And at that point you thought that he was lying,

10        right?

11   A    Yes.

12   Q    Okay.  And you went to Buffalo Wild Wings with him

13        the very next night for a second dinner?

14   A    Yes.

15   Q    Okay.  And at that point you still thought that he

16        was lying, right?

17   A    Yes.

18   Q    And when asked this question on direct yesterday, why

19        you didn't call the police, you said because I

20        thought he was lying.

21   A    Yes.

22   Q    Okay.  Why did you think he was lying?

23   A    Well, because he lies all the time.

24   Q    Okay.  About a lot of things?

25   A    Yes.

17

1   Q    Can you give us some examples of things that he lies
2        about?
3                    ATTORNEY MAIER:  Object at this point.
4                    THE COURT:  Counsel, approach.
5                    (Bench conference.)
6                    THE COURT:  We have to address an issue.
7        It will be five minute break tops.  My bailiff will
8        be here momentarily.
9                    (The jury was escorted out of the
10       courtroom.)
11                   THE COURT:  And there was -- there was a
12       question asked by defense, an objection was raised.
13       I understood it to be on potential hearsay grounds.
14       I'm referring it on that grounds.  That fact
15       notwithstanding, the suggestion was posed that given
16       the concerns that we've had in terms of the potential
17       for inadmissible testimony I'm going to ask, Mr.
18       Weitz, that you ask the question and we'll conduct a
19       voir dire type of questioning of Miss Thao at this
20       point in time.  And so if you would ask the
21       questions, sir.
22                   ATTORNEY WEITZ:  Sure.
23       **VOIR DIRE EXAMINATION OF STEPHANIE T. THAO**
24   **BY ATTORNEY WEITZ**:
25   Q    The question was if you could give examples of things

18

```
 1          that Chong has lied about.
 2    A     Yes.  Like he lied about owning a house, having a lot
 3          of money, and just like, I don't know, like little
 4          things like just to make himself look cool or
 5          something.
 6    Q     I guess there's another follow-up question.  Did
 7          Chong ever brag about crimes that you knew that he
 8          didn't commit?
 9    A     No.
10    Q     Just one more question for you then, Stephanie.  You
11          had heard about the Luna shooting on the news,
12          right?
13    A     Yes.
14    Q     Okay.  And prior to when this statement was made by
15          Chong, did you believe that anyone else might have
16          been responsible for that shooting?
17    A     Yes.
18    Q     And who was that?
19    A     I -- I don't know.  I just thought it wasn't Chong.
20          I just thought it was someone else and it wasn't
21          him.
22    Q     Okay.  Why did you think that it was someone else?
23    A     Well because I've never seen Chong aggressive or
24          anything, and for as long as I knew him, he didn't
25          seem like the type of person that would hurt
```

19

```
1          anyone.

2     Q    Okay.  So there's no one specific in mind that you

3          thought?

4     A    No.

5               ATTORNEY VISHNY:  Just to clarify, we're

6          not going to introduce that.  I think that that would

7          open the door to evidence of violent character by the

8          State, so we're not going to.

9               ATTORNEY WEITZ:  So I think we're just

10         going to limit it to the first question asked.

11              ATTORNEY VISHNY:  We're not going to ask

12         about peaceful character.

13              THE COURT:  No.  And that's where I wanted

14         to ask because I was concerned that that may then

15         open a door.

16              ATTORNEY VISHNY:  We didn't know what she

17         was gonna say, whether somebody else had admitted

18         doing it to her, we really didn't know what she was

19         going to say.

20              THE COURT:  I understand.  And that's why

21         we're doing it in this context.

22              ATTORNEY WEITZ:  So when we bring the jury

23         back in, we'll just limit it to --

24              THE COURT:  So you will ask the question of

25         examples he's lied about.
```

20

```
 1                    ATTORNEY VISHNY:  Right.
 2                    THE COURT:  And then, Miss Thao, then the
 3          examination will be is that you will give the same
 4          type of answer that you just gave about owning a
 5          house, having lots of money, and so I'm not -- I mean
 6          that was your answer -- whatever your answer was,
 7          that's what it should be.
 8                    THE WITNESS:  Okay.
 9                    THE COURT:  Does that make sense and
10          everyone is comfortable with that type of
11          instruction?
12                    ATTORNEY WEITZ:  Yup.
13                    ATTORNEY VISHNY:  I just want to explain to
14          Mr. Lee why we're doing this.  Okay.  Thanks.
15                    THE COURT:  And, Mr. Maier, are we all set
16          to bring in the jury?
17               All right.  Very good.  Please rise for the
18          jury.
19                    (The jury was escorted into the courtroom.)
20                    THE COURT:  Please be seated.
21               Attorney Weitz, you may continue your
22          questioning, sir.
23                    ATTORNEY WEITZ:  Thank you, Your Honor.
24          __EXAMINATION OF STEPHANIE T. THAO__
25     __BY ATTORNEY WEITZ:__
```

21

1   Q   I think the question that was asked before we took

2       the short break is can you give some examples of

3       things that Chong had lied about.

4   A   Owning a house, having lots of money, and just little

5       things that make him look cool.

6   Q   Okay.  And the owning the house, that wasn't

7       something that was true, right?

8   A   I don't think so.

9   Q   Okay.  So all these things would have been things

10      that he told you that were actually false?

11   A   Yes.

12   Q   Okay.  And actually, when the police came and talked

13      to you, you told them many times that you didn't

14      believe Chong when he made this admission to you,

15      right?

16   A   Yes.

17   Q   Okay.  You told the police, I didn't really believe

18      him, you know how he is, he likes to say things to

19      make himself look cool.  So I'm like, whatever, I

20      don't believe you.  Does that sound familiar?

21   A   Yes.

22   Q   Okay.  Something to that effect maybe if you can't

23      recall the exact words?

24   A   Yeah.

25   Q   Again, you said to the police that when he said at

```
 1          Buffalo Wild Wings you still didn't believe him and
 2          you believe Chong to be a liar, right?
 3     A    Yes.
 4     Q    You say that you ignored him, and lots of things that
 5          he says, you don't believe him, right?
 6     A    Yes.
 7     Q    You said you didn't believe him, you thought he was
 8          just trying to make himself look cool, something to
 9          that effect.  Sound familiar?
10     A    Yes.
11     Q    Again later in the interview you say that you still
12          weren't really believing him?
13     A    Yes.
14     Q    And would it help you if I showed you the transcript
15          or do these concepts sound roughly familiar to you?
16     A    It sounds familiar.
17     Q    Okay.  So, again, I'm kind of paraphrasing so these
18          may not be your exact words, but you conveyed this
19          type of message, right?
20     A    Yes.
21     Q    Okay.  Later on you mentioned again something about
22          not paying attention to him, you didn't believe him.
23          Again you reference that you thought he was just
24          trying to make himself look cool?
25     A    Yes.
```

23

1    Q    Is it fair to say you told the police several times

2         that you thought he was just saying this to make

3         himself look cool?

4    A    Yes.

5    Q    Okay.  And then yesterday you -- you testified that

6         at some point you just said stop talking about it

7         because you thought he was lying and he didn't say

8         anything after that.

9    A    Yes.

10   Q    Okay.  And then you also told the police at some

11        point that you didn't believe him, that your sister

12        Melanie was kind of joking with him about it because

13        you guys didn't think this was something serious,

14        right?

15   A    Yes.

16   Q    And you mentioned to the police that you guys maybe

17        were kind of laughing about it at that point?

18   A    Yeah.  Well, my sister was joking with Chong that it

19        was him.

20   Q    Okay.  And again, the reason you would joke about

21        that is because you didn't believe that what he was

22        saying was true?

23   A    Yes.

24   Q    Before the police came to talk to you, you had

25        already talked to your sister Melanie, right?

24

```
1    A    I don't remember.

2    Q    Well, you guys are pretty close, right?

3    A    Yes, we are.

4    Q    Okay.  So a lot of things that go on you guys share

5         with each other and talk about things?

6    A    Yes.

7    Q    So believe -- before the police came to talk to you,

8         you knew that the police had already talked to

9         Melanie?

10   A    Yes.

11   Q    Because you weren't home when they came to talk to

12        Melanie, right?

13   A    Yeah.  I wasn't home.

14   Q    And you probably then talked about the police coming

15        to talk to your sister Melanie, right?

16   A    I don't remember if we talked about it after they

17        came because I believe when I came home from work,

18        she was already at work.

19   Q    Okay.  Do you remember in those phone calls that you

20        were just going through with Mr. Maier where you said

21        at one point that you knew that your sister talked to

22        them so you had to say the same thing or they'd think

23        that you were lying?

24   A    Yes.

25   Q    So you had talked to her about it?
```

25

```
 1   A    Yeah.

 2   Q    Okay.  Now yesterday, Miss Thao, you were shown a

 3        letter that you received, right?

 4   A    Yes.

 5   Q    All right.  Miss Thao, I'm going to show you what's

 6        previously been marked as Exhibit 92.  That's the

 7        letter that you were shown yesterday, right?

 8   A    Yes.

 9   Q    And you remember reading this one sentence towards

10        the top that was highlighted, right?

11   A    Yes.

12   Q    Okay.  Before that, there's another sentence,

13        right?

14   A    Yes.

15   Q    And that sentence says:  Every time someone sees me

16        they be like ain't you the guy that did the Luna

17        shooting.  I fucking hate that.  It pisses me off.

18        Is that what it says?  Yes?

19   A    Yes.

20   Q    So this is a letter from Chong, right?

21   A    Yes.

22   Q    So that's him expressing anger that people think that

23        he's the one that did the Luna shooting?

24   A    Yes.

25   Q    Now, today you were shown some more telephone calls,
```

26

```
1        and late yesterday, right?
2    A   Yes.
3    Q   Okay.  And one of those calls, I believe it was
4        yesterday, was a call between you and Chong, right?
5    A   Yes.
6    Q   Okay.  I'm going to show you Exhibit 136.  Does this
7        look like one of those phone calls that you were
8        shown yesterday?
9    A   Yes.
10   Q   Okay.  I'm going to direct your attention to Page 8.
11       And in the middle of that line -- page that you
12       read --
13                ATTORNEY SCHNEIDER:  Evan, do you have what
14       call number this is?
15                ATTORNEY WEITZ:  This would be call
16       18136.
17                ATTORNEY SCHNEIDER:  Thank you.
18   Q   (BY ATTORNEY WEITZ)  There is a portion from Chong.
19       Do you see where I'm pointing at?  And that's on Page
20       8.
21   A   Yes.
22   Q   And in that portion he says:  I didn't do it.
23       Right?
24   A   Yes.
25   Q   And then later on in that call he says -- I'm sorry.
```

27

```
 1         The page numbers are -- this would be on Page 10 of

 2         that call.  He's talking about Joe and Paul; is that

 3         right?  If I need to go back one page to help you get

 4         the context.

 5    A    Okay.

 6    Q    There's a message talking about Joe and Paul,

 7         right?

 8    A    Yes.

 9    Q    And Chong says:  They didn't know anything.  And then

10         suddenly he and Paul said it was me.  Right?

11    A    Yes.

12    Q    So in that call Chong denied doing the shooting,

13         right?

14    A    Yes.

15    Q    All right.  Now another call you were shown today,

16         I'm going to show you what's been marked Exhibit 140.

17         Turning your attention to Page 6.  This was a portion

18         that you read earlier today, right?

19    A    Yes.

20    Q    Okay.  And Chong is talking about them coming and

21         looking for letters at your house and whether you

22         guys would have to testify.  That's the gist of the

23         earlier conversation?

24    A    Yes.

25    Q    Okay.  And at some point he says:  Forget it, let
```

28

```
 1        them do it.  Right?

 2    A   Yes.

 3    Q   Okay.  And then later on he says:  I will just go

 4        against them in court -- or I will go against them in

 5        court?

 6    A   Yes.

 7    Q   And again he says:  Forget it.  Let them do it.

 8        Right?

 9    A   Yes.

10    Q   Okay.  I'm going to turn your attention to later in

11        that call.  There is a portion that you again read,

12        right?

13    A   Yes.

14    Q   And you're talking -- Chong is talking about you guys

15        coming to court and testifying, and you say not to

16        talk about this on the phone, right?

17    A   Yes.

18    Q   And Chong says:  I don't care if they listen.  I

19        don't talk about anything.  Is that right?

20    A   Yes.

21    Q   Okay.  And then later on, on Page 11, you're again

22        talking about you and your sister coming to court and

23        testifying, and do you see this portion where Chong

24        says:  Yeah, and then whatever you guys say, forget

25        it, does not matter.
```

29

```
 1    A    Yes.
 2    Q    Okay.  Now yesterday you were asked a question and
 3         you said that you personally wouldn't joke about
 4         murder, right?
 5    A    Yes.
 6    Q    And you also wouldn't want to hang out with someone
 7         that you knew to be a murderer, right?
 8    A    Yes.
 9    Q    But you, after Chong said this to you at Jet Sushi,
10         went out to dinner with him a second night, right?
11    A    Yes.
12    Q    And after he said this at Buffalo Wild Wings, you
13         still continued to talk to Chong, right?
14    A    Yes.
15    Q    Even after he was arrested you're sending him
16         letters, right?
17    A    I didn't send him letters.
18    Q    You called him or he called you?
19    A    Yeah, he called me.
20    Q    So you're talking to him?
21    A    Yes.
22    Q    Okay.  And your uncle is Sergeant Thao, right?
23    A    Yes.
24    Q    And he's a member of the Appleton Police
25         Department?
```

30

1    A    Yes.

2    Q    And you never told him about this, right?

3    A    No.

4    Q    That's because you didn't believe Chong?

5    A    No.

6              ATTORNEY WEITZ:  Nothing further.  Thank

7         you.

8              THE COURT:  Redirect, Mr. Maier?

9              **EXAMINATION OF STEPHANIE T. THAO**

10   **BY ATTORNEY MAIER:**

11   Q    Miss Thao, you indicated on direct that the things

12        that the defendant bragged about were having a house

13        and having lots of money, correct?

14   A    Yes.

15   Q    So that would be things that would make him, I think

16        you said, that would make him look cool?

17   A    Yes.

18   Q    Would you think that it makes someone look cool to

19        say that they shot someone in the head and killed

20        them?

21   A    No.

22   Q    Especially two or three days after a person was shot

23        in the head and killed at Luna Lounge in Appleton,

24        right?

25   A    Yes.

31

 1   Q   There has been some questioning about what the
 2       defendant's demeanor was like when he was talking to
 3       you, and I think yesterday you said that you didn't
 4       recall and then today there may have been a different
 5       answer given.  It will be from 146 and 147.
 6           Miss Thao, I'm going to show you what's been
 7       marked Exhibit 146.  Do you see that?
 8   A   Yes.
 9   Q   And if we turn to Page 5, we'll start at Line 6.
10       Sergeant Schira asks you, how is his -- how was his,
11       like, demeanor.  I mean, did he -- did he seem like
12       he was sorry that he did it, that he was like ashamed
13       that he did it, that he was -- was he scared that the
14       police were looking at him.  And how did you reply?
15   A   He seemed scared but then, like I said, like when he
16       told me about it, he seemed like he was scared but
17       then I was kind of like not really believing him.
18   Q   And that last sentence was one of the questions that
19       Attorney Weitz asked you about on direct, correct?
20   A   Yes.
21   Q   So the beginning part of that gives a little bit more
22       context to what you were asked about on direct?
23   A   Yes.
24   Q   This is Exhibit 147.  We're on Page 22.  It will be
25       starting with Line 22 and then going to the next

32

1     page.

2                 ATTORNEY VISHNY:  Are we on the same

3     transcript?

4                 ATTORNEY MAIER:  Different.  This is the

5     February 12th interview.

6                 ATTORNEY WEITZ:  Your Honor, could we

7     approach on this one?

8                 THE COURT:  You may.

9                 (Bench conference.)

10                 THE COURT:  Go ahead, Mr. Maier.

11   Q   (BY ATTORNEY MAIER)  Again, this is Exhibit 147 on

12       what on the exhibit is Page 22.  I'm showing you the

13       bottom here, correct?

14   A   Yes.

15   Q   Sergeant Tauber, excuse me, asks you, maybe fear, I'm

16       sorry, did you see remorse, did you -- he feel bad

17       about what he did.  Is that correct, that's what he

18       asked?

19   A   Yes.

20   Q   And your reply?  Just read that answer please.

21   A   Well, a little bit but he seemed more like he was

22       scared.

23   Q   Thank you.

24         Maybe while I'm setting this up I can ask you a

25       couple questions.  It was brought out that, both when

33

```
 1          your sister testified yesterday but also just now,
 2          but Sergeant Thao with the Appleton Police Department
 3          is a relative of yours?
 4     A    Yes.
 5     Q    And it was asked both of your sister and you if he
 6          was your uncle; is that correct?
 7     A    Yes.
 8     Q    But he's not your mom's brother or your dad's
 9          brother, correct?
10     A    No.
11     Q    It's more distant than that?
12     A    Yes.
13     Q    Have you ever talked with Sergeant Thao about
14          anything?
15     A    No.
16     Q    All right.  While I'm waiting for that, there were
17          some questions, excuse me, about a letter that --
18          that Chong sent you, correct?
19     A    Yes.
20     Q    And where did that letter come from?
21     A    Milwaukee.
22     Q    Well, let me ask you this.  Where was Chong when he
23          sent the letter where he said that everywhere he goes
24          people say to him you're the guy who did the Luna
25          shooting?
```

34

```
 1   A    Jail.

 2   Q    Thank you.

 3             I'm going to refer you on Exhibit 136 - I'm

 4        trying do it so that it fits all on the screen - I'm

 5        not asking you to read it again, but just to kind of

 6        give you some context about what I'm going to ask you

 7        about.

 8             During this call, as you read it, did you have

 9        any recollection about talking to the defendant about

10        it?

11   A    No.

12   Q    In reading what the defendant said to you and what

13        you said back to him, he was upset with Joe and Paul,

14        correct --

15   A    Yes.

16   Q    -- because they had talked to the police.

17   A    Yes.

18   Q    And the implication is that they had told things that

19        they had seen and what the defendant had told them

20        about doing this shooting in Luna?

21                  ATTORNEY WEITZ:  Object at this point.

22                  THE COURT:  Sustained.  You don't need to

23        answer.

24   Q    (BY ATTORNEY MAIER)  There is a mention in there

25        about he thought it would be that white guy or that
```

35

1  white person.  Do you recall that?

2 A Yes.

3 Q Any idea who he's talking about?

4 A No.

5 Q Had to be somebody who had some knowledge of what

6  happened at Luna though, correct?

7    ATTORNEY WEITZ:  I'm going to object at

8  this point.

9    THE COURT:  Same grounds?

10    ATTORNEY WEITZ:  That and also leading.

11    THE COURT:  Sustained.

12    ATTORNEY MAIER:  That's all the questions I

13  have, Your Honor.  Thank you.

14    THE COURT:  Any recross?

15    ATTORNEY WEITZ:  Just briefly.

16    **EXAMINATION OF STEPHANIE T. THAO**

17 **BY ATTORNEY WEITZ:**

18 Q Miss Thao, you were present at Jet Sushi and Buffalo

19  Wild Wings, right?

20 A Yes.

21 Q And you were there with Chong, right?

22 A Yes.

23 Q You had an opportunity to observe him, right?

24 A Yes.

25 Q You saw how he was acting, right?

36

1    A    Yes.

2    Q    You heard what he said?

3    A    Yes.

4    Q    And based upon that, you thought he was lying,

5         right?

6    A    Yes.

7              ATTORNEY WEITZ:  Nothing further.

8              THE COURT:  Any redirect, Mr. Maier?

9              ATTORNEY MAIER:  No.

10             THE COURT:  Members of the jury, do you

11        have any questions that you wish to submit for

12        consideration?

13             (No response.)

14             THE COURT:  Very good.  Miss Thao, thank

15        you.  You may be excused.

16        And, Miss Schneider?  All right.  We're doing

17        well pace-wise this morning.  We'll take five minutes

18        just to stretch and then we will reconvene.

19             (The jury was escorted out of the

20        courtroom.)

21             ATTORNEY VISHNY:  State's going to call

22        Jared Randall.  During our earlier presentation when

23        Johnny Thao was on the stand we showed a video and

24        asked whether or not we -- we thought the person was

25        Alyson on the video going into the parking lot and we

37

1            were wrong, it was not Alyson, and the witness said
2            that that man walking the female was not Jared
3            Randall.
4                      THE COURT:  Okay.
5                      ATTORNEY VISHNY:  And I know that the State
6            is requesting to call Jared Randall for the purpose
7            of him saying that's not him, but I want to make sure
8            that there's not a question like the defense said
9            this was you, you know, to some --
10                     ATTORNEY SCHNEIDER:  No, no, no, no.  I'll
11           just ask him what he did and then I'll play him these
12           portions of the video and ask him if that's him we
13           see.
14                     ATTORNEY VISHNY:  That's fine.
15                     THE COURT:  Okay.
16                     ATTORNEY VISHNY:  Great.  Thanks.
17                     THE COURT:  Problem resolved.  Are we all
18           set to bring in the jury, Miss Schneider?
19                     ATTORNEY SCHNEIDER:  Yes.
20                     THE COURT:  Please rise.
21                     (The jury was escorted into the courtroom.)
22                     THE COURT:  Please be seated.
23               Miss Schneider, your next witness.
24                     ATTORNEY SCHNEIDER:  Thank you.  The State
25           would call Jared Randall to the stand, Your Honor.

38

```
1                    THE COURT:  If you would please remain
2        standing, sir, the clerk will swear you in.
3                    THE CLERK:  Please raise your right hand.
4                    (Oath administered to witness.)
5                    THE WITNESS:  I do.
6                    THE CLERK:  Please state your full name and
7        spell it for the record please.
8                    THE WITNESS:  Jared Randall.  J-A-R-E-D,
9        R-A-N-D-A-L-L.
10                   THE COURT:  You may be seated, sir.  Miss
11       Schneider, your witness.
12                   EXAMINATION OF JARED RANDALL
13       BY ATTORNEY SCHNEIDER:
14   Q    Good morning.  May I call you Jared?
15   A    You may.
16   Q    How old are you?
17   A    24.
18   Q    What city were you raised in?
19   A    Manitowoc.
20   Q    Are you familiar with the downtown Appleton area?
21   A    I'm fairly familiar, yes.
22   Q    Have you been out previously out to the bars or other
23        entertainment areas in downtown Appleton?
24   A    Not in a while.
25   Q    Are you familiar with a business that used to exist
```

39

1          called Luna Lounge?

2     A    I am.

3     Q    Have you visited Luna?

4     A    Not in a while.

5     Q    Okay.  I want to direct your attention back, Mr.

6          Randall, to the Saturday, December 7th into Sunday

7          morning -- the very early morning hours of Sunday

8          December 8th, 2013.  Do you remember where you were

9          that -- that evening?

10    A    I was at the Luna Lounge.

11    Q    Why were you there?

12    A    Out with friends.

13    Q    Do you remember any of their names?

14    A    Jonathon, I don't know his last name, Johnny Thao,

15         Timothy Jokinson, really who I was there with.

16    Q    Okay.  I want to direct your attention, Mr. Randall,

17         to a time period at about two in the morning.  Okay?

18         So around bar close.  Do you recall if you were

19         inside or outside of Luna?

20    A    I believe I was just leaving or being told to leave.

21         My friend Johnny came and got me and told me, hey, we

22         should leave.

23    Q    It was getting to be bar close?

24    A    Or it was probably around 2:00.

25    Q    After you went outside, did you immediately walk to

40

1      your car or did you stop in any area?

2   A  When I left, I went around the corner and there was

3      like a big rush of people around the time that kind

4      of came out, and there was a fight that broke out

5      between two women and me and my friend Johnny had

6      broken that up.

7   Q  Okay.  Just to assist you, Mr. Randall, I'm going to

8      show you what's been previously marked State's

9      Exhibit No. 6.

10  A  Okay.

11  Q  And to help you out with the frame of reference,

12     we've already had the bar Luna marked on here.  Next

13     to that there is a building marked the Performing

14     Arts Center.  Are you familiar with that?

15  A  Yup.

16  Q  So using this diagram, when you said you left Luna

17     and then there was a fight, can you show using

18     Exhibit 6 where you remember that fight occurring?

19  A  So if this is the front of Luna?

20  Q  Yup.

21            ATTORNEY VISHNY:  I'm sorry.  Can he please

22     talk a little louder?

23  A  I'm sorry.  So the front of Luna --

24  Q  Here.  Let's do this.

25  A  -- is right here, and I came out, I went around the

41

```
1              block right here, so probably where this red line is
2              is where the fight had broken out.
3      Q      So the approximate area where that red mark is?
4      A      Yeah.
5      Q      And when you moved your finger you kind of went out
6              from the door on the sidewalk and then went up the
7              next street there, Division?
8      A      Yeah.
9      Q      Okay.  And you remember Johnny back in that area?
10     A      Yup.
11     Q      When you saw the two women fighting, did that
12             surprise you?
13     A      It did, yes.
14     Q      Were there other people watching or looking at what
15             was going on?
16     A      There were other individuals around there, yes.
17     Q      And the fight that you saw, were the girls standing,
18             on the ground, what do you recall?
19     A      They were standing.  One of them did fall to the
20             ground, got back up.
21     Q      Do you remember anything -- you don't know their
22             names, correct?
23     A      I do not know.
24     Q      So do you remember anything about them, their hair,
25             what they were wearing, their height that you can
```

42

1          describe one versus the other?

2     A    One of them I believe was dark haired, one of them

3          was a blonde.  Both wearing boots.

4     Q    Okay.  But one was definitely a blonde and one had

5          darker hair?

6     A    One was a little bit thicker than the other.

7     Q    Okay.  Could you see who was hitting who?

8     A    They were both hitting each other, pulling each

9          other's hair.

10    Q    Do you remember anything that was being said?

11    A    I recall one of the women saying something along the

12         lines of your boyfriend shot my boyfriend.

13    Q    Did that surprise you?

14    A    It -- yeah, it surprised me.

15    Q    Up to that point, had you heard anything that sounded

16         like a gunshot to you?

17    A    No, but there was definitely a lot of panic in the

18         area, and just a ton of people running, screaming at

19         that time so --

20    Q    And I think what you said is you were out of the

21         building.  When you walked out of Luna, you were

22         walking at a normal pace?

23    A    Pretty normal pace.  I wasn't really in a rush.  I

24         didn't -- I was inebriated, I mean a little bit, so

25         obviously I didn't know what entirely was going on

43

1     but I knew something was definitely not right.

2  Q  And that's -- is that when you -- the rush of people

3     came behind you?

4  A  Yeah.

5  Q  And did you or anyone else that was with you try to

6     step into the fight or do anything?

7  A  Myself and my friend Johnny Thao both tried to

8     separate the two individuals.

9  Q  Were you able to get them apart?

10 A  We were, yes.

11 Q  Did you directly deal with one of the two ladies?

12 A  I did.

13 Q  Which one was that?

14 A  The blonde haired lady.

15 Q  And what do you remember doing with her after the

16    fight ended?

17 A  Just remember kind of like carrying her a little bit

18    and then walking with her to get her away.  She was

19    really upset and crying, and I walked her to the --

20    to the parking garage.

21 Q  Do you remember seeing any injuries she had?

22 A  No, I can't recall.

23 Q  And after you walked her to the parking garage area,

24    did you stay with her?

25 A  For a moment.  We kind of walked like through the

44

```
1         parking garage a little bit, and I was talking to her
2         at that time, trying to figure out what was going
3         on.
4    Q    Do you remember anything she said?
5    A    No, other than she didn't -- she just kept saying I
6         don't know what's going on, I don't know what's going
7         on.
8    Q    And then after you kind of walked her to the parking
9         area for a bit, did you stay with her or go
10        anywhere?
11   A    I told her to stay there and then I had ran back to
12        where the fight had occurred to meet back with my
13        friends.
14   Q    Were you going to try to get her a ride or what was
15        the purpose of you telling her to stay there?
16   A    I was going to try and get her a ride, yes.
17   Q    Do you smoke, Mr. Randall?
18   A    I do not.
19   Q    Okay.  And some people don't smoke cigarettes but
20        maybe after drinking they might have a cigarette, are
21        you that kind of person or you don't smoke at all?
22   A    I do not smoke at all.
23   Q    Okay.
24             ATTORNEY SCHNEIDER:  Judge, we might ask
25        you to turn the lights off if that's okay.
```

45

```
 1                        THE COURT:  That's fine.
 2    Q    (BY ATTORNEY SCHNEIDER)  Mr. Randall, I'm going to
 3         show you some video footage from that parking ramp or
 4         that parking structure you described.  Okay?
 5    A    Okay.
 6                        ATTORNEY SCHNEIDER:  And we're going to
 7         start, for the record, the play point at 1:51:29.
 8                        ATTORNEY VISHNY:  I'm sorry.  One --
 9                        ATTORNEY SCHNEIDER:  51:29.  And before you
10         start -- one second.
11    Q    (BY ATTORNEY SCHNEIDER)  Mr. Randall, as we look at
12         this image to the left side kind of middle of the
13         image we can see what appears to be two people.  Do
14         you see those with me?
15    A    I do.
16    Q    And I want you to focus on those two people while we
17         play a portion of this.
18                        (Video played.)
19    Q    Now the people have kind of come to almost the middle
20         of the screen - we're at 1:51:39 for the record - is
21         that correct, the people are now in the middle of the
22         screen?
23    A    Oh, yeah.  Sorry.
24    Q    And I'm going to ask you to continue to watch that
25         couple.
```

46

```
 1                    (Video played.)
 2    Q    And we stopped it at 1:51:42.  Do you remember seeing
 3         what that male was doing as we stop the image?
 4    A    He appears to be lighting or smoking a cigarette.
 5    Q    Is that you from what you recall about this night?
 6    A    That is not me.
 7    Q    So the woman walking with him would not have been the
 8         blonde that you helped.
 9    A    Correct.  There was no other individual in there when
10         I was in there with her.
11    Q    Okay.  And then we're just going to continue to watch
12         the segment for a little bit, Mr. Randall.
13                    ATTORNEY SCHNEIDER:  And again, our
14         starting play point is 1:51:42.
15                    (Video played.)
16    Q    Do you see in this image an area where like a parking
17         attendant would normally sit?
18    A    I do, yeah.
19    Q    Okay.  And so as we look at this image at 1:52:35,
20         just to the left of that you can see what appears to
21         be the legs of a person, correct?
22    A    Correct.
23    Q    Okay.  I'm going to ask you to focus on that
24         individual as we continue through the next few
25         frames.
```

47

1    A    Okay.

2                    (Video played.)

3    Q    Now we've stopped at 1:52:49.  And, Mr. Randall, do

4         you see where those people have now walked to?

5    A    I do.

6    Q    And can you describe that area as best you can for

7         the jury?

8    A    I guess I'm confused with the question.  What do you

9         mean describe the area?

10   Q    Those people are now in, as we look at the image,

11        kind of the upper right corner, correct?

12   A    Yes.

13   Q    And they're walking?

14   A    Um-hum.

15   Q    Do you remember walking through that area?

16   A    I do, yeah.  I walked through like the side of it and

17        then around just because I was trying to figure out

18        what was going on so I was talking to her for a

19        little while.

20   Q    Do you have an opinion as to who those people are?

21   A    I'm pretty confident that that's myself and her,

22        yes.

23   Q    Okay.

24                    ATTORNEY SCHNEIDER:  Then we'll continue to

25        play it for a little bit.  Okay.  Can you pause it

48

1         now?

2    Q    Now at 1:53:14 we see an individual who has entered

3         from the right of the image and is running to the

4         left.  Is that correct?

5    A    That's correct.

6    Q    Is that what you remember doing?

7    A    That's exactly what I remember doing.  I left her

8         kind of back there a little bit and then I ran

9         back.

10   Q    Is it your belief that this person who we see running

11        through the scene is you?

12   A    Yeah.

13   Q    And you said you ran back to where Johnny was?

14   A    I ran back to where the fight had taken place just

15        because that's where I remember them being last.

16              ATTORNEY SCHNEIDER:  And just for the

17        record, we've ended it at 1:53:14.

18            And then thank you, Mr. Randall, I have no

19        additional questions.

20              THE COURT:  Lights can come back on, Miss

21        Schneider?

22              ATTORNEY SCHNEIDER:  Yes, please.

23              THE COURT:  Any further questions, Miss

24        Schneider?

25              ATTORNEY SCHNEIDER:  No.  I'm sorry.  I

49

1      thought I had said that.

2                THE WITNESS:  Yeah.  You did say.

3                THE COURT:  My apologies if I didn't catch

4      that.

5          Attorney Weitz.

6                ATTORNEY WEITZ:  One moment, Your Honor.

7      Thank you.

8                **EXAMINATION OF JARED RANDALL**

9      **BY ATTORNEY WEITZ:**

10  Q   Now, Mr. Randall, that night that we've been talking

11      about, December of 2013, right?

12  A   Correct.

13  Q   That was over two years ago at this point?

14  A   It would be, yes.

15  Q   Okay.  And on that night you were out with friends

16      for, I think you said it was -- to police it was one

17      of your friend's 21st birthday party or something to

18      that effect?

19  A   Yeah.

20  Q   Okay.  So you guys were out that night drinking,

21      having a good time?

22  A   Yup.

23  Q   Correct.  And actually, when the police came and

24      talked to you, you told them that you were pretty

25      drunk that night.

```
 1   A    Yes.

 2   Q    Okay.  And there's this fight that happens outside

 3        between the two girls, right?

 4   A    Correct.

 5   Q    And you helped break it up, right?

 6   A    Correct.

 7   Q    And as you testified, you walked the lighter haired

 8        girl to the parking lot where we saw in the video?

 9   A    Correct.

10   Q    And during walking her to the parking lot, she didn't

11        say anything out of the ordinary, right?

12   A    She was just, no, I mean just crying and --

13   Q    Just upset about the fight?

14   A    Yeah.  She couldn't really -- she didn't say anything

15        really.

16   Q    Okay.  And when you talked to the police, you said

17        that during the fight you remembered some comments

18        that one of the girls said something about a

19        boyfriend in the bar.  That's what you told the

20        police, right?

21   A    Correct.

22   Q    And you thought that you had heard something about

23        shooting, right?

24   A    Correct, yes.

25   Q    But you weren't sure what girl said it, just that it
```

51

1         was at some point during the fight?

2    A    Yes.

3    Q    So your recollection of the specific words that were

4         said is -- is kind of hazy.

5    A    Well, the recollection comes just from not only

6         myself but asking the individuals that were there

7         with me as well, hey, did you hear that, did you hear

8         that as well, am I --

9    Q    But you talked to police shortly after this happened,

10        right, back in December of 2013, couple days after?

11   A    I would say, yeah, they came to my work maybe a week

12        later or so or maybe.

13   Q    If I told you December 11th, would that sound about

14        right?

15   A    I mean I can't say yes or no.  I don't remember the

16        actual date that they came there but --

17   Q    But that same time frame.

18   A    Yeah.

19   Q    Okay.  And at that point you told the police that you

20        weren't sure which girl said it and you told them it

21        was just something about shooting or killing someone,

22        right?

23   A    Yeah.

24   Q    Okay.  Today you were shown a video of a person that

25        wasn't you, right?

1   A    Correct.

2   Q    Okay.  And on that video you saw that guy take a puff

3        of a cigarette, right?

4   A    Right.

5   Q    And that's how you knew it wasn't you because you

6        don't smoke?

7   A    There were a lot of factors.

8   Q    And the reason you knew it was a cigarette was

9        because you saw that guy take a puff of it, right?

10  A    Right.

11  Q    And when you saw yourself later in that video, that

12       was still just you and the girl, right?

13  A    Correct.

14  Q    Johnny Thao wasn't with you at that point?

15  A    No, just her and I.

16            ATTORNEY WEITZ:  Nothing further.  Thank

17       you.

18            ATTORNEY SCHNEIDER:  Just a few follow-up

19       please.

20            **EXAMINATION OF JARED RANDALL**

21  **BY ATTORNEY SCHNEIDER:**

22  Q    Not often you see a girl fight outside a bar,

23       correct?

24  A    Usually men.

25  Q    So pretty unusual to see girls fighting?

53

```
 1   A    Yeah.

 2   Q    Something that you remembered?

 3   A    Definitely, yeah.

 4   Q    And even after having some drinks you remember seeing

 5        that fight and hearing what you heard?

 6   A    I do, yeah.

 7   Q    And Johnny didn't walk with you through the parking

 8        ramp, correct?

 9   A    Correct, no.

10   Q    But Johnny was there when he helped break up the

11        fight?

12   A    Yes, as well as Jonathon Nielsen, I want to say, his

13        last name.

14   Q    And I think on cross you were asked a question about

15        when you saw the first man who took the puff of

16        cigarettes, and I think you were asked because you

17        saw that --

18             ATTORNEY WEITZ:  Your Honor, I'm going to

19        object as to the form of the question.

20             ATTORNEY SCHNEIDER:  Well I need to direct

21        him somewhat.  I think his answer was cut off by Mr.

22        Weitz, and I'm just going to ask him to finish the

23        answer.

24             ATTORNEY WEITZ:  Okay.

25             THE COURT:  That's what I understood, and
```

54

```
 1          so I'll allow you to sort of set up the question.
 2                    ATTORNEY SCHNEIDER:  Okay.
 3     Q    (BY ATTORNEY SCHNEIDER)  So during cross you were
 4          asked when you saw that first person you saw that
 5          first male take a puff of the cigarette.  Do you
 6          remember that?
 7     A    I do, yes.
 8     Q    And I think you were asked is that why you knew it
 9          wasn't you.
10     A    There was a lot of reasons I knew it wasn't me, but
11          that was a big indication, yes.
12     Q    One, you didn't recognize yourself, correct?
13     A    Not only that, I knew that there was nobody else in
14          there and I saw a bunch of people in the garage at
15          the time.
16     Q    Okay.
17                    ATTORNEY SCHNEIDER:  Nothing further.
18                    THE COURT:  Redirect?
19                    ATTORNEY WEITZ:  Nothing.
20                    THE COURT:  All right.  Ladies and
21          gentlemen of the jury, any questions for
22          consideration?
23                    (No response.)
24                    THE COURT:  All right.  Mr. Randall, thank
25          you, sir.  You are excused.
```

55

1                    THE WITNESS:  Thank you.

2                    ATTORNEY SCHNEIDER:  I would then mark the

3           -- I'm going to let him take it off so I don't do

4           anything, but I'm going to mark the CD we used

5           Exhibit 148.

6                    ATTORNEY VISHNY:  148?

7                    ATTORNEY WEITZ:  No objection.

8                    THE COURT:  148 will be received.

9                    ATTORNEY SCHNEIDER:  I want this thumb

10          drive though.

11                   THE COURT:  So the reference will be that

12          it is the same video as 98; is that correct?

13                   ATTORNEY SCHNEIDER:  Yes.  And then I'm

14          going to call Jonathon Nielsen.

15                   THE COURT:  Sir, if you would please remain

16          standing at the witness stand, the clerk will swear

17          you in.

18                   THE CLERK:  Please raise your right hand.

19                   (Oath administered to witness.)

20                   THE WITNESS:  I do.

21                   THE CLERK:  Please state your full name and

22          spell it for the record please.

23                   THE WITNESS:  Jonathon J-O-N-A-T-H-O-N,

24          middle name is James, J-A-M-E-S, and then Nielsen,

25          N-I-E-L-S-E-N.

56

1                    THE COURT:  Mr. Nielsen, you may be seated.

2               Miss Schneider, your witness.

3          **EXAMINATION OF JONATHON JAMES NIELSEN**

4     **BY ATTORNEY SCHNEIDER:**

5     Q     Good morning, sir.  How old are you?

6     A     28.

7     Q     Where do you -- what city do you currently live in?

8     A     Appleton.

9     Q     And are you currently employed?

10    A     I am.

11    Q     And where are you employed?

12    A     Faith Technologies.

13    Q     Are you familiar, Mr. Nielsen, with downtown Appleton

14          area?

15    A     I am.

16    Q     Do you know someone named Johnny Thao?

17    A     I do.

18    Q     And how do you know Mr. Thao?

19    A     I've worked with Johnny at Plexus.

20    Q     Was that back around the time of 2013?

21    A     Yes, ma'am.

22    Q     Do you know someone named Jared Randall?

23    A     I do.

24    Q     And how do you know Mr. Randall?

25    A     The same.  Worked with him at Plexus.

57

1    Q    I want to direct your attention, Mr. Nielsen, to what
2         would have been Saturday, December 7th into the early
3         Sunday morning hours of December 8th, 2013.  Do you
4         remember being with Johnny or Jared that night?
5    A    I was.
6    Q    And where were you guys?
7    A    Downtown Appleton.
8    Q    Specifically do you remember ever being at a place
9         called Luna?
10   A    Yes, ma'am.
11   Q    Is there anything particular related to Luna that you
12        remember seeing that you later spoke to officers
13        about?
14   A    There was an altercation between two young women.
15   Q    Do you remember if this was close to bar time, bar
16        closing time, I mean?
17   A    Yes, ma'am.
18   Q    So let's back up a little bit from there, Mr.
19        Nielsen.  How did you get to be outside of Luna
20        around that time?
21   A    I actually came down from the second story, ran into
22        Johnny.  I was up there with some other friends.
23        Johnny told me to go wait outside, he was going to
24        finish talking to somebody, something, and he would
25        meet me out there in short order so --

58

1    Q    Okay.  And so just to help the jury understand, Luna
2         Lounge is multilevels?
3    A    Yes, ma'am.
4    Q    Okay.  So there's a bar area and then you go down to
5         a lower bar area; is that correct?
6    A    Yes, ma'am.
7    Q    And then is there even like the dance stage would be
8         further into the bar?
9    A    Correct.
10   Q    And then you talked about being at a second story.
11        Can you describe for them what area that is?
12   A    That would be on the -- I guess the second floor,
13        second level.  As you walked into the bar and headed
14        back towards I guess what would be the dance stage,
15        there was a staircase to your right.  If you took
16        that up, you would reach the second level.
17   Q    Okay.  So there was a whole other bar then up on a
18        second level?
19   A    Correct.
20   Q    So after Johnny said he was going to go get some
21        friends to have you wait outside, did you go
22        outside?
23   A    Yes, ma'am.
24   Q    While you were outside, did Johnny ever come out?
25   A    I do not recall Johnny being out.

59

1    Q    Do you remember seeing Jared at all?

2    A    Yes.

3    Q    Is it possible Johnny was out and you just didn't see

4         him?

5    A    Correct.

6    Q    And if I'm going to approach and just show you an

7         exhibit, Mr. Nielsen, just to kind of help give the

8         jury a frame of reference, do you remember the area

9         where you saw this fight occurring?

10   A    Yes, ma'am.

11   Q    Okay.  So just to help acquaint you, I'm going to

12        show you Exhibit 6.  Already been marked on here at

13        Luna with the area kind of marking the entrance door

14        and exit.  Are you familiar with what's depicted

15        here?

16   A    Yes, ma'am.

17   Q    Using Exhibit 6 then, Mr. Nielsen, where do you see

18        this fight occur?

19   A    Right in here.

20   Q    Okay.  You're pointing to an area where there is a

21        red line already?

22   A    Yes, ma'am.

23   Q    Okay.  When these girls were in this area, were other

24        people around?

25   A    Yes, ma'am.

1    Q    Okay.  Go ahead.  I'll wait for you to take your coat

2         off.  That's okay.

3    A    Thanks.

4    Q    Did other people -- were other people watching?

5    A    Yes, ma'am.

6    Q    From your past experience, pretty unusual to see

7         girls fighting out on the street?

8    A    You could say that, yeah.

9    Q    Okay.  Do you remember anything that distinguishes

10        one girl from the other?

11   A    I guess three years later I can't recall off the top

12        of my head.

13   Q    Okay.  Let me ask you this.  At one point during this

14        did you specifically have more contact with one girl

15        than the other?

16   A    I did.

17   Q    Okay.  So if we use the girl you had contact with as

18        a reference point, and then the other girl, does that

19        make sense?

20   A    Yes, ma'am.

21   Q    Okay.  So when the fight was -- that was going on --

22        because, Mr. Nielsen, you don't know their names,

23        right?

24   A    Correct.

25   Q    When the fight was going on, the girl that you had

61

```
 1         contact with later, what was she doing?
 2    A    She was actually on top of the other girl attacking
 3         her.
 4    Q    Was she upset?
 5    A    She was very upset.
 6    Q    Did you see her before she came to be fighting with
 7         the other girl?
 8    A    I remember glancing at her once inside, not like I
 9         really paid any attention to it.
10    Q    Okay.  So then you see her out on the street?
11    A    Yes, ma'am.
12    Q    And you said she was on top of the other girl?
13    A    Yes, ma'am.
14    Q    Can you describe that a little more for us please?
15    A    The girl she was on top of was basically laying on
16         the sidewalk, face up, trying to protect herself.
17         The other girl was laying pretty much on top of her
18         facing, I guess, same way and then trying to strike
19         her.
20    Q    And was she hitting this other person?
21    A    Yes, ma'am.
22    Q    Do you remember anything that was being said while
23         this was going on?
24    A    I do.
25    Q    What do you remember?
```

62

```
 1   A   The girl who was attacking said to the effect of, he
 2       shot my boyfriend, your boyfriend shot my
 3       boyfriend.
 4   Q   Did that surprise you?
 5   A   Given the fact that it was a fight and that both
 6       girls were extremely emotional at the time, I didn't
 7       give much credence to that given the fact that they
 8       were fighting and that was, I guess, what I was
 9       giving my attention to.
10   Q   Did you hear anything prior to this?
11   A   No, ma'am.
12   Q   During the fight, did anybody try to intervene or get
13       involved?
14   A   There was a gentleman near the beginning of the
15       altercation.
16   Q   And did you see what if anything he did?
17   A   He haphazardly attempted to stop the girl who was
18       attacking to stop, it wasn't a very concerted effort
19       by any means, and that was over pretty quick.
20   Q   Do you remember anything about this male party?
21       Other than that he was a man?
22   A   And I guess more specifically --
23   Q   Do you remember anything about his race or anything
24       he was wearing, if you even know, Mr. Nielsen.
25   A   To the best of my knowledge, I would say that he did
```

63

1              look Asian.  Beyond that, I would be hesitant to draw

2              any conclusions.

3        Q    So you said he -- I think your word was "haphazardly"

4              tried to break up the fight?

5        A    Yes, ma'am.

6        Q    And then just kind of walked away?

7        A    Yes, ma'am.  He didn't walk away, he more or less

8              jogged -- jogged away.

9        Q    And the girls were still fighting?

10       A    Yes, ma'am.

11       Q    Where was your attention focused at that time?

12       A    On the two ladies fighting.

13       Q    Did you really focus on where he went at all?

14       A    I turned around and glanced.  That was the most

15             attention I paid to it.

16       Q    Was -- let me ask you this.  From where you guys

17             were, was he walking towards College Avenue or away

18             from College Avenue?

19       A    Away.

20       Q    One thing, Mr. Nielsen, and it's probably my mistake,

21             just wait until I finish completely so the court

22             reporter doesn't yell at us at some point for talking

23             on top of each other.  Okay?

24       A    Yes, ma'am.

25       Q    Okay.  Thank you.  So then do you and anyone else

1         step in to try to stop the fight?

2    A    Jared and I.

3    Q    Which girl did you then encounter?

4    A    The girl who was doing the attacking or the

5         aggressor.

6    Q    When you were trying to get her -- did you literally

7         have to like pull her off the other girl?

8    A    Yes, ma'am.  I had to restrain her.

9    Q    Was she continuing to kind of fight with you?

10   A    Yes, ma'am.

11   Q    Did that kind of take all of your focus at that

12        time?

13   A    Yes, ma'am.

14   Q    So could you see where Jared was or where the other

15        girl was at all?

16   A    I made sure that Jared got at least a few steps back

17        to clear the altercation, keep them from contacting

18        each other.  Then my focus was on the girl who I have

19        restrained.

20   Q    Was she still upset?

21   A    She was very upset.

22   Q    I'll just ask you, if you had to rate it from your

23        experience seeing people being upset from a one to a

24        ten, where was she?

25   A    She would be near a nine or a ten.  She wasn't

1          thinking coherently at all or logically.

2     Q    That's based on what you saw or what you heard?

3     A    Yes, ma'am.

4     Q    She seemed to be in a rage?

5     A    Yes.

6     Q    Did you try talking to her at all?

7     A    As far as like talking her down from it?

8     Q    Yeah.

9     A    I just kind of let her cool off.  I knew that

10         whatever I said probably wasn't going to be, you

11         know, rationally computed by her, so I just figure

12         restraining her and then letting her calm down at

13         least a little bit on her own would be the best

14         course of action.

15    Q    Ultimately, Mr. Nielsen, do you let go of her?

16    A    I did.

17    Q    Had police arrived?

18    A    Not on the scene, not, you know --

19    Q    Could you hear sirens?

20    A    Oh, yes, ma'am.

21    Q    Did you see where this girl then went?

22    A    Not entirely.  I know that Jared had removed the

23         other girl from the scene and that she was far enough

24         away to avoid any further conflict.

25    Q    So you kind of made sure she didn't go back to the

66

```
 1        direction maybe where Jared was or the other girl

 2        was?

 3   A    Correct.

 4   Q    But other than that you didn't pay attention to where

 5        she went?

 6   A    I know that she went around towards the front of the

 7        building again.  As far as where she went once she

 8        got, I guess, kind of rounded the corner, my

 9        attention then focused back to Jared and what our

10        next course of action should be.

11   Q    Did you see what Jared was doing at that time?

12   A    Jared was -- I know he had walked the other girl off

13        and he was walking back.  I forget how close to me he

14        was at that exact moment.

15   Q    Okay.  Did you follow him or did you stay where you

16        were?

17   A    When he took the other girl off, I remained with the

18        girl who I still had restrained.  I let him walk her

19        off and then come back.  I guess after we had

20        released both -- both girls, that's when we did walk

21        off together.

22   Q    Okay.  So Jared went, and when he came back, the

23        first girl that was getting hit wasn't with him

24        anymore?

25   A    Correct.
```

67

```
1    Q    Do you remember seeing Johnny at all at that point?

2    A    I remember seeing Jocko not Johnny.

3    Q    And Jocko would be another friend of yours?

4    A    Yes.

5    Q    Were there other people besides, now you've mentioned

6         Jocko, so besides the four of you that you had gone

7         out with that night?

8    A    No.

9    Q    Were there other people at the bar that Johnny

10        knew?

11   A    I believe so.

12             ATTORNEY SCHNEIDER:  I don't have any other

13        questions then.

14             THE COURT:  Attorney Weitz.

15             ATTORNEY WEITZ:  Thank you.
```

16             **EXAMINATION OF JONATHON JAMES NIELSEN**

17   **BY ATTORNEY WEITZ:**

```
18   Q    So, Mr. Nielsen, you're outside at the time that this

19        fight breaks out between two girls, right?

20   A    Correct.

21   Q    Okay.  And you had been outside for a little while

22        before that fight waiting for your friend, right?

23   A    Correct.

24   Q    Okay.  So you're standing outside, there is this

25        fight between two girls, and you intervene and try to
```

68

1          -- to break up the fight, right?

2    A     Correct.

3    Q     And you take the one girl off to the side, right?

4    A     Correct.

5    Q     And within moments of that you heard what you believe

6          to be two gunshots, right?

7    A     I -- I honestly could not tell you for certain that

8          they were in fact gunshots.  In my experience with

9          firearms, I did not hear a distinct report from those

10         sounds leading me to believe that they were not in

11         fact gunshots but they were very loud noise.

12   Q     Okay.  But you talked to the police back in December

13         of 2013, right?

14   A     Yes, sir.

15   Q     And this was -- that would have been roughly two days

16         after the incident happened, right?

17   A     Correct.

18   Q     And as you said today, you don't -- this was two

19         years ago, your memory today is probably not as good

20         as it was then, right?

21   A     Correct.

22   Q     Okay.  And when you talked to police back in December

23         of 2013, you told them that within moments of you

24         holding on to the girl you heard two gunshots,

25         right?

69

```
 1   A    I do not have any statement in front of me.

 2   Q    If I showed you a police report, would that help

 3        refresh your recollection?

 4   A    Please.

 5   Q    Okay.  All right.  Mr. Nielsen, I'm going to show you

 6        what's been marked as Exhibit 149.  Do you recognize

 7        your name at the top of that?

 8   A    Yup.

 9   Q    Okay.  And that appears to be a police report,

10        right?

11   A    Yes, sir.

12   Q    Okay.  I'll just let you take a minute and kind of

13        orient yourself with that.

14   A    Okay.

15   Q    And then I'm going to direct your attention to a

16        couple of spots --

17   A    Yup.

18   Q    -- and let you review those.  Okay?  Does that help

19        refresh your recollection?

20   A    Yes, sir.

21   Q    So you told police when they talked to you that you

22        heard two gunshots, right?

23   A    Yes, sir.

24   Q    Okay.  And that was when you were outside --

25   A    Yes.
```

70

1   Q   -- near the fight?  Yes?

2   A   Yes.

3   Q   Okay.

4               ATTORNEY WEITZ:  Nothing further, Your

5       Honor.

6               THE COURT:  Any redirect?

7               ATTORNEY SCHNEIDER:  Yes.

8   **EXAMINATION OF JONATHON JAMES NIELSEN**

9   **BY ATTORNEY SCHNEIDER:**

10  Q   When you heard -- you told them originally you

11      thought it was two gunshots, correct?

12  A   Correct.

13  Q   Now you don't hold that same belief?

14  A   At the time I was questioning whether or not they

15      would be in fact gunshots.  Jared and I had both

16      heard them.  He said that he believed that they were

17      gunshots.

18              ATTORNEY WEITZ:  Your Honor --

19              ATTORNEY SCHNEIDER:  Just --

20              ATTORNEY WEITZ:  I'll withdraw it.

21              THE COURT:  All right.  Do you need the

22      question read back or do you kind of know where you

23      were at?

24              THE WITNESS:  Yeah.  Let's go with the

25      question.

71

```
 1                    THE COURT:  All right.  Could you read the
 2          question back, and then, likewise, Mr. Nielsen's
 3          answer up to that point please.
 4                    (Requested portion read back.)
 5                    ATTORNEY SCHNEIDER:  Go ahead.
 6                    THE COURT:  Go ahead, sir.
 7     A    Jared said he had believed that they were gunshots.
 8          I know for a fact that they were two loud noises.  I
 9          guess between talking between both of us, for the
10          sake of I guess being more specific, I said two
11          gunshots.  I do not recall hearing a distinct report
12          from those two sounds that I'm -- in my experience
13          would indicate a gunshot.
14     Q    You say the word "report"?
15     A    Yes, ma'am.
16     Q    Why do you use that word, Mr. Nielsen?
17     A    Specifically being around guns, hunting a lot,
18          especially with a firearm discharging, you do get a
19          distinct report sound that usually follows a gunshot
20          so --
21     Q    Do you have any military experience?
22     A    I do not have specific military.
23     Q    Have you had experience hunting and with firearms --
24          this is on odd question, but how old do you think you
25          were maybe when you first were around firearms?
```

72

1  A    Probably eight.

2  Q    And hunted here in Wisconsin during our normal

3       hunting seasons?

4  A    Wisconsin, Oklahoma, Arkansas, Texas.

5  Q    Okay.  Do you hunt a variety of game?

6  A    Yes, ma'am.

7  Q    Okay.  And do you have experience not only with

8       hearing shotguns or rifles but with smaller

9       firearms?

10  A   Yes, ma'am.

11  Q   You don't know someone named -- or I'll ask it this

12      way.  Do you know anyone named Paul Lee?

13  A   No, ma'am.

14  Q   Joe Thor?

15  A   No, ma'am.

16  Q   Phong Lee?

17  A   No.

18  Q   Josh Richards?

19  A   No, ma'am.

20  Q   Chong Lee?

21  A   No, ma'am.

22             ATTORNEY SCHNEIDER:  I have nothing

23      further.

24             THE COURT:  Attorney Weitz?

25             ATTORNEY WEITZ:  Nothing further, Your

73

1    Honor.  Thank you.

2              THE COURT:  Ladies and gentlemen of the

3    jury, any questions you wish to submit for

4    consideration?

5              (No response.)

6              THE COURT:  All right.  Mr. Nielsen, thank

7    you for your testimony.

8              THE WITNESS:  Thank you.

9              THE COURT:  Why don't we have counsel just

10   approach for a second.

11             (Bench conference.)

12             THE COURT:  Next witness?

13             ATTORNEY MAIER:  Your Honor, the State

14   calls Dan Tauber.

15             THE COURT:  Sir, if you would come to the

16   witness stand, please remain standing and the clerk

17   will swear you in.

18             (Oath administered to witness.)

19             THE WITNESS:  I do.

20             THE CLERK:  Please state your full name and

21   spell it for the record please.

22             THE WITNESS:  Daniel K. Tauber, T-A-U-B, as

23   in boy, E-R.

24             THE COURT:  Mr. Maier, you'll be

25   questioning; is that correct?

74

1                    ATTORNEY MAIER:  I will.

2                    THE COURT:  All right.  Your witness,

3        sir.

4                    ATTORNEY MAIER:  Thank you.

5              **EXAMINATION OF DANIEL K. TAUBER**

6   **BY ATTORNEY MAIER:**

7   Q    Good morning, Mr. Tauber.

8   A    Good morning.

9   Q    Sir, how are you employed?

10  A    I'm a police officer with the City of Appleton.

11  Q    And do you have a particular rank within that

12       department?

13  A    I'm a sergeant and I'm a detective in ISU, the

14       investigative unit.

15  Q    How long have you worked for the Appleton Police

16       Department?

17  A    Since 1990, so approximately 26 years.

18  Q    I was going to ask if you were gonna make me do the

19       math on that.

20            So do you have prior law enforcement experience

21       before becoming an officer with the Appleton Police

22       Department?

23  A    Yes.  I worked at Kaukauna Police Department prior to

24       that.

25  Q    When you were with the Kaukauna Police Department,

75

```
1          was that in a patrol officer role?
2     A    Yes, sir, it was.
3     Q    At that time in the City of Kaukauna did you
4          investigate crimes as well or simply respond to calls
5          for service?
6     A    Pretty much responded to calls for service.
7     Q    Okay.  When you were hired as an Appleton police
8          officer, you worked as a patrol officer; is that
9          correct?
10    A    Yes.
11    Q    And at some point did you move out of marked squads
12         and traffic stops and do something different with
13         that department prior to becoming a detective?
14    A    Yes.  I was with the sensitive crime unit since 1996
15         until -- from 1996, and then I went -- from that
16         portion I went back to the road for a couple years,
17         went back into the sensitive crime unit in 2007, came
18         back into the detective bureau in 2012.
19    Q    Okay.  And you say "sensitive crimes unit".  You
20         were, at least in the second stretch of that,
21         assigned to work in a school; is that correct?
22    A    Correct.
23    Q    In the first stretch was that the same as well?
24    A    Yes, sir.
25    Q    And in the -- in your role as -- they were called
```

76

1           then a police school liaison officer, correct?

2    A      Yes.

3    Q      And those are officers that are now called school

4           resource officers, correct?

5    A      I believe.

6    Q      So the jury might have heard that other role earlier.

7                In addition to working on issues that happened

8           inside the school, what were some of your

9           responsibilities when you were a police school

10          liaison officer?

11   A      I was responsible for investigating sensitive crimes

12          which would be crimes which would be sexual assault

13          in nature or abuse crimes of children.

14   Q      And then the goal – I'm just trying to move this

15          along – the goal then is you're in a school so if a

16          child is a victim in the school where you're working,

17          you start as the investigator.

18   A      Correct.  Or if I'm assigned to different cases

19          outside the school, correct.

20   Q      And then that's the next question.  You could have

21          been assigned to work maybe an adult sexual assault

22          or something like that, correct?

23   A      Correct.

24   Q      Are you able to estimate the number of crimes that

25          you investigated as a police school liaison officer?

77

```
 1          I'm going to stay with sexual assault with an adult
 2          victim, sexual assault with a child victim, or
 3          physical abuse of a child.  Are you able to estimate
 4          the number in your stint as a PSL?
 5     A    Of each one of those?
 6     Q    Just if -- of that type of case.  I'm not asking you
 7          to say this many of this type, but I don't really
 8          worry too much about the theft from a locker for
 9          example.
10     A    Sure.  I would say hundreds.
11     Q    And those hundreds of investigations of those fairly
12          serious matters involved interviewing witnesses and
13          suspects, correct?
14     A    Correct.
15     Q    Have you received any training specific to
16          interviewing child witnesses?
17     A    I believe I went to StepWise training somewhere in my
18          career.  I don't know exactly what the date of that
19          would be though.
20     Q    Okay.  You've also received some training with regard
21          to interviewing adult suspects?
22     A    I believe so.
23     Q    Okay.  The -- an interview of a child, how is
24          interviewing a child different than interviewing an
25          adult?
```

78

```
 1   A   With a child we try to get an open-ended narration so
 2       that we don't put any bias into the child and give
 3       them any information that might lead them to tell us
 4       something that they're -- based off of what we're
 5       saying to them.
 6   Q   With an adult witness or victim, it's similar, you
 7       want them to tell the story as best they recall,
 8       correct?
 9   A   Correct.
10   Q   If people are uncooperative for whatever reason, what
11       sort of things do you do to get around that with an
12       adult witness or victim?
13   A   Sometimes we might give them some information that
14       will clarify that we know something about the case so
15       that they can see that we have Point A, Point B,
16       Point C, and then I will ask them to provide me with
17       Point D, E and F.
18   Q   And you would try not to do that with a child of
19       course, right?
20   A   Correct.
21   Q   People that are uncooperative, as you mentioned, you
22       -- you can't get anything out of someone so you would
23       give them A, B, C with the goal of getting D, E and
24       F.  Have you had it in your experience where they
25       know A, B and C and simply don't just want to tell
```

79

1          you?

2     A    Yes, sir.

3     Q    And there's a number of reasons that they might have

4          that, correct?

5     A    Correct.

6     Q    Have you spoken with people after they give you D, E

7          and F as you explained it to find out why they didn't

8          tell you A, B and C in the first place?

9     A    Yes, sir, I have.

10    Q    And what are some reasons that people give?

11              ATTORNEY VISHNY:  Object.  Approach the

12         bench.

13              (Bench conference.)

14    Q    (BY ATTORNEY MAIER)  All right.  During your time as

15         an officer both with Kaukauna PD and with Appleton

16         PD, you have to complete ongoing training; is that

17         correct?

18    A    Correct.

19    Q    And the training relates to certain things that

20         aren't necessarily important to today like firearms

21         and vehicle driving, correct?

22    A    Correct.  I've been to training to how to sit in a

23         chair also, which I don't find too useful, but

24         correct.

25    Q    And then things like defense or arrest tactics.  Do

80

1    you have ongoing training with regard to interviewing

2    people?

3  A  I wouldn't say that there is necessarily --

4    throughout the department that there's a set ongoing

5    training with that.  I don't believe so.

6  Q  And there's a -- a set of policies about interviewing

7    people but no set you must follow this template; is

8    that correct?

9  A  Correct.

10  Q  Was that the case with Kaukauna PD as well?

11  A  I believe so.

12  Q  Now I asked you about your -- the time periods that

13    you were a police school liaison.  In your time as a

14    detective with the Appleton Police Department, which

15    was since 20 and when?

16  A  2012.

17  Q  Are you able to estimate the number of witness or

18    victim interviews that you've done?

19  A  I really can't give a number.  A lot, I guess I could

20    say.

21  Q  Okay.  More than a hundred?

22  A  I would say approximately a hundred.

23  Q  We're just talking about the time period from 2012

24    and you're agreeing with that, correct?

25  A  Correct.

81

1    Q    And you would agree with me if I said that how an
2         interview is done, much like how direct examination
3         is done, depends on things like the witness's answers
4         to questions that are asked, right?
5    A    Correct.
6    Q    You may have to have some flexibility about what
7         style you take or what tacts you -- or what paths you
8         follow trying to get where you want to go?
9    A    Correct.
10   Q    Sergeant, I'm going to ask you about an investigation
11        that you became part of that started in the early
12        morning hours of December 8th, 2013.  Did you get
13        called in that early morning to a crime that had been
14        committed downtown in Appleton?
15   A    Yes, sir.  I was called in by Lieutenant Gostisha, my
16        commander, to respond to the Luna Lounge.
17   Q    So you weren't working during the hours that it
18        happened?
19   A    No, I was not.
20   Q    Roughly what time did you arrive at Luna Lounge?
21   A    I want to say within an hour of the incident
22        itself.
23   Q    Okay.  So talking in the neighborhood of 2:00 or so
24        in the morning?
25   A    That the incident happened?

82

1    Q    No.  That you arrived.

2    A    I would say I probably arrived there maybe 2:30 to

3         2:50, somewhere around there.

4    Q    Okay.  What was the weather like that night?

5    A    Extremely cold.

6    Q    And you were outdoors as part of the investigation?

7    A    Yes, sir, I was.

8    Q    What did you do when you arrived on scene?

9    A    I was briefed by Lieutenant Gostisha as to what we

10        had and what he had determined thus far, and I was

11        asked to begin to start to interview witnesses.

12   Q    Among the witnesses that you interviewed at the scene

13        were Dan Kersten -- or was Dan Kersten, correct?

14   A    Yes.

15   Q    And he was a security person or bouncer at the bar?

16   A    That's correct.

17   Q    Did you also interview a person named Michael

18        Verheyden?

19   A    Yes, sir, I did.

20   Q    And he was also present at the bar when the incident

21        occurred, correct?

22   A    Yes, sir.

23   Q    What else did you do besides interview those people

24        and others at the scene?

25   A    I interviewed other people obviously at the scene and

83

1        I also met with detectives on scene and clarified

2        some information that was coming in from other

3        detectives.

4    Q   Now, based on some of that information, did

5        investigators become aware that there might be some

6        areas to search outside of the Luna Lounge?

7    A   Yes, sir, we did.

8    Q   And what was the focus or what -- what area was the

9        focus of that search?

10   A   Based on the information we had obtained we focused

11       towards the west of the Luna Lounge on College Avenue

12       and then towards the north on Division Street.

13   Q   Okay.  And were you part of the group of

14       investigators who searched that area?

15   A   Eventually I was.

16   Q   At some point were some items recovered from the area

17       that you became aware of?

18   A   Yes.  At about the 400 block of North Clark Street

19       there were some dumpsters in that location behind the

20       emergency shelter and there were some items located

21       outside the dumpster and in the dumpster.

22   Q   Sergeant Tauber, what items were recovered from the

23       dumpster?

24   A   From inside the dumpster it would have been a white

25       South Pole vest.

84

1    Q    Okay.  And I'm going to -- and I realize you may need

2         to take a look at this, but this is Exhibit 104, just

3         previously this has been moved into evidence.  Does

4         that appear to be the vest that was recovered from

5         the dumpster?

6    A    Yes, sir, it does.

7    Q    Okay.  Anything else recovered from nearby to the

8         dumpster?

9    A    By a second set of dumpsters outside those dumpsters,

10        in between the dumpsters there was a red baseball hat

11        that was recovered.

12   Q    This is Exhibit 133.  Do you recognize this,

13        Sergeant?

14   A    Yes, sir, I do.

15   Q    And this is the hat that was recovered from that area

16        you just described?

17   A    That's correct.

18   Q    And that was already moved into evidence, 133.

19            At the time that these -- actually, let me ask

20        you this.  The vest you indicated was inside the

21        dumpster?

22   A    Correct.

23   Q    Do you recall if it was right on top or something

24        else?

25   A    No, it was actually shoved down beneath some other

85

1            items inside the dumpster.

2    Q     Did you have any idea if these items, the hat and the

3            vest or anything else had any relevancy at all to the

4            investigation?

5    A     We believed that they might have some relevancy in

6            regards to the investigation based on traffic videos

7            that we had collected where these subjects had ran

8            and also some video that we had recovered from the

9            emergency shelter indicating those subjects that had

10           ran had possibly been in this area where these

11           dumpsters are located.

12   Q     All right.  Sorry about that.

13           Sergeant, I'm going to show you what's been

14           marked Exhibit 150.  Okay?  And this is a photo board

15           with, excuse me, four images displayed on it,

16           correct?

17   A     Correct.

18   Q     And it's 150A at the top, B to the left, C to the

19           right and D to the bottom.  Do you see that?  Can you

20           describe what Item A is in Exhibit 150?

21   A     This would be the dumpster that was located behind

22           the emergency shelter where the white vest was

23           found.

24   Q     And exhibit or Item B from Exhibit 150?

25   A     That's actually a picture inside that dumpster where

1           the white vest is still within the dumpster.

2      Q    Then Exhibit -- Item D is a closer version of that

3           same picture?

4      A    Correct.

5      Q    And then Item C?

6      A    That's when the vest was removed from the dumpster so

7           we could photograph it outside the dumpster.

8      Q    And that's how all these things looked at the time

9           that they were found?

10     A    Correct.

11     Q    Now, it's daylight when these pictures are taken.

12          Was it daylight by the time they were found?

13     A    I believe they were found approximately about 9:40 in

14          the morning.

15     Q    Okay.  Thank you.

16                ATTORNEY MAIER:  I'd move in Exhibit 150 at

17          this time.

18                ATTORNEY VISHNY:  No objection.

19                THE COURT:  150 will be received.

20     Q    (BY ATTORNEY MAIER)  Now I'll show you what's been

21          marked Exhibit 151, a board with three images mounted

22          labeled Items A, B and C.  Can you tell me what Item

23          1 on Exhibit 151 described -- or depicts?  Excuse me.

24     A    This is the second set of dumpsters that would be

25          located a little bit more to the south of that --

87

1          actually southeast of that other dumpster set that we

2          just looked at behind the emergency shelter.  This

3          would be the fence -- fenced in portion from the

4          outside looking at those -- where those dumpsters are

5          enclosed.

6     Q    And Item B?

7     A    That's a little bit more of a close-up of the fenced

8          in portion, and you can see that there is the red hat

9          that's just in between the two dumpsters in the

10         middle of the picture there, right off to the side.

11    Q    And then Item C?

12    A    That's more of a close-up of that hat that we had

13         recovered.

14    Q    And that's the same hat that we talked about earlier

15         today?

16    A    Correct.

17              ATTORNEY MAIER:  I'd move in Exhibit 151 at

18         this time.

19              ATTORNEY VISHNY:  No objection.

20              THE COURT:  151 shall be received.

21    Q    (BY ATTORNEY MAIER)  Sergeant, I want to talk to you

22         about something that -- briefly about something that

23         happened on December 9th of 2013.  Did you and

24         Sergeant John Schira speak with someone named Phong

25         Lee?

88

1    A    Yes, sir, we did.

2    Q    And where did you speak with Mr. Lee?

3    A    Actually, in the courthouse here on the second

4         level.

5    Q    So on the same floor we're on now?

6    A    Correct.

7              ATTORNEY VISHNY:  I'm sorry.  Did you

8         mention the date?

9              ATTORNEY MAIER:  December 9th.

10             ATTORNEY VISHNY:  Yeah.  Okay.

11   Q    (BY ATTORNEY MAIER)  And thinking about that

12        interview with Mr. Lee, how would you characterize

13        his level of cooperation with you?

14   A    In the beginning not very cooperative at all.

15   Q    How did that change as the interview went on?

16   A    After I pointed out -- can I explain a little bit?

17   Q    Sure.

18   A    Okay.  When we first interviewed Mr. Lee, we already

19        had identified video surveillance of him inside Luna

20        Lounge as this incident had occurred.  When we

21        started to interview him in regards to we wanted to

22        talk to him about his whereabouts on the evening

23        before, on the 8th, he denied ever being -- at first,

24        I believe, he said he wasn't at the Luna Lounge

25        during the time that this incident unfolded.  He said

89

```
 1        he had left prior to.  We asked him if there was any
 2        reason that he would have left quickly or anything of
 3        that nature.  He said no, he just walked out and
 4        walked home.  We knew from the video surveillance
 5        that that was not true, so he wasn't really being
 6        cooperative with us at all.
 7   Q    Sure.  And then at that point what did you do?  He's
 8        telling you that he's not at a place you know him to
 9        be, and then he was there but went a different
10        direction you know him to have gone, what did you
11        do?
12   A    We tried to get as much detail from him as possible
13        to see the details he would provide that we could see
14        if he was telling us the truth about some things or
15        if he was lying about things.  Eventually, I do point
16        out some factors that I had in regards to this
17        investigation already to get him to understand that
18        there is more -- more to the story that I already
19        have so he would maybe cooperate with me.
20                   ATTORNEY MAIER:  Your Honor, could we
21        approach?
22                   THE COURT:  You may.
23                   (Bench conference.)
24                   THE COURT:  As it's now been brought to my
25        attention, we're getting at the lunchtime.  Because I
```

90

1          don't want to create an unusual break for the parties

2          for questioning purposes, I am going to have you

3          break right now.

4               One thing I do want you as members of the jury

5          to consider, it does look -- I mean the parties are

6          being as efficient as possible, but it may go into

7          early next week.  With that understanding, what I --

8          and still trying to be as efficient as possible, one

9          option to help reduce going into next week may be to

10         have testimony on Saturday.  And it's just an option,

11         but it's most importantly if it creates a problem for

12         you, then we simply don't even explore that option.

13         So over the lunch hour, if you can just let the

14         bailiff know if you have a commitment or there are

15         things on the weekend, then what it does is it simply

16         resolves that issue and I don't even have to consider

17         it.  Again, we're going to try to get as much done

18         and as quickly as possible, but in the event that we

19         need that option, I just want to see if that's even

20         an option I should even consider.  So if you can let

21         the bailiff know if you have commitments or things

22         that would prevent that from being put on the table,

23         that would be wonderful, and then we can go from

24         there.

25               Please rise for the jury.

91

1              (The jury was escorted out of the

2      courtroom.)

3              THE COURT:  Please be seated.  We had

4      several sidebars.  Some of these I don't recall if

5      I've already addressed them at previous breaking

6      points, but I'll go back and address them.

7              During Stephanie Thao there was a sidebar.

8      There was an allowance for some questioning outside

9      of the presence of the jury and some questioning was

10     subsequently allowed as a byproduct of that.

11             Subsequently there was a sidebar related to a

12     question or series of questions by Attorney Maier,

13     felt that it was beyond the scope of direct.  The

14     court concluded that the defense's questioning of the

15     subject matter of joking opened the door for

16     subsequent questions.  The court did feel that it,

17     likewise, did not necessarily go to state of mind but

18     it was something that a lay person could make

19     observations on so the court permitted those

20     questions.

21             There was subsequently a sidebar during Mr.

22     Tauber's testimony, or Sergeant Tauber's testimony,

23     on relevancy grounds.  The court did sustain that

24     objection.  However, the court further indicated it

25     would give the State a bit of latitude in terms of

92

1        form of questions and so that by and large resolved

2        that issue.

3            I believe those were the only sidebars that were

4        addressed during the morning sessions that I've not

5        already discussed.  Is that your understanding,

6        Attorney Maier?

7                 ATTORNEY MAIER:  Yes.

8                 THE COURT:  Attorney Vishny?

9                 ATTORNEY VISHNY:  Yes.

10                THE COURT:  Okay.  Very good.  Then if

11       everyone could be back and ready by 1:15.

12                (Lunch recess.)

13                THE COURT:  Actually, Sergeant Tauber, if

14       you want to come up right away.  If we haven't

15       mentioned, that's a fresh bottle of water for you.

16                THE WITNESS:  Okay.  Thanks, Judge.

17                (The jury was escorted into the courtroom.)

18                THE COURT:  Please be seated.

19           Mr. Maier, are you prepared to continue with

20       your questioning, sir?

21                ATTORNEY MAIER:  I am.

22   Q   (BY ATTORNEY MAIER)  Sergeant Tauber, I think where

23       we left off, and I'm doing this for my -- I guess for

24       everyone's sake, but for my own, we were talking

25       about interviewing Phong Lee, correct?

1    A    Correct.

2    Q    And that was an interview that was done in this

3         building?

4    A    That's correct.

5    Q    And that was from December 12th of 2013.

6    A    In this building?  No, sir.

7    Q    I'm sorry.  December 9th was done in this building.

8    A    Correct.

9    Q    There was a subsequent interview of Mr. Lee though,

10        correct?

11   A    Correct.

12   Q    On December 12th of 2013 in the afternoon, yourself

13        and Sergeant Chue Thao interviewed Phong Lee,

14        correct?

15   A    That's correct.

16   Q    Where was that interview?

17   A    At his residence on East Street.

18   Q    And that's an Appleton address?

19   A    Correct.

20   Q    South East Street is on the south side, kind of East

21        South River running south?

22   A    Correct.

23   Q    Was that interview recorded?

24   A    Yes, sir, it was.

25   Q    Audio?

94

```
1    A    Correct.

2    Q    Sergeant Tauber, I'm going to -- excuse me.  What I'm

3         going to do is play a few seconds of an audio

4         recording.

5              ATTORNEY MAIER:  For the record, this has

6         been marked 152.

7    Q    You said in the interview with Phong Lee you were

8         with Sergeant Chue Thao?

9    A    Correct.

10   Q    And you recognize his voice if not the voice of Phong

11        Lee?

12   A    Correct.

13             ATTORNEY MAIER:  We're having some issues

14        with the disk, so what I want to do is move on.

15        We'll come back to that interview of Phong Lee.

16   Q    (BY ATTORNEY MAIER)  At some point in the course of

17        the investigation of this fatal shooting at Luna, did

18        you and other investigators go to Milwaukee?

19   A    Yes, sir, we did.

20   Q    Who went with you to Milwaukee?

21   A    Sergeant Meyer.

22   Q    And when you went to Milwaukee, did you go once,

23        twice?

24   A    We went numerous times down to Milwaukee.

25   Q    Okay.  The first time that you went down there, what
```

95

1    was the purpose?

2    A    The first time we went down to Milwaukee was to meet

3         with Alyson Blom.

4    Q    How was it that the investigation led to an interview

5         of Alyson Blom?

6    A    One of the parties that was out with these

7         individuals, Phong Lee, Chong Lee, was a female by

8         the name of Dalinda Gomez.  She had actually called

9         the police department and wanted to talk to a police

10        officer about some information that she had.

11   Q    And then as a result of a conversation with her, the

12        name Alyson Blom became known?

13   A    Correct.

14   Q    Now, Alyson Blom's name had also been provided

15        earlier but people said Alyson Kristy; is that

16        correct?

17   A    Correct.

18   Q    That's the same person?

19   A    Yes, sir, it is.

20   Q    Did you speak with Alyson Blom?

21   A    Yes, sir, I did.

22   Q    Where were you when you spoke with her?

23   A    I spoke with her at her place of employment in the

24        Mayfair Mall, I believe it is, in Milwaukee.  I think

25        the store is called PacSun.

96

1   Q   What time of day was it that you interviewed her?

2   A   I believe it was in the evening about 8:40 at

3       night.

4   Q   When you arrived, was she working then?

5   A   Yes, sir, she was.

6   Q   And did she have to do anything before you were able

7       to speak with her?

8   A   We spoke with her briefly but she had to shut down

9       the store.  I think her store closed at 9:00.  So she

10      asked if she could shut that down and then we spoke

11      to her after that.

12  Q   Where did you -- was this out in a public area or

13      where were you when you spoke?

14  A   Actually on the second floor of the Mayfair Mall,

15      there's some couches out in the general area, and we

16      sat down in some of those couches and chairs and

17      spoke with her there.

18  Q   How would you characterize her level of cooperation

19      as you're interviewing her that -- that evening?

20  A   In the beginning I would say that she didn't want to

21      be involved in it at all and was not very

22      cooperative.  Eventually she became more

23      cooperative.

24  Q   What if anything to your recollection --

25           ATTORNEY VISHNY:  Judge, can we approach

97

1    the bench?

2              THE COURT:  You may.

3              (Bench conference.)

4    Q    (BY ATTORNEY MAIER)  Sergeant Tauber, I think you

5         indicated that Miss Blom's demeanor or level of

6         cooperation changed, I'll say for the better, as the

7         interview went on; is that correct?

8    A    Correct.

9    Q    After interviewing her at the Mayfair Mall that

10        evening, did you and Sergeant Meyer then return to

11        Appleton?

12   A    Yes, sir, we did.

13   Q    And on -- on the trip back did you make contact with

14        Lieutenant Gostisha?

15   A    Yes, sir, I did.

16   Q    And among other things, you made Lieutenant Gostisha

17        aware that the police should be certain to conduct

18        follow-up interviews with those at the bar and focus

19        on -- not just on Paul Lee but others; is that

20        correct?

21   A    Correct.

22             ATTORNEY VISHNY:  We don't need to come up.

23             THE COURT:  Overruled.

24   Q    (BY ATTORNEY MAIER)  Actually, I skipped a spot

25        because of the break, and I apologize for that.

98

1              At the point during this interview with Alyson,
2         you're out in a public area of the mall then?
3    A    That's correct.
4    Q    And the mall itself is open but the store is closed;
5         is that correct?
6    A    That's correct.
7    Q    Anyone could walk past and hear the conversation?
8    A    Yes, sir.
9    Q    She could have gotten up and leave -- and left?
10   A    Yes, sir.
11   Q    How would you describe the tone of the interview,
12        your tone, I should say?
13   A    Very soft and relaxed.
14   Q    Like you are now?
15   A    Yes.
16   Q    Sergeant Thao?
17   A    It was Sergeant Meyer with me.
18   Q    I'm sorry.  Sergeant Meyer.
19   A    Correct.  The same.
20   Q    Did you then make an additional trip to Milwaukee for
21        purposes of interviewing witnesses after further
22        investigation?
23   A    Yes, sir, I did.
24   Q    And -- yes, you did?
25   A    Yes, I did.

99

```
 1   Q    And you spoke with a person named Peter Thao,
 2        correct?
 3   A    Peter Moua.
 4   Q    Peter Moua.  And a person named Kong Vang?
 5   A    Kong Joseph Vang, I believe.
 6   Q    And a person named Keng Vang?  One was known as Jesus
 7        and one was known as Joseph?
 8   A    Correct.
 9   Q    Do you recall them?
10   A    Yes, I -- and I don't know which one is Keng and
11        which one is Kong but one goes by the nickname of
12        Jesus and the other one goes by the first name of
13        Joseph.
14   Q    One you interviewed at his place of business,
15        correct?
16   A    Correct.
17   Q    And the other at his apartment?
18   A    Correct.
19   Q    You interviewed a Dia Vang?
20   A    Correct.
21   Q    And a Xai Thao?
22   A    Correct.
23   Q    Was there anything about those interviews as you
24        think back that was confrontational where you or --
25        Sergeant Meyer with you again?
```

1    A    Correct.

2    Q    That you or Sergeant Meyer would have raised your

3         voice or said anything in more than a conversational

4         tone?

5    A    No, I don't believe we ever raised our voice at all.

6         In some of those interviews we weren't -- in the

7         initial part of those interviews people were denying

8         knowledge of any type of conversation or knowledge

9         that they had known anything about the shooting in

10        the beginning, which some of that we knew to be not

11        true right from the beginning, and I did point out to

12        those people that there were consequences for lying

13        to the police during a homicide investigation.

14   Q    And they all ended up telling you additional

15        information after being confronted with some of this

16        information?

17   A    The ones that were confronted with that information

18        did then provide additional information, correct.

19   Q    Okay.  During a -- one of the trips to Milwaukee,

20        were you able to determine or did you visit a

21        hotel?

22   A    Yes, I did.

23   Q    Not for purposes of staying there?

24   A    No, sir.

25   Q    What was the purpose of going to the hotel?

101

1    A    We had received information during the interviews in

2         Milwaukee on the 17th that Chong Vang had stayed at

3         one of the hotels at that location.

4    Q    Chong Lee?

5    A    Chong Lee.  I'm sorry, Chong Lee.

6    Q    That he stayed at a hotel in the area?

7    A    Correct.

8    Q    What did you do after hearing that from those

9         individuals?

10   A    We responded to that hotel to see if we could get

11        check-in information and also if they had any video

12        surveillance tapes.

13   Q    I'm going to ask you about the receipts first,

14        Sergeant.  I'm going to show you what's been marked

15        as Exhibit 75.  Can you take a look at that and let

16        the jury know if you recognize that item please?

17   A    Yes, sir.

18   Q    What is that?

19   A    This is the check-in bill receipt from the Hotel

20        Hilton located on Port Washington Road under the

21        guest name of Chong Lee for 11/22/13, 2013.

22   Q    And that's the item or a copy of the item that you

23        received from the hotel during the course of the

24        investigation?

25   A    I actually received a different copy with this

102

1             information on it.

2    Q    Okay.  Does that contain this -- this exhibit, does

3         it contain the same information that you received

4         from the hotel?

5    A    The -- the paperwork that I received from the hotel

6         is not this paperwork.  Now, there were other

7         officers that went back on the 19th and obtained

8         other information.  In regards to the CD, that

9         couldn't be presented to me on the 17th, the general

10        manager couldn't print off that CD, so he gave me a

11        photocopy of some of the information, and this must

12        have been on the electronic version or this was

13        picked up on the 19th from a different officer.

14   Q    Okay.  The information that's in Exhibit 75 is

15        consistent with that provided by the manager?

16   A    Correct.

17   Q    And looking at Exhibit 75, it appears to be guest

18        registration information from a Hilton hotel at 4700

19        North Port Washington Road in Milwaukee?

20   A    Correct.

21             ATTORNEY MAIER:  Move in 75 at this time.

22             THE COURT:  Any objection?

23             ATTORNEY VISHNY:  No.

24             THE COURT:  75 will be received.

25   Q    (BY ATTORNEY MAIER)  Exhibit 77, tell the jury what

103

1     that is please.

2  A  This is also check-in information for the individual

3     for Chong Lee for the Hilton hotel located at 4700

4     North Port Washington Road for 12/8/2013 and the

5     check-in time is indicated at 6:43 a.m.  It indicates

6     a walk-in.

7  Q  I'm sorry.  I think you may have just said this but I

8     need to ask you.  What time did that check-in occur

9     in December of 2013?

10  A  6:43 a.m.

11  Q  Okay.  And what is the checkout date?

12  A  The checkout date would be 12/9/2013 at 11:03 a.m.

13             ATTORNEY VISHNY:  I'm sorry, Mr. Maier, can

14     I just take a look at something that you have in your

15     hand?  I apologize.  Judge, can we approach the

16     bench?

17             THE COURT:  You may.

18             (Bench conference.)

19             THE COURT:  Ladies and gentlemen, few items

20     we need to work out as you can tell.  Rather than

21     have you sit in your seats, we'll release you to the

22     jury room for a moment.  Please rise.

23             (The jury was escorted out of the

24     courtroom.)

25             THE COURT:  Are we all set, Mr. Maier?

104

1                    ATTORNEY MAIER:  Yes.

2                    THE COURT:  Attorney Vishny, fine, we're

3        all set?

4                    ATTORNEY VISHNY:  Yup.

5                    (The jury was escorted into the courtroom.)

6                    THE COURT:  Please be seated.

7             Mr. Maier, are you ready to continue, sir?

8                    ATTORNEY MAIER:  I am.  I think the next

9        thing I need to do is move in Exhibit 77 at this

10       time.

11                   THE COURT:  Any objection?

12                   ATTORNEY VISHNY:  I'm sorry?

13                   ATTORNEY MAIER:  Moving in 77.

14                   ATTORNEY VISHNY:  No.

15                   THE COURT:  77 will be received.

16   Q   (BY ATTORNEY MAIER)  Sergeant Tauber, what other

17       requests did you make of the staff at the Hilton on

18       Port Washington Road in Milwaukee?

19   A   I asked if he had checked in there previously, if

20       they could check the name to see if he had checked in

21       previously, and that's when they gave me that other

22       information on the 22nd.  I also asked if they could

23       print off a copy of their video surveillance tapes.

24   Q   Were they able to do that?

25   A   Yes.

105

1    Q    And were you able to view that video?

2    A    I -- I viewed it that day in question when I went

3         down there on the 17th, but they couldn't burn a copy

4         for me.

5    Q    I'm going to show you what has been marked as Exhibit

6         76.  This exhibit has four pages.  Do you see?

7    A    Yes, sir.

8    Q    And I'd ask you to take a look at them and then tell

9         the jury if you're able to what that exhibit is.

10   A    These are four different pictures that they presented

11        -- I should say from the video that I saw indicating

12        the check-in arrival time of 11/22/2013 at 7:16 p.m.

13        And they said that this individual that had checked

14        in at that time or was at the counter at that time

15        should be the individual known as Chong Lee.

16   Q    So that's the check-in video for the -- that

17        corresponds with the November receipt that you

18        received?

19   A    Correct.

20   Q    And that receipt bore the name Chong Lee?

21   A    Yes.

22              ATTORNEY MAIER:  I move Exhibit 76 at this

23        time.

24              ATTORNEY VISHNY:  No objection.

25              THE COURT:  Exhibit 76 will be received.

106

```
1    Q    (BY ATTORNEY MAIER)  Similarly, Exhibit 78?

2    A    This would be the check-in video on 12/8/2013.  The

3         approximate time in the four different pictures would

4         be 6:45:49 a.m.  And they indicated that the

5         individual seen in this footage should be the

6         individual that checked in by the name of Chong

7         Lee.

8    Q    I should have asked this with the last one, but this

9         is a series of screen captures from that video that

10        you viewed?

11   A    Correct.

12             ATTORNEY MAIER:  I'd move in Exhibit 78 at

13        this time.

14             THE COURT:  Any objection?

15             ATTORNEY VISHNY:  78, that and the last

16        one, I think we previously discussed that at sidebar

17        so I understand they're going to be received.

18             THE COURT:  All right.  78 will be

19        received.

20             Would you like the lights down?

21             ATTORNEY MAIER:  Please.

22   Q    (BY ATTORNEY MAIER)  Sergeant Tauber, on the

23        screen - stand in front of you - is -- it's a viewer

24        used to play a video and it's on the jump drive which

25        is marked Exhibit 73.  I realize you may not be able
```

1           to see the letters and numbers in the lower left

2           corner from your distance.  Are you able to read

3           those numbers?

4    A     No, sir, I'm not.  Thanks for pointing that out to

5           me.

6    Q     I'll -- I'll spare you the walk.

7    A     Okay.

8    Q     It indicates 11/22/2013 and says 7:20:14 p.m.  That

9           corresponds roughly with the time on the receipt --

10          the registration receipt that you received,

11          correct --

12   A     Correct.

13   Q     -- for that date.

14   A     Correct.

15   Q     This is consistent with the video that you watched

16          when you were at the Hilton in Milwaukee?

17   A     Correct.

18   Q     Yeah.  This is actually showing 7:20:14 p.m. is the

19          start time.

20               (Video played.)

21               ATTORNEY MAIER:  We played it at -- in a

22          somewhat compressed way to 7:23:33 on November 22nd.

23   Q     (BY ATTORNEY MAIER)  Is that similar to the video

24          that you watched at the hotel?

25   A     Yes, sir.

108

1    Q    All right.  Did I say 7:32?  I meant 7:23:33.

2              While we're confusing that up, Sergeant Tauber,

3         in other investigations, something involving a

4         business, is it common or uncommon now to be able to

5         have them pull up surveillance video like they did at

6         the hotel that day?

7    A    It's very common to have them be able to pull up

8         video surveillance equipment.

9    Q    Businesses are fairly cooperative about doing that?

10   A    Yes, sir.

11   Q    Sergeant Tauber, I'm going to show you the beginning

12        of another video segment from the Hilton hotel on

13        North Port Washington Road in Milwaukee.  This one –

14        and again I'll save you the walk – is December 8th,

15        2013, and the time stamp is 6:45:47 a.m.  Is that

16        consistent with the registration information you

17        received from the hotel about the check-in of Chong

18        Lee on that date?

19   A    Correct.

20   Q    And is this similar in appearance to what you recall

21        when you watched the video provided by the hotel that

22        day?

23   A    Yes, sir, it is.

24   Q    Okay.

25              ATTORNEY MAIER:  I ask you to play that

1      then, Sergeant Rabas.  I'm going to go frame by

2      frame.

3                   (Video played.)

4  Q   We stopped at 6:45:50.  Excuse me.  Again, that's

5      consistent with your recollection of the video you

6      watched?

7  A   Yes, sir, it is.

8                   ATTORNEY MAIER:  I'd move in Exhibit 73 at

9      this time.

10                  THE COURT:  Any objection?

11                  ATTORNEY VISHNY:  No.

12                  THE COURT:  Exhibit 73 will be received.

13              Lights can come back on, Mr. Maier?

14                  ATTORNEY MAIER:  Yes, please.

15 Q   (BY ATTORNEY MAIER)  So in -- in the period after --

16     in the period of this investigation, you're able to

17     determine then that Chong Lee stayed at that Hilton

18     hotel starting in the early morning hours following

19     the fatal shooting at Luna, he at least checked in at

20     that point, correct?

21 A   Correct.

22 Q   Were you able to determine during the course of the

23     investigation anything else that would connect the

24     defendant to the City of Milwaukee?

25 A   Yes.  I -- I -- during -- during that portion of the

110

1          investigation or during the investigation itself?

2     Q    During the investigation itself.

3     A    Yes.  There was also a search warrant that had been

4          done on Chong Lee's residence.  Inside the residence

5          we did locate a receipt for JJ Fish, which is located

6          in Milwaukee.

7     Q    You may not know this, there is more than one JJ's

8          Fish in Milwaukee.

9     A    I went to one that was listed on the receipt.  It's

10         not a place that I typically go.

11    Q    All right.  Detective, I'm going to show you what's

12         been marked Exhibit 79.  Are you able to tell the

13         jury what that is please, sir?

14    A    This is the receipt that was located inside his

15         residence at the time of the search warrant.

16    Q    And the receipt has a logo at the top?

17    A    Yeah.  It has a logo that says JJ Fish & Chicken.

18         The address I believe on the receipt says 1334 35th

19         Street.  The date on the receipt is 12/9/2013 at

20         11:29 a.m.

21    Q    And you indicated this is what was taken from the

22         defendant's house?

23    A    Correct.

24              ATTORNEY MAIER:  I move in Exhibit 79.

25              THE COURT:  Any objection to the receipt of

```
1          Exhibit 79?
2                     ATTORNEY VISHNY:  No.
3                     THE COURT:  79 shall be received.
4     Q    (BY ATTORNEY MAIER)  Back a while?
5     A    Yes, sir.
6     Q    We talked a little bit about an interview that you
7          did with Phong Lee, correct?
8     A    Correct.
9                     ATTORNEY VISHNY:  Now we're going to -- now
10         we have where we were going.
11                    ATTORNEY MAIER:  Yes.  This is 152.
12                    ATTORNEY VISHNY:  Okay.  Exhibit 152.
13                    ATTORNEY MAIER:  Exhibit 152.
14                    ATTORNEY VISHNY:  Okay.
15    Q    (BY ATTORNEY MAIER)  As I mentioned before, Sergeant,
16         what I'm going to do is play a couple seconds of this
17         interview and then ask you a couple questions and
18         then we'll probably play the rest.  Okay?  All right?
19    A    Okay.
20                    (Recording played.)
21    Q    All right.  I started at 7:51 elapsed time and I
22         stopped at 7:57 elapsed time.  Did you recognize the
23         voice on the recording there?
24    A    Yes, sir, I do.
25    Q    And whose voice was that?
```

```
1   A    There is actually two voices, one would be Sergeant

2        Chue Thao, the other voice would be Phong Lee.

3              ATTORNEY MAIER:  Your Honor, I realize the

4        volume is probably not so much the issue as the

5        clarity for this.  What we did was prepare a

6        transcript of this section which is only

7        approximately a minute, and it's two pages long.  We

8        provided them to the defense.  I'd ask to be able to

9        provide it for the jury as well.

10             THE COURT:  Any objection?

11             ATTORNEY VISHNY:  That's fine.

12             THE COURT:  You may do so.

13             (Providing transcript to jury.)

14             ATTORNEY MAIER:  Your Honor, what I'll do

15       is the transcript we'll mark Exhibit 74, at least for

16       identification purposes.

17             ATTORNEY VISHNY:  I'm sorry.  You're

18       marking the transcript what?

19             ATTORNEY MAIER:  No. 74.

20             ATTORNEY VISHNY:  Oh, okay.  So it's an

21       excerpt.

22             ATTORNEY MAIER:  It's a transcript excerpt,

23       yes.

24  Q    (BY ATTORNEY MAIER)  I'll place Exhibit 74 with you,

25       Sergeant.
```

113

```
 1                    (Recording played.)
 2                    ATTORNEY VISHNY:  So has the same number as
 3          the actual recordings?
 4                    ATTORNEY MAIER:  At this point I'd move in
 5          152.
 6                    ATTORNEY VISHNY:  No objection.
 7                    THE COURT:  152 will be received.  And then
 8          I'd ask to have the bailiff collect the transcripts
 9          from the jury please.
10                    THE COURT:  Wendy, would you please collect
11          the transcripts?  Thank you.
12     Q    (BY ATTORNEY MAIER)  Now we listened to about a
13          minute, I guess a minute and six seconds all told,
14          and you could hear Sergeant Thao and Phong Lee
15          talking.  Was the balance of the interview, the seven
16          minutes and 51 seconds before that and whatever was
17          after, similar in tone?
18     A    Yes, sir.
19     Q    Do you recall how long the interview was?
20     A    I believe it was approximately twelve minutes.
21     Q    And after the end of that interview, Mr. Phong Lee
22          left the room and the courthouse, you and Sergeant
23          Thao went on about your business?
24     A    No, sir.  That interview there took place on his
25          front steps at his residence on the 12th.
```

1   Q   I'm sorry.  I keep mixing up those two interviews.

2   A   That's okay.

3   Q   But the result is the same, he went about his

4       business, you went about yours and that was the end

5       of it?

6   A   Yeah.  Sergeant Thao said something to him like do

7       good and he said I will, something to that effect,

8       and I think that's the end of the interview.

9   Q   Okay.  Thank you.

10          ATTORNEY MAIER:  That's all the questions I

11      have for you, Sergeant.  Thank you.

12          THE COURT:  Attorney Vishny, will you be

13      questioning Sergeant Tauber?

14          ATTORNEY VISHNY:  Yes.

15          THE COURT:  Very good.  You may do so

16      whenever you're ready.

17              **EXAMINATION OF DANIEL K. TAUBER**

18  **BY ATTORNEY VISHNY:**

19  Q   Sergeant Tauber, when you were first called to the

20      scene, you interviewed a man named Daniel Kersten,

21      right?

22  A   Correct.

23  Q   And Daniel Kersten was the bouncer at Luna?

24  A   Correct.

25  Q   What you found out from interviewing Daniel Kersten

115

1        was that he was very close to the shooting at the

2        time it happened because he was a bouncer standing at

3        the front door.

4    A   Correct.

5    Q   And that you were able to determine looking at the

6        tape the time of the shooting because Daniel Kersten,

7        the bouncer, turns around and looks the other way

8        immediately, correct?

9    A   At the time that I interviewed Daniel Kersten, I

10       didn't see any tape, ma'am.

11   Q   Okay.  But later on have you seen the tape?

12   A   Yes, ma'am.

13   Q   And basically the time line that's been developed by

14       the Appleton Police Department is that when Daniel

15       Kersten turns his head, that's the exact time of the

16       shooting?

17   A   That would be my understanding that that would be

18       approximately the time of the shooting.

19   Q   And you watched the video and you know then that

20       Daniel Kersten had a view from that place where he

21       was standing to where the shooting occurred

22       immediately after it occurred.

23   A   I don't know exactly what his view would be, ma'am,

24       based on his location.  I don't know if he -- it's

25       very dark in there so I don't know exactly what his

1        view would be.

2    Q   What he told you was that after he had observed the

3        shooting, he specifically focused on some individuals

4        that he wanted to -- that he thought were important,

5        right?

6    A   He focused on one individual that he had pointed out

7        to me that he thought was important.

8    Q   Okay.  And that person was -- he described that

9        person as the second person who went out the door?

10   A   That I can't recall if he said the second person,

11       ma'am.

12   Q   All right.  Can I show you -- I'm going to show you

13       -- I'm going to show you what's been marked as

14       Exhibit No. 153.  Is that a copy of your report

15       regarding your interview with Daniel Kersten?

16   A   Yes, ma'am.

17   Q   Okay.  And why don't you take a minute to read that

18       to refresh your memory.

19   A   (Witness complying.)  Okay.  What my report indicates

20       is that there was a first group of people began

21       running and exiting out toward the door.  He stated

22       there was a second guy who went running out, and it

23       looked like he was taking off his hat, removing his

24       jacket.

25   Q   Quite -- but what he meant by the second guy was the

117

1      second person of the first group that ran out the

2      door?

3   A   He says the first group of people began running and

4      actual exiting out toward the door.  He stated that

5      there was then a second guy.  So I don't know if he's

6      indicating there was a second guy or if he's in that

7      first group.  Do you understand what I mean?

8   Q   Yes.

9   A   Okay.

10  Q   One minute.  Do you think that reviewing the

11     transcript would probably refresh your recollection a

12     little more accurately as to what he said?

13  A   It probably would, ma'am.

14  Q   Okay.  And I'm going to have this marked, then I'm

15     going to show you what's been marked as Exhibit 154.

16     You recorded your interview with Mr. Kersten,

17     right?

18  A   Yes, I did.

19  Q   Just as you review all of your interviews with

20     people, correct?

21         And you just take a look and tell me, or I might

22     as well let you know this has been stipulated to be

23     the transcript.

24  A   Is there a certain portion you want me to --

25  Q   Yes.  Okay.  So can you review the transcript and now

118

```
1          see what exactly Mr. Kersten's word was and read that
2          to the jury?
3     A    Sure.  Ah, soon as I heard that, I looked and I seen
4          those first group of guys go out.  The second guy
5          went running.
6     Q    Go ahead.  Keep going.
7     A    Um, I seen him.  As soon as he got out the door, he
8          started taking his coat off and then, you know,
9          everybody else went out.  Um --
10    Q    Then he starts to talk about something else, going
11         over to attend to the victim, right?
12    A    He goes a little bit more before he says that.  He
13         says, um, just kind of like a bum rush to the door.
14         Everyone -- no one wanted to be there.
15    Q    As you continued to interview, Mr. Kersten again was
16         talking about this group of people who ran out the
17         door to the right.
18    A    Correct, about taking off the jacket, correct.
19    Q    And you asked in particular about the description of
20         the guy who was taking off the jacket, right?
21    A    Correct.
22    Q    All right.  And he talked about - let me just see
23         that - that he thought there was a black shirt
24         underneath the jacket?  Bottom of Page 3.
25    A    Yes.  He says it was just as soon as he was taking it
```

119

1     off it looked like a black shirt underneath it.

2   Q   All right.  And then he told you the group went

3       westbound but also that -- you asked if they went

4       westbound, and he said they separated and went in

5       different directions?  That was what he thought?

6   A   Do you want me to go through the transcript or can I

7       give you --

8   Q   What I'm trying to ask is this.  Did -- and maybe

9       you'll remember this.  I'm really trying to use this

10      to refresh your memory.  But what Mr. Kersten told

11      you was the fellow that he was particularly focused

12      on, the one taking off his jacket, went westbound on

13      College, correct?  If you want to just look at that

14      to refresh your memory.

15  A   What he had told me is that he didn't see the

16      shooting.

17  Q   Right.

18  A   But as -- he saw one individual that went westbound

19      on College and he could see it through the fogged

20      glass of the front door only going to the west, and

21      he said it appeared that subject was taking his

22      jacket off over his shoulder.

23  Q   So he particularly noted that -- who that person was,

24      right?

25  A   He noted that event, correct.

120

```
 1   Q    Okay.  So although he didn't see the shooting, he saw
 2        the immediate aftermath, and for some reason this
 3        second individual caught his attention, right?
 4   A    My only concern that I would add to that, ma'am, is
 5        unbeknownst to me at that time he had viewed the
 6        video surveillance tape.
 7   Q    Right.
 8   A    So I didn't know that.
 9   Q    All right.  Now, the video surveillance tape, you
10        have seen that tape yourself, right?
11   A    Portions of it, ma'am.
12   Q    And it's fair to say that you can't really make out
13        in the video surveillance tape, right -- when you say
14        he viewed the surveillance tape, he had actually
15        viewed the people running out of the door afterwards.
16   A    I don't know which portion.  That was prior to my
17        arrival, so I don't know which portion he viewed.
18   Q    Okay.  But in that portion of the video surveillance
19        tape where people are running out the door, it's hard
20        to make out faces?
21   A    In the portion I viewed?
22   Q    Yes.  It happens right after the shot.
23   A    It's somewhat difficult.
24   Q    Okay.  So when he talked to you, you interviewed him
25        and he was never shown a photo array to try and see
```

121

1          if he could identify the face of the second male that

2          he noticed, right?

3    A     No, ma'am.

4    Q     And he could have been shown a photo array to see

5          whether he could identify the person's face but

6          instead he had looked at the surveillance video and

7          just seen them running out as far as you know?

8    A     I don't know what photo array we would have showed

9          him, ma'am.

10   Q     Eventually Paul Lee became a suspect in this case,

11         right?

12   A     Eventually Paul Lee was considered a suspect in this

13         case, correct.

14   Q     And Joe Thor was considered potentially a suspect?

15   A     Correct.

16   Q     Phong Lee was considered a suspect?

17   A     Correct.

18   Q     Chong Lee was considered a suspect?

19   A     Actually, in the beginning, anybody that had been in

20         the bar or exited out would be considered a

21         suspect.

22   Q     Okay.  So he was never shown a photo array or

23         reinterviewed by the police to determine whether or

24         not he could identify which person he saw taking

25         their jacket off as they ran out the door.

1    A    By the time we identified the person, we also had
2         admissions shortly thereafter from that person that
3         he was the person.
4    Q    Running out the door?
5    A    Correct.
6    Q    So that's why you didn't show him a photo array?
7    A    Well, that's one of the reasons I would not show him
8         a photo array.
9    Q    Now Mr. Kersten was interviewed upstairs, right,
10        pretty quick in time after this happened, correct?
11   A    Like I said, I arrived probably an hour after the
12        incident, and he was like the first person, other
13        than my briefing with Lieutenant Gostisha, that I
14        would have interviewed.
15   Q    Your interview of him took about ten or twelve
16        minutes?
17   A    I would say possibly.
18   Q    And you did not ever attempt to reinterview him to
19        see if he could recall further information getting
20        away from the chaos of Luna that night or having come
21        into the Appleton Police Department for a follow-up
22        interview?
23   A    Did I -- did I have him come back down there?
24   Q    Yes.
25   A    No, ma'am.

123

```
 1   Q    Okay.  You mentioned earlier -- let me just take a
 2        look at my notes on your testimony.
 3             You were talking, and the prosecutor was
 4        questioning you, about the importance of conducting
 5        an interview, that a person -- you can sometimes let
 6        a person know A, B, C so that you can get them to
 7        tell you D, E, F.  I realize this isn't an exact
 8        quote, but I'm trying to paraphrase this.  Is that
 9        accurate?
10   A    Correct.
11   Q    So, for example, if -- if you're talking to somebody
12        and they're denying being in a location and you have
13        a picture of them in that location, that would be an
14        A, B, C that you would want to tell that person,
15        right?
16   A    Not necessarily immediately.
17   Q    Right.  But eventually -- let's put it this way --
18        let's just talk about Phong Lee.  Phong Lee first
19        tells you he's not at Luna when the shooting happens,
20        right?
21   A    Correct.
22   Q    You know it's not true because you have the video
23        showing he is at Luna running out right after the
24        shooting?
25   A    Correct.
```

124

1    Q    So after taking his initial statement then he's shown

2         the picture to confront him that he's not being

3         truthful, right?

4    A    No, ma'am, he was not shown a picture.

5    Q    But he was told that you did have the picture?

6    A    I did explain to him that I had video of him.

7    Q    Right.  And there's clearly nothing wrong with

8         telling the witness, look, we have you on this video

9         so we know you're not telling us the truth, right?

10   A    Correct.

11   Q    And that is different than contaminating an interview

12        by suggesting, look, I believe it's this person and I

13        want you to tell me it's this person who committed

14        the crime.

15   A    Sometimes in an investigation you might give certain

16        details because you don't know all the details and

17        you're trying to get more information from that

18        person.  If you're talking specifically about Phong

19        Lee's interview, is that what we're talking about?

20   Q    Well, I'm asking as a general question now, you have

21        been taught that when you do an interview with

22        somebody it's important not to contaminate an

23        interview, you always have some hold back information

24        that you can later on verify.

25   A    Correct.

125

1   Q   And contaminating an interview occurs when you may
2       give information to a witness that leads the witness
3       to believe that you definitely want a certain answer,
4       right --
5   A   Can you --
6   Q   -- contamination can occur?
7   A   Okay.
8   Q   First of all, contamination is when facts are given
9       to a witness so that they -- their statement becomes
10      not really what they saw but what they believe the
11      police interviewer wants them to say, right?
12  A   It -- yes.  And as I explained with children
13      interviews, you want to make sure that you don't
14      contaminate that based on their -- their youth, their
15      inexperience, their mental capacity, you want to make
16      sure you don't give them information and they develop
17      that information throughout the interview.
18  Q   But not only do you not want to contaminate
19      interviews of children, you don't want to contaminate
20      interviews of adults either?
21  A   Correct.
22  Q   Especially if an adult seems to have some mental
23      limitations, you wouldn't want to contaminate that,
24      right?
25  A   If I knew the adult had mental limitations, correct.

126

```
 1   Q   Because then you could see that they might be more
 2       vulnerable, right?
 3   A   Correct.
 4   Q   And you wouldn't want to contaminate it if somebody
 5       has a low level of education or doesn't seem
 6       particularly intelligent, that also runs a greater
 7       risk if you contaminate an interview?
 8   A   You want to make sure that you can at some point
 9       verify all the information that you have.
10   Q   So the interview that we're seeing that we were
11       playing a couple of pages or a couple minutes of, in
12       that particular interview there is no contamination
13       in that Sergeant Thao is not telling Phong Lee, well,
14       tell us that Chong Lee did it, right?
15   A   He's asking what did Chong say.
16   Q   Right.  So that's an open-ended question and then he
17       gets an answer.
18   A   Correct.
19   Q   He's not saying Chong came and told you he popped
20       him.
21   A   Correct.
22   Q   That would be an example of contaminating?
23   A   Again, unless you have more information that you can
24       verify, if that would be something that you're going
25       to give him that information and have more
```

127

1      verification at a later time.

2    Q  But you would agree with me that if you were to do

3       that, you run a risk of a witness simply repeating

4       back what the witness thinks the police investigator

5       wants to hear.

6    A  That's why verification is so important.

7    Q  Absolutely.  One of the concerns with witnesses is

8       also making threats to witnesses.  Police officers

9       should not make threats to witnesses, correct?

10   A  Depends on what you consider a threat, ma'am.

11   Q  Well, stating to a witness that you could get a

12      search warrant when you can in fact really get a

13      search warrant is simply stating the truth, right?

14   A  Correct.

15   Q  But stating to a witness that you can get a search

16      warrant when you can't get a search warrant, that's

17      more of a threat.

18   A  Or coercion.

19   Q  Coercion.  Maybe I should use the word coercion

20      instead of threat.  Some people do use them

21      synonymously, don't they?

22   A  Maybe.

23   Q  All right.  So you wouldn't say to a witness, I can

24      get a search warrant for your house when you couldn't

25      because that would be coercing a witness

1           improperly?

2     A     Correct.

3     Q     Now, when you -- you talk about when witnesses lie to

4           police.  A little earlier you were testifying about

5           that?

6     A     Yes, ma'am.

7     Q     And we all know that there are consequences for being

8           untruthful to police officers.

9     A     I'd like to think that everybody knows that.  I don't

10          think everybody does, or at least they don't --

11    Q     But there's a law against it and it's called

12          obstructing a police officer, right?

13    A     Correct.

14    Q     And that means if you lie to a police officer and if

15          a prosecutor can charge it and prove beyond a

16          reasonable doubt, that's an offense, that's a

17          criminal offense?

18    A     Correct.

19    Q     But you don't have the power to take people's jobs

20          away.

21    A     I think, ma'am, that if you're talking about

22          specifics, if in an interview --

23    Q     Yes.

24    A     -- if you express to somebody that myself -- I'll use

25          myself as an example.  If I obstructed on my job, I

129

```
 1          could pretty much guarantee you my job would be
 2          gone.
 3     Q    But you're a police officer, and as a police officer
 4          you have other rules and responsibilities other than
 5          employment, correct?
 6     A    I have other --
 7     Q    Look.  As a police officer, you have certain rules
 8          and police regulations and a conduct -- a code of
 9          conduct that as a police officer that you have to
10          follow to keep your job, right?
11     A    Correct.
12     Q    And I as a lawyer, I have certain rules, Miss
13          Schneider has certain rules that we have to follow to
14          keep our law licenses.
15     A    Correct.
16     Q    And they're not necessarily the same rules.
17     A    No, but I think anybody that would be charged with
18          obstructing, and if they do go in a county jail,
19          let's say, and they're gone for a period of time,
20          they will most likely lose their job.
21     Q    That would be speculative on your part to say that
22          about any individual, right?
23     A    Well, I'm a specific individual, I don't know, I'm
24          just using generalities.
25     Q    You weren't the employer of witnesses who you told
```

130

```
1              you could go and potentially interfere with their

2              jobs or they could be fired with jobs they worked so

3              hard to get.  When you told it to those witnesses,

4              you weren't their employer, were you?

5     A        Do you have a specific witness, ma'am?

6     Q        Yeah.  Let's take about Dalinda Guzman.  Her name was

7              mentioned a little bit earlier.  That woman was a

8              teacher in Green Bay, correct?

9     A        Correct.

10    Q        Without getting extensively into what was said by

11             Miss Guzman and by you, at a certain point in the

12             interview it was your opinion that she was

13             withholding some information from you.

14    A        Correct.

15    Q        And you wanted her to give you that information,

16             right?

17    A        Correct.

18    Q        Now, ultimately Miss Guzman did not see the actual

19             shooting, didn't know who the shooter was, correct?

20    A        That's correct.

21    Q        Just to briefly summarize.  And, again, so what you

22             told Miss Guzman was that you could go to the

23             principal of her school and she might lose her job if

24             she didn't tell you everything she knew.

25                   ATTORNEY MAIER:  I'm going to object, Your
```

131

```
1          Honor.  May we approach?
2                   (Bench conference.)
3     Q   (BY ATTORNEY VISHNY)  So just to make things
4          perfectly clear, when you interviewed Miss Guzman, it
5          was your opinion she was omitting some information,
6          correct?
7     A   Correct.
8     Q   And when she was -- when you were talking to her, you
9          were aware she was a teacher, right?
10    A   She brought that up, yes.
11    Q   And so you became aware of that, she was a teacher?
12    A   Um-hum.
13    Q   And what you told her is if she didn't fully give you
14         all the information she had that she could
15         potentially lose her job.
16    A   I don't know if that's the exact words, and if they
17         are, there is more context to it.
18    Q   Well, didn't you tell her that this is the difference
19         between employment and not?
20    A   Can I see the transcript, ma'am?
21    Q   Okay.  That's fine.  Let me go get the real
22         transcript.  Okay.
23                  ATTORNEY VISHNY:  I need No. 91.
24    Q   (BY ATTORNEY VISHNY)  I'm showing you what's been
25         marked as Exhibit No. 155.  This is what's been
```

132

1       agreed as an excerpt of a transcript of you talking

2       to Miss Guzman on the second occasion that you

3       interviewed her.

4    A  This conversation, ma'am, is in regards to preparing

5       her for a phone call.

6    Q  Right.  You prepared her for a phone call and then

7       the conversation shifted from preparing her to a

8       phone call to then you just talking to her about

9       herself, right?

10   A  If this is from the second conversation --

11   Q  Right.

12   A  -- this is prep work to have her place a one-party

13      phone call.

14   Q  Right.  You wanted her to place a one-party phone

15      call so you could listen in to what the other person

16      was saying, correct?

17   A  Correct.

18   Q  And so it's your opinion that when you say to Miss

19      Guzman, what we're doing here is to protect you, and

20      she says, I know and I'm trying, and you say, so, she

21      says, and I'm trying, and you say, this is the

22      difference between employment and not, and she says,

23      yeah, and I am angry, that our -- at this point you

24      had shifted from prepping her for what to say on the

25      phone call to another person to directly talking to

133

```
 1         her about how important this was because you were
 2         trying to protect her and this was the difference
 3         between employment or not, correct?
 4    A    I explained to her that this phone call needs to be
 5         very real and she has to have a lot of emotion
 6         involved in this phone call and that's some of the
 7         prep work.  If you played the entire conversation,
 8         that's some of the prep work in that conversation.
 9    Q    Well I have played the entire conversation, but we're
10         not going to play it for the jury.  So let me just
11         ask you this.
12              Pretty easy to get real emotion out of her
13         because you had already talked to her once and you
14         had in fact threatened that if she didn't tell you
15         everything she knew, you were going to go to her
16         employer, didn't you?
17    A    Ma'am, there was not a threat.
18    Q    You coerced her then, would you prefer to use that
19         word?
20    A    Ma'am, what had happened, there was a conversation
21         that took place with Sergeant Meyer, myself and Miss
22         Guzman.
23    Q    Right.
24    A    During that conversation there is things that we
25         share with her that you have to understand that we
```

134

```
1          entrust you with our most prized possession as a
2          school teacher, things of that nature, saying you
3          didn't come forward with information in regards to a
4          homicide investigation, can you imagine if we went
5          back and told your principal that you did not come
6          forward with information in regards to a homicide
7          investigation, things of that nature were said to
8          her.
9     Q    Okay.  So she could imagine if you went to the
10         principal what would happen is, and then she said,
11         I'm -- I could lose my job.  She was afraid then,
12         right?
13    A    And we explained to her in our situation, we would
14         lose our job.
15    Q    Right.  But I don't want to talk about your
16         situation.  Okay?  What I'm really asking you about
17         is how you interview and interrogate witnesses.  I'm
18         not going to ask you about your situation and your
19         employment.
20    A    But you can't take sections out of the whole context
21         of a conversation.
22    Q    I'm trying to show excerpts for the jury instead of
23         play a three-hour tape so please bear with me, they
24         try to show the essence of things.
25              When you had Dalinda Guzman, it brought her to
```

135

1          the point of tears?

2     A    I believe she was at tears prior to even our

3          conversation, ma'am.  She was very emotional.  She

4          had witnessed a homicide.

5     Q    Right.  And -- the thing that you felt she was

6          omitting was knowing some of the names of the people

7          who had been in the bar that night, right?

8     A    Not that I felt that she omitted.

9     Q    She was omitting that?

10    A    She omitted that information.

11    Q    She didn't actually witness the shooting herself?

12    A    She witnessed the subject go down.

13    Q    Right.  But she didn't know who the shooter was, I

14         mean, just to --

15    A    No, but she witnessed a homicide, ma'am.

16    Q    Nonetheless you thought it appropriate to tell her

17         that you could potentially go to her principal to the

18         extent where she might not be working at a job she

19         had worked so hard to go to college for and get a

20         degree to?

21    A    Again, ma'am, you're taking two conversations and

22         molding them into one.

23    Q    I can get you quotes from the first one if you would

24         like it.

25    A    Sure.

1   Q   Okay.  So I'm going to show you No. 156.  And again,

2       we're not going to go through the whole several

3       hours, so I will just advise you --

4   A   Yup.

5   Q   -- that this is from the first conversation, correct?

6   A   Correct.

7   Q   And at this time you are talking -- it's not you

8       actually, you're present in the room, but Sergeant

9       Meyer is talking to her.

10  A   Probably want to take that out too.  So this is not

11      my conversation.

12  Q   Well, you're there but you're not the person talking,

13      right?

14  A   Correct.

15  Q   It's a joint interview between you, Miss Dalinda

16      Guzman and Mr. Meyer, and you can see that really I'm

17      going to ask you something about the middle of the

18      page, but at the top of the page your name appears so

19      you know you were there?

20  A   No.  I'm present during this conversation.

21  Q   And Sergeant Meyer says, you know, in talking to her,

22      and you made some bad decisions to hang out with

23      people that are involved, um, but again, just try to

24      preserve your job and things, you know, we need to

25      know everything, right?

137

1   A   Correct.  That's what it states.

2   Q   And the reference was that if she didn't tell you

3       everything, her job as a teacher might not be

4       preserved, correct?

5   A   I don't know exactly what Sergeant Meyer's reference

6       is there, but you just read what he said, ma'am.

7   Q   Well you were there in the conversation, you know

8       that this happened, right?

9   A   Ma'am, I just said that's what the transcript says.

10  Q   Okay.  Well not to belabor the point, but showing you

11      what's been marked as Exhibit No. 157, that is a

12      transcript of again the first interview, has nothing

13      to do with setting up a phone call.  Okay?

14  A   Okay.  This is from the first interview.  Okay.

15  Q   That's from the first interview.

16  A   Yup.

17  Q   And Miss Guzman states to you on Page 41, Line 17, I

18      have a job, I work so hard to be a teacher, and you

19      say yup?

20  A   Correct.

21  Q   And she says, and -- and then you say, but that can

22      all be gone inaudible.

23  A   Correct.  So there's more to that statement that I --

24  Q   And then she says, I know, and that's what's so

25      scary, correct?

138

1    A    Correct.

2    Q    All right.  And then you say, you know.  And she

3         says, and I just --

4    A    Yup.

5    Q    And you said, inaudible to be honest with you, he

6         could have made that disappear, right?

7    A    Correct.

8    Q    And she says, I know.  And you say, already for you.

9         And she says, I know.  And then you say, because by

10        not giving us the truth initially when you called him

11        and not telling him, you know, inaudible.

12   A    There's more to that conversation, correct.

13   Q    I understand there is going to be hours more.

14   A    Yup.

15   Q    All right.  And then you -- Sergeant Meyer goes

16        ahead, she says something that's virtually inaudible,

17        I was, and Sergeant Meyer says, you didn't tell us

18        everything, you're withholding, withholding

19        sometimes, it's kind of like just to set it in

20        context, right?

21   A    Um-hum.

22   Q    And then she says, I wasn't withholding, I was just

23        so shocked.

24   A    Correct.

25   Q    And then the conversation goes on to you saying that

139

```
 1         you wanted to -- she should have told you that she
 2         knew the names of some people in the bar, right?
 3    A    Correct.  She should have provided that information.
 4    Q    Should provide the information specifically that was
 5         reference to Phong Lee, just to clear that up.
 6    A    Yup.
 7    Q    So that is a fair summary that you guys are telling
 8         her her job could be gone, right?
 9    A    Again, the -- I'm not going to say that that's a fair
10         summary because it's a large conversation.
11    Q    Okay.  I don't think I'm ever going to get you to
12         agree so we'll move on.
13    A    Okay.
14    Q    Now, moving on from Dalinda Guzman, you interviewed
15         some witnesses in Milwaukee too; is that correct?
16    A    Correct.
17    Q    And you also told a couple of these witnesses in
18         Milwaukee who you believed were withholding
19         information that -- that you also could take some
20         steps to ensure that they might -- that their
21         employment might also be in jeopardy if they didn't
22         tell you the full truth, right?
23    A    I explained to numerous individuals that would lie to
24         us that there are consequences for lying to the
25         police, especially during a homicide investigation.
```

1          It's not like I can just walk away when they lie to
2          me, ma'am, and I know that -- let's say I have them
3          on video and they say they're not there.
4     Q    Right.  So did you tell Peter Moua who was studying
5          radiology in college that something could happen
6          where he wouldn't be able to get his radiology degree
7          anymore at the University of Wisconsin Milwaukee?
8     A    That I don't recall, ma'am.
9     Q    Okay.  Did you -- did you tell another person who was
10         an RN that perhaps if he wasn't completely honest he
11         could be fired for his job as a nurse?
12    A    Not in those terms, ma'am, no.
13    Q    Okay.  But something similar basically?
14    A    I explained in the beginning of that conversation
15         that he's worked very hard, very hard, and he's
16         probably spent -- and I asked him how many years in
17         school, and I said you don't want to get yourself all
18         wrapped up into this, just -- you need to be honest
19         with us and tell us the truth, something to that
20         effect.
21    Q    But it went further when you told people they might
22         lose their jobs over this.
23    A    That conversation I just told you what that was with
24         Xai.
25    Q    All right.  Now, the conversation with Miss Guzman as

141

1         we know was recorded, right?

2    A    Correct.

3    Q    So was the conversation with Xai Thao, the nurse,

4         right?

5    A    Correct.

6    Q    So was the conversation with Peter Moua, the young

7         man studying at the University of Wisconsin, right?

8    A    We --

9    Q    Or at college?

10   A    We believe that was recorded, ma'am.

11   Q    So you believe it's recorded but some kind of mistake

12        happened when logging in recordings at the Appleton

13        Police Department and so if it was recorded, the

14        recording has been lost so of course no one can

15        produce a transcript of it right now, right?

16   A    Correct.

17   Q    I mean it's your policy to record, you certainly

18        intended to record, but some accident occurred with

19        the recorder or with the logging.

20   A    Correct.

21   Q    Okay.  Now, you also in your opinion consider it

22        appropriate when interviewing a witness to advise

23        them that if they don't give you information that

24        they could be charged as party to a crime, correct?

25   A    Not just because they don't give us information,

1    ma'am.

2  Q  Okay.  I'm going to ask you specifically about Phong

3     Lee.  I'm going to show you what was previously

4     marked as Exhibit No. 114.  I hate wearing these.

5           ATTORNEY SCHNEIDER:  Attorney Vishny, can I

6     come up and see that really quick?  I just want to

7     see the cover page.

8           ATTORNEY VISHNY:  All right.

9  Q  (BY ATTORNEY VISHNY)  All right.  Directing your --

10     when you interviewed Phong Lee of course he told you

11     he wasn't there and you -- you knew of course you had

12     video evidence to the contrary, right?

13  A  Correct.

14  Q  So there's a difference between what's called an

15     interview and interrogation, right?  Have you learned

16     that in police training?

17  A  Sometimes an interview can turn into an

18     interrogation.

19  Q  Correct.  And that's what happened with Phong Lee,

20     the interview turned into an interrogation, right?

21  A  Correct.

22  Q  And those are different terms of art and they mean

23     different things in police work?

24  A  Typically, yes.

25  Q  Now you have not gone to the Reid School of

143

1              Interviewing Interrogation?

2      A      I don't believe so.  I think you have my

3              transcript.

4      Q      I have your training records.  I wouldn't ask you

5              that if I didn't know that already.

6      A      Well then you can help me out because after 28 years

7              I might forget.

8      Q      But even though you haven't gone, you know some

9              things that they teach and the difference between

10             interview and interrogation, that's pretty -- that's

11             common knowledge among investigators, right?

12     A      Okay.

13     Q      So when you talked to Phong Lee, basically the

14             interview became an interrogation, correct?

15     A      I would say when he's not presenting us with the

16             information, it does become more of an interrogation,

17             correct.

18     Q      Turning your attention to Page 13, Lines 1 through

19             19.  Okay.  What you said to Mr. Lee -- actually,

20             I -- just to set it in context a little bit.  Mr.

21             Lee, you're telling him you knew he was downtown, you

22             know, you're aware of the clothing that was dumped,

23             and he says, I didn't do nothing though, correct?

24     A      Correct.

25     Q      Mr. Phong Lee says that.  Okay.  So going to the next

```
 1        page --
 2   A    Yup.
 3   Q    -- you -- you say:  I know you didn't but you were
 4        there and I don't want you to get caught up in what's
 5        called party to the crime.  Correct?
 6   A    Correct.
 7   Q    And just for the sake of time, I'm going to skip
 8        down, and you tell him -- well, actually he says, I
 9        didn't do anything, I'm going to paraphrase a little
10        if that's okay, and you say, I know but you were
11        there when it happened, you were there and you know
12        who did it.  You said that to him, right?
13   A    Where are you at, ma'am?
14   Q    Okay.  And he says, I don't know who did it.
15   A    Um-hum.
16   Q    And you say, well it was the guy that ran out with
17        you and I know that.  Okay?  And he says, I ain't --
18        I don't know.  All right?
19   A    Um-hum.
20   Q    And then the next thing you say is, listen, listen,
21        listen to me.  Okay.  The problem is he was looking
22        at the video.  I don't want you to get jammed up for
23        conspiracy, do you understand that, I'm talking about
24        your life right now, we're talking about your life.
25        Actually, I'm not sure it's you who said that.  Yeah,
```

145

1       it is you who said it.  Sorry.  I wasn't sure if it

2       was you or Sergeant Meyer.

3    A  Correct.

4    Q  And then you say to him, okay, you don't want to be

5       in prison for your life.  All right.  Think about

6       this.  This is silly for you.  I just want your help.

7       You tell me what happened.  Not that I'm pretending

8       to have your vocal tone because we know I don't.

9       Okay?  Right?

10   A  Correct.

11   Q  Okay.  Turn to Page 18, Lines 22 to 29.

12          So you're asking some questions about himself,

13      right?  And his answer is no.

14   A  Okay.  Can I explain a little bit of the conversation

15      context or no?

16   Q  You know, you can explain as much as you want to, and

17      I'm sure the District Attorney is going to give you a

18      lot of chance, but I just want to try and get through

19      the questions.

20   A  Okay.

21   Q  Okay?  And what you say to him is, you know, you're

22      again trying to persuade him to give you more

23      information.  I guess I want to use that to explain.

24   A  Um-hum.

25   Q  And what you say to him is, okay, imagine the rest of

146

```
1         your life going there, in other words referring to
2         prison, for this because of this conversation, you
3         can never get this conversation back.
4    A    Correct.
5    Q    And then Sergeant Schira who is with you says, you're
6         getting one shot.  Correct?
7    A    Correct.
8    Q    Page 19, Line 21.  Sergeant Schira says, think about
9         a homicide trial, think about what a jury is going to
10        think of you guys being there when originally not
11        admitting to us the truth, that you run with these
12        guys, that you hide clothing, that's all party to the
13        crime, Phong, and this is homicide, this is not a
14        game.
15   A    Correct.
16   Q    And then you start to say, Phong, this isn't, and
17        Phong says, I know that, man, I'm thinking, man, calm
18        down, dude.  And you say, I know, I'm just trying to
19        help you buddy.
20   A    Correct.
21   Q    Okay.  And just skipping a couple lines just for the
22        sake, Sergeant Schira says, do you want to go down
23        for the rest of your life because of someone else's
24        mistake.  Correct?
25   A    Correct.
```

147

1    Q    All right.  So moving on to Page 32, Lines 26 to 41.

2          You say, do you understand what I'm trying to

3          do.  I don't want you to be party to that.  You got

4          to help me.  Right?

5    A    Correct.

6    Q    And again you're trying to persuade him to give you

7          some information regarding seeing the shooting,

8          correct?

9    A    Correct.

10   Q    He says, I'm already helping you as much as I can.

11         And you say, Phong, this, and there's something

12         inaudible, this inaudible then anything else you've

13         ever had in your life, this is your life.  Phong

14         says, this is whatever to me, I will do whatever.

15         You say, Phong, you're -- no, Phong, your life.

16         Sergeant Schira, don't throw it away, man.  And you

17         don't throw it away, your life, you're 20 something

18         years old, don't throw your life for what.  Right?

19   A    Correct.

20   Q    Now, in terms of who the shooter was, turning to Page

21         21, and I realize this is going backwards in time a

22         little bit, we're going to kind of skip back and

23         forth.  21 Line 41.

24   A    Okay.

25   Q    He tells you -- he claims he doesn't know who the

148

```
 1        shooter is, correct?

 2    A   Correct.

 3    Q   And Sergeant Schira says he's standing right next to

 4        you, correct?

 5    A   Correct.

 6    Q   And he says, I don't know who the shooter is.

 7        Correct?

 8    A   Correct.

 9    Q   Page 47 -- I should have organized this with the

10        other stuff.  I apologize.

11    A   Very busy.

12    Q   I know.  I have this flipped around.  I apologize for

13        that.

14    A   That's okay.

15    Q   Page 47, Line 36.  Again, you're talking to him about

16        some other matters, correct?

17    A   Correct.

18    Q   And then you say this, you're talking -- Line 36.

19        You're talking prison for the rest of your life.

20        It's not worth it, Phong.  Nobody, nobody out there

21        is going to help you as much as I am because I care

22        and you got to believe that, buddy.

23    A   Correct.

24    Q   Okay.  And it would be fair to say that when you talk

25        to people, you weren't yelling at him or anything
```

149

```
 1        like that.
 2   A    No, ma'am.
 3   Q    Okay.  And Page 56, Line 17?
 4   A    Line 17?
 5   Q    Yeah.  Okay.  What you say to him is, well, it can't
 6        be, Phong, you understand your life, man.  And you're
 7        not trying to say it can't be --
 8   A    Correct.
 9   Q    We're not talking -- you're going to look back at
10        this and you're going to look at you, you and I, and
11        if you make a decision right now, may be a bad
12        decision on me.  I'll always be there for you.  If
13        you write me letters from prison, I will write you
14        back.  I guarantee you that because -- and then Phong
15        says, it ain't gonna happen like that.  It ain't
16        gonna happen like that.  And you said, well, I'll
17        tell you what, because I do write people in prison, I
18        go visit people in prison.
19   A    Correct.
20   Q    And he says I don't.  And you say, and everything
21        else because once that decision is made that they
22        want to take that path, there is nothing I can do to
23        stop that train.  Nothing.  He says yup.  And you
24        said, so I always think back to what I did, how did I
25        mess up, how did I not let them see that their life
```

150

```
1          was on the line.  I feel bad about that.  I feel
2          guilty when they -- when they got jammed into
3          something, and I'm just like, excuse my language
4          please, god damn it, if he would have just been
5          honest right from the start, we could have stopped
6          this F-ing train.  I'm not going to overly curse if I
7          can avoid it.  Right?
8     A    Correct.
9     Q    And then Sergeant Schira said, do you understand,
10         Phong, that if I were you, if I were sitting in your
11         chair right now, I'd be extremely scared, I would be
12         because I'd be thinking -- looking, thinking about
13         the rest of my life.  You don't have to be tough or
14         act brave.
15    A    Correct.
16    Q    Okay.  Now -- and you also remember at some point
17         saying to him, and I don't have the right page number
18         here but you can let me know if this sounds familiar
19         to you, knowing that I'm using cut and paste copy,
20         that the hardest part for you was to prove to other
21         people that Phong Lee wasn't a conspiracy or party to
22         the crime.  Right?
23    A    Yes.
24    Q    Now, when one person spontaneously shoots another
25         person without discussing it with other people in
```

151

```
 1         advance, that's not what party to the crime means,
 2         right?
 3    A    In regards to this interview, what I explained to
 4         Phong is that I had told him that I had the entire
 5         scene on video but I did not have audio so I wanted
 6         to make sure that there wasn't a discussion
 7         beforehand, that Phong didn't tell this guy, shoot
 8         him, kill him.  I said to Phong, you didn't pull the
 9         trigger.  He says correct.  I didn't tell nobody
10         nothing.  I said I have to be able to prove that.  So
11         I was bluffing him that I had the entire video on --
12    Q    Right.  Yeah.  You were bluffing him.  I was just
13         going to ask you that.
14    A    Yeah.  Absolutely, ma'am.
15    Q    Now, you also had an interview with an individual by
16         the name of Tom Lee, correct?
17    A    Correct.
18    Q    And that was -- was that on the same date, on
19         December 9th, or was that on the 10th, do you
20         remember?
21    A    I believe Tom Lee would have been on the 10th.
22    Q    Okay.  And at that time do you recall telling Tom Lee
23         you were aware that Tom Lee was also a person who was
24         present at the time of the shooting, correct?
25    A    I believe he had been identified as one of the people
```

152

 1          that came out of the bar then.

 2     Q    He was never a suspect?

 3     A    Again, we were trying to develop exactly who was who,

 4          ma'am, so I can't say that a certain person was not a

 5          suspect, not at that point.

 6     Q    Okay.  What you do know is that Tom Lee, compared to

 7          the other Hmong individuals who were there, is

 8          substantially taller, fair to say?

 9     A    Correct.

10     Q    And unlike the other people, he has long hair, not

11          short hair?

12     A    Correct.

13     Q    Or had long hair at the time?

14     A    I don't know what he has now.

15     Q    Okay.  Now --

16               (Bench conference.)

17               ATTORNEY VISHNY:  Okay.  Let me get this

18          one marked also.

19     Q    (BY ATTORNEY VISHNY)  Now I'm going to come back to

20          Phong Lee in a minute because he was talked to twice,

21          but going in the chronological order of the

22          investigation, I'm showing you what's been marked as

23          Exhibit No. 158, and this is an excerpt from a

24          transcript when you spoke with -- and you were with

25          Sergeant Probst, spoke with Tom Lee briefly in the

1        building here.

2    A   With his attorney.

3    Q   No, that's before -- no, beforehand.  Beforehand.

4        You talked to him alone for a little bit.

5    A   Okay.

6    Q   And, you know, what you said to him during that is

7        you're talking about what happened, you say, and

8        you're part of the group that runs towards that door.

9        You're speaking about the shooting at Luna, right?

10   A   Correct.

11   Q   Mr. Lee says uh-huh.  And you say, you're not coming

12       out of that bar there, you're coming out from where

13       this argument takes place so I want to make sure,

14       Tommy, that you understand that's how close in

15       proximity you are to this whole thing that takes

16       place, and I'm not asking you inaudible, I'm not

17       asking you tell me anything about any of the people

18       who was there, any of your friends, I don't want you

19       to be jammed up in that mess.  Okay?  You understand

20       how close that is, correct?

21   A   Correct.

22   Q   Okay.  And then basically Tom Lee asks to leave,

23       right?

24   A   Yup.

25   Q   And you tell him of course he can leave at any point,

154

1        right?

2    A   Correct.

3    Q   And he -- and I don't want to get any further into

4        the conversation other than to say he left, but later

5        you were able to interview him again?

6    A   Correct.

7    Q   Later that morning.  Okay.

8            Now turning your attention back to the interview

9        of Phong Lee, the second one, this actually occurred

10       on December 12th, right?

11   A   Correct.

12   Q   What happened was you and Sergeant Thao went to Phong

13       Lee's employment which was at a McDonalds to talk to

14       him, right?

15   A   I don't -- I don't recall if that was Sergeant Thao

16       that went to McDonalds with me.

17   Q   With you?  Let me try and pull the report.

18   A   Okay.  I don't --

19   Q   Well, there is two trips to McDonalds actually,

20       aren't there?

21   A   The second trip to McDonalds, later on.

22   Q   I'm not talking about that one.

23   A   So that was Sergeant Thao.  I don't believe that --

24       you mean directly before this interview on the 12th?

25   Q   Yeah.  A little bit before you went to his job and --

155

1    A    Yes.  I don't believe Sergeant Thao was with me.

2    Q    Okay.  That's right.  So -- that's correct.  I -- as

3         I recall -- well, I didn't recall anything.  As I

4         look at your report, you join up with Sergeant Thao

5         later after first going to McDonalds to try to talk

6         to Phong Lee, right?

7    A    Correct.

8    Q    And you go there at about 11:20 in the morning and he

9         tells you he doesn't want to talk to you at work?

10   A    No.  I ask him if there is a different time that he

11        can talk to me, something of that nature.

12   Q    Right.

13   A    Because it was a lunchtime at McDonalds, that's

14        pretty busy.

15   Q    Right.  And so you set up a time where you could go

16        back over there at approximately two p.m.?

17   A    Correct.

18   Q    And at 2:09 p.m., that's when you went to his house,

19        right?

20   A    With -- with Sergeant Thao, correct.

21   Q    With Sergeant Thao.  And at that time -- so it's 2:09

22        p.m., and Chong Lee was already arrested.

23   A    Chong Lee is in custody at that point.

24   Q    Meaning he's under arrest?

25   A    I -- I didn't have dealings with Chong Lee so I can't

156

1       tell you when he was arrested.  I do know that

2       eventually he's placed on a probation hold, ma'am.  I

3       don't know the exact time that he was actually

4       arrested for --

5   Q   Maybe we can stipulate to the time of the arrest if

6       you remember.  It's that morning, I'm just trying to

7       find out the time.

8       So without calling it an arrest or taken into

9       custody but just the fact that police go to his home

10       and remove him from the home, right?

11   A   Correct.

12   Q   And he's not free to leave?

13   A   Correct.

14   Q   He's taken to the Appleton Police Department?

15   A   Correct.

16   Q   And the parties are stipulating that happened at

17       approximately 7:45 in the morning.

18   A   Correct.

19   Q   Right?  And he didn't have the opportunity once he

20       was taken to the Appleton Police Department to

21       converse with any of his friends anymore.

22   A   No, ma'am.

23   Q   Right?  Between that and the time that you talked to

24       Phong Lee at 2:10 in the afternoon.

25   A   Correct.

157

```
1    Q    But certainly Phong Lee got off work and had
2         opportunity to converse with his friends, the four,
3         between the time you told him you wanted to talk to
4         him and the time that he was interviewed at about ten
5         minutes after two.
6              ATTORNEY MAIER:  Your Honor, I have to
7         object.  That calls for speculation.
8              ATTORNEY VISHNY:  Okay.  Let me rephrase
9         that.
10   Q    (BY ATTORNEY VISHNY)  There was nothing that you know
11        of Mr. Phong Lee, he wasn't in custody during that
12        time, right?
13   A    No, ma'am.
14   Q    And you had offered him a ride from McDonalds but he
15        said he was going to get a ride from his dad or some
16        relative, some person was going to give him a ride
17        home?
18   A    That was in the interview here, ma'am, that I offered
19        him a ride to his residence.
20   Q    Okay.
21   A    I don't believe I offered him a ride from McDonalds.
22        I think he said that he would be home at like 2:00.
23        I think his shift got done at 2:00 and we were over
24        there at 2:09.
25              ATTORNEY VISHNY:  I'm going have to look
```

1   for the recording, but he'll look while I'm

2   questioning you.

3 Q (BY ATTORNEY VISHNY)  In any event, Paul Lee had been

4   earlier, and you were aware Paul Lee had been in

5   custody at the Appleton Police Department in

6   connection with this case.

7 A Correct.

8 Q He had been taken into custody the day before on

9   December 11th somewhere in the vicinity of 10:30,

10   11:00, somewhere around there, right?

11 A I don't know the exact time.  You have to remember

12   that I'm coming back from Milwaukee, ma'am.

13 Q Right somewhere around --

14 A Somewhere around that time.

15 Q When you found the information you also learned that

16   he had been talked to and taken into custody at that

17   time.

18 A Correct.

19 Q And Paul Lee was actually released from custody, and

20   you may not know the answer, but he was released from

21   custody on the 12th at about 1:17 p.m.

22 A I don't know that answer, ma'am.  If you're telling

23   me that that's the time, I don't know.

24     ATTORNEY VISHNY:  Stipulate.  The parties

25   stipulate that that's the time.

159

1          So I don't have any questions -- anymore

2      questions at this time.

3              THE COURT:  Any redirect?

4          **EXAMINATION OF DANIEL K. TAUBER**

5  **BY ATTORNEY MAIER**:

6  Q    Sergeant, I'm going to try, I think I'm losing my

7      voice here.

8  A    I have some cough drops if you would like.

9  Q    Believe me, everyone has seen me with the cough

10     drops.  I'm sorry for this.

11         When -- when you talked with Phong, he told you

12     to come back at 2:00 the one time, right?

13 A    That he would be home after 2:00.

14 Q    And when you were there he did willingly talk to

15     you?

16 A    Correct.

17 Q    He willingly talked to you when you spoke with him at

18     the courthouse, correct?

19 A    Correct.

20 Q    During the course of the interviews with Phong, you

21     showed him photos, I believe they would have been

22     still images from the bar -- Luna Lounge video; is

23     that correct?

24 A    Sergeant Schira did, correct.

25 Q    You were there when that happened?

160

1    A    Yes, sir, I was.

2    Q    And he pointed out several people and was actually of

3         some assistance in identifying various people as they

4         were captured leaving the bar that night?

5    A    Actually, I -- he -- he identified people coming into

6         the bar.  We had some pictures of the people coming

7         into the bar.  He was able to identify the people

8         coming into the bar.

9    Q    Fair enough.  And that was of some assistance to you,

10        right?

11   A    Yes, sir, it was.

12   Q    And if not providing the information that was

13        unknown, it may have corroborated information you

14        already had?

15   A    Correct.

16   Q    And those were truthful statements that he made to

17        you?

18   A    Correct.

19   Q    And some of them may have been even after talking as

20        Miss Vishny described, correct?

21   A    Correct.

22   Q    The -- the interview with Miss Guzman where we --

23        there was some cross about it dealing with her job,

24        the information that she first provided you and other

25        investigators was false; is that correct?

```
1    A    Correct.

2    Q    And --

3              ATTORNEY VISHNY:  I object.  She omitted

4         things.  That's different than false information.

5              ATTORNEY MAIER:  I'll withdraw the question

6         and rephrase then.

7              THE COURT:  Please rephrase.  And maybe

8         it's a -- maybe it's a semantics thing.

9    Q    (BY ATTORNEY MAIER)  She left out some information

10        that she knew?

11   A    Correct.

12   Q    And later you were able to validate information she

13        provided?

14   A    Correct.

15   Q    The images that you showed Phong Lee of the people

16        coming into the bar that night, was one of the images

17        captured from the video of the defendant coming into

18        the bar?

19   A    Yes.

20   Q    Was Phong willing to identify him?

21   A    No.  He indicated that he couldn't identify that

22        person and the picture was too blurry.

23   Q    Was there anything about that picture that was

24        different than any of the others?

25   A    No.  It was actually almost better than the other
```

162

```
1         pictures.

2    Q    Thank you.

3              Now there was some talk, and I think it was in

4         the Dalinda Guzman interview, although I may be wrong

5         about that, maybe Phong, about getting one shot to

6         give a statement to officers.  Do you recall that?

7    A    Yes, sir.

8    Q    You want people to provide everything they know the

9         first time you interview them, right --

10   A    Correct.

11   Q    -- to avoid having to have three, four, five

12        interviews with them?

13   A    Correct.

14   Q    And in the end, what do you want out of people that

15        you're interviewing?

16   A    I want to have that they provide me with the truth

17        and that truth can be validated.

18   Q    Did you get that more or less out of the people you

19        spoke with in this case?

20   A    Yes, sir, I did.

21             ATTORNEY VISHNY:  Well, objection.  The

22        truth is going to be determined by the jury, not by a

23        police officer.

24             THE COURT:  Sustained.  I'll order that

25        that question be stricken.  You can rephrase if
```

163

1     necessary.  And the answer will be stricken too.  The

2     jury is to disregard.

3               ATTORNEY MAIER:  I apologize for asking it

4     that way.

5  Q  (BY ATTORNEY MAIER)  There was information provided

6     by witnesses you interviewed that was corroborated by

7     other information as you proceed.

8  A  Correct.

9  Q  Thank you.

10              ATTORNEY MAIER:  That's all the questions I

11    have for you.

12              THE COURT:  Any recross?

13    **EXAMINATION OF DANIEL K. TAUBER**

14    **BY ATTORNEY VISHNY:**

15 Q  We can all agree it's a lot better if you can get a

16    full statement, something everybody knows, the first

17    time you talk to them.

18 A  It would be nice.

19 Q  It would be nice, but given the fact that it doesn't

20    always happen, the purpose of telling somebody that

21    they have one shot isn't really -- you're not saying,

22    you know, it would be really nice if you gave me

23    everything right now so I didn't have to come back

24    and talk to you.  That's not what you said, right?

25 A  Actually, I don't even think I said that.  I think

164

1     that's Sergeant Schira that says that, ma'am.

2  Q  But the interpretation -- or it appeared to me that

3     when Sergeant Schira says you have one shot, that's

4     talked about being coupled with inferences that if

5     somebody doesn't do that one shot, they could go to

6     prison for the rest of their life.

7  A  I don't believe I can answer that question without an

8     explanation to it.  Can I give you an explanation to

9     it?

10 Q  Sure.

11 A  Okay.  When we had this interview with Phong Lee, at

12    the end of it I actually tell him that he's got two

13    hours to contact me back.  I was afraid that other

14    people would start talking, I didn't know what his

15    involvement was in it, and I said call me back in two

16    hours.  And I offered to give him a ride home.  He

17    actually met his father down below, he talked

18    briefly, and he said can I have a little longer, and

19    I said you have two hours to contact me back.

20 Q  But you only have one shot, that wasn't the context.

21 A  Again, you're taking something out of an entire

22    conversation, ma'am, so I can't.

23 Q  Well, when -- all right.  When there had been this

24    earlier talk that I had read to you from Page 13 of

25    about a 50-page typed interview, that wasn't right

165

```
 1          before going down and talking to his father about
 2          call me back in a couple of hours, was it?
 3    A     I don't believe so.
 4    Q     So these discussions about how you could go to prison
 5          and you just had this one shot, that was to make him
 6          believe that if he didn't tell you what you wanted to
 7          know at that time that there could be severe
 8          consequences from him so the one shot is to put
 9          pressure on him, that's the purpose, isn't it?
10    A     It's to express our concern to him that he needs to
11          tell us the truth.
12    Q     Okay.
13                ATTORNEY VISHNY:  Nothing further.
14                THE COURT:  Any questions, Mr. Maier?
15                ATTORNEY MAIER:  Yes.
16          **EXAMINATION OF DANIEL K. TAUBER**
17    **BY ATTORNEY MAIER**:
18    Q     Sergeant Tauber, this wouldn't have been the first
19          time you've had to use several interviews to get
20          people to tell you what they actually know,
21          correct?
22    A     No, sir.
23    Q     Is that especially true for witnesses who might know
24          the party who did the crime?
25    A     Yes.
```

166

```
1                    ATTORNEY MAIER:  Thank you.  That's it.
2                    THE COURT:  Any follow-up, Attorney Vishny?
3                    ATTORNEY VISHNY:  No.
4                    THE COURT:  Ladies and gentlemen of the
5          jury, any questions to submit for consideration?
6                    (No response.)
7                    THE COURT:  Sergeant Tauber, thank you,
8          sir.
9               Can I have counsel approach?
10                   (Bench conference.)
11                   THE COURT:  Logically it makes sense to
12         take a break now rather than get partway into a
13         witness and then break, so we will take our afternoon
14         break at this time.  We'll try to return as close as
15         we can to about quarter to, ten to four.
16              Please rise for the jury.
17                   (The jury was escorted out of the
18         courtroom.)
19                   THE COURT:  Please be seated.
20              And then we have a couple things we need to
21         address before we go to break.  I'll take care of --
22         there were two sidebars.  One related to questions
23         about Sergeant Tauber asking questions to Miss
24         Guzman.  The court indicated that generic questions
25         could be asked but it may open the door on
```

1    cross-examination.  There was a second sidebar

2    related to comments of making the charge go away.

3    The court ordered that that not be referenced.

4         I'll let Attorney Vishny go.

5         ATTORNEY VISHNY:  Well, the -- my concern

6    is just about the things you put on the record, was

7    then once I asked if I had an objection, I said no

8    when we were in court, but I actually had made an

9    objection at the bench to -- this was to the exhibit

10   from the Hilton hotel.  I had -- you know, this was

11   -- this is earlier, and I don't think we put that on

12   the record yet, and so the record is going to read no

13   when in fact I had made an objection, and I just made

14   an error of counsel, so I just want the record to

15   reflect that I had made a sidebar objection and I had

16   misspoken at that time.

17        THE COURT:  That's correct.  I'll attempt

18   to summarize that.  There was some concerns in

19   particular about the November 22nd video and then

20   subsequent photos attached to the same.  I believe

21   the objection was predominantly on relevancy.  The

22   court concluded that there may be some -- it couldn't

23   conclude that it was completely irrelevant, it's

24   total relevancy to the case may be marginal, but did

25   conclude that it did meet the threshold for relevant

168

1     information and so the court did -- the objection was

2     clearly made, the court did overrule that

3     objection.

4          ATTORNEY VISHNY:  Thank you.  All right.

5     So the next thing I want to talk about are two

6     things that came up in the testimony, one of which I

7     didn't say anything about as it occurred.  We can

8     address that first.  Sergeant Tauber talked about Mr.

9     Chong Lee being on probation.  We've had a lot of

10    pretrial litigation.  I'm going to ask the court to

11    have the prosecutor instruct their witnesses that

12    they're not to mention this.

13         I was really surprised that a law enforcement

14    officer who, you know, I don't know if there was a

15    failure to tell him or if he simply forgot.  I did

16    not make an objection at the time for a couple

17    different reasons; one, it came out during my own

18    question; number two, I didn't want to call attention

19    to the jury, I think it would have been much more

20    attention calling; number three, I'm asking the

21    response be stricken from the record but I don't want

22    to do that in front of the jury but I want it to be

23    that counsel can't argue it; number four --

24         ATTORNEY SCHNEIDER:  We'd agree.  I'm not

25    going to.  I think it was a confusion about when was

169

1     he there literally under arrest, brought over here,

2     and I think that's how the answer went.  It would

3     have been better had he just said hold, but he said a

4     probation hold.

5             THE COURT:  It struck me as a caught up in

6     the moment comment, but I don't know that it's so

7     ironic, but my notes, in fact, before this was even

8     mentioned, was reference to probation, ignore, do not

9     highlight.

10            ATTORNEY VISHNY:  Right.

11            THE COURT:  I'm glad we're bringing it up

12    now.  I think that's perfectly appropriate.  I'm

13    going to order that be stricken from the record,

14    Attorney Schneider, that you instruct your

15    officers --

16            ATTORNEY VISHNY:  I'm not trying to suggest

17    there is any malevolent intent part on anybody's

18    part.  These things happen in trial.  I just want to

19    make sure it doesn't happen again.

20            THE COURT:  And that's the context in which

21    I took that.

22            ATTORNEY VISHNY:  The second thing is we

23    are now getting into a part of the trial, and this is

24    going to keep going on, where the police

25    interrogation methods are going to be questioned.

170

1    And police officers, it's their responsibility to

2    interview people and try to find out the truth, and I

3    certainly think it's appropriate for police officers

4    to say we are trying to determine the truth.  That

5    being said, police officers may not comment on what

6    the truth is or is not.  I'm going to try to skirt

7    around this very carefully with my questions, and

8    I'll tell everybody what I'm doing, I'm going to be

9    asking questions that, you know, you did this to

10   further the investigation, instead of this is the

11   truth, so that the various investigators here can

12   answer these questions honestly.  But I am going to

13   ask that the law enforcement officers be instructed

14   and that the State not elicit questions which would

15   give rise to answers where officers would state their

16   opinion as to what was the truth and who was not the

17   truth.  They should say who the suspect is, who they

18   arrested, further investigation, that they wanted to

19   do follow-up, that's all appropriate, but I'm, you

20   know, the court sustained the objection before, I

21   want to make sure it doesn't happen again.

22            ATTORNEY SCHNEIDER:  And I think it might

23   have just been the way it was phrased, but it's

24   difficult because you can point out to them you knew

25   this person lied to you when they said they weren't

171

1    at Luna, right, and you had photos.  So I mean I
2    think it becomes hard when they have something that
3    they've been able to corroborate through other people
4    when we ask them about was that a lie for them to say
5    when they said they were there or they ran this
6    direction, we knew that was the truth.
7            THE COURT:  Right.  And I think it was
8    predominantly -- and as I took it, it was in response
9    to, and I think Attorney Maier had clarified, it
10    wasn't his intention to ask the question the way that
11    he did, but if we can avoid that type of scenario
12    again.
13            ATTORNEY SCHNEIDER:  And it might be that
14    they were able to corroborate it through other
15    information or other materials or facts or items that
16    they gained.
17            ATTORNEY VISHNY:  So all I would ask is
18    that we choose our words carefully.
19        We also have Sergeant Rabas and Sergeant Thao
20    here, they're the court officers, and they and the
21    prosecutors can inform the other law enforcement
22    witnesses that will testify to not do that.  I think
23    it's quite easy to get around this problem by our use
24    of language.
25            THE COURT:  And I would -- I would concur,

172

1          if there can be those instructions, and I see

2          Sergeant Rabas is nodding affirmatively.  Attorney

3          Schneider, Attorney Maier, you're okay with that?

4                    ATTORNEY MAIER:  Okay.

5                    THE COURT:  Take ten minutes from now.  We

6          took a little bit of time.

7                    ATTORNEY VISHNY:  Okay.  Good.

8                    THE COURT:  All right.

9                    (Court in recess.)

10                    (The jury was escorted into the courtroom.)

11                    THE COURT:  Please be seated.

12          Is the State ready with its next witness?

13                    ATTORNEY MAIER:  We are.  Your Honor, the

14          State calls Ryan Zukowski.  What I'm going to ask is

15          he go to the witness stand.  At a certain point I may

16          ask him to come down and work at the media cart or

17          whatever we're calling that now.

18                    THE COURT:  That's fine.

19          Raise your right hand.

20                    (Oath administered to witness.)

21                    THE WITNESS:  Yes, I do.

22                    THE CLERK:  Please state your full name and

23          spell it for the record please.

24                    THE WITNESS:  Ryan Joseph Zukowski,

25          Z-U-K-O-W-S-K-I.

173

1             THE COURT:  Mr. Maier.

2             ATTORNEY MAIER:  Thank you.

3          **EXAMINATION OF RYAN JOSEPH ZUKOWSKI**

4   **BY ATTORNEY MAIER:**

5   Q   Good afternoon.  Mr. Zukowski, how are you employed?

6   A   State trooper, Wisconsin State Patrol.

7   Q   And how long have you worked as a trooper with the

8       Wisconsin State Patrol?

9   A   Nineteen-and-a-half years.

10   Q   Are you -- are you assigned to a particular type of

11       duties with the Wisconsin State Patrol?

12   A   Yes.  I'm assigned the technical reconstruction unit

13       of the Wisconsin State Patrol.  I do crash and crime

14       scene reconstruction work on a full-time basis.

15   Q   Can you briefly go through some of your education and

16       training related to that please.

17   A   Certainly.  I'm a graduate of Ripon College.  I have

18       a Bachelor of Arts degree in Spanish and sociology.

19       I graduated in 1996.  I was hired by the State Patrol

20       that summer.  I've been a trooper ever since.

21          As a trooper I went back to school.  I earned my

22       Master's of Science degree from UW-Platteville in

23       criminal justice administration.  And I'm also an

24       accredited reconstructionist.  I've been doing

25       reconstruction work for the last 17 years for the

1        patrol.

2    Q   Can you -- with reconstructions, and I'm hoping for

3        sort of a summary, what sort of things do you do in

4        the course of your duties?

5    A   Well, the term reconstruction, if we are to look at

6        an incident, for example, the who, what, the where

7        and the when is kind of what incident reporting is.

8        A reconstruction attempts to answer how something

9        occurred.  And then, in certainly the crash

10       reconstruction realm, the next step after that is

11       causation analysis which attempts to answer why.  So

12       in my line of work, on crash related specifically, a

13       lot of the evidence isn't so physical or tangible,

14       it's residual, it's transferred to the roadway.  So

15       we have a lot of experience measuring evidence

16       because that's the way that we in the crash world

17       preserve evidence is identify it, photograph it and

18       then measure it.  And we have various tools that we

19       use to document that as evidence.

20   Q   And some of those measuring tools are very precise;

21       is that correct?

22   A   Absolutely, yes.

23   Q   Because it's important -- I'll use one example that's

24       not related to this case but then get into that.  The

25       debris field, you know, the area where after a motor

175

1   vehicle accident parts and objects are flying off of

2   cars and that sort of thing, it's important to know

3   where those things are in relation to one another in

4   order to help get to the how and then also the

5   causation; is that correct?

6 A That's correct, yes, sir.

7 Q If -- are you able to do a similar type of series of

8   measurements for indoor incidents?

9 A There is certainly an overlap and an application into

10   the more traditional crime scene realm, if you will,

11   and our work group is probably involved -- in any

12   given year about 15 percent of our cases are crime

13   scene related, whether it be arson or shooting or

14   missing person cases, for example.  Because we have

15   that expertise in documenting and preserving crime

16   scenes, we often work with local and state agencies

17   to accomplish that.

18 Q How -- with regard to an indoor crime scene, how do

19   you take the measurements that you're -- that the

20   agency is seeking?  Is it a matter of a measuring

21   tape or something more?

22 A I like to refer to multiple tools that are in our

23   toolbox.  We're pretty fortunate as an agency to have

24   different tools for different types of work.  To

25   measure a specific point in space is easier and it

176

1    can be accomplished with a tape measure.  We could

2    measure, for example, the corner of the table that

3    the prosecution is sitting at.  We could define an

4    origin or a zero point as the corner of the

5    courtroom.  We could measure in one direction, even

6    with the corner, we could come perpendicular off that

7    measurement for another distance.  We could measure

8    the elevation of the corner of that desk and get

9    essentially the three dimensions, the X, the Y and

10   the Z elevation of any given point.

11        Now, the amount of time that it would take for

12   me to string the tape measures, we could also use a

13   laser scanning device and get several million points

14   in that same amount of time.  So it's -- it's a

15   matter of which tool is right for the job.

16   Q   Okay.  And as it relates to this case, the Appleton

17       Police Department asked you to assist with some crime

18       location data collection related to Luna Lounge; is

19       that correct?

20   A   That's correct.

21   Q   Explain to the jury what it was you did related to

22       this case.

23   A   Well, we were contacted, our work unit was contacted

24       in April of last year to assist them in their

25       investigation.  We were informed that this was

177

1       related to a homicide that occurred in December of

2       2013.  We were told that the location of the homicide

3       occurred at the Luna Lounge located at 344 West

4       College Avenue in Appleton, Wisconsin, and the reason

5       that we were being asked to assist them is that the

6       property had new ownership and that they were on the

7       verge of doing a complete overhaul or remodel of that

8       building so we were asked to document and preserve

9       the structure before it was changed.

10  Q   And then you -- you became the trooper out of your

11      group that was assigned to do that task?

12  A   Yes, sir.

13  Q   Okay.  What did you do?

14  A   Well, essentially the right tool for the job that we

15      determined was going to be a three-dimensional laser

16      scanner.

17         On April 23rd in the morningtime myself and my

18      partner, Trooper Jason Schwartz, arrived at the Luna

19      Lounge facility and we began to complete a laser scan

20      of the structure inside and outside.

21  Q   How does the scanner work?

22  A   Well, a scanner, instead of using tape measures, what

23      it's doing is actually using lasers to calculate the

24      distance an object is or a specific point in your

25      environment.  It's also very accurately knowing and

178

1    measuring the angle that that angle -- that that

2    laser left the instrument, and it's also measuring

3    the amount of rotation that the instrument is

4    experience -- is experiencing to calculate that

5    three-dimensional point.  So essentially it is an

6    instrument much like a thick laptop computer that

7    sits on a tripod and it spins around and measures

8    your environment.

9  Q    From that, what kind of diagramming or display

10        results are you able to get?

11  A    Well, laser scanning kind of requires you to navigate

12        through your scene because the -- the laser scanner

13        can only measure what it can see.  For example, if we

14        set it up in my position here, it would certainly

15        measure the box that the jury is sitting in.  It

16        would also measure the table, but I wouldn't be able

17        to capture or measure anything beyond that.  So it

18        kind of requires strategic maneuvering through your

19        scene.  And each position that the scanner is

20        capturing is almost like the piece of a puzzle.  And

21        then at the end of your project, with the help of the

22        computer software, you're kind of putting the pieces

23        of this project together to essentially create a

24        large point cloud project of your scene.

25  Q    And so the more overlap you have, the more detail you

179

1    have, fair to say?

2  A  That's fair, yes.

3  Q  And you're going to have more overlap as a result of

4     more scan from more locations?

5  A  Yes, sir.

6  Q  Did you do that in this case at Luna Lounge?

7  A  Yes.  We captured 42 different scan positions.

8  Q  And from that were able to create some useful

9     compiled information that leads to something of a

10    walk-through of the Luna Lounge?

11 A  Yes.  Once it's brought into the software, you're

12    essentially looking at a three-dimensional model made

13    up of millions of data points, and with the help of

14    the computer and the software, I'm able to actually

15    control a camera view through the three dimensional

16    model.  And I've created an exhibit for you today,

17    yes.

18 Q  Okay.  What -- I guess what I'll ask you to do is

19    step down and come to your laptop here.

20       Now, this is --

21            THE COURT:  Do you want to turn down the

22    lights at some point?

23            ATTORNEY MAIER:  I think turning the lights

24    down is probably a good idea.

25            THE COURT:  Are we okay to do that now?

180

1                    ATTORNEY MAIER:  Please.

2      Q    (BY ATTORNEY MAIER)  This will be an exhibit that's

3           159 that will be a thumb drive with both of these

4           items on them.

5                All right.  Trooper Zukowski, you indicated you

6           were actually able to -- I'm going to stand over here

7           if the court is okay with it.  You're able to create

8           something that amounts to a fly-through.  Is that a

9           fair way of putting it?

10     A    I was kind of thinking on my drive up from Madison

11          that the jury might understand having watched Packer

12          games they have the camera that's on the cable system

13          and some lucky person gets to steer that around

14          during the game.  Well, I essentially get to steer

15          the camera within the software and fly the jury and

16          any viewer through the computer model.

17     Q    And the first one that you created which we'll play

18          now, this is a video file of something you've already

19          done going through the bar; is that correct?

20     A    That's correct.

21     Q    What I'm going to ask you to do is play it, and there

22          may be one or two spots I ask you to stop.

23                    (Video played.)

24     Q    All right.  Trooper, if you could stop right there.

25          You were present at Luna when the scan was done as

1       well?

2   A   April 23rd, 2015, yes.

3   Q   The area where we've stopped, from the viewer's

4       perspective, this is the entranceway into the bar,

5       correct?

6   A   Yes.

7   Q   And to the -- I'll say right and ahead you can see an

8       arched doorway, correct?

9   A   Correct.

10  Q   And a half wall to its right, I'm sorry, to our right

11      as we look at it?

12  A   Yes, sir.

13  Q   Okay.  Could you press play please?

14              (Video played.)

15  Q   All right.  If you could pause it please.

16          Now we've rotated as we moved through that

17      arched doorway.  What is straight ahead of us as we

18      look now?

19  A   This would be the bar area of the Luna Lounge.

20  Q   And the arched doorway from the entranceway into the

21      bar area is to the left, correct, as we look at

22      this?

23  A   Correct.

24  Q   All right.  Thank you.  You can press play again.

25              (Video played.)

182

1    Q    And then if you could pause it again please.

2         Now we've moved past the bar, so -- and moved

3         up, correct?

4    A    Correct.

5    Q    The bar would be down and to the left of our viewing

6         location?

7    A    Yes.

8    Q    What is depicted ahead of us at various levels?

9    A    I think this is best described as the dance area

10        consists of multiple levels and multiple dance

11        platforms.

12   Q    All right.  You can press play.  Thank you.

13              (Video played.)

14   Q    And then if you could pause it again please.

15        Now we're more or less standing in that arched

16        doorway that I mentioned before, correct?

17   A    Correct.

18   Q    And ahead of us -- slightly ahead of us and to the

19        left is the half wall?

20   A    Yes.

21   Q    What's just past the end of the half wall?

22   A    Some stairs that lead down to a restroom area.

23   Q    Okay.  Thank you.  You can press play.

24              (Video played.)

25   Q    Okay.  And at the end there, we sort of flew out

183

1           through the entrance and out onto College Avenue

2           before stopping with an exterior view of the bar,

3           correct?

4       A   Correct.

5       Q   Now, you indicated that this is an animation that was

6           created by taking all of the scanned data at the 42

7           different locations, sort of compiling them into a

8           viewable space, and then, through software means,

9           sort of maneuvering through that space point to

10          point; is that correct?

11      A   That's correct.

12      Q   Are you able to -- excuse me.  Given a particular

13          scan location, are you able to use software to go in

14          and give us an ability to look around and see what

15          the scanner saw?

16      A   Yes.  The software has viewer sharing component to

17          it, some software that allows us to kind of navigate

18          through the scene from the perspective of each

19          scanned position.  It also allows you to take

20          measurements and things like that.

21      Q   Okay.  Could you open that up please?

22      A   (Witness complying.)

23      Q   Now, the screen that's in front of us, the upper

24          right has some green dots, some golden dots and some

25          red dots.  Do you see what I'm talking about?

184

```
 1   A    Yes, I do.

 2   Q    What are -- what is that portion of the screen and

 3        what do those dots signify?

 4   A    I'm going to expand the view of this window.  This

 5        would be an overhead view of the scanned project.

 6        Each of the colored dots represents one of the 42

 7        scan positions in this project.

 8   Q    Okay.  And then what is the meaning of the different

 9        colors?

10   A    There are multiple sensors in a scanner that kind of

11        help the software in the final registration process

12        put all these pieces together, and one of them is an

13        altimeter which senses the change in air pressure.

14        For example, all the green dots, which is a majority

15        of these positions, are generally at what I would

16        describe as the ground level.  You can see some

17        towards the back of the dance floor portion of the

18        building have different colors.  For example, these

19        red dots on the northern extreme of the project would

20        be the highest elevated platforms, the back of the

21        nightclub, and then you have some orange in this

22        intermediate area, which would be, once again, the

23        platforms but at a different elevation than the red,

24        for example.  So the change in color simply denotes a

25        different elevation to the scanner location which
```

185

1          kind of helps in the final registration process.

2      Q   Okay.  Now, each dot is a scanner location, correct?

3      A   Yes.

4      Q   And are you able to show us sort of from the

5          perspective of the scanner if we go to a given

6          scanner or scanned location?

7      A   Yes.  I can simply double click on any scan position

8          and then its view through the scanner will appear in

9          this bottom window.

10     Q   I'd ask you to go to scan location 32 please.

11             Now there's -- Trooper, there is some bullseyes

12         on the screen.  Those are the different locations

13         where you scan from, correct?

14     A   Yes.  I can actually toggle those off, and I will do

15         that so they're not distracting.

16     Q   Thank you.  So this scan location from 32, we're

17         looking towards the entrance at Luna from a location

18         at or inside that arched doorway, correct?

19     A   Correct.

20     Q   That's the doorway between the bar area and the

21         landing and the top of the stairs?

22     A   Yes.

23     Q   So we just rotated to the right and can you see a row

24         of seats and then the bar would be ahead and to the

25         left, correct?

186

1    A    That's correct.

2    Q    All right.  If you could rotate back, this is the

3         half wall that we've mentioned, it's in the center of

4         the screen, correct?

5    A    Correct.

6    Q    And then just past the half wall is the steps that go

7         down to the bathroom?

8    A    Yes.

9    Q    All right.  If you could go to, I think it's No. 33,

10        it's the next one to the south.

11   A    (Witness complying.)

12   Q    Yes.  Thank you.

13            Now, again, we're looking towards the entrance.

14        If you rotate to the left, and I think you're going

15        to have to look down a little bit also, we've got the

16        half wall visible as well as the top of the staircase

17        which goes down to the bathrooms, correct?

18   A    Correct.

19   Q    You've learned through your -- the course of this

20        assignment that this is more or less the location

21        that this fatal shooting happened, correct?

22   A    That's correct.

23   Q    Are you able to tell me, excuse me, what the length

24        of that half wall is?

25   A    Yes.  In this software there is a measurement tool,

187

1          and even though the image on the screen that has the

2          appearance of a photograph, there is actually

3          measured data points behind it, so I can simply use

4          this tool to get an approximate distance from two

5          points or more in the project.

6     Q    And I know from using this software that the number

7          you're going to get is in a very small balloon.  Are

8          you able to read what that says?

9     A    It's reading 7.176 feet, so approximately seven feet

10         long.

11    Q    Okay.  And then could you give me a distance then for

12         how wide the opening is to the staircase?

13    A    It's reading 4.143 feet, so approximately four

14         feet.

15    Q    Okay.  And then how wide is the -- is the arched

16         doorway?

17    A    It's reporting 5.073 feet, so approximately five

18         feet.

19    Q    Okay.  Can you go back out then to the overview?

20         We're going to go to a different location.  The

21         location which is to the sort of seven or 8:00

22         position from the last one, which I think might be

23         34; is that correct?

24    A    Yes.  Scan No. 34.

25    Q    All right.  If you could open that one up to the

1           screen please.

2       A   (Witness complying.)

3       Q   With this view are you able to tell the distance from

4           the half wall to the wall that's opposite to it,

5           which would be the left for us?

6       A   It might be easier if we go back to the overview, the

7           birds eye view.

8       Q   That's fine.

9       A   I think that might be easier.  So these measurement

10          tools actually carry over to the overview map view of

11          the scene.  So you're talking about the half wall

12          here on the right edge of the screen to essentially

13          the parallel well, the left?

14      Q   Please.

15      A   It's reporting 15.99 feet, so approximately 16

16          feet.

17      Q   And then one more distance, which I think probably is

18          easiest from here as well, is from the arched

19          doorway, which would actually be scanner location 32,

20          down to the parallel wall which would lead down into

21          the steps.

22      A   It's reporting 11.75 feet.

23      Q   All right.  Trooper Zukowski, if you could go back

24          to, I think it's 32, are you able to tell me --

25          actually, if you rotate to the right please.

189

```
1    A    (Witness complying.)

2    Q    Can you give me a distance on the screen from the end

3         of the half wall to the front door at the Luna

4         Lounge?

5    A    It's reporting 29.778 feet, so approximately 30

6         feet.

7    Q    Okay.  And then from the entrance -- and I realize

8         you can't get exactly into that arched doorway

9         because that's where the scanner is, but as close to

10        that point as you could.

11   A    That is also reporting 30.359 feet, so approximately

12        30 feet as well.

13   Q    All right.  If you could go back out to the overview

14        diagram pleas?

15   A    (Witness complying.)

16   Q    There's a scan location which is -- I'm actually --

17        what I'm going to do is point at it because I can't

18        remember what number it is.  I think it's 36 maybe.

19        This one.  36.  Could you go to that perspective,

20        please.

21   A    (Witness complying.)

22   Q    It's showing us -- you're showing us the entrance.

23        Can you swing it around so we can see towards that

24        half wall?

25   A    (Witness complying.)
```

1    Q    This would be -- this would be the view -- if it was
2         unobstructed by people, it would be the view someone
3         would have when they walked into the bar and looked
4         towards the bathroom staircase, correct?
5    A    Walked into the establishment, yes.
6    Q    Okay.  Can you -- and I don't know if maybe -- I
7         don't know if this is the best view for it, but can
8         we go back out to maybe 33 and measure how tall the
9         half wall is?
10   A    43.760 (sic) feet.
11                  ATTORNEY VISHNY:  I'm sorry?
12                  ATTORNEY MAIER:  3.760.
13                  ATTORNEY VISHNY:  3.760.  I misheard him.
14   Q    (BY ATTORNEY MAIER)  Trooper, I just have a couple
15        more questions for you and then we'll see if the
16        defense has anything to ask you, but you did these
17        measurements in April of 2015; is that correct?
18   A    Yes.
19   Q    I think you said April 23rd?
20   A    Correct.
21   Q    There's some equipment that's visible as we look --
22        in fact actually in this one if you rotate to the
23        left you can see a big edge, actually, I guess with a
24        big floor dryer, there is some what looks like maybe
25        carpet stacked up which the scanner picked up, you

191

1       have no idea -- this is because of the status of the

2       building, correct?

3    A  In fact, by that afternoon, there were workers that

4       were beginning the demolition process, so we were

5       just able to complete our work before that started.

6    Q  Okay.  Sorry.  I was sitting at the table about to

7       talk to your back.

8           When you -- when you did the scan, it was -- it

9       was daylight outside; is that correct?

10   A  Correct.

11   Q  Does the scanner care whether it's light or dark

12      out?

13   A  It really doesn't.  In fact, that's why it appears in

14      black and white.  The interior of that building is

15      rather dark, and there wasn't much in terms of

16      ambient lighting on the inside, so the scanner did

17      not take photographs and apply any color to the data

18      that you see simply because there was insufficient

19      lighting to do that.  So the reason it is recording

20      or displaying in black and white is that the laser,

21      in addition to measuring the three-dimensional

22      position of all these points, it also assigned a gray

23      scale value based on the intensity of the signal

24      coming back to it.  So that's why even a very low

25      light or even dark conditions the laser scanner can

192

1          create data that allows you to discern objects within

2          the environment.

3    Q    It has something to be way beyond the capacity of

4          human eyesight, correct?

5    A    That's true.

6    Q    All right, Trooper, if you could go back to the

7          overview.

8    A    (Witness complying.)

9    Q    There's a view which I'm getting is 31 which is to

10         the north.  And in fact that -- if you go up one

11         more, is that 30?

12   A    Correct.

13   Q    Could you show us 30 and then spin us so that we're

14         facing towards the south, we're looking towards the

15         arched doorway?

16   A    (Witness complying.)

17   Q    This is the perspective a person would have from --

18         from that location, which is near the north end of

19         the bar; is that correct?

20   A    That's correct.

21   Q    Okay.  Can you go back out and then show us the next

22         spot to the south which would be 31?

23   A    (Witness complying.)

24   Q    This is somewhat, if you rotate to the right, who

25         sitting -- standing at the very southern end of the

193

1    bar, almost into the doorway, correct?

2  A    Correct.

3  Q    And there's a sheet of drywall or acoustic tile or

4        something there?

5  A    Yes.

6  Q    That person can see the half wall now, right?

7  A    Yes.

8  Q    And the opening to the staircase as well as at an

9        angle to the right toward that front entrance,

10       correct?

11 A    Correct.

12 Q    Okay.  Could you go down to 32 one more time please.

13 A    (Witness complying.)

14 Q    Now this is standing -- the scanner is set up in the

15       doorway --

16 A    Yes, it is.

17 Q    -- correct?  And your -- at that point the

18       perspective is about seven feet, maybe seven feet

19       from the end of the half wall --

20 A    I would agree.

21 Q    -- based on the prior measurement that we took.

22 A    Correct.

23 Q    So basically slightly or a little more than an

24       average height person is the distance from where

25       we're standing here for the scanner and the end of

194

1        the half wall.

2    A   I would agree, yes.

3    Q   Could you turn just a bit to the right again then.

4    A   (Witness complying.)

5    Q   Thank you.  And now we're -- we're 30 feet either

6        from the end of the half wall or from the doorway to

7        the doors to go outside onto College Avenue?

8    A   Correct.

9    Q   Correct?  This is among the types of work that you

10       can do with the scanner, but you can also create just

11       two-dimensional diagrams with floor plans and that

12       sort of thing based on the measurements, correct?

13   A   Definitely, yes.

14   Q   And were you able to do that in this case for the --

15       more or less from where the scanner is to the

16       entrance?

17   A   Yes.

18   Q   And it's larger, but Exhibit 2 would have been one of

19       the diagrams that you were able to create?

20   A   That's correct.

21   Q   As well as Exhibit 1 --

22   A   That's correct.

23   Q   -- correct?

24          So these -- these diagrams, one and two, are the

25       same scale as -- they're built to the same scale,

195

1        correct?

2    A   Correct.  They were created from the scanner data but

3        simply represented in a two-dimensional overview in

4        those exhibits.

5    Q   I'm glad you answered it that way.  It was a terrible

6        question from what I really wanted you to say so I

7        appreciate that.

8            ATTORNEY MAIER:  Thank you, sir.  That's

9        all the questions I have, Your Honor.

10           THE COURT:  Any cross-examination?

11           ATTORNEY WEITZ:  Just very briefly.

12   **EXAMINATION OF RYAN JOSEPH ZUKOWSKI**

13   **BY ATTORNEY WEITZ:**

14   Q   Trooper Zukowski, so you went in April of 2015,

15       correct?

16   A   Correct.

17   Q   And you were able to observe the lighting conditions

18       then that you were testifying about earlier?

19   A   Yes.

20   Q   Okay.  There were some lights in the place, wasn't

21       there, actually lights in this place that turn on?

22   A   I imagine there's lights that turn on, yes.

23   Q   Okay.  For the people to do the demolition work that

24       you were talking about?

25   A   Correct.

196

1   Q    Or you to do your work?

2   A    Correct.

3   Q    Okay.  But you don't know what the lighting

4        conditions were in December of 2013?

5   A    I do not.

6   Q    In addition to the carpets we referenced earlier,

7        which are -- clearly appear to be part of that

8        demolition that you referenced, there are some other

9        objects there as well.  You don't know whether those

10       were there in December of 2013 either?

11  A    I do not.  In fact, when I created the fly-through

12       animation, I was actually able to cut out of the

13       point cloud that -- that information or those objects

14       because I wasn't sure if they were there at the

15       time.

16                 ATTORNEY WEITZ:  Okay.  Nothing further.

17                 THE COURT:  And, ladies and gentlemen of

18       the jury, any questions you wish to submit for

19       consideration?

20                 (No response.)

21                 THE COURT:  Very good.  Thank you.  You are

22       excused.

23                 ATTORNEY MAIER:  Your Honor, I would move

24       in Exhibit 159 at this point.

25                 THE COURT:  Any objection?

197

```
 1                    ATTORNEY WEITZ:  No.

 2                    THE COURT:  159 will be received.

 3                    ATTORNEY SCHNEIDER:  One second.  We might

 4          be switching a witness.

 5                    THE COURT:  Not a problem.

 6                    ATTORNEY MAIER:  Your Honor, the State

 7          calls Lisa Stutzman.

 8                    ATTORNEY VISHNY:  Can we just approach the

 9          bench before?

10                    (Bench conference.)

11                    THE COURT:  If you would please remain

12          standing, raise your right hand.

13                    (Oath administered to witness.)

14                    THE WITNESS:  I do.

15                    THE CLERK:  Please state your full name and

16          spell it for the record please.

17                    THE WITNESS:  Lisa Marie Stutzman, L-I-S-A,

18          M-A-R-I-E, S-T-U-T-Z-M-A-N.

19                    THE COURT:  You may be seated.

20               EXAMINATION OF LISA MARIE STUTZMAN

21     BY ATTORNEY MAIER:

22     Q    Good afternoon, Miss Stutzman.  Do you know someone

23          named Hu Lee?

24     A    Yes.

25     Q    Who is that?
```

1  A    He is the father of my children.

2  Q    And does he have a relative named Chong Lee?

3  A    Yes.

4  Q    Chong's his brother, correct?

5  A    Yes.

6         THE COURT:  Miss Stutzman, can you move the

7         microphone just a little closer for you so it's a

8         little easier for you to hear?

9  Q    (BY ATTORNEY MAIER)  And Chong Lee is the defendant

10        seated in court today, correct?

11  A    Yes.

12  Q    How long have you known Chong Lee?

13  A    About eleven years.

14  Q    And is he someone that you hung out with on

15        occasion?

16  A    Yes.

17  Q    As part of a group?

18  A    Yes.

19  Q    Now, you know that there was a man shot and killed at

20        Luna Lounge on the early morning hours of December

21        8th, 2013, correct?

22  A    Yes.

23  Q    You weren't at Luna that night, correct?

24  A    No.

25  Q    The next morning did something unusual happen?

```
1    A    Well, early morning the next day, two of our friends
2         showed up at my house.
3    Q    Who were those people?
4    A    Alyson Blom and Xung Xiong.
5    Q    Did you know that Alyson was in town?
6    A    Yes.
7    Q    What -- what was unusual about Alyson coming to your
8         home in the early morning hours?
9    A    Well, they had came and woke me up.  They had said
10        that someone had got shot that night, and she said
11        that she had gotten beat up by a female that night
12        when she tried to run away from the incident.
13   Q    Okay.  And was it obvious that she was -- let me ask
14        it this way.  What did she look like?
15   A    Her hair was just messed up.  I don't really remember
16        if there was any blood or anything on her.
17   Q    Okay.  Just one moment please.  Miss Stutzman, did
18        you talk with Alyson about the shooting over the next
19        couple days?
20   A    Yes.
21   Q    Among others?
22   A    There was a few people that talked about it with.
23   Q    During this time, Miss Stutzman, and I'm -- I'm not
24        asking you to base this on anything that anybody said
25        to you or anything that the defendant might have
```

200

1      said, but did you tell Alyson that you had an opinion

2      as to who had done the shooting at Luna Lounge?

3    A   Yes.

4    Q   And who was that?

5    A   I said that it was probably Chong.

6              ATTORNEY MAIER:  Thank you, Miss Stutzman.

7      That's all the questions I have.

8              THE COURT:  Any cross?

9              ATTORNEY VISHNY:  Yeah.

10              **EXAMINATION OF LISA MARIE STUTZMAN**

11    **BY ATTORNEY VISHNY:**

12    Q   So when you were gossiping with Alyson, you told her

13      you thought it was probably Chong, right?

14    A   Yes.

15    Q   But you also think that it is possibly Paul, right?

16    A   No.

17    Q   So -- okay.

18              ATTORNEY VISHNY:  Nothing further.

19              ATTORNEY MAIER:  No redirect.

20              THE COURT:  Any questions from the jury?

21              (No response.)

22              THE COURT:  Thank you.  You may be excused.

23              ATTORNEY MAIER:  Your Honor, our next

24      witness is actually Sergeant Tauber.  He's actually

25      on his way from the police department.

201

```
 1                    THE COURT:  While we're waiting, why don't
 2           we have counsel come up.
 3                    (Bench conference.)
 4                    THE COURT:  Mr. Maier, the next witness.
 5                    ATTORNEY MAIER:  Your Honor, at this point
 6           the State recalls Sergeant Dan Tauber.
 7                    THE COURT:  And, sir, you are still under
 8           oath so we'll not reswear you in.  You may be seated.
 9              Mr. Maier.
10                EXAMINATION OF DANIEL K. TAUBER
11      BY ATTORNEY MAIER:
12      Q    Sergeant Tauber, I have some questions for you about
13           when you interviewed Alyson Blom in Milwaukee.  Do
14           you recall that conversation?
15      A    Yes, sir, I do.
16      Q    This would have been the workplace or the mall area
17           conversation, correct?
18      A    Correct.
19      Q    Do you recall the date of that interview?
20      A    That would have been on the 11th, 12/11 of '13.
21      Q    Did you speak with Alyson Blom about talking to
22           someone named Lisa Stutzman?
23      A    Yes, sir, I did.
24      Q    And what did she tell you about that conversation?
25      A    She indicated that on the night of the incident she
```

202

1          had actually went over to Lisa Stutzman's house.

2     Q    Alyson Blom did?

3     A    Yes.

4     Q    Okay.

5     A    And at that point she explained to Alyson --

6          correction, she explained to Lisa what had happened

7          downtown, gave her some of the facts of what had

8          happened downtown.  She indicated at that point she

9          really didn't know who had done the shooting.  Later

10         on in the afternoon when she was at her residence she

11         received a phone call from Lisa Stutzman.

12    Q    And in that conversation -- in that conversation

13         between Alyson Blom and Lisa Stutzman, did Alyson

14         Blom indicate who she believed the shooter was?

15    A    Yes, she believed --

16              ATTORNEY VISHNY:  Can we clarify the

17         question?  Did Alyson Blom or who Lisa believed?

18    Q    (BY ATTORNEY MAIER)  Did Alyson indicate who Alyson

19         believed the shooter was?

20    A    Yes.  Alyson believed the shooter could have been

21         Paul.

22    Q    And did Lisa, according to Alyson, provide a

23         statement about her position, Lisa's position, on who

24         the shooter was?

25    A    That would have been in the phone call --

203

1    Q    Correct.

2    A    -- later on.  Yes.  She indicated that the shooter

3         was actually Chong.

4              ATTORNEY VISHNY:  Wait.  Just, again, she

5         meaning Lisa?

6    A    Lisa Stutzman had told Alyson Blom during a phone

7         conversation.

8              ATTORNEY VISHNY:  What she thought.  Okay.

9         I'm sorry to take over your witness.

10   Q    (BY ATTORNEY MAIER)  No.  Having learned this

11        information, on your return trip from Milwaukee to

12        Appleton, was this part of what was shared with

13        Lieutenant Gostisha?

14   A    Yes, sir.

15   Q    And do you recall what -- that would have been on the

16        11th as well, correct?

17   A    Correct.

18   Q    Do you recall what time the phone call would have

19        been made from you -- or you and Sergeant Meyer to

20        Lieutenant Gostisha?

21   A    I believe it was at 10:43.

22   Q    In the evening?

23   A    P.m.  Correct.

24   Q    Was there only one phone call about what you had

25        learned on the trip home or more than one?

204

1    A    More than one.

2    Q    But one for sure at 10:43 p.m. that you made?

3    A    Correct.

4              ATTORNEY MAIER:  All right.  Thank you.

5         That's all.

6              THE COURT:  Any cross-examination?

7              **EXAMINATION OF DANIEL K. TAUBER**

8    **BY ATTORNEY VISHNY:**

9    Q    Okay.  So basically you got some information that

10        Lisa and Alyson were gossiping together on the phone

11        after the incident, right, that they had a phone call

12        afterwards, correct?

13   A    They had a conversation at the residence and then

14        subsequently later on she received a phone call from

15        Lisa Stutzman.

16   Q    Okay.  So what Alyson told you, she went to the

17        residence because she had gotten beaten up after, and

18        she went to go see her friend Lisa and talk about

19        being beaten up, right?

20   A    Correct.

21   Q    And then later on she got a phone call from

22        Lisa Stutzman who was not present at the shooting,

23        right?

24   A    Correct.

25   Q    Lisa wasn't there, right?

1    A    Correct.

2    Q    Didn't see it, right?

3    A    Correct.

4    Q    Isn't a witness, correct?

5    A    A witness to the shooting?

6    Q    Right.

7    A    Correct.

8    Q    Not a witness to the shooting.  Doesn't have any

9         personal knowledge about what happened, right?

10   A    Firsthand knowledge?

11   Q    Yeah.  Firsthand knowledge.  Has no firsthand

12        knowledge, and the two young women have a phone call

13        together and so Lisa tells this to Alyson and Alyson

14        tells it to you, right?

15   A    Correct.

16             ATTORNEY VISHNY:  Nothing further.

17             THE COURT:  Any redirect?

18             ATTORNEY MAIER:  No.  Thank you.

19             THE COURT:  Any questions from the jury for

20        consideration?

21             (No response.)

22             THE COURT:  Thank you again.  You are

23        excused.

24             So we're at 5:00.  We're earlier than I'd like

25        to be, but what I'm going to do to accommodate that

206

1 is I'm going to -- I'm going to have counsel, we'll

2 deal with some of our normal pretrial matters this

3 evening.  Unless I hear strongly otherwise, I'm going

4 to ask that the jury be here at nine a.m. tomorrow.

5 Okay?  Everyone is okay with that?

6  So you'll be released for the evening.  I ask

7 that you be ready to go by nine a.m., and thank you

8 again.

9  And if you please escort the jury out.  Please

10 rise.

11   (The jury was escorted out of the

12 courtroom.)

13  THE COURT:  Please be seated.  During that

14 session we did have a sidebar related to Alyson's or,

15 I'm sorry, Lisa Stutzman's testimony.  There was an

16 objection raised on grounds of hearsay.  The State

17 was of the position it was not offered for the truth

18 of the matter asserted.  The court then did allow

19 inquiry based upon what was further permitted by the

20 court was direct examination in a leading format so

21 that the questions were narrowly tailored and did not

22 go beyond the intended purpose.  So the court did

23 allow it under those -- under that auspice.  And

24 again, noting the objection, the court did overrule

25 the objection.

1           I believe that was the only sidebar that we had

2    during that portion of the proceedings.  Is that your

3    understanding, Attorney Maier?

4           ATTORNEY MAIER:  Yes.

5           THE COURT:  Believe that's an accurate

6    summary of the sidebar?

7           ATTORNEY MAIER:  I do.

8           THE COURT:  Attorney Vishny?

9           ATTORNEY VISHNY:  Yeah, I think it's an

10   accurate summary, but -- and I didn't want to

11   interrupt, but, you know, the way this ended up being

12   said, not because of anything anybody told you, not

13   because of that, I -- I would ask the testimony be

14   stricken from the record because it left the

15   impression that in fact it was because of something

16   other people had told her.  I'm not asking you

17   because of this -- maybe the question should be read

18   back because I can't paraphrase -- I can't possibly

19   paraphrase the exact words.  But in our opinion over

20   here, we felt that it left the impression that she

21   actually had heard it from other people, the way the

22   question was phrased.

23           THE COURT:  Okay.  I thought the question

24   was intended to not convey that, but let me -- let's

25   read it back.

208

1                    (Testimony from Page 200, Line 23 through

2          Page 201, Line 2 read back.)

3                    THE COURT:  If you want to argue more, go

4          ahead.

5                    ATTORNEY VISHNY:  No.  I think you've heard

6          it.  You go.

7                    ATTORNEY WEITZ:  Sure.  I guess the only --

8          and I guess it comes down to semantics, but our

9          concern was the way it was phrased with "I'm not

10         asking you to base this upon" leaves the impression

11         that she's being asked to ignore things rather than

12         saying this wasn't based upon.

13                   THE COURT:  Read it back one more time.

14                   (Testimony from Page 200, Line 23 through

15         Page 201, Line 2 read back.)

16                   THE COURT:  I think the question as phrased

17         is ambiguous enough that it doesn't necessarily

18         assert that.  That said, the prosecution would be

19         prohibited from arguing in any subsequent arguments

20         that Miss Stutzman's statements were based upon

21         things she had heard or things of that nature.

22                   ATTORNEY SCHNEIDER:  That's not our intent.

23         This goes into the timing and what the officers then

24         did.

25                   THE COURT:  Understand.  That fact

1    notwithstanding, the defense is not prohibited from

2    saying she just made this up and came up with a name,

3    and based on that, the police went on with their

4    questioning.

5            ATTORNEY VISHNY:  Okay.

6            THE COURT:  So it's -- that's my -- that's

7    my ruling, the long and the short of it.

8            ATTORNEY VISHNY:  Okay.

9            THE COURT:  Anything else?

10           ATTORNEY VISHNY:  No, but we want to talk

11   to Mr. Lee for a few minutes before we have meetings

12   in chambers.

13           THE COURT:  Absolutely fine.  Why don't we

14   -- why don't we take 10 to 15 minutes and then I'll

15   be back in chambers, you just let me know when you're

16   ready.

17           ATTORNEY SCHNEIDER:  Do you want to do it

18   out here or be back in chambers when we have the

19   discussions?

20           THE COURT:  Either way.  Quite frankly, if

21   Mr. Lee wants -- if we want to do it out here and Mr.

22   Lee wants to be present, that's fine with me.  Why

23   don't you take 10, 15 minutes to talk to him and then

24   I'll come out here and we'll decide from there.

25           (Court in recess.)

210

```
 1

 2

 3

 4                    C E R T I F I C A T E

 5

 6    STATE OF WISCONSIN     )
                             ) ss.:
 7    COUNTY OF OUTAGAMIE    )

 8

 9

10          I, JOAN BIESE, RMR/CRR, do hereby certify that I
      am the official court reporter for Branch IV of the
11    Circuit Court of Outagamie County;

12          That as such court reporter, I made full and
      correct stenographic notes of the foregoing proceedings;
13
            That the same was later reduced to typewritten
14    form;

15          And that the foregoing proceedings is a full and
      correct transcript of my stenographic notes so taken.
16

17          Dated this 7th day of August, 2016.

18

19

20          _____

21          JOAN BIESE, RMR/CRR

22

23

24

25
```

211