FILED
02-13-2019
Clerk of Circuit Court
Outagamie County
2013CF001074

1   STATE OF WISCONSIN    CIRCUIT COURT    OUTAGAMIE COUNTY

2   _____

**STATE OF WISCONSIN,**

3
                 Plaintiff,

4   v.                              **Case No. 13-CF-1074**

5   **CHONG LENG LEE,**

6                 Defendant.

    _____

7
                  **JURY TRIAL - DAY SEVEN**

8   _____

9

    BEFORE:         **HONORABLE GREGORY B. GILL, JR.**
10                  Circuit Court Judge, Branch IV
                    Outagamie County Justice Center
11                  Appleton, WI  54911

12
    DATE:           **March 3, 2016**
13

14  APPEARANCES:    **CARRIE SCHNEIDER**
                    District Attorney
15                  Appearing on behalf of the State

16                  **ANDREW MAIER** and **ALEXANDER DUROS**
                    Assistant District Attorneys
17                  Appearing on behalf of the State

18                  **DEBORAH VISHNY** and **EVAN WEITZ**
                    Attorneys at Law
19                  Appearing on behalf of the Defendant

20                  **CHONG LENG LEE**
                    Defendant
21                  Appearing in person

22

23

24  Joan Biese
    Official Reporter, Branch IV
25  Outagamie County

1

Exhibit 22

1                         **I N D E X**

2

3    **WITNESSES**                                              **PAGE**

4    **JOE THOR**

         Examination by Attorney Maier.....................   5
5        Examination by Attorney Vishny...................  38
         Voir Dire Examination by Attorney Maier...........  97
6        Examination by Attorney Maier.................... 100
         Examination by Attorney Vishny................... 109
7        Examination by Attorney Maier.................... 113
         Questions by Jury................................ 114
8        Examination by Attorney Maier.................... 115

9    **DANIEL J. CAMPBELL**

         Examination by Attorney Maier.................... 118
10       Examination by Attorney Vishny................... 123

11   **JOHN SCHIRA**

         Examination by Attorney Schneider................ 124
12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                  2

1

**EXHIBIT**                                                                 **PAGE**

2    4  –   Letter................................................ 184
        32–   Photo Board-Photos 32A-32K................... 140
3    33G– Photo................................................. 47
        33H– Photo................................................. 47
4    33I– Photo................................................. 49
        33K– Photo................................................. 50
5    33L– Photo................................................. 50
        72–   Map.................................................. 26
6    83–   Photo............................................... 182
        84–   Photo............................................... 182
7    85–   Photo............................................... 182
        86–   Photo............................................... 199
8    87–   Photo............................................... 199
        93–   Diagram-Joe Thor................................... 11
9    94–   Video.............................................. 202
        95–   Hat (Brewers)...................................... 200
10   104– Vest (White)........................................ 42
        105– Coat (White/Gray) Patterned....................... 50
11   122– Paul Lee Statement................................ 194
        133– Hat (Red).......................................... 22
12   160– Transcript-Interview of Joe Thor................. 60
        162– Transcript-Interview of Joe Thor-Item 142....... 92
13   163– Transcript-Interview of Joe Thor-Sergeant Rabas. 93

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    **TRANSCRIPT OF PROCEEDINGS**

2              THE COURT:  Please be seated.  We are on

3      the record in *State of Wisconsin v. Chong Lee*.

4              Mr. Lee appears in person, along with his

5      counsel, Attorney Evan Weitz and Deja Vishny.  Also

6      seated at counsel table appearing under the student

7      practice rule is Mr. Solomon Gatton.  Representing

8      the State of Wisconsin is Outagamie County District

9      Attorney Carrie Schneider, along with Assistant

10     District Attorneys Alex Duros and Andrew Maier.

11             And we'll just wait a moment.

12             ATTORNEY VISHNY:  Can I talk to Miss

13     Peterson for a minute please?

14             THE COURT:  Absolutely.

15             Defense all set?

16             ATTORNEY VISHNY:  Yes.  Thank you.

17             THE COURT:  Okay.  Please rise for the

18     jury.

19                 (The jury was escorted into the courtroom.)

20             THE COURT:  Morning, everyone.  Please be

21     seated.

22             Is the State prepared to call its first witness?

23             ATTORNEY MAIER:  We are, Your Honor.  The

24     State calls Joe Thor.

25             THE COURT:  Sir, if you would please remain

                                 4

1          standing, the clerk will swear you in.

2                    THE CLERK:  Please raise your right hand.

3                    (Oath administered to witness.)

4                    THE WITNESS:  Yes, I swear.

5                    THE CLERK:  Please state your full name and

6          spell it for the record please.

7                    THE WITNESS:  Joe Thor, J-O-E, T-H-O-R.

8                    THE COURT:  All right.  Mr. Thor, you may

9          be seated.  I would ask that you please adjust the

10         microphone so that it's able to pick up your voice a

11         little better.  Also, if you do need any water, that

12         is a new bottle of water.

13                   THE WITNESS:  Okay.  Thank you.

14                   THE COURT:  You're welcome.

15                   Whenever the State is ready.

16                   **EXAMINATION OF JOE THOR**

17    **BY ATTORNEY MAIER:**

18    Q    How you doing, Mr. Thor?

19    A    Good.

20    Q    Do you know someone named Chong Lee?

21    A    Yes, I do.

22    Q    How long have you known Chong Lee?

23    A    Pretty much since we were kids.

24    Q    And is he the defendant seated in court today?

25    A    Yes, he is.

5

1   Q   You know someone named Phong Lee?

2   A   Yes, I do.

3   Q   And is he someone that is also a friend from way

4       back?

5   A   Yeah.  We went to school together.

6   Q   How about Paul Lee?

7   A   Yes, I also know him too.

8   Q   Do you know someone named Tou Shoua Lee?

9   A   Yes, I do.

10  Q   Do you know somebody named Johnny Thao?

11  A   Yes, I do.

12  Q   How well do you know him?

13  A   Johnny Thao, he is my uncle.

14  Q   How old is Johnny Thao?

15  A   I believe about 30s, 30 something.

16  Q   Okay.  I want to talk to you about something that

17      happened in the early part of December of 2013, and I

18      realize you may not recall the exact date or the day

19      of the week, but it was an incident that happened at

20      Luna Lounge in Appleton.  Was there a -- a night that

21      you and some friends were at City Limits bar in

22      Menasha?

23  A   Yes.

24  Q   Who was at City Limits with you?

25  A   I cannot recall everyone, but I know I was there

6

```
 1        so --
 2   Q    Was -- was Chong Lee with you there?
 3   A    Yes.
 4   Q    And after you were at City Limits, where did you
 5        go?
 6   A    I believe to Sharks.
 7   Q    And that's the pool hall in downtown Appleton?
 8   A    Yes.
 9   Q    After Sharks, where did -- where did you go?
10   A    Luna Lounge.
11   Q    And that -- not just you personally, but the -- kind
12        of the whole group, right?
13   A    It was like scattered, like couple people went and
14        then I don't know.  Later on everybody just ended up
15        there.
16   Q    Okay.  Was there a point near the end of the night
17        where you and Paul Lee went downstairs to the
18        bathroom?
19   A    Yes.
20   Q    When you came back up, was Paul ahead of you or
21        behind you?
22   A    Ahead of me.
23   Q    Okay.  And what happened after you and Paul came back
24        upstairs from the bathroom?
25   A    I believe there was an argument.
```

7

1    Q    Who was involved in the argument?

2    A    The victim and Paul.

3    Q    Did you see Phong anywhere nearby?

4    A    Yes.

5    Q    Were there people, I'll just say associated with --

6         do you know the -- the victim's name?

7    A    Just from the news reports and stuff.

8    Q    Josh, right?

9    A    Yes.

10   Q    Were there people, I'll say, associated with Josh who

11        were in that area as well?

12   A    Yes.

13   Q    Any females?

14   A    Yes.  I believe his girlfriend.

15   Q    These are people that -- how well did you know

16        them?

17   A    I didn't know any of them.

18   Q    Okay.  When you come back upstairs from going to the

19        bathrooms, Paul's in front of you and you see this

20        disagreement with Paul and Josh, correct?

21   A    Yes.

22   Q    Now, how -- where are you as this disagreement

23        happens?

24   A    I believe I was to the left side of Paul, so pretty

25        much right behind him.

8

```
 1   Q    Behind and to the left?

 2   A    Yeah.

 3   Q    Where is Phong?

 4   A    To the right.

 5   Q    Your right?

 6   A    His right.

 7   Q    Paul's right.

 8   A    Yes.

 9   Q    Okay.  Is Phong also -- is he ahead of Paul, even

10        with Paul or behind Paul?

11   A    He's more behind him also.

12   Q    So you guys make kind of a -- a triangle more than a

13        line; is that fair to say?

14   A    Yes.

15   Q    The other people, Josh, his girlfriend, and the other

16        people that are there with him, is -- who's in the

17        front of that group?

18   A    I believe it was him, but I believe his girlfriend

19        was trying to stop him so she was in front of him.

20   Q    The disagreement that happens, is it verbal or

21        physical or both?

22   A    It was just verbal.  Verbal at first.

23   Q    Okay.  Then what happened?

24   A    Then I believe Paul swung at him.

25   Q    At who?
```

9

1   A   The victim.

2   Q   Did you see Paul connect with Josh?

3   A   No, I did not.

4   Q   And I guess if I need to ask it a different way, was

5       it that you didn't see or that he didn't connect?

6   A   I think he connect, but it did not even hurt the guy

7       so Paul kind of got scared.

8   Q   Then what happened?

9   A   He jumped back and kind of pinned me to the wall, me

10      and Phong.

11  Q   Who jumped back?

12  A   Paul.  Because he -- he jumped back just because Mr.

13      Richards was pretty big guy.

14  Q   Now you say that this sort of pinned you against the

15      wall.  Can you describe this wall for me?

16  A   I believe it was the stairway wall.

17  Q   Is it all the way to the ceiling or something

18      different?

19  A   Not all the way to the ceiling.

20  Q   Something like the jury rail?

21  A   Yes, yes.

22          THE COURT:  Are we going to need lights,

23      Mr. Maier?

24          ATTORNEY MAIER:  Not yet.  Thank you.

25          ATTORNEY SCHNEIDER:  Just for the record,

10

1    why don't we note that the jury rail comes up about

2    waist height just for the average person just so that

3    later there's no confusion.

4              ATTORNEY VISHNY:  I don't know.

5              THE COURT:  Why don't we say it's a little

6    over three feet tall.

7              ATTORNEY SCHNEIDER:  Like a half wall.

8              THE COURT:  All right.

9              ATTORNEY MAIER:  Okay.  All right.

10   Q    (BY ATTORNEY MAIER)  Mr. Thor, I'm going to show you

11        what's been marked as Exhibit 93.  Do you see the

12        exhibit sticker on there?

13   A    Yes.

14   Q    Okay.  Take a look at that exhibit and let us know if

15        you recognize what that is.

16   A    I believe it's the front of the Luna Lounge.

17   Q    And you -- a couple days after this incident you were

18        interviewed by the police at the police department,

19        correct?

20   A    Yes.

21   Q    Is that when this diagram was created?

22   A    Possibly.  I'm not too sure.

23   Q    Okay.  Up in the upper right there's a date and a

24        name and it says interviewed at APD, correct?

25   A    Yes.

11

1   Q    Did you write those?

2   A    No, I did not.

3   Q    What is the date that's on top there?

4   A    December 10th, 2013.

5   Q    13.  And then the name?

6   A    Joe Thor.

7   Q    Okay.  Looking at the content on this diagram, are

8         you able to say -- is that something that you marked

9         up or something that was done, you know, written by

10       the police but you pointed out where people were?

11  A    I believe I just pointed out where people was.

12  Q    And in taking a look at that, is that an accurate

13       diagram as far as where people were that night?

14  A    Yes.

15  Q    Okay.  What I'm going to do, Mr. Thor, is throw it up

16       on the screen here.  Can you see the screen okay?

17  A    Yes.

18  Q    Can you see that all right?

19  A    Yes.

20  Q    And understanding that there's some handwriting

21       there, there is a name on there that's more or less

22       the top of the stairs.  It says Mikey Thao.  Is that

23       somebody that you know?

24  A    Yes.

25  Q    And is that more or less where he was?

12

1    A    He was more of a -- beside me or like a little behind

2         me.

3    Q    I'm sorry.  A little behind you?

4    A    Yeah.

5    Q    So you're -- your name is right here, right?

6    A    Yes.

7    Q    And there's an X next to you?  The X is you, right?

8    A    Yes.

9    Q    So Mikey Thao is -- if he's -- I'm sorry, if he's

10        next to you, what does that mean I guess?

11   A    Like more to the wall.

12   Q    Okay.  Like up in this area?

13   A    A little behind me more, you know, yeah.  Yeah.

14        About there.  But too at the side a little bit more.

15        A little more angle.

16   Q    You say he's behind you and to the side?

17   A    Yeah.  Kind of like right here pretty much.

18   Q    And you just pointed -- I just blocked everybody's

19        view of it.  You just sort of turned and pointed off

20        your left shoulder?

21   A    Yeah.  Correct.

22   Q    Okay.  So people are positioned here when Paul takes

23        the swing at Mr. Richards, right?

24   A    Yes.

25   Q    And you say -- I'm sorry.  And after this punch Paul

13

1       throws, which at the most didn't do much?

2    A  No.

3    Q  You say he moves back and that pins you and Phong?

4    A  He -- sorry.  He kind of jumped back.

5    Q  Jumped back?

6    A  Yeah.

7    Q  And that moves you and Phong up against this half

8       wall?

9    A  Yes.

10   Q  Okay.  Now that's giving -- that's more space then,

11      right, between Paul and Mr. Richards?

12   A  Yes.

13   Q  What happens next?

14   A  Mr. Richards started cocking his arm back and coming

15      towards us.

16   Q  Now you moved your right arm back, right?

17   A  Yeah, yeah.

18   Q  And you -- I'm going to say a word.  If you don't

19      know what I mean then let me know.  You sort of

20      almost loaded it about armpit height?

21   A  Yeah, yes, because --

22   Q  Is that what he did?

23   A  Yeah.  Because I was scared.  I didn't know who he

24      was going to hit or if he was going to hit anyone.

25   Q  Okay.  Now at some point you said -- earlier you said

14

```
 1        that Josh's girlfriend was in front of him.
 2   A    He kind of threw her off because I believe he got mad
 3        after he got hit so --
 4   Q    Okay.  So she's not in front of him anymore.
 5   A    No.
 6   Q    Where is she at this point?
 7   A    He kind of just threw her and she just fell to the
 8        side.
 9   Q    Okay.  Where are the -- the other guys that are --
10        are there with him?  Are they in the same spots they
11        were in before Paul throws the punch?
12   A    They were kind of behind him so -- and to the side of
13        him.  I believe his left side.
14   Q    More or less the -- the same spots they were that you
15        got marked on the --
16   A    Yes.
17   Q    -- diagram?  And the diagram, it says girlfriend and
18        there is two spots where it says buddies, right?
19   A    Yes, correct.
20             THE COURT:  Actually, while you're drinking
21        is a good time to mention this.  If you can, Mr.
22        Maier, the same instruction, Mr. Maier, if you can
23        wait until Mr. Thor finishes speaking, and likewise,
24        Mr. Thor, if you let Mr. Maier finish the questions,
25        even if you know the answer or if you know what the
```

15

```
1          question is asking, and that's largely so my court
2          reporter can get everyone's notes.  She's only able
3          to take one person at a time.
4                    THE WITNESS:  Okay.  Sorry.
5                    THE COURT:  No problem.
6     Q    (BY ATTORNEY MAIER)  These buddies of Josh's, what
7          race are they?
8     A    Not too sure.  I believe they're Caucasian because
9          it's kind of dark too but I believe they were
10         Caucasian.
11    Q    They're not -- they're at least -- they look white.
12    A    Yes.
13    Q    And Mikey Thao is also Asian, correct?
14    A    Correct.
15    Q    All right.  So as Josh cocks his fist back, you made
16         a fist also, correct?
17    A    Yeah.
18    Q    And that's what he did?
19    A    Yeah, yeah.
20    Q    He cocks his fist back, you're seeing this happen,
21         what happens next, Mr. Thor?
22    A    I just kind of put my arms up and just prepare for --
23         to get hit.
24    Q    So you're worried about yourself getting hit?
25    A    Yes.
```

16

1    Q    What happens then?

2    A    And then a flash and then I heard a bang and then I

3         looked in front of me and then Mr. Richards was on

4         the ground.

5    Q    Okay.  Before you saw the flash and heard the bang

6         and saw Mr. Richards go to the floor, what were you

7         looking at?

8    A    I was looking at Mr. Richards.

9    Q    Okay.  And looking at him continued seeing the flash

10        and hearing the bang?

11   A    Yes.

12   Q    What do you recall seeing, Mr. Thor?

13   A    I seen him on the ground and not getting up.

14   Q    I mean before that.  When you're looking at him and

15        you see the flash and hear the bang, what do you

16        see?

17   A    Just a bunch of people and then just a quick flash.

18   Q    Do you recall seeing anything with Mr. Richards'

19        face?

20   A    What do you mean by that?

21   Q    Did he have any reaction as the flash and bang

22        happened?

23   A    I can't recall, it was so quick.  He was already on

24        the ground.

25   Q    When he -- and so he falls after this, correct?

17

1    A    Correct.

2    Q    What direction does he fall?

3    A    I'm not too sure.  All I know is he was on the ground

4         and then I kind of panicked and just ran.

5              THE COURT:  Do we still need the lights?

6              ATTORNEY MAIER:  I think so.  I'm going to

7         work off the diagram a little more.

8              THE COURT:  Just let me know then.

9              ATTORNEY MAIER:  Thank you, Your Honor.

10   Q    (BY ATTORNEY MAIER)  Now, Mr. Thor, how many times

11        had you been to Luna before that night?

12   A    Plenty.

13   Q    Okay.  So you're pretty familiar with -- it didn't

14        take much to get you to realize this was the early

15        part or the front part of Luna Lounge, right?

16   A    Correct.

17   Q    And we've got -- we've got space here between this

18        wall on the right edge and what I'll say is kind of a

19        corner here.  Do you see what I'm talking about?

20   A    Yes.

21   Q    And when I say corner, I'm looking more or less in

22        the middle of this part of the diagram.  On this

23        diagram, the distance from this far area, this

24        corner --

25              ATTORNEY VISHNY:  Object to leading.

18

```
1                    THE COURT:  Well, let -- finish the
2          question and then I'll determine.
3     Q    (BY ATTORNEY MAIER)  -- it appears to be
4          approximately the same as the distance from the wall
5          where this opening is?
6                    THE COURT:  Now I'll sustain it.  Please
7          rephrase.
8     Q    (BY ATTORNEY MAIER)  How wide is that opening from
9          the entryway to the bar area?
10    A    A little bigger than a doorway.  It's about, just
11         measuring by those doors there, about that size but
12         no doors connected to it.
13    Q    Kind of an archway.
14    A    Yeah.
15    Q    Five feet sound about right?
16    A    Yeah, sounds about right.
17    Q    Okay.  And then is it five feet or shorter or longer
18         to go from this point, which would be -- if you're
19         coming from the bar, it would be the right -- sort of
20         at the right entrance.  See what I mean?
21    A    Yes.
22    Q    To the corner that's to your far right, how far is
23         that?
24    A    Can you repeat that?  Sorry about that.
25    Q    That's okay.  If you're coming from the bar and
```

19

```
1              you're walking through this arched entranceway, how
2              far would it be, you know, if you're -- if you put
3              your hands on the right side of the arch and stepped
4              through, there's a corner to your right, correct?
5     A       Yes.
6     Q       How far is that corner?
7     A       Away from me?
8     Q       Yes.
9     A       Pretty far yet.
10    Q       Pretty far.  So this diagram is obviously not to
11             scale.
12    A       Yeah.  Yeah.  It's not to scale.
13    Q       So you have -- I think before we got onto that, you
14             were saying that after you see the flash and hear the
15             bang and you see Mr. Richards fall to the floor that
16             you -- did you say got scared?
17    A       Yeah.  I just got scared and ran away right away.
18    Q       Where did you run?
19    A       Out the doors to my left, ran out.
20    Q       The -- the door was to your left, correct?
21    A       Yes.
22    Q       And that's what you mean by that?
23    A       At an angle yet though.
24    Q       When you get outside the doors at Luna, do you have
25             any idea where Paul is?
```

20

```
1    A    I think it was right behind me.

2    Q    Okay.  Do you know where Phong is?

3    A    I believe right behind him.

4    Q    When you get out through the doors, what do you do?

5    A    I took a right and turned the corner.

6    Q    Okay.  So that's onto what street?

7    A    Division.

8    Q    And what did you do when you got onto Division

9         Street?

10   A    Then I cut through the parking lot and I was just

11        headed towards my house.

12   Q    Okay.  Did you end up at your house?

13   A    Yes, I did.

14   Q    Is that the first place you went?

15   A    Yes.

16   Q    How long did it take before Paul caught up to you?

17   A    About five minutes or so because I ran really fast

18        and then they couldn't keep up.

19   Q    Okay.  What about Phong, how long did it take for him

20        to catch up?

21   A    He was right next to Paul so --

22   Q    Okay.  Somewhere along the lines between the Luna

23        Lounge and your house, the three of you made a stop

24        or two, correct?

25   A    Yes, correct.
```

21

1   Q   And what did you do at one of those stops along the
2       way?
3   A   I tossed my hat, I believe.
4   Q   What kind of hat was it?
5   A   It was a baseball cap.
6   Q   Do you recall what kind of hat it was?
7   A   No, I cannot recall because the stuff I wore wasn't
8       even mine, I usually don't wear that stuff.
9   Q   Okay.  Could it be a red hat?
10  A   Possibly.
11  Q   Okay.  If I showed you something, would you recognize
12      it?
13  A   Possibly.
14  Q   Mr. Thor, I'm sorry, I'm showing you what's been
15      marked Exhibit 133.  Do you recognize this?
16  A   No, I don't.
17  Q   Okay.  And at the time that you get rid of the hat
18      that you say you were wearing, or near then, what
19      does Phong do?
20  A   I believe he tossed something too.  I'm not too sure.
21      Can't recall what it was.
22  Q   Was it also --
23  A   It was some clothing though.
24  Q   Okay.  You don't recall what item of clothing?
25  A   No, I don't.

22

```
1    Q    It was -- something that he was wearing on the
2         outside of his -- he didn't take stuff off, take
3         something else off and put things back on, right?
4    A    Yes, yes.
5    Q    So was it from the upper or lower half of his body?
6    A    Should be upper, I believe.
7    Q    Okay.  And this is -- Mr. Thor, did you and Phong get
8         rid of these things because of being scared?
9    A    Yes.
10   Q    All right.  After -- after getting rid of the
11        clothes, any other stops?
12   A    No.
13   Q    Okay.  And so you end up at your house, right?
14   A    Correct.
15             ATTORNEY MAIER:  Your Honor, before I
16        forget I would move in Exhibit 93 at this time.
17             THE COURT:  Any objection?
18             ATTORNEY VISHNY:  No.
19             THE COURT:  93 will be received.
20        Lights okay, Mr. Maier?
21             ATTORNEY MAIER:  Yes.  Please.
22   Q    (BY ATTORNEY MAIER)  Mr. Thor, when you arrived at
23        your house, who else was there?
24   A    It was just the three of us.
25   Q    So it's you and Phong and Paul?
```

23

```
1    A    Yes, correct.

2    Q    And where did you go?

3    A    We just went in my room and they just called for a

4         ride.

5    Q    Where is your room in your house?

6    A    The basement.

7    Q    Phong and Paul called for a ride?

8    A    Yes.

9    Q    Who else came to your house?

10   A    Later on -- later in the evening, a couple hours

11        later, Chong did.

12   Q    Who was with Chong if anyone?

13   A    Just himself.

14   Q    And this is sometime later?

15   A    Yes.

16   Q    What happened when Chong arrived at your house?

17   A    He told me he wanted me to go look at a car with him

18        in Chicago the next day.

19   Q    What else did he talk about?

20   A    Not too much at my house.  I just asked him why.  He

21        said he needed a new car and he wanted me to go

22        check out the body because I'm a student for auto

23        body tech so --

24   Q    What did he say about Luna Lounge?

25   A    He said he did it.
```

24

1    Q    That he did what?

2    A    He did the shooting at Luna Lounge.

3    Q    Those are the words that he said?

4    A    Correct.

5    Q    Where were you when he said this to you?

6    A    This was on the way to Chicago.  It start to blizzard

7         kind of so we stopped in Milwaukee.

8    Q    Where did you stop in Milwaukee?

9    A    The Hilton hotel.

10   Q    And you said that the defendant wanted you to look at

11        a car in Chicago the next day.  How long after he got

12        to your house did the two of you leave to head

13        south?

14   A    I believe it was three hours later because I was

15        about to fall asleep already and all of a sudden I

16        hear the doorbell ring.

17   Q    What car are you in?

18   A    I believe his mother's green car.

19   Q    What kind of -- what kind of car is the green car?

20   A    Toyota.

21   Q    And it's a car, SUV, truck?

22   A    It's more of a luxury car.

23   Q    Four doors?

24   A    Two-door.

25   Q    Two-door.

25

1              Mr. Thor, you said that you were starting to
2          fall asleep and you heard a knock or heard the
3          doorbell, correct?
4      A   Correct.
5      Q   When you answered it, Chong was there?
6      A   Yes.
7      Q   Do you have any idea how he got to your house?
8      A   No, I asked him, he said he just got dropped off.
9      Q   What was your address at that time?
10     A   1745 North Harriman Street.
11     Q   Mr. Thor, I'm showing you what has been marked as
12         Exhibit 72. Do you see that?
13     A   Yes, I see that.
14     Q   Do you recognize what this is, sir? Sorry. Let me
15         stop wiggling it around.
16     A   It looks like a map.
17     Q   Are you able to see the area of downtown Appleton
18         that would have included where Luna Lounge was?
19     A   Yes, I do.
20     Q   And that's the corner of College and Division,
21         right?
22     A   Correct.
23     Q   And are you able to see where your house was at the
24         time up on Harriman Street?
25     A   Can you reask that question, simpler terms?

26

1  Q  Sure.  Within -- on the map are you able to also see
2     where your house is located at the time?
3  A  Yes, yes.
4  Q  And can you point out where that house was?
5  A  Right here, I believe.
6  Q  You pointed at the top of the map right near the
7     label that actually says 1745 North Harriman,
8     right?
9  A  Correct.  Because I think that's where it should be.
10 Q  Okay.  That's the address that you said you lived
11    at?
12 A  Yes.
13 Q  Did you know the people who lived next to you to the
14    south?
15 A  Not too well.  But they've been long time
16    neighbors.
17 Q  Chong had been to your house before?
18 A  Yes.
19 Q  Including after dark?
20 A  What do you mean by that?
21 Q  Had he been there at night before?
22 A  Yes, plenty times.
23 Q  When you left your house with Chong to head, you
24    think, to Chicago to look at this car the next day,
25    how did you get to the -- how did you get there, did

27

```
 1        you leave on foot and walk somewhere, did you drive
 2        right away?
 3   A    He left to go get his vehicle and then he came back
 4        and picked me up because he asked if I was willing to
 5        go with him.
 6   Q    So he -- he left on foot?
 7   A    I cannot recall.  I just told him to come back and
 8        get me then.
 9   Q    Okay.  Did that happen?
10   A    Yes, it did.
11   Q    Do you know what time it was when you got to the
12        hotel in Milwaukee?
13   A    No, I can't recall that.
14   Q    Was it light yet?
15   A    No.  It was close.  It was snowing all night too
16        so -- but there was no light when we arrived.
17   Q    There was no light?
18   A    It was still dark.
19   Q    Okay.  So what did you do when you arrived at the
20        hotel?
21   A    Just laid down and slept.
22   Q    All right.  On the way down is when you say that the
23        defendant told you that he did it, meaning shot this
24        person at Luna?
25   A    Yes, correct.
```

28

```
1    Q    Did the defendant say anything about the gun that
2         would have been involved in shooting someone?
3    A    No, he did not.
4    Q    Did you ask him anything about --
5    A    No.  I just kind of made a statement, whatever,
6         you're stupid, and then just kind of just dozed
7         off.
8    Q    So after -- and as far as you know, the defendant
9         sleeps also at the hotel, right?
10   A    Yes.
11   Q    What time of day was it when you woke up there?
12   A    I can't recall.  He kind of woke me up.
13   Q    Okay.  What happened then?
14   A    He just said let's go eat and hang out with some of
15        my relatives and watch football game or something.
16   Q    Where did you eat?
17   A    We just ate at the -- my relative's house.
18   Q    And then you went to this place to watch a football
19        game?
20   A    Yes, correct.
21   Q    Did you know those people?
22   A    Yes, I do.
23   Q    Okay.  So you -- you know the person who goes by Q?
24   A    Yes, I do.
25   Q    You know Peter Moua?
```

1    A    Yes, I do.

2    Q    And someone who goes by Jesus?

3    A    Yes, I do.

4    Q    And then someone who goes by Joseph?

5    A    Yes, I do.

6    Q    And then a person named Dia?

7    A    Yes, I do.

8    Q    And then someone named Xai Thao?

9    A    Yes, I do.

10   Q    How long have you known those people?

11   A    Forever too, I know them forever too.

12   Q    Okay.  So you're at this -- at Q's house watching

13        football.  Does anything related -- anybody say

14        anything about Luna Lounge while you're at Q's

15        house?

16   A    Not that I can recall.  I was just drinking some

17        beers with them, just smoking, we didn't talk much

18        about that.

19   Q    Okay.  Where did you stay that night?

20   A    I believe I stayed at Peter Moua's.

21   Q    So you -- you left Q's house and ended up at Peter

22        Moua's house?

23   A    Correct.

24   Q    Where did the defendant stay, if you know?

25   A    I brought him along with me because he didn't have a

30

```
 1        place to stay.
 2   Q    What happens when you wake up the next morning?
 3   A    We woke up and we stopped by, I believe, some
 4        restaurant, picked up some food and just came back
 5        home.
 6   Q    What kind of food was it, do you recall?
 7   A    I believe it was JJ Fish.  That's the name of the
 8        restaurant.  It was some fried chicken gizzards and
 9        all that.
10   Q    And it was in what city?
11   A    I believe Milwaukee.
12   Q    Okay.  Are you familiar with Milwaukee streets?
13   A    No, I'm not too familiar --
14   Q    Okay.
15   A    -- with their streets over there.
16   Q    Okay.  And then after JJ Fish you said you came
17        back?
18   A    Yes.
19   Q    And where is the defendant when you leave and go to
20        JJ Fish?
21   A    He was with me, he was driving, he actually was the
22        one who went in, I just sat in the car.
23   Q    Okay.  Same car as the day before?
24   A    Yes, correct.
25   Q    And same car that you drove down from Appleton in?
```

31

```
1    A    Yes, correct.

2    Q    And then did -- did the defendant drive back up to

3         Appleton?

4    A    Yes, correct.

5    Q    On the way back -- and I -- I'll say on the way back,

6         I'll include from Peter Moua's house all the way to

7         Appleton, so even though it's kind of in two chunks,

8         what did the defendant say about the shooting at Luna

9         to you?

10   A    He didn't say much.  We were just listening to music

11        mostly on the ride back.

12   Q    Did the defendant ever tell you what happened with

13        the gun?

14   A    No, he did not.

15   Q    Now, we've talked about -- I guess we kind of

16        referenced one time that you talked to the police

17        right after you guys got back up then, right?

18   A    Yes.

19   Q    You talked to them on the 10th in the afternoon,

20        right?

21   A    Correct.

22   Q    And then you talked to them a number of other times

23        as well, right?

24   A    Correct.

25   Q    Did you ever tell the police that Chong told you what
```

32

1        he did with the gun?

2    A   Yes, I did.

3    Q   Was that based on what he actually told you?

4    A   No, no, I was just saying that.  I don't know, I just

5        didn't want to be involved with the situation so --

6    Q   And that's -- that sort of remains the case, right,

7        you don't want to be involved in this?

8    A   Yes.

9    Q   This is someone -- it's an incident that involves

10       some people you've known for a long time, right?

11   A   Correct.

12   Q   You care about them?

13   A   Yes, I do.

14   Q   Just a couple more questions, Mr. Thor.

15           When -- when we started talking about that

16       night, you went in a group from City Limits in

17       Menasha to Sharks pool hall, right?

18   A   Correct.

19   Q   Did you go back to Sharks that night at all?

20   A   No, I did not.

21   Q   Did you go -- when was the next time you went to

22       Sharks?

23   A   I never went back to Sharks.

24   Q   Did you tell anybody to go to Sharks?

25   A   No, I did not tell nobody to go there.

33

```
 1   Q    From the time that this happened -- and actually I
 2        guess I need to change it a little bit.
 3            From the time that the defendant gets to your
 4        house, sometime in the middle of the night on
 5        December 8th, until you talked with the police on
 6        December 10th, did you talk to Paul at all?
 7   A    No, I have not.
 8   Q    Did you talk to Phong at all?
 9   A    No, I have not.
10   Q    And then after talking with the detectives on
11        December 10th in the afternoon, did you talk with
12        Paul at all?
13   A    No, I did not.
14   Q    Did you talk to Phong at all?
15   A    No, I did not.
16            ATTORNEY VISHNY:  I'm sorry.  I -- from the
17        10th to the 12th you're asking?  First you said for
18        the first time you talked to the police and then I
19        didn't hear the question.
20            ATTORNEY MAIER:  It was open-ended.
21            ATTORNEY VISHNY:  Okay.
22   Q    (BY ATTORNEY MAIER)  And you had come back on Monday
23        the 9th, right?
24   A    That's correct.
25   Q    Do you know someone named Lisa Stutzman?
```

34

```
 1   A    Yes, I do.

 2   Q    How well or how do you know her?

 3   A    I known her since we were like kids too almost so...

 4   Q    Okay.  Who is she?

 5   A    She is Hu's -- was his wife.

 6   Q    Hu is the defendant's brother, right?

 7   A    Correct.

 8   Q    And they have children together, right?

 9   A    Correct.

10   Q    Mr. Thor, I'm going to take you back to the moment --

11        basically the moment before the shooting inside Luna

12        Lounge that night.  Okay?

13   A    Okay.

14   Q    And as you're standing there and you say you've got

15        your hands up, you're thinking you're going to get

16        hit, you're looking at Mr. Richards when you see the

17        flash.  Do you see anything before the flash?

18   A    No, I do not.

19   Q    Do you see anything happen to him when you see the

20        flash and hear the bang?

21   A    What do you mean by that?

22   Q    Besides him dropping, do you see any -- any reaction

23        or any effect on him?

24   A    Just seemed like he passed out.  He just kind of fell

25        straight to the ground.
```

35

1   Q   Mr. Thor, you talked a couple times to Sergeant Rabas

2        who is seated to my right, correct?

3   A   Correct.

4   Q   And you told him a couple different things about that

5        -- that instant right before and right after the

6        shooting, right?

7   A   I can't recall, but I believe so.

8   Q   You -- you told me that you -- I'm sorry.  You told

9        Sergeant Rabas that you saw a sleeve go up just

10       before the -- the -- what turned out to be a shot was

11       fired, right?

12   A   Yes, correct.

13   Q   And that was a sleeve that had -- what do you recall

14       about that?

15   A   I just kind of put Chong's appearance out there

16       because at first they came and told me it was Paul,

17       and then second time around they said it was Chong,

18       so, I don't know, I just kind of give them an

19       appearance of what Chong was wearing because I seen

20       pictures of what Chong was wearing before that.

21   Q   You told them that you thought it was a .22 that had

22       been shot, correct?

23   A   I believe so.  I'm not too sure.

24   Q   You shot guns before?

25   A   No, I have not.  Just a cap gun if anything.

36

1    Q    When you talked with the police, you also told them

2         something about what the defendant did with the gun

3         after the shooting, right?

4    A    Yes, correct.

5    Q    And you told the police that he -- the defendant told

6         you that he had flushed the gun in a bar downtown,

7         right?

8    A    Correct.

9              ATTORNEY MAIER:  That's all the questions I

10   have for you, Mr. Thor.  Thank you.

11             THE COURT:  Any cross?

12             ATTORNEY VISHNY:  Yes, I do, but could we

13   have five minutes?  I -- just I need to use the

14   restroom.

15             THE COURT:  That's fine.

16        Please rise.

17             (The jury was escorted out of the

18   courtroom.)

19             THE COURT:  All right.  You may be seated.

20   We'll resume at approximately 10:25.

21             (Court in recess.)

22             THE COURT:  All right.  We'll bring in the

23   jury.

24             (The jury was escorted into the courtroom.)

25             THE COURT:  Please be seated.

37

1          Mr. Thor, come on up.  And you are still under

2     oath, sir, so I won't reswear you in.

3               THE WITNESS:  Okay.

4               THE COURT:  Please be seated.

5          And then, whenever we're ready,

6     cross-examination may begin.

7                    **EXAMINATION OF JOE THOR**

8     **BY ATTORNEY VISHNY:**

9  Q   Mr. Thor, right after you heard a gunshot, you ran

10     out of Luna, right?

11  A   Correct.

12  Q   Now, you drew a diagram for the police, and I'm going

13     to put it on back up here if I can figure out how to

14     use this.

15               THE COURT:  Do you want the lights down

16     then, counsel?

17               ATTORNEY VISHNY:  Well let me figure out

18     how to do this first.  I don't know, because if the

19     jurors can see it then, you know, it's just so hard

20     on us with the lights, so let's just see.

21               THE COURT:  Let me check with -- how is the

22     jury if we leave -- and maybe we'll pull it up.

23               ATTORNEY VISHNY:  It's not on yet.

24               THE COURT:  Let me see what it looks like

25     and then we'll tell you.

38

1              ATTORNEY VISHNY:  No, it's not visible.

2       Oh, it is up now.

3              THE COURT:  It's up?

4              ATTORNEY VISHNY:  It's up now.  It's not

5       visible.  It's starting to get brighter, starting to

6       get brighter.

7              THE COURT:  Should we go with the lights

8       down?

9              UNIDENTIFIED JUROR:  Yes, put the lights

10      down please.

11             ATTORNEY VISHNY:  All right.

12  Q   (BY ATTORNEY VISHNY)  So this is a diagram that was

13      made when you talked to the police on December either

14      9th or 10th, right?

15  A   I believe the 10th, correct.

16  Q   And that was because you met the police over at the

17      courthouse here and then you walked over to the

18      police department with them?

19  A   Correct.

20  Q   And it's not because you went to the police and told

21      them you knew things.

22  A   Correct.

23  Q   In fact, you had already talked to police officers

24      about this case once before?

25  A   Correct.

39

```
1    Q    You had been at Lisa Stutzman's house, as soon as you
2         got back from Milwaukee you went over to
3         Lisa Stutzman's, right?
4    A    Correct.
5    Q    And she's the person who you described as Hu Lee's
6         former wife?
7    A    Correct.
8    Q    They're not together anymore?
9    A    No, after this situation, no.
10   Q    And in fact she has a new boyfriend now named Tom
11        Lee?
12   A    Correct.
13   Q    And she is not -- never mind.  Strike that.
14            All right.  So when the police came over to
15        Lisa Stutzman's house and questioned you the first
16        time, what you told them is that you weren't in
17        Luna.
18   A    Correct.
19   Q    Or maybe that you had been there -- which one did you
20        tell them, that you had been there but left before
21        the gunshot or that you'd never been there at all?
22   A    I told them I wasn't there at all.
23   Q    And you stuck with that story only for a few minutes
24        because it wasn't working, right?
25   A    Correct.
```

40

1   Q   It wasn't working because they told you they had
2       pictures of you inside Luna?
3   A   They showed me pictures.
4   Q   And they showed you pictures and they told you that
5       they had some belief you were involved in this?
6   A   Correct.
7   Q   And that you could be accused as party to the crime
8       or as part of this shooting?
9   A   Correct.
10  Q   That was pretty scary for you, right?
11  A   Correct.
12  Q   Because at various times they told you if you were
13      party to a crime you could potentially get life.
14  A   Correct.
15  Q   And that's not something that you wanted to do.
16  A   Correct.
17  Q   And you knew that you had run out of Luna after this
18      shooting and ditched your red hat?
19  A   Correct.
20  Q   So apparently you recall it was a red hat?
21  A   I believe it was white, actually, but I can't recall,
22      so I'm just saying yeah.
23  Q   And this is Exhibit No. 133, right?
24  A   Correct.
25  Q   This is the hat that police got near the trash can?

41

1    A    I believe so, but I don't think it was red, I thought

2         it was white actually but --

3    Q    Okay.  And your buddy Phong Lee, he's still your

4         friend, right?

5    A    Correct.

6    Q    And Paul Lee is still your friend, right?

7    A    Correct.

8    Q    They -- Paul Lee didn't throw any clothing out but

9         Phong Lee did, right?

10   A    Correct.

11   Q    And I'm showing you what's been marked as No. 104.

12        This is what Phong Lee threw out, this white vest?

13   A    Yes, if -- if it's a vest, I believe so.

14   Q    Okay.  Because he was wearing a white vest with a

15        plaid shirt underneath it that night?

16   A    Yes, I believe so.

17   Q    He had a hat on too.

18   A    Yes, I believe so.

19   Q    He threw that out too?

20   A    I can't recall.

21   Q    All right.  So as I understand this, you still --

22        although it's not to scale, it's still your testimony

23        today that this map is accurate.

24   A    Yes, correct.

25   Q    All right.  And so here is the door to Luna, right?

42

1    A    Correct.

2    Q    And here is the guy who was shot?

3    A    Correct.

4    Q    Joshua Richards, right?  So he's kind of right

5         between.

6              You walk in Luna, there is a first foyer and

7         then there's kind of a second foyer?

8    A    Correct.

9    Q    And he is standing right between them at the time

10        he's shot?

11   A    Correct.

12   Q    And then Paul is right over here, right?

13   A    Correct.

14   Q    Paul punches him, according to what you said?

15   A    Correct.

16   Q    Paul's right handed.

17   A    Yes, correct.

18   Q    And he punches Josh to the left side of Josh's face.

19   A    I believe so.

20   Q    And that's what you told the police?

21   A    Yes.

22   Q    Then what you claim is that as Paul is punching them,

23        you and Phong are stepping back along this wall,

24        right?

25   A    Correct, but Paul jumped back and kind of pinned us

43

1           to the wall.

2    Q    So in other words Paul fights him and gets in a

3           position where the three of you are going to be

4           cornered now by this guy and his buddies who are over

5           here.

6    A    Yes.

7    Q    So he's in a fight and he puts himself in a position

8           to put you -- be cornered, and not only -- right, or

9           you already -- you already really answered that.  So

10          his buddies, like him, they were taller too.

11   A    Correct.

12   Q    So now it's you three short guys over here and

13          these -- potentially Mr. Richards and his buddies, at

14          least two who are taller, males, and you guys are

15          cornered.

16   A    Correct.

17   Q    And when he falls, he falls right in front of you,

18          right?

19   A    Not exactly in front of me, but like, yeah.

20                ATTORNEY MAIER:  If I could interrupt.  He

21          made a gesture.  I just want to note for the record.

22   Q    (BY ATTORNEY VISHNY)  Can you show us what you did

23          again?

24   A    It was kind of an angle like not too far.

25   Q    Kind of an angle?  His body was at an angle to you?

44

1    A    Yeah.

2    Q    You had to step over his body to get out of there?

3    A    No.  Actually, I just went right around.

4    Q    You went right around him?

5    A    Yeah.

6    Q    Okay.  So you're at the wall, he falls at an angle.

7         By angle, do you see how I'm drawing this on a

8         diagonal, is that what you mean?

9    A    No, he like just fell forward.

10   Q    He fell forward?

11   A    But when I was looking I was at an angle.

12   Q    Okay.  So were you -- you're saying you were able to

13        go kind of around him, is that what --

14   A    Yeah, yeah, just like right there.

15   Q    Okay.  So -- so you go from here around him to the --

16   A    No, no, no, like -- are those arrows on there?

17   Q    Are these arrows?

18   A    That line by my name, follow that, that line straight

19        out.

20   Q    So that's how you do it, right?

21   A    Yes.

22   Q    You go with this arrow right here is you going out,

23        right?

24   A    Yes, correct.

25   Q    And then you have this arrow right here.  Is that

45

1          Phong or Paul running out, according to you?

2     A    I believe both of them.

3     Q    You believe both of them it refers to?

4     A    Yes, correct.

5     Q    But you're still kind of cornered back there before

6          you run out, according to this, right, and that's --

7     A    Correct.

8     Q    All right.  And you're the first person out the door,

9          right --

10    A    Correct.

11    Q    -- in the whole thing.

12    A    Yes, correct.

13              ATTORNEY VISHNY:  We can turn the lights

14         back on, Judge.

15              THE COURT:  Okay.

16              ATTORNEY VISHNY:  Can the jurors see these

17         pictures?  Okay.

18    Q    (BY ATTORNEY VISHNY)  Mr. Thor -- and you can come

19         off the witness stand if you can't see this well

20         enough.  All right?

21    A    Okay.

22    Q    This is kind of still shots that are taken from the

23         bar video, just to orient you to what they are.  All

24         right?  So you can see people turning around,

25         right?

46

1    A    Correct.

2    Q    And this is you, right?

3    A    Correct.

4    Q    And you're the very -- do you see this is also you --

5         let me -- let me rephrase those to use the numbers.

6         I'm going to show you what's marked as 33G on Exhibit

7         33.  This is you going right out, correct?

8    A    Correct.

9    Q    All right.  And then you're almost at the door and

10        then this is you very first at the door, correct?

11   A    Yes, correct.

12   Q    This woman right here, do you know who that is?

13   A    No, I do not.

14   Q    All right.  So this woman right here, she's kind of

15        in between you, you had your hat on backwards it

16        looked like?

17   A    Yes.

18   Q    And then that's Paul Lee?

19   A    Correct.

20   Q    Then we have -- and that's -- all right.  So the

21        woman here, first of all, this was 33H, you're right

22        there pushing towards the door first?

23   A    Yes.

24   Q    And you don't know the woman in 33H, right?

25   A    Well, if it's --

47

1    Q    Do you know who Dalinda Guzman is?

2    A    Yes, I do.

3    Q    Okay.  So ignore what's written here.  Do you

4         independently of your own memory know if this is

5         Dalinda Guzman?

6    A    I believe that is not.

7    Q    Okay.  You think it's someone else?

8    A    Yes.

9    Q    So right here behind this woman -- and you think it's

10        not because Dalinda Guzman doesn't have blonde hair,

11        right?

12   A    Yeah.  I think she has darker hair.

13   Q    You have to say it really loud.  If you don't want to

14        use the microphone, you have to feel like you're

15        shouting.

16   A    Sorry.

17   Q    Think about your voice reaching all the way back to

18        the back of the room.

19   A    Yes, I believe that's not her because that's not her

20        hair color.

21   Q    This person is from the back, you can't see them,

22        right?

23   A    Correct.

24   Q    All right.  And -- well, actually, your hat is white

25        in this picture.  Is that why you think your hat --

48

1    A    Yes, correct, because I thought it was white.

2    Q    Do you think that because of the picture or because

3         that's your memory?

4    A    My memory.

5    Q    All right.  And what about your coat here, you've got

6         kind of a big puffy coat on.  Do you remember what

7         coat you wore that night?

8    A    Yes.

9    Q    What color was it?

10   A    It was white.

11   Q    It was a white coat.

12        Okay.  And then you see Paul Lee right here, and

13        all -- we're pointing to -- all these last series of

14        questions have been 33I.  We're pointing at Paul Lee

15        right here, correct?

16   A    Correct.

17   Q    And he's got on what looks like to be a white coat

18        here?

19   A    Correct.

20   Q    But the coat wasn't actually white, it was black and

21        white?

22   A    Yes, I believe so, because I don't think it was all

23        white.

24   Q    Okay.  And so he's the very next guy right behind

25        you?

49

```
 1   A   Yes, correct.

 2   Q   And then moving over to 33I and then 33K you see

 3       another person right behind Paul there.

 4   A   Yes, correct.

 5   Q   And that person is Phong Lee?

 6   A   Correct.

 7   Q   And then it's the -- over to 33L you can see the

 8       three of you going out the door, correct?

 9   A   Correct.

10   Q   And this woman here now who is turned to the side,

11       can you see her face at all?

12   A   Yes, I can.

13   Q   Does that look like Dalinda to you?

14   A   Yes, it does.

15   Q   All right.  All right.  I'm showing you what's been

16       marked as Exhibit No. 105.  This is actually Paul's

17       coat, right, that he had on that night?

18   A   I do not believe so.

19   Q   Okay.  So you don't think it's what he wore that

20       night?

21   A   No.

22   Q   You believe he wore a different coat that night?

23   A   Yes.

24   Q   All right.  Now, you run away and the first thing you

25       guys do is find a garbage can to ditch your
```

50

1          clothes?

2     A    Correct.

3     Q    Was the garbage can on the way to your house?

4     A    Correct.

5     Q    And so you toss your hat, Phong tosses his jacket

6          because you say you're scared?

7     A    Yes, correct.

8     Q    Oh.  So what are you scared of?

9     A    Because I believe I thought we were getting shot

10         at.

11    Q    Okay.  So you think that you're being shot at, not

12         that Joshua Richards is being shot at.

13    A    Yes.

14    Q    And in fact, when the police questioned you at first,

15         that's what you told them, you said, well, we're

16         being shot at, I'm afraid, right?

17    A    Correct.

18    Q    But that wasn't true, you were scared that the police

19         were going to catch you, right?

20    A    No.

21    Q    So you weren't afraid at all the police are going to

22         get you and say that you're involved in this at the

23         bar, you never felt that way?

24    A    Actually, yes, I did.

25    Q    You did feel that way, didn't you?

51

```
 1   A    A little bit.

 2   Q    A little bit?  More than a little bit?

 3   A    Yes.

 4   Q    A lot.

 5   A    Yes.

 6   Q    And you're afraid the police are going to catch you

 7        so you toss your stuff so you won't be recognized,

 8        right?

 9   A    That's correct.

10   Q    And then you go to your house, right?

11   A    That's correct.

12   Q    And Paul and Phong come over there, right?

13   A    Correct.

14   Q    They get a ride -- they call someone named Letty as

15        far as you know who gives them a ride?

16   A    Correct.

17   Q    And Chong never says anything to them over at your

18        house because he's not there at the same time.

19   A    Correct.

20   Q    They both leave before Chong gets to your house?

21   A    Correct.

22   Q    And then you say Chong comes over, he's wearing a

23        dark colored coat, right?

24   A    Correct.

25   Q    And he had on a dark colored coat in the bar?  Do you
```

52

1     remember one way or the other?

2  A  Yes, correct.

3  Q  And was it like gray almost black?

4  A  Correct.

5         ATTORNEY MAIER:  I'm going to just ask for

6     clarification about which one we're talking about,

7     which time period.

8  Q  (BY ATTORNEY VISHNY)  In the bar, Chong comes over,

9     he's wearing a gray almost black coat as far as you

10    know?

11 A  Correct.

12 Q  And he's wearing the same coat when he comes to your

13    house?

14 A  Correct.

15 Q  Is he wearing the same coat when you go check in at

16    the hotel or a different one?

17 A  I can't recall that.

18 Q  Okay.  But certainly nobody would mistake what he was

19    wearing for a white coat?

20 A  Correct.

21 Q  And nobody would mistake it for being a white vest.

22 A  Correct.

23 Q  So you ditch your stuff, you're afraid the police are

24    going to come get you, and then they do, they come

25    over to Lisa Stutzman's house, right?

```
 1    A    Correct.

 2    Q    And by the time they come over, this all happened at

 3         December 8th just before two in the morning, that's

 4         when the shooting happens.

 5    A    Correct, I believe so.

 6    Q    But you -- the police don't manage to catch up with

 7         you to talk to you until the afternoon or evening on

 8         December 9th?

 9    A    Correct.

10    Q    That's on a Monday.

11    A    Correct.

12    Q    And when they talk to you on a Monday, first you lie,

13         then they tell you you're in a heck of a lot of

14         trouble, you could be charged with this crime,

15         correct?

16    A    Correct.

17    Q    And what you tell them is you'll talk to them

18         tomorrow.

19    A    Correct.

20    Q    So you've got some more thinking, some more talking

21         time.

22    A    Correct.

23    Q    Now, you're over at Lisa who is Hu's brother's house,

24         right?

25    A    Correct.
```

54

```
 1   Q   And you know that Paul goes over there sometimes.
 2   A   Correct.
 3   Q   And you know that Phong goes over there sometimes.
 4   A   Correct.
 5   Q   And you're claiming that you've never talked to Paul
 6       or Phong since they left your house on the 8th?
 7   A   Yes.  Because I was with Chong only until the 10th.
 8   Q   No phone calls?
 9   A   No phone calls.
10   Q   No texting?
11   A   No.
12   Q   Well you weren't with Chong anymore when you got to
13       Lisa's, right?
14   A   Yeah.  That was the day we got back.
15   Q   All right.  And you weren't with Chong that night on
16       December 9th after leaving Lisa's house, you went
17       home.
18   A   Correct.
19   Q   And you weren't with Chong on December 10th before
20       you talked to the police?
21   A   Correct.
22   Q   So you had opportunities certainly all the way until
23       the police talked to you to talk to Phong and Paul.
24   A   Correct.
25   Q   So what you're saying is you witnessed this traumatic
```

55

1          shooting so much that you're scared for your life and
2          scared that you're going to get shot, and you claim
3          you've never talked to them between the time that you
4          came back from Milwaukee and the time the police
5          talked to you at Lisa's, right?
6     A    Correct.
7     Q    And you know the police are there accusing you of
8          being party to a crime of potentially looking at
9          life.
10    A    Correct.
11    Q    You know it's pretty serious, right?
12    A    Correct.
13    Q    And you know that you ran out of that bar with Paul
14         and Phong.
15    A    Correct.
16    Q    You know that Paul and Phong are with you when you
17         toss the clothing.
18    A    Correct.
19    Q    You know that Paul and Phong came to your house.
20    A    Correct.
21    Q    And you're going to tell this jury that knowing the
22         police are coming and that they have pictures from
23         the bar of the three of you walking out together,
24         that you never contact Paul or Phong to warn them
25         that the police might come talk to them?

56

1    A    Why would I warn them?

2    Q    You ask -- you tell me.  These are your buddies,

3         right?

4    A    Yes, correct.

5    Q    And you don't want to tell them at all the police are

6         coming to talk to you.

7    A    No.  Why would I know that?  Maybe they already been

8         talked to.  How do I know?

9    Q    Well, you don't want to then find out what they told

10        the police before the police come and talk to you on

11        December 10th?

12   A    Can you repeat that question?

13   Q    Yeah.  So you don't want to find out from them --

14        you're saying maybe the police had already talked to

15        them, so you're not interested in finding out if the

16        police had talked to them or what they said?  You

17        don't want to know that?

18   A    I would like to but maybe it's better off not to

19        know.

20   Q    So that's what you say, you didn't really want to

21        know, right?

22   A    Yes, correct.

23   Q    Okay.  And so the police come and talk to you on the

24        10th and they're basically telling you they believe

25        that Paul is the shooter.

57

1    A    Correct.

2    Q    And at that time they really press you on that,

3         right?

4    A    Yes, correct.

5    Q    And you tell them -- they tell you that they believe

6         that Paul had something in his hand that's a gun.

7    A    Correct.

8    Q    You tell them that you can't say a hundred percent

9         that it's not Paul.

10   A    Correct.

11   Q    You tell them you know you didn't do it, right, tell

12        that to the police?

13   A    Yes.

14   Q    You know Phong didn't do it, you tell that to the

15        police, right?

16   A    Correct.

17   Q    But based on how the police are questioning you, you

18        say, well, you know, I don't think it's Paul but it

19        could have been him.

20   A    Well what they said is there a possibility because

21        he's the only one who punched him or got close

22        enough.

23   Q    And you say, yeah, there's a possibility?

24   A    Yes, correct.

25   Q    And you say I couldn't say a hundred percent it

58

1        wasn't Paul.

2    A   Yes, correct.

3    Q   Now, during that time when you're being questioned --

4        by the way, when you ran out of Luna, you're the

5        fastest runner of the group, right?

6    A   Yes.

7    Q   Is that because you run regularly or, you know --

8    A   I'm athletic, play sports, been on sports teams.

9    Q   And you know that the way to run the fastest is to

10       use your arms when you're running, right?

11   A   Correct.

12   Q   And if you put arms in your pockets it will restrain

13       you while you're running?

14   A   Correct.

15   Q   So when you want to hightail it somewhere, it's best

16       to run swinging your arms, it gives you more

17       momentum?

18   A   Correct.

19   Q   And there's no reason to put your hands in your

20       pockets -- well, let me just say this.  It was a very

21       cold night out, right?

22   A   Correct.

23   Q   And it's fair to saying that running kept you warm?

24   A   Correct.

25   Q   Because when you run your body heats up?

59

1    A    Correct.

2    Q    So when the -- when you tell the police -- by the

3         way, the officer's name, do you remember the name

4         Schira talking to you?

5    A    Yes, correct.

6    Q    Okay.  So when Sergeant Schira comes and talk to you

7         and you tell him you've taken off your vest -- Phong

8         took off his vest and you got rid of the hat, you say

9         you're scared and you're even more scared because you

10        heard a rumor that it's an Asian person who did the

11        shooting, right?  That's even scarier to you?

12   A    I did not hear that.

13   Q    Okay.  So I'm going to show you what's been marked as

14        Exhibit 160.  Okay.  I'm going to show you what's a

15        transcript of the first time you talked to the

16        police.  Okay?

17   A    Okay.

18   Q    Now, in order to prepare for court, you saw a police

19        summary of what you said, right?

20   A    Correct.

21   Q    But you didn't actually listen to the recording or

22        read a transcript of it.

23   A    No.

24   Q    I'm going to direct your attention now to Line 39.

25             Detective Schira:  You strip off your -- you get

60

1          rid of your hat by the dumpsters, Phong takes off his
2          vest, gets rid of it, but who was coming after you.
3               Joe.  This is you.  I don't know.  That's the
4          main thing.  That's why I was wondering.  And then as
5          soon as like the next two days I heard it was an
6          Asian person I'm like even more scared.
7               Right?  That's what you said, isn't it?
8     A    No, incorrect.
9     Q    So you don't agree that that's what you said, you
10         don't agree with the transcript?
11    A    Correct.
12    Q    Okay.
13              ATTORNEY VISHNY:  Judge, I move in Exhibit
14         160.
15              THE COURT:  Any objection?
16              ATTORNEY VISHNY:  I mean to the extent it's
17         been read in court.
18              ATTORNEY MAIER:  No.
19              THE COURT:  To that extent, 160 will be
20         received.
21    Q    (BY ATTORNEY VISHNY)  Now, this -- when -- when the
22         police are talking to you at this point, it's
23         Detective Schira and Detective Rabas who's present in
24         court here?
25    A    Correct.

61

1    Q    His name is sergeant, but I have a habit of calling
2         him detective because that's kind of the
3         investigator.
4              They tell you - if you don't remember, let me
5         know - that they have a dude with a gun in his hand,
6         right?
7    A    Yes, correct.
8    Q    And they have to make a decision whether you're going
9         to be party to the crime or try and hide the truth --
10   A    Correct.
11   Q    -- in the investigation.
12             And do they tell you that they met with the DA's
13        office and they want to give you another opportunity
14        because you had lied the day before?
15   A    That's correct.
16   Q    And this was your chance, right?
17   A    Correct.
18   Q    And they make it -- they talk to you about having the
19        rest of your life in front of you?
20   A    Correct.
21   Q    They talk about -- let me ask this.  Do you remember
22        the exact words they said?
23   A    Not by -- off of my head.
24   Q    Okay.  55, Lines 12 to 23.  It starts with the word
25        okay.  Sergeant Rabas.  All right.  I'm going to show

62

1      you the previously discussed transcript.  Page 55,

2      Line 12.  I'm going to ask you to read from Line 23

3      what Sergeant Rabas said.

4   A  (Witness complying.)

5   Q  Does that remind you of what he told you or should I

6      read it?

7   A  You can read it.

8   Q  Okay.  You can either be a witness or you can be

9      party to the crime or part of it.  Okay?  And I'll

10     tell you what.  After somebody shoots someone, you

11     run off with that person, okay, you help either cover

12     up his story of what took place or provide

13     transportation --

14         And then the other sergeant, Schira, says:

15     Takes him to his house.

16         Rabas:  Takes him to his house, he goes into

17     your house, you dig yourself a very deep, deep hole.

18         Schira:  It's called party to a crime.

19         Rabas:  Party to the crime.  And after the fact,

20     you were there, this guy got shot now.

21         Joe:  If he did it, he would have told me but he

22     didn't --

23         Joe, Joe, says Rabas.

24         You say:  -- tell me that so I believe he didn't

25     do it.

63

```
1              Schira:  Well, this is where I think you're not
2         being truthful.
3              You say yes, you are.
4              Then they take -- tell you to look at a picture,
5         right?
6    A    That's correct.
7    Q    And ask if you remember what's in the hand and then
8         what you tell them is it looks like a beer bottle --
9    A    That's correct.
10   Q    -- to you.  That's your opinion of what's in his
11        right hand, correct?
12   A    Correct.
13   Q    And so, you know, you think these guys are pretty
14        serious when you talk to them, right?
15   A    Yes, correct.
16   Q    So clearly you believe if somebody came to your house
17        and said that they had committed a murder that the
18        fact that you have this knowledge means you could be
19        a party to the crime?
20   A    Yes, they were saying that, yes.
21   Q    They were saying it and you believed it, right?
22   A    They were just really pressuring me, too, so I didn't
23        really know what to do.
24   Q    Right.  But you didn't think they were lying to you,
25        that you could be prosecuted for it, did you?
```

64

```
1    A    I did.

2    Q    You did think they were lying?

3    A    No, I believed.

4    Q    You believed it, right?

5    A    Yes.

6    Q    And many times when they talk to you, they would

7         remind you of that, that if you didn't tell them what

8         you thought was what they wanted to hear, that you

9         would be in trouble, right?

10   A    Correct.

11   Q    And that continues to today, right, you're worried

12        about being in trouble?

13   A    Correct.

14   Q    And do you remember them saying how do you think all

15        this stuff is going to affect you for the rest of

16        your life?  Think about going down for 25 to --

17   A    Correct.

18   Q    25 to what?

19   A    To life.

20   Q    And being told, you know, it's not summer camp, this

21        happens, you go to big boy prison?

22   A    Yes, correct.

23   Q    And them telling you you're going to go to court and

24        testify?

25   A    Correct.
```

65

1   Q   So you know that they want Paul at that point and you

2       give them Paul, right?

3   A   I do not give them Paul.  I didn't give them.  Well,

4       repeat that question.

5           ATTORNEY VISHNY:  The court reporter can

6       repeat it.

7           (Question read back.)

8   A   I didn't give them Paul.

9   Q   Well, you made it very clear it wasn't you or Phong,

10      right?

11  A   Well it wasn't Paul either because he pinned us to

12      the wall, his hands were open -- wide open right up

13      because he had Paul pinned -- or Phong pinned to the

14      right side of him.

15  Q   Okay.  But when the police are telling you it could

16      be Paul, you're saying it -- you're agreeing it's

17      possible.

18  A   Anything is possible.

19  Q   I'm asking you what you told the police.

20  A   Yes, correct.

21  Q   Not in general.

22  A   That's correct.

23  Q   All right.  And they tell you that you've got two

24      choices, you can get on the witness line and be a

25      witness, you can be a suspect, right?

66

```
 1   A   Correct.
 2   Q   And that you need to know which line you're going to
 3       be on, correct?
 4   A   Correct.
 5   Q   Now, a few days later on December 12th -- so on that
 6       day you're saying here today in court you already
 7       knew that Chong told you he did it, right?
 8   A   That's correct.
 9   Q   By the way, Chong is a terrific liar sometimes,
10       correct?
11   A   Yes, correct.
12   Q   He brags about stuff he has that he doesn't really
13       have?
14   A   Yes, correct.
15   Q   Claims that people are girlfriends that aren't really
16       girlfriends?
17   A   Yes.
18   Q   Claims to have money when he doesn't really have
19       money?
20   A   Correct.
21   Q   Claims to have cars when he doesn't really have
22       cars?
23   A   Correct.
24   Q   Claims to have done things to other people when he
25       hasn't really done them?
```

67

```
 1   A    Correct.

 2   Q    You know, and claims to in fact have done bad things

 3        when he hasn't even done them, correct?

 4   A    Correct.

 5   Q    All right.  So that's Chong.  There's something wrong

 6        with his personality in that way.

 7   A    Correct.

 8   Q    Now on December 12th the police come and they talk to

 9        you, they come up to your house and you talk to them

10        in a squad car, right?

11   A    Correct.

12   Q    And they also -- again they tell you you can either

13        get yourself on the witness line or be looking to 25

14        to life?

15             ATTORNEY SCHNEIDER:  Objection.  Asked and

16        answered.

17             ATTORNEY VISHNY:  No.  This is on the 12th.

18             ATTORNEY SCHNEIDER:  I didn't hear a

19        different reference to a transcript number.

20             ATTORNEY VISHNY:  I'm sorry.  This is on

21        December 12th now.

22   A    Correct.

23   Q    You basically are told the same thing by the police

24        at the beginning of the interview, right?

25   A    Correct.
```

68

1                          ATTORNEY MAIER:  Judge, can we approach?

2                          THE COURT:  You may.

3                          (Bench conference.)

4       Q    (BY ATTORNEY VISHNY)  Now, I'm actually going to go

5            back to the first time that you talked to the -- the

6            long time you talked to the police on December 10th,

7            right?

8       A    Okay.

9       Q    Do you -- when the -- when Sergeant Schira is saying

10           you couldn't see anything, it was that quick, so it's

11           possible Paul shot him, do you remember saying that,

12           right?

13      A    Yes.

14      Q    And do you remember saying it's possible, you didn't

15           believe from what you saw, but he had his hands like

16           this in his pockets?

17      A    No, I did not say that.  I had -- I said he had his

18           hands up, spread up.

19      Q    All right.  I'm going back to show you this long

20           transcript again.  Okay?

21      A    Okay.

22      Q    Sergeant Schira:  You couldn't see anything, it was

23           that quick, so it's possible Paul shot.  Okay?

24                And then you said:  It's possible but I believe

25           he didn't.  From what I saw, he did not do that.  He

69

1    had his hands like this in his pockets.

2        Do you remember saying that?

3    A    The last line, I did not say that.

4    Q    You didn't say that.  So that's a wrong transcript,

5        correct?

6    A    Correct.

7    Q    Okay.  But he did have his hands in his pockets as he

8        was running out, right?

9            ATTORNEY MAIER:  Object.  Calls for

10        speculation.

11   A    I'm not too sure.

12   Q    Okay.  You didn't see whether he had his hands in his

13        pockets running out?

14   A    I was ahead of him so I did not see.

15            THE COURT:  As rephrased, I'll allow it.

16            ATTORNEY VISHNY:  Sorry.  I should have

17        waited.  I just went ahead to clear it up.

18   Q    (BY ATTORNEY VISHNY)  Now one of the things you also

19        told them was that Paul had a temper, right?

20   A    Yes, correct.

21   Q    And the police seemed to already know that when they

22        talked to you, right?

23   A    Correct.

24   Q    Now, one of the things the police wanted to do in

25        that interview was have you call Paul on the phone

70

```
 1          while they recorded your conversation?
 2    A    Correct.
 3    Q    But you didn't want to do that.
 4    A    Correct.
 5    Q    Instead of saying flat out no, what you said is I'll
 6          do it another time?
 7    A    Correct.
 8    Q    Now you were busy, you couldn't do it right now.
 9    A    Yes, correct.
10    Q    That's not something you were willing to do.
11    A    Correct.
12    Q    You were not willing to have the police listen in to
13          what you and Paul would privately say.
14    A    Correct.
15    Q    All right.  Now let's go to the couple of times
16          later.  When the police talked to you on that day,
17          they tell you right away that Paul and Chong are in
18          jail, right?
19    A    Correct.
20    Q    And you already knew that.
21    A    No, I didn't.
22    Q    Okay.  So you're saying you didn't know that Paul and
23          Chong were in jail at that point.
24    A    Yes.
25    Q    And now the police are telling you at first, now what
```

71

1     you say is, well I didn't see him do it.  Do you

2     remember that?

3  A  Yes, correct.

4  Q  And then -- and the police tell you they're there to

5     help you, right?

6  A  Correct.

7  Q  Do you remember them telling you, Chong's in jail,

8     they don't think Paul is the shooter, and you've got

9     to help Paul get out of jail?

10  A  Correct.

11  Q  So now you can help your friend get out, right?

12  A  Correct.

13  Q  And the way you can help your friend get out is by

14     telling them that it's Chong who did it, right?

15  A  Well, when they were saying that, they're like Chong

16     was the one who did it, and then they kept nodding

17     their head like this, so kind of gesture, so I don't

18     know, I just went with what they said.

19  Q  So you knew what they were out after, right?

20  A  Yes.

21  Q  And at first you tell them you just heard rumors

22     about it, right?

23  A  Yes.

24  Q  And then eventually you tell them, yeah, Chong told

25     me he did it.

72

1    A    That's correct.

2    Q    And at a certain point you go inside your house

3         because the police want to see some numbers on a

4         phone?

5    A    Yes, correct.

6    Q    They want to look at a phone and see what numbers

7         have been called on that phone, right?

8    A    Yes, correct.

9    Q    And you felt they might want to see both incoming and

10        outgoing calls?

11   A    Yes, correct.

12   Q    And maybe text messages?

13   A    Correct.

14   Q    But you don't let them come in the house and see the

15        actual phone.

16   A    Yes, correct.

17   Q    You go in and you say I'll look at the phone and then

18        you come back out?

19   A    Well, they wanted a phone number for my brother's

20        phone I believe.  I forgot whose number.

21   Q    But you didn't want them actually looking at any

22        phones, right?

23   A    Correct.

24   Q    You were afraid that a phone might really be examined

25        by the police?

73

```
1    A    I didn't have a phone, I was using my brother's, so I
2         didn't feel that that would be necessary to do that
3         to his phone.
4    Q    I see.  So you wanted to make sure the police didn't
5         have your brother's phone.
6    A    Correct.
7    Q    Now, before you went in the house, that's when you
8         told the police that you didn't actually see who did
9         the shooting but you see this gray hand fire the
10        shot, right?
11   A    Correct.
12   Q    And, you know, they say gray hand, and then you
13        correct it, gray sleeve.
14   A    Yup.
15   Q    Right?
16   A    Yup.
17   Q    So you're saying today you just made that up because
18        you knew that's the color Chong was wearing and you
19        knew that's what the police wanted?
20   A    Correct.
21   Q    Now, you -- after this break you go inside, you're in
22        your house for what, like about five minutes or so?
23   A    That's correct.
24   Q    And then you come back out after not having the
25        police come in, right?
```

74

```
1    A    Correct.

2    Q    And when they come out they again tell you, if you

3         don't say everything you know, you could be arrested

4         for party to the crime of a first-degree murder?

5    A    Correct.

6    Q    And that they will be your worst nightmare, right?

7    A    Correct.

8    Q    And they may -- they will sure to make it your

9         project to say that you're in jail, right?

10   A    Correct.

11   Q    And they are continuing to tell you you're looking at

12        life in prison, right?

13   A    Correct.

14   Q    You're repeating you never saw the shooter's face,

15        you saw the sleeve.

16   A    I just said I didn't see anything happen.

17   Q    And -- but you know Chong is under arrest and that's

18        what the police want you to tell them, correct?

19   A    Correct.

20   Q    In fact, they tell you he's in jail and he's not

21        getting out, right?

22   A    Correct.

23   Q    So it's a done deal.

24   A    Correct.

25   Q    And again they tell you that even though Paul's in
```

75

1          jail, they don't think Paul's the shooter, right?

2     A    Correct.

3     Q    So they're not going to hold someone who is not the

4          shooter in jail in your mind, he's going to get out,

5          right?

6     A    Well, they said for me to help out because some

7          people said Paul was the one doing it.

8     Q    Okay.  And do you remember saying to them, well, you

9          guys told me it was a .22?

10    A    That's correct.

11    Q    And then Sergeant Rabas says, we're not supposed to

12         -- forget that or --

13    A    Yes.

14    Q    -- we can't talk about what we've told you.

15    A    That's correct.

16    Q    Now, when the police are talking to you all the times

17         you're listening to them, right?

18    A    Correct.

19    Q    Pretty intently, right?

20    A    Correct.

21    Q    Thinking about what you should say when they tell you

22         things they know?

23    A    Correct.

24    Q    And we're back on the December 10th, Page 80, police

25         were asking you, you know, about what's in the hand,

76

```
1          if it could be a gun, and what you said, it doesn't
2          look like a gun.  Come on, obviously, would a gun be
3          that small.  You remember saying that?
4     A    Yes, correct.
5     Q    And then Schira says, yeah, it would be, it's a .25.
6          Right?
7     A    Correct.
8     Q    That means a .25 caliber gun, that's what he's
9          referring to, right?
10    A    I believe so.
11    Q    And then you say, looks like a, it's inaudible, and
12         Schira says small gun?
13    A    No.  I said it looks like a --
14    Q    Well, it's inaudible in the transcript, right?
15    A    Yup.
16    Q    And then Sergeant Schira says, small gun, and then
17         you say, like how big is that?
18    A    Correct.
19    Q    And then Sergeant Schira says, small, not even the
20         size of your hand, correct?
21    A    Yes, correct.
22    Q    And that's when you say, I don't know, it could be a
23         gun?
24    A    Yes, correct.
25              And later on in that interrogation, going
```

77

1        to page -- the court's copy, 150, you went -- what

2        you say is you're talking about I -- top of the page,

3        at least.

4                ATTORNEY VISHNY:  I'm going up a little bit

5        higher, Miss Schneider.

6  Q    They're talking to you and it says, I don't know, I

7        believe it's not Paul though, right?

8  A    Yes.

9                ATTORNEY SCHNEIDER:  Judge, I know this is

10       going to be higher, we don't have a transcript that

11       matches her.

12              ATTORNEY VISHNY:  It's about eight lines

13       higher.  What page are you on?  I'm on Page 150, so

14       it's --

15              ATTORNEY SCHNEIDER:  Do you have a time

16       stamp near your reference?

17              ATTORNEY VISHNY:  Well, it's right before

18       that 2:19:29.  Yeah.  It's about eight lines higher.

19             THE COURT:  If there's going to be

20       reference, let's just wait until everyone is on the

21       same page before we proceed.

22             ATTORNEY VISHNY:  Of course.

23             THE COURT:  Just let us know when you're

24       there.

25            ATTORNEY SCHNEIDER:  We're ready.

1   Q    (BY ATTORNEY VISHNY)  So you say you believe it's not

2        Paul and then the police are asking you why not,

3        right?

4   A    Correct.

5   Q    And they say:  Is it because it's you?

6   A    Yes, correct.

7   Q    You say:  No, it's not me either.

8   A    Yes, correct.

9   Q    And you also say:  It's not Phong either I don't

10       believe.  Because they didn't pull anything out.

11       That's what you think, right?

12  A    Yes, correct.

13  Q    And then Sergeant Schira says:  Reach for your

14       pocket.  There is something inaudible.  Right?

15  A    Yes, correct.

16  Q    Now take your hand out.  That's how long it takes to

17       get a gun out.  Right?

18  A    Correct.

19  Q    Then you say:  But like from what you guys show me,

20       of course there is a possibility.

21  A    Correct.

22  Q    And now you say you thought it was a bottle?

23  A    Yes, correct.

24  Q    And Schira is going to say something, but you guys

25       say it was a gun, right?

79

1   A   Yes, correct.

2   Q   And Sergeant Schira says:  This gun is this big,

3       that's all, it's like a little .25.  Remember that?

4   A   Correct.

5   Q   And so this isn't something -- this is something you

6       do remember him actually saying, correct?

7   A   Correct.

8   Q   Unlike some of the other stuff.

9   A   Correct.

10  Q   And he says:  I reach into my pocket, I pull it out,

11      I do this, bang, and it's done.  That's how long it

12      takes.

13  A   Correct.

14  Q   And you say:  Yeah, just a split second, like you

15      said, I did not catch it.

16  A   Correct.

17  Q   All right.  Now, this wasn't the last time when --

18      okay.  So that's the first time the police talk, and

19      then the second time you bring it up and you say .22

20      to the police at that point, right?

21  A   No, I never said that.

22  Q   You never said it the second time.

23  A   No.

24  Q   Okay.  So one minute.  Well, I think we were just

25      talking earlier and I said that the time the police

80

```
 1          come now when they're talking to you outside your

 2          house, we just talked about this a few minutes ago.

 3          You say:  The gun, you guys told me it was a .22.

 4          And then Sergeant Rabas says:  No, no, we're not

 5          going to talk about that.  Right?

 6   A      Yes, correct.

 7   Q      All right.  Just so I cleared that up.

 8              Now -- and then, you know, Sergeant Rabas comes

 9          and talked to you again on December 16th to kind of

10          confirm some stuff, right?

11   A      Correct.

12   Q      Another time there -- there is another time where

13          another investigator comes to talk to you, and this

14          time it's Sergeant Thao, right?

15   A      Correct.

16   Q      And when Sergeant Thao comes to your house, he's

17          looking for someone else to talk to, right?

18   A      Correct.

19   Q      But since you're there, he starts talking to you.

20   A      Correct.

21   Q      And clearly Sergeant Thao, you know, he -- does he

22          express the belief to you again that it's Chong who

23          did it?

24   A      No.

25   Q      Well, Sergeant Thao comes over after telling you who
```

81

1         he's looking for?

2    A    Yup.

3    Q    He says to you:  Was it just you, Phong and then Paul

4         initially and about an hour later he was dropped off.

5         He's talking about Chong, right?

6    A    Yes, I believe so.

7    Q    Okay.  And then Sergeant Thao says:  Okay.  And he

8         told you about what he did.  Correct?

9    A    No, he did not ask me that.

10   Q    He didn't.  So it's in the transcript but you don't

11        believe he ever asked you that?

12   A    No, he was asking who I was all with and that's about

13        it.

14   Q    Okay.  So when Sergeant Thao said to you:  So he just

15        said that he killed the guy, and I -- I realize this

16        is in Hmong on one side of the page and English.  Do

17        you remember talking to Sergeant Thao a little bit in

18        Hmong?

19   A    Yes.

20   Q    And do you remember Sergeant Thao -- we're going to

21        use English here since people in the courtroom don't

22        speak Hmong.

23   A    Sounds good.

24   Q    So go with that side of the page.

25   A    Okay.

82

1   Q   So he just said that he killed that guy.  Do you --

2   A   He -- I don't recall him asking me that.

3   Q   Okay.  And -- okay.  Just wait one minute until I ask

4       you a question.  Okay?  Unless you need a break?

5   A   Oh.

6   Q   But otherwise I have to ask you questions.  Okay?

7   A   Okay.  Sounds good.

8   Q   All right.  And do you remember at Page 4 Sergeant

9       Thao saying:  Because you were, let me see, you were

10      to the left of Paul.  Do you remember him saying

11      that?

12  A   Yup.

13  Q   Right behind him or to the left.  And you just say

14      yeah.

15  A   Yup.

16  Q   So you tell him you're to the left, okay?

17  A   Correct.

18  Q   And you tell him at that time when this happens you

19      were talking to Mikey, right?

20  A   Yes.

21  Q   And then you see that there's going to be a fight,

22      right?

23  A   Yes, correct.  But as soon as I said that he opened

24      up his binder and shut off the tape recorder.

25  Q   Okay.  So you're saying that Sergeant Thao shut off

83

1       his tape recorder and quit taping you for a while?

2   A   Yeah.  As soon as I brought Mikey Thao up.

3   Q   Okay.  And then how long was it before he turned his

4       recorder back on?

5   A   I believe he did not even turn it back on.

6   Q   Well, we still have more transcript here, so does

7       that change your belief?

8   A   Yeah -- repeat that.

9   Q   You don't really know if he shut his recorder off or

10      not, it's just what you thought was going on?

11  A   Yes, correct.

12  Q   And do you remember, maybe you don't, that what you

13      said to him then was you were talking to Mikey and

14      then you said:  I saw like they were gonna fight or

15      something because I was like, uh, Mikey, let's forget

16      it, let's slide through and go take a drink, forget

17      about it, that you said that to Sergeant Thao in

18      Hmong but I'm reading you the English translation?

19  A   I said we were going to get a drink because he asked

20      where were we going.

21  Q   Right, right, you're talking to Mikey is what's in

22      the translation, not that you actually went and got a

23      drink.

24  A   Yes, yes.

25  Q   Okay.  And then Sergeant Thao said:  But you didn't

84

1       have time.  Right?

2   A   Yes, correct.

3   Q   And you said:  No, he didn't, he didn't budge either,

4       so -- and Sergeant Thao said right?

5   A   Yes.

6   Q   And what you told Sergeant Thao then was:  I kind of

7       tried to shove him.

8   A   That's correct.

9   Q   And you're talking about Joshua Richards, that's the

10      person who you're saying to Thao you tried to shove.

11  A   No, Mikey Thao.

12  Q   So you tell Sergeant Thao you're trying to shove

13      Mikey Thao?

14  A   Yeah.  In a group like through the door.

15              ATTORNEY MAIER:  I'm sorry.  Can we --

16              THE COURT:  Hold on.  Just wait.

17              ATTORNEY MAIER:  I didn't hear all of that

18      answer.  Real quiet.

19              ATTORNEY VISHNY:  I'm sorry.  Let's --

20              THE COURT:  Hold on.  We'll have the clerk

21      read it back.

22              (Previous question and answer read back.)

23              THE COURT:  Is that far enough back?

24              ATTORNEY MAIER:  Yes.  Thank you.

25  Q   (BY ATTORNEY VISHNY)  Okay.  But you say Mikey didn't

85

1          move, he was kind of like, whoa, like watching the

2          guy too because the guy was gonna hit us.  Right?

3     A    Correct.

4     Q    And then Sergeant Thao says:  So what happened.

5          Right?

6     A    Yes, correct.

7     Q    And then you say:  Well, I don't know really, I was

8          smoking a cigarette and -- right?

9     A    Yes, correct.

10    Q    Sergeant Thao points out you can't smoke inside,

11         right?

12    A    Yes, correct.

13    Q    Okay.  So then you guys clear that up that that's

14         before the fight, right?

15    A    Yes, correct.

16    Q    All right.  And what you -- what happens then is you

17         tell Sergeant Thao again in Hmong, but we're wording

18         it in English:  We were going to drink, and as we

19         were walking in the hallway right there, I guess

20         Phong and Paul were trying to walk into the bar

21         already, and then the white person kept saying

22         something to them.

23    A    Correct.

24    Q    Okay.  So that's not a hallway where you have on your

25         diagram there?

86

1    A    I believe it is but --

2    Q    You call that a hallway?

3    A    Not really a hallway but entryway.

4    Q    Okay.  It's part of the foyer, right, it's just like

5         kind of a second foyer area?

6    A    Yes, correct.

7    Q    Okay.  And actually it's not where you have it marked

8         victim, the hallway is farther down if you look at

9         that diagram going down?

10   A    Yes, yes.

11   Q    That's where the hallway is, correct?

12   A    Correct.

13   Q    And then Sergeant Thao says:  He's a big guy,

14        right?

15   A    Yes, correct.

16   Q    And you say:  Yeah, yeah, and then his girlfriend was

17        trying to stop him.

18   A    Correct.

19   Q    I was like, and he kept pointing fingers, he's trying

20        to swing at me too, so I say, hey, man, I don't even

21        know you, I don't want trouble with you.  Right?

22   A    Correct.

23   Q    And then you tell Sergeant Thao he says to you,

24        right, I'm on Page 6 now in the middle of the page.

25        You were -- just before the shooting, you were kind

87

1         of behind Paul, and you say yeah, right?

2   A     Yes, correct.

3   Q     And Sergeant Thao says:  Actually next to Paul.  And

4         you say yeah to that?

5   A     Yes, correct.

6   Q     And he says:  Paul threw a punch.  Right?

7   A     Yes, correct.

8   Q     And then Sergeant Thao says:  Did the guy do anything

9         to Paul before that.

10  A     Yes, that's correct.

11  Q     And you said:  Well he kept coming, he was kind of

12        like he had his hand cocked back, he was trying to

13        swing but his girlfriend was holding.

14  A     Correct.

15  Q     So you tell Sergeant Thao that's what Joshua Richards

16        was doing before Paul actually hit him, that's when

17        he had the hand cocked back, that's what you told

18        Sergeant Thao.

19  A     No.  Paul -- yes, but I must have mistaken that Paul

20        hit him before that.

21  Q     I'm just asking you what you told Sergeant Thao right

22        now.  I want to be clear about that.

23  A     Correct.

24  Q     So this is on December 18th, ten days after it

25        happened, right?

88

1   A   Yes, correct.

2   Q   And you're talking about the guy's girlfriend, and

3       she's like, stop it, stop it, and I was like, dude,

4       your girlfriend is even trying to stop this, please

5       don't do this, you know?

6   A   Yes, correct.

7   Q   And then he says:  And so then what happened after

8       Paul threw the punch.  And you say:  Then all of a

9       sudden I just saw a hand and bang.  Right?

10  A   No, I didn't say that.

11  Q   You didn't say that?

12  A   Yes.

13  Q   But the bang happened right after the punch?

14  A   Yeah, after he pinned us to the wall, yes.

15  Q   Okay.  And then you say:  You know, I'm like, holy

16      shit, you know, stuff like that.  Okay?

17  A   That's correct.

18  Q   All right.  And how scared you were, right?

19  A   Yes, correct.

20  Q   Okay.  Then Sergeant Thao says to you:  Whose hand

21      did you see with the gun pump bang.  Right?

22  A   I don't recall him asking me that.

23  Q   Your answer is:  I saw a silver sleeve, it was almost

24      like this but like, and then Sergeant Thao says:

25      Black.  Right?  And you say:  Black inaudible.

89

```
 1        Correct?
 2   A    I can't recall that.
 3   Q    So he says:  Okay, a silver sleeve, right?  Sergeant
 4        Thao says that?
 5   A    I don't believe so because I don't think that
 6        conversation even lasted that long.
 7   Q    Okay.
 8   A    It ended right when something about Mikey.
 9   Q    Okay.  So you say:  I think it's like silver or
10        white.  I'm not sure.
11   A    I never said that.
12   Q    And he says:  Okay.  And you say:  But it's pretty
13        close.  Right?
14   A    Yes.
15   Q    And then he says:  Well, and the pictures so, you
16        know, I saw the pictures.  Sergeant Thao says:  Which
17        is, which is Chong.  And you said:  I don't know, I
18        believe so because he wore it.  Right?
19   A    Correct.
20   Q    And then Thao says:  You know how to put two and two
21        together.  And you say yes?
22   A    Correct.
23   Q    Now let's talk about your trip to Milwaukee.  Today
24        in court when you're being questioned, what you say
25        is you came to Milwaukee, if I remember this, you get
```

90

1         to the Hilton, it's still dark out, there's some
2         going on, but you've told a few different stories
3         about what happened when you came to Milwaukee to the
4         Hilton, haven't you?
5    A    No, I haven't.
6    Q    So you've always said the exact same thing, that you
7         came to Milwaukee, you guys went to -- you say your
8         relatives, you're referring to Peter Moua, right?
9    A    Yeah, people in Milwaukee there.
10   Q    Peter Moua is your cousin?
11   A    Yes.
12   Q    And he lives with some other people?
13   A    Correct.
14   Q    Is he the only one you're a blood relative to?
15   A    No.  Most of them are.
16   Q    Most of them are your cousins.  Is Dia Vang your
17        cousin?
18   A    Yes.
19   Q    Is Xai Thao your cousin?
20   A    No.
21   Q    Is Joseph, is he your cousin?
22   A    Yes.
23   Q    Is Jesus, is he your cousin?
24   A    No.
25   Q    Is Q your cousin?

91

1   A    No.

2   Q    And do you remember -- okay.  I'm showing you what's

3        been marked as Exhibit 162.  This is a transcript of

4        when Sergeant Rabas and Sergeant Lietzinger came to

5        your house, and this is before you went inside for

6        the five minutes.  Okay?

7   A    Yup.

8   Q    And they asked you -- I'm going to just go back.

9        They were asking you some questions about who you saw

10       in Milwaukee, right?

11  A    Yeah.

12  Q    And then Sergeant Lietzinger says to you:  Well who

13       were you partying with down there.  Do you remember

14       that?

15  A    Yes.

16  Q    And you say:  Ah, just some of my cousins.  Right?

17  A    Yes.

18  Q    And then he says:  What are your names, and you say:

19       Roger Thor.  Right?

20  A    I can't recall that.

21  Q    Okay.  But this is the transcript, and you --

22       actually then Sergeant Rabas says:  Roger Thor.  And

23       you say:  Yeah.  Right?

24  A    Yes, correct.

25  Q    Okay.  So you don't tell him the same things you're

92

```
 1        saying in court today about going to Q's and going to
 2        Peter's?
 3   A    Yes, I have.
 4   Q    Oh, you did, huh?
 5             All right.  Let's go to the next place.  Now on
 6        December 16th -- on December 16th Sergeant Rabas
 7        interview -- that's Exhibit 163.  Right?  Do you
 8        remember that?
 9   A    I don't know.  That's -- I believe so.
10   Q    Now, I'm going to show you what's been marked as
11        Exhibit 163.  This is a transcript of you talking to
12        Sergeant Rabas on December 16th.  Okay?
13   A    Okay.
14   Q    So this is two days before Sergeant Thao interviewed
15        you.
16   A    Okay.
17   Q    Turning to Page 8, Line 11, Sergeant Rabas says:
18        About what time did you get to the hotel.  And you
19        say:  I believe it was about eight.  Right?
20   A    Correct.
21   Q    And then Rabas says:  And it was just you two, and I
22        know you talked about inaudible and stuff.  Do you
23        remember that?
24   A    Yes, correct.
25   Q    And as far as that inaudible goes, what Sergeant
```

93

1           Rabas was telling you -- do you remember what he was

2           telling you that you talked about?

3     A     Not off top of my head.

4     Q     Was he asking you at all whether or not you were

5           talking about the shooting in Milwaukee?  He says,

6           and I know you talked about something or other?

7     A     I believe he said that, yes.

8     Q     Okay.  And you say:  Okay, yeah.  Right?

9     A     Yeah.

10    Q     And then he says:  You then -- then you went to

11          Peter's house, or where did you go after the hotel.

12          Right?

13    A     Yes.

14    Q     And you said:  Yeah, Peter, to watch the games and

15          hung out there for a bit.  Right?

16    A     That's correct.

17    Q     And Sergeant Rabas says:  The football game, the

18          football game.  Right?

19    A     Yes.

20    Q     And there is some talk about fantasy football,

21          right?

22    A     Yes.

23    Q     And then you say:  Just went back to the hotel and

24          spent the night there.  Correct?

25    A     Oh, yes, yes.

94

```
 1   Q   So when you talked to Sergeant Rabas at that time you
 2       totally leave out that you went to Q's house at all.
 3   A   It was two nights so one of the nights we went back
 4       to the hotel.
 5   Q   So you were in Milwaukee for two nights?
 6   A   I believe so because we got back on Monday.
 7   Q   So you went Saturday night?
 8   A   I think early morning, yeah.
 9   Q   So that's what you're saying two nights, that's what
10       you mean by that?
11   A   Yeah, yeah.
12   Q   But you know that Sergeant Rabas wants to interview
13       you about who possibly you or Chong has supposedly
14       told about this, right?
15   A   Correct.
16   Q   And you know that's the point of him questioning you,
17       right?  He's trying to get information for his
18       investigation?
19   A   That's correct.
20   Q   And you just say you went to Peter's house, you never
21       mention Q's house, right?
22   A   I just said, ah, I believe I did.
23   Q   Okay.
24   A   I believe I did.
25   Q   But you couldn't remember JJ's Fish when you talked
```

95

```
 1          to him.  You remember where you went to eat?
 2    A     Yeah, yeah, yeah, yeah.
 3    Q     Must have been a pretty good meal, huh?
 4    A     Oh, yeah.
 5    Q     Okay.  So all along here the police come to talk to
 6          you several times and you know you're a potential
 7          suspect, right?
 8    A     Correct.
 9    Q     And you tell them what you think they want to hear
10          and you want to make sure that you're not in trouble,
11          right?
12    A     Correct.
13                    ATTORNEY VISHNY:  Nothing further.
14                    THE COURT:  Mr. Maier, any -- let me ask
15          this, Mr. Maier.  Why don't we have counsel approach.
16                    (Bench conference.)THE WITNESS:  Can I use
17                    the restroom?
18                    THE COURT:  Just one second.  We'll take
19          care of that.
20                    (Bench conference.)
21                    ATTORNEY VISHNY:  You're going to excuse
22          the jury?
23                    THE COURT:  Excuse the witness for a
24          moment, and while we're doing that we'll excuse the
25          jury for a moment so they don't have to wait in here.
```

96

1        Be about five minutes.  And then from the sounds of
2        it, what we're going to do is we'll go a little bit
3        into the lunch hour but that way we don't break up
4        another witness so we'll be able to complete that.
5             Please rise for the jury.
6                  (The jury was escorted out of the
7        courtroom.)
8                  THE COURT:  Mr. Thor, I'm going to have the
9        clerk or the court reporter read back some of the
10       questions that were asked of you previously, and then
11       that will prompt some additional questions, and so if
12       you could go back maybe one or two questions before
13       and then up to the -- and through the question and
14       answer and then that will -- and then, Mr. Maier,
15       we'll turn it over to him.
16                  (Testimony from Page 67, Line 12 to Page
17       68, Line 4 read back.)
18                  THE COURT:  Okay.  Mr. Maier.
19            **VOIR DIRE EXAMINATION OF JOE THOR**
20   **BY ATTORNEY MAIER:**
21   Q   On the last two questions that you answered yes, that
22       the defendant had claimed to have done people -- I'm
23       sorry, done things to people that he hadn't done,
24       what are you referring to?
25                  I guess let me ask it this way.  What makes you

97

1           answer that question yes?

2    A      Because he's a liar.

3    Q      But give me an example of a time.

4    A      All right.  Two sisters, he said he got both of them

5           pregnant.

6    Q      And are there other -- other things?

7    A      Yes.  He came over with a car that wasn't even his.

8           He's like, this is my car.  And then a few days later

9           one of his friends is like, what, you told them

10          that's your car, that's not even your car.

11   Q      And then the last question that was read you answered

12          yes was that the defendant had claimed to have done

13          bad things to people that he hadn't really done --

14          I'm sorry, bad things that he didn't really do, or

15          very close to that.  What does -- what causes you to

16          answer that question yes?

17   A      Because like the sisters, you know, for example, like

18          he said he got both of them pregnant.  I can't

19          believe him.

20   Q      And that's all that causes you to answer that yes?

21   A      Yes.

22                  ATTORNEY MAIER:  That's fine.

23                  THE COURT:  Okay.  Thank you.

24                  ATTORNEY SCHNEIDER:  Actually, just one

25          second once.

98

1                   THE COURT:  I'll wait.

2    Q   (BY ATTORNEY MAIER)  Mr. Thor --

3                   ATTORNEY MAIER:  And, Judge, I do have a

4        question.

5    Q   (BY ATTORNEY MAIER)  Mr. Thor, can you tell me about

6        a time that the defendant has claimed to have done

7        something bad that he had done something bad?

8                   ATTORNEY VISHNY:  Objection.  That is not

9        responsive.  We were going to ask what he meant by

10       that, and when he has said he's done things that are

11       bad, I don't think that they have a right to go there

12       based on this.

13                  THE COURT:  Why don't I -- parties come on

14       up.

15                  (Bench conference.)

16                  THE COURT:  Okay.  So just a few more

17       questions for you, Mr. Thor.  Mr. Maier?

18   Q   (BY ATTORNEY MAIER)  Mr. Thor, you indicated that the

19       bad things that Chong told you he had done was having

20       claimed to have gotten two sisters pregnant, correct?

21   A   Correct.

22   Q   And you don't know that that was -- I'm sorry.  You

23       know that's not true, correct?

24   A   Correct.

25   Q   Is there anything else that would cause you to answer

99

1    that question yes?

2  A   No.

3             ATTORNEY MAIER:  Okay.

4             THE COURT:  Are we all set to bring in the

5    jury?

6             ATTORNEY VISHNY:  Yup.

7             THE COURT:  Please rise for the jury.

8             (The jury was escorted into the courtroom.)

9             THE COURT:  Please be seated.  I believe we

10    were at the point, Mr. Maier, for redirect.

11             ATTORNEY MAIER:  Yes.

12             **EXAMINATION OF JOE THOR**

13  **BY ATTORNEY MAIER**:

14  Q   Mr. Thor, at the end of the questions that Attorney

15    Vishny was asking you, she was -- I think you

16    indicated that part of the reason why you didn't want

17    to talk to the police was because you didn't want to

18    get in trouble; is that correct?

19  A   Yes, correct.

20  Q   You didn't do anything at Luna that would -- could

21    get you in trouble though, correct?

22  A   Correct.

23  Q   You had nothing to do with the shooting except being

24    in the room when it happened.

25  A   Yes, correct.

1  Q  Maybe even on the other side of the person when he

2     got shot?

3  A  What was that?

4  Q  You were on the other side of the person when he got

5     shot.

6  A  What person?  Are you speaking about the victim?

7  Q  Yes.  When Mr. Richards got shot, he was facing you,

8     right?

9  A  Yes, correct.

10 Q  Where did the shot come from?

11 A  I think -- I don't know, a little behind him to the

12    side I believe.

13 Q  And you just held your hand up to your left side,

14    right?

15        ATTORNEY VISHNY:  I couldn't see that.  I'm

16    sorry.

17 A  No, not left side, but like an angle, yeah.

18 Q  I'm sorry?

19 A  He's right here, I'm over, you know, to the side

20    here.

21 Q  His left side?

22        ATTORNEY VISHNY:  I'm going to object to

23    leading at this juncture about this issue.

24        THE COURT:  I'm going to give a small bit

25    of latitude, but just if you spend too much time then

101

1            I'll expect you to rephrase.

2                    ATTORNEY MAIER:  That's fine.

3     Q    (BY ATTORNEY MAIER)  As you're facing Josh and as you

4          see the flash and hear the bang, which side is it

5          coming from as you look at it?

6     A    You mean the flash or the --

7     Q    The flash.

8     A    I don't know.  It was quick flash, the whole room

9          kind of lit up.

10    Q    Okay.  It's dark in there, right?

11    A    Yes, correct.

12    Q    It was still dark when you -- how dark was it when

13         you left?

14    A    It was still dark.

15    Q    How dark was it when Paul took the swing?

16    A    It was dark also.

17    Q    How dark was it when you had gone downstairs to the

18         bathroom before this all happened?

19    A    It was really dark down there, yeah.

20    Q    Dark upstairs -- or on the ground level still when

21         you first left to go downstairs?

22    A    Yes, because all the walls are like pretty much black

23         so --

24    Q    Do you know somebody named Teng Lee?

25    A    Yes, I do.

```
 1    Q    How do you know Teng?

 2    A    I went to school with him also.

 3              ATTORNEY VISHNY:  Judge, can we approach

 4         please?

 5              (Bench conference.)

 6              THE COURT:  Go ahead, Mr. Maier.

 7    Q    (BY ATTORNEY MAIER)  How do you know Teng?

 8    A    Through school.

 9    Q    And he's related to someone you know as well,

10         correct?

11    A    Phong.

12    Q    How is he related to Phong?

13    A    Brothers.

14    Q    All right.  Back in December of 2013, do you know

15         where Chong's mother lived?

16    A    Yes, I do.

17    Q    Where did she live?

18    A    I believe in Neenah.  Well, she lived in Appleton

19         then Neenah.

20    Q    Appleton and then Neenah?

21    A    That's correct.

22    Q    Same block as you in Appleton?

23    A    No.

24    Q    When you and Paul and Phong run out of Luna that

25         night, what did Paul -- what clothing did Paul get
```

103

1        rid of?

2    A   I can't recall.

3    Q   Did he get rid of anything?

4    A   I don't believe so.

5    Q   And you recall Phong taking off the vest, right?

6    A   Yes.

7    Q   And you've told us that you took off your hat and got

8        rid of that?

9    A   Yes.

10   Q   As you're doing this, is Paul doing anything?

11   A   I don't think so.

12   Q   So no.

13   A   No.

14   Q   Now, you -- you testified on cross that the officers

15       wanted you to make a phone call to Paul, correct?

16   A   Correct.

17   Q   And they were going to record that phone call,

18       right?

19   A   Yes, correct.

20   Q   And you told them what, I have to do it later?

21   A   No, I just told them I'll try to do that, I'll see if

22       I can do it.

23   Q   And it never happened, right?

24   A   No, it never happened.

25   Q   How willing really were you to do that?

104

1    A    Not willing at all.

2    Q    You didn't want to be involved in this, right?

3    A    That's correct.

4    Q    And you know that if you do that someone might find

5         out later on that you made a recorded call with the

6         police?

7                   ATTORNEY VISHNY:  Objection.  Leading.

8                   THE COURT:  Please rephrase.

9    A    Can you repeat that?

10   Q    Well, I have to ask it differently.

11   A    Oh.

12   Q    What's your concern if you make a recorded phone call

13        with the police?

14   A    I didn't really have no concerns, it was just privacy

15        because that's my brother's phone so why would I want

16        to do that to my brother's phone.

17   Q    We're talking about your brother -- which brother's

18        phone is it that we're talking about it?

19   A    I believe Cassidy.

20   Q    And does Cassidy have one phone or more than one

21        phone?

22   A    One phone.  The police officers still have it.

23   Q    Now, you did tell the police some things, correct?

24        You told them a lot of things, right?

25   A    Correct.

105

1   Q   You told them that Chong came to your house after the

2       shooting.

3   A   Yes, correct.

4           ATTORNEY VISHNY:  Again object to leading

5       at this juncture.

6           THE COURT:  I'll allow that question to

7       stand.  Please move on.

8   Q   (BY ATTORNEY MAIER)  When you got home, you indicated

9       that Phong and Paul called for a ride, correct?

10  A   Yes, I believe so.

11          ATTORNEY VISHNY:  Same objection.

12          ATTORNEY MAIER:  I'm really just trying to

13      get --

14          THE COURT:  I'll consider it somewhat

15      foundational.

16  Q   (BY ATTORNEY MAIER)  What did you do after they

17      left?

18  A   Nothing, just sat in my room, laid down.

19  Q   You sat in your room and laid down?

20  A   Yeah.

21  Q   Did you sleep?

22  A   I was about fall asleep and then I heard the doorbell

23      ring.

24  Q   What did you tell the police about what Chong had

25      done with the gun that he used in the shooting?

106

```
 1   A    I had told them he flushed it down the toilet.

 2   Q    And where?

 3   A    At Sharks nightclub.

 4   Q    Whose car did you tell the police you took to

 5        Milwaukee?

 6   A    I believe Chong's mother's.

 7   Q    Where did you stay in Milwaukee, according to what

 8        you told the police?

 9   A    The Hilton and Q's house and Peter Moua's house.

10   Q    Who else was with you when you went to Milwaukee,

11        according to what you told the police?

12   A    Chong Lee.

13   Q    Who paid for the hotel room when you went to

14        Milwaukee, according to what you told the police?

15   A    Chong.

16   Q    And what time did you tell the police that Chong had

17        checked into the hotel?

18   A    I just guessed 8:00.

19   Q    8:00 a.m. or p.m.?

20   A    A.m.

21   Q    A.m.?  When Chong indicated that he wanted to go to

22        Chicago to look for this car, how long was it before

23        you left or before he picked you up at your house and

24        you left for Milwaukee?

25   A    What do you mean, how long was it for him to come
```

107

1      back to pick me up?

2    Q    Correct.

3    A    I believe like an hour or so.

4    Q    So it was the same night yet that you drove down to

5         Milwaukee with him?

6    A    Yes, correct.

7    Q    When you talked to the officers on December 10th,

8         which would have been right when you got back -- or

9         right after you got back up to -- do you recall that

10        conversation?

11   A    Yes.

12   Q    And I think Attorney Vishny had you looking at some

13        transcripts of that conversation.  Do you recall

14        that?

15   A    That's correct.

16   Q    And during that conversation the officers were trying

17        to get -- they're making it pretty clear to you they

18        think Paul did this, right?

19   A    That's correct.

20   Q    And you're not willing to say that Paul did this,

21        right?

22   A    I was saying I know he didn't do it.

23   Q    You know Paul didn't do it?

24   A    Yeah.  Because his hands were spread wide open like

25        this pinning me to the wall and Phong.  So how would

108

1       you just shoot, he gonna shoot like this?

2   Q   Now you've told all of us today about what Chong told

3       you while you were going down to Milwaukee, correct?

4   A   Yes, correct.

5   Q   And you recall him saying that?

6   A   Yes, correct.

7   Q   That's what he said.

8   A   Yes, correct.

9               ATTORNEY MAIER:  That's all the questions I

10      have.  Thank you, Joe.

11              THE COURT:  Attorney Vishny.

12              ATTORNEY VISHNY:  Yes, I do.  Just a few.

13                  **EXAMINATION OF JOE THOR**

14  **BY ATTORNEY VISHNY:**

15  Q   The prosecutor was asking you if you know Teng Lee,

16      correct?

17  A   That's correct.

18  Q   Teng Lee has never told you to not testify in this

19      case, has he?

20  A   No, sir.  He never contacted me.

21  Q   He never threatened you, right?

22  A   No, never.

23  Q   You said that -- I'm going to go back to Exhibit No.

24      160 now, going back to your first interview with the

25      police officers on December 10th.  I'm going to show

```
1            you a page from that.  Okay?  We're on page of 60.
2            And police officer Sergeant Rabas says did anybody
3            else throw a punch at him, and you said no.  And then
4            he asked you if you were a hundred percent sure, and
5            you said yes, right?
6     A      Correct.
7     Q      And then he said, on what side of his face would he
8            have hit him.  If Paul swung a punch, what side, does
9            he hit him on the right side or does he hit him on
10           the left side.  And your answer is, would have to be
11           the left.  Correct?
12    A      I believe so, yes.
13    Q      And then Sergeant Rabas says left side.  And you say,
14           okay, right?
15    A      Yes, correct.
16    Q      Then he asks you, where do you think the guy got
17           shot, and you said you didn't know?
18    A      Yes, correct.
19    Q      Now, you say that right after this punch -- what
20           you're saying today is that Paul -- I think the word
21           you used just now were his hands were spread wide
22           open.  Right?
23    A      Yup.
24    Q      So in other words what you're saying is -- I want you
25           to stand up so everybody can see your hands.  Okay?
```

110

1    A    Okay.

2    Q    When you say his, meaning Paul's hands were spread

3         wide open, you're talking about right now as he's

4         backing away from the guy he just punched, right?

5    A    Yeah, yeah.  Like that.

6    Q    And just -- I want you to show the jury, and big, so

7         everybody can see.

8    A    He had his hands out like that and he pinned us to

9         the wall.

10             ATTORNEY VISHNY:  I'd ask the record to

11        reflect that Mr. Thor has his hands both out to the

12        side in a slightly backward angle when he stood up.

13   A    That's correct.

14   Q    Is that accurate?

15        Okay.  So he got his hands completely showing,

16        nothing in his hands, and at that point he's pinning

17        the two of you guys to a wall, right?

18   A    Yes, correct.

19   Q    And while he's there with nothing in his hands

20        pinning you to a wall, that's when you see this

21        flash, right?

22   A    I see Mr. Richards coming towards us.

23   Q    You see him coming towards you and then the flashes

24        occurring, right?

25   A    Yes, but I don't --

111

1    Q    I'm sorry.  I didn't mean to cut you off.

2    A    I just kind of put my hands up to get ready to get

3         punched so --

4    Q    Right.  So you take a defensive move and you go like

5         this, right?

6    A    Yes.

7    Q    You didn't close your eyes though?

8    A    No.

9    Q    You don't close your eyes when somebody might hit

10        you?

11   A    Yeah.

12   Q    You need to be able to see what's going on, right?

13   A    Correct.

14   Q    And it's right then the flash occurs?

15   A    Yes, correct.

16   Q    Lights up the whole room?

17   A    Yes, correct.

18   Q    And right after the flash you see him to the floor

19        and you guys immediately run out the door?

20   A    Yes, correct.

21   Q    Because you're scared?

22   A    Correct.

23   Q    Gunshot, right?

24   A    Correct.

25   Q    Don't want to get hit?

```
 1   A   Yes, correct.

 2   Q   Run away?

 3   A   Yes, correct.

 4   Q   Toss your stuff in the garbage because you're scared

 5       the police are going to talk to you about it,

 6       right?

 7   A   No, just scared whoever shot.  We don't know who

 8       shot, so what if they're shooting at us, so just

 9       changing appearance.

10   Q   But you're positive Paul runs, you know, he has his

11       hands out kind of like almost protecting or pinning

12       you guys?

13   A   Correct.

14   Q   Then the guy comes towards you and, boom, you guys

15       run out of there?

16   A   Yes, correct.

17               ATTORNEY VISHNY:  Nothing further.

18               THE COURT:  Any redirect?
```

19                    **EXAMINATION OF JOE THOR**

20   **BY ATTORNEY MAIER:**

```
21   Q   Did you hear anything -- yes, please.

22       Did you hear anything said out loud before the

23       shot went off?

24   A   No.

25   Q   There was no warning?
```

113

```
 1   A     No.

 2                  ATTORNEY MAIER:  That's all.

 3                  THE COURT:  Counsel approach just for a

 4         second.

 5                  (Bench conference.)

 6                  THE COURT:  We will be in -- I'm sorry.  We

 7         have some questions.  I apologize.

 8                  (Bench conference.)

 9                  THE COURT:  Okay.  We have several

10         questions for you, Mr. Thor.

11             Showing you what's previously been marked as

12         Exhibit 93, and can you tell me, is -- is Chong

13         located in that diagram?

14                  THE WITNESS:  No, he is not.

15                  THE COURT:  Okay.  Then I'll take that

16         back, sir.  Thank you.

17             The next question:  Was it unusual to have Chong

18         show up in the night and want to go on a road trip

19         out of town?

20                  THE WITNESS:  No.  That guy likes to travel

21         around, go see girls and stuff so --

22                  THE COURT:  All right.  Why did you decide

23         to return to Appleton without looking at the car in

24         Chicago?

25                  THE WITNESS:  Because it was a blizzard and
```

114

1        I said I gotta get back.  It's already been two days.

2        Since it was snowing, I just want to go home.

3               THE COURT:  What prompted you to pick

4        Sharks for the place where Chong Lee flushed the gun?

5               THE WITNESS:  Because usually when we're at

6        Luna we just go to Sharks only if we're around that

7        area.

8               THE COURT:  Okay.  What was the date you

9        told officers Chong Lee flushed the gun at Sharks?

10              THE WITNESS:  I cannot recall that day.  I

11       believe it was the day Chong got arrested.

12              THE COURT:  Okay.  Mr. Maier, any follow-up

13       questions.

14                      **EXAMINATION OF JOE THOR**

15       **BY ATTORNEY MAIER**:

16   Q    Why isn't Chong in that diagram?

17   A    Because I didn't know where he was at that time.

18   Q    Where was your focus at that time?

19   A    Just towards Mr. Richards.

20              ATTORNEY MAIER:  Thank you.  That's all.

21              THE COURT:  Any follow up cross-examination

22       questions?

23              ATTORNEY VISHNY:  No.

24              THE COURT:  All right.

25          And, sir, thank you.

115

1           And let's rise for the jury.  I'd ask that you

2       be back at 1:30.  We'll give you an hour.

3               (The jury was escorted out of the

4       courtroom.)

5               THE COURT:  We had -- we had two brief

6       sidebars.  One pertained to concerns about some

7       cross-examination questions, a voir dire was

8       conducted.  It was addressed what questions would be

9       able to be asked and that resolved that issue.

10          There was a second sidebar pertaining to

11      concerns about questions related to Mr. Teng Lee.

12      The court allowed those questions.

13              Anything else that you can recall from any

14      sidebar discussions or is that an accurate summary to

15      the best of your recollection, Attorney Schneider?

16              ATTORNEY SCHNEIDER:  It is, Judge.

17              THE COURT:  Attorney Vishny?

18              ATTORNEY VISHNY:  Yes, that is.

19              THE COURT:  Okay.  We'll be in recess until

20      1:30.

21              ATTORNEY VISHNY:  Yes.  Judge, I have moved

22      in Exhibit 160, but I'm going to ask the court's

23      permission to be able to take transcripts.  We will

24      go through everything later and make sure that all

25      copies are with the court, but we still need to use

116

1          these right now.

2                    ATTORNEY SCHNEIDER:  The clerk can probably

3          make you a copy over lunch.  Can you make a copy of

4          160?

5                    ATTORNEY VISHNY:  I was going to not --

6                    THE COURT:  We'll make a copy.

7                    ATTORNEY VISHNY:  Okay.  That's fine.

8          Could you -- I think the State would like a copy too.

9                    THE COURT:  I'll do two copies.

10                    (Lunch recess.)

11                    (The jury was escorted into the courtroom.)

12                    THE COURT:  Please be seated.  State ready

13          to call its next witness?

14                    ATTORNEY MAIER:  We are.

15              Your Honor, the State calls Dan Campbell.

16                    THE COURT:  If you would please remain

17          standing, the clerk will swear you in, sir.

18                    (Oath administered to witness.)

19                    THE WITNESS:  I do.

20                    THE CLERK:  Please state your full name and

21          spell it for the record please.

22                    THE WITNESS:  Daniel J. Campbell,

23          C-A-M-P-B-E-L-L.

24                    THE COURT:  You may be seated, sir.

25              Mr. Maier, your witness, sir.

117

1                **EXAMINATION OF DANIEL J. CAMPBELL**

2    **BY ATTORNEY MAIER:**

3    Q    Good afternoon, Mr. Campbell.

4    A    Good afternoon.

5    Q    How are you employed, sir?

6    A    I'm a forensic scientist supervisor in the DNA

7         Analysis Unit at the State Crime Lab in Madison.

8    Q    How long have you worked for the State Crime Lab in

9         Madison as a forensic analyst?

10    A    A little over 22 years.

11    Q    And how much of that has involved DNA analysis?

12    A    The first 17 years I worked at the laboratory as an

13         analyst on the bench performing DNA analysis on

14         evidence, and then the remaining five years has been

15         as a supervisor for the unit.

16    Q    And how many analysts do you supervise?

17    A    As a unit, I have assigned to me for supervision

18         14.

19    Q    Is one of them Samantha Delfosse?

20    A    She is not one assigned directly to me.  That's about

21         half of the unit in the casework section of the

22         analysis unit, so approximately 28, and she's

23         actually assigned to one of the other supervisors.

24    Q    Okay.  We heard some testimony about her the other

25         day, I'm sorry, from her the other day about touch

1           DNA, and so I think the jury and everyone else knows

2           more or less what we're talking about, but in -- in

3           the crime lab, or with -- from the crime lab are

4           there a set of guidelines or suggestions for law

5           enforcement agencies about the submission of DNA --

6           excuse me, submission of items for DNA analysis?

7    A      Yes, there is.

8    Q      And if you could summarize the suggestions or

9           procedures about submissions for touch DNA analysis

10          for the jury please.

11   A      Touch DNA analysis as a whole would be in my

12          description not optimal DNA evidence just because the

13          amount of DNA that typically can be recovered can be

14          very low.  We typically try to focus on evidence, if

15          there is evidence available, that contains biological

16          fluids, so fluids such as blood, semen, saliva.  That

17          would not be considered touch DNA evidence.  Touch

18          DNA evidence would be evidence being briefly touched

19          by the skin and then if there is skin cells present

20          on that item to be able to obtain a DNA profile.  So

21          touch DNA evidence for the most part, for cases like

22          property crime, it's not an acceptable type of

23          evidence.  There are guidelines, so we do have

24          exceptions at times based on communications with

25          attorneys or law enforcement agencies.

119

1    Q    Now, at some point in the later part of 2014 or the

2         early part of 2015, did you receive a request from

3         the Appleton Police Department related to an analysis

4         of some unfired shell casings that had been recovered

5         as part of a homicide case?

6    A    Yes, I did.

7    Q    And it was Sergeant Kevin Thompson from -- now

8         retired from Appleton PD that made that request,

9         correct?

10   A    That is correct.

11   Q    What did you do in response to the request?

12   A    We had a phone conversation regarding some unspent,

13        unfired shells that were within water and whether or

14        not that would be an item worthwhile to submit to the

15        crime lab for testing.  I basically described our

16        experience with touch DNA, just like I did I guess

17        with you previously, and felt that it would not be a

18        worthwhile item to submit, and then at that time

19        offered if he would like I could write a letter

20        basically summarizing DNA submission guidelines,

21        touch DNA evidence, and evidence such as he was

22        describing.

23   Q    And did you do that?

24   A    Yes, I did.

25   Q    Your -- you indicated before these are -- these are

120

1        guidelines but they're actually more like

2        suggestions, correct?

3    A   Correct.

4    Q   And if someone calls and has a conversation with you,

5        there might be something unique to the piece of

6        evidence or to the case itself that might cause the

7        lab to be willing to take a look anyway, correct?

8    A   That is correct.

9    Q   What are some of the -- what are some of the issues

10       with, first, shell casings in analyzing for touch

11       DNA?

12   A   Well, shell casings as a whole, if they're fired

13       casings -- when a bullet is fired, there is heat

14       generated, often casings are metal, they become very

15       hot and it degrades.  In an unfired casing we're

16       still talking about a smooth metal surface.  DNA --

17       for example, if we use a handgun, a handgun typically

18       will have grips on it, textured areas, those are the

19       areas for DNA evidence or skin cells would be

20       recovered from someone handling or rubbing on the

21       skin, and then we'll attempt to to recover those skin

22       cells.  Smooth surfaces contradictory speaking to

23       that same thought process, smooth doesn't retain or

24       capture those skin cells nearly as well so a shell

25       casing that's metal is a smooth surface that readily

1          doesn't collect skin cells, you know, on the item.

2     Q    So an unfired shell casing just found on the ground

3          would not be an optimal candidate for touch DNA,

4          correct?

5     A    Correct.

6     Q    And then adding in, as you mentioned, a fired casing

7          because of the heat that's involved in the process of

8          firing the bullet would make that even less optimal,

9          correct?

10    A    Correct.

11    Q    What about sitting in water for some period of

12         time?

13    A    That also would make the item less optimal, as far as

14         the ability to obtain enough skin cells or DNA to get

15         a DNA profile.

16    Q    Does it matter how long an item sits in water as far

17         as that?  We're talking about something that's

18         smooth.

19    A    Anytime water, essentially washing any item, so your

20         hands, if you have DNA on your hands from someone

21         else and you're washing your hands, those cells are

22         washed away.  Same process with the shells with skin

23         cells potentially on them.

24    Q    If there even were skin cells in the first --

25    A    Or enough skin cells in the first place to be able to

122

1        obtain a DNA profile.

2     Q  Would the size of -- size of the casing or cartridge

3        have an impact on things too?

4     A  It may.  I mean, the larger the item, although it

5        becomes more difficult to target where to swab, we

6        can't just put an item into a tube to throw some

7        chemicals and/or agent in there to attempt to obtain

8        a DNA profile, so the larger the item it becomes more

9        difficult to concentrate those cells and get enough

10       to do DNA, but it could.  I mean a larger item or a

11       larger casing is still small, again, the opportunity

12       to have more skin cells associated with it.  That's

13       possible.

14             ATTORNEY MAIER:  Okay.  Mr. Campbell, thank

15       you very much.  That's all the questions I have.

16             THE COURT:  Any cross-examination?

17          **EXAMINATION OF DANIEL J. CAMPBELL**

18  **BY ATTORNEY VISHNY:**

19    Q  So if I understand this right, there are guidelines

20       but there can be exceptions, right?

21    A  That is correct.

22    Q  And so when you communicated with the Appleton Police

23       Department and you advised them the guidelines, they

24       didn't request that any tests be made?

25    A  No further requests were made of the lab for those

123

```
 1          items to be examined, that's correct.

 2                    ATTORNEY VISHNY:  Thank you.  Nothing

 3          further.

 4                    THE COURT:  Any redirect?

 5                    ATTORNEY MAIER:  Nothing else.  Thank you,

 6          sir.

 7                    THE COURT:  Members of the jury, any

 8          questions for consideration?

 9                    (No response.)

10                    THE COURT:  Thank you, sir.  You may be

11          excused.

12                    ATTORNEY SCHNEIDER:  The State would then

13          call Officer John Schira.

14                    THE COURT:  If you please remain standing,

15          the clerk will swear you in.

16                    (Oath administered to witness.)

17                    THE WITNESS:  I do.

18                    THE CLERK:  Please state your full name and

19          spell it for the record please.

20                    THE WITNESS:  My name is John Schira,

21          spelled S-C-H-I-R-A.

22                    THE COURT:  Whenever you're ready.

23                    ATTORNEY SCHNEIDER:  Thank you.

24                  **EXAMINATION OF JOHN SCHIRA**

25     **BY ATTORNEY SCHNEIDER:**
```

124

1   Q   Good afternoon.  How are you?

2   A   I'm good.  Thank you.

3   Q   I just want to walk you through some things that you

4       did in an investigation for a shooting back at Luna

5       Lounge in December of 2013.  Do you -- did you work

6       on that date?

7   A   I did.

8   Q   I haven't asked this to begin, but how are you

9       employed?

10  A   I am a City of Appleton police officer.

11  Q   How long have you been employed in law enforcement?

12  A   With Appleton roughly 18 years and a couple years out

13      in California.

14  Q   And what are your current duties for the Appleton

15      Police Department?

16  A   I'm a detective.

17  Q   How long have you worked as a detective for Appleton

18      Police Department?

19  A   Nine years.

20  Q   And have you had any special assignments as a

21      detective?

22  A   Before I was a detective, I was also in the CRU Unit

23      which is also an investigation unit.

24  Q   And how many years did you serve in the CRU Unit?

25  A   Six years.

125

1   Q   Can you describe for the jury generally what the

2       focus of the CRU Unit is?

3   A   Street crimes, street investigations.

4   Q   So, in total, 15 years you've been an investigator

5       there then?

6   A   Correct.

7   Q   What did you do your first three years, if I can

8       ask?

9   A   I was a patrol officer.

10  Q   And just to help assist the jury understand, Sergeant

11      Schira, are there yearly or annual requirements for

12      training for officers?

13  A   There is.

14  Q   And if you recall, how many or what's the current

15      requirement?

16  A   Well, depending on I guess your specialty, the

17      general officers will have yearly updates, legal

18      updates which are taught by either judges or, you

19      know, district attorneys, things like that.  Those

20      are four hours.  There is also in-services that we do

21      that can be either tactical type of training like

22      firearms, EVOC driving, stuff like that, or it can be

23      case law, investigations, things like that.

24  Q   And on top of that, does the City of Appleton require

25      you at times have additional training that you do as

126

1       a city employee?

2    A  They do, they do.

3    Q  Is part of the ongoing training involved, I think you

4       called it tactical training, but firearm training?

5    A  It is.

6    Q  Do you have any unique or specialty related to

7       firearms?

8    A  I do.

9    Q  What is that?

10   A  I'm a unified tactical instructor, which means that

11      anything dealing with tactics, could be defensive

12      tactics, firearms, EVOC driving, communication

13      skills, I'm a trainer in that.  I'm also a SWAT

14      member, and I'm a sniper on the SWAT team.

15   Q  And does that involve you going to some specialty

16      trainings related to those duties?

17   A  It does.

18   Q  How long have you held that -- I don't know if I want

19      to call it an assignment, but those duties?

20   A  Pretty much right from the get-go, probably 16, 17

21      years.

22   Q  And, Sergeant Schira, during your career has some of

23      your training also focused on interviews of

24      witnesses, children or suspects?

25   A  It has.

1    Q    Is that something that is done on an annual basis?

2    A    We get annual training in the form of in-service

3         training and legal update type of training, and then

4         there is also some specialized training that we go

5         to.

6    Q    And have you gone to specialized training related to

7         when your duties were the street crimes unit?

8    A    I did.

9    Q    And what about when you've now just been assigned to

10        general detective unit or investigation unit?

11   A    I have.

12   Q    What are some of those trainings?

13   A    I've gone to DCI street investigator school that was

14        a two-week schooling.

15   Q    I say we all talk in our own alphabet soup, so if you

16        don't eat my soup you don't know.  DCI means what?

17   A    Department of Criminal Investigations.

18   Q    And that's a State of Wisconsin agency?

19   A    Yes, ma'am.

20   Q    Okay.  So I interrupted you.  It was a DCI

21        training?

22   A    Street investigation school.

23   Q    Okay.  Have you gone to any trainings related to

24        homicide investigations?

25   A    I've gone to death investigation school, I've done

128

1   numerous in-service trainings for violent crime

2   investigation, I've gone through additional training

3   like at the techs for in-service and investigation,

4   backgrounds, things like that.

5  Q The death investigation school, when was that, if you

6   even know, Sergeant?

7  A I believe it was eight years ago.

8  Q And have you specifically gone to trainings that

9   focus on interviewing -- I'm going to talk about

10   adult witnesses or suspects.

11  A I have.

12  Q What trainings in that field have you gone to, if you

13   know?

14  A The Department of Criminal Investigation training,

15   the two-week school, that was an investigation type

16   of school.

17  Q I'm sorry.  Did you say a two-week school?

18  A That was a two-week school, yes.

19  Q Eight hours a day?

20  A Yes.

21  Q All right.  Sorry.  I interrupted you.

22  A I also went to a Reid school, I believe that was ten

23   or eleven years ago, that was a three-day school.

24  Q And based upon these trainings, is there any set

25   practice you have to utilize when conducting an

129

1          investigation?

2      A   There is really not a template for that.  I think

3          investigations are something that you certainly get

4          training from and you pick things up when you train,

5          but most of it is -- for me has been -- I guess it's

6          like when I grew up on a farm.  I learned how to do

7          that from watching my dad and my brothers do it, and

8          that's kind of what I did here.  I worked with good

9          investigators and I watched the techniques and

10         tactics that they use and I use those myself.

11     Q   From your past practice, Sergeant Schira, have you

12         had people that you wanted to talk to who refuse to

13         speak to you?

14     A   Yes.

15     Q   Do you have people who later you found they had

16         information about what you were asking about and they

17         still refused to speak to you?

18     A   Yes.

19     Q   From your past experience, what are some of those

20         reasons?

21     A   Sometimes --

22                ATTORNEY VISHNY:  Object.  Relevancy.

23                ATTORNEY SCHNEIDER:  Well, I either ask it

24         now or I can ask it later in the interviews, but I

25         thought it was more appropriate to lay some of this

130

```
1        now.
2                THE COURT:  I'll give a little bit of
3        latitude.  Foundational.  Go ahead.  Do you need
4        the question read back?
5                THE WITNESS:  No, sir.
6    A   I think there is a variety of reasons why so many
7        people don't talk to you.  One time it could be fear,
8        sometimes people are afraid of police officers,
9        sometimes it's because they're guilty of something
10       and they don't want to talk to you, sometimes they
11       don't want to incriminate a friend, a loved one.
12       There is -- wide variety of why people don't want to
13       talk to you.
14   Q   Have you found that in your 18 years there's also
15       from your past experience people sometimes just don't
16       want to be involved?
17   A   Yes.
18   Q   When you go into an interview, Sergeant, do you have
19       a set script you use at all?
20   A   Not at all.
21   Q   Why is that?
22   A   Because people are people.  Everybody is different.
23       When you talk to people, you have to -- you know, you
24       have to relate to them, you have to relate to what
25       they're going through.
```

131

1    Q    And is it part of your experience that, I think you
2         might have said this already, but do you always take
3         the same approach in every interview?
4    A    No, I do not.
5    Q    Why not?
6    A    Again it goes back to, you know, that everyone is
7         different, every circumstance is different.  You use
8         the same, I guess, recipe or template every time,
9         it's not going to work.
10   Q    And I know you mentioned some of the trainings that
11        you've gone through related to interviewing.  Do you
12        follow any set structure from either one of them?
13   A    No.  Again, I guess when you go to training, it
14        doesn't matter if it's tactical training or if it's
15        investigation training, there is things that you get
16        from the training that you glean from it and that you
17        use and there is things that you don't.
18   Q    Have you had to deal with witnesses, Sergeant Schira,
19        who have been very emotional because of the time
20        period when you're interviewing them related to an
21        incident?
22   A    Yes.
23   Q    Does that come through in their interviews?
24   A    Yes.
25   Q    Sorry.  I'm hitting the microphone here with my pen.

132

1           And even with a person who is showing high

2       emotion, is there one set way you can approach them

3       when trying to talk to them?

4    A  No.

5    Q  Do you take a different approach when you're talking

6       to someone who is a victim/witness or a victim?

7    A  Yes.  I mean, you -- you're always going to take a

8       wide variety of things into account when you're

9       interviewing someone.

10   Q  What about someone who you might think is involved in

11      an offense?

12   A  Yes.

13   Q  Have you talked -- your past experience and training,

14      have you talked to witnesses who have known the

15      suspect?

16   A  Yes.

17   Q  Been related to the suspect?

18   A  Yes.

19   Q  What are some of the issues you've encountered in

20      those types of situations?

21   A  As you pointed out earlier, it's very difficult

22      sometimes to get someone who is a friend or a

23      relative to -- to give you details, to give you

24      information on the incident.

25   Q  Do you have -- I think this comes from the TV world,

1          and I'm not going to remember all the famous pairs of

2          investigators on TV, but do you have a set partner

3          you're assigned with in the Appleton Police

4          Department?

5     A    No, I do not.

6     Q    Okay.  How many investigators are -- and I might as

7          well reference back to 2013.  If you get the number

8          wrong, not a big deal if you remember the range, how

9          many investigators were in the investigative unit

10         back in 2013?

11    A    I believe there was, let's see, Dan, Chue, Neal,

12         seven or eight maybe.

13    Q    Okay.  And then were there also then investigators

14         assigned to what is the CRU Unit?

15    A    Yes.

16    Q    I won't ask you try to guess how many.  Is it more or

17         less?

18    A    I think it's just a little less.

19    Q    Can the approach you take in an interview change

20         depending upon who the partner is that you're to go

21         do the interview with?

22    A    Yes.

23    Q    Why is that?

24    A    Because we're just like the people we interview.

25         We're people.  We have different skill sets.  We have

134

1          different ability to relate and talk to people, and
2          it's just normal, I guess.
3      Q   When you -- and you've obviously during your career
4          done interviews with people where there is not
5          another officer with you?
6      A   Many times.
7      Q   When you have another officer that's going to do an
8          interview with you, do you talk through the interview
9          with that person, come up with a script, prepare in
10         any way like that?
11     A   Very rarely.
12     Q   Why not?
13     A   I guess because until you have contact with the
14         person, to try to come up with a preconceived notion
15         or plan, it just doesn't work out.
16     Q   I'm going to let you pick what time frame you want to
17         do here, Sergeant, whether it's in an average month
18         or an average year.  How many times do you think
19         you've interviewed, and I'm going to say broadly
20         witnesses, so it could be a victim, a witness or
21         person who ultimately is the suspect?
22     A   Boy, a lot.  I mean some investigations it can be
23         just one person and some investigations it can be,
24         you know, ten, fifteen.  Hundreds, I guess,
25         throughout a year.

135

1    Q    And would have that been the same amount that you did

2         approximately when you were assigned to the CRU, the

3         street crimes unit?

4    A    Yes.

5    Q    I want to now direct your attention, Sergeant Schira,

6         to this night.  It would have been -- we've been

7         referring to it as Saturday evening, December 7th

8         into the early morning hours of December 8th, 2013.

9         Were you working that night?

10   A    No, I was not.

11   Q    Okay.  How did you become involved in the case?

12   A    I was called in.

13   Q    And who makes that call?

14   A    At that time it was Lieutenant Gostisha.

15   Q    Is that common when there is a shooting for you as an

16        investigator to be called in?

17   A    Yes.

18   Q    And when you were called in, were you aware if other

19        officers had also been called in?

20   A    Yes.

21   Q    What -- if you remember, Sergeant Schira, what time

22        were you called in?

23   A    I think I was -- it was a little bit later in the

24        evening, I want to say it was probably after two,

25        maybe between two and three.

136

1  Q   And where were you assigned to go?

2  A   I responded first to the police department.  I got my

3      equipment and then I responded to Luna Lounge.

4  Q   And when you arrived at Luna Lounge, was Lieutenant

5      Gostisha there?

6  A   Yes, he was.

7  Q   Did he then give you a different assignment or did

8      you stay there?

9  A   No.  I was there for a very short period of time.

10  Q   And what -- where did you go then?

11  A   I was directed down to Theda Clark where the victim

12      was at.

13  Q   And was -- were medical -- was medical treatment or

14      intervention being attempted on Mr. Richards?

15  A   At Theda Clark, yes.

16  Q   And you're aware his name is Joshua Richards?

17  A   I do.

18  Q   Ultimately did you, through that contact at Theda

19      Clark, learn what was going to be the prognosis for

20      Mr. Richards?

21  A   I did.

22  Q   What was that?

23  A   There was multiple medical staff on scene.  I was

24      told both at the scene by investigators and then by

25      medical staff that he had received a single gunshot

137

1          wound to the side of the head, the left side of the
2          head.  The wound was right almost touching the ear,
3          real close to the left ear, that there was not an
4          exit hole.  I saw there were some x-rays that had
5          been done, and I saw the wound cavity going through
6          the head, and the prognosis was that he was not going
7          to survive.
8     Q    And related to this case, if I can just ask this
9          question before we walk through it, was any potential
10         gun ever recovered?
11    A    Not recovered, no.
12    Q    So in any -- if anyone said they read or heard in the
13         news that a gun was located in the case, that would
14         be accurate or inaccurate?
15    A    Inaccurate.
16    Q    As the case began then on that Sunday, I'm going to
17         say, do you remember becoming aware that there was
18         some video images from Luna?
19    A    Yes.
20    Q    Was that a focus that investigators used or focused
21         on initially?
22    A    Yes.
23    Q    Were those -- I want to say it this way.  Were the
24         primary duties for reviewing that assigned to one
25         officer?

138

1   A   Yes.

2   Q   Who was that?

3   A   Sergeant Neal Rabas.

4   Q   Despite the primary duties being assigned to Sergeant

5       Rabas, at some point was it a process where all of

6       the investigators were involved in reviewing that

7       video?

8   A   We were trying to determine who some of these people

9       were.

10  Q   And how was that done?

11  A   We reviewed -- the video was turned into stills and

12      the stills were put into a -- we call it the fish

13      bowl, a place where we get together to look at cases,

14      and we looked at them.

15  Q   And you call it the fish bowl because it's glass

16      windows all around?

17  A   Every time you go in there people just stare at 'ya.

18  Q   So you ended up putting up still images from the

19      video?

20  A   Correct.

21  Q   And then what was done?

22  A   Well, we started looking at them, trying to figure

23      out who these people were.

24  Q   And ultimately, through that process, were you able

25      to identify some of the people that were involved in

139

1       this incident?

2    A   Yes.

3    Q   Okay.

4              ATTORNEY SCHNEIDER:  May I approach?

5              THE COURT:  You may.

6              ATTORNEY SCHNEIDER:  Sorry I asked.  Habit.

7              THE COURT:  That's quite all right.

8              ATTORNEY SCHNEIDER:  I haven't done it in a

9       day or two.

10   A   Is this for me, by the way?

11   Q   Yes.  That is fresh for you.

12           I'm going to show you what's been marked State's

13      Exhibit No. 32, and it is a series of -- this

14      actually is not a good place.  We have two big

15      exhibits.

16           Eleven photos on Exhibit 32, correct?

17   A   Yes.

18   Q   And they range from letters 32A through 32K, correct?

19   A   Correct.

20   Q   Is this similar to what was - I'm going to use your

21      word - kind of posted or up in the fish bowl where

22      you had still images and attempting to identify

23      them?

24   A   Yes.

25   Q   Okay.  Was there also a different sequence in the

```
 1        video that was utilized to try to focus and identify
 2        people?
 3   A    Yes.  There's really two.  There was people coming
 4        in, and then after the shooting people leaving, and
 5        showing obviously the speed that they were going at
 6        and who they were with, and you could also see
 7        direction, a little bit of a direction of travel once
 8        they got through the outside doors.
 9   Q    So through those two, I'm going to say, like the two
10        images, people entering and then the exit sequence,
11        were people -- were you able to start identifying
12        individuals?
13   A    Yes.
14   Q    Okay.  And from what you became aware of, you're
15        familiar there is kind of a mass exodus of people
16        right after the time of the shooting?
17   A    Correct.
18   Q    Did any of those people, kind of the initial groups
19        you looked at, stay at the scene?
20   A    Did -- can you say that again please?
21   Q    Kind of the initial mass exodus of people?
22   A    Right.
23   Q    Did any of those people remain at the scene when
24        officers had arrived as far as you know?
25   A    No, not that I'm aware of.
```

141

1   Q   It wasn't that they were around where people could
2       start identifying them or talk to them?
3   A   No.
4   Q   Okay.  Did this case in that day, that Sunday into
5       Monday, if you know, Sergeant Schira, result in a lot
6       of citizens calling in who had been witnesses?
7   A   No.  No.  It didn't.
8   Q   Did the department, though, take the time or steps to
9       try to talk to the people who were at Luna when they
10      arrived?
11  A   Yes, we did.
12  Q   Were you at Luna long enough to go into the bar?
13  A   I was there long enough to see that it was -- yeah,
14      that there was investigators there, that they were
15      trying to identify people, they were taking pictures
16      and just doing a lot of things to make sure that we
17      could identify everyone that was there.
18  Q   And this is now after bar close?
19  A   Yes.
20  Q   Was it a happy crowd that was there waiting and
21      trying to talk to officers?
22  A   As bad as going to the hospital was with Josh, that
23      was also a pretty bad position to be in for an
24      investigator.
25  Q   People -- I'm sorry.  I won't even ask.  Do you

142

1      remember who you might have had first contact with

2      related to this case?

3   A   I think it was Josh.

4   Q   Okay.  And ultimately, as part of this case, you

5      learned Mr. Richards did not survive, correct?

6   A   I did.

7   Q   As you then began to try to identify people in the

8      photographs, who did you first have contact with

9      then?

10  A   The first person that I had contact with after

11     looking at the photographs that you showed was Phong

12     Lee.

13  Q   Do you remember what date that happened on?

14  A   That would have been I believe on Monday the 9th.

15  Q   And where was that?

16  A   Here at the -- this facility.

17  Q   Was anyone with you?

18  A   Myself and Sergeant Tauber.

19  Q   And did you speak to Phong on that day?

20  A   I did.

21  Q   When you initially spoke with him, did you ask him

22     about being at Luna?

23  A   I did.

24  Q   How did he respond?

25  A   He told me that he was there, that he had left before

143

1       there was any incidents or anything going on.  He

2       repeatedly lied to me.  Obviously I had the pictures

3       and I knew that he was inside when the shell hit

4       Josh.

5   Q   By that point had he been identified in kind of that

6       sequence of people who had exited?

7   A   He was.

8   Q   On that date did you gather a lot of information from

9       him?

10  A   It was a good start.

11  Q   In your past experience have you had to interview

12      witnesses on more than one occasion?

13  A   Many times.

14  Q   How does that happen?

15  A   Well, it's a process.  When we interviewed Phong,

16      obviously he was -- he was nervous and he knew that

17      -- knew that we were asking very specific questions.

18      He repeatedly, like I said, said that he had left

19      prior to the incident, said that he had walked home.

20      You know, we just knew that that just wasn't true.

21  Q   In addition to the Luna video, by this point had you

22      gathered any other videos that show you where parties

23      went?

24  A   Yes.

25  Q   If you can give the jury some examples of what else

144

1         you reviewed.

2    A    Appleton has a pretty good system of exterior cameras

3         that are on street corners for traffic control

4         reasons.  Several of those cameras picked up Phong

5         and two other individuals that ran from the scene,

6         ran westbound on College Avenue, on the corner of

7         Division and College and then ran northbound on

8         Division.

9    Q    And then were you able to follow them in some extent

10        even from that next intersection which I think would

11        be Washington?

12   A    Yes.

13   Q    And is there a camera up by Franklin and Division?

14   A    Yes.

15   Q    And that corner, not everybody always knows the names

16        of the streets, but that's where the Appleton Post

17        Office is, correct?

18   A    Yes, ma'am.

19   Q    Did you talk to -- did you specifically talk to Phong

20        on more than one occasion?

21   A    No, I only spoke with Phong on one occasion.

22   Q    Why is it a situation that you might have to go back

23        and talk to someone a second time?

24   A    We try to -- you know, when we speak to people, we

25        are looking for information, we're looking for facts,

145

1   and what we're trying to do is be able to corroborate

2   and follow up, verify things that they told us.

3 Q Is it something sometimes that you need to go back

4   and talk to them again because of that?

5 A Yes.

6 Q In essence, for many people in a case, do you ever

7   consider that you have a final interview with a

8   person?

9 A You know, it's difficult because it seems like every

10   time you talk to somebody they come up with a little

11   bit of more information or you find out what they

12   were telling you wasn't true and you have to explain

13   to them that there's consequences when you lie.

14 Q Some people share with you everything they know the

15   first time?

16 A No.

17 Q And as part of this investigation, Sergeant Schira,

18   was the entire investigative unit at some time or in

19   some way working on the case in different

20   capacities?

21 A Yes.

22 Q And were you tracking down not just one potential

23   witness but multiple witnesses?

24 A Correct.

25 Q And over those next few days, did that all just lead

146

1         to you staying here in the Fox Cities area?

2    A    Myself, yes.  Other investigators went to outside

3         areas.

4    Q    Okay.  Do you remember who you had contact with after

5         Phong?

6    A    There's a list.  It started with Phong that evening.

7         Then, after that conversation and identifying some

8         additional people through Neal's hard work, I ended

9         up going over to Little Chute and I made contact

10        with -- would you like me to list them?

11   Q    Sure.

12   A    Lisa Stutzman, Bobby Jo Stutzman, Ricky Chang, and

13        Joe Thor.

14   Q    And did Miss Stutzman speak to you?

15   A    Lisa did, yes.

16   Q    And Joe Thor, did you speak to him on December 9th?

17   A    I did.

18   Q    When you went to that address in Little Chute, was

19        there a person you were expecting or possibly looking

20        to find there?

21   A    Yes.

22   Q    And who was that?

23   A    We were also looking to speak with a Hu Lee.

24   Q    Were you planning to see Joe Thor at that Little

25        Chute address?

147

```
 1   A    No.

 2   Q    When you saw him had he been identified in those

 3        photos from Luna yet, if you know?

 4   A    I believe he -- actually, yes, he was.

 5   Q    And where did you speak to him on this day?

 6   A    Unfortunately outside for the first part of the

 7        conversation, and then the second part was inside.

 8   Q    Was it cold outside?

 9   A    It was terribly cold.

10   Q    Was anyone else near you while you were speaking to

11        Joe?

12   A    Investigator Cary Meyer was also with me, but there

13        was an incident that kind of occurred there that

14        required him to -- to separate himself from me for a

15        little bit.

16   Q    Okay.  And when you spoke with Joe on this day, did

17        you ask him about Luna?

18   A    I did.

19   Q    What did he initially tell you?

20   A    He surprised me in the sense that I was speaking with

21        Bobby Jo Stutzman and she had just identified some of

22        the people in the photographs that you showed us,

23        additional people that were there.  And the door

24        opened behind me and Joe -- well, she said something

25        about, hi, Joe, and then the door closed.  And I
```

148

1          said, is that Joe Thor, and she said, yes, so I

2          actually had to run outside because he was trying to

3          get out of there before he had contact with me.

4     Q    Okay.  Bobby Jo Stutzman was able to identify people

5          in the photos that you had?

6     A    Lisa Stutzman and Bobby Jo.

7     Q    Did you ultimately learn how Lisa was connected or

8          involved with Hu Lee?

9     A    I was.

10    Q    And how was that?

11    A    Boyfriend/girlfriend.  I believe they have children

12         together.

13    Q    And overall, as part of this investigation, have you

14         learned how Hu Lee is connected to Chong Lee?

15    A    I have.

16    Q    And what's that connection?

17    A    Brother.

18    Q    When you went to speak to Mr. Thor then, did he stay

19         and speak with you?

20    A    He did.

21    Q    Did you then ask him about Luna?

22    A    I did.

23    Q    And what did he tell you initially?

24    A    He told me nine times that he was not there, and nine

25         times I told him I think you were there, I have

149

```
1            photographs.  As a matter of fact, I had the
2            photographs in my binder that I had in my hand.  And
3            he repeatedly told me that he was not there, that he
4            was in Milwaukee.
5      Q     Did you ever pull out any of the photographs to show
6            him?
7      A     I did.
8      Q     When you did so, did his position on whether he was
9            in Milwaukee change?
10     A     He did.  He actually -- we had gone back inside.  I
11           had my binder open, and I actually opened up my
12           binder and I had the pictures on top of my binder,
13           and he's sitting right across the table from me, less
14           than a foot-and-a-half, two feet away, and the
15           pictures are just sitting there and I'm looking at
16           him thinking, why do you continue to lie to me.
17           You're right there.
18     Q     Did you specifically have the image where he was on
19           those photographs?
20     A     Yes.
21     Q     Did he ultimately identify himself in those photos?
22     A     He did.
23     Q     Did he identify anyone else?
24     A     He did.
25     Q     Who else if you remember?
```

1    A    Phong Lee and Paul Lee.

2    Q    At that time, Sergeant Schira, did you show him a

3         picture of the person you knew -- well, let me ask

4         you this first.  Did you know in that series of

5         photos you had was there a picture of Chong Lee?

6    A    There was.

7    Q    Did you know that it was Chong Lee in the photo at

8         the time you were speaking to Mr. Thor?

9    A    I did.

10   Q    Did you show him that photo?

11   A    I did.

12   Q    Did he identify Chong Lee?

13   A    He said he -- he couldn't tell who it was.

14   Q    And were those photos of the people running out or

15        coming -- when they first were entering?

16   A    I believe I had both sets of in and out.

17   Q    And you ultimately have learned that the cameras at

18        Luna, I've been calling them night vision, I don't

19        know if that's the best term, or infrared, but they

20        don't show color at all, correct?

21   A    Yeah.  Not only do they not show color but they

22        actually -- you can have the same color but different

23        material and it will transflux (sic) the colors, so,

24        yeah, you can't tell anything by the color.

25   Q    And in many of the images the Appleton Police

1      Department's uniforms and even their outer exterior

2      clothing are all like a really dark navy blue,

3      correct?

4  A   Correct.

5  Q   But when we see officers in those, that often looks

6      white or gray?

7  A   May I -- I just remembered something.  I think I just

8      told you that I -- that I showed you pictures of -- I

9      showed pictures to Joe of Chong.  I don't believe I

10     did then.  I believe I did it the following day, that

11     next interview.

12 Q   Okay.

13         ATTORNEY VISHNY:  Okay.  Can I approach the

14     bench please?

15         THE COURT:  You may.

16         (Bench conference.)

17         ATTORNEY VISHNY:  So, Judge, the objection

18     is sustained?

19         THE COURT:  Sustained.

20 Q   (BY ATTORNEY SCHNEIDER)  When Joe Thor, when you

21     first met with him on December 9th, when he told you

22     he wasn't at Luna, did you just stop talking to

23     him?

24 A   No.

25 Q   Why not?

152

1    A    Because this is a homicide investigation, and many
2         times, as we talked about earlier, sometimes people
3         don't want to talk to you.
4    Q    You said he told you nine times he wasn't at Luna?
5    A    I'm sure it's either eight or nine, but I think it's
6         nine.
7    Q    At what point did you pull out the photos that you
8         had?
9    A    We had gone inside, we had asked Lisa and Bobby Jo if
10        we could come inside, obviously they're friends with
11        Joe, and we had gotten into their kitchen area.  We
12        were seated at a table in their kitchen.
13   Q    Did you feel when Mr. Thor told you he wasn't at Luna
14        it was appropriate for you just to kind of hold up
15        your binder, I think you said, and walk away?
16   A    Of course not.  I was hired to investigate, to
17        protect my community, and sometimes people lie to you
18        and you just have to, you know, you have to seek the
19        truth, you have to seek information.
20   Q    Ultimately when you're meeting with Joe on that day
21        and then he now has told you he was at Luna, did you
22        ask him why he lied?
23   A    I did.
24   Q    What did he tell you?
25   A    He said that he was scared.

153

1    Q    Did he describe anything that had happened at Luna?

2    A    He did.  He described the confrontation.

3    Q    Did he describe who that was with?

4    A    He did.

5    Q    Who was that with?

6    A    He stated that he was with Paul Lee, Phong Lee and

7         himself and that there was a verbal altercation

8         between -- I believe he said it was Phong Lee first

9         and Josh and then turned into Paul Lee and Josh.

10   Q    When you spoke to him on the 9th, did you ask him

11        specifically about the time of the shooting?

12   A    I did.

13   Q    What did he tell you?

14   A    He actually stood up because I -- I said that we

15        believed -- he said that he was very close, that he

16        was -- he was very upset when he was talking to me.

17        He actually stood up and he kind of mimed like the

18        distance of how close we were, and I stood up with

19        him and we were probably within our reach, about a

20        three-foot reach, and he stated that he heard the

21        bang.  That's what he said.  I always thought that

22        was weird because you say you hear the bang but he

23        said -- he was very adamant and even made like a

24        motion like miming like a bullet hitting a person in

25        the head.

154

```
 1   Q   When Mr. Thor was describing that, what was his
 2       demeanor?
 3   A   Agitated, upset.
 4   Q   Did he describe hearing anything other than the --
 5       I'm sorry, this was a bad question.  Did he describe
 6       seeing anything around the time he heard the bang?
 7   A   He said he saw the bang and he mentioned something
 8       about the flash, the muzzle flash.
 9   Q   From your training and experience, muzzle flash, were
10       you aware of the lighting condition at Luna at that
11       time?
12   A   I've worked downtown College Avenue occasionally and
13       have been in the bar numerous times.
14   Q   Would that -- knowing the lighting condition, would a
15       flash from like a muzzle appear to be pretty bright
16       for at least a moment of time?
17   A   It would.
18   Q   Did Joe tell you what he did after he saw the
19       flash?
20   A   He said he ran.
21   Q   Did he tell you if he saw anything related to Josh?
22   A   He saw Josh fall, and he basically said he fell on
23       his feet.
24   Q   Did he tell you where if anywhere he was focusing
25       when he heard the bang?
```

```
 1   A   He stated that he was behind -- I believe he said he
 2       was behind Paul and that Phong was maybe stacked off
 3       one of his shoulders but he wasn't real sure at that
 4       time, and that he was looking at Josh, and again, he
 5       had mimed the bullet hitting him, so he's focusing in
 6       right on Josh's face.
 7   Q   Did he tell you if, and I don't know if you even
 8       asked, but did you try to determine if Paul was to
 9       his right or to his left?
10   A   I believe he said that Paul was actually in front of
11       him.
12   Q   And it -- I think you already answered that, but he
13       didn't really know where Phong was?
14   A   Correct.
15   Q   And he said after he heard the noise he ran?
16   A   Correct.
17   Q   And from what you saw at Luna, did you know that to
18       be accurate?
19   A   It was.
20   Q   And in fact Mr. Thor wasn't the only person who ran
21       from Luna?
22   A   Correct.
23   Q   I described it as kind of a mass exodus.  There were
24       several people who ran?
25   A   Correct.
```

156

1   Q   Were there people who ran who, based upon your

2       investigation, didn't even see what happened?

3   A   I found it interesting that the majority of the first

4       group of people that were out the door were in fact

5       Joe, Paul and Phong.

6   Q   Did Joe tell you after he heard the bang if he

7       hesitated at all?

8   A   I believe he said he ran almost immediately.

9   Q   [Did he ever] tell you he was scared after he heard

10      that bang?

11  A   Repeatedly.

12  Q   Did you talk to him -- or how long did you speak to

13      him on that day?

14  A   That was about it.  Like I said, there was Ricky

15      Chang and some other individuals had come in.  They

16      were very clear that they were trying to get Joe out

17      of there, that he wouldn't talk to me, and it got to

18      the point that we had to actually leave because we

19      thought we were going to have a problem there.

20  Q   Had Joe been asking you to leave?

21  A   No.  Joe was actually very decent.  As a matter of

22      fact, he said that he would -- he would talk to me

23      the next day, that he was going to be here and said

24      he would come and see me when he was done.

25  Q   So he told you where he was going to be that next

1    day?

2  A    He did.

3  Q    And obviously you know the courthouse is -- well, the

4       jury may not know this.  Where is the Appleton Police

5       Department located?

6  A    It's actually just across the parking lot right next

7       door.

8  Q    So the buildings are next door to each other?

9  A    They are.

10  Q    And Mr. Thor knew this?

11            ATTORNEY VISHNY:  Object.  Never mind.

12  Q    (BY ATTORNEY SCHNEIDER)  Did you make contact with

13       Joe then on December 10th?

14  A    I did.

15  Q    And where did you have contact with him?

16  A    In the parking lot.

17  Q    And did he agree to come speak with you?

18  A    He did.

19  Q    Who was with you on that occasion?

20  A    There were, I believe, two or three officer from CRU,

21       and I also believe that Sergeant Rabas, I don't know

22       if he was with me in the parking lot but he met us, I

23       think, coming back.

24  Q    On that date then did you continue to speak to Joe

25       about what happened at Luna?

```
1    A    We did.

2    Q    On that date did he tell you -- did he again express

3         that he was scared?

4    A    He did.

5    Q    On that date did you specifically ask him who might

6         have been the shooter?

7    A    I did.

8    Q    What did he say when you asked that?

9    A    He said he didn't know repeatedly.

10   Q    Did he ever identify that it was Paul?

11   A    No.

12   Q    Did he ever say it was not Paul?

13   A    He did, in a sense that we pressed him on information

14        that we had gotten through the photographs why we

15        were looking at Paul.  We had identified also that --

16        that Phong was there.  And myself and Sergeant Rabas

17        continually asked him about that, about who the

18        shooter could be.

19   Q    And did he deny being the shooter himself?

20   A    He did.

21   Q    And I think you've already said he indicated at some

22        point it was not Paul?

23   A    Correct.

24   Q    Did he ever indicate during this interview that it

25        was or was not Phong?
```

159

```
 1   A    I believe so, yes.

 2   Q    That it was not or was?

 3   A    Was not.

 4   Q    And on that interview on the 10th with Mr. Thor did

 5        you gain more information from him about what he knew

 6        or saw?

 7   A    Yes.

 8   Q    Like the previous day, were there other citizens or

 9        friends of his present or milling around while you

10        were speaking to him?

11   A    No.  This was done at the Appleton Police

12        Department.

13   Q    So there was nobody interrupting you?

14   A    Correct.

15   Q    Did you try to get him on that date to focus on

16        anything else he recalled about the moments before or

17        the time right before the shot?

18   A    He -- he got into more specifics on the

19        altercation.

20             ATTORNEY VISHNY:  I'm sorry.  I couldn't

21        hear the answer.

22             ATTORNEY SCHNEIDER:  I think we were

23        rattling chairs back here.  I didn't hear it

24        either.

25   A    I'm sorry, ma'am.
```

160

1    Q    He got into more details about the --

2    A    The altercation.

3    Q    Oh, the altercation.  Did he ever express to you that

4         he heard any words said preceding the shot?

5    A    When speaking with Paul, you know, he --

6    Q    I'm talking about Joe.

7    A    I'm sorry.  When speaking with Joe, he wasn't real

8         specific on how it started.

9    Q    Maybe that was a bad question.  Did he ever say he

10        heard anybody call out like gun or I got a gun, any

11        comment like that?

12   A    No.

13   Q    And over the next several days -- well, let me ask

14        you this.  When you talked to him on the 10th, did

15        you try to focus on if you saw anything relevant to

16        who could have been the shooter?

17   A    Yes.  We specifically asked if he had seen any

18        additional information.  We kind of focused on Paul,

19        and he was adamant that he just didn't believe it was

20        Paul that did the shooting.

21   Q    Did he describe seeing anything near Josh's head at

22        or near the time of the shot?

23   A    I believe there was a punch thrown nearly

24        simultaneously with the gunshot.

25   Q    That's what he thought?

```
1    A    Yes.
2    Q    Over the next -- let me just get -- let me have one
3         second.  Actually, I'll continue moving on.
4              Over the next several days as the 10th then
5         spilled into the 11th, it might seem like an odd
6         question, but how many hours in a day were you or
7         other investigators working on this case in those
8         days after?
9    A    We were putting maximum effort into it.
10   Q    Is it a time where you worked through nights?
11   A    Yes.
12   Q    And were people on that board continued to be
13        identified?
14   A    Yes.
15   Q    And were some of those parties -- were there attempts
16        made to locate or speak to those people?
17   A    Yes.
18   Q    And during those next several days, did any other
19        calls come in with anybody else who was a citizen who
20        had information to share with you at all that you
21        remember?
22   A    Not that I'm aware of.
23   Q    I want to focus on December 11th then, that would be
24        Wednesday.  Do you remember, Sergeant Schira, where
25        you were during the evening hours?
```

162

1    A    I think I was at home.

2              ATTORNEY VISHNY:  I'm sorry.  The date?

3              ATTORNEY SCHNEIDER:  December 11th.

4              ATTORNEY VISHNY:  Okay.

5    Q    (BY ATTORNEY SCHNEIDER)  Did you come to the police

6         department the night of December 11th?

7    A    I was called back in, yes.

8    Q    During that day when you were working on the case

9         with others, what became something that was of focus

10        for you as an investigative team?

11   A    It looked like something was in Paul Lee's hand.

12   Q    And that was done through examining that Luna

13        video?

14   A    The Luna video and then obviously the stills from

15        that Luna video.

16   Q    You said later that night you were called back into

17        the police department?

18   A    Yes, ma'am.

19   Q    Why?

20   A    For follow-up interviews assisting some of the other

21        investigators.

22   Q    And when you were called in, had you become aware

23        officers had spoke to Paul?

24   A    Yes.

25   Q    And that was at what location?

163

1    A    Where he worked.  I believe it's called Norka.

2    Q    I think, just for the court reporter, I don't know if

3         we told you this, it's N-O-R-K-A.

4              So officers found Paul at work that night?

5    A    They did.

6    Q    Were you involved with any tasks or duties at

7         Norka?

8    A    No.

9    Q    So you responded back to the police department?

10   A    I was -- I didn't go anywhere else.

11   Q    At the time when you went back to the police

12        department, did you know where Sergeant -- and I'll

13        say their first names and last, Sergeant Cary Meyer

14        or Sergeant Dan Tauber were?

15   A    I was told that they were either in Milwaukee or

16        either en route coming back.

17   Q    Do you know why they had gone to Milwaukee?

18   A    Follow-up interviews -- or maybe not follow-up

19        interviews but interviews.

20   Q    Ultimately did you learn who they spoke to?

21   A    I really don't have a lot of information on the

22        Milwaukee investigations.

23   Q    Okay.  That night do you -- and maybe I'll say it

24        this way, do you know if they went to speak to a

25        female or a male, if you know?

164

1   A   I believe they went to speak to a female.

2   Q   And at some point was information they had shared

3       with the lieutenant or yourself?

4   A   At that time I believe that information was shared

5       with the lieutenant but not with me.

6   Q   Was there a specific request made of you or a

7       specific task assigned to you when you were at the

8       police department that night?

9   A   Yes.

10  Q   What was that?

11  A   I was told by Lieutenant Gostisha to assist Sergeant

12      Thao with an -- an interview of Paul Lee.

13  Q   And when you went to do that, did you know if he had

14      been spoken to earlier in the night?

15  A   I knew that they had made contact with him at his

16      place of business, but I don't know if there was an

17      interview done, I didn't -- I wasn't sure what had

18      happened there.

19  Q   Did they -- were you given any specifics about what

20      he said or didn't say at the interview at Norka prior

21      to you going to speak to him?

22  A   No.

23  Q   Did Sergeant Thao share with you any facts or

24      information he knew from speaking to Paul at Norka?

25  A   No.  The only one that talked to me about -- prior to

165

1       me interviewing Paul was Lieutenant Gostisha.

2  Q  And what did you learn from him?

3  A  He told me that there was additional information that

4      had come in that Chong Lee was the shooter.

5  Q  So you knew that prior to the time you went in to

6      talk to Paul?

7  A  I did.

8  Q  Do you remember what time you went in to speak to

9      Paul?

10  A  It was shortly after midnight.  I'm not sure what

11      time.

12  Q  And I think there is some things we'll agree to, but

13      if I told you the first interview started

14      approximately 12:41 a.m., would that sound right?

15  A  Yes.

16  Q  Do you remember, Sergeant, how long that interview

17      with Mr. Lee lasted?

18  A  We had two interviews with him.  I believe the first

19      one was an hour and fifteen minutes roughly.

20  Q  And what was the time of the second interview, if you

21      know?

22  A  The second interview didn't happen until well into

23      the following day, I want to say it was around 11:00

24      or so.

25  Q  You had an interview with him 12:41 a.m. and then

166

```
1              about 11 a.m.?

2      A       Correct.

3      Q       Was Mr. Lee at the police department that entire

4              time?

5      A       He was.

6      Q       While he -- and if you know, while he was there, was

7              he given access to make any phone calls?

8      A       No.

9      Q       Had -- when you went in to meet with Mr. Lee, just to

10             give the jury a -- an understanding of Paul Lee, were

11             you in a uniform or in plain clothes?

12     A       I was in just a -- an Appleton polo shirt.

13     Q       And introduce yourself?

14     A       I did.

15     Q       And you spoke with him?

16     A       I did.

17     Q       During that time when you spoke with him, did you ask

18             him if he was the shooter?

19     A       I did.

20     Q       More than once?

21     A       Yes.

22     Q       What did he say?

23     A       That he was not.

24     Q       Did his position on that ever change?

25     A       No.
```

167

```
 1   Q   Prior to going in, did you and Sergeant Thao talk
 2       about a script or anything, points or items you
 3       wanted to make sure you spoke with Paul Lee on?
 4   A   No.
 5   Q   Were there any comments Sergeant Thao made to you
 6       about Paul or his family before the interview?
 7   A   No.
 8   Q   When you went into the interview, were you aware if
 9       he had any siblings?
10   A   I did know that, yes.
11   Q   Did you know the relationship between Chong and
12       Paul?
13   A   Yes.
14   Q   During that time when you spoke to Paul, did you ask
15       him if Joe was the shooter?
16   A   I don't recall.
17   Q   [Did he ever] indicate to you in any time you spoke
18       to him that Joe was the shooter?
19   A   He did not.
20   Q   What about Phong?
21   A   He did not.
22   Q   Meaning he did not ever indicate he was the
23       shooter?
24   A   Correct.
25   Q   During this time when you're speaking to him, did you
```

168

1          ask him about -- well, let me ask you this.  How did

2          the name Chong get brought up in the interview?

3     A    I was speaking with him for a while, I don't know,

4          maybe five, ten minutes, something along those lines.

5          And then Chue was speaking with him and Chue -- Chue

6          Lee Thao, detective, started talking to him about

7          specifically who was there, who was -- who were with

8          you when you were downtown, and he went through

9          names, and he went through that Phong was there, he

10         went through that Joe Thor was there, he went through

11         some other names, and to me this was interesting

12         because I had already known that we had tried to --

13              ATTORNEY VISHNY:  I want to approach the

14         bench at this point.

15              ATTORNEY SCHNEIDER:  Okay.

16              (Bench conference.)

17              THE COURT:  Five-minute restroom break and

18         then we'll be all set.

19              (The jury was escorted out of the

20         courtroom.)

21              ATTORNEY SCHNEIDER:  Sergeant Schira, go

22         ahead and take a seat.  There was just -- you were in

23         the middle of an answer, and do you want the court

24         reporter to read the question back?  I just think

25         Attorney Vishny had some concerns about how you might

169

1        respond so instead of letting you respond and trying
2        to move to strike, I think we just want to know --
3                THE WITNESS:  I don't have -- I've already
4        forgotten the question so please can you read it
5        back.
6                (Question and answer read back.)
7                ATTORNEY SCHNEIDER:  How were you going to
8        finish your answer?
9                THE WITNESS:  Identify Chong as being there
10       because I had -- should I continue?
11               ATTORNEY VISHNY:  Yeah.
12               ATTORNEY SCHNEIDER:  Go ahead.
13               THE WITNESS:  Because I had already talked
14       to Phong who didn't identify him, I had talked to Joe
15       Thor who didn't identify him, and we knew from the
16       pictures as well as Lisa Stutzman's statement that he
17       was there, so I thought it was interesting that they
18       were not picking him out.
19               THE COURT:  Okay.
20               ATTORNEY SCHNEIDER:  I don't know if there
21       is a continuing objection otherwise.
22               THE COURT:  Does that objection stand?  I
23       don't know that -- I don't know that the concern
24       raised was what you thought, but in light of now what
25       you know, does that --

170

1          ATTORNEY VISHNY:  Well, yeah, it's the

2     exact same thing because it's exactly that.  He

3     interviewed -- maybe he didn't interview Phong, but

4     Phong didn't ID the picture, I don't know who did it

5     off the top of my head, but it's the exact same

6     thing, that he had interviewed Joe and shown the

7     picture and Joe hadn't identified him.  The same

8     hearsay objection that I made before.

9          ATTORNEY SCHNEIDER:  Maybe I can --

10         THE COURT:  But I guess I don't know that I

11    agree because that's -- it's not suggestive that he

12    showed him a picture and he didn't identify it, it's

13    just saying he didn't identify it.

14         ATTORNEY VISHNY:  Well, I'm -- I'm assuming

15    that he showed him the picture, asked Joe a question,

16    and Joe gave a verbal response.

17         ATTORNEY SCHNEIDER:  We're talking about

18    Paul's interview now?

19         ATTORNEY VISHNY:  Right.  But he's talking

20    about his own state of mind.  He finds it interesting

21    as Sergeant Thao is saying who was there, who was

22    there, who was there, he's saying, if I get what

23    Sergeant Schira said, what he's saying is I found

24    this interesting because when he, Sergeant Schira,

25    talked to Joe and Joe knew the picture, Joe hadn't

171

1       identified the guy, and I don't know if it's Sergeant

2       Schira or a different officer, I don't remember,

3       talked to Phong and then showed Phong the picture,

4       Phong didn't identify him.

5               THE COURT:  I don't think he said -- I

6       don't think he referenced the picture.  I don't think

7       he referenced that there was any affirmative conduct

8       which led to a negative identification.  I don't

9       think the answer, at least as it's presented, brings

10      into the potential -- there is a lot of inferences

11      that could be made.  It could be he never showed

12      them.  I am inclined at this point to allow it in.

13              ATTORNEY VISHNY:  Okay.  Then I just want

14      to be overruled on the record.

15              THE COURT:  You're overruled.

16              ATTORNEY VISHNY:  Thank you.

17              ATTORNEY SCHNEIDER:  Good luck trying to

18      answer the same.

19              THE WITNESS:  You know, now I don't even

20      know what we're talking about anymore.  I'm just

21      worried that this chair is gonna flip me over

22      backwards.  Right?

23              THE COURT:  Do you need a minute or two?

24              THE WITNESS:  No.  I'm good to go.

25              ATTORNEY SCHNEIDER:  I'll have her reread

172

1          the question and where you stopped your answer,

2          outside, and then we'll pick up from there if that's

3          okay when you return.

4                    THE COURT:  Two-minute bathroom break.

5                    ATTORNEY SCHNEIDER:  Okay.

6                    (Court in recess.)

7                    (The jury was escorted into the courtroom.)

8                    THE COURT:  Please be seated.  And then,

9          Miss Schneider, do we need where we left off?

10                   ATTORNEY SCHNEIDER:  Yeah, because I don't

11         think with the break I'm going to remember so I'm

12         just going to ask the court reporter to read the

13         question and then read where he stops his answer.

14   Q     (BY ATTORNEY SCHNEIDER)  And then, Sergeant Schira,

15         I'll just ask you to continue your answer.

16                   (Question and answer read back again.)

17   A     Identify Chong through interviews of both Phong Lee

18         and Joe Thor, and they were both shown pictures

19         during those interviews and they identified obviously

20         themselves, they identified Phong and Joe and Paul as

21         being there.

22   Q     Okay.  So let me ask you this, Sergeant Schira.

23         During the December 9th interview with Joe Thor was

24         Chong's name ever brought up?

25   A     The first one, no.

173

1    Q    On December 10th was Chong's name brought up?

2    A    It was.

3    Q    How was that brought up?

4    A    We asked him if he was there, we showed a picture and

5         asked who is this.  I take that back.  His name was

6         not brought up.  We showed him the picture of Chong

7         because we're trying to verify information to see if

8         they're going to tell us who actually is there, and

9         Joe said that was -- I believe actually said that was

10        somebody by the name of Kang, but said it was fuzzy,

11        I think it might be Kang, but he would not identify

12        it as Chong.

13             ATTORNEY VISHNY:  I'd object to this.

14        Would not identify.  He doesn't know what's in Joe

15        Thor's mind and nobody asked him that question.  We

16        know he didn't identify him.

17             THE COURT:  Sustained.  Stricken, that

18        portion of the question.

19    Q    (BY ATTORNEY SCHNEIDER)  Were you ever able to

20        identify Chong in that photo?

21    A    I did not.

22    Q    During the interview with Phong on December 9th was

23        Chong's name ever brought up?

24    A    Not his name but again the picture was.

25    Q    Okay.  So the name -- to lay kind of the framework,

174

```
 1        you -- Sergeant Thao had asked -- Sergeant Thao had
 2        asked who was there, who was with him, and Paul
 3        identified Phong and Joe Thor and some other names.
 4        Did Sergeant Thao follow up?
 5   A    He did.  He -- it was like a natural break in the
 6        conversation after asking who was all there, and
 7        Chong did -- check that.  Paul did not give us a
 8        name.  So what Chue did is Chue said, how about
 9        Chong, was Chong there.  And Paul kind of sat -- sat
10        upright and then changed, I forget specifically what
11        he said, but he kind of brought up someone else,
12        maybe it was Tom or someone else, and Chue brought
13        him back to it and said, no, was your brother Chong
14        there, and he said, I don't know, I don't know.
15   Q    Did his demeanor change at that time?
16   A    It did.
17   Q    When the name -- when the name Chong was first
18        brought up with Paul, were you specifically focusing
19        on Paul, were you trying to take notes, what were you
20        doing?
21   A    I was -- at this point we kind of switched off.  I
22        had been -- I had been interviewing Paul, and then
23        when Chue started talking, I was looking -- I was,
24        you know, it's on video, I was looking directly at
25        Paul, I was looking right at his face, I was very
```

175

```
 1          close to him, and when Chue brought up the name
 2          Chong, was Chong there, I distinctly saw something
 3          happen to his face.
 4    Q     Okay.  Do you continue to ask about Chong?
 5    A     Chue does.
 6    Q     And at that point did Paul ever indicate Chong was at
 7          Luna?
 8    A     Eventually, yes.
 9    Q     Did you talk with him about -- or prior to saying
10          Chong was at Luna, did he talk about being scared?
11    A     He -- he did.  I mean, he said, you know, that the
12          entire situation upset him and that he was scared.
13    Q     Did he ever express any concerns about talking about
14          Chong?
15    A     Yes.
16    Q     What did he say?
17    A     Specifically that he didn't -- I believe what he said
18          was, I don't want my brother to hate me, or my
19          brother's gonna hate me.
20    Q     And at the time you're talking about this, what's the
21          tone?
22    A     With Chue, it's very, very soft.
23    Q     Did they ever talk in Hmong at all?
24    A     They did.
25    Q     Do you understand Hmong?
```

176

1  A    I do not.

2  Q    So you don't know what was said if they did?

3  A    Not specifically.

4  Q    Was it a lengthy period of time?

5  A    No, there was just -- just seemed like occasionally

6       maybe one or two Hmong words would be kind of slipped

7       in.  I mean 99 percent of it was in English.

8  Q    Did -- was Paul specifically asked about what

9       happened with the gun?

10 A    Yes.

11 Q    What did he say?

12 A    I guess I'd like clarification as far as what part of

13      the conversation.

14 Q    Okay.  At some point Chong describes his brother

15      being at Luna?

16 A    Correct.

17 Q    Does Paul at some point --

18           ATTORNEY VISHNY:  I think you meant to say

19      at some point Paul describes his brother at Luna, you

20      said at some point Chong.

21           ATTORNEY SCHNEIDER:  Chong?  Okay.

22 Q    (BY ATTORNEY SCHNEIDER)  So at some point Paul admits

23      or confirms with you that Chong was there, correct?

24 A    Correct.

25 Q    Do you remember asking him specifically if Chong had

1        done the shooting?

2    A   Yes.

3    Q   What did he say?

4    A   He said Chong was the shooter.

5    Q   And prior to giving that answer, were either of you

6        yelling at him?

7    A   No.

8    Q   Were either of you raising your voice?

9    A   My voice might have been a little hard, yes.

10   Q   Did you ultimately ask him if -- if -- did you

11       ultimately ask Paul if Paul knew what Chong had done

12       with the gun?

13   A   I did.

14   Q   What did Paul say?

15   A   At that point he didn't know.

16   Q   Did you ask Paul how he knew Chong was the shooter?

17   A   I did.

18   Q   What did he say?

19   A   During this interview he said there was -- because

20       there was two interviews, during this interview he

21       said that Chong had come to his house sometime on

22       Monday and said that he had fucked up, pardon my

23       language, and that he had shot the guy.

24   Q   During the time you spoke to Paul on this date, did

25       he say that once or more than once?

178

```
 1    A    Several times.
 2    Q    During the -- the time you were talking to Paul, did
 3         you ask him - and I might have asked you this so I
 4         apologize - if he was the shooter?
 5    A    Yes.
 6    Q    What did he say?
 7    A    Denied it.
 8    Q    When he said he wasn't, did you respond in any way
 9         that you recall?
10    A    I did.
11    Q    How did you respond?
12    A    I pointed out several of the facts, the information
13         that we had, and I said that at that point he was
14         either the shooter or he knew who the shooter was.
15    Q    And why did you say that to him?
16    A    Because that's what I believed.
17    Q    Was that based upon some of the images from Luna?
18    A    Yes.
19    Q    Do you recall, Sergeant Schira, this first interview,
20         how long it was until Paul indicated Chong was the
21         shooter?  How much time had passed?
22    A    It was -- it wasn't -- I mean that whole interview
23         was not that long.  Like I said, I think it was an
24         hour and fifteen minutes.  It was probably thirty
25         minutes maybe into the interview.
```

179

```
 1   Q   Did you talk to Paul -- actually, when you were
 2       talking to Paul this first time, did you ask him
 3       about that item that -- or I shouldn't say that item,
 4       did you ask him about the image of him at Luna where
 5       you thought there was something in his hand?
 6   A   I did.
 7   Q   Do you remember as you were discussing that seeing
 8       anything in the room?
 9   A   I did, and it was -- it was surprising to me.
10   Q   Okay.  What do you remember seeing?
11   A   Well, he was seated at a table, and I believe there
12       was like a Kleenex box or something on the table, and
13       on top of it was this instrument.  I'd never seen an
14       e-cigarette before, and looking at that, I saw that
15       one end of it was silver, and there's like a flange
16       on it, and he started -- because I was questioning
17       him about what could have possibly in his hand, what
18       was in his hand, and he mentioned he thought maybe it
19       was a beer or maybe it was the e-cigarette.  And when
20       I'm looking at that e-cigarette, I'm thinking to
21       myself, I think that's what was in his hand.  I had
22       never seen something like that before, and after
23       looking at it, I -- I even eventually asked him to
24       put it in his hand to demonstrate what it -- what it
25       would look like, and it was a dead ringer.  That's
```

```
 1        what it was.
 2   Q    Okay.  And I'm going to direct you, it's hard now
 3        because two years have passed, but back in 2013 were
 4        e-cigarettes common items at that time as part of
 5        your investigation, did you run into people with
 6        that?
 7   A    I've seen them since then, but at the time I'd never
 8        -- I think I maybe seen a commercial on them but I'd
 9        never actually seen one.
10   Q    You don't smoke yourself?
11   A    No.
12   Q    And you said at some point you asked him to
13        demonstrate with that e-cigarette?
14   A    I did.
15   Q    And did he have problems or concerns doing that for
16        you?
17   A    Not at all.
18   Q    And had you -- did you ask someone to come in to
19        assist in that process?
20   A    I did.  I believe that happened during the second
21        interview with him.
22   Q    Okay.
23                 THE COURT:  Lights?
24                 ATTORNEY SCHNEIDER:  Not quite yet.
25   Q    (BY ATTORNEY SCHNEIDER)  So during the second
```

181

```
1          interview then you asked if someone could come in and

2          take a picture of him?

3     A    Yes, ma'am.

4     Q    Do you remember any other item he had that you asked

5          him to demonstrate with other than the e-cigarette?

6     A    I don't believe there was anything else, no.

7     Q    Do you remember anything about the clothing he had

8          on?

9     A    He had on kind of a white jacket with some like black

10         patching, kind of like a camouflage pattern.

11    Q    Okay.  I'm going to show you a photo board marked

12         Exhibits 83, 84 and 85.  Are you familiar with who's

13         in these photos?

14    A    I am.

15    Q    And who is that?

16    A    That's Paul.

17    Q    This is really hard for everybody in the world, and

18         we put the microphone in a bad spot, no, that's okay,

19         which maybe we'll correct at some point.  Either try

20         to talk --

21    A    I will.

22    Q    I'm sure you have an outside voice.

23    A    I do.

24    Q    Use your outside voice so everyone can hear you.

25    A    I'm sure.
```

182

1  Q    Starting with Exhibit 83, what were you asking Paul

2       to do in that photo?

3  A    To stand in a similar stance that he was taken from

4       the Luna video.

5  Q    Okay.  And did you do the same thing then in Exhibit

6       84?

7  A    Correct.

8  Q    And is the background just different as to where or

9       what's reflected behind the image of his hand?

10 A    Yes.  We wanted to have some different coloring

11      behind it to offset the e-cigarette.

12 Q    And did you ultimately learn that the coat he is

13      wearing in these photos was the same coat he had on

14      the night of the incident?

15 A    I believe so, yes.

16 Q    And in the Luna images his coat pretty much appears

17      white, correct?

18 A    It does.

19 Q    So, again, is that just reflective of the fact you

20      said this infrared video doesn't show pattern like we

21      see here on his coat?

22 A    Correct.  It's not so much the color of the material,

23      but it's like the -- what the material is made of.

24 Q    Okay.  And then finally, in Exhibit 85, what's

25      depicted there?

183

1   A   That is his e-cigarette.

2   Q   Okay.

3               ATTORNEY SCHNEIDER:  And I previously moved

4       these in.  What I want to do -- Judge, just for the

5       record, defense attorney has agreed -- I'm going to

6       use what is actually a duplicate of Exhibit 84 --

7               THE COURT:  Okay.

8               ATTORNEY SCHNEIDER:  -- for the next

9       purposes.

10  Q   (BY ATTORNEY SCHNEIDER)  But just can you confirm,

11      Sergeant Schira, one of the photos labeled Exhibit 4,

12      the other one in my hand I'm holding does not have an

13      exhibit sticker on it?

14  A   Correct.

15  Q   Does it appear to be, though, that they are the same

16      photo?

17  A   It does.

18  Q   Okay.  Going to direct your attention up to the

19      screen.

20              ATTORNEY SCHNEIDER:  And if you could get

21      the lights, Judge?

22              THE COURT:  Not a problem.

23  Q   (BY ATTORNEY SCHNEIDER)  And I kind of have two

24      images here on the screen.  First there is an image

25      on the right-hand side of the screen.  Are you

184

1         familiar with that image?

2    A    I am.

3    Q    And there is a time stamp on the top of this photo,

4         and I won't ask how good your eyesight is, but if I

5         tell you the time stamp's 1:50:29, do you agree with

6         me?

7    A    I do.

8    Q    And in --

9              ATTORNEY SCHNEIDER:  Judge, may I have him

10        approach if he needs to?

11             THE COURT:  That's fine.

12   Q    (BY ATTORNEY SCHNEIDER)  -- again outside voice

13        because now you're going to be further away from the

14        microphone, but in that image we have on the

15        right-hand side, can you point out for the jury what

16        was of interest or concern to you guys at one point

17        during this investigation?

18   A    Yes.  From the video that Sergeant Rabas had gotten

19        from the Luna cameras and then made into stills, when

20        we were watching individuals doing that rush like we

21        said going out of the bar, one of the things that

22        came up right away that we looked at was who we knew

23        to be Paul here and having this in his hand.  When we

24        were looking at that, from my training and experience

25        and from other officer training and experience, that

185

1    looked like the back portion of a slide of a small

2    gun.  I also note that we had recovered a .25 caliber

3    casing from the scene.  That gun is very small.  That

4    gun was designed in 1905 by John Browning.  My hand

5    is approximately seven-and-a-half inches long, almost

6    eight inches long.  That gun -- majority of the guns

7    that are out there are only four inches in length.

8    They're very, very small.  When you hold that guy,

9    I've seen guns like that, held guns like that, the

10   back portion of that, that back portion of the slide

11   or that back dovetail looks just like that.

12 Q  And you're pointing to an area which would be the

13    area kind of above where Paul Lee's right hand is

14    depicted?

15 A  Correct.

16 Q  And at this point had you asked Paul to confirm the

17    photos that that was in fact him in these Luna

18    images?

19 A  We did.

20 Q  Okay.  I now -- I don't know if it -- where the best

21    spot is going to be for you to stand, but we'll do

22    this for one sec.

23         THE COURT:  If we need to reference the

24    screen, I do know we have the pointer if need be.

25 Q  (BY ATTORNEY SCHNEIDER)  So now I'm showing you a

186

```
 1          photograph, again it's Exhibit 84, but we're using it
 2          here on the Elmo display.  Is that -- that's, again,
 3          that photograph of Mr. Lee taken at the Appleton
 4          Police Department holding his e-cigarette?
 5     A    It is.
 6     Q    Okay.  And what do you recall noting or seeing when
 7          you asked him to hold that e-cigarette at the police
 8          department?
 9     A    Again, from -- from my perspective, my training and
10          experience that I have, I looked at that and I just
11          -- I thought it was the same thing.
12     Q    Okay.  You can have a seat then, sir.  Thank you.
13               THE COURT:  Lights, Counsel?
14               ATTORNEY SCHNEIDER:  Yes, please.
15     Q    (BY ATTORNEY SCHNEIDER)  Ever have a case or a
16          situation, Sergeant Schira, where someone in a fight
17          pulls an item?
18     A    I'm sorry.  I didn't hear you.
19     Q    Ever have a situation or a case where someone who's
20          in a punch or throws a punch might be holding an
21          item?
22     A    Yes.
23     Q    Happen more than once in your career?
24     A    Yes.
25     Q    After you finished your interview, your first
```

187

1           interview with Paul, what was done at that time?

2      A    We finished that initial interview.  Based off of

3           that interview, I believe we had a brief discussion

4           and we applied for a search warrant for the address

5           that we believed that Chong was at.

6      Q    Did officers ultimately have contact with Chong Lee

7           then that day?

8      A    They did.

9      Q    Do you remember about what time that was?

10     A    It was -- it was early, I want to say it was around

11          five, five or six, I'm sorry, I don't remember

12          specifically.

13     Q    Okay.  Ultimately did you interview Chong Lee at the

14          Appleton Police Department on this day?

15     A    I did.

16     Q    And that interview would have a time stamp on it,

17          correct?

18     A    It would.

19     Q    You talked to Paul, though, again at 2:19 a.m.  Does

20          that sound correct, briefly?

21     A    Yes.

22     Q    You remember talking about his trip as he left Luna

23          during that conversation?

24     A    Yes.

25     Q    Did you specifically talk about clothing or items

1        that had been found by officers?

2    A   I did.

3    Q   What do you remember talking to Paul about?

4    A   I'm a little fuzzy on this, but I believe one of the

5        things that came up was that we had recovered a vest

6        that -- that Phong Lee had admitted to was his, we

7        had recovered a hat that Joe Thor had admitted that

8        was his, and Paul had said to them, why are you guys

9        dumping your clothes, we're not the shooters.

10   Q   Did he tell you that?

11   A   He did.

12   Q   Did he get rid of any items that he told you about?

13   A   He did not.

14   Q   Then when you -- when you talked to Paul then at

15       about noon, I'm going to say the next interview is at

16       11:58 a.m., at that point was Chong Lee at the

17       Appleton Police Department?

18   A   He was.

19   Q   Was Paul aware of that?

20   A   He was not.

21   Q   Do you remember talking to Paul about what if

22       anything he knew about the coat Chong had on the

23       night of the shooting?

24   A   I did.

25   Q   And what was said?

189

1           ATTORNEY VISHNY:  Okay.  I'd like to

2    approach the bench.

3           ATTORNEY SCHNEIDER:  I can get more

4    directed if you want me to.  It's just something you

5    brought up during Paul's questioning.

6    Q    (BY ATTORNEY SCHNEIDER)  So as you were talking about

7         the coat with Paul, did he indicate if he knew where

8         it was?

9    A    He did not.

10   Q    Do you remember any comment he made to you at the

11        time you were talking about that coat?

12   A    He talked about what it looked like.

13   Q    Okay.  Do you remember what he said?

14   A    He said it looked, I guess, the best term I could

15        use --

16           ATTORNEY VISHNY:  I'm going to object at

17        this point because that's not what you told me you

18        were going to elicit.

19           ATTORNEY SCHNEIDER:  I still think that's

20        another question you asked Paul about but --

21           ATTORNEY VISHNY:  I didn't -- Paul wasn't

22        asked if he said this to Detective Schira.

23           THE COURT:  If need be, you can always

24        approach.

25           ATTORNEY SCHNEIDER:  I'll go back to it.

190

```
 1   Q   (BY ATTORNEY SCHNEIDER)  Did Paul talk about a -- in
 2       addition to the -- again, excuse my language, I think
 3       it's, I fucked up and I shot a guy, that was a quote
 4       he said Chong had said or something Chong had said to
 5       him?
 6   A   He did.
 7   Q   During this second interview around noon, did he make
 8       any other comments about something Chong had said to
 9       him about the shooting?
10   A   He did.
11   Q   What was that?
12   A   He clarified a couple things.  One of the things that
13       he said was that Chong had said that he had point
14       blanked Josh, the guy.  He didn't say Josh, he said
15       the guy.
16   Q   When he said those words, point blanked the guy, was
17       that something you had been -- that term, during this
18       time at the Appleton Police Department, had you ever
19       used that terminology?
20   A   I don't believe so, no.
21   Q   Do you remember if Sergeant Chue Thao ever had?
22   A   I don't believe so.
23   Q   Do you then -- well, I'm going to ask you this.  When
24       he said that, I point blanked him, did you ask him to
25       clarify or explain that further?
```

191

1   A   I guess I didn't ask him to clarify that in the sense
2       of more specifics because that's a very specific
3       term.
4   Q   Okay.  What do you -- and not -- what do you know
5       point blanked to mean?
6   A   Close quarter combat, near contact shot.
7   Q   Ultimately during that interview then, Sergeant
8       Schira, do you ask Paul to write a written statement
9       for you?
10  A   I do.
11  Q   And you had spoken to him for a period of time before
12      this written statement?
13  A   I had.
14  Q   And when you asked him to write this written
15      statement, was Sergeant Thao in the room with you?
16  A   I believe Sergeant Thao had gotten up and left.
17  Q   Is it a situation where during this interview
18      Sergeant Thao was always in the room with you?
19  A   He was with me the majority of the interview.  I
20      think he was -- he was doing something else.  I
21      stayed because I was doing some paperwork on -- I
22      think we had taken some buccal swabs as well.
23  Q   Okay.  And prior to -- well, let me ask you this.
24      Did you ask him if he would write a statement?
25  A   Yes.

192

1   Q   And did he agree to do it?

2   A   Yes.

3   Q   Did you tell him he had to write a statement?

4   A   No.

5   Q   And when you have a witness write a statement, maybe

6       but for children, I guess, do you have them literally

7       write it themselves?

8   A   Yes.

9   Q   Do you go over anything with them prior to asking

10      them to write the statement?

11   A   I do.

12   Q   What was that?

13   A   I start at the top and just talk about you need to

14      put your name and date of birth and where you live

15      and phone number on the top portion of the form, and

16      then because many times when we interview it's a

17      process, it takes a while, and what I do is while I'm

18      interviewing people I'm either taking mental notes or

19      writing notes, and once we get done, and if the

20      person agrees to do a written statement, what I do is

21      I just simply say I'm not going to put words in your

22      mouth, but what you told me was X, Y and Z.  If

23      that's what you told me then that's what you want to

24      put in the report.  Go ahead.

25   Q   Do you ever tell them they have to put that in the

1         report?

2    A    No.

3    Q    Do you have situations where they write more than

4         just X, Y or Z?

5    A    It goes both ways.  Sometimes they put more,

6         sometimes they put less.

7    Q    Is it a situation by this time for some interviews

8         you've talked to them about, you know, A through Z

9         plus the next whole series of alphabet letters if

10        there were such?

11   A    Yes.

12   Q    And they are allowed to write whatever they want?

13   A    They write whatever they want.

14   Q    Is that what was done with Mr. Lee?

15   A    Yes.

16   Q    I'm going to show you Exhibit 122.  Are you familiar

17        with that exhibit?

18   A    I am.

19   Q    And what is it?

20   A    It is an Appleton Police Department written statement

21        form.

22   Q    Completed by whom?

23   A    Paul Lee.

24   Q    And the date of that was the 12th then at around

25        12:30 p.m.?

194

```
 1   A    Yes.

 2   Q    And what is written in that statement, that's Paul's

 3        own handwriting, correct?

 4   A    Correct.

 5   Q    And what is written there was sentences he wrote?

 6   A    Correct.

 7   Q    So you might have prior to this said, listen, Paul,

 8        we talked about these things, did you -- but did you

 9        tell him he had to write that in the form?

10   A    No.

11   Q    And what you repeated to him were things he had told

12        you during the course of the interview?

13   A    I specifically only repeat things that they tell me,

14        whoever the person is I'm talking to.

15   Q    And that's been your practice in these years?

16   A    All my interviews.

17   Q    Okay.  Do you ask him to read it?

18   A    I do.

19   Q    Why do you do that?

20   A    I don't ever want, well, honestly, be in this

21        position where defense attorney is going to say

22        that --

23             ATTORNEY VISHNY:  No.  I object to that.

24             ATTORNEY SCHNEIDER:  No.

25             THE COURT:  Sustained.  I'll strike what
```

195

1          little portion of the answer there is.

2     Q    (BY ATTORNEY SCHNEIDER)  Okay.  So let me ask you

3          this.  Are sometimes people's handwriting pretty

4          bad?

5     A    Oh, yes.

6     Q    Okay.  So do you, before you leave, make sure either

7          you read it to them or they read it to you so you

8          understand what the words are?

9     A    I do.

10    Q    Have you ever had people slip in or write words in a

11         foreign language in a written statement?

12    A    Yes.

13    Q    So if you don't know what that word is, do you ask

14         them to write it in English?

15    A    Yes.

16    Q    And Mr. Lee's statement was all written in English.

17    A    Yes.

18    Q    And Paul then signed that written statement?

19    A    He did.

20    Q    When you were finished speaking to Paul at the

21         Appleton Police Department, where did he go?

22    A    We gave him a ride home.

23    Q    And do you remember what time that might have been?

24    A    I believe it was very shortly after he finished the

25         report.

196

```
 1   Q   If I told you -- and I think yesterday we somewhat
 2       agreed or stipulated that the time you dropped Paul
 3       off was about 1:17 p.m.  Does that sound right?
 4   A   Yes, it does.
 5   Q   Who was with you when you dropped him off?
 6   A   Myself and Sergeant Thao.
 7   Q   Prior -- let me ask you this because I don't know.
 8       Prior to dropping Paul off, did you tell him where
 9       Chong was?
10   A   No.
11   Q   Did you ever tell him where Chong was?
12   A   I don't believe I did, no.
13   Q   Did you ever hear Sergeant Thao or anyone else
14       explain where Chong was to him?
15   A   I don't believe so, no.
16   Q   And at that time when you dropped him off, that was
17       the home where he lived with his sister?
18   A   Correct.
19   Q   So now I want to focus your attention, it's going to
20       seem weird, but if this was a movie reel, we're going
21       to go backwards the day of December 12th.
22           Earlier in the morning hours before you spoke to
23       Paul again around noon, did you have responsibilities
24       to speak to anyone else?
25   A   I did.
```

197

1   Q    Who was that?

2   A    Chong Lee.

3   Q    Is the Chong Lee that you spoke with here today in

4        the courtroom, Sergeant?

5   A    Yes, ma'am.

6   Q    Is he seated at the defendant's table in a light blue

7        shirt?

8   A    Yes, ma'am.

9             ATTORNEY SCHNEIDER:  I would ask the record

10       reflect identification.

11            THE COURT:  The record shall so reflect.

12  Q    (BY ATTORNEY SCHNEIDER)  And as part of -- as part of

13       the work in this case, when Chong Lee was found at

14       his home were items taken from the home as well?

15  A    There were.

16  Q    And when you're at a house and you may be collecting

17       items, do you always know what to collect?

18  A    Well, we -- we ask for specific things in the search

19       warrant.

20  Q    Okay.  But if you're looking for clothing, you know,

21       unless you get a very specific description like a

22       pair of Grinch flannel pajama pants, do you collect

23       anything that might be relevant?

24  A    Yes.

25  Q    Why?

198

1    A    Because it might be relevant.

2    Q    Okay.  I'm going to show you two photos, Exhibit 86

3         and then Exhibit 87.  Are you familiar with what's

4         depicted there, Sergeant?

5    A    I am.

6    Q    What's first in Exhibit 86?

7    A    Wisconsin ID card.

8    Q    And who is that for?

9    A    Chong Lee.

10   Q    That was located where?

11   A    I didn't specifically grab that.  I was told that was

12        grabbed, and I saw it when it was coming out, but I'm

13        not positive, I believe it was taken from the

14        downstairs bedroom.

15   Q    At his home?

16   A    Correct.

17   Q    And Exhibit 87, what's that a photograph of?

18   A    That is a gray Brewers hat.

19   Q    Okay.  Found at that home as well?

20   A    Correct.

21   Q    Was it found in the same room as the wallet?

22   A    I believe so.

23             ATTORNEY SCHNEIDER:  I move 86 and 87 in at

24        this time, Your Honor.

25             THE COURT:  Any objection?

1                    ATTORNEY VISHNY:  No.

2                    THE COURT:  86 and 87 will be received.

3    Q    (BY ATTORNEY SCHNEIDER)  I'm going to next show you,

4         Sergeant, what's been marked as State's Exhibit No.

5         95?

6    A    Okay.

7    Q    Are you familiar with, excuse me, are you familiar

8         with that item?

9    A    Yes.

10   Q    What is that item?

11   A    The -- the hat.

12   Q    Okay.  So in essence 87 is a photograph, 95 is the

13        actual hat?

14   A    Correct.

15                   ATTORNEY SCHNEIDER:  I move 95 into

16        evidence at this time.

17                   THE COURT:  Any objection?

18                   ATTORNEY VISHNY:  No objection.

19                   THE COURT:  95 will be received.

20                   ATTORNEY VISHNY:  I'm sorry, Miss

21        Schneider, the hat is what number?

22                   ATTORNEY SCHNEIDER:  95.

23                   ATTORNEY VISHNY:  And the other one is?

24                   ATTORNEY SCHNEIDER:  86, 87.

25              Judge, this may be somewhat of a logical point

                            200

1      to take a break because I need to adjust the

2      equipment a little bit before we get to the next

3      part, and I anticipate it will be a little lengthy

4      with, you know, I'm going to need at least an hour

5      probably without a break so --

6              THE COURT:  Let's make it a short break.

7      We'll -- I want to start promptly at ten to four.

8              (The jury was escorted out of the

9      courtroom.)

10             (Court in recess.)

11             (The jury was escorted into the courtroom.)

12             ATTORNEY SCHNEIDER:  Can I ask few

13     questions?

14             THE COURT:  You tell me.

15  Q  (BY ATTORNEY SCHNEIDER)  Sergeant Schira, at the

16     Appleton Police Department, the interview room where

17     you spoke to Chong, is that recorded?

18  A  It is.

19  Q  Is that a video and audio recording?

20  A  It is.

21  Q  Does that in some ways allow you not to have to take

22     so many notes?

23  A  It does.

24  Q  When you started as an investigator, I don't mean to

25     say this in a bad way, but did you even ever video

201

1      record interviews when you first started as an
2      investigator?
3   A  No.
4   Q  Would you have the ability when you first started to
5      have like a recorder where you could try to record
6      the audio?
7   A  Yes.
8   Q  Would you then still rely upon taking notes?
9   A  Yes.
10  Q  And that's kind of as technology has advanced some of
11     that has gone away because of technology, correct?
12  A  Correct.
13  Q  And the person that was doing the interview with you,
14     that person's name again was?
15  A  Sergeant Cary Meyer.
16  Q  Okay.
17             ATTORNEY SCHNEIDER:  And, Judge, I'm going
18     to be playing what we've marked as Exhibit 94.
19             THE COURT:  Okay.
20             ATTORNEY SCHNEIDER:  If you could get the
21     lights now.
22             THE COURT:  Certainly.
23  Q  (BY ATTORNEY SCHNEIDER)  And so, just to start,
24     Sergeant Schira, the image that we see up on the
25     screen is what room at the Appleton Police

202

1        Department?

2   A    That is an interview room.

3   Q    Okay.  So we see a gentleman in a black hooded

4        sweatshirt.  Who is that person?

5   A    That is myself.

6   Q    Okay.  And the person I'm going to say seated more at

7        the table with maybe a -- knowing Sergeant Meyer, I

8        would say maybe a lighter pale green?

9   A    Mint.

10  Q    I believe it's a mint green dress shirt?

11  A    Yes.

12  Q    And across from both of you, who is that

13       individual?

14  A    That is Chong Lee.

15  Q    The defendant in this case?

16  A    Yes.

17            ATTORNEY SCHNEIDER:  So, Judge, what I'm

18       going to do at this time is play the interview.  It

19       is lengthy.  We will have to take some pauses and

20       some time.  Sergeant Duros -- or Mr. Duros is going

21       to be in charge of that, but otherwise at this time I

22       would ask for permission to play Exhibit 94.

23            THE COURT:  That's fine.  And why don't we

24       do this.  Start it and let the -- just so that the

25       jury can get a sense of the volume, and then I'm

203

1          going to ask if the volume is okay.

2                    ATTORNEY SCHNEIDER:  Okay.

3                    (Video played.)

4                    THE COURT:  And is that -- is that volume

5          sufficient for everyone?

6                    ATTORNEY SCHNEIDER:  For the record, I'm

7          kind of crazy about this, 7:57:08 to 7:57:19 is the

8          next section we just played.  We're going to move it

9          back to the start point.

10                   THE COURT:  That's fine.  Thank you.

11                   (Video played.)

12                   ATTORNEY SCHNEIDER:  I don't know if this

13         is a scratch on the disk, so I just ask if we can

14         have thirty seconds to excuse the jury and I'll try

15         to adjust something on the player?

16                   THE COURT:  That's fine.

17                   (The jury was escorted out of the

18         courtroom.)

19                   THE COURT:  Bring them in.

20                   (The jury was escorted into the courtroom.)

21                   ATTORNEY SCHNEIDER:  So we backed it up

22         just a few seconds to 8:43:39 and we'll resume it at

23         that point.

24                   (Video played.)

25                   ATTORNEY SCHNEIDER:  Just for the record,

1          Judge, we played a section from 8:49:57 to 8:59:33 at
2          like an eight speed on the player because the parties
3          weren't in the room at that point.  We'll resume this
4          now then at regular speed.
5                    (Video played.)
6                    ATTORNEY SCHNEIDER:  So then we stopped it
7          at 9:00:01 and we're resuming it at 9:00 -- 9:00:08.
8                    (Video played.)
9                    ATTORNEY SCHNEIDER:  We stopped it at
10         9:00:40 and we're going to pick it up at 9:00:47.
11                   (Video played.)
12                   ATTORNEY SCHNEIDER:  Stopped it at 9:01:01.
13         Okay.  Picking it up at 9:01:04.
14                   (Video played.)
15                   ATTORNEY SCHNEIDER:  Stopped it at 9:04:34,
16         pick it up at 9:04:44.
17                   (Video played.)
18                   ATTORNEY SCHNEIDER:  Stopped at 9:07:07,
19         going to pick it up at 9:08:35.
20                   (Video played.)
21                   ATTORNEY SCHNEIDER:  Stopped at 9:11:35.
22         Picking it up at 9:11:41 -- picking up at 9:11:47.
23                   ATTORNEY VISHNY:  One minute.  Judge, can
24         we approach please?
25                   THE COURT:  You may.

205

1              (Bench conference.)

2              ATTORNEY SCHNEIDER:  Going to pick it up at

3      9:11:48.

4              (Video played.)

5              ATTORNEY SCHNEIDER:  Stopped at 9:11:20.

6      I'm sorry, 9:13:20.  We're picking it up at

7      9:13:49.

8              (Video played.)

9              ATTORNEY SCHNEIDER:  Stopped it at 9:17:11,

10     and then pick it up at 9:17:26.

11             (Video played.)

12             ATTORNEY SCHNEIDER:  We stopped it at

13     9:17:34.

14          Judge, can we turn the lights back on please?

15  Q   (BY ATTORNEY SCHNEIDER)  When you were speaking with

16      the defendant in this case, he mentioned Sharks.  Do

17      you recall that?

18  A   I do.

19  Q   And specifically what did he say in relationship to

20      what he did related to Sharks that night?

21  A   He said that after leaving Luna he went to Sharks.

22  Q   And prior to that, do you know if your investigation

23      had any information that he had been at Sharks?

24  A   Yes.

25  Q   And at some point officers continued to follow up on

1        that?

2   A    Yes.

3   Q    And after this interview with the defendant, were --

4        was it a situation where interviews continued?

5   A    Yes.

6   Q    Was it a situation then where you went back to some

7        of the people that had been spoken to before?

8   A    We did.

9   Q    At some point were items from Milwaukee obtained?

10  A    Yes.

11  Q    And some of those items related to a hotel?

12  A    Correct.

13  Q    And that came after this day?

14  A    After what?

15  Q    After the date of the interview, December 12th,

16       2013?

17  A    Yes.

18  Q    Okay.  And after this date, I want to direct your

19       attention, fast forward a little bit, Sergeant

20       Schira, to January 21st of 2014.

21  A    Okay.

22  Q    Do you remember what was done on that day?

23  A    I think I do, but I don't want to misspeak.

24  Q    Okay.  Officers obtained different letters on January

25       21st, 2014, correct?

```
1   A   They did.

2   Q   And it wasn't just from one location but from a

3       variety of locations?

4   A   Correct.

5   Q   And were those letters -- some were collected from

6       the defendant's jail cell, correct?

7   A   Correct.

8   Q   And up to that point, what was the basis that law

9       enforcement wanted to collect the letters?

10  A   There were letters that were being sent to people

11      involved, witnesses, specifically asking them or --

12          ATTORNEY VISHNY:  Judge, I'm going to

13      object.  I think whatever letters the State puts in

14      will speak for themselves.

15          ATTORNEY SCHNEIDER:  But it's -- maybe I

16      can --

17          ATTORNEY VISHNY:  I will agree the police

18      had a basis for a search warrant if that helps.  I'm

19      not challenging that.

20          ATTORNEY SCHNEIDER:  No.  I might be able

21      to ask some questions.

22  Q   (BY ATTORNEY SCHNEIDER)  During this intervening time

23      from December 12th to January 21st, were jail phone

24      calls listened to?

25  A   They were.
```

208

1    Q    A few or several?

2    A    Many.

3    Q    And was that a basis for why you went to look for

4         letters?

5    A    Yes.

6    Q    I'm going to -- as part of this case, do you know a

7         person who's named Nhia, spelled N-H-I-A, Lee?

8    A    I do.

9    Q    And who is Nhia Lee?

10   A    He is Chong's brother.  I believe he is an older

11        brother.

12   Q    And --

13                  ATTORNEY SCHNEIDER:  Your Honor, if I may

14        approach?

15                  THE COURT:  You may.

16   Q    (BY ATTORNEY SCHNEIDER)  Just for the record, I'm

17        showing you what has been marked Exhibit No. 4; is

18        that correct?

19   A    It is.

20   Q    And kind of a little crazy about this.  How many

21        pages is No. 4?

22   A    It is one page with an envelope cover.

23   Q    Is it actually the front and the back of the

24        envelope, three pages?

25   A    Yes.

1   Q   Okay.  And the envelope, it is not mailed yet,

2       correct?

3   A   Correct.

4   Q   And who is it addressed to?

5   A   Nhia Lee.

6   Q   And who is it addressed from?

7   A   Chong Lee.

8   Q   And after officers obtained these letters, were you

9       involved in reviewing some of them?

10  A   I was.

11  Q   And this letter was located where again?

12  A   In Mr. Chong Lee's cell.

13  Q   Okay.  Okay.  I'm going to direct you to read just

14      the highlighted portions here, Sergeant Schira.

15  A   I'm going to just -- okay.

16  Q   So if you can read the first highlighted portion.

17      And this is the start of the letter starts this way,

18      correct?

19  A   Correct.

20  Q   Please read that.

21  A   It starts with, hey big bro.  Yeah.  I got what

22      you're saying but I ain't trying to prove anything.

23      I do what I do because that's just me.  I do whatever

24      to protect family and friends.  That's all.

25  Q   Then is there a reference in the next paragraph?

210

```
 1   A    It does.

 2   Q    What's that say?

 3   A    Joe and Pao suppose to recant.  If they recant at the

 4        prelims then this case is going to get dropped.

 5   Q    What's a -- he references the term prelims.  What is

 6        that?

 7   A    A preliminary hearing.

 8   Q    Okay.  Is that a court hearing related to a case when

 9        someone is charged?

10   A    It is.

11   Q    And as of this date, January 21st, 2014, the

12        preliminary hearing in this case had not occurred

13        yet, correct?

14   A    Correct.

15             ATTORNEY SCHNEIDER:  I would move Exhibit 4

16        in at this time.

17             THE COURT:  Any objection?

18             ATTORNEY VISHNY:  No.

19             THE COURT:  Exhibit 4 shall be received.

20             ATTORNEY SCHNEIDER:  And I have no further

21        questions at this time.

22             THE COURT:  And just finish my notes here.

23          And I'm guessing after that questioning that

24        counsel will have significant questioning, and so

25        rather than hold you into the late night hours, let's
```

211

1    break, but I'd like to have counsel come up here
2    first just so we can get a good gauge on what time we
3    should ask the jury to be here for starting time
4    tomorrow.
5              (Bench conference.)
6              THE COURT:  All right.  So we will start at
7    8:45 tomorrow.  You are released for the evening.
8    Thank you again.
9              (The jury was escorted out of the
10   courtroom.)
11             THE COURT:  We had two sidebars related to
12   hearsay identification by Joe.  That was originally
13   sustained.
14        There was a second sidebar related to hearsay
15   objecting on Phong not IDing Chong in photographs.
16   For reasons that the court also explained off the
17   record during the in camera, that was overruled.
18        I believe those were the only two substantive
19   sidebars that we had.
20             ATTORNEY VISHNY:  Yes.  That's correct.
21   Just to supplement my record, our objection was that
22   neither Joe Thor nor Phong Lee had ever been asked
23   whether or not they had been shown pictures of Mr.
24   Chong Lee and said that they didn't know him so our
25   objection was a hearsay objection.

212

1                    THE COURT:  Yes.

2                    ATTORNEY VISHNY:  And that -- in our

3       opinion there was no hearsay exception.  Thanks.

4                    (Proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5     STATE OF WISCONSIN      )
                              ) ss.:
6     COUNTY OF OUTAGAMIE     )

7

8

9             I, JOAN BIESE, RMR/CRR, do hereby certify that I
      am the official court reporter for Branch IV of the
10    Circuit Court of Outagamie County;

11            That as such court reporter, I made full and
      correct stenographic notes of the foregoing proceedings;
12
              That the same was later reduced to typewritten
13    form;

14            And that the foregoing proceedings is a full and
      correct transcript of my stenographic notes so taken.
15

16            Dated this 8th day of August, 2016.

17

18

19                               _____

20                               JOAN BIESE, RMR/CRR

21

22

23

24

25

214