FILED
02-13-2019
Clerk of Circuit Court
Outagamie County
2013CF001074

1    STATE OF WISCONSIN     CIRCUIT COURT     OUTAGAMIE COUNTY
     _____

2    **STATE OF WISCONSIN,**

3              Plaintiff,

4    v.                              **Case No. 13-CF-1074**

5    **CHONG LENG LEE,**

6              Defendant.
     _____

7                    **JURY TRIAL – DAY EIGHT**

8    _____

9

     BEFORE:        **HONORABLE GREGORY B. GILL, JR.**
10                  Circuit Court Judge, Branch IV
                    Outagamie County Justice Center
11                  Appleton, WI  54911

12
     DATE:          **March 4, 2016**
13

14   APPEARANCES:   **CARRIE SCHNEIDER**
                    District Attorney
15                  Appearing on behalf of the State

16                  **ANDREW MAIER** and **ALEXANDER DUROS**
                    Assistant District Attorneys
17                  Appearing on behalf of the State

18                  **DEBORAH VISHNY** and **EVAN WEITZ**
                    Attorneys at Law
19                  Appearing on behalf of the Defendant

20                  **CHONG LENG LEE**
                    Defendant
21                  Appearing in person

22

23

24   Joan Biese
     Official Reporter, Branch IV
25   Outagamie County

                              1

                                        Exhibit 23

1                                    **I N D E X**

2

3  <u>**WITNESSES**</u>                                                      <u>**PAGE**</u>

4  **JOHN SCHIRA**
       Examination by Attorney Vishny....................   5
5      Examination by Attorney Schneider................ 108
       Examination by Attorney Vishny................... 145
6      Examination by Attorney Schneider................ 153
       Examination by Attorney Vishny................... 154
7      Questions from Jury.............................. 159
       Examination by Attorney Schneider................ 161
8
   **JAMES L. TRAINUM**
9      Examination by Attorney Vishny................... 170
       Examination by Attorney Schneider................ 254
10     Examination by Attorney Vishny................... 271
       Examination by Attorney Schneider................ 275
11
   **TENG LEE**
12     Examination by Attorney Maier.................... 278
       Examination by Attorney Weitz.................... 298
13     Examination by Attorney Maier.................... 307
       Examination by Attorney Weitz.................... 309
14     Examination by Attorney Maier.................... 312

15

16

17

18

19

20

21

22

23

24

25

2

1  **EXHIBIT**                                                          **PAGE**

2  1 –  White Board–Luna Lounge......................... 156
   97–  Disk 10 of 16 HEMS #60–62, 71.................... 240
3  106– Transcript–Interview of Tou Shoua Lee........... 249
   114– Transcript–Interview of Phong Lee..............  60
4  122– Paul Lee Statement.............................. 127
   160– Transcript–Interview of Joe Thor................ 115
5  161– Transcript–Interview of Joe Thor................ 242
   162– Transcript–Interview of Joe Thor–Item 142....... 242
6  170– Jail Call Transcript–12/18/13................... 280
   171– Jail Call Transcript–12/28/13................... 282
7  172– Jail Call Transcript–1/7/14.................... 285
   173– Jail Call Transcript–1/22/14................... 287
8  174– Jail Call Transcript–1/29/14................... 289
   175– Jail Call Transcript–2/2/14.................... 294
9  176– Transcript–Interview of Paul Lee
        12/12/13–12:41 a.m.............................  66
10 177– Transcript–Interview of Paul Lee
        12/12/13–11:58 a.m.............................  81
11 178– Reid Training Manual...........................  16
   179– Transcript–Interview of Joe Thor–Item 233.......  33
12 180– Search Warrant................................. 103
   181– Search Warrant................................. 103
13 182– Transcript–Interview of Paul Lee
        12/12/13–2:19 a.m............................. 126
14 189– Transcript–Interview of Paul Lee–12/11/13....... 217
   190– James L. Trainum Resume........................ 170
15 191– James L. Trainum Preliminary Report............ 203
   192– Appendix A..................................... 204
16 193– James L. Trainum Supplemental Report........... 204
   194– Appendix G..................................... 192

17

18

19

20

21

22

23

24

25

3

1                  **<u>TRANSCRIPT OF PROCEEDINGS</u>**

2           (The jury was escorted into the courtroom.)

3           THE COURT:  Please be seated.  We will go

4    on the record.

5        We are on the record in *State of Wisconsin v.*

6    *Chong Lee.*

7        Mr. Lee appears at counsel table, along with his

8    counsel, Attorney Evan Weitz and Deja Vishny.  Also

9    seated at counsel table under the student practice

10    rule is Solomon Gatton.  Representing the State of

11    Wisconsin, Outagamie County District Attorney Carrie

12    Schneider.  Also present are Assistant District

13    Attorneys Andrew Maier and Alex Duros.

14        We are prepared to continue with the testimony

15    of the sergeant, correct?

16           THE WITNESS:  Yes.

17           THE COURT:  Sergeant, I would remind you

18    that you are still under oath, sir; and with that, I

19    believe that we were at the point where

20    cross-examination was to commence.  Is that your

21    recollection, Attorney Schneider?

22           ATTORNEY SCHNEIDER:  Yes.

23           THE COURT:  Attorney Vishny, whenever you

24    are ready.

25           ATTORNEY VISHNY:  Thank you.

1                          **EXAMINATION OF JOHN SCHIRA**

2    **BY ATTORNEY VISHNY**:

3    Q    Sergeant Schira.

4    A    Yes, ma'am.

5    Q    Yesterday you were asked some questions about your

6         training?

7    A    Yes, ma'am.

8    Q    The Appleton Police Department has sent you to many

9         training programs.

10   A    Yes, ma'am.

11   Q    And those are primarily by outside providers as well

12        as in-service.

13   A    It's -- I guess, ma'am, yes.

14   Q    But as far as outside providers, when Appleton Police

15        Department sends you to an outside provider, what you

16        have to do -- or what they have to do is pay a fee

17        and then you go to the outside provider?

18   A    No.

19   Q    They do it for free?

20   A    Many of the trainings that we go to are free.

21        They're funded through the -- well, through state

22        funding, there is DOJ grants, things like that.

23   Q    So they're grant funded, but somebody -- some

24        taxpayer somewhere is funding these trainings,

25        right?

5

```
 1   A    I wouldn't know that, ma'am.
 2   Q    All right.  But it's an investment in you being able
 3        to do a good job as a detective.  You can agree with
 4        that.
 5   A    Yes, ma'am.
 6   Q    And I assume you would agree that anybody in any
 7        profession, that training them to do their job
 8        properly is very important.
 9   A    Is that a question, ma'am?  I guess I don't
10        understand.
11   Q    Would you agree with me that for any person in any
12        professional capacity that going to training to learn
13        how to do your job properly is very important?
14   A    Yes.
15   Q    Now, one example of some of the training you receive,
16        and this is probably in-house, is using your firearm.
17   A    Correct.
18   Q    And how it functions mechanically?
19   A    Yes.
20   Q    How to break it down?
21   A    Yes.
22   Q    Keep it in good condition?
23   A    Yes.
24   Q    Safety features?
25   A    Yes.
```

6

```
 1   Q   How to aim and fire at a target properly should that
 2       unfortunate day ever come for you that you have to
 3       use it in the line of duty?
 4   A   Yes.
 5   Q   When to shoot and not to shoot?
 6   A   Yes.
 7   Q   That's very important as well, right?
 8   A   Correct.
 9   Q   And we can agree that this training is so important
10       because it could actually come down to a matter of
11       life and death?
12   A   What training are we talking about?
13   Q   Firearm training.  I'm talking about firearms right
14       now, right?
15   A   Yes.
16   Q   And it's fair to say that you follow your training
17       when it comes to dealing with firearms?
18   A   It depends on the type of training that you go to.
19   Q   Do you ignore your training when it comes to
20       firearms?
21   A   Depends what training you go to.  There is the
22       training that I've gone to where it's not been good
23       training.
24   Q   How about the training inside the Appleton Police
25       Department for firearm training?
```

7

1    A    For the most part it's good.

2    Q    But sometimes you think you know how to do it better

3         it sounds like.

4    A    I didn't say that.

5    Q    Well you say some of the training is not good, so

6         when you've gone to not good training, I gather your

7         opinion is that you are able to do a better job than

8         what's being taught by the trainer?

9    A    Or that I've learned things from other sources that I

10        think are better.

11   Q    But you wouldn't want to disregard training you think

12        is good because it could involve making a serious

13        mistake, right?

14   A    I guess it depends on the training.

15   Q    Now, you've also been trained in evidence collection

16        and preservation?

17   A    Yes, I have.

18   Q    In report writing?

19   A    Yes, I have.

20   Q    In interviewing witnesses?

21   A    Yes, I have.

22   Q    How to draft search warrants properly?

23   A    Yes.

24   Q    Or work with the District Attorney to get search

25        warrants?

8

```
 1   A    Yes.

 2   Q    Understanding when you need a search warrant in order

 3        to obtain evidence compared to when you don't need a

 4        search warrant, that's very important, right?

 5   A    Correct.

 6   Q    Because if you don't have a search warrant and you

 7        needed one, evidence might not be admissible in

 8        court?

 9   A    Correct.

10   Q    So that's clearly not a mistake you would ever want

11        to make, right?

12   A    Correct.

13   Q    And how to interrogate suspects.  You've learned

14        that?

15   A    I have.

16   Q    Now, not only are you trained when you first began

17        your job, but you learn updates as you go on with

18        your job, you get updated training.

19   A    We do.

20   Q    And learn the latest methods that are available to

21        you as law enforcement officers to investigate and

22        solve crimes.

23   A    We do.

24   Q    And that's important because things change over time

25        in the law enforcement field, right?
```

9

```
1    A    Are we talking about firearms, ma'am?

2    Q    We're talking about everything now.

3    A    Okay.

4    Q    I mean, things -- for example, the way identification

5         procedures are done if one uses a photo array, that's

6         changed over time, hasn't it?

7    A    I'm sorry.  Did you say photo?

8    Q    Yes.  Identification procedures with photo arrays,

9         that's changed over time, how you do that.

10   A    I guess I'm not sure.

11   Q    Well, did you used to do them where all the pictures

12        of the suspect and the fillers were all in one page

13        and shown to a witness and they would pick it out if

14        they could make an identification?

15   A    I don't think I've ever done it that way, no.

16   Q    Okay.  But you know that several years ago there

17        became training from the Wisconsin Department of

18        Justice that identification procedures were supposed

19        to be done by showing pictures one at a time to an

20        eyewitness.

21   A    I believe so, yes.

22   Q    And that it was important that those pictures be

23        shown in a way so that the law enforcement officer

24        showing the pictures would not know who the suspect

25        was in which order so that they wouldn't contaminate
```

10

1          the identification process.

2     A    I really don't know, ma'am.  I don't do a lot of

3          photo lineups.  But I believe what you're saying is

4          true.

5     Q    Right.  But certainly you wouldn't go do a photo

6          lineup and not follow the proper guidelines set forth

7          by the Department of Justice, would you?

8     A    I believe I would not.

9     Q    Okay.  So if the guideline -- when guidelines came

10         in, you know, whatever year they came in, everyone in

11         your department, yourself included, would switch to

12         doing it the right way?

13    A    I believe so, yes.

14    Q    And you know that in a photo identification

15         proceeding it's very important to not contaminate the

16         memory of the eyewitness.

17    A    I guess you would have to explain contaminate.

18    Q    In other words, to give the eyewitness information so

19         that instead of them making an identification from

20         their own memory, they might be making it because of

21         suggestions you might make as a law enforcement

22         officer.  You wouldn't do that.

23    A    Again, I think that's not exactly how it would

24         happen.  If I'm -- may I explain?

25    Q    Of course.

1    A    If I'm doing the investigation and I've been

2         interviewing maybe a witness or a victim of a crime,

3         I'm going to be asking them specific questions about

4         what the person looks like, the clothing that they

5         may be wearing, if they have scars or tattoos,

6         anything that's like a distinguishing mark maybe, so

7         if pictures are shown, in a sense, I've refreshed

8         their memory of what the person looks like.  I've

9         asked them specific questions on what the person

10        looks like, clothing, size, distinguishing marks, so

11        I guess that would be doing that, wouldn't it?

12   Q    I don't think you understood my question.

13   A    Okay.

14   Q    But obviously you would get the information, but then

15        you pick -- if you have a suspect in mind, you get a

16        picture of the suspect and some fillers, people who

17        you don't believe -- or don't believe were involved

18        in the crime but they look roughly alike to show to

19        the witness, right?

20   A    I believe one of the things that DOJ standardized, or

21        maybe it's just how Appleton does it, again I'm not

22        an expert in this field because I rarely use photo

23        lineups, but I believe we don't even get the

24        pictures.  I believe the pictures come through an

25        outside source.  I think we many times will use

12

```
 1          Outagamie here to get pictures.
 2     Q    Right.  But when you get the pictures, the point I'm
 3          trying to make is you would never show the pictures
 4          to the witness and say, hey, pick this guy out,
 5          right?
 6     A    Another thing that we don't do is when you're talking
 7          about changes, again, I'm not an expert in this
 8          field, but the investigating officer, if you're
 9          saying if it was me, we don't even provide the
10          pictures to the witness or the -- whoever it is.
11          There would be another officer that would do that.
12     Q    Okay.  Maybe you misunderstood my question.
13               ATTORNEY SCHNEIDER:  I'm -- at this point I
14          think I'm going to object as to relevance, and I can
15          approach if you want us to.
16               THE COURT:  Come on up.
17               (Bench conference.)
18     Q    (BY ATTORNEY VISHNY)  If I understood you right,
19          maybe I misunderstood you, what you're saying is you
20          don't even have the officer who got the information
21          from the witness show pictures -- photo array to a
22          witness, you get somebody else to do it so they don't
23          even know who the suspect is, right?
24     A    Yes.
25     Q    And the reason that you do that is because you want
```

```
1         to make sure you don't contaminate the suspect's
2         memory -- I mean the witness's memory by the officer
3         even inadvertently, right?
4    A    Yes, ma'am.
5    Q    Because certainly you would never deliberately
6         contaminate somebody's memory, but the guidelines
7         require this because mistakes can happen and
8         contamination can occur by accident without even
9         realizing it's going on in showing a photo array?
10   A    I believe that's why the state did that, yes.
11   Q    Now -- so I guess we can all agree you don't want to
12        use 1990s methods in a, you know, 2013 to 2016 world.
13   A    Actually --
14              ATTORNEY SCHNEIDER:  I'm going to object
15        and ask for clarification.  What methods,
16        interviewing, photo lineups, she's talked about gun
17        use?
18   Q    (BY ATTORNEY VISHNY)  You wouldn't want to use those
19        kind of methods with guns, right?
20   A    No, I would disagree.
21   Q    You would want to use 1990s methods -- if there are
22        new safety features on a gun, would you want to use
23        1990?
24   A    When it comes to common sense things that work that
25        stand the test of time --
```

14

1    Q    Right.

2    A    -- absolutely.  Some of the best training techniques

3         I ever learned, regardless if it's gun or interview

4         techniques, aren't necessarily brand new

5         techniques.

6    Q    Okay.  But we have new techniques with witness

7         identification and contamination, and those are

8         better techniques, right?

9    A    Specific towards?

10   Q    Eyewitness identification.

11   A    I -- I believe some of them are better, yes.

12   Q    And they're based on research by sociologists,

13        scientists, to prevent mistakes, right?

14   A    I don't know that.

15   Q    Okay.  Now let's talk about interrogation.  You have

16        been trained in interrogation techniques?

17   A    Yes, ma'am.

18   Q    And you went to what's called the Reid School of

19        Interrogation?

20   A    I did.

21   Q    You did that at Fox Valley Technical College,

22        right?

23   A    I -- I'm not sure where I went, but I did go, yes.

24   Q    You remember that it was three days long?

25   A    It was the -- the basic class, yes.

15

1    Q    And the Reid School is a -- an outfit that teaches

2         interviewing and interrogation of suspects, in

3         particular, and witnesses, they teach all over the

4         country.  Are you aware of that?

5    A    I'm not very familiar with Reid, no.

6    Q    All right.  So you went to their training and you

7         were given a workbook by them, right?

8    A    I don't recall.

9    Q    I'm going to show you --

10             ATTORNEY VISHNY:  Get this marked.

11             ATTORNEY SCHNEIDER:  Judge, can we approach

12        before she shows it to the witness?

13             THE COURT:  You may.

14             (Bench conference.)

15             ATTORNEY VISHNY:  All right.

16   Q    (BY ATTORNEY VISHNY)  I'm showing you what's been

17        marked as 178.  Now this is obviously a photocopy.

18        Does that look similar to the book?

19   A    Ma'am, I don't know.  How many years ago was the

20        training?

21   Q    Well, I didn't go, but I thought you said eleven

22        yesterday.

23   A    Okay.  I don't remember.  That was eleven years

24        ago.

25   Q    All right.  Whether you recall what the -- you don't

16

1          remember like a green kind of soft cover book?

2    A     No.

3    Q     You do remember, or maybe you don't, I guess you'll

4          have to tell me, some of the things that you were

5          taught in terms of how to interrogate suspects?

6    A     Ma'am, I truly remember very little about that

7          school.  That was eleven years ago, and I -- I mean I

8          understand some of the basic concepts of Reid, but

9          again, I don't follow a specific technique or outline

10         or template for when I do investigations.

11   Q     When you interrogate somebody you suspect of a crime,

12         one of the things you do is you express a strong

13         belief that the person has some involvement in the

14         crime that you're investigating.

15   A     I guess what I first would say is I try to interview

16         people.  I try to talk to them.  That's where I begin

17         with.

18   Q     The method that you've been trained in is actually

19         you should interview people first with some

20         open-ended questions and then proceed to an

21         interrogation after first interviewing and getting

22         what they have to say, right?

23   A     Are you saying that I learned this at Reid to do

24         this?

25   Q     Well, I'll ask you about Reid and I'll ask you

17

```
 1          generally have you learned to do that.  So, you know,
 2          I don't want to do compound questions here, so let me
 3          first ask Reid.
 4     A    Okay.  Are you asking me if that's what I learned at
 5          Reid, ma'am?
 6     Q    Yeah.
 7     A    I -- again, I don't remember specifics about it.  I
 8          believe that at that time I'd already been an
 9          investigator for four or five years possibly, maybe
10          even more, and I had kind of already developed my own
11          interview techniques.  And as far as the Reid
12          technique, I don't recall that Reid is a specific
13          technique, I believe it's like a -- like some
14          theories and questions, and I think they just
15          basically took -- honestly I think they took
16          basically common sense interview stuff and put their
17          name on it.
18     Q    All right.  That's your belief.  I understand that.
19          Do -- have you been trained in general then for this
20          question to express when interrogating a suspect a
21          strong belief that they're involved in the crime?
22     A    When I interview people it depends on the initial
23          contact, what they say, how they say, their
24          interaction with the police, their level of
25          cooperation of -- I guess I look at a variety of
```

18

```
 1          things.

 2     Q    You know what theme development is, right?

 3     A    I -- I might know what it means, but I don't want to

 4          -- maybe you can explain it to me.

 5     Q    Have you done what you believe to be theme

 6          development when you've interrogated people?

 7     A    I'm not positive I know what theme development is.  I

 8          think it's -- I think I do, ma'am, but I think I kind

 9          of renamed it something else.

10     Q    What's your name for it?

11     A    If it's what I think you are talking about, well,

12          again, maybe you can explain to me what it is.  I'm

13          not going to play games with you.  I truly will tell

14          you what I think it is.

15     Q    Okay.  Unfortunately we're in a situation where I ask

16          the questions.

17     A    Okay.

18     Q    So if you don't want to answer them, I can understand

19          feeling uncomfortable, but I want to ask you what is

20          -- what's the name you use for theme development?

21     A    Okay.  I don't want to get into semantics with you,

22          but I don't know what you mean by theme.  What I try

23          to do is I try to -- you know, if somebody -- let's

24          say I -- let's say I was working patrol and I come up

25          to a corner and there's tire tracks, you know, going
```

19

```
1          off the ditch and going into somebody's front yard
2          running over their mailbox, and it's kind of slippery
3          out, I'd get out and I'd say were you driving a
4          little bit too fast for conditions, and that might be
5          a theme.  So when the person tells me, yeah, I was
6          driving too fast for conditions, that's what
7          happened.
8     Q    So in other words, you would take a look at the
9          evidence, suggest what happened and see if the person
10         you're questioning would agree with you.
11    A    That's what I believe theme is, yes.
12    Q    Okay.  Now, one theme -- have you ever heard of a
13         theme being offered to a suspect as a moral excuse?
14    A    As a moral excuse?
15    Q    A moral excuse.
16    A    No, ma'am.
17    Q    And could an example of a theme be if you're talking
18         to somebody and saying I believe you're the shooter
19         but, you know, look, this guy was a lot bigger and
20         you were potentially in danger, would that be an
21         example of a theme?
22    A    I would think that's similar to basically just coming
23         up with a reasonable, you know, explanation of why
24         somebody would act in a certain manner.
25    Q    Because when you offer that explanation, you know,
```

20

1       what you're offering to the person is that it

2       minimizes their behavior, right?

3    A  I don't think it minimizes it, I think it just

4       explains why they did it.

5    Q  So it's one thing to go up and just shoot somebody in

6       the head for no reason, but it's something different

7       if you say to the person, well, you did it because

8       this guy was bigger than you.  That -- wouldn't you

9       agree that that offer minimizes behavior?

10   A  Again, I don't think it minimizes, I think it just

11      gives a reasonable explanation of why somebody would

12      do something like that.  I -- I can't wrap my head

13      around why somebody would do something like that.

14      And that's maybe what I'm trying to think is like

15      maybe this is why he did it.

16   Q  I see.  So you don't remember being trained that

17      that's a specific template or paradigm to interrogate

18      people?  Apparently you don't recall that?

19   A  I think that's an innate investigation skill.  I

20      think everybody is -- any good investigator would try

21      to figure out why somebody does something.  I just

22      think that's common sense.

23   Q  Now, one of the things, you know, you're saying it's

24      common sense to make these suggestions, so, you know,

25      we'll use your word, explanation, common sense, what

21

```
 1          you call, you know -- you understand other people may
 2          call that -- people who study interrogation may call
 3          that minimization.  You understand that, right?
 4     A    Minimalization?
 5     Q    Minimization.
 6     A    No, I did not know that.
 7     Q    So one thing you do know is that you cannot coerce
 8          people into making statements.  That's pretty clear,
 9          right?
10     A    Coerce as in force them to making a statement?
11     Q    Right.
12     A    Correct.
13     Q    So, you know, certainly beating people up, holding
14          guns to their head, depriving them of food, water,
15          that's out?
16     A    Yes, ma'am.
17     Q    All right.  There's also psychological coercion,
18          right?
19     A    I'm not a psychiatrist, I don't know.
20     Q    Well, for example, if you threaten to take somebody's
21          children away when you're interrogating them unless
22          they give you a confession, that would be an example
23          of psychological coercion, right?
24     A    I guess it would be, yes.
25     Q    And certainly threats and promises are not permitted
```

22

```
 1        in an interrogation.
 2   A    Threats or promises.
 3   Q    Yeah.
 4   A    I don't know that, no.
 5   Q    You can't threaten somebody, can you?  You think it's
 6        okay?
 7   A    I think you can tell people that there's consequences
 8        that if they lie to you or if they're involved in a
 9        crime that they'll be held accountable for that.  I
10        think you can do that.
11   Q    Including telling them how much time they might be
12        looking at?  Do you feel that's okay?
13   A    I do.  I think if somebody has committed a crime or
14        you think that they've committed a crime and you tell
15        them, you know, you punched somebody in the nose down
16        on College Avenue, the bond amount for that is $275.
17        I can do that.
18   Q    So you feel it's fine that -- now obviously you have
19        a soft tone when you question suspects, right?
20   A    I try to.
21   Q    And that's part of the training too, to have a soft
22        tone.
23   A    No, not necessarily.  I have -- I've never been
24        taught to have a soft tone.
25   Q    It's just you naturally.
```

23

```
 1   A    I think a lot of it, again, depends on, like we
 2        talked about earlier, the people that you're dealing
 3        with, their level of cooperation.  If they're
 4        outright lying to you, I think I'm a human being, I
 5        can -- I can, you know, be affected by an interview
 6        just like the person being interviewed can be.
 7   Q    So you can be affected with a soft tone and harsh
 8        words?
 9   A    I guess I wouldn't consider telling somebody that
10        they're going to be held responsible for what they
11        did, if they in fact did it, being harsh.  I think
12        it's just being honest.
13   Q    All right.
14             ATTORNEY VISHNY:  All right.  Page 48.
15   Q    (BY ATTORNEY VISHNY)  I'm going to show you something
16        from the Reid book and just ask you if you've ever
17        been trained in this, whether you recall it from Reid
18        or something else.
19   A    Yes, ma'am.
20   Q    Okay.  On Page 48, and it's highlighted here to help
21        you, there's a discussion of what they call, III,
22        Principles of Theme Development.
23   A    Okay.
24   Q    All right.  And the highlighted part -- why don't you
25        read the highlighted out loud.
```

24

```
 1    A    Okay.  I really should have brought my glasses.

 2    Q    I can do it if you --

 3    A    Can I hold it away from me?

 4    Q    You can even borrow my reading glasses because I need

 5         them too.

 6    A    I'll wear your reading glasses.  What do they look

 7         like?

 8    Q    Well, they're red and they're very feminine.

 9    A    Somebody will take a picture of me wearing those

10         glasses.  No way.

11              Under A:  Basic rules underlying interrogation.

12         It is psychologically wrong for the interrogator to

13         remind the suspect of the punishment for his crime.

14         We cannot expect a person to tell the truth without

15         giving him the opportunity to couple his admission

16         with an excuse that allows him to save

17         self-respect.

18    Q    Okay.  So have you ever been trained that?  Do you

19         know?

20    A    I don't know.

21    Q    I mean, whether -- from wherever.

22    A    If this was in the basic Reid class that I went to,

23         then I probably was.

24    Q    Okay.  But, you know, as you said, you took Reid a

25         long time ago, and I'm saying a similar book, I can't
```

25

1          tell you that this is the identical book that you

2          took because they have different editions, but in

3          that principle -- and I will -- since it's coming

4          evidence later, I will advise this is a 2008 edition

5          of the book.  Okay?  So I can't say the book was

6          identical.

7    A    Okay.

8    Q    All right.  So that's --

9    A    Is what you're saying, though, then this is probably

10         not what I was trained in.

11   Q    No.  I'm not saying it is or isn't.  I'm asking you,

12         you know, whether it was a Reid or any of your later

13         training because you referred to a lot that later

14         training is very important.

15   A    None of that was Reid.

16   Q    Okay.  So that principle that's in this book --

17   A    Um-hum.

18   Q    -- have you been trained in that principle?  That's

19         what I'm trying to ask you.

20   A    I'm going to have to say I don't recall.

21   Q    All right.  Now, on Page 73, and I'll just read this

22         because it's dark and it's going to be hard to read.

23         Okay?

24   A    I got it.

25   Q    Okay.  That's fine.  The highlighted part, this is in

26

```
 1          a different section, and can you read D, what's

 2          highlighted?

 3   A     Yes.  D is:  The alternative question should not

 4          threaten consequences or offer promises of leniency.

 5          Do you want me to do those too?

 6   Q     Yes.  And then they say there are examples of

 7          improper alternative questions, right?

 8   A     Yes.  It says:  Do not -- do you want to cooperate

 9          with me and tell me what happened or spend the next

10          five to seven years behind bars.

11   Q     Okay.  Stop.  That's one example of an improper

12          question, correct?

13   A     According to this.

14   Q     According to this, yes.

15          And No. 2, is there a -- what's the second

16          example they give of improper question?

17   A     It says:  Do you want to be charged with first-degree

18          murder which will mean life in prison or was this

19          just manslaughter.

20   Q     Okay.  Thank you.

21          Have you ever been trained that those are

22          improper questions?

23   A     Again, I don't recall, and plus this isn't the

24          book -- even if I had been at that training, that's

25          not the book I would have been trained out of, right?
```

27

```
 1   Q   Yeah.  I can't say it's the book.  I'm asking about

 2       your general training.  Have you ever been trained no

 3       matter who the provider is that -- whether the

 4       provider is the Appleton Police Department, a

 5       homicide investigation seminar you went to, have you

 6       ever been trained that that's improper?

 7   A   No.

 8   Q   Have you ever been trained that the reason it's

 9       considered improper is because it can get false

10       statements?

11   A   I don't recall that, no.

12   Q   Okay.  Now, turning to Page 84, Statement Written By

13       Suspect.

14              ATTORNEY VISHNY:  Do you have Page 84?  I

15       just want to make sure they have it, because if they

16       don't -- can you please give them Page 84?

17              ATTORNEY SCHNEIDER:  No.  I do have 84.

18              ATTORNEY VISHNY:  Okay.  Good.  I just want

19       to make sure.

20   Q   (BY ATTORNEY VISHNY)  There is also some guidelines

21       in this book on a statement written by the suspect,

22       correct?

23   A   This top one here?

24   Q   No.  I'm going to -- but the general topic here, IV,

25       Statement Written By Suspect.
```

28

1   A    Yes, ma'am.

2   Q    Right?

3   A    Yes.

4   Q    And the guideline says that you should tell them that

5        -- and this part is not highlighted, explain to the

6        person you want them to write a letter to a victim,

7        that's one thing, but that's not really relevant

8        here, but when writing a statement that you should

9        remain in the room, correct?

10   A    Correct.

11   Q    And you do not dictate what the suspect should

12        write?

13   A    Correct.

14   Q    And do not spell words for example?

15   A    Right.

16   Q    So that you're not supposed to coach a statement.  Do

17        you agree with that from your training wherever you

18        have gone to training?

19   A    Can I explain?

20   Q    You know, you gave an explanation yesterday of what

21        you want to do, and I'm sure Miss Schneider will ask

22        you on redirect, but have you been trained to not

23        coach people in what to say?

24   A    No.  I just wanted to point out again that you're

25        showing me a book that I didn't get trained on and

```
1              you're asking me if I've been trained on that book.
2    Q    No.  Actually, I think maybe you're not understanding
3         my question.  I'm asking if you've ever been trained
4         on this to not coach people what to write in any
5         training program you've ever gone to.
6    A    Well, yeah, you don't want to tell the person to make
7         a false statement, of course.
8    Q    Okay.  Now, you don't want to tell a person to make a
9         false statement.  Like you would never say, hey, I'd
10        like to you write a fake statement, right?  You would
11        never say that, I want you to write a lie for me, to
12        a person you're interviewing.
13   A    Correct.
14   Q    But do you at all believe -- never mind.  Strike
15        that.
16             All right.  So you wouldn't say it.
17             I'm going to ask you now some questions about
18        this particular investigation.
19   A    Yes, ma'am.
20   Q    You became involved in this investigation and you
21        took a statement from Joe Thor on December 9th, very
22        briefly, you talked to him.  You didn't take a
23        written statement, maybe you talked to him and asked
24        him some questions, right?
25   A    Was that my first interview with him?
```

30

```
 1   Q   Yes.  And that was at the Lisa Stutzman residence.

 2   A   Yes, ma'am, I did.

 3   Q   When you were there and talking to Joe Thor, it was

 4       kind of a chaotic situation, I believe you described

 5       it that way?

 6   A   A little bit, yes.

 7   Q   To the point that you felt that you and -- I can't

 8       remember if you were with Meyer or Tauber right now.

 9       I'm forgetting.

10   A   Yeah.  It was with Cary.

11   Q   Cary Meyer.  You were with Sergeant Meyer.  And to

12       the point where even maybe potentially your safety

13       could have been compromised?  Maybe I misunderstood

14       you, but there was a reason you felt you had to leave

15       at that time.

16   A   There was a lot of people that had shown up at the

17       residence, and I really want an opportunity to -- to

18       have a calm setting, not to have outside influences

19       and things like that.

20   Q   Now, when you first made contact with Joe Thor, there

21       was another individual there named Ricky Chang,

22       right?

23   A   That's -- that's what Joe told me his name was,

24       right.

25   Q   You didn't know that personally of your own
```

31

```
 1        knowledge?

 2   A    No.

 3   Q    But whoever this person was, he was trying to tell

 4        Joe Thor to not answer questions.

 5   A    I don't think he was saying don't answer questions,

 6        he was saying like, we have to go, we got to go, and

 7        Joe was saying that he was his ride.

 8   Q    I see.

 9   A    I think I even said that I would -- I think I even

10        said to Joe that we would give him a ride home if he

11        needed a ride.

12   Q    Which he declined?

13   A    Yeah.  Because I think either Ricky or someone else

14        came back and got him.

15   Q    When you talked to Joe Thor there, he initially

16        denied being present in Luna at the time of the

17        shooting, right?

18   A    Yes, ma'am.

19   Q    And then you told him you had some photographic or

20        documentary or video -- documentary evidence or video

21        that would show that he was in fact there at the time

22        of the shooting, right?

23   A    Yes, ma'am.

24   Q    And at that time he then admitted to you to being

25        there, right?
```

32

1    A    It took a little while, but he did, yes.

2    Q    Do you recall telling Joe Thor that time that the

3         victim was shot point blank?

4    A    I don't -- is it in the transcript?  I guess I'd have

5         to see it.  I don't recall that.

6    Q    We may have to come back to it because I don't have

7         it here but I'll show you the transcript eventually.

8              I'm going to move on.  If it's not in there, I'll

9         let you know.

10             Do you recall at that -- telling Joe Thor that?

11                  ATTORNEY VISHNY:  I'm just going to get it

12        marked.  Sorry, I didn't have this marked.  I meant

13        to.

14                  THE COURT:  If you need more water, just

15        let us know.

16                  THE WITNESS:  Yeah.  I will probably.

17                  THE COURT:  All right.

18                  ATTORNEY VISHNY:  All right.  I have found

19        the right places.

20   Q    (BY ATTORNEY VISHNY)  I'm going to show you what's

21        been marked as Exhibit 179?

22   A    Okay.

23   Q    Okay.  This is a transcript of your interview with

24        Joe Thor at Lisa Stutzman's, correct?

25   A    Let me look.  Is there a specific place?  Can I look

33

1      at the front?

2    Q   You can look at whatever you want.  I will let you

3        know that the parties have agreed that this is the

4        transcript.

5    A   Okay.

6              ATTORNEY SCHNEIDER:  And, I mean, we should

7        say all the transcripts we've agreed that may not be

8        a hundred percent accurate because of the inaudibles

9        but the best we can possibly maybe do.

10             THE COURT:  Very good.

11   A   Okay.

12   Q   Okay.  But you're the person talking to Joe Thor, it

13       says detective here, but you were the person who

14       talked to Joe Thor, right?

15   A   Is this outside?

16   Q   I can't tell you if it's outside or inside.

17   A   I can tell if I look at it.

18   Q   Okay.  Just take a look.

19   A   Because Cary was also speaking with him for a short

20       period of time.  Yup.

21   Q   That's you.  Okay.  Great.

22             So, can you -- you told the -- Joe Thor when he

23       was denying that, you know, you had pictures of him

24       inside the building, watched him run out of the

25       building.  I'm just paraphrasing to get this done

34

```
1         quickly.  Okay?

2     A   Okay.

3     Q   And you say:  I'm not going to yell.  I'm not that

4         kind of cop.  I'm not a cop that's going to trick.

5         He's cut you off, he starts talking, right?

6     A   Okay.

7     Q   All right.  So you said to him:  You're standing

8         right there when it happened.  You're right -- you're

9         right -- you're right in the mix, you're right there,

10        point blank on that guy.

11            No.  He was like this.  So holy shit, holy shit.

12        That was Joe Thor's answer.

13            But so you say:  Yes, you're right there point

14        blank on that guy.  Correct?

15    A   Yes.

16    Q   And then going to Page 10, when you are talking to

17        him, and just to set this in the context, you're

18        discussing with him the fact that he and his buddies,

19        Phong and Paul, are running away, right?

20    A   This must be -- this must be inside now, right?

21    Q   I don't know.  If you don't remember it --

22    A   Yes, this is -- yeah.  This was inside.

23    Q   But is that still you?

24    A   Yes.

25    Q   Okay.  And so what you tell him, and I realize
```

1       there's some inaudibles here so it's not a perfect

2       transcript, you -- you say to him that you're talking

3       about when they're running away, correct?

4    A  Yes.

5    Q  All right.  And you mention him and Paul and Phong

6       and then you say:  You know what the reason is.

7       Correct?

8    A  Yes.

9    Q  You're talking to him about why he's running away,

10      right?

11   A  Right, um-hum.

12   Q  And then what you say to him is, because you're

13      involved in a crime.

14   A  Correct.

15   Q  He says:  No.  And then you say to him:  And every

16      jury in the world is going to think that.

17   A  Yes.

18   Q  And you repeat that:  Every jury in the world is

19      going, and then it becomes inaudible.

20   A  Yeah.  I believe I kind of -- is that how much time

21      is like not in a transcript or what does that mean?

22   Q  No.  That's at --

23   A  Oh, so at that section that's where it goes.

24   Q  This doesn't have anything to do with real time, this

25      has to do if I wanted to listen to the tape I know to

36

1           go to 42 minutes and one second on the overall tape.

2    A     Gotcha.

3    Q     And the overall tape is longer than this transcript.

4           This is an excerpt.  So that's what you said.  Every

5           jury in the world is going.

6    A     I believe what I was -- again, that's a very short

7           snippet of a -- I believe like an 18-minute

8           conversation.  What I believe I was saying is that he

9           had finally admitted to, you know, being there, that

10          took a while for him to get there, and then he had

11          talked about, you know, being in a confrontation and

12          running and hiding clothes and stuff like that.  And

13          I said, well, it makes you look guilty.  That's what

14          it looks like.

15   Q     Okay.  All right.  The next time you talk to Joe Thor

16          was the following day?

17   A     Yes, ma'am.

18   Q     He was here at the court?

19   A     Yes, ma'am.

20   Q     And what had the -- if I understand right, what had

21          been left was he told you he'd be in court, he would

22          talk to you, and he was supposed to contact you.

23   A     Yes, ma'am.

24   Q     But in fact he did not call you, right?

25   A     No, he actually said when -- when I made contact with

37

```
 1          him, he actually had my card in his hand, he says,
 2          oh, I was just coming over to see you.
 3     Q    Right.  So he's here at the court and the Appleton
 4          Police Department is across the street?
 5     A    Yes, ma'am.
 6     Q    Basically, right?
 7     A    Um-hum.
 8     Q    You wouldn't drive from the parking lot here to the
 9          Appleton Police Department?
10     A    God, no, there's no parking.
11     Q    Not only is there no parking, you're basically
12          walking across the street and down the block,
13          right?
14     A    Correct.
15     Q    And when he was approached, he was in his car at the
16          court at that point.
17     A    I think he was -- he was getting his car.
18     Q    He was getting in his car and then he says, oh, gee,
19          I've got your card, I was going to call you, right?
20     A    Yes.
21     Q    That's what he said.  But it didn't seem like he was
22          calling you from the courthouse to really come over
23          to the police department.
24     A    Well, I don't -- I don't know, ma'am.  I don't know
25          if he was going to go get lunch first, or I -- I
```

38

1           don't know what he was thinking.  He was -- he was
2           real decent.  Joe seems like a decent guy.
3      Q    Okay.  I'm going to ask that you just answer the
4           questions --
5      A    Yes, ma'am.
6      Q    -- and not offer your opinion about it one way or
7           another.  Okay?
8      A    Yup.
9      Q    Okay.  So now at that point he comes into the police
10          department and you conduct an interrogation with him,
11          right?
12     A    Well, like I said, how would you like to start with
13          an interview.
14     Q    Well you may like to start with an interview --
15     A    I do.
16     Q    -- but you ended with an interrogation.
17     A    I know.  That was the longest one I think that I had
18          of any of them.
19     Q    Well, this actually is 206 pages.
20     A    Yeah.
21     Q    So it would be fair to say this went on for about
22          three hours, right?
23     A    I believe so, yes.
24     Q    Okay.  So you were with Sergeant Rabas?
25     A    Actually I think I was with him.

39

1    Q    I'm sorry?

2    A    Yes, ma'am.

3    Q    Now, during that interrogation, this person -- let's

4         talk about what happened in this interrogation.

5    A    Are you bringing it all up here?

6    Q    I'm bringing it all.

7    A    All right.

8    Q    The whole enchilada, as they say.  All right?

9    A    Yup.

10   Q    But we're not going to read it word-for-word, we're

11        going to try to focus on some points.

12   A    Okay.

13   Q    All right?  All right.

14        You told Joe that Paul had a gun.  You told him

15        that during this interrogation, right?

16   A    I did.

17   Q    Okay.  And in fact you said it many times, correct?

18   A    I don't know how many times.

19   Q    All right.  Well, let's go through a few of them.

20        Page 26, Line 19.  You said:  This is, you know,

21        when we look at our pictures that we have it, dude,

22        we got a guy with a gun in his hand.  All right?

23        It's done.  What we got to do now is we got to make a

24        decision if you're going to be party to the crime.

25        Okay?  If you're trying to help, trying to hinder the

40

```
 1          investigation, trying to hide the truth from us.
 2               That's what you said, right, not -- didn't
 3          mention specifically right then it was Paul, but
 4          earlier you had mentioned that he's, you know,
 5          running with the guy with the gun in his hand, right?
 6     A    I believe I did.
 7     Q    And you knew that in the video it shows Joe going out
 8          the door first with Paul like right behind him.
 9     A    Yeah.  I think Joe was the first guy and then I think
10          it was Paul and then maybe Phong.
11     Q    Yes.  Now, going to Page 29, Line 8, you say to
12          him --
13               ATTORNEY SCHNEIDER:  Can you give me a
14          second to get there please?  Thank you.
15               ATTORNEY VISHNY:  Of course.
16               ATTORNEY SCHNEIDER:  Okay.
17     Q    (BY ATTORNEY VISHNY)  You're talking with him about
18          Paul, and Joe says:  Paul did not do it.  And you
19          say:  Yeah, he did.  Right?
20     A    Yes.
21     Q    He says:  I'm serious.  Paul -- and then you say to
22          him:  He's got a gun in his hand.
23     A    At that time that's what I thought.
24     Q    And you say:  Yeah, he does, we got it on film, he's
25          got a gun in his hand, we know he did it.
```

41

1   A   Correct.

2   Q   And even on that same page you basically repeat that

3       and say:  Then why does he have a gun in his hand.

4       Right?

5   A   Yes.

6   Q   And you say:  It's not that -- like I said, it's not

7       a complicated case.  If you're at a shooting where a

8       guy just got shot in the head and about two seconds

9       later he's seen with a gun in his hand, he shot him,

10      that's the guy, stop protecting him.

11  A   Correct.

12  Q   Page 31, Line 36.  You ask him:  Why would Paul have

13      a gun.

14              ATTORNEY SCHNEIDER:  One second please.

15      Okay.

16  Q   (BY ATTORNEY VISHNY)  Right?

17  A   Here?

18  Q   Page 31, Line 36.

19  A   Why would Paul have a gun?

20  Q   Right.

21  A   Yes.

22  Q   Page 34, Line 6.

23          I'm sorry, but I can't have a side conversation

24      with you.  We're not -- it's 300 pages long.  I'm

25      only going to give examples to Page 56.

42

1                All right.  Page 34, Line 6.

2     A    Maybe he handed the gun off and you shot him.

3     Q    So you suggest that it's Joe who did the shooting,

4          right?  That's what you're doing, correct?

5     A    Yes.

6     Q    All right.  Page 35, same -- you make the same

7          suggestion, right:  Maybe he did it, maybe he handed

8          the gun off.  Correct?

9     A    Correct.

10    Q    I'm sorry.  That was Line 5.

11              ATTORNEY SCHNEIDER:  Yup, I got it.

12              ATTORNEY VISHNY:  Miss Schneider, I

13         apologize.

14    Q    (BY ATTORNEY VISHNY)  The next one is line -- Page

15         42, if I can read my handwriting.  Page 42, Line 7 --

16         well that's actually Sergeant Rabas but you're there.

17              Sergeant Rabas says:  Do you believe, that's

18         Line 16, that we got a video of him carrying the

19         gun.

20    A    Yes, that's what it says.

21    Q    And then Sergeant -- and Joe says:  Who.  And

22         Sergeant Rabas says:  Paul.  Who did we say had the

23         gun.

24    A    Yes, that's what it says.

25    Q    Page 46, Line 9 to 10.  Sergeant Rabas says:  All

43

```
 1          right.  Now I'm going to point something out in this
 2          picture because you don't think Paul had a gun,
 3          right?
 4     A    Correct.
 5     Q    And then Joe says:  No, I don't think so.  And
 6          Sergeant Rabas says:  What if I show you this picture
 7          again and point out where he's got the gun.  Now
 8          here's your opportunity.  Okay?  And have I lied
 9          about any of these pictures I showed you.  And Joe
10          says:  No.  Right?
11     A    Correct.
12     Q    And Sergeant Rabas says:  Any tricks, nothing like
13          that.  And you say:  Have we lied about where their
14          clothing is, and basically some more talk about that,
15          and Joe says:  No.  Correct?
16     A    Correct.
17     Q    And at Line 29 Sergeant Rabas says:  Why would we lie
18          to you about who had the gun.
19     A    Yes.
20     Q    Page 50, Line 33, Sergeant Rabas says:  Okay.  We
21          have a picture of a gun in Paul's hands.  Now when we
22          eventually talk to him he's going to say he got the
23          gun from you and you're the one who shot him or that
24          Phong is the one who shot him or that he's the one
25          who shot him.
```

44

1   A   That's kind of confusing.  Let me read that.  Okay.

2       We have a picture of a gun in Paul's hand, now when

3       we --

4   Q   Now when we eventually talk to him is he going to say

5       that he got the gun from you and you're the one who

6       shot him or that Phong is the one that shot him or

7       that he's the one that shot him.  He was asked that

8       question, right?

9   A   Yeah.  I don't understand what that means.

10  Q   Okay.  Can you say that out loud so the jurors can

11      hear your answer?

12  A   It's confusing.  I didn't understand that.

13  Q   Okay.  Page 56, Line 33.  You say:  He had in his

14      hand and on video, it's very clear, it's a gun.

15      Right?

16  A   I do.

17  Q   And in order to avoid the tedium of going through 300

18      pages about guns, would it be fair to say that there

19      were other references to your recollection regarding

20      guns?

21  A   About the gun?

22  Q   In this interrogation.

23  A   Yes, ma'am.

24  Q   All right.  Now, you also then said -- either you or

25      Sergeant Rabas said numerous times that you

45

1      believed -- what you said was that you were thinking

2      that Joe could be the perpetrator and that he shot

3      him.  Do you remember saying that?

4  A   I don't.

5  Q   Okay.  Going to Page 36, Line 46, you say -- I'm

6      going to start actually at Line 39.  You got to sell

7      that shit to the jury.  I'm telling you right now,

8      the jury is going to say you're arguing with the guy

9      who gets shot.  You then admit you see him get shot.

10     You can tell by how his head gets hit.  You run.  You

11     hide your -- you hide things.  You lie to the police

12     afterwards.  Who do you think they're going to

13     charge.  Who do you think they're going to believe.

14     Seriously, man.  Who do you think they're going to

15     believe.  Right?

16  A   Yes.

17  Q   He said that?

18  A   Yes.

19  Q   And on Page 37 you say:  You think Paul is going to

20     protect you.  This is -- I'm sorry.  This is Line 7,

21     next page.

22        You think Paul is going to protect you.  Not

23     when it comes to going to jail for the rest of your

24     life.  I know these guys think they're hard, but go

25     sit in prison for the rest of your life.  Forever.

46

```
 1   A   Yes.

 2   Q   Okay.  And then Page 50, Line 28, Sergeant Rabas

 3       says:  Okay.  Here what it comes down to, comes down

 4       to you, Phong and Paul.  And you say:  That's what it

 5       comes down to.

 6   A   Yes.

 7   Q   And then the picture of the gun in the hand, that

 8       comes up there, we've already talked about that?

 9   A   Correct.

10   Q   Page 61, Line -- you say:  Dude, I don't know any of

11       these guys -- this is Line 43.  I don't know any of

12       these guys, and you know what, everyone is telling me

13       you guys did it.  Everybody.  Right?

14   A   Correct.

15   Q   Page 62, Line 30, Sergeant Rabas says:  We're not

16       lying to you, I don't -- I'm giving you an

17       opportunity, dude.  I'm giving you the opportunity to

18       stay out of prison.

19   A   Yes.

20   Q   Page 63, beginning at Line 16, Sergeant Rabas says:

21       Okay.  Our DA office is like we're going to take

22       everybody down.  If they're not cooperating, if

23       they're not giving you everything, and if they lie to

24       you.

25   A   Yes.
```

47

1    Q    And Joe says:  I'm just telling you everything I
2         know.  And Sergeant Rabas continues:  I'm just
3         telling you what our DA's office --
4              ATTORNEY SCHNEIDER:  Judge, can I approach?
5              THE COURT:  You may.
6              (Bench conference.)
7    Q    (BY ATTORNEY VISHNY)  Now I just want to make this
8         clear, the District Attorney's office had not really
9         said that to you and Sergeant Rabas, right?
10   A    No.  We had -- we had been ongoing, you know, stuff.
11        I mean this is a common -- common theme when we deal
12        with the DA's office, that if people don't cooperate,
13        if they're involved in a serious crime and they're
14        covering stuff or destroying evidence, of course
15        they're going to get charged.
16   Q    Well, no, I understand that, but you hadn't
17        specifically said to the DA's office Joe Thor is
18        going to be charged or Phong Lee is going to be
19        charged if they don't cooperate.  There had not been
20        those specific discussions, had there?
21   A    I don't believe so, no.
22   Q    All right.
23   A    But that's what you do.
24   Q    And you know that sometimes you bluff when you're
25        doing interrogations?

48

```
1    A    That's not a bluff.

2    Q    Okay.  That's not a bluff?

3    A    I don't believe so, no.

4    Q    And then you say on Page -- the same page going to

5         Line 24:  Anyone that hides, anyone that lies to him,

6         I'm going after everyone of them.  Everyone of them.

7    A    I'm sorry.

8    Q    Sergeant Rabas says, maybe I misspoke:  Anyone that

9         hides, anyone that lies to him, I'm going after

10        everyone of them.  Everyone of them.

11   A    I believe what he meant to say is anyone who lies for

12        him.

13   Q    I see.  So either that's an error in the transcript

14        or misspeaking apparently.

15   A    Probably.

16   Q    And it's minor, right?

17   A    Um-hum.

18   Q    And on Line 30 you say to him, after Sergeant Rabas

19        talks about this anyone who lies, you say to him:

20        You've got a lot to lose.

21   A    Yes.

22   Q    Turning to Page 64 on Line 44, Sergeant Rabas says:

23        I know.  That's what I said.  I think you're a nice

24        guy.  Why do you want to spend the rest of your life

25        in prison and lying.  Right?
```

49

```
 1   A    Yes.
 2   Q    Page 68, Line 13.  Sorry.  Actually I'll start a
 3        little earlier to set it in context.
 4            Sergeant Rabas says:  Don't help us.  Help
 5        yourself.
 6   A    You say:  Yeah.
 7   Q    Rabas:  Because we're not the ones who are going to
 8        end up in prison.  Right?
 9   A    Correct.
10   Q    And in fact you tell him later that you have a
11        picture of him running out with the guy who's got a
12        gun and that he'll see it in court eventually.  Do
13        you remember that or do you need me to refresh your
14        memory with the transcript?
15   A    I don't remember saying it, but I'll take your word
16        for it.
17   Q    Okay.  You also tell him that he's got a certain time
18        limit to tell you this.  Do you remember doing
19        that?
20   A    No.
21   Q    Okay.  Page 76, Line 36.  Just to set in context, at
22        32, Rabas says:  You know we're going talk to Paul.
23        And Joe says:  Yes.  And then Sergeant Rabas says:
24        Remember I told you, today is your day, because after
25        our interview is done -- and you say:  It's like a
```

50

```
1           bus, man, whoever gets on the bus first gets the best
2           seat.  And Sergeant Rabas again says:  Today it's it.
3           Right?
4      A    Yes.
5      Q    Do you recall telling him -- talking about that there
6           were check marks against him and either he's going to
7           be a witness or he's going to be party to the crime?
8           Do you recall saying that or do I need to look at the
9           transcript?
10     A    I do.  I think -- I think I said some stuff before
11          that too that was kind of involved in that.
12     Q    Right.  Do you remember Sergeant Rabas asking him if
13          he wanted to spend that much time away from his
14          family because that was going to be what happened?
15     A    I don't recall that, no.
16     Q    Page 152, Line 1.  After Sergeant Rabas says, you
17          know, you were there, I wasn't - I'm paraphrasing,
18          not the exact words.  Sergeant Rabas says:  You
19          actually see the gun going off.  Now again I point to
20          this.  Because you could be either this or this.
21          Because you were one of the two of these, you're one
22          of the two of these.  Do you remember that?
23               And then you -- Joe says:  I am this, what am I.
24          And you say:  You've only got two options, one or the
25          other.  Do you recall that?
```

51

```
 1   A    Yes, ma'am.

 2   Q    And what you're referring to is his two options are

 3        he can either be a witness or he can be a party to

 4        the crime and get charged, correct?

 5   A    I believe so, yes.

 6   Q    All right.  And then very shortly after that on the

 7        next page, 153, Line 1, you say:  How do you think

 8        all of this stuff is going to affect you for the rest

 9        of your life.  You think you're worried about one

10        court case, think about going down for 25 to -- and

11        was that life?  It's inaudible in the transcript.

12   A    I'm not sure.

13   Q    You don't know if you said 25 to 50, 25 to life, but

14        from the context it appears you said something along

15        those lines?

16   A    Probably, yes.

17   Q    Okay.  Now, and Sergeant Rabas, you remember him

18        telling Joe that he was missing an opportunity

19        because he can't guarantee that Joe might not get

20        charged, right?

21   A    Again, I don't know.

22   Q    Page 204, Line 26.  Sergeant Rabas says:  And you

23        talk about helping us, you're helping yourself.

24        Right?

25   A    Correct.
```

52

```
1    Q    Page 204 --

2    A    Sorry.

3    Q    That's okay.  Line 45.  What is said by Sergeant

4         Rabas:  Decision day as far as arrests are going to

5         happen are going to happen probably fairly quick.

6         Right?

7    A    Yes.

8    Q    So the context of that is Sergeant Rabas is saying

9         you better decide if you're a witness or a suspect

10        because we're going to be deciding pretty quickly

11        here who we're going to arrest?

12   A    Correct.

13   Q    All right.  Now, we talked a little earlier about

14        contamination, right, we talked about it in the

15        context of eyewitness identification?

16   A    Photo lineups.

17   Q    Photo lineups, right?

18   A    Yes.

19   Q    And I'm trying to make this a little neater, but

20        before we get to this, now -- and you agreed with me

21        that it's really important when somebody identifies

22        someone that it be their own memory, not having it be

23        contaminated by a police officer, right?

24   A    No, I think what I said was that if I'm the

25        investigating officer, before I would have somebody
```

53

```
1          do a photo lineup, I would of course review what the
2          person looks like, what -- if they have scars, marks,
3          tattoos.
4     Q    I don't mean to be rude and cut you off, but in the
5          interest of trying to get through this a little more
6          quickly, you talked about how a different officer
7          shows the pictures because you don't want it to be
8          the witness -- their memory should not be influenced
9          or contaminated by the police officer who knows who
10         the suspect is, that's what I'm referring to.
11    A    Yes, ma'am.
12    Q    All right.  Now -- now, in this, one of the things
13         that was done -- before I get to contamination, Page
14         29, Line 12.
15              ATTORNEY SCHNEIDER:  Is this back on in
16         that same big one?
17              ATTORNEY VISHNY:  Yeah, yeah.  We're still
18         in the same transcript.  Page 29, Line 12.  Yeah.  We
19         have a little ways to go still, but I promise it
20         won't go on forever.  It won't nearly be as long as
21         the interrogation was.
22    Q    (BY ATTORNEY VISHNY)  All right.  Now, Page 29, Line
23         12.  You know, we've already actually reviewed some
24         of that about having the gun in the hand, right, Line
25         12, we've already --
```

54

```
 1    A    Yes, ma'am.

 2    Q    -- quoted that.  And we -- I don't know if we quoted,

 3         but about making a decision, you want to be part of

 4         this or go down with the guy, right?

 5    A    Right.

 6    Q    And page -- and then there's discussion clearly that

 7         Paul has the gun in the hand, right?

 8    A    Where is that?

 9    Q    Right here.  Wait a second.  That's a different page.

10         Right here, yes, Line 30, then why does he have a gun

11         in his hand.  We've already talked about that,

12         correct?

13    A    I don't think so.

14    Q    Okay.  Maybe we didn't then.  I'll make sure I read

15         that to the jury at Line 30.  Then why does he got a

16         gun in his hand.  It's not -- like I said, this isn't

17         a complicated case.  If you're at a shooting where a

18         guy just gets shot in the head and about two seconds

19         later he's seen with a gun in his hand, he shot him,

20         that's the guy, stop protecting him.  Right?

21    A    Yes.

22    Q    And you mention on Page 56 -- again there is mention

23         that it's very clear that Paul had the gun in his

24         hand at Line 33.  Let me get to that.  You said:  He

25         has the gun and it's on video.  It's very clear it's
```

1        a gun.  Right?

2    A   Yes, ma'am.

3    Q   Okay.  And then there's some discussion at the bottom

4        of the page, starting Page 4, you say:  The very --

5        the video --

6                ATTORNEY SCHNEIDER:  Hold on.  You're back

7        on 43?

8                ATTORNEY VISHNY:  No.  Same page.  Line 43.

9    Q   (BY ATTORNEY SCHNEIDER)  And I'm doing this to put in

10       context.  The video is very clear and shows he's got

11       his hands -- and then you say:  When he runs, guess

12       where his hand is.  You remember saying that?

13   A   Yes, ma'am.

14   Q   And Joe says:  Where.  And you tell him it's in his

15       pocket.  I'm right on the next page.  You know why

16       it's in his pocket, because he's got a gun in his

17       hand and he's holding on to it so it doesn't fly out

18       of his pocket.  Joe says:  See, I did not know that.

19       I did not see that.  Which would be true because on

20       the video you can tell Joe is down the block.

21   A   Joe is way faster.

22   Q   Right.  So he doesn't have eyes in the back of his

23       head and he's not looking behind him on the video,

24       right?

25   A   Right.

56

1    Q    So you're telling him, we're telling you that now.

2         You're telling him what the evidence is in this case.

3    A    No, I'm telling him what I saw on video.

4    Q    Okay.  So what you saw on video isn't the evidence in

5         this case?

6    A    No, I think it's a part of it.

7    Q    Okay.  So you are telling him a part of what's the

8         evidence in this case.

9    A    When we do interviews many times we give a little bit

10        of evidence.

11   Q    Well there's certain things you're not supposed to

12        give, you're supposed to have some holdbacks,

13        right?

14   A    Sometimes.

15   Q    Okay.  Like telling somebody what caliber of a gun

16        was used?  That would be something that --

17        information you don't want to give, right?

18   A    No.  Not necessarily true.

19   Q    You think it's okay to do that?

20   A    Depending on the case, sure.

21   Q    So apparently you thought it was okay in this case?

22   A    I must have.  I did it.

23   Q    That would be true.

24        So Page 23 you say to him:  This guy was shot at

25        point blank range, meaning it was right on him,

57

1          meaning the shot was not from -- and then it gets cut

2          off.  So you also tell him that the shot occurred at

3          point blank range, right?

4    A     Yes.

5    Q     And at Page 60 -- skip that one.

6          Okay.  I'm sorry.  Page 80.  Joe says to you,

7          and he's referring to the picture, he says:  It

8          doesn't look like a gun.  Would a gun be that small.

9          And you said:  Yeah, it would be.  It's a .25.  He

10         says:  Looks like -- whatever he's saying, and you

11         say:  Small gun.  He says:  Like how big is that.

12         And you say:  Small, not even the size of your hand.

13         And then Joe says:  I don't know, it could be a gun.

14         Let me see again.  Right?  That's what was said,

15         right?

16   A     Yes, ma'am.

17   Q     So he is adopting what you are suggesting?

18   A     From the evidence that I showed, yes.

19   Q     Okay.  And on Page 147, Line 31, you say:  A contact

20         shot is this, this is a contact shot.  So you tell

21         him that it's a contact shot at that time, right?

22   A     Yes.  And the reason I'm doing that is because we're

23         talking about positioning and where he was at and

24         where Paul and everything was at.

25   Q     Right.  So you're telling him what the positioning

58

1        was at the time.  This is not on video, right?

2    A   The --

3    Q   The actual shooting is not on video.

4    A   Correct.

5    Q   So you're telling him it's a contact shot.

6    A   Um-hum.

7    Q   And then on Page 50, again you say:  This gun is this

8        big, that's all, it's a little .25.  So you again

9        tell him it's a .25.

10   A   Yes.

11   Q   Okay.  I think that's enough for this transcript.

12   A   I think so too.

13              ATTORNEY VISHNY:  Just looking at my notes

14       here.

15   Q   Now, the day before you talked to Joe Thor you had

16       actually been involved in interviewing Phong Lee,

17       correct?

18   A   Yes, ma'am.

19   Q   And similar things were said?

20   A   No, actually, can I correct that?  I interviewed Joe

21       Thor the first time on the same day that I

22       interviewed Phong.

23   Q   Okay.  So I -- so that they're both on December 9th.

24   A   Yeah.  I interviewed Phong I think in mid-day and

25       then Joe later that evening and then Joe again the

59

1          following day.

2     Q    Okay.  So -- right.  We're talking about the first

3          interview of Joe Thor, but I'm saying this interview

4          with Phong Lee occurred the day before all this stuff

5          we were just discussing?

6     A    Yes, ma'am.

7     Q    That's what I'm trying to establish, that time line.

8               And on that day when you talked to Phong Lee,

9          you said similar things to Phong Lee that had been

10         said to Joe Thor, right?

11    A    I'm not sure.

12    Q    Okay.  Page 44.

13              ATTORNEY SCHNEIDER:  Which item number are

14         you on?

15              ATTORNEY VISHNY:  It's Exhibit 114, Item

16         43.

17              ATTORNEY SCHNEIDER:  43.  Okay.

18              ATTORNEY VISHNY:  Correct.

19              ATTORNEY SCHNEIDER:  I don't have line

20         numbers on these so you're going to have to go --

21              ATTORNEY VISHNY:  Yeah.  I understand that.

22         I'm not sure I have line numbers in mine -- I think I

23         wrote this out before mine had line numbers too.

24    Q    (BY ATTORNEY VISHNY)  Okay.  I'm showing you what's

25         been marked as Exhibit No. 114.  This is the

60

1       transcript of the interview with Phong Lee with you

2       and Detective Tauber.  Okay?

3  A    Yes, ma'am.

4  Q    All right.  And this also took place over here at the

5       courthouse, correct?

6  A    It did.

7  Q    And so what you said to him, reading from Page 44,

8       Line 29, you can't get over the fact that we've got a

9       gun -- a guy with a gun in his hand and you're in the

10      picture.  Right?

11 A    Yes.

12 Q    And he says:  I don't care.  I'm going to tell you

13      that they're not the ones who did it.  Right?

14 A    Yes.

15 Q    And then you explain to him:  You're not the one, you

16      don't have to convince us, buddy, you have to

17      convince the District Attorney's office that's going

18      to charge you and you've got to convince the jury

19      that's going to look at this stuff and say of course

20      he knows.  Right?

21 A    Yes, ma'am.

22 Q    And on page -- I have to --

23 A    Can you finish that sentence so -- it's actually kind

24      of interesting.

25 Q    Okay.  Sure.  I'm happy to finish it.  I was just

61

1          trying to make it go faster.

2                  Just like Dan says, you guys bolted from the

3          scene before anyone else, you hid your clothing, you

4          lied when you first got here and that you weren't

5          going down, that you're with some girl and nothing

6          going on.

7                  Because Phong did lie to you when he first got

8          there, right?

9      A   Yes, ma'am.

10     Q   Told you that he wasn't there, and of course you knew

11         he was there because of the picture, right?

12     A   And what I'm trying to -- yeah.

13     Q   No.  Go ahead.  Why don't you say what you're trying

14         to say.

15     A   No.  You did correct me last time.  I'm okay.

16     Q   Regardless of what you're trying to say, okay, you

17         knew he should be challenged, right, because what he

18         initially told you was clear from the video that it

19         was not accurate --

20     A   Yes.

21     Q   -- correct?  Right.

22                 And so you feel that a proper response to this

23         is to say to him if he doesn't tell you what you --

24         what is your theory of what happened, that he's going

25         down for this and he could go away for life.  You

62

```
 1        believe that's a proper interrogation technique?
 2   A    Well, that's -- actually you're on Page 44 so there's
 3        a lot of stuff that -- you're taking a very
 4        compressed idea that we were already probably 35
 5        minutes into the interview before we came to that.
 6   Q    Okay.  Well, without going endlessly, similar things
 7        were said to Phong Lee about potentially going down
 8        for life or getting prison time that were said to Joe
 9        Thor, is that a fair statement, without going line by
10        line?
11   A    As I said earlier, I believe telling people that
12        they're going to be held responsible if they're
13        involved in this crime is the proper thing to do.
14   Q    Okay.  And in fact -- now for me it's page 58.
15               ATTORNEY VISHNY:  Let me go talk to Miss
16        Schneider because we have different versions of this
17        unfortunately.
18               ATTORNEY SCHNEIDER:  You have a play point?
19               ATTORNEY VISHNY:  I'm coming over.
20               ATTORNEY SCHNEIDER:  I know.
21               ATTORNEY VISHNY:  It's before 1:31.23.
22   Q    (BY ATTORNEY SCHNEIDER)  Okay.  Now, coming back to
23        this, Page 57, you're with Sergeant Tauber, right?
24   A    Yes, ma'am.
25   Q    And you basically tell Phong, you know, getting the
```

63

```
1          shooter is easy because not too many times in this
2          world you would have a video of a crime occurring,
3          right?
4     A    Actually, that's what Dan says.
5     Q    Okay.  Dan Tauber says that but you're there, you
6          hear this, right?
7     A    Yes, ma'am.
8     Q    And he goes on to say:  Okay.  The hard part of it is
9          for me to prove to other people that you weren't a
10         conspiracy to commit that crime.
11    A    Yes, ma'am.
12    Q    And moving on he says:  You weren't party to that
13         crime in regards to took off and told him prior to
14         shoot him, kill him, things like -- and then you say:
15         What's the shooter gonna say when we interview him.
16         You say that a couple of times, right?
17    A    Yes, ma'am.
18    Q    And then, you know, he says:  You guys have the wrong
19         people.  And then Sergeant Tauber says to him, and
20         I'm going to paraphrase it here:  Look.  We've got a
21         guy going down for an autopsy right now.  We're going
22         to get the bullet angles, we're going to get this
23         various information, distance, with the gunshot, you
24         watch CSI, that's easy, right?
25    A    I don't see that on this page.
```

64

1   Q   Well, okay, I'm paraphrasing, but if you want to take

2       a look at the exact words, why don't you just look.

3   A   I can't read that.

4   Q   Okay.  That's fine.

5   A   Okay.  Yup.

6   Q   Okay.  And I'm not going to question you everything

7       about this transcript because we've already talked

8       about it with Sergeant Tauber so I don't see any

9       reason to go through this twice.

10  A   Okay.

11  Q   Okay?

12  A   Yup.

13              ATTORNEY VISHNY:  Judge, would it be okay

14      -- would this be a good place to take the morning

15      break?

16              THE COURT:  It's -- I had hoped to around

17      10:30, so if this is as good of a breaking point for

18      you, then this is fine for me so this is close

19      enough.

20              ATTORNEY SCHNEIDER:  Yeah.

21              ATTORNEY VISHNY:  Okay.  Thanks.

22              (The jury was escorted out of the

23      courtroom.)

24              (Brief recess.)

25              THE COURT:  All right.  You may be seated.

65

1          We did have during the previous session one

2       sidebar.  There was an objection on relevancy

3       pertaining to the photos.  The court did overrule

4       that objection.  That was the only sidebar that we

5       had of any decision making substance.

6          We can bring in the jury.

7             (The jury was escorted into the courtroom.)

8             THE COURT:  All right.  Please be seated.

9          Attorney Vishny, whenever you are ready.

10   Q   (BY ATTORNEY VISHNY)  Sergeant Tauber, we're going to

11       move on now -- Schira.  Excuse me.  I am so sorry.

12   A   I'm the younger, better looking one.

13   Q   You're the -- what did you say?

14   A   I said I'm the younger, better looking one.

15   Q   Well, Sergeant Tauber might take issue with that.

16   A   He does.  Trust me.

17   Q   All right.  In any event, we're going to talk about

18       the interrogation of Paul Lee at the Appleton Police

19       Department --

20   A   Yes, ma'am.

21   Q   -- that was conducted on December 12th beginning at

22       1:41 a.m., and I'm going to bring you the transcript

23       which is marked Exhibit 176.

24   A   Okay.

25   Q   And just to preface this by saying you were assigned

66

1    to interrogate Paul Lee after he had already been
2    talked to once by Sergeant Rabas and Sergeant Thao,
3    right?
4  A  Yes, ma'am.
5  Q  And I think you talked about in direct examination
6    that you had received some information that there --
7    that Chong Lee should be looked at as a suspect,
8    right?
9  A  Yes, ma'am.
10 Q  And that information was based on a conversation
11   between a woman named Alyson and a woman named
12   Lisa talking on the phone, right?
13 A  I don't know that.
14 Q  Okay.  You don't know what it was.  But somebody told
15   you this information, right?
16 A  No.  What happened was Lieutenant Gostisha --
17 Q  Told you?
18 A  But he didn't give me any specifics.
19 Q  He didn't give you details?
20 A  No, ma'am.
21 Q  He just said this is a possibility here too, right?
22 A  Yes, ma'am.
23 Q  Okay.  So you and Sergeant Thao go in and start
24   talking, and I'm not going to belabor this too, too
25   much because the jury has watched exactly what

67

1        happened for part of the interrogation.

2    A   Okay.

3    Q   So you recall just kind of generally that Sergeant --

4        one second.  No.  That's a different one.  All right.

5            Do you recall generally Sergeant Thao talking to

6        him at length in the beginning of the interrogation

7        about the fact that, you know, just to kind of

8        summarize it, these are not exact words, but the

9        essence of it being that we could have you here,

10       looking at a very serious charge, and, you know,

11       explaining how the evidence was strong potentially

12       against Paul.  If I would just summarize that.  I

13       don't really want to go through it line by line.

14   A   Sure.  Yes, ma'am.

15   Q   And, you know, in fact I'll just take one line, for

16       example, on Page 5, Line 20 -- I don't know if it's

17       205 or 206.  I'm having a hard time.  I think it's

18       starting at 205.

19               ATTORNEY VISHNY:  Do you have that, Miss

20       Schneider?

21               ATTORNEY SCHNEIDER:  What page are you at?

22               ATTORNEY VISHNY:  Page 5, line 206.

23   Q   I'm just going to do this by way of example.  I'm not

24       going to go through it as much as before.

25           He starts out by saying:  You're the only one

68

```
 1          that did not do that at all because you had that gun,

 2          so if you want to go down with this because we have

 3          proved that, you're going to go down hard.  Right?

 4     A    Yes.  Can I just check to see which person?

 5     Q    You're Q1.  Okay.  I think that's Q, right?

 6     A    Yes.

 7     Q    So that conversation to that effect when on.  Again,

 8          the jury has seen it so we're not going to go through

 9          a lot of what they've seen.

10               Now, at a certain point, as you testified to

11          yesterday, Chong Lee's name is brought into the

12          conversation by Sergeant Thao, right?

13     A    Yes, ma'am.

14     Q    And it first comes in in terms of he was there and

15          Paul is saying, well I didn't see him there.

16     A    I think how Chue Lee Thao brought it in is he was

17          questioning having Paul give him everyone that he

18          went down there or knew that was there.

19     Q    Right.  He was there.  That's what I'm saying.  That

20          he was there at Luna and asking him who was he around

21          that night.

22     A    Right.  And Paul didn't bring his name up.

23     Q    Correct.  And then -- so Sergeant Thao brings the

24          name up, right?

25     A    Correct.
```

69

1    Q    And so that's the first time the word Chong has come
2         into the interrogation is it's brought out by
3         Sergeant Thao, right?
4    A    I believe so, yes.
5    Q    Okay.  So now at -- eventually Sergeant Thao is
6         saying things to him like, you know, is it you, it's
7         your brother, it's either one or the other, it's
8         either you or it's your brother.  Is that a fair --
9         again, not line for line, but a fair
10        characterization?
11   A    I -- I think Chue had asked him at some point
12        specifically if it was Chong.  I don't recall how far
13        into the interview it was.
14   Q    All right.  Well, this is a -- let's see.  We're on
15        Page 20 here.
16   A    I think it was like an hour and five minute
17        interview.
18   Q    Okay.  So the interview, just for the sake of pages,
19        goes to 49 pages, right?
20   A    Yes, ma'am.
21   Q    And I don't remember what pages, but just by way of
22        example, he says to him, on Page 485 -- I'm sorry,
23        Page 11, Line 485, just again, by way of example, he
24        says:  I'm going to ask you one question.  This
25        question is going to come down to how you want to go

70

1       about this.  Okay?  Did Chong do the shooting.

2   A   Yes.

3   Q   Okay.  So it's pretty early actually that he starts

4       mentioning that, fair?

5   A   Yes.

6   Q   And eventually then, you know, after mentioning

7       several times to Paul -- after Sergeant Thao says

8       several times to Paul, it's your brother, it's you or

9       your brother, making those suggestions, eventually

10      Paul says, yes, it's my brother.

11  A   Yes, ma'am.

12  Q   Okay.  And after he does that, on Page 21 -- in

13      fact --

14  A   Actually, I think I ask him.

15  Q   Okay.  That might be.  It's Q1.

16  A   Can I read that?

17  Q   I'm going to read it.

18  A   Okay.

19  Q   On Page 20, Line 895.  And this is the definitive

20      moment in this interrogation now where Paul Lee

21      says -- we're getting to where Paul Lee says, yes,

22      it's his brother.

23  A   I think he said some stuff previous to that as

24      well.

25  Q   Yeah.  But he didn't directly say it.  It's really at

71

```
 1        this point --
 2                   ATTORNEY VISHNY:  And I'm going to read
 3        this now, if you're ready.  Are you ready in the
 4        right place?
 5                   ATTORNEY SCHNEIDER:  Yup.
 6   Q    (BY ATTORNEY VISHNY)  You've given every opportunity,
 7        every cue that your brother is the one that did it,
 8        but what's stopping you is that your heart is just
 9        not allowing you to tell us that.  So, Paul, look at
10        me and tell me that.  Was it your brother that shot
11        him.  And then continuing to Page 21, the answer is
12        yes.  Right?
13   A    Yes, ma'am.
14   Q    And the next thing you do is say, okay.  You're doing
15        the right thing.  Is that in fact what you said?
16   A    Yes, ma'am.
17   Q    Now, as he goes through and tells you what happened,
18        what he says is that he never actually saw Chong do
19        the shooting, but he knows that he did it because he
20        -- Chong came over on Monday, right?
21            And I'm going to direct you to Page 26 starting
22        at Line 1144.  If you need to, you can refer back,
23        but I'm not going to go over it line by line.  Right?
24        And he's --
25   A    You talking about when he said that he came over to
```

72

```
 1          his house?

 2    Q     Right.

 3    A     Yes, ma'am.

 4    Q     He tells you he came over on Monday, and so he

 5          doesn't know that Chong did the shooting, he's

 6          saying, because he didn't see it, he didn't see him

 7          right at the time, but what he's saying is Chong came

 8          over to his house a few days later, the next day

 9          actually, but, you know, 36 hours later, whatever.

10    A     Following day.

11    Q     Yeah.  Following day.  And told him I did it.

12    A     Yes, ma'am.

13    Q     Okay.  And the words, the exact words that he says

14          Chong said were, I fucked up.  Excuse my language.

15          Right?

16    A     Yes, ma'am.

17    Q     There's been a lot of F words.

18    A     The bombs, yes.

19    Q     Been all over the place.

20              So on Page 28, Line 1563, okay?  Wait a second.

21          I'm sorry.  It's Page 35.  My mistake.

22              And this is some part that the jury didn't see

23          so we're going to go over this in more detail.  Okay.

24              Now, at that point in the interrogation -- well,

25          maybe I have the wrong page.
```

73

```
 1                Okay.  You want Paul -- you want to have a
 2         diagram done, correct?
 3    A    I believe that's Chue.
 4    Q    Okay.  So Sergeant Thao is saying I want to have a
 5         diagram done, and actually Paul Lee doesn't draw the
 6         diagram, Sergeant Thao draws the diagram?
 7    A    You know, I don't recall, I don't specifically
 8         recall.
 9    Q    All right.  You don't remember, you don't remember.
10                But in any event, what we have are these words
11         Sergeant Thao says:  So obviously everybody that I
12         name you knew were there.  Okay.  I'm just giving you
13         an opportunity -- I'm just kind of like you -- throw
14         a plan in here for you to draw a diagram as to how
15         Josh was approaching you guys and where you were
16         positioned and how Chong, um, and the others were
17         positioned in relation to, you know, the argument
18         when the shooting happened.  I left out a few ums and
19         ahs.
20    A    Sure.
21    Q    That's what Sergeant Thao says, right?
22    A    Yes, ma'am.
23    Q    So Paul's never said that he saw him there but
24         Sergeant Thao wants to put Chong in the diagram,
25         right?
```

74

```
 1   A   I think -- I don't think he specifically talks about
 2       that, I think he's just trying to get like where
 3       everybody was standing and trying to get an
 4       understanding of where it occurred to see if it
 5       validates and if it's verified through other
 6       investigations and other interviews that we did.  I
 7       can't speak for him obviously.
 8   Q   Right.  But you were there, you heard this, you
 9       witnessed this, right?
10   A   Yeah.  And I mean that's what I would be thinking.
11   Q   There is a diagram, there is reference to a diagram
12       here, right?
13   A   There is, but again, I don't remember -- I don't
14       remember Chue doing the diagram.  I guess I'd have to
15       see the video.
16   Q   But you can tell from the words here that there's
17       discussion of the diagram.
18   A   Yes, ma'am.
19   Q   And Sergeant Thao telling Paul Lee he wants to put
20       Chong in the diagram even though Paul Lee has
21       previously said he never actually saw Chong at the
22       time of the shooting, right?
23   A   Yes, ma'am.
24   Q   Okay.  Thank you.
25           Now, turning to Page 41.
```

75

1            ATTORNEY VISHNY:  I believe it's Line 1827,

2       Miss Schneider.

3            ATTORNEY SCHNEIDER:  Okay.  Thank you.

4            ATTORNEY VISHNY:  Okay.

5    Q   (BY ATTORNEY VISHNY)  There is some discussion then.

6       Okay.  Can you see that?

7    A   Yes.  Unintelligible?

8    Q   Yeah.  Well that's in the middle of it, yeah.  You're

9       talking -- at that point the topic of the discussion

10       is that you and Sergeant Thao are questioning Paul

11       Lee about how this whole shooting went down, right?

12    A   Yes.

13    Q   And trying to get his version.  Okay?

14            And one of the things that's said to him

15       starting at Line 1827 -- even I'll start a little bit

16       early just to set in context.  1819.  You say:  So

17       you heard the shot and you see him go down.  Right?

18    A   Yes, ma'am.

19    Q   And then you say:  Okay, but you don't see who shoots

20       him, and he explains that he doesn't, right?

21    A   Right.

22    Q   And then you say:  And one of the reasons that we

23       bring this up here.  Here, please stand up.  When

24       they do autopsies, Paul, we can tell how close the

25       barrel of the gun is to the victim's head, Josh's

76

```
 1        head.

 2   A    Yes.

 3   Q    And you say:  Okay.  He wasn't shot from right back

 4        here.  Remember those words?

 5   A    Yes.

 6   Q    And I guess "from right back here", you must have

 7        been at some distance to Paul when you said that,

 8        right?

 9   A    Yeah, I think we had stood up, and I think we were

10        kind of trying to figure out positioning of where

11        everybody was, where Joe was, where Phong was, where

12        he was.

13   Q    Now, as I understand it, you know quite a bit about

14        firearms, right?

15   A    A little bit.

16   Q    And even though you're not a firearms examiner per

17        se, you are aware that when a gun is a contact wound

18        or a near contact wound or very close to the target

19        that soot is deposited potentially on a person's body

20        or clothing if the muzzle of the gun is very close to

21        the person being shot.  You know that, right?

22   A    On the victim you're saying?

23   Q    Yeah.  On the victim --

24   A    Yes.

25   Q    -- or on anything being shot, could be on clothing.
```

77

1       There's a person inside the clothing, I get that.

2    A    There's been studies that are showing it's less and

3        less prevalent, but yes, I agree with that.

4    Q    And certainly if something is very close, that

5        unburnt gunpowder leaves little marks on the skin

6        that are known as stippling, right?

7    A    Yes, ma'am.

8    Q    And that of course as you move farther away, when you

9        get a couple feet away, three feet, depends on the

10       gun, but the farther away eventually you don't see

11       the soot and you don't see the stippling on the

12       person that was shot or their clothing because it

13       sprays outward and it's no longer showing up on the

14       target.  Right?  You know that.

15   A    Yes, ma'am.

16   Q    That's like firearms 101 basically.

17   A    No, that's actually pretty knowledgeable.

18   Q    All right.  Well, firearms 401.  Let's call it that.

19        And so you're telling him -- when you're saying,

20       well, he wasn't shot from right back here, you're

21       showing him a distance of a few feet, right?

22   A    Yeah.  I know we're standing up.  I don't know

23       specifically how close I was to him, but I'm going to

24       guess within three or four feet.

25   Q    And you know that the smaller the gun, the closer you

78

1          -- you are when you quit seeing this soot and

2          stippling type pattern, right?

3     A    Yeah.  Barrel length does sometimes matter.

4     Q    So like a nine-millimeter or something like that will

5          maybe be a little bit farther away?

6     A    It's more barrel length than caliber.

7     Q    Okay.  So -- so I should say bigger gun instead of

8          caliber here.

9     A    Barrel length.

10    Q    .25, small gun as you pointed out earlier, you can

11         hold it in the palm of your hand.

12    A    Yes.  Again, barrel length, how long the barrel is.

13    Q    Okay.  Now, so when you're doing this, you know it

14         wasn't from here, you know it has to have been

15         farther than what actually happened because you knew

16         at this point that the gunshot wound was actually a

17         close wound or near contact.

18    A    I guess you lost me there.

19    Q    Okay.  You knew at the time you were interrogating

20         Paul at this time on the 12th that that gunshot wound

21         itself was very close range, right?

22    A    That we believe that whoever --

23    Q    Whoever did it.

24    A    -- shot him was very close.

25    Q    Was very close.

79

1    A    Yes, ma'am.

2    Q    Right.  And that's kind of like point blank, that

3         means pretty close, right?

4    A    Yes, ma'am.  That's a common term.

5    Q    So when you say that, you're saying, well he wasn't

6         shot from right back here, so in other words not from

7         a distance of, you know, whatever, three, four feet,

8         right?

9    A    Yes, ma'am.

10   Q    And then you say, okay, when he was shot the barrel

11        of the gun was probably almost touching, like this

12        close, so that's why we think you might have seen the

13        barrel of the hand holding the gun, right?

14   A    Yes, ma'am.

15   Q    Now, this is long before Paul ever uses the term

16        later, close to noon, point blank, right?

17   A    Yes, ma'am.

18   Q    Which could be in some people's opinion a synonym for

19        what you're telling him.

20   A    Did I -- did I say point blank?

21   Q    No, no, synonym, synonymous, meaning the same thing,

22        right?

23   A    Yes, but I -- just so we're clear, I didn't say point

24        blank to him, right?

25   Q    No, I'm not suggesting that you did.

80

1   A    Okay.

2   Q    Now, I'm going to move on to Exhibit 177.

3           Excuse me.  I need a quick drink of water.

4           And this is the interview -- this one starts at

5       11:58 a.m.

6   A    So this is the second interview with Paul?

7   Q    Well, I don't know that it's the second one, but it's

8       one that -- there is some very short contact with

9       him.

10  A    You're right, ma'am.  I'm sorry.  That's my fault.  I

11      meant that it was my second interview with him, not

12      that it was a second interview.

13  Q    Right, right, right.  So this is the one now where

14      things happen in this one, just to kind of refresh

15      your memory, he writes a statement, there's pictures

16      of the e-cigarette, stuff like that.

17  A    Yes, ma'am.

18  Q    Okay.  So here's a transcript of that.  Okay?

19  A    Yes, ma'am.

20  Q    Now turning your page -- attention to Page 2, Line

21      76, okay?  All right.  You are talking to him at this

22      point?

23  A    That's his Miranda warning.

24  Q    Okay.  That's his Miranda warnings, correct?

25  A    Yes, ma'am.

81

1    Q    Now after reading him the Miranda warnings and

2         getting him to sign that he acknowledges them,

3         right?

4    A    Right.

5    Q    You go on, and I think on this one you're actually Q,

6         so this is you this time.

7    A    Yes, ma'am.

8    Q    Okay.  You go on to say:  All right.  One of the

9         things, you know, we talked about earlier is how

10        important it is for us to be able to prove what

11        you're saying.  Okay?  Because really now, when you

12        think about it, we're kind of working for you.  Does

13        that make sense?  Because for a while we really

14        thought you were possibly the shooter.  All right?

15        Now from the statements you're telling us, you know,

16        you're saying you didn't do that and that -- that

17        your brother Chong admitted to you and other people

18        that he was the guy that actually did it.  What we

19        have to be able to do is we have to be able to prove,

20        because one of the things that happened this morning

21        is we spoke with the District Attorney's office and

22        that, and she requested that we do -- we make sure we

23        can absolutely prove it wasn't you.  Right?

24   A    Yes, ma'am.

25   Q    And you ask him if he understands that and he says

82

1        yes.

2    A    Yes.

3    Q    And then you go on to have some discussion and

4         saying:  Well, obviously - I'm on the next page now -

5         your statement helps, right?  The problem is your

6         brother can make a statement it wasn't me.  So what

7         do we have.  We've got one brother saying, the other

8         brother saying, nope, it wasn't me, so that kind of

9         cancels each other out.  Does that make sense?

10   A    Yes.

11   Q    You ask him that, and he says yes.

12            All right.  And then I'm going to just skip a

13        little bit to get through this faster, but looking on

14        the same page now at Line 103, how do we prove that

15        it's not really you.  How do we prove that it was

16        actually your brother.  Right?  And then Paul says:

17        Well, if he can tell me, the gun is the biggest part,

18        right?

19   A    Yeah.  What I'm asking for there is how to verify it,

20        and Paul just independently says I'll see if I can

21        find out where the gun is.

22   Q    Right.  So you don't at that point -- at that point,

23        actually, Chong Lee is in custody, right?

24   A    Paul doesn't know that.

25   Q    Well, let's talk about that.  In an earlier

83

```
1        discussion you actually -- after he tells you it's
2        Chong, isn't there a whole discussion with Paul Lee
3        about where you ask where Chong Lee went?  Where he
4        would be right now?  Do you recall that?
5   A    I -- I probably was.  I don't specifically recall
6        it.
7   Q    Do you recall you and Sergeant Thao kind of talking
8        to him at length about is he at his mother's and
9        where can we find him because we're really concerned
10       about his safety, we want to make sure your brother
11       is safe?
12  A    Yeah.  I didn't want him to go kill himself.
13  Q    Did you have any reason to think that Chong Lee was
14       going to commit suicide?
15  A    From speaking with him and other people, they said he
16       was under an enormous amount of stress.
17  Q    Okay.  Well, without getting into that, you basically
18       have no personal knowledge that he would be
19       committing suicide, correct?
20  A    I don't know.
21  Q    Okay.  So what you're trying to do when you're
22       talking to Paul Lee, you're saying you're trying to
23       do it out of great concern for Chong Lee, right?
24  A    And I also say that I'm also concerned about any law
25       enforcement that have contact with him.
```

84

```
 1   Q   Yes.  So -- and you're worried about that, but you
 2       want to find out where he is because basically you
 3       guys want to go take the guy into custody, right?
 4   A   Well, I think you can serve both purposes though.
 5       It's not one thing.  I'm looking for -- obviously I'm
 6       concerned about him, I'm concerned about officers
 7       that may encounter him, and also I want to have
 8       contact with him, yes, ma'am.
 9   Q   Okay.  And the contact you wanted to have, you knew
10       what to do because when that 12:41 a.m. discussion
11       was done, you went and drafted a search warrant so
12       you could go search his house and take him into
13       custody, right?
14   A   Yes, ma'am.
15   Q   And so, in other words, he was under arrest at that
16       point when he was taken out of his house.
17   A   When he was taken out of his house?
18   Q   Yeah.
19   A   We took him into custody.
20   Q   He wasn't free to leave anymore, right?
21   A   Um-hum.
22   Q   And so moving back over to this, talking about how
23       you can prove it's Chong, so then Paul says, well, he
24       just told me he stopped by Joe Thor's.  Right?
25   A   Yes.
```

85

```
1    Q    Okay.  Now right before he says this --
2              ATTORNEY SCHNEIDER:  I'm sorry.  What page
3         and line?
4              ATTORNEY VISHNY:  I'm sorry.  Still Page 3.
5         That was Line 112.  Just going back a couple lines.
6    Q    (BY ATTORNEY VISHNY)  There had been some discussion
7         of that earlier in the earlier talk where, I mean,
8         and you say he said something to Joe Thor, right?  So
9         Paul had referred to that earlier, that Chong had
10        said something to Joe Thor.  You remember that in the
11        first interrogation?  Not the first one but the first
12        one on December 12th, the 12:41 a.m. one.
13   A    I'm -- I guess I'm kind of confused on it.  Are you
14        asking if Paul said to me that Chong said something
15        to Joe Thor previously?
16   Q    Yeah.  At 12:41 when you guys were questioning him,
17        you know, saying -- you were asking, well did he tell
18        anybody else he had done the shooting, and what Paul
19        told you was that Chong had gone to Joe Thor's house,
20        right?
21   A    Yes, ma'am, I do remember that.
22   Q    And that Chong had told Joe Thor about this, right?
23   A    I don't know specifically, but I -- I think so,
24        yes.
25   Q    Okay.  But Chong had -- but Paul had never brought up
```

86

```
1         that Chong had told Phong Lee about it, correct?  It
2         was just Joe.
3   A     I believe so, yes.
4   Q     Okay.
5   A     Well, actually, no, hold on here.  This is on the
6         second interview, right?
7   Q     Yeah.
8   A     I believe -- no.
9   Q     Do you remember?
10  A     No.  I believe that he -- I believe that he said in
11        the second interview that -- that -- yeah, actually,
12        now I do think about this.  I think in the second
13        interview he said that Chong ended up coming to Joe's
14        -- Thor's house and saying this in front of Phong and
15        Joe.
16  Q     Well actually what Paul said was that Chong came to
17        Joe's but he didn't put Phong as hearing the
18        statement, he just talks about Joe hearing the
19        statement, did he?
20  A     No, I think he did.
21  Q     All right.  One minute.
22  A     Yeah, actually, because -- yeah, no, I'm pretty sure
23        he did, ma'am.
24  Q     I didn't mean to turn my back on you.  I don't want
25        to be rude.
```

87

1    A    No.  I'm just thinking about what you said.  Yeah.

2         I'm pretty sure he did.

3    Q    Okay.  Well, we'll double-check it.  Maybe I'm wrong.

4    A    No.  I'm positive.  I'm positive he did.

5    Q    You're positive.  Okay.

6    A    Yes.

7    Q    All right.  Well, we'll see if you're right or wrong.

8         But eventually we do know --

9    A    I think we can tell right from the report.  It should

10        be right in here, shouldn't it?

11   Q    Well this is a transcript of the very last

12        discussion.  Okay?  Okay.  Actually, he says that in

13        this discussion.

14   A    Right.  This is the one we're talking about.

15             ATTORNEY VISHNY:  This is Page 5, Miss

16        Schneider, Line 188.  Okay?

17   A    Yeah.  Right there.

18   Q    Right.  So --

19   A    It says:  Okay.  So Phong would have heard that too.

20        Yeah.

21   Q    Okay.  But before this, when he talked to you at the

22        12:41 interview, he had not brought up Phong's name

23        until this later one, right?  That's what I'm trying

24        to ask you.

25   A    But was -- I'm sorry.  But this is the one we're

88

```
 1        talking about.
 2   Q    Well, I was trying to talk to you about the other
 3        one, but I want to make sure absolutely that I'm not
 4        confusing you.  Okay?
 5   A    Too late.
 6   Q    Well then let me try to assist.
 7             At 12:41, during that interrogation with Paul
 8        Lee, he never brought up Phong's name, he just said
 9        that Chong also told Joe, right?
10   A    I believe so, yes.
11   Q    Okay.  And then later now, you know, eleven hours
12        later, now he tells that you Phong was also there.
13        He had never brought that up before, correct?
14   A    Yes, ma'am.
15   Q    All right.  So -- and -- okay.  And then -- so for
16        the first time now Paul Lee is telling you on Page 5,
17        Line 188, we are in Joe's house and then probably
18        like 30 minutes to an hour he showed up.  And then
19        you say:  Okay.  What happened.  And Paul says:  And
20        then he just said he just fucked up.  And then -- and
21        then you say:  He said he fucked up in front of
22        everybody else there, and he says yes.  Right?
23   A    Yes.
24   Q    So then you say:  Okay.  Would Phong have heard that
25        too.  And he says:  Yes.  But Phong was in shock.  He
```

89

```
 1        wasn't even paying any attention anymore.  Right?
 2        That's him who says that.
 3   A    Right.
 4   Q    And then you go on and ask -- and so it's continued
 5        conversation kind of along those lines.
 6   A    Yes, ma'am.
 7   Q    All right.  So going to the next page, Page 6, after
 8        some discussion about this -- well, Page 6, at the
 9        top, you say -- after Line 1 you say:  Well, how do I
10        prove you're innocent, man.  I mean I've got to be
11        able to prove it.  And you tell him:  I got to prove
12        it through physical evidence or witnesses or
13        statements.  Right?
14   A    Yes, ma'am.
15   Q    And I have to be able to show that.
16   A    Right.
17   Q    And then what you say to him at Line 234 is you say:
18        I -- so we got to -- we got to overcome.  We've built
19        this great case against you, now all we got to do is
20        we got to get rid of that case to show that it wasn't
21        you, that in fact it was your brother, so you've
22        gotta help us.
23   A    Yes.  I said that because, again, at that time when
24        we're doing those interviews, my belief was that
25        Phong was either -- I'm sorry, Paul was either a
```

90

```
1              witness, knew what was going on, or he was the

2              shooter.  That was my belief.

3    Q   Okay.  On Page 8, Line 233 -- no, wait a minute.  I'm

4              sorry.  332.  Okay.  Do you -- let's go back to 328.

5              You said:  Do you know who dropped him or you don't

6              know.  And then he says:  No, we were in the

7              basement.  And then he says:  So when you guys are in

8              the basement, just the four of you now, okay.  And he

9              says:  Three of us, oh, four, oh, Chong, okay.  It's

10             not you, I'm sorry, it's Sergeant Thao, Q1.  What was

11             the discussion.  I mean obviously he say he fucked

12             up, and he says, yeah, and he says, right, he shot

13             the guy, and he says, yeah.  Okay.  He said that to

14             you guys, yeah.  Right?

15   A   Yes, ma'am.

16   Q   All right.  Now, on Page 17 at 747, okay, this is

17             kind of getting a little bit farther down the road so

18             now we're on Page 17 out of 29.  So kind of smack in

19             the middle.

20   A   Okay.

21   Q   So what you say is, move forward.  This is line 747.

22                  ATTORNEY VISHNY:  You have that, Miss

23             Schneider?

24                  ATTORNEY SCHNEIDER:  Yes.

25   Q   (BY ATTORNEY VISHNY)  So Phong and Joe, we may ask
```

91

1          you to talk to these guys and just say, listen, hey,
2          I need, you know, you guys are my friends.  I need
3          help.  I can't go to prison for the rest of my life
4          because of something my brother did.  Okay.  And, you
5          know, we don't -- we don't believe that this is a
6          conspiracy that you guys were planning to do this, we
7          don't see any of that, what we see is a terrible
8          tragedy that happened in the blink of an eye, but you
9          got to get those guys to go to bat for you.  You said
10         that, right?
11    A    Yeah.  What I was thinking at that point was that
12         obviously anytime that we can corroborate evidence,
13         that we can verify information, and if these guys at
14         that point hadn't told us the truth, maybe we could
15         set up a one-party consent phone call, maybe we could
16         do something like that.
17    Q    You're not talking about a one-party consent phone
18         call here.  Those words are never mentioned, are
19         they?
20    A    But that's what I'm thinking.  It's not going to show
21         what I'm thinking.
22    Q    We're going to talk about what you're communicating,
23         not what's inside your head, because we can all
24         agree --
25    A    Well --

92

1   Q   -- we can't read each other's minds.

2   A   No, I don't think so.

3           THE COURT:  Just remember it's one at a

4       time.  You can't both speak.  My court reporter needs

5       to be able to take down everyone.

6   Q   (BY ATTORNEY VISHNY)  We can all agree we can't read

7       each other's minds, right?

8   A   Correct.

9   Q   I mean I could be thinking about lunch right now and

10      you would have no idea, right?

11  A   Correct.

12  Q   Okay.  And I don't know what's in your mind, I can

13      only talk about your words.  Fair?

14  A   But you're talking about my words and I know what I

15      was thinking.

16  Q   Right.  But we're talking about what you're

17      communicating to Paul Lee.  That's the -- what I'm

18      questioning you about.

19  A   Sure.

20  Q   Not what's in your head.

21  A   I understand.

22  Q   All right.  So after you tell him that, you ask him

23      because you want to make sure he knows what you're

24      talking about.  Do you know that expression go to

25      bat, right?

93

1  A    Yes.

2  Q    And he clearly understands when you say that because

3       his next answer is:  I got to -- I got to go talk to

4       Joe.  Right?

5  A    Yes, ma'am.

6  Q    And you say:  Yeah, yeah, and we don't want him to

7       lie to us.  I don't want you to go there and have him

8       lie to us, just tell him to be truthful.  Besides

9       those two guys, anybody you can think of?  Right?

10 A    Yes, ma'am.  Again what I'm looking for is I'm

11      looking for outside sources that can -- that can

12      qualify what he said.

13 Q    But what you're telling him is go talk to your

14      friends and get them to back you up.

15 A    I would not allow Paul to go talk to somebody unless

16      we were there or if -- I prefer a one-party consent

17      phone call.

18 Q    Whatever -- you may prefer that, but that's not what

19      you said to him, right?

20 A    But again, common sense is going to say if I'm an

21      investigator, I would never leave or let someone go

22      interview someone or talk to somebody because you

23      can't -- you -- I don't know what's being said.  I

24      want to have a taped conversation.

25 Q    Actually at 1:17 p.m. Paul is let out of jail and

94

```
 1         driven home by you, right?

 2     A   I don't know the time, but it sounds about right.

 3     Q   Right.  And you don't follow him into his house,

 4         right?

 5     A   No, ma'am.

 6     Q   You're not tape recording his phone calls, right?

 7     A   Correct.

 8     Q   You don't have like a wire tap order, right?

 9     A   Correct.

10     Q   So after 1:17 or the time he's dropped off you don't

11         know what he's doing or who he's saying to other

12         people, do you?

13     A   No.

14     Q   You have no idea if the first thing he does is get on

15         the phone with his buddies, hey, Joe, you got to say

16         this, hey, Phong, you got to say that.  You don't

17         know that, do you?

18     A   No, ma'am.

19     Q   Okay.  Now Page 28, let's talk about his written

20         statement for a minute.  Okay?

21     A   Sure.

22     Q   All right.  Yesterday you talked about the written

23         statement, and what you say to him, you know, and

24         this is after telling him, you know, how to put his

25         name, address, date and stuff like that?
```

95

1    A    Right.

2    Q    Mechanical stuff.  You say:  I'm not going to put any

3         words in your head, but what you told me is your

4         brother Chong, I'm sorry, Chong Lee had a gun on him.

5         And he says:  Uh-huh.

6              ATTORNEY SCHNEIDER:  I'm sorry.  What page?

7              ATTORNEY VISHNY:  Page 28 right at the top.

8         First line.

9              ATTORNEY SCHNEIDER:  Okay.

10   Q    (BY ATTORNEY VISHNY)  Okay.  And you say:  You got in

11        an altercation with a guy by the name of Josh at

12        Luna.  While you were kind of struggling with the

13        guy, fighting with the guy, Chong stepped up, shot

14        him in the side of the head, you guys ran.  Roughly

15        an hour, hour-and-a-half later Chong came to Joe

16        Thor's house where he admitted to you and Joe Thor

17        and to Phong Lee that he fucked up, that he's going

18        to go for a -- away for a while and he shot that guy.

19        You say:  Is that about right.

20   A    Yes, ma'am.

21   Q    All right.  And it's shortly after that that he

22        actually sits down and writes the statement, correct?

23   A    Yes, ma'am.

24   Q    And you want him to say there that Chong stepped up,

25        shot him to the side of the head.  That's one of the

96

1    things you specifically tell him you want in that
2    statement?
3  A    Actually, what I did there is I -- all I did is again
4    reiterate what he has told me throughout the
5    interview.
6  Q    Okay.  But you could agree that some people might
7    call that coaching him.
8  A    No.
9  Q    Even if you don't?
10  A    I don't.  I don't agree with that.
11  Q    Okay.  That's fine.  But he's never told you he
12    actually saw Chong shoot him in the head, he just
13    told him later at Joe's that he fucked up.
14  A    No.  He said all of these things.  Throughout the
15    interview I'm pretty sure he said all of these things
16    to us.
17  Q    Actually, he never did say that he saw Chong shoot
18    him.
19  A    No, you're right.
20  Q    He never said that, did he?
21  A    No, ma'am.  I believe what he said is he came from
22    the bar.  He came -- he came from a certain angle
23    up.
24  Q    Okay.  Now, it's in this conversation where Paul uses
25    the expression point blank, that Chong point blanked

97

1    him, right?

2  A  In this interview, ma'am?

3  Q  Yeah.

4  A  Yes, ma'am.

5  Q  And you were not aware that the expression point

6     blank had been used with Paul earlier by other

7     people, other investigators.  You didn't know that,

8     right?

9  A  No, I didn't know that.  Who?  When was that?

10 Q  Well, I don't answer questions here, I just ask them.

11    But all the evidence will come in before the jury, I

12    assure you.

13 A  Yes, ma'am.

14 Q  Now, during this interrogation, in the beginning --

15    I'm going back now to the 12:41.  All right?

16 A  Yes, ma'am.

17 Q  What -- when Paul tells you and Sergeant Thao that

18    he's not the shooter, that Chong told him afterwards,

19    came over on Monday and told him he'd done it,

20    what -- you and Sergeant Thao are still questioning

21    him about having the gun, right --

22 A  Yes, ma'am.

23 Q  -- for a while?

24 A  Yes, ma'am.

25 Q  And he keeps telling you, no, what I had in my hand

98

1          was an e-cigarette.

2     A    Yes, ma'am.

3     Q    And were you aware that before he had made numerous

4          statements to Sergeant Rabas that he had nothing in

5          his hand when he ran out of the bar?

6     A    No, ma'am.

7     Q    Okay.  So -- and were you aware that the video -- you

8          can see something distinct in the right hand in the

9          video, right?

10    A    Yes, ma'am.

11    Q    It also looks in the video that he may have something

12         in his left hand as well, correct?

13    A    Actually, no, I didn't know that.

14    Q    And were you aware that he was running down the

15         street, that as he left he put his hands into his

16         pockets and was running away from the scene with his

17         hands in his pockets the entire time.

18    A    Yes, ma'am.

19    Q    All right.  So you have this -- you noticed the

20         e-cigarette there, you start thinking that could be

21         it, and then of course you call in the photographer

22         to do the same angle, right?

23    A    Yes, ma'am.

24    Q    As we saw the pictures yesterday, when you do that,

25         you photograph so that the right hand looks very

99

```
 1        similar but the photograph does not show Paul Lee's

 2        left hand at all.

 3   A    I don't recall that.

 4   Q    All right.  You want me to -- well, the thing isn't

 5        plugged in.

 6             ATTORNEY VISHNY:  They're on a poster

 7        board.  Do you know what the exhibit number is?

 8             ATTORNEY SCHNEIDER:  No, but I can tell you

 9        in a second.

10             ATTORNEY VISHNY:  It's probably 150 or

11        151.

12             ATTORNEY SCHNEIDER:  No.  It's earlier than

13        that.

14             THE COURT:  I think it's --

15             ATTORNEY SCHNEIDER:  86 through 87 maybe?

16             ATTORNEY VISHNY:  Thank you.

17   Q    So I'm showing you what was --

18             ATTORNEY SCHNEIDER:  No.  78 through 79 I'm

19        saying.

20             ATTORNEY VISHNY:  Thank you very much.

21             ATTORNEY SCHNEIDER:  I'm coming to help.

22             ATTORNEY VISHNY:  83 to 85?

23             ATTORNEY SCHNEIDER:  Yup.

24             ATTORNEY VISHNY:  Oh, okay.  I thought you

25        said 78 to 79.
```

1   Q   (BY ATTORNEY VISHNY)  So I'm showing you -- this was

2        shown in court yesterday, right?

3   A   Yes, ma'am.

4   Q   So the pictures are taken of Paul Lee wearing what he

5        says is the same coat holding the item that he says

6        he had in his hand there, the e-cigarette, and you

7        tried to shoot it from a similar angle, correct?

8   A   Yes, ma'am.

9   Q   But you never include his left hand in this picture

10       and show that, right?

11   A   Correct.

12   Q   Now, this picture is taken at the Appleton Police

13       Department where the lighting is good and bright,

14       right?

15   A   Yes, ma'am.

16   Q   You never attempted to go to Luna and recreate that

17       scene with the e-cigarette in his hand and have it

18       recorded through the Luna video recording system.

19   A   Correct.

20   Q   Now you notice the e-cigarette was silver, right?

21   A   Yes, ma'am.

22   Q   All right.  And when you were done, the e-cigarette

23       was taken into evidence, right?

24   A   I -- I believe so.  I'm not sure, ma'am.

25   Q   All right.  Well, if it was taken into evidence,

1       wouldn't you be the one to do it since you were

2       there?

3    A  No.  We had evidence technicians that were -- the guy

4       that took the pictures, he's one of our evidence

5       guys.

6    Q  He would have been the one to take it then?

7    A  I don't know, ma'am.

8    Q  Okay.  So you don't know, you're doing this

9       investigation and you don't know what's taken into

10      evidence or not?

11   A  Correct.

12   Q  That's someone else's job?

13   A  No, it's just that I -- that wasn't my job.  I was

14      there to interview.

15   Q  So, now, you said the e-cigarette is metal though,

16      that much you know, right?

17   A  I believe parts of it are, yes.

18   Q  Okay.  Now yesterday -- no.  I'll strike that.

19          Now, speaking of the Luna video, you're not

20      aware of anybody who attempted to enhance that video,

21      are you?

22   A  I know that Sergeant Rabas worked tirelessly on that.

23      I don't know specifically what all he did.  That's

24      not my forte.

25   Q  Okay.  All right.  Now, you were involved in drafting

102

```
 1       a number of search warrants in this case?
 2   A   Yes, ma'am.
 3   Q   And so one of the search warrants --
 4               ATTORNEY VISHNY:  Can I have these two
 5       marked?
 6   Q   So when you talked to Phong Lee the first time, when
 7       you talked to him at the courthouse, you had a search
 8       warrant for his phone, right?
 9   A   Yes, ma'am.
10   Q   Remember that?
11   A   I do.  I don't know if I wrote that one or if I was
12       on there or not.  I don't recall.
13   Q   Well, let's bring up Exhibits No. 180 and -- wait a
14       second.  The second one didn't get marked.  Hold on.
15       Okay.  My mistake.  I'm sorry.
16               ATTORNEY SCHNEIDER:  Attorney Vishny, it's
17       180, the one that starts with my reference 1223.
18               ATTORNEY VISHNY:  I'm going to take a look.
19       I think so.  Yes.  181 starts with 1279.
20               ATTORNEY SCHNEIDER:  Okay.  Thank you.
21   Q   (BY ATTORNEY VISHNY)  These are both search warrant
22       affidavits drafted by you, correct?
23   A   Yes, yes, ma'am.
24   Q   Okay.  And in the search warrant affidavit, you are
25       asking, in the very first one marked Exhibit 180, you
```

103

```
 1          can take a look through if you want, this is asking

 2          for -- this is the search warrant affidavit that was

 3          done that allowed you to take Phong Lee's phone when

 4          you interviewed him the first time, correct?

 5     A    I believe so, ma'am.

 6     Q    And, in fact, you did another search warrant

 7          affidavit for another phone belonging to Phong Lee

 8          with a different phone number, right?

 9     A    It appears to be, ma'am.

10     Q    Okay.  So taking his phone away did not disable his

11          communications or ability to talk on his cell phone,

12          right, because you found out there's another one that

13          you got?

14     A    I'm not sure if it was like his brother's phone or

15          there was something along those lines that he was

16          using somebody's phone.

17     Q    Okay.  Now you recall getting a search warrant for

18          the telephone of Jenny Lee?

19     A    I do not, no.

20     Q    Okay.  For a couple of different phones for Chong

21          Lee?

22     A    Again, I don't recall.

23     Q    Okay.

24     A    I believe I did.

25     Q    For Lisa Stutzman?
```

104

1   A    I think I did 20 some search warrants, so I don't

2        recall specific ones.

3   Q    For Hu Lee?

4   A    I don't know, ma'am.

5   Q    The landline for Lisa Stutzman and Hu Lee --

6   A    I don't recall.

7   Q    -- were you involved in that?  For Alyson Blom?

8   A    I don't recall.

9   Q    For Joshua Richards?

10  A    I don't recall.

11  Q    For Brittany Olson?

12  A    I don't recall.

13  Q    You never did a search warrant for the phone of Joe

14       Thor, did you?

15  A    I don't recall.

16  Q    But somebody got a phone from Joe Thor, right?

17  A    I think when we were -- I think we did.  I think

18       there was a search warrant for Joe's phone as well,

19       but I don't believe I was involved in that.

20  Q    Were you ever aware -- so other people did search

21       warrants besides you, right?

22  A    Yes, ma'am.

23  Q    Did you have any awareness that Joe Thor was

24       interviewed at some point by Sergeants Rabas and

25       Leitzinger, in fact on the 12th, and that there was a

105

1          break in that interview where he went in a house for

2          about four minutes?

3     A    No, ma'am.

4     Q    So you didn't know that he went -- at least claimed

5          he had consulted a telephone, right?

6     A    No, ma'am.

7     Q    And to your knowledge there was never any search

8          warrant for the telephone of Tou Shoua Lee?

9     A    No, ma'am, I don't --

10    Q    And I just want to clarify that these are search

11         warrants, the list I read you, I was talking about

12         phones at first with Phong Lee, but you were involved

13         with search warrants for all records, right?

14    A    Yes, ma'am.

15    Q    And I want to correct the record because I made a

16         mistake.  The names I just read you, these were

17         search warrants for call records, not actual phones

18         themselves?

19    A    Yeah.  I don't recall, ma'am.

20    Q    Okay.  But you know what call records are, don't

21         you?

22    A    Yes, ma'am.

23    Q    So sometimes when you get a search warrant and you

24         get somebody's phone you can't tell what's gone on

25         because people have erased data from the phone,

106

```
 1        right?

 2   A    You mean when you physically get the phone?

 3   Q    Yeah.  When you physically get the phone.

 4   A    Yes, ma'am.

 5   Q    Sometimes data can be erased, right?

 6   A    Yes, ma'am.

 7   Q    Now sometimes it can be recovered using a special

 8        machine that law enforcement departments have --

 9        well, Cellebrite is one name, but there are other

10        trade names for that kind of equipment, right?

11   A    Ma'am, I really don't have a lot of technical

12        expertise in that area.

13   Q    I understand somebody else does that kind of work in

14        your department.

15            Were you aware after seizing the first phone

16        from Phong Lee that it was examined and it had been

17        factory reset?

18   A    No, ma'am, I was not aware of that.

19   Q    Do you know or are you aware that when a phone is

20        factory reset it means you can no longer get data

21        from it?

22   A    Again, ma'am, that's outside of my area of

23        expertise.

24   Q    Okay.  That's fine.  But even when a phone has been

25        wiped clean, so to speak, you know, or damaged or
```

107

```
 1           destroyed, one can get call records to show -- those

 2           can't be changed by the person who opens a phone,

 3           right?

 4     A     Again, I -- I don't know that.

 5     Q     All right.  So you've never worked with actually

 6           getting phone call data to see who called who or who

 7           has communicated at a particular time?

 8     A     No, ma'am.

 9     Q     Okay.  But you could agree that that could be very

10           important information to obtain to verify whether or

11           not witnesses have communicated with each other,

12           right?

13     A     Yes, ma'am.

14                 ATTORNEY VISHNY:  Nothing further.

15                 THE COURT:  Redirect?

16                 ATTORNEY SCHNEIDER:  I know you would love

17           me to say I have no questions but I do, so I'm going

18           to try to start and come back and review some

19           transcripts in just a little bit, Sergeant Schira.

20                       EXAMINATION OF JOHN SCHIRA

21     BY ATTORNEY SCHNEIDER:

22     Q     If a person or if a witness tells you that they saw a

23           person and they're talking about that person to you

24           on the news or in the newspaper, is that then a good

25           idea to do a photo lineup with that person?
```

108

1   A   No.  They've already basically identified the person

2       through other means.

3   Q   Why is it important when you're interviewing a

4       suspect about something they did to ask the why, why

5       did you do this or what?

6   A   I think there is several reasons for that actually.

7       I think the why personalizes it.  When you ask why,

8       it's not just giving a person an out but it's an

9       opportunity for that person to tell you why they did

10      it.  It makes a lot of sense to me.

11  Q   And your job as a law enforcement officer is also to

12      check a case to see if there's self-defense issues,

13      correct?

14  A   Yes, ma'am.

15  Q   So that's sometimes the why question?

16  A   Yes, ma'am.

17  Q   And from your -- I don't have your first page of

18      questions.  26 years?

19  A   No.

20  Q   Or 18?

21  A   With Appleton, 18.

22  Q   18.  18 years as an officer.  When there's a fight or

23      an altercation, do you ask the why to find out what

24      the other person was doing prior to?

25  A   Yes.

```
1    Q    Or after?

2    A    Yes.

3    Q    Do you think in most fights you've investigated you

4         look at or ask about self-defense issues?

5    A    Yes.

6    Q    Or defense of others?

7    A    Yes.

8    Q    Chong Lee didn't write a statement, correct?

9    A    Correct.

10   Q    You were asked questions on cross about written

11        statements of suspects?

12   A    Yes.

13              ATTORNEY VISHNY:  Judge, can we approach?

14              THE COURT:  You may.

15              (Bench conference.)

16   Q    (BY ATTORNEY SCHNEIDER)  And you never asked Chong to

17        write a statement?

18   A    He had --

19   Q    Right, yes or no, you never asked him to?

20   A    Correct.

21   Q    Have you had other cases, Sergeant Schira, where

22        you've investigated situations where guns are

23        fired?

24   A    Yes, ma'am.

25   Q    In those other cases, have you had people run from
```

110

1        the location where a gunshot was heard?

2    A   Yes, ma'am.

3    Q   In your experience, when there's an investigation

4        you've done and there's been a gunshot, have you ever

5        had a case where no one has run from that scene?

6        Maybe it's a bad question otherwise.

7    A   I've done several, yes, there has been -- there has

8        been one.

9    Q   One?

10   A   Yes.

11   Q   Okay.  There have been more than one where people

12       run?

13   A   Yes, ma'am.

14   Q   So it's more often that in your investigations if

15       there is a gunshot people run?

16   A   Oh, almost -- almost always, yes.

17   Q   And some of those people through your investigations

18       had nothing to do with the shooting but they still

19       ran?

20   A   Yes, ma'am.

21   Q   In those past cases, have you asked those people why

22       they ran if they had nothing to do with the

23       shooting?

24   A   Yes.

25   Q   And what do they tell you?

111

```
 1   A   Variety of reasons.  First of all, scared for their

 2       own safety, don't want to get involved, knew that --

 3       that they had information and that we would -- we

 4       would ask for that information, trying to protect

 5       someone else or that they themselves were involved.

 6   Q   I want to focus in on some transcripts that were went

 7       through with you.  I'm going to first focus on the

 8       transcripts with Joe Thor, but before we look at the

 9       transcripts, the first time you spoke to Joe Thor on

10       the 9th, and then also the second time on the 10th,

11       and I think it's more likely on the 10th, you brought

12       up the fact and you were asked during cross Paul was

13       running with his hands in his pockets.  Do you

14       remember talking to Joe about that?

15   A   Yes, ma'am.

16   Q   And even though you asked it of Joe many times, he

17       didn't end up saying, well that's because he was the

18       shooter, correct?

19   A   Correct.

20   Q   Weather again on this night from when you

21       responded?

22   A   I believe I said brutally cold.

23   Q   Do you have the transcripts, Sergeant, or are they --

24   A   No.

25   Q   First we're going to look at 179.  I know this is
```

112

```
1         hard because they don't have a date on them, but if I
2         told you this transcript is of the interview you did
3         on December 9th, does that seem to be accurate?
4    A    I do.  I recognize that.
5    Q    Okay.  You were asked a question, and I'm just going
6         to have to flip pages here because they're not
7         numbered, okay, so you were asked a question,
8         Detective, and I'm going to point to you, it's Page 8
9         about middle of the page where you're talking to Joe
10        about what happened, and this is where that point
11        blank reference comes out.  Do you see that?
12   A    Yes.
13   Q    Okay.  So can you read what you first said to Joe?
14   A    You're standing right there when it happened.  You're
15        -- you're right -- you're right in the mix, you're
16        right there, point blank on the guy.
17   Q    How does Joe respond?
18   A    No.  He was like this, holy shit, holy shit, that's
19        why I was --
20   Q    What -- do you kind of interrupt him?
21   A    I do.  And I say:  You're right next to -- right next
22        to it.  You were there when --
23   Q    And how does Joe respond?
24   A    I was this to the wall because I was trapped actually
25        to tell the truth.
```

113

```
 1   Q    What do you say next?

 2   A    But you saw him get shot.

 3   Q    And what did he say?

 4   A    I was so scared 'cause -- and I respond with:  You

 5        saw him get shot.

 6   Q    How does he respond?

 7   A    No.  I just saw him fall over, and I was like, holy

 8        shit, what the hell, so I ran.

 9   Q    And then I'm going to have you -- do you remember

10        during this interview Joe telling you at that moment

11        when he's there in this -- he's looking at Josh, he

12        sees that shot, how he felt?

13   A    Yeah.  I mean, Joe was -- Joe was traumatized by

14        that.

15             ATTORNEY VISHNY:  Okay.  I'm going to

16        object.  Joe may say he was traumatized, but this

17        detective does not know what was in his mind.

18             ATTORNEY SCHNEIDER:  I can ask him a

19        different question otherwise.

20             THE COURT:  That's fine.

21   Q    (BY ATTORNEY SCHNEIDER)  Did he ever physically get

22        emotional when he talked about seeing Josh in the

23        head?

24   A    Absolutely.  His eyes -- I mean, I was right there.

25        I was looking in the guy's eyes.  His eyes were
```

114

1        watering, he was --

2    Q   Did he motion or do anything with his hands when he

3        talked about seeing Josh's head get struck by the

4        bullet?

5    A   He did.  He like mimed that -- the round hitting

6        him.

7    Q   And in this first interview with Mr. Thor, I'm

8        looking now on Page 9 in the middle, does he talk

9        about how he was feeling?

10   A   Yeah.  He says again, I was so scared, though, I -- I

11       didn't know who shot anything.

12   Q   I'm going to move on.

13              ATTORNEY SCHNEIDER:  And that was from,

14       just for the record, Exhibit 179.

15   Q   I'm going to shift to - and please take the clip off

16       the top, if you don't mind, it will be easier for

17       us - Exhibit 160 which is the longer interview done

18       on December 10th.

19              Was he still or did he still express to you on

20       this date being scared about what he had seen?

21   A   He repeatedly said how scared he was.

22   Q   Okay.  If you want to flip, Page 14, Line 11,

23       starting with 11, if you can, and then just read

24       through, I'm just going to direct you to Line 17.

25   A   Okay.

115

1   Q   So your starting comments?

2   A   I start.  I say:  So you see him get shot in the

3       head.  And Joe says:  That's frickin' scary.  I said:

4       Yeah, I'm sure it is.  I can't imagine.  Joe says:

5       I'm still fucking scared to death right now.

6   Q   If you want to flip to Page 29 please?

7   A   Yes.  Okay.

8   Q   Actually, I'm going start on Page 28, Line 30.

9       You're talking about when Joe ran out of Luna,

10      correct?

11  A   Yes, ma'am.

12  Q   And you're trying to go through what he did, who he

13      was with?

14  A   Yes.

15  Q   Okay.  So on Line 30, Page 28, what did you start

16      saying to him?

17  A   I said:  You ran out of the building with him.

18  Q   Okay.  And how did he respond?

19  A   No, I didn't.

20  Q   When you said "him", who were you referring to?

21  A   Paul.

22  Q   Okay.  Go ahead.

23  A   Yeah, you did.  Again me.

24  Q   And then how did Joe respond?

25  A   Phong did not shoot him.

116

1    Q    How did you respond?

2    A    I didn't say Phong, did I.

3    Q    How does he respond?

4    A    Right.  I'm serious.  Phong did not do that.  Okay?

5    Q    Your response?

6    A    I didn't say Phong, did I.

7    Q    What does Joe say?

8    A    No, you didn't.

9    Q    So what do you then respond back to him?

10   A    I said:  The other guy did.

11   Q    Flip to Page 29.  His response?

12   A    Paul did not do it -- or Paul did not do it, yes.

13   Q    And then how did -- what did Joe say or what did you

14        say back to him?

15   A    I said:  Yeah, he did.

16   Q    And his response?

17   A    I'm serious.  Paul --

18   Q    I say:  He's got a gun in his hand.

19   A    And Joe responds:  No, he didn't.

20   Q    And then during cross you asked him, and this would

21        be line -- starting on Line 30, basically you're

22        asking him, Attorney Vishny, about being there,

23        seeing a guy with a gun in his hand.  That's the guy.

24        Stop protecting him.  And what was Joe's response?

25        Because I don't think you were allowed to give Joe's

117

```
 1          response, just your topic matter.
 2    A     He said -- Joe said:  I did not see him with it
 3          though.
 4    Q     So he's saying he did not see anyone with a gun.
 5    A     Correct.
 6    Q     Page 56.  Again you were asked about your reference.
 7          And this would be on Line 33.
 8    A     Okay.
 9    Q     To him having a gun.  And I think what you were asked
10          about, you said, he had a gun in his hand on the
11          video, it's very clear, it's a gun.  How does --
12    A     I'm sorry.  I lost your line.
13    Q     That's okay.  I went too fast.  Line 33.  You were
14          asked on cross about saying this to Joe.  He had in
15          his hand and on video, it's very clear, it's a gun.
16          What was Joe's response?
17    A     He ran like that the whole time.
18    Q     And you say?
19    A     No, no, no.
20    Q     And what does Joe say?  Response?
21    A     I did not see.  You're not listening.
22    Q     And throughout this interview with Joe, he tells you
23          when you asked or by his own comments Paul was not
24          the shooter.
25    A     Yes.
```

118

```
 1   Q   And does he also tell you that Phong was not the
 2       shooter?
 3   A   Yes.
 4   Q   Okay.  If you can go to Line 76 -- or Page 76?
 5   A   Okay.
 6   Q   And this is where in the cross Joe was being told --
 7       Sergeant Rabas is making a comment like, today is
 8       your day, it's your interview, today is it, I think
 9       there is reference.  Did you literally mean like he
10       had 24 hours or he only had this day?
11   A   No.  We're trying to get across to him, it's like you
12       got to come clean, man, you got to tell us what's
13       going on.
14   Q   And if you flip to Page 77, because you weren't
15       allowed to give Joe's response, what did he tell you
16       in response?
17   A   I'm just telling you what I saw.
18   Q   And more pointed on Line 29, Sergeant Rabas asks him
19       directly what?
20   A   Why did Paul shoot him.  Did he tell you that.
21   Q   What was Joe's response?
22   A   He didn't shoot him.  He did not shoot him from what
23       I saw.
24   Q   Page 80 you were asked about references to a gun, and
25       this is where you're talking about the size of the
```

119

```
1          gun, and you're talking to -- Attorney Vishny had you
2          read several lines, it's a small gun, not even the
3          size of your hand.  What does Joe say?
4     A    I don't know.  It could be a gun.  Let me see it
5          again.
6     Q    And what do you say?
7     A    Why did he shoot him.
8     Q    And Joe responded?
9     A    He did not shoot him from what I saw.
10    Q    And what do you say to him again?
11    A    Why did he shoot him.
12    Q    And his response?
13    A    He did not shoot him from what I saw.
14    Q    Page 168 please.
15    A    Okay.
16    Q    There are probably times when people make references
17         to how they feel or react that are just pretty much
18         talking as plainly as you can, right?
19    A    Yes.
20    Q    Okay.  On this page Sergeant Rabas is -- I'm going to
21         have you look at Line 38, is talking to Joe about how
22         he was running away.  Do you remember that?
23    A    Yes.
24    Q    And what is his response?
25    A    Neal goes:  That's probably why you ran fastest you
```

```
1          probably ever ran in the first two blocks.  And Joe's
2          response was:  I almost pissed my pants to tell you
3          the truth.
4     Q    In that same conversation he was talking about how he
5          was scared he heard those shots and saw Josh.
6     A    Yes.
7     Q    Okay.  We're not quite done.  204.  Here.  Way in the
8          back.
9              You were asked a few questions, and I just again
10         want to elicit what Joe's responds either you or
11         Sergeant Rabas to some of those questions.
12    A    Okay.
13    Q    And on Line 26 Sergeant Rabas is talking about --
14         talking -- you're helping -- you talk about helping
15         us, you're helping yourself.  That's on Line 26?
16    A    Correct.
17    Q    And what does Joe say in response?
18    A    He says:  I'll find out what I can.
19    Q    And if you flip to Page 205?
20    A    Okay.
21    Q    Line 11.  Or just look at the content starting at the
22         top of the page.
23    A    Okay.
24    Q    Is it again like finding out, helping us?
25    A    Yes.
```

121

1    Q    And how does Joe respond on Line 11?

2    A    On Line 11 he says:  I'll try to find out a way to

3         help you guys.

4    Q    And then on Page 206, Line 30, again you're kind of

5         concluding your discussion with Joe on this day?

6    A    Correct.

7    Q    What does he say on Line 30?

8    A    Joe says:  I'm going to try to find out what I can

9         before you guys will.

10   Q    And when -- this is odd, I'm standing behind you,

11        this is very odd, but when you finish that interview,

12        Joe left?

13   A    Yes, he did.  We -- actually, I think he had laundry.

14        We actually called the laundromat because he had

15        stuff in the laundry and we made sure nobody took his

16        stuff and, yeah, he left.

17   Q    Okay.  I want to talk about Phong Lee.

18   A    Okay.

19   Q    First day you spoke to Phong, December 9th?

20   A    Yes, ma'am.

21   Q    Did he express some concerns about talking to you

22        about what he knew?

23   A    He did.

24   Q    You work the street crimes unit?

25   A    I did.

122

```
1   Q   For how many years?

2   A   Six years.

3   Q   Okay.  Was there a specific term or reference Phong

4       used in that discussion with you?

5   A   He did.

6   Q   What did he say?

7   A   He said that he did not want to be a snitch.

8   Q   Did he express concerns about that?

9   A   Repeatedly.

10  Q   I'm going to show you what's previously marked

11      State's Exhibit or Exhibit 114.

12  A   Okay.

13  Q   Can you -- and I think actually Attorney Maier used

14      it with Phong Lee.  That's a transcript of the

15      discussion you had with him on December 9th?

16  A   Yes, ma'am.

17  Q   And I think you were asked if you could flip to Page

18      47 please, Sergeant.

19  A   Okay.

20  Q   And in this one again you were being -- he was being

21      asked about the gun and who had the gun in their

22      hand, correct?

23  A   Correct.

24  Q   And at this point who had Phong identified being at

25      Luna with, if you recall?
```

123

1   A   Specifically on this page or --

2   Q   In the context of the interview, did he talk about

3       Paul?

4   A   At this point, I'm not sure.  He -- at first he did

5       not want to tell us.

6   Q   Okay.

7   A   And we had to convince him to help.

8               ATTORNEY VISHNY:  Judge, can we approach

9       the bench please?

10              THE COURT:  You may.

11              (Bench conference.)

12  Q   (BY ATTORNEY SCHNEIDER)  Are you on Page 47?

13  A   Yes, ma'am.

14  Q   Okay.  So you were asked in cross about line -- I

15      don't have line numbers on mine, so this will be a

16      little tricky.  I'm going to go behind you.  One

17      second.  I found it.  Sorry.  I didn't mean to

18      interrupt you.

19  A   No, no, you're good.

20  Q   On Page 44 it was in the transcript, you were asked a

21      question on cross about saying to Phong comments

22      about the gun.  Can you read what you said to him?

23  A   You can't get over the fact that we got a guy with a

24      gun in his hand and you're in the picture.

25  Q   And how did Phong respond?

124

```
 1   A   I don't care.  I'm going to tell you that, they're
 2       not the ones that did it.
 3   Q   At any point during this discussion with Phong was
 4       Chong's name brought up on December 9th?
 5   A   Yes.
 6   Q   In his -- go ahead.
 7   A   I believe we showed pictures at the end.  I don't
 8       think his name was actually brought up.  I believe
 9       what was happening is we were just showing
10       pictures.
11   Q   Okay.  And you were showing him kind of like the
12       whole series of pictures?
13   A   Yes, ma'am.
14   Q   So at this point you hadn't brought up Chong's name
15       in the interview?
16   A   Correct.
17   Q   Okay.  And then I have another transcript.
18           Do you recall, Sergeant Schira, during that
19       first interview on December 9th with Phong, does he
20       identify who the shooter is at all?
21   A   No.
22   Q   And he talked about he was worried about being a
23       snitch?
24   A   Yes, ma'am.
25   Q   Was that something he continued to express to you
```

125

1        during that conversation?

2    A    He was very concerned about that.

3    Q    Let me ask you this, Sergeant Schira.  Paul was

4         initially talked to on the 12th at 1:41, correct?

5    A    Yes, ma'am.

6    Q    Was there a short period of time when he was also

7         spoken to at 2:19?

8    A    I -- I believe there was.

9    Q    Okay.  You weren't present for the 2:19 references,

10        correct?

11   A    Correct.

12   Q    Do you remember who that was?

13   A    It may have been Investigator Thao.

14   Q    Okay.

15   A    I don't recall.

16   Q    Okay.  One second please.

17            ATTORNEY SCHNEIDER:  It appears the 2:19 section

18        has not been marked yet so I'm going to mark that.

19   Q    (BY ATTORNEY SCHNEIDER)  So now I think you have all

20        three sections.

21   A    Okay.

22   Q    And one is labeled 12:41 and that's 176?

23   A    Yes, ma'am.

24   Q    The second one would be 2:19 and that's Exhibit 182?

25   A    Okay.

126

1    Q    And then 11:58, Exhibit 177?

2    A    Okay.

3    Q    Okay.  So we'll start these in order.

4         You were asked during cross about the written

5         statement you asked Paul Lee to write.  Do you recall

6         that?

7    A    I do.

8    Q    Okay.  Just so we don't end up -- Exhibit 122 is the

9         written statement of Paul Lee?

10   A    Yes, ma'am.

11   Q    And that's the written statement you obtained?

12   A    Yes, ma'am.

13   Q    Okay.  I'm going to keep that in front of you, but

14        just so I don't write all over that one --

15   A    Okay.

16   Q    -- I'm going to put it up on the Elmo as well.

17             THE COURT:  Lights down, Attorney

18        Schneider?

19             ATTORNEY SCHNEIDER:  Let's just wait and

20        see once, Judge.

21             THE COURT:  The jury want lights down or --

22        we're okay.  Is that good?  You can all see it?  All

23        right.

24   Q    (BY ATTORNEY SCHNEIDER)  So I want to walk you

25        through that written statement because on cross you

127

1        were asked about a quote towards the end, and this

2        quote comes at a time before you're about to have

3        Paul write the statement, correct?

4  A   Yes.

5  Q   And before you did that, you summarized some things,

6        correct?

7  A   Yes, ma'am.

8  Q   And let's first look at -- I'm going to highlight

9        these one at a time.  So I want to look at -- first

10       what I'm going to highlight which is, while I was in

11       Luna coming back from the bathroom, me and Josh got

12       into an argument.  Do you see that?

13  A   Yes, ma'am.

14  Q   And it's your recollection that those were things

15       Paul told you during the course of this interview?

16  A   I do.

17  Q   And he told you those before you ever asked him to

18       write this written statement?

19  A   Yes.

20  Q   Looking at 12:41 interview, Exhibit 176, can you

21       please flip to Page 4 -- actually, the bottom of Page

22       3 please.

23  A   Sure.  Okay.

24  Q   Starting at Line 131, this is Paul giving you a

25       comment, right?

128

1    A    Yes.

2    Q    And what does he say?

3    A    Like I said, me and unintelligible went to use the

4         bathroom.

5    Q    What's the next thing an officer says?

6    A    Right.  And then Paul says:  I came back up and that

7         bum came up first.

8    Q    You want to keep going into Page 4?

9    A    I say:  Okay.

10   Q    And how does he respond?

11   A    And this white guy came up and talked shit about

12        him.

13   Q    Who -- is that when Paul is talking about coming up

14        from the bathroom and there an argument starts?

15   A    Correct.

16   Q    And it continues on Line 144.  And what does he

17        continue to say?

18   A    And then he went into unintelligible.  I told him

19        unintelligible, I tell him to stop.

20   Q    If you can flip to Page 8 please.

21   A    8?  Okay.

22   Q    Starting with Line 343, this is Paul making a

23        comment?

24   A    Correct.

25   Q    And what does he say?

```
 1    A    The truth is that me and Phong, when we use the
 2         bathroom, we came up, Phong came up first.
 3    Q    What does an officer say?
 4    A    Okay.
 5    Q    And then what does Paul continue to tell you?
 6    A    And then he started talking shit to Phong so I go to
 7         unintelligible and I tell him to stop it, and that's
 8         my guy, you know, we don't know who you are
 9         unintelligible.  And I say:  Okay.
10    Q    What does Paul continue to describe?
11    A    And when I turned around, he came and talked shit to
12         me.
13    Q    Okay.  So he's continuing to talk about this
14         argument?
15    A    Yes, ma'am.
16    Q    The next line that Paul wrote I'm going to highlight
17         in yellow.
18    A    Okay.
19    Q    What did Paul write there that's highlighted in
20         yellow on this statement?
21    A    When it got physical, Chong came from Josh's left
22         side and point blanked Josh.
23    Q    12:41 interview, if you can go to Page 39 please.
24         Yup.  176 exhibit.
25    A    Page 39?
```

130

```
 1   Q   Um-hum.

 2   A   Okay.

 3               ATTORNEY VISHNY:  What's the line number?

 4               ATTORNEY SCHNEIDER:  I'm just finding it.

 5       Hold on one second.

 6   Q   (BY ATTORNEY SCHNEIDER)  If you want to start at Line

 7       1733.

 8   A   Okay.

 9   Q   This is Paul commenting, correct?

10   A   Correct.

11   Q   And what does Paul say?

12   A   And then like a big -- he said that Josh bum rushed

13       me.

14   Q   How do you respond?

15   A   Okay.

16   Q   And how does he answer?

17   A   And punched me back, and that's when I flew back like

18       I told you guys, you know.  I say:  Okay.

19   Q   What did Paul continue to tell you?

20   A   I step back and I was backed up for like 30 seconds

21       unintelligible.  I say:  Okay.  He then says:  The

22       shot was fired.

23   Q   What do you ask him?

24   A   From your brother.

25   Q   And his response?
```

131

1   A   Yeah.

2   Q   I'm going to point to Page 42, you're asking him --

3       or, actually, I think this would be Sergeant Thao, if

4       he's Q1, at Line 1873.  What's the question that Paul

5       gets asked?

6   A   But you think that he's on this -- he's over on this

7       side.

8   Q   Is this at the time you were looking at that written

9       diagram, if you recall?

10  A   I believe so, yes.

11  Q   Okay.  So when that is asked of him, what is Paul's

12      response?

13  A   He told me he came through the bar.

14  Q   And when he says, he told me he came through the bar,

15      who was he referring to?

16  A   Chong.

17  Q   And then we're going to -- actually, I want to stay

18      on this reference, but I'm going to flip to the --

19      the last interview, 11:58 a.m.

20  A   Okay.

21  Q   If you it flip to Page 11 please?

22  A   Okay.  Okay.

23  Q   And at the top of the page you're talking about

24      Chong's jacket, right?

25  A   Yes.

132

1    Q    Okay.  So then on 461 -- well, actually, to give it
2         context, can you start with Line 455 and read what's
3         said there?
4    A    Do you think there was any -- do you think there was
5         any blood splatter on it.
6    Q    And that was a question by you?
7    A    Yes.
8    Q    And how did he respond?
9    A    Maybe, I don't know.
10   Q    What was said next?
11   A    Okay.
12   Q    And his answer?
13   A    He did say he point blanked him.  I say:  That's what
14        he said, he point blanked him.  Yeah.
15   Q    Okay.  Thank you.
16             Next section I'm going to highlight, and I'll
17        just read it, you can follow along, Sergeant.  I just
18        highlighted the part that says:  After leaving Luna
19        me Joe and Phong walked to Joe's.  Do you see those
20        references?
21   A    I do.
22   Q    Can you find the 2:19 a.m., the smallest one, Exhibit
23        182?
24   A    Yes.
25   Q    Page 7 please?

1    A    Okay.

2    Q    Okay.  So the frame of reference is, and this was

3         Sergeant Thao, but at Line 288 he's talking about

4         them being at the dumpster?

5              ATTORNEY VISHNY:  I'm sorry.  What page are

6         you on?

7              ATTORNEY SCHNEIDER:  Page 7 of the 2:19

8         a.m. interview.

9    Q    Line 292, what question was asked?

10   A    Okay.  But you guys walked the way -- all the way to

11        Joe's house, right.

12   Q    And what did Paul respond?

13   A    Yeah.

14   Q    Next sentence I'm going to highlight, Sergeant

15        Schira, Chong shows up and told us he shot Josh.

16   A    Yes, ma'am.

17   Q    Okay.  So I'm going to walk through some references

18        that's found within his interview.

19   A    Okay.

20   Q    I want to start first with your 12:41 interview.

21   A    Okay.

22             ATTORNEY VISHNY:  Which one?

23             ATTORNEY SCHNEIDER:  12:41, Exhibit 176.

24   Q    (BY ATTORNEY SCHNEIDER)  You can go to Page 22

25        please.

1    A    Okay.

2    Q    Starting on Line 961, that would be -- actually,

3         your --

4              ATTORNEY VISHNY:  I'm sorry.  You said Page

5         22?

6              ATTORNEY SCHNEIDER:  Page 22, Line 961.

7              ATTORNEY VISHNY:  Okay.

8    Q    (BY ATTORNEY SCHNEIDER)  Your Q1 is the reference.

9         So what do you ask Paul at this point?

10   A    I -- it says:  How do you know that he shot him.

11   Q    Go ahead.

12   A    He responds:  Because he came to my house.  I ask

13        him:  Okay.  And he told you.

14   Q    And what did he respond?

15   A    He said he fucked up.

16   Q    Same transcript, I'm going to forward to line -- page

17        first, 26, Line 1154.  You're asking him again about

18        Chong and what the conversation was.

19   A    I say to him:  Okay.  And what did he say to 'ya.  He

20        responds:  He just said, eh, Paul, I fucked up.

21   Q    Does he continue to talk about that?

22   A    Okay.  What else.  That was --

23   Q    Go ahead.  How does he answer?

24   A    That was it and when I had to go to work and he's

25        gone.  I respond:  And when he says I fucked up, how

135

```
1           do you know he's talking about shooting him.  And he

2           says:  Because he told me he shot the guy.

3    Q     Can you read what you asked him next then please?

4    A     He did tell you he shot the guy.  Did he -- is that

5           exactly what he said, I fucked up, I shot the guy.

6    Q     And then continuing to Page 27, what was Paul's

7           response?

8    A     Yeah.

9    Q     When you spoke to him then -- just leave that one

10          right there.  At 11:58 a.m., if you can please flip

11          to Page 5.

12   A     Okay.

13   Q     Line 191.

14                ATTORNEY VISHNY:  I'm sorry.  Just taking

15          us a second to bring it up on the computer.  Page

16          what?

17                ATTORNEY SCHNEIDER:  Five.

18                ATTORNEY VISHNY:  Line 191?

19                ATTORNEY SCHNEIDER:  Actually I'm going

20          back it up to Line 188.

21                ATTORNEY VISHNY:  Okay.

22   Q     (BY ATTORNEY SCHNEIDER)  Can you start?  This is an

23          answer Paul gives, correct?

24   A     Yes.

25   Q     What does he say?
```

136

```
1    A    He says:  But we were at Joe's house and then
2         probably like roughly 30 minutes to an hour he showed
3         up.
4    Q    And when he references "he", is he talking about
5         Chong?
6    A    He is.
7    Q    Okay.  And what did you ask next?
8    A    Okay.  And then what happened.
9    Q    And his response?
10   A    And then that's when he say he just fucked up, and
11        then -- and I respond to that:  And did he say that
12        he fucked up in front of everybody there.
13   Q    And what was his response?
14   A    He says:  Yes, yeah.
15   Q    Okay.  Then we go to the last sentence then that Paul
16        wrote.  Highlight that in pink then.  And it reads:
17        Chong told me, Joe and Phong that he ditched the gun
18        and planned on leaving town.  Is that what Paul
19        wrote?
20   A    Yes, ma'am.
21   Q    12:41 a.m. interview please.
22   A    Okay.
23   Q    Line -- Page 32.
24             ATTORNEY VISHNY:  I'm sorry?
25             ATTORNEY SCHNEIDER:  12:41 a.m., Page 32.
```

137

1                    ATTORNEY VISHNY:  You said 12:41.

2                    ATTORNEY SCHNEIDER:  Yes.  A.m.  We're

3            flipping back to the first one.  Page 32, Line

4            1410.

5       Q    (BY ATTORNEY SCHNEIDER)  What does Paul say at that

6            point?

7       A    All Chong told me was he said he ditched the gun

8            unintelligible.

9       Q    And how do you then respond?

10      A    He just said he ditched the gun.  I'm just going to

11           kind of tell Chue right here what's going on, because

12           he had just come back in.  And just so you know, Chue

13           truly does care about you and your family and what's

14           going to happen.  He truly does.

15      Q    Okay.  I'm just going to fast forward here a little

16           bit.  So you're on question one then.  Are you

17           continuing to fill Chue Thao in?

18      A    I am.

19      Q    And what did you say?

20      A    I said:  Chong came over to his house and said that I

21           fucked up.  And then said, I fucked up, I shot the

22           guy.

23                   ATTORNEY VISHNY:  I'm sorry.  What were

24           those line numbers?

25                   ATTORNEY SCHNEIDER:  1419 to 1420.

138

1                    ATTORNEY VISHNY:  Thank you.

2    Q    (BY ATTORNEY SCHNEIDER)  And then on Line 1424, what

3         do you say?

4    A    I say:  And he said after he did that at some point

5         he went over and told Joe Thor as well.  So Joe Thor

6         is also aware of what happened.

7    Q    And then -- and that was 1424 to 1425?

8    A    Correct.

9    Q    And then you continue to kind of go over with

10        Sergeant Thao what Paul had been telling you?

11   A    Correct.

12   Q    Starting on Line 1430, is there a reference to him

13        talking or you summarizing what he told you about

14        Chong and the gun?

15   A    Yes.  I say:  And his brother also said that he

16        ditched the gun someplace but he doesn't know

17        where.

18   Q    And then Chue asks you?

19   A    Which brother.  And I said:  Chong.

20   Q    We go to Page 33 -- and Paul is present while you're

21        talking about this with Sergeant Thao?

22   A    Sitting right there with us.

23   Q    So then on Page 33, Line 1441, Paul gives another

24        comment about the gun.  And what does he say there?

25   A    He said:  He never gave me a location but just said

139

1          that he ditched it.

2    Q    Then if we can flip to the 11:58 interview.  Page 8

3          please.

4    A    Okay.

5    Q    Starting on Line 341, Page 8, there is a question

6          asked.  And what's that question?

7    A    Right.  He say he shot the guy.

8    Q    And what was Paul's response?

9    A    Yeah.

10   Q    And the next question from an officer?

11   A    Okay.  He said that to you guys.

12   Q    And his response?

13   A    Yeah.

14   Q    What is asked of him next then?

15   A    Okay.  What else did he say that now needs -- pardon

16         me again.  Okay.  What else did he say that what now

17         he needs to do next.  There has to be something.

18   Q    And then I'm going to just look at this.  Sergeant

19         Schira, that would be you, so that first comment was

20         made by Sergeant Thao?

21   A    Yes, ma'am.

22   Q    And then Sergeant Schira says what?

23   A    I said:  Was he planning on running, was he -- what

24         was he planning on doing.

25   Q    And what did he say?

                              140

```
 1   A   He said he was planning on running but I told him, if
 2       you're so hard, why you gonna run.
 3   Q   How did he -- can you continue his answer?
 4   A   He was like, well I fucked up.  I shot him.  I got to
 5       run.
 6   Q   And again on Page 363 -- I'm sorry, not -- Page 9,
 7       Line 363.  Do you ask him about the gun again?
 8   A   I do.  Okay.  Did -- when you said that he dumped the
 9       gun, what do you think he did with it.
10   Q   And what was Paul's answer?
11   A   He said he just ditched it.
12   Q   And the series of comments and questions and answers
13       came before you asked him to write the statement,
14       correct?
15   A   Yes, ma'am.
16   Q   And came before that section you were asked about on
17       cross where you summarized to him?
18   A   Yes, ma'am.
19   Q   I just want to go through a couple more things with
20       you, Sergeant Schira.
21           I'm going to have you just look at the 11:58
22       a.m. transcript in time.
23               ATTORNEY VISHNY:  Page?
24               ATTORNEY SCHNEIDER:  We're going to go to
25       Page 6.
```

141

```
 1                    ATTORNEY VISHNY:  Line?
 2    A    Okay.
 3                    ATTORNEY SCHNEIDER:  239.
 4    Q    (BY ATTORNEY SCHNEIDER)  So you were asked on cross,
 5         and if you need to start reading at the top of the
 6         page just to give yourself a frame of reference what
 7         you're talking about with him and just tell me kind
 8         of when you're done with that.
 9    A    Okay.  Okay.
10    Q    So at that point you're talking to him about asking
11         for his help, looking for anything else he can do to
12         help you, get physical evidence.  That's where you
13         make the comment about getting rid of the case to
14         show it was you, it was your brother.  When you say
15         that, getting rid of the case to show it wasn't you,
16         that it was in fact your brother, do you think Paul
17         had any understanding of the elements of offenses at
18         all?
19    A    No.
20    Q    Is that something said in a way that he would
21         understand?
22    A    Street vernacular, yes.
23    Q    So after that Paul makes an offer to you, right?
24    A    Yes.
25    Q    And what does he say?
```

```
1   A    What he says is --

2   Q    And this would be Line 239, just for the record.

3   A    Oh, man.  Well the only evidence I can get if I went

4        straight up to Chong and talked to him like, you

5        know, look, Chong.

6   Q    And what is said in response to him?

7   A    To go talk to him.

8   Q    And what does he say?

9   A    Yeah.

10  Q    So at that point he had offered to go talk to Chong

11       for you potentially?

12  A    Yes.

13  Q    But there was no ability to do that?

14  A    He was in the -- he was -- yeah.  He was locked up.

15  Q    Were you aware at any point, Sergeant Schira, that

16       while at Norka Paul brought up the topic of the

17       e-cigarette?

18  A    No, I was not aware of that.

19  Q    So when you're asking him in this interview at APD

20       about the item in his hand, you didn't realize he had

21       already mentioned an e-cigarette?

22  A    I did not know that.

23  Q    Okay.  And even if we have phone records, if we have

24       a phone record and we show a call was placed to

25       another number, does it truly tell us who was on
```

143

```
1          either the calling end or the receiving end?
2     A    I believe it does not.
3     Q    In your past experience, do people always carry just
4          their own phones?
5     A    Not always, no.
6     Q    And even if we had records to show that there was a
7          lengthy call at any given time, we don't know who is
8          on either end, whether it's a two-minute call or a
9          30-minute call?
10    A    Again, I'm not an expert in that area, but I believe,
11         no, it's simply the length of time.
12    Q    And this -- this group of people that we're talking
13         about, whether it be Alyson Blom, Joe, Paul, Phong,
14         Chong, even Lisa Stutzman, Hu Lee, you're all aware
15         of all of those people, correct?
16    A    Yes.
17    Q    Bobby Jo Stutzman?
18    A    Yes.
19    Q    They all knew each other, and many of them were
20         related, correct?
21    A    That was the difficulties in this case.  They all
22         knew each other.
23    Q    So probably communicated with each other regularly
24         I'm told?
25    A    Yes.
```

144

1              ATTORNEY SCHNEIDER:  I don't have any other

2        questions.

3              THE COURT:  Recross.

4              ATTORNEY VISHNY:  Thank you.

5          Can I have the 12:41 transcript please?

6              THE WITNESS:  Ma'am, do you want these

7        back?

8              ATTORNEY SCHNEIDER:  Just leave them right

9        up there.

10              ATTORNEY VISHNY:  Can you please put them

11        in front of you?

12              THE WITNESS:  Sure.

13              ATTORNEY VISHNY:  Okay.  I promise to be

14        short.

15              THE WITNESS:  You can take as much time as

16        you'd like.

17              **EXAMINATION OF JOHN SCHIRA**

18        **BY ATTORNEY VISHNY:**

19   Q    Now, all right.  Miss Schneider was asking you some

20        questions to show you that -- or I think, if I

21        understood the point, that Paul Lee mentioned that

22        the victim Joshua Richards had been shot from the

23        left side so that Chong would have to be approaching

24        that way, right?

25   A    I believe so, yes.

1    Q    Okay.  So let's go back to where that is in the

2         transcript.  Looking at Page 42, starting with Line

3         1869, right after Paul says, I heard the shot and I

4         ran -- that's why I ran -- Q1 is you, right?

5    A    I -- I don't know.

6    Q    Yeah.  This is the transcript at 12:41 a.m., and

7         you're Q1?

8    A    Okay.

9    Q    And you say:  Sure, and you don't see Chong, you

10        don't see him.  And Paul says:  No, I don't see

11        nobody.  You say:  But you think he's on this -- he's

12        over on this side.  This is while you're working with

13        the diagram, right?  That's what Miss Schneider asked

14        you and you said you believed that's what was going

15        on?

16   A    Yeah.

17   Q    Answer:  He told me he came through the bar.

18             Question:  All right.  So that would have put

19        him -- if I'm Josh, Chong is Chong, that would have

20        put him on the right side.

21             Answer:  Um-hum.

22   A    You know, I'm glad you brought that up because

23        actually I made a mistake there and if you keep

24        going --

25   Q    So you make a mistake, you suggest one thing, he

146

1        agrees with you, and then when you suggest the other

2        thing, and then he agrees with you then, right?

3    A   No.  I think actually Chue corrected me because I was

4        on the wrong side.  If you go in, you can see that I

5        acknowledge that I made a mistake.

6              ATTORNEY SCHNEIDER:  What line was that

7        that you started at if I can ask?

8              ATTORNEY VISHNY:  I started at Line 1869.

9        I'm planning to go to 1915 which is the next page.

10   Q   (BY ATTORNEY VISHNY)  So you're getting a little

11       ahead of me there.

12   A   Sorry.

13   Q   So you said that would have put him right side.  He

14       says:  Um-hum.  And then Chue says:  He should be

15       on -- so he's facing you so he -- and then you say:

16       Oh, I'm sorry.  I'm (sic) right.

17             ATTORNEY SCHNEIDER:  It's you're right, not

18       I'm right.

19   Q   You're right.

20       Okay.  So then Chue says:  So I come this way.

21       And you say:  So.  And then Sergeant Thao says:  I'm

22       Chong.  I'm coming this way.  And you say:  Yeah,

23       right.  So it's like --

24       Answer:  He had already bum rushed me.  I was

25       like --

147

```
 1            Question:  So he bum rushes you.
 2            And that's referring to Josh Richards there,
 3       right?
 4    A   Yes, ma'am.
 5    Q   Okay.  He says:  Yeah.  And then Sergeant Thao said:
 6        And then Chong comes through there.  And he says:
 7        From the bars.  And Chong -- I'm sorry.  And you say:
 8        And then Chong comes through there.  And he says:
 9        From the bars.  And he says:  Yeah, and I was right
10        like right at the wall.  I was like over there.
11        Okay, you say.
12            Answer:  I was right over here like this.
13            Answer -- you say:  Okay. Paul says:  And the
14        next thing you know, boom, he falls and I say, oh, my
15        God.  And you say:  So he goes down.  Okay.  So it's
16        the left side which is important.  And then he agrees
17        with you.
18    A   No.  Actually, that's not how it happened.
19    Q   Well, I just read the transcript.  Do you disagree
20        that this is what's on the piece of paper?
21    A   Because the video -- if you were to watch the video
22        it would show that I was facing the wrong way.
23        That's why I said it's important to be on the left
24        side.
25    Q   Right.  So you told him it was important to be on the
```

148

1       left side, didn't you?

2    A  That I made the mistake of being in the wrong

3       direction, yes.

4    Q  Okay.  And so when you change your direction, he

5       changes his direction, right?

6    A  No, because I was -- when we're doing this we're all

7       standing up and I'm having him demonstrate where he

8       was standing, but because I'm not that smart I was

9       facing the wrong way and Chue picked up on that and

10      corrected me.

11   Q  Now, Miss Schneider was also going through

12      extensively questions that Paul had made these

13      statements that Chong Lee had come and told him about

14      the shooting, right?  She went through a number of

15      examples with you that I'm not going to belabor right

16      now on redirect.

17   A  For --

18   Q  That Chong had come to his brother Paul and said I

19      fucked up.

20   A  Yes.

21   Q  Basically confessing that he had shot the guy,

22      right?

23   A  Correct.

24   Q  And so actually there was a change in those because

25      the first time he's telling you all those things,

149

1      Paul is saying, well, that happened at my house on
2      Monday, right?  The first set of questions that
3      refers to that, right?
4   A  Yes, ma'am.
5   Q  And then later he changes his story and says, well he
6      went to Joe's, Joe knows about it, right?
7   A  Correct.
8   Q  And then later he changes his story again and says he
9      came over to Joe's and Phong was there too and he
10     told all three of us at the same time, right?
11  A  That's not unusual.
12  Q  Yeah.  Some people might call that a growing story,
13     correct?
14  A  I've never heard that expression.
15  Q  Okay.  And eventually he wrote that statement out?
16  A  He did that at the end, yes.
17          ATTORNEY VISHNY:  Nothing further.
18       One minute.  I think Mr. Weitz thinks I've
19     forgotten something important.
20  Q  (BY ATTORNEY VISHNY)  And one other thing I forgot,
21     very briefly, I'm not going to use any paperwork on
22     this.
23       Joe Thor -- you went through with me and then
24     later with the prosecutor about all these things Joe
25     Thor said about how scared he was and it wasn't Paul,

150

```
 1        it wasn't Paul, right?

 2   A    Yes, ma'am.

 3   Q    But notwithstanding what Joe Thor said, Paul Lee got

 4        arrested the next night, didn't he?

 5   A    Not for the homicide.

 6   Q    Well, the next night you're aware he was talked to at

 7        Norka, right, by Sergeant Rabas and Sergeant Thao?

 8   A    I was aware that they talked to him but not

 9        specifics.

10   Q    Were you aware that at the end of talking to him and

11        him vigorously denying doing this and after being

12        told repeatedly he was looking at life that they

13        slapped handcuffs on him and brought him down to the

14        station in custody?

15   A    Slapped?

16   Q    Well that's my terminology.  Put handcuffs on him.

17   A    I knew that he was taken into custody and transported

18        to Appleton Police Department.

19   Q    Taking into custody, that means you're under arrest,

20        right?

21   A    Yes.

22   Q    You're not free to go, right?

23   A    Yes, correct.

24   Q    So no matter what got said in that interview at

25        Norka --
```

1  A  I'm sorry.

2  Q  -- he was placed under arrest and taken down to the

3     Appleton Police Department, right?

4  A  I don't know if he was under arrest or detained,

5     quite honestly, I don't know specifics on that.

6  Q  Let's use your word.  He was detained, meaning he

7     couldn't leave, correct?

8  A  Correct.

9  Q  And he couldn't leave after telling you at 12:41 a.m.

10    that it was his brother Chong who said that he had

11    F'd up, right?  He couldn't leave then?

12 A  No, correct.

13 Q  He couldn't leave after the 2:19 a.m. conversation,

14    right?

15 A  The 2:19.  Correct.  Yes, ma'am.

16 Q  And then there was the 11:58 a.m. conversation,

17    right?

18 A  Correct.

19 Q  And only once you got his written statement from him

20    and took the pictures and all the things you guys

21    needed to do, then he was allowed to leave at 1:17

22    p.m. and driven home.

23 A  Actually I think at the beginning of the last

24    interview that I did with him, I told him that he --

25    he was going to be going home.

152

1   Q    Right.  But the time when he was allowed to go home

2        was at 1:17.

3   A    I believe so, ma'am.

4             ATTORNEY VISHNY:  Thank you.  Nothing

5        further.

6             ATTORNEY SCHNEIDER:  Just one follow-up.

7                 **EXAMINATION OF JOHN SCHIRA**

8   **BY ATTORNEY SCHNEIDER:**

9   Q    Do you have the 12:41 a.m. transcript in front of

10       you?

11  A    No, ma'am.  She took them.

12            ATTORNEY VISHNY:  No.  It's right here.  I

13       had brought them here.

14            ATTORNEY SCHNEIDER:  Okay.

15  Q    Okay.  I'm going to direct your attention, I have one

16       question about that sequence that Attorney Vishny

17       asked to you about where you're trying to stand and

18       describe what happened.

19  A    Yes.

20  Q    Okay.  So she went through on Page 42 into 43 where

21       people were, what direction they were coming from,

22       correct?

23  A    Correct.

24  Q    That sequence starts with Paul describing what on

25       Page 1875?

153

1    A    Saying --

2                   ATTORNEY VISHNY:  Line?

3                   ATTORNEY SCHNEIDER:  Line 1875, Page 42.

4    A    Paul saying he told me he came through the bar.

5    Q    Okay.  And then you tried to figure out where

6         everybody else was?

7    A    Right.  And what I was trying to explain is that I

8         was simply -- I was facing the wrong direction when I

9         -- when I was doing that with Paul.

10   Q    Okay.  But it started by Paul saying he told me he

11        came through the bar?

12   A    Yes.

13                  ATTORNEY SCHNEIDER:  Nothing further.

14                **EXAMINATION OF JOHN SCHIRA**

15   **BY ATTORNEY VISHNY:**

16   Q    And regardless of whether or not somebody comes

17        through the bar, whether or not the victim was shot

18        in the right or the left would be de -- depend on the

19        relationship to the victim and the shooter, right?

20   A    Yes, ma'am.

21   Q    So it doesn't really matter that he -- somebody came

22        from the bar.  If the victim was facing away from the

23        bar and shot on the left face, the shooter would

24        actually have to walk around to shoot him on the left

25        side, right?

154

407-154

1    A    That's incorrect.  The victim from our statements was

2         actually facing north, facing towards the bar which

3         would expose the left side of his head which Chong

4         came from.

5    Q    Well, you had a number of different statements and

6         different diagrams from people about where the victim

7         was located, correct?

8    A    No.  When speaking with Paul and Joe, and not so much

9         Phong but those two, the directions were good, and

10        especially Paul's as far as, you know, which

11        direction they were facing.

12   Q    Well, as far as directions were good, you think

13        they're good, but they could have made it up,

14        right?

15   A    They may have.

16   Q    Yeah.  Okay.  So the guy could have been facing any

17        way as far as you know scientifically because there

18        is no video camera to show which way he was facing.

19   A    That's why you always try to corroborate and verify

20        information.

21   Q    And if he was facing more towards the front door and

22        Paul was over to his left more against the wall and

23        Paul shot him, Paul would be facing his left side of

24        his face, right?

25   A    Okay.  Now you got me confused.  This is what

155

1      happened last time.

2    Q   This is Exhibit 1, if I've got the right thing.  Yup.

3        Okay.  So this is to scale, Exhibit 1 is this to

4        scale drawing.  All right.

5            So if Paul is here by this half wall with Phong

6        and Joe behind him, he's facing in this direction,

7        correct?

8    A   Paul?

9    Q   Yeah.  I'm asking you.  Paul.  If -- if Paul is in

10       the area where I'm putting my finger, all right --

11   A   Um-hum.

12   Q   -- and Joe and Phong are to his right and left and a

13       little behind him, and Paul is like holding his arms

14       out kind of like protecting them almost after

15       punching a guy, and he's doing that, then Paul could

16       be facing in this direction, correct?

17   A   Paul could be, yes.

18   Q   Yeah.  And you see here where somebody put V for

19       victim right here?  Do you see this on the map where

20       it says Tou Shoua and then there is an X and the word

21       -- and the letter V written next to it?

22   A   Ma'am, I don't know who put that there, and I don't

23       know what that means.

24   Q   I'm asking you what you know, I'm asking what you see

25       on this.

156

```
1    A    From my information, that's not where the victim
2         was.
3    Q    Right.  But I'm asking you if you're seeing
4         something.  Look, you're under sequestration, you
5         don't know what other witnesses said in court,
6         right?
7    A    Right.
8    Q    So I'm showing you this, and what I'm saying is if
9         Paul is facing this way, meaning to the left of this
10        diagram, and the victim is in front of him, correct?
11   A    I see what you're saying, yes.
12   Q    Yeah.  And Paul could shoot him on the right or the
13        left side or anybody could shoot him on the right or
14        the left side from there?
15   A    But that's contrary to the information that I know.
16   Q    Well, I know it's contrary to what you know.
17   A    So I'm not going to -- I'm not going to agree to that
18        because that's contrary to what I know.
19   Q    You can agree that whether somebody is shot in the
20        right or left side doesn't matter what direction the
21        bar is, it matters which way people are facing,
22        right?
23   A    Well it depends if the person is coming -- which we
24        believe was coming from the bar then it is
25        important.
```

157

1    Q    We're not talking about your belief.  All right?

2    A    Okay.

3    Q    What we're talking about isn't your belief.  Look.

4         If you had a gun in your hand and you shot me right

5         now, it's fair to say you would shoot me on the right

6         side, right?

7    A    Correct.

8    Q    If you have a gun in your hand and you shoot me right

9         now, you would shoot me on the left side?

10   A    But your argument is based off of where you're saying

11        the victim is.

12   Q    Do me a favor and answer my question.  Okay?  I'm not

13        saying where the victim is.  I wasn't there.

14        Witnesses are saying different things.  Do you

15        understand that?

16   A    Yes, ma'am.

17   Q    You weren't there either, right?

18   A    Correct.

19   Q    Didn't see it happen?

20   A    Correct.

21   Q    No video?

22   A    Correct.

23   Q    So you're relying completely on the statements of

24        people like Paul, Joe and Phong, right?

25   A    Yes, ma'am.

158

1    Q    And you would agree if I'm facing this way you would

2         shoot me on the left, right?

3    A    Yes, ma'am.

4              ATTORNEY VISHNY:  Nothing further.

5              THE COURT:  Attorney Schneider?

6              ATTORNEY SCHNEIDER:  No questions.

7              THE COURT:  Members of the jury?  Very

8         good.  Attorneys may approach.

9              (Bench conference.)

10             THE COURT:  Okay.  I have some questions

11        for you.

12             Was Paul left by himself to write the statement

13        that was highlighted on the overhead?

14             THE WITNESS:  Chue Thao left.  I was

15        actually doing paperwork so I was in the room with

16        him while he was doing that.  I never spoke with him,

17        never talked to him.  That's on video.

18             THE COURT:  All right.  How long were the

19        interviews with Paul that you felt it necessary to

20        give a summary of what was covered?

21             THE WITNESS:  There were two interviews

22        with Paul.  The first I believe was an hour and

23        fifteen minutes long, the second one was an hour and

24        five minutes long, but the -- there was a big break

25        between them.  I want to say eight hours between

159

1    those interviews.

2            THE COURT:  Is it common practice of yours

3    to do this with a witness?

4            THE WITNESS:  I do this every time.

5            THE COURT:  In your firearm experience, how

6    does a semi-auto discharge a spent round and fly

7    away?

8            THE WITNESS:  What happens is the -- it's a

9    gas operating system.  When a round goes off, that

10   gas operates the slide.  The slide slides back, there

11   is a thing called an ejector or an extractor, and

12   what that does is grabs a casing, pulls that casing

13   out, expends that casing out the side of the gun, and

14   then as the slide comes back the spring picks it up

15   and it picks up another round and feeds it into the

16   chamber.  So that's why they call it a semi-automatic

17   gas report operating system.

18           THE COURT:  Is there any other cameras on

19   College Avenue and the corner by Luna outside or

20   around Sharks?

21           THE WITNESS:  I believe there are but

22   that's not my area of expertise.  That would be

23   Sergeant Rabas who really looked at all the camera

24   systems.

25           THE COURT:  Did Joe Thor at any time say

160

1     Paul Lee was the shooter, not he could have or maybe,

2     but was the shooter?

3              THE WITNESS:  Did Joe Thor ever say that

4     Paul Lee was the shooter?

5              THE COURT:  I can read the question again.

6              THE WITNESS:  Please.

7              THE COURT:  Did Joe Thor at any time say

8     Paul Lee was the shooter, not he could have or maybe,

9     but was the shooter?

10             THE WITNESS:  No.  It was the exact

11    opposite.  He was adamant that he wasn't the shooter.

12             THE COURT:  Were any firearms, bullets or

13    accessories found when searching Chong's residence?

14             THE WITNESS:  I don't believe so, no.

15             THE COURT:  Does that prompt any additional

16    questions, Attorney Schneider?

17             ATTORNEY SCHNEIDER:  Just one question, and

18    I might lead a little bit.  I think I know the

19    intent.

20            **EXAMINATION OF JOHN SCHIRA**

21    **BY ATTORNEY SCHNEIDER:**

22    Q    When a semi-automatic, a bullet is fired, the actual

23         projectile we call the bullet, right?

24    A    Yes.

25    Q    And then the casing remains and that's ejected from

161

1      the firearm in some fashion, correct?

2   A  Correct.

3   Q  Is there any way to tell all of a certain make eject

4      to the right, to the left, forward or back?

5   A  The majority of firearms are designed for

6      right-handed shooters meaning that the ejection port

7      is on the right side so it throws the round to the

8      right, but there are some exceptions.

9   Q  Okay.  And we don't know whether they go forward or

10     back when they're ejected?

11  A  Again, really based off the manufacturer.  Some of

12     them are designed to do a 45-degree angle, some are

13     90-degree angle, but the majority of them are in

14     between that.

15  Q  And the area -- if you go back to yesterday with me,

16     the area where this occurred, the foyer area, I

17     talked about a mass exodus of people.  Do you

18     remember that?

19  A  I do.

20  Q  So at the point after the shooting, there is a bunch

21     of people who go walking or running through that

22     foyer area.

23  A  Correct.

24          ATTORNEY SCHNEIDER:  Nothing further for

25     follow-up.

162

1                    THE COURT:  Attorney Vishny?

2                    ATTORNEY VISHNY:  No questions.

3                    THE COURT:  All right.  Thank you, sir.

4          And let me ask this, members of the jury, and I

5     -- I defer to you on this, are you okay with a

6     45-minute lunch or would you prefer an hour lunch?

7     And I'm fine either way.  Is anyone strongly opposed

8     to a 45-minute lunch?

9                    (No response.)

10                    THE COURT:  Okay.  Very good.  So what I

11     will do is I'll ask that everyone be back here at

12     about 1:40.  Okay?  Thank you.

13          Please rise for the jury.

14                    (The jury was escorted out of the

15     courtroom.)

16                    THE COURT:  There were -- and the gallery,

17     you're free to be seated or leave or whatever you

18     would like to do, we just have a few housekeeping

19     items.

20          There were two sidebars during this session, one

21     related to Chong Lee never being asked about a

22     statement.  That was clarified in a subsequent

23     question, it was moved on.

24          There was a second objection related to some of

25     the questioning of Sergeant Schira on redirect about

163

1    going into some of the witness statements.  I

2    overruled the objection with the further

3    understanding that not a great amount of time be

4    spent on those subjects.  The court -- or the State

5    did comply with that request.

6        That's a summary of the two sidebars as I best

7    recall.

8                ATTORNEY VISHNY:  Yes.

9                ATTORNEY SCHNEIDER:  Yes, Judge.

10               THE COURT:  The easier -- so then we have

11   two other issues.  One relates to Sergeant Thao and

12   Sergeant Rabas being present during their respective

13   testimonies.  What I'm going to do is indicate that

14   when there is a subject matter where they were both

15   involved that the other be excluded from that, and,

16   likewise, I don't know who's questioning on defense,

17   if, Attorney Vishny, if you just let me know when

18   you're getting into that subject matter, I'll ask

19   the --

20               ATTORNEY SCHNEIDER:  But let me ask this.

21   Let's say it's Sergeant Rabas's interview but

22   Sergeant Thao wasn't there.  Can we have it so

23   Sergeant Thao remains in the room for that part and

24   Sergeant Rabas leave?  That's what I would like to

25   do.

164

1                    ATTORNEY VISHNY:  Say it again once.  I
2         don't think I understand.
3                    ATTORNEY SCHNEIDER:  So who's testifying?
4                    ATTORNEY VISHNY:  Trainum.
5                    ATTORNEY SCHNEIDER:  Oh.
6                    THE COURT:  I didn't get to that part
7         yet.
8                    ATTORNEY SCHNEIDER:  He's just talking
9         about --
10                    ATTORNEY VISHNY:  I thought that's what we
11         were talking about.
12                    ATTORNEY SCHNEIDER:  Their being in for
13         each other.
14                    THE COURT:  There was a request that one be
15         out during the other.
16                    ATTORNEY SCHNEIDER:  So it really would be
17         the Paul Lee interview at Norka is the interview they
18         overlapped on.
19                    ATTORNEY VISHNY:  Right.  But what I'm
20         asking is that when James Trainum testifies, and he
21         is the next witness out of order, that because he is
22         out of order, I am requesting that when he testifies
23         regarding interrogations done by Sergeant Rabas, he
24         be out of the room, and that when he does them about
25         Sergeant Thao, that Sergeant Thao be out of the room.

165

1     However, there will be one where they were both in

2     and that I -- my request was that they both not be in

3     the room at that time and that Miss Schneider have a

4     different court officer assist her if she needs one

5     during that particular time.

6          THE COURT:  How -- how -- the earlier part

7     I'm not as concerned about as a practical matter.  I

8     think it would be very difficult to get a different

9     court officer, that's my concern.

10          ATTORNEY SCHNEIDER:  It would be in terms

11     of how we prepped and what we've done, it would be.

12     And -- and I understand they're going out of order,

13     but had they finished and then he testifies, they

14     would be in the courtroom, and then I could call them

15     for rebuttal if I needed to.  So I might end up

16     moving what would have been questions in rebuttal in

17     my direct, but she still gets to cross them on that.

18     So I'm going to ask that they be allowed to stay.

19          THE COURT:  How much time is -- how much

20     time is going to be when they're both involved?

21          ATTORNEY VISHNY:  There is only one

22     interview where they're both involved, and that's the

23     Norka interview by Sergeants Rabas and, you know, I

24     don't know how long it's going to -- I don't know how

25     long it's going to take.  I have to look at my notes

166

1    to see how many questions I have about that.  Let me

2    just see like compared to how many pages I have.

3              THE COURT:  Okay.

4              ATTORNEY SCHNEIDER:  And even that

5    interview, they weren't both there the full hour and

6    fifteen minutes because Sergeant Thao was talking to

7    Michael Xiong, so I think it's about half an hour,

8    the last half hour they were there together.

9              ATTORNEY VISHNY:  Well then I would ask

10   that Sergeant Thao be able to be permitted in the

11   courtroom then and Sergeant Rabas be the one who

12   steps out if Miss Schneider has one court officer.

13   Let me just say that that particular part of my

14   direct is not that long.  It takes up about a third

15   to a half of a page.

16             THE COURT:  This isn't the one -- didn't

17   you say you have a 22 page?

18             ATTORNEY VISHNY:  That was something else.

19   I have a seven-page direct because we -- my pages are

20   less because the witness is doing more of the

21   talking.

22             THE COURT:  Right.

23             ATTORNEY VISHNY:  Not me.

24             ATTORNEY SCHNEIDER:  So --

25             THE COURT:  What I'll do is when -- when

167

1          they're both there, Sergeant Thao may be present, and
2          then when it's individual, I'd ask that --
3                    ATTORNEY SCHNEIDER:  You want them to go in
4          and out?
5                    THE COURT:  That's what we're doing when --
6          no, we're not.
7                    ATTORNEY SCHNEIDER:  No.  Well, when
8          Sergeant Rabas is talking and we start talking about
9          Appleton Norka --
10                   THE COURT:  Let me ask this.  I mean, the
11         -- Attorney Vishny, I dealt with it as a practical
12         matter, if -- if we had had the ability to have Mr.
13         Trainum in order, Sergeant Rabas would have already
14         testified.
15                   ATTORNEY VISHNY:  That's right.  But then I
16         would have cross-examined Sergeant Rabas already
17         about his interrogation techniques, and I haven't had
18         the opportunity to do that, and it's that
19         cross-examination that I'm going to do that I -- the
20         points I would bring out are what are going to be
21         testified here, you know.
22                   THE COURT:  That's fair enough.
23                   ATTORNEY SCHNEIDER:  And all I would do is
24         call him in rebuttal if I needed to clarify something
25         if I thought their interrogation techniques -- to me

168

1     I don't think it's any different than having them
2     in.
3                THE COURT:  I'm going to grant the request
4     in part.  When it's questioned about Sergeant Rabas,
5     Sergeant Rabas should be out.  When it's Sergeant
6     Thao, Sergeant Thao should be out.  But when it's
7     both, Sergeant Thao can remain so that you always
8     have a court officer.
9                ATTORNEY SCHNEIDER:  Okay.  I think I
10    understand.  We only have 45 minutes for lunch.
11               (Lunch recess.)
12               (The jury was escorted into the courtroom.)
13               THE COURT:  Please be seated.
14         And my understanding, ladies and gentlemen, just
15    to briefly explain to you, our next witness is
16    actually a witness that will be or is being called by
17    the defense.  Because of his unavailability, the
18    parties have agreed that he may go out of order.  So
19    just so that you understand when Attorney Vishny is
20    asking questions first, that's the explanation.
21         So, Attorney Vishny.
22               ATTORNEY VISHNY:  Thanks.  I call James
23    Trainum.
24               THE CLERK:  Please raise your right hand.
25               (Oath administered to witness.)

169

1                    THE WITNESS:  I do.

2                    THE CLERK:  Please state your full name and

3       spell it for the record please.

4                    THE WITNESS:  James L. Trainum, spelled

5       T-R-A-I-N-U-M.

6                    THE COURT:  Okay.  And you may be seated,

7       sir.  And then the only thing I would ask before

8       turning it over to counsel is if you could adjust the

9       microphone so that -- the acoustics in here aren't

10      fantastic, so if you could adjust the microphone,

11      that would be appreciated.

12                 THE WITNESS:  Testing.

13                 THE COURT:  Okay.  Attorney Vishny.

14                 ATTORNEY VISHNY:  Thank you.

15             **EXAMINATION OF JAMES L. TRAINUM**

16    **BY ATTORNEY VISHNY**:

17    Q    I think you stated your name.

18         Can you tell the jurors what your occupation is?

19    A    I'm currently a retired D.C. police officer.  I work

20       as a combination consultant, teacher and writer.

21    Q    I'm going to ask you some questions about your

22       qualifications, but before I do that, I'm showing you

23       what's been marked as Exhibit No. 190.

24    A    Yes.

25    Q    Can you please tell the jurors what that is?

1    A    This is a copy of my resume.

2    Q    Okay.

3                ATTORNEY VISHNY:  Thank you.  I'd move

4         Exhibit 190 into evidence.

5                ATTORNEY SCHNEIDER:  No objection.

6                THE COURT:  Exhibit 190 will be received.

7    Q    (BY ATTORNEY VISHNY)  Can you tell the jurors about

8         your particular experience with -- as a metropolitan

9         police department officer in Washington D.C.

10   A    I was hired by the D.C. Police Department back in

11        1983, and I did the normal thing like every other

12        officer did, I worked routine patrol.  I then went

13        with an investigative group called repeat offender

14        project in '86.  Soon after that I ended up in

15        homicide.  That was in 1993.  And I spent the rest of

16        my career there until I retired in March of 2010.

17             The last several years I was assigned to

18        homicide, I was in the major -- what they call the

19        major cold case unit, and as part of my

20        responsibilities there, I created a program, or we

21        were using college interns to do a systematic review

22        of all homicide cases going back into the early

23        1960s.  What we were doing was not only looking for

24        cold cases that had gone unsolved and trying to see

25        whether or not we could resuscitate any of them, but

171

```
1          we were looking for issues with investigations in
2          general that we could identify in order to help
3          assist with the future investigations.
4    Q     Now I'm going to ask you specifically about your
5          experience in criminal interrogation as it refers to
6          homicide interrogations.  About how many homicide
7          interrogations do you believe you've done?
8    A     Well, probably under 50, I would say.
9    Q     Okay.  And what about criminal interrogations
10         altogether?
11   A     Interrogations altogether, well more than that,
12         probably over a hundred.  You just don't interrogate
13         that many suspects.  You have a tendency to deal more
14         with uncooperative witnesses and you deal with
15         probably several hundred of those.
16   Q     Okay.  So it would be -- so the lower number you're
17         giving me, as I understand it, is suspects, the
18         higher number is uncooperative witnesses?
19   A     That's correct.
20   Q     And did you receive any training on interrogation
21         while you were a law enforcement officer?
22   A     Yes, I did.
23   Q     Can you tell the jury what that is?
24   A     I received training through the FBI Academy on
25         interview and interrogations, I attended the basic
```

172

1          and advanced Reid interrogation courses.  I received

2          a couple of in-service trainings through my own

3          department on interview and interrogation, and I

4          attended various seminars, homicide conferences,

5          things like that where they taught maybe half a day

6          to full day segments on interview and interrogation

7          tactics.

8     Q    When you say Reid, first of all, that's spelled

9          R-E-I-D?

10    A    That's correct.

11    Q    When you say Reid interrogation, I don't think the

12         jurors really are familiar with that.  Can you

13         explain to them what that means?

14    A    I apologize.  Sometimes fall into slang and I need to

15         explain further.  The Reid Institute is the largest

16         and oldest interrogation school here in the US, and

17         they teach a process that is known as the Reid

18         technique when it comes to interview and

19         interrogation.  It's a nine-step process, as they

20         call it, and basically, in my studies and research, I

21         have found that just about every single -- because it

22         is the oldest, it's been taught probably more than

23         any other technique out there, but all the other --

24         just about all the other interrogation schools here

25         in the country teach a version of what the Reid

173

1          technique is.

2     Q    Now, I will come back to talk about the Reid

3          technique later, but I'll return more to your

4          qualifications.  Have you caught -- taught any

5          courses regarding interviewing, interrogation or

6          matters related to law enforcement?

7     A    Yes.  While I was active with the D.C. Police

8          Department, I taught at the D.C. Police Academy.  I

9          also taught at the Richmond hom -- Richmond, Virginia

10         Homicide School.  I taught classes at the US

11         Attorney's office in D.C., mostly about

12         investigations and issues with statement evidence,

13         how to avoid things like problematic tactics and

14         statement evidence contamination.

15    Q    Have you specifically taught mostly on evaluating

16         confession evidence?

17    A    That's pretty much it, yes.

18    Q    And statement evidence?

19    A    Yes.  Well pretty much it's the same thing.  You kind

20         of evaluate both in the same manner.

21    Q    Have you taught this for both -- let me ask this.

22         The audiences that you've spoken to, what is the

23         variety of audiences that you've spoken to when

24         you've taught about interviewing, interrogation and

25         taking statements?

174

1    A    When I was working for the D.C. Police Department it
2         was probably half and half.  I taught some classes
3         for the public defender service.  Like I said, I've
4         taught some prosecutor classes and homicide school
5         classes and basic investigator classes.  Since then I
6         still continue teaching, it's -- most of it is for
7         defense attorneys, students with The Innocence
8         Project, things along that line, but I do have
9         programs that I taught down for supervisors, judges
10        and prosecutors in Texas, I've taught the Boston
11        prosecutor's office, the north homicide unit, the
12        Nevada Chiefs and Sheriff Association, I lectured
13        there.  That's just a few of the ones that I've
14        taught for.
15   Q    Okay.  In addition to your teaching, do you serve on
16        any committees, advisory boards or professional
17        organizations?
18   A    Yes, I do.
19   Q    And what would that be?
20   A    I'm a board member for the Mid Atlantic Cold Case
21        Homicide Investigators Association.  I'm a member of
22        the Vidocq Society, which is a society of
23        investigators from around the country that meet to
24        consult on cold cases on a voluntary basis.  The
25        International Association of Homicide Investigators,

175

1          the International Investigative -- International

2          Investigative Interviewers Research Group.  That's

3          kind of a mouthful right there.  I do volunteer work

4          doing case reviews for the National Center for

5          Missing and Exploited Children and also for the

6          Parents of Murdered Children.

7     Q    So is it fair to say that when you do your teaching,

8          you will teach for anybody who will bring you, it

9          doesn't matter if they're law enforcement,

10         prosecutors, defenses lawyers, judges?

11    A    That's correct.

12    Q    Have you conducted any research or published anything

13         regarding specifically in the area of interviewing,

14         interrogation and police and witness and suspect

15         interviewing?

16    A    Yes.  I'm the co-author of a chapter in this book

17         called Criminal Investigative Failures, and it's

18         basically a textbook for law enforcement and

19         attorneys on the issues that can lead to things like

20         unsolved cases, wrongful convictions, wrongful

21         arrest, and how to avoid them.  I'm the author of an

22         article that was published in the International -- in

23         the International Association of Chiefs of Police

24         magazine, *Police Chief*.  It's basically for

25         supervisors on how to evaluate confession evidence

176

1        and how to avoid contamination of confession

2        evidence.  And I have a book pending right now that

3        is out in July on police interrogation techniques and

4        how they can lead to false confessions, bad statement

5        evidence and how to avoid those issues.

6    Q   Have you testified previously in court?

7    A   Yes, I have.

8    Q   And approximately how many times have you been on a

9        witness stand in your life?

10   A   Probably several hundred in general.

11   Q   Have you testified -- now I'm assuming you testified

12       as a police officer?

13   A   That's a majority of it, that's correct.

14   Q   Okay.  Have you also testified as -- once you were in

15       your consulting practice?

16   A   Yes, I have.

17   Q   And would that be in both court and depositions?

18   A   Yes.

19   Q   Did you conduct a review of the homicide of Joshua

20       Richards?

21   A   Yes, I did.

22   Q   Did you review the police investigation?

23   A   I did.

24   Q   Can you tell the jurors what you reviewed in

25       connection with that?

177

```
 1   A    It was a lot of material.  Basically all the police
 2        reports, whatever video was out there, surveillance
 3        videos, still pictures, autopsy report, the witness
 4        statements transcripts, videos and audio transcripts,
 5        and also there were some charts of search warrants
 6        that were issued and things along that line.
 7   Q    Did you also review Mr. Chong Lee's statement?
 8   A    Yes, I did.
 9   Q    Did you review the statements of Phong Lee, Joe Thor,
10        Paul Lee and Tou Shoua Lee?
11   A    Yes, ma'am.
12   Q    And that was just part of what you reviewed, you
13        reviewed other people's statements as well?
14   A    That's correct.
15   Q    You reviewed Alyson Blom?
16   A    Yes.
17   Q    All right.  Have you also had an opportunity to
18        review transcripts of phone calls in which Chong Lee
19        is a person on the telephone calls?
20   A    Yes, I have.
21   Q    Have you also reviewed letters that Chong Lee has
22        written that were found in his jail cell?
23   A    Yes, I did.
24   Q    Or in other people's homes?
25   A    Yes.
```

178

1    Q    All right.  Let me ask you, Mr. Trainum, what is the

2         difference between an interview, a police interview

3         and an interrogation?

4    A    In the US we basically differentiate the two.  An

5         interview is a -- where you collect information from

6         like a witness or whatever.  It's not accusatory.

7         You basically ask them open-ended questions and try

8         to extract as much information from them as possible.

9         An interrogation is accusatory.  You basically have

10        decided that that person is either guilty or has

11        information that they're withholding, and it becomes

12        more of a monologue.  It's not open-ended questions,

13        you kind of -- it's more of a structured

14        conversation.  With an interview, the person who is

15        being interviewed does most of the talking.  In an

16        interrogation, it's typically the detective who is

17        doing 90 percent of the talking.

18   Q    How important is interviewing and interrogation in

19        police investigation work?

20   A    Well, when you look at -- there is an old adage about

21        three things that it takes to solve crimes,

22        witnesses, confessions and evidence.  Two of the

23        three involve talking to people and being able to get

24        information from them.  And you need to do it in such

25        a way that that information is admissible, it's

179

1           reliable and it's accurate.  It's pretty much the

2           most important thing that we do, because as

3           detectives we do it just about every single day if

4           not multiple times a day.

5      Q    Now, what -- before I get to asking about accuracy

6           and reliability, what is the difference between what

7           you call interviewing and interrogation or

8           witness-based evidence?  Do you mean the same thing

9           as physical evidence?

10     A    Physical evidence such as DNA, shell casings, phone

11          records, computer records, things along that -- that

12          line.  It's a very general categorization.  Sometimes

13          they might bleed over back and forth, but witnesses,

14          it's things that people see, things that people hear,

15          and of course suspects, you consider them to be the

16          people who committed the crime.

17     Q    You were talking earlier about accuracy and

18          reliability.  Is there a difference between those two

19          words when it comes to police investigations?

20     A    Well, yes.

21     Q    And witness -- I'm sorry.  And witness statements?

22     A    It's -- it's all in the information that you get and

23          how you recover that information.  Statement evidence

24          and confessions -- and I should just use the word

25          statement evidence because it covers everything.  You

180

1    recover it pretty much the same way.  You have to be
2    careful in how you recover it.  It's like physical
3    evidence in that it can be contaminated so that it
4    becomes unreliable.  It might be accurate but it
5    won't be reliable.  If I talk about physical
6    evidence, as an example, let's say that I recover --
7    in a standing case I recover the victim's bloody
8    clothing and I recover clothing from the suspect and
9    the lab comes back saying that, lo and behold, the
10   victim's DNA is on the suspect's clothing.  Well,
11   that's an accurate piece of evidence because the lab
12   says that it was there, but is it reliable in
13   reference to this case.  When you go back and examine
14   how the evidence was recovered, you find out that I
15   as a lab technician, I recovered the bloody clothing
16   with the same pair of gloves that I recovered the
17   victim's clothing, the suspect's clothing, so
18   therefore I've cross contaminated it and it makes --
19   it brings the blood that's on the suspect's clothing
20   into question.  The same thing can happen with
21   statement evidence.  If you ask the wrong questions,
22   if you -- if you retrieve it the wrong way, you can
23   actually contaminate it and modify it and make it
24   unreliable.  It might still be accurate, but you just
25   couldn't show that it's accurate because of the way

181

1       that it was recovered.

2   Q   Now, when we apply these concepts of accuracy and

3       reliability, I'm going to talk about -- I'm going to

4       get into that, but let me just first ask, do you

5       think I've adequately asked you or is there anything

6       you want to add to how law enforcement is trained to

7       do interviews and interrogations?

8   A   Well, I basically was talking about the Reid

9       technique, and the point that I was bringing up is

10      that when law enforcement -- just about every single

11      law enforcement sponsored training that I received

12      out there is either the Reid technique or a variation

13      of the Reid technique, and so when researchers study

14      interrogation tactics and how interrogations are

15      done, they basically -- the number one school they

16      refer to is the Reid School.

17  Q   And have you personally reviewed not just Reid

18      interrogation but the other leading training methods

19      in the United States?  I think you said that before.

20      I don't want to be repetitive.

21  A   I've been -- I've been to some.  I also reviewed

22      their textbooks, their other literature.  They have a

23      lot of online websites, online training.  I went

24      through a ton of it.  I also have attended schools

25      internationally as well.  There is a system over in

182

1          the UK called investigative interviewing or PEACE,

2          PEACE is an acronym for the different steps, and I've

3          taken classes in that, and also I've reviewed the

4          training material from other countries as well.

5      Q   Okay.  We'll talk about that a little bit later.

6          What I want to say is can you explain to the jurors

7          kind of how a typical police interrogation

8          develops?

9      A   Sure.  Basically -- and these aren't the full nine

10         steps.  Like I said, I'm just going to give you a

11         general idea of how an interrogation is supposed to

12         go.

13              I've already determined as a detective that

14         you're either withholding information from me or that

15         I strongly feel that you're guilty.  I am supposed to

16         confidently accuse you of the crime.  I'm supposed to

17         say our investigation -- or something along this

18         line, our investigation has shown that the evidence

19         has proven that you've committed this crime.  I don't

20         want to hear anything else except why you did it.  I

21         want to understand why you did it.  At that point I'm

22         going to start offering you what they call themes,

23         different schools call them different things, but a

24         theme is supposed to be a psychological or a moral

25         justification as to why you did the crime.

1  Q   Now, can you explain what a theme -- a typical theme

2      would be, give an example of this psychological or

3      moral justification?

4  A   Sure.  Such as, let's say I'm investigating money

5      that was stolen out of a cash register.  A typical

6      theme might be that the business left it out and you

7      were tempted, like anybody would be tempted, and that

8      you're sorry for what you did, you feel remorse, that

9      sort of thing, and you were going to pay it back

10     anyway.  Those sorts of themes.  Like that.  Or like

11     an assault case, you just lost control because

12     somebody called you a racial epithet or something

13     along that line.  That would be a moral or

14     psychological justification that you would be allowed

15     to use.  If you don't bite on one theme, then I throw

16     out another theme or another theme until I find one

17     that you find acceptable that you're going to agree,

18     yes, you know, that's -- that's the reason I did it

19     and so I'm going to confess and tell you why I did

20     it.  If you try to deny, if you try to explain, if

21     you try to do anything else other than say I did it,

22     I'm supposed to block you.  So that's the difference

23     between an interview and interrogation.  With an

24     interview I'm getting information, with an

25     interrogation I'm trying to move you towards a final

1    goal of telling me what I think you should be able to

2    tell me.  So I'm blocking your denials, another

3    theme, another theme, blocking your denials, another

4    theme.

5        At some point I'm going to give you what we call

6    the alternative question.  Now, the alternative

7    question is going to be, listen, all the evidence

8    shows that you did it.  Like I said, you cannot

9    convince me that you didn't.  So either you did it

10   because of a really, really bad reason or a not so

11   bad reason.  It's one of the two, which one is it.

12   And typically a lot of times I'll put in a time

13   constraint to increase the pressure.  The time

14   constraint will be, look, you either did it because

15   you're a really, really bad person.  If that's the

16   case, I don't want anymore to do with you, I'm out of

17   here.  But if you did it because you're not so bad a

18   person, then people will understand and, you know,

19   we'll go from there.  At that point, if you bite and

20   you accept the lesser of the two themes, of course,

21   that's the admission.  After I get the admission,

22   that's not the confession, I'm then supposed to go in

23   and obtain those details about the crime that only

24   you would know, that only the person who was -- we

25   call them holdback details.  That's information that

185

1      I supposedly know about the crime that only the real

2      suspect or witness who was there would know.  Now,

3      I'm supposed to be able to get those from you and

4      then that's when I have the confession.

5   Q   All right.  You have been talking about this now in

6      terms of confessions.  Are these same techniques used

7      of interrogation as to witness statements as opposed

8      to just the alleged perpetrator?

9   A   Yes.  Pretty much the same thing.  They teach if the

10     witness is not being -- that you have determined that

11     the witness is not being cooperative, then you go

12     into interrogation mode and you use basically the

13     same tactics against the witness as you would a

14     suspect in order to get them to admit to what you

15     think is the truth and what you think they should be

16     able to tell you.

17  Q   Now, is there agreement among those who teach

18     interrogation or train in this area that there are

19     certain themes or techniques which are problematic?

20  A   Yes.

21  Q   What is -- is the feeling or what -- what in the

22     field do people feel are problematic interrogation

23     techniques?

24  A   Well there's a large body of research that thinks

25     that the entire approach that Reid has is

186

1     problematic.  But that's for another topic.  There is

2     agreement Reid and other interrogation schools, but

3     primarily Reid, has come to an agreement with the

4     interrogation and research experts as to problematic

5     tactics that should be avoided or not used at all.

6     One is any kind of real or imagined threat of any

7     kind of inevitable consequence.  I'm sorry, kind of a

8     mouthful for me right there.  You're not suppose --

9     you should not be saying that the evidence proves

10    that you were guilty, you will be found guilty no

11    matter what you say, you're going to go to jail for

12    life, the jury is going to convict you on this stuff.

13    That is not appropriate according to what the

14    interrogation schools and the researchers say.  In

15    conjunction with that, any implied -- real or implied

16    promise of leniency is -- should not be used as well.

17    I talk about a moral or psychological justification.

18    An improper one would be if you tell me what I think

19    is the truth, what I need to hear, then these bad

20    things won't happen, you know, the DA won't charge

21    you, you won't go to jail, I'll get you help, I'll

22    make sure that this goes away, you know, that sort of

23    thing.  So those two things combined is oftentimes

24    what causes people to give statements that they think

25    -- what ends up happening is that we create the

1     temporary perception that it's to your benefit to

2     tell the detective what they think is the truth in

3     order to escape that inevitable consequence and

4     receive that benefit.

5   Q   Now, I'm going to show you what's been marked as

6       Exhibit No. --

7   A   I'm sorry.  I have one more issue that I was going to

8       bring up.

9   Q   Sure.

10  A   What they call false evidence ploys, lying about

11      evidence.  The Reid technique or Reid people and

12      other interrogation schools recognize that the courts

13      allow detectives to do this, and so there -- because

14      even if you lie about evidence up to a point, it's

15      still admissible.  However, Reid recommends that you

16      avoid it for two reasons.  One is if you're lying

17      about evidence and you get caught, you lose your

18      credibility.  In one case, I remember personally, I

19      had a suspect who we thought killed our victim with a

20      .38 caliber weapon.  We locked him up on another

21      warrant, he had the .38 caliber weapon there with

22      him, or a .38 caliber weapon.  We -- I'm

23      interrogating him and we're going on and on, I've

24      spent time with him in the interrogation room.  I got

25      an informant saying, yeah, you got him with the right

188

1          weapon, so I decided I would bluff.  I walked in and

2          I told him, hey, the lab just came back, that was the

3          same weapon that killed the victim over here.  And he

4          just totally turned around.  He totally shut down

5          because it turned out it wasn't the right weapon.

6          So, like I said, when you -- when you bluff you run

7          that risk of saying the wrong thing and you lose

8          credibility.

9              More importantly, lying about evidence is one of

10         the things that can contribute to false statements

11         and false confessions.  Now, Reid will teach that

12         simply saying -- just simply presenting a false

13         evidence ploy to somebody would not induce them to

14         falsely confess.  And I totally agree.  However, they

15         say, and the experts agree, that if you introduce the

16         false evidence ploy in conjunction with the real or

17         implied threats or the real or implied promises, then

18         that could potentially increase the possibility of

19         falsely confessing or getting -- giving a false

20         statement, especially in a case of younger people,

21         juveniles, and people with let's say diminished

22         social maturity right there.

23    Q    Mr. Trainum, specifically in the Reid book, I'm just

24         going to show you what's been marked as Exhibit 178,

25         just a couple of examples here.  What is Exhibit 178?

189

1          Can you explain what that is?

2     A    Sure.  This is the workbook that is handed out at the

3          Reid training classes to law enforcement.

4     Q    All right.  Turning your attention to Page 48, in

5          discussing interrogation themes, is there something

6          that the Reid people advise as far as telling

7          suspects, witnesses, something about the punishment

8          for their crime?  Is that a problem?

9     A    They say it is psychologically wrong for the

10         interrogator to remind the suspect of the punishment

11         for his crime.  We cannot expect a person to tell the

12         truth without giving him the opportunity to couple

13         his admission with an excuse that allows him to save

14         self-respect.

15    Q    And turning to page, I think it's 73.  Let me find

16         it.  Numbers are kind of cut off on the bottom so --

17         do the trainers then in the workbook advise some

18         things that should not be put in what they call the

19         alternative question or questions to a person that's

20         being interrogated?

21    A    Sure.  They should not threaten consequences or offer

22         promises of leniency.  An example is, inappropriate

23         ones, do you want to cooperate with me and tell me

24         what happened or spend the next five to seven years

25         behind bars.  Do you want to be cleared with

190

```
 1          first-degree murder charges -- I mean, sorry, do you
 2          want to be charged with first-degree murder charges
 3          which will mean life in prison or want this just to
 4          be manslaughter.
 5    Q     Now, what is the problem with using those kinds of
 6          questions when you're questioning a witness and
 7          trying to get information from a witness?
 8    A     What you're doing is you're trying to get them to
 9          admit to what you have already perceived as the truth
10          and you're boxing them in, you're not listening to
11          what they may have to offer, and you're creating the
12          atmosphere, like I had mentioned before, where they
13          perceive temporarily at least that in order to escape
14          first-degree murder charges and receive the benefit
15          of manslaughter that they're going to have to tell
16          you what you want to hear.
17    Q     Now, regarding written reports that are -- I'm sorry,
18          written statements, excuse me, is there any advice in
19          this workbook about what an investigator should do
20          when having somebody write out a written statement?
21    A     It basically says you don't dictate what the suspect
22          should write and you don't spell words for the
23          suspect.
24    Q     What does that mean, don't dictate?  You've been
25          through this training, you --
```

191

1   A   You just don't tell them what to include in the

2       written statement.  The written statement is theirs,

3       and you basically, you know, say, okay, you've

4       already -- back before we recorded videos we took

5       more written statements and you would just pretty

6       much say, okay, you've explained it to me, now please

7       just put it down here in your own words, and I would

8       typically leave the room and let them do that and

9       then come back.

10  Q   Okay.  Now, in that particular part of the workbook,

11      we -- the questions I asked you or the comments in

12      the workbook were about very specific threats of this

13      is how much time a person could get in jail when

14      posing a question.

15  A   That's correct.

16  Q   I'm going to show you --

17          ATTORNEY VISHNY:  This is 194.

18  Q   (BY ATTORNEY VISHNY)  I'm showing you what's been

19      marked as Exhibit No. 194.  Is that an appendix to

20      the same book that we were just looking at?

21  A   Yes, it is.

22  Q   All right.  And what does that appendix have to say

23      regarding even implied promises of leniency?

24  A   Well, the appendix is entitled Maintaining the

25      Integrity of the Confession, and it says that our

192

1          position, as will be set forth in this article, is

2          even -- is that even implying a threat or promise of

3          leniency should be considered impermissible as an

4          interrogation technique.  The discussion will also

5          address the use of trickery or deceit.

6     Q    And -- all right.  Let me go take my seat before I

7          ask you the next question.

8               Don't police need to use these techniques,

9          threats of consequences, promises of leniency, false

10         evidence ploys, don't they need to use that to get

11         accurate statements from people who don't want to

12         tell the truth?

13    A    Absolutely not.  In fact, numerous studies have shown

14         that it increases the chance of inaccuracy.  There

15         are other protections out there that get information

16         without the use of threats.  Journalists are one.

17         Private investigators, they don't have the power to

18         tell somebody they're going to get locked up or

19         something along that line.  In the UK, all of these

20         techniques -- they used to use the Reid technique and

21         such practices like that.  They've outlawed all of

22         that stuff.  They don't do interrogations anymore,

23         they're not allowed by law, and they still get tons

24         of useful, reliable and accurate information by the

25         process that they teach there.

193

```
 1   Q   Now, let me ask you if you agree or disagree with
 2       this statement.  These techniques that we've talked
 3       about of theme development, threats, are they
 4       effective to get coercions and statements for
 5       people?
 6   A   They're very effective.  That's why they've been used
 7       for so long.
 8   Q   And are they also very effective for getting false
 9       confessions?
10   A   They -- yes, they've been shown to also -- when
11       compared to systems that don't use those threats,
12       such as they have in the UK, they've been shown to
13       not only -- yes, they get good confessions, but they
14       also increase the number of unreliable or false
15       confessions as well in statements.
16   Q   Besides these techniques, are there other things that
17       can contribute to getting bad or unreliable statement
18       evidence?
19   A   Sure.  Tunnel vision.
20   Q   Can you explain that?  I'm sorry for interrupting
21       you.  Can you explain what tunnel vision is?
22   A   Tunnel vision is -- it's one of those comic devices.
23       What they are is basically things that our brains do
24       in the way that we process evidence that kind of
25       screws up how we interpret things.  Tunnel vision, a
```

194

1        lot of people equate it to things -- what happens

2        like if you were in a car accident, you suddenly

3        focus on one little thing and you don't see things

4        that are -- that are happening around you.  In an

5        investigation, if a detective falls victim to tunnel

6        vision, then they don't see the alternative

7        explanations, the alternative suspects.  They see it,

8        okay, this person is guilty and so I'm going to

9        interpret -- I'm going to interpret everything that

10       happens through that lens.

11            Verification bias, that's what they call an

12       aspect of tunnel vision, is when I have a tendency --

13       I've convinced myself that this is the truth.

14       Anything that doesn't fit my theory, anything that

15       doesn't prove that this is the truth, I'm either

16       going to discredit or ignore.  And it's just a very

17       common thing that happens to all of us in all sorts

18       of situations in our lives.  But that's one of the

19       reasons that some of the researchers say that the

20       actual Reid technique itself attributes to false

21       confessions because it encourages tunnel vision.  The

22       detective is going in there already thinking that

23       I've determined what the truth is, I just need to get

24       the person who I'm interrogating to admit to me what

25       I think is true.  And what if I have it wrong.

195

1    Q    Are police investigators usually aware that they have
2         this kind of cognitive bias or tunnel vision?
3    A    None of us are.  We always have a tendency to see it
4         in other people but we don't have a tendency to see
5         it when it's happening to us.  I -- when I talk about
6         it to cops, I kind of say it's like having a bad
7         relationship.  All your friends know that you're in
8         it, but you don't until you're able to extricate
9         yourself out of it and look back.  But at the time,
10        oh, she loves me, you know, all that stuff, and
11        they're going, oh, no, she doesn't.  So --
12   Q    Is there a way to counter tunnel vision?
13   A    Yes, there is.  It's not just knowing about it,
14        because like I said it's often hard to get over it
15        once you're in it.  What a lot of places are now
16        doing, what they promote is the use of a devil's
17        advocate, somebody who is outside of the
18        investigation whose job it is to examine the evidence
19        and say, okay, I'm going to challenge your
20        interpretation of the evidence.  You think it means
21        this, but I'm going look at it from this viewpoint
22        and we're going to see what it says.  Basically it's
23        called developing investigative mindset.  You don't
24        believe anything and you challenge everything, and
25        you look for proof that -- rather than we in law

```
1           enforcement, we have a tendency that once we develop
2           a theory, we want to engineer evidence to prove that
3           theory.  That's the verification bias.  What the
4           devil's advocate does is they want to test the
5           theory, does the evidence prove or disprove it, and
6           you follow the evidence but not the theory.
7      Q    How does a -- a law enforcement officer or how can a
8           person, rather, evaluate the accuracy and reliability
9           of statement evidence?
10     A    It's basically a -- roughly a two-step process, and I
11          talked to you before about the holdback evidence.
12          This is information that I've developed during my
13          investigation that shouldn't be out there in the
14          public, it shouldn't be known to anybody else but
15          somebody who was there and, like, information, as we
16          love to say, that only the true killer would know.
17          Now, during the process of the interview or
18          interrogation, if you provide that information to me,
19          then that's a good indicator that you were there and
20          that you saw.  The caveat to that is I have to be
21          able to show that the information originated from you
22          and not another source.  Another source might be,
23          well maybe you saw it in the news or maybe the
24          neighborhood, there's a rumor in the neighborhood
25          going around and that's where you picked up that
```

197

1    information.  Unfortunately, a lot of times what

2    happens is during the interrogation process, because

3    we're so convinced that that person has this

4    information or whatever, we unintentionally, through

5    the way that we question people and the things that

6    we do, we provide the information to them, and

7    thereby we contaminate the investigation.  And we can

8    do it in extremely subtle ways.  One of the things

9    that we're taught not to do is not to use leading

10   questions, like he had a -- he had on a blue hat,

11   didn't he.  Well that's a leading question because

12   you're telling the person that the suspect had on a

13   hat and that it's blue.  You know, that's a form of

14   contamination.  Another form would be if the suspect

15   gives you the wrong answer and you accuse them of

16   lying or the answer that you think is wrong and

17   accuse them of lying and eventually they get or they

18   somehow extract from you the information and they

19   give you the right answer and you go, oh, very good,

20   now we're making progress.  Showing crime scene

21   photos, all kinds of ways like that.  There is very

22   subtle ways that the suspect can pick up this

23   information because, like I remember, if this is a

24   person who doesn't have the information or who is

25   innocent and yet they truly believe, oh, my God, this

198

1    person is telling me I'm going to jail for life,

2    they're telling me that I got five witnesses

3    testifying against me, they're telling me that the

4    only way I can escape this is by saying this, I'm

5    going to figure out what they want me to say, and so

6    the interrogations often become a game of 20

7    questions, a child's game where I'm picking up bits

8    and clues and I'm developing a narrative that's going

9    to be acceptable to the investigator and that he'll

10    adopt as the truth.

11    Q    Is it possible to avoid contamination?

12    A    It is.

13    Q    How does one do that?

14    A    By knowing how it occurs, and by carefully knowing

15    how to write -- ask questions without putting the

16    evidence in there, such as leading questions.

17    Q    Has there been some change in police practices to

18    avoid contamination that you're aware of?

19    A    Well, yes.  The main things -- there are things that

20    we've done in the past, because we recognize that

21    contamination occurs, one of the basic principles of

22    witness interviewing is that you separate your

23    witnesses, you don't want one witness talking to the

24    other because if you have -- if you're doing that,

25    then a lot of times this witness will say, well,

199

1    didn't you see this, and the other witness starts to
2    fill in the blanks of what they missed.  So we
3    separate witnesses, things along that line.  But
4    videotaping now is one of the biggest things, most
5    important things, because what videotaping does, it
6    allows you to go back and review the interrogation to
7    pick up on where potential contamination occurred and
8    see whether or not it happened.  And that helps --
9    also, if it's used for training purposes, then the
10    detective can get better at avoiding contamination.
11  Q  What about showing -- there's been some testimony
12    regarding if somebody has seen a witness's picture --
13    rather, I'm sorry, a -- a witness has seen a person's
14    picture in the newspaper, all right, and then
15    contacts the police and said I think I saw this
16    person.  Would you show that witness a photo array?
17  A  I would not personally, simply because you can't --
18    you couldn't tell -- maybe that witness picked out
19    the person from the photo array because they really
20    recognized them from the photo array, but you just
21    don't know whether or not the memory from the
22    newspaper picture or whatever transferred over into
23    the photo lineup.  So that would just cause that
24    photo array to be brought into question, whether or
25    not they really picked it out because they remember

200

```
1          or they picked it out because they first saw the
2          person in the newspaper.
3    Q     Okay.  Let me ask you, how do you corroborate a
4          confession, or not a confession, a statement is what
5          I meant to say.
6    A     Well, a statement, a confession, statements from
7          witnesses, victims.  Like I said, one of the things
8          that do is you look at it, does it contain
9          information that you believe to be true based on the
10         crime scene analysis, based on the physical evidence
11         and things like that, and can you show that that
12         information was provided without contamination.  One
13         of the things that I do is I also say, okay, if what
14         the witness is telling me is true, what would I
15         expect to find at the crime scene, and I'll see if
16         it's there.  A good way of doing it is what you're
17         always looking for is -- in every single interview
18         and interrogation, the gold standard is are they
19         going to tell me something I didn't already know that
20         I now can go out and corroborate.  And if you're able
21         to go out and do it with physical evidence, that's
22         the best type of corroboration.  However, physical
23         evidence can be misinterpreted as well.  I always
24         have to put that caveat in there.  As an example,
25         let's say in a sexual assault case you have a victim
```

201

1        who's telling you that she's been sexually assaulted.

2        There is bruises on her face, that's corroboration;

3        there is signs that she has had sexual intercourse,

4        that's corroboration; there is the physical evidence

5        recovered from her body that contains DNA, that's

6        corroboration, and if she's saying that this suspect,

7        you know, that she was raped by an unknown person.

8        However, that's good corroboration.  However, if the

9        DNA came back to her husband, then that corroboration

10       isn't as strong, so you always have to, like I said,

11       even though it's physical, you have to go -- take it

12       as far down the road as you can.

13           You can also corroborate it by going back and

14       double-checking with witnesses.  Does what the

15       suspect or the witness is saying match up to what

16       other witnesses are saying.  The problem is a lot of

17       times we'll do what we call cross-contamination or,

18       in the case of a confession, post-confession

19       contamination.  You got to be very, very careful.

20       You can't go back to a witness and say so and so is

21       saying that this is what happened, is that true,

22       because what you're doing is you're telling the --

23       one witness what the other witness is saying, the

24       same thing that you were trying to avoid when you

25       kept the witnesses separate, except now you're the

202

1        one conveying the information.  It happens a lot in

2        confessions.  If -- let's say the victim says, well,

3        the suspect did A and B, and you get a suspect who

4        confesses and say that they did A, B and C, they go

5        back to the victim and say, well he confessed but he

6        said he did C, did he do C as well, and the victim is

7        going, well, he confessed so he must have done it, so

8        maybe I don't remember C, and the victim incorporates

9        C within her statement.  Memory's kind of one of

10       those things that you have to be careful about when

11       you're trying to recover evidence from it.

12   Q   Okay.  Now before I get to the specifics of your

13       review in this case, after reviewing all the matters,

14       did you write a report in connection with this

15       case?

16   A   Yes, I did.

17   Q   I'm showing you what's been marked as Exhibit 191.

18       Is that the preliminary report you wrote in this

19       matter?

20   A   Yes, it is.

21   Q   And with that report is there an appendix of the

22       materials that you have reviewed up until the date of

23       your first report which was at the end of December?

24   A   Yes.

25   Q   Then at a later date did you write a supplementary

203

1      report after reviewing additional materials?

2   A   Yes.

3   Q   And that's dated February 29th, 2016?

4   A   Yes.

5   Q   And did you even after that review a few additional

6       items --

7   A   I have.

8   Q   -- that we've already discussed here?

9   A   Yes.

10          ATTORNEY VISHNY:  Judge, I would move

11      Exhibits No. 191, 92 and 93 into evidence.

12          THE COURT:  Any objection?

13          ATTORNEY SCHNEIDER:  No.

14          THE COURT:  Those exhibits shall be

15      received.

16   Q   (BY ATTORNEY VISHNY)  All right.  I'm going to ask

17      you just first a general question and then we're

18      going to go through some of the witnesses in this

19      case.

20          Did you observe some of the problematic

21      techniques that you've discussed occurring in this

22      investigation into the homicide of Joshua Richards?

23   A   Yes, I did.

24   Q   All right.  Let's -- I'm going to talk to you about

25      some of the witnesses, not all of them, but some of

204

```
1        them.
2              I'm going to first direct your attention to
3        Phong Lee's interview.  And what we're going to do,
4        I'm going to ask you these things in the
5        chronological order of the way the investigation went
6        as opposed to witness by witness.  All right?
7    A   Yes.
8    Q   All right.  Now, did you review Phong Lee's
9        interrogation that occurred on December 9th by
10       Sergeants Schira, and I can't remember if it's Meyer
11       or Tauber right now.  Tauber.  Did you review that?
12   A   Yes, I did.
13   Q   Now, did you observe -- when you reviewed that
14       interrogation, did you determine that there were some
15       problems that, excuse me, gave you concerns about the
16       techniques used and whether it would produce a
17       reliable statement?
18   A   Yes, I did.
19   Q   Can you please tell the jury what those were.  And
20       don't be afraid to let me get in a question every now
21       and then.
22   A   Okay.  I have transcripts that are marked up.  Is
23       that stuff that I can --
24   Q   Yes, you may use them.  Yes, you may.  So I'm going
25       to refer you, first, to we have it as Exhibit No.
```

205

1          114, you have it as Disk 6, Item 43.  Can you tell

2          the jurors what problems you observed in that

3          particular conversation that they had with Phong

4          Lee?

5     A    Well, in general with this conversation, as with the

6          others, you saw -- what I would come across are both

7          real and implied threats of inevitable consequences

8          such as being charged with a crime, you know, jail

9          time, life in prison, that sort of thing, and they

10         would be given the option of either being go to jail

11         or cooperating as a witness.  There was also times in

12         there where they were basically told what the

13         detectives theory of the case was, which kind of

14         indicated what the detective wanted them to say until

15         such time -- in order for them to receive the benefit

16         that was being offered by the detective.

17              Just as an example, I'm just only doing a few

18         examples here for each one, it's on Page 13, and it

19         starts with the detective saying, I know but you were

20         there when it happened.  You were there and you know

21         who did it.  Mr. Phong goes -- or Phong goes, I don't

22         know who did it.  The detective, well, it was the guy

23         who ran out with you.

24              ATTORNEY SCHNEIDER:  Mr. Trainum, can you

25         stop?  Can we approach because you might have a

206

1      different set than we do?

2                  ATTORNEY VISHNY:  We're just not sure if

3      you have the same.  Some of these are numbered with

4      different pages.

5                  THE WITNESS:  I apologize.  Should I step

6      away?

7                  ATTORNEY SCHNEIDER:  You're fine.  We want

8      to just compare our page numbers.

9                  ATTORNEY VISHNY:  It's a Google docs versus

10     Microsoft Word that created these problems.

11          Just let us know, Mr. Trainum, what page you're

12     on.  And yours, Google docs didn't put line numbers

13     in.

14                  THE WITNESS:  Okay.

15                  THE COURT:  And, counsel, if at any point

16     in time Mr. Trainum's going over something or you're

17     lost, just let me know and then we can stop things,

18     you can find where we're at and then we can

19     proceed.

20                  ATTORNEY VISHNY:  Sure.

21     Q   (BY ATTORNEY VISHNY)  Okay.  Returning back to where

22     we were, I think that was the top of Page 13, if I

23     was right.  Is that where we were?

24     A   Towards the top of Page 13, that's correct.

25     Q   Okay.  So go ahead.

```
1    A    The detective said, I know but you were there when it
2         happened.  You were there and you know who did it.
3         Phong:  I don't know who did it.  Detective:  Well it
4         was the guy who ran out with you, and I know that.
5         Phong:  I ain't -- I don't know.  Detective:  Listen,
6         listen, listen to me.  Okay.  The problem is he was
7         looking at the video.  I don't want you to get jammed
8         up for conspiracy, do you understand, I'm talking
9         about your life right now, we're talking about your
10        life.
11             So basically he's telling him who he believes
12        did this crime, and he's also saying that you have
13        the choice, this is a conspiracy and we're talking
14        about you cooperating and preventing you from ruining
15        your life.
16   Q    Is there any other example in that particular
17        interrogation that you think is important to discuss,
18        bearing in mind that the jury has heard this gone
19        over many times, but is there something that
20        particularly stands out?
21   A    Let's see.  On Page 19 right about the middle of the
22        page there -- there's a detective going, think about
23        a homicide trial and think about what a jury is going
24        to think.  You guys picked up on that?
25   Q    Yeah.  We know where you are.
```

208

1    A    Basically going over, you hide clothing, that's all

2         party to the crime.  This is a homicide and not a

3         game.

4              A little bit further down the detective goes,

5         look, I'm trying to help you out, buddy.

6              And then a little bit further down the detective

7         goes, you got to think about yourself right now,

8         Phong.  You're telling me that you had nothing to do

9         with it, that this was somebody else that just

10        immediately -- immediately reacted to what this guy

11        was saying.

12             They also brought up that it was racial like

13        that.  So they're talking -- here's a theme that I

14        was talking about that they're trying to get them to

15        adopt, but then they go down, do you want to go away

16        for the rest of your life or we need to find out if

17        it's a self-defense thing.  A self-defense theme is a

18        suggestion of leniency there.  That would have been

19        taught -- that would have been inappropriate

20        according to the teaching.

21             On Page 23, again, in the middle, the detective

22        basically tells him who does it or asks him who does

23        it.  Phong goes, I don't know who did it.  Detective

24        goes, you know because you run out, the guy is right

25        with you, again suggesting that -- exactly who the

1       person is.

2   Q   Now, when you -- that particular sentence that you

3       just read where the detective says, the guy is right

4       with you, is that an example of what you call

5       contamination?

6   A   That's -- that is contamination because it's

7       suggesting to the witness who the person is that the

8       detective wants them to name as the shooter.

9   Q   Is there any other example that stands out for you in

10      this particular interrogation regarding contamination

11      or else that you think is very significant or do you

12      want us to --

13  A   Well, I had several.  Is there one in particular?

14  Q   I'm going to ask you about Page 44.  For you it's

15      kind of just below the second half of the page, for

16      us it's Line 29.

17  A   Okay.

18  Q   Is that another example?

19  A   Yes.  The detective goes, you can't get over the fact

20      that we got -- that we got a guy with a gun in his

21      hand and you're in the picture.  Phong goes, I don't

22      care, I'm going to tell you that they're not the ones

23      who did it.  The detective goes, you're not the one.

24      You don't have to convince us, buddy, you got to

25      convince the District Attorney's office that's going

210

```
1          to charge you, and you got to convince the jury
2          that's going to look at this stuff and say of course
3          he knows.  Just like Dan said, you bolted from the
4          scene before anybody else, you hid your clothing, you
5          lied to us when you first got here about what -- you
6          weren't down there and that it was some girl and
7          nothing was going on.
8     Q    Okay.
9     A    And then at the very end the detective goes, what do
10         you think a jury is going to look at this and say,
11         they're going to say guilty, guilty, guilty.
12    Q    All right.  Why don't we move on from Phong Lee,
13         unless you think there is something else of
14         particular importance, and let's talk about the next
15         transcript, and this would be -- or the next
16         interview.  That would be Joe Thor on December 10th.
17              One of the techniques that you talked about --
18         or let me ask you this.  What's a high pressure sales
19         tactic in an interrogation?
20    A    One of the high pressure sales tactics that's
21         frequently used I had mentioned is the use of a time
22         constraint.  We told you that, you know, you're going
23         to face serious consequences and the only way to
24         escape those is by telling us what we want to hear,
25         but this is your only opportunity, you have now or
```

211

```
 1        never to do it.  It's just like a salesman telling
 2        you, look, if you want to buy this car, you better
 3        buy it now because I got a guy coming in at 5:00
 4        who's got cash for it.  You better make up your mind
 5        now.  So it increases the pressure for you to jump on
 6        that -- that great deal that may not be so great at
 7        the time.
 8    Q   I'm going to direct your attention to Page 28, and
 9        for me it starts with Line 5.
10    A   Okay.
11    Q   I just want to clarify the record.  This is actually
12        the second time Joe Thor talked to the police on
13        December 10th, but the other time is very short.
14    A   That's correct.
15    Q   So we're just going to go right to this.  So looking
16        at that on Page 28, beginning at Line 5, what -- what
17        do you make of what you read there?
18    A   The detective goes, are dear friends more important
19        than your family because right now what you tell us
20        in the next ten minutes is going to decide whether
21        you spend the rest of your days with your family or
22        you spend the rest of the days with your buddy, and
23        he goes on to say, in prison somewhere.  And that is
24        a high pressure sales tactic, like I said, you have
25        this opportunity to tell us what we want to hear or
```

212

1       bad things are going to happen.

2    Q  And can you give us an example of another similar

3       tactic, maybe not high pressure sales, but of these

4       kind of threats to go to prison or anything of that

5       nature, consequences, adverse consequences that

6       can --

7    A  Well, on Page 29 -- I'm sorry, I didn't want to

8       interrupt.  On Page 29, right about the middle of the

9       page, the detective continues, and you better make a

10      decision right now.  Do you want to be a part of this

11      investigation or do you want to go down with this guy

12      because I'm talking about the rest of your life.

13   Q  There's been a phrase that's been tossed around here

14      that occurs in a number of these interrogations which

15      is similar, do you want to get yourself on the

16      witness line or do you want to be on the suspect

17      line.  Is that another example of what you're talking

18      about?

19   A  That's another example of what I'm talking about.

20      You only have two options.  It's kind of a form of

21      the alternative question, you know, a very extreme

22      form, either you want to go to prison or do you want

23      to be free and be on our side, but to be on our side,

24      you have to tell us what we think is true.

25   Q  Are there any examples of contamination by the

213

```
 1        detectives in this conversation with Joe Thor on
 2        December 10th?
 3   A    Well, just on the same page, 28, in the very --
 4        towards the bottom middle what they're telling him,
 5        that you -- we know from the video that you know who
 6        shot him, you ran out of the building with him.  And
 7        Joe goes, Phong did not shoot him.  See, I didn't say
 8        Phong, did I.  Right.  I'm serious, Phong did not do
 9        that.  The detective goes, I didn't say Phong, did I.
10        Joe:  No, you didn't.  The detective:  The other guy
11        did.  So he's telling him specifically who he needs
12        him to name in order for him to be believed at that
13        point.
14   Q    Is there any contamination that you see in this
15        interview regarding the firearm that was used in the
16        homicide?
17   A    Yes.  It would be on -- one is on Page 80, and Joe --
18        at the very top Joe is actually challenging --
19             ATTORNEY SCHNEIDER:  Can you just wait
20        until I get there please?  Sorry.
21             THE WITNESS:  I'm sorry.
22             ATTORNEY SCHNEIDER:  Okay.
23   A    I'm sorry.  I'm going to go back to Page 79 at the
24        bottom, and what they're talking about is the
25        surveillance picture of Paul going out with the
```

214

1          object in his hand that the detectives are saying is

2          a gun.  And the detective is pretty much going, it's

3          a fricking gun.  Everybody that we've shown it to who

4          isn't involved and aren't suspects are going, holy

5          shit, that's a gun.  And he goes along that line.

6                On Page 80 Joe says, it doesn't -- it does not

7          look like a gun.  Come on, obviously, would a gun be

8          that small.  And the detective goes, yeah, it would

9          be.  It's a .25 caliber.

10     Q    Is there another time in this interrogation where the

11          specific type of caliber gun is mentioned?

12     A    Yes, it is, on Page 150.  And again, it's towards the

13          bottom of the page.  Joe is saying, there was

14          something in his hand, I thought it was a bottle.

15          They're talking about the picture, and Joe -- and the

16          detective says this, Joe, you guys said it was a gun.

17          The detective says, this gun is this big, that's all

18          it is, is a little .25.  I can reach in my pocket and

19          pull it out and, bang, it's done.

20                So here again is just an example of them

21          providing information that if Joe had provided it to

22          them first, that would be significant, but because

23          they're providing it to him first, you have to

24          question where -- where did the actual information

25          come from.  As I frequently say, when you look at

215

407-215

```
 1           this, you -- I try to figure out who is telling the
 2           story, the witness or the suspect or the detective.
 3    Q      And I know that there is a really, really long
 4           transcript and the jury has heard many things
 5           repeated several times.  Is there anything that you
 6           just want to point out about this?
 7    A      I'll spare you guys.  Looking real quick.  I don't
 8           think so.
 9    Q      All right.  Would it be a fair characterization to
10           say that the things that you have pointed to, these
11           three -- these brief examples of contamination,
12           threats to do how much time, whether the -- that the
13           person has to decide today if they're a witness or a
14           suspect, that that -- did you count how many times it
15           occurred in that transcript?
16    A      I started to at one point but I just lost track.  I'm
17           sorry.
18                   ATTORNEY SCHNEIDER:  Okay.  It will
19           probably come back but for now it's gone.
20                   ATTORNEY VISHNY:  I thought it was an
21           objection at first.
22                   ATTORNEY SCHNEIDER:  I'll be a little
23           louder if I have an objection.  Bear with me.
24                   ATTORNEY VISHNY:  All right.
25    Q      (BY ATTORNEY VISHNY)  So is it fair to say it just
```

216

1      got to be too many to count up, is that what you

2      mean, or that was pointless?

3   A  It -- like I said, it just got to be so many and I

4      just lost track of that and went on to other

5      things.

6   Q  Okay.  I'm next going to ask you about Exhibit 189,

7      which is Item 89 in this case, and this is the first

8      interview of Paul Lee which took place on December

9      11th at Norka, his place of employment.

10  A  Yes.

11  Q  Did you see examples of false evidence presented to

12     Mr. Lee?

13  A  I did.

14  Q  Can you tell the jury what that is or give an

15     example?  Again, we're not going to go through the

16     whole thing.

17  A  Again, one example would be on Page 51 starting right

18     about in the middle when the detective starts by

19     saying, I'm not -- I'm not just relaying information

20     that was told to me because, you know what, there is

21     one, two, three, four, five different people saying

22     Paul shot him in the head.  Paul goes, please, man.

23     The detective goes, yeah, you know how many people

24     were there.  How could they not see it.  How did they

25     not see it.  You think that there's five different

217

```
 1         people who have told us who you're the one who shot
 2         him in the side of the head and they're all lying.
 3         They did not even know each other.
 4     Q   Is there an example in this that you can point out of
 5         this high pressure sales tactic or time constraints
 6         that you previously talked about?
 7     A   Yes.  On Page 59.
 8     Q   59.  Okay.  59, right?
 9     A   59 right towards the bottom.  Paul is -- basically
10         they're challenging him about what's in his hands.
11         Paul was saying, I had nothing in my hand.  The
12         detective is going, well I can prove otherwise, so do
13         you want to explain what happened or do you just want
14         to go down.  I didn't do it, I didn't do it.  I --
15         all the way to life in prison.  Paul says, tell you
16         straight up I didn't do it.  The detective, you want
17         to go -- I'm telling you now is your last chance to
18         provide an explanation as to why you shot that guy.
19     Q   Now, on Page 66 did you observe some contamination
20         that occurred in this interrogation?
21     A   Yes.  Well, earlier on I believe the detective -- in
22         one of my earlier examples the detective mentioned
23         that the victim was shot in the left side of the
24         head.
25     Q   Okay.
```

218

1    A    In this case, the detective -- it's right towards the

2         bottom of the page.  Paul starts with, I don't know,

3         I just punched him and I stepped back.  The detective

4         goes, and then someone else is going to come up for

5         no reason, even though he's arguing with you and

6         Phong, and he's so pissed off at you guys for -- some

7         guy for no reason is going to come up and shoot him

8         in the side of the head at point blank range.

9    Q    Is there anything else -- again, how many times did

10        you see examples of these kinds of threats, time

11        constraints in this transcript?

12             Well, first of all, how many pages long is this

13        transcript?

14   A    I have 110.

15   Q    Okay.  Then you definitely -- yeah.  Okay.  And did

16        you see this kind of threat, telling people that he

17        was going to go to prison for life, you know, he

18        better be a witness or tell on somebody else, did you

19        see more examples of that in this?

20   A    In this one it pretty much -- not so much that he

21        better tell on somebody else but pretty much that he

22        did it and that this is his chance to confess.

23   Q    Now, I'm going to turn next to Exhibit No. 176 which

24        is an interview with Paul Lee by Sergeant Chue Thao

25        and John Schira that took place at 12/12/13 at 12:41

219

1       a.m.

2              First of all, was there a change that occurred

3       in Paul Lee's status between the Norka interview you

4       were just talking about and the December 12th, early

5       morning hours, interview?

6    A  Yes, there was.

7    Q  And what was that change?

8    A  Paul had been placed under arrest at the end of the

9       first interview and transported down to the police

10      station, I believe.

11   Q  All right.  So in this second interview is -- he's in

12      custody?

13   A  He's now in custody.

14   Q  Getting to this interview, and we'll go through this

15      now in chronological order, I'm going to ask you

16      about things that you found to be significant in the

17      interview by Sergeant Schira and Sergeant Thao.  What

18      would you like to point out first?

19   A  Well, we can start with the very beginning of the

20      interview pretty much after we do Miranda, and it's

21      on Page 5, and where again we're talking about --

22      they're expressing, on Line 197, that there's no

23      shadow of a doubt that they did this, that there's a

24      gun in his hand.  That's what they were saying, that

25      there is no shadow of a doubt, that there is a gun in

220

1    the hand.  Then they go -- when they do -- see --
2    when they -- I'm sorry.  When they do see that we
3    have nothing, you're the only one that did not
4    because you -- because you had that gun.  So if you
5    want to go down hard, you know that you're gonna go
6    down hard.  And then they talk about your friends are
7    telling us, so this is your chance to really take
8    advantage of that.  And it's at this point when they
9    start saying, well if you didn't do it, who did.  And
10   that is kind of a theme that picks up at this point
11   in the interrogation.

12        And now the next page, they basically bring up,
13   on Line 231, do you know what the statutes to this --
14   the consequences of this are.  It's basically life in
15   prison, they say.  And there is only two options,
16   they give him only two options in Line 238, and the
17   two options are you either did it or somebody else
18   did it, so either confess to it or tell us it was
19   somebody else at that point.
20  Q    Do they also mention anything when they said it's
21       either you or somebody else regarding a firearm right
22       after that on Line 239, Page 6?
23  A    I think you're --
24  Q    Okay.  At line --
25  A    I'm sorry.  Yes.  I didn't go to -- I misspoke.  They

221

```
1           said that there's two options, either you did it or

2           you handed the gun to somebody or somebody handed the

3           gun to you, so either you're the shooter or somebody

4           else did the shooting and handed the gun to you at

5           that point.

6     Q     All right.

7     A     Sometimes these old eyes.

8     Q     Okay.  Now, I'm sorry, I'm asking the wrong question.

9           On Page 7 and 8 is there any discussion on that page

10          as this continues that concerns you again with the

11          interrogation methods being used, Page 7, I think

12          he's going to Line 285, but I'm not sure.  He'll have

13          to tell us.

14    A     Well, again, what they're doing here is they're kind

15          of presenting some false evidence ploys, they're

16          talking about threats and they're also offering

17          leniency.  On page -- on Line 29 -- 292 on Page 7,

18          can you let these other guys tell us, you know, why

19          they ran.  And Paul answers, why.  And the detective

20          says, because there was a shooting and one of them

21          turned around and looked at you and said why did you

22          shoot him.  Of course Paul said it didn't happen.

23          They then tell him, well that's what they're telling

24          us, you know.  Basically your own buddies are saying

25          why did you shoot him, why did you shoot him.
```

222

```
1              At the very bottom of the page, 315, just like I
2         said, it's no longer a question that you did it, now
3         the question is why you did it.  This is at the top
4         of Page 8.  The question is why you did it.  And you
5         got to try to minimize what happened because there's
6         a big difference between first-degree intentional
7         homicide and reckless endangerment or even
8         self-defense.  So again, they're maximizing it and
9         they're minimizing it there.  I've been in court.
10        I've seen cases like this.  They're gonna say that
11        you're guilty.
12   Q    And skip down a few lines.
13   A    Yes.
14   Q    Do they continue to -- when they start saying, so
15        what I really would like for you, did they start
16        developing a theme there?
17   A    I'd like for you to tell me that there was a reason
18        for this to happen, that you were protecting your
19        friends.  And so that's the psychological or moral
20        justification that I was talking about there.  That's
21        that type of theme that would typically be
22        appropriate.
23   Q    Do you see more of this as this unfolds, as the
24        interrogation unfolds?
25   A    Like I said, this is pretty much the same theme
```

223

1        throughout this entire thing.  On Page 11 right in

2        the middle of a page, Line 468, they're basically

3        telling him, we already know the facts, what you got

4        to think about is what the jury is going to think

5        about because the jury is made up of good intelligent

6        people.  And basically later on he talks about, I

7        believe that object in your hand to be a gun in my

8        training and experience.  What do you think they're

9        going to say.  They're going to say that you were

10       guilty.  And I'll be honest with you, I'll do this

11       jury trial tomorrow.  The people will win.

12  Q   All right.  Right after that statement, is there

13       something significant that occurs in the very next

14       sentence in this interrogation?

15  A   Yes.

16  Q   What is that?

17  A   At Line 485 then it kind of shifts.  I'm going to ask

18       you one question.  The question is going to come down

19       to how you want to go about this.  Okay.  Did Chong

20       do the shooting.

21  Q   Now, until now, had Chong's name been brought up as a

22       potential person who had committed the shooting by

23       Paul Lee?

24  A   I had not seen it anywhere in these transcripts.

25  Q   Let me ask you this.  Let's just say the police

```
 1          officers conducting this interrogation receive some
 2          evidence in the form of a rumor that Chong Lee had
 3          done it and they had been told you should investigate
 4          Chong Lee as a suspect as well.  All right?
 5    A     Okay.
 6    Q     So let's say their supervisor tells them or, as in
 7          fact did happen in this case, the supervisor says we
 8          also want to consider Chong Lee as a suspect before
 9          starting this interrogation.  Is it fair to say that
10          it would be a good idea for the police investigators
11          to try to see if there is any information they can
12          get from Paul as to whether or not Chong is the
13          suspect, or the perpetrator rather?
14    A     That would be a line that you would want to
15          investigate if you have that, most definitely,
16          because like I said, you don't want to cut yourself
17          off to alternative suspects.
18    Q     All right.  So in this particular case, the way it's
19          done is by just straight out asking, Paul, is Chong
20          -- did Chong do the shooting.  Is that an appropriate
21          way to go about investigating that particular line of
22          inquiry?
23    A     Well, the line of inquiry at first is not as
24          problematic as what follows after that.
25    Q     And why don't you tell us about that.
```

1    A    Well, basically, again, they then shift to well we

2         want to give you the benefit of the doubt.

3    Q    What page is that?

4    A    This is on Page 12.

5    Q    If you could just tell us the line?

6    A    It's going to be Line 496 at the end of it.  That's

7         why I keep giving you the benefit of the doubt.

8         That's the first time I've heard that phrase.  If

9         you're trying to cover for somebody, for Chong,

10        you're going to go down hard on this because we have

11        proof on you that it -- at this time.  But now

12        they're trying to push -- he's saying, I'm pushing my

13        ass hard to try to save yours.  I'm trying to save

14        you, give you the benefit of the doubt.  You go by I

15        don't know, he was there or not, is not going to put

16        you right.  So if you're not -- if you're saying that

17        you don't know that he's there, that's not going to

18        help you.  Then he shifts and at Line 515 he says,

19        I'm telling you that you're doing this to protect

20        your brother.  So they -- it sounds to me like

21        they've totally shifted and they're giving him the

22        option -- in fact, at Line 536 on the same page, Page

23        12, they make it very clear, you either -- you did

24        this or your brother did this.  So we have the

25        evidence to put you in jail for life, but if you

226

1          didn't do it, then you're going to have to tell us

2          that your brother did this, because those are the

3          only two options that you have at this point.

4     Q    And what is the concern that you have as somebody who

5          has studied false statements and interrogation about

6          this type of technique?

7     A    What's happening here is, like I said, Paul is facing

8          the inevitable consequence that they have all this

9          overwhelming evidence that he's guilty.  He's being

10         told that he's going to be convicted of this crime.

11         But, however, if you say your brother did it, that

12         changes the entire equation.  So that's an out.  And

13         rather -- and it's something that's been suggested by

14         the detectives.  There's no other evidence at this

15         point, from my understanding, except a rumor that

16         Chong might have done it, and so what they're trying

17         to do is actually build on that rumor by ways other

18         than ones that could be corroborated.

19    Q    Okay.  So the police have been told, and I'm just

20         going to let you know, the police have been told and

21         it's in evidence that a woman named Lisa told a woman

22         named Alyson that she believed Chong did it.  So that

23         is the evidence that has been presented to the jury,

24         just so you know, without -- I won't characterize it

25         anymore as a rumor but this is what they've been

227

```
 1        told.

 2   A    Okay.

 3   Q    So do they continue to say that Chong is -- that they

 4        continue along this line for a while until Paul then

 5        finally agrees with them that Chong is the person who

 6        did it.

 7   A    Yes.  They continue, just like on Page 13, Line 553,

 8        think about forever, do you want to do forever in

 9        jail, in prison.  And on Line 578, if you can't name

10        the person, then it's gonna be you.  So you either

11        name the person or you're the one going to prison for

12        the rest of your life.  There is -- further down they

13        say, there is no middle ground here whatsoever.  And

14        then it's over -- it's finally over on Page 21 -- I

15        should say really Page 20 when they ask him

16        specifically at the very bottom, was it your brother

17        that shot him, and when he says yes, they give him a

18        positive affirmation, okay, you're doing the right

19        thing.

20   Q    What is the importance of them giving this positive

21        information, you're doing the right thing?

22   A    Well, like I had talked about before, that's a form

23        of contamination.  I've come up with a theory, I want

24        you to confirm my theory.  If you're telling me

25        things that don't confirm my theory, you're a liar,
```

228

```
1       you're resisting, but once you confirm my theory,
2       we're on the right track, you're doing the right
3       thing, good things are gonna happen.  And like I
4       said, that's that 20 questions game that I was kind
5       of referring to earlier.
6    Q  All right.  Direct your attention to Page 28, Line
7       1245.
8    A  Okay.  And at that point, what's happening here is
9       what I'll call rescripting the narrative.  We're
10      coming up with more information to add to the story
11      right here.  And what the detective does on Line
12      1245, besides -- what he's trying do is he's trying
13      to corroborate what Paul is saying, because if he can
14      do that, of course all this other stuff -- if he can
15      get good corroboration from -- like independent
16      corroboration, all this other stuff might be negated.
17      But he says, okay, 1245, who besides you, who knows
18      that Chong did the shooting.  Answer:  Probably just
19      me.  Question:  No.  There's got to be more people.
20      Well, it was either -- it's just me or Joe.  Joe
21      Thor.  Yes.  Okay.  So what else.  When you guys ran
22      that night, I mean you must have talked about it.
23      You must have said, holy shit, right.  I - and the
24      next page - mean you guys ran up there, you took off
25      your clothing for a reason.  And he goes, no, only
```

1   they did, I didn't.  And then further down the

2   detective goes, right.  But then you talk about who

3   actually shot the guy.  I mean that -- if you -- if

4   you and I are friends and then all of a sudden guy,

5   whatever, we're fighting and some guy, some guy gets

6   shot, we take off running, we're going to talk about

7   the shooting.  We're going to say, holy shit, bottom

8   just shot that guy, whatever.  So that had to happen

9   that night.  They're suggesting that this

10  conversation took place.  And Paul goes, yeah.  The

11  detective goes, what then, what did you say.  I mean

12  what -- I mean did you say Chong shot that guy.  The

13  answer:  No.  We didn't know that Chong shot the guy

14  until he told me on Monday.  And then the detective,

15  the positive affirmation, goes, okay, all right, well

16  that makes sense.  How did Joe find out.  Answer:

17  Hm.  How did Joe find out.  I don't know.  Question:

18  Do you think Chong unintelligible him.  Is Chong and

19  Joe friends.  Answer:  Yes.  So maybe Chong told him.

20  He's suggesting maybe Chong told him.  You know, so

21  you didn't tell Joe, somebody else did.  And how do

22  you know that Joe knows.  Well he didn't say that Joe

23  knows, he said it was me or Joe.  Answer:  I don't

24  know.  Question:  Well you just said Joe probably --

25  and I think it says don't, but I think from what I

230

1    remember it says does know, so how would Joe know.

2    He goes, I don't know.  Well how do you know that Joe

3    knows that Chong shot him.  Did he tell you.  No.  We

4    don't know that.  And he goes down, he probably went

5    and told Joe that too.  So you see in my opinion how

6    this is beginning to develop because they're

7    pressuring him, saying that these conversations had

8    to take place.

9        Let's see.  I'm trying to jump.  The question.

10   Oh, 1323.  Oh, yeah.  But you just said that Joe

11   knows that Chong shot him.  That's what he said.  So

12   what I'm asking is how does Joe know.  How do you

13   know that Joe knows.  Did he -- did Joe tell you, I

14   know that Chong shot him.  And then answer:  Chong

15   told me straight up, Chong went over to Joe's house.

16   So again, like I said, he goes from, well I know and

17   maybe Joe knows to Chong told me straight up because

18   he went over to Joe's house.  But it's in response to

19   the line of questioning and the suggestions that

20   these conversations took place.

21   Q   All right.  I'm going to ask you some questions about

22       some discussion that goes a little further down about

23       a diagram that occurred.  All right?

24   A   Okay.

25   Q   So turning your attention to I think maybe Page 35, I

231

1           think, but unless you have a different page number.

2    A      I think I have the same one as you these days.

3    Q      So Page 35.  Do you see them starting to talk about a

4           diagram near the bottom of the page around Line 1565

5           or so?

6    A      Yes, I do.

7    Q      All right.  So -- is there anything you found

8           problematic with the way that this was gone about?

9    A      Well, one of the things that they do is they're

10          asking him on the diagram, and where were you

11          positioned.  And now Chong, hm, and the other were,

12          ah, positioned in relationship, you know, during the

13          argument, and to when and then when the shooting

14          happened.  It's my recollection that nowhere in here

15          does he put Chong in his memory around the shooting,

16          but I interpreted that as he's trying to get him to

17          inter -- to insert Chong within the diagram itself

18          that he's drawing for him.

19   Q      Okay.  And did you observe some other, in your review

20          of this, other contamination that occurred in this

21          particular interrogation?

22   A      Yes.  On Page 41 we were talking about the injuries

23          to the victim, and they start talking about -- on

24          Line 1827 they start talking about the autopsy, and

25          they're telling him that when we do autopsies, Paul,

232

1       we can tell you how close the barrel of the gun was

2       to the victim's head.  Um-hum.  The detective:  Okay.

3       He wasn't shot from right back here.  Answer:

4       Um-hum.  Detective:  Okay.  When he was shot, the

5       barrel of the gun was probably almost touching like

6       this close.  So that's why we think you must have

7       seen the barrel or the hand holding the gun.  So he's

8       telling him specifically, where before he mentioned

9       the left side of the head, he's now showing how close

10      the gun was and -- as well.

11  Q   Okay.  I'm going to -- is there anything else in

12      particular that you want to point to in this

13      particular interrogation or should we move on?

14  A   I think we can move on.

15  Q   Okay.  Moving on to Exhibit No. 177, this is an

16      interrogation continuing of Paul Lee about eleven

17      hours or so later at 11 -- that begins at 11:58 a.m.

18  A   Yes.

19  Q   The detectives begin talking to Paul Lee and start

20      seeing on Page 2, Line 76, about have -- they have to

21      prove that it's not you, how can we prove it's Chong.

22  A   Right.

23  Q   So there is a discussion that goes on for a little

24      bit about that.  Are there any problems that you

25      associate with that?  And I know it goes on for a

1        ways.

2    A    It goes on for a ways.  But basically now they're

3         trying, of course, to disprove their original theory

4         and prove their theory that Chong did it and so

5         therefore they have to disprove the evidence.  And at

6         one point they start again talking to him about, on

7         Page 3, Line 110, I mean, where he says, I mean, you

8         said that he said something to Joe Thor, right.  And

9         the answer was, yeah, he told me that he stopped by

10        Joe Thor's house.  Okay.  Before he came to mine.

11        And then they go and they start talking about we got

12        to be able to prove that it was you, wasn't it.

13             And on Page 4 on Line 152 they ask him when was

14        the first time that you saw him, meaning Chong, after

15        the shooting.  When was the first time you saw him.

16        Paul then shifts what he had said earlier and he said

17        at Joe's.  And the question was right after the

18        shooting.  Probably an hour after.

19    Q    Okay.  Now, the police didn't suggest that shift, did

20        they?

21    A    No, they did not -- they did not suggest that shift.

22        That shift came from Paul himself.

23    Q    Okay.

24    A    And -- however, they suggested right after the

25        shooting, which I think would have been normal based

234

```
1              on the conversation as it was leading up to that.

2       Q      Okay.

3       A      Okay.  And then that's when they started having the

4              conversation, and that's when he said that he had

5              just fucked up, and then -- and the question is, and

6              did he say that he fucked up in front of everybody.

7              Yes.

8       Q      All right.  So then another name is brought into it,

9              right?

10      A      Yes, yes.

11      Q      And the police don't bring that name in it either?

12      A      No.

13      Q      Now --

14      A      But it's on the -- Page 8 after that that the story

15             does begin -- become more developed, and so it's on

16             Line 332.  That's when the detectives were asking --

17             they were talking about being in the basement.  Okay.

18             When you guys were in the basement, just the four of

19             you now, okay.  Answer:  Three of us.  Oh, four.

20             Chong.  Okay.  Detective:  Okay.  What was the

21             discussion.  I mean obviously he said he fucked up,

22             right.  Answer:  Yes.  And that's what the earlier

23             conversation was about.  The detective, right.  He

24             said he shot the guy.  So we add that from the

25             detective in there.  Answer:  Yeah.  Question:  Okay.
```

235

```
1           He said that to you guys.  Answer:  Yeah.  Question:

2           Okay.  What else did he say that -- what now he needs

3           to do next.  There has to be something.  And the

4           answer is -- to the question, again, the second

5           detective, was he planning on running.  So what's

6           been added to this by the investigators is he shot

7           the guy and he's planning on running.  And these are

8           things that you later see incorporated into Paul's

9           statement and other statements as well.

10    Q     What do you make of this -- I'm just going to turn

11          you back a page or so to Page 6 when the detectives

12          say to Paul on Page 6, Line 234, first -- right

13          before that they're talking about how they have to

14          prove Paul's innocent and they say, well we've got to

15          overcome -- we built this case -- great case against

16          you, now we have to get rid of that case to show it

17          wasn't you, it was in fact your brother, and ask for

18          his help.  What do you make of that?

19    A     Well, they just need for him to help explain and add

20          details that would help now corroborate their new

21          theory that it was Chong that did it.

22    Q     And Paul then offers -- says that the only evidence I

23          can get is if I went straight up to Chong and talked

24          to him, like, you know, look Chong.

25    A     Right.
```

236

1    Q    So that's Paul who makes the offer?

2    A    Paul makes the offer.

3    Q    And does the fact that Paul makes the offer, does

4         that change the problems with this interrogation and

5         the previous interrogations of Paul, does that change

6         your analysis of this?

7    A    No, I would say no.  I mean, I -- I've seen that a

8         lot of times in cases where people were guilty and

9         not guilty as well.  They make the offer.  Sometimes

10        people will take them up on it, sometimes they

11        won't.

12   Q    Eventually in this discussion, turning to Page 17,

13        the police, and I'd say looking at Line 747, the

14        police talk about that they may ask him to talk to

15        Phong and Joe.  Do you see any problem with that?

16   A    Well, what they're saying here is you -- is they're

17        recommending that since Phong and Joe might not

18        cooperate with them and give them the information

19        that they need against Chong that they're now seeking

20        to, you know, prove did this, that they will get Paul

21        to go say, look, you guys are my friends, I can't go

22        to prison for life, so please help me out and provide

23        the information to get me out of this situation.

24   Q    Is that the same thing as asking somebody to set up a

25        one-party -- a phone call where the person makes a

237

```
 1            call an behalf of the police and the police can
 2            listen in and try to get information that way?
 3     A      That doesn't sound like it to me, I mean, because
 4            they've talked about one-party consent calls a couple
 5            of other times in this case and they didn't do it.
 6            This -- this sounds like, you know, you just need to
 7            recruit these guys to get on your side to help us
 8            bring this charge.
 9     Q      And do they in fact go on to say that as you get to
10            the bottom of that page and the top of Page 18?
11     A      Basically.  But you got to get these guys to
12            basically go to bat for you, right.
13     Q      Okay.  And what does Paul respond by saying?
14     A      He says that he's going to go talk to Joe.
15     Q      All right.  Now, at some point at the end of this
16            they take a written statement.  Are there any
17            problems that you see with that?
18     A      Well, yes.  On Line 28 when they start talking
19            about --
20     Q      What page?
21                    ATTORNEY SCHNEIDER:  What page?
22     A      It's Page 28, Line 1208.
23     Q      Okay.
24     A      When they start talking about him creating the
25            written statement, they go, look, I'm not going to
```

238

1    put any words in your head, and then they script out

2    what they want him to write in the written statement.

3    You got into an altercation with the guy by the name

4    of Josh at Luna.  While you were kind of struggling

5    with the guy, fighting with the guy, Chong stepped up

6    and shot him on the side of the head.  So he's

7    recommending, suggesting that he put that in the

8    narrative, though I never saw anything in the

9    conversation where he admitted to having seen Chong

10    shoot him in the side of the head.

11   Q    All right.  Is there anything else or shall we move

12        on to another interrogation?

13   A    We can move on.

14             THE COURT:  Attorney Vishny, Attorney

15        Schneider, just step up for a minute.

16             (Bench conference.)

17   Q    (BY ATTORNEY VISHNY)  All right.  We have three more

18        to go through with you.  They're kind of short.  All

19        right.

20             Then let's go -- the next person or, actually,

21        simultaneously, but I'm going to ask you about Phong

22        Lee who was interviewed on December 12th by Sergeant

23        Thao and Tauber.  Where is that?  I don't think I

24        have it right in front of me, but in that interview

25        with Phong Lee with Sergeants Thao and Tauber, is

239

1          there -- do you have it?  I can't say the exhibit

2          number right now because I literally don't have it

3          right in front of me.

4                    ATTORNEY SCHNEIDER:  What name, Deja?

5                    ATTORNEY VISHNY:  I'm trying to figure that

6          out.

7                    ATTORNEY SCHNEIDER:  43?

8                    ATTORNEY VISHNY:  No, it's not 43.

9                    ATTORNEY SCHNEIDER:  97 or 220?

10                   THE WITNESS:  It's 97.

11                   ATTORNEY SCHNEIDER:  Thank you, Mr.

12         Trainum.

13                   THE WITNESS:  Anything to move it along for

14         everybody.

15                   ATTORNEY VISHNY:  All right.

16    Q    (BY ATTORNEY VISHNY)  That's a short interview where

17         Phong Lee is interviewed.  Are there any problems

18         just briefly that you see in that particular -- with

19         the way that that interview starts out?

20    A    Well, very briefly, leading into it, they -- on Page

21         2, right about -- right below the middle of the page,

22         they tell him that they want to make sure that he

23         gets himself in line, they let him know that they've

24         talked to Chong, they've talked to Paul, and they got

25         the information, and the only thing that's going to

240

1    get him in trouble is if he lied. And then over on

2    Page 9 they're again talking to him some more about

3    the events of that night, and it's about the middle

4    of the page the detective goes, okay, this is the

5    really important part. We got you and Paul. Phong

6    goes, yup. Went to Joe's house. Yeah. Okay. The

7    detective, okay. I know for sure, and I got

8    information corroborated by many other people that

9    you guys were there for maybe half an hour to almost

10   an hour. Phong: Yeah. The detective, Chong shows

11   up. Okay. Right. Phong: Yup. Detective: And you

12   guys went into the basement. Phong: Yeah.

13   Detective: Chong told you what happened. Phong:

14   Yeah. Detective: Just be honest. Okay. Phong:

15   Yeah. Detective: I got that information already.

16   Phong: Yeah. Detective: What did he say. Phong:

17   He said he popped the guy. Most of that conversation

18   is the detective just saying we have the information,

19   this is what we know, and he's just -- the detective

20   is telling the story and he's just saying yeah. And

21   what we've seen -- what I've seen not only a couple

22   times in this case but also in other cases is a lot

23   of times these yeahs is just, okay, you got me, just

24   tell me what you want me to say, I'm going to respond

25   yes or I'm just listening to you and I'm responding,

1      yeah, I hear you, and going from there.  So here is

2      an example of what I would describe as the detective

3      telling the story rather than the suspect relaying

4      the information to them.

5   Q  Right.  Now we're on the same time or sometime that

6      afternoon, the police also went -- different

7      detectives went and talked to Joe Thor again.

8         Turning your attention to Exhibits 161 and 162,

9      this is a -- one interview but there is a five-minute

10      or four-minute break that occurs in the middle of it.

11  A  Okay.

12  Q  Okay.  And that's Item No. 141.

13  A  Okay.

14  Q  All right.  What do they tell Joe Thor in this

15      interview that you find problematic?

16  A  Well, again, the first -- that they begin with on

17      Line -- on Page 2 right about the middle they

18      basically tell him that both Chong and Paul have

19      talked to us and part of the reason that they're both

20      in custody is they both talked.  That could be

21      inferring that they both confessed or they both told

22      them what -- their variation.  Then later on on Page

23      10 they basically -- and up towards the upper third,

24      they tell them, look, Joe -- they tell Joe, the

25      detective goes, and now we know that he was not -- we

242

1    don't think he was the shooter.  Joe goes, I didn't

2    believe so far too because from what I saw --

3    detective:  Say, Joe, you got to help him out.  Joe:

4    I'm trying.  I'm trying.  Detective:  Because, you

5    know, remember I -- I said we thought Paul was the

6    shooter.  Joe:  Yeah.  If you really want to help him

7    out you got to be up front with us and everything

8    that Paul did so we can verify what he's telling us.

9    Again, you know, this is the information that we're

10   seeking in order to help Paul, your friend, there.

11       But the threats also continue like on Page 21

12   towards the bottom of the page.  Okay, Joe, we've

13   just got done.  I talked to the District Attorney's

14   office.  Joe says yes.  This is a homicide case.

15   Yes.  Detective:  She wants everybody, and Brian can

16   verify, everybody responsible for this to be punished

17   to the fullest extent of the law so I'm asking you

18   for you to help yourself.  So again, you know, you're

19   going to be punished unless you help us but now the

20   help is in order to go after Chong.

21       It's repeated on Page 27 in the middle where the

22   detective says, I told you from the beginning I will

23   absolve you of everything if you -- if you tell us

24   exactly what happened after you left Luna, okay, with

25   Paul.

1           A bit further down.  You can get yourself on

2      that witness line and off that 25-year to life

3      line.

4   Q  All right.  And then, finally, is there something

5      mentioned about the needs of the police on Page 32

6      regarding Paul that's suggested to Joe.

7   A  Is that on the -- yes.  On Page 32 towards the bottom

8      the detective goes, okay.  Paul was initially -- he's

9      arrested for shooting him, right.  Joe:  Paul was.

10          ATTORNEY VISHNY:  One minute.  Let me just

11     show her.

12  A  Sure.  I'm trying to talk quicker than I should.

13  Q  We're just going to continue.  All right.  Go ahead.

14  A  Okay.  So Page 32.  The detective, okay.  Paul was

15     initially -- is arrested for shooting him initially.

16     Joe:  Paul was.  Detective:  We need people to verify

17     information of what Paul is telling us.  Okay.

18     Everything that Paul is telling us in order to

19     remember to put him on the right side of the line.

20     Joe:  Yup.  Detective:  Because there's some people

21     that put him on the wrong side of that line.

22  Q  Okay.  And do they say something next as that goes

23     on?

24  A  I'm sorry.  I -- like I said, I thought I was -- I

25     think I'm going a little too quickly.  I need to slow

244

1    down a little bit.

2        Joe:  Oh, I see.  Detective:  Now Paul is

3    telling us that Chong shot the guy Josh.  So that's

4    what they need help in getting from Joe to help

5    corroborate that.

6  Q  All right.  Moving on to Exhibit 162, which is Item

7    142, so this is the part of that interrogation that

8    occurs after the break.  Are there comments -- are

9    there again these kind of threats made by the

10    detectives that concern you that can lead to a false

11    statement?

12  A  Yes.  Again, they continue.  It's on Page 4 of my

13    transcript where the detective is going, what you

14    need to be afraid of, and what you will get arrested

15    for, is covering things up and lying to us.  Okay?

16    If you took steps, and we're giving you a green light

17    pass here today.  Joe:  Okay.  But this is it.  And

18    if we find out after today that you've covered up

19    evidence or you've helped hide evidence or you've

20    lied to us, we will be your worst nightmare.  I will

21    make it my project to see that you're in the county

22    jail.  Further down the detective goes, because we're

23    not messing around and it's going to be party to the

24    crime of first-degree intentional homicide.  A little

25    bit further down the detective goes, now I don't want

```
1          to scare you from telling me -- I don't want to scare
2          you from telling the truth but I want you to
3          understand that this is it.
4     Q    And then does he say this is the final period where
5          you have a green light pass?
6     A    This is the final period where you have the green
7          light pass.
8     Q    All right.  And then Joe starts to give more
9          information?
10    A    Joe starts to give more information.
11    Q    Now, is there anything else in particular -- is there
12         -- do you recall there is some discussion about
13         Sharks and bullets?
14    A    Yes.
15    Q    And how does that unfold?
16    A    Well, there's a discussion about Sharks itself, and
17         it's on Page 6, goes into Page 7.  The detective
18         goes, okay, what did you do with the gun.  And I know
19         we talked about this.  Joe goes, well he said he
20         flushed it somewhere.  I don't know where though.  He
21         said, maybe he said a bar downtown so I don't know
22         where.  The detective, he flushed it in a bar
23         downtown.  Joe:  That's what he said to me so.
24         Detective:  Like he flushed it down a toilet.  Guns
25         don't flush down a toilet.  Joe:  Well that's what he
```

246

1    said to me but.  Detective:  The terminology was he

2    said he flushed it down the toilet and then it -- Joe

3    goes, well that's what kind of comes to my mind.  The

4    detective goes, well they -- they went through

5    Sharks.  Joe goes, who.  The detective, after.  Joe

6    goes, who did.  Detective:  Not you.  Did he talk to

7    you about going through Sharks.  So that's the first

8    time that Sharks came up in that conversation.  And

9    Joe just goes, well, yeah, he said he went down there

10   and that he -- and the detective interrupts him

11   rather than let him finish, goes, right after the

12   shooting.  And then Joe agrees with him, yup, and

13   then he left.  Detective:  Okay.  Then did he ditch

14   it down at Sharks.  Joe:  Possibly that -- he's cut

15   off again.  Detective:  Well help yourself, Joe.

16   Joe:  He said he -- he said he threw it down the

17   toilet and flushed it.  And the detective, at Sharks.

18   Joe:  Yes.  I believe so.  And the detective goes,

19   well, okay.  Yes or no.  One or the other.  That was

20   my add-on there.  Joe goes, yes.  Detective:  Did he

21   say.  Joe:  He said Sharks.  And the detective says,

22   okay.  Okay.  Tell me exactly what he said about the

23   gun at Sharks.  He said it flushed down the toilet.

24       And what I was trying to point out is how that

25   conversation developed, how Sharks was added by the

247

1    detective, and Joe, when he wavered said possibly.

2    They forced the issue until he came to that final

3    statement right there.

4  Q    All right.  And finally, regarding that statement, on

5    Page 17 is there the referral in that discussion to

6    some past contamination that has occurred regarding

7    the gun?  Turning to Page 17 -- well, for me it's

8    Line 35 but --

9        ATTORNEY SCHNEIDER:  We'll find it.  For

10    you it's near the bottom quarter of the page or so.

11  A    Well, the detective, at this point it looks like he's

12    trying to get corroboration of -- he's trying to get

13    information that he could use for corroboration, and

14    he goes, Joe, big question for you.  Joe goes, yes.

15    The detective, what kind of gun did he say it was.

16    Joe:  He did not say what.  Well, you guys told me it

17    was a .22, right?  And the detective goes, okay.  I'm

18    not going to be able to repeat that.  So, you know,

19    the detective realized that he could not get that

20    corroboration because he already had been told the

21    information beforehand so that anything that he

22    talked about the gun was pretty much useless at that

23    point.

24  Q    All right.  And continuing on the next page, does Joe

25    say that Chong didn't say what kind of gun it was and

248

1          does Joe express a belief of why it's a .22?

2    A     Yes.  Again at the top of the page, Joe, he did not

3          say what kind of gun it was.  Joe:  But I believe it

4          was a .22 from what you guys told me.  He then asked,

5          did -- do you know what a semi-automatic is.  Well

6          kind of.  A revolver.  No.  I don't know the

7          difference.

8    Q     All right.  One more, and this is the last one.  I'm

9          going to ask you about Tou Shoua Lee's interview that

10         took place on December 18th which we have at Exhibit

11         No. 106, and that's APD Item No. 177.  All right?

12            We're not going to read the whole interview, and

13         I will tell you that a large part of this was read to

14         the jury early in this case when Tou Shoua Lee

15         testified.  So what happens in this particular

16         interrogation of Tou Shoua Lee?

17   A     Basically there isn't so much threats here as

18         suggesting of what the narrative should be through,

19         you know, contamination, them kind of scripting, just

20         like the examples I had given before where they're

21         suggesting possible answers to their questions where

22         the conversation may want to go, things along that

23         type.  Kind of shaping his memory of the events.

24   Q     Are there any very specific examples you would like

25         to give?

1    A    Trying to find the best one.

2    Q    Let me ask you this.  Is it fair to say that pretty

3         much the whole interview goes like that so it's hard

4         to just pick up one?

5    A    Pretty much the whole -- it's like on Page 22 where

6         they say, okay, so obviously the person that we're

7         talking about is Chong.  He says, yeah, he came from

8         the dance floor.  But they keep saying, yeah, but he

9         wasn't there, he wasn't there initially.  Okay.  And

10        you saw him walking from the bar area.  Lee:  I just

11        see him, like I didn't know that he was a gunman, I

12        didn't know he was a shooter, I just don't know.  He

13        keeps saying that there could have been anybody there

14        who was the shooter, and they kept bringing about

15        Chong.  Line 29, so the three of them that -- Page

16        29, so the three of them that walked past you, you're

17        saying that it most likely will be Chong.  He goes,

18        could have been Chong, could have been Michael, I

19        don't know.  Detective:  Okay.  I have no idea who it

20        was at the time.  Lee:  It could have been anybody

21        there.

22             Like I said, they keep suggesting Chong's name

23        throughout this, even though he insists that he just

24        didn't know.

25    Q    Now, earlier before we started getting the specifics

250

1        of the case you mentioned what they call the PEACE

2        method in the UK.  That's a different method of

3        interviewing and interrogation.  Can you just briefly

4        tell -- explain what that means to the jurors, that

5        methodology?

6    A   Well, like I said, the term PEACE is not the name of

7        it, just an acronym of the investigative

8        interviewing, and what it is, it's designed to obtain

9        as much information from the suspect as possible with

10       a minimum amount of contamination.  Detectives are

11       given extensive training in the right questions to

12       ask in order to avoid things like leading questions,

13       and they're given a lot of practice on how to do this

14       as well.  And just very, very quickly, what they do

15       is they first know everything they know about the

16       case and they ask the suspect to provide their

17       account.  They then listen to the suspect's account,

18       they repeat it back to them, and then they'll ask

19       something like, okay, you say that you drove home

20       that night.  Please tell me the route that you drove.

21       They'll explore that in intimate detail, and then

22       they'll go to another point.  By the time they're

23       finished, they have a ton of information, the suspect

24       is locked into all of this stuff, be it an alibi or

25       whatever, and then at that point they're allowed to

```
 1          challenge the suspect.  They don't give up their
 2          information up front, they're -- because the suspect
 3          may have an explanation for it.  They explore all the
 4          possible explanations that might be present for that
 5          evidence, and then they say, well, we -- you say that
 6          you drove him on this route but we would like for you
 7          to explain why CCTV caught your car over on this
 8          route at this time.  And they're not yelling, they're
 9          not screaming, they're not accusing him, they're not
10          saying that you're lying, they're just asking him to
11          provide an account, and they do it in such a way
12          that, like I said, the person's locked in, they now
13          to have explain.  If they can't explain then there is
14          a saying in the police work that an alibi can be as
15          good as the -- that a blown alibi can be as good as a
16          confession.  So -- and what they end up getting is a
17          lot of information that they can then go out and
18          check.  Because if you tell me that you took this
19          route home, I can go back and check red light
20          cameras, I can check gas receipts, I can do all this
21          other kind of stuff rather than spend all my time
22          trying to get somebody to admit it and not much more
23          information than that.
24     Q    Isn't that what the police did here when they took
25          the versions from witnesses and then they would, you
```

252

1           know, the witnesses would say, well, I wasn't there,

2           and they would say to them, look, we have you on

3           video, we have you walking out of the bar, or they

4           would show them their photographs?

5    A      Well, they did do that, but the questions that they

6           asked were so leading and contained so much

7           information about the case and kind of gave major

8           hints as to the direction that they thought the

9           narrative should go, that they were actually giving

10          out more information at one point than they were

11          getting back from the suspect.  So that's not

12          investigative interview, that's -- that's not seeking

13          information, that's seeking confirmation.

14                   ATTORNEY VISHNY:  Your Honor, at this time

15          that's the last question I have if you want to take a

16          break.

17                   THE COURT:  Thank you.  Why don't we -- as

18          close as we're going to get to a break time.  Why

19          don't we give the jury ten minutes.

20              All rise.  And then I'll expect that we'll

21          commence at around four p.m.

22                   (The jury was escorted out of the

23          courtroom.)

24                   THE COURT:  Okay.  We'll be in recess for

25          about ten minutes.

1                    (Court in recess.)

2                    THE COURT:  Please rise for the jury.

3                    (The jury was escorted into the courtroom.)

4                    THE COURT:  Please be seated.

5               Attorney Schneider, whenever you're ready.

6          **EXAMINATION OF JAMES L. TRAINUM**

7     **BY ATTORNEY SCHNEIDER:**

8     Q    Mr. Trainum, when were you hired to review this

9          case?

10    A    I was first approached probably I think it was last

11         spring, last spring, first part of summer.  I don't

12         quite remember when.

13    Q    And then after that point it was the defense that

14         sent you materials to review?

15    A    Yes, ma'am.

16    Q    And I just want to clarify something, you're -- when

17         you talked about how many cases you worked, you said

18         you'd been an officer I think for 27 years, right?

19    A    That's correct.

20    Q    And 17 years as an investigator?

21    A    Correct.

22    Q    And not everybody knows the size of D.C. but you said

23         you did 50 homicide interrogations and about a

24         hundred other interrogations?

25    A    Like I kind of mentioned before, it -- if you do the

254

1          math, because I know that a lot of detectives will

2          talk about doing hundreds and hundreds of

3          interrogations, just don't interrogate that many

4          suspects.  And especially if you work homicides.

5          Homicide you may work -- in a busy department you may

6          work five to ten per year, but what you typically do

7          is end up interrogating more witnesses using the same

8          tactics of course that you do with a suspect.

9     Q    And you've talked -- Attorney Vishny asked you,

10         you'll go teach here, go teach there.  You're often

11         paid to go teach at different places, correct?

12    A    No.

13    Q    You do it all pro bono?

14    A    I've only been paid once.  Other than that,

15         everything is pro bono, especially if it's law

16         enforcement that asks me.  They'll pay for expenses,

17         but other than that it's all pro bono.

18    Q    And the Reid technique, it is not mandated by statute

19         in Wisconsin?

20    A    I do not know that it is.

21    Q    It's probably not mandated by any state in the United

22         States, correct?

23    A    That's correct.

24    Q    It's an approach.

25    A    It is the interrogation technique that is primarily

1          used in the US, that's correct.

2    Q    It's a guide, correct?

3    A    They don't teach it as a guide.

4    Q    Okay.  But there is no requirement to be an officer

5          in the State of Wisconsin that you have Reid

6          technique training, is there?

7    A    Not that I know of.

8    Q    And you talked about admissible items or admissible

9          testimony in this.  Everything a jury hears during

10         the course of the trial, unless it's objected to or

11         stricken, is admissible, correct?

12   A    And like I mentioned, there is a difference between

13         what's admissible, what's reliable, and what's

14         accurate, but, yes, everything that comes before the

15         jury has been ruled admissible by the judge.

16   Q    Okay.  And you've reviewed the reports prepared by or

17         since sent to you by the defense, correct?

18   A    Yes.

19   Q    Did you ever make contact with anyone in the Appleton

20         Police Department?

21              ATTORNEY VISHNY:  I just want to object.

22         The reports are prepared by the police.

23   Q    Reports sent to you by the defense.

24   A    That's correct.

25   Q    You never made contact with anyone from the Appleton

1          Police Department to talk to them, did you?

2    A    I did not.

3    Q    You could have?

4    A    I could have.

5    Q    Never met with any of the individuals who gave the

6          statements in this case?

7    A    That's correct.

8    Q    And obviously you weren't here, I mean there's been a

9          lot of people in and out of the courtroom, but you

10         weren't here until today, correct?

11   A    I was not in this courtroom until today, that's

12         correct.

13   Q    So you weren't able to observe any of the people when

14         they came in to testify?

15   A    That's correct.

16   Q    And you -- when you talked about these Reid

17         techniques or the different techniques that you would

18         say -- maybe you would say they're not proper, your

19         position is that they may lead to false confessions,

20         correct?

21   A    That they -- yes, I think that -- what I was saying

22         is that the position of Reid and the researchers is

23         that they increase the possibility of false

24         statements.

25   Q    Okay.  What percentage?  You talked about all this

1         research, what percentage of cases using the Reid

2         technique results in a false statement?

3    A    That's the problem.  We really don't know because

4         there's no master database out there of how many

5         interrogations are done, there's no master database

6         of how many of those result in false statements, and

7         so there's really no baseline per se.  We do have an

8         idea of how many false confessions have occurred --

9         confirmed false confessions have occurred in

10        confirmed wrongful conviction cases.

11   Q    And there is no false confession in this case,

12        correct?

13   A    I'm not saying there is -- what's false and what

14        isn't false, of course, is totally up to the jury.

15   Q    A false confession.  There is no false confession in

16        this case, correct, Mr. Trainum?

17   A    That's correct.

18   Q    Okay.  In your experience with homicides, if people

19        hear a gunshot, do some people run?

20   A    Yes.

21   Q    Do people run who have no involvement in the case?

22   A    I have seen that, yes.

23   Q    Because they're scared?

24   A    I have had that as an explanation, yes.

25   Q    Sometimes even a lesser offense, not a homicide, you

258

```
 1          know, a theft from a store or they see a fight out,
 2          some people just don't want to be involved; isn't
 3          that correct, Mr. Trainum?
 4     A    That's correct.
 5     Q    They don't want to have to come into court to
 6          testify?
 7     A    That's correct.
 8     Q    Some people don't want to have to talk about what
 9          then saw their friends do, correct?
10     A    That's correct.
11     Q    Or what they saw a family member do?
12     A    That's correct.
13     Q    Would you agree with me that most people don't joke
14          about committing or shooting someone?  That was a bad
15          word in there.  Would you agree with me that most
16          people don't joke about shooting someone?
17     A    Joke how?  I don't understand.
18     Q    Like I tell Mr. Maier, hey, last Saturday night I was
19          out downtown and I shot a guy?
20               ATTORNEY VISHNY:  Judge, I'd like to
21          approach the bench.
22               THE COURT:  You may.
23               (Bench conference.)
24               ATTORNEY SCHNEIDER:  And I'm just going to
25          ask the court reporter to read the question back.
```

259

1       Thank you.

2                 (Question read back.)

3    Q   (BY ATTORNEY SCHNEIDER)  Do you think most people

4        joke about that?

5    A   Not in my circle.

6    Q   And in your investigations?

7    A   I've had people joke.  It depends -- yes, I've had

8        cases where people have made light of it for various

9        reasons.  Yes.

10   Q   Were those people actually involved in the offense?

11   A   Some were and some weren't.

12   Q   So do you believe if someone, you know, someone was

13       at a scene because of something you have and you go

14       to talk to that person and you say, hey, I want to

15       talk to you about being at this spot, and they say I

16       wasn't there, okay, so you don't -- do you think that

17       officer should probe into that?

18   A   Yes, of course.

19   Q   Do you think they should confront a person if they're

20       lying?

21   A   Appropriately, yes.

22   Q   So it's not appropriate -- if someone denies

23       something eight times can they continue to ask that

24       person if they've been there?

25   A   If they do it in such a way that doesn't involve the

260

1        problematic techniques that I talked about or

2        involves contamination, it's quite appropriate.

3  Q   You've dealt with probably people on the spectrum,

4        and that I mean you've probably dealt with people who

5        have had low cognitive functioning to people who were

6        professionals in corporations.

7  A   Yes.

8  Q   And you've had to interview all those types of

9        people.

10  A   Yes.

11  Q   And you probably interviewed people who have gone

12        from wanting to be willing and tell you what they

13        knew to absolutely not wanting to talk about what

14        they knew.

15  A   Absolutely.

16  Q   And would you agree with me that because there's such

17        a broad spectrum of people you can't take the same

18        approach with every person?

19  A   That's correct.  You can't take the same approach,

20        but there are certain approaches that you shouldn't

21        take period.

22  Q   Your position on this is that these were problematic

23        and that sometimes these problematic approaches may

24        lead to false statements.

25  A   That's exactly right.

261

```
1    Q    Not that they do lead to false statements in every
2         case.
3    A    Which is why I talked about the second step which is
4         corroboration of the evidence.  You don't take it at
5         face value, you need to test it, be it from a
6         cooperative witness who voluntarily gives you that
7         information or one that you get it from other
8         means.
9    Q    In this case were you ever seen or shown any photos
10        relevant to a jacket?
11   A    Yes.
12   Q    What do you remember about that?
13   A    It was a -- I believe, I think it was a lighter
14        jacket with darker sleeves and some stripes around
15        the wrist.
16   Q    And where did you see that from?
17   A    That was a photograph that I was sent.
18   Q    When?
19   A    I don't remember exactly when.
20   Q    Was it the first packet you got or a packet you just
21        recently received?
22   A    It was a later package, but I think it was -- I don't
23        remember how recently.
24   Q    Okay.  Did you ever see any video from the Hilton
25        hotel in Milwaukee?
```

262

1    A    No, I did not.

2    Q    Okay.  So if officers had gone down and obtained

3         video of Mr. Lee checking into the Hilton hotel

4         Sunday morning at 6:43 a.m. the morning of the

5         shooting and some other people had said we went down

6         to Milwaukee, that would be a piece of evidence that

7         corroborates someone's statement, correct?

8    A    It depends on what the statement was of course, but

9         yes, that -- that could be.  Videotape like that

10        could be a piece of corroboration.

11   Q    Or like a receipt from the hotel to verify where he

12        had been?

13   A    Yes, that could be a piece of corroboration.

14   Q    Or a receipt from a JJ Fish & Chicken restaurant in

15        Milwaukee?

16   A    That's correct.

17   Q    Did you see any of those items?

18   A    No.

19   Q    I'm going to assume that in Washington D.C. you have

20        a tip line for individuals, correct?

21   A    That's correct.

22   Q    And had that probably during most of your career?

23   A    All my career, that's correct.

24   Q    Are you aware of tips that also were received in this

25        case?

263

1    A    No, I was not.

2    Q    So if officers had gotten tips on this case on

3         December 11th, that's not something you're aware

4         of?

5    A    That's correct.

6    Q    But if they had gotten tips that said Chong might be

7         involved --

8                   ATTORNEY VISHNY:  I object to that.  That's

9         hearsay.

10                  ATTORNEY SCHNEIDER:  I can't ask him the

11        question tomorrow, I guess.

12                  ATTORNEY VISHNY:  Can we approach the

13        bench?

14                  THE COURT:  Approach.

15                  (Bench conference.)

16   Q    (BY ATTORNEY SCHNEIDER)  As part of this case, Mr.

17        Trainum, recently you were given jail phone calls to

18        review, correct?

19   A    That's correct.

20   Q    Did Washington D.C. have a system where when a person

21        was in custody their jail phone calls were

22        recorded?

23   A    Yes, towards the second half of my homicide career.

24   Q    I was gonna say, we haven't always had that.

25   A    No, we have not.

264

```
1    Q    And is it a similar practice in Washington D.C. where

2         at the start of those calls it's this call is

3         recorded and monitored?

4    A    Yes.

5    Q    Is it a situation -- our old system about every five

6         minutes a voice would come in and say this call is

7         being recorded and monitored.  Was that the system

8         you had in D.C.

9    A    Not in D.C., I don't believe.

10   Q    Okay.  But you've reviewed those jail phone calls?

11   A    I went through them, that's correct.

12   Q    And letters written by the defendant?

13   A    The ones that were given to me, yes.

14   Q    And you're aware, Mr. Trainum, the charges in this

15        case aren't just the homicide charges, correct?

16   A    That's correct.

17   Q    There's charges for intimidation of witnesses and

18        solicitation of perjury?

19   A    Yes.

20   Q    I just want to talk a little about Paul Lee's written

21        statement.  You said in your testimony that you

22        thought when Sergeant Schira went through, prior to

23        him making his written statement, some facts or

24        details, what was your issue or concern with that?

25   A    The fact that he suggested from the transcript that
```

265

```
 1            he include in there -- included in there that Chong
 2            shot the victim, when there was nothing that I saw in
 3            the transcript where Paul said that he saw Chong
 4            shoot the victim or anything along that line.  I
 5            think that it was -- it sounded to me like a
 6            misrepresentation of the information that he had.
 7       Q    Well, if I tell you I shot the Grinch, I think I
 8            referenced the Grinch at some point, I shot the
 9            Grinch, okay, from the movie, and then we're at --
10            you were there when it happened, you think it's --
11            would be improper for you to say Carrie shot the
12            Grinch in that statement?
13       A    I think what was improper is the way that he had it
14            phrased is that I was involved in -- if I remember
15            off the top of my head, I was involved -- he asked
16            him to write, I was involved in a fight, Chong shot
17            the victim.  And that sounds like that happened all
18            at once, that was the way that he remembered it.  I
19            think it would have been more appropriate to have him
20            write it in his own words without it being suggested
21            to him how he phrase it.
22       Q    So when it got physical, Chong came from Josh's left
23            side and point blanked Josh.  That's what you had
24            issue at?
25       A    Yes.
```

266

```
 1   Q    If I would tell you there is references within the
 2        transcripts to him talking about Paul coming from the
 3        bar, would you agree with -- or Chong coming from the
 4        bar prior to shooting would you agree with me?
 5   A    Well, I was thinking about that, and I believe like
 6        the point blank contact wound and all that, that
 7        first came up from the detectives.
 8   Q    Do you have your -- do you have --
 9             ATTORNEY SCHNEIDER:  Do you want me to have
10        him use the exhibit or his notes?
11             ATTORNEY VISHNY:  Well, he's got his notes
12        up there.
13   Q    (BY ATTORNEY SCHNEIDER)  Okay.  So do you have the
14        11:58 Paul Lee transcript at Appleton PD?  I'll give
15        you time to get there.  You gave us time to catch up
16        too.
17   A    11:58?
18   Q    Yes.  Page 11.
19   A    I have Page 11.
20   Q    Okay.  So the top of that they're asking about the
21        jacket?
22   A    This is the 11:58 a.m.?
23   Q    Yes.
24   A    Page 11?
25   Q    Yes.
```

267

```
 1    A    Possibly he threw it in a dumpster somewhere, yes.

 2    Q    Okay.  So you're with me.  Then they ask him if there

 3         is blood splatter, right?

 4    A    Right.

 5    Q    And then the -- Paul's answer says, maybe, I don't

 6         know?

 7    A    Right.

 8    Q    The officer says, okay.  Correct?

 9    A    Yes.

10    Q    And then Paul says, he did say he point blanked him.

11    A    That's correct.

12    Q    Okay.  And during Phong's interview, his first

13         interview, he talked about how he didn't want to be a

14         snitch, right?

15    A    Did he bring that up or did they bring that up?

16    Q    He talked about it, right?

17    A    It was discussed.

18    Q    Have you ever heard the phrase snitches get

19         stitches?

20              ATTORNEY VISHNY:  I object to that, think

21         we've been down this road before.

22              ATTORNEY SCHNEIDER:  It was a comment made

23         during the course of this trial.

24              ATTORNEY VISHNY:  By Mr. Maier.

25              THE COURT:  Counsel, approach.
```

268

```
1                        (Bench conference.)

2    Q    (BY ATTORNEY SCHNEIDER)  We're going to flip to Phong

3         interview.

4    A    Okay.

5    Q    So Phong --

6                   ATTORNEY VISHNY:  What page?

7                   THE COURT:  27 is the first reference.

8                   ATTORNEY VISHNY:  Page 27 of what exhibit

9         number?

10                  ATTORNEY SCHNEIDER:  Item 43.

11   Q    Line 23.  Do you see that?

12   A    I don't have lines.  What does it start with, if you

13        would, please.

14   Q    The first word is dude.

15   A    Okay.

16   Q    So Phong says, during the course of that interview,

17        dude, I'm not -- I'm snitching.  Right?

18   A    I'm snitching.  Okay.

19   Q    And then can you --

20   A    Well, he says on that page, like I said, I haven't

21        gone back and looked at the others, but he does say

22        that on Line -- on Page 27.

23   Q    So why don't we switch to Page 33.  I'm going to

24        direct you to Line 32.  He says -- Phong says during

25        the course of that, you a snitch, you gonna -- you
```

269

```
 1            gonna to get it.  A snitch gonna to get it like fast
 2            as hell.  Right?
 3     A      Yes.
 4     Q      So he expressed some concerns to the officers during
 5            that interview.
 6     A      Apparently, yes.
 7     Q      And Joe Thor, during his interview on the 9th and on
 8            the 10th, even when the officers were pushing him
 9            about you got to tell us this, we saw him and he had
10            this item in his hand, he never said Paul was the
11            shooter, right?
12     A      No, he did not.
13     Q      And in fact he said Paul was not the shooter.
14     A      Yes.
15     Q      It was not Paul, it was not Phong?
16     A      Yes.
17     Q      And during the first interview of Paul at Appleton
18            Police Department, even when they're saying, you
19            know, we think it's you, you got this item in your
20            hand, Paul does not say he was a shooter, correct?
21     A      That's correct.
22     Q      Have you ever had cases, Mr. Trainum, where a family
23            member has been hesitant about talking about what
24            another family member did?
25     A      Absolutely, yes.
```

270

1    Q    You don't speak Hmong, do you?

2    A    No.

3    Q    So if there were references within any of the

4         transcripts like the Appleton Police Department that

5         were in Hmong, you don't know what they said?

6    A    Just based on the transcript itself.

7    Q    Okay.

8    A    The translation, I should say, of the transcript.

9    Q    And you're familiar with the form Monday morning

10        quarterbacking, right?

11   A    Yes.

12             ATTORNEY SCHNEIDER:  Nothing further.

13             THE COURT:  Attorney Vishny, any follow-up

14        examination of this?

15             **EXAMINATION OF JAMES L. TRAINUM**

16   **BY ATTORNEY VISHNY:**

17   Q    Are you Monday morning quarterbacking in this case?

18   A    No, I'm not.

19   Q    What are you doing when you tell us what your

20        expertise is when you analyze the interrogation

21        techniques used here?

22   A    Basically I'm trying to offer information as to what

23        is basically accepted practices and problem -- what

24        have been identified as problematic practices and

25        explain the tools that law enforcement is supposed to

271

1       use in order to corroborate the reliability and the

2       accuracy of confession evidence.

3   Q   And are the opinions that you've offered based not

4       only on your own personal opinion but extensive

5       research in the area of false statements?

6   A   Yes.

7   Q   And finally, what I want to ask, since this issue has

8       come up, is what does constitute independent

9       corroboration that can be done in a case such as this

10      after a lot of witness statements are obtained?

11  A   One, I like to create time lines of the events, not

12      only the events but also the witness statements

13      themselves.  It's interesting -- actually, one of --

14      this was taught to me by one of the people who used

15      to work for Reid is that if you have witness

16      statements that change over time, it's interesting to

17      see what might have influenced those changes, and so

18      you're looking for the type of interrogation

19      practices and contamination that might have

20      influenced those changes.  Other things that you can

21      look for is they talk about phone records, you pull

22      phone records.  If they talk about routes that they

23      drove or they walk, you go out and you find

24      videotapes, like they were talking about before,

25      receipts, things along that line.  That's the type of

272

1       stuff you're looking for.  If you're telling me this

2       is what happened, how can I go about proving where

3       you were at that time.  That sort of thing.  And then

4       you go out there and you try to do it.

5           I -- I've done crime scene reconstructions

6       before, and they've often -- by having an independent

7       person come in and trying to re -- recreate the crime

8       scene or a situation, that sometimes helps to

9       corroborate a situation.

10  Q   I'm just going to ask you really quickly about phone

11      records.  Is checking phone records to see if there

12      were calls between phone numbers that are known to be

13      certain individual's cell phone, is that a good way

14      to corroborate whether or not people have spoken to

15      each other in a certain time period?

16  A   Yes.  In fact, the last part of my career that's a

17      heck of a lot of what we did.

18  Q   And now it's fair to say, of course, it doesn't mean

19      you're proving who is on the phone because you're not

20      there taping the conversation, I mean somebody could

21      pick up somebody else's phone, right?

22  A   That's correct.

23  Q   Okay.  But it -- even though that can occur, why is

24      this a valuable tool?

25  A   Well, I mean, if I say that I made three phone calls

273

1          this afternoon, and there's three phone calls that

2          are listed from the number that I say that I called

3          to another number, what it shows is that three phone

4          calls were made from that number, but it does back up

5          what I'm saying.  There is independent proof that

6          what I'm saying is true.

7     Q    And can there also be a -- if a witness claims, gee,

8          I haven't talked to somebody for several months, can

9          one also make use of checking their phone records to

10         see whether or not there have been calls between that

11         witness's telephone and the person who they claim

12         they've never spoken to?

13    A    Yes.  But of course you have to take into account

14         that that only shows phone call communication.  It

15         doesn't show all communication.  So even physical

16         evidence of that nature is limited, you have to

17         recognize it for what it is, but yes, if somebody is

18         saying, no, I haven't had any conversations with them

19         and there is no phone traffic, you would also, during

20         your conversation with him, during your interview,

21         what I'm talking about is getting information, okay,

22         you say that you haven't talked to him in a month.

23         Does that mean that you haven't met with him in

24         person, does that mean that you haven't talked to him

25         on the phone, you would eliminate all those

274

1     possibilities, and then you would check the phone

2     records or whatever means you had to corroborate

3     that.

4          ATTORNEY VISHNY:  Nothing further.

5          THE COURT:  Attorney Schneider.

6     **EXAMINATION OF JAMES L. TRAINUM**

7     **BY ATTORNEY SCHNEIDER:**

8  Q  All phone records really do is tell us this phone

9     number called another phone number, right, we can

10    never put anybody behind the phone at the time unless

11    you're sitting with them.

12 A  Or unless you have some other sort of documentation

13    like a video with them on the phone or whatever like

14    that.  Generally, that's correct.

15 Q  And family members probably sometimes call each other

16    quite a bit.

17 A  Depends on the family member.  Sure.

18 Q  And you've -- you reviewed search warrants in this

19    case?

20 A  No.

21 Q  Okay.  So would you know that even Joe Thor did not

22    have a cell phone but his brother Cassidy did and law

23    enforcement took that phone from him on December

24    12th?

25 A  Excuse me.  I'll correct myself.  I remember phones

275

1       being seized, I remember a spreadsheet of search

2       warrants, and some were and some were not -- the

3       information apparently on some was received from the

4       phone company and some was not received from the

5       phone company.

6    Q   Okay.  And are you aware on December 12th, 2013, Paul

7       Lee was at the Appleton Police Department, I think

8       we've agreed, and got dropped off at about 1:17 p.m.

9       Okay?  Were you aware of that?  You talked about time

10      lines.

11   A   I don't -- I'm not specifically aware of that time

12      off the top of my head.  If I went back and looked at

13      the reports, it would probably be in there.

14   Q   Do you know what time officers started speaking to

15      Joe Thor on that same day?

16   A   I do not know off the top of my head.

17              ATTORNEY SCHNEIDER:  Okay.  Nothing

18      further.

19              THE COURT:  Attorney Vishny?

20              ATTORNEY VISHNY:  Nothing.

21              THE COURT:  Ladies and gentlemen of the

22      jury, any questions for consideration?

23         Attorneys please approach.

24         (Bench conference.)

25              THE COURT:  Any other questions?

276

1                    ATTORNEY SCHNEIDER:  No, I don't have any

2          other questions of Mr. Trainum.  Thank you.

3                    THE COURT:  Thank you, sir.  And you may be

4          excused.

5                    THE WITNESS:  Oh, thank you.

6                    THE COURT:  And then the -- we'd go back to

7          now our original batting order, and so the State, it

8          is now your case again.

9               Mr. Maier, you have another witness, sir?

10                   ATTORNEY MAIER:  We do.  Your Honor, the

11         State calls Teng Lee.

12                   THE COURT:  Very good.

13                   THE CLERK:  Please raise your right hand.

14                   (Oath administered to witness.)

15                   THE WITNESS:  Yes, I do.

16                   THE COURT:  Please state your full name and

17         spell it for the record please.

18                   THE WITNESS:  Teng Lee, T-E-N-G, last name

19         Lee, L-E-E.

20                   THE COURT:  Okay.  Mr. Lee, you may be

21         seated.  And then I would ask -- well, we do have a

22         new bottle of water for you if need be.  And then

23         additionally, once you're seated I'd ask that you

24         adjust the microphone so that you're able to be heard

25         by everyone.

277

```
 1                    THE WITNESS:  Okay.

 2                    THE COURT:  Thank you, sir.

 3            And then, Mr. Maier, you'll be questioning; is

 4        that correct?

 5                    ATTORNEY MAIER:  I am, Your Honor.

 6                 EXAMINATION OF TENG LEE

 7   BY ATTORNEY MAIER:

 8   Q    Good afternoon, Mr. Lee.

 9   A    Good afternoon.

10   Q    Mr. Lee, do you know Chong Lee?

11   A    Yes, I do.

12   Q    And how long have you known Chong?

13   A    Since I was a child.

14   Q    He's the defendant seated in court today?

15   A    Yes.

16   Q    Do you have any brothers?

17   A    Yes, I do.

18   Q    Is one of them named Phong?

19   A    Yes.

20   Q    I'm going is to ask if you know some people, and I'd

21        like you to just say yes or no, depending on whether

22        you know that.  Okay?

23   A    Okay.

24   Q    Joe Thor?

25   A    Yes.
```

278

1   Q   Paul Lee?

2   A   Yes.

3   Q   Alyson Blom?

4   A   Yes.

5   Q   You may know her as Alyson Kristy; is that correct?

6   A   I believe so, yeah.

7   Q   Do you know a Hu Lee?

8   A   Yes.

9   Q   And a Lisa Stutzman?

10  A   Yes.

11  Q   If you had a nickname, what would it be?

12  A   Big T.

13  Q   Or maybe T?

14  A   T, yeah, T for short.

15  Q   Okay.  I want to ask you some questions about a time

16      in December of 2013, specifically it would be after

17      the police arrested the defendant.  Do you recall

18      roughly that time period?

19  A   No.

20  Q   Okay.  After the defendant was arrested, though, he

21      called you on the phone, correct?

22  A   Yes.

23  Q   And he would have called you from the Outagamie

24      County Jail?

25  A   Yes.

279

```
 1   Q   Mr. Lee, I'm showing you what has been marked as

 2       Exhibit 170.  Do you see the sticker by my number

 3       there?

 4   A   Yup.

 5   Q   Okay.  Now, what I'm showing you, you have not seen

 6       before, correct?

 7   A   No.

 8   Q   This is a transcript of a jail phone call placed from

 9       the Outagamie County Jail on a date and a time.  Do

10       you see that?

11   A   Yes.

12   Q   And to a number, correct?

13   A   Yes.

14   Q   What is the date and time that the call was placed?

15   A   12/18/2013 at 12:55 p.m.

16   Q   All right.  Thank you.  And the phone number that was

17       called was 920 --

18   A   574-6656.

19   Q   Is that a number that has some meaning to you?

20   A   Yes.

21   Q   Whose number is that?

22   A   I believe it was mine at that time.

23   Q   All right.  What I'm going to do is --

24               ATTORNEY SCHNEIDER:  And actually, Your

25       Honor, I think the lights at this point would be
```

280

1      helpful.

2   Q   (BY ATTORNEY MAIER)  Mr. Lee, are you able to read

3       that on the screen right now?

4   A   Yes.

5   Q   Okay.  Now, there's some lines that say Chong Lee and

6       some lines that say Teng Lee.  When you spoke with

7       the defendant when he was in the jail, did you speak

8       only in English or in some other language also?

9   A   We speak another language too.

10  Q   What other language would you have spoken?

11  A   Hmong.

12  Q   So realizing that what was said may have been in

13      Hmong, it's been translated and we've agreed that at

14      least to a reasonable degree the translation is as

15      accurate as we can get it to be.

16          What I'd ask you to do is direct your attention

17      to the screen which reflects a portion of Exhibit

18      170, a portion of a conversation between you and the

19      defendant.

20          Chong Lee says, uh, Joe's working for the

21      police.  How do you reply to that?

22  A   For real.

23  Q   Chong Lee then says, yes, Joe told me.  You reply?

24  A   What about Paul.

25  Q   Chong says, those two, Paul and Joe.  You say?

281

1    A    For real.

2    Q    Chong says, yes.

3         Mr. Lee, the next one has been marked as Exhibit

4         171.  Do you see that mark there?

5    A    Yes.

6    Q    And this is another transcript of a jail call.  Could

7         you describe to the jury what the date and time of

8         this call was please?

9    A    12/28/2013 at 9:36 a.m.

10   Q    And it says call to 920 --

11   A    574-6646.

12   Q    And you testified just now that was your number at

13        the time, right?

14   A    Right.

15   Q    Thank you.  And again I'll display it on the screen.

16        You don't have any independent recollection of this

17        phone call?

18   A    I can't recall.

19   Q    Okay.  Now in this one, and I've left part of one

20        column visible so that we can see that part of this

21        call is in English and part of this is in Hmong, do

22        you sort of see where that works there, where if it's

23        no box it's in English and if there's a box with two

24        columns it's in English and Hmong and the

25        translation?  Do you see how that works, Mr. Lee?

282

1   A   Yeah, I see.

2   Q   You can see that at the top of the page there is a T

3       with words.  That's you versus Chong Lee, correct?

4   A   Yeah.

5   Q   What do you say to start this?

6   A   Yeah, yeah, yeah, I know, so how is your case

7       going.

8   Q   And Chong says, uh, so I could -- I should win.  And

9       you say?

10  A   You sure.

11  Q   Chong says, yes.  I don't like -- they don't have

12      anything on me.  You say?

13  A   Okay.  Man.  So you deny it completely.

14  Q   Chong says, yes, I completely denied it.  But then if

15      Joe, you know -- and then there's a T and you say?

16  A   Yeah, I'm not sure if it's Joe though.  I'm thinking

17      it's Paul.

18  Q   Chong says, no, it is Joe.

19  A   You sure.

20  Q   Chong says, yeah, because Joe told -- Joe told them

21      that the bullets are here and other things, you know.

22      You say?

23  A   Joe said what.

24  Q   Chong says, Joe said to them -- told the police that

25      inaudible, oh, the bullets inaudible are here, they

283

1        flushed the toilets like this, like this.  You say?

2    A   I can't really see from here.

3    Q   If you want to step down.

4              ATTORNEY SCHNEIDER:  Maybe it's low, Andy,

5        just raise it up.

6    Q   Can you see it now?

7    A   Yeah.  It says, oh, that's bad, I believe.

8    Q   Chong says, Joe said that, yeah, Joe said that Chong

9        told me that Chong flushed at, uh, and it continues

10       to the next page.

11             THE COURT:  And if you need to move, Mr.

12       Lee, to be able to see better, that's perfectly

13       fine.

14             THE WITNESS:  Okay.

15   Q   (BY ATTORNEY MAIER)  And at the top of the page in

16       the box you say?

17   A   Yes, yes, I get it.  I get it.

18   Q   Chong says, you know.

19   A   I know.

20   Q   Chong says, yes, it is Joe.  You say?  And you can

21       say the words.

22   A   Fuck.  All right.  Damn, but -- oh, man.  I don't --

23       those people were fucking thinking.

24   Q   Chong says, it is not your brother so I am not

25       worried.  Your brother knows his part.  And you

284

1      say?

2  A   What.  I know that.  Yeah.  I know that but the other

3      two, man, they're like starting fuck and shit.  For

4      real, man.

5  Q   Chong says, tell them to disappear.

6          Mr. Lee, I'm -- I'm sorry, I'm going to show you

7      what's been marked as Exhibit 172.  Do you see that?

8  A   Yes.

9  Q   Similar to the prior two, correct?

10 A   Yes.

11 Q   What is the date of this jail phone call?

12 A   January 7, 2014, at 11:48 a.m.

13 Q   And the number called is 920 --

14 A   574-6656.

15 Q   And that's your number at that time, right?

16 A   Yeah.

17 Q   I'm going to show you a portion of the conversation

18     on the screen.  I would ask you again to read your

19     part which is in this one identified as Teng Lee.

20     Can you see that okay?

21 A   Yes.

22 Q   All right.  Chong Lee says, I could call Stephanie,

23     but Stephanie is at work right now.

24 A   I said, you guys dating, dude.

25 Q   Chong says, no.  Why.

285

```
1    A    I don't know.  It looks like you guys are in love.

2    Q    Chong says, she loves me but I love Melanie more.

3    A    Damn.

4    Q    Chong says, Melanie is my love, Melanie, not

5         Stephanie.

6              And this continues on to the next page.  At the

7         top it's labeled as T.  Do you see that?

8    A    Yes.

9    Q    What did you say there?

10   A    Did you go to your court hearing already.

11   Q    Chong says, I got my preliminary hearing on 8:30 in

12        the morning on February 12th.  Chong then says, if

13        Joe and Paul come, then I am dead.  Hey, um, you --

14        Phong don't have it, they did not give Phong a

15        inaudible to come.  You say?

16   A    No, Phong didn't get a subpoena.

17   Q    Chong says, oh, because I received my papers and they

18        said the witness is Phong.  You say?

19   A    No.  Fuck that.  I will tell Phong not to come.

20   Q    Chong says, Phong, Paul and Joe, if the three of them

21        do not come, then I get out.

22              And then I'm going to move this up so you can

23        see the bottom of the page what you say.

24   A    I won't let Phong come.  If Phong comes I will take

25        Phong inaudible.
```

286

1   Q   And then later in the discussion, later in the

2       conversation Chong says, as long as Paul, Joe and

3       your brother do not come to say that I did this and

4       that when I don't care, you know.  You say?

5   A   That's hard.

6   Q   Chong says, but then since they are using the

7       witnesses as Paul and Phong and Joe as witnesses,

8       then they are going to fuck me up.  You say?

9   A   Have you talked to Shoua.

10  Q   Chong says, uh-huh.  You say?

11  A   Have you talked to Shoua.

12  Q   Chong says, man, I talked to inaudible, he is so gay.

13      Chong then says in English, I told him to fucking

14      come visit me this weekend, so hopefully he comes and

15      shit because he said he wasn't able to until this

16      weekend.

17          Mr. Lee, I'm going to show you what's been

18      marked as Exhibit 173.  Similar to the prior

19      transcripts, right?

20  A   Yes.

21  Q   This is a call that was made at what time, according

22      to the printout?

23  A   January 22nd, 2014, at 15:46 p.m.

24  Q   Okay.  That's 3:46.  Do you know how a 24-hour clock

25      works?

```
 1   A    Right.

 2   Q    And the call is to 920 --

 3   A    574-6656.

 4   Q    Same number you had back then?

 5   A    Yes.

 6   Q    I'm going to again show you some things up on the

 7        screen.

 8            Chong says, you don't give them the letter.

 9        Okay.

10   A    Dude, they found it.  I'm like, yeah, that's the only

11        one.

12   Q    Chong says, I told you to throw it away.  You are so

13        stupid.

14   A    Yes, but, dude, you did not say anything in there

15        inaudible.

16   Q    Chong says, yes, I talked about inaudible.  You say?

17   A    Oh, fuck that bitch ass nigga.

18   Q    Chong says, yeah, never mind, that didn't say

19        anything, hmm, how did they know earlier that I wrote

20        to Michael too.

21            Mr. Lee, do you know who the Michael that's

22        referred to is?

23   A    Michael Chang, I believe.

24   Q    Could it be Michael Thor?

25   A    Oh, yeah.  Michael Thor, yeah, probably.
```

288

1    Q    Do you think that's more likely Michael Thor?

2                    ATTORNEY VISHNY:  I'm going to object.

3                    THE COURT:  Sustained.

4    Q    (BY ATTORNEY MAIER)  Later in the conversation Chong

5         says, I told you that I told him that if he is scared

6         then inaudible.  You say?

7    A    Oh, man.  So lame.

8    Q    Chong says, but if those two come and say they just

9         lied, there isn't anything, then they will let me go.

10   A    Yes.

11   Q    Chong says, because right now I --

12            Mr. Lee, I'm going to show you what's been

13        marked Exhibit 174.  You see this document?

14   A    Yes.

15   Q    And this is another transcript of a recorded jail

16        call.  What's the date of this call?

17   A    January 29th, 2014, at approximately, what, 1:00?

18        11:11 a.m.

19   Q    11:11 a.m.  And it's a phone call to 920 --

20   A    574-6656.

21   Q    That was still your number on January 29th of 2014 at

22        11:11 a.m.?

23   A    Correct.

24   Q    Mr. Lee, in this call Chong says, Melanie and

25        Stephanie had told the police that I was the one who

289

1        did it, that I was the one who told them that I did
2        those things.  You say?
3    A   What.  For real.
4    Q   Chong says, yes, for real.  Later in the conversation
5        Chong says, yesterday I talked to Stephanie over the
6        phone, you know, and then I guess Stephanie said that
7        the police kept harassing them, that was why they
8        told that to the police.  And then Stephanie said
9        that when the police came to question Stephanie,
10       Stephanie said it was me because she knew Melanie had
11       told them already so Stephanie inaudible her sister.
12       What do you say?
13   A   What.  So what did Stephanie say.
14   Q   Chong says, Stephanie said the same thing as Melanie,
15       that when I was still out there I took us to eat
16       B-dubs because they had the picture of me and
17       Stephanie and Melanie, we went to eat B-dubs, right.
18       Stephanie said I told them.  I said why would I do
19       anything like that when I have so many people there.
20            You say?  And I'll move this up so you can see
21       better.
22   A   What the fuck, man, and now I got to track those
23       fucking two down too.
24   Q   Chong replies something inaudible.  And you say?
25   A   Damn, man, I'm tired of tracking mother fuckers down.

290

```
 1         Man, shit.
 2    Q    Later in the conversation Chong says, yes, but then
 3         -- but then they knew that, that fat boy and Joe,
 4         these jerks did not want to come to court, and then
 5         they were gone and the police were scared so they
 6         left to look for other people to testify against me.
 7         And you say?
 8    A    Oh, that's so bad.
 9    Q    He makes reference to someone who calls him fat boy.
10         Does that have any meaning to you?
11    A    Not at this point.
12    Q    And later in that conversation you say?
13    A    Hey, but do they use those two crazies on your
14         case.
15    Q    Chong says, yes.  You say?
16    A    They are going to use Melanie and Stephanie too.
17    Q    Chong says, yes.
18    A    Fuck.
19    Q    Chong says, they will bring along those two.
20    A    I said, why.
21    Q    Chong says, because there's no one else.  You say?
22    A    Dude, that's so gay.  How do they get pictures of
23         those two and you at B-dubs.
24    Q    Chong says, because of Stephanie's picture.
25    A    Oh.
```

291

1    Q    Chong says, yes.

2    A    Dude, that's going to be annoying, dude.

3    Q    Chong says, I know, right.  They're looking at you

4         guys evil.  Jerk.  You say?

5    A    I don't care.  I got nothing to hide.

6    Q    And the conversation continues on to the next page

7         with Chong saying, I know, they are looking at

8         people's Facebook.  You say?

9    A    I don't give a fuck.

10   Q    Chong says, that's why I'm like, damn, they're

11        watching me so good.  But I don't know what those two

12        jerk heads are saying.

13             At this point -- I'm going to zoom out a little

14        bit -- they switch to English, right, so it's T.  And

15        you say?

16   A    Damn.  And Stephanie just told me -- I mean told you

17        this yesterday.

18   Q    Chong says, yes, that's why I tried to call you back

19        last night.  You say?

20   A    Damn, man.  What the fuck.  Why don't they -- why

21        don't they -- why don't them two just fucking --

22        fucking don't even show up either.

23   Q    Chong says, I know.  You have to tell them.

24             Later in this conversation Chong says, they are

25        too stupid.  Man.  But I was like, fuck, I'm not

292

1       dead.  Too hurt that those two are doing that to me.

2       You say?

3   A   Dude, they didn't do it on purpose.

4   Q   Chong says, because the police harassed her too much.

5       That's why I told them it's okay.  I know Stephanie

6       and Melanie are crying like crazy.  You say in

7       English?

8   A   Oh, they said they were crying.

9   Q   Chong says in English, Stephanie sounded like she was

10      crying on the phone.  I was like, don't cry.  Then

11      you say?

12  A   Man, they --

13  Q   Chong says, man.  And you say?

14  A   I don't know if they like -- they had never been in

15      that position before.  You know what I'm saying.

16  Q   Chong says, yes, them, they got harassed, yes, so --

17      then you switch to English and say?

18  A   They didn't like write anything or sign anything, did

19      they.

20  Q   Chong says, no.

21          This then continues on to the next page with you

22      saying -- in English you say?

23  A   Okay.  Then that's good.

24  Q   Chong says, I know.  He switches to Hmong and says,

25      that's why I'm not too worried.  The thing I worry

293

1    most is they keep bothering my family and friends.

2    You say?

3    A    I'll get to the bottom of it.  I'll go talk to them

4    and shit.

5    Q    Chong says, I'm so hurt, dude, man, I'm so hurt.

6         Mr. Lee, this is the last one.  I'm showing you

7    what's been marked as Exhibit 175, jail call

8    recording transcript from what date?

9    A    February 2nd, 2014.

10    Q    At what time?

11    A    At 14:17 p.m.

12    Q    That's 2:17?

13    A    Yeah.

14    Q    The call is made to 920 --

15    A    574-6656.

16    Q    And that was still your number in early February,

17    February 2nd of 2014?

18    A    Correct.

19    Q    This section starts with you talking, it's labeled

20    Teng.  You -- you say in Hmong what?

21    A    Where are your -- where are your courts again.

22    Q    Chong says, um, the 12th at 8:30.  You say?

23    A    The 12th of this month.

24    Q    Chong says, yes, coming up.

25    A    Okay.  Okay.

294

```
 1   Q    Chong says, they will pull Melanie, Stephanie, Joe
 2        and Paul, all of them to come.
 3   A    They what.
 4   Q    Chong says, they will pull Melanie, Stephanie, Joe
 5        and Paul, all of them to come.  You switch to English
 6        and say?
 7   A    No way, they can't.
 8   Q    Chong says, yes, they are.  And you say in English?
 9   A    I already talked to Mel and Stef and they said, no,
10        they weren't going to come.
11   Q    Chong says, yeah.  You say?
12   A    Yeah.
13   Q    Chong says, whatever.  Are you serious.  You reply
14        with something that's inaudible, correct?
15   A    I can't remember.
16   Q    Well, it says inaudible on there, right?
17   A    Yeah.
18   Q    And then we switch back to Hmong.  Chong says, what
19        did they say to you.  Can you see the bottom there?
20   A    No, I can't see from here.
21             They said they're just not going to come and
22        tell the cops they don't want to be involved.
23   Q    The call continues to the next page.  Chong says --
24        sorry.  I'm trying to fit this all on one screen.
25             All right.  Just clarifying something before we
```

295

```
1           go too far here.

2                Chong continues from the prior page, yes, see,

3           but the police are so dumb.  They hated me so much,

4           dude.  You say?   Dude, if --

5    A      Fucking if Paul or Joe shows up, we're probably going

6           to do what we have to do.  You know.

7    Q      Chong says, I think let Paul and Joe both come.

8           They'll be too scared because you guys are there.

9           You say in English?

10   A      Dude, if Paul or Joe shows up, then you know what

11          your brother is going to do, right.

12   Q      Chong then says, I -- in Hmong, I know.  Sorry.  Paul

13          and Joe both come, then you and foot -- you and

14          everybody sitting there watching those two dummies.

15          You say?

16   A      Yeah.  Do you ever think that Paul -- Paul and Joe

17          are going to sit on the stand and look at us and have

18          the balls to fucking say shit.

19   Q      Chong says, I know, right.  And I sit there watching

20          those two gay.

21               ATTORNEY MAIER:  Your Honor, at this point

22          I'd ask to move Exhibits 171, 17 -- I'm sorry, 170,

23          171, 172, 173, 174 and 175 in to the extent that they

24          were used.

25               THE COURT:  Any objection, Counsel?
```

296

```
 1                    ATTORNEY WEITZ:  No.
 2                    THE COURT:  170 through 175 shall be
 3          received to the extent that they were used.
 4               Any additional questions, Mr. Maier?
 5                    ATTORNEY MAIER:  Yes.  Briefly.
 6      Q    (BY ATTORNEY MAIER)  In -- Mr. Lee, in January,
 7          specifically January 21st of 2014, Appleton police
 8          officers came to talk to you, correct?
 9      A    I don't recall remembering that.
10      Q    You don't recall which day or you don't recall
11          officers coming to talk to you?
12      A    I don't recall me -- which officers, when they came
13          to talk to me.
14      Q    The -- in the calls, and I can show you which one if
15          you need to, but there was one that talked about a
16          letter, and I think it was the same one I was asking
17          you about the identity of a person named Michael.  Do
18          you recall that?
19      A    Yes.
20      Q    There was a point that you did receive a letter from
21          the defendant; is that correct?
22      A    Yes.
23      Q    And you eventually provided it to the police?
24      A    Yes.
25                    ATTORNEY MAIER:  Mr. Lee, thank you very
```

297

1          much.  I appreciate that.

2                 That's all the questions I have, Your Honor.

3                      THE COURT:  Attorney Weitz?

4                      ATTORNEY WEITZ:  One moment.

5                      THE COURT:  Whenever you're ready, sir.

6                      **EXAMINATION OF TENG LEE**

7     **BY ATTORNEY WEITZ**:

8     Q    All right.  Mr. Lee, you were asked a lot of

9          questions about these phone calls that were just up

10         on this board, right?

11    A    Yes.

12    Q    Okay.  And at this point in time, roughly over two

13         years after the phone calls were made, you don't have

14         any specific recollection of the -- the words that

15         were used in those phone calls, right?

16    A    No.

17    Q    Okay.  So the only reason you know what that content

18         is because that's what was shown to you from those

19         transcripts, right?

20    A    Yes.

21    Q    Okay.  I'm going to ask you a couple of things about

22         some of the phone calls, and I'll probably go in the

23         same order that they were presented to you.

24                 So first of all I'm going to turn your attention

25         to Exhibit 171, which is a phone call from 12/28/13,

298

1        and I'm going to flip to the part that you were

2        shown.  Do you remember seeing this -- this

3        highlighted portion that was up on the screen?

4    A   Yes.

5    Q   Okay.  And on Page 5, that was also what you were

6        shown, right?

7    A   Yes.

8    Q   Okay.  But there was a portion that wasn't up on the

9        screen at the very bottom of that page, and that's

10       something that you said, right?

11   A   Yes.

12   Q   And what does that say there?

13   A   Paul said that it was not him, but I'm like, dude, we

14       know it's you already, you know you don't need to lie

15       and shit.

16   Q   Okay.  So you're talking about Paul there, right?

17   A   Yes.

18   Q   Okay.  Now the next call that you were shown -- I'm

19       going to show you a page that wasn't up on the

20       screen, that being Page 5 of Exhibit 172, and there

21       is another thing that you said, right?  That T is

22       you?

23   A   Yes.

24   Q   And what does that one say?

25   A   But you didn't do it though.

299

1    Q    And this is another conversation with Chong, right?

2    A    I believe so.

3    Q    Okay.  Well you were shown this one and that was a

4         conversation with Chong, right?

5    A    Correct.

6    Q    Okay.  And then on the very next page, Chong responds

7         to that, right, and he says, I know, that's why I'm

8         not worried.  I don't care.  Right?

9    A    Correct.

10   Q    In that conversation you were saying that you knew

11        Chong didn't do it, right?

12   A    Correct.

13   Q    That was what was on that page?  Okay.

14            I'm going to turn your attention to the next

15        call which was Exhibit 173.  I'm going to show you

16        the top of Page 4 of that call, and it starts again

17        with something that you said, right?

18   A    Correct.

19   Q    And what does that say?

20   A    Don't worry, dude.  We know you didn't do it

21        though.

22   Q    And then Chong responds.

23   A    I know.

24   Q    Okay.  All right.  And I'm just going to ask you to

25        read another line on Page 16.  There's another thing

300

1         that you said.  You see that line right there?

2    A    Yes.

3    Q    Can you just read that line right there?

4    A    This one.

5    Q    The one up there.  That's you speaking.  That T is

6         you, right?

7    A    Right.  I'm like, dude, Chong didn't even do it.  Why

8         the fuck would you point the finger at Chong.

9    Q    Okay.

10                   ATTORNEY WEITZ:  I just need one moment.  I

11        need to mess with these Post-it notes here.

12                   THE COURT:  Not a problem.

13   Q    (BY ATTORNEY WEITZ)  I'm going to go back to the same

14        exhibit now that I moved the Post-it notes around.

15        I'm just going to have you read.  This is the

16        sentence where I'm pointing that you just read,

17        correct?

18   A    Correct.

19   Q    And then you just kind of orient yourself here, if

20        you read it a little bit further, this is talking

21        about Paul, right?

22   A    Correct.

23   Q    Okay.  So after that sentence that you just read

24        where you said Chong didn't even do it, why would you

25        point the finger at Chong, what does Chong say after

301

1      that?

2   A   He's so dumb.  I'm like, oh, no, too stupid.  They

3      make me so mad.

4   Q   Okay.  And then you say?

5          ATTORNEY MAIER:  I'm going to object at

6      this point, Your Honor.  Can we come up?

7          (Bench conference.)

8   Q   (BY ATTORNEY WEITZ)  All right.  I'm going to turn

9      your attention back to that same page.  There is a

10     couple things we'll skip here, and then at the bottom

11     of the page it starts again with you saying

12     something, right?  Do you want to read that line?

13  A   I know, I was like, dude, I was like, man, your

14     brother.

15  Q   Unintelligible.  Out.

16         And that's again talking about Paul, right?

17     That's from that same conversation.

18  A   Correct.

19  Q   And then Chong says, I told you that -- I told him if

20     he is scared then inaudible.  And you say?

21  A   Oh, man, so lame.

22  Q   And then Chong says, but if those two come and say

23     that they just lied, there isn't anything and they

24     will let me go.  Right?

25  A   Yes.

```
 1   Q   And then Chong says, because right now I -- and then
 2       you kind of interrupt him, and you say?
 3   A   I told them up front you need to go to court and tell
 4       the truth, you need to bury this shit unintelligible
 5       under the fucking inaudible the pressure.  Paul, he
 6       got scared so he unintelligible and shit.
 7   Q   And then Chong says, Paul said what.
 8               ATTORNEY MAIER:  At this point I'd raise
 9       the same issue we just did.
10               ATTORNEY WEITZ:  Okay.
11   Q   (BY ATTORNEY WEITZ)  And then Chong says later, I
12       know the report stated Paul hit him.  And then you
13       say?
14   A   Yeah, I know, and I'm like, Paul, you fucking hit
15       that fool.  What the --
16   Q   And then Chong says, you dog, yeah, they said that
17       they were just pointing fingers at me.  I got mad.
18       Right?
19   A   Correct.
20   Q   Next I'm going to turn your attention to Exhibit 174,
21       which is one of the ones that was up on the screen.
22       And just to refresh your memory, this is a
23       conversation about Stephanie and Melanie; is that
24       fair to say?
25   A   Correct.
```

303

1   Q   Okay.  And when you say, what the fuck, man, and now
2       I got to track those, pardon my language, fucking two
3       down too, right?
4   A   Correct.
5   Q   And in that conversation, you're the one that brings
6       up tracking people down, aren't you?
7   A   Correct.
8   Q   Okay.  And Chong responds with inaudible, right?
9   A   Correct.
10  Q   And then you are the one that again brings up, I'm
11      tired of tracking, again, pardon my language, mother
12      fuckers down, right?
13  A   Correct.
14  Q   So that came from you, not from Chong?
15  A   Right.
16  Q   I'm going to turn your attention to Page 7 of that
17      same phone call which was up on the -- the screen
18      where you were saying that, why don't them two –
19      again, about Stephanie and Melanie – just – and then
20      there is a couple of F words – don't even show up
21      either.  Is that what that says, right?
22  A   Correct.
23  Q   And then Chong says, I know, you have to tell them.
24      Right?
25  A   Correct.

304

1    Q    And then if you go ahead a little bit in the

2         conversation, turn your attention to this line right

3         here.  Chong says, I know, dude, forget it.  Don't

4         worry.  Right?

5    A    Correct.

6    Q    And then goes on to say, because I -- I already

7         wanted, it's inaudible, right?

8    A    Correct.

9    Q    They try to push people to say things against me,

10        right?

11   A    Correct.

12   Q    So at that point he's saying forget it, don't worry.

13        Right?

14   A    Correct.

15   Q    And that's just a couple lines past when you're

16        talking about them not showing up for court, right?

17   A    Correct.

18   Q    And then he says, forget it.  Right?

19   A    Yup.

20   Q    Okay.  All right.  I'm going to go a little bit

21        further in that phone call, we're on Page 8 now, and

22        this is a statement by you, right, this is T, that's

23        you?

24   A    Correct.

25   Q    And you're saying, we're still trying to track down

305

1        the mother fucker who did it, right?

2    A   Correct.

3    Q   Okay.  Now I'm going to show you Exhibit 175 which

4        was another call that you were shown.  And this is

5        again a conversation about Stephanie and Melanie,

6        right?  You just want to take a second to read it?

7    A   Yeah.

8    Q   Okay.  And in this conversation, again, you're the

9        first person that brings up talking to Melanie and

10       Stephanie, right?

11   A   Correct.

12   Q   And you're the one that says that, no, they weren't

13       gonna come, right?

14   A   Correct.

15   Q   And then Chong later on, two lines down, acts kind of

16       surprised.  He said, whatever.  Are you serious.  And

17       that's a question, right?

18   A   Correct.

19   Q   Okay.  And then we'll go ahead to the next page, and

20       there's some conversation then about Paul or Joe,

21       right?

22   A   Correct.

23   Q   And you're the one that says, dude, if fucking -- if

24       Paul or Joe shows up we're probably going to do what

25       we have to, you know.  That's what you say?

306

```
 1   A    Correct.

 2   Q    And Chong actually responds back with, I think let

 3        Paul and Joe both come, right?

 4   A    Correct.

 5   Q    And he goes on to say a couple other things about

 6        them being too scared, but he certainly doesn't say

 7        that they shouldn't come to court, right?

 8   A    Correct.

 9   Q    Okay.  So you've known Chong for a while now, Mr.

10        Lee, right?

11   A    Yes.

12   Q    And you know from your experience with Chong that he

13        lies and brags about stuff, right?

14   A    Yes.

15   Q    Okay.

16             ATTORNEY WEITZ:  Nothing further.  Thank

17        you.

18             THE COURT:  Any redirect, Mr. Maier?

19             ATTORNEY MAIER:  Yes.

20                  EXAMINATION OF TENG LEE

21   BY ATTORNEY MAIER:

22   Q    Mr. Lee, you -- you indicated to the defendant one of

23        the calls that Melanie and Stephanie were not going

24        to come to court and then you talk a little bit about

25        what they told you; is that fair to say?
```

307

```
1    A    Yes.

2    Q    How did you -- how did you find out that they weren't

3         going to come to court?

4    A    I don't recall remembering how.

5    Q    Do you recall sending Melanie a message through

6         Facebook?

7    A    That I believe I remember a little bit about, yeah.

8    Q    And the message told them not to talk to the cops or

9         to testify, right?

10   A    I can't recall if it said that or anything.

11   Q    Okay.  Do you recall talking to the -- the police

12        about the message that you sent on Facebook?

13   A    I believe it was just about them not coming to

14        Chong's court.

15   Q    Right.

16   A    Yeah.

17   Q    You told the police about that, right?

18   A    Correct, I believe so, yes.

19   Q    You said that you had sent that message?

20   A    Yes.

21   Q    Attorney Weitz then -- and actually, while I was

22        having you read some of the calls and then Attorney

23        Weitz covered some other things, there is some spots

24        in some of these calls where you tell the defendant

25        words to the effect of, I know you didn't do it or
```

308

1      you didn't do it, right?

2  A   Correct.

3  Q   You talked to the police about that topic as well,

4      right?

5  A   I believe so.

6  Q   And you told them --

7           ATTORNEY WEITZ:  Your Honor, can we

8      approach at this point?

9           THE COURT:  You may.

10          (Bench conference.)

11          THE COURT:  Whenever you're ready, Mr.

12     Maier.

13 Q   (BY ATTORNEY MAIER)  What do you recall telling the

14     police about a reason why you did that?

15 A   I don't recall remember what I said.

16 Q   You don't recall telling Sergeant Thao that it was to

17     help make Chong feel better while he was in jail?

18 A   Yeah.  I believe so.  Like big bad talks only just to

19     keep Chong comfy in jail.  Yeah, I believe so.

20          ATTORNEY MAIER:  Okay.  That's all the

21     questions I have.  Thank you.

22          THE COURT:  Attorney Weitz, any follow-up

23     questions?

24              **EXAMINATION OF TENG LEE**

25 **BY ATTORNEY WEITZ:**

309

1   Q   Mr. Lee, when you told Sergeant Thao that, that you

2       were just saying things to kind of appease Chong,

3       that wasn't about when you said that Chong didn't do

4       it, that was about the other things you were saying

5       about witnesses, right?

6   A   I don't recall remembering that either so --

7   Q   Do you remember one way or another what exactly you

8       were talking about then?

9   A   Probably not.

10  Q   Okay.  Well you -- you certainly didn't intend to

11      follow through and make sure that witnesses weren't

12      going to come to court, right?

13  A   Correct.

14          ATTORNEY MAIER:  I'm going to object.

15      Relevancy.

16          ATTORNEY SCHNEIDER:  What he does is

17      irrelevant or what he intended to do.

18          THE COURT:  I'll sustain the objection.

19  Q   (BY ATTORNEY WEITZ)  Mr. Lee, when you were talking

20      to Sergeant Thao, he was making some statements

21      towards you about potential jail time that you were

22      looking at, right?

23  A   I believe so.

24  Q   Okay.  And that was in reference to your involvement

25      in this case, right?

310

```
1    A    Correct.
2    Q    Okay.  And at one point he even told you that you
3         would potentially be referred for charges on this
4         case, right?
5    A    Correct.
6    Q    And that was in regards to these telephone calls.
7    A    I believe so, yeah.
8    Q    Okay.  So at the point when you're saying these
9         things to Sergeant Thao, that was after he had
10        already told you that you were potentially looking at
11        jail time.
12   A    Yes.
13   Q    And do you remember the exact words from Sergeant
14        Thao being, because right now you're looking at
15        potential, just one count, ten years?
16   A    I don't recall remembering that so.
17   Q    Okay.  And then later on do you remember him saying
18        that he's willing to give you consideration today
19        because he thinks you're a good person?
20   A    I don't recall remembering that either so.
21   Q    Do you remember in the conversation him telling you a
22        few times that he thinks you're a good person, you
23        didn't actually want to get involved in this,
24        correct?
25   A    Correct.
```

311

```
 1    Q    And in that conversation, that's when you bring up
 2         that you were just saying these things kind of as
 3         puffery, right?
 4    A    Right.
 5    Q    And that's when Sergeant Thao says that he thinks
 6         you're a good person and no longer thinks that you
 7         were involved or needed to face jail.
 8    A    I believe so.
 9              ATTORNEY WEITZ:  Nothing further.
10              THE COURT:  Mr. Maier.
11                 EXAMINATION OF TENG LEE
12    BY ATTORNEY MAIER:
13    Q    At the time Sergeant Thao said these things, this is
14         after these calls have been made, right?
15    A    I believe so, yes.
16    Q    And they came and talked to you February 19th, the
17         last call that we talked about was made on February
18         2nd?
19    A    I believe so.
20              ATTORNEY MAIER:  That's all.
21              THE COURT:  Attorney Weitz?
22              ATTORNEY WEITZ:  Nothing further.  Thank
23         you.
24              THE COURT:  Ladies and gentlemen of the
25         jury, any questions?
```

312

1                    (No response.)

2                    THE COURT:  Very good.

3              Sir, I thank you.  You may be excused.

4              Can I have counsel approach?

5                    (Bench conference.)

6                    THE COURT:  Ladies and gentlemen, we are

7        concluded for today.  We are not going to be

8        conducting court over the weekend, so your weekend

9        will be free.  I hope that you're able to enjoy that.

10             Again, my orders about social media and the news

11       still remain in effect.

12             I'd ask that you return at 8:45 on Monday.  So

13       thank you for your attention this week, and I will

14       see you on Monday.

15                   (The jury was escorted out of the

16       courtroom.)

17                   THE COURT:  During that session we had

18       three sidebars, one related to a question --

19       actually, I believe all of them but one related to

20       questions during Mr. Trainum's testimony.

21             The first one related to questions about joking

22       about murder, that was allowed.

23             Subsequently there was a question about or an

24       objection to hearsay based on the anonymous tips.

25       The court did sustain that objection.

313

1          There was also a question which was posed about

2     snitches get stitches.  The court sustained the

3     objection as to that reference indicating that

4     questions may come from the -- the actual testimony

5     but that that phrase should not be utilized.

6          Finally, there were a couple other sidebars

7     during Mr. Teng Lee's testimony, but those did not

8     necessitate any affirmative decisions by the court.

9          Is that your understanding of a summary of the

10    objections, Attorney Schneider, Attorney Maier?

11               ATTORNEY SCHNEIDER:  Yup.

12               THE COURT:  Attorney Vishny, Attorney

13    Weitz?

14               ATTORNEY VISHNY:  Yes.

15               ATTORNEY WEITZ:  Yes.

16               THE COURT:  Okay.

17         I do have, only in hopes that we might be able

18    to get a jump start on this, I have full packets of

19    the proposed jury instructions.

20               ATTORNEY SCHNEIDER:  Sure.  We'll take them

21    home and look over the weekend.

22               THE COURT:  I'll have each a copy for you.

23    We'll still do a jury conference, but I thought if

24    you want --

25               ATTORNEY VISHNY:  This is what -- based on

314

1 our submissions and your analysis of the law.

2     THE COURT:  At this point in time all I've

3 done is I've compiled the two requested instructions

4 into one packet.

5     ATTORNEY VISHNY:  I see.

6     THE COURT:  So that's the extent of what

7 I've done up to this point.

8     ATTORNEY VISHNY:  Thank you.

9     THE COURT:  And I will get that

10 momentarily.

11     (Proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1

2

3                    C E R T I F I C A T E

4

5    STATE OF WISCONSIN        )
                               ) ss.:
6    COUNTY OF OUTAGAMIE       )

7

8

9            I, JOAN BIESE, RMR/CRR, do hereby certify that I
     am the official court reporter for Branch IV of the
10   Circuit Court of Outagamie County;

11           That as such court reporter, I made full and
     correct stenographic notes of the foregoing proceedings;
12
             That the same was later reduced to typewritten
13   form;

14           And that the foregoing proceedings is a full and
     correct transcript of my stenographic notes so taken.
15

16           Dated this 15th day of August, 2016.

17

18

19                              _____

20                              JOAN BIESE, RMR/CRR

21

22

23

24

25
```

316