FILED
02-13-2019
Clerk of Circuit Court
Outagamie County
2013CF001074

```
1   STATE OF WISCONSIN     CIRCUIT COURT     OUTAGAMIE COUNTY
    _____
2
    STATE OF WISCONSIN,
3
                   Plaintiff,
4   v.                                  Case No. 13-CF-1074

5   CHONG LENG LEE,

6                  Defendant.
    _____
7
                   JURY TRIAL - DAY NINE
8   _____

9
    BEFORE:        HONORABLE GREGORY B. GILL, JR.
10                 Circuit Court Judge, Branch IV
                   Outagamie County Justice Center
11                 Appleton, WI  54911

12
    DATE:          March 7, 2016
13

14  APPEARANCES:   CARRIE SCHNEIDER
                   District Attorney
15                 Appearing on behalf of the State

16                 ANDREW MAIER and ALEXANDER DUROS
                   Assistant District Attorneys
17                 Appearing on behalf of the State

18                 DEBORAH VISHNY and EVAN WEITZ
                   Attorneys at Law
19                 Appearing on behalf of the Defendant

20                 CHONG LENG LEE
                   Defendant
21                 Appearing in person

22

23

24  Joan Biese
    Official Reporter, Branch IV
25  Outagamie County
```

1

Exhibit 24

1                          **I N D E X**

2

3   **WITNESSES**                                                         **PAGE**

4   **CHAD RIDDLE**
       Examination by Attorney Maier...................... 5
5     Examination by Attorney Vishny..................... 9
       Examination by Attorney Maier...................... 11
6

7   **NEAL RABAS**
       Examination by Attorney Schneider................. 12
       Examination by Attorney Vishny..................... 127
8     Examination by Attorney Schneider................. 229
       Examination by Attorney Vishny..................... 243
9     Examination by Attorney Schneider................. 249
       Examination by Attorney Vishny..................... 249
10

11  **CHUE LEE THAO**
       Examination by Attorney Schneider................. 251

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

<u>**EXHIBIT**</u>                                                    <u>**PAGE**</u>

2    3 –  Map of Luna.....................................  40
     5 –  Luna Diagram...................................  71
3    6 –  Appleton City Map..............................  72
     32–  Photo Board–Photos 32A–32K.....................  34
4    33–  Photo Board–Photos 33A–33L.....................  42
     34–  Photo Board–Photos 34A–34L.....................  42
5    35–  Photo Board–Photos 35A–35L.....................  42
     76–  Photos........................................ 113
6    78–  Photos........................................ 114
     88–  Photo Board–Photos 88A–88M.....................  66
7    89–  Letter........................................ 121
     90–  Letter........................................ 123
8    103– Jacket (Dark)..................................   8
     105– Coat (White/Gray) Patterned...................   8
9    132– Drawing of Luna............................... 169
     196– Bullet........................................   7
10   197– E-Cigarette...................................   9
     198– Luna Time Line................................ 127

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **TRANSCRIPT OF PROCEEDINGS**

2              THE COURT:  Is there anything we need to

3     address before we bring in the jury, Attorney

4     Schneider?

5              ATTORNEY SCHNEIDER:  No, Judge.

6              THE COURT:  Attorney Vishny?

7              ATTORNEY VISHNY:  No.

8              THE COURT:  We are on the record in *State*

9     *of Wisconsin v. Chong Lee*.

10         Mr. Lee appears in person along, with his

11    counsel, Attorneys Deja Vishny and Evan Weitz.  Also

12    seated at counsel table is Mr. Solomon Gatton

13    appearing under the student practice rule.

14    Representing the State of Wisconsin, Outagamie County

15    District Attorney Carrie Schneider.  Also seated at

16    counsel table is Assistant District Attorney Andrew

17    Maier, and I'm assuming we will have Mr. Alex Duros

18    shortly with us.

19         With that, Wendy, could we please bring in the

20    jury.  Please rise for the jury.

21              (The jury was escorted into the courtroom.)

22              THE COURT:  Morning, everyone.  Please be

23    seated.

24         Attorney Schneider, are you prepared to call

25    your first witness?

4

```
 1                    ATTORNEY SCHNEIDER:  Be Attorney Maier this
 2       morning, Your Honor.
 3                    THE COURT:  Mr. Maier, are you prepared to
 4       call your first witness?
 5                    ATTORNEY MAIER:  I am.  Your Honor, the
 6       State calls Chad Riddle.
 7                    THE COURT:  If you please remain standing,
 8       the clerk will swear you in.
 9                    (Oath administered to witness.)
10                    THE WITNESS:  I do.
11                    THE CLERK:  Please state your full name and
12       spell it for the record please.
13                    THE WITNESS:  Sergeant Chad Riddle, Chad is
14       C-H-A-D, Riddle is R-I-D-D-L-E.
15                    THE COURT:  And, Mr. Maier, your witness,
16       sir.
17                    ATTORNEY MAIER:  Thank you.
18                    **EXAMINATION OF CHAD RIDDLE**
19       **BY ATTORNEY MAIER:**
20       Q    Mr. Riddle, how are you employed, sir?
21       A    I'm employed by the City of Appleton Police
22            Department.
23       Q    And what is your current assignment within that
24            department?
25       A    I'm currently assigned to the identification
```

5

```
1          section.

2     Q    How long have you worked in that section?

3     A    Three years.

4     Q    What are some of your job duties with respect to that

5          assignment?

6     A    Our main duty in that section is to process crime

7          scenes which is to go out to a crime scene, find

8          evidence, analysis, that kind of thing.  On an

9          incoming basis we take in evidence and store

10         evidence.

11    Q    And who has access to the evidence that's been

12         brought in by other officers once it's received at

13         the identification section?

14    A    There's currently three of us that have access to the

15         main evidence storage area.

16    Q    At one point was an officer named Kevin Thompson also

17         employed by Appleton PD in the identification

18         section?

19    A    Yes, he was.

20    Q    And he was -- he worked with you, before you, how did

21         that work?

22    A    He was in the section before I started there, and

23         then we worked together until he retired last June, I

24         believe it was.

25    Q    Thank you.  As it relates to a homicide that occurred
```

6

1          at the Luna Lounge in December of 2013, you'd be the

2          sworn officer that was responsible for the

3          maintaining of the evidence collected during that

4          investigation; is that correct?

5      A   Yes.

6      Q   You're aware that the bullet that was fired into

7          Joshua Richards and caused him to die was sent to the

8          crime lab for analysis; is that true?

9      A   Yes, it was.

10     Q   And who brought it back from the crime lab to the

11         property area at Appleton PD?

12     A   I believe it was Sergeant Cary Meyer.

13     Q   Sergeant Riddle, I'm going to show you what's been

14         marked as Exhibit 196.  Are you able to tell the jury

15         what this item is, sir?

16     A   According to the evidence label it states it's a

17         bullet from the intracranial cavity.

18              ATTORNEY MAIER:  Thank you.  I'd move in

19         this exhibit at this point.

20              THE COURT:  Any objection?

21              ATTORNEY VISHNY:  No objection.

22              THE COURT:  That exhibit shall be

23         received.

24     Q   (BY ATTORNEY MAIER)  Excuse me.  Sergeant, there is

25         some other items that were collected and maintained

7

1      as part of this investigation, correct?

2  A   Correct.

3  Q   One of them would have been a jacket collected from

4      Paul Lee; is that correct?

5  A   Yes.

6  Q   I'll show you what's been marked as Exhibit 105.  Are

7      you able to tell what this item is based on the

8      label?

9  A   Yes.  It is a white with black design coat from Paul

10     Lee's person.

11             ATTORNEY MAIER:  Move in 105 at this

12     time.

13             ATTORNEY VISHNY:  No objection.

14             THE COURT:  105 shall be received.

15 Q   (BY ATTORNEY MAIER)  Another item collected, that was

16     a jacket seized during a search warrant of the

17     defendant's residence; is that correct?

18 A   Yes.

19 Q   This is Exhibit 103.  Are you able to tell looking at

20     the evidence label what this item is please?

21 A   This would be a black, slash, gray E-N-Y-C-E, Sean

22     Combs whole button jacket, size XL, cuff, slash,

23     bottoms, bottom are, A-R-E.

24             ATTORNEY MAIER:  Okay.  I'd move in 103.

25             THE COURT:  Any objection?

8

```
 1                    ATTORNEY VISHNY:  No.

 2                    THE COURT:  103 shall be received.

 3    Q    (BY ATTORNEY MAIER)  I'm going to show you what's

 4         been marked as Exhibit 197.  Are you able to say what

 5         this item is, Sergeant Riddle?

 6    A    This is an e-cig device from Paul Lee.

 7                    ATTORNEY MAIER:  Thank you.  I'd move in

 8         197 at this time.

 9                    THE COURT:  Any objection?

10                    ATTORNEY VISHNY:  Can we see that?

11                    ATTORNEY MAIER:  Sure.

12                    THE COURT:  Any objection?

13                    ATTORNEY VISHNY:  No.

14                    ATTORNEY MAIER:  I think we've moved in

15         197.

16              At this point I don't have any further

17         questions.

18                    THE COURT:  No objection to 197?

19                    ATTORNEY VISHNY:  No.

20                    THE COURT:  Okay.  197 will be received.

21              Any cross-examination?

22                    ATTORNEY VISHNY:  Yes.  Just briefly.

23                    THE COURT:  Very good.

24                    **EXAMINATION OF CHAD RIDDLE**

25    **BY ATTORNEY VISHNY:**
```

9

1    Q    Sergeant Riddle, when you were working on this case

2         and went to the hospital, one of the things you did

3         was to take some photographs of Mr. Richards,

4         right?

5    A    Yes.

6    Q    And you took photographs of his hands?

7    A    Yes.

8    Q    You noticed there were some scratches in the knuckle

9         area of both the left and right hand?

10   A    Yes, ma'am, that's right.

11   Q    You also took photographs of his face.

12   A    Yes, ma'am, I did.

13   Q    You did not notice any marks on his chin at all,

14        right?

15   A    Not that I recall.  Not that I would have

16        photographed.

17   Q    Or his cheek.  What you took photographs of were

18        injuries related to the bullet wound in the ear?

19   A    Yes, that's right.

20   Q    Okay.  I just want to ask you a question about No.

21        197, this e-cigarette that you are -- can you please

22        hold this in your hand?

23   A    (Witness complying.)

24   Q    Okay.  And would you agree with me that this is quite

25        a bit heavier than just like a normal cigarette would

10

1      be?

2   A    Yes.

3   Q    Okay.  So -- all right.  Thanks.

4              ATTORNEY VISHNY:  I don't have anything

5        further.

6              THE COURT:  Any redirect, Mr. Maier?

7              **EXAMINATION OF CHAD RIDDLE**

8   **BY ATTORNEY MAIER:**

9   Q    When you saw Mr. Richards at the hospital, did he

10       have any type of medical apparatus on, let's say

11       from -- from the rib cage up?

12  A    Yes, I don't recall specifically what the apparatuses

13       were, but there were a number of things that were

14       attached to him that -- to the point I wasn't able to

15       gain access to certain parts of his body.

16       Particularly like some of his side and his back.

17  Q    Do you know what Mr. Richards did for a living?

18  A    No, I do not.

19             ATTORNEY MAIER:  That's all the questions I

20       have.

21             THE COURT:  Any follow-up?

22             ATTORNEY VISHNY:  No.

23             THE COURT:  Very good.  Thank you, sir.

24       You may be excused.

25             State's next witness.

11

1                    ATTORNEY SCHNEIDER:  Thanks.  We will call

2          Sergeant Rabas to the stand, Your Honor.

3                    (Oath administered to witness.)

4                    THE WITNESS:  I do.

5                    THE CLERK:  Please state your full name and

6          spell it for the record.

7                    THE WITNESS:  Neal Rabas, N-E-A-L,

8          R-A-B-A-S.

9                    **EXAMINATION OF NEAL RABAS**

10    **BY ATTORNEY SCHNEIDER:**

11    Q    Good morning, Sergeant.  How are you?

12    A    Very good.

13    Q    Good.  Can you explain to the jury what your current

14         occupation is?

15    A    Yes.  I'm an investigator with the City of Appleton

16         Police Department.

17    Q    How long have you worked in law enforcement?

18    A    In August it will be 27 years.

19    Q    What are your current duties then as an

20         investigator?

21    A    I'm one of eight or nine investigators with the City

22         of Appleton Police Department.  We primarily

23         investigate felony type of offenses that range from

24         forgery all the way to homicide.

25    Q    What other occupations or duties have you had for the

12

1          Appleton Police Department?

2     A    I've had several.  I started out as most officers do

3          or all officers do in the City of Appleton working as

4          a patrol officer.  I worked in patrol from 1989 to 19

5          -- 9 -- let me see.  1996.  1996 I worked -- I was

6          assigned to a role of a police school liaison officer

7          at Appleton North High School.  I was Appleton North

8          High School until 2003.  We rotate our positions, our

9          SRO, our school resource officer's positions as

10         they're called now.  So I rotated back out in 2003 --

11         back out into patrol until 2004.  In 2004, late 2004

12         I was assigned as the public information officer for

13         the City of Appleton Police Department until

14         September of 2005.  2005 I then went back into the

15         schools at Appleton West High School for

16         approximately a year, and a position became available

17         and I applied for a position as investigative

18         services unit in 2006 and have been assigned in the

19         investigative services unit since then.

20    Q    In the duties as a police school liaison officer,

21         because you've had a couple cycles of that and time

22         periods of that, really you're an investigator within

23         the schools.  Is that an easy way to explain it?

24    A    Yes.  In addition to making contact with the kids and

25         dealing with some of the everyday business that goes

13

1      on at a school, we are also sensitive crime
2      investigators.  We work several different
3      investigations, primarily with children and/or
4      victims of sexual and physical abuse.
5   Q  So is it a situation where if there is a student at
6      school and you learn they're a victim and the setting
7      of that is not within school but within the city, you
8      then are able to investigate?
9   A  Correct.  Not only children, but also adults.  So we
10     work as a sensitive crime investigator.  We not only
11     work cases that involve the sexual and physical abuse
12     of children but also the sexual assault of adults as
13     well.
14  Q  And is there a training requirement that you've met
15     every year that you've been an officer?
16  A  Yeah.  The State mandates that we have 24 hours of
17     additional training in order to retain your
18     certification as a police officer.  Every officer in
19     the State of Wisconsin has to meet that training
20     requirement.  In addition to that, every other year
21     we have to obtain at least four years of EVOC, motor
22     vehicle operation training.  And in addition to that
23     you also have to qualify with your handgun at least
24     once a year.
25  Q  The 24 hours of training, does some of that involve

1         like classroom or practical setting training as

2         well?

3    A    Yes, it does.

4    Q    Some of that training during your time, Sergeant

5         Rabas, 27 years, been focused on interviews of

6         witnesses and suspects?

7    A    Yes, it has.

8    Q    You attended additional special training related to

9         crime victims because of some of your roles as a

10        sensitive crimes investigator?

11   A    Yes.  When I entered the role of the police school

12        liaison officer, I attended a two-week school down in

13        Madison that dealt primarily with juvenile law, which

14        is a little bit different than adult law.  There are

15        specific statutes that deal with juveniles.  I

16        attended that.  In addition to that I received

17        training on how to interview, in particular,

18        children, it's called a StepWise method, and

19        participated in that training as well as updates

20        throughout my year.

21   Q    And then have you also had training related to

22        interviewing adult witnesses or suspects?

23   A    Yes.  Back in 1991 I attended the Reid Interview

24        Interrogation School, and one of my additional roles

25        at the police department is I'm also a negotiator

15

```
 1          with the SWAT team, so I also went through training

 2          as a negotiator that also deals with speaking with

 3          people in crisis, obviously in a little bit different

 4          situation.

 5    Q     Have you from these experiences developed kind of a

 6          set technique or pattern that you follow when

 7          interviewing a witness or a suspect?

 8    A     From each of these trainings you get certain skills,

 9          different ways of speaking with individuals,

10          interviewing them, but I don't have a set protocol,

11          outline.  My approach in an interview is -- is the

12          person I'm interviewing actually holds the key to the

13          interview.  They have the information.  I just have

14          to figure out a way for them to relay that

15          information to me.  And what information they do

16          have.  So ultimately the person I'm interviewing

17          really dictates how the interview is conducted.  So I

18          don't have a set way.  It would be nice if I just sat

19          down and said can you tell me what happened and they

20          went on a half hour to an hour narrative exactly what

21          took place, but in reality that doesn't take place.

22    Q     Have you had past experiences in your 27 years where

23          people have refused to talk to law enforcement?

24    A     Yes.

25    Q     Have you had past experiences where people are
```

16

```
 1          nervous about talking to officers?
 2     A    Yes.
 3     Q    Have you had experiences where people are willing to
 4          talk to you?
 5     A    Yes.
 6     Q    And in some cases people actually call the police
 7          department when they have information to share?
 8     A    Yes.
 9     Q    And would you agree that over your 27 years you've
10          kind of met many different personality types when
11          you're interviewing?
12     A    Yeah.  I would -- I would like to say I've met all
13          the personalities, but then you meet someone new,
14          but, yeah, the personalities have a wide variety, a
15          wide range of people I've interviewed in the past,
16          you know, 26, 27 years.
17     Q    Is that a reason why you sometimes need to take a
18          different approach depending upon who you're talking
19          to?
20     A    Absolutely.  If you only had one approach and went in
21          with that individual, it may not be appropriate
22          depending on the age, maturity level, knowledge,
23          education level that individual has, their
24          understanding, also the circumstances in which you're
25          interviewing them, are they a victim, are they a
```

17

```
 1        witness, are they a suspect, have they just been
 2        traumatized by something, and, you know, how willing
 3        are they to share information with you, what may be
 4        holding them back.  So there is a multitude of
 5        factors you have to consider when interviewing a
 6        person, and some of that you don't know in advance,
 7        some of that develops as you talk to the person.
 8    Q   Have you encountered people who have lied to you?
 9    A   Yes.
10    Q   Do you always confront them immediately if they
11        provide you with information you know not to be
12        true?
13    A   No, I don't.  I'm -- I'm interested in having the
14        person tell me what happened or what they think has
15        happened.  When people sometimes withhold information
16        or lying, sometimes it's intentional, sometimes
17        witnesses, individuals may be telling you something
18        that in their mind is actually what they believe
19        happened, and we may have evidence that is contrary
20        to that, so it may not be that they're -- they're
21        providing misinformation intentionally, it may be
22        something that they actually think is true based upon
23        either their view of what took place or what they saw
24        took place.  So confrontation always just because
25        someone is not or their information doesn't match
```

18

1      what you've already known either through video or

2      some other necessarily isn't the best route to do

3      that.

4           The more information someone provides also is

5      better.  So even if you know they're lying, or even

6      intentionally lying, the more details you can get or

7      have them provide to you in reference to that lie is

8      something more that you can disprove later.  So if

9      someone says that they went home after, that's why we

10     ask specific directions, what route did you take,

11     what vehicle did you take, who were you with, those

12     type of things, so we can confirm maybe some of that

13     information later through traffic cameras or

14     something like that.  So the more details you obtain

15     the more you are able to determine later if in fact

16     what the person is telling you is the truth or not.

17     And sometimes disproving -- disproving a lie or

18     proving that the person lies is sometimes as good as

19     someone actually telling you the truth.

20  Q  Have you had occasions where the person you're

21     interviewing or speaking to is related to the suspect

22     in the case?

23  A  Yes.

24  Q  Does that cause issues or concerns at times?

25  A  Yes, it does.  It does in the sense that that's one

19

```
 1        thing you always try to determine is the relationship
 2        of the person you're talking to with the relationship
 3        of the -- or the connection to the actual incident
 4        that you're involved with.  Obviously if there is a
 5        relationship, people are less hesitant to provide
 6        information or less likely to provide information
 7        against that individual because they care for this
 8        individual, and even though the person may or may not
 9        have done something bad, they're hesitant to provide
10        information that may hurt that individual.  Or
11        they're not sure if this information will benefit
12        that -- that person or the subject of the
13        investigation, so they either withhold information,
14        don't provide all the details of what they know, or
15        in some instances they will provide you inaccurate
16        information, they will lie to you about that person's
17        involvement.
18    Q   Is it sometimes where these people actually tell you
19        what they know about the person they're related to or
20        they know?
21    A   Yeah, they -- they do as well.
22    Q   That's okay.  That's okay.
23            Is it a situation with the Appleton Police
24        Department where you're assigned a partner?
25    A   No.
```

20

1   Q   So is it a situation, I think the jury has sometimes
2       seen this in this case, where you're not always
3       assigned to the same person when you go talk to an
4       individual?
5   A   Correct.
6   Q   Because of that, does the role you take in interviews
7       sometimes change?
8   A   Yes, it does.  When we are teamed up with two
9       individuals or the two of us that do an interview,
10      typically one will take the lead role as the
11      interviewer.  Again, interviewing is as much about
12      listening as it is about asking questions.  So the
13      secondary investigator will primarily listen, take
14      notes, and the primary lead or interviewer will ask
15      the questions, and then the secondary investigator
16      will provide additional questions or some question
17      that may need clarification or follow-up.
18  Q   And there is no requirement that you have a second
19      officer when you do an interview, correct?
20  A   Correct.
21  Q   And even if you're interviewing a suspect, there is
22      no requirement that a second officer be present?
23  A   Correct.
24  Q   Are there times during the course of interviews where
25      one of you needs to leave to go do or check on other

21

1    things?

2    A    Yes.

3    Q    You talked about the Reid training.  Is there any

4         requirement in the State of Wisconsin to be an

5         officer that you have to be Reid trained?

6    A    No, there is not.

7    Q    Is there any requirement that you have to have gone

8         through any particular training to be an officer in

9         the State of Wisconsin?

10   A    No, there is not.

11   Q    And I don't know if you're -- if you know this,

12        Sergeant Rabas, and if you don't that's fine, there

13        any requirement in any state in the United States

14        that you have to be Reid trained?

15   A    No, not -- not that I'm aware of.

16   Q    Okay.  When you go in with a partner into an

17        interview, do you script out what you're going to say

18        or go through?

19   A    No.  It's -- it would be essentially a waste of time

20        because you don't know where that interview is gonna

21        go.

22   Q    Can you estimate, and I'll let you figure out whether

23        you want to do it by month or by year, how many

24        interviews since you've been an investigator, either

25        while you were a PSL or now assigned to the

22

```
 1            investigative services unit, do you think you do in a
 2            month or year?  And I'm going to talk about both with
 3            witnesses, victims and suspects, if you have an
 4            estimate.
 5    A       Well, interviewing is what we do.  I mean that's --
 6            that's what investigators do.  So we conduct
 7            interviews almost on a daily basis.  So the -- you
 8            know, it's hundreds of thousands of interviews of all
 9            types of individuals.  I mean that's what we're in,
10            the people business, and we talk to people.  That's
11            what investigation is about.
12    Q       Do you sometimes exaggerate or lie about what you
13            know when you're doing an interview?
14    A       Yes, we do.
15    Q       Why?
16    A       Sometimes doing an interview you have to -- when
17            there is resistance to provide information, like
18            ideally if you went into a room and said can you tell
19            me what happened and someone goes on a half hour
20            narrative.  Sometimes you have to convince the person
21            that it's worthwhile to provide information to you.
22            Sometimes it's similar to like playing poker.  You
23            have to bluff the person to think that you have a
24            better hand than they do, so you provide some details
25            or overexaggerate the amount of information, evidence
```

23

```
1            you have to convince the person that, first of all,

2            we do know that they're lying and that it's in their

3            best interest to provide accurate information to

4            us.

5    Q       Is it sometimes ever done to see if they correct

6            you?

7    A       Yes, it is as well.

8    Q       I want to direct your attention now to this case,

9            Sergeant Rabas.  Were you working what would have

10           been like the Saturday evening shift into the early

11           morning hours of Sunday, December 8th, 2013?

12   A       I was called in to work from home.

13   Q       And where did you go after you were called in?

14   A       I went to the Luna Lounge in Appleton.

15   Q       Who did you meet with there?

16   A       Lieutenant Gostisha.

17   Q       And what do you recall about the situation when you

18           arrived -- well, first let me ask you this, Sergeant

19           Rabas.  Do you know what time you might have

20           arrived?

21   A       Yes.  I believe it was right around three a.m.

22   Q       And do you remember the situation when you arrived at

23           Luna Lounge?

24   A       Yes.  It was -- it was somewhat a unique scene.

25           Obviously we were called in, I was briefed that there
```

24

1    had been a shooting.  It was unique in the sense that

2    we had a large establishment, the Luna Lounge, that

3    the individual who was shot, Josh Richards, was no

4    longer on scene, we were informed that he was taken

5    to Theda Clark hospital, and the individuals,

6    immediate witnesses to this incident had all left the

7    scene, that the -- where this incident happened was

8    described as the foyer, and everybody that was

9    primarily in that foyer was no longer present, they

10    were all gone, they had run out.  So the immediate

11    witnesses to that were not there.  The other thing

12    unique was that we had a bar full of about 150

13    patrons who were ready to go home because it was bar

14    time, and most of them had been drinking, and we had

15    to detain them until we could identify who they were

16    and what they knew before they were -- could go.  So

17    they were not happy about being detained because they

18    were tired, they had enough, the bar no longer was

19    serving alcohol, and they wanted to go home, and we

20    had to figure out who they are and what they knew.

21    In addition to that, we were informed shortly

22    thereafter that there was a busload or at least two

23    busloads of individuals that were associated with

24    Josh Richards.  One of the busloads we were informed

25    had actually left prior to the shooting taking place,

25

```
 1           but there was a second busload of individuals that
 2           were parked on College Avenue and they were just
 3           about to leave, so we had to stop that bus and
 4           identify those individuals and find out what they
 5           knew about what was going on.  So in essence,
 6           short-term, it was kind of a chaotic scene when we
 7           got there.  And it was unique in that there also was
 8           not a lot of physical evidence, and I think you've
 9           seen some of the photos, but there was not a lot of
10           physical evidence as far -- remaining at the scene.
11    Q      At that time were phone calls coming in from anyone
12           who were witnesses to the offense?
13    A      No.
14    Q      What tasks were you initially assigned?
15    A      I was assigned to start identifying and I guess going
16           through the 150 patrons, the people who remained in
17           the bar, to find witnesses to what had taken place.
18           I started that process and then, like I said, we were
19           informed shortly thereafter or as soon as I started
20           that there was this busload of individuals, so I left
21           the bar and actually went to the bus that was parked
22           on College Avenue and identified the people on the
23           bus and any information they may have had.
24    Q      And do you recall one person in particular you spoke
25           to who was back on the bus?
```

26

1    A    Yes.  James Phimmachack.

2    Q    And did he share with you what he knew or what he

3         had?

4    A    Yes.

5    Q    And what was that?

6    A    James had a cell phone recording of Josh right after

7         he had been shot.  There was -- the recording

8         documented the moments after Josh had been shot.  You

9         can see him laying on the floor.

10   Q    And did James continue to record until the point of

11        arrival of officers?

12   A    Yes, he did.

13   Q    Did you make any requests of him related to those

14        items?

15   A    Yes.  Obviously this was important documentation of

16        what had taken place.  James was very attached to his

17        phone, did not want turn it over, so I went --

18        actually took James right to the police department

19        and we downloaded the video off his cell phone onto

20        my computer, and then later on to a mobile or jump

21        drive that was placed into evidence.  But it

22        essentially was downloaded onto my computer so that

23        it could be retained and saved and then James was

24        advised to destroy the -- the video from his phone.

25   Q    What do you recall about his demeanor?

27

1    A    At first James was a little embarrassed that he
2         actually did what he did, in fact, of documenting it.
3         And he was obviously shooken up.  He knew Josh from
4         this bus trip, he was on the bus that Josh was kind
5         of in charge with, and he was upset by what had taken
6         place.
7    Q    What do you remember about initially watching that
8         video?
9    A    The -- two things.  It clearly showed Josh laying on
10        the floor and Josh's last moments of life as he's
11        taking his last breaths.  You could see the -- how
12        dark it was inside of Luna.  I remember how noisy it
13        was and how confused everybody was as to what had
14        taken place.  Through the audio part of the video,
15        you could tell that some individuals didn't even
16        realize that Josh had been shot.  They weren't sure
17        what had happened to him.  There was a delay in
18        calling 911 I think because of that reason.  They
19        weren't sure if he had been punched, knocked out, or
20        if he had actually been shot in the side of the head.
21        So there was that confusion going on.  No one knew
22        for sure what was gonna -- what to do.  There were
23        some individuals that started to provide aid to Josh.
24             And then the most -- the thing I'll never forget
25        is Josh as he begins his agonal breathing, which is

28

```
 1          really, oftentimes with a head injury, is the last
 2          breath someone takes.
 3     Q    Did officers -- so you go to the bus, you kind of
 4          make sure you gather what you can from the people on
 5          the bus or gather their names, were other officers
 6          doing anything related to like the parking ramps or
 7          areas downtown Appleton?
 8     A    Yes.  We had a number of uniformed officers obviously
 9          responded to the scene, and they began to -- again,
10          with most crime scenes we try to contain the area and
11          identify people who may have information.  One of the
12          tasks was identify people leaving the -- not only the
13          bar but also the area.  So officers documented every
14          vehicle that was parked.  What I mean documented,
15          they took the license plate numbers of every vehicle
16          that was parked in the ramp and the surrounding
17          parking lots.
18     Q    Was it a situation where you were going to try to
19          hold all those vehicles at the scene?
20     A    No.
21     Q    And you became aware the next few days that an
22          autopsy was done on Mr. Richards?
23     A    Yes.
24     Q    And from that information you learned that he didn't
25          (sic) pass the same day, correct?
```

29

1    A    Correct.

2    Q    Do you recall as part of this case learning what

3         Josh's height or weight was?

4    A    Yes.  He was six feet tall and just over 200

5         pounds.

6    Q    Do you remember learning as part of this case what

7         his occupation was?

8    A    Yes.  Josh was a diesel mechanic up in the Green Bay

9         area.

10   Q    And had he held that job for some period of time?

11   A    Yes, he did.

12   Q    What was another one of the major assignments you had

13        starting then on those early Sunday morning hours,

14        Sergeant Rabas?

15   A    One of the key pieces of what we identified as

16        evidence or information that we were going to rely

17        upon was, since a lot of the immediate witnesses had

18        left the scene, was that there was a -- Luna Lounge

19        has video surveillance system.  And although the

20        cameras didn't capture the actual area of the

21        shooting, it did document the people who were coming

22        from and going from the establishment.

23   Q    And were you able to actually in some fashion bring

24        that recording back to the police department?

25   A    Yeah.  We actually took the whole DVR system.  We

30

1          didn't take the cameras but we took the DVR, the

2          digital video recording system, their system from

3          their bar and brought it to the Appleton Police

4          Department.  I made a copy of the recordings, entered

5          them into evidence, and then we worked with the DVR

6          to try to view the video.

7     Q    Is that something where there was -- did you discover

8          there was one camera angle or more than one camera in

9          the bar?

10    A    There is a total of seven cameras that were recording

11         through the DVR system.  There are three that pertain

12         to the downtown bar, one captures the entrance of

13         Luna where people walk in, and then the main bar of

14         Luna there is one that captures the west side of the

15         bar, one that captures the east side of the bar.  The

16         remaining other four cameras were associated with the

17         bar upstairs called Drinks Inc.  That captured the

18         bar area upstairs in Drinks Inc, and then the fourth

19         or final camera captured the stairwell on the west

20         side of Luna that goes up to Drinks Inc.

21    Q    As part of your work on this case have you reviewed

22         all of those seven different camera angles and

23         views?

24    A    I've looked at them all extensively.  Primarily I've

25         looked at -- on the DVR it was Camera No. 9 and

31

1         Camera No. 2.  Camera No. 9 covered the front door

2         entrance and Camera No. 2 covered the east side of

3         the bar.

4    Q    And when you began the process of trying to identify

5         people, is there a point in time on the video that

6         you started with?

7    A    Yes.  I went -- once -- I primarily -- I started with

8         the actual time of what we determined to be what we

9         thought was the shot -- when the shot was fired, and

10        that was kind of looking at the front door when

11        everybody reacted simultaneously to something, and

12        then there was a rush of people after that.  So

13        starting at that point, I then went forward and

14        backward from that point.

15   Q    And is it something as part of that process that you

16        then were able to capture still images from the

17        video?

18   A    Yes.

19   Q    And we've heard some testimony through some previous

20        officers about a white board in kind of a conference

21        room area for investigators.  What was done related

22        to those still images?

23   A    Sure.  Once we identified the starting point or when

24        the shot was fired, then there was a total -- within

25        several seconds there was a total of 14 individuals

32

1          that we identified as running out of Luna out through
2          the front doors.  From those 14 individuals we were
3          able to go frame by frame and try to identify them.
4          Once I saw them exiting, I then tried to locate on
5          the video where they may have entered Luna.  So,
6          using that, I -- I printed off screenshots or -- of
7          each frame of them exiting and then also screenshots
8          of them entering.  At this point we didn't know who
9          each of the individuals were, so we assigned numbers
10         to them, 1 through 14, to try to identify each and
11         every person that left the foyer area right after the
12         shot had been fired.
13    Q    And my guess is when they were entering, much better
14         image of that and able to identify them or clothing
15         as opposed to when they were exiting or running
16         out?
17    A    Yes.
18    Q    And I think the jury may understand this, but back in
19         2013 was smoking allowed inside of Luna?
20    A    No, it was not.
21    Q    And so because of that, were there times where you
22         saw images of these people entering and exiting for
23         short periods of time?
24    A    Yes.
25    Q    And what was your assumption when you would see

33

1      that?

2   A   They would oftentimes -- some of these individuals

3      would some of the time go out onto College Avenue to

4      smoke or to talk to someone who was smoking.

5   Q   Could you sometimes see still the bottom portion of

6      their clothing through the windows or the front image

7      of Luna?

8   A   Yes.  Luna has glass doors so you could still see

9      them or their images out onto College Avenue.

10   Q   Did their entering and exiting at times help you in

11      the identification process?

12   A   Yes, it did.

13   Q   And as part of your work in this case, Sergeant, have

14      you even taken steps to identify the time at which

15      Brittany Olson and Joshua Richards entered the bar?

16   A   Yes.

17   Q   I'm going to show you -- I'm going to actually put it

18      up here, Exhibit 32, a photo board that has eleven

19      photos on it.  Are you familiar with what's depicted

20      here?

21   A   I am.

22   Q   And generally what's depicted here as it related to

23      the work you did in this case?

24   A   Yes.

25   Q   What is depicted here?

34

1   A   Oh, sorry.  Excuse me.  This is the view from Camera

2       No. 9 which is the -- which captured the video or

3       images of people coming and going from Luna off of

4       College Avenue.

5   Q   Okay.  And starting in Exhibit 32A, who is depicted

6       in that entering the bar?

7   A   That is -- 32A is right here.  That is Brittany

8       Olson, the first person walking through the door, and

9       then Joshua Richards is right behind her still

10      standing on the sidewalk on College Avenue.

11  Q   Do we see Josh then in 32B?

12  A   Correct.  This is just a few frames later or a few

13      seconds later.  Josh is now walking through the front

14      door in 32B of Luna.

15  Q   And 32A have a time stamp to show when they

16      entered?

17  A   Yes.  The time stamp is 11:06:29.  It says a.m., but

18      just in -- to clarify that, the Luna Lounge security

19      camera was twelve hours off so their 11:06 a.m. was

20      really 11:06 p.m.

21  Q   And then continuing down 32C, who is depicted there

22      that was relevant to your investigation?

23  A   This is Tou Shoua Lee who was in the foyer when the

24      incident happened and then left with the group of

25      people.

35

1    Q    Okay.  And just to assist the jury, when we look at
2         32C, I would say there is a woman kind of to the
3         right of the picture, her hair is back in a ponytail.
4         Would you agree with me?
5    A    Yes.
6    Q    Okay.  And then why don't you write Tou Shoua
7         underneath 32C.
8    A    (Witness complying.)
9    Q    And if you can draw a line to where he is.
10   A    (Witness complying.)
11   Q    Okay.  So he would be, as we look at this image, to
12        the left of that woman?
13   A    Correct.  The woman is holding a rose, I believe, and
14        he's actually -- you look right through the rose you
15        can see his face.
16   Q    The next -- moving on to 32D, who is depicted
17        there?
18   A    That is Chong Lee, the defendant in this case,
19        walking through the front door.
20   Q    And what was the time that -- of that photograph?
21   A    1:12:25.
22   Q    And from what you recall, Sergeant, was that the
23        first image you had of Chong Lee entering?
24   A    I believe it is.  The very first time that I could
25        observe him walking through the front doors into

36

1    Luna.

2  Q  Okay.  And then moving to 32E, who is depicted there?

3  A  This is similar picture, it's just a frame or two

4     later, and this is Chong Lee walking with Alyson

5     Kristy Blom right behind him.

6  Q  Okay.  And then continuing down to 32F, who is

7     depicted in that photograph?

8  A  That is Phong Lee.

9  Q  And the time on that photo would be 1:12:48; is that

10    correct?

11 A  Yes.

12 Q  Moving then to 32G, who is depicted in this photo?

13 A  32G is a female walking in with a hood.  That is

14    Dalinda Guzman, Dalinda Melo Guzman she sometimes

15    goes through.

16 Q  And that would be at 1:14:03?

17 A  Yes.

18 Q  And I'll have you write Dalinda under her name for me

19    please.

20 A  (Witness complying.)

21 Q  And then moving to the next photograph, you might as

22    well keep the marker, 32H, who is shown there then?

23 A  Then that's just a few seconds later, that is Dalinda

24    continuing through into the foyer area with -- and

25    then Michael Thor is the individual behind him.

37

1   Q   So why don't you write a D and then just draw a line

2       to where Dalinda is at.  And then if you can write

3       Michael Thor and then draw a line to where Michael

4       is.

5   A   (Witness complying.)

6   Q   And the time of them entering is 1:14:04?

7   A   Correct.

8   Q   Moving down to 32I, who is depicted -- again, we have

9       this -- I think it's the same woman with the rose in

10      that image that we see in 32C, but is there someone

11      else that you observe in that photograph?

12  A   Yes.  This is a photo of Tommy Lee who is in the

13      foyer at the time of the shooting walking into

14      Luna.

15  Q   Okay.  And if you can write Tom Lee on there and then

16      draw a line to him please?

17  A   (Witness complying.)

18  Q   And in that image, just to assist, his face appears

19      just to the left of the woman, correct?

20  A   Yes.

21  Q   Okay.  But in this image she is much closer to the

22      camera and he's further away from the camera angle?

23  A   Correct.

24  Q   And then moving down to 32G, who is depicted there

25      related to your case?

38

1    A    This is, again, a few seconds later, this is Tom --
2         Tommy Lee as he's walking toward -- further into the
3         bar area, and then Paul Lee is just entering through
4         the front doors of Luna.
5    Q    Okay.  And then finally, 32K, is there anyone you
6         recognize in those photographs?
7    A    Yes.  Two individuals.  The first person is Paul Lee
8         as he's just further into the foyer area and then the
9         second individual just coming through the front doors
10        with the hat and the jacket open is Joe Thor.
11   Q    If you can put a -- why don't you write Paul, because
12        we do have two people with the first initial P, and
13        then if you can write Joe and draw a line to where
14        Joe is.
15   A    (Witness complying.)
16   Q    Okay.  And 32J we see Tom Lee followed by Paul.
17        That's at 1:21:18?
18   A    Yes.
19   Q    And then the next image, 32K where we saw Paul
20        followed by Joe, that's at 1:34:2?
21   A    Correct.
22   Q    And did you see Paul and Joe go in and out on -- you
23        assume we're going to say the cigarette breaks or
24        smoke breaks?
25   A    Yes, several times.

39

1    Q    From observing these images, were you then also able
2         to track where these people went into the bar area?
3    A    Yes.  Whatever -- whatever area was captured onto the
4         camera, I was able to track based upon their
5         clothing, their stature, head wear, those types of
6         things, I was able to track them through the bars at
7         various points throughout the night.
8    Q    I'm going to show you, Officer, what's been marked
9         Exhibit No. 3.  Are you familiar with what is
10        depicted here?
11   A    I am.
12   Q    And what is Exhibit 3 showing us?
13   A    This is the schematic of the front bar, the main area
14        of Luna Lounge with the main entrance being out on
15        College Avenue.  Again, there is more of Luna, but
16        then this particular schematic shows the camera what
17        is labeled as Camera 1 and Camera 2, the camera
18        angles or the area that's covered by those cameras
19        inside of Luna.
20   Q    So you had referred to a cam -- watching what on the
21        DVR was Camera 9 at the front door.  Here it's been
22        marked as Camera 1; is that correct?
23   A    Correct.
24   Q    You also talked about a Camera 2 which showed the
25        west side of the bar.  That's what is shown here on

40

1          Camera 2?

2     A    It's the east side of the bar.

3     Q    East side of the bar, sorry.

4     A    And that is Camera 2.

5     Q    Now these images and what areas they show, was that

6          actually created by Trooper Zukowski related to his

7          work on those laser images he did as well as watching

8          the DVR?

9     A    Yes, yes.  He was given photos and from that he came

10         up with his approximation of the area that was

11         covered by those cameras.

12    Q    And that's consistent with what you recall from

13         watching those images?

14    A    Yes, it is.

15    Q    So this area of the foyer or the area at the top of

16         the stairs that we've been talking about, no cameras

17         captured anything in that area, correct?

18    A    Unfortunately not.

19              ATTORNEY SCHNEIDER:  I'd move Exhibit 3 in

20         at this time, Your Honor.

21              THE COURT:  Any objection?

22              ATTORNEY VISHNY:  No.

23              ATTORNEY SCHNEIDER:  And I would move in

24         the balance of 32 if we didn't previously move in any

25         of the letter numbers.  I don't know if we did or did

41

1        not.

2                    THE CLERK:  We received them all.

3                    ATTORNEY SCHNEIDER:  Your clerk says we

4        have received them all.

5                    THE COURT:  Okay.

6    Q   (BY ATTORNEY SCHNEIDER)  Why don't you go ahead and

7        grab a seat.  I need your assistance in a second but

8        --

9                    ATTORNEY SCHNEIDER:  I'm actually going to

10       ask Sergeant Rabas to come down.  I got a weird debug

11       message when this was first opened, I want to make

12       sure I don't open the wrong file on it.

13                   Judge, I think I'm going to have you turn the

14       lights down just to help us a little bit.

15                   THE COURT:  Not a problem.

16   Q   (BY ATTORNEY SCHNEIDER)  And for trial purposes, we

17       created -- there is a couple exhibits, 33, 34 and 35

18       that are still images, correct?

19   A   Yes.

20   Q   And what time sequence was captured on those still

21       images?

22   A   The -- I believe those are the ones where individuals

23       are exiting, correct?  So it's basically from -- I

24       believe it's 1:50:25 or 1:50:26 to the final exit

25       point, which I believe is four or five seconds

42

1      later.

2  Q   And in this image the time stamp is 1:50:17.  Can you

3      -- you may not be able to see that, but --

4  A   Well, I know because I just put it there.

5  Q   Okay.  All right.  And in this image who is

6      depicted?

7  A   This is the security person or the person with the

8      security name is -- that's Dan Kersten.  Adam

9      Richardson is standing with his back to the door, has

10     a hooded sweatshirt on.  And then the two females are

11     the third -- Thern sisters, I believe it's Tori and

12     Ellen Thern, I'm not sure which one is which.

13 Q   And for the court reporter the spelling is T-H-E-R-N.

14 A   Yes.

15 Q   Is that correct?

16         And what -- what at least appears in this image

17     to be black and white pattern on her coat?

18 A   Yes.

19 Q   But we know it could be any kind of pattern on the

20     coat, correct?

21 A   Yeah.  That's what's unique about this surveillance

22     system is a low light camera situation, or infrared,

23     I'm not specific what type of camera system, but the

24     important thing to remember is that it documented

25     everything in gray hues or color scale, so there is

43

```
1          no color depicted, and how dark or how light

2          something is didn't actually depend on the actual

3          true color.  For example I'll give you the security

4          shirt is actually a black shirt and in this video it

5          appears white.  I noticed through this video what

6          determines the different hue of the gray scale is

7          actually the type of fabric that the material or the

8          item that the person is wearing is made out of.  So

9          what you're seeing is really how the different fabric

10         was identified or documented in the camera system.

11    Q    Okay.  If you were a photography buff, you might say

12         certain things the light would absorb and certain

13         things the light reflects off of using this type of

14         camera system?

15    A    Correct.

16    Q    Okay.  I'm just going to play it through then in real

17         time, Sergeant Rabas, starting again for the record

18         at 1:50:17.

19              (Video played.)

20    Q    I'm stopping it at 1:50:42.

21              In that segment we saw played from 1:50:17 to

22         1:50:42, is that that group of I think you said about

23         14 people who exited immediately?

24    A    Yes.

25    Q    And were those the people that then you tried to
```

44

```
 1          still frame individual images to identify them as

 2          part of the process?

 3    A     Correct.

 4    Q     In 1:50 -- 1:50:42 we see two individuals standing in

 5          the doorway.  The gentleman to the right, who is

 6          that?

 7    A     That is Adam Richardson.

 8    Q     And the gentleman to the left, what was his name?

 9    A     Trent Thomas.

10    Q     I'm just going to play through to the point of the

11          time of arrival of officers which we also have

12          documented in the still photos.  So again now we

13          would start at 1:50:42.

14                   (Video played.)

15    Q     I've stopped it there at 1:50:54.

16              There is a person -- were you able to identify

17          if this was a male or a female ultimately?

18    A     It's a male.

19    Q     And who was this person we see in this image?

20    A     Michael Verheyden.

21    Q     We continue on.

22                   (Video played.)

23    Q     We then see at 1:52:04 a female has entered back into

24          Luna; is that correct?

25    A     Yes.
```

45

1    Q    And who was that female party?

2    A    That is Brittany Olson who is Josh's girlfriend at

3         the time.

4    Q    And I then stopped it at 1:52:48.

5         Who is now entering the Luna Lounge?

6    A    That is Lieutenant Todd Peters.

7    Q    And some of the coloring things are such that like

8         the stocking cap officers wear is like a dark navy

9         blue but it appears white in this image?

10   A    Correct.

11             ATTORNEY SCHNEIDER:  Judge, if you wouldn't

12        mind turning on the lights.

13             THE COURT:  Not a problem.

14   Q    (BY ATTORNEY SCHNEIDER)  I'm going to walk through

15        then the individual still images you created from

16        what we just showed the jury.

17        Start with the board marked Exhibit 33.  And

18        what's the first image and time stamp in this

19        sequence?

20   A    1:50:17.

21   Q    And that's the point at which Dan Kersten is looking

22        in which direction?

23   A    Dan Kersten at this time is looking straight out to

24        the south right through the doors of College onto

25        College Avenue.

46

```
 1   Q   And then based on the sequence, is there a point in
 2       time at which from your viewing the images you
 3       believe the shot occurred?
 4   A   Yes.  As you progress through at 1:50:23 Dan is
 5       now -- his gaze is turned more toward the bar area,
 6       the foyer area.
 7   Q   And that's 33B?
 8   A   33B.  At 1:50:24 Dan now again has turned back toward
 9       the doors of College Avenue and is looking out
10       through the front door.
11            ATTORNEY VISHNY:  I'm sorry.  I didn't get
12       catch the time.
13   A   1:50:24.  And at 1:50:25 on 33D, Dan Kersten turns --
14       not only Dan but also the two girls as well as Adam
15       Richardson, all their heads turn simultaneously and
16       that's when we believe they heard the pop or the
17       noise, the shot.
18   Q   What then occurs through the images continuing on?
19   A   At 33E at 1:50:26 they're continuing to look that
20       way, and there is a little movement by the girls as
21       it appears they're reacting to people running toward
22       them.
23   Q   What then continues in 33F and then 33G?
24   A   33F is -- the time stamp is 1:50:27.  Dan Kersten is
25       now moving in the direction toward the foyer, and the
```

47

```
1      girls again are reacting.  What I believe they're
2      reacting to is people running toward them and trying
3      to get out of their way.
4   Q  And then --
5              ATTORNEY VISHNY:  Judge, I'm just going to
6      object to Sergeant Rabas commenting on what people
7      are reacting to.  He doesn't know unless he has
8      talked to them.  They could be reacting to a number
9      of different things.
10              ATTORNEY SCHNEIDER:  I think he can give
11      his opinion as to what he saw in viewing these images
12      the number of times that he did.
13              THE COURT:  And understand it's based on --
14      Sergeant, correct?
15              THE WITNESS:  Yes.
16              THE COURT:  Sergeant Rabas's lay
17      observations, but beyond that, I don't want the
18      sergeant to speculate.
19              THE WITNESS:  Okay.
20   Q  (BY ATTORNEY SCHNEIDER)  Then in 33G we still see
21      Adam Richardson in two images by the front door?
22   A  Yes.  This time stamp is 1:52:29.  In 33G Adam
23      Richardson is the closest to the lower left-hand
24      corner and just above his head you can see the first
25      individual we were trying to identify and that
```

48

1          individual is Joe Thor as he enters the camera

2          frame.

3     Q    33H do we see a better image, picture of Mr. Thor?

4     A    Yes.

5     Q    And that's actually still the same time stamp so it's

6          within the second of 1:50:29?

7     A    Correct.  In looking through this video, there are

8          seven, I guess I'll -- they're not frames but seven

9          clicks of the slow motion that you can go through for

10         each second, so in each second there are -- there

11         would be seven photos that you could get out of --

12         out of that second.  So that's why the time stamp is

13         the same.  It doesn't break it down into, I guess it

14         would be, tenths of a second, so in each second you

15         can get actually seven different seconds.  I don't

16         know if I explained who that was.

17    Q    No.  33H, who is the first person by the front door

18         there?

19    A    First person is Joe Thor.

20    Q    And then behind him?

21    A    Well, behind him and off to the side would be

22         Dalinda, and then the person behind him would be Paul

23         Lee.

24    Q    Okay.  I'm going to give you a marker again, if you

25         can write Joe and then draw a line to where Joe is.

49

1   A   (Witness complying.)

2   Q   And then Paul, and mark a line to where Paul is.

3   A   (Witness complying.)

4   Q   Then continuing down in 33I do we see those three

5       same individuals, Joe, Dalinda, then Paul?

6   A   Yes.

7   Q   And continuing into 33J, the time stamp on that is

8       still 1:50:29?

9   A   Yes.

10  Q   Okay.  And is -- we still see Joe, Dalinda and Paul

11      in that frame?

12  A   Correct.  And just the beginning of Phong.

13  Q   Okay.  And this image, what's shown here on 1:50:29,

14      the image where it appears Paul had something in his

15      hands that was the focus of Appleton Police

16      Department as part of this case?

17  A   Correct.  This is the only image that -- image that

18      we observed the item in Paul's hand.

19  Q   And then continuing, 33K, then we now have a person

20      labeled Phong, so that's the sequence you saw them

21      exit?

22  A   Yes.

23  Q   And now the time stamped is moved to 1:50:30?

24  A   Correct.

25  Q   And then in 33L we continue to see Dalinda and Phong,

50

```
 1          and Paul, I would assume, is kind of in the doorway.

 2    A     Correct.

 3               ATTORNEY SCHNEIDER:  And if I haven't, I

 4          would move all of the photos of 33 into evidence at

 5          this time, Your Honor.

 6               THE COURT:  They've already been received

 7          in full.

 8               ATTORNEY SCHNEIDER:  Okay.

 9    Q     (BY ATTORNEY SCHNEIDER)  Continue then board 34.

10          First time stamp is 1:50:30, correct?

11    A     Yes.

12    Q     And do we see -- still see Dalinda in this image?

13    A     Correct.

14    Q     And who else do we see exiting at that time?

15    A     Phong Lee.

16    Q     Do you mind writing his name or put a PH for Phong?

17    A     (Witness complying.)

18    Q     And then continuing now to 34B, who is in the

19          image?

20    A     Dalinda is just in the doorway and then the next

21          person that walks in is Tom Lee.

22    Q     And that's at 1:50:32?

23    A     Correct.

24    Q     And then continuing, 34C, we see the same two

25          people?
```

51

1   A   Yes.

2   Q   And then 34D, same time stamp, 1:50:32, who is now

3       observed in that image?

4   A   Chong Lee.

5   Q   So you believe the time of the shot was approximately

6       1:50:25, or a noise?

7   A   Correct.

8   Q   So about how much time has passed then until we start

9       to see Chong in this image?

10  A   And this is 1:50:32, so a total of seven seconds.

11  Q   And then continuing down, 34E, we continue to see the

12      sequence of Dalinda, Tom and Chong Lee?

13  A   Correct.

14  Q   34F, that continues still that same second of time?

15  A   Yes.

16  Q   And then 33 -- or 34G we now have 1:50:33?

17  A   Yes.

18  Q   And there is another person now in that image?

19  A   Yes.  Alyson.

20  Q   And then that is what we continue to see in 34H?

21  A   Correct.

22  Q   34I, same people, continue to exit?

23  A   Yes.  And you -- and in this one you also just begin

24      to see Brittany going after Alyson or reaching out

25      for Alyson.

52

1   Q   Okay.  I'm going to move you to 34J.  Is there a
2       better image, still 1:50:33, where we can see
3       Brittany?
4   A   Yes.
5   Q   And can you mark her and then write a line or just
6       mark a B?
7   A   (Witness complying.)
8   Q   And draw a line to Brittany.
9   A   (Witness complying.)
10  Q   And then that would be approximately eight seconds
11      after what you believe was the time of the shot?
12  A   Yes.
13  Q   And then continuing, 34K just continuing to show the
14      sequence of them exiting?
15  A   Yes.
16  Q   And 34L the same thing?
17  A   Yes.
18  Q   From these images up to this point, were you able to,
19      from the images, when Joe left, whether he went to
20      the right or to the left, could you tell that?
21  A   Yes.  The general direction of where people turned as
22      soon as they walked out the door, you were able to
23      determine that.
24  Q   And which direction did he turn, right or left?
25  A   Joe went right to the west.

53

1    Q    What about Paul?

2    A    Paul went right to the west.

3    Q    What about Phong?

4    A    Phong went -- Paul went right to the west.

5    Q    You mean Phong?

6    A    Sorry.  Phong went right to the west.

7    Q    And then can you see Chong as he exits, which

8         direction he went?

9    A    Yes.  Chong goes to the left or to the east.

10   Q    And if you continued east on that block, you would

11        then -- Sharks is within the same block?

12   A    Yeah.  I believe it's three doors down or three

13        businesses down on the same side of the street.

14             ATTORNEY SCHNEIDER:  And if all of 34

15        hasn't been received, I would ask that it would be at

16        this time, Your Honor.

17             THE COURT:  And I did just check, it had

18        been previously received in its entirety.

19             ATTORNEY SCHNEIDER:  Thank you.

20   Q    (BY ATTORNEY SCHNEIDER)  Then we're going to finish

21        up with 35.

22             We're continuing here at 1:50:34; is that

23        correct?

24   A    Yes.

25   Q    And Image 35A shows Brittany and Alyson?

54

1    A    Yes.  It shows Brittany, Alyson and Chong and then
2         Michael Thor.
3    Q    And continuing, 35B and 35C show those same images?
4    A    Correct.  This would be Chong going off to the left
5         towards Sharks, Brittany and Alyson -- Brittany
6         grabbing Alyson and then Michael Thor.
7    Q    Okay.  And you were pointing -- when you pointed to
8         Chong, why don't you go ahead and, 35C, write his
9         name and then draw a line to him.
10   A    (Witness complying.)
11   Q    And then you've talked about a Michael Thor on this
12        image.  Why don't you write Michael's name.
13   A    (Witness complying.)
14   Q    Okay.  And then in 35D do we continue to see the path
15        of the girls as they exit?
16   A    Yes.
17   Q    And Michael has not yet exited?
18   A    Correct.
19   Q    Are you able to see Chong in the back through the
20        opening of the door?
21   A    Yes.  He continues going into an easterly
22        direction.
23   Q    35E you still see Michael exiting, correct?
24   A    Yes.
25   Q    And this is now 1:50:35, so just ten seconds after

55

1     the time of what was the -- the noise or the pop you

2     believe?

3   A   Correct.

4   Q   35F shows that same sequence?

5   A   Yes.

6   Q   And then 35G, was there someone related to your case

7       that you identified exiting 35G or 35H?

8   A   Yes.  Tou Shoua Lee is the individual without the

9       baseball cap here and the hooded sweatshirt.  So you

10      can see him in 35G in the middle of the picture, and

11      35H he's also identified right here.

12  Q   Why don't you write -- he's the only T name, I think,

13      we have, so if you want to just write a T and then

14      draw a line to him in both 35G --

15  A   Actually --

16  Q   Actually, that's not right.  Can you write Tou Shoua

17      because we do have a Tom Lee after I had you do that.

18      Sorry.

19  A   (Witness complying.)

20  Q   Okay.  And then continuing, 35I we see that same

21      group exiting which included Tou Shoua?

22  A   Yes.  Tou Shoua is just walking out the doorway.

23  Q   35J shows which two individuals?

24  A   That would be Adam Richardson and Trent Thomas.

25  Q   And then 35K shows whom?

56

1   A   That is Brittany Olson reentering the Luna.

2   Q   And then finally 35L is whom?

3   A   Lieutenant Todd Peters in the threshold of the

4       doorway.

5   Q   And that would be at 1:52:48?

6   A   Correct.

7               ATTORNEY SCHNEIDER:  And if 35 all has not,

8       I would ask that 35 be received.

9               THE COURT:  It previously was so we're all

10      covered.

11  Q   (BY ATTORNEY SCHNEIDER)  You talked about Camera 2

12      that could show the bar area?

13  A   Yes.

14  Q   Okay.  I'm going to have you probably drive, if you

15      don't mind, and come up this way and get that cued up

16      for us.

17              ATTORNEY SCHNEIDER:  Judge, if you don't

18      mind, the light.

19  Q   So you had -- we're now showing images from a

20      different camera within Luna; is that correct,

21      Officer?

22  A   Yes.  This would be from Camera No. 2 which depicts

23      the west side of the main bar of Luna, the top bar.

24  Q   And in this image - and for the record we stopped it

25      at 1:49:07 - is Mike Verheyden in this image?

57

1     A     Yes.  He's the individual holding the beer bottle.

2           He has the stocking hat on, glasses and like a

3           goatee.  Essentially almost in the center frame of

4           the video.

5     Q     And so just off center we have -- I'm going to point

6           out an area that would be the bar, correct?

7     A     Yes.

8     Q     We have several patrons at the bar?

9     A     Yes.

10    Q     And Mike Verheyden would be one person to the right

11          of that, that person here I'm showing?

12    A     Yes.

13    Q     And clearly you can kind of see the dark reflection

14          of the beer bottle glass?

15    A     Yes.

16    Q     And what was your focus or an area of your focus as

17          you watched Camera 2 here as it related to and kind

18          of corresponds with what we saw in that entrance

19          camera?

20    A     When people walked from the bar area into the foyer

21          area, this is the last camera or last angle that you

22          could observe people, and then walk from the bar area

23          into the foyer area before they would be caught by

24          the next camera.  So once they leave this camera

25          angle, they really have two options, either go down

58

1          to the basement to the bathroom or you exit through

2          the front door, I guess three options, or you come

3          back into the main bar.  So this was the last area

4          that was captured on here, so I was trying to

5          determine from this angle who was coming and going

6          from that foyer area.

7     Q    And were you then kind of able to determine who was

8          in that foyer area around the time that the shot

9          occurred?

10    A    Yes.

11    Q    And as part of your work in this case, you didn't

12         just watch this time period from 1:49 to 1:50,

13         correct?

14    A    Correct.

15    Q    Did you walk it back to track people from kind of the

16         point of when they entered?

17    A    Yes.  In particular, like Josh Richards and Brittany

18         Olson, from the time they walked into Luna, which is

19         around 11 a.m. -- or 11 p.m. until the time of the

20         incident is -- I was able to track whenever they were

21         on camera, I was able to pretty much find them on the

22         camera video.  So it was quite extensive period of

23         time.

24    Q    Okay.  We may take this back at a slower speed, but

25         for right now why don't you go ahead and start

59

1       playing this.  And again, for the record, it's

2       1:49:07.

3                   (Video played.)

4    Q  Okay.  And at this point we stopped it at 1:49:10.

5          Are there individuals that were relevant to you

6       that are now in these images?  And if you want to get

7       up with the pointer, that may be better than trying

8       to do it from the chair.

9    A  Yeah.  The important individual we were keying on

10      is -- there is four individuals I guess I would like

11      to point out to the jury.

12         In particular again we'll start with Mike

13      Verheyden.  Directly in front of Mike Verheyden is

14      Michael Thor.  He's got the beanie or the stocking

15      hat on.  Directly behind Michael Verheyden, this is

16      Brittany Olson.  Just to the front of Brittany and

17      he's kind of canted so you can see his right side,

18      this individual with the short sleeves, this is Josh

19      Richards.

20   Q  And then I'm just going to forward it.

21                   ATTORNEY VISHNY:  I'm sorry.  Could he

22      point out -- okay.

23   Q  And can you kind of see on Brittany she has a darker

24      object down from her shoulder kind of like a purse or

25      a bag might be?

60

1    A    Correct.

2    Q    Okay.  So again we're starting back at 1:49:07.  Is

3         it -- and I'm going to go frame-by-frame.

4              Is it through this sequence that we can see then

5         Josh approaching and then Brittany?

6    A    Yes.  I'm going to point to -- directly behind Mike

7         Verheyden, this individual here is Josh Richards.

8    Q    Okay.  So it would be a person who would be kind of

9         off of what we see him behind Mike's left shoulder?

10   A    Correct.  He does not have a hat on, real short

11        haircut and short-sleeved shirt.

12   Q    Okay.  So I'm going to just kind of forward

13        frame-by-frame through 1:47:09.

14              (Video played.)

15   Q    I stopped it at 1:49:09.  Do you see Josh still in

16        this image?

17   A    Yes.  Josh is now -- his gaze is now turned toward

18        the north or back toward the -- where the dance floor

19        is located in that area.

20   Q    Do we yet see Brittany?

21   A    No, we do not.

22              (Video played.)

23   Q    And now I've stopped it again at 1:49:10.  Is now --

24        is Brittany Olson on this image then?

25   A    Yes.  She has entered the video frame, and again she

61

1          would be several steps behind what we've identified

2          as Michael Verheyden just off his left shoulder.

3     Q    And Michael Thor is still at the bar?

4     A    Yes.

5     Q    And kind of not directly at the bar, just maybe next

6          in line?

7     A    Yes.  A step off.

8     Q    I'm just going to continue frame-by-frame then.

9                 (Video played.)

10    Q    Now I've stopped it at 1:49:12.  Is Josh still

11         visible?

12    A    No.  Josh is no longer visible on camera.  Brittany

13         Olson is in the lower right-hand corner of the

14         frame.

15    Q    And Mike Verheyden still in the same position he has

16         been?

17    A    Yes.

18    Q    I'm going to let it play per second for a little bit.

19                (Video played.)

20    Q    Stopped it at 1:49:28.  Is there anyone relevant to

21         the names we've been talking about that is observed

22         in this image, Sergeant Rabas?

23    A    Yes.  Tou Shoua Lee is in the lower right-hand corner

24         of the picture frame.  He's wearing what appears to

25         be a hooded jacket or a sweatshirt with a hood on it.

62

```
1          Got no hat on and short haircut.  Just about to walk
2          off camera.
3     Q    And actually in this image he would be standing what
4          it appears to be like right next to Mike Verheyden?
5     A    Yes.
6     Q    I'll play it -- we're at 1:49:21, I'm going to play
7          it just for a few seconds real time.
8                   (Video played.)
9     Q    What are we seeing then at 1:49:34, Sergeant?
10    A    What you're seeing in this still photo is Michael
11         Verheyden walking toward the foyer area, into the
12         foyer area or just off camera.  Just a few frames
13         prior to this he had set his beer down on the bar.
14    Q    Is Michael Thor still visible in this image?
15    A    Yes.  Michael Thor is in right next to the bar.
16         He's, I guess, the second head above the bottom of
17         the frame.  Got a stocking hat on leaning on the
18         bar.
19    Q    Then I'm just going to play it in real time for a few
20         more seconds.
21                  (Video played.)
22    Q    I've stopped it at 1:50:07.  Are there parties in
23         this image that then are now depicted, Sergeant?
24    A    Yes.  I'll start off with the easy one again.  This
25         is Michael Thor with the stocking hat.  He has
```

63

1    purchased four beers, grabbing them off of the bar.

2    Behind Michael and to his right, approximately say

3    four, five feet, this individual here is Dalinda

4    Gomez.

5  Q  Dalinda Guzman?

6  A  Guzman.  Sorry.

7  Q  Melo Gomez, right?

8  A  Yes.  Behind Dalinda Guzman is Alyson Blom, and then

9    behind Alyson Blom, the person holding on to his hat,

10   that is the defendant, Chong Lee.

11 Q  And I've stopped it now at 1:50:09.  Can we still see

12   some of those individuals?

13 A  Yes.  Again, Michael Thor is still on the bottom of

14   the screen, center bottom screen grabbing his four

15   beers, Alyson has a beer in her hand, the thing that

16   distinguished Alyson amongst everybody was that she

17   was easily identifiable because she had boots that

18   went over her knee.  Chong Lee is behind Alyson.  The

19   thing that identified Chong was that his sleeves were

20   totally black so he was identifiable in this image so

21   he is directly behind Alyson.

22             (Video played.)

23 Q  Now I stopped it at 1:50:10.  Can you still see

24   Alyson and then the person you identified as Chong

25   Lee?

64

1    A    Yes.  Alyson just about walked out of the camera

2         view, and then Chong Lee again with the black sleeves

3         and baseball hat is directly behind Alyson.

4                   (Video played.)

5    Q    And I've stopped it at 1:50:11 again, still Chong Lee

6         is visible?

7    A    Yes.  Chong Lee is visible.  He is approaching where

8         the camera angle ends.  Michael Thor has secured his

9         four beers and is about to walk away from the bar.

10                  (Video played.)

11   Q    And I stopped it now at 1:50:12.  Is this the point

12        in which we can no longer see the defendant Chong

13        Lee?

14   A    We can make out just -- basically this is his right

15        arm as he's just walking off camera view, and then

16        Michael Thor is -- is right located here in the lower

17        right-hand corner.

18   Q    I'll move forward.

19                  (Video played.)

20   Q    And then it's at 1:50:14 that we can no longer see

21        Michael Thor?

22   A    Correct.

23   Q    Okay.  You can have a seat then.

24                  THE COURT:  Lights can come back up?

25                  ATTORNEY SCHNEIDER:  Please, Judge.  Thank

65

1              you.

2    Q    And I think you said you took still images from that

3         portion we showed as well?

4    A    Yes, I did.

5    Q    Okay.  I'm going to show you what's been marked

6         Exhibit No. 88.  Are you familiar with what's

7         depicted here?

8    A    Yes, I am.

9    Q    Okay.  And just quickly, we'll start -- the start of

10        the time stamp is 1:49:07.  Would you agree with

11        me?

12   A    Yes.

13   Q    And 88A and it ends at 88M at 1:50:12, correct?

14   A    Correct.

15   Q    And what is shown in this sequence as we just

16        observed, Sergeant Rabas?

17   A    It's really snapshots from the video that we just

18        observed, so starting at 1:49:07 you can see Michael

19        Verheyden in that frame as we had started it before,

20        and then frame-by-frame, select frames obviously, not

21        each one of them, that depicts the individuals who

22        were in the bar area and then moved into the foyer

23        area where the shooting took place.

24   Q    Okay.  So on 88B can you see both Josh and

25        Brittany?

66

```
 1    A    Yes, you can.

 2    Q    And can you mark a J and then draw a line to where J

 3         was located?

 4    A    (Witness complying.)

 5    Q    And then a B for Brittany?

 6    A    (Witness complying.)

 7    Q    And 88C we continue to see both of those

 8         individuals?

 9    A    Yes.

10    Q    And then in 88D only Brittany?

11    A    Correct.

12    Q    Okay.  88E, who was depicted here at 1:49:28?

13    A    Well there's Tou Shoua Lee, Michael Verhyden and

14         Michael Thor.

15    Q    Why don't you write Tou Shoua and then draw a line to

16         where he is located.

17    A    (Witness complying.)

18    Q    And then MV for Michael Verheyden.

19    A    (Witness complying.)

20    Q    And then MT for Michael Thor?

21    A    (Witness complying.)

22    Q    And that time stamp would be 1:49:28?

23    A    Correct.

24    Q    And it's shortly after that that Tou Shoua then in

25         88F is kind of the last image at 1:49:29 we see of
```

67

1          him?

2     A    Yes.

3     Q    Followed by 1:49:34 the last image we see of Michael

4          Verheyden as he exits?

5     A    Yes.

6     Q    And then that would be 88F and 88G.  And then --

7     A    Correct.

8     Q    And then continuing down in 88H, who is depicted

9          there at 1:50:07?

10    A    The significant individuals again are Michael Thor,

11         and then you have Dalinda followed by Alyson followed

12         by the defendant, Chong Lee.

13    Q    And can you write -- let's identify in that where

14         Chong would be located.

15    A    (Witness complying.)

16    Q    And he continues then in 88I, two seconds later, to

17         walk towards that front foyer area?

18    A    Yes.

19    Q    Then in 88G we see him again, and can you write his

20         name and draw a line to where he's depicted?

21    A    (Witness complying.)

22    Q    That's at 1:50:10?

23    A    Correct.

24    Q    And then in 1:50:11 do we still continue to see him

25         in that -- kind of that dark sleeve on the coat or

68

1              whatever type of clothing he had on?

2      A      Correct.  He's in the lower right-hand corner.

3      Q      And then at about 1:50:11 do we continue to see

4              him?

5      A      Yes.  He's just beginning to walk off the camera

6              view.

7      Q      And then at 1:50:12 we -- do you still see a portion

8              of Chong Lee?

9      A      Correct.  You just see his right arm and right

10             shoulder.

11     Q      Can you write a C on 1:50:12 which is 88M?

12     A      (Witness complying.)

13     Q      So were the time stamps on all the cameras

14             consistent?

15     A      Yes.  It was one DVR so it's really working off of

16             one timer system so the times were consistent from

17             camera to camera.

18     Q      So would -- if we have Chong Lee entering at 1:50:12,

19             correct?

20     A      Correct.

21     Q      What time then from the other camera angle did you

22             believe to be the shot?

23     A      1:50:25, so approximately 13 seconds.

24                    ATTORNEY SCHNEIDER:  Okay.  I would move 88

25             into evidence at this time.

69

```
 1                    ATTORNEY VISHNY:  No objection.
 2                    THE COURT:  88 shall be received.
 3                    ATTORNEY SCHNEIDER:  Should we take our
 4          mid-morning break?
 5                    THE COURT:  That's fine.  All rise for the
 6          jury.
 7                    (The jury was escorted out of the
 8          courtroom.)
 9                    THE COURT:  We're okay if we're ready to go
10          at about 10:45?  All right.
11                    (Court in recess.)
12                    THE COURT:  Sergeant Rabas, come on up.
13                    (The jury was escorted into the courtroom.)
14                    THE COURT:  Please be seated.
15              Attorney Schneider, whenever you're ready to
16          continue.
17     Q    (BY ATTORNEY SCHNEIDER)  I put that up next to you,
18          Sergeant Rabas, I think it's Exhibit 3, although my
19          eyes aren't that great.
20              So what we just played for the jury, the first
21          images where we saw the front door, that's what
22          Trooper Zukowski marked as Camera 1, correct?
23     A    Yes.
24     Q    And then that second sequence where we saw a side of
25          the bar, that would be what was shown in Camera 2?
```

70

1    A    Correct.

2    Q    And then the area in the middle at the top of the

3         stairs, that's kind of that area of void?

4    A    Yes.

5    Q    And at some point did you ask the trooper with his

6         technology to kind of make a representation of the

7         size of that area?

8    A    Yes.

9    Q    And is that what we see here in Exhibit 5?

10   A    Yes.

11   Q    Okay.  And that would be the area -- the opening as

12        well as then the area from that -- the half wall,

13        which I'm going to literally write half wall on the

14        exhibit.

15             ATTORNEY VISHNY:  I'm sorry.  What exhibit

16        are you referring to?

17             ATTORNEY SCHNEIDER:  I wrote half wall.

18             THE COURT:  That's on No. 5?

19             ATTORNEY SCHNEIDER:  On Exhibit 5.

20   Q    (BY ATTORNEY SCHNEIDER)  So you asked him also to

21        show the size and space of that area, correct?

22   A    Yes.

23   Q    Because as part of your investigation it revealed

24        there weren't just one, two, three or four people in

25        that area, correct?

71

1   A   Correct.

2   Q   Officer Vander Wielen previously in this trial

3       testified that he had checked some cameras that were

4       at Division and Washington?

5   A   Yes.

6   Q   And those are cameras that you also as part of this

7       case were able to go and observe?

8   A   Yes.

9   Q   And the city has a series of street cameras, correct?

10  A   Yes, they do.

11  Q   So previously on this exhibit, which is Exhibit No.

12      6, in the northwest corner of Washington and Division

13      there is TC for traffic camera; is that correct?

14  A   Yes.

15  Q   And that camera you could pan and zoom?

16  A   Correct.

17  Q   And did it show the area of what would be the parking

18      ramp?

19  A   Yes, to the -- from the parking ramp and then to the

20      south of the parking ramp.

21  Q   Because it has not been marked, can you write parking

22      ramp on what is the parking ramp there at Washington?

23  A   (Witness complying.)

24  Q   And did you or other officers also check this area

25      for any other relevant traffic cameras?

72

1    A    Yes.  We saved or captured a lot of different traffic
2         cameras, but in particular most of them were centered
3         around what could have covered the Luna area.
4    Q    Okay.  And you actually -- and part of what we
5         observed last week with Mr. Randall was a camera
6         angle that was inside of the parking ramp, correct?
7    A    Correct.
8    Q    And was there any cameras or are there any cameras at
9         North Division and College back in December of
10        2013?
11   A    Yes, there is.
12   Q    And is that Camera 1 that is in a consistent position
13        when it's on or does it move?
14   A    No, that's a moveable -- what we call a pan-tilt-zoom
15        camera, so it can be manipulated to point one
16        particular direction and then zoom in and obviously
17        tilt as well.
18   Q    Does it, however, if it's facing -- if it's facing
19        north can you ask it to pan down and see what is
20        south?
21   A    Not simultaneously, no.  So whatever direction it's
22        facing, that's what it captures at the time.
23   Q    So that's what it records.
24   A    Yes.
25   Q    Okay.  Were you able to find the North Division

73

1        Street, West College Avenue camera, what area it was

2        focusing or facing at the time of this incident?

3    A   Yeah.  At the time of this incident it was facing

4        what's been referred to as Sal's Pizza, so almost in

5        a southwest direction.

6    Q   Okay.  And do you want to write -- is Sal's Pizza

7        actually shown in here or off of the image?

8    A   Without delineation in building, it's hard to

9        determine that, but it would be in this area, so I'm

10       not sure if this gray area down here would

11       incorporate Sal's or not because there is several

12       other businesses as well.

13   Q   But it -- that traffic camera was not in a position

14       to show us, if I look at North Division as it

15       intersects West College, anywhere east of that

16       intersection, correct?

17   A   Correct.

18   Q   And it did not pick up anything north of West

19       College?

20   A   Correct.

21   Q   So it was pointed kind of at that corner in a

22       southwest direction?

23   A   Correct.

24   Q   And in part of viewing that camera at Washington and

25       Division, at some point did you observe an area where

74

1        it appeared a fight between Alyson and Brittany

2        occurred?

3   A    Yes, yes.

4   Q    And where is that?

5   A    It was on the side of the building of Luna, just to

6        the north of College Avenue on the sidewalk off of

7        Division Street.

8   Q    There is a red mark here on Exhibit 6.  Would that

9        appear to be fairly consistent where that fight

10       was?

11  A    Yes, it would be.

12  Q    Okay.  You can grab a seat then.  Thank you.

13           As part of the investigation, at some point did

14       you look into what came to be known as the Facebook

15       account of -- assigned to Chong Lee?

16  A    Yes.

17  Q    Remember the account name on there?

18  A    Little Lee.

19  Q    And were there images that were on that account?

20  A    Yes.

21  Q    And messages?

22  A    Yes.

23  Q    But again, like a cell phone, you don't know if a

24       particular person puts it on or someone else posts to

25       an account?

75

1    A    That is correct.

2    Q    But that is something do you think within 48 to 72

3         hours after the incident officers were looking at?

4    A    Yes.

5    Q    And then the process of identifying people in the

6         photos and then making contact and speaking to them,

7         do you remember when some of those interviews would

8         have started?

9    A    Yes.  I believe the first interviews would have

10        commenced on the Monday the 10th with the interview

11        of Phong Lee.

12   Q    Were some of those interviews possibly what you say

13        Monday the 10th, would it actually be Monday the 9th

14        or Tuesday the 10th?

15   A    I'm sorry, Monday the 9th.  Correct.

16   Q    Okay.  So Phong Lee was spoken to on that day?

17   A    Yes.

18   Q    And anyone else on that day?

19   A    I know early on Sergeant Cary Meyer had contact with

20        Dalinda Guzman.  Obviously that night we had contact

21        with Brittany Olson.  But those were the first

22        initial interviews.

23   Q    And after speaking to Dalinda Guzman, was there then

24        a different individual that officers wanted to speak

25        with?

76

```
1   A   Yes.  Dalinda gave us the information and identity.

2   Q   Who was that person?

3   A   I'm sorry.  Alyson.  Alyson Blom.

4   Q   Did officers also initially speak with Bobby Jo or

5       Lisa Stutzman?

6   A   Yes.

7   Q   And what date was that first contact, if you know?

8   A   That would have been on the evening of the 8th,

9       Sunday night.

10  Q   And would have -- would have they also at some point

11      had contact with Joe Thor then in those first few

12      days?

13  A   Yes.

14  Q   And what was that first contact?

15  A   It was the evening of the 8th at Lisa Stutzman's

16      residence.

17  Q   Could it have been the 9th?

18  A   I'm sorry.  The days all kind of blur together.  Yes.

19      It was when they first went to Lisa Stutzman's

20      residence.  Whatever date that was the very first

21      time, that's when they had made contact with Joe

22      Thor.

23  Q   After you learned the name Alyson Blom, did you look

24      at the videos to determine who she was based upon the

25      case at that point?
```

77

1  A    Yes.

2  Q    And could you see -- I think you previously testified

3       you see her enter Luna with Chong Lee, correct?

4  A    Yes.

5  Q    Could you see where she went or who she was by

6       throughout that night?

7  A    Yes.  After she enters Luna, she walked with Chong to

8       the -- to the back bar area or to the dance floor

9       area.

10 Q    At any point do you see Dalinda with her throughout

11      that night?

12 A    Yes.  Dalinda also joins them.

13 Q    And then at the point when they exit, is Alyson near

14      or with Chong?

15 A    Yes.

16 Q    Were those individuals on that white board over the

17      next few days continued to be identified or sort out

18      who they are?

19 A    Yes.

20 Q    And then were some interviews done of some of those

21      parties?

22 A    Yes.

23 Q    Do you remember you first had contact or anyone did

24      in this case related to Paul Lee?

25 A    Yes.  The first contact we had with him was

78

1          approximately nine p.m. on December 11th at his

2          workplace, Norka.

3     Q    And was Paul located at work?

4     A    Yes.

5     Q    Prior to going and making contact with Paul, was

6          there any contact with any other family members of

7          him at Norka?

8     A    Yes.  In the -- I think when we arrived his sister

9          was in the parking lot waiting -- I believe it was an

10         exchange of vehicles.  Her boyfriend, Michael Xiong,

11         also worked at Norka and she was contacted just

12         before we went in to talk to Paul.

13    Q    And did you -- was -- were you identified as Appleton

14         Police Department officers when you spoke with her?

15    A    Yes.

16    Q    And did you explain to her why you were at Norka?

17    A    I didn't directly -- I wasn't the one who made

18         contact, but I believe it was Officer Blaine Vander

19         Wielen made contact and had questioned her as to

20         whether Paul was here or whoever else was here, so

21         yes, there was contact made with her.

22    Q    And ultimately after that point do you know the name

23         of that sister?

24    A    Yes.  That would be Xeng Lee, X-E-N-G.

25    Q    And through the process of this case did you learn if

79

```
 1           she has a nickname she's sometimes referred it as?
 2      A    Yes.  It's Mao.
 3      Q    And that might be M-A-O for the court reporter?
 4      A    Yes.
 5      Q    Ultimately at Norka did you also have contact with
 6           Michael Xiong?
 7      A    I did not.  Sergeant Chue Thao did have contact with
 8           her.
 9      Q    And as part of speaking to Paul, did you learn where
10           he was living on this date?
11      A    Yes.
12      Q    And where was that?
13      A    He was living -- I don't -- it was on North
14           Kensington, Apartment No. 4.  I don't remember the
15           exact digits.  It was an apartment.
16      Q    Okay.  Who was he living with?
17      A    He was living with Michael and Xeng.
18      Q    At the time you went to speak to Paul Lee at Norka,
19           were you aware where Sergeant Tauber and Sergeant
20           Meyer were heading?
21      A    I knew they were heading down to Milwaukee to try to
22           make contact with Alyson Blom.
23      Q    And that was also during the evening hours of the
24           11th?
25      A    Correct.
```

80

1  Q   Ultimately, later that night, Sergeant Rabas, was a
2      search performed at the residence where Paul was
3      living, the apartment with his sister Xeng and
4      Michael?

5  A   Yes.

6  Q   Any guns or ammunition found?

7  A   No, there was not.

8  Q   At Norka did you locate any clothing Paul had?

9  A   Yes.

10 Q   What was located?

11 A   It was a white and black winter jacket.

12 Q   Is that the coat we've seen here a few times?

13 A   Yes.

14 Q   And he had that with him still?

15 A   Yes.

16 Q   At some point did you look at and make observations
17      of that coat as it related to some images you saw at
18      Luna?

19 A   Yes, I did.

20 Q   And ultimately when you spoke to Paul on that night,
21      did you ask him if that was the coat he was wearing
22      at Luna?

23 A   Yes.

24 Q   What did he say?

25 A   Initially he said that, yes, that it was the coat.

81

1          As the interview progressed, there was a time that he
2          said it wasn't his coat because you could not see the
3          black in it.
4     Q    Is that when you were showing him the images from
5          Luna?
6     A    Correct.
7     Q    Had you explained to him the color issue about the
8          video at Luna yet?
9     A    Yes.
10    Q    Are there some characteristics about the coat that
11         are consistent with the coat he was wearing in those
12         Luna images?
13    A    Yes.
14    Q    What are those?
15    A    It's about the same size.  It's a larger, puffier
16         jacket.  The size of the jacket, the fact that it's
17         got a hood on, the zipping method or the closure
18         method is all consistent with what he -- we had
19         observed.  There was also, like I said, the -- the
20         appearance of it on him appeared to be the same as it
21         would when it was in the video.
22    Q    Was there some -- this is probably not the right
23         word, but I'm not a clothing wording person, so was
24         there some type of like fur or some other things on
25         the hood of the coat when he would have it up by his

82

1    face?

2  A  Correct.

3  Q  And did that appear to be consistent in both the coat

4     you observed and in the video?

5  A  Yes.

6  Q  When you first started speaking with Paul at Norka,

7     were you alone or was Sergeant Thao with you?

8  A  When we first started talking with Paul, I was alone

9     for the majority of it and Sergeant Thao was talking

10    with Michael Xiong or with the manager from Norka.

11 Q  And what was the reason or was there a particular

12    item or issue you wanted to talk through with Paul

13    when you went to speak with him?

14 A  Yes.  The reason we wanted to talk to Paul is, one,

15    he had not been talked to in reference to this, and

16    from the video, we suspected that perhaps he had an

17    item in his hand that may be a weapon or a gun.  So

18    that was our main concentration in talking to him.

19 Q  And when you first spoke to Paul, did he agree to

20    talk to you?

21 A  Yes.

22 Q  And just, if you can describe to the jury, where was

23    that within his -- his employment?

24 A  We -- we had contacted his supervisor and the

25    supervisor led us into like the business part of the

83

1          building, it's a manufacturing plant, and the

2          supervisor led us into a conference room which is

3          located near the employee entrance of Norka, and

4          there's a conference room right off the entrance.

5          That's where we were located.

6     Q    And at some point did Sergeant Thao then join you?

7     A    Yes.

8     Q    When you first started speaking with him, did you ask

9          him if he was at Luna?

10    A    Yes.

11    Q    What did he say?

12    A    He said he was there.

13    Q    Did you ask him who was with him?

14    A    Yes.

15    Q    Who did he indicate was with him?

16    A    Right -- well, he said Paul and Phong were with him

17         -- I'm sorry, Joe and Phong were with him.

18    Q    Did you talk about a shooting?

19    A    Yes.

20    Q    Who brings up the word shooter?

21    A    Paul actually brings it up.  He makes a statement

22         that -- or asks us, do you think I'm the shooter.

23         And that's how it's brought into the conversation.

24    Q    How did you respond?

25    A    I -- I said, well, are you.

84

1    Q    And how did he respond?

2    A    He denied it.  He said, I'm not the shooter.

3    Q    Did you ask him throughout that contact at Norka if

4         he was the shooter more than once?

5    A    Oh, yeah.  Several times.

6    Q    And what did he always provide you as an answer?

7    A    He always denied that he was the shooter or that he

8         had a gun.

9    Q    When you made those -- when you made that question or

10        asked him those questions, what was his demeanor and

11        his responses at times?

12   A    Paul was upset and angry and very adamant and

13        expressed that and swore at us, called us names and

14        said that he is not the shooter, that he did not do

15        this.

16   Q    Did you ask him who the shooter was?

17   A    Yes.

18   Q    More than once?

19   A    Several times.

20   Q    Did he ever give you any response?

21   A    No.  Except for one time he gave some indication.

22   Q    Okay.  What was that time?

23   A    He made a statement near the end of the interview

24        indicating that when he left, he did not stay with

25        the shooter.

85

1   Q   Prior to that had you discussed with him when he left
2       Luna where he went?
3   A   Yes.
4   Q   What did he tell you?
5   A   When he first told us where he -- when he left Luna
6       he gave a description that he had actually walked
7       home to his Kensington Street apartment.  We
8       confronted him with that, and then he acknowledged
9       that he did go with Joe and Phong to Joe's
10      residence.
11  Q   So throughout this time he describes after being at
12      Luna being with Joe and Phong?
13  A   Correct.
14  Q   In that interview, did the name Chong ever get
15      brought up, if you recall?
16  A   I don't believe it was ever brought up.
17  Q   After he left Luna during that interview, did he ever
18      indicate being or staying with Chong?
19  A   I'm sorry.  Could you repeat the question?
20  Q   Yup.  After he leaves Luna, he describes leaving
21      Luna, does he ever describe to you being or staying
22      with Chong?
23  A   No, he does not.
24  Q   When you talked about what he saw related to Josh,
25      did he know his name or did you share his name with

86

```
 1        him?
 2   A    I believe we shared his name with him.
 3   Q    Did he describe seeing what happened to Josh?
 4   A    Yes, he did.
 5   Q    What did he tell you?
 6             ATTORNEY VISHNY:  Judge, can we approach
 7        the bench?
 8             THE COURT:  You may.
 9             (Bench conference.)
10   A    He told me that he was in an altercation with Josh
11        that initially was between Josh and Phong and then he
12        became involved with it.  He admits that he took a
13        swing at Josh and then backed up, and then after he
14        backed up, he saw a flash which he recognized as
15        being a shot and then saw Josh getting shot in the
16        side of the head and that he was scared as a result
17        of that.
18   Q    Did he tell you what he did after that?
19   A    Yes.  He said he ran out of Luna through the front
20        doors and then north on Division Street.
21   Q    During this process, did Paul -- was he ever shown
22        photos from the still images of Luna?
23   A    Yes, he was.
24   Q    Was he able to identify himself?
25   A    Yes.
```

87

1   Q   Joe, if you recall?

2   A   I believe he did identify Joe.

3   Q   Phong?

4   A   Yes.

5   Q   When you talked about that object that was in his

6       hand or a gun in his hand, how did he respond during

7       this interview at Norka?

8   A   He stated it was his e-cigarette.  The very first

9       time we brought up the possibility that he may have

10      had a gun in his hand, he denied that, said he didn't

11      have a gun, that all he had was his e-cigarette.  And

12      when we showed him a photo which is depicted, which

13      you've seen earlier, he stated, I believe his exact

14      words, something to the effect of -- well, he said it

15      wasn't a gun, that it was, again, his e-cigarette.

16      He immediately identified it as his e-cigarette.

17  Q   During that time did you ask him if Joe was the

18      shooter?

19  A   Yes.

20  Q   What did he say?

21  A   No.

22  Q   What about Phong?

23  A   Yes, I asked him and he said no.

24  Q   During this time when you spoke with Paul, did he

25      describe for you which way he left or ran after he

88

1      exited?

2   A   Yes.

3   Q   And was that consistent with what you had seen on the

4      video?

5   A   Yes.

6   Q   Was it also consistent with what you had seen on the

7      video from North Division where it shows the side of

8      the parking ramp?

9   A   Yes.

10  Q   And in those video images, I'm just going to jump

11     around just a little bit, Sergeant Rabas, when Paul

12     is running by the side of the ramp, his hands are in

13     his coat, correct?

14  A   Correct.

15  Q   Phong still had his vest on?

16  A   Yes.

17  Q   Do you remember -- and have you looked to see what

18     the temperature was that morning?

19  A   Yes.  It was five degrees out.

20  Q   Was Paul's coat open or closed as he was going past

21     the parking ramp?

22  A   It was open, unzipped.

23  Q   Do you remember during the time you spoke to him at

24     Norka talking about a video or video images?

25  A   Yes.

89

1   Q   What did Paul say in response?

2   A   He stated that, play the video, show the video.  He

3       was adamant that if we had video of the actual

4       shooting that we should play that.

5   Q   Did he ask to -- you to play it or show it more than

6       once?

7   A   Yes.

8   Q   How long did you speak with Paul at Norka?

9   A   I believe it was approximately an hour and 15

10      minutes.

11  Q   And part of that time Sergeant Thao was with you?

12  A   Yes.

13  Q   And at the end of that Paul then went to the Appleton

14      Police Department?

15  A   Correct.

16  Q   Back at the Appleton Police Department, did you learn

17      where Sergeant Tauber and Meyer had been?

18  A   Yes.

19  Q   So if you started speaking to Paul at about nine

20      p.m., do you think you were back to the police

21      department by 10:30, 10:45?

22  A   Correct.

23  Q   And did you learn if Sergeant Meyer and Tauber had

24      spoken with anyone?

25  A   Yes.

90

1    Q    Who had they spoken with?

2    A    They had spoken with Alyson Blom down in Milwaukee.

3    Q    And from that, was Chong's name brought up?

4    A    Yes.

5    Q    Did you discuss that with Sergeant Tauber and Meyer

6         and others at the police department?

7    A    Yes.  As soon as I returned to the police department,

8         Lieutenant Mike Gostisha had informed us briefly what

9         Sergeant Tauber and Meyer had learned, and then we

10        did -- they were still traveling from Milwaukee area

11        in their vehicle, so then we had, I guess it would

12        be, a conference call.  We had them on speaker and

13        they were on speaker and we discussed the

14        investigation and what -- what was learned, and we

15        shared information both ways as to what Paul had told

16        us as well as to what they had gained from Alyson.

17   Q    After that point, did Paul remain at the police

18        department?

19   A    Yes, he did.

20   Q    And did other officers speak to him?

21   A    Yes.

22   Q    And that was not yourself, correct?

23   A    Correct.

24   Q    If I told you it was about 1241 a.m. when they spoke

25        to him again, does that seem accurate?

91

1    A    That would be accurate.

2    Q    And those individuals were Sergeant Thao and Sergeant

3         Schira?

4    A    Correct.

5    Q    Was there anything you were doing at this time

6         related to Paul's home?

7    A    Yes.  After we -- I returned back to the police

8         department, obviously we were still interested in the

9         location of the gun, and I was drafting a search

10        warrant for Paul's residence.  After we located where

11        Paul had been living, we had officers who were

12        securing the residence, and they were essentially

13        waiting for me to draft a search warrant and arrive

14        with a search warrant so we could search the

15        residence.

16   Q    And was that done that early morning hours?

17   A    Yes, it was.

18   Q    Was his sister Xeng home when you arrived to do the

19        search?

20   A    Yes.  Xeng and Michael.

21   Q    So they knew what was going on at that time?

22   A    Yes.

23   Q    And again, no guns or ammunition found?

24   A    Correct.

25   Q    During the time Paul was at the Appleton Police

92

```
 1          Department, he stayed there until after one p.m. the

 2          next morning, right?

 3    A     Correct.

 4    Q     Was he ever allowed access to a phone?

 5    A     No.

 6    Q     Did he have a cell phone on him that he might have

 7          been using?

 8    A     No.  Paul did not have a cell phone at that time.

 9    Q     Did you become aware during this time, Sergeant

10          Rabas, of any tips that had come in?

11    A     Yes.

12    Q     And they were anonymous, right?

13    A     Correct.

14    Q     Did they indicate --

15                    ATTORNEY VISHNY:  Objection.

16                    ATTORNEY SCHNEIDER:  Let's just approach.

17                    (Bench conference.)

18    Q     (BY ATTORNEY SCHNEIDER)  As the early morning hours

19          went on, were you and other officers kind of each

20          working on different items and different areas of

21          focus at the time?

22    A     Yes.

23    Q     And did part of that focus include officers making

24          contact with Chong Lee at his residence?

25    A     Yes.
```

93

1    Q    And do you remember where they had contact with

2         him?

3    A    Yes.  I believe it's 513 South Lake Street in

4         Neenah.

5    Q    And at what time did -- was Chong brought to the

6         police department?

7    A    I believe it was shortly after seven a.m.

8    Q    Paul was still at the police department?

9    A    Yes.

10   Q    Did you allow any contact between Paul and Chong?

11   A    No.

12   Q    And from what you were aware, was Paul ever aware

13        that Chong was at the police department at the same

14        time he was?

15   A    I don't know for certain if at the end when he left

16        if he was notified of that or not.  I'm not sure.

17   Q    Okay.  Prior to speaking with Paul on December 11th,

18        did you yourself have any contact with Joe Thor?

19   A    Yes.

20   Q    What date was that?

21   A    I believe it -- I believe it was Tuesday morning, the

22        10th.

23   Q    And did you speak to him after finding him at some

24        location?

25   A    Yes.  He had a court appearance and we talked to him

94

1    after that court appearance.  It may have been

2    actually late morning, early afternoon.

3  Q    And that was also with Sergeant Schira?

4  A    Correct.

5  Q    Did you follow up with Joe Thor after Paul and Chong

6        were spoken to on December 12th?

7  A    Yes.

8  Q    What time did you go and have contact with Joe

9        Thor?

10 A    One p.m. -- approximately one p.m. on the 12th.

11 Q    At this point had Paul been yet dropped off at

12       home?

13 A    No.  He was still at the Appleton Police

14       Department.

15 Q    During both the date when you met with Joe on the

16       10th and on the 12th did you ask him if he was the

17       shooter?

18 A    Yes.

19 Q    What did he say?

20 A    He was not the shooter.

21 Q    Did you ask him if Paul was the shooter?

22 A    Yes.

23 Q    What did he say?

24 A    Paul was not the shooter.

25 Q    What about Phong?

95

1  A    Phong was not the shooter.

2  Q    Did you ask Joe on the 12th or even on the 9th about

3       what he recalled at the time at which Josh's head was

4       struck with the bullet?

5  A    Yes.

6            ATTORNEY VISHNY:  And again, this is

7       hearsay.

8            THE COURT:  Read back the question please.

9            (Question read back.)

10           THE COURT:  Overruled.

11 Q    Go ahead.

12           THE COURT:  You can answer.

13 A    Okay.  Thank you.

14       Joe told us that when he saw the flash he

15      thought he saw the bullet actually hit Josh's head,

16      and actually his description of it was that he

17      thought the bullet came out of Josh's forehead and

18      that he also had saw blood splatter or bone fragments

19      come out.

20 Q    Did he describe seeing anything near Josh's head at

21      the time just prior to seeing the bullet?

22 A    Yes.  He described seeing the flash and then he

23      described a gray sleeve holding, again, would be the

24      weapon.

25 Q    And when you spoke with Joe on December 12th, did you

96

1       have any information or images of Chong Lee in a coat

2       other than the Luna videos?

3    A   No.

4    Q   So all you had were the Luna videos where you know

5       colors aren't always representative of what they

6       actually are?

7    A   Correct.

8    Q   And he brought up the gray sleeve?

9    A   Correct.  He also later described it also as having

10      some striping.  I believe he pointed at his own

11      coat.

12          ATTORNEY VISHNY:  This is all hearsay that

13      was never testified to by Joe Thor.

14          ATTORNEY SCHNEIDER:  Joe --

15          ATTORNEY VISHNY:  He never testified about

16      striping on the coat.

17          ATTORNEY SCHNEIDER:  He testified he

18      couldn't remember what he told the officers.  We

19      asked him some pointed questions so I think this --

20          ATTORNEY VISHNY:  Let's approach.

21

22          (Bench conference.)

23   Q   (BY ATTORNEY SCHNEIDER)  So the question that I asked

24      you, and he brought up the gray sleeve and you

25      started saying correct, and can you give us that

97

1       answer again because now I can't see how I started
2       anymore.
3   A   Yes.  And he also -- later in the interview he
4       described striping on the gray sleeve, and he was
5       wearing a coat that had, I believe it was black and
6       gray striping, he said it was similar to this but the
7       -- it was just a little bit lighter.
8   Q   And up to that point had you mentioned the word gray
9       at all?
10  A   No.
11  Q   And just -- this might take a little bit out of
12      order, but just to assist the jury, when did you
13      first obtain any of the Hilton images of the
14      defendant checking into the Milwaukee Hilton?
15  A   I believe it was on the 19th of December.
16  Q   So prior to that you had no color images of the
17      defendant either the morning of the 8th of December
18      or back on November 22nd?
19  A   Correct.
20  Q   When you were first with Joe on December -- when you
21      met with Joe on December 12th, at that point did you
22      learn if he had his own cell phone?
23  A   Yes.  That he did not.
24  Q   Did he use anyone else's cell phone in his family?
25  A   Yes.  His brother's.

98

```
1    Q    And what was his brother's name?

2    A    He has two brothers.  One is Cassidy and one is -- I

3         believe it's Cher or Cher, I believe it's C-H-E-R.

4         I'm not a hundred percent on that.

5    Q    At some point was Cassidy's phone taken?

6    A    Yes.  During our first interview on the 10th we had

7         taken Joe's phone that he had, which was Cassidy's

8         phone.

9    Q    And were there any limits on how often or how much

10        that phone could be used?

11   A    Yes.

12   Q    And what were those?

13   A    I believe Cassidy --

14             ATTORNEY VISHNY:  Is this -- does --

15        objection to personal knowledge.

16             ATTORNEY SCHNEIDER:  Well, we can approach,

17        Judge.

18             THE COURT:  Come on up.

19             (Bench conference.)

20   Q    (BY ATTORNEY SCHNEIDER)  As part of this case,

21        Sergeant Rabas, did you ever personally examine or

22        look at that phone you collected from Joe that was

23        his brother Cassidy's phone?

24   A    I remember getting it from him, I don't believe I

25        personally looked through it or did any examination
```

99

```
 1        on it.
 2    Q   Okay.  Back on the interview with Joe on December
 3        10th, did he express any concerns to you about
 4        sharing information?
 5    A   Yes.
 6    Q   What were some of those concerns?
 7                ATTORNEY VISHNY:  I'm sorry.  Back on the
 8        10th you say?
 9                ATTORNEY SCHNEIDER:  Yes.
10    A   Joe said he was scared and he was scared for his
11        family, for himself and his family.
12    Q   When you talked -- spoke to him on the 12th, did he
13        have those same concerns?
14    A   Yes.
15    Q   On -- on the 12th, did you talk to Joe about where he
16        went or if he had any contact with Chong after the
17        shooting?
18    A   Yes.
19    Q   What did he tell you?
20    A   Actually, Joe brought it up to us, is that he had
21        contact with Chong.  Initially he stated on -- I
22        believe it was on Monday, and then later in the
23        conversation he said that Chong had actually come to
24        his residence after the shooting and that he and
25        Chong had then gone down to Milwaukee.
```

1    Q    Did you ask him if the defendant made any comments

2         related to the shooting on that Sunday?

3    A    Yes.

4    Q    What did he say?

5    A    He stated that on the drive down to Milwaukee Chong

6         told him that he did it, referring to the shooting,

7         execution of Joshua Richards.

8              ATTORNEY VISHNY:  Can we approach the bench

9         please?

10             THE COURT:  You may.

11             (Bench conference.)

12             THE COURT:  We're going to excuse the jury

13        for a few minutes.

14             (The jury was escorted out of the

15        courtroom.)

16             THE COURT:  The issue that we have relates

17        to references to what Joe had indicated during the

18        previous interview.  There is -- it is hearsay on its

19        generalized base, however, there are exceptions when

20        it is offered -- I'll see if I can get the specific

21        verbiage, when it is inconsistent with the

22        declarant's testimony, i.e. Joe, or is consistent

23        with his testimony and is offered to rebut an express

24        or implied charge against the declarant of recent

25        fabrication or improper influence or -- that's under

101

1     90 -- 908.01(4)(a)(1) and (2).  And the -- again, the

2     objection is to hearsay.  Attorney Schneider has

3     articulated that the concern relates to the fact that

4     the defense is impeached -- and it's Joe Thor,

5     correct?

6          ATTORNEY SCHNEIDER:  Yes.

7          THE COURT:  At least at this point Joe Thor

8     has impeached Joe Thor suggesting that he has had

9     recent incidences of fabrication or is fabricating at

10    one point or the other.  The State wants to elicit

11    his prior testimony.  The concern the court has is if

12    the defense, although impeaching -- let me back up.

13    The concern of the court is if Mr. Thor had testified

14    to a statement and it still is consistent today,

15    notwithstanding the impeachment techniques, that the

16    court does not want to get into a -- simply a

17    regurgitation of Mr. Thor's interview which was

18    already addressed through Mr. Thor, and so the

19    defense had asked for offers of proof as to what

20    subject matters would be delved into further.  It was

21    at that point in time that it was suggested that we

22    excuse the jury so that we could go through what

23    potential issues -- because I do think that some

24    latitude is deserved under the hearsay rules.

25    However, it is not meant in my opinion to open the

```
1        door to simply reciting everything that Mr. Thor has

2        previously testified to.

3             And so, Attorney Schneider, my understanding is

4        that you were going to make an offer of proof as to

5        where you wanted to go with these questions, and then

6        I would -- after hearing counsel's objection, we

7        would make a determination or I would make a

8        determination as to what subjects or what questions

9        are acceptable or not.

10                 ATTORNEY SCHNEIDER:  So the next question I

11       wanted to ask him is if he described what city they

12       went to, did he have to do follow-up with him to try

13       to determine specifically where when he mentioned a

14       Hilton they had gone, and then what date did that

15       happen.

16                 THE COURT:  Okay.

17                 ATTORNEY SCHNEIDER:  I was then going to

18       ask about on the interview on the 12th, the

19       discussion about Sharks, how that was brought up,

20       what was described related to Sharks.

21                 THE COURT:  Let me.  Okay.  Let's go

22       through one by one.  I don't think that the -- the

23       first subject -- the first question was related to

24       the Milwaukee trip, and then the second question was

25       part of the Milwaukee trip but what was the second
```

103

1    question?

2              ATTORNEY SCHNEIDER:  More specifically did

3    he try to go back or did he go back at some point to

4    ask Joe more specifically where in Milwaukee they had

5    been.  I mean, I'll forecast his answer.  I think he

6    said the Hilton, they couldn't figure out which one

7    it was so when they talked to him again I think on

8    the 16th then they tried to narrow down which

9    Hilton.

10             THE COURT:  I think that second question is

11   fine.

12             ATTORNEY SCHNEIDER:  And then did they have

13   a discussion on the 12th about Chong saying he had

14   done anything with the gun or how did the topic of

15   Sharks get brought up.  That's kind of a topic area I

16   would go.

17             THE COURT:  And I think that's likewise

18   acceptable because of the -- what I recall is Mr.

19   Thor's recollection or lack thereof or combination of

20   both within his questioning both on direct and

21   cross-examination.

22             ATTORNEY SCHNEIDER:  Okay.  And then I'm

23   done with Joe, but I'm just going to continue on to

24   see what else.  Because then I'm going to the Hilton

25   images that they obtained which don't come from Joe,

104

1     don't come from anyone.  And then I don't have

2     anymore questions about witness interviews after that

3     point.

4               THE COURT:  Okay.

5               ATTORNEY SCHNEIDER:  I'm just standing

6     because I'm just still sore from sitting all last

7     week.

8               THE COURT:  That's fine.  Anything else

9     from defense side?

10              ATTORNEY VISHNY:  Well, Judge, I mean our

11    objections have been hearsay, but the -- the other

12    objection is that this recitation of the interview is

13    extremely misleading because now the jury hears from

14    the nice voice of Sergeant Rabas these great things

15    that Joe Thor said, and as the impressions of what

16    Joe Thor said become more and more distant because

17    it's been a while from the testimony, so it's really

18    dressed up quite nicely here by Sergeant Rabas and

19    it's really a misrepresentation actually as to how

20    the interview proceeded to -- though that part I feel

21    I can clear up on the cross-examination, you know,

22    but I think this is part of why we don't rehash these

23    things, it's like the State is trying its case twice,

24    and it's clearly coming off much better out of the

25    mouth of Sergeant Rabas than Joe Thor, and that's why

105

1    we have these rules.  So that's why I will make my

2    objections.  I understand the court's ruling, I just

3    ask that this be registered as a continuing objection

4    so I don't have to keep interrupting.

5         THE COURT:  You do have a standing

6    objection, and if I recall correctly, the -- the

7    questions you've asked are not necessarily, at

8    least --

9         ATTORNEY SCHNEIDER:  Not like tell me

10   everything.  I'm trying to be pointed.

11        THE COURT:  That's why I don't -- as much

12   as possible I don't want a regurgitation of what

13   exactly Joe had stated.

14        ATTORNEY SCHNEIDER:  Right.  So with some

15   allowance to start the question kind of leading him

16   to the topic or the subject matter, I've tried to do

17   that.  They haven't objected, I think they understand

18   why I'm trying to do that.

19        THE COURT:  What I'm more interested in is

20   or what I think is more important and what I'm trying

21   to convey is that this should be why did Sergeant

22   Rabas do what Sergeant Rabas did as opposed to a

23   regurgitation of what Joe did because I think that

24   there is some merit likewise to the objections raised

25   by and the concerns raised by opposing counsel.

106

1           ATTORNEY SCHNEIDER:  And if we're going to

2      have objections as to linguistic style, I didn't

3      object when Trainum was saying things in voices and

4      giving intonation and tone to things that unless he

5      has somehow memorized those many of the things and

6      emphasis he put on words are not what's there.  I

7      don't do that when Attorney Vishny asks questions or

8      the same questions or during cross.

9           THE COURT:  And I have enough confidence in

10     the jury that the jury recognizes that Attorney - I'm

11     sorry - detective -- Sergeant Rabas may have

12     intonations that are unique unto himself and are not

13     necessarily representative, just as we have had when,

14     by way of example, Mr. Trainum testified.

15          ATTORNEY VISHNY:  Just so the record is

16     clear, I'm not objecting to his intonations here,

17     it's just -- I don't find anything wrong with his

18     voice.  I'm not doing that.

19          THE COURT:  No.  The context is

20     understood.

21          ATTORNEY VISHNY:  Right.  Okay.

22          THE COURT:  The context is absolutely

23     understood, and that's why I don't want to have

24     simply Sergeant Rabas reread what Joe had said.

25          Okay.  Since we're dealing with it, we did have

1          four other sidebars apparently.  We had a sidebar

2          related to seeing what had happened.  It was objected

3          to on hearsay.  The court did overrule that.

4                Second objection related to the anonymous tip.

5          The court did sustain that objection.  There was not

6          reference to that.

7                There was an objection related to the coat and

8          the descriptions of the same.  The court did overrule

9          that.

10               The -- there was a subsequent sidebar related to

11         the analysis of Cassidy's phone.  It was the court's

12         ruling that Sergeant Rabas would only be able to

13         answer what he personally did.  He then subsequently

14         identified that he did not personally participate in

15         the -- what I'll call categorically the phone dump

16         and so that ended the questions on that subject and

17         counsel proceeded on.

18               Attorney Schneider, is that your understanding

19         of the sidebars?

20                    ATTORNEY SCHNEIDER:  Yes.

21                    THE COURT:  Attorney Vishny?

22                    ATTORNEY VISHNY:  Yes.

23                    THE COURT:  Okay.  Are we ready to bring

24         the jury back in?

25                    ATTORNEY SCHNEIDER:  Yes.

108

```
1                    THE COURT:  Very good.
2                    (The jury was escorted into the courtroom.)
3                    THE COURT:  Please be seated.
4              Attorney Schneider, you may continue.
5                    ATTORNEY SCHNEIDER:  Thank you.
6    Q    (BY ATTORNEY SCHNEIDER)  Just bear with me because I
7         might ask a question I asked already.
8              Did Joe indicate to you on Sunday where he went
9         with the defendant?
10   A    Yes.
11   Q    Where?
12   A    To Milwaukee.
13   Q    And at some point during this case did you attempt to
14        follow up or determine more specifically where he had
15        gone?
16   A    Yes.  He stated they had stayed at a hotel, a Hilton.
17        He had also mentioned that they had gone to his
18        cousin Peter Moua's house and then also a girl by the
19        name of Diaz, but in trying to confirm the
20        information, we were not certain as to what hotel,
21        which Hilton hotel in Milwaukee, so I had to
22        recontact Joe to get clarification as to the route of
23        travel and what possible hotel they stayed at.
24   Q    And what date did you do that on?
25   A    I believe that was done on the 16th.  Sergeant Tauber
```

109

1           -- actually, yeah, I believe my interview with Joe

2           was on the 16th, that follow-up one.

3      Q    Prior to the 16th did officers have any information

4           or color images of Chong Lee prior to the night of

5           the shooting in any jackets?

6      A    No.

7      Q    Did Sergeant Tauber then follow up on that?

8      A    Yes.

9      Q    During the time that you spoke with Joe on December

10          12th, did you discuss the gun, bullets or what had

11          happened?

12     A    Yes.

13     Q    What was said?

14     A    I asked Joe if he knew what -- or if Chong told him

15          during these discussions what Chong had done with the

16          gun, and Joe told us that Chong told him that he had

17          flushed the gun at a bar in downtown Appleton.

18     Q    How does the name Sharks get brought up?

19     A    I believe I introduced Sharks because at that point I

20          knew that Chong had been interviewed and observed

21          even part of his interview where he admitted that

22          after he left Luna he had gone to Sharks, so I asked

23          Joe if -- after he told me that Chong told him that

24          he had flushed it down a toilet at a bar, downtown

25          bar, I said could it be possibly Sharks.  Joe then

110

1    said it could have been.  Later in the conversation I

2    believe he then states that Chong did specifically

3    tell him that he flushed the gun at Sharks.

4  Q  On this same date, December 12th, were officers

5    attempting to make contact with Phong Lee?

6  A  Yes.

7  Q  And do you know where they first had contact with

8    Phong on that date?

9  A  Yes.

10  Q  Where was that?

11  A  At his workplace, McDonalds.

12  Q  Do you know what time that was?

13  A  I believe it was around 11 a.m.

14  Q  And were they able to speak to him?

15  A  Not at that time.

16  Q  And did all -- officers ultimately speak to Phong on

17    that day?

18  A  I should correct that.  They did speak with him

19    briefly.  They set up for an appointment to meet with

20    him after work.  And he stated to meet with them at

21    his residence after he finished work which was just

22    shortly after two p.m.

23  Q  After this date, December 12th, was follow-up done

24    again with Alyson?

25  A  Yes.

111

1    Q    What about follow-up done related to Milwaukee?

2    A    Yes.

3    Q    Ultimately -- ultimately also follow-up done with

4         Stephanie and Melanie Thao?

5    A    Yes.

6              ATTORNEY SCHNEIDER:  I've just got to

7         switch some cords here.

8    Q    (BY ATTORNEY SCHNEIDER)  So after kind of following

9         up with Joe on December 16th and officers went and

10        collected more information related to Hilton hotel in

11        Milwaukee?

12   A    Yes.

13   Q    And what did they obtain related to that visit?

14   A    They obtained receipts from when Chong Lee had

15        recently checked in to the Hilton hotel.  There was

16        two receipts, one from November 22nd, 2013, and then

17        one from December 8th, 2013.  Along with the receipts

18        they also obtained still images of photos of Chong

19        Lee checking into the hotel.

20   Q    I'm going to show you - going to have to let it take

21        a second to focus - previously been marked

22        State's Exhibit 78.  Are you familiar with that

23        exhibit, Sergeant Rabas?

24   A    Yes.

25   Q    And it's actually one image of a series taken from

112

1       video surveillance from the Hilton hotel?

2    A  Correct.

3    Q  And the date of this would be what date?

4    A  12/8/2013.

5    Q  And what time is this shown?

6    A  6:45:49 a.m.

7    Q  And this would have corresponded with the receipt

8       that the Hilton provided for stay of Chong Lee at

9       their hotel checking in at about 6:45 a.m.?

10   A  Yes.

11   Q  And is this the first time you saw any color images

12      of coats of Chong Lee?

13   A  Yes.

14   Q  And the coat of Chong Lee here, not a -- not a

15      consistent color, correct?

16   A  Correct.

17   Q  And I don't want to describe it.  What would you

18      describe about this coat or the colors of the coat?

19   A  It is two-tone blue, dark blue and a lighter blue,

20      and I'm not a fashion guy so I don't know the design

21      pattern, but obviously there is some design pattern

22      where the light blue and darker blue are intermittent

23      along the sleeve line and in throughout the jacket.

24   Q  Okay.  So then I'm going to show you what's been

25      marked State's Exhibit No. 76.  Are you familiar with

113

1      what's depicted here?

2   A   Yes.

3   Q   And what time stamp was noted on this item obtained

4      from Hilton?

5   A   11/22/2013 and 7:16:33 p.m.

6   Q   And that related to a previous stay of the defendant

7      at that Hilton?

8   A   Yes.

9   Q   Did it appear the coats in 78 and this coat shown

10     here are the same?

11  A   No.

12  Q   Prior to seeing these images, and I think you said it

13     was sometime after December 19th, had you ever seen

14     any color photo of this jacket?

15  A   No.

16  Q   And what was of note when you obtained this

17     photograph for you related to what you had seen and

18     viewed at the Luna images?

19  A   This coat appeared to match the coat that Chong would

20     have been wearing the -- the night or the early

21     morning hours on December 8th when he shot Josh

22     Richards in the head.

23  Q   And this isn't the only image of this coat you saw of

24     him down at the Hilton?

25  A   No.  This is a screenshot from the video.  There is

114

```
 1          other camera angles and a lengthy part of the
 2          recording of him checking in.
 3     Q    And what was it of note for you about this coat or
 4          the sleeves of the coat?
 5     A    Again, these sleeves are dark -- almost appear to be
 6          like a dark black leather sleeve.  Of note, our
 7          officers, when Sergeant Cary Meyer walked into --
 8               ATTORNEY VISHNY:  I'm going to object to
 9          anything that Cary Meyer did say.  It's not here.
10               ATTORNEY SCHNEIDER:  On the Luna images?
11     A    Correct.  That's where I was going.
12               ATTORNEY VISHNY:  I'm sorry.
13     A    When Cary Meyer walks into Luna, he's wearing what we
14          call the old timers black leather coat, and I knew
15          that was consistent.  That's why, like I said, I --
16          it appears his sleeves were very similar to Sergeant
17          Cary Meyer's black leather coat, and again that
18          material was consistent with the sleeves of this
19          jacket that Chong Lee is wearing when he checks in on
20          November 22nd, 2013.
21     Q    Anything of note in this image related to the wrist
22          or the bottom of his sleeve area?
23     A    Yes.  This image there is a black and gray striping,
24          his coat, and I know when it prints off on this
25          paper, his coat actually appears -- in the actual
```

1          video appears to be a little more gray than what it

2          does in this photo, but it's a black and gray stripe

3          along the bottom of his coat, also along the collar

4          of his coat and also along the sleeves of his coat.

5                    ATTORNEY SCHNEIDER:  You can turn the

6          lights on please, Judge.

7                    THE COURT:  Okay.

8     Q    (BY ATTORNEY SCHNEIDER)  And there was a coat

9          obtained during the search of Chong's house,

10         correct?

11    A    Correct.

12    Q    And I'm showing you Exhibit 103.

13    A    Yes.

14    Q    Did you ever have any belief or opinion that this

15         coat was the coat in the Luna video?

16    A    It is not the coat that is from the Luna video.  It

17         was seized from his house.  But further analysis --

18                   ATTORNEY VISHNY:  No, Judge, I'm going to

19         object because I don't think that Sergeant Rabas is

20         qualified to say if it's the coat or not.  He's not

21         an expert.

22                   ATTORNEY SCHNEIDER:  I think he can give

23         his opinion based upon this coat, it's

24         characterizations, items related to this coat and

25         what he saw in the Luna video.

116

1                    THE COURT:  I think he can attest to what

2          he believes, he cannot make an ultimate conclusion

3          based on -- unless there is further foundation he can

4          say this is what I believe, but he's not able to make

5          a conclusive statement.

6                    ATTORNEY SCHNEIDER:  Right.

7      Q   (BY ATTORNEY SCHNEIDER)  Why don't you believe this

8          is the coat that was in the Luna video?

9      A   Because, again, the Luna video captures the

10         differences between fabrics.  In the Luna video, the

11         -- what jacket Chong is wearing, the only thing that

12         remains black or dark is the sleeves, and this

13         jacket, you will see that the sleeves here are of a

14         certain material, which is different than the body of

15         the jacket, but that same material also appears on

16         the collar, down the center, middle of the jacket,

17         and also along the pocket outline.  So when we looked

18         at the video at Luna and look at the body of Chong's

19         coat, we don't see any differentiation in -- I guess

20         the black that you saw on his black sleeves did not

21         appear before the pocket, it does not appear before

22         the collar and does not appear down the middle of the

23         coat, so therefore this jacket, based upon that

24         video --

25     Q   In your opinion.

117

1  A  -- in my opinion is not the same jacket that Chong is

2     wearing that night.

3  Q  The video image of the -- image of the jacket you saw

4     at 6:45 a.m. down in Milwaukee, in your opinion, does

5     it appear in your opinion that's the same coat as

6     what he had on in the Luna images?

7  A  Yes.  In my opinion it is.

8  Q  No.  The December jacket.

9  A  I'm sorry.  The December jacket.  Oh, the December

10    jacket, no, it would not.

11 Q  During the next several days after December 12th, is

12    that when officers received phone calls from Talisa

13    Farias and Marissa Emenecker?

14 A  Yes.

15 Q  And in essence, were there very few calls that came

16    in, actual calls where people identified themselves

17    and wanted to speak to you about the case?

18 A  Yes.

19 Q  And who were they from?

20 A  Dalinda, Melissa and Talisa.  Actually, they showed

21    up at the police department.  We had the 911 calls

22    that came in.

23 Q  Okay.  Over the next time period of December into

24    January did officers continue to work on the case?

25 A  Yes.

118

1    Q    And did some of that work involve listening to jail

2         phone calls of the defendant?

3    A    Yes.

4    Q    And what became of concern or of note related to the

5         investigation in those calls?

6              ATTORNEY VISHNY:  Judge, I'm going to

7         object.  Calls have been entered into evidence.  I

8         believe that they speak for themselves.

9              ATTORNEY SCHNEIDER:  I think it -- it goes

10        to what they did on January 21st of 2014.

11             THE COURT:  Approach.

12             (Bench conference.)

13   Q    (BY ATTORNEY SCHNEIDER)  What was the focus of the

14        case on January 21st of 2014?

15   A    We executed several search warrants simultaneously at

16        several different locations looking for letters

17        written by Chong Lee to several different

18        individuals.

19   Q    Were items located in his cell at the Outagamie

20        County Jail?

21   A    That was -- yes, that was an additional place that we

22        searched.

23   Q    Stephanie and Melanie Thao's house, were officers

24        sent there?

25   A    Yes.

119

1   Q   Letters located there?

2   A   Yes.

3   Q   What about the home where Paul was residing, anything

4       found there?

5   A   Yes, there was.

6   Q   What was that?

7   A   I believe it was a letter and a Christmas card.

8   Q   Do you remember where that letter was found?

9   A   I don't recall specifically.

10  Q   Do you remember the condition of the letter when it

11      was found?

12  A   Yes.  Actually, that brings to mind, I believe it was

13      found in the kitchen garbage can.

14  Q   Was it in one piece?

15  A   No, it had been torn apart.

16  Q   Anything related to Teng Lee's home?

17  A   Yes.  I actually recovered a letter myself from that

18      residence.

19  Q   What about Michael Thor's home?

20  A   Yes.

21  Q   Even after the date of January 21st were phone calls

22      continued to be monitored?

23  A   Yes.

24  Q   And subsequent to that date was there additional

25      follow-up with Stephanie and Melanie Thao?

120

1    A    Yes.

2    Q    And do you recall a court hearing that was to be

3         commenced in February of 2014 for this case?

4    A    Yes.

5    Q    What type of hearing was that?

6    A    I believe it was a preliminary hearing.

7    Q    And that's a case that's part of the standard

8         procedure of cases like this?

9    A    Yeah.  It's one of the first steps of the trial

10        process.

11   Q    First I'm going to show you, Sergeant Rabas, what's

12        been identified as Exhibit 89.  Can you confirm

13        that?

14   A    Correct.

15   Q    And are you familiar with what Exhibit 89 is?

16   A    Yes.

17   Q    What is it?

18   A    This is a letter written by -- by Chong Lee to --

19        it's initialed to T, which is Teng Lee.

20   Q    Okay.  And there's a portion -- first, for the

21        record, can you identify what -- it's four pages?

22   A    Yes, it is.

23   Q    Okay.  There's a portion in Page 1 that leads into

24        Page 2.  Can you read the highlighted lines there

25        please?

121

```
1   A    Sure.  Damn T.  I been mad lately.  I just can't
2        believe that my own blood could do this to me.
3   Q    And then on Page 3 is there additional highlighted
4        portions?
5   A    Yes.
6   Q    And if you can read just what is highlighted
7        please?
8   A    Um, Phong, Paul and Joe are -- be subpoenaed for it.
9        It's scheduled for 10:30 a.m. February 25th.  The
10       only people that will be allowed to come is the
11       witnesses which is Paul, Joe and Phong, along with
12       the cops.  For evidence they only have the testimony
13       of Paul and Joe.  No physical evidence.  So that
14       means no prints, guns, et cetera.  I can't have Paul
15       and Joe show up.  If they do, I would lose.  Man,
16       those two put me into a difficult situation, bro.  I
17       really hate those two at the moment.
18                  ATTORNEY SCHNEIDER:  I move 89 into
19       evidence at this time.
20                  THE COURT:  Any objection?
21                  ATTORNEY VISHNY:  No.
22                  THE COURT:  89 will be received.
23   Q   (BY ATTORNEY SCHNEIDER)  And you indicated as part of
24       this case a letter was also obtained at the home of
25       Michael Thor?
```

122

1    A    Yes.

2    Q    And can you identify Exhibit 90 which is in front of

3         you is two pages in length?

4    A    Yes.

5    Q    And, again, on Page 1 can you read the highlighted

6         portions please.

7    A    Sure.  I don't look for trouble, but when trouble

8         comes, I end it.  That's why I didn't really want to

9         hang out with trouble seeking people 'cause I know

10        myself, no hesitation.  I do everything the smart

11        way.  I made sure I have a way out.  I just never

12        thought family would do this to me.

13   Q    Is there a portion on Page 2 also highlighted?

14   A    Yes.  Risks is an adventure.  You play with fire, got

15        to be ready to get burnt.

16   Q    And both of these items were obtained on January

17        21st?

18   A    Yes.

19             ATTORNEY SCHNEIDER:  I'd move Exhibit 90

20        into evidence.

21             THE COURT:  Any objection?

22             ATTORNEY VISHNY:  No.

23             THE COURT:  90 will be received.

24             ATTORNEY SCHNEIDER:  If I can just have a

25        moment, I don't think I have any other questions at

123

1      this time, Your Honor.

2                      THE COURT:  Okay.

3                      ATTORNEY SCHNEIDER:  Nothing further.

4                      THE COURT:  I'm assuming that defense will

5      have some cross-examination and so what we will do is

6      we will break for lunch at this time.  I'd ask that

7      the jury be back as well as the parties be ready at

8      1:15.

9           Please rise for the jury.

10                     (The jury was escorted out of the

11     courtroom.)

12                     THE COURT:  Attorney Schneider, anything

13     else we need to address before we recess for lunch?

14                     ATTORNEY SCHNEIDER:  No, not before lunch,

15     Judge.

16                     THE COURT:  Attorney Vishny?

17                     ATTORNEY VISHNY:  Yes.  We were going to

18     voir dire Sergeant Rabas very briefly because

19     Sergeant Rabas in his testimony said that Alyson was

20     talked to -- that Alyson was followed up with after

21     the interview with Phong Lee and we only received

22     discovery regarding Alyson on one interview which was

23     on December 11th.

24                     THE COURT:  Okay.

25                     ATTORNEY VISHNY:  And Sergeant Rabas

124

1    testified that there was further follow-up, and we've

2    never received anything on that, so I'd like to know

3    what it is.

4              THE COURT:  All right.  Sergeant Rabas,

5    you're still under oath.  Go ahead.

6         Attorney Vishny, if that was your question --

7              ATTORNEY VISHNY:  Right.

8              THE COURT:  -- then that's it or otherwise

9    go ahead.

10             THE WITNESS:  The question is did I have

11   contact with or was Alyson followed up with after

12   December 12th?

13             ATTORNEY VISHNY:  12th.

14             THE WITNESS:  12th?

15             ATTORNEY VISHNY:  Yes.

16             THE WITNESS:  Personally, I did not.  And I

17   may have misspoke.  I thought -- and I don't recall.

18   I don't know if there was a phone call after that or

19   not, but I guess, thinking back, I don't have a

20   recollection of any other reports or any other

21   contacts with Alyson as I further think about it.

22             ATTORNEY VISHNY:  Well why did you say yes?

23             THE WITNESS:  Mistake on my part.  This

24   report is 391 pages.  We made contact with 150

25   people.  I can't even tell you how many different

125

1    interviews we did over a two-year period, so it was a

2    mistake.

3            ATTORNEY VISHNY:  Okay.  Nothing further.

4            ATTORNEY SCHNEIDER:  No.  And just to tell,

5    Attorney Vishny, I made an error.  I thought the

6    phone call came after they met with her, it came

7    before they met with her.  So that's my -- I mean,

8    bad question on my part.  I don't have any other

9    records or reports or anything to say we followed up

10    with her or they did anything with her after the

11    contact during the evening hours at the mall.

12            ATTORNEY VISHNY:  Okay.

13            THE COURT:  Okay.

14            ATTORNEY VISHNY:  I'm satisfied.

15            THE COURT:  Very good.  I'll also mention

16    that there was a -- one sidebar related to jail

17    calls.  The court didn't want to address the issues

18    before that.  Attorney Schneider clarified.  I

19    indicated that I would allow Attorney Schneider to

20    lead on that question.  Attorney Schneider did and

21    that's how we resolved that issue.

22        Okay.  We'll be in recess until 1:15.

23            (Lunch recess.)

24            THE COURT:  We can bring in the jury then.

25            (The jury was escorted into the courtroom.)

126

1              THE COURT:  Okay.  Please be seated.

2           If I recall correctly, Attorney Schneider, you

3       had completed your direct examination.  It was now,

4       Attorney Vishny, your opportunity for cross.

5              ATTORNEY SCHNEIDER:  Yes.

6              THE COURT:  Okay.  Whenever you are

7       ready.

8              ATTORNEY VISHNY:  Thank you, Your Honor.

9                   **EXAMINATION OF NEAL RABAS**

10      **BY ATTORNEY VISHNY:**

11  Q   Sergeant Rabas, you talked about the fact that Chong

12      Lee had initially walked in with Alyson Blom when

13      they first came into Luna, right?

14  A   Yes.

15  Q   And that happened at about 1:12 a.m.

16  A   I'm not certain on the time.  I'd have to review

17      either the video or a snapshot from the video to

18      exact --

19  Q   Well you made a time line in connection with this,

20      right?

21  A   Several time lines.

22  Q   Okay.  And I'm going to show you what is marked as

23      Exhibit 198, and this is the -- there were times when

24      the time line had to be corrected so the final

25      version is the most accurate one, right?

127

```
 1   A   It was a working document, so it was constantly being
 2       updated or modified in a sense, so --
 3   Q   Okay.  I apologize for the very small print, but this
 4       is the very -- this is what I've been sent by the
 5       District Attorney as the final version of your time
 6       line.
 7   A   This is not the final version of my time line.
 8   Q   Okay.  Well, let me just ask, because we're not going
 9       to discuss the whole thing, and so if you think that
10       this is inaccurate, why don't you just let me know.
11       Okay?
12   A   Okay.
13   Q   All right.  It -- do you believe that the time line,
14       at least as far as before the shooting, never really
15       changed from this version, that this version is
16       accurate?
17   A   I probably have to compare it to my current or most
18       up-to-date time line to see if there was any changes.
19       I know there were some changes --
20   Q   Right.  I know --
21   A   -- to it, but I don't -- I can't answer that until --
22       and actually the video is the most accurate
23       document.
24   Q   Well, let's turn the video then to -- let me just ask
25       you this first.  When Chong Lee entered with Alyson
```

128

1      Blom, as far as you know, Joshua Richards and

2      Brittany Olson were back in the rear of the Luna

3      somewhere, whether it's the dance floor or the bar,

4      they're nowhere near the door, right?

5   A  Correct.

6   Q  So they don't see the fact that the two of these

7      people enter in together, right?  I mean they

8      wouldn't be in a position to observe that?

9   A  Not when they walk into -- walk into the bar

10     itself.

11  Q  Okay.  And there -- as you said before, there are

12     times where people go in and out?

13  A  Yes.

14  Q  And if you can't read this, just let me know because

15     I can't believe how tiny the print is.  I can barely

16     read it with glasses on.

17        Why don't we just cue up the video then so we'll

18     just show it so it is the most accurate.

19             ATTORNEY VISHNY:  Mr. Weitz, if you could

20     go to 13:42:47.

21  Q  Now, whether I can read this piece of paper with the

22     lights down, we'll see how challenging this is.

23             ATTORNEY WEITZ:  Ready?

24             ATTORNEY VISHNY:  Yeah.

25             ATTORNEY WEITZ:  It's actually back,

1          13:42:44.

2                    ATTORNEY VISHNY:  Okay.  That's fine.  So

3          we'll just start this running here.

4                    (Video played.)

5     Q    At 13:42:44, so do you see Phong Lee in that

6          picture?

7     A    Yes, I believe that's him on the left side.

8     Q    Okay.  He's on the left side wearing what appears to

9          be the white puffy vest or down vest, down style

10         vest?

11    A    Yeah.  And a baseball hat.

12    Q    And a baseball hat.  You never found out what color

13         that hat was, did you?

14    A    No, I don't believe so.

15    Q    That hat was never recovered, right?

16    A    Correct.

17    Q    Okay.  So if we can just see that --

18                   ATTORNEY VISHNY:  Just run it a little bit,

19         Mr. Weitz.

20    Q    And what your diagram says, do you see the other

21         person who is walking out the door with him with the

22         hoodie on?

23    A    Yes.

24    Q    And is that what you believe to be Tou Shoua Lee?

25    A    Yeah, I believe so.

                              130

```
 1   Q    Okay.  And the time stamp on that is 1:42:48.  Okay.
 2            ATTORNEY VISHNY:  Mr. Weitz, if you could
 3        just -- well, I -- it's only 13 seconds or so or 14
 4        seconds.  Let's just play it.  It's easier than fast
 5        forwarding it.
 6            (Video played.)
 7   Q    So as we're watching this, these are other patrons,
 8        right?
 9   A    Yes.
10   Q    Okay.  Now did you see the woman -- we just stopped
11        it and the time stamp is 1:34:02.  All right?  We
12        just ran it backwards but now it's at 1 --
13            ATTORNEY WEITZ:  43:01.
14   Q    1:43:01.  Excuse me.  And that's Alyson Blom.  Do you
15        see the woman in the white jacket with the blonde
16        hair?
17   A    Yes.
18   Q    And that's Alyson Blom leaving, right?
19   A    Correct.
20   Q    And if we could just forward this now to
21        approximately 1:45:01.
22            ATTORNEY WEITZ:  This is 13:45 exactly.
23   Q    So at 13:45 we see other people reentering, correct?
24   A    Correct.
25   Q    Go ahead.  You can play it.  Right now you can see
```

131

```
 1        Phong Lee reentering?

 2   A    Yes.

 3   Q    Okay.  Go ahead.  Play it.

 4             (Video played.)

 5   Q    Stop.  And the next person you see reentering is

 6        Michael Thor?

 7   A    Yes.

 8   Q    And that's at 13:45:01.  Okay.  Go ahead.  Play.

 9             (Video played.)

10   Q    Stop.  And at 13:45:02 we see Alyson Blom reenter?

11   A    Yes.

12   Q    All right.  And then according to your diagram, Chong

13        Lee comes in again, it's a little over a full minute

14        later, at 13:46:36.  Do you want to check that

15        accuracy with the tape?

16   A    Sure.

17   Q    Okay.

18             ATTORNEY VISHNY:  13:46:46, Mr. Weitz.

19   A    36?  I thought you said 46.  Isn't that 36?

20        13:46:36?

21   Q    Yeah.  13:46:36.  But while he's setting that up,

22        it's a fair statement that every time Chong Lee

23        walked in and out of this bar, he wasn't with Alyson

24        Blom, right?

25   A    Yeah.  That's a fair statement.
```

132

1   Q   Okay.  And it's a fair statement that every time

2       Alyson Blom walked in and out of the bar, she wasn't

3       necessarily with Chong Lee, correct?

4   A   Yes.

5   Q   And that there is no real reason to believe that,

6       except for the very end, that Chong Lee and Alyson

7       Blom were seen together in Brittany Olson's line of

8       vision except immediately after the shooting

9       happened, right?

10  A   I'm not certain, because when they first walked in

11      that first time, Chong and Alyson walked all the way

12      to the back dance floor lower bar area and that's

13      where Josh and Brittany Olson were located.

14  Q   Right.  But you have no evidence that there was eye

15      contact, conversation, or that these people had

16      anything to do with each other back there, right?

17  A   Correct.

18  Q   Or even noticed each other, right?

19  A   Correct.

20  Q   Okay.

21          ATTORNEY VISHNY:  Mr. Weitz, I guess we'll

22      show this very last thing and then I'd like to

23      forward to the shooting part.

24          ATTORNEY WEITZ:  This is starting at

25      13:46:35.

133

1                    ATTORNEY VISHNY:  Okay.

2    Q    Okay.  And we're still at 13:46 now 36, that is Chong

3         Lee coming in?

4    A    Yes.

5    Q    And you can recognize him by the clothing but not by

6         the face because his face is blurry, right?

7    A    In that screenshot, correct.

8    Q    Correct.

9                    ATTORNEY VISHNY:  We can just run it ahead

10        a second, see if it clears up.

11                   (Video played.)

12                   ATTORNEY VISHNY:  Doesn't seem to clear up

13        in this particular screenshot.  We're now at 13:46:36

14        as well.

15   Q    So this -- this isn't one of the best screenshots

16        here, right?

17   A    Correct.

18   Q    Now, you took screenshots of this, however, correct?

19        Is this one of the screenshots that you took?

20   A    I took a lot of screenshots.  I'm not certain.

21   Q    Okay.  Now, if we could just forward this up to the

22        shooting when people are leaving at the shooting, or

23        the time of the shooting, which we have at 13:50:26

24        or 25 is where we should be actually.

25   A    Yeah.

134

1   Q    Okay.  We can start there.  All right.  So we're

2        going to start playing this at 13:50:25.

3             ATTORNEY VISHNY:  And I'll tell you when to

4        stop, Mr. Weitz.

5             ATTORNEY WEITZ:  Full speed or

6        frame-by-frame?

7             ATTORNEY VISHNY:  Full speed.  I'll tell

8        you when to stop.

9             (Video played.)

10            ATTORNEY VISHNY:  Stop.  Actually, you

11       stopped it too late, let's run them back.  I'll tell

12       you where I want it to stop.

13  Q    All right.  Now, we're at 13:50:29, so three seconds

14       later, is that -- no, four seconds later we are

15       seeing Joe Thor approaching the door, right?

16  A    Correct.

17  Q    Okay.  And what do you see in his hands?

18  A    I don't see anything in his hands.

19  Q    Okay.  Let's just run it frame-by-frame then.  All

20       right.  And now again he's on the next frame, still

21       the same time, you don't see anything in his hands

22       here either, right?

23  A    Correct.

24  Q    Okay.  Now, you can see Paul Lee in this frame moved

25       in, right?

135

1    A    Yes.

2    Q    Okay.  And do you see his left hand?

3    A    Yeah.  Part of it.

4    Q    Okay.  You can't see whether there is something in

5         his left hand or not in this, you don't see the full

6         hand, right?

7    A    Correct.

8    Q    Okay.  Let's do the next frame.  All right.  And

9         that's at 13:50:29.  Is that still the same thing,

10        correct?

11   A    It's not the same thing.

12   Q    The next frame but it's the same timing, that's what

13        I mean, we've advanced one frame, correct?

14   A    Yes.

15   Q    And you can see his left hand, correct?

16   A    Yes.

17   Q    It's impossible to tell.  There may be something in

18        his left hand however, correct?  I'm not saying you

19        can say for sure, but I'm saying it's possible.

20   A    I -- I don't know.  I know we looked at that

21        extensively and I can't say for certain whether there

22        is something there or not but we lean toward that

23        there was not.

24   Q    But you can't say for sure, that's what I'm saying,

25        correct?

136

```
 1   A    Correct.

 2   Q    Okay.  And in his right hand at this point you can't

 3        see because it's obscured by the person standing to

 4        his right which you know to be Dalinda Melo Guzman,

 5        correct?

 6   A    Correct.

 7   Q    Now, at this point, again, you can see his left hand,

 8        correct?  And this is the same time stamp.  You can

 9        still see his left hand, right?

10   A    I guess I'd have to go back and forth again.  I'm not

11        sure.  I thought his left hand dropped down.

12   Q    Okay.  So you're not sure.

13   A    Correct.  I don't know if that's his left hand there

14        or not.

15   Q    But as far as his right hand goes, you cannot in this

16        frame see if anything is in there, right?

17   A    Correct.

18   Q    Okay.  So this could be his left hand but might not

19        be, right?

20   A    Right.

21   Q    Okay.  Let's go to the next frame.

22            Now, we are at 13:50:29 again.  Next frame.  At

23        this juncture you cannot see his left hand, can you?

24   A    No, I don't believe so.

25   Q    Okay.  But what you can see is his right hand,
```

137

1          correct?

2      A   Yes.

3      Q   And he's holding his elbow out in front of him at

4          approximately a 90-degree angle, right?

5      A   I would -- yeah, it's parallel to the floor.

6      Q   Okay.  So if it's parallel to the floor, to the body

7          it's at about a 90-degree angle?

8      A   Yeah.  You can see his elbow raised there so it's

9          away from his body a little bit.

10     Q   Okay.  So it's not geometry class so we're saying

11         approximately.  All right.

12     A   Okay.

13     Q   This is where you're saying you believed was a gun

14         initially?

15     A   Yes, probably a gun.

16     Q   And you believed it was possibly a gun because of the

17         positioning of his right arm, right?

18     A   Just in the sense that he had something in his hand

19         that we were able to identify.

20     Q   Okay.  And so from your point of view, this could

21         potentially be -- I'm not going to -- we're just

22         saying at the time when you first looked at this,

23         this could potentially be a firearm, right?

24     A   Yes.

25     Q   Okay.  Now take the next frame.  All right.  At this

138

```
 1          juncture, which is still at 13:50:30, it appears that
 2          he's taking his right hand and putting it in his
 3          pocket, correct, or at least lowering it?
 4    A     He moved his hand or his body is positioned
 5          differently that it's just the hand is in front of
 6          him.  I don't think you can determine where he's
 7          putting his hand from that position.
 8    Q     But certainly he's lowering his hand, and the object
 9          that was in his right hand, you can't see it anymore,
10          correct?
11    A     Well I don't even know if it's that much a lowering
12          of a hand or a twisting of the body as he's moving
13          through these people.
14    Q     All right.
15    A     He's moved, his hand you can no longer see.
16    Q     Okay.  Next frame.
17              Now here can you see his right hand in the next
18          frame?  This is still the same time stamp.
19    A     His hand itself?
20    Q     Yeah.
21    A     I don't think I can see his hand.
22    Q     What you can see is that his right arm again is lower
23          than it was when you initially saw the object in his
24          hand?
25    A     Yes.
```

1    Q    All right.  Now right behind him you see Phong Lee?

2    A    Yes.

3    Q    You can see both of Phong Lee's hands, right?

4    A    Yes.

5    Q    And he looks like he's maybe pushing Paul Lee out the

6         door.

7    A    Correct.

8    Q    All right.  Let's go to the next frame.

9              Now, in this frame Paul Lee is very close to the

10        door and again Phong Lee is right behind him?

11   A    Yes.

12   Q    And you're not able to see what if anything would be

13        in Paul Lee's hands at this juncture?

14   A    Correct.

15   Q    Next frame.  And that was the same time stamp on the

16        last frame we just showed.

17             ATTORNEY VISHNY:  Did we forward one more

18        frame, Mr. Weitz?

19             ATTORNEY WEITZ:  Yup.

20   Q    So we're on the next frame, same time stamp, and

21        again Paul Lee is going out the door and Phong Lee is

22        pushing him, right?

23   A    Yes.

24   Q    All right.

25             ATTORNEY VISHNY:  Now can you run it --

140

1       take it back just a couple to where Joe Thor is right
2       in the front of the door.  I'm going to take it
3       backwards just so we can see this in real time again.
4       All right.  Stop.  All right.  We're back at
5       13:50:29.  Can you just run this at regular speed,
6       Mr. Weitz?
7               (Video played.)
8               ATTORNEY VISHNY:  All right.  Stop.
9    Q  Now we have a gap -- we stopped at 13:50:31.  We have
10      a gap between Dalinda Guzman and the next person who
11      is coming, right?
12   A  Yes.
13   Q  And the next person who's coming on the lower left of
14      the screen, that's a person you've identified as Tom
15      Lee or Tommy Lee?
16   A  Tommy Lee, yes.
17   Q  Okay.  So let's watch Mr. Tommy Lee go out the door.
18              (Video played.)
19   Q  Okay.  We're playing this slow.
20              ATTORNEY VISHNY:  And stop.
21   Q  Now, right behind Tom Lee is Chong Lee?
22   A  Correct.
23   Q  And that's at 13:50:32.  And did you see that his
24      hands are also up, correct?
25   A  Yes, they're up.

141

1   Q    And there is nothing in his hands?

2   A    Correct.

3   Q    All right.

4            ATTORNEY VISHNY:  Let's keep going.  All

5        right.  Stop.  Actually, I want to go back a couple

6        frames.  All right.

7   Q    Now, again you see Chong Lee's -- at least his right

8        hand and there is nothing in it in this frame which

9        is at 13:50:33, correct?

10  A    Yes.

11  Q    And then can you watch the video and you can see that

12       Chong Lee goes to the left, right?  Correct, I mean.

13  A    Yes.  That is accurate.

14  Q    Okay.  Now you see Brittany with her arms

15       outstretched right behind Alyson?

16  A    Yes, that is correct.

17           ATTORNEY VISHNY:  Let's just play this

18       forward.

19  Q    Let me ask this.  There was some talk about what the

20       actual distances are here, and based on what you know

21       of the distances in Luna, would it be fair to say

22       that Brittany is probably two feet or less from Chong

23       Lee at this point in time?

24  A    Brittany is two feet or less from Chong Lee.  I would

25       make it a larger gap than two feet.

```
1    Q    Three?

2    A    Yeah.  Three to four feet it looks like because

3         Alyson is in between them, so --

4    Q    But it would appear from here that Chong Lee would be

5         in Brittany's line of vision.  It would appear that.

6         Of course we don't know what she sees or not,

7         right?

8    A    Right.

9    Q    Okay.

10             ATTORNEY VISHNY:  Let's go ahead and

11        forward this again regular speed.  All right.

12        Actually, frame-by-frame.

13             (Video played.)

14             ATTORNEY VISHNY:  Now if you'll just stop

15        at 13:50:34.

16   Q    Chong Lee is going to the left?

17   A    Yes.

18   Q    Tom Lee also goes to the left.

19   A    Yes.

20   Q    So Chong Lee is not the only person who goes to the

21        left.

22   A    Correct.

23   Q    And in the center of the frame now we see the guy

24        with the beers, that's Michael Thor, right?

25   A    Correct.
```

143

1                    ATTORNEY VISHNY:  And can we just run this
2          forward again?  And we'll just stop this now at
3          13:50:36.
4     Q    Michael Thor also goes to the left.
5     A    Yes.
6     Q    And eventually Tom Lee and Michael Thor come back
7          around to the right.
8     A    It's --
9     Q    A little later.
10    A    Yeah, a little later, and I think actually Noah Vang
11         is also with them or comes back that way.
12    Q    So Chong Lee is certainly not the only person who
13         goes to the left in the immediate aftermath of what's
14         going on here.
15    A    Well, within seconds they go to the left, actually,
16         Michael sets his beers down and then swings back
17         toward Division Street.
18    Q    Right.
19    A    And then goes back to the right.
20    Q    But in the immediate aftermath what I'm trying to
21         point out is that Chong Lee is not the only person
22         who went to the left.
23    A    Right outside the doors, correct, he's not the only
24         one who went left.
25    Q    Okay.  Right.

144

1                    ATTORNEY VISHNY:  We can turn the lights

2         back up.

3    Q    Now, I'm going to ask you some questions about this

4         jacket that has been the subject of a lot of

5         discussion.  Looking for the number on it.  This is

6         Exhibit No. 103.  We discussed the material in this

7         jacket, right?

8    A    We didn't, Attorney Schneider and I did.

9    Q    Yeah.  I mean "we", the collective we of the

10        courtroom.

11   A    Yes.

12   Q    Sorry about that.

13   A    I didn't know if you meant previously.

14   Q    No.  Everybody.  Everybody listened to your direct

15        examination.

16             So what you talked about is how the center mass

17        of the jacket, except for the area with the buttons,

18        is a different material than the sleeves, right?

19   A    Than the sleeves, the collar and the -- right before

20        the pockets or right alongside the pockets.

21   Q    All right.  So they're a different material and the

22        -- there is a striping at the end of the sleeve, and

23        that is not the same material as the center of the

24        jacket either, right?  It's not that kind of shiny

25        kind of -- I don't know what you would call this, if

145

1       you call it fake leather?

2    A   Yeah.  If that's the same as that.  No.  It appears

3        to be different material.

4    Q   Okay.  It's a different material.  More like the

5        material in the sleeves?

6    A   Yes, more like that.

7    Q   And that's -- the same is true with the bottom where

8        there is stripes, that's a material that's like --

9        that's also not like the center mass of the jacket,

10       right?

11   A   Correct.

12   Q   And the -- I think the collar, we already mentioned

13       that.  Let's see.  You said something about the back

14       seems pretty solidly to be that black kind of shiny

15       material?

16   A   Yeah.  I don't think I said anything about the

17       back.

18   Q   All right.  Okay.  And of course we know that colors

19       can end up quite different because I'm showing you

20       what's been marked as Exhibit No. 133, Joe Thor's

21       hat, it looks white in the video, or light colored?

22   A   Yeah.  It's definitely not red.

23   Q   It's not even dark in the video, it's -- it looks

24       like it matches his jacket in the video, right?

25   A   Correct.

146

```
 1   Q   And -- but it's far -- it's about as far from being
 2       white as you could imagine, it's really red and black
 3       with maybe a teeny bit of white stitching on it?
 4   A   Correct.
 5   Q   Now, you also looked at the street cameras, there was
 6       some discussion regarding that?
 7   A   Yes.
 8   Q   And apparently there is no street camera that covers
 9       Sharks?
10   A   No.  There -- I mean there is no street camera
11       because it's in mid-block.  Most of the street
12       cameras are at intersections.
13   Q   So the cameras do rotate that are at -- cover a
14       section of a block, some of them?
15   A   Yes.
16   Q   But Sharks was never covered.
17           Did you check the cameras down the block to see
18       if Sharks was ever covered by them?
19   A   I know we checked Division and Washington.  The
20       next -- I believe next camera up is - I'm trying to
21       think if they even had a camera at that time - was
22       College and Appleton.  We recovered a lot of
23       different traffic cameras and sergeant -- or Officer
24       VanderWielen initially did the initial assessment of
25       the traffic cameras.  I know at one point I looked at
```

147

1        a lot of the traffic cameras myself, but I don't know

2        if there is one at College and Appleton or if we had

3        one there at that time.  That would have been the

4        next closest traffic camera that may have captured

5        Sharks.

6    Q   What you -- so you never saw any images of Sharks,

7        whether or not Chong Lee went in there, who he came

8        in with, who he came out with, you were never able to

9        determine that from a camera?

10   A   Correct.

11   Q   What you were able to identify was that right after

12       this shooting that Paul Lee, Phong Lee and Joe Thor

13       went running, they went to the right and went

14       northbound on Division Street?

15   A   Yes.

16   Q   And you were able to see that Joe Thor was running

17       the fastest?

18   A   Yes.

19   Q   His hands were out?

20   A   Yes.

21   Q   Paul Lee and Phong Lee were slower?

22   A   Yes.

23   Q   With Phong Lee bringing up the rear?

24   A   Yeah.

25   Q   Phong Lee's hands were out?

148

```
 1   A   No, Phong actually inserts his hands in his vest
 2       pockets in the ramp as he's going north on Division
 3       in the ramp area.
 4   Q   That's what you think you saw?
 5   A   I believe so, that's what it looks like from the
 6       video.
 7   Q   And Phong Lee, I mean, excuse me, Paul Lee runs with
 8       his hands in his pockets.
 9   A   Yes.
10   Q   The video doesn't actually capture when Phong Lee
11       takes off his jacket, does it?  Do you see that on
12       the video, the street camera video?
13   A   Are you referencing at Division and College?
14   Q   Does that camera ever capture him when he actually
15       takes his jacket off?
16   A   No.  He -- every time he's on a video up to that
17       point, I should say, obviously he takes his vest off
18       when he gets by the emergency shelter, but prior to
19       that he has his vest on the entire time.
20   Q   So you don't see the act of him taking off his vest,
21       that's -- that's determined later because it's found
22       in the garbage can.
23   A   Correct.
24   Q   Now, there was a search when -- when all was said and
25       done, meaning, you know, not all was said and done,
```

149

```
1          when this investigation was going on, there was a

2          search of the area around Luna for evidence.

3    A     Yes, there were several searches.

4    Q     And garbage cans in the vicinity were searched.

5    A     Yes.  Primarily initially the garbage cans to the --

6          in the back alleyway.  We were never -- I don't

7          believe the garbage cans on College Avenue itself

8          were ever searched.

9    Q     But the ones in the back alleyway where somebody

10         might throw a gun away, they were searched?

11   A     Yes.

12   Q     And that included the garbage cans in the vicinity of

13         Sharks as well as Luna?

14   A     Yes.

15   Q     No gun was ever found in that area.

16   A     Correct.

17   Q     And no bullets were ever found in that area until

18         several days later.

19   A     They were found at Sharks.

20   Q     Right.  That was several days later however?

21   A     Yeah.  On the 11th.

22   Q     Correct.

23   A     Yes.

24   Q     And not found by a police officer?

25   A     Correct.
```

150

1    Q    So you're saying the police only searched the garbage

2         cans in the back alley but not the ones on the front

3         in the street at all?

4    A    There -- the initial search was directed towards the

5         west and then the report of individuals running

6         toward the north and then obviously that back

7         alleyway, we knew some individuals will park back

8         there and in the parking ramp area, so there was a

9         search initially designated toward those areas where

10        the reports of where people were running to.  I don't

11        think we -- I don't have any -- documented that any

12        officers searched the -- there is garbage cans on

13        College Avenue on the sidewalks, and I don't believe

14        anybody had searched those garbage cans.

15   Q    You're the person who was in charge of reviewing this

16        video, that was one of your early jobs in this

17        investigation?

18   A    Yes.

19   Q    That was on a Sunday?

20   A    Yes.

21   Q    You went to the Appleton Police Department and it's

22        fair to say you watched it over and over?

23   A    Yes.

24   Q    And when you watched this video over and over, you

25        didn't know at the time who this initial group of 10

151

1          to 14 people, or however many there were, were

2          running out, but you certainly knew that there was an

3          initial group that went out and some went to the left

4          and some went to the right.

5     A    The initial assessment of the video was primarily

6          just to identify and locate the individuals.  So it

7          took some time just to identify, first of all, the 14

8          that ran out and then get photos of them entering the

9          bar and location.  So initially I was just trying to

10         obtain as many still shots so that we could get some

11         facial features of those -- what we called the 14

12         people that we put up on the board to first try to

13         identify them.  It was later after -- so that was the

14         initial assessment, just get those out there, let's

15         start identifying these people, see what they know.

16         Later on I went through further and further analysis

17         of the video in tracking people through -- after we

18         identify them through the video through the hours and

19         hours that I looked through exactly where they were

20         throughout the bar at certain different times, and

21         that's, I guess, the -- when we start identifying

22         people and their possible involvement, there was more

23         detail put into the documents.

24    Q    You looked at this video on December 8th in the early

25         morning hours or mid-morning hours, right?

1    A    Yes.

2    Q    And so you didn't bother to notice at that time that

3         there were people going to the left as well as to the

4         right, you were only focused on the people going to

5         the right and identification of everybody who went

6         out.

7    A    I wouldn't say didn't notice.  I mean I noticed

8         individuals as they exited.  In particular, again,

9         our focus was on just trying to get photos of them

10        and figure out who they were.  We were identifying

11        everybody.

12   Q    So as an investigator it didn't -- you did not inform

13        other people at the department, hey, it's Sunday, I

14        saw some people went to the left, I think that these

15        garbage cans out there should be searched on College

16        Avenue.

17   A    Yeah.  I never relayed that information.

18   Q    There is no garbage pickup on Sunday, correct?

19   A    Correct, there is not.

20   Q    All right.  Let's talk about your interrogation of

21        Paul Lee.  When you went to go see Paul Lee at Norka,

22        this was on December 11th at about nine p.m.?

23   A    Yes.

24   Q    He was your suspect at that time.

25   A    He was one of several suspects.

1    Q    He was accused by you repeatedly in that

2         interrogation of being the shooter?

3    A    Correct.

4    Q    Now, you had talked earlier with Joe Thor, right?

5    A    Yes.

6    Q    And you had, when you talked to Joe Thor, had accused

7         him of being party to a crime potentially or part of

8         a conspiracy but not of being the shooter.

9    A    I -- you know, obviously Joe was questioned, in fact

10        I even asked Paul if Joe was the shooter, so it was

11        still a possibility that we were exploring.

12   Q    I understand that, but in your interview of Joe Thor

13        that went on for three hours, you did say at one

14        point I'm starting to think you're the shooter

15        because of the way he responded to your question?

16   A    Correct.

17   Q    But at -- but you didn't keep saying that to him, I

18        think you're the shooter, I think you're the shooter,

19        I think you're the shooter, that's not how that

20        particular interrogation of Joe Thor went.

21   A    That's an accurate assessment of it.

22   Q    On the other hand, with Paul Lee, there were numerous

23        times that you told him you thought he was the

24        shooter.

25   A    Yes.

154

1    Q    At least 20 or 21, right?

2    A    Yes.

3    Q    You asked him, what if witnesses said he shot him?

4    A    If you're reading from the transcript, I would agree

5         with that.

6    Q    I'll bring it in case you want to look.

7    A    That's fine.  I mean I don't think you're going to

8         misread it.

9    Q    All right.  You told him that five people had said

10        that he had shot the victim on the side of the head

11        and they didn't even know each other?

12   A    I think I worded that maybe as a question at that

13        point.  Maybe I should look at the transcript.

14   Q    Okay.  Yeah.  It may not be word-for-word, I could be

15        paraphrasing.

16   A    Okay.  Then I better look at the transcript.

17   Q    Sure.  Turn your attention to Page 51, Lines 8 to 18.

18        All right.  Let's look specifically at Lines 15 and

19        16.

20   A    Okay.

21   Q    That's where you say there is one, two, three, four,

22        five people who say he's the shooter, five different

23        people saying Paul shot him in the side of the

24        head?

25   A    Yes, I did tell him that.

155

1    Q    Obviously you knew that wasn't true?

2    A    Correct.

3    Q    You didn't even have one person much less five people

4         who had said he was the shooter, right?

5    A    Correct.

6    Q    And --

7    A    No one said Paul was the shooter.

8    Q    Well, but Joe at some point never said Paul was the

9         shooter but he did, when you were questioning him the

10        day before, he wasn't that firm on whether Paul was

11        the shooter compared to himself or Phong?

12   A    Yeah.  Joe said anything is possible.

13   Q    You tell Paul again that he's the shooter on the very

14        next page at 52, Line 24 to 28, right?

15   A    I'm just reading.  I don't think I say anything about

16        shooting there.

17   Q    Okay.  Then maybe I have the wrong page.  Page 53 --

18        all right.  Actually that's talking about something

19        else.  You told him -- let's go to Page 8.

20   A    8?

21   Q    58.  I'm sorry.  Actually, 55 comes before then.  You

22        tell him on Page 55, Line 25, that if you didn't

23        shoot him, then you would know who shot him.

24        Right?

25   A    Yeah.  And then it goes, because you're --

156

1   Q   Right.

2   A   Right.

3   Q   And --

4   A   And get into the fact that he was --

5   Q   I was just going to ask another question.

6   A   I'm sorry.  Go ahead.

7   Q   So he says he doesn't know, and you said, 'cause

8       you're looking right at him when he got shot.  You

9       just punched him in the face, you don't punch

10      somebody and then turn.

11  A   I don't know if I say turn.  Oh, yes, I do.  Okay.

12  Q   And continuing on the next page, because you know

13      he's coming after you, he's a big dude, but he's not

14      coming after you if you put a bullet through his

15      head.  You told him that.

16  A   Yes.

17  Q   Now, it's fair to say that that's kind of common

18      sense, you don't punch somebody and then turn your

19      back to a person.  You wouldn't do that, would you?

20  A   Well, unless you're trying to run away.  If you're

21      going to punch and run, then you would turn your back

22      and get the heck out of there.

23  Q   Right.  But if you're not running away, if you're

24      backing up to a wall, you don't turn around and look

25      at a wall?

157

1   A   No, I'm assuming not.  I don't know.

2   Q   Well, so this went on and on and on, and I -- we've

3       had a lot of discussion about this, but --

4   A   Yeah.

5   Q   -- feel free to double-check my notes, but wouldn't

6       it be fair to say that at least about 20 times or

7       more you told him he was the shooter?

8   A   Yes, that's very fair.

9   Q   Okay.  Now you also told him he would go to prison at

10      various points in that interrogation?

11  A   I'm trying to think if I worded it that he could or

12      would.

13  Q   All right.  Let's play a little bit of the video.

14      We're going to go to the play point is 49 minutes 48

15      seconds.

16              ATTORNEY SCHNEIDER:  And, Miss Schneider,

17      we're going to talk at 50:44, and the page number on

18      the transcript will be at Page 58, Line 4 is where

19      we're going to begin.

20              (Video played.)

21  Q   Stop.  Well, there's a reference to life in prison,

22      right?

23  A   Yeah.  I think it was a question.  I said, do you

24      want to explain what happened or do you want to go

25      down saying I didn't do it all the way to life in

158

1       prison.  So it was a question.

2   Q   Some people might call that coercion, right?

3   A   Yeah.

4   Q   Yes?

5   A   Yeah.

6   Q   Okay.  We can keep playing it.  I don't think we

7       finished that play point.

8                  ATTORNEY SCHNEIDER:  We stopped at -- we

9       should identify that, Solomon, please, for the

10      record.

11                 MR. GATTON:  50:19.

12                 ATTORNEY VISHNY:  Okay.  We're going to go

13      a little bit farther.  So it's at 50:19.

14                 (Video played.)

15  Q   Stop.  So you tell him this is his last chance.  And

16      what play point are we at?

17  A   50:29.

18  Q   50:29  You tell him it's his last chance, right?

19  A   That's true.

20  Q   All right.  Let's keep playing it.

21                 (Video played.)

22  Q   We'll stop right there.  He insists he's not doing

23      it, and within the space of a minute you tell him

24      he'll go to prison, he's facing felony murder, he

25      should be scared, et cetera, and you tell him --

159

1      basically put some time pressure on him.  Fair to

2      say?

3   A  I ask him the first time the question, give him an

4      option, and references to going to prison is

5      accurate.  The time -- time sense is a general one

6      because obviously we're only halfway through the

7      interview so there wasn't a time crunch like in the

8      next two minutes.

9   Q  No, there wasn't a two-minute time crunch, but your

10     intentions there are to basically make him believe

11     he's basically got to tell you this now in this

12     interrogation.

13  A  It would be nice the sooner he tells me what's going

14     on, it would be beneficial for both of us.

15  Q  That's not what I asked you.  What I said is you're

16     trying to give him the impression that he's got to

17     tell you in this interrogation.

18  A  Impression is received -- taken by the person who

19     receives it.

20  Q  All right.

21             ATTORNEY VISHNY:  Can we have the lights,

22     Your Honor?

23             THE COURT:  Sure.

24  Q  (BY ATTORNEY VISHNY)  Well, a little bit after that

25     on Page 62 -- no.  Wrong page.

160

1         Well, let me ask this.  I'm going to change
2         subjects a little bit.
3         Paul Lee, you were talking on direct about how
4         he said he was running with his e-cigarette, right?
5         His hand, you were talking with him about what's in
6         his hand, he tells you his e-cigarette, as he's
7         running out of the bar.
8    A    I don't know if he ever said he was running with his
9         e-cigarette.  I think I showed him a photo, and the
10        photo I think is 1:50:29 still frame, and he said
11        that's his e-cigarette.
12   Q    But many times he told you that when he left that bar
13        he had nothing in his hand.
14   A    Yes.  He also said that.
15   Q    So, for example, Page 62, Line 24, one of the things
16        you say to him is, you all said you're running up
17        that street.  How do people run, with their hand out,
18        right, boom, boom, boom.  How are you running.  He
19        says, excuse my language, I don't fucking remember.
20        And you said, with your hands in your pockets.  Why
21        -- what do you got in your pockets that you got to
22        keep in your pockets, and his response is, I don't
23        fucking run with my pock -- I'm sure he's talking so
24        fast, but he's meaning to say I don't run -- F-ing
25        run with my pocket, with my hands in my pocket, and

161

1       you say, yes, you do, I can show you in the video,

2       and he says, yeah, I would love to see it.

3       Correct?

4    A   Yes.

5    Q   And then we go back to talking about prison because

6        the very next thing you say is, you know when you're

7        in court and there is twelve jurors deciding how long

8        you spend in prison, you'll see it.  Right?

9    A   Yup.

10   Q   Then he goes on and says, you're going to put the

11       wrong person in prison, so he's still denying, and

12       he's actually getting pretty upset and angry and

13       screaming at a certain point?

14   A   Yeah.  If I could finish that line, he says, I ain't

15       happy if I go to prison for some shit that I fucking

16       do.

17   Q   Right.  He keeps denying it throughout.  I don't want

18       to misrepresent that.

19   A   No.  I just wanted to finish that sentence.

20   Q   But he does give you many inconsistent statements

21       from where he is in the bar to whether or not he's

22       got something in his hands or not, those are things

23       he says at different points, right?

24   A   Yes.

25   Q   And he tells you that -- he doesn't tell you at first

162

1          that he went to Joe's, he tells you he went home, he

2          walked home, right?

3     A    Yes.

4     Q    And these are things you kind of had to drag out of

5          him during this interrogation, right?

6     A    Yes.

7     Q    You also tell him during this interrogation that

8          basically either he has to tell you he committed the

9          crime or he has to tell you who else did it.

10    A    I'm not sure if that's a question or are you looking

11         for a response?

12    Q    Yeah.  At different times you tell him, look, if you

13         didn't do it, you know who did it, or words -- again,

14         I'm paraphrasing here.

15    A    Correct.

16    Q    Words to that effect, that he has to tell you one way

17         or the other, right?

18    A    Well, I said to him that either I believed he either

19         did it or then he should know who did the shooting.

20    Q    Right.  So it's got to be one or the other, right?

21    A    It would make sense that he would understand that

22         because he had -- was looking at the individual when

23         he was shot.

24    Q    And of course that's coupled with again threatening

25         him that he's going to go to prison for this,

```
 1          right?

 2    A     Yeah.  Very strong possibility if he was involved

 3          with the shooting.

 4    Q     For example, on Page 91, Line 1 -- well, go back,

 5          Page 90, Line 27, you want to bring into this Josh --

 6          Josh's name as part of this discussion, right?

 7    A     Yeah.  Because that's -- that's who this is all

 8          about, Josh Richards who died.

 9    Q     Yes.  You say to him, yup, his name is Josh, he's

10          dead.  At Line 27, right?

11    A     Yes.

12    Q     And Paul's response is, well I don't fucking know his

13          name.  I don't want to know his name.  And your

14          response to that is?

15    A     You should because you're going to prison for him.

16    Q     And he says, whatever, dude, I ain't going to prison

17          for nobody.  And you say, why did you shoot him.

18          Why.  He says, for anybody else's murder.  And then

19          you say to him, all I want to know is why.  Why.

20          What was so important that you had to put a bullet in

21          this guy's head.  What was your reason.  Right?

22    A     Yes.

23    Q     And at that point there is some inaudible here from

24          what Paul is saying.  You say, are you -- do you have

25          to be that much of a man that you have to use a gun
```

164

```
 1        to prove your tougher than some big dude who's up in

 2        your face.  And Paul says, you know what, I don't

 3        need no fucking gun to prove that I'm fucking

 4        tougher.  Right?

 5    A   Yes.

 6    Q   And then you ask why he shot him, and he says, you

 7        know, I'm a man, if I was going to fight, I'll fight,

 8        there is some inaudible, he says, I don't give a fuck

 9        if he's twice the size.  Right?

10    A   Correct.

11    Q   Now --

12    A   He was explaining that he doesn't need a gun to fight

13        with.

14    Q   Right.  Can you just wait for a question though?

15    A   Oh, I'm sorry.

16    Q   That's okay.

17            So several times you tell him he needs to help

18        you out, the shooter is -- he knows who the shooter

19        is, et cetera, et cetera, right?

20    A   Yes.

21    Q   So if we were going to summarize this interrogation,

22        we would say it would be characterized by a few

23        things, primarily, number one, you insisting Paul is

24        the shooter, right?  I'm going to name them all.

25    A   Okay.
```

165

```
1    Q    You insisting Paul is the shooter, right?

2    A    Yes.

3    Q    You insisting that there's evidence against him and

4         that you observe a gun in his hand?

5    A    Yes.

6    Q    All right.  Him insisting that he didn't do it.

7         Right?  That he didn't do the shooting, him

8         insisting --

9    A    Him insisting, yes.

10   Q    Him insisting he's not the shooter.

11            You repeatedly telling him that he's going to go

12        to life in prison.

13   A    Yes.

14   Q    That's another element.  And also telling him if he

15        doesn't tell you he's the shooter then he has to say

16        that somebody else is, right?

17   A    Well, that he should know who else is the shooter.

18        It's up to him whether he tells me that or not.

19   Q    Well -- all right.

20            Now, you also told him where exactly you

21        believed the gunshot was, right?  You told him you

22        thought it was on the left temple?

23   A    I believe at one point during the interview process

24        we -- actually, he had -- I believe he actually even

25        stood up and we kind of tried to demonstrate how he
```

166

1      punched at Josh, and I think during that process I

2      think there was a discussion about that it -- the

3      injury was to his left temple.

4   Q  All right.  Let's play the video then.

5              ATTORNEY VISHNY:  Play point 1:17 to

6      1:18:20.  Transcript, Page 94, Line 4 to 9422.

7              (Video played.)

8              MR. GATTON:  I don't think that's the right

9      tape.

10             ATTORNEY VISHNY:  Hold on.  I think it's

11     not the right page but, I mean, this is definitely

12     the right tape.  I just asked you --

13             MR. GATTON:  I'm sorry, the right segment

14     of the tape is what I referred to.

15             ATTORNEY VISHNY:  Okay.

16             MR. GATTON:  The right time period.  I

17     should have corrected.

18             (Video played.)

19             ATTORNEY SCHNEIDER:  Just for the record,

20     Solomon, can you put an ending time on that?

21             MR. GATTON:  That was 1:17:10.

22             ATTORNEY SCHNEIDER:  Thank you.

23   Q  (BY ATTORNEY VISHNY)  All right.  I'll tell you what.

24     I don't want to make it not correspond, but that's

25     Paul yelling at you, right?

167

1   A   Yes.

2   Q   Now, and you well recall, at least -- although the

3       tape didn't correspond, what I did show you, Page 94,

4       you did say these words, everybody says it was a

5       straight right hook to his left temple and you have a

6       gun in your hand and boom, down he goes.  All I'm

7       asking is why.  Why, why would you do this.  Right?

8               ATTORNEY VISHNY:  Oh, you know, I think

9       that it started later, because we just --

10              ATTORNEY SCHNEIDER:  Do you want him to

11      finish his answer before --

12              ATTORNEY VISHNY:  Yes, I do.

13  A   Yes, I believe that was said, but there's more

14      conversation to that obviously.

15  Q   Obviously.  And I think I found where we started it.

16          Didn't he just say this.  All right.  Well,

17      there is more to the conversation, and I've made a

18      mistake about what matches what so let's get what

19      Paul's next line is.

20          Well all I'm asking is why are you trying to

21      give me stupid bullshit.  I didn't do it.  Tell me

22      that.  Correct?

23  A   Paul says that?

24  Q   Yes.  Right after you.

25  A   Yes, he says that.

168

1                    THE COURT:  Can the lights go back on?

2                    ATTORNEY VISHNY:  Okay.  I think I found

3          the page where we actually started, so why don't we

4          try again starting at 1:17:00.  I'm sorry.  It was

5          the page before Page 93, so why don't we just run it

6          back and do that until the point where we're supposed

7          to stop.

8     Q    So we'll set it in context.  You said it wasn't set

9          in context so we'll do that.  Go ahead.

10                   (Video played.)

11    Q    Okay.  Stop.  Sergeant Thao is laughing at that

12         point, right?

13    A    Yes.

14    Q    Did you see that?  All right.  We can keep going.

15                   (Video played.)

16    Q    All right.  We can stop.

17                   ATTORNEY SCHNEIDER:  We started at 1:17:00

18         and ending at 1:18:21.

19                   ATTORNEY VISHNY:  We can have the lights.

20                   THE COURT:  Is the overhead projector on?

21         Is that worked out?

22    Q    (BY ATTORNEY VISHNY)  All right.  This is Exhibit No.

23         132.

24                   THE COURT:  Do we need lights or can

25         everyone see this all right?

1              ATTORNEY VISHNY:  Everyone can see it?

2        Okay.

3    Q   All right.  I'm showing you what's Exhibit 132.  This

4        is a diagram that was drawn during this interrogation

5        of Paul Lee, right?

6    A   Yes.

7    Q   And the diagram was drawn by who?

8    A   If I remember correct, I think Paul put the X's on it

9        and then I wrote the names and the arrows possibly.

10       I think Paul might have done the X's and the

11       scribbling, and then I wrote the -- the word, like,

12       fight and Paul and Phong.

13   Q   So what Paul and Phong are telling you is the fight

14       happens right here at the entranceway from the arch

15       to this kind of second foyer area, right?  That's

16       where fight is written on this diagram.

17   A   Yeah.  And I -- we should explain this earlier.  This

18       is really a -- not an accurate drawing by us that we

19       were using in a sense, because there is -- the wall

20       that goes to the left where that half wall is, there

21       is really not that much space.  Actually, once you

22       get through the entryway, there really isn't any

23       space there.  So where they're set back is you would

24       have to actually move them to the right to be more

25       accurate.  So that was an error on our part when we

170

```
 1         initially drew that.
 2    Q    All right.  Well the diagram is not to scale.
 3         Everybody knows that.
 4    A    Correct.
 5    Q    So when we had some talk about the half wall, see
 6         where I'm putting my finger on the very left side of
 7         the page, that's where this half wall is, correct?
 8    A    Yes.
 9    Q    All right.  And so what they show is that Paul and
10         Phong, they put the X's, they start from the
11         stairway, right?
12    A    Yes.
13    Q    And then they move towards where Josh is for this
14         fight.
15    A    I'd have to review exactly how -- they said they came
16         up from the stairwell, and I think that's where he
17         put the initial X's, and I think the arrow indicated
18         they were moving toward the bar area so I think they
19         were moving there and that's where they encountered
20         Josh and then the fight took place where that
21         scribbly sign is.
22    Q    So, in other words, if they're coming from the
23         direction up here in the upper left and they're
24         moving toward Josh, they're facing into the archway
25         or into the bar area.
```

171

```
 1   A   Well, I -- I can't say that because there was a lot
 2       of people in that area, you could be jostled any
 3       which way.
 4   Q   Regardless of that, this is what your diagram
 5       reflects, that they're in the corner and moving into
 6       the direction, and ultimately that the fight takes
 7       place right near the archway.  That is what the
 8       diagram reflects, correct?
 9   A   You'll have to -- I mean Paul is the one who actually
10       directed the diagram so --
11   Q   But you noted things at his direction.  I'm not
12       saying you directed the diagram.  You --
13   A   Right.
14   Q   -- noted things at his direction.  Right?
15   A   Correct.
16   Q   And you didn't correct this diagram at all while you
17       were interrogating him, right?
18   A   This is what Paul was telling us.
19   Q   So you didn't make changes, it was what Paul told
20       you.  This is what he told you and the diagram
21       reflects that.
22   A   Well, and I think this diagram was done relatively
23       early in the interview.  It probably didn't even get
24       to the confrontational stage yet at this point.  It
25       was -- Paul provided this information relatively
```

172

```
 1         early into the interview, so he wasn't providing,
 2         let's put it this way, the whole story at that
 3         point.
 4    Q    Well he never really provided anymore story except
 5         for where he went afterwards, did he?  I mean he
 6         didn't provide -- you're aware of later statements
 7         that he eventually made, correct?
 8    A    Yes.
 9    Q    He didn't provide those during this particular
10         interrogation, he never said he knew who the shooter
11         was, right?
12    A    With the exception of that one statement indicating
13         he knew that he didn't leave with the shooter, or
14         stay with the shooter I think was the terminology.
15    Q    Right.  He did everything he could to remove himself
16         in this interrogation from being with the shooter,
17         including saying he didn't leave with the person.
18    A    Correct.
19    Q    And continuing to insist - well, while he was being
20         threatened with life in prison by you - that he
21         wasn't the guy who did it, right?
22    A    There's a lot to that question.  I'm not sure.  Can
23         you break that down?  I'm not sure.
24    Q    I'll have the reporter read it back.
25    A    Okay.  Thank you.
```

173

1                    (Question read back.)

2    A    Correct.  He always stated he was not the guy who did

3         it.

4    Q    And you always stated that it was either him or he

5         would have to tell you who it would be.

6    A    Or that he knew who the shooter would be.

7    Q    Right.

8    A    Not that he would have to tell me.

9    Q    Right.  Now, let's go on the tape to play point

10        56:05.

11                   ATTORNEY VISHNY:  I think I may have

12        forgotten to tell you this one.  I made a mistake so

13        it's just going to take a second here so I apologize.

14        Play point is 56:05, Page 66, Line 1 going to Page

15        67, Line 2.  56:05.  Judge, we're ready.

16                   THE COURT:  All right.

17                   (Video played.)

18   Q    (BY ATTORNEY VISHNY)  Stop.  That's the first time

19        the words point blank were ever mentioned in this

20        interrogation, correct?

21   A    I believe so.  I believe it's the only time.

22   Q    And the words of point blank were not first mentioned

23        by Paul Lee, they were mentioned by you --

24   A    Correct.

25   Q    -- right?

174

```
 1                    All right.  Let's move on.  Oh, by the way --
 2                    ATTORNEY SCHNEIDER:  Can we get an ending
 3          play point?
 4                    MR. GATTON:  57:03.
 5                    ATTORNEY VISHNY:  57:03.
 6     Q    Let's talk about Joe Thor.  Just going to take me a
 7          minute to get set up here.
 8               Now, you had talked to Joe Thor the day before
 9          with Sergeant Schira, right?
10     A    Yes.
11     Q    And during that interrogation Sergeant Schira said
12          that he was starting to think that Joe was the
13          shooter at one point and could go to jail the rest of
14          his life?
15     A    I -- yeah, I believe that was said.
16     Q    And similar to what you said to Paul, you also told
17          Joe Thor that he should be worried about how long he
18          could spend in prison.
19     A    Yes.
20     Q    And you told him that he had a choice, he could be a
21          witness or a party to the crime.
22     A    Yes.
23     Q    You told him that you were going to be giving him an
24          opportunity to stay out of prison, right?
25     A    I -- yeah.  I believe in one form or fashion that was
```

175

1        relayed to him.

2    Q    Well, let's just get the exact words then.  Page 62,

3        Lines 29 to 30.

4            We're not lying to you.  I don't -- I'm giving

5        you an opportunity, dude.  I'm giving you the

6        opportunity to stay out of prison.  Right?

7    A    Yes.

8    Q    And in fact, you basically said, Page 63, Line 16,

9        that we're going to take everybody down if they're

10       not cooperating, if they're not giving you everything

11       and lying to you.

12   A    It's cooperating.

13   Q    Cooperating.  Excuse me.

14   A    Yes.

15   Q    And that same page you tell him that he's got a lot

16       to lose.

17   A    Sergeant Schira tells him that.

18   Q    All right.  But you're part of -- it's kind of a

19       joint interrogation by the two of you, right?

20   A    Yes.

21   Q    And you asked him, Line 44, the next page, Page 64, I

22       think you're a nice guy.  Why do you want to spend

23       the rest of your life in prison.

24   A    And lying, just to finish the sentence.

25   Q    Yes.  But I'm trying to focus on the prison part.

176

```
1           Right?

2    A      Yeah.  I -- I said I -- probably one form or fashion

3           I told him that, yes.

4    Q      Multiple times.

5    A      Yeah.  Obviously we just went through three in two

6           pages.

7    Q      All right.  He was also told several times that he

8           was either a witness or party to a crime.  We went

9           for it before, but there is other times where he says

10          that, right?

11   A      Yes.

12   Q      And that, you know, he's just got these two options,

13          right?

14   A      Yeah.

15   Q      Correct?

16              And at the end of that particular interrogation,

17          he's actually told that it's decision day because

18          arrests are going to happen pretty quickly in the

19          case.

20   A      I hate to even ask this, but I'd have to see the

21          transcript to -- to confirm that.  I'm not sure how

22          that was said.  I know -- I don't know if we said

23          arrests were going to be soon.

24   Q      Okay.

25   A      Obviously I don't think we had advanced our
```

177

```
 1         investigation that far at that point.
 2    Q    Okay.  Well, you said probably very quickly, just to
 3         refresh your memory here.
 4    A    Oh.
 5    Q    I don't want to nitpick on words, but fairly soon or
 6         probably fairly quickly.  What you did was say
 7         decision day as far as arrests are going to happen
 8         are going to happen probably fairly quick, right?
 9    A    Yes.
10    Q    All right.
11    A    I mean we were working nonstop on the case.
12    Q    Now, during that particular interrogation, similar to
13         what was said to Paul, Joe was told that there's film
14         and that either Paul shot the guy or someone gave
15         Paul the gun and Paul had the gun in his hand, right,
16         Sergeant Schira said that to him a few times?
17    A    I believe so.
18    Q    And he also used this word point blank, he said that
19         the victim was shot at point blank range on the same
20         side as the punch, right?
21    A    I believe so, yes.
22    Q    All right.  And in fact, he went so far as one point
23         to tell them it was a contact shot.  Do you recall
24         that?
25    A    If you're reading it from a transcript, yes, then it
```

178

1          was said.

2      Q    All right.  Well, I'll read Page 147, Line 31.  A

3          contact shot --

4                    ATTORNEY SCHNEIDER:  Can you give me one

5          second please?

6                    ATTORNEY VISHNY:  I'm sorry.

7      Q    Even if a I start a little earlier at Line 25 Segeant

8          Schira says, and you don't know if you, you know,

9          that he threw a punch at him but you know that he was

10         close enough to do a contact, and I had to explain

11         what a contact shot is.  Joe says, yeah.  And

12         Sergeant Schira says, a contact shot is this.  This

13         is a contact shot.  Right?  He's explaining it to

14         him.

15     A    Yes.

16     Q    All right.  And in that interrogation, you were here

17         during the testimony, he -- at some point he's able

18         to get Joe Thor to say that the victim was punched on

19         the left side and then tells him that the victim was

20         punched on the same side was shot, excuse me, on the

21         same side as the punch.

22     A    Well, there's -- can you mind reading that back to

23         me?  I'm not sure.  There's a lot to that question

24         again.

25     Q    Well, why don't I just bring up the transcript.  It's

179

```
1        easier at this point.
2              Actually, what you say is, okay, what side of
3        the --
4                    ATTORNEY SCHNEIDER:  Can you --
5                    ATTORNEY VISHNY:  I'm sorry.  Page 60, Line
6        26.
7                    ATTORNEY SCHNEIDER:  Okay.
8   Q    (BY ATTORNEY VISHNY)  You say, what side of his face
9        would he be hit on.  If Paul swung a punch, does he
10       hit him on the right side or did he hit him on the
11       left side.  And Joe says, would have to be the left.
12       And then you say, left side.  And you say, and where
13       do you think he got shot.  And Joe says, I do not
14       know.  I believe here, I don't know, I just saw
15       splatter and that's when I heard the bang and so
16       like, holy shit, and run, you know.  And then
17       Sergeant Schira says, well guess what side he got
18       shot on.  Joe says, which.  And Sergeant Schira says,
19       think about it.  Just how you -- just how you
20       described how the punch went, how everything went,
21       that's the side he got shot.  You understand why we
22       know that Paul did it.  And then Joe says, I don't
23       believe he did it though because I didn't see a gun
24       in his hand.  Correct?
25  A    Right.
```

180

1    Q    Okay.  So after you and Sergeant Schira tell Joe Thor

2         that the shot's at the same place as the punch on the

3         left side, then you tell him -- not you but Sergeant

4         Schira tells him it's a .25 caliber bullet.

5    A    Sergeant Schira mentions that, yes.

6    Q    More than once, right?

7    A    Yes, more than once.

8    Q    And you know because you were here in court watching

9         it?

10   A    Yes.

11   Q    And in fact the next time you go talk to Joe Thor,

12        and when he at this time says he thinks it's a .22

13        and says didn't you guys tell me that, you don't want

14        to answer that question, right?

15   A    Right.  Because I didn't recall that we had provided

16        that information during the first three-hour

17        interview that we had with Joe.

18   Q    But you think it's okay to provide that

19        information?

20   A    I'm not sure what you mean okay by.  It was provided

21        to him.  I didn't recall that it had been provided to

22        him.  I don't know if it's okay or not okay, I just

23        didn't think we had provided it.

24   Q    Okay.  And that's the interrogation where basically

25        Joe says, well I'm sure Phong didn't, I'm sure I

181

```
 1        didn't, mostly says Paul didn't, but he's again --
 2        can't say a hundred percent or it's possible Paul
 3        shot him, possibly Paul did it, stuff like that.
 4        Right?
 5   A    Yeah.  He didn't identify anybody as the shooter.
 6   Q    Okay.  But he says it's possible with Paul, but he
 7        doesn't like give it to you.  He doesn't say Paul is
 8        the shooter, I saw him do it, anything like that.
 9   A    He says anything is possible, but I don't think he
10        did it.
11   Q    Okay.  Now -- now -- so just to get the time line
12        going here, talk to Joe, then you go talk to Phong --
13        I mean Paul, excuse me.
14             And by the way, when you talked to Paul at
15        Norka, this interview, this interrogation all started
16        out with him telling you that he was out of custody,
17        he would be able to go back to work, right?
18   A    Yes.
19   Q    And at the very end you tell him he can go back to
20        work, right?
21   A    Yes.
22   Q    About three steps away from you, you say, no, wait,
23        we're arresting you and you put him in handcuffs.
24   A    We didn't arrest him.  We detained him and took him
25        to the police department.
```

182

1    Q    Well, he wasn't free to go back to work, right?

2    A    Right.  He was detained.  Arrest is when you're

3         actually charged with something.  He wasn't charged

4         with anything.

5    Q    Well, I can have the judge read a legal definition of

6         arrest to the jury later, but let's just agree that

7         he was put on handcuffs and he wasn't free to go,

8         right?

9    A    Yes.

10   Q    And that no reasonable person in his position would

11        have believed he was free to go.

12   A    Right.

13   Q    Okay.  Now, you've talked quite a bit about this

14        interview with Joe Thor that then took place on

15        December 12th at 1:00, right?

16   A    Yes.

17   Q    And at this point Paul has given this information to

18        Sergeant Thao that you're aware of saying that it's

19        Chong, right?  Paul has given that information at a

20        later interview with Sergeant Schira and Sergeant

21        Thao?

22   A    Yes, I am aware of that.

23   Q    Were you aware that this had been done by Sergeant

24        Thao suggesting to him a few times that it was your

25        brother who did it?  Were you aware of that?

183

1    A    I was not aware of the discussion because I was not

2         present when the interview took place, I was doing a

3         search warrant of Paul's residence.

4    Q    Okay.  Meaning you were executing a search warrant?

5    A    Yes.  Drafting and then executing.

6    Q    Did you also execute the search warrant when Chong

7         Lee got arrested?

8    A    I was part of that, yes.

9    Q    And that's where this coat was taken into custody,

10        the exhibit that we've seen in court, right?

11   A    Yes.

12   Q    It was felt to be important enough that it should be

13        brought into evidence.

14   A    Yeah.  We collect anything that might be associated

15        with it.

16   Q    But one thing you didn't collect at his house, at

17        Chong Lee's house was a gun.

18   A    Correct.  We did not locate one.

19   Q    Didn't locate a .25 caliber gun, right?

20   A    No, we did not.

21   Q    Did not locate any .25 caliber bullets?

22   A    No, we did not.

23   Q    When you went to Chong Lee's house to arrest him,

24        that was -- or when the team went there to arrest him

25        and execute the search warrant it was approximately

184

1      seven in the morning roughly?

2   A   Correct.

3   Q   And Chong Lee was sleeping.

4   A   Yes.

5           ATTORNEY VISHNY:  Judge, I don't know when

6      you want take a break or do you want me to keep going

7      for a while?  I mean I'm only saying that because

8      it's three, but I'm certainly willing to keep going.

9           THE COURT:  Why don't we have counsel

10     approach just for a second.

11          (Bench conference.)

12         The COURT:  Does the jury have any

13     preference?

14         UNIDENTIFIED JUROR:  Could you turn the air

15     on in here?

16         ATTORNEY VISHNY:  Oh, my God.

17         THE COURT:  I will see what I can do, but

18     it -- I will do everything I can to make it cooler,

19     yes, absolutely.

20         ATTORNEY SCHNEIDER:  Why don't we take a

21     break.  If nothing else they can bring up fresh

22     bottles of water.  That might help a little bit.

23         THE COURT:  That's fine.  We can absolutely

24     do that.  Please rise.

25         (The jury was escorted out of the

185

1          courtroom.)

2                    (Court in recess.)

3                    THE COURT:  Ready to bring in the jury?

4                    ATTORNEY VISHNY:  Yes.

5                    THE COURT:  All right.  Please bring in the

6          jury.

7                    (The jury was escorted into the courtroom.)

8                    THE COURT:  Please be seated.

9            I have made a call to maintenance so hopefully

10         we'll be able to have some cooler climate in here.

11           Whenever you're ready, Attorney Vishny.

12                   ATTORNEY VISHNY:  Thank you.

13    Q    (BY ATTORNEY VISHNY)  I think what we were talking

14         about is you were involved in -- we were talking

15         about the fact that you were involved in some search

16         warrant at Paul's house and at Chong's house, right,

17         some searches of the houses?

18    A    Yes.

19    Q    And then after the searches of the houses, between

20         the time of the searches of the houses and when you

21         talked to Joe Thor, you weren't personally involved

22         in anymore witness interviews, correct?

23    A    Correct.

24    Q    The only witness who was being interviewed during

25         that time was Paul Lee until you went and talked to

186

1          Joe Thor.

2    A     And Chong Lee.

3    Q     Well Chong Lee was being talked to also by Sergeant

4          Schira and we saw that video here, right?

5    A     Yes.

6    Q     But nobody had -- and certainly Chong Lee did not

7          confirm what Paul Lee had said --

8    A     No.

9    Q     -- right?  He said he wasn't the shooter, correct?

10   A     Correct.

11   Q     And he had said, you know, go watch the video, bring

12         the video, that's fine.  If you have a video, come

13         bring it.  Right?  Were you aware of that?

14   A     Yes.

15   Q     So the first time that anything that happens that you

16         believe is confirmatory is actually when Joe Thor

17         happened, right, when he was interviewed by you

18         again?

19   A     Confirmatory?

20   Q     Of what Paul Lee said, the first time any witness --

21   A     Yes.  That's one of the reasons we went to go

22         interview Joe was to get verification of what Paul

23         was saying.

24   Q     Well there wasn't any confirmation from the search of

25         Chong Lee's house because there were no guns, bullets

187

1     or physical evidence that linked him to the homicide,

2     correct?

3  A  Correct.

4  Q  And there wasn't confirmation from Phong Lee because

5     he hadn't been talked to, right?

6  A  Correct.

7  Q  So basically the four -- before even talking to Joe

8     Thor or Phong Lee, you go to Paul Lee and tell him

9     you're really sorry about how you talked to him in

10    the first interrogation.

11  A  Yes.

12  Q  Because you told him you felt you were wrong and

13    you're sorry, and then after that you go out and talk

14    to Joe Thor.

15  A  Yes.

16  Q  Now, you testified here about how Joe Thor just gave

17    this critical information, right?

18  A  I'm sorry.  Are we talking about Paul Lee or Joe Thor

19    now?

20  Q  Joe Thor.  We're going to move on to Joe Thor now.

21    We're done with Paul Lee.

22  A  Yes.

23  Q  And you -- you believe that or what you state is that

24    that information came from Joe Thor or did it come

25    from you telling Joe Thor things to say?

1  A  There was information came directly from Joe Thor.

2  Q  All right.  Well, let's talk about how this

3     interrogation starts.  He comes out and sits in your

4     car with you, right?  He's outside and then doesn't

5     want to go in the house and the two of you sit in the

6     car.

7        Yeah.  It would be good to move these.

8        Isn't that the very first thing that happens?

9  A  Yes.

10 Q  And then he starts telling you, well, I can't get a

11    hold of Paul.  All right?  And really on -- right

12    here, Page 1, about the shooting at Luna, I said you

13    got to do some stuff to help yourself.  Right?  You

14    tell him that.  Right after telling him he's not

15    under arrest.

16 A  Yes.

17 Q  All right.  And then the very next thing you tell him

18    after he says I can't get a hold of Paul is you tell

19    him Paul's been arrested.

20 A  Yes.

21 Q  The very next thing you tell him is that his brother

22    Chong has been arrested.

23 A  Correct.

24 Q  And --

25 A  Can I explain why?

189

1    Q    I'm sure if Miss Schneider wants to know why, she'll
2         ask you, but right now I'm just trying to get through
3         this.
4    A    Okay.
5    Q    Okay?  All right.  So you -- you then say, well we
6         didn't talk much about Chong, and Joe tells you,
7         yeah, I saw him at Sharks, but he says he hadn't seen
8         him at Luna, correct?
9    A    Correct.
10   Q    So then you say -- the very next thing you say after
11        that response is, tell me about -- and now I'll let
12        you know they both talked to us.  Right?
13   A    Yes.
14   Q    And then you tell him, part of the reason that
15        they're both in custody is because they both talked.
16        All right?
17   A    Correct.
18   Q    You then tell him that you have some information that
19        Chong talked to Joe.
20             If you're not sure, just say that because I'm
21        going to play the tape.
22   A    No.  I believe I told him, I'm just not sure where in
23        this part of the interview, because initially I think
24        I ask him about anything he had learned from Chong
25        and then he tells about this conversation with this

190

1          Natasha Vang.

2     Q    All right.  So we're not going to get into that kind

3          of hearsay information.

4     A    Okay.

5     Q    All right.  So what we're going to talk about is --

6          so we're going to talk about what people actually

7          said.

8     A    No.  I understand that.  You said next thing or

9          something.  There was a period of conversation in

10         between there.  That's what I guess I wanted to

11         clarify.

12              ATTORNEY VISHNY:  Well, let's watch the

13         tape, Miss Schneider, at three minutes and 30

14         seconds.

15              MR. GATTON:  It's just audio.

16              ATTORNEY VISHNY:  That would be Page 4,

17         Line 6.  This is audio only, this recording.  There

18         is no video here.  So thankfully we can keep the

19         lights on.  Okay.

20              (Tape played.)

21    Q    We can stop.

22         So you go and tell him Chong is in custody, he's

23         not getting out, and you tell him that you know that

24         Chong called and talked about the shooting.  We just

25         heard that, right?

191

1    A    Yes.  I mean that's what we heard.

2    Q    Right.  And again, as he keeps telling you that

3         didn't happen, you say again – I'm on Page 7, Line

4         28 – okay, I know about this phone call.

5    A    Yes.

6    Q    And then again, I know Chong called you.  And then

7         again, I know there was a conversation about the Luna

8         shooting.  Right?

9    A    Yes.

10   Q    All right.  And Joe is still denying that that

11        happened.

12   A    Yes.

13   Q    So then you start talking to him about how he's got

14        to help Paul out.

15             ATTORNEY VISHNY:  And we'll just go to the

16        tape.  8:57.  That would be Page 9, Line 35.

17             MR. GATTON:  I'm sorry.  I don't have that

18        time.

19             ATTORNEY VISHNY:  8:57 to 9:31?

20             MR. GATTON:  I don't have that.

21             ATTORNEY VISHNY:  Okay.  Well, that's --

22        here it is.

23        Miss Schneider, I gave you that, correct?

24        All right.  I messed up.  It's 8:57 to 9:31, and

25        that corresponds to Page 9, Line 35, Page 10, Line

192

```
1        17.
2                  (Tape played.)
3   Q    All right.  We'll stop.
4            So you tell him that you don't believe Paul is
5        the shooter and now he's got to help out Paul.
6        That's the next thing you tell him.  Right?
7   A    Yes.
8   Q    All right.  And then --
9                  ATTORNEY SCHNEIDER:  Can we have Solomon
10       give the play points of what we need -- what we
11       played?
12                 ATTORNEY VISHNY:  We just played 8:57 to
13       9:31.
14                 ATTORNEY SCHNEIDER:  Okay.
15                 ATTORNEY VISHNY:  And now let's go to 14:38
16       on the tape.
17  Q    (BY ATTORNEY VISHNY)  There is some discussion about
18       some other matters, right, some directions that
19       you're asking about, about where some other person
20       lives, right?
21  A    Yes.
22  Q    All right.  Now we'll go back to talking about this.
23       So then we will talk about getting back to this
24       conversation.  All right?
25                 ATTORNEY VISHNY:  So we are at Line 16 --
```

193

1          Page 16, Line 12.  Hold on a second.  Yes.  So it's
2          -- it should be 14:38 on the tape.
3               All right.  Hopefully I got this lined up right.
4                    MR. GATTON:  Play?
5     Q    (BY ATTORNEY VISHNY)  All right.  Now at this point
6          Joe still really hasn't given you any information,
7          correct?  He's taking you around to show you where
8          somebody lives, but he has not at this point told you
9          that Chong Lee told him that he had shot the guy.
10              Eventually -- let me go back.  Eventually in
11         this interview he tells you that Chong Lee is the
12         shooter.
13    A    Yes.
14    Q    Not because he saw it but he says he saw a gray
15         sleeve and Chong came over afterwards and told him
16         about it.
17    A    Well, and there is other information that led him to
18         believe that as well.
19    Q    Well, what we're talking about is what he told you
20         that he personally saw and knew, correct?  We're not
21         going to talk about rumors, we're not discussing that
22         in court.
23    A    Correct.
24    Q    All right.  So because that's not admissible in
25         court.  So we're going to stick to what's admissible

194

```
1    evidence.  All right?
2                 ATTORNEY SCHNEIDER:  Judge, you make the
3    rulings about what's admissible or not.  I ask that
4    she not comment about what is or isn't.  Just ask the
5    questions.
6                 THE COURT:  That commentary should be
7    stricken for the record.  Jury is instructed to
8    disregard.  Please move on.
9    Q    (BY ATTORNEY VISHNY)  All right.  So after these
10        directions now eventually he tells you about he sees
11        a gray sleeve, right?
12   A    Yes.
13   Q    And -- and Chong had come to his house and told him
14        that he was the shooter, that's what he eventually
15        tells you.  It takes him a while to get there though,
16        right?
17   A    Yes.  And then he also mentions that Chong told him
18        on the way to down to Milwaukee.
19   Q    Correct.  But he doesn't tell you that right away
20        either.  There is a lot of twists and turns to Joe
21        Thor, right?
22   A    Yeah.  You've met Joe, right?  Yeah.
23   Q    I think we all met Joe Thor in this courtroom.  But
24        there is a lot of twists and turns to what he says,
25        and you are continuously telling him certain things
```

195

1         to get information from him, true?

2    A    I am trying to get over obstacles that I think is

3         preventing Joe from telling us what happened.

4    Q    Okay.  We understand that that's your opinion, but --

5    A    I think that's what you asked.

6    Q    Well, I said you're constantly telling things to get

7         him to come to a different story.  Right?

8    A    No, ultimately to what happened.

9    Q    Well that's your opinion about what happened.

10   A    Well, what Joe thinks happened.

11   Q    What Joe says he thinks happened, right?

12   A    I'm trying to find out the information Joe has about

13        what took place.

14   Q    You're trying to find out information and Joe tells

15        you certain things, right?

16   A    Yes.

17   Q    And it's going to be up to the jury to decide if that

18        information is believable or not, right?

19   A    Yes.

20   Q    All right.

21             ATTORNEY VISHNY:  Let's go and play that

22        next play point then at 14:38.

23             (Tape played in open court.)

24   Q    (BY ATTORNEY VISHNY)  Okay.  So then conversation

25        continues, right?

196

1   A   Yes.

2   Q   And there is conversation about various issues going

3       on in town, he's got to buy a car, et cetera, et

4       cetera, right?

5   A   Yes.

6   Q   Okay.

7   A   That Chong has to -- wants to buy a car, he has to

8       run, he has to go.

9   Q   Yes.  As if he's going to be leaving town

10      permanently.  Joe is giving you that impression.

11  A   Yes.

12  Q   Okay.

13          ATTORNEY VISHNY:  So -- and then, let's

14      see, next part is at 23:50, which is Line 26, Page

15      26 -- excuse me.  Page 26, Line -- Page 25.  Excuse

16      me.

17  Q   (BY ATTORNEY VISHNY)  And as this continues, Sergeant

18      Lietzinger is basically continuing to challenge Joe,

19      right?

20  A   Yes.

21  Q   All right.

22          ATTORNEY VISHNY:  Let's start at play 23:50

23      which is Page 26, Line 25.

24          (Tape played in open court.)

25  Q   (BY ATTORNEY VISHNY)  Okay.  So after that there is

197

```
1        some discussion, and let's go to Page 32 -- well --
2        actually, you start asking him about what happened
3        after you guys left Luna with Paul and the gun, and
4        Joe tells you Paul didn't have a gun and he explains
5        why he thinks that, right?
6    A   Correct.
7    Q   Okay.  And -- and you at this point are still of the
8        opinion that Paul had a gun when he's leaving, is
9        that why you asked him that?
10   A   Well, that was one of the processes that we were
11       going through with Joe is, again, verification of the
12       information.  So, in questioning, we wanted to verify
13       Paul's statement as did he in fact have a gun when he
14       left Luna or not, so this was the -- the -- I guess
15       the vetting out process of Joe as to whether he knew
16       if Paul had a gun or not when he left Luna.
17   Q   Okay.  But you make it clear trying to find something
18       about a gun is pretty important, right?
19   A   Yeah.  That's part of the investigation.
20   Q   So then again you ask him, well, did you talk to
21       Chong, did you ask Chong why he shot the guy, and
22       then Joe says, no, I didn't ask him anything.
23       Right?
24   A   Yes.  And then he --
25   Q   And then --
```

198

1   A    He says, I just said why are you leaving and he said

2        don't worry about it and then I was like holy shit.

3   Q    Okay.  All right.  And so then you continue on.

4             ATTORNEY VISHNY:  And now let's play the

5        tape at 30 minutes, Page 32, Line 30.

6             (Tape played.)

7   Q    (BY ATTORNEY VISHNY)  Okay.  So what Joe says, yup, I

8        believe he too because the sleeve matches, and then

9        he mentions, from the photos that you showed me.

10       Right?

11  A    Yes.

12  Q    And this is the second time that Joe mentions that

13       you had showed him photos with a gray sleeve.  He had

14       -- we had heard that just a few minutes ago on the

15       tape as well.

16  A    Yeah.  And I -- he's referring to the very first

17       interview we had when we were trying to have him

18       identify individuals from the snapshots.

19  Q    Right.  So --

20  A    I just want to put it in context.

21  Q    No.  I understand that.  That he's referring to the

22       first pictures that were shown earlier.

23  A    Right.  We did not show him photos during this

24       interview.

25  Q    Correct.

199

```
 1   A   Okay.  I just wanted to make that clear.
 2   Q   All right.  Now, and then he tells you he doesn't
 3       know anything about the gun, Joe tells you that,
 4       that -- now he's shifted, telling you that Chong came
 5       the next day, you know, like Chong never even came to
 6       my house, he didn't come inside the next day, he and
 7       I just talked from outside my doorstep.  So his story
 8       is continuing to change, right?
 9   A   Yeah.  And that was new information.  We didn't know
10       that Chong had come to his house.
11   Q   So -- well, that's because Paul hadn't said that
12       Chong had come to the house?  Actually, that wasn't
13       new information, was it?
14   A   I wasn't in on the entire interview with Paul, so I'm
15       not sure if -- I don't think I had those details.  It
16       was new to me.
17   Q   All right.  So you didn't know that Paul had said
18       that Chong had come over when Paul, Phong and Joe
19       were all there, right?
20   A   I was in the middle of the search warrants,
21       interviews with Paul, you know, I know that some
22       information was relayed to me, but I can't say with
23       certainty, and I -- I'm more -- that was news to me
24       that Chong had come to Joe's house.  That was new
25       information that Joe provided to us.
```

1    Q    And in fact what Joe told you never matched what Paul

2         said because Joe just said that when Chong came over

3         that Phong and Paul were already gone, right?

4    A    Well, he initially said that he came over on Monday,

5         I believe, and then he said he actually came over

6         just a couple hours after the shooting.

7    Q    Okay.  Now, as this continues on, he is basically

8         told -- this kind of goes on and on talking about the

9         punches, et cetera, et cetera, right?  And it goes

10        back and forth here, right?

11   A    Yup, that's how Joe goes.

12   Q    And as that's going on, you tell him, and we're

13        getting pretty close to the end here, we're on Page

14        43 and this one only goes to Page 49 here, so we're

15        getting close to the end.  I'm going to get to the

16        break.  Don't worry.  If you would just let me ask

17        the questions and answer them, I would really

18        appreciate it because we can make this go faster.

19        Okay?

20   A    Okay.

21   Q    So you say, right now the best thing you can do,

22        because the more information we have, the more we can

23        hold Chong accountable for shooting this guy, and Joe

24        says, yes, and you say, do you understand, and Joe

25        says, yes, I understand.  Right?

201

```
 1    A    Yup.  I'm looking for information.
 2    Q    And then so you're asking if he ever admitted to you
 3         that you shot him, and then Joe tells, well he never
 4         admitted it.  Right?
 5    A    At that point, yes.
 6    Q    Correct.  And so this interview goes on a little bit
 7         longer, and then ultimately you're trying to verify
 8         some information and you ask Joe, you want to look at
 9         a phone belonging to one of his brothers to see if
10         you can verify information about phone calls?
11    A    Yes.
12    Q    And you ask to come in or you ask for him to bring
13         out the phone and show it to you personally?
14    A    Yes.
15    Q    Right?  But he doesn't ever do that?
16    A    Yes.  Can I explain?
17    Q    He doesn't ever do it.  And have a little trust that
18         I'll get to what happened next.  Okay?
19    A    Okay.
20    Q    Is that okay?  So he doesn't let you come in and do
21         it, but he goes in, he's in the house for four
22         minutes, he comes outside and he gives you the
23         information you're seeking, correct?
24    A    He gives us some information.
25    Q    And your opinion was he was worried maybe that you
```

1          would take the phone away, right?

2     A    Yes.

3     Q    That's what you wanted to explain before, right?

4     A    Correct.  Because we had taken the first phone Joe

5          had with him, we had taken it, so Joe was very

6          apprehensive of us getting phones or another phone

7          that may have belonged to one of his brothers.

8     Q    Well that's what your opinion is as to why he went in

9          the house, correct?

10    A    On the way back out Joe pretty much confirms that

11         through our conversation.

12    Q    Well he told you that, but you don't know what's

13         going on in his head, do you?

14    A    He confirmed that.

15    Q    He told you that, right?

16    A    Yes.

17    Q    And that's what you mean by confirmed?

18    A    Yes.

19    Q    But you didn't have like x-ray vision, you couldn't

20         see what was going on in that house when he was gone

21         for four minutes?

22    A    No.

23    Q    You have no idea if he made phone calls at that point

24         in time, do you?

25    A    No.

1    Q    Because you never got to see that phone yourself,

2         right?

3    A    Correct.

4    Q    Nor did you ever get records of that phone, right?

5    A    No.

6    Q    Never got call records so you don't know if he made a

7         phone call or not?

8    A    I do not.  He did come back with information though.

9    Q    Yes.  I'm going to talk about the kind of information

10        he came back with.

11            So let's talk about what happens when he comes

12        back outside.  As soon as he comes back out --

13                ATTORNEY VISHNY:  So I'm going to ask Mr.

14        Gatton to please play from Exhibit 162 -- one other

15        thing I wanted to just -- one second.  No.  That's

16        later.  All right.

17   Q    So let's talk about how when he comes back outside

18        how the discussion begins.

19                ATTORNEY VISHNY:  We're going to play it

20        right from the beginning, four seconds in until 3:58.

21        And that would be Page 1, Line 4 to Page 4, Line 29.

22                (Tape played.)

23                ATTORNEY VISHNY:  Wait.  Stop the tape one

24        second.

25   Q    (BY ATTORNEY VISHNY)  You're actually on the phone

1       talking to somebody else right now?

2    A    Yes.

3    Q    While Sergeant Lietzinger is talking to Joe?

4    A    Yes.  I was relaying information that we had gained

5         through that first part of the interview, and so I'm

6         on the phone and Sergeant Leitzinger, another

7         investigator -- Joe was sitting in the front seat,

8         Sergeant Leitzinger was sitting in the back seat of

9         the squad car.

10   Q    I just didn't want the jury to be confused and think

11        that you were both talking to Joe at the same time.

12   A    Correct.

13             ATTORNEY VISHNY:  Let's go ahead and play

14        this.

15             (Tape played.)

16             ATTORNEY VISHNY:  We can stop.

17   Q    (BY ATTORNEY VISHNY)  So it's after this discussion

18        that then Joe comes out and tells you about these

19        bullets, right?  I mean in this second part of your

20        discussions with him -- I'm not saying it happens the

21        second afterwards.

22   A    Right.

23   Q    And like you said earlier, you're the person who

24        suggests that the bullets are at Sharks, right?

25   A    Well, I -- no, I don't suggest.  He says it was in a

205

1          downtown bar.  I ask if it was Sharks because

2          previously in that prior conversation they mentioned

3          that they had been down to Sharks, and I had known at

4          that point that Chong said that he went to Sharks

5          after, so it was just a logical question when you

6          mention a downtown bar, in particular trying to get

7          details if he had mentioned it was Sharks.

8   Q   Okay.  So you didn't ask him if he went inside to

9          make a phone call to make sure that somebody else had

10         planted any bullets in Sharks, did you?

11  A   I'm not sure why I would ever ask that question.

12  Q   Okay.  Now, you again in this interrogation repeat to

13         Joe Thor that Paul told them that Chong had shot the

14         guy, right?

15  A   I believe so, yes.

16  Q   And that had been really said quite a few times by

17         this point, hadn't it?

18  A   I don't know what your definition of quite a few is.

19         More than once, more than twice probably.  I'm not

20         sure how many times.

21  Q   And you had some discussion, and at some point he

22         tells you -- well, he doesn't tell you anything

23         actually about bullets in Sharks, he tells you Chong

24         said he flushed the gun down the toilet there,

25         right?

1    A    Correct.

2    Q    And -- and even Leitzinger says, did he take it apart

3         and flush it, and Joe said, he didn't say but I

4         believe he did.  Correct?

5    A    Yeah.  Actually we had a lengthy discussion because

6         Joe brought up the fact that he said he flushed the

7         gun down the toilet at Sharks, and I said -- I was

8         kind of, I guess, surprised by that because I said,

9         he tried to flush the gun at Sharks, and Joe says,

10        yeah, I don't even know if you can flush a gun down

11        the toilet, so then there was a question of, well,

12        did he perhaps take it apart or something like that.

13        So that's how the conversation went.  It was several

14        back and forth questions and answers.

15   Q    And Sergeant Leitzinger said, well what kind of gun

16        did he say it was.  Page 17, Line 33.  Do you

17        remember Sergeant Leitzinger saying that?

18   A    Yes.

19   Q    And then Joe says, he did not say, you guys told me

20        it was a .22.  Was it.  Right?

21   A    Correct.

22   Q    And that's when you say, okay, I'm not going to be

23        able to repeat that.

24   A    Yes.

25   Q    Now, you know that it's wrong to contaminate an

207

1      interview with a subject, right?

2   A  Well, I'm not sure what you --

3   Q  Well, there is a risk when you give somebody a lot of

4      information that they just parrot back to you what

5      you want to hear, right?

6   A  Yeah.  That's why verification of the information is

7      -- is vitally important to any investigation.

8   Q  And for example, telling somebody that a gun is a .25

9      caliber, that would lead somebody to know that if

10     they were going to have to plant evidence they better

11     get .25 caliber bullets, right?

12  A  That -- I guess if that was a possibility, yeah.  I

13     mean it would make sense if we told them it was a

14     .25, if that was the scenario possible, that they

15     could -- that they would have to need .25s.

16  Q  Right.  So the information about the caliber of the

17     gun came from the police to Joe Thor, not the other

18     way around.

19  A  Yes.

20  Q  And the information about where the gunshot was

21     fired, that came in earlier by telling Joe Thor or

22     telling that it was on the left side of the face,

23     right?

24  A  Yes.

25  Q  And the information that Chong was under arrest and

```
 1          wasn't going to be getting out of jail, would be gone

 2          for a long time, that came from you to Joe Thor,

 3          right?

 4   A      Yes.

 5   Q      And then the information that if he didn't want to be

 6          looking at 25 to life, or whatever variations you

 7          told him he could be looking at prison, but needed to

 8          give some information to help Paul, that came from

 9          you, right?

10   A      Yeah.  We were looking for additional information,

11          and we felt he was still withholding the information

12          so we wanted to overcome those obstacles.

13   Q      So the best way to overcome those obstacles would be

14          to threaten him that he could go to prison as party

15          to a crime or get potentially 25, life, felony

16          murder, whatever variation of you said it at

17          different times.

18   A      Well, if he's helping a felon who -- someone who

19          committed a felony murder, a homicide, there is

20          charges for aiding a felon or aiding someone who just

21          committed a homicide, so, you know, it's -- it's an

22          actual real possibility for Joe to be charged with a

23          crime if he aided that person.

24   Q      Sure.  It is.  And so somebody could look at a few

25          years but not life.  You guys kept saying Joe could
```

209

1       be looking at life, correct?

2   A   Yeah.

3   Q   Yeah.

4           Now, in this interview, there's -- he is telling

5       you eventually that there's some travel down to

6       Milwaukee, the intentions are to go to Chicago but

7       instead they go to Milwaukee and stay at a hotel.

8       You testified about that earlier, right?

9   A   Yes.

10  Q   And of course you're going to ask who they're

11      spending some time with down in Milwaukee, right?

12  A   Yes.  Again, looking for details.

13  Q   Page 10, Line 18.

14          So you and Sergeant Leitzinger ask him who he

15      spends time with when he goes down to Milwaukee,

16      right?

17  A   Yes.

18  Q   And he tells you his cousin Roger Thor?

19  A   Yes.

20  Q   He doesn't tell you it's Peter Moua, right?  Not in

21      this interview?

22  A   Boy, I did a lot of interviews with Joe.  I know at

23      one point he tells us it's Peter Moua.

24  Q   Right.  That was on December 16th he tells you Peter

25      Moua.

210

1  A  So this one he mentions Roger Thor if this is where
2     the transcript is from.
3  Q  If you don't trust me, I'll bring the transcript.
4  A  No.  It's been long enough.
5  Q  Okay.  Now, you are aware, I think you talked about
6     the importance of verification, right?
7  A  Yes.
8  Q  And earlier you said that Alyson was talked to again
9     after Paul and Joe, but that's not accurate, correct?
10 A  Correct.
11 Q  Alyson was never -- Alyson Blom was never in fact
12    talked to again --
13 A  Correct.
14 Q  -- right?
15        And there are -- a number of phones were
16    involved in this investigation, correct?
17 A  Yes.
18 Q  And search warrants, you're in charge of the
19    investigation, so whether you personally drafted each
20    search warrant or not, you're aware of which phones
21    search warrants were drafted for, correct?
22 A  Yes.
23 Q  And that would be -- for Chong Lee there were a
24    couple search warrants, right?
25 A  Several phones that he had, correct.

211

1  Q  Two in particular there were search warrants

2     drafted?

3  A  Yes.

4  Q  Jenny Lee, Chong's younger sister, who is in high

5     school, right?

6  A  Correct.

7  Q  Two phones for Phong Lee, right?

8  A  If you have the list there, I know Phong Lee had at

9     least one phone, I'm not sure if there was a second

10    phone.

11 Q  So just to make it clear, what I'm asking you about

12    are call detail records.

13 A  Right.  Because we have to get search warrants for

14    the actual phones and then we have to get subpoenas

15    or search warrants for the actual records --

16 Q  Correct.

17 A  -- of the numbers associated with the phones or what

18    we think are the numbers.

19 Q  All right.  I'm going to show you a chart that was

20    based on information from the Appleton Police

21    Department; however, I have original data here that

22    would take a little more time to look at but I

23    brought stuff with me.  Okay?

24        So these are call detail records, just so I want

25    to make that clear.  So you got to -- to see who is

212

1    making phone calls.  There is two phones of Chong Lee

2    that -- right?

3  A  Well, Jenny Lee and then two from Chong Lee,

4    correct.

5  Q  Okay.  Now, when you send a search warrant to a

6    telephone service provider, like AT&T or Verizon or

7    Sprint, you know, whoever they are, they -- you're

8    aware as an investigator that they maintain their

9    records of call data for a certain period of time but

10   not forever, right?

11 A  Correct.

12 Q  And generally they maintain that data for at least a

13   year, some maintain it for two or three years.

14 A  Oh, I'm not even sure if it's that long.  When we

15   have a number, oftentimes, if we know, we send

16   sometimes preservation letters so they preserve the

17   information, but I would be surprised if they hold on

18   to it for a year or two years.  I don't think we can

19   get call data back that far.

20 Q  But you acted pretty promptly.  The shooting happened

21   on December 8th and you actually had these warrants,

22   at least several of them were drafted by January 10th

23   of 2014, correct?

24 A  Well, that's -- that's a year later.

25 Q  Right.  No.  January, 2014?

213

1    A    I'm sorry.  Several months later, two months later,

2         my fault.

3    Q    Well, actually it's a month and two days, January 10,

4         2014?

5    A    Okay.  Yes.

6    Q    So pretty quickly.

7             And then Phong Lee, there is a couple of search

8         warrants sent for his call data and it's never

9         provided, right?

10   A    Yes.  Verizon didn't return any information.

11   Q    What did you do to follow up on that?

12   A    Well, I -- I did not do anything in reference to that

13        because there are several reasons.  Sometimes

14        providers don't provide information to police

15        departments, sometimes they're old numbers and there

16        is no information to provide, so the warrants are

17        issued, and if there is not a return, the providers

18        are not under any, my understanding, legal

19        requirement to actually provide that information to

20        us.  So if there is nothing that comes back to us

21        within several months, we assume that there either

22        is, one, no -- there is no information or they're not

23        willing to provide the information.

24   Q    Well, each one of these providers, they have search

25        warrant -- they have people assigned who work for

214

```
 1         their company who are in charge of gathering data

 2         from search warrants or subpoena compliance people,

 3         correct?

 4    A    I don't know that.

 5    Q    You've never bothered to follow up and find that

 6         out?

 7    A    No.  I -- I mean I've sent information or warrants to

 8         the Verizon providers, but I don't know what process

 9         it goes to once it gets to Verizon.

10    Q    So to your knowledge neither you nor anybody from

11         your department followed up in these various

12         individuals for whom you did not get data provided,

13         there was no follow-up that you're aware of to see

14         what the problem was.

15    A    Well, I know in one particular phone here that there

16         was a second warrant that was issued for that number.

17         Another one there was a refaxed carrier.  So there

18         was some attempts in some of the phone numbers.

19         Again, I don't know what the response, if there was

20         any, from these companies when we sent the warrants

21         and the subpoenas in reference to the phone

22         information.

23    Q    All right.  Now, you don't start out but you end up

24         being kind of the lead investigator in this case,

25         right?
```

215

1    A    Yeah.  Sergeant Cary Meyer was the lead investigator,

2         and then when he announced his retirement, I took

3         over the case.  It was probably six to nine months

4         into the investigation.

5    Q    And it was your job when -- six to nine months when

6         you took over the lead investigator, if things hadn't

7         been tested or things hadn't come to your attention

8         yet, it was your job to follow up on them.

9    A    Yes, it was.

10   Q    So in fact in December of 2014 we had a pretrial

11        hearing in this case, and you probably recall myself

12        and Mr. Weitz asked to take a look at some of the

13        seized evidence in this matter --

14   A    Yes.

15   Q    -- right?

16             And what we wanted to see were the coats that

17        you had of Phong Lee, Paul Lee and the black coat

18        that had been seized from -- the black and gray coat

19        that had been seized from Chong Lee's place, right?

20   A    Yes.

21   Q    And we looked them over pretty carefully, and you

22        were right there and saw us doing that, right?

23   A    Yes.

24   Q    We looked at a hat also of Joe Thor, right?

25   A    Yes.

216

1  Q    Now, up to that point, these articles of clothing had
2       never been sent to the crime lab for analysis to see
3       whether DNA could be extracted for them, right?
4  A    Not at that time, no.
5  Q    So -- but about a month after we came in and took a
6       look at this, then the Appleton Police Department
7       sends these garments to the crime lab to see whether
8       DNA can be extracted from them, right?
9  A    Yes.  And that's not unusual.
10 Q    It's not unusual for the Appleton Police Department
11      to not get around to something for a year but when
12      the defense lawyer comes in and asks questions then
13      you send it to the lab?
14 A    No.  We oftentimes, as investigators, through our
15      investigations we confer with the District Attorney's
16      office as to exactly what items should be sent down
17      to the State Crime Lab for initial -- for further
18      analysis.  They determine as to what already had been
19      sent or what needs to be sent.  So there was ongoing
20      discussion with the District Attorney's office as to
21      what items we should actually send for further
22      examination.
23 Q    But regardless of whether it came about, we do agree
24      that discussion -- did that discussion not take place
25      until after myself and Mr. Weitz came to look at

217

1      these articles of clothing?

2  A   No.  We had ongoing discussions.  I don't think there

3      was a final determination yet because the trial date

4      was so far out yet.

5  Q   I see.  So the first time you send this is 13 months

6      after the crime occurs, then things get sent to the

7      crime lab, correct?

8  A   I'd have to see what the actual date was that we sent

9      it down and then we got it back.  I'm not sure if

10     it's 13 months.  It was after our meeting

11     obviously.

12 Q   Well it was sent in January of 2015.  I'm not saying

13     that's when it came back.

14 A   Okay.

15 Q   And the crime lab took several months to get it back

16     because they have the work order that they have to do

17     their work in, right?

18 A   Right.

19 Q   Okay.  So, in any event, as far as call detail

20     records, nobody attempted to get call detail records

21     to your knowledge of any of the phones that you

22     believed Joe Thor was using, correct?

23 A   The phone that we obtained from Joe Thor, I don't --

24     I'm not sure how to answer this.  I don't believe the

25     records were available based upon the type of phone

218

1        it was.

2    Q   All right.  But in terms of the records of the phone

3        he went -- not the one you obtained but the other

4        one, the one that he went inside to supposedly look

5        at and get some information from, you didn't get a

6        search warrant to see whether or not that phone was

7        used or when it was used by Joe Thor, right?

8    A   Correct.

9    Q   And during these interviews while you're telling him

10       he could go to prison and he's got to give you

11       information about Chong, et cetera, et cetera, you

12       didn't ask him for a list of all the phone numbers

13       that he had used between the time of the shooting and

14       the time of your interview with him on December 12th.

15   A   No.

16   Q   Okay.  You didn't ask him whether he had gotten

17       together prior to Paul's arrest with Paul or Phong

18       Lee and discussed what had happened.

19   A   I think we did.  He said he hadn't seen Paul,

20       remember, and then I told him that Paul was in

21       custody.

22   Q   I see.

23   A   So he didn't -- he hasn't seen him since.  And I

24       don't remember if I specifically asked about Phong,

25       but I did ask if he had seen Paul.

219

1    Q    I see.  Now you knew that Joe Thor had actually been

2         over at Paul's brother Hu's house on December 9th

3         because he had been talked to by a different

4         sergeant, a different investigator from your office

5         on that day, correct?

6    A    Yes.  Sergeant Schira had spoken to him at

7         Lisa Stutzman's house, at Hu's house.

8    Q    Now, in addition to getting call data records,

9         another way to examine a phone is to look at a phone

10        itself?

11   A    Correct.

12   Q    And when one looks at a phone itself, like common

13        ordinary people like us, we just take the phone

14        that's in our hand and we can see how many calls

15        we've made, what texts we've sent that are still

16        visible on the phone.

17   A    Yeah.  If that phone retains that data.

18   Q    And if the phone is erased by a person, the police

19        still have a tool called Cellebrite or similar

20        machines that can analyze even data that's been

21        erased from a phone?

22   A    It's sometimes possible, it's not an absolute, it's

23        not -- it doesn't happen -- actually, it's becoming

24        more and more difficult to do that.

25   Q    And the reason it's becoming more and more

220

1       difficult -- well, first of all, people can

2       physically destroy their phones and that's one way it

3       can be difficult to do that, right?

4    A  Yeah.  Ask Tom Brady.

5    Q  Pardon me?

6    A  Ask Tom Brady.

7    Q  Okay.  And you can damage the data ports so that you

8       can't go on the machine to look at the phone,

9       right?

10   A  Correct.

11   Q  There can be a factory reset of a phone, right?

12   A  Yeah.  I'm not sure the full effect of that.

13   Q  But basically what happened was, through the analysis

14      of various phones, there was not particularly useful

15      data extracted from these phones as to who called

16      when right after this homicide.

17   A  No.  And even if we had the data it would be

18      difficult because we would have to actually place the

19      phone in the person's hand as they're making the call

20      or sending the text message or whatever it may be,

21      but -- so that information is very, very difficult to

22      determine exactly who has the phone when that phone

23      call is either sent or received and who's the actual

24      holder of the phone when that information is shared.

25      And oftentimes it's just one number called another

221

1        number, there isn't -- you don't have the

2        conversation and transcripts, you don't have

3        sometimes complete text messages, so the information

4        you get from phones is sometimes very limited.

5    Q   So you're saying when information is limited it

6        shouldn't be sought?  Is that what you're telling

7        us?

8    A   No, I'm just explaining that when we get information

9        from phones it is still limited, and we did seek it,

10       that's why we obtained search warrants for numerous

11       phones and for their cell phone data.

12   Q   Another kind of data that can be gotten from the

13       search warrant is called cell tower data?

14   A   Yes, and that will return oftentimes, that's part of

15       the request for the data from the cell phone

16       companies.

17   Q   And historical cell tower data can tell you within a

18       range of a few miles where somebody is located at a

19       particular time, correct?

20   A   Correct.

21   Q   Only GPS data can actually show you where a person

22       really is within a few feet.

23   A   Yes.

24   Q   Okay.  So when you got called -- if you had gotten

25       call detail records of Joe Thor, that would have also

222

1          come with this cell tower data, right?

2    A     Joe didn't have a phone of his own, so the night of

3          the shooting Joe -- no one informed us that Joe had a

4          phone, so Joe didn't carry his own phone, he borrowed

5          his brother's phone, and then one of the phones we

6          took from him and the other one he was not going to

7          let us get close to.

8    Q     So the phone he wouldn't let you get close to,

9          knowing that phone number, you didn't seek

10         information like call detail records from that

11         phone?

12   A     I don't know if we knew what that phone number was.

13   Q     Well, you went and asked him for numbers on the

14         phone, did you ask him what the phone number was?

15   A     I don't recall.  I wanted to find out what numbers he

16         stated that he had received phone calls from Chong

17         from.

18   Q     I see.  Okay.  Well, you know, you did get call

19         detail records from Lisa Stutzman.  She wasn't

20         present at Luna on that night, correct?

21   A     Correct.  Because there was information I believe

22         that came from Lisa that some phone calls had been

23         placed.

24   Q     Right.  Correct.  So -- and then you also got call

25         detail records from Joshua Richards that night,

223

1      right?  You didn't get them but you sent out a

2      warrant for them, right?

3   A  Right.

4   Q  And for Brittany Olson, you sent out a warrant for

5      that, right?

6   A  Yes.

7   Q  But not for the phone that you could have asked Joe

8      Thor which one he was using.

9   A  Joe didn't have a phone as far as we know the night

10     that Joshua Richards was killed.

11  Q  Well you also didn't send out a search warrant for

12     call detail records of Paul Lee, did you?

13  A  Paul did not have a phone that was associated with

14     him.  Paul didn't have a phone as well the night that

15     Joshua Richards was killed.

16  Q  Well, you believe that because that's what Paul Lee

17     said, right?

18  A  That's the information we have, yes.

19  Q  However, when Paul Lee's residence was searched,

20     there were actually four telephones associated with

21     Paul Lee that were obtained during the execution of

22     that search warrant.

23  A  Yeah.  And I don't believe, as far as I know, any of

24     them were active.

25  Q  Okay.  And there was also an unknown phone and there

224

1    was a problem being able to take a look at that one

2    because the phone wouldn't power up for an analysis,

3    right?

4  A    Yeah.  That was an old -- another old phone.  I think

5    that was -- I found underneath the TV stand or by the

6    TV stand in -- both Xeng and Michael were found, just

7    another old phone, so we didn't even know who it was

8    associated with.

9  Q    So apparently if people were using phones, they

10    weren't located in a place where they could be

11    recovered by the police.

12  A    I'm not sure.  Can you read the question back?  I'm

13    not sure what you're asking or what the question is.

14                (Question read back.)

15  A    Well, whoever -- when we had contact with people, we

16    did recover their phones.  We took one from Phong, we

17    took one from Joe.  Obviously we obtained Joshua's,

18    we obtained Brittany's.  So that's not true.  We did

19    obtain phones when we were able to get our hands on

20    them.

21  Q    You also -- were you aware that on one of the phones

22    that had been seized from Paul Lee that there were

23    actually text messages that went through December 5th

24    or 6th of 2013, just a couple of days before the

25    shooting?

225

```
 1    A    Are you in reference the actual phone dumps, are you
 2         referencing phone records back?
 3    Q    Actual phone dump.
 4    A    There was a number of phones, and I don't recall -- I
 5         don't recall all the phone messages or all the
 6         results of the phone dumps.
 7    Q    Okay.  But regardless, you didn't send for call
 8         records on that phone, correct, because you didn't
 9         send for call records -- try to get call records for
10         any phone belonging to Paul Lee.
11    A    No, because my understanding was the phones were
12         inactive, there was no active carrier associated with
13         those phones, therefore there is no one to send the
14         records to because they're not active phones.  Who do
15         you subpoena for that information.
16    Q    I see.  There are a few materials from this case
17         that -- some recordings made in Milwaukee that ended
18         up never being inventoried, correct?  You're aware of
19         that?
20    A    Yes.
21    Q    And so that whatever was exactly said by Peter Moua,
22         Dia Vang, Joseph, that we don't have those recordings
23         because those were lost by accident, right?
24    A    Those are the interviews I believe Sergeant Cary
25         Meyer did a report on but, yes, we did not have
```

226

1          recordings.  I'm not certain those are -- I know

2          Peter was one of them.  I'm not sure of the other

3          two, if those were correct, but if that's the report

4          that Cary Meyer did on those interviews, that is

5          correct.

6     Q    And Dalinda Guzman was talked to twice and asked to

7          draw diagrams twice in this case.

8     A    Yes, I believe so.

9     Q    And I asked --

10              ATTORNEY SCHNEIDER:  I'm going to object

11         and ask to approach at this point.

12              THE COURT:  You may.

13              (Bench conference.)

14    Q    (BY ATTORNEY VISHNY)  So ultimately what you do know

15         is that there were some items of evidence that were

16         somehow inadvertently lost in this particular case,

17         correct?

18    A    Yes.  It was a rather extensive case.  I mean

19         obviously we had, I believe, over 300 items that were

20         entered into evidence, and those are entries, so

21         there is multiple items sometimes entered under

22         evidence numbers, there was over 150 people that were

23         interviewed in reference to this investigation and

24         report.  Just the narrative part is over 391 pages in

25         addition to that.  There is other supplemental

227

1        reports or documents that go with that, so it's a --

2        it was a rather massive investigation, and through

3        that process, there were some items that were not

4        placed into evidence.

5  Q   And another one of those items that somehow was not

6        placed into evidence was back at Luna on the night

7        the shooting happened there was a photographer who

8        took some pictures of individuals and gave copies of

9        those photos to somebody at the Appleton Police

10       Department on a flash drive.

11  A   Yes.

12  Q   And ultimately -- you were actually the person -- are

13       you actually the person who got them from the --

14  A   They actually transferred hands.  I believe

15       Lieutenant Larry Potter was the first one who that

16       individual talked to, and then Sergeant Chad Probst

17       actually obtained them from the individual, the

18       photographer, and then Sergeant Probst had indicated

19       that he provided -- when he -- he was also the

20       individual who actually seized the VCR, the digital

21       video recorder from Luna, and he stated that when

22       that was turned over that he had also turned over the

23       thumb drive to me.  I don't necessarily recall ever

24       receiving it.  So somewhere in that transfer of

25       items, we don't know where that thumb drive of photos

228

1        from sometime in the night from a photographer

2        went.

3    Q   So that was lost as well?

4    A   Yeah.  I don't have any idea where the location of

5        that thumb drive is.

6            ATTORNEY VISHNY:  Okay.  No further

7        questions.

8              **EXAMINATION OF NEAL RABAS**

9    **BY ATTORNEY SCHNEIDER:**

10   Q   The map of Dalinda Guzman, from your understanding

11       with officers, it was some X's and O's?

12   A   Yeah.  I actually saw the video when it was being

13       created.  Essentially it was two X's on a piece of

14       paper, a notebook piece of paper, and then from there

15       they actually stood up and actually acted out the

16       positioning of where everybody was located.

17   Q   So do you think their acting it out was a better

18       representation than two X's on a piece of notebook

19       paper?

20   A   Yes.

21   Q   And the Milwaukee recordings, those were summarized

22       in Sergeant Meyer's reports?

23   A   Yes.

24   Q   This photo or the photo drive of people at Luna, did

25       Sergeant Probst have a chance to review those at some

229

```
 1        point?
 2    A   Yes.
 3    Q   Did he ever tell you they had any relevance?
 4    A   He said they -- he did not believe --
 5                ATTORNEY VISHNY:  I object.  That is
 6        hearsay.  Sergeant Probst is available to testify.
 7                THE COURT:  Sustained.
 8                ATTORNEY VISHNY:  The State can call him.
 9                THE COURT:  Sustained.
10    Q   (BY ATTORNEY SCHNEIDER)  In your understanding of the
11        phones that were found at Paul's, when you go to
12        these houses you're taking every phone, right?
13    A   Yes.
14    Q   Even the one that's underneath the TV cabinet.
15    A   Correct.
16    Q   And some of these you couldn't power on?
17    A   Correct.
18    Q   And you said the phones you found at Paul Lee's
19        house, there was no active carrier to them.
20    A   I don't believe so.
21    Q   So if I had like my old model of my iPhone at home,
22        it might be sitting in a drawer and you could power
23        it up and turn it on, correct?
24    A   Correct.
25    Q   But it wouldn't have any data because there is no
```

230

```
1           carrier assigned to that phone anymore.

2     A     Correct.  Or it would have ended whenever your

3           carrier time would have ended, if that data was still

4           available.

5     Q     From -- I'm just going to come up, Sergeant, I just

6           want to talk about some camera angles.

7                 Exhibit 3 again shows camera -- what Trooper

8           Zukowski called Camera 1 and Camera 2, correct?

9     A     Yes.

10    Q     And you walked us through images found on Camera 1,

11          correct?

12    A     Yes.

13    Q     And you also then walked us through images found on

14          Camera 2?

15    A     I did.

16    Q     Okay.  And photo board 88 was kind of stills taken

17          from Camera 2; do you recall that?

18    A     Yes.

19    Q     And the last image which is 88M, time stamp was

20          1:50:12, correct?

21    A     Correct.

22    Q     And after that point on watching the video, which

23          parties do we then see go off camera?

24    A     Chong Lee and Michael Thor.

25    Q     And from that point, 1:50:12 until 1:50:25, the time
```

231

```
 1        when the shot from what you watched of Dan Kersten
 2        reacting and Adam and others, does anyone else go off
 3        camera?
 4   A    I don't believe so.  I don't think anybody goes off
 5        that camera angle.
 6   Q    And that would have been something you looked at or
 7        focused on as part of this investigation?
 8   A    Yes.
 9   Q    Who does Chong enter Luna with?
10   A    Alyson Blom.
11   Q    And at the point when he's walking out, who is he
12        walking out with?
13   A    Alyson Blom.
14   Q    And at the point when he's walking off of what would
15        have been Camera 2 into this foyer area, who was he
16        walking with?
17   A    Alyson Blom.
18   Q    She also went in or out at times for cigarettes, if
19        you recall?
20   A    Yeah.  I don't know if it was cigarettes, I don't
21        know if she smoked or she just went out to say hi to
22        someone or grab a hot dog, I'm not sure why, but she
23        was in and out.
24   Q    Have you had cases where you've sent things to the
25        crime lab?
```

232

1    A    Yes.

2    Q    And have there been other cases where they come back

3         saying there is no results they can obtain?

4    A    Yes.

5    Q    Has it been your past experience, and I know we had

6         Kyle Anderson speak a while ago, but has it been your

7         experience even sending things down does not result

8         in DNA coming back on those items?

9    A    Yes.

10   Q    Is that common or uncommon?

11   A    It really depends on the type of item that is being

12        sent.  I mean some items are less likely to produce

13        DNA.  Obviously some items we sent down, for example,

14        a buccal swab we take from a person, we're going to

15        get DNA back almost every time obviously on that

16        item, so it really depends on the item.  But it

17        varies, unknown items, of whether there is even DNA

18        on it.  In particular if we're looking particularly

19        for touch DNA, touch DNA is very difficult to obtain

20        off of items.

21   Q    And the items you initially had Phong's vest, Paul

22        Lee's jacket and then this other black coat found at

23        Chong's house, when you first observed and looked at

24        those items, was there anything of concern for you

25        that you wanted to send to the lab right away?

233

1    A    No.

2    Q    Okay.  And ultimately the results on all three of

3         those items came back with what for any -- they

4         tested them for blood, correct?

5    A    Yeah.  They were looking for biological and they all

6         came back negative for any type of biological

7         substances.

8    Q    And the black coat you had, based upon what you saw

9         from the Luna images, it's your opinion that was not

10        the coat Chong is seen wearing at Luna?

11   A    Correct.

12   Q    But you sent that anyways?

13   A    Yes.

14   Q    And at the time you collected it you had no idea if

15        it did relate or not relate?

16   A    Correct.

17   Q    Just like you collect a lot of phones and you don't

18        know if they relate to a case or not relate?

19   A    Yeah.  Like in a search warrant or you're at a house,

20        you take what you -- what you can get because you

21        don't really know until you evaluate it later as to

22        whether there is any relevance to the incident you're

23        investigating.

24   Q    And in this case analyzing cell phones, you knew

25        these -- many of these people were related?

234

```
1    A    Yes.

2    Q    Or some of them claimed they were cousins, even

3         though maybe they might not be cousins like we would

4         think, but they call each other family?

5    A    Yes.

6    Q    So would have you expected to see that there were

7         phone calls between these parties?

8    A    Yes.

9    Q    And again, your testimony was that you can't always

10        then tell who is on either end of the phone?

11   A    Correct.

12   Q    When Joe described seeing Josh's head, and you were

13        asked questions about this because of comments made

14        during interviews with Joe, earlier I think during

15        direct you talked about where Joe thought the bullet

16        exited.

17   A    Yes.

18   Q    What did he say when he was describing or showing you

19        that?

20   A    He said he saw this flash and he said he was looking

21        right at Josh and he indicated to us he thought the

22        bullet or splattering of blood came out his

23        forehead.

24   Q    Okay.  He said he was facing you at the time?

25   A    He was facing Josh.
```

235

1   Q    Josh.

2        When you talked to Joe on the 12th, and this

3        would have been after you -- Chong was in custody,

4        Paul had been spoken with, when you talked to him, he

5        mentioned to you that he thought the gun was a .22,

6        correct?

7   A    Yeah.

8   Q    Were .22 caliber bullets found at Sharks?

9   A    No.

10  Q    What caliber bullets were found at Sharks?

11  A    .25.

12  Q    And Joe says twice in that interview I -- he thought

13       they were .22s, right?

14  A    Yes.

15  Q    And you don't correct him or give him any

16       information.

17  A    Correct.

18  Q    At the point that you're talking to Joe at 1:00

19       starting on the 12th, had the initial four bullets

20       been found by Sharks' employees?

21  A    Yes.  They were found on the 11th, the night before,

22       by the employees, by Phillip Moore and Mitch

23       Roepcke.

24  Q    And when officers went there actually the afternoon

25       of the 12th, almost probably the same time you were

236

```
1           talking to Joe Thor, correct?

2      A    Yes.

3      Q    And that's when they found some additional bullets

4           inside of the toilet?

5      A    Yes.  And that's when we learned that the other

6           additional bullets had been found the previous night

7           on the 11th.

8      Q    And so all six of those bullets located were the same

9           caliber?

10     A    Yes.

11     Q    Same marking on the back of those bullets?

12     A    Yes.

13     Q    And were those consistent with any other bullet or

14          casing recovered in this case?

15     A    Yes.

16     Q    What is that?

17     A    The casing that was discarded when Josh Richards was

18          shot at Luna.

19     Q    Okay.  And even to the point where the same labeling

20          on the back of those bullets or casings?

21     A    Yes.

22     Q    And a casing is what's left after a bullet is

23          fired?

24     A    Correct.  The bullet is actually the projectile that

25          exits.  The casing is what holds that and the gun
```

```
 1              powder, and obviously the bullet is expelled and then
 2              the casing is ejected.  So the casing remained at the
 3              scene, obviously the bullet was with Josh.
 4         Q    And that area from what you've seen from watching the
 5              Luna video as well as seeing James Phimmachack's cell
 6              phone video, there were a lot of people in that area
 7              immediately after Josh was shot?
 8         A    Yeah.  After the shot was fired, obviously, there is
 9              at least 14 people that ran out, then you had the
10              paramedics, including the fire department and then
11              Gold Cross Ambulance, you had the bouncer running
12              back and forth, you had people trying to provide aid
13              to Josh, and then you had the officers initial
14              responding all in that location, so there was a lot
15              of traffic in that area.
16         Q    And during the time you spoke with Joe, he always
17              indicated to you that he was scared, correct?
18         A    Yes.  Very scared.
19         Q    And scared for his family?
20         A    Yes.
21         Q    And he tells you I think --
22              ATTORNEY VISHNY:  Judge, I'm going to
23              object.  I have let Miss Schneider lead the entire
24              way so far, but it's really, I think, gone past the
25              point where this should be allowed.
```

238

```
 1                    THE COURT:  Please make the questions open
 2          ended, Counsel.
 3    Q     (BY ATTORNEY SCHNEIDER)  On December 9th when you
 4          spoke to Joe -- you didn't speak to him on the 9th,
 5          correct?
 6    A     No, I did not.
 7    Q     You spoke to him on the 10th?
 8    A     Correct.
 9    Q     When you spoke with him on the 10th, did he describe
10          anything about the sleeve or the coat on the 10th
11          when you spoke to him?
12                    ATTORNEY VISHNY:  I'm going to object to
13          it's been asked and answered.  I didn't challenge
14          that.
15                    ATTORNEY SCHNEIDER:  Well, she -- she made
16          a point of who said what in what interview, so I'm
17          going to try to walk through that a little bit
18          without having to show him transcripts again.
19                    THE COURT:  Unless it was -- you can answer
20          that question, but unless it's been covered on cross,
21          I don't want the -- I don't want this to be a
22          revisitation of direct examination.
23                    ATTORNEY SCHNEIDER:  Right.
24    A     Okay.  And the question was did Joe tell me about
25          Chong's jacket on the 10th.
```

239

```
 1   Q    10th.  Or a sleeve or color on the 10th.

 2   A    No, I don't believe he did.  No, I don't believe he

 3        did.  I don't recall exactly.

 4   Q    On the 12th you were shown parts of transcripts where

 5        Joe was making comments about seeing a sleeve.  Do

 6        you remember being shown those on cross?

 7   A    Yes.

 8   Q    And he talked about seeing photos?

 9   A    Yes.

10   Q    What photos had you shown him, if anything?

11   A    Similar photos that we were showing everybody was the

12        people who were exiting and entering that you've seen

13        here to try to identify individuals.

14   Q    So they were from the Luna cameras, correct?

15   A    Yes, the video from Luna, it was the still shots or

16        screenshots.

17   Q    And when did any color photos of Chong's jacket first

18        arrive or you first obtained those?

19   A    Well, it was either -- I believe we actually obtained

20        them on the 19th.  We were aware of them on the

21        16th --

22   Q    Okay.

23   A    -- of December.

24             ATTORNEY VISHNY:  Again, Judge, I haven't

25        covered this.  It's asked and answered and not
```

240

1    covered in my cross.

2          ATTORNEY SCHNEIDER:  I think she's implying

3    the cross that they somehow told him what to say

4    about color, so I think I'm allowed to reestablish

5    when they first had color photos of any coats the

6    defendant was wearing.

7          THE COURT:  Small amount of latitude,

8    counsel, but again, I don't want to revisit direct

9    examination.

10   Q   (BY ATTORNEY SCHNEIDER)  During cross you were asked

11       about Joe making a comment about Chong and the

12       bullets or what had been done with the gun.  Do you

13       recall that?

14   A   Yes.

15   Q   And you were asked who first brought up Sharks?

16   A   Well, Joe and -- I -- when it was in reference to

17       that, I'm the one who brought up Sharks because he

18       had referenced that Chong told him that he had

19       flushed the gun at a downtown bar.

20   Q   Prior to that had you learned through this

21       investigation any information related to Chong being

22       at Sharks after the shooting?

23   A   Only from Chong.  Chong Lee had told us during his

24       interview that he had gone to Sharks after the

25       shooting.

241

1    Q    Talisa or Marissa had not yet been talked to.

2    A    No.

3    Q    You were asked and played a part of Paul Lee's Norka

4         interview.  At that point one of the portions you

5         were played you were asking him about a gun, recall

6         that?

7    A    Yes.

8    Q    And what does Paul at that interview at Norka tell

9         you that he had in his hand or what does he

10        mention?

11   A    Several times he mentioned, when I asked him about

12        what was in his hand, he said it's his e-cigarette.

13   Q    Have you had cases where people are hesitant about

14        naming others who may have information?

15   A    Yes.

16   Q    Do you think that probably happens in almost every

17        case you have?

18   A    Yes, unfortunately.

19   Q    And, Sergeant Rabas, would it have been easier in

20        this case if people had stayed at Luna?

21   A    Oh, absolutely.

22   Q    Or if everyone told you what they knew initially?

23   A    Yes.

24             ATTORNEY SCHNEIDER:  Nothing further.

25             THE COURT:  Recross.

1                    **EXAMINATION OF NEAL RABAS**

2    **BY ATTORNEY VISHNY**:

3    Q    Several people were not able to be seen on that

4         camera, not just Chong, Alyson and Michael Thor,

5         right, from Camera 2 during the altercation and

6         shooting?

7    A    Okay.  What -- I'm not sure what point are you

8         referring to.

9    Q    The District Attorney asked you about camera angles,

10        and there was a blind spot that there are a lot of

11        people that you knew have something to do with this

12        case who are not shown on the video, right?

13   A    Oh, correct, yes.

14   Q    Okay.  So it's not just Chong, Alyson and Michael,

15        there is other people too, right?

16   A    Yes.

17   Q    Like Phong, Paul and Joe.

18   A    Correct.

19   Q    Now, if a person is walking from the bar and stays in

20        the archway and watches the shooting, they're not

21        going to show up on the camera angles either,

22        right?

23   A    That's correct.

24   Q    So -- all right.  Now, let me just ask, you were

25        asked about the fact that the crime lab, you know,

243

1      sometimes you send things and they don't get results
2      from DNA, right?
3   A   Correct.
4   Q   But you don't say to yourself, oh, gee, I might not
5      have results so I won't bother to send this evidence
6      to the crime lab.  You don't say that about DNA
7      evidence, do you?
8   A   I mean, if we send it down, we're obviously looking
9      for either DNA or whatever we're asking them to
10     search for.
11  Q   Yeah.  So you don't say to yourself, well, you know,
12     I'm probably not going to get DNA from this so I
13     won't even look for it?
14  A   Well, all pieces of evidence that we look for we
15     obviously analyze as to the relevance as the
16     investigation continues and then we make a
17     determination as to which ones need further analysis,
18     and from there we send it down looking for that
19     additional information or evidence to it.  So, like,
20     we collected numerous items in this, but we didn't
21     send it all down to the State Crime Lab.
22  Q   Right.  But I think you were asked is it hard to get
23     touch DNA from it.  It's hard to get touch DNA from
24     items, right?
25  A   Yes.

244

1    Q    But if you had recovered a gun in this case, you

2         would still send it to the crime lab to see if you

3         could get touch DNA, wouldn't you?

4    A    Yes.

5    Q    You wouldn't say, oh, gee, it's just so hard to get

6         this, I'm not even going to try.  You would try,

7         wouldn't you?

8    A    We would try if it fits their protocol.  He discussed

9         that some items they won't do because --

10   Q    Right.  But I'm not asking about items that don't fit

11        their protocol.

12   A    You're asking about items -- some items, and then

13        specifically you asked about the gun.  Obviously if

14        we had a gun we would send it down to the State Crime

15        Lab, but items generally was the general statement,

16        and some items in general don't fit their protocol so

17        we wouldn't send it down.

18   Q    I understand that, but I'm just asking about a gun.

19        Maybe we can make this go a little faster if you just

20        answer the questions I'm asking.  Okay?

21   A    Yes.  Your first part of your question didn't specify

22        a gun, the second part did.

23   Q    All right.  Well, one second.  I don't want to argue.

24        It's just one question though.

25             Now, the prosecutor asked you about the fact

245

1       that Joe mentioned in this second interview that it

2       was a .22 caliber, right?

3   A   Yes.

4   Q   And earlier in the interview just two days before he

5       had been told that it was a .25 caliber that were

6       involved, correct?

7   A   Yes.

8   Q   So -- and it had been explained to him that it's a

9       very small gun.  That had all been told to him,

10      right?

11  A   Correct.

12  Q   So that information had not ever been held back,

13      right?

14  A   Correct.

15  Q   And when you interviewed Paul at Norka and

16      interrogated him, whenever he admitted he had

17      something in his hand, he always said it was an

18      e-cigarette, right?

19  A   Yes.

20  Q   But many times he also said I had nothing in my

21      hands.

22  A   Correct.

23  Q   He said that repeatedly, right?

24  A   Yes.  When I showed him the photo that showed the

25      object in his hand, he said that's an e-cigarette.

246

1   Q   But until then he told you many times he had nothing

2       in his hand?

3   A   Right.

4   Q   And then this is the explanation that he came up

5       with, right?

6   A   That's what he said it was.

7   Q   Now, in terms of the follow-up after talking to Joe

8       Thor, then somebody from the police department went

9       to Sharks to see whether or not there were any

10      bullets in fact in the toilet, right?

11  A   Yes.  Sharks was closed so we contacted the owner.

12      The owner advised us that, ironically, they had just

13      recovered some bullets the night prior, so then

14      officers went there to do a further search.

15  Q   Right.  It didn't happen at the same time while

16      talking to Joe, it happened a little bit later?

17  A   I believe we were still talking to Joe because our

18      interviews with Joe were about an hour -- hour, and I

19      believe they -- when Joe went into the house I think

20      -- I'm not sure.  At some point the search is almost

21      simultaneous or beginning to happen simultaneously

22      based upon the information actually Chong had

23      provided that he had gone to Sharks after, so I think

24      that's where the -- what started the impetus to look

25      at Sharks.

247

```
 1   Q   Well actually Sharks and the people from Sharks, they
 2       were never contacted until after Joe Thor says that a
 3       gun was flushed down the toilet there, said that
 4       Chong had told him that, right?
 5   A   I don't -- because Chong -- I'm sorry.  Joe doesn't
 6       tell us that until the second part of our interview,
 7       and I know -- I believe they started the search at
 8       Sharks, it was right around 2:00, and they had to
 9       make arrangements to contact a City of Appleton
10       plumber.  They had already contacted the owner of
11       Sharks to gain access to it.  So I think, you know,
12       the process of starting that search at Sharks was
13       even underway prior to us getting that information
14       from Joe Thor.
15   Q   Now, you were asked whether or not, you know,
16       sometimes witnesses don't tell you the truth, right,
17       or don't give you information?
18   A   Yes.
19   Q   Is it your habit or procedure to threaten these
20       people with 25 years to life when you don't get the
21       information you want?  Do you do that all the time
22       too?
23   A   No.
24   Q   Okay.
25                ATTORNEY VISHNY:  Nothing.  Nothing
```

```
1          further.
2                    THE COURT:  Any follow-up, Attorney
3          Schneider?
4                    ATTORNEY SCHNEIDER:  Yes.
5                    EXAMINATION OF NEAL RABAS
6     BY ATTORNEY SCHNEIDER:
7     Q    Attorney Vishny asked you just a few moments ago
8          about people who were also in that foyer area, the
9          area where there is no camera?
10    A    Correct.
11    Q    Based on your watching both the entrance door as well
12         as the angle from Camera 2, which people who were
13         white or Caucasian would have been in that area?
14    A    It would have been Mike Vanderheyden, it would have
15         been Alyson Blom, it would have been Brittany
16         Olson.
17    Q    And then Josh?
18    A    And then Joshua Richards.
19                   ATTORNEY SCHNEIDER:  Nothing further.
20                   ATTORNEY VISHNY:  Just really quickly.
21                   EXAMINATION OF NEAL RABAS
22    BY ATTORNEY VISHNY:
23    Q    Daniel Kersten, you have fixed the time of the
24         gunshot at when Daniel Kersten turned around and
25         other people turn around and are clearly looking at
```

249

1   something, right?

2 A Yeah.  The simultaneous turn of those four

3   individuals including Daniel Kersten.

4 Q You also studied this videotape in the 30 seconds to

5   a minute before that happens?

6 A Yes.

7 Q And you don't see Daniel Kersten reacting at all as

8   if some kind of fight might be going on that he has

9   to break up.

10 A Correct.  I think he's looking over in that direction

11   and -- but he doesn't move toward that direction,

12   then he gazes back out toward the front door.

13 Q And as a police officer, of course you're familiar

14   with the fact that the job of bouncers is to break up

15   trouble, among other things, at bars, right?

16 A Yes.

17 Q They're prepared to break up fights.

18 A Yes.

19     ATTORNEY VISHNY:  Nothing further.

20     ATTORNEY SCHNEIDER:  No questions.

21     THE COURT:  Members of the jury, any

22   questions for consideration?

23     (No response.)

24     THE COURT:  Thank you, sir.

25    And can I get counsel to approach just for a

250

1      second?

2                (Bench conference.)

3                ATTORNEY SCHNEIDER:  The State would then

4      call Sergeant Thao.

5                THE COURT:  Please remain standing, the

6      clerk will swear you in.

7                (Oath administered to witness.)

8                THE WITNESS:  I do.

9                THE CLERK:  Please state your full name and

10     spell it for the record please.

11               THE WITNESS:  Chue Lee Thao, C-H-U-E,

12     L-E-E, last name is T-H-A-O.

13               ATTORNEY SCHNEIDER:  Just give me one

14     second while I shift to your material.  Thank you.

15               **EXAMINATION OF CHUE LEE THAO**

16     **BY ATTORNEY SCHNEIDER:**

17  Q  How are you currently employed?

18  A  I'm a police officer for the City of Appleton.

19  Q  How long have you been employed in law enforcement?

20  A  In a couple weeks it will be exactly 20 years.

21  Q  Has that entire time been with the Appleton Police

22     Department?

23  A  Yes.

24  Q  And I think it might be expected, but did you first

25     start as a patrol officer?

251

```
 1   A   Yes, I did, for the first five years.
 2   Q   What assignment did you have after that, Sergeant
 3       Thao?
 4   A   I was assigned to the police school liaison unit
 5       investigating sensitive crimes, abuse and also handle
 6       issue in the school.
 7   Q   And as part of that training, did you undergo
 8       training related to interviews of citizens,
 9       witnesses, victims?
10   A   Yes.
11   Q   Did that training also include training related to
12       interviewing suspects?
13   A   Yes.
14   Q   Even as a patrol officer, do you cover some of the
15       trainings related to suspects?
16   A   Yes.
17   Q   And how long did you serve then as a police school
18       liaison officer?
19   A   I was there for five years, I mean six years.
20   Q   Were there particular schools you were assigned to?
21   A   The elementary school, I was assigned for school.
22   Q   And in that assignment you covered four different
23       elementary schools?
24   A   Yes.
25   Q   And is it a situation, Sergeant Thao, where if any of
```

252

1       the children in the school are a victim or a witness

2       to a crime and it occurs within the City of Appleton

3       you investigate?

4   A   Yes.

5   Q   So it doesn't exclusively have to happen related to

6       the school location or the school grounds?

7   A   Right.  It could be outside the school, at homes or

8       in the community.

9   Q   Part of that work you focus a lot on sensitive crime

10      investigation?

11  A   Yes, for that portion of that five years.

12  Q   And that would be cases where children might be

13      victims of physical or sexual abuse?

14  A   Yes.

15  Q   Part of that work, did you at times interview people

16      who are suspects in those types of cases?

17  A   Of course.

18  Q   After your six years as a police school liaison

19      officer, what duties did you have?

20  A   I spent a year in the patrol -- back in patrol doing

21      FTO, training other officer, I became a SWAT team

22      member, and then thereafter I got promoted to the

23      investigative service unit.

24  Q   So how long then -- I'll let you do the math rather

25      than me, how long have you worked as an

253

1          investigator?

2     A    For the past eight years.

3     Q    And at times as part of your investigation do you

4          speak Hmong?

5     A    I do.

6     Q    And do you utilize that in interviews at times?

7     A    Yes.

8     Q    And have you done that throughout your career?

9     A    I have, yes, I have.

10    Q    As an investigator were there any types of trainings

11         you attended?

12    A    Yes.  Requirements mandated trainings through the

13         State as well as other trainings provided by --

14         whether it be other agencies or other discipline.

15    Q    Is there a requirement for officers to get a certain

16         number of hours in a year?

17    A    For mandated training by the State, yes.

18    Q    Some of those training topics relate to interviews of

19         witnesses and victims?

20    A    Yes.  Legal updates, those type of training.

21    Q    They also relate to interviewing suspects?

22    A    Yes.

23    Q    When you work as an investigator, is there a

24         particular type of case you're assigned to work such

25         as financial crimes, sensitive crimes, or is it

254

```
 1        anything and everything?
 2    A   Initially it began assignment in the unit you
 3        typically would get case involve property crimes,
 4        financial crimes.  As you establish yourself in the
 5        unit then you move on to some of the major cases like
 6        death, suspicious death to robberies, major property
 7        crimes.
 8    Q   From your past experience in these investigations,
 9        are there times when people refuse to speak to law
10        enforcement?
11    A   Yes.
12    Q   Are there times when people indicate they don't want
13        to be involved?
14    A   Of course.
15    Q   Have you talked to people who have been highly
16        emotional?
17    A   I have.
18    Q   Can you always obtain information from them?
19    A   Not always.
20    Q   Why not?
21    A   Because of the emotional state, the situations, the
22        needed time to process what happened, and this
23        required we go back in a day or a week or so,
24        whenever they're ready to speak.
25    Q   Have you ever been to the Reid training?
```

255

1    A    No, I have not.

2    Q    There is no requirement for you to work as an

3         investigator with the City of Appleton that you be

4         Reid trained, correct?

5    A    Correct.

6    Q    Have you been to other trainings related to

7         interviewing witnesses or suspects?

8    A    Yes, I have.

9    Q    Is there any set steps or procedure you utilize,

10        Sergeant Thao, when you go in to conduct an

11        interview?

12   A    No, I do not.

13   Q    Why not?

14   A    Human behavior is unique and complex and sometime

15        unpredictable so you have to go in with an open mind,

16        not be rigid, not stick to a set protocol, you have

17        to go with the flow of information, let the

18        conversation take you, not you dictate the

19        conversation.

20   Q    Have you had it in your past experience where some

21        people you walk in and they're like an open book,

22        they just spill everything they know?

23   A    Yes, there have been times.

24   Q    Have you had the opposite of that where people don't

25        want to give you information?

256

```
 1   A   Yes, especially the witness or involved in a
 2       situation.
 3   Q   Have you had situations where you're speaking with
 4       people who are related to a suspect in a case?
 5   A   I have.
 6   Q   Based upon your past experience, what are some of the
 7       things you've encountered in those situations?
 8   A   Denial, maybe they try to provide unofficial stories,
 9       trying come up with ways to see if they can escape
10       responsibility or not have to talk about it,
11       basically what I would consider layers that you have
12       to try to, like onions, you have to try remove some
13       of the layers in order to get to the core to have a
14       meaningful conversations.
15   Q   Is it a situation where sometimes people want to tell
16       you or give other names they know were involved or at
17       locations you're trying to investigate?
18   A   Yes.
19   Q   And why?
20   A   Sometime they try to test you to see if you have
21       information, whether you have information about a
22       case, or sometimes they try to withhold information
23       to see if you actually have what they think we have.
24       So those are some of the dynamic involvement in
25       conversation.
```

257

1    Q    Have you ever been assigned to a specific partner

2         within the Appleton Police Department?

3    A    No, unfortunately we only have eight detectives and

4         it's difficult to be assigned one on a permanent

5         basis.

6    Q    When you go into an interview, if you know, for

7         example, you're going into an interview with Sergeant

8         Rabas, is there a certain role you take in that

9         interview?

10   A    Yes.  It depend on who is kind of the lead

11        investigator at the time.  If -- if I know that I was

12        there just to be assistance, I would just basically

13        sit -- sit in on the interview, take notes, listen,

14        and then when the other officer is done with the

15        questioning, I may jump in to provide assistance and

16        asking questions.

17   Q    And sometimes is that role the opposite?

18   A    Yes.

19   Q    And, Sergeant Thao, I'll let you use -- whether you

20        want to use a month or a year or an average week, how

21        many times do you think as an investigator you're

22        conducting interviews of witnesses, victims or

23        suspects?

24   A    Just on average I would say between 150 and 200 a

25        year.

258

```
1    Q    Has that number been pretty consistent throughout
2         your time as an investigator?
3    A    I think some years it's actually more higher like
4         depending on the number of cases we're assigned and
5         during duty and off-duty as well case that we come
6         in.
7    Q    I want to direct your attention, Sergeant Thao, to
8         the incident, the shooting that occurred at Luna on
9         Saturday, December 7th into the morning of Saturday,
10        December 8th.  First, were you working on that
11        Saturday or that Sunday?
12   A    Yes.  I was working actually from Friday, December 6
13        all the way to December 10, December 10th, that
14        Tuesday, on a different investigations.
15   Q    So starting on Friday, December 6th you had a
16        different case assigned to you?
17   A    Yes.  Detective Brian Leitzinger and myself, we had
18        been working with a number of other agencies
19        regarding a regional burglary cases, and so we
20        started that on December 6th and then did not
21        complete that investigation until December 10th.
22   Q    Which would have been a Tuesday?
23   A    Yes.
24   Q    Is that when you first became involved in this
25        case?
```

259

1    A    No.  Actually, it was the next day.

2    Q    So Wednesday then, December 11th?

3    A    Yes.  When I reported back to work.

4    Q    And what do you remember being asked to assist with

5         when you first started working on the case, Sergeant

6         Thao?

7    A    Yes.  At the time my Lieutenant Gostisha approached

8         me and asked me to participate in a homicide

9         investigation, and then I was provided some briefing

10        regarding what officer have done up to that point,

11        interview that they have done, and then also asked me

12        to look at some videos as well as still photos and to

13        confirm some of the names that they have or identify

14        names on that board.

15   Q    Okay.  As part of that process had still images from

16        the Luna video been kind of displayed or extracted

17        out of the overall video?

18   A    Yes.  They have -- Sergeant Rabas as well as others

19        had placed photos along -- on the wall in our

20        conference room and to try to identify each

21        individual both coming into the bar as well as after

22        the shooting people leaving the bar.

23   Q    And was that something that a significant amount of

24        time was focused on or spent on?

25   A    I believe so.

260

```
 1   Q   And at that point, if you recall, as best you recall,
 2       had anyone -- had everyone been identified?
 3   A   I believe they identified the majority of people.
 4       There were a couple of them that they were not sure
 5       and I was asked to assist with either confirmations
 6       or try to identify some of those party.
 7   Q   And throughout this case did you also then watch the
 8       Luna video?
 9   A   Yes.
10   Q   And was that also done so you could review and look
11       at the images of the people?
12   A   Yes.  Also to have an understanding of what
13       transpired before and after the shooting when people
14       were seen running out of the Luna Lounge.
15   Q   Is it a situation where sometimes watching it play in
16       real time gives you a clearer picture than when one
17       is like frozen and taken as a still image?
18   A   Yes.
19   Q   I want to talk to you, Sergeant Thao, about --
20               ATTORNEY SCHNEIDER:  Judge, can we
21       approach?
22               THE COURT:  You may.
23               (Bench conference.)
24               THE COURT:  The concern we had is we didn't
25       want to get into a subject matter and then keep you a
```

261

1      long time, or potentially a long time, and so now is

2      as logical of a breaking point as any so that we

3      don't create unusual breaks, and likewise so that we

4      don't keep you until later than has already been a

5      long day.  So we're going to excuse you at this time.

6      I'd ask that you be here ready to go at 8:45

7      tomorrow.

8          And, Wendy, if you can please let them out.

9            (The jury was escorted out of the

10     courtroom.)

11          THE COURT:  Sergeant, you can step down.

12     We can be seated.

13          (Proceedings concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

262

```
 1

 2

 3                     C E R T I F I C A T E

 4

 5   STATE OF WISCONSIN    )
                          ) ss.:
 6   COUNTY OF OUTAGAMIE   )

 7

 8

 9          I, JOAN BIESE, RMR/CRR, do hereby certify that I
     am the official court reporter for Branch IV of the
10   Circuit Court of Outagamie County;

11          That as such court reporter, I made full and
     correct stenographic notes of the foregoing proceedings;
12
            That the same was later reduced to typewritten
13   form;

14          And that the foregoing proceedings is a full and
     correct transcript of my stenographic notes so taken.
15

16          Dated this 18th day of August, 2016.

17

18

19                              _____

20                              JOAN BIESE, RMR/CRR

21

22

23

24

25
```