**FILED
02-13-2019
Clerk of Circuit Court
Outagamie County
2013CF001074**

1  STATE OF WISCONSIN    CIRCUIT COURT    OUTAGAMIE COUNTY
   _____

2  **STATE OF WISCONSIN,**

3              Plaintiff,

4  v.                          **Case No. 13-CF-1074**

5  **CHONG LENG LEE,**

6              Defendant.
   _____

7                  **JURY TRIAL – DAY TEN**

8  _____

9

   BEFORE:        **HONORABLE GREGORY B. GILL, JR.**
10                Circuit Court Judge, Branch IV
                  Outagamie County Justice Center
11                Appleton, WI  54911

12
   DATE:          **March 8, 2016**
13

14 APPEARANCES:   **CARRIE SCHNEIDER**
                  District Attorney
15                Appearing on behalf of the State

16                **ANDREW MAIER** and **ALEXANDER DUROS**
                  Assistant District Attorneys
17                Appearing on behalf of the State

18                **DEBORAH VISHNY** and **EVAN WEITZ**
                  Attorneys at Law
19                Appearing on behalf of the Defendant

20                **CHONG LENG LEE**
                  Defendant
21                Appearing in person

22

23

24 Joan Biese
   Official Reporter, Branch IV
25 Outagamie County

                        1

                                        Exhibit 25

1                         **I N D E X**

2

3    **WITNESSES**                                              **PAGE**

4    **CHUE LEE THAO**
          Examination by Attorney Schneider.................   6
5         Examination by Attorney Vishny...................  68
          Examination by Attorney Schneider................  96
6         Examination by Attorney Vishny................... 103
          Examination by Attorney Schneider................ 108
7
     **WILLIAM PEOTTER**
8         Examination by Attorney Vishny................... 110
          Examination by Attorney Schneider................ 115
9
     **WAIVER OF RIGHT TO TESTIFY BY DEFENDANT**............. 118
10
     **MOTIONS**.......................................... 122
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1

2

3  **EXHIBIT**                                                              **PAGE**

4    2 –  White Board–Luna Loung–Mark for Victim........... 29
     75–  Hilton Receipt.................................... 31
5    76–  Photos............................................ 31
     77–  Hilton Receipt.................................... 32
6    102– Tou Shoua Lee Drawing............................ 27
     103– Jacket (Dark)..................................... 94
7    106– Transcript–Interview of Tou Shoua Lee........... 82
     125– Jail Call Transcript–2/12/13–19:31............... 50
8    176– Transcript–Interview of Paul Lee
          12/12/13–12:41 a.m............................... 74
9    188– Judgment of Conviction...........................  4
     199– Jail Call Transcript–12/12/13–12:07 p.m.......... 43
10   200– Jail Call Transcript–12/12/13–12:11 p.m.......... 49
     201– Jail Call Transcript–1/18/14–15:13 p.m.......... 53
11   202– Jail Call Transcript–1/21/14–14:26 p.m.......... 57
     203– Jail Call Transcript–1/28/14–16:36 p.m.......... 60
12   204– Jail Call Transcript–1/11/14–17:17 p.m.......... 104

13

14

15

16

17

18

19

20

21

22

23

24

25

3

409-3

1                    **TRANSCRIPT OF PROCEEDINGS**

2                    ATTORNEY SCHNEIDER:  We would move in

3          what's been previously marked State's Exhibit No.

4          188, and I'll provide a copy to defense, although I

5          think they got it as part of discovery.  It would be

6          a certified judgment of conviction for this defendant

7          on August 22nd of 2003 for the felony offense of

8          party to the crime of burglary, so it just forms a

9          basis for what's needed for the possession.

10                   THE COURT:  And I think we have the

11         stipulation, but this further --

12                   ATTORNEY SCHNEIDER:  I just think I need to

13         do it for the record.

14                   THE COURT:  Not a problem.  Any objection?

15                   ATTORNEY VISHNY:  No.

16                   THE COURT:  188 will be received.

17                   ATTORNEY SCHNEIDER:  And then one other

18         thing, and I forgot because Andy was -- I just want

19         to -- what I'll probably do --

20                   THE COURT:  Let's deal with that --

21                   ATTORNEY SCHNEIDER:  -- say I rest but just

22         ask to reserve the ability to address amending the

23         solicitation of perjury count.

24                   THE COURT:  Let's do this so we don't have

25         to address it.  You're reserving your right.  I'll

4

1    listen to arguments on it later.  Not an indication

2    of any decision, but I don't want there to be anymore

3    delay with our jury so we'll address that at a later

4    point.  Okay?

5              ATTORNEY SCHNEIDER:  Do you want Sergeant

6    Thao to resume the seat?

7                   THE COURT:  Please.

8         We can bring in the jury.

9              (The jury was escorted into the courtroom.)

10              THE COURT:  Please be seated.  My apologies

11    for the delay.  My hope is that what we took care of

12    will help streamline the rest of the day for you.  I

13    did -- and again, I also apologize.  I've been

14    informed by maintenance they cannot get the air

15    conditioning running for a long explanation that

16    would only delay things further.  I have brought in

17    fans, but if it gets to the point -- it's cooled

18    things down a little bit, but if it gets to the point

19    where it's too noisy, please let me know and then we

20    can turn it down and turn on during breaks.  If that

21    becomes an issue, just let me know.

22         But other than that, Attorney Schneider, are you

23    prepared?

24              ATTORNEY SCHNEIDER:  Thank you.  Yes,

25    Judge.

5

1                 THE COURT:  All right.  Very good.

2                 ATTORNEY SCHNEIDER:  Thank you, Sergeant

3    Thao.

4             **EXAMINATION OF CHUE LEE THAO**

5   **BY ATTORNEY SCHNEIDER:**

6    Q    We were at the point yesterday where we were going to

7          begin talking about a time at which had you contact

8          with Paul Lee in this case.  Do you remember when you

9          would have had contact with Mr. Lee?

10   A    Yes.  On Wednesday, December 11 about nine p.m. at

11         Norka.

12   Q    And what was the purpose of you going there?

13   A    Sergeant Rabas and I made contact with him to try to

14         conduct an interview with him.

15   Q    And while you were there, did you learn if he was

16         working that day?

17   A    Yes, we did.

18   Q    Did you learn anything about the normal shift that he

19         worked?

20   A    Yes.

21   Q    What was that?

22   A    Three p.m. to one a.m.

23   Q    When you arrived at Norka, did you first speak to Mr.

24         Lee or did you speak to someone else?

25   A    I spoke to somebody else.

6

1   Q   Who was that?

2   A   I believe it's the -- like the plant manager.

3   Q   And was Paul Lee then located within Norka?

4   A   Yes.

5   Q   At that point who did you speak to?

6   A   I spoke to the manager just kind of inquire about the

7       break room and get some information about how

8       employees were giving either a locker, a place to

9       store their personal belongs, coat, jacket, that kind

10      of thing.

11  Q   And after speaking to the manager, did you have

12      contact with Paul Lee?

13  A   Yes, I did.

14  Q   How long -- where was that?

15  A   Paul came into the conference room and that's where

16      we had -- conduct the interview.

17  Q   And the manager knew you were going to use that

18      area?

19  A   Yes, he provided that.

20  Q   Do you stay in and speak with Mr. Lee or did you go

21      somewhere else?

22  A   I stayed with Mr. Lee and Sergeant Rabas.

23  Q   Did you speak to anyone else after you spoke to Paul

24      Lee at Norka?

25  A   Yes.

7

```
 1   Q   Okay.  Who was that?

 2   A   Again, it would be the -- I spoke to the plant

 3       manager a little bit and then after that I spoke to

 4       Michael Xiong.

 5   Q   Okay.  Let's first talk about the time when you spoke

 6       with Paul at Norka.  During that time was Paul

 7       directly asked if he was the shooter?

 8   A   Yes.

 9   Q   How did he respond?

10   A   Multiple occasion he said he was not.

11   Q   What was the tone of his voice during that

12       interview?

13   A   He was animated, loud, upset.

14   Q   Did he use profanity?

15   A   Yes.

16   Q   Did you ask him during this contact if Joe had been

17       the shooter?

18   A   Yes.

19   Q   What did he say?

20   A   He said none of his boy are the shooter or to that

21       effect.

22   Q   Did you ask him if Phong was the shooter?

23   A   Yes.

24   Q   What did he say?

25   A   No.
```

8

1   Q   Did you talk about an item that -- what you believed
2       was in his hand?
3   A   That was addressed repeatedly during that
4       interview.
5   Q   What did Paul tell you about anything he had in his
6       hand?
7   A   He did.  Unfortunately at the time I didn't catch it
8       but on later I noticed that he did on three or four
9       occasion he said that was his e-cigarette.
10  Q   Do you remember a time at which Paul demonstrates
11      something or some point of the argument with Josh?
12  A   Yes.
13  Q   And he was doing that with Sergeant Rabas?
14  A   Yes.
15  Q   Do you remember laughing?
16  A   Yes, I did.
17  Q   Why?
18  A   That was almost toward the end of the interview which
19      is about an hour and 25 minutes.  At about maybe an
20      hour and 15, 16 minutes, Paul got up, he was very
21      upset at the time, loud, he got up and he was getting
22      to a heated argument with Sergeant Rabas and made
23      some kind of comical illustrations about the fight,
24      the punch, and say something to the fact of, you
25      think I do this, I punch him and then the bullets,

9

1       like in the movie, it's going to fly this way, that

2       way.  And I shouldn't have, I apologize, but I did

3       show a little bit of smile and what he illustrated,

4       you know, that the fight with Josh.

5  Q   And Paul at that point said, what, do you think this

6       is like the movies, is that what you were laughing

7       about?

8  A   Yes.

9  Q   When Paul was brought from Norka to the Appleton

10      Police Department, did you bring any item with you?

11  A   Yes.

12  Q   What was that?

13  A   His coat.

14  Q   And was he asked if that was a coat he had back on

15      Saturday night?

16  A   Yes.

17  Q   What did he tell you?

18  A   It was.

19  Q   Did he have any cell phone on him?

20  A   No, he did not have a cell phone.

21  Q   After that point then did you -- that's when you

22      spoke with Michael Xiong?

23  A   Yes.

24  Q   And just to assist the jury because it was a couple

25      days ago when they heard this, how is Michael related

1        or connected to Paul Lee?

2    A   Michael Xiong is the brother-in-law of Paul Lee and

3        they live together in the apartment on Kensington.

4    Q   And the sister, it would be Xeng I think is her name,

5        spelled X-E-N-G?

6    A   Correct, Xeng Lee.

7    Q   Does she also go by another name?

8    A   Mao, M-A-O.

9    Q   What do you remember telling Michael?

10   A   I explained to him that Paul has been taken into

11       custody, arrested for the incident, the shooting, and

12       advised him to inform Mao or Xeng, she was outside in

13       the parking lot, that that's the reason and also to

14       advise Hu and Chong and all the family to contact me

15       at the Appleton Police Department if they have any

16       informations to assist with the investigation.

17   Q   You knew at that time Hu and Chong were Paul's

18       brothers?

19   A   Yes.

20   Q   Did you even provide him with like a business card?

21   A   I did.

22   Q   Prior to the time you spoke with Paul at the Appleton

23       Police Department at 12:41 a.m., did you learn

24       anything about where Sergeant Tauber and Meyer had

25       been?

11

1    A    Yes.

2    Q    What was that?

3    A    They were coming back from Milwaukee and then have

4         received some information about the investigations.

5    Q    And that was information they learned during speaking

6         -- during the time they spoke with Alyson Blom?

7    A    Yes.

8    Q    And that was about Lisa's opinion; is that correct?

9    A    It was related to me about suspect initially, yes.

10   Q    And so you knew that information before you went in

11        to speak to Paul at 12:41?

12   A    Yes.

13   Q    During the time when you spoke to Paul then at 12:41,

14        Sergeant John Schira was with you?

15   A    Yes.

16   Q    During that conversation did Paul ever say he was the

17        shooter?

18   A    No.

19   Q    Did he say he was not the shooter?

20   A    Yes, he said he was not the shooter, correct.

21   Q    During that time when you had contact with him, do

22        you remember asking him who he was with?

23   A    Yes.

24   Q    What did he say?

25   A    Spent the first about eight minutes just kind of

12

1      inquire as to that night on December 7 who they were

2      downtown, and I went through each names and then I

3      came across interesting quite that his brother was

4      downtown with him as well.

5  Q  When you were asking him who he was with, were you

6      giving him names or was Paul giving you names, if you

7      know?

8  A  I think he gave me some, but also included as well

9      others based on information that I have up to that

10     point.

11  Q  You had seen the photos in those images of the people

12     as they exited, right?

13  A  Yes.

14  Q  So you then ask Paul if Chong was with him?

15  A  Yes.

16  Q  What was his response or reaction?

17  A  He -- he say he did not know and he was kind of

18     stuttered a couple of times even and say what about

19     your brother and he stutter and say what.  So that's

20     kind of one of those where he did not want to

21     identify that his brother was with him that night.

22  Q  Okay.

23          ATTORNEY VISHNY:  I'm going to object to

24     the commentary.  The testimony should be restricted

25     to what he says was said, not his opinion about

13

1          what's inside Paul's head.

2                    THE COURT:  He can render -- you can render

3          an opinion about what your observations are but you

4          are not to go into anybody else's thought process or

5          things of that nature.  So to that extent it would be

6          sustained.

7     Q    (BY ATTORNEY SCHNEIDER)  Initially did Paul ever talk

8          about Chong being at Luna?

9     A    Not right away.

10    Q    Eventually does he talk about Chong being at Luna?

11    A    Yes.

12    Q    Did he express any concerns to you when you were at

13         this point starting to talk about Chong being at

14         Luna?

15    A    It depend on what stage of the interview, but he did

16         discuss about concern about his brother.

17    Q    Did he say something to you in Hmong about his

18         brother?

19    A    Yes.

20    Q    What did he say?

21    A    About half an hour into the interview he expressed to

22         me a couple times that he was concerned that his

23         brother is going to hate him.

24    Q    And at that point was he describing or telling you

25         what Chong's involvement was at Luna?

14

```
1    A    Yes.

2    Q    Did Paul get emotional during this time?

3    A    Yes.

4    Q    Even with that, did he tell you specifics about what

5         Chong had done or what Chong had said to him?

6    A    Yes.

7    Q    And that was the first time you spoke to him at

8         Appleton Police Department?

9    A    That was the first time.

10   Q    About how long into that interview at 12:41 was it

11        before Paul indicated to you Chong had some

12        involvement in the shooting?

13   A    It was approximately like 31 or 32 minutes into the

14        interview when he indicated that his brother was the

15        shooter.

16   Q    Was the balance of that time then spent talking about

17        what he learned or what he knew?

18   A    Yes.

19   Q    Paul stay emotional throughout much of the time?

20   A    Yes.  He was totally different from the Norka

21        interview.  He was calm, he spoke slowly, voice

22        obviously, his body moves and voice changed

23        dramatically.

24   Q    And during that did he also indicate if anyone else

25        was present when anything was said related to Chong?
```

15

1            Might have been a bad question.  Did you understand

2            my question?

3    A    No, I was thinking.

4    Q    That's okay.  You can say you don't understand if I

5            ask a bad one.  Please do that, Sergeant.

6                During the time when you spoke to Paul, he was

7            talking about Chong's involvement at Luna, did he

8            indicate anyone else was aware of Chong's

9            involvement?

10   A    Yes.  I mean in a different interview after that he

11           did indicate other people that were aware of that.

12   Q    Okay.  So the first time you spoke to him at 12:41 do

13           you remember about how long that was?

14   A    That was about one hour and seven minutes or eight

15           minutes.

16   Q    And you spoke to him again then, if I told you it was

17           about 2:19, does that seem about accurate?

18   A    Yes, I did.

19   Q    And when you went to speak with him on that time,

20           were you by yourself?

21   A    I was.

22   Q    Did you learn additional information from Paul at

23           that time?

24   A    Yes.  At that time he did share with me about other

25           people that was aware of the conversation.

16

1   Q    What did he tell you?

2   A    He indicated that Phong, Joe Thor as well.

3   Q    Did he indicate where that happened?

4   A    Back at Joe Thor's residence as well as at his

5        apartment the next day, which would be Monday.

6   Q    And during these times does he specifically tell you

7        if Chong said anything about his involvement?

8   A    Yes.

9   Q    What was that?

10  A    Back at the Joe Thor residence, the defendant Chong

11       Lee admitted to them that he was the shooter.

12  Q    How long did you speak with him at 2:19?

13  A    Seven minutes.

14  Q    After that were you aware that Chong Lee ultimately

15       was brought to the Appleton Police Department

16       sometime after 7:30 in the morning?

17  A    I was.

18  Q    Was Paul allowed access to any phones while he was at

19       the Appleton Police Department as much as you're

20       aware?

21  A    No.

22  Q    Was Paul ever made aware that Chong was also at the

23       police department?

24  A    Not by me.

25  Q    And then you have one additional follow-up with Paul

17

1       on this date?

2    A   Yes.

3    Q   And now it would be Wednesday the 12th?

4    A   Yes.

5    Q   And actually all the contacts at the police

6        department happened on Wednesday because they were

7        all after midnight?

8    A   Correct.

9    Q   That would have been at about 11:58 a.m.

10   A   Yes.

11   Q   And what was the -- and I want you to just talk

12       generally rather than specifically, did you go

13       through what you had learned with Paul again during

14       that 11:58 time?

15   A   Yes.

16   Q   Did you talk more about the e-cigarette?

17   A   Yes, we did.

18   Q   And did he have it with him?

19   A   Yes.

20   Q   Were you able to see it?

21   A   Yes.

22   Q   Did you make any requests of Paul related to the

23       e-cigarettes?

24   A   Yes, we did.

25   Q   What was that?

18

1    A    We asked him to hold the e-cigarette and so that we
2         could at least photograph as close as we can similar
3         to the position that it was in the Luna video.
4    Q    You weren't able to, because that's a surveillance
5         video, take like the exact same distance or angle to
6         Paul, correct?
7    A    Correct.
8    Q    Just did the best approximation of that same angle
9         you could while at the Appleton Police Department?
10   A    To the best, but obviously we couldn't get it
11        exact.
12   Q    Okay.  For example, to try to recreate the image from
13        Luna, the image of what you were questioning him
14        about is reflected against another person's clothing,
15        correct?
16   A    Correct.  We weren't able to assimilate that.
17   Q    Because you didn't -- based upon the video, you have
18        no idea or even what kind of color that was?
19   A    Did not.
20   Q    And at that point did Paul write a written
21        statement?
22   A    Yes, he did.
23   Q    Were you present for any of it?
24   A    I gave him the written statement, then after that I
25        step out of the room.

19

1    Q    Did anyone stay with him?

2    A    At the time I did not, no, but I would learn later

3         that Sergeant Schira did remain with him.

4    Q    When he was finished with the statement, did you go

5         back in?

6    A    Yes.

7    Q    Did you go over it with him?

8    A    No, I did not.  I just collected it from him.

9    Q    And was Paul ultimately then after that time period

10        taken home?

11   A    Yes.

12   Q    What time did he arrive home?

13   A    Exactly 1:17 p.m. on the 12th.

14   Q    How do you know that?

15   A    As we were transporting home, my handheld recorder

16        was running at the time.

17   Q    And that recorder would correspond to exactly what

18        time he is out?

19   A    Yes.

20   Q    And prior to leaving the police department did you

21        allow Paul to have any access to phones?

22   A    No.

23   Q    Were you aware prior to leaving with Paul if anyone

24        was following up with Joe or Phong?

25   A    Yes.

20

1  Q  And who was following up with Joe?

2  A  I was aware that Sergeant Rabas was going to make

3     contact with Joe.

4  Q  Where did you go after finishing with Paul at 1:17?

5  A  After we dropped Paul off at his apartment, I

6     immediately responded back to the Appleton Police

7     Department to meet with Sergeant Tauber.

8  Q  When you dropped Paul off, do you remember seeing if

9     anybody was there?

10 A  No, I do not believe so.

11 Q  So you met up with Sergeant Tauber.  Where did you

12    then go?

13 A  We then went straight to Phong Lee residence on the

14    south side of Appleton.

15 Q  Had anything been set up or prearranged to meet with

16    Phong?

17 A  Yes.

18 Q  And what did you know about that?

19 A  I was informed that about eleven a.m. that day

20    Sergeant Tauber had made contact with Phong Lee at

21    his workplace, McDonalds, and Phong have agreed to

22    meet us at his residence after work.

23 Q  And did he meet with you then?

24 A  Yes, he did.

25 Q  Was there a certain time he was getting off of work

```
 1        so you knew what time to be at his house?
 2   A    Yes, 2:00.
 3   Q    And was Phong pretty much timely?
 4   A    Yes, he was.
 5   Q    Did he beat you home or were you to his house first,
 6        if you know?
 7   A    He got home first.
 8   Q    Okay.  When you talked to Phong on December 12th, had
 9        you spoken with him previously?
10   A    No, I have not.
11   Q    During the time you spoke with him on the 12th, did
12        he express being scared about talking?
13   A    No, he did not.
14   Q    Did he ultimately talk to you about what he knew?
15   A    Yes, he did.
16   Q    Did he talk about Chong's involvement in the
17        shooting?
18   A    Yes.
19   Q    What did he tell you?
20   A    He went to great detail about the incident with Josh
21        at Luna, and then after the shooting they went to Joe
22        Thor's residence and he indicated that about maybe
23        half an hour to an hour Chong Lee came to the
24        residence and told them that he popped a guy.
25   Q    As part of your work on this case, Sergeant Thao, did
```

22

```
1         you also at some point have contact with a person

2         named Tou Shoua Lee?

3    A    Yes, I did.

4    Q    And do you remember what date you had contact with

5         Tou Shoua?

6    A    Yes.  December 18, 2013.

7    Q    Was Tou Shoua one of the people that was identified

8         in those photos coming or exiting Luna?

9    A    Yes, he was.

10   Q    Prior to you speaking with him, had anyone else

11        spoken to him about this from the Appleton Police

12        Department?

13   A    No.

14   Q    When you met with Tou Shoua, did he agree to speak

15        with you?

16   A    Yes.

17   Q    When you asked him -- or let me ask you this.  I

18        shouldn't assume.  Did you ask him if he was at Luna

19        on December 7th?

20   A    Yes.  He indicated to me that he was aware that this

21        was about the incident.

22   Q    Did he tell you who he was with that night?

23   A    Yes.

24   Q    Who was that?

25   A    Initially he was with an Alex Schilling, then he met
```

23

```
 1          up with a number of friends, associates at City

 2          Limits in Menasha, and then from there they came to

 3          downtown Appleton.

 4     Q    And did you meet with Tou Shoua at his residence?

 5     A    Yes, I did.

 6     Q    And is that close to downtown Appleton?

 7     A    Yes.

 8     Q    Within five to six blocks of College?

 9     A    Yes.  Live in the 500 block of North Division

10          Street.

11     Q    Did you talk to him specifically about what happened

12          at Luna?

13     A    Yes.

14     Q    Did he describe seeing Paul or Phong involved in any

15          altercation?

16     A    Yes.  He provided details about the incident as well

17          as the shooting and then thereafter.

18     Q    Did he tell you where he was as he was observing

19          this?

20     A    Yes.

21     Q    Where did he say he was?

22     A    He had just walk from the bar into the foyer and then

23          he was just standing in the corner, I guess,

24          threshold between the foyer and then the bar.

25     Q    Did he tell you what he saw?
```

24

```
1    A    Yes.

2    Q    What did he tell you?

3    A    He noticed an altercation argument between --

4              ATTORNEY VISHNY:  Judge, I object.  I think

5         we discussed this in chambers.

6              THE COURT:  Please approach.

7              (Bench conference.)  I might have been in

8              the middle of a question, but I'll ask you

9              a new one.

10        At that point you had said Tou Shoua described

11        seeing a fight?

12   A    Yes.

13   Q    And who was involved in that?

14   A    Paul and Phong.

15   Q    And what did he describe seeing?

16   A    That Phong -- Paul and Josh were in a physical

17        altercation, and then he saw Paul throwing a punch at

18        Josh.

19   Q    Did he indicate if he saw if that made any contact at

20        all?

21   A    I didn't -- I don't recall asking that specific

22        question.

23   Q    Okay.  What did he tell you after that happened?

24   A    And then after that then he notice about five to ten

25        second later then the bang or the boom happened.
```

25

```
 1   Q   Did he tell you what -- if he saw what Paul did after

 2       Paul threw the punch?

 3   A   I think he indicated that Paul actually moved back

 4       after the punch and then that's when the delay of

 5       about five to ten second and then the shooting

 6       occur.

 7   Q   Did he describe the area where this happened?

 8   A   Yes.

 9   Q   How did he describe it?

10   A   He said it was dark, kind of confined, lot of people

11       in that area.

12   Q   Did he tell you more specifically what happened prior

13       to hearing the boom?

14   A   Yes.  I mean throughout the interview he then

15       indicated that as he was watching, he was trying

16       to -- in his mind was going to stop the fight if

17       there was going to be a fight, he was watching the

18       entire incident, and then he noticed Michael Thor,

19       Alyson and Chong walking past him.

20   Q   Did he tell you what he saw then?

21   A   Yes.  That Chong approach Josh.

22   Q   What did he see Chong do?

23   A   With his right hand that it was gonna be -- looks

24       again from his angle was going to be a punch but then

25       as the coat, boom.
```

26

```
 1    Q    Did he indicate what he saw happen if anything to

 2         Josh after the -- hearing the boom?

 3    A    Yes.  Josh then fell down on the floor kind of in his

 4         -- in front of him.  He froze for a couple second.

 5    Q    Meaning Tou Shoua froze?

 6    A    Tou Shoua, yes.

 7    Q    Did he tell you what he did then?

 8    A    Yes.  After that then he started walking out.

 9    Q    During this time did Tou Shoua write a statement for

10         you?

11    A    Yes, he did.

12    Q    During the time when you were speaking to him, did he

13         talk about any clothing Chong had?

14    A    Yes.

15    Q    What did he describe?

16    A    He describe a gray Milwaukee Brewer hat and then he

17         describe this jacket with the gray kind of the main

18         vest area and then he described a dark sleeve.

19    Q    Prior to that had you seen any color photos of Chong

20         Lee in any coats?

21    A    No.

22    Q    I'm actually just going to show it to you.  We'll try

23         to use it this way, Sergeant Thao.

24              Well, first, have you look at Exhibit 102.  Are

25         you familiar with what's depicted there?
```

27

```
 1   A    Yes.

 2   Q    What is that?

 3   A    That's the drawing that was done during the interview

 4        with Tou Shoua Lee on December 18.

 5   Q    And you do that as you're speaking with him?

 6   A    Yes.

 7   Q    And did you do the writings on there or did Tou

 8        Shoua?

 9   A    I did the writing.

10   Q    Okay.  And this outline of the room and the layout at

11        the time was something – sorry – something the

12        Appleton Police Department was trying to use with

13        individuals, correct?

14   A    Yes.

15   Q    But at this point nobody had gone to do an exact

16        diagram or anything to scale, correct?

17   A    No, we didn't.

18   Q    Okay.

19              THE COURT:  Do you want the lights on,

20        Attorney Schneider?

21              ATTORNEY SCHNEIDER:  No, I don't think so.

22        I'll ask them in just a second.  I think we can see

23        this.  Is that okay without the lights?

24   Q    (BY ATTORNEY SCHNEIDER)  In this drawing down at what

25        would be, as we're looking at it, the bottom where my
```

28

1      fingers are, what's the area that would be

2      immediately below this area?

3   A  Would be the bar.

4   Q  Okay.  So how this drawing was done, it's written as

5      you enter the bar to the left, as we look here you go

6      -- there is -- the wall goes out to the left and then

7      continues on, correct?

8   A  Correct.

9   Q  And actually is there a recessed area to the left

10     there once you go into the bar area?

11  A  No.  It should be just straight wall, that half wall

12     just straight.

13  Q  Okay.  So when people were writing this, there is no

14     little recessed area over to the left.

15  A  Correct.

16  Q  For example, when we look at what's been previously

17     marked Exhibit 2, that area when you come out from

18     the bar is denoted on here with some dotted lines; is

19     that correct?

20  A  Correct.

21  Q  And that's actually -- it's an archway, correct?

22  A  Yes.

23  Q  So it's kind of at a circle format at the top of the

24     arch?

25  A  Yes.

29

1   Q   Okay.  No door though.

2   A   No door.

3   Q   So as you enter from the bar, there is no jag over to

4       the left on this, it just is a straight wall as right

5       there, correct?

6   A   Correct.

7   Q   Okay.  When you spoke to -- well, let me ask you

8       this.  Tou Shoua gave you a description of the

9       defendant's coat, correct?

10  A   Yes, he did.

11  Q   When you spoke to anyone else prior to Tou Shoua, had

12      you been given any description about his coat?

13  A   Other than what's on the Luna video.

14  Q   Okay.  Did you talk to Joe Thor on December 18th?

15  A   Yes, I did.

16  Q   Was that before or after you spoke with Tou Shoua?

17  A   That would be after.

18  Q   Were colors of clothing discussed with Joe Thor?

19  A   Yes.

20  Q   And what did he say related to Chong?

21  A   He indicated that he saw a gray sleeve as his

22      approach Josh.

23  Q   At that point had Appleton seen any color photos of

24      the defendant in any jackets?

25  A   No.

30

1  Q  You're aware ultimately some color photos were

2     obtained?

3  A  Yes.

4  Q  And where were they obtained from?

5  A  From Hilton hotel in Milwaukee.

6  Q  Okay.  And have you looked at those as part of this

7     case?

8  A  Yes.

9  Q  Okay.  I'm going to show you what's been marked

10    Exhibit No. 76.  You're familiar with what that item

11    is?

12 A  Yes.

13 Q  And what is Exhibit 76?

14 A  It's a still photo of Chong Lee from November 22nd,

15    2013.

16 Q  Okay.  Prior to speaking to both Joe and Tou Shoua on

17    the 18th, you had never seen these images, correct?

18 A  Correct.

19 Q  Okay.  And the -- at some point did you see the

20    receipts that were obtained from the Hilton?

21 A  Yes, I did.

22 Q  Okay.  And both the receipt from November 22nd, which

23    is dated Exhibit 75 --

24 A  Yes.

25 Q  That receipt is for an individual named Chong Lee?

31

```
 1   A    Yes, it is.

 2   Q    And the address associated with Chong Lee in that

 3        address on November 22nd, is that an address you knew

 4        to be associated with him?

 5   A    Yes.

 6   Q    And then the receipt, Exhibit 77, is a receipt for

 7        December 8th starting at 6:43 a.m., Hilton on Port

 8        Washington Road; is that correct?

 9   A    Yes.

10   Q    And that receipt is for an individual named Chong

11        Lee?

12   A    Yes.

13   Q    And the address associated with that receipt for

14        Chong Lee, the 513 South Lake Street, you're familiar

15        with that as an address for the defendant?

16   A    Yes.

17   Q    Okay.  As -- let me know if you can hear me.  As part

18        of your work on this case, you were involved at times

19        in watching the Luna video, correct?

20   A    Yes.

21   Q    All right.  Bear with me.  My tech people are not in

22        the courtroom with me right now and they knew where I

23        wanted to go with this.

24             THE COURT:  Is this audio, video or both?

25             ATTORNEY SCHNEIDER:  This will just be the
```

32

```
1          Luna video at Luna, Judge.

2                    THE COURT:  Let me know when to bring the

3          lights down.

4                    ATTORNEY SCHNEIDER:  Thank you.  Okay.  Now

5          the lights, Judge.  Thank you.

6    Q     (BY ATTORNEY SCHNEIDER)  And you're aware from

7          watching the video at times the defendant went in and

8          out for cigarette -- well, went in and out, correct?

9    A     Yes.

10   Q     We don't necessarily know if he was smoking or not

11         but there are times when you can see him go out of

12         Luna?

13   A     Yes.

14   Q     We're going to start at 1 -- 13:46:35, so this would

15         be 1:46:35.  And, Sergeant Thao, I'm just going to

16         step this forward frame-by-frame here for a few

17         frames.  Stopped it at 1 -- what would be 1:46:36 or

18         13:46:36?

19   A     Yes.

20   Q     Do you recognize anyone that has come into the image

21         in this photograph?

22   A     Yes.

23   Q     Go ahead.

24   A     A subject with a hat to the right of the tallest

25         subject with what appears to be a hoodie shirt come
```

33

1          in.  I recognize him as Chong Lee.

2     Q    And as we're looking at this, he would be shorter

3          than the gentleman -- the tallest gentleman in that

4          frame, correct?

5     A    Yes.

6     Q    And just to assist, in center of the image is two

7          heads that are much closer to the camera, correct?

8     A    Yes.

9     Q    You're describing the person said a hat, I'm pointing

10         to a person here with a hat with a coat.  Is that the

11         person you're identifying as Chong Lee?

12    A    Yes, it is.

13    Q    And from this image, at least again not knowing the

14         colors, but the bottom of his sleeve at least

15         reflects a different coloring than the sleeve; is

16         that correct?

17    A    That's correct.

18    Q    And part of the case at one point focused on the

19         parties as they were exiting, correct?

20    A    Yes.

21    Q    And at one point part of the focus in the case --

22              ATTORNEY VISHNY:  I'm sorry, Miss

23         Schneider.  I missed the last play point on the first

24         video.

25              ATTORNEY SCHNEIDER:  I just went one second

34

```
 1        in time.
 2                    ATTORNEY VISHNY:  Oh, just one second.  I
 3        apologize.
 4                    ATTORNEY SCHNEIDER:  That's okay.  Okay.
 5             For the record, the play point is 13:50:25.
 6    Q   (BY ATTORNEY SCHNEIDER)  So at this point, Sergeant
 7        Thao, are you familiar with what's depicted here?
 8    A   Yes.
 9    Q   Okay.  And previously Sergeant Rabas and I think
10        others may have identified this as the time at which
11        they believe the shot occurred.  Would that be your
12        opinion as well?
13    A   It is.
14    Q   Okay.  I'm going to play it through, and I've stopped
15        it at 13:50:30, I'm just going to step it forward
16        now, Sergeant Thao.
17                    (Video played.)
18    Q   At 1:35:03 a gentleman to the left has appeared.  Are
19        you familiar with who that is?
20    A   Yes, I am.
21    Q   Who is that?
22    A   Tom Lee.
23    Q   Okay.  And then immediately behind him will be
24        whom?
25    A   Chong Lee.
```

35

1    Q    Okay.  I'm just going to go frame-by-frame, and we're

2         starting at 13:50:32, and I've stopped at 13:50:34.

3              In that sequence, and I can back it up if you

4         want me to, is there something about Chong Lee in

5         your viewing of this at some point that became at

6         least noticeable or maybe an issue for you?

7    A    Yes.

8    Q    What was that?

9    A    His right pocket, I can see some type of shape or

10        bulging on -- as he was walking out the door.

11   Q    You don't know what that was though?

12   A    I do not.

13   Q    Could have been a cell phone?

14   A    Possibly.

15   Q    Could have been a small gun?

16   A    Yes.

17   Q    Could have been a set of keys?

18   A    Yes.

19   Q    And I'm showing it at 13:50:32.  Again, is that Tom

20        Lee entering?

21   A    Yes, it is.

22   Q    And then I'm just going to play through until the

23        time point again when we see the defendant exiting

24        the door.  Again, I played it to 13:50:34.

25              ATTORNEY SCHNEIDER:  If you could turn the

36

```
 1          lights on, Judge.
 2     Q    (BY ATTORNEY SCHNEIDER)  Were you aware back in
 3          December of 2013 what time did Sharks open during the
 4          week?
 5     A    I believe it was five p.m.
 6     Q    Okay.  And as a pool hall it wasn't something that
 7          was open all day long during like normal eight to
 8          five hours?
 9     A    Correct.
10     Q    On the weekend did they have different hours
11          though?
12     A    I believe so, but I have not been to --
13     Q    Okay.
14     A    -- Sharks for a long time.
15     Q    Stephanie and Melanie Thao I think testified in some
16          fashion that you're their uncle?
17     A    Correct, they did.
18     Q    Okay.  There are only so many clans of Hmong,
19          correct?
20     A    Yes.
21     Q    And it's 18 clans, correct?
22     A    Yes.
23     Q    So in some fashion all Thao's are related?
24     A    In some way.
25     Q    All Lee's are related?
```

37

```
1   A    Yes.

2   Q    And I'm just going to say it this way.  You're not

3        related to either one of their parents, correct?

4   A    No.

5   Q    So their dad is not your brother?

6   A    Correct.

7   Q    Their mom is not your sister?

8   A    Correct.

9   Q    So somehow if they say you're an uncle that's

10       probably accurate in some fashion?

11  A    Courtesy.

12  Q    Okay.  Have they ever come to you with any issues or

13       concerns they had on cases?

14  A    No, they have not.

15  Q    Do you even know prior to this case if they were

16       aware you were a police officer?

17  A    I'm sure they were aware.

18  Q    I'm going to walk you through and have you talk and

19       explain to the jury a little bit about the jail phone

20       call system --

21  A    Yes.

22  Q    -- here in the Outagamie County Jail.

23            Throughout your 20 years has the jail always had

24       a system for recording phone calls?

25  A    Yes.
```

38

1    Q    And you're familiar with how that system works?

2    A    Yes.

3    Q    And how it worked back in 2013?

4    A    Yes.

5    Q    Is it a situation -- let me ask you this, Sergeant

6         Thao.  How is a person able to make phone calls?

7    A    From the jail they would assign an inmate number or

8         ID and then they could purchase, I guess, time on the

9         ID, and then they can make call to whoever they want

10        to call or they could have outside people purchase

11        time on their cell phone and then anybody could call

12        them.

13   Q    Are you able to track calls in the jail through then

14        the person's inmate ID number?

15   A    Yes.

16   Q    Are you also able to track based upon the calls

17        made --

18   A    Yes.

19   Q    -- to a certain number.

20   A    Yes.  That's destination number.

21   Q    I'm going to just -- maybe I'm hungry for lunch

22        already.  I'm just going to say Pizza Hut.  Let's say

23        you knew a certain number for a Pizza Hut in

24        Appleton.  Is there a way through the system you

25        could put that phone number in and it would tell you

39

1                everybody who has called that number?

2      A        Yes, you can.

3      Q        Regardless of the inmate ID number used?

4      A        Correct.

5      Q        Have you had past cases where people do not use their

6                own inmate ID number when making calls?

7      A        Many times.

8      Q        Why?

9      A        Either they want to conceal the communications or

10               they don't want to give that information out to

11               whoever is on the other -- the receiving end of the

12               call.

13     Q        Is it a situation that they have to put an inmate ID

14               number in the system to start the call?

15     A        Yes.

16     Q        And is -- is part of -- there is a recording that

17               starts every call, correct?

18     A        Yes.

19     Q        As part of that recording, does the system say, you

20               have received a call from, and then it says whatever

21               inmate ID number is put in from the call?

22     A        It gave you a warning, yes.

23     Q        Okay.  Are you aware if the jail call system also

24               allows people to end up making three-way calls?

25     A        I'm aware of that, yes.

40

1    Q    And can you explain that to the jury?

2    A    Yes.  When a call is made to a number, then they can

3         ask that number to make another phone call to, let's

4         say, a third person so they can have a discussions

5         with that secondary person.

6    Q    So, for example, if I called Pizza Hut, I could ask

7         the person at Pizza Hut, hey, can you call Copps

8         grocery store and they could call Copps grocery

9         store?

10   A    Yes.

11   Q    But the way the system would record that call, it

12        would record it as a call placed only to Pizza Hut?

13   A    To the first one, first number.

14   Q    You wouldn't have a way to track that that call

15        ultimately ended up going to Copps grocery store?

16   A    No, I don't think so.

17   Q    In this case did you review a significant number of

18        jail phone calls?

19   A    Yes, I did.

20   Q    Were they in English or Hmong?

21   A    The majority of them were in Hmong and some of them

22        were in English.

23   Q    At times is it a split between Hmong and English?

24   A    Yes.

25   Q    For these calls, were you able to track some of those

41

1      using Chong Lee's inmate ID number?

2   A   Yes.

3   Q   Were you able to also track based upon the phone

4      number that was called?

5   A   Yes, multiple times.

6   Q   You've been present when we played a number of these

7      calls, correct?

8   A   I was.

9   Q   And you would have listened to those calls at some

10      point in this case?

11  A   Yes.

12  Q   For the calls that we've listened to and that have

13      been presented as exhibits, and there's a few more

14      we're going to go through, how many of those were

15      made using Chong Lee's inmate ID number?

16  A   I believe five were made using his own ID number and

17      the rest were somebody else.

18  Q   At some point in this case after listening to jail

19      phone calls were search warrants executed?

20  A   Yes.

21  Q   And even after those search warrants were executed,

22      did you continue to listen to calls?

23  A   I did.

24  Q   At some point do you speak with Teng Lee?

25  A   Yes.

42

```
 1   Q   And do you remember, and I'll just ask you for a
 2       month, whether it was December, January or February
 3       when you spoke to Teng.
 4   A   I believe it's in mid-February of 2014.
 5   Q   Do you remember specifically asking Teng about
 6       comments he made to Chong during the calls?
 7   A   Yes.
 8   Q   Okay.  I'm going to start, Sergeant Lee, with a call
 9       numbered Exhibit 199?
10   A   Yes.
11   Q   Is that a call you had listened to at one point in
12       this case?
13   A   Yes.
14   Q   And is there a date for this call?
15   A   Yes.
16   Q   And what's that date?
17   A   December 12th, 2013 at 12:07 p.m.
18   Q   So the same date --
19               ATTORNEY VISHNY:  I'm sorry.  Call number?
20               ATTORNEY SCHNEIDER:  Call number one.
21               ATTORNEY VISHNY:  Okay.
22   Q   (BY ATTORNEY SCHNEIDER)  The same date Chong Lee was
23       interviewed in the morning, correct?
24   A   Yes.
25   Q   And as of 12:07 p.m. on December 12th was Paul still
```

43

1          at the Appleton Police Department?

2      A   Yes, he was.

3      Q   Okay.  I'm going to take it back from you for a

4          second.

5                  ATTORNEY SCHNEIDER:  Judge, do you mind

6          getting the lights?

7                  THE COURT:  Not a problem.

8                  ATTORNEY SCHNEIDER:  I should ask, is it

9          readable without the lights?  They're saying no.  I'd

10         rather have them off please.

11     Q   (BY ATTORNEY SCHNEIDER)  So this call would have been

12         again on December 12th, 2013 at 12:07 p.m.

13     A   Yes.

14     Q   And the call number was to 809-1074?

15     A   Yes.

16     Q   And the way the transcript of this reads, the AR is

17         the automated recording; is that correct?

18     A   Yes.

19     Q   So the call starts, and I'll probably cover much of

20         this, starts call number 11878807, Inmate ID

21         00128862.  Date:  2013, 12/12.  Time:  12:07:47.

22         Dial number 1(920)809-1975 from Station 1213.  Press

23         one.  And then in quotes it says dialing.  Is that

24         correct?

25     A   Yes.

44

```
 1   Q    Is there something the person placing the call needs
 2        to do as they're making the call to continue the
 3        call?  I mean they have to put in their inmate ID
 4        number?
 5   A    Yes.
 6   Q    And they have to put in the number they're trying to
 7        call?
 8   A    It asks for it, yes.
 9   Q    And then the next line says please enter your pin?
10   A    Yes.
11   Q    Are all inmate ID numbers also assigned a specific
12        pin, like a pin number?
13   A    I believe so.
14   Q    And then the recording device says --
15             ATTORNEY VISHNY:  Can we approach the bench
16        please?
17             THE COURT:  You may.
18             (Bench conference.)  And so we have to give
19             it a second to focus.  I'll just kind of
20             follow along.
21        We're at a point where it said to enter a pin,
22        correct?
23   A    Yes.
24   Q    And then the recorded voice says press zero to make a
25        -- and then it stopped?
```

45

```
 1   A    Right.
 2   Q    And then the recorded device says, for calls within,
 3        and then it starts dialing again.
 4   A    Yes.
 5   Q    This is not the first case where you've reviewed jail
 6        calls, correct?
 7   A    No.
 8   Q    Do you think in your career you've probably listened
 9        to hundreds if not thousands of hours of jail
10        calls?
11   A    At least.
12   Q    Okay.  So this is kind of the standard the way each
13        call begins, correct?
14   A    Yes.
15   Q    Is there a warning given or instructions given to the
16        person that received the calls?
17   A    Yes.
18   Q    Okay.  I'm going to continue on then.  There is a
19        voice that then says hello; is that correct?
20   A    Yes.
21   Q    And then the reporting voice says, hello, you have a
22        call from Yee Yang, an inmate at Outagamie County
23        Jail?
24   A    Correct.
25   Q    In listening to this call and the content, as well as
```

46

```
 1        the other calls you've listened related to this case,
 2        was this Yee Yeng?
 3   A    No, it's not.
 4   Q    Who was on the call?
 5   A    Chong Lee.
 6   Q    And then the recorded voice says, to accept this call
 7        press five?
 8   A    Yes.
 9   Q    Recorded voice says, to refuse this call hang up
10        now?
11   A    Yes.
12   Q    To block this call and all future, and then the call
13        starts dialing again?
14   A    Yes.
15             ATTORNEY VISHNY:  Judge, could we approach
16        the bench again?
17             THE COURT:  You may.
18             (Bench conference.)  I
19   Q    (BY ATTORNEY SCHNEIDER)  And do you remember, we're
20        going to review here in a second, but do you remember
21        the first -- the content of the first calls made by
22        Chong?
23   A    Yes.
24   Q    And what was generally discussed in those first
25        calls?
```

47

1    A    That first call?

2    Q    Yes.

3    A    Basically to deactivate or delete his Facebook.

4    Q    Okay.  Give it a second to focus.  And there are

5         references now on the screen in Exhibit 199 to

6         comments made by the voice Chong?

7    A    Yes.

8    Q    Can you please read those?

9    A    Chong Lee:  Mao.

10   Q    What was said then?

11   A    Mao, is inaudible in here.  I am in Outagamie.  Oh,

12        ah, I did not see Paul.  Oh, hey, man.  Mao.  Can you

13        delete my inaudible.  You delete my Facebook.

14   Q    And at this -- at this time prior to this you were

15        aware Mao was who as it related to Mr. Lee?

16   A    Xeng Lee, the sister of Chong.

17   Q    And then how did Chong continue this conversation?

18   A    No, it is my name 920 then my full name at

19        920@yahoo.com.

20   Q    What did he say next?

21   A    Then my password is number one.  No, it is Yahoo.

22        Number one.  Uh-huh.

23   Q    And then the call ends, it's kind of interrupted by

24        the recording saying, please stand by to be connected

25        to the customer call center?

48

1   A   Yes, this was pretty short call.

2   Q   Okay.

3           ATTORNEY SCHNEIDER:  I move Exhibit 199

4       into evidence at this time.

5           THE COURT:  Any objection?

6           ATTORNEY VISHNY:  Not except for

7       previous.

8           THE COURT:  199 will be received.

9   Q   (BY ATTORNEY SCHNEIDER)  From your work on this case,

10      Sergeant Thao, do you recall if there was another

11      call made on that same topic matter?

12  A   Yes.

13  Q   And what if you remember was the timing between the

14      first call and the second one made?

15  A   I think within, you know, couple hours.

16  Q   I'll show you Exhibit 200.  And again, the date of

17      this call is 12/12/2013?

18  A   Yes.

19  Q   And the time is 12:11 p.m.?

20  A   Yes.

21  Q   So it would have been, in essence, just a few minutes

22      after that first one we listened to?

23  A   Yes.

24  Q   And is this also a call placed by Chong Lee?

25  A   Yes.

49

1   Q   And the general topic again was what?

2   A   Basically deleting his Facebook account.

3   Q   Okay.  If you want to just start reading the first

4       line, Chong Lee says hello.  Is that correct?

5   A   Yes.

6   Q   What did he say next?

7   A   Tell Mao it is one love -- listen carefully.  Tell

8       Mao it is one love this life.  You hear.  I love --

9       correction.  One love this life.  Just tell that to

10      Mao.  Something about V-E this life.  Love this life,

11      comma, stupid.  I love this life.  I said I love the

12      life, stupid.  I, then, love the life.

13  Q   Did that call then continue on?

14  A   Yes.  The number one, I think.  Exclamation.  And

15      then the number one then love the life.

16  Q   And that would be a transcript fair and accurate as

17      best you recall that call?

18  A   Yes.

19              ATTORNEY SCHNEIDER:  I move Exhibit 200

20      into evidence.

21              THE COURT:  Any objection?

22              ATTORNEY VISHNY:  No.

23              THE COURT:  That will be received.

24  Q   (BY ATTORNEY SCHNEIDER)  Sergeant Thao, I'm going to

25      show you what's been previously used as Exhibit 125.

1    A    Yes.

2    Q    Are you familiar with that exhibit?

3    A    Yes.

4    Q    And what is the date of that call?

5    A    This call was made on December 12th, 2013, at 19:31

6         p.m. or 7:31 p.m.

7    Q    And in this --

8              ATTORNEY VISHNY:  Excuse me.  I'm sorry for

9         interrupting but what is the call number?

10             ATTORNEY SCHNEIDER:  Four.  We would have

11        used -- just if I ask the next question.

12             ATTORNEY VISHNY:  I'm sorry.

13   Q    (BY ATTORNEY SCHNEIDER)  This would have been a call

14        where Chong talks to Paul for a portion of the call,

15        correct?

16   A    Yes.

17   Q    Okay.

18             ATTORNEY SCHNEIDER:  I'm going to be on

19        Page 11.

20   Q    (BY ATTORNEY SCHNEIDER)  So we would have previously

21        heard some testimony from Paul about this call?

22   A    I believe so, yes.

23   Q    But again, to assist the jury, it takes place on

24        December 12th at 19:31, so 7:30 p.m.?

25   A    Yes.

51

```
1   Q    And that would have been the date officers first had
2        contact with Chong Lee?
3   A    Yes.
4   Q    Chong makes a comment here just prior to 13 minutes
5        and 45 seconds into the call.  What is the comment
6        that he makes?
7   A    If mom didn't tell me to stay, I would've disappeared
8        already, you know.
9                ATTORNEY SCHNEIDER:  And I think we offered
10       125 before and it's been received, but if not, I
11       would offer it at this time, Your Honor.
12               THE COURT:  Okay.  Any objection to the
13       receipt of 125?
14               ATTORNEY VISHNY:  No.
15               THE COURT:  All right.  125 will be
16       received.
17               ATTORNEY SCHNEIDER:  Judge, I don't think
18       you've ever told the jury, but if they need to stand
19       while we are doing something like this --
20               THE COURT:  Right.  That's fine.  But if
21       you need to stretch.
22               UNIDENTIFIED JUROR:  Can we take a
23       five-minute break?
24               THE COURT:  That's perfect.  Please rise
25       for the jury.
```

52

```
 1                      (The jury was escorted out of the
 2          courtroom.)
 3                      (Brief recess.)
 4                      (The jury was escorted into the courtroom.)
 5                      THE COURT:  Please be seated.
 6              Attorney Schneider, you may continue.
 7      Q   (BY ATTORNEY SCHNEIDER)  Okay.  Sergeant Thao, I just
 8          have three more calls to walk through with you.  I'm
 9          going to show you a call, Exhibit 201; is that
10          correct?
11      A   Yes, 201.
12      Q   And the date of that call is what date?
13      A   January 18, 2014, at 15:13 p.m.
14      Q   Okay.  And in this call, Sergeant Thao, Chong was
15          speaking with his brother Hu.  Okay?
16      A   Yes.
17      Q   So why don't you start and you say the lines that Hu
18          said, I will say the lines that Chong said.
19      A   Okay.
20      Q   Starting at 6:45, what does Hu say?
21      A   What.
22      Q   Chong then says, when you are with Joe, tell Joe he
23          needs to say something different.
24              How does Hu respond?
25      A   Joe is the one who said you are the one who told him
```

1    to say that so they would bother him.

2  Q  Chong's response is, stupid.

3        What does Hu say?

4  A  That's what Joe told me.

5  Q  Chong says, that nigga's be lying man?

6  A  That's what Joe told me.

7  Q  That's a big lie, man, is Chong's response.

8  A  Yes.

9  Q  Chong then says, tell him to go say something

10    different.

11  A  What.

12  Q  Tell him to say it differently.

13  A  Yes.  I talk to him.

14  Q  Because the only way I could win is if they -- if

15    they say something different.  You know.  And that's

16    Chong's response?

17  A  Yes.

18  Q  Now on Page 5 of that call, on this line Chong says,

19    yes, the only way I could win is if fucking Paul and

20    Joe say something different.  Fucking Joe man.

21        What is Hu's response?

22  A  Inaudible.

23  Q  Chong:  Do you still talk with him.

24  A  Who.

25  Q  Joe.

54

1   A    What.

2   Q    Do you still talk to him.

3   A    What.  Who.  Sorry.

4   Q    Chong then says at the top of the next line, Joe.

5   A    I have not talked to him in like couple days.

6   Q    Chong says, do you still have his number.

7   A    Uh-uh.

8   Q    Chong:  The fuck.  He --

9   A    He does not have a phone.

10  Q    Chong says, what.

11  A    He does not have a phone.

12  Q    Chong then responds, oh.  Well if you see him, tell

13       him that.

14  A    What.

15  Q    Tell him to say something different and tell him that

16       when he -- he --

17  A    Shut up.  I'm on the phone.

18  Q    Chong's response is, inaudible saying a joke.

19  A    So loud.

20  Q    Chong says, you hear.

21  A    What.

22  Q    Chong then says, you tell him that when he talked to

23       them he -- he was telling lies, lies because he

24       doesn't know the truth.

25  A    Yes.

55

```
 1   Q    Chong says, because he told me that he saw that I did
 2        it.
 3   A    He didn't say that.
 4   Q    Yeah, he did say that.  He did say that.  He said he
 5        saw me do it.  He said I was wearing clothes that
 6        looked like this and like that.  He said he saw the
 7        black thing in my hand.  So do you hear that.
 8   A    What.
 9   Q    Do you hear that.  So you have to tell Joe not to say
10        anything.
11             How does Hu respond?
12   A    Yup.
13   Q    Chong then says, don't say anything, don't say
14        anything about me and that he was just lying.  'Cause
15        he -- you have to tell him to say that he was scared
16        and he was scared about the, um, about going to
17        court.  Is that that section, that call?
18   A    Yes.
19             ATTORNEY SCHNEIDER:  I move 201 into
20        evidence.
21             THE COURT:  Any objection?
22             ATTORNEY VISHNY:  No.
23             THE COURT:  201 will be received.
24   Q    (BY ATTORNEY SCHNEIDER)  Was there a court date
25        scheduled in this matter for February of 2014?
```

56

1   A   Yes.

2   Q   And that was tied to the homicide case?

3   A   Yes.

4   Q   Exhibit 201 (sic), call number 11, what's the date of

5       that call?

6   A   January 21st, 2014, at 14:26 p.m.

7   Q   And we previously talked about, I think through your

8       testimony, was there something done on January 21st

9       of 2014?

10  A   Yes.

11  Q   What was done on that date?

12  A   Several search warrants were simultaneously executed

13      at several residence in the area.

14  Q   So to get you back, January 21st is the date of this

15      next call?

16  A   Yes.

17  Q   And that's a call several search warrants were issued

18      and executed?

19  A   Yes, on that date.

20  Q   Did that start the morning or the afternoon?

21  A   The search warrant?

22  Q   Yeah.  If you know.

23  A   I'm not sure exactly.

24  Q   Okay.  And I'm going to start Page 4 of this call

25      there's a Michael Thor referenced in the call.

57

1   A   Yes.

2   Q   We'll talk about that after.  So I'll read, first

3       Chong says to Michael Thor, stupid ass.

4           How does Michael respond?

5   A   Hey, what's up.

6   Q   Hey.  Did they just search your house earlier.

7   A   Yes, dude.

8   Q   What did they say.

9   A   They fucking come fucking to see the letter.

10  Q   Chong says, did you throw the letter away.

11  A   No, I did not throw it away yet.  They fucking search

12      and they fucking found it.

13  Q   And Chong's response is, that is okay, let them have

14      it because I did not say anything in the letter, you

15      know.  Is that correct?

16  A   Correct.

17  Q   Now I'm on Page 6.  Chong starts by saying, the

18      police keep looking for stuff to say that I did it.

19          How does Michael respond?

20  A   Yes.

21  Q   Chong:  And then the only one that said it is Joe and

22      Paul.

23          How does Michael respond?

24  A   Okay.

25  Q   Chong says, okay.  But I need to talk to Joe because

58

1          that guy lied that I told him to say that, you know.

2    A     Yes.

3    Q     Said that it was me.  And then he is such a liar.  I

4          hate it so much.  But then I need you to visit me so

5          I can talk to you guys.

6               Is that what Chong's response was?

7    A     Yes.

8    Q     Then on Page 8 -- these are all references for Chong;

9          is that correct?

10   A     Um-hum, yes.

11   Q     Can you read them please, Sergeant Thao?

12   A     Okay.  And then, um, when you see stupid Fatty, tell

13         stupid Fatty that I need to talk to him.  I don't

14         know how to talk to him.  And he needs to say -- I

15         don't know.  Yes.  But if they lock him up, his

16         maximum is only one year and nine months only.

17         Inaudible but I don't know about Joe.  Joe said that

18         too.  Oh, because you know I have court in two weeks

19         and then inaudible will come talk.  No, but I need

20         them to come.  If they come, then they just have to

21         say they lied then it's okay.  Then I get released

22         first.  You know.

23   Q     Those were Chong's comments in that call?

24   A     Yes.

25                    ATTORNEY SCHNEIDER:  I move 202 into

                                    59

1              evidence at this time.

2                         THE COURT:  Any objection?

3                         ATTORNEY VISHNY:  Not right now, no.

4                         THE COURT:  202 will be received.

5    Q    (BY ATTORNEY SCHNEIDER)  And was it at the time of

6         the search warrants that Stephanie and Melanie Thao

7         were first spoken to in this case?

8    A    Yes.

9    Q    I want to show you a call, Exhibit 203.  The date of

10        the call is what date, Sergeant Thao?

11   A    January 28th, 2014, at 16:36 p.m.

12   Q    And the name referenced in the call, Chong is talking

13        to his brother Hu?

14   A    Yes, it is.

15   Q    And it says with the statement by Chong:  Oh, um,

16        police talked to Melanie and Stephanie.  Melanie and

17        Stephanie said that they knew what I said inaudible

18        to them to tell the police that they knew I was the

19        one who did it.

20             How does Hu respond?

21   A    They say that.

22   Q    Chong:  Yes.

23   A    What the fuck.

24   Q    And they also talked to Tou Shoua.

25   A    For real.

60

1    Q    So I don't know what was going on is Chong's

2         response?

3    A    Yes.

4    Q    How does Hu respond to that?

5    A    Inaudible with those two dummies.

6    Q    Chong says what?

7    A    Keep hanging out with those two dummies.

8    Q    Chong's response, I know.  So I don't know and then,

9         uh, do you work tomorrow.  Is that correct?

10   A    Yes.

11             ATTORNEY SCHNEIDER:  I would move 203 into

12        evidence.

13             THE COURT:  Any objection?

14             ATTORNEY VISHNY:  No.

15             THE COURT:  203 will be received.

16             ATTORNEY SCHNEIDER:  And I think you can

17        turn the lights back on, although it's probably kept

18        the temperature down for us.  Thank you.

19   Q    (BY ATTORNEY SCHNEIDER)  During the phone calls --

20        during the phone calls that you listened to, Sergeant

21        Thao, did Chong ever say it was an accident?

22   A    No.

23   Q    Did he ever say he was just bragging when he talked

24        to Melanie or Stephanie?

25   A    No.

61

1   Q    Did he ever talk about bragging to people in

2        Milwaukee?

3   A    No.

4             ATTORNEY SCHNEIDER:  I don't have any other

5        questions then.

6             THE COURT:  Attorney Vishny, do you or

7        Attorney Weitz, I'm not sure, but what I'd like to do

8        is get through the questioning without a break.

9        Would it make more sense to start lunch early or

10       to --

11            ATTORNEY VISHNY:  It's pretty long, so

12       yeah, I would say it would definitely make more sense

13       to start lunch early.

14            THE COURT:  Is a 45-minute lunch okay with

15       everyone?  Okay.  So let's have a 45-minute lunch,

16       and if we can be back at 12:30, give or take a couple

17       minutes, that would be wonderful.

18          Please rise for the jury.

19            (The jury was escorted out of the

20       courtroom.)

21            THE COURT:  We did have, Attorney

22       Schneider, this morning we had had a discussion in

23       chambers about some anticipated objections.

24       Unbeknownst to you, you became sort of the designated

25       scribner on the rulings and objections.  Can you go

62

1    through those for us?

2            ATTORNEY SCHNEIDER:  Sure.  I think

3    Attorney Vishny just indicated she wanted to kind of

4    raise some of those instead of us having to come up

5    all the time.

6            THE COURT:  Sure.

7            ATTORNEY SCHNEIDER:  So then I talked about

8    the item that I would have him talk about at the

9    Norka interview.  I think the court allowed me to ask

10   him about Paul's comment if he or Joe or Phong were

11   the shooter.  The court allowed me to discuss his

12   mention of e-cigarette.  I had intended to elicit

13   from Sergeant Thao that during the interview Paul Lee

14   made the comment, I didn't stay with the shooter, and

15   then some follow-up.  There was an objection by

16   Attorney Vishny.  I think her observation was that it

17   had been previously talked about by Sergeant Rabas

18   and she didn't feel it should be brought up again.

19   The court ruled in favor of her on that objection so

20   that was not asked.

21       I then mentioned I was going to talk about the

22   physical items they found or did not find, which the

23   court allowed.

24       The Appleton interview we talked about what

25   specifically Sergeant Thao would be able to elicit or

63

1    describe was said in Hmong, and the parties in

2    essence agreed that the comment could be related to,

3    my brother is going to hate me for this, because that

4    is something Paul Lee himself testified about.  The

5    State had requested the ability to talk about a

6    comment made by Paul, I just don't want to go to

7    court or anything, just testify against my brother.

8    The court -- defense objected.  The court limited it

9    to just a narrow question about did he have any

10    concern or did he continue to express concern.

11        The court allowed the inquiry in the 2:19 a.m.

12    interview into what additional information about Joe

13    and Phong -- or that trip.  I think defense objected

14    to that but the court allowed that.

15        The 11:58 a.m. interview, I don't know if

16    there's a specific objection but the court didn't

17    want another recitation of all the facts and details

18    but it could be generally stated that he again went

19    through what he had earlier told him.

20        Phong's testimony was the next area.  The court

21    -- the State had wanted to elicit that Phong was

22    still scared or expressed being scared during that

23    interview.  The court -- defense objected saying I

24    think it had -- I think her objection was that it had

25    previously been talked about so it wasn't --

64

1      shouldn't be allowed.  The court allowed it just in

2      that framework.  The court then allowed some

3      discussion about that conversation without going into

4      specifics.

5          Tou Shoua Lee, because the State explained

6      Sergeant Thao was the only officer that has yet

7      testified that interviewed Tou Shoua on December

8      18th, so I wanted to be able to go into some of the

9      facts or details, there was a defense objection to

10     that, but the court allowed us to go into some of

11     those details.  That relates to the sidebar that we

12     had in the middle of those questions.

13              THE COURT:  Correct.

14              ATTORNEY SCHNEIDER:  We talked about the

15     written statement of Tou Shoua Lee, and the State

16     agreed the only thing it would do is reference that

17     the wall was not in the correct place on the diagram

18     that Tou Shoua used as opposed to eliciting

19     additional information from him which he gave during

20     his direct or cross.  The court did allow the State

21     to get in or elicit the colors from Tou Shoua or Joe

22     Thor.

23         And I think those were the only points I have

24     noted where we talked and there was any objections or

25     comments.

65

1              THE COURT:  Okay.  Additionally we had a --
2      related to the Yee Moua call there was an objection
3      to hearsay and authentication grounds.  The court
4      said it was not being offered for the truth of the
5      matter asserted.  The court overruled those
6      objections.
7          There was a second objection and sidebar related
8      to the relevancy, and it pertained to a section of a
9      phone call that was going to be shown and it
10     pertained to collect call language.  The State agreed
11     to remove those or that section of reference.
12         Is that your best recollection, Attorney Vishny?
13             ATTORNEY VISHNY:  Yeah.  Just to supplement
14     the record regarding the in chambers discussions, my
15     objections were hearsay and repetitive.
16             THE COURT:  Yes.
17             ATTORNEY VISHNY:  And regarding the call, I
18     also raised authentication as an issue.
19             THE COURT:  Yes.
20             ATTORNEY VISHNY:  Judge, I just want to
21     point something out.  It's a total mistake I think
22     that occurred, but just for the future that the last
23     -- well, Call No. 11, the part was not blocked out to
24     the jurors in English where Chong says, I know, I'll
25     talk to my lawyer.  This wasn't testified to.  To

66

1    give you guys a call back.  I don't know what the

2    fuck is going on, I need to talk to my lawyer.  It

3    was blocked at about the halfway point, but I know

4    the I'll talk to my lawyer, so I just want to make

5    sure like in closings when Miss Schneider does it --

6    I doubt the jury saw it, but you know --

7              THE COURT:  Just for completeness sake, I

8    direct the State not to make reference to that.

9              ATTORNEY SCHNEIDER:  No.

10             ATTORNEY VISHNY:  It's just a -- there's

11   just so much to keep track of here.

12             THE COURT:  Understood.  And I didn't

13   expect that the State would go into it.

14             ATTORNEY VISHNY:  It's not a big deal, I

15   just wanted -- because you may want to pick those up

16   later, I just wanted to point that out.

17             (Lunch recess.)

18             THE COURT:  All right.  Let's rise for the

19   jury.

20             (The jury was escorted into the courtroom.)

21             THE COURT:  All right.  Please be seated.

22        Attorney Vishny, are you prepared to commence

23   your questioning?

24             ATTORNEY VISHNY:  Yes.

25             THE COURT:  Very good.  Whenever you're

67

1        ready.

2              **EXAMINATION OF CHUE LEE THAO**

3    **BY ATTORNEY VISHNY:**

4    Q    Sergeant Thao, before you became a police officer, or

5         maybe while you became a police officer, you went

6         through some basic training.

7    A    Yes.

8    Q    And in that basic training you learn a lot of

9         different aspects of police work so you can do it

10        properly?

11   A    Yes.

12   Q    One of the things that you learned is that it's

13        really important to write accurate reports?

14   A    Of course.

15   Q    That they should be complete and thorough?

16   A    To the best of our ability, yes.

17   Q    That you use them to remind yourself of things, to

18        refresh your memory later?

19   A    Yes.

20   Q    That they're also important for other members of the

21        department to learn what you've done?

22   A    Yes.

23   Q    Correct?  They can review them, that the District

24        Attorney reviews them?

25   A    Yes.

68

1    Q    That the defense lawyers also review them to

2         understand what the case is all about?

3    A    Yes.

4    Q    And it's fair to say that you refreshed your memory

5         before coming to court to testify sometime in the

6         recent past so you would remember, you know, by

7         looking at your reports everything that happened?

8    A    As much of the report I have done, yes.

9    Q    Okay.  Now, in this case, not one time in any report

10        did you note anything about a bulge that you

11        allegedly see or that you see that is allegedly in

12        Chong Lee's pants.  You never wrote a word about

13        that, right?

14   A    No.

15   Q    You never even thought about it until a few weeks ago

16        preparing for trial.

17   A    Yes.

18   Q    All right.  So actually in this case I -- we talked a

19        lot about interrogations.  You know that it is

20        important to be prepared to interrogate a person,

21        right?

22   A    To interview them, yes.

23   Q    When you interrogate a person, the reason that you

24        prepare isn't to have a script per se but that you

25        know what's going on with a case because if you know

69

1        the facts, it can help you bring out information.

2    A   Yes, as much as possible to that point.

3    Q   And in this particular case you were involved in the

4        interrogations of Paul Lee.

5    A   I wouldn't consider it interrogation entirely based

6        on the definition given by Mr. Trainer (sic).

7    Q   Okay.  Well, based on the definitions of Mr. Trainum,

8        not just Mr. Trainum but you've learned about the

9        difference between interview and interrogation,

10       yes?

11   A   Yes.

12   Q   So you definitely know that yelling at somebody, such

13       as was done by Sergeant Rabas, that's an

14       interrogation.

15   A   Depending on the context.  I would say not entirely

16       always.

17   Q   You may not believe, but in the context of telling

18       somebody they're looking at 25 to life, do you

19       consider that an interrogation?

20   A   Depend on the context if it to bring up the

21       seriousness of the incident, but in that context I

22       would agree with you I guess if you say it in that

23       form.

24   Q   Suggesting evidence and who to say is a shooter, is

25       that considered interrogation in your opinion?

70

```
 1   A   Yes.

 2   Q   Not interviewing, because interviewing is open ended

 3       and you let the other person provide the answers,

 4       right?

 5   A   Exchange information, yes.

 6   Q   Okay.  But in your exchanges of information, as you

 7       want to say them, with Paul Lee, you out and out

 8       suggested that Chong Lee was the shooter, right?

 9   A   Which interview?

10   Q   You mean which interrogation?

11   A   Semantic.  You call it one way, I call it the

12       other.

13   Q   Okay.  You know what?  I'm going to use your word

14       because I want to be polite to you.

15           So in your interview of Paul Lee at 12:41

16       a.m. --

17   A   Yes.

18   Q   -- that you are the person who brought -- suggested

19       that Chong was the shooter, right?

20   A   I asked about whether his brother was downtown, yes.

21       First.

22   Q   Well after asking about his brother being downtown

23       and clearing that part up, you suggested to him that

24       Chong was the shooter, right?

25   A   Yes.
```

71

1   Q   You said, it's your brother, isn't it, correct?

2   A   I didn't say in that way.  I said did your brother do

3       the shooting.

4   Q   Okay.

5               ATTORNEY VISHNY:  I'm sorry, Madam Clerk,

6       but I need the transcript.  I don't recall the

7       exhibit number right now.

8   Q   (BY ATTORNEY VISHNY)  So what you agree is that when

9       Paul was interrogated by Sergeant Rabas and you were

10      present in the room, you agree that it was repeatedly

11      mentioned to Paul, you're holding something in your

12      hand, right?

13  A   Yes.

14  Q   And it was repeatedly mentioned to Paul during that

15      interrogation that -- by either Sergeant Rabas, and I

16      don't know if it was by you, but you didn't do much

17      talking in that one, that it was a gun, that Sergeant

18      Rabas said it was a gun in his hand, right?

19  A   It was our belief up to that point, yes.

20  Q   Okay.  I know it was your belief up to that point,

21      but it was repeatedly told to Paul, right?

22  A   Yes, yes, ma'am.

23  Q   Now you're familiar with the interrogation of Chong

24      Lee, that he was -- I'm sorry.  We're going to use

25      your word.  Interview.  My mistake.

72

```
1              Are you familiar with the interview of Chong

2       Lee?

3    A  I did not watch that, I wasn't present for that, so I

4       can't say.

5    Q  But you sat here in court and watched it, right?

6    A  Yes, I did.

7    Q  Okay.  And not once during that interview did anybody

8       suggest to Chong Lee that he had a bulge in his

9       pocket at all, right?

10             ATTORNEY SCHNEIDER:  I think I'm going to

11      object.  If he wasn't part of the interview, I don't

12      think he should be asked a question about the

13      interview.  She can make the argument later.

14             ATTORNEY VISHNY:  Well, this is new

15      information that's never been disclosed before,

16      otherwise I would have certainly cross-examined

17      Sergeant Schira about it.

18             THE COURT:  It's understood this witness

19      was not present at the interview.  To the extent

20      you're able to answer based on what you saw during

21      the video, you can, but that's how you'll have to

22      answer it.

23   Q  (BY ATTORNEY VISHNY)  Your answer please?

24   A  Your question please.

25   Q  My question -- I'll just rephrase it because I can't
```

73

1        totally remember it word-for-word.

2              So my question is, you sat here watching the

3        interview of Chong Lee and nothing was ever mentioned

4        by Sergeant Schira about an alleged bulge in Chong

5        Lee's jacket or pants or whatever, right?

6    A    Right.

7    Q    Now -- and when you went and spoke to Phong Lee, you

8        never mentioned -- okay.  So -- strike that.

9              So when you talked to Paul, you mentioned -- I'm

10       showing you what's been marked as 176.  You actually

11       suggested to him more than once that it was his

12       brother, correct?

13             For example, on Page -- and I don't want to

14       belabor the point.  Okay.  I'm going to ask you one

15       question.  Line 45.  I'm sorry.  This question is

16       going to come down to how you want to go about this.

17       Okay?

18                   ATTORNEY SCHNEIDER:  Page?  Sorry.

19                   ATTORNEY VISHNY:  I thought I said that.

20       I'm sorry.  Page 11, Line 45.

21                   THE COURT:  Are you there, Counsel?

22                   ATTORNEY SCHNEIDER:  Yes.

23                   THE COURT:  Okay.  Go ahead.

24   Q    (BY ATTORNEY VISHNY)  I'm going to ask you one

25       question.  Now this is after giving him -- after kind

74

1          of a speech by you about the checkmarks against him

2          and what people are going to think and how he could

3          go down, then you say to him, I'm going to ask you

4          one question, this question is going to come down how

5          you want to go about this, okay, did Chong do the

6          shooting.

7     A    I'm going to correct you on that.  I did not mention

8          to him of the checkmark.  That was done by Sergeant

9          Schira.

10    Q    Okay.  But you were there when that happened, if I'm

11         misreading the Q or Q1.

12    A    Yes.

13    Q    But you yourself, though you haven't mentioned

14         checkmarks, you had mentioned some other things

15         during the course of this leading up to this

16         questioning, correct?

17    A    Yes, to let him know the seriousness of what we were

18         working on on the investigation.

19    Q    Right.  Like you are the one who said, so if you want

20         to go down this, we proved it, you're going to go

21         down hard.  You're the guy who said that, right?

22    A    Yes, I did.

23    Q    Okay.  And et cetera, et cetera.  I'm not going to --

24         the jury has watched it, so I'm not going to spend a

25         lot of time on it.

75

 1            And again, on Page 12, for example, at Line 496,
 2       again you said, if you're trying to cover for someone
 3       or for Chong, you're going to go down hard on this
 4       because we have the proof on you, right, but if
 5       you're doing it for him because you happen to be the
 6       youngest one, now is your time.  Okay?  Right?
 7   A   Yes, I said that to get him the benefit of the doubt
 8       to explain himself to come forward information so
 9       that we can get to the bottom of this and get it
10       right.
11   Q   And you can certainly understand that reasonable
12       people might say that you were suggesting to him and
13       that he picked up on your cue about what to do?
14   A   I don't know what's on his mind other than trying to
15       get to the bottom of his case.
16   Q   Did you know what was on his mind when he issued a
17       stream of F words in the previous interrogation at
18       Norka?
19   A   I'm sure he was not happy.
20   Q   But in this interview of Paul, all the interviews,
21       there is never any mention about Chong allegedly
22       having a bulge anywhere, right?
23   A   Not in the interview, no.
24   Q   Okay.  And by the way, in this -- the number one
25       meeting with Paul at Norka, I think even you would

76

1          agree it's an interrogation at this point, you're

2          laughing while Sergeant Rabas and him are talking at

3          a certain point, right?

4     A    It was one time at 1:17 -- one hour and 17 minute

5          into it I did based on his comical illustration, yes,

6          I did.

7     Q    So you're just laughing because Paul said something

8          funny?

9     A    For two or three seconds I did, yes.

10    Q    You didn't catch the part where you're laughing

11         longer because what Paul is saying is so ridiculous

12         that it's laughable?

13    A    I don't recall that one, but I recall obviously the

14         one minute -- one hour and 17 minute into it I did

15         see myself doing that.

16    Q    Okay.  Now, with Paul at 2:19 a.m. you go in and talk

17         to him, and one of the things you do is get

18         directions to Chong Lee's house, right?

19    A    Yes.

20    Q    And the purpose of getting the directions was because

21         a search warrant was going to be executed at that

22         house and everybody wants to know how to get there,

23         right?

24    A    Of course.

25    Q    Okay.  So -- all right.  I'm going to talk to you a

77

```
 1          little bit about Michael Xiong.  There was some
 2          discussion about your interview of Michael Xiong that
 3          occurred in the parking lot?
 4    A     I did not occur in the parking lot, it occurred in
 5          Norka.
 6    Q     In Norka, after you were done talking to Paul Lee,
 7          that's when you talked to Michael Xiong, right?
 8    A     Yes.
 9    Q     And during that talk with Michael Xiong, you
10          mentioned that -- well, you found out that Michael
11          Xiong was in fact roommates with Paul Lee.
12    A     Yes.
13    Q     And with Xeng Lee who's Michael's girlfriend, Paul's
14          sister, right?
15    A     Yes.
16    Q     And what you said to Michael Xiong, and if you need
17          me to show you the transcript, I will, and I'm on
18          page -- I'm sorry -- do you recall saying to Michael
19          Xiong, so if you think there is something where you
20          want to or say help him out or go talk to your
21          girlfriend, you can tell her he's getting charged,
22          you know, with first-degree intentional homicide,
23          he's not coming home tonight, he's not coming home
24          tomorrow.  Do you remember saying that to Michael
25          Xiong?
```

78

```
 1   A    I do.

 2   Q    And that was in reference to Paul Lee, right?

 3   A    Correct.

 4   Q    And then you suggest that if Hu, H-U, his brother, or

 5        Chong want to help him they should call up at the

 6        public -- at the police department, right?

 7   A    I did say that.

 8   Q    And then you said, but no one helps, that's fine, we

 9        have what we have, we have a clear picture of him

10        running out with a gun.  You said that to Michael

11        Xiong as well, right?

12   A    I -- I don't recall the gun, but if I did say that,

13        it's on the transcript, I believe it's accurate.

14             ATTORNEY VISHNY:  Can we just stipulate

15        that's on the transcript?  Can we stipulate to that,

16        Miss Schneider?

17             ATTORNEY SCHNEIDER:  You didn't let me get

18        there.

19             ATTORNEY VISHNY:  I'm sorry.

20             ATTORNEY SCHNEIDER:  Okay.  Yes.

21             ATTORNEY VISHNY:  Okay.  Great.  All right.

22   Q    (BY ATTORNEY VISHNY)  Now let's talk about Tou Shoua

23        Lee, about your interview with him on, let's see,

24        that's December 18th, isn't it?

25   A    Correct.
```

79

1    Q    And on December -- you related in court your version

2         of what he had to say, right?

3    A    Yes.

4    Q    But that's not exactly how your conversation went

5         with him, is it, that he just told you these

6         things?

7    A    Well, he did for the first 14 minutes.

8    Q    Well, for the first 14 minutes or in the beginning he

9         told you several times that he never -- that he never

10        has said that Chong Lee is the person who did the

11        shooting, right?

12   A    No, he did not.

13   Q    All right.  In fact, almost as soon as you're there,

14        within -- before two minutes go by you say, we talked

15        to Phong, we talked to Joe, and everybody at the end

16        has been very honest so I come here pretty much

17        knowing what happened.

18   A    Yes, to give him reassurance, and the other thing is

19        that he obviously didn't want to be a snitch, to let

20        him know that he's not the only one we talked to,

21        that I spoke to a number of other people.

22   Q    Okay.  Sergeant Thao, you're certainly welcome to

23        explain why you did things if you want, but I'm just

24        trying to get through with what the actual dialogue

25        is, not what's in your mind.

80

1   A   I just want to make sure jury get the context.

2   Q   Okay.  I'm sure that if Miss Schneider wants them to

3       get the context, she'll ask you those questions.

4       Okay?

5   A   Yes, ma'am.

6   Q   All right.  So -- and then do you recall, Page 8 at

7       the bottom, Tou Shoua Lee saying, well if you

8       remembered seeing Paul throw a punch at something,

9       and the next thing he knew it was like bang?

10  A   Yes.  Five to ten second, yes.

11  Q   Well, actually that's not what he said at that point.

12  A   Well maybe not at that point but during the

13      interview.

14  Q   But later he said that after you continued

15      questioning him, right?

16  A   I believe he actually say it earlier than that.  I

17      may be mistaken, but you can show me the transcript.

18  Q   Okay.

19                  ATTORNEY VISHNY:  I can't remember the

20      prior exhibit number.

21                  THE COURT:  The last one?

22                  ATTORNEY VISHNY:  This is Tou Shoua Lee.

23      Do we know the prior exhibit number?  Judge, can I

24      clear that up later?

25                  THE COURT:  That's fine.

81

```
 1                    ATTORNEY WEITZ:  Maybe 106.

 2                    ATTORNEY VISHNY:  106.  All right.

 3    Q    (BY ATTORNEY VISHNY)  So here you are six minutes

 4         into this, and Tou Shoua Lee says, I remember just

 5         like seeing Paul like punch, throw a punch at

 6         something, and the next thing I know it's just like

 7         bang, right?

 8    A    Yes.

 9    Q    And then he says, everyone was just so crazy, it's

10         like bang and then everyone froze for a second.

11    A    Yes.

12    Q    Tou Shoua Lee also told you he was drunk that night

13         so he was having a hard time remembering all the

14         details, right?

15    A    That's what he said, but I didn't believe.

16    Q    Well, okay.  Just -- your beliefs are your beliefs

17         but we are talking about what people said, not about

18         beliefs.

19    A    That's what he said, yes.

20    Q    Okay.

21                    (Bench conference.)

22                    THE COURT:  If I can get five minutes.

23         Please excuse the jury.

24                    (The jury was escorted out of the

25         courtroom.)
```

1                    THE COURT:  Please be seated.

2                    ATTORNEY VISHNY:  Judge, we've had numerous

3        conferences during which the four -- I have asked for

4        or the court has made clear that the police witnesses

5        are not to express their beliefs of people and

6        whether or not they're telling the truth.  Miss

7        Schneider has advised the police witnesses, she's

8        told me, and I certainly believe her, that she has

9        advised the police witnesses they are not going to

10       say that.  Nonetheless, Sergeant Thao chose to just

11       say this.  I'm not going to ask for it to be stricken

12       from the record because I don't want to call

13       attention to it, but I want to put Sergeant Thao on

14       notice that -- I have no idea what the court would

15       do, but I'm asking the court to instruct him to not

16       do that, and I am going to request that the court

17       sanction Sergeant Thao if he does this again.

18                   THE COURT:  Thank you, Counsel.

19                   ATTORNEY SCHNEIDER:  And I think the

20       parameters, just if I could explain this to Sergeant

21       Thao, you can talk about what someone told him, we

22       can talk about their emotional state when they're

23       making statements, we can talk about their tone,

24       their voice, I think he can confront if someone gives

25       him information that's not true to say I thought they

83

1     were lying because of that, but he should refrain

2     from making comments about whether he believed

3     someone said they were really drunk, whether they

4     were or weren't really drunk.  They're kind of in a

5     catch 22 because they can point out I think these are

6     lies, but they can't point out I think they're

7     telling me the truth.  But his opinions he shouldn't

8     give unless for some reason we -- I can't fathom why,

9     but unless we very closely phrase a question and say

10    in your opinion, because I mean I don't think I've

11    asked him about any clothing like that.  I know I

12    asked Sergeant Rabas lay opinions like that, but

13    otherwise, unless it's worded that way, he should

14    stick to what they give or their tone, emotion, those

15    kinds of things.

16          THE COURT:  That's correct.

17       And, Sergeant Thao, so I'm instructing you to

18    refrain from making any commentary about personal

19    beliefs.  Stick -- you may answer observations.  And

20    again, Attorney Schneider has given some examples.

21    However, if there is a question in your own mind,

22    refrain, and if Attorney Schneider feels that it is

23    something to be delved into, Attorney Schneider can

24    ask that question or we can sidebar before there

25    is -- I guess it would be re-redirect.

84

1                    ATTORNEY VISHNY:  I want to just state for
2          the record I don't agree with Miss Schneider that
3          they can say that people are lying to them either
4          unless they have some direct proof to the contrary.
5          I think to express just opinions whether it's lying
6          or telling the truth are both --
7                    THE COURT:  And I would concur with that.
8          If it's based on specific examples, so by way of
9          example, if I said this cup is blue and you can --
10         well, if I said it's yellow.
11                   ATTORNEY SCHNEIDER:  Purple.
12                   THE COURT:  You can clearly --
13                   THE WITNESS:  Yes.
14                   ATTORNEY VISHNY:  Like somebody said they
15         weren't at Luna and they're on the video.  There's
16         proof.
17                   THE COURT:  Right.  But aside from that,
18         there should be no speculating or guessing or beliefs
19         espoused.
20                   THE WITNESS:  Yes, Your Honor.
21                   THE COURT:  I will take the request for
22         sanctions under advisement at this point.  And I
23         understand that it's simply letting me know you're
24         likely to make that formal motion should it occur
25         again, but I would take that under advisement.

85

```
1                    ATTORNEY VISHNY:  Yes.
2                    THE COURT:  Okay.  Are we all set?
3                    ATTORNEY VISHNY:  Yes.
4                    THE COURT:  Any questions, Sergeant Thao?
5                    THE WITNESS:  No, sir.  Thank you.
6                    THE COURT:  All right.  Please rise for the
7         jury.
8                    (The jury was escorted into the courtroom.)
9                    THE CLERK:  Please be seated.
10                   THE COURT:  Attorney Vishny, you may
11        continue your questions.
12                   ATTORNEY VISHNY:  Jumping the gun there.
13   Q    (BY ATTORNEY VISHNY)  All right.  I think I was
14        saying that Mr. Tou Shoua Lee told you he was drunk
15        that night after a night of bar hopping, correct?
16   A    That's what he told me.
17   Q    Yeah.  And he told you that and you didn't follow him
18        around that night or count his drinks, right?
19   A    No, I did not.
20   Q    And you didn't observe or even ask him how many
21        drinks he had the night when he told you that?
22   A    No, I did not.
23   Q    All right.  Now, what you told him was that -- Page
24        18, bottom -- you told him where the bang went on and
25        that you believe based on what other people were
```

```
 1        saying in the video that you thought Tou Shoua Lee
 2        had an idea of who caused the bang.  Do you recall
 3        saying that?
 4   A    Yes.  Based on where he was standing and watching the
 5        incident, yes.
 6   Q    Okay.  Again I'm asking you what you said to him --
 7   A    Yes.
 8   Q    -- if my question is not clear.  And his response to
 9        you was that he didn't know.  Right?
10   A    Yes.
11   Q    And then you started to get some -- in discussion you
12        referred earlier to, you know, Tou Shoua Lee saying
13        that he didn't want to be a snitch.  Do you remember
14        testifying about that this morning?
15   A    Yes.
16   Q    Okay.  And right after he says that, you said, why do
17        you think the person is in jail right now.  And you
18        say, okay, I know you know who that person is.
19        Right?
20   A    Yes.
21   Q    And then about a minute later you say to him, so
22        obviously the person to talk about is Chong, and then
23        you say, you saw him coming from right here in this
24        area.
25   A    Yes.
```

87

1    Q    And Tou Shoua Lee says to you, well, he saw him but
2         he didn't know he was a gunman or a shooter, and he's
3         trying to explain to you everything is happening so
4         fast, and then you keep questioning him.
5    A    Correct.
6    Q    And again he tells you, right about 20 minutes into
7         the interview, he doesn't know who the shooter is,
8         lot of people are walking by and it just went boom,
9         right?
10   A    That's what he said.
11   Q    But he tells you also he's got some outside
12        information because he's checked Facebook, he's seen
13        what's on the news, right?
14   A    He did say that.
15   Q    And you know that about six days before this Chong
16        Lee had been arrested and it was on the front page of
17        the news, the newspaper, the Appleton Post-Crescent
18        with his picture?
19   A    Unfortunately, I don't read the Post-Crescent, but
20        I'm sure it's in there.
21   Q    And the television, it had been on the TV news
22        locally?
23   A    I don't recall seeing it on TV, but if it's on there,
24        it's on there.
25   Q    Okay.  And then you go through -- and then you say to

88

```
 1          him, now -- and I'm at about 26 minutes into the
 2          interview.  Then you say to him, okay, let, let, I'm
 3          just going to get this out.  Okay.  And I want you to
 4          know you're not the first one to name Chong as the
 5          shooter.
 6     A    I did say that.
 7     Q    And he hadn't named Chong as the shooter?
 8     A    Not up to that point, no.
 9     Q    You named Chong as the shooter and told him he wasn't
10          the first person to do that, right?
11     A    That we talked to other people, yes.
12     Q    Okay.  Now you know what contamination is in an
13          interview or an interrogation?
14     A    It's been explained, yes.
15     Q    I'm sorry?
16     A    Yes, it's been explained.
17     Q    It's been explained.  And so after you contaminated
18          this interview, then you lead him through the diagram
19          and all the things he tells you?
20               ATTORNEY SCHNEIDER:  I'd object as to the
21          characterization of the interview.
22               THE COURT:  Sustained.
23               ATTORNEY VISHNY:  Okay.
24     Q    (BY ATTORNEY VISHNY)  After you told him, even though
25          he'd never named Chong as the shooter that he was
```

89

1       naming Chong as the shooter, that's when he

2       started -- that's when all these things you testified

3       to went on about the diagram, him walking you

4       through, that's when that -- at that point, that's

5       when he starts to tell you that?

6  A   Not accurate.

7  Q   Okay.  So you're saying the diagram had been drawn

8       before that?

9  A   About seven minute into it we start doing it.

10  Q   Right.  But you don't draw the whole diagram at once,

11       right?

12  A   He finished at the end, right.

13  Q   Right.  The part about Chong coming here, that came

14       later after you had named Chong, that wasn't done

15       before that?

16  A   After he explained to me as well, yes.

17  Q   And he explained this to you after you said that he

18       wasn't the first person to name Chong, right?

19  A   To let him know that we talked to other people,

20       yes.

21  Q   And to let him know that other people had named Chong

22       as the shooter, right?

23  A   To reassure him that he doesn't have to worry about

24       being the only one.

25  Q   Right.  And then you -- at the end you start telling

90

```
1          him how he should give a written statement and give
2          -- because maybe then he won't have to come to court
3          because he clearly expresses to you that he doesn't
4          want to come to court?
5     A    I didn't say that.  I say it's -- I can't guarantee,
6          definitely it's a homicide that he's going to be a
7          witness and be subpoenaed to court, yes.
8     Q    Well, Page 40.  Right.  You said you couldn't promise
9          or guarantee, but the more, the all, if, if they have
10         the -- all the information from you, they may then
11         give them the choice to decide whether they need you
12         to be in court or not.  Okay?
13    A    That's up to the court, yes.
14    Q    Right.  So because he was expressing a desire to not
15         do that, right?
16    A    I don't think he expressed that he didn't want to
17         come, I just wanted him to know that it is certainly
18         that he's going to be subpoenaed to come to court,
19         yes.
20    Q    Well, actually what proceeded that was you're talking
21         to him - again, Page 40 - you're giving him -- you're
22         telling him you want him to write a statement, and
23         then he says he doesn't know whether -- do you need
24         him to write it.  And that's when you say to him that
25         this might give him the choice.  Okay?
```

91

```
 1   A   It's my practice as an officer to give people an
 2       opportunity to write a statement.
 3   Q   That's not what I asked you.  I said, after he says
 4       that, without being asked anything by him, you start
 5       suggesting to him that maybe he won't have to come to
 6       court if he writes a statement.
 7   A   I don't think I make that clarification other than to
 8       write a statement as to what happened.
 9   Q   Was there a reason you said that they have all the
10       information, they may give them the choice to decide
11       whether or not they need you in court when that had
12       never been brought up by him?
13   A   That was brought up by me, but it's up to the
14       court.
15   Q   Okay.  I understand.  All right.
16           Now -- so let me talk about Facebook for a
17       minute.  You have been involved as you testified
18       listening to a bunch of these phone calls, right?
19   A   Many, yes.
20   Q   All right.  And you're aware also that police were
21       able to get all of Chong Lee's Facebook postings,
22       right?
23   A   I wasn't the officer responsible for that so I can't
24       answer your question completely in sense of how much
25       material they got.
```

92

1    Q    Well you have reviewed those postings, haven't you?

2    A    No, I have not.

3    Q    Or discussed them with other officers?

4    A    No, I was not involved in that.

5    Q    So you're not aware that there is never anything from

6         Chong in there saying ever that he did this shooting,

7         right?

8              ATTORNEY SCHNEIDER:  Judge, I think we made

9         a characterization about how those postings can be

10        characterized, not that they came from a person but

11        the account of, unless she has a way to independently

12        verify the information was in the posting consistent

13        with your earlier ruling.

14             THE COURT:  Yes.  That is correct.  And so

15        references to Facebook accounts should be referenced

16        such as the account belonging to but not a specific

17        person.

18             ATTORNEY VISHNY:  I'm sorry.  I misspoke.

19   Q    (BY ATTORNEY VISHNY)  So by the way, in terms of this

20        Facebook account -- never mind.  I'll move on to

21        another subject.  He said he didn't review them so.

22        Now, you also testified briefly here about your

23        interview of Joe Thor on December 18th?

24   A    Yes, I did.

25   Q    And regarding that interview, you -- hold on a

93

```
1          second.  Well -- so on December 18th you go and you
2          -- it's No. 164.  You go and you have a brief
3          discussion with Joe Thor at his house?
4     A    Yeah.  Unexpectedly, yes, I did.
5     Q    And when you had that unexpected encounter, you
6          decide to ask him a few questions about what
7          happened, right?
8     A    I did, yes.
9     Q    And at that time you were aware at that time that
10         what we've discussed quite a bit, and you've seen it
11         in court, exhibit number -- I'm not very -- okay.
12         Exhibit No. 103.  You were aware that this had been
13         recovered at Chong Lee's house, right?
14    A    No, I was not.
15    Q    You didn't know that this --
16    A    I didn't participate in the search at that
17         residence.
18    Q    So nobody told you at the police department that this
19         coat had been found at Chong Lee's house?
20    A    I believe they indicated they found some items but
21         not -- I didn't physically look at any particular
22         items.
23    Q    From -- but you had reviewed the video, right?
24    A    From Luna, yes, I did.
25    Q    And in the video in Luna it shows the sleeves as
```

94

1          being dark colored and the center of the mass of the

2          coat as being white, right?

3     A    That's what indicated on the Luna video, yes.

4     Q    All right.  So when you went and talked to Joe Thor,

5          you were interviewing Joe Thor and you were asking

6          him about, you know, whose hand he saw, right?  Do

7          you remember saying that to him?

8     A    Yes.

9     Q    And then he said to you, I saw a silver sleeve,

10         right?

11    A    Yes.

12    Q    The next words out of your mouth are, black.  And if

13         you can't remember, I can show you.

14    A    No.  I remember.

15    Q    And he says, black inaudible.  What he said was he

16         didn't think it was black, right?  It's inaudible on

17         the transcript.

18    A    I'm not sure what that -- what's in the inaudible.

19    Q    Well, it says inaudible, but the next words from you

20         are, okay, so a silver sleeve, right?

21    A    Confirming him what he said, yes.

22    Q    And then he says, I think it's like silver or white,

23         I'm not sure.

24    A    That's the -- I guess the conversation, yes.

25    Q    Okay.  Now, there's been a lot of discussion about

95

1          the e-cigarette and the reenactment of the

2          e-cigarette.  I won't belabor the point, but the

3          police department had the ability to go back into

4          Luna and ask the Luna owner to allow them to view

5          things at Luna to do reenactments using the video

6          recording system?

7     A    Yes.

8     Q    And at no time before telling Paul Lee he could go

9          home and give him the ride did you or anybody to your

10         knowledge contact the owner of Luna and said, can we

11         get in there, we want to see something and see how it

12         looks on the video system.

13    A    It didn't come across my mind at that time.

14    Q    And at no time did you or any other officer to your

15         knowledge, once the coat had been seized from Chong

16         Lee's house, go back into Luna and say we want to see

17         what this coat looks like under the video light

18         system.

19    A    No, we didn't do that.

20              ATTORNEY VISHNY:  I don't have anything

21         further.  Thank you.

22              THE COURT:  Attorney Schneider, any

23         redirect?

24              ATTORNEY SCHNEIDER:  Yes.

25              **EXAMINATION OF CHUE LEE THAO**

96

1    **BY ATTORNEY SCHNEIDER:**

2    Q    Sergeant Thao, are you aware of any report listing a

3         date, time or place when you first saw the

4         e-cigarette or the item in Paul's hand that you

5         thought was a gun?

6    A    Repeat that question again.

7    Q    Sure.  Are you aware of any date, time where you

8         would have noted in a report where you first saw the

9         item in Paul's hand that you thought was a gun?

10   A    No.

11   Q    So sometimes you make observations that don't make it

12        into reports?

13   A    Of course.

14   Q    You were asked during cross about talking to Michael

15        Xiong?

16   A    Yes.

17   Q    And telling him, Paul, we're taking him, et cetera.

18        Why did you say that to Michael?

19   A    To let him know to advise, inform his girlfriend Xeng

20        as well as the rest of the family that Paul was

21        arrested or taken in custody to the Appleton Police

22        Department, and that if they have any informations to

23        assist with the investigation about the shooting then

24        she should contact me.

25   Q    Okay.  Going to show you the transcript.  I'm going

97

1      to take the clip right off of it for a bit here.

2      Exhibit 106.  That's the interview with Tou Shoua

3      done on December 18th?

4  A  Yes, it is.

5  Q  During cross you were asked about a reference, if you

6      flip to Page 8 of that transcript.

7  A  Page 8.

8  Q  Okay.  And there is some time stamps at times in

9      these transcripts, correct?

10  A  Yes.

11  Q  So this Page 8 prior to this comment have a time

12      stamp noted, Sergeant?

13  A  Yes.

14  Q  What is that time Stamp?

15  A  I believe it's six minutes and seven seconds.

16  Q  So about at a point after six minutes and seven

17      seconds at the end is the statement from Tou Shoua

18      Lee, I remember just -- I remember seeing just like

19      Paul like punch -- throw a punch or something?

20  A  Yes.

21  Q  Okay.  And then if you want to flip to the next

22      page?

23  A  Page 9.

24  Q  I think you were asked, he doesn't talk about this

25      five- to ten-second break at that point, correct?

98

1    A    No.

2    Q    And I think during cross you were asked if it came

3         shortly after or long after.  Do you remember that?

4    A    I don't think it was that long after.

5    Q    Can you please flip to Page 15.  Actually, start at

6         the bottom of 14, Sergeant Thao.  That's where the

7         play point is marked.

8    A    Yes.

9    Q    So the bottom of Page 14 is a play point of what?

10   A    Eleven minutes and ten second into the interview.

11   Q    Okay.  And if you want to -- just give me one second.

12        The bottom of Page 11, what is Tou Shoua talking

13        about there?

14   A    You mean Page 14?

15   Q    Page 14.  Sorry.

16   A    Tou Shoua Lee and I should stay and like break it up

17        or something.

18   Q    Does he go on to continue to describe what he saw?

19   A    Yes.

20   Q    And these are his words, not your words, right?

21   A    Correct.

22   Q    What does he say next?

23   A    Because then around that time it really, really late

24        and there is a bunch of people that comes in out

25        through Luna so it's worse to you to fight the

1           bouncer.

2    Q    Does he continue to talk about what he saw?

3    A    Yes.

4    Q    What's -- what did he say next?

5    A    Then -- and then I was going stop them if they would

6         got a fight and then I see Paul swing at the guy.

7    Q    And what does he say next?

8    A    And then the next thing I know like five, ten second

9         later there is come a bang.

10   Q    So five minutes after that first point in about

11        eleven to twelve minutes into it he talks about this

12        pause in the fight sequence?

13   A    Yes.

14   Q    If you want to flip to Page 20 please.

15   A    Page 20.

16   Q    And you were asked -- you were asked about making

17        references to snitch.  Do you remember that on

18        cross?

19   A    Yes.

20   Q    At the bottom of Page 20 is it where you have that

21        comment?

22   A    Yes, I did.

23   Q    And can you please read that to the jury?

24   A    Thao:  I just want -- I just want you to be honest,

25        that you are not here to snitch them, you're just

1    telling the truth.

2  Q   And then on Page 21, how does Tou Shoua respond?

3  A   Lee:  Yup.

4  Q   What do you say?

5  A   Why do you think that person's in jail right now.

6  Q   And what does he say?

7  A   Lee:  Yup.

8  Q   So -- and how do you respond?

9  A   Okay.  I know you know who that person is.

10  Q   And how does he respond?

11  A   Uh-huh, I do.

12  Q   At that point Paul Lee was not in jail, correct?

13  A   Paul Lee was not.

14  Q   Chong Lee was.

15  A   Yes.

16  Q   And during the time that you continue to speak to Tou

17      Shoua, he was able to give you a lot of details about

18      what he saw?

19  A   Yes, he did.

20  Q   And what he heard?

21  A   Yes.

22  Q   I think you started to say or ask -- think you

23      started to answer, when you do an interview with a

24      person, do you give them the option to make a written

25      statement?

1    A    I do.

2    Q    Why?

3    A    It's an opportunity for them to share their stories,

4        their observations and what happened.

5    Q    When you gave Tou -- did you allow Tou Shoua or ask

6        him if he would?

7    A    Yes, I did.

8    Q    When you did that, do you remember if you stayed with

9        him or if you had to leave for any reason?

10   A    I did have to leave.  I didn't have the face sheet of

11       the statement, and so I gave him a couple page

12       without the face sheet, let him know that I would be

13       going to my squad car which is parked in the parking

14       lot and that I would be back.

15   Q    And when you got back, had he -- what had he done?

16   A    When I returned back to the apartment, he -- he

17       already completed the statements.

18   Q    Did you go through it with him?

19   A    I just read through it but we didn't go line by line,

20       no.

21   Q    And were any other officers alone with him while he

22       wrote that statement?

23   A    No.

24   Q    And you're aware in this case that the entire DVR

25       recording system was taken from Luna that night,

102

1         right?

2    A    I was aware of that, yes.

3    Q    Would have that maybe been an issue in going back to

4         try to recreate some items?

5    A    It would be.

6    Q    What about the fabric?  We see an image from Luna on

7         December 8th, I think it's 1:50:19, the play point,

8         we're not able to know what the fabric or color of

9         all those coats in that area is, correct?

10   A    Correct.  It would be difficult to assimilate exactly

11        what the material of clothing at that time.

12   Q    Because some things that are dark blue look white in

13        the video?

14   A    Right.  We don't know.

15   Q    And some things that are dark blue look black in the

16        video?

17   A    Yes.

18             ATTORNEY SCHNEIDER:  I have nothing

19        further.

20             ATTORNEY VISHNY:  Very briefly.  And there

21        is something I forgot to ask when I originally did my

22        cross.

23             THE COURT:  Go ahead.

24             ATTORNEY VISHNY:  Okay.

25             **EXAMINATION OF CHUE LEE THAO**

103

1    **BY ATTORNEY VISHNY:**

2    Q    Sergeant Thao, I forgot to ask you this before.

3    A    Yes, ma'am.

4    Q    It's about these phone calls.

5    A    Yes.

6    Q    I'm showing you what's been marked as Call Priority

7         No. 9.  This one has not been testified to yet.

8         Okay?  So I'm going to ask you about this phone call.

9         What is the date that it happened?

10   A    January 11, 2014, at 17:17 p.m.

11   Q    All right.  And that phone call begins with a

12        conversation between Chong Lee and his brother Hu?

13   A    Correct.

14   Q    And that doesn't really have anything to do with this

15        case, but at some point Paul Lee gets on the phone,

16        doesn't he?

17   A    Yes, he did.

18   Q    And at that point Paul asks Chong -- they say hello

19        to each other, and Paul says, so what is going on.

20        Correct?  This is the agreed on translation here.

21   A    Okay.

22   Q    All right.  And Chong Lee says, shit, I don't know.

23        Right?

24   A    Yes.

25   Q    And Paul says, um, this month inaudible they told us

1       to come, did they say anything because I said I do

2       not want to come.  So that's what Paul Lee said to

3       Chong, right?

4    A  Yes.

5    Q  And then Chong doesn't tell him what to do at that

6       point, he just starts telling him other things about

7       putting money on the phone and he'll make another

8       call some other time, correct?

9    A  Yes.

10   Q  Okay.

11              ATTORNEY VISHNY:  I move No. 204 into

12       evidence.

13              ATTORNEY SCHNEIDER:  No objection.

14              THE COURT:  204 will be received.

15   Q  (BY ATTORNEY VISHNY)  Now, there were some questions

16       by the District Attorney regarding the written

17       statement.  First of all, Tou Shoua Lee, when you

18       talked to him, he expressed some fear of the police

19       in general, or at least of white police officers and

20       said he was glad you were the one there, right?

21   A  He did say that.

22   Q  And at various points during this interview, you

23       know, he starts talking about how he wants to help

24       himself by helping you, right?

25   A  Yes.

105

1   Q   And right before you leave him to do the written

2       statement, you summarize to him what you would like

3       him to put in the written statement?

4   A   He asked me and I say start with what you did that

5       night.

6   Q   He asked you?

7   A   I think he asked for like, you know, where he should

8       start.  I say wherever you have start that night

9       going to like the City Limits, that kind of thing to

10      begin the statements.

11  Q   I see.  Well, I'm going to actually show you Page 40,

12      and here at the top of Page 40 is you start telling

13      him, the other things I always do with anybody where

14      they're a suspect or witness, I give them an

15      opportunity to write a statement.  Right?

16  A   Yes.

17  Q   Okay.  And this is the first time statement comes

18      up?

19  A   Yes.

20  Q   And then he says, um, I don't know, do you need me to

21      write it or -- and you say, yeah, I -- because, you

22      know, I prefer you to.  And he says yes.  Right?

23      Yes?

24  A   Yes.

25  Q   And that's when you tell him the whole thing about

1    not promising he doesn't have to come to court,

2    right?

3  A  Yes.

4  Q  And then he doesn't ask you any other questions, you

5    continue to talk to him about the statement, right?

6  A  I can read that because what we need -- what we talk

7    about today and what you told me.

8  Q  Obviously, it's recorded.

9  A  Right.

10 Q  And you said, I will put that statements in my report

11    but then if -- and also from your perspective what

12    you saw, what you were trying to do which was to stop

13    the fight before him -- before the -- before the

14    boom, and then that happened and what you saw Chong,

15    Alyson and Michael Thor walking from -- from the bar,

16    and then you said, you know, with Chong, you thought

17    he was going to punch the guy with his right hand and

18    that's when the boom goes off, those things are

19    important to put on paper as supposed to tell what

20    happened.  You're not supposed to -- you're not here

21    to try to put the finger at anybody who didn't do

22    anything.  Right?

23 A  Yes.

24 Q  And so actually you told him that, he wasn't asking

25    you where to start the statement or what to write.

107

1   A   Based on the entire conversation, I did say that,

2       yes.

3   Q   Okay.  You mentioned that the video system from Luna

4       was not there anymore, it was at the Appleton Police

5       Department, right?

6   A   At the police department, yes.

7   Q   And certainly the Appleton Police Department could

8       have taken it back to Luna to do a reenactment,

9       right?

10  A   It could be done I guess.

11              ATTORNEY VISHNY:  Thank you.  Nothing

12      further.

13              THE COURT:  Attorney Schneider?

14              **EXAMINATION OF CHUE LEE THAO**

15  **BY ATTORNEY SCHNEIDER:**

16  Q   Everything that you were just asked about in Tou

17      Shoua that you summarized for him, if we went back

18      through that transcript, would we find all those

19      references?

20  A   He made those reference, yes.

21              ATTORNEY SCHNEIDER:  Nothing further.

22              ATTORNEY VISHNY:  No questions.

23              THE COURT:  Members of the jury, any

24      questions for this witness?

25              (No response.)

108

1           THE COURT:  Thank you, sir.

2           THE WITNESS:  Thank you, Your Honor.

3           ATTORNEY SCHNEIDER:  And subject to just

4       double-checking with the clerk on exhibits, we don't

5       have any additional witnesses at this time, Your

6       Honor.

7           THE COURT:  Very good.

8       And, Attorney Vishny, are you prepared to call

9       your witnesses -- any witnesses?

10          ATTORNEY VISHNY:  Yes, we are, but I want

11      to approach the bench.

12          THE COURT:  Please do.

13          (Bench conference.)

14          THE COURT:  Feel free to stretch in the

15      interim.  Counsel just needs to organize their notes

16      a little bit, and so if you need to stretch or stand

17      up, that's fine.  If you need more water, let us

18      know, we can take care of that for you.

19          ATTORNEY VISHNY:  We're ready to call our

20      first witness.  Mr. Gatton is going to do the

21      questioning.

22          MR. GATTON:  Your Honor, we would call

23      William Peotter.

24          THE COURT:  Mr. Peotter in the hallway?

25      Remain standing for a moment, we'll swear you in

109

1          and then you'll be all set.

2                  Raise your right hand please.  Your other right

3          hand.

4                      (Oath administered to witness.)

5                      THE WITNESS:  Yes.

6                      THE CLERK:  Please state your full name and

7          spell it for the record please.

8                      THE WITNESS:  William Peotter,

9          W-I-L-L-I-A-M, P-E-O-T-T-E-R.

10                     THE COURT:  Mr. Peotter, you may be seated,

11         sir.

12             And, Mr. Gatton, your witness, sir.

13                     MR. GATTON:  Thank you, Your Honor.

14                    **EXAMINATION OF WILLIAM PEOTTER**

15         **BY MR. GATTON:**

16     Q   Mr. Peotter, how are you employed?

17     A   I'm the owner and operator of Speedy Clean Drain and

18         Sewer.

19     Q   And how long have you owned it?

20     A   Thirty years.

21     Q   And have you serviced toilets before?

22     A   Yes.

23     Q   And have you serviced sewer systems before?

24     A   Yes, I have.

25     Q   And about how many inspections have you done?

```
 1    A    In 2015 we serviced and televised about a million
 2         feet of sewer, which is roughly from here to Great
 3         America.
 4    Q    Mr. Peotter, were you familiar with the septic system
 5         at Sharks?
 6    A    Yes.  Actually, they are a customer of ours.
 7    Q    And how long were they a customer with Speedy
 8         Clean?
 9    A    For as long as I can remember.
10    Q    How did the toilet system at Sharks work?
11    A    Their restrooms are in the northeast corner of the
12         building, and they -- the sewer system travels to the
13         south to a lift station.  Go ahead.
14    Q    Could you explain what a lift station is?
15    A    A lift station is a -- a vault or a tank where all
16         the waste would fall into, and then there would be a
17         pump that would assist that waste up and out into the
18         sanitary.  That -- Sharks is in the basement, and
19         that basement is lower than the city sewer so they
20         have to lift the product and move it, so that's the
21         reason.
22    Q    And is this like a normal system as a normal building
23         would have?
24    A    It's a little unusual because of the depth and the
25         need to, but otherwise the layout is standard.
```

1    Q    And what would a normal system look like?

2    A    A normal system would just leave the property and go

3         directly to the sanitary sewer, which would be a lot

4         of times in the street where the manholes -- where we

5         see the manholes and things of that nature.

6    Q    Okay.  Mr. Peotter, directing you to January of 2014,

7         were you called into Sharks?

8    A    I was.

9    Q    And why were you called there?

10   A    I was told to -- we were -- to look for some

11        ammunition and possibly a weapon.

12   Q    And did you remove anything from the bathroom in

13        there?

14   A    I -- I removed the toilet from the floor, but I did

15        not remove any items.

16   Q    What equipment did you use during your inspection?

17   A    We used a closed circuit camera that we traversed

18        through the sewer system to that lift station.

19   Q    And could you explain how that equipment works?

20   A    It -- it is a camera that's tethered to a push rod

21        and it has a monitor and it's live action as you push

22        it through.  You control the speed, you control the

23        angle, and you inspect.  We use that equipment to

24        inspect flaws in sewers all the time.

25   Q    So what you're watching is live.

112

1   A   It's live and it's very clear.

2   Q   How far did you go in your inspection?

3   A   I want to say 125 feet to that lift pump.

4   Q   Okay.  And did you go any further than that lift

5       pump?

6   A   We did not.

7   Q   Why not?

8   A   Whatever went into that -- that lift pump would stop

9       there.  It wouldn't be able to be lifted.  We did

10      return and vacuum that lift pump out, the lift

11      station out.

12  Q   And what did you find as a result of that?

13  A   We found some foreign objects like a cell phone and

14      some silverware and odds and ends like that, but we

15      did not find any ammunition or weapon.

16  Q   So you did not find any weapons.

17  A   Found no weapons.

18  Q   How far could a weapon have traveled if it had been

19      flushed?

20  A   Depending on the size, it may not even traverse the

21      toilet, or it -- I guess it could possibly make it

22      all the way to the lift station, but from that point

23      it's kind of done, it's not going to go through the

24      pump.

25  Q   How did you know that there weren't guns or gun parts

113

1           in the system?

2      A    Through my inspection I knew that.

3      Q    Would there have been backups?

4      A    Yes, it's possible there would be a backup if there

5           was an item like that.  A weapon -- I don't think

6           shells would back up the system, but a weapon

7           would.

8      Q    Could bullets be flushed down a toilet?

9      A    Possibly.  They're extremely aerodynamic making it

10          difficult to push it through the toilet.

11     Q    So how -- how could someone flush bullets down a

12          toilet?

13     A    In my professional opinion, maybe if you would take a

14          large volume of water like, let's say, a five-gallon

15          pail and dump it down at a fast rate, that may be

16          enough to push it through the two J bends in the

17          toilet, or the hydro flush toilets that flush with a

18          great deal of velocity, usually in a commercial

19          building where it's connected directly to the water

20          system.

21     Q    And did Sharks have those types of toilets?

22     A    Sharks has a gravity flow standard toilet like you

23          would see in your home.

24     Q    Now, let's assume that the bullets make it down.

25          Could they come back up?

114

```
1    A    No, not through the toilet.

2    Q    Why not?

3    A    There is two J bends that it would have to navigate,

4         they're far too aerodynamic, and so the weight to

5         size ratio just -- it's not going to allow them to

6         come back up.

7    Q    Would they have come back up from a backup?

8    A    No, no, they wouldn't.  I -- we've searched for --

9         for lost jewelry, a ring that would -- fell down the

10        toilet as they flushed it, or threw a sink, and we'd

11        find it laying in the bottom of a pipe that -- and,

12        you know, a ring is not that heavy, but again, it

13        doesn't have that much mass, but it wouldn't back up

14        and it didn't, you know, it's just -- it's small

15        items, heavy, don't go far.

16             MR. GATTON:  No further questions.

17             THE COURT:  Any cross-examination?

18             ATTORNEY MAIER:  Yes.  Very briefly.

19             EXAMINATION OF WILLIAM PEOTTER

20    BY ATTORNEY MAIER:

21    Q    Mr. Peotter, you indicated that the toilets at Sharks

22        were standard toilets like you would see in a home,

23        correct?

24    A    Correct.

25    Q    Roughly how many gallons per flush in one of those
```

115

1        toilets?

2    A   I'm going to say 3.5 gallons in those toilets that

3        are at Sharks.

4    Q   And something like five you think might move

5        something past -- size-wise might move something past

6        the J bends in the toilet?

7    A   Possible but very unlikely.

8    Q   So it may be more than a five-gallon bucket all at

9        once to do that?

10   A   I think -- you would almost have to take a

11       five-gallon pail and pour it nearly as fast as you

12       could to create enough energy and push to do it, but

13       through the transfer from a tank to the bowl in a

14       toilet, it would be very difficult to pick that mass

15       up unless you had something to carry it.

16           ATTORNEY MAIER:  Okay.  Thank you.  That's

17       all the questions I have.

18           MR. GATTON:  Nothing further.  Thank you.

19           THE COURT:  Any questions from members of

20       the jury?

21           (No response.)

22           THE COURT:  Mr. Peotter, thank you, sir.

23       You are excused.

24           ATTORNEY VISHNY:  May we approach?

25           (Bench conference.)

116

```
 1              THE COURT:  So we are going to take a
 2     15-minute break at this time.  Please rise for the
 3     jury.
 4              (The jury was escorted out of the
 5     courtroom.)
 6              THE COURT:  Please be seated.  And we had a
 7     brief sidebar -- well, first of all there was a
 8     sidebar.  The defense had made a motion for a
 9     directed verdict.  The court indicated it would take
10     it under advisement.  Additionally, the -- it is my
11     understanding that subject to further questioning I'm
12     going to have for Mr. Lee at this time, that the
13     defense would have no further witnesses; is that
14     correct?
15              ATTORNEY VISHNY:  Yes.  I also want to let
16     you know that at least I can barely hear you.
17              THE COURT:  Okay.  My apologies.
18              ATTORNEY VISHNY:  I mean I know we don't
19     want the jurors to hear this so I don't know, maybe
20     just shutting the fan off would do the trick.  I
21     don't know.
22              THE COURT:  I'll do that and talk louder.
23     Okay.
24          Mr. Lee, can you hear me all right?  So, Mr.
25     Lee, can you hear me now?
```

117

```
1                    THE DEFENDANT:  Yes, I can.

2                    THE COURT:  I ask that you raise your right

3          hand, sir.

4                    (Oath administered to defendant.)

5                    THE DEFENDANT:  I do.

6                    THE CLERK:  All right.

7               Now, you understand, Mr. Lee, that in a case

8          such as this you have the absolute right to remain

9          silent.

10                   THE DEFENDANT:  I do.

11                   THE COURT:  You understand furthermore that

12         that right is absolute and personal to you?

13                   THE DEFENDANT:  Yes, I do.

14                   THE COURT:  While your attorneys, Attorneys

15         Vishny and Weitz, they can -- they can advise you,

16         they can give you suggestions, at the end of the day,

17         the decision as to whether or not you would testify

18         is yours and yours alone, you do understand?

19                   THE DEFENDANT:  Yes, I do.

20                   THE COURT:  Now, before I'm -- before I --

21         I ask you what your decision is on that subject, I'm

22         going to ask you some questions to ensure that any

23         decision you've made has been made freely and

24         voluntarily and intelligently.  Do you understand

25         that?
```

1                    THE DEFENDANT:  Yes, I do.

2                    THE COURT:  Okay.  Now, first of all, have

3        you had an opportunity to consider the issue that I'm

4        now discussing with you?

5                    THE DEFENDANT:  Yes, I have.

6                    THE COURT:  And have you had enough time to

7        discuss this matter with your attorneys?

8                    THE DEFENDANT:  Yes, I have.

9                    THE COURT:  And in asking that question, I

10       want you to understand that if -- even if as we're

11       having this discussion you have concerns or

12       questions, let me know and you can take additional

13       time to talk to your attorneys.  You understand that?

14                   THE DEFENDANT:  Yes, I do.

15                   THE COURT:  Now, do you understand and have

16       you had an opportunity to consider the consequences

17       of your decision if you were to decide to testify or

18       if you were to decide to remain silent?  And by that,

19       most specifically, do you understand what those

20       options are and what the benefits and the pros and

21       cons of both are?

22                   THE DEFENDANT:  Yes, I do.

23                   THE COURT:  Okay.  And do you -- do you

24       need any additional time to discuss that decision

25       with your attorney?

1          THE DEFENDANT:  No, I do not.

2          THE COURT:  Okay.  Now, are there any

3     questions that you have for me regarding either your

4     decision to testify or your right to remain silent?

5          THE DEFENDANT:  None.

6          THE COURT:  Okay.  And with that, Mr. Lee,

7     what is your decision regarding your right to remain

8     silent or alternatively your decision to testify?

9          THE DEFENDANT:  I have chose not to

10    testify.

11         THE COURT:  Okay.  And has anyone -- has

12    anyone made any threats or has -- in any way -- let

13    me back that up.  Has anyone made any threats or is

14    anyone forcing you to make that decision?

15         THE DEFENDANT:  No.

16         THE COURT:  Do you need any additional time

17    whatsoever to consider that or to further consider

18    your decision?

19         THE DEFENDANT:  No.

20         THE COURT:  Do you -- do you want to

21    further consult with Attorney Vishny or Attorney

22    Weitz on that subject?

23         THE DEFENDANT:  No.

24         THE COURT:  Okay.  Now, you understand that

25    by -- by waiving your right to testify that you're

120

```
1        intentionally relinquishing that right and you
2        understand that?
3               THE DEFENDANT:  Yes, I do.
4               THE COURT:  Okay.  And likewise, you
5        understand that you would be then invoking your right
6        to remain silent?
7               THE DEFENDANT:  Yes.
8               THE COURT:  Okay.  And you understand that
9        in invoking the right to remain silent, that cannot
10       be used against you?
11              THE DEFENDANT:  Yes, I do.
12              THE COURT:  Okay.  Before I -- I conclude,
13       do you have any additional questions for me, Mr. Lee?
14              THE DEFENDANT:  No, I don't.
15              THE COURT:  Do you need any additional time
16       whatsoever, and again --
17              THE DEFENDANT:  No, I don't.
18              THE COURT:  -- if you need two minutes, ten
19       minutes, thirty minutes to discuss this with your
20       attorneys, I'm fine with that.  Do you need any
21       additional time?
22              THE DEFENDANT:  No.
23              THE COURT:  Then -- and again, just to
24       confirm, Mr. Lee, what is your decision?
25              THE DEFENDANT:  Not to testify.
```

121

1                    THE COURT:  Okay.  With that I find that

2          you've waived your right to testify on your own

3          behalf.  I find that you've made this decision

4          freely, voluntarily and intelligently, and I do

5          accept that decision, sir.

6               Okay.  Anything else then -- and we have to

7          receive exhibits, but anything else then, Attorney

8          Schneider?

9                    ATTORNEY SCHNEIDER:  Judge, earlier this

10         morning I had indicated that we would be making a

11         motion to amend the solicitation of perjury charge.

12         I think currently as drafted the date is January

13         25th, but it says Tou and it says Stephanie Thao.  We

14         would make a motion to amend that to have that

15         reflect Paul Lee.  And we can talk about 971.29 and

16         the provisions that allow for amendment if you want

17         my argument at this time or not.

18                    THE COURT:  The concern I have, Counsel,

19         with that, knowing that it was forthcoming, is that

20         as a practical matter, if it were to conform a date,

21         to conform a particular call, I wouldn't have a

22         concern with that.  The concern that I have is that

23         in essence it would be adding a new charge because,

24         as a practical matter, you could name Paul

25         individually as a standalone.

122

1                    ATTORNEY SCHNEIDER:  And I could file

2         another case with that charge.  So we're trying to

3         serve the interest of justice here and not file

4         another case with that charge or with the charge of

5         solicitation of perjury for Joe Thor, which I think

6         is coming in this case.  There is case law that talks

7         about adding charges, not just amending, but adding

8         charges.

9                    THE COURT:  And I -- and I can understand

10        that and respect that, my concern is that I don't

11        know if it -- well, I suppose I should hear Attorney

12        Vishny before I pontificate any further.

13                   ATTORNEY VISHNY:  Judge, I won't make

14        argument if it's necessary other than to say that I

15        oppose the State doing this and this would not

16        constitute fair notice as to this case and due

17        process issue.

18                   THE COURT:  I don't know how it would have

19        affected the strategy of defense counsel.  I don't

20        find that this in and of itself would be a waiver to

21        bring further charges should they come, but at this

22        point I'm not inclined to grant the request.

23                   ATTORNEY SCHNEIDER:  Can I point the court

24        to *State v. Malcom*, M-A-L-C-O-M?  It's a specific

25        case, Judge, where they added charges, and it related

123

1          to how a person was maintaining their home or their

2          location.

3                    ATTORNEY VISHNY:  Could I have the cite

4          please?

5                    ATTORNEY SCHNEIDER:  Sure.  It's 249 Wis.2d

6          403.

7                    THE COURT:  249.

8                    ATTORNEY SCHNEIDER:  Wis.2d 403.

9                    THE COURT:  Let me go get my --

10                   ATTORNEY SCHNEIDER:  Grab 236 as well.

11                   THE COURT:  236 and 249?

12                   ATTORNEY SCHNEIDER:  Yes.

13                   THE COURT:  Which one do you want me to

14         look at first?

15                   ATTORNEY VISHNY:  Why don't you grab the

16         *Malcom* case, which is what I talked about first.  249

17         Wis.2d 403.

18              For the court's information we're going to grab

19         the preliminary hearing transcript as well because I

20         think -- and I just want to review the testimony

21         given at the preliminary hearing transcript to see if

22         it related to Paul.  When I did my opening, I

23         referenced the solicitation of perjury being related

24         to Paul Lee, and I looked through my notes, and if we

25         need the court reporter to verify that we could, but

124

1        I think under *Malcom* they talk about adding a new

2        charge, the charges cover the same time period, same

3        witnesses, same location, same physical evidence,

4        evidence in that case didn't show or suggest they

5        would have presented different witnesses in defense

6        of the amended charge.  Here that charge strictly

7        comes from the phone call and comments by Chong.

8        There is no issue or requirement as to how those

9        comments, if Paul said he would or didn't, we're

10       alleging they're proven by Chong's comments himself.

11       Here they've chosen not to put Chong on so I don't

12       know that their defense would change because we

13       amended that to Paul as opposed to having it read

14       Stephanie.  I doubt they would have for that reason

15       alone then called the defendant.

16              THE COURT:  Let me -- let me just take a

17       moment.  It looks like it begins at 413 the specific

18       discussion.

19              ATTORNEY VISHNY:  I'm just starting to read

20       it right now.

21              THE COURT:  What's the 236?

22              ATTORNEY SCHNEIDER:  That would be *State v.*

23       *Derango*, D-E-R-A-N-G-O.

24              THE COURT:  Okay.

25              ATTORNEY SCHNEIDER:  That starts on 751

125

1      because it's a long decision, but that is

2      specifically the case where they added a charge that

3      was not originally filed and then was found not to be

4      prejudicial and the court allowed the amendment per

5      971.29.

6                THE COURT:  Wendy, we can bring in the

7      jury.

8                (The jury was escorted into the courtroom.)

9                THE COURT:  Ladies and gentlemen, by and

10     large we have completed our evidentiary portion, by

11     and large, and so what we're going to do is I'm going

12     to release you for today.  We will begin -- we still

13     have some work to do in terms of instructions and

14     making sure that we're ready to proceed, but it is

15     expected that we will begin at 8:40 tomorrow and that

16     we will commence with the closing arguments.

17          And then what I'd ask, because what I'd like to

18     do is move things as efficiently as possible, Wendy,

19     could you get lunch orders for everybody so that we

20     don't have any breaks and what we'll do is bring in

21     lunch tomorrow.  Okay?

22          So, with that, you are excused for the day.

23                ATTORNEY SCHNEIDER:  Do you want to just

24     remind them about news, TV, media for one more night?

25                THE COURT:  One more night of no news, TV

126

1          or media.

2                    ATTORNEY SCHNEIDER:  Thank you.

3                    THE COURT:  Thank you.

4                    (The jury was escorted out of the

5          courtroom.)

6                    THE COURT:  So *Derango* seems to be

7          suggesting that, by way of example, if you have a

8          sexual assault case that you can amend to say it

9          wasn't sexual intercourse but it was sexual touching,

10         and that's just by illustration.

11                   ATTORNEY VISHNY:  Right.

12                   THE COURT:  The -- it's not necessarily

13         suggesting that you can substitute out a party, and

14         so I think that really the analysis comes down to

15         *Malcom*, and what *Malcom* has us looking at are several

16         items.  Among other things, did the preliminary

17         hearing bring up the issue, did -- obviously

18         prejudice is a huge issue in terms of timing and

19         things of that nature, certainly bringing it at the

20         close of evidence.

21                   ATTORNEY SCHNEIDER:  I tried to bring it up

22         this morning because Sergeant Thao was finishing my

23         calls.

24                   THE COURT:  Okay.

25                   ATTORNEY SCHNEIDER:  And I almost feel like

127

```
 1        I should have forced you to make a decision because

 2        if you had said there is another chunk of a call I

 3        could have put in related to Stephanie.

 4             THE COURT:  Although I guess the point

 5        being it's maybe not at the close of evidence but

 6        it's certainly after two weeks.  So that said, the

 7        courts before me has said that there is not an

 8        automatic prohibition to it being prejudicial, it

 9        largely becomes a position of would the defense have

10        changed as a byproduct of changing the -- while

11        generally both *Malcom* and *Derango*s seem to suggest --

12        or those specific examples pertain to facts as

13        opposed to parties, also doesn't include an automatic

14        prohibition to modifying the potential parties if

15        there is notice and other items.

16             And so I guess the question then, Attorney

17        Vishny, is, you know, what do you feel would have

18        changed had it been Paul Lee versus Stephanie Lee?

19        That seems to be the -- sort of the threshold in my

20        -- my analysis.  I don't like -- and this isn't meant

21        to be a negative towards the State, and it may have

22        even been opened in the reference or in the opening,

23        I don't like that it's brought on the last day of

24        State's testimony, but, you know, aside from that.

25             ATTORNEY SCHNEIDER:  And really the only
```

128

1     testimony related to this has been that phone call.

2          ATTORNEY VISHNY:  I need to read the call,

3     but can you tell me specifically to support the

4     charge exactly in that call what you are relying on?

5     Because I think I know what you're relying on, but I

6     want to make sure I know what you're relying on.

7          ATTORNEY SCHNEIDER:  There's a reference

8     starting on Page 3.

9          ATTORNEY VISHNY:  Is that the discussion

10    between Chong and Hu?

11         ATTORNEY SCHNEIDER:  Yes.

12         ATTORNEY VISHNY:  All right.

13         ATTORNEY SCHNEIDER:  And then more

14    specifically and directly there is references

15    starting on Page 5 where Chong makes the request for

16    Hu to do a three-way to Paul.  Paul is then included

17    in that three-way.

18         THE COURT:  Is this item -- is this call

19    log 14 or 13?

20         ATTORNEY SCHNEIDER:  Yes.

21         THE COURT:  And what pages are you looking

22    at?

23         ATTORNEY VISHNY:  Now, is the -- the first

24    part about the three-way is not in evidence, right?

25    Doesn't it start with, inaudible when you arrive you

129

1          tell them that you -- you were scared.  That's what

2          we have highlighted here.

3                    ATTORNEY SCHNEIDER:  No.  I think I wanted

4          it to include the --

5                    ATTORNEY VISHNY:  Oh, it was.

6                    ATTORNEY SCHNEIDER:  Yeah.  The reference

7          to making the three-way call to Paul.

8                    ATTORNEY VISHNY:  Okay.  I'm sorry because

9          it's a little different version here.

10                    ATTORNEY SCHNEIDER:  So it's the Page 3

11          small chunk and then later the request to do the

12          three-way call with Chong.  And then there's specific

13          comments about -- from Chong to Paul at the top of

14          Page 6, we continue down, they talk about the letter,

15          but then Paul says, what about the trial because if

16          inaudible I don't have to say it I will take time.

17          And then Chong continues, if you come, you want me to

18          say that, yes, you come.

19                    ATTORNEY VISHNY:  You're on Page 5, right?

20                    ATTORNEY SCHNEIDER:  Page 6.

21                    THE COURT:  Now, while they're reading, let

22          me ask this.  I don't know that this would help in

23          the analysis, but -- and I didn't take it as a

24          threat, but you would consider issuing a new charge

25          subsequent to this based on this?

130

1              ATTORNEY SCHNEIDER:  I could.  I mean in

2       that -- and that's trying to balance the interests of

3       justice of doing that or --

4              THE COURT:  I understand that, and so I'm

5       just saying that Mr. Lee could be subject to a

6       separate trial on the same issue using the same

7       evidence.

8              ATTORNEY SCHNEIDER:  Right.

9              THE COURT:  I'll let the parties review and

10      talk about things for a few minutes, and I mean no

11      offense, I may come back out without my robe on.  If

12      you want your jackets off, take jackets off.  It's

13      hot.

14             (Court in recess.)

15             ATTORNEY VISHNY:  Judge, what I really want

16      to do is move on from this issue.  I want to make my

17      record, hear the court's ruling, and move on so that

18      we can do other stuff.

19             THE COURT:  So here's what I'm -- I guess

20      -- and I'll let you argue however you would like.

21      Mostly what I'm interested in, Attorney Vishny, is

22      with this change would it materially change the

23      presentation of your defense in the issue.

24             ATTORNEY VISHNY:  Okay.  So here -- we're

25      on the record so I'll just make my whole argument.

131

1          Judge, what my argument is is that I could have

2     cross-examined Paul Lee on whether or not his

3     statement that he would change was in fact true.  So

4     Paul Lee came in, he had this memory lapse, he was

5     impeached about his memory lapse, he was accused of

6     being the shooter by me.  I never specifically

7     cross-examined him about this phone call.  Okay?  I

8     didn't think of it in conjunction with subornation of

9     perjury because the intent to lie is an element there

10    as opposed to intimidation.  Intimidation has

11    different elements than suborning perjury.  In

12    suborning perjury the statement that's being elicited

13    has to in fact not be true.  So I didn't ask him

14    those particular questions at trial and didn't even

15    think about asking those particular questions at

16    trial, and, you know, I was prepared to argue, I

17    think when we were up there earlier I said for the

18    motion for directed verdict, I think we have an

19    argument on one count, other than just a simple

20    preservation of the record.  So I didn't do anything,

21    so that would be my argument.

22         I have read the cases.  I do think that the case

23    -- the *Malcom* case is clearly on point.  I've

24    shepardized it.  It hasn't been overruled.  And, you

25    know, the only difference I would point out with

132

1        *Malcom* is that in the *Malcom* case it was one statute

2        that was being dealt with.  There were different

3        modes of the statute, and that's the statute that was

4        being dealt with by the court, whereas here we're

5        talking about really a different statute which was

6        subornation of perjury as opposed to intimidation of

7        a witness, so for that reason I would request that

8        the court deny the State's motion and I'm prepared to

9        rest on that argument.

10              THE COURT:  Attorney Schneider, anything

11       further?

12              ATTORNEY SCHNEIDER:  I just think -- I

13       think I've given my position in my statement on

14       this.

15              THE COURT:  Does -- I'm just looking at

16       this.  I apologize.  Does, though, Mr. Lee have to be

17       sworn in for him to -- no, no, no, no.

18              ATTORNEY VISHNY:  That's another issue.

19       There is also another issue which is the subornation

20       of perjury was for the preliminary hearing and the

21       State never called him as a witness.  I mean all of

22       these counts deal with the preliminary hearing.  They

23       -- and if I'm wrong, then the State should correct me

24       about the phone calls as well because I thought they

25       were all prior.

133

1            ATTORNEY SCHNEIDER:  They were all prior to

2       the preliminary hearing.

3            ATTORNEY VISHNY:  To the preliminary

4       hearing.  But that's what this testimony is about.

5       This testimony relates to the preliminary hearing,

6       and, you know, I mean I think the inference that is

7       going to be drawn by the court or by the State to the

8       jury is that Chong Lee evinced a belief that Paul Lee

9       was going to testify at the preliminary examination.

10      This is not about the trial, so it's all about

11      whether they should change the story for a

12      preliminary hearing.  In fact, the State did not need

13      to call Paul Lee and didn't because by the time we

14      had the preliminary hearing in this case, I think

15      this was probably also true with these phone calls,

16      the law had changed that permitted hearsay testimony

17      at a preliminary examination and there was no reason

18      for the State to call anybody other than the police

19      officers.

20            THE COURT:  Wasn't --

21            ATTORNEY VISHNY:  So --

22            ATTORNEY SCHNEIDER:  And the -- the way

23      protect words it in the charging language is odd but

24      it's the solicitation of perjury.  So it's the

25      request -- I'm just -- it's 550, Judge, is the

134

1     instruction on solicitation.

2              THE COURT:  Isn't it a request to make a

3     false statement when he's under oath or affirmation?

4              ATTORNEY SCHNEIDER:  Yes.

5              THE COURT:  So he's asking him to make a

6     false statement at the preliminary hearing.

7              ATTORNEY SCHNEIDER:  Correct.

8              THE COURT:  And my recollection, and I

9     could be wrong, I thought we had a stipulation -- and

10    I'm -- this isn't directly on point, but then I'm

11    going to work backwards from here.  I thought we had

12    a stipulation that in January we had -- that hearing

13    that was coming up was the preliminary hearing.

14             ATTORNEY SCHNEIDER:  The preliminary

15    hearing date was actually February 12th of 2014.

16             THE COURT:  That's right.  Wasn't there a

17    stipulation to that point?

18             ATTORNEY SCHNEIDER:  Yes.  Because I think

19    one of the officers couldn't remember and she asked

20    if we would just stipulate.  I also did have Sergeant

21    Rabas testify about it during his direct testimony.

22             THE COURT:  But wasn't the purpose of that

23    within the context of talking about -- and maybe it

24    wasn't Paul's phone calls, but I thought it was --

25    it's one of our witness's phone calls.

135

1                    ATTORNEY VISHNY:  Well, the reason that we
2          wanted to do that in terms of all the discussions in
3          the back was because quite a few of these
4          intimidation counts, not quite a few but at least one
5          of the phone calls, the discussion is primarily about
6          revocation and we didn't even think that that should
7          be allowed into evidence.  The court overruled us.
8                    ATTORNEY SCHNEIDER:  Because there is a --
9                    ATTORNEY VISHNY:  But I don't -- so as far
10         as the date, though, you know, whether we stipulated
11         or the court takes judicial notice, the date of the
12         preliminary hearing was February 12th.  You know, I
13         certainly wouldn't back out of any stipulation like
14         that because of this discussion.
15                   ATTORNEY SCHNEIDER:  And --
16                   THE COURT:  I'm just trying to get a frame
17         of what we're talking about.
18                   ATTORNEY SCHNEIDER:  Call eight was a call
19         where there is some comments or disputes, but that's
20         also the call where Chong, they're talking about his
21         case or hearings and he says my revocation, my case
22         is the same thing.
23                   THE COURT:  That's right.
24                   ATTORNEY SCHNEIDER:  If you look at how the
25         intimidation charges were drafted related to the

136

1          dates, they're all drafted through the day of the

2          preliminary hearing --

3                    ATTORNEY VISHNY:  Right.

4                    ATTORNEY SCHNEIDER:  -- February 12th,

5          2014.  And it's our theory that a specific request to

6          solicit perjury comes through the phone call on the

7          25th involving Paul Lee.  And I don't think there was

8          cross by -- if you want me to respond to her comments

9          on the issue?

10                   THE COURT:  Go ahead.

11                   ATTORNEY SCHNEIDER:  You know, she said she

12         would have crossed Paul differently.  I don't think

13         there was cross of Paul about any of the content of

14         the calls, so I know that's what her position is now,

15         but I don't know that that would have significantly

16         changed.  It's really based upon Chong's comments to

17         him and what he's asking me to do that the State is

18         going to argue for as the basis for the charge.

19                   ATTORNEY VISHNY:  And I just want to

20         respond.  The elements for solicitation are different

21         because it has to do with in fact whether Paul was

22         going to -- I mean at issue here is whether what Paul

23         told the police to begin with true or a lie, so --

24         and I certainly accused him of lying to the police in

25         my cross-examination and I never referenced the

137

```
 1        calls.  But whether or not Paul is truthful or not is
 2        not relevant in an intimidation count.
 3                THE COURT:  Okay.  It certainly is a -- is
 4        a close call in this.  I think in the situation given
 5        that the representations of defense counsel, and I
 6        certainly appreciate the arguments of counsel, and I
 7        don't fault them, but I think in light of the fact
 8        that it may have altered the questioning of Paul Lee
 9        and understanding those facts at this point I am
10        going to deny the motion.
11                ATTORNEY SCHNEIDER:  Okay.  Then can I just
12        have one second?
13                THE COURT:  Absolutely.
14                ATTORNEY SCHNEIDER:  Judge, we're going to
15        have to pull a different transcript for you.  Call
16        No. 14.  January 28th.
17                THE COURT:  Now what are we looking at?
18                ATTORNEY SCHNEIDER:  Well, I should have
19        asked you to make a decision, but I know we were
20        trying to get started on this, because that's a call
21        specifically involved with Stephanie where they talk
22        about her and her comments and comments she makes,
23        what she told the police that they may come in as
24        witnesses to them.  Had the court told me this
25        morning it was going to deny it, I would have
```

138

1          played -- there is a section on Page 11 of that call
2          related to them discussing, and I would have played
3          just Chong's comments, her coming in and changing her
4          story, which then, I think, if we amend the date to
5          January 28th as opposed to the 25th, give the basis
6          for the solicitation of perjury related to Stephanie
7          Thao.  We played many other sections of this call.
8          I'm just trying to find a transcript for you, or the
9          exhibit number.  This is Call 14, and I'm
10         specifically looking at the section on Page 11.
11                    THE COURT:  So this has not been received?
12                    ATTORNEY SCHNEIDER:  It has been.  We've
13         played other portions of it.
14                    ATTORNEY VISHNY:  Well, however, we've
15         already cross-examined Stephanie Thao, including --
16         well, we cross-examined her.  The focus of the cross
17         was about the statements, but, you know, we didn't
18         cross-examine -- not cross-examine Stephanie Thao --
19         wait.  I'm really saying this in a way that doesn't
20         make any sense.  We didn't cross Stephanie Thao on
21         evidence that would be adversarial to Mr. Lee that
22         wasn't presented by the State, nor of course would we
23         have done so.
24                    THE COURT:  So this did come in?
25                    ATTORNEY SCHNEIDER:  This section did not.

139

1     But because you hadn't given me a ruling on my motion

2     this morning to amend, I would have tried to add,

3     because I knew there -- there's calls related to Joe,

4     Stephanie and Paul on solicitation of perjury.

5               THE COURT:  So what's the request, you want

6     this to be considered as part of the evidence?

7               ATTORNEY SCHNEIDER:  I would move in

8     rebuttal I'm going to call Sergeant Thao and ask to

9     play these references just to Chong because now the

10    court has made its ruling on my motion to amend.  I

11    should have asked for you to make that decision prior

12    to the State resting but we were trying to save

13    time.

14              THE COURT:  I understand.

15              ATTORNEY VISHNY:  I have an argument to

16    make against that too.

17              THE COURT:  Go ahead, counsel.

18              ATTORNEY VISHNY:  Judge, we did not

19    cross-examine Stephanie Thao about this call at all.

20    You know, first of all, my argument would be that we

21    haven't waived any hearsay objections as to Stephanie

22    Thao.  Number two, we haven't cross-examined about

23    it.  And also, as far as moving to reopen a case,

24    I'll cite *State v. Arredondo* which is at -- well, I

25    have the public citation, but 269 Wis.2d 369, and

140

1      I'll tell you what the issue was in *Arredondo*.  Mr.

2      Arredondo was charged with a homicide and a sexual

3      assault, and after Mr. Arredondo -- the State rested

4      and the court had an on the record colloquy with Mr.

5      Arredondo to determine if he was going to testify,

6      and afterwards the, you know, the -- ultimately what

7      happened is the defense rested and Mr. Arredondo said

8      that his constitutional rights were violated where

9      the trial court declined to reopen the evidence to

10     allow him to testify and the court went on and said

11     that -- so the colloquy is discussed, but clearly I

12     -- I would ask the court to deny counsel's motion to

13     reopen the record at this point.

14              THE COURT:  I'm not going to reopen the

15     record.

16              ATTORNEY VISHNY:  Okay.  So if you're not

17     going to reopen the record, then I'm prepared to

18     argue our motion to directed verdict as to Count 7.

19              THE COURT:  I'm going to -- I'm going to

20     leave -- I'm going to leave it in there.  The jury

21     can decide.  Denied.

22              ATTORNEY VISHNY:  The jury can decide?

23              THE COURT:  Count 7.

24              ATTORNEY VISHNY:  Okay.  Well, at least

25     allow me to make a record because there is no

1          evidence in this record at all from any phone call

2          the State has put in that there was solicitation of

3          perjury to Stephanie Thao.  So the State has to put

4          in evidence, and at this point, you know -- well,

5          first of all, I -- the directed verdict motions at

6          this point because we -- the court noted that I had

7          reserved the right, you know, so the right is

8          reserved for the very first burden which has to do

9          with prima facie case, but now we're at the burden

10         also of beyond a reasonable doubt as to Stephanie

11         Thao, and I -- you know, unless the State can point

12         somewhere in the record where there is some evidence

13         that can go to the jury where they have proven these

14         elements beyond a reasonable doubt that Mr. Chong Lee

15         advised Stephanie Thao to orally make a false

16         material statement which a person imprisoned does not

17         believe to be true before a judge, then I would argue

18         that that count, Count 7, should not go in front of

19         the jury.  As Counts 1 through 6 are concerned, at

20         this time, I will --

21              THE COURT:  As -- certainly as to one

22         through six the motion would be denied, I think it's

23         something for the jury to consider.

24              Miss Schneider, are you conceding?

25              ATTORNEY SCHNEIDER:  No, I'm trying to look

142

1          at what play portions we did of call -- did utilize

2          in Call 14.  I'll never shorten them again, I will

3          always go with everything.  I want to avoid this

4          problem.

5                    THE COURT:  And I'll be candid, I don't

6          recall everything over the last two weeks, so I'd be

7          inclined to defer to the jury on this.  I don't

8          recall.  I'll be candid.

9                    ATTORNEY VISHNY:  I think if the State can

10         make an argument that they've done it, but if they

11         can't make an argument that they've done it, I -- you

12         know, I think it kind of rests on that.  I can't

13         recall every single piece of evidence either, but

14         certainly if the State put it in, that's one thing,

15         but if the State can't say that they did it, then I

16         would argue that the court can grant that motion.

17              I have an argument on another count also, but I

18         want to settle this one first.

19              Judge, I misspoke, I'm not going to make an

20         argument to another count.  The only one is Count

21         7.

22                    THE COURT:  That's fine.

23                    ATTORNEY SCHNEIDER:  Your Honor, I can

24         review what -- the relevant play points in exhibit or

25         Call 14.  Do you have the exhibit number?  I might

143

1    want to just double-check yours to make sure.  I

2    don't know if it's a Post-it moved or not Post-it

3    moved.

4        I think what we did put in on that call with

5    Stephanie is literally like two pages of short -- of

6    where the records just go to this request for her to

7    come to court and what she should say.  So I know the

8    court's inclination is just to send it to the jury,

9    but I don't want this to become the issue that comes

10   back on appeal.  So I don't think we played the

11   relevant portion because, as my argument will

12   continue, and I know you're not going to change your

13   decision, is the January 25th call and the

14   solicitation of perjury relates to Paul Lee, not

15   Stephanie Thao, and so I still think there is a basis

16   for you to allow us to amend that to conform to the

17   evidence as has been presented.  That's our request.

18   Short of that, then I don't think we did play the

19   relevant portion of Call 7.

20              THE COURT:  Okay.  And --

21              ATTORNEY SCHNEIDER:  Or Charge 7.

22              THE COURT:  To further add, and you had

23   highlighted it, to not --

24              ATTORNEY SCHNEIDER:  And really the reason

25   why they allow these amendments is to avoid us having

144

1    to file another charge at some point where we're

2    going to have the same evidence presented.

3         THE COURT:  And I can appreciate that.  And

4    part of my rationale, just to fully understand, is

5    counsel has made an earnest representation that it

6    may have changed the way in which Paul Lee was

7    approached, that doesn't appear to be a speculative

8    representation, and so I don't want that to be the

9    basis on why this comes back on appeal.  So that's --

10   that's the basis for my ruling.

11        ATTORNEY VISHNY:  So as to Count 7, I'm

12   gathering the State is conceding.

13        ATTORNEY SCHNEIDER:  We -- at this point we

14   will ask --

15        THE COURT:  Based upon the position of the

16   State, then that motion will be granted.

17        ATTORNEY VISHNY:  Okay.  All right.  We are

18   asking -- we want to address regarding the use of

19   calls in closing argument.  I don't know if you want

20   to do that in chambers when we do the jury

21   instruction conference or how you would like to do

22   that?  I don't know, you know, if it's more

23   convenient because the actual calls -- the

24   transcripts are out here.

25        ATTORNEY SCHNEIDER:  I think we do it out

145

1    here.  We can go off the record.  If you wanted -- if
2    you want what we would have done in chambers closed
3    to the general public, I'll concede that.  I think
4    it's just much cooler and the fans are probably
5    better here.
6                THE COURT:  I'll do whatever the parties --
7    whatever the parties want.
8                ATTORNEY WEITZ:  And the -- you may have
9    already ruled on this, I just wanted to bring this to
10   the court's attention again on the record.  I know
11   prior to the trial we filed a motion about the one
12   specific phone call, Call No. 8, that was replete
13   with the references to the revocation hearing, and
14   there was argument made about the fact that saying
15   someone shouldn't show up for the revocation hearing
16   isn't the charged offense of felony intimidation
17   because that involves having a person not show up for
18   a proceeding associated with that crime.
19               THE COURT:  But didn't I allow it based on
20   then Mr. Lee's subsequent comments that said they're
21   one in the same?
22               ATTORNEY SCHNEIDER:  Yes.
23               ATTORNEY WEITZ:  It was -- that motion was
24   overruled, or denied, and I think that was part of
25   it, and part of it was there was some representation

146

1    by the State that this goes to consciousness of

2    guilt.

3            THE COURT:  I think that was part.  Yes.  I

4    do recall that.

5            ATTORNEY WEITZ:  So my concern is now the

6    way this has come out to the jury there have been

7    portions that have been sanitized to remove

8    references specifically to revocation.  For example,

9    Chong Lee says, Phong, Paul and Joe, if the three of

10   them do not come then I get out of revocation.

11   Obviously for the trial we took out the revocation.

12           THE COURT:  Right.

13           ATTORNEY WEITZ:  So I just worry that if

14   the State is going to use these phone calls in

15   closing and use those sanitized portions that it may

16   mislead the jury into thinking that it's about the

17   proceeding associated with this case rather than the

18   revocation.  So I just wanted to bring that to the

19   court's attention.  Obviously our position I guess

20   would be that they're misleading and shouldn't be

21   used in closing.  We understand that the court's

22   ruling was that it could come in in the substantive

23   case, but to use that as a specific example in

24   closing of him telling someone not to come to court I

25   think would be misleading so I guess I would ask that

147

1          the court not allow the State to do that.

2                    ATTORNEY SCHNEIDER:  What page number are

3          you referring to?

4                    ATTORNEY WEITZ:  That specific example is

5          from Page 3 of Call 8.

6                    ATTORNEY SCHNEIDER:  Same page where he

7          says, did you go to your court hearing, and he says,

8          I got my preliminary hearing at 8:30 in the morning

9          on February 12th.

10                   ATTORNEY WEITZ:  That was the previous page

11         on mine.

12                   ATTORNEY SCHNEIDER:  Okay.

13                   ATTORNEY WEITZ:  So --

14                   THE COURT:  I guess my initial reaction is

15         if it was allowed in during the evidentiary portion

16         I'm not going to amend my ruling to now exclude

17         evidence.

18                   ATTORNEY SCHNEIDER:  And I can give the

19         court the full comment.  Teng says, did you go to

20         your court hearing already.

21                   THE COURT:  Did I -- I already somewhat

22         ruled in your favor.

23                   ATTORNEY SCHNEIDER:  I know.  But just to

24         preserve the record.

25                   ATTORNEY VISHNY:  I don't think you have to

148

1          preserve the record.

2                    ATTORNEY SCHNEIDER:  Okay.

3                    ATTORNEY VISHNY:  I mean I think the record

4          is clear, and we accept the court's ruling.

5                    THE COURT:  Okay.  Where do we stand on the

6          -- lesser included offenses, do we need to address

7          that?

8                    ATTORNEY VISHNY:  What?  Anything else

9          before the jury instruction issue?

10                   THE COURT:  No.  Lesser included.

11                   ATTORNEY VISHNY:  Oh, lesser included.

12              Well, the State opposes it and we're asking for

13          it, and Mr. Weitz is the person who's going to

14          present the defense argument.

15                   THE COURT:  Now it seems to me that in

16          part, though, and again this is from -- and Attorney

17          Schneider, thank you for the jury instruction.  That

18          was very helpful.

19                   ATTORNEY SCHNEIDER:  I just know I had an

20          old copy, that's why I had them run me --

21                   THE COURT:  It seems that in part I should

22          go through a colloquy with Mr. Lee because there was

23          some suggestion, let me just take a look, that it

24          could be prejudicial to Mr. Lee if -- well, here's

25          the thought process, and I -- I wish I had the exact

1     page, but here -- I know I did read it last night.
2     The substance of it is that as it stands right now,
3     Mr. Lee, you've been charged with first-degree
4     intentional homicide.  Do you understand that?
5              THE DEFENDANT:  Yes, I do.
6              THE COURT:  You understand that if you are
7     -- if the State is unable to prove those elements,
8     that would result in acquittal of those charges and
9     you would not be found guilty of a homicide charge,
10    correct?
11             THE DEFENDANT:  I understand.
12             THE COURT:  You understand that by
13    including a lesser included offense that that may
14    lower the burden that the State or change the burden
15    that the State has to meet and could allow you to be
16    convicted of a lesser charge, whereas if the State
17    proceeds under the first-degree intentional homicide
18    theory, there is only one chance, I guess, so to
19    speak.  You understand that?
20             THE DEFENDANT:  Yes, I do.
21             THE COURT:  The lesser included offenses
22    would mean that potentially a jury could say we don't
23    see enough for the first-degree intentional but we
24    see something for something lesser, and that could
25    result in a conviction to you, whereas, as presently

150

1    charged, an acquittal would happen.  Do you

2    understand that?

3                THE DEFENDANT:  I do understand.

4                THE COURT:  Have you had a chance to

5    thoroughly discuss that with your counsel?

6                THE DEFENDANT:  I would like another

7    moment.

8                THE COURT:  You would like some time to

9    talk to your counsel about that?

10               ATTORNEY VISHNY:  That's fine.

11               (Court in recess.)

12               THE COURT:  So the threshold issue then is,

13   Mr. Lee, have you had a chance to talk or discuss

14   that issue with your attorneys?

15               THE DEFENDANT:  Yes, I have.

16               THE COURT:  Okay.  And with respect to

17   that, is that still something -- and I guess it would

18   be Attorney Vishny and Weitz, is that something you

19   would still like me to entertain at this point?

20               ATTORNEY VISHNY:  Yes.

21               THE COURT:  And, Mr. Lee, you've had an

22   adequate opportunity to consider that issue?

23               THE DEFENDANT:  Yes, I have.

24               THE COURT:  You understand the pros and the

25   cons potentially of that?

151

1              THE DEFENDANT:  Yes, I have.

2              THE COURT:  Do you have any questions for

3     me -- do you have any questions for me on the issue

4     of the inclusion of a lesser included offense?

5              THE DEFENDANT:  No.

6              THE COURT:  Okay.  And again, I want you to

7     understand I haven't made up my mind on that issue, I

8     just wanted to cross that threshold issue, because if

9     you had discussed it with your counsel and decided

10    you didn't want to pursue it, then that takes the

11    ball out of my court.

12         Attorney Vishny, what more would you like to

13    say?  I've had a chance to again read the criminal

14    jury instructions issue, and are you seeking --

15    you're seeking a first-degree reckless, correct?

16             ATTORNEY VISHNY:  Yes.

17             THE COURT:  And then --

18             ATTORNEY VISHNY:  Second-degree reckless

19    homicide.

20             THE COURT:  Let me take a look at --

21             ATTORNEY VISHNY:  The only difference

22    between first- and second-degree reckless homicide is

23    the third element, whether the evidence shows

24    circumstances that showed -- whether there are

25    circumstances present that show utter disregard to

152

1     human life.  Elements one and two are identical.

2          THE COURT:  Any further argument that you

3     want to add?  I don't know that you presented -- I

4     knew it was forthcoming.  I don't know what the

5     arguments were, Attorney Vishny, in terms of --

6          ATTORNEY VISHNY:  Well, Mr. Weitz was going

7     to argue this.

8          THE COURT:  That's right.  Whenever you're

9     ready, Attorney Weitz.

10          ATTORNEY WEITZ:  All right.  Thank you.

11      I think yesterday when we had discussed this

12     issue the court was going to review a case that was

13     cited.  I did review that case, and it was basically

14     in comport with what is included in I believe the

15     benchbook, so I think ultimately what the State has

16     to decide is whether there is a reasonable -- and I

17     believe -- I'm sorry, the court has to decide is

18     whether there is a reasonable basis in the evidence

19     for the jury to acquit on the greater offense and

20     convict on the lesser, and I think that the case

21     indicates that that reason should give some deference

22     when making that decision.

23      There was some additional discussion about in

24     the circumstance where a defendant testifies and

25     presents wholly exculpatory evidence and then also

153

1    requests a lesser included offense the court then is

2    tasked with rejecting that exculpatory evidence,

3    assuming that the jury disregards it, and deciding

4    whether or not again there is still a reasonable

5    basis in the evidence for the jury to acquit on the

6    greater and convict on the lesser.

7            THE COURT:  And that's in the *Saravia* case

8    that we discussed?

9            ATTORNEY WEITZ:  Right.  And I think in

10    this circumstance, as we kind of brought forth

11    yesterday, there is certainly a basis in the evidence

12    to believe that there is reckless conduct here rather

13    than the intent necessary for first-degree

14    intentional homicide.  I can't remember if it was on

15    the record or not, but we did point the court towards

16    the testimony of the medical examiner regarding

17    whether or not there could have been a -- an

18    accidental discharge of the firearm as it struck the

19    victim, Mr. Richards.  So I certainly think that

20    there is a reasonable basis in the evidence, and

21    therefore we would ask that the court give the lesser

22    included instruction.

23            THE COURT:  Whenever the State is ready.

24            ATTORNEY SCHNEIDER:  I mean, I provided the

25    special materials because I think that provides not

154

1    only the *Saravia* case the court talked about but many

2    other cases.  I know the case State -- the case *State*

3    *v. Bergenthal*, B-E-R-G-E-N-T-H-A-L, talks about --

4                ATTORNEY VISHNY:  Can I ask for a citation?

5                ATTORNEY SCHNEIDER:  If they would give me

6    one.

7                ATTORNEY VISHNY:  Is it 47 Wis.2d?

8                THE COURT:  Correct.

9                ATTORNEY VISHNY:  Okay.  I already found

10   it.

11               ATTORNEY SCHNEIDER:  It talks about what's

12   reasonable.  And there is other cases, Judge, that

13   you can't give the lesser includeds just when it's

14   supported by mere conjecture, that's *Johnson v. State*

15   at 85 Wis.2d 22.  It's a case from 1978, but it's a

16   case that still holds for that position.  It's not a

17   situation where you're -- you can say, well there is

18   a mere scintilla of evidence to support giving the

19   lesser included, and there's been cases where it's

20   been specifically denied I think in facts where I

21   would argue it would be more supported than us.  Here

22   we have -- their argument is because a doctor said

23   that -- and I don't even know if it's the gun could

24   have hit the side of the head and then bounced back

25   and then the gun could have been fired, which is a

155

1     hypothetical not supported by any evidence or

2     testimony in this case, so I think under that theory

3     there isn't a reasonable view that this should be

4     given.  I just want to -- one more second.

5          ATTORNEY WEITZ:  Your Honor, while the

6     State is looking for that other case, I guess I would

7     just briefly respond to the State's assertion that

8     it's a mere scintilla of evidence.  I think there is

9     a lot of evidence in this case that would support

10    that theory.  The only witness that the State

11    presented that even references, although there is

12    some dispute about it, seeing Mr. Lee commit the

13    shooting describes it as a punch, not as him holding

14    the gun up and then pulling the trigger.  He

15    describes it as a punch.  So that would also be

16    consistent with the medical examiner's testimony, so

17    I think a lot of the testimony in this case would

18    support that.  I mean the standard is not very high,

19    it's just any reasonable view of the evidence.  So I

20    think there is quite a bit here that would support

21    giving a lesser.

22          THE COURT:  The -- and I --

23          ATTORNEY VISHNY:  Judge, if you want me to

24    add, I mean I think I'm looking at more recent case

25    law on this issue, *State v. Morgan*, 195 Wis.2d 388,

156

1    citing *State v. Weeks*, 165 2d 200, but the legal

2    standard is, first, the court must determine whether

3    the crime is a lesser included offense of the charged

4    crime.  Well that is.  Next, the court must weigh

5    whether there is a reasonable basis in the evidence

6    for a jury to acquit on the greater offense and to

7    convict on the lesser offense.  If both steps are

8    satisfied, the trial court should submit the lesser

9    included instruction to the jury if the defendant

10   requests it.  A trial court commits reversible error

11   if it refuses to submit an instruction on an error

12   that is reported by the evidence citing the *State v.*

13   *Weeks*, 165 Wis.2d 200 and 208, 1991.

14            THE COURT:  Here's where I'm at on this

15   issue.  The --

16            ATTORNEY SCHNEIDER:  And I want to have a

17   separate argument if we get to your consideration of

18   second.

19            THE COURT:  Okay.  On the -- as it relates

20   to the first-degree reckless, we look at whoever

21   recklessly causes the death of another human being.

22   Well, we know that Mr. Richards has obviously passed.

23   The -- really what is the focus of my analysis, and

24   again it's for the jury to weigh the veracity of it,

25   but are the comments attributed to Mr. Lee saying, I

157

1    fucked up and I shot the guy, suggesting that there

2    may be some question as to whether that was his

3    intent or not.  Now, I think that's a plausible

4    explanation in terms of I think a reasonable

5    inference can be made from that.  That's not to

6    suggest that that is what a jury will conclude, but I

7    think that a jury could conclude that while the

8    result was death it was not the intent to cause the

9    death.

10        That said, there is also a competing inference

11    as to the angle of the shot, where the shot took

12    place.  I'm not so persuaded by the medical

13    examiner's commentary or hypothetical.  I don't think

14    that standing alone would persuade me.  But I think

15    that in light of the -- at least to the best of my

16    recollection there is nothing to suggest -- well,

17    there was very -- various incantations of Mr. Lee

18    shot him, there is also at least some commentary

19    saying that I fucked up, which would suggest that

20    there may not have been the intent to cause that

21    result or at least an argument to be made to that

22    which is not completely out in left field.  So I'm

23    going to allow the first-degree reckless.

24        Let's address the second-degree, Attorney

25    Schneider.

158

1          ATTORNEY SCHNEIDER:  I think then -- one, I

2     think there is no basis to support the second-degree

3     reckless at all.  The difference is you have to find

4     or make the assessment, and you go to that same, in

5     what reasonable view is there evidence sufficient to

6     prove the guilt of the higher beyond a reasonable

7     doubt, and if under a different reasonable view the

8     evidence would suffice to prove guilt of the lower

9     beyond a reasonable doubt but leave a reasonable

10    doubt as to some element in the higher but not in the

11    lower the court should request to submit the

12    lesser.

13          THE COURT:  I know you're reading that.

14    Where are you?

15          ATTORNEY SCHNEIDER:  It's *Zenou*, Z-E-N-O-U,

16    *v. State*.  It's on Page 11 of SM6.

17          THE COURT:  That's -- I've got it

18    highlighted.

19          ATTORNEY SCHNEIDER:  So you kind of start

20    to go through that analysis to say first reckless

21    versus second-degree reckless, the difference is does

22    the conduct show utter disregard for human life.  You

23    have to say that under these facts there would be a

24    way for the court or the jury to conclude that it did

25    not show utter disregard, and then you give

159

1    second-degree reckless because that's the difference.

2    I don't see how the facts of this, when there -- at

3    least our position is the person engaged in this

4    fight is not the defendant giving a shot from inches

5    to close range, I don't know how they do not find

6    that it shows utter disregard.

7            THE COURT:  I mean, that's a good point.

8        Attorney Weitz, on that issue, let's assume --

9    let's give every benefit of the doubt to the scenario

10   posed.  If the argument is he -- he meant to punch

11   him and not shoot him, he punched him with what we

12   now know -- or somebody punched him with what we now

13   know is a loaded weapon, apparently at an angle such

14   that it could go into the head cavity; and second of

15   all this wasn't a - and I'm not trying to make light

16   of it - it wasn't a body shot so to speak where at

17   least there would be -- I mean, I don't think most

18   people would be of the opinion that a shot to the

19   brain, no pun intended, is not likely to result in

20   death.  What's the response to that, I guess?

21           ATTORNEY WEITZ:  I'm going to defer to

22   Attorney Vishny on that.

23           THE COURT:  Attorney Vishny.

24           ATTORNEY VISHNY:  Okay.  Well, I think the

25   issue becomes what circumstances the defendant's

160

1     conduct show utter disregard for human life, and what
2     the jury instruction says is in determining whether
3     the circumstances of the conduct show utter disregard
4     for human life, consider these factors, what the
5     defendant was doing, why the defendant was engaged in
6     that conduct, how dangerous the conduct was, how
7     obvious the danger was, whether the conduct showed
8     any regard for life, and all other facts and
9     circumstances relating to the conduct.  So I do think
10    it really -- a legal analysis is virtually identical
11    to the difference between first and second -- between
12    first-degree intentional and first-degree reckless
13    homicide.  It's really a factual question.  In other
14    words, is there a basis to say that he engaged in
15    criminally reckless conduct and to not say that there
16    were, you know, but that the elements are missing of
17    circumstances showing utter disregard for human life.
18         This element of the offense is, in my opinion,
19    fairly broad and fairly subjective.  In other words,
20    the element itself uses extremely broad language as
21    it defines, as opposed to the criminally reckless
22    conduct language which shows that the conduct has to
23    be -- create, and this is what -- you know, the
24    conduct clearly creates an unreasonable and
25    substantial risk of death or great bodily harm.  You

161

```
1          know, hitting somebody in the head with a gun clearly
2          does that.
3                    THE COURT:  Right.
4                    ATTORNEY VISHNY:  It also clearly, you
5          know, one can infer that -- because awareness of the
6          conduct is also an element of criminally reckless
7          conduct.  So the question then becomes this lesser
8          included circumstances showing utter disregard for
9          human life, and if the jury has to -- has to
10         determine did this exist or not, what -- to what
11         degree did this exist.  In my opinion is that there
12         is a, you know, viewing this as the court has pointed
13         out that, you know, we have a split second moment
14         here, you know.  I mean the State's theory is that
15         Mr. Chong Lee comes upon a fight that his brother is
16         engaged in, sees what's going on, that there's a
17         fight between his brother and a much larger guy, and
18         then he walks up and, you know, I'm sure the State
19         will argue deliberately shoots the guy in the head,
20         but, you know, there is this evidence in the record
21         that it can be a holding a gun in the hand and
22         hitting and the gun discharging.  I think whether
23         there are circumstances that show utter disregard for
24         human life is really a jury question.  The purpose
25         really in many ways of allowing lesser includeds is
```

162

1    to not create a situation where a jury does not

2    convict of a greater because they think some elements

3    aren't proved, so I think for that reason the law

4    favors the submission of lesser includeds to make

5    sure that there is a conviction where it is

6    appropriate for a certain conduct.

7         That being said, I'm prepared for the court's

8    ruling.  I'm not sure if Miss Schneider wants to make

9    more argument, but I've made the defense argument.

10         ATTORNEY SCHNEIDER:  The facts you started

11    to state go to the facts of why this absolutely shows

12    utter disregard.  I know it goes to consider these

13    facts, what he was doing, why the defendant engaged,

14    how dangerous it was.  It wasn't as if he was pistol

15    whipping him and his hand was just around the grip of

16    the gun.  His hand had to be on the trigger at the

17    time he came up if the theory is he punched him with

18    the gun -- with a loaded gun in his hand, but his

19    hand had to be on the trigger then at this time.  So

20    I think that is another factor for the court to

21    consider.

22         In the jury instructions, immediately after the

23    definition of utter disregard, it also indicates,

24    consider also the defendant's conduct after the death

25    to the extent it helps you decide whether or not the

163

1    circumstances showed utter disregard for human life

2    at the time.

3          THE COURT:  Is that the elements sheet?

4          ATTORNEY SCHNEIDER:  Yes.

5          THE COURT:  Can I take a look at them?

6          ATTORNEY SCHNEIDER:  Yes.  I'm showing 1022

7    which would be first-degree reckless, second-degree

8    reckless.

9          THE COURT:  Under the circumstance I'm

10   allowing the first-degree reckless, I'm not going to

11   allow the second-degree.

12       It does appear that I should at least make the

13   inquiry.  Mr. Lee, you would like to be present

14   during the jury instruction conference?

15         THE DEFENDANT:  Yes.

16         THE COURT:  We would consider this our

17   informal jury instruction conference.  We don't need

18   to be on the record, but you still have the right to

19   be present during this and so I would certainly allow

20   that.

21       And then we'll have -- tomorrow morning

22   first thing we'll do what's known as the formal jury

23   instruction conference where we simply basically say

24   these are the forms and we've agreed on these and

25   this is what's going to go to the jury.  Okay?

164

1                    THE DEFENDANT:  Okay.

2                    THE COURT:  Anything else, Attorney

3         Schneider, that needs to be on the record today?

4                    ATTORNEY SCHNEIDER:  No.

5                    THE COURT:  Attorney Vishny, on the record

6         today?

7                    ATTORNEY VISHNY:  No.

8                    THE COURT:  Okay.  So what I'll do is I'm

9         going to excuse my court reporter and I'm in fact --

10        I'm going to come down and get a chair and just come

11        down and sit by everyone.

12                   (Proceedings concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3                    C E R T I F I C A T E

 4

 5   STATE OF WISCONSIN      )
                             ) ss.:
 6   COUNTY OF OUTAGAMIE     )

 7

 8

 9           I, JOAN BIESE, RMR/CRR, do hereby certify that I
     am the official court reporter for Branch IV of the
10   Circuit Court of Outagamie County;

11           That as such court reporter, I made full and
     correct stenographic notes of the foregoing proceedings;
12
             That the same was later reduced to typewritten
13   form;

14           And that the foregoing proceedings is a full and
     correct transcript of my stenographic notes so taken.
15

16           Dated this 21st day of August, 2016.

17

18

19                            _____

20                            JOAN BIESE, RMR/CRR

21

22

23

24

25
```

166