FILED
02-13-2019
Clerk of Circuit Court
Outagamie County
2013CF001074

1  STATE OF WISCONSIN     CIRCUIT COURT     OUTAGAMIE COUNTY
   ─────────────────────────────────────────────────────────────
2  **STATE OF WISCONSIN,**

3              Plaintiff,

4  v.                                    **Case No. 13—CF—1074**

5  **CHONG LENG LEE,**

6              Defendant.
   ─────────────────────────────────────────────────────────────
7                    **JURY TRIAL — DAY ELEVEN**

8  ─────────────────────────────────────────────────────────────

9
   BEFORE:        **HONORABLE GREGORY B. GILL, JR.**
10                Circuit Court Judge, Branch IV
                  Outagamie County Justice Center
11                Appleton, WI  54911

12
   DATE:          **March 9, 2016**
13

14 APPEARANCES:   **CARRIE SCHNEIDER**
                  District Attorney
15                Appearing on behalf of the State

16                **ANDREW MAIER** and **ALEXANDER DUROS**
                  Assistant District Attorneys
17                Appearing on behalf of the State

18                **DEBORAH VISHNY** and **EVAN WEITZ**
                  Attorneys at Law
19                Appearing on behalf of the Defendant

20                **CHONG LENG LEE**
                  Defendant
21                Appearing in person

22

23

24 Joan Biese
   Official Reporter, Branch IV
25 Outagamie County

1

Exhibit 26

1                        **I N D E X**

2

3                                                          **PAGE**

4    JURY INSTRUCTION CONFERENCE...........................   3

5    COLLOQUY WITH DEFENDANT...............................   4

6    JURY INSTRUCTIONS.....................................  10

7    CLOSING ARGUMENT BY ATTORNEY SCHNEIDER...............  42

8    CLOSING ARGUMENT BY ATTORNEY VISHNY..................  87

9    REBUTTAL ARGUMENT BY ATTORNEY SCHNEIDER..............  151

10   CLOSING JURY INSTRUCTIONS............................  180

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1               **TRANSCRIPT OF PROCEEDINGS**

2          THE COURT:  We're on the record in *State of*

3     *Wisconsin v. Chong Lee*.

4          Mr. Lee appears in person, along with his

5     counsel, Attorney Evan Weitz and Deja Vishny.  Also

6     seated at counsel table appearing under the student

7     practice rule is Mr. Solomon Gatton.  Representing

8     the State of Wisconsin, Outagamie County District

9     Attorney Carrie Schneider.  Also seated and

10    representing the State, Assistant District Attorneys

11    Andrew Maier and Alex Duros.

12         We are here -- the evidentiary portion of this

13    proceeding has closed.  Yesterday we did conduct our

14    informal jury instruction conference.  By and large

15    the parties agreed as to what instructions should be

16    included and what if any modifications should be made

17    to the same.  The only requested instruction which

18    was ultimately denied was the request for instruction

19    305.  That was presented by the defense, and again

20    the court felt that was not appropriate for

21    inclusion.

22         I have provided the parties with the updated

23    instructions as has been agreed upon.  And, Attorney

24    Schneider, to the best of your understanding, are

25    these the instructions that have been agreed upon?

3

1                    ATTORNEY SCHNEIDER:  Yes, Judge.

2                    THE COURT:  Attorney Vishny, the same

3          question.

4                    ATTORNEY VISHNY:  Yes.

5                    THE COURT:  Okay.  Additionally, it is

6          appropriate at this time, Mr. Lee, to conduct a brief

7          colloquy with you, sir, and again I would ask you to

8          raise your right hand.

9                    (Judge administers oath to defendant.)

10                   THE DEFENDANT:  I do.

11                   THE COURT:  All right.  Now, in one of the

12         charges, Mr. Lee, is felony -- felon in possession of

13         a firearm.  You do understand that, sir?

14                   THE DEFENDANT:  Yes, I do.

15                   THE COURT:  All right.  Now, you understand

16         that one of the elements that would need to be

17         established is that you were previously convicted of

18         a felony offense, correct?

19                   THE DEFENDANT:  Correct.

20                   THE COURT:  Now, you understand that you

21         have the right to have this jury, that is the twelve

22         people, decide whether or not the State has proved

23         beyond a reasonable doubt that you have been

24         convicted of a felony before the date of the offense

25         on which we are here today.  You do understand that?

4

```
 1                    THE DEFENDANT:  Yes, I do.
 2                    THE COURT:  Now, you understand that the
 3          State has to convince each member of the jury that
 4          you have been convicted of a felony before the date
 5          of this offense, correct?
 6                    THE DEFENDANT:  Correct.
 7                    THE COURT:  Now, with this stipulation that
 8          you've entered into, you're agreeing that I can tell
 9          the jury that you've been convicted of a felony
10          before the date of the offense in question today and
11          that they are to accept this fact as being
12          conclusively proved.
13                    THE DEFENDANT:  Yes.
14                    THE COURT:  Now, have you had an
15          opportunity previous to this moment to discuss the
16          pros and the cons and the advantages and
17          disadvantages of entering into that stipulation?
18                    THE DEFENDANT:  I have.
19                    THE COURT:  Are you satisfied that you've
20          had enough time to discuss that issue with your
21          attorneys, sir?
22                    THE DEFENDANT:  Yes.
23                    THE COURT:  Has anyone pressured you or
24          threatened you in any way or made promises to get you
25          to agree or enter into that stipulation?
```

5

1                THE DEFENDANT:  No.

2                THE COURT:  And are you entering into and

3       have you entered into that stipulation based on your

4       own free will?

5                THE DEFENDANT:  Yes, I have.

6                THE COURT:  Have you had enough time to

7       make your decision?

8                THE DEFENDANT:  Yes, I have.

9                THE COURT:  And, Attorneys Vishny and

10      Weitz, are you satisfied that Mr. Lee thoroughly

11      understands his right to enter into the agreement

12      regarding his prior conviction and likewise his right

13      to not enter into that agreement?

14               ATTORNEY VISHNY:  Yes.

15               THE COURT:  And are you satisfied that Mr.

16      Lee is entering into this agreement freely,

17      voluntarily and intelligently and knowingly?

18               ATTORNEY VISHNY:  Yes.

19               THE COURT:  Okay.  With that, and based

20      upon the comments of Mr. Lee, as well as

21      representations of counsel, I do find that Mr. Lee

22      has entered into that stipulation freely, voluntarily

23      and intelligently and knowingly.  And so, therefore,

24      the court does accept that stipulation.

25               With that, are we prepared to bring the jury in?

6

1          And again, my anticipated course of events would be I

2          will read the instructions.  Again, I would ask that

3          counsel follow along.  If you see any issue, I think

4          we've covered them all, but if you do see something;

5          please notify me immediately so that we can address

6          that issue.  Once we have completed the instructions,

7          I would anticipate we will do a brief five minutes to

8          get everybody ready for arguments.  Miss Schneider,

9          you would complete and perform your closing argument,

10         again, the five-minute break to allow, Attorney

11         Vishny, you an opportunity to get ready for yours.

12         If it's more minutes --

13              ATTORNEY VISHNY:  Yeah.  I would prefer

14         that we tell the jury ten because I -- you know, I

15         don't -- I want them to expect something longer and

16         be happier because we have quite a few exhibits we're

17         going to have to get together to do it.

18              THE COURT:  I think at this point they're

19         just happy if five minutes means thirty.  In any

20         event, I will give them a notification of a little --

21         a little more time.  And then, after that, there

22         would be a similar short break for you, Attorney

23         Schneider, to then perform your rebuttal.

24              ATTORNEY SCHNEIDER:  Thank you.

25              ATTORNEY WEITZ:  One other matter before we

7

1    bring in the jury, Your Honor.  Yesterday we had

2    talked about that we agreed that we could move items

3    that had not been moved into evidence yet into

4    evidence today.

5              THE COURT:  Correct.

6              ATTORNEY WEITZ:  So I went through and made

7    notes.  So at this time the defense would move Items

8    5 --

9              THE COURT:  Do you have --

10             ATTORNEY SCHNEIDER:  Yes.  She did just

11   give us that.

12             ATTORNEY WEITZ:  100, 106, 107, 111, 112,

13   113, 114, 118, 128, 132, 141, 142, 143, 146, 147,

14   149, 153, 154, 155, 156, 157, 158, 161, 162, 163,

15   164, 165, 176, 177, 178, 179, 180, 181, 182, 189, 194

16   and 198.  And many of those were transcripts, so we

17   would move those to the extent that they were

18   referenced during the trial.

19             THE COURT:  I'll give opposing counsel a

20   chance just to catch up if they need to.

21             ATTORNEY SCHNEIDER:  And I -- the only

22   ones -- and I don't know if 122 was mentioned, so we

23   would move in 122.  I think 126, 127, those were not

24   mentioned so I would move those in.  Actually I'm

25   going to just go over by the clerk, Judge, if that's

8

1          easier.  I think, Judge, what the State would move

2          in, and the clerk is going to just cross-check to

3          verify this, we would move in 44, 72 -- let me go

4          back.  61 through 69, 74, 94, 122, 126, 127, 136

5          through 140, and 199 through 203.  And then I think

6          we've got everything in but for there were a couple

7          things that were marked but not used by either party,

8          but we'll just have the clerk double-check that if

9          you don't mind at the end.

10                 THE COURT:  And if you -- either way, if

11         you're ready to make -- either way, if you're

12         prepared to look at that now or to decide whether

13         there's any objections to receipt of those, that's

14         fine.  If you need some time, that's fine as well.

15                 ATTORNEY SCHNEIDER:  We don't object to

16         anything they moved in.  I just wanted to make sure

17         we didn't miss a number in that sequence.

18                 THE COURT:  No.  Exactly.

19                 ATTORNEY VISHNY:  That's fine.

20                 ATTORNEY WEITZ:  We don't have any.

21                 THE COURT:  All mentioned exhibits will be

22         received.

23              Are we prepared to bring in the jury at this

24         time?

25                 ATTORNEY SCHNEIDER:  Yes.

9

1          THE COURT:  All right.  All rise please.

2          (The jury was escorted into the courtroom.)

3          THE COURT:  Please be seated.

4     Okay.  As I had indicated to you yesterday, we

5     have completed the evidentiary portion of these

6     proceedings, and so now it is my opportunity to

7     instruct you on the principles of law that will guide

8     you, after which time you will then hear the closing

9     arguments from the respective counsel.  And so, with

10    that, we will now begin with those instructions.

11         As I had mentioned, the court will now instruct

12    you upon the principles of law which you are to

13    follow in reaching the evidence and in reaching your

14    verdict.

15         It is your duty to follow all of these

16    instructions regardless of any opinion that you may

17    have about what the law is or ought to be.  You must

18    base your verdict on the law that I give you in these

19    instructions, apply that law to the facts in the case

20    which have been properly proven by the evidence.

21    Consider only the evidence received during this trial

22    and the law as given to you by these instructions,

23    and from these alone, guided by your soundest reason

24    and best judgment, reach your verdict.

25         If any member of the jury has an impression of

10

1       my opinion as to whether or not the defendant is

2       guilty or not guilty, disregard that impression

3       entirely and decide the issues of fact solely as you

4       view the evidence.  You the jury are the sole judges

5       of the facts, and the court is the judge of the law

6       only.

7            Now, evidence is:  First, the sworn testimony of

8       witnesses, both on direct and cross-examination,

9       regardless of who may have called the witness;

10      second, the exhibits the court has received, whether

11      or not an exhibit goes to the jury room; third, any

12      facts to which the lawyers have agreed or stipulated

13      or which the court has directed you to find.

14           Anything you may have seen or heard outside the

15      courtroom is not evidence.  You are to decide the

16      case solely on the evidence offered and received at

17      trial.

18           In reaching your verdicts, examine the evidence

19      with care and caution.  Act with judgment, reason and

20      prudence.

21           Defendants are not required to prove their

22      innocence.  The law presumes every person charged

23      with the commission of an offense to be innocent.

24      This presumption requires a finding of not guilty

25      unless in your deliberations you find it is overcome

1    by evidence which satisfies you beyond a reasonable

2    doubt that the defendant is guilty.

3         The burden of establishing every fact necessary

4    to constitute guilt is upon the State.  Before you

5    can return a verdict of guilty, the evidence must

6    satisfy you beyond a reasonable doubt that the

7    defendant is guilty.

8         If you can reconcile the evidence upon any

9    reasonable hypothesis consistent with the defendant's

10   innocence you should do so and return a verdict of

11   not guilty.

12        The term reasonable doubt means a doubt based on

13   reason and common sense.  It is a doubt for which a

14   reason can be given arising from a fair and rational

15   consideration of the evidence or lack of evidence.

16   It means such a doubt as would cause a person of

17   ordinary prudence to pause or hesitate when called

18   upon to act in the most important affairs of life.

19        A reasonable doubt is not a doubt which is based

20   upon mere guesswork or speculation.  A doubt which

21   arises merely from sympathy or from fear to return a

22   verdict of guilt is not a reasonable doubt.  A

23   reasonable doubt is not a doubt such as may be used

24   to escape the responsibility of a decision.

25        While it is your duty to give the defendant the

12

1    benefit of every reasonable doubt, you are not to

2    search for doubt.

3        Now, the identification of the defendant is an

4    issue in this case and you should give it your

5    careful attention.  You should consider the

6    reliability of any identification made by a witness

7    regardless -- whether made in or out of court.  You

8    should consider the credibility of a witness making

9    an identification of the defendant in the same way

10   you determine or consider the credibility of any

11   other witness.

12       Identification evidence involves an expression

13   of belief or impression by the witness.  Its value

14   depends on the opportunity the witness had to observe

15   the offender at the time of the offense and later to

16   make a reliable identification.

17       Consider the witness's opportunity for

18   observation, how long the observation lasted, how

19   close the witness was, the lighting, the mental state

20   of the witness at the time, the physical ability of

21   the witness to see and hear the events, and any other

22   circumstances of the observation.

23       You should also consider the period of time

24   which elapsed between the witness's observation and

25   the identification of the defendant and any

1    intervening events which may have affected or

2    influenced the identification.

3        In evaluating the identification evidence, you

4    are to consider those factors which might affect

5    human perception and memory and all the influences

6    and circumstances relating to the identification.

7    Then give the evidence the weight you believe it

8    should receive.

9        If you find the crime alleged was committed,

10   before you may find the defendant guilty, you must be

11   satisfied beyond a reasonable doubt that the

12   defendant is the person who committed the crime.

13       Now, an information is nothing more than a

14   written formal accusation against a defendant

15   charging the commission of one or more criminal acts.

16   You are not to consider it as any evidence against

17   the defendant in any way.  It does not raise any

18   inference of guilt.

19       Now, the first count of the information in this

20   case charges that the defendant, on or about Sunday,

21   December 8th of 2013, in the City of Appleton,

22   Outagamie County, Wisconsin, did cause the death of

23   Joshua Richards with the intent to kill that person

24   contrary to Wisconsin statutes.

25       To this charge, the defendant has entered a plea

14

1    of not guilty which means that the State must prove

2    every element of the offense charged beyond a

3    reasonable doubt.

4         Now, the crime referred to -- I'm sorry -- as

5    mentioned, the defendant in this case is charged with

6    first-degree intentional homicide and you must first

7    consider whether the defendant is guilty of that

8    offense.  If you are not satisfied the defendant is

9    guilty of first-degree intentional homicide, you must

10   consider whether or not the defendant is guilty of

11   first-degree reckless homicide which is a less

12   serious degree of criminal homicide.

13        The crimes referred to as first-degree

14   intentional and first-degree reckless homicide are

15   different types of homicide.  Homicide is the taking

16   of the life of another human being.  The degree of

17   homicide defined by the law depends on the facts and

18   circumstances of each particular case.

19        Both intentional and reckless homicide require

20   that the defendant caused the death of the victim.

21   First-degree intentional homicide requires that the

22   State prove that the defendant acted with the intent

23   to kill.  First-degree reckless homicide requires

24   that the defendant acted recklessly under

25   circumstances which show utter disregard for human

15

1     life.  It is for you to decide of what type of

2     homicide the defendant is guilty, if guilty at all,

3     according to the instructions which define the two

4     offenses.

5          First-degree intentional homicide is defined in

6     Wisconsin statutes of the Criminal Code as committed

7     by one who causes the death of another human being

8     with the intent to kill that person or another.

9          Before you may find the defendant guilty of

10    first-degree intentional homicide, the State must

11    prove by evidence which satisfies you beyond a

12    reasonable doubt that the following two elements were

13    present.

14         The defendant caused the death of Joshua

15    Richards.

16         Cause means that the defendant's act was a

17    substantial factor in producing death.

18         Two, the defendant acted with the intent to kill

19    Joshua Richards.

20         Intent to kill means that the defendant had the

21    mental purpose to take the life of another human

22    being or was aware that his conduct was practically

23    certain to cause the death of another human being.

24         While the law requires that the defendant acted

25    with intent to kill, it does not require that the

16

1     intent exist for any particular length of time before

2     the act is committed.  The act not be brooded over,

3     considered or reflected upon for a week, a day, an

4     hour, or even a minute.  There need not be any

5     appreciable time between the information (sic) of the

6     intent -- I'm sorry, between the formation of the

7     intent and the act.  The intent to kill may be formed

8     at any time before the act, including the instant

9     before the act, and must continue to exist at the

10    time of the act.

11         You cannot look into a person's mind to find

12    intent.  Intent to kill must be found, if found at

13    all, from the defendant's acts, words and statements,

14    if any, and from all the facts and circumstances in

15    this case bearing upon intent.

16         Intent should not be confused with motive.

17    While proof of intent is necessary to a conviction,

18    proof of motive is not.  Motive refers to a person's

19    reason for doing something.  While motive may be

20    shown as a circumstance to aid in establishing the

21    guilt of a defendant, the State is not required to

22    prove motive on the part of a defendant in order to

23    convict.  Evidence of motive by itself does not

24    establish guilt.  You should give it the weight you

25    believe it deserves under all of the circumstances.

17

1    If you are satisfied beyond a reasonable doubt

2    that the defendant caused the death of Joshua

3    Richards with the intent to kill, you should find the

4    defendant guilty of first-degree intentional

5    homicide.

6    If you are not so satisfied, you must find the

7    defendant not guilty of first-degree intentional

8    homicide and you should consider -- if you are not so

9    satisfied you must find the defendant not guilty of

10    first-degree intentional homicide and you should

11    consider whether the defendant is guilty of

12    first-degree reckless homicide in violation of

13    Wisconsin statutes which is a lesser included offense

14    of first-degree intentional homicide.

15    You should make every reasonable effort to agree

16    unanimously on the charge of first-degree intentional

17    homicide before considering the offense of

18    first-degree reckless homicide.  However, if after

19    full and complete consideration of the evidence you

20    conclude that further deliberation would not result

21    in a unanimous agreement on the charge of

22    first-degree intentional homicide, you should

23    consider whether the defendant is guilty of

24    first-degree reckless homicide.

25    First-degree reckless homicide, as defined in

18

1       Wisconsin statutes, is committed by one who

2       recklessly causes the death of another human being

3       under circumstances that show utter disregard for

4       human life.

5           Before you may find the defendant guilty of

6       first-degree reckless homicide, the State must prove

7       by evidence which satisfies you beyond a reasonable

8       doubt that the following three elements were present:

9           One, the defendant caused the death of Joshua

10      Richards.

11          Cause means that the defendant's act was a

12      substantial factor in producing death.

13          Two, the defendant caused the death by

14      criminally reckless conduct.

15          Criminally reckless conduct means the conduct

16      created a risk of death or great bodily harm to

17      another person, and the risk of death or great bodily

18      harm was unreasonable and substantial, and the

19      defendant was aware that his conduct created the

20      unreasonable and substantial risk of death or great

21      bodily harm.

22          Three, the circumstances of the defendant's

23      conduct showed utter disregard for human life.

24          In determining whether the circumstances of the

25      conduct showed utter disregard for human life,

19

1    consider these factors:  What the defendant was

2    doing; why the defendant was engaged in that conduct;

3    how dangerous the conduct was; how obvious the danger

4    was; whether the conduct showed any regard for life;

5    and all other facts and circumstances relating to the

6    crime.

7         Consider also the defendant's conduct after the

8    death to the extent it helps you decide whether or

9    not the circumstances showed utter disregard for

10   human life at the time the death occurred.

11        If you are satisfied beyond a reasonable doubt

12   that the defendant caused the death of Joshua

13   Richards by criminally reckless conduct and that the

14   circumstances of the conduct showed utter disregard

15   for human life, you should find the defendant guilty

16   of first-degree reckless homicide.

17        If you are not so satisfied, you must find the

18   defendant not guilty.

19        You are not, in any event, to find the defendant

20   guilty of more than one offense.

21        Now, the information alleges not only that the

22   defendant committed the crime of first-degree

23   intentional homicide but also that the defendant –

24   I'm sorry, let me back up – first-degree intentional

25   homicide, the lesser included being the first-degree

1    reckless homicide, but also that the defendant did so

2    while using a dangerous weapon.

3        If you find the defendant guilty, you must

4    answer the following question:

5        Did the defendant commit the crime of

6    first-degree intentional homicide or first-degree

7    reckless homicide while using a dangerous weapon.

8        Dangerous weapon means any firearm, whether

9    loaded or unloaded.  A firearm is a weapon that acts

10   by force of gunpowder.  Before you answer this

11   question yes, you must be satisfied beyond a

12   reasonable doubt that the defendant committed the

13   crime while using a dangerous weapon.

14       If you are not so satisfied, you must answer the

15   question no.  The second count of the information

16   charges that the defendant, on or around Sunday,

17   December 8th, 2013, in the City of Appleton,

18   Outagamie County, Wisconsin, did possess a firearm

19   subsequent to the conviction of a felony or other

20   crime as specified in Wisconsin statutes.

21       To this charge the defendant has also entered a

22   plea of not guilty which means that the State must

23   prove every element of the offense charged beyond a

24   reasonable doubt.

25       Now, before you may find the defendant guilty of

21

1    this offense, the State must prove by evidence which

2    satisfies you beyond a reasonable doubt that the

3    following element was present:

4        The defendant possessed a firearm.

5        Firearm means a weapon which acts by the force

6    of gunpowder.

7        Possess means that the defendant knowingly had

8    actual physical control of a firearm.

9        The parties have agreed that the defendant was

10    convicted of a felony before December 8th of 2013 and

11    you must accept this as conclusively proved.

12        If you are satisfied beyond a reasonable doubt

13    that the element of this offense has been proved, you

14    should find the defendant guilty.

15        If you are not so satisfied, you must find the

16    defendant not guilty.

17        Now, evidence has been presented that the

18    defendant was previously convicted of a felony for

19    which the defendant is not on trial.

20        You may consider this evidence only for the

21    purpose of determining whether or not the defendant

22    is guilty of possession of a firearm by a convicted

23    felon.  It is not to be used to conclude that the

24    defendant is a bad person and for that reason is

25    guilty of the other offenses charged.

22

1        Now, Counts 3 through 6 allege that the

2     defendant, on or about December 12th of 2013 through

3     February 12th of 2014, Outagamie County, Wisconsin,

4     as a party to the crime, knowingly and maliciously

5     did attempt to prevent or dissuade a witness from

6     attending or giving testimony at a trial, proceeding

7     or inquiry authorized by law where the act is

8     committed by a person who is charged with a felony in

9     connection with a trial, proceeding or inquiry for

10    that crime.

11       Now, Section 939.05 of the Criminal Code

12    provides that whoever is concerned in the commission

13    of a crime is a party to that crime and may be

14    convicted of that crime although the person did not

15    directly commit it.

16       The State contends that the defendant was

17    concerned in the commission of the crime of

18    intimidation of a witness by either directly

19    committing it or by intentionally aiding and abetting

20    the person who directly committed it.  If a person

21    intentionally aids and abets the commission of a

22    crime, then that person is guilty of the crime as

23    well as the person who directly committed it.

24       A person intentionally aids and abets the

25    commission of a crime when acting with the knowledge

23

1       or belief that another person is committing or

2       intends to commit a crime, he knowingly either

3       assists the person who commits the crime or is ready

4       and willing to assist and the person who commits the

5       crime knows of the willingness to assist.

6              To intentionally aid and abet intimidation of a

7       witness, the defendant must know that the other

8       person is committing or intends to commit the crime

9       of intimidation of a witness and have the purpose to

10      assist the commission of that crime.

11             Before you find the defendant guilty -- or

12      before you may find the defendant guilty, the State

13      must prove by evidence which satisfies you beyond a

14      reasonable doubt that the defendant directly

15      committed the crime of intimidation of a witness or

16      intentionally aided and abetted the commission of

17      that crime.

18             All twelve jurors do not have to agree whether

19      the defendant directly committed the crime or aided

20      and abetted the commission of the crime; however,

21      each juror must be convinced beyond a reasonable

22      doubt that the defendant was concerned in the

23      commission of the crime in one of those ways.

24             Intimidation of a witness, as defined by

25      Wisconsin statutes, is committed by one who knowingly

24

1    and maliciously attempts to prevent or dissuade any

2    witness from attending or giving testimony at any

3    trial, proceeding or inquiry authorized by law.

4        Before you may find the defendant guilty of each

5    of these offenses, the State must prove by evidence

6    which satisfies you beyond a reasonable doubt that

7    the following three elements were present:

8        As to Count 3, Paul Lee was a witness.

9        Witness means any person who has been called to

10   testify or who is expected to be called to testify.

11       Two, the defendant attempted to prevent Paul Lee

12   from attending or giving testimony at a proceeding

13   authorized by law.

14       A preliminary hearing is a proceeding authorized

15   by law.

16       Three, the defendant acted knowingly and

17   maliciously.

18       This requires that the defendant knew Paul Lee

19   was a witness and that the defendant acted with the

20   purpose to prevent Paul Lee from attending or

21   testifying.

22           ATTORNEY WEITZ:  Your Honor, could we

23   approach?

24           THE COURT:  You may.

25           (Bench conference.)

25

1           THE COURT:  You cannot look into a person's

2       mind to find intent.  Intent must be found, if found

3       at all, from the defendant's acts, words and

4       statements, if any, and from all the facts and

5       circumstances in this case bearing upon intent.

6           If you are satisfied beyond a reasonable doubt

7       that the defendant directly committed all three

8       elements of intimidation of a witness or that the

9       defendant intentionally aided and abetted the

10      commission of that crime, you should find the

11      defendant not guilty -- guilty -- you should find the

12      defendant guilty and answer the following question

13      yes or no.  If you are not so satisfied, you must

14      answer -- you must find the defendant not guilty.

15          If you find the defendant guilty, you must

16      answer the following question:

17          Did the defendant commit the act in connection

18      with a trial, proceeding or inquiry in a felony case

19      in which he was charged.

20          If you are satisfied beyond a reasonable doubt

21      that the defendant committed the act in connection

22      with a trial, proceeding or inquiry in a felony case

23      in which he was charged, you should answer the

24      question yes.

25          If you are not so satisfied, you must answer the

26

1    question no.

2        As to Count 4, the State would have to prove

3    that Joe Thor was a witness.

4        Witness means any person who has been called to

5    -- has been -- who has been called to testify or who

6    is expected to be called to testify.

7        Two, the defendant attempted to prevent Joe Thor

8    from attending or giving testimony at a proceeding

9    authorized by law.

10       A preliminary hearing is a proceeding authorized

11   by law.

12       Three, the defendant acted knowingly and

13   maliciously.

14       This requires that the defendant knew Joe Thor

15   was a witness and that the defendant acted with the

16   purpose to prevent Joe Thor from attending or

17   testifying.

18       You cannot look into a person's mind to find

19   intent.  Intent must be found, if at all, from the

20   defendant's acts, words and statements, if any, and

21   from all of the facts and circumstances in the case

22   bearing upon intent.

23       If you are so satisfied beyond a reasonable

24   doubt that the defendant directly committed all three

25   elements of intimidation of a witness or that the

27

1    defendant intentionally aided and abetted the

2    commission of that crime, you should find the

3    defendant guilty and answer the following question

4    yes or no.  If you are not so satisfied, you must

5    find the defendant not guilty.

6         Again, the following question upon a finding of

7    guilt is:

8         Did the defendant commit the act in connection

9    with a trial, proceeding or inquiry in a felony case

10   in which he was charged.

11        If you are satisfied beyond a reasonable doubt

12   that the defendant committed the act in connection

13   with a trial, proceeding or inquiry in a felony case

14   in which he was charged, you should answer the

15   question yes.

16        If you are not so satisfied, you must answer the

17   question no.  As to Count 5 -- and I should mention,

18   as to Counts 3 and 4, as well as Count 5, to those

19   charges the defendant has entered a plea of not

20   guilty which again means the State must prove every

21   element of those offenses charged beyond a reasonable

22   doubt.

23        As to Count 5, the State must prove that Melanie

24   Thao was a witness.

25        Witness means any person who has been called to

28

1     testify or who is expected to be called to testify.

2         Two, the defendant attempted to prevent Melanie

3     Thao from attending or giving testimony at a

4     proceeding authorized by law.

5         A preliminary hearing is a proceeding authorized

6     by law.

7         Three, the defendant acted knowingly and

8     maliciously.

9         This requires that the defendant knew Melanie

10    Thao was a witness and that the defendant acted with

11    the purpose to prevent Melanie Thao from attending or

12    testifying.

13        You cannot look into a person's mind to find

14    intent.  Intent must be found, if found at all, from

15    the defendant's acts, words and statements, if any,

16    and from all of the facts and circumstances in this

17    case bearing upon intent.

18        If you are so satisfied beyond a reasonable

19    doubt that the defendant directly committed all three

20    elements of intimidation of a witness or that the

21    defendant intentionally aided and abetted the

22    commission of that crime, you should find the

23    defendant guilty and answer the following question

24    yes or no.

25        Again, if you are not so satisfied, you must

1     find the defendant not guilty.

2         But the following question again is:

3         Did the defendant commit the act in connection

4     with a trial, proceeding or inquiry in a felony case

5     in which he was charged.

6         If you are satisfied beyond a reasonable doubt

7     that the defendant committed the act in connection

8     with a trial, proceeding or inquiry in a felony case

9     in which he was charged, you should answer the

10     question yes.

11         If you are not so satisfied, you must answer the

12     question no.

13         Now, the sixth count of the information again is

14     similar to Counts 3, 4 and 5.  And again, to Count 6,

15     the defendant has also entered a plea of not guilty

16     which means the State must prove every element of the

17     offense charged beyond a reasonable doubt.

18         As to Count 6, the State must prove that

19     Stephanie Thao was a witness.

20         Witness, again, means any person who has been

21     called to testify or who is expected to be called to

22     testify.

23         Two, the defendant attempted to prevent

24     Stephanie Thao from attending or giving testimony at

25     a proceeding authorized by law.

30

1          A preliminary hearing is a proceeding authorized

2     by law.

3          Three, the defendant acted knowingly and

4     maliciously.

5          This requires that the defendant knew Stephanie

6     Thao was a witness and that the defendant acted with

7     a purpose to prevent Stephanie Thao from attending or

8     testifying.

9          You cannot look in a person's mind to find

10     intent.  Intent must be found, if found at all, from

11     the defendant's acts, words and statements, if any,

12     and from all the facts and circumstances in this case

13     bearing upon intent.

14          If you are satisfied beyond a reasonable doubt

15     that the defendant directly committed all three

16     elements of intimidation of a witness or that the

17     defendant intentionally aided and abetted the

18     commission of that crime, you should find the

19     defendant guilty and answer the following question

20     yes or no.

21          Again, if you are not satisfied, you must find

22     the defendant not guilty.

23          The following question is:

24          Did the defendant commit the act in connection

25     with a trial, proceeding or inquiry in a felony case

1       in which he was charged.

2               If you are satisfied beyond a reasonable doubt

3       that the defendant committed the act in connection

4       with a trial, proceeding or inquiry in a felony case

5       in which he was charged, you should answer the

6       question yes.

7               If you are not so satisfied, you must answer the

8       question no.

9               Now, an exhibit becomes evidence only when

10      received by the court.  An exhibit marked for

11      identification and not received is not evidence.  An

12      exhibit received is evidence whether or not it goes

13      to the jury room.

14              The District Attorney and the attorney for the

15      defense have stipulated or agreed to the existence of

16      certain facts, and you must accept those facts as

17      conclusively proved.

18              You are to disregard any question that the court

19      did not allow to be answered.  Do not guess at what

20      the witness's answer might have been.  If the

21      question itself suggested that certain information

22      might be true, ignore the suggestion and do not

23      consider it as evidence.

24              During the trial, the court has ordered certain

25      testimony to be stricken.  Disregard all stricken

32

1      testimony.

2           Remarks of the attorneys are not evidence.  If

3      the remarks suggested certain facts not in evidence,

4      disregard the suggestion.

5           Consider carefully the closing arguments of the

6      attorneys, but their arguments and conclusions and

7      opinions are not evidence.  Draw your own conclusions

8      from the evidence and decide upon your verdict

9      according to the evidence under the instructions

10     given to you by the court.

11          It is not necessary that every fact be proved

12     directly by a witness or an exhibit.  A fact may be

13     proved indirectly by circumstantial evidence.

14     Circumstantial evidence is evidence from which a jury

15     may logically find other facts according to common

16     sense and -- common knowledge and experience.

17          Circumstantial evidence is not necessarily

18     better or worse than direct evidence.  Either type of

19     evidence can prove a fact.

20          Whether evidence is direct or circumstantial, it

21     must find -- it must satisfy you beyond a reasonable

22     doubt that the defendant committed the offense before

23     you may find the defendant guilty.

24          Now, evidence has been presented related to the

25     defendant's conduct after the alleged crime was

33

1    committed.  Whether the evidence shows a

2    consciousness of guilt and whether consciousness of

3    guilt shows actual guilt are matters exclusively for

4    you to decide.

5         Now, intent should not be confused with motive.

6    While proof of intent is necessary to a conviction,

7    proof of motive is not.

8         Motive refers to a person's reason for doing

9    something.  While motive may be shown as a

10   circumstance to aid in establishing the guilt of a

11   defendant, the State is not required to prove motive

12   on the part of a defendant in order to convict.

13   Evidence of motive does not by itself establish

14   guilt, and you should give it the weight you believe

15   it deserves under all of the circumstances.

16        Now, the State has introduced evidence of

17   statements which it claims were made by the

18   defendant.  It is for you to determine how much

19   weight, if any, to give each statement.

20        In evaluating each statement you must determine

21   three things:

22        Whether the statement was actually made by the

23   defendant.  Only so much of a statement as was

24   actually made by a person may be considered as

25   evidence.

34

1          Whether the statement was accurately restated

2     here at trial.

3          Whether the statement or any part of it ought to

4     be believed.

5          You should consider the facts and circumstances

6     surrounding the making of each statement along with

7     all of the other evidence in determining how much

8     weight, if any, the statement deserves.

9          The weight of evidence does not depend on the

10    number of witnesses on each side.  You may find that

11    the testimony of one witness is greater -- is

12    entitled to greater weight than that of another

13    witness or even of several other witnesses.

14         In weighing the evidence you may take into

15    account matters of your common knowledge and your

16    observations and experience in the affairs of life.

17         Now, attorneys for each side have the right and

18    the duty to object to what they consider are improper

19    questions asked of witnesses and to the admission of

20    other evidence which they believe is not properly

21    admissible.  You should not draw any conclusions from

22    the fact an objection was made.

23         By allowing testimony or other evidence to be

24    received over the objection of counsel, the court is

25    not indicating any opinion about the evidence.  You

35

1      jurors are the judges of the credibility of the

2      witnesses and the weight of the evidence.

3           Now, if you find that the offense -- the offense

4      charged was committed by the defendant, it is not

5      necessary for the State to prove that the offense was

6      committed on the precise date alleged in the

7      information.  If the evidence shows beyond a

8      reasonable doubt that the offense was committed on a

9      date near the date alleged, that is sufficient.

10          Now, it is the duty of the jury to scrutinize

11     and to weigh the testimony of witnesses and to

12     determine the effect of the evidence as a whole.  You

13     are the sole judges of credibility, that is, the

14     believability of the witnesses and of the weight to

15     be given to their testimony.

16          In determining the credibility of each witness

17     and the weight you give to the testimony of each

18     witness, consider these factors:

19          Whether the witness has an interest or lack of

20     interest in the result of this trial;

21          The witness's conduct, appearance and demeanor

22     on the witness stand;

23          The clearness or lack of clearness of the

24     witness's recollections;

25          The opportunity the witness had for observing

36

1        and for knowing the matters the witness testified

2        about;

3             The reasonableness of the witness's testimony;

4             The apparent intelligence of the witness;

5             Bias or prejudice, if any has been shown;

6             And possible motives for falsifying testimony;

7             And all other facts and circumstances during the

8        trial which tend either to support or to discredit

9        the testimony.

10            Then give to the testimony of each witness the

11       weight you believe it should receive.

12            There is no magic way for you to evaluate the

13       testimony.  Instead, you should use your common sense

14       and experience.  In everyday life you determine for

15       yourselves the reliability of things people say to

16       you, and you should do the same thing here.

17            Now, evidence has been received that one of the

18       witnesses in this trial has been convicted of crimes.

19       The evidence was received solely because it bears

20       upon the credibility of the witness.  It must not be

21       used for any other purpose.

22            Now, a defendant in a criminal trial has the

23       absolute constitutional right not to testify.

24            The defendant's decision not to testify must not

25       be considered by you in any way and must not

37

1    influence your verdict in any manner.

2         You are to decide this case fairly and

3    impartially.

4         You are to decide only whether the defendant is

5    guilty or not guilty of the offenses charged.  Any

6    consequences of your verdict are matters for the

7    court alone to decide and must not affect your

8    deliberations.

9         Before I turn it over to closing arguments, I do

10   want to reread one instruction to you, and that again

11   is the burden of proof and the presumption of --

12             ATTORNEY VISHNY:  Judge, can we approach?

13             THE COURT:  You may.

14             (Bench conference.)

15             THE COURT:  Okay.  And I was -- I was

16   corrected.  I have three instructions to read to you.

17        The first is ordinarily a witness may testify

18   only about facts.  However, a witness with expertise

19   in a particular field may give an opinion in that

20   field.

21        In determining the weight to give to this

22   opinion you should consider the qualifications and

23   credibility of the witness, the facts upon which the

24   opinion is based, and the reason given for that

25   opinion.

38

1          Opinion evidence was received to help you reach

2     a conclusion.  However, you are not bound by any

3     expert's opinion.

4          Now, I'd also informed you about objections, but

5     additionally I should mention to you that attorneys

6     for each side have the right and the duty to object

7     to what they consider are improper questions asked of

8     witnesses and to the admission of other evidence

9     which they believe is not properly admissible.  You

10     should not draw any conclusions from the fact an

11     objection was made.

12          By allowing testimony or other evidence to be

13     received over the objection of counsel, the court is

14     not indicating any opinion about the evidence.  You

15     the jurors are the judges of the credibility of the

16     witness and the weight of the testified evidence.

17          Finally, I'm going to reread to you the burden

18     of proof and the presumption of innocence.

19          In reaching your verdicts examine the evidence

20     with care and caution.  Act with judgment, reason and

21     prudence.

22          Defendants are not required to prove their

23     innocence.  The law presumes every person charged

24     with the commission of an offense to be innocent.

25     This presumption requires a finding of not guilty

1    unless in your deliberations you find it is overcome

2    by evidence which satisfied you beyond a reasonable

3    doubt that the defendant is guilty.

4        The burden of establishing every fact necessary

5    to constitute guilt is upon the State.  Before you

6    can return a verdict of guilty, the evidence must

7    satisfy you beyond a reasonable doubt that the

8    defendant is guilty.  If you can reconcile the

9    evidence upon any reasonable hypothesis consistent

10    with the defendant's innocence, you should do so and

11    return a verdict of not guilty.

12        The term reasonable doubt means a doubt based

13    upon reason and common sense.  It is a doubt for

14    which a reason can be given arising from a fair and

15    rational consideration of the evidence or lack of

16    evidence.  It means such a doubt as would cause a

17    person of ordinary prudence to pause or hesitate when

18    called upon to act in the most important affairs of

19    life.

20        A reasonable doubt is not a doubt which is based

21    on sympathy, guesswork or speculation.  A doubt which

22    arises merely from sympathy or from fear to return a

23    verdict of guilt is not a reasonable doubt.  A

24    reasonable doubt is not a doubt such as may be used

25    to escape the responsibility of a decision.

40

1          Now, while it is your duty to give the defendant

2      the benefit of every reasonable doubt, you are not to

3      search for doubt, you are to search for the truth.

4          With that, any -- counsel need to approach on

5      anything?

6              ATTORNEY VISHNY:  No.

7              ATTORNEY WEITZ:  No, Your Honor.

8              THE COURT:  Attorney Schneider, do you need

9      a few moments before we go directly into --

10             ATTORNEY SCHNEIDER:  Maybe for a bathroom

11     break, so just five.

12             THE COURT:  We will take a brief restroom

13     break and be ready for closing arguments momentarily.

14         Please rise for the jury.

15             (The jury was escorted out of the

16     courtroom.)

17             ATTORNEY SCHNEIDER:  During the time when

18     you were reading, someone in the back was either

19     answering a call or on their cell phones, so I'm just

20     going to ask that you remind everybody there should

21     be no cell phone use while the parties are giving

22     closing argument.

23             THE COURT:  Yes.  I'd ask that everyone

24     turn off their cell phones please.

25         And then, likewise, the gallery has been

41

1          wonderful up to this point, but just because this is

2          the last opportunity for the jury to hear from

3          respective counsel, that everyone maintain

4          appropriate courtroom decorum and remain silent

5          during the presentations.

6                We can bring in the jury.

7                     (The jury was escorted into the courtroom.)

8                     THE COURT:  Please be seated.

9                Attorney Schneider, are you prepared to proceed?

10                    ATTORNEY SCHNEIDER:  Yes, Your Honor.

11         Thank you.

12               First and foremost, I need to thank each one of

13         you for your time and your attention that you've

14         given this case over the last several days.

15               Your job is really now about to begin.  It is a

16         job in which you've taken the time over the last

17         several days of testimony to listen to the witnesses,

18         to examine exhibits, review them, listen to

19         witnesses' statements, look at items we've shown you,

20         and really now it turns for you to render a verdict

21         in this case.

22               As I think I said to you in openings, it's one

23         of the reasons why we stand when you enter the room.

24         We give you that same respect because you are going

25         to decide the verdicts in this case, the same respect

42

1     we give when the judge enters the courtroom.

2          Closing arguments are really kind of like a

3     wrap-up or a snapshot of the evidence and testimony

4     that you've heard over the last several days.

5     Because this case has been as long as it has taken us

6     to present all the witnesses and the testimony to

7     you, it is going to take a little bit of time to give

8     you that snapshot.  It is a job in rendering this

9     verdict I know you will take significantly, you will

10     consider it, be careful and deliberate.

11          As the judge has instructed you, in this case

12     the State has chosen and has charged the defendant,

13     Chong Lee, with the crime of first-degree intentional

14     homicide for causing the death of Joshua Richards

15     back on December 8th, 2013.  There are additional

16     charges of possession of a firearm by a felon and

17     then four counts of intimidation of a witness, one

18     count related to Paul Lee, one count for Joe Thor,

19     one count for Stephanie Thao, and one count for

20     Melanie Thao.

21          Before I start reviewing with you the facts and

22     the evidence we've heard about those offenses, I want

23     to review with you the elements, briefly, of the

24     offenses.

25          First-degree intentional homicide.  December

43

1    8th, 2013, City of Appleton, Outagamie County,

2    Wisconsin. Two elements: Defendant caused the death

3    of Joshua Richards; second element, that he acted

4    with the intent to kill Joshua Richards.

5        Judge has read to you what does intent mean.

6    Intent means the defendant had the mental purpose to

7    take the life of another human being or was aware

8    that his conduct was practically certain to cause the

9    death of another human being. It's first defined --

10    there is no requirement that the intent exist for any

11    particular length of time before the act is

12    committed. It's not something, and the State has not

13    alleged in this case, that there was any preplan,

14    preplanning, med -- time period before. The act need

15    not be brooded over, considered or reflected upon for

16    a week, a day, an hour or even a minute. The intent

17    to kill may be formed at any time before the act,

18    including the instant before the act occurs. It must

19    continue at the time of the act.

20        So the State is going to argue to you the intent

21    is when he has that gun raised intentionally pointing

22    at Josh Richards' head and he pulls that trigger. It

23    may not be brooded over, thought about, planned or

24    considered for weeks or months. It happens at that

25    moment in this case.

1           The judge has also instructed you that in this

2      case there is also a lesser included instruction that

3      you're going to be given on the homicide charge, and

4      that is for the lesser included instruction of

5      first-degree reckless homicide.

6           So what you're to do is you're to first make

7      every reasonable effort between the group of you

8      that's selected to serve as our jurors to agree

9      unanimously on first-degree intentional homicide

10     first.  You must make every effort to try to agree

11     unanimously on first-degree intentional before you

12     consider first-degree reckless.

13          If you get to that point of considering

14     first-degree reckless, the elements -- first element

15     is similar.  Defendant caused the death of Joshua

16     Richards.  Defendant caused the death by criminally

17     reckless conduct.  The conduct created a risk of

18     death or great bodily harm.  The risk of death or

19     great bodily harm was unreasonable and substantial.

20     The defendant was aware that his conduct created the

21     unreasonable and substantial risk of death or great

22     bodily harm and under circumstances which showed

23     utter disregard for human life.

24          One of those terms I think you can get on your

25     own, utter disregard for human life, but the judge

45

1     has instructed you you can consider what he was

2     doing, how dangerous the conduct was, how obvious the

3     danger was, why he engaged in the conduct, whether

4     the conduct showed any regard for human life, and all

5     other facts and circumstances around reckless --

6     showing utter disregard.

7          There is an additional question you have to

8     answer on the homicide charge that will be on the

9     verdict form that's presented to you, and that is,

10    did this defendant commit the offense while using a

11    dangerous weapon.  And you'll see that on the verdict

12    form that's presented to you.

13         Second count in this case, possession of a

14    firearm by a felon.  Again, December 8th, 2013, City

15    of Appleton, Outagamie County, Wisconsin, did the

16    defendant possess a firearm.

17         The parties have agreed that the defendant was

18    convicted of a felony before December 8th, 2013, and

19    you must accept this as conclusively proven.  So you

20    really just have to decide if you believe he had a

21    firearm on December 8th, 2013.

22         The last four counts are all similar, and we're

23    going to kind of describe them.  It is party to the

24    crime of intimidation of a witness.  Time period,

25    December 12th, 2013, through February 12th, 2014.

46

1          Count 1, Paul Lee, Count 2 -- I'm sorry.  Count 4,

2     Paul Lee -- we'll start over.  Count 3, Paul Lee;

3     Count 4, Joe Thor; Count 5, Melanie Thao; Count 6,

4     Stephanie Thao.

5          Party to the crime.  It is committed by someone

6     who directly commits the offense or someone who aids

7     or abets the person who does.  That's kind of a weird

8     word.  Aids or abets means that you assist the person

9     who commits the crime or are ready and willing to

10    assist the person and the person who commits a crime

11    knows of your willingness to assist.  So that's party

12    to the crime.  He either directly committed it or

13    with another assisted in committing the crime.

14         Intimidation of a witness.  Each person in this

15    was a witness, a person who is expected to be called

16    to testify.  The defendant attempted to prevent or

17    dissuade the person from attending or giving

18    testimony at a proceeding authorized by law.  A

19    preliminary hearing is a proceeding authorized by

20    law.

21         That this defendant acted knowingly and

22    maliciously.

23         The defendant -- you'll also be asked to

24    consider and answer did the defendant commit the act

25    in connection with a proceeding in a felony case in

47

1     which he was charged; so, in essence, the theory that

2     he's encouraging them or to prevent or dissuade them

3     from coming, was that tied to a hearing related to

4     the homicide, to the felony in which he was charged.

5          At the conclusion of the case, I will ask you to

6     return a guilty verdict for each of those crimes

7     we've discussed.

8          The court has read to you an instruction called

9     burden of proof.  You'll hear and you have heard from

10    the start of the case the burden is on the State to

11    prove to you every element in this case beyond a

12    reasonable doubt.  What's reasonable doubt?  Judge

13    has given you instructions on that, but it is a doubt

14    for which you can give a reason.  It is not a

15    situation where you have to search for doubt.  Judge

16    has told you in this case you are to search for the

17    truth.  You're not asked to guess or speculate on

18    remote possibilities, you are to use your common

19    sense and life experiences.

20         Many things, Miss Wendy, I don't know her last

21    name so I would call her Miss Wendy, has probably

22    instructed you throughout this week, probably told

23    you can't bring in your phones in the courtroom, just

24    so they're not a distraction, but we never tell you

25    to leave your common sense or your life experiences

48

1     at the door.  Those you bring with you when you weigh

2     and decide this case.

3          The State is confident that the evidence and

4     testimony we have presented to you will show beyond a

5     reasonable doubt the defendant is guilty of each of

6     the crimes charged, and by each of the crimes charged

7     I mean the first-degree intentional homicide charge

8     as well as the possession of firearm and the four

9     counts of intimidation of a witness.

10         I typically like to tell a story in a sequence,

11     and in this case I'm going to ask you to bear with me

12     because before we talk about the night of the

13     homicide, I think it's easier and faster to talk

14     about those intimidation charges and the jail phone

15     calls and the letters that we heard about those

16     intimidation charges.

17         So I want to first talk about what -- Counts 3

18     and 4 which are the counts that relate to Joe Thor

19     and Paul Lee.  I think I actually typed those in

20     reverse.  But there is a jail phone call.  December

21     28th.  Teng:  Fuck.  All right.  Dumb but -- oh, man.

22     I don't inaudible those people were fucking thinking.

23     Chong:  It's not your brother so I am not worried.

24     Your brother knows his part.  Remember you heard

25     Teng's brother is Phong Lee.  Teng:  Well, I know

49

1    that, yeah.  I know that.  But the other two, they're

2    like starting fuck and shit.  For real, man.  Chong

3    Lee's response on December 28th, tell them to

4    disappear.

5        January 7th, 2014.  Teng:  Did you go to your

6    court hearing already.  Chong:  I got my preliminary

7    hearing on 8:30 in the morning on February 10th.

8    Chong:  If Joe and Paul come then I am dead.  Hey,

9    um, you, Phong don't have it.  They did not give

10   Phong a inaudible to come.  Teng:  No.  Phong didn't

11   get a subpoena.  Chong:  Oh, because I received my

12   papers and they said the witness is Phong.  Teng:

13   No.  Fuck that.  I will tell Phong not to come.

14   Chong:  Phong, Paul and Joe.  If the three of them do

15   not come, then I get out.

16       Continuing on.  Teng:  I won't let Phong come.

17   If Phong comes I will take Phong, and then it's

18   inaudible.  Chong:  As long as Paul, Joe and your

19   brother do not come to say that I did this, and then

20   I don't care, you know.  Later in the call Teng

21   responds or replied, that's hard.  Chong:  But then

22   since they are using the witnesses as Paul and Phong

23   and Joe as witnesses then they are going to fuck me

24   up.

25       Finally a call placed January 18th.  Comments by

50

1    Chong.  Because the only way I can win is if they --
2    if they say something different.  You know.  Tell
3    them to say something different and tell him that
4    when he -- he -- you tell him that when he talked to
5    them he -- he was telling lies, lies because he
6    doesn't know the truth.  Chong:  Do you hear that.
7    So you have to tell Joe not to say anything.  Don't
8    say anything.  Don't say anything about me and that
9    he was just lying.  'Cause he -- you tell him to say
10    that he was scared and he was scared about the, um,
11    about going to court.
12        We then have the series of phone calls that deal
13    with Melanie and Stephanie.  Call January 28th, 2014.
14    Stephanie:  Yeah.  But then Melanie said that she was
15    really scared.  Like she didn't want to say anything
16    but they kept asking so she had to say it.  Chong:
17    No.  She did not have to say it.  She got scared and
18    just said it.  Stephanie:  Yeah.  She got scared and
19    said it.  Chong:  She's stupid.  How come she's not
20    strong like you.
21        Later in that call.  Maybe they will try to
22    bring you guys to court.  Stephanie:  They're going
23    to try to bring us to court.  Chong:  Yeah.  Make you
24    guys witnesses against me.  Stephanie:  Oh, yeah.  To
25    testify against you.  Chong:  I said they will use

51

1          Melanie and Stephanie against me.  They will use
2          Melanie against you.  Stephanie:  Yes.  And you.  I'm
3          sorry, Chong says, yes, and you.  Stephanie:  And me.
4          Chong:  Yes, and you.  Chong:  Yes.  I'm pretty sure
5          he will take you guys to testify against me in court.
6               After that call we then have calls between Chong
7          and Teng.  January 29th.  Melanie and Stephanie had
8          told the police that I was the one who did it.  That
9          I was the one who told them that I did those things.
10         Teng:  What.  For real.  Chong:  Yes.  For real.
11         Teng:  Hey, but did they use those two crazies on
12         your case.  Chong:  Yes.  Teng:  They are going to
13         use Melanie and Stephanie too.  Chong:  Yes.  Teng:
14         Fuck.  Chong:  They will bring along those two.
15              Later in the call.  Teng:  Damn.  And Stephanie
16         just told you this yesterday.  Chong:  Yes.  That's
17         why I tried to call you back last night.  Teng:
18         Damn, man.  What the fuck.  Why don't they -- why
19         don't they -- why don't them two just fucking,
20         fucking don't even show up either.  Chong:  I know.
21         You have to tell them.  Teng, later in the call, what
22         the fuck, man.  And now I got to track those fucking
23         two down too.  Chong is inaudible.  Teng says, damn,
24         man, I'm tired of tracking mother fuckers down.  Man,
25         shit.

1          And a call a few days later on February 2nd.
2     Can you move it over, Alex?  Teng:  When are your
3     courts again.  Chong:  The 12th at 8:30.  Teng:  The
4     12th of this month.  Yes.  Coming up, says Chong.
5     Teng:  Okay.  Okay.  Chong:  They will pull Melanie,
6     Stephanie, Joe and Paul, all of them to come.  They
7     what.  They will call Melanie, Stephanie, Joe and
8     Paul.  All of them to come.  Teng:  No way.  They
9     can't.  Chong:  Yes, they are.  Teng:  I already
10    talked to Mel and Steph, and they said no.  They
11    weren't going to come.  Chong:  Yeah.  Teng:  Yeah.
12    Chong then says – can you move it up, Alex –
13    whatever, are you serious.  Teng is inaudible.
14    Chong:  What did they say to you.  Teng:  They said
15    they're just not going to come and tell the cops they
16    don't want to be involved.
17         So, again, trying to shorten that and explain to
18    you the calls you heard and the portions you heard
19    that relate to the charges of intimidation for Joe,
20    Paul, Stephanie and Melanie.
21         I want to now take you back and talk about that
22    Saturday night, Saturday, December 7th into the early
23    morning hours of Sunday, December 8th, 2013.  As you
24    heard from many witnesses, this was a normal night
25    out in the City of Appleton.  People were out, I

53

1          think we heard maybe a reference to a birthday party,

2          we had a bus of people that came down from Green Bay

3          to go out.  People were at Luna Lounge, people were

4          having a good time.  It was just another Saturday

5          night.  Different groups of people, some didn't know

6          each other, all out.

7               It was just another Saturday night, the State

8          believes, until the evidence and testimony has shown

9          you that there began a series of intentional acts and

10         choices by this defendant that resulted in the death

11         of Joshua Richards.  Intentionally having a loaded

12         firearm on his person.  Intentionally walking to an

13         area where his brother Paul was standing and Phong

14         potentially arguing with Josh Richards.

15         Intentionally taking that firearm out, raising his

16         hand, holding out his arm intentionally,

17         intentionally aiming that gun at the left side of

18         Josh's face.  Intentionally putting that gun a

19         fraction of inches to inches away from the left

20         temple, left ear of Josh.  Intentionally pulling that

21         trigger, sending that .25 caliber bullet into Josh's

22         head, intentionally then turning and running away.

23         Intentionally running back to Sharks pool hall.

24         Intentionally dumping bullets from the gun into the

25         toilet.  Intentionally continuing to run.

54

1          Intentionally heading to Milwaukee that same morning.

2          6:43 a.m. he's checking into the Milwaukee Hilton.

3              As you heard from Joshua's friends and people

4          who were with him on the bus, when they were out,

5          there wasn't any issues.

6              Brittany came in -- and I think you can see she

7          still is emotional about this.  She reports being out

8          that night, they went to a couple different bars,

9          there weren't any issues, there weren't any problems.

10         She talked about Josh.  He wasn't drinking a lot that

11         night.  We know Josh was six foot tall, he was a

12         diesel mechanic.  We know there really wasn't any

13         issues that night until about the last 60 seconds of

14         Josh's life.

15             We heard from Brittany it was getting to be

16         closing time.  You saw from that second camera angle

17         that shows you into the bar Josh walking in front of

18         Brittany, at one point kind of pausing, waiting for

19         her to catch up, and then they walk into that front

20         foyer area.

21             We know from testimony in that foyer was Phong

22         Lee, Paul Lee, ultimately Tom Lee, Joe Thor.  We know

23         that words are exchanged, I think multiple people

24         describe that, between Josh and Phong or Paul or any

25         combination.

55

1        But we know from testimony those words weren't

2    so significant that Dan Kersten, who was sober

3    working at that front door, didn't go over there,

4    didn't go to see what was going on.  It wasn't so

5    significant and caught his attention at all, and

6    that's his job, to stand by that door and watch and

7    see what's going on.

8        We know from Mike Verheyden, he was going to go

9    out and get a cigarette.  He's standing, I think when

10   you saw that camera in the bar, finishing his beer.

11   He sets down his beer.  And then Mike described to

12   you, as you saw, he walks into that foyer area.  We

13   know from Mike he saw Josh and this group of people.

14   He recognized Josh from being on the bus with him

15   that night, just kind of stood by to make sure

16   nothing happened, what was going on, check on things.

17   And Mike told you at a point it seemed like things

18   weren't escalating anymore, it seemed like people

19   were splitting up, so he turns to go get his

20   cigarette -- to go outside and have a cigarette, and

21   then he hears pop or boom.  He hears a noise and

22   turns and he sees Josh is now down on the ground.

23       We also heard and you heard from Tou Shoua Lee

24   who came into that area kind of like Mike.  He knew

25   some of the other people, checking out, seeing what's

56

1          going on, maybe going to break things up, it's end of

2          bar time.  And I'll talk about Tou Shoua in a minute,

3          but you also heard from him it was Chong coming into

4          this area, raising his hands as if it looked like he

5          was going to punch Josh in the head, and then boom

6          and Josh is down.

7              We had shown you through the video that the time

8          period from when Chong leaves camera angle to when

9          he's in the foyer to when Dan Kersten and the others

10         react, thirteen seconds in time.  And in that

11         thirteen seconds, in a split second, we believe the

12         evidence and testimony has shown you, for no good

13         reason, without any warning at all, the life of

14         Joshua Richards was forever changed by that man,

15         Chong Lee.

16             We know from officers some of them were very

17         close by.  There is this College Avenue foot patrol.

18         So you have Officer VanderWielen, Lieutenant Peters,

19         Cary Meyer, others start responding to that scene.

20         Some were very close, just kind of across over by

21         Sal's Pizza.  They get there.  And as Lieutenant

22         Peters described to you, as he goes to Josh to see

23         what's going on, he's literally passing away in front

24         of his eyes because they had gotten there so quick,

25         but his injury and that shot to his head was so

1    severe.

2        You ultimately learn that officers also locate a

3    .25 caliber shell casing on the stairs by this

4    landing area.  I'll talk about the markings on that

5    shell casing, but at the time they collect it, .25

6    caliber, there is writing FC 25 on it.

7        Officers start to talk to people.  They talk to

8    Dan Kersten.  Dan Kersten describes for them what he

9    had seen, how he wasn't really alerted to anything.

10    He described to the officers and to you how he had

11    walked past this area at some point when people were

12    there, nothing of concern.  He talks about and

13    describes seeing a person run out, not the shooter,

14    he did not see the shooting, but a person who ran out

15    that had been in that area had a white vest on.  We

16    know that's Phong Lee.  But Dan Kersten never tells

17    you that was the shooter or that was someone who was

18    by the shooter, he tells you it was someone he saw in

19    that area.

20        Dan Kersten told you he's got past military

21    experience.  Went up, checked on Josh, could see left

22    temple entrance wound, could see blood, looked, no

23    exit wound.  Dan tries to start giving aid, along

24    with some others, and then the officers arrive.

25        Officers ultimately met and spoke with Brittany

58

1          who, from the video, you see literally ran out after

2          the fight after Alyson who was walking directly

3          behind Chong.  Brittany is upset, emotional, shocked,

4          I think was the word she used, and I don't think you,

5          applying your common sense and your life experiences,

6          would really expect anything different.  She had just

7          seen Josh shot right in front of her without any

8          warning, no fights, didn't know these people.  I

9          think we even played a portion of the video where you

10         see her almost like pushing her way back into the bar

11         because she wants to get back in and be by Josh.  She

12         remembers, as she told you, going down and kneeling

13         by him.

14              We also saw, and I think I talked about it as

15         this mass exodus of people, this reaction from Dan

16         Kersten and Adam Richardson and the girls, they turn

17         and then you see people come out.  And I think

18         through the testimony and the video we kind of

19         identify that series of people.  Video shows that Joe

20         Thor is out the door, Paul Lee's behind him, then

21         Phong Lee.  You see the two girls who are standing by

22         Adam kind of get pushed out in the swell of people.

23         Dalinda Guzman is in this area at that time.  We saw

24         the next sequence of people, Tom Lee, Chong Lee

25         behind him, then Alyson, and following Alyson,

1          Brittany trying to reach out and grab, and as you see

2          them exit, start to reach and grab to tackle Alyson.

3          We then see other people who also leave and exit that

4          scene immediately after the shot.

5              We learn from Alyson that she had been out that

6          night with her friend Dalinda, others.  She lives in

7          Milwaukee now but was from Appleton.  They met at

8          City Limits, Phong, Paul, Chong, Joe, others, I think

9          there was a gentleman named Xung there also that was

10         also mentioned.  Alyson describes them being at City

11         Limits, being at Sharks, then being at Luna.  Nothing

12         concerning to her.  Nothing she was worried about as

13         the night went on.  Alyson tells you, and she was

14         helpful in drawing and identifying many of the names

15         on the boards of the people and her friends who were

16         out with her that night, but she describes a time

17         when it's getting to be bar closing and walking out,

18         Chong is in front of her, Dalinda is in front of her,

19         and she then, as she's kind of standing in that

20         entranceway now off camera, but she sees a bright

21         flash in front of her.  Unexpected.  Shocked her.

22         She told you as she was walking to that area, walking

23         as Chong is walking to that area, she can see Paul in

24         that foyer because he's got this black and white

25         patterned coat which you've seen.  Weird black

60

1     lighting in that area.  And she can see that it's

2     Paul.  She thought maybe there was something going on

3     or a fight.  She wasn't paying complete attention.

4     But as she approaches, that's when she sees that

5     flash and she turns and runs because she's scared.

6          We heard about the girl fight.  I don't know

7     what other way to call it.  But we heard about the

8     fight that occurred immediately outside of Luna where

9     Brittany runs out after, grabs and tackles Alyson,

10    starts hitting her, yelling at her.

11         And then you met a different group of people,

12    Johnny Thao, Jared Randall and Jonathan Nielsen,

13    people who were just, again, out downtown who

14    happened to be outside at this time of the night, and

15    they see -- one of them described this swell of

16    people.  I think one of them said they thought they

17    saw a bunch of Asians run out and then there is these

18    two girls fighting.  Not normal, I think one of them

19    described, for a Saturday night on College Avenue.

20    They don't know them.  So remember we talked about a

21    blonde haired girl or a brown haired girl, brown

22    would be Brittany, blonde is Alyson, but the girl

23    who's more of the aggressor, the one in a rage, I

24    think one of them said, is Brittany.  Hitting Alyson.

25    Brittany I don't think remembers exactly what she

1          said.  I think that's what she testified to you

2          about.  But the guys heard it, and they heard her

3          yelling and screaming while she's hitting her, your

4          boyfriend shot my boyfriend.  Your boyfriend shot my

5          friend is what John Nielsen thought he remembers.

6          Johnny thought it was your friend shot my friend.

7          But clearly comments immediately after this incident

8          from Brittany to Alyson.

9               We also know in that area, in approaching and

10         walking up to that area were Alyson and Chong just

11         prior to the time of the shooting in the thirteen

12         seconds before the time of the shooting.  The

13         gentleman who watched this fight described how they

14         separated the girls, tried to get them calmed down.

15         I think Jonathan Nielsen described even at one point

16         seeing an Asian male, and I remember he used the word

17         haphazardly, little unique of a word, he said there

18         was an Asian male and tried to haphazardly split up

19         the girls or do something.  You know from hearing

20         testimony of Tou Shoua that was him.  He told you how

21         after he ran out of Luna he saw Alyson, went by her

22         for a little bit but then left.  But you also heard

23         after the girls get up, Johnny Thao and I think Jared

24         described Alyson being pretty beat up, maybe a broken

25         nose, bloody face, and Johnny remembers them asking

62

1          her, you know, what was that about, what happened,

2          and her response that Johnny remembers is my friend

3          shot that guy at a point where Alyson had just been

4          beaten up, struck several times, at a point in time

5          the State would argue before she can probably really

6          think about what she's going to just off the cuff say

7          to this person, before a point in time when she hears

8          she has later when she's scared and doesn't really

9          want to know who's involved.  And I think Johnny even

10         said she made a comment that her friend who shot the

11         guy was Asian.

12              We know the officers encountered what can best

13         be described as a chaotic scene.  Bar close, people

14         have been drinking all night.  Because that front

15         door is the only in and out, no one else can really

16         leave once officers get there.  They start trying to

17         identify people who are not happy they have to stay,

18         want to go home, have been drinking.  I think one of

19         the witnesses testified Luna didn't continue to serve

20         alcohol when they were there.  So you have a group of

21         people who want to go home.

22              Officer VanderWielen, Lieutenant Peters

23         described getting there and that bar being loud, that

24         foyer area being dark and being chaotic.

25              We know from testimony of officers the people

63

1     who had been in the immediate area, but for a few,

2     Brittany and Mike, left.  There is little physical

3     evidence at the scene.

4          And then as Sergeant Rabas described to you this

5     week, they had also had and learned quickly that

6     there was this bus full of people, two buses, one had

7     left but there was a second bus of people from Green

8     Bay, so now try to go to that bus and say we need you

9     to stay for a minute, we got to sort this out.

10         We learned from Sergeant Rabas he met a

11    gentleman named James Phimmachack, and probably in

12    today's era, cell phones, everybody has them, most

13    people have them.  They're out all the time.  Very

14    probably infrequently that people go out to the bars

15    without their own cell phones or without a cell phone

16    if they have one.  But James, he comes in and sees

17    what happens, he recognized Josh and decides I'm

18    going to start recording this because he doesn't know

19    if it's going to be helpful later, he doesn't know if

20    it's going to show something that might be important

21    to show, but he does that.  I'm not going to play

22    that cell phone video again for you, but I think you

23    recall the first Friday of the trial you saw that

24    cell phone.  You could see that video, how dark it

25    was, how loud that music was.  You can hear and make

64

1           out what song was even playing.  How chaotic it was.

2           People are trying to -- should we roll him, and

3           another voice screams out don't touch him.  People

4           are trying to figure out what happened, is he hurt,

5           what's going on.

6               We heard evidence and testimony then from people

7           who left the scene.  And officers ultimately, through

8           this white board, they get the video and they, in

9           essence what Exhibit 32 is, they take still images of

10          people.  Sergeant Rabas described how he was able to

11          watch people enter and exit that night and come up

12          with different still images of when they first came

13          into the bar, other times when they might have left

14          to go out, assuming they were having a cigarette,

15          came back in, but they take those still images and

16          the Appleton Police Department starts to work on

17          identifying those people, who are they, what are

18          their names.

19              Ultimately that leads them to talk to Phong Lee

20          who Sergeant Schira described to you, I think it was

21          nine times he asked was he there, and no, no, and

22          ultimately they have to confront these people.  We

23          have photographs of you at Luna, okay, so let's talk

24          about you being there.  And we heard from Phong in

25          that first interview, he doesn't want to be a snitch,

1    he doesn't want to talk about what happened or what

2    he knew or what he saw.

3        He talked to Joe Thor on December 9th.  He

4    doesn't also really want to talk about what happened.

5    First, are you at Luna.  Again, no, I'm not there.  I

6    think you see a pattern of people who don't want to

7    be involved, don't want to snitch, don't want to be a

8    snitch, don't want to talk about what they know.  But

9    over time they start to.  Ultimately Joe Thor

10   disclosed to the officers, and it kind of tells the

11   story of the rest of where did this defendant go

12   after he had intentionally put a round into Josh's

13   head.

14       We know from Talisa and Marissa they were at

15   Sharks around bar close.  I'm going to get it wrong.

16   One of them is not of legal drinking age so she was

17   not drinking, but it's a pool hall so you only need

18   to be 18 years old to go there.  And that woman

19   remembers seeing the defendant come in.  One of them

20   remembers him going back by the bathroom area for

21   ten, fifteen minutes.  They weren't exactly watching

22   him but remember him being in that area of the

23   bathroom, talking to him at one point, comes up to

24   them and said can I get a ride to my mom's house, he

25   needs a ride.  And Talisa and Marissa tell you

66

1          ultimately they're able to leave.  There had been

2          some kind of announcement even at Sharks that

3          something was going on down by Luna, there had been a

4          shooting, but they leave and they take this gentleman

5          who they identify to you as the defendant to a house.

6          And I think it's fair to say neither of them knew

7          which house or where they were going.  He directed

8          them.  And they took him to a house you ultimately

9          learned through Officer Nagel that is on the 1700

10         block of North Harriman.

11             The girls describe they drop him off and then

12         they remember seeing him standing outside, which they

13         thought was odd because if it's his mom's house, they

14         thought that was odd, but he didn't go in the house

15         right away, so they see him standing outside for a

16         bit and then they just leave.  They don't want to

17         stay anymore.

18             You learn when he -- those two ladies come in

19         and talk to Officer Nagel, he doesn't know where Joe

20         Thor's house is, and I think it was probably like a

21         cat and mouse game trying to figure out what house in

22         Appleton did they go to.  So ultimately Talisa and

23         Marissa are in a car, Officer Nagel is in a separate

24         car following them, and they -- the girls drive

25         around and ultimately they get to that house 1739, I

1          believe it is, North Harriman Street, and they say
2          that's the house where we dropped him off.
3              You learned as the case went on Joe Thor lives
4          at 1745 North Harriman Street.  You learned from Paul
5          Lee, Joe Thor and Phong that a short time after the
6          shooting, they don't know how he got there, but Chong
7          ends up at Joe's house.  They're down in the
8          basement, which is Joe's room, and while there, Chong
9          makes statements.  I fucked up and I shot the guy or
10         I popped the guy.  But a statement about him being
11         the shooter.
12             You know a few hours after that Joe and Chong
13         are in a car heading to Milwaukee because the video
14         and the photos we showed you have Chong now in a
15         blue, shades of blue maybe, white plaidish pattern on
16         his jacket checking into the Hilton at 6:43 a.m.  We
17         ultimately know Joe disclosed to the officers that at
18         some point Chong had told him he flushed some things
19         or flushed the gun at a downtown bar.
20             We met a group of people then from Milwaukee.
21         Xai Thao, Peter Moua, Joseph Vang, and Kong Vang, who
22         goes by Jesus, which is an easy way to keep Joseph
23         and Jesus separate, but you hear from those people
24         that Sunday they were at maybe Phonesay's house, this
25         man they call Q.  I think they were watching football

1       or watching games.  Chong's there.  Joe Thor is

2       there.  Some of them know those people from living up

3       here.  Xai Thao really doesn't.  He's dating Dia who

4       is Peter's sister.  But while they are outside, Xai

5       kind of describes, you can't smoke at Q's house, you

6       got to go outside to smoke, and while out there the

7       defendant says to him that he shot a guy.  Xai says

8       when the defendant says this he seems scared.

9            Peter Moua tells you that when Chong was down

10      there the defendant makes a comment I shot a guy.  I

11      got him.

12           Jesus tells us that the defendant makes a

13      comment to him about shooting a guy and that he seems

14      scared when he made the comment.

15           We learn from the checkout time at Hilton and

16      also from this unique restaurant down in Milwaukee,

17      JJ's Chicken & Fish, that the next day, that morning,

18      Chong and Joe check out of the Hilton, stop at JJ's

19      and come back up to Appleton.

20           We know over the next several days Chong

21      continues to talk to people about what he did, goes

22      out to eat with Stephanie and Melanie Thao.  First

23      they're eating at a sushi restaurant and that night

24      Chong tells them that he did the shooting.  I think

25      Melanie said the seating was Chong, Stephanie in the

69

1    middle, and then Melanie.  She's described being

2    pretty surprised when he said that.  Stephanie

3    describes that same disclosure by this defendant,

4    tells him he did the shooting.

5        The next day, Tuesday, there must be some

6    connection to Tuesday and Buffalo Wild Wings with

7    these people, but Tuesday they go to Buffalo Wild

8    Wings, and while they're there Chong tells them

9    again, and I think Stephanie even described further

10   comments made by Chong.  Melanie described Chong

11   saying that he broke apart the gun, threw it in a

12   lake.  I think to one of the girls he talks about

13   Paul being in a fight and being cornered and then he

14   shot the guy.

15       We heard from the first interview officers had

16   with Phong he doesn't want to talk about it.  When

17   the officers are pressing him on Joe and Paul, he

18   says, I'm going to tell you, they're not the ones

19   that did it.  He ultimately discloses that it was

20   Chong who told them he popped a guy after he came

21   back to Joe's house.

22       You'll learn that officers -- on December 11th

23   some officers head to Milwaukee because by now you've

24   heard, I think, other than Talisa and Marissa, the

25   one other person I think we've had who called in to

70

1        share some information was Dalinda Guzman who after

2        left the scene but calls officers.  That leads

3        officers to Alyson Blom.  They go down to talk to

4        Alyson who is working down at the mall in Milwaukee,

5        I think it was the Mayfair Mall even, and on the

6        night of December 11th they talk to Alyson.  You'll

7        learn those officers were told by Alyson that she had

8        a conversation with Lisa prior to where Lisa shared

9        her opinion, Lisa Stutzman, this would be the

10       sister-in-law of the defendant, that Chong was the

11       shooter.

12            You'll learn those detectives, Sergeant Meyer

13       and Sergeant Tauber, call back and have a

14       conversation with the officers at the Appleton Police

15       Department about what they had learned.

16            And you'll learn in the time line of things

17       around the same time they're talking to Alyson is

18       when Sergeants Rabas and Schira are over at Norka

19       because they had observed this object in Paul's hand

20       that they thought was a gun.  Something reflected.

21       And you've seen the Luna images, how color doesn't

22       mean really anything, how different fabrics show up

23       different ways depending upon the light.  But the

24       officers see an object and they want to talk to Paul.

25       They know up to that point that Paul had at least

71

1    been in some kind of verbal or physical altercation

2    based upon what had been described.  You'll learn

3    that Paul, and I think you heard and saw some of

4    that, was very adamant throughout.  I am not the

5    shooter.  I did not do this.  Was it Joe?  No.  Joe

6    is not the shooter.  Was it Phong?  No.  Phong is not

7    the shooter.  And I think he's asked several times,

8    who was it then.  Paul tells them probably one of the

9    -- I don't want to say one of the few people, but one

10    of the people who said when we want to talk to you

11    about Luna he says he was there.  He describes being

12    in a fight or an argument.  He ultimately describes

13    coming up from the bathroom with Phong.  Phong and

14    Josh, they ultimately know theirs name, and Paul,

15    they have words with Josh.

16         Several times during that interview at Norka

17    Paul was asked if he's the shooter.  Always says no.

18    Gets angry, gets upset with them.  I think testimony

19    was that at one point he said, you think I'm the

20    shooter?  He brought that up.  Through that testimony

21    and interview there is one comment Paul makes at one

22    point when he's not identifying the shooter but he

23    tells the officers, I didn't stay with the shooter.

24    And that, the State would argue, is important for you

25    to know because when he runs out he runs to the

72

1     right, Joe is in front of him, Phong is behind him,
2     and they head up North Division Street.  We know
3     Chong Lee exits that door and heads to the left.  We
4     know that when Paul is at the Appleton Police
5     Department Sergeant Schira now goes in to talk to
6     him, and this is at a point when they've learned what
7     was shared from Milwaukee, a point where I think
8     Sergeant Schira described literally like walking to
9     the interview and being told by Lieutenant Gostisha,
10    we have this other information about Chong.  And that
11    going into that they ask him again, what is this
12    thing in your hand.  And we learn from the detectives
13    at Norka he said a few times, I didn't have anything
14    in my hand.  If I did, my e-cigarette or a bottle,
15    not a gun.
16        We learned when they talked to Paul there, they
17    ask him, okay, let's talk about who was with you.  He
18    talks about different people.  Doesn't say Chong was
19    with him.  And you learn from Sergeant Thao at one
20    point he says, what about your brother Chong, because
21    they know based upon the photos Chong was there.  And
22    I think Sergeant Thao described at that point after
23    bringing up Chong's name Paul's demeanor changes, and
24    ultimately he gets emotional, and he says in Hmong,
25    my brother's going to hate me for this.  I think the

73

1          transcript in a portion he plays, because I think

2          Sergeant Rabas or Sergeant Schira remembers hearing

3          it as that same comment.  My brother is going to hate

4          me for this.  And he tells him not that he saw Chong

5          do the shooting but that after the fact -- first he

6          tells them on Monday when Chong came to his house

7          Chong talked about doing the shooting.  Ultimately

8          also talks about being at Joe's house that next

9          morning and Chong coming there and saying he did the

10         shooting, he popped the guy, or I fucked up, I shot

11         the guy.  I think another part of Paul's interviews

12         that are interesting is it was brought out when they

13         stop and Joe's getting rid of his hat, Phong is

14         taking off his vest, he kind of says, what are you

15         doing.  Paul doesn't get rid of anything.

16              The other thing that I think is interesting to

17         note is when they first spoke to Paul at Norka, he's

18         like, let's see the video, I want to see that video.

19         And I asked him, did you think the video was going to

20         have anything on it that would be hurtful to you.  He

21         said no.  Anything hurtful to Joe.  No.  Phong.  No.

22         Your brother Chong.  His answer was I don't know.  We

23         know there is no video of this specific moment in

24         time when Joshua Richards was intentionally shot.

25              You'll hear over that time then officers go and

74

1    make contact with Chong.  He's brought to the

2    Appleton Police Department as well, and you'll -- you

3    heard about that conversation.  It was Sergeant Meyer

4    and Sergeant Schira.  You'll learn or you did learn

5    that at that point in time Paul was at the police

6    department.  Paul had no access to phones during the

7    time he's there.  Paul doesn't know Chong's brought

8    in at this point.  And officers talk to the

9    defendant.  And we played that portion for you.

10   Talks about I was gone by that time.  I left at 1:40.

11   Then it's, I was outside with three girls but I don't

12   know their names.  Then it was, I was almost out the

13   door at the time of the shot.

14        I'm going to ask you to use your common sense

15   and your life experiences when you examine and watch

16   that video.  At times the defendant was seen

17   laughing.  He's yawning during the time they're

18   talking to him about someone being shot and them

19   confronting him about he being the person that did

20   that.  A killer is a killer.  Murder is murder.

21        You'll learn on December 12th officers continued

22   to follow up.  At 1:00 Sergeant Rabas is at Joe

23   Thor's door and starts talking to Joe Thor.  Paul's

24   still at the PD.  He doesn't get home until 1:17 that

25   afternoon.  We know Sergeant Tauber had gone to try

1         to talk to Phong at eleven that day.  Phong was
2         working but says I'll meet you when I'm done at 2:00.
3              So the officers talk to Joe Thor starting at
4         one.  Joe then describes Chong, the gray sleeve.  I
5         think that moment in time, based upon how Joe
6         described it and how the officers describe it, is
7         pretty much frozen in Joe's mind, seeing Josh's head
8         and seeing that bullet or reaction to the head of
9         Josh when he's shot.  You heard him describe and
10        ultimately tell Sergeant Rabas at that point that
11        Chong talked about flushing the gun or stuff at a
12        downtown bar.  Sergeant Rabas knows from that
13        interview Chong had done that morning Chong describes
14        leaving and going to Sharks, so he asks, is it
15        Sharks, could it be Sharks.  And what you know is
16        layered on top of those interviews with Joe and with
17        Phong that started at 2:09.
18             Additional group of officers go out to Sharks
19        that afternoon.  They learned from the owner that the
20        night before on the 11th they had found four bullets
21        in the men's toilet in the bathroom.  You learned
22        that on December 12th when some of the Appleton
23        officers went there they went with a plumber, he
24        takes the toilet off and two more bullets come out of
25        the toilet.  And you learned that the casing at

1          Sharks, same marking, FC 25, casing or the bullets
2          all at Sharks, same marks on those.  Mr. Peotter
3          yesterday called by the defense told you that they
4          checked from the pipe down, there is no gun.  They
5          found a bunch of other junk but no gun.  But he also
6          talked, when Attorney Maier asked him questions
7          about, you know, could bullets get flushed.  He
8          talked about how heavy they are.  I think his
9          description was you need a five-gallon pail or bucket
10         of water going down that toilet to get those out
11         through that -- those traps, those J tubes he
12         described.  Or this high powered toilet, which he
13         knows from servicing Sharks, Sharks doesn't have.

14             We know that as the investigation continued
15         additional things happened.  Dr. Kelley, the morning
16         of the 10th, does an autopsy on Josh Richards after
17         an organ harvest had been done.  Dr. Kelly tells you
18         Josh basically died instantly at the scene.  That
19         bullet entering his head, entering his brain,
20         fracturing his skull.  He talked about the wound
21         path, left ear by the ear lobe entering Josh's head.
22         The wound path being upwards, left to right, slightly
23         front to back, and he talked about the soot or the
24         stippling from the end of the barrel, how hot things
25         come out, how sometimes gunpowder and other things

77

1    are immediately ejected, and based upon what he saw

2    in Josh, fraction of an inch to a few inches, near

3    contact to a few inches at the time of the shot.

4        We learned that after this December 12th

5    officers monitored jail calls, and you learned

6    probably more than you ever thought you would learn

7    about the Outagamie County Jail call system, but it's

8    a system in which inmates are assigned an ID number.

9    You can call using that number, or if someone, I

10   think Sergeant Thao describes, has money on their

11   phone, any inmate ID number can call a phone.  And

12   you learn that in many of the calls that we used they

13   were placed by the defendant to Chong (sic) or to

14   Stephanie, to others, to Teng, to Hu, to Paul, but

15   most of those were not under his own inmate ID

16   number, and from that officers then on January 21st

17   executed a bunch of search warrants for letters, and

18   you heard and we read to you some of those letters.

19       But they also then talked to Stephanie and

20   Melanie and learned what the girls had been told by

21   this defendant, how Stephanie described, and I think

22   we -- she was asked several times when Chong said

23   this, you know, was he joking, and she said, what she

24   told the officers then, he was scared.  Melanie

25   described how he broke down the gun, tossed it in the

78

1       lake.  Stephanie explains she learned the other guy

2       was going to take a swing at Paul, Chong got mad, and

3       he shot him in the head, and it was a tall or really

4       tall person.

5            We played several calls for you, and I don't

6       want to read all of them back, but we had to do it in

7       a sequence based upon what witness we had, not based

8       upon the order that they occurred, so I feel like we

9       almost through the evidence and testimony gave you

10      several chapters of a book but you never knew when

11      you were getting Chapter 6 and then 2 and then 12,

12      and I want to go through some of the calls because I

13      think when you go through them in the order and the

14      sequence in which they occurred it tells a story.

15           We also found letters, and some of those

16      portions were read to you.  A letter to his brother

17      Nhia found in the defendant's cell.  On January 21st.

18      Joe and Paul supposed to recant.  If they recant at

19      the prelims, then the case is going to be dropped.

20           A letter officers found at the home of Teng.

21      Damn, T.  I been mad lately.  I just can't believe

22      that my own blood could do this to me.  The only

23      people -- I should start over.  Um, Phong, Paul and

24      Joe be subpoenaed for it.  Scheduled for 10:30

25      February 25th.  The only people that will be allowed

79

1      to come is the witnesses, which is Paul, Joe and

2      Phong, along with the cops.  For evidence they only

3      have the testimonys of Paul and Joe, no physical

4      evidence, so that means no prints, guns, et cetera.

5      I can't have Paul and Joe show up.  If they do, I

6      would lose.  Man, those two put me into a difficult

7      situation, bro.  I really hate those two at the

8      moment.

9          I think, and the State would argue, the letters

10     the defendant never expected we'd find.  Never

11     expected that these letters sent to Michael or the

12     letter that was about to go out to Nhia or to the

13     girls or to Teng would be found.  And I think many of

14     the references in them are very telling.

15         We also look at the phone calls.  First calls he

16     makes he wants his Facebook account taken down.  Take

17     it down.  Tries to give the pass code, one love this

18     life, many times.  There is some confusion.  I think

19     somebody says just say it in English.

20         Then there is calls starting on -- at 6:30,

21     December 12th, so the day he had first contact, the

22     day Paul had contact, Paul was brought to his house

23     at 1:17.  So 6:23.  Paul tells him, so then I said

24     you were there.  Chong says, put money on the phone.

25     I will call back.  And he later says to Paul, why did

80

1    you say -- say that to them.  Call then occurred at

2    9:19:31, so 7:30.  Chong says to Paul, as long as

3    when you tell them again that it was not me.  Paul:

4    Huh.  As long as you say it is not me, I don't care.

5    Paul then says, but they already got me.  And then

6    they talk about Paul being on camera.

7         December 18th, call with Teng and Chong.  And

8    Joe (sic) tells Teng, Joe's working for the police.

9    Teng's response is, for real.  Chong says, yes.  Joe

10   told me.  Teng:  What about Paul.  Chong:  Those two,

11   Paul and Joe.  Teng:  For real.  Chong says, yes.

12        December 28th, 10 days later, 9:30 in the

13   morning.  Teng and Chong talking.  So how is your

14   case going, asked Teng.  Chong:  So I could, I should

15   win.  Teng:  You sure.  Chong:  Yes.  I don't like --

16   they don't have anything on me.  Teng:  Okay, man.

17   So you denied it completely.  Chong:  Yes, I

18   completely denied it.  But then if Joe, you know.

19   Teng:  I'm not sure if it's Joe though.  I'm thinking

20   it's Paul.  Teng -- or Chong:  No.  It is Joe.  Teng:

21   You sure.  Chong:  Yeah.  Because Joe told -- Joe

22   told them that the bullets are here and other things.

23   You know.  Teng:  Joe said what.  Chong:  Joe said to

24   them -- told the police that inaudible, oh, the

25   bullets inaudible are here.  They flushed the bullets

81

1    like this.  Like this.  Teng's response, oh, that's
2    bad.
3         And that's the call where I talked about
4    earlier, ultimately, as they continue to talk about
5    Joe and Paul, Chong says to Teng, tell them to
6    disappear.
7         A call on January 4th between Chong and
8    Stephanie.  That gay jerk, he is so mean to me, he
9    and Paul.  Stephanie:  Yes.  Chong:  I told you they
10   didn't know anything.  But you see.  Stephanie:
11   Yeah.  Chong:  Like they didn't know anything and
12   then suddenly he and Paul said it was me.  Then
13   kicked in the door.  Chong says, and then I took
14   Teddy inaudible so far away.  Stephanie:  Really.
15   Chong:  Yeah.  I was like what the fuck.  And then I
16   woke up and I was inaudible.  Stephanie:  Yeah.  I
17   knew that someone was -- has to say that.  Chong:  I
18   figured that it was that white person, you know.
19   Stephanie:  Oh, yeah.  Chong:  But it was them and it
20   turned out to be my two guys.
21        I think that's interesting when you examine all
22   the evidence and testimony because what white person
23   could Chong be worried about?  Alyson, Mike
24   Verheyden, Brittany Olson?
25        January 7th, the call we played already where

1    they -- Teng says, or we've shown you, did you go to
2    your court hearing.  I got my prelim hearing on 8:30
3    in the morning of February 12th.  That's where Chong
4    says, if Joe and Paul come, then I am dead.  Later in
5    that call Chong says, as long as Paul and Joe and
6    your brother did not come to say that I did this and
7    that, then I don't care, you know.  Teng:  That's
8    hard.  Chong:  But then since they are using
9    witnesses as Paul and Phong and Joe as witnesses,
10   then they are going to fuck me up.  Teng:  Have you
11   talked to Shoua.  Chong:  Huh.  Teng:  Have you
12   talked to Shoua.  Chong:  Man, I talk to him.  He is
13   so gay.
14        And we learn ultimately the officers did talk to
15   Tou Shoua Lee and what he saw and what he described.
16        Then the calls in January continue with Chong
17   saying on January 18th, when you are with Joe, tell
18   Joe he needs to say something different.  Tell him to
19   say something different.  Chong again says, because
20   the only way I can win is if they -- if they say
21   something different, you know.  That gets -- that
22   theme gets repeated that we played for you in that
23   call.  Chong again, tell them to say something
24   different.  You tell them that when he talked to him,
25   he -- he was telling lies, lies, because he doesn't

83

1     know the truth.  Because he told me that he saw that

2     I did it.  Chong:  He did say that.  He said he saw

3     me do it.  He said I was wearing clothes that look

4     like this and that.  He said he saw the black thing

5     in my hand.  So did you hear that.  Did you hear

6     that.  You have to tell Joe not to say anything.

7          And then there is calls where Chong talks about

8     Paul.  January 21st.  When you see stupid Fatty tell

9     Fatty -- tell stupid Fatty that I need to talk to

10    him.  I don't know how to talk to him.  And he needs

11    to say I don't know.  Yes.  But if they lock him up

12    his max is only one year and nine months only.

13    Inaudible.  But I don't know about Joe.  Joe said

14    that too.  Oh, because you know I have court in two

15    weeks.

16         Then we get to the point on January 25th when

17    Chong realizes Stephanie and Melanie have talked to

18    the police.  We played part of those calls for you,

19    and we highlighted some of those.

20         Chong on January 28th is talking to Hu.  Tells

21    Hu, the police talked to Melanie and Stephanie.

22    Melanie and Stephanie said that they knew what I said

23    to them.  So tell the police that they knew I was the

24    one who did it.  Hu says, they said that.  Chong:

25    Yes.  Hu:  What the fuck.  Chong:  And they also

84

1      talked to Tou Shoua.

2          There is then the recording on January 29th

3      which we showed you earlier with Teng where Chong

4      says, Melanie and Stephanie told the police that I

5      was the one who did it, that I was the one who told

6      them that I did this thing.  Teng:  What, for real?

7      Yes.  For real.  That's when Teng talks about having

8      to track those two down and find them.

9          And then on December -- February 2nd, comment,

10     when are your courts again.  We talk about the 12th

11     at 8:30.  They will pull Melanie, Stephanie and Joe,

12     Paul, all of them to come.  They will pull all of

13     them to come.  Teng says, I already talked to Melanie

14     and Stephanie, they said no, they weren't going to

15     come.  Chong:  Yeah.  Teng:  Yeah.  Chong:  Whatever.

16     Are you serious.  Because there is a previous call

17     where Chong says to Teng, talking about Melanie and

18     Stephanie, why don't them two just fucking -- fucking

19     don't even show up.  That's Teng.  Chong:  I know.

20     You have to tell them.

21         As I told you at the start of this case, this

22     case is as much -- and we're going to focus as much

23     as what happened in that small thirteen-second

24     window, the last thirteen seconds of Josh's life, to

25     tell you who was responsible and who did this, but

85

1        what I think also tells you who is responsible and

2        who did this is what happens after.  Those phone

3        calls.  Going to Milwaukee.  Hiding items.

4             I think the evidence and testimony has shown you

5        that when you examine all the evidence in this case,

6        and the witnesses, this case, evidence and testimony

7        showed you, was an intentional act by this defendant,

8        someone who is not involved in the fight, someone who

9        intentionally walked through Luna, seen his brother

10       involved in a fight, someone who then intentionally

11       removed that gun, intentionally raised the gun to the

12       victim's head, intentionally pulled the trigger on a

13       near contact shot.

14            At the end of this case I will ask you to return

15       a guilty verdict on all the charges in this case.

16       Thank you.

17                 THE COURT:  Thank you, Attorney Schneider.

18            And, Attorney Vishny, do you need a few moments

19       to get prepared?

20                 ATTORNEY VISHNY:  Yes.

21                 THE COURT:  Okay.  Why don't we leave the

22       jury for about ten minutes and then we should be all

23       set to go with defense closing.

24            Please rise.

25                 (The jury was escorted out of the

1        courtroom.)

2                    (Court in recess.)

3                    THE COURT:  Please rise for the jury.

4                    (The jury was escorted into the courtroom.)

5                    THE COURT:  Please be seated.

6            Attorney Vishny, whenever you are ready.

7                    ATTORNEY VISHNY:  Thank you, Your Honor.

8            We told you in the beginning they got the wrong

9        guy.  We're going to talk about that.  I'm going to

10       talk about it as I do this closing argument because

11       I'm going to talk about three things:  How the

12       evidence shows that Chong Lee is not the shooter and

13       who the defense submits is the shooter; No. 2, the

14       police investigation methods and what the problem was

15       with them; and, No. 3, what the law is and what you

16       must follow as jurors.

17           So there's a really old philosophical saying,

18       and for those who have heard of things that are more

19       obscure, because I didn't hear about this until last

20       week, it's a 14th century philosopher came up with

21       this principle called Occam's razor, very obscure in

22       my mind, but basically what this principle says, and

23       it's still true today, is that if there are two

24       competing theories, the simple one is usually true.

25       So we might think of it as keep it simple, stupid.

1    Right?  Not to say anybody is dumb, that's not the

2    point of this.  I like to say, if it walks like a

3    duck, if it talks like a duck, it's a duck.

4         So what does the evidence show in this case.

5    And the first group of witnesses I'm going to talk

6    about are what I call the independent witnesses.

7    They're not friends with any of the people in the bar

8    and they don't have any pressure to solve a case on

9    them, but they are people who happen to be there and

10   see what happens, and what is it that they had to

11   say.

12        Adam Richardson.  Adam Richardson testified in

13   the beginning of the trial, pretty early, and you may

14   remember that he is standing right by the door.  He's

15   waiting for a ride with his friends.  He is looking,

16   according to the testimony, straight at the direction

17   where the shooting is about to occur.  He is looking

18   at that time for that second.  He hears a pop.  He

19   looks.  What does he notice?  A bunch of people

20   running out the door.  A lot of people running out

21   the door.  Said 10, 14, something like this.  But he

22   focuses on one person.  He focuses on the guy who is

23   the second person out the door.  Why?  Because that

24   man, he sees him doing something, putting something

25   in his coat pocket.  He's concealing something.  And

88

1   what does Adam say?  It could be a gun.  He doesn't

2   know for sure.  It could be a gun, but it draws his

3   attention.  And seconds later, when he goes out the

4   door, he sees this man and two others, that they've

5   gone to the right and that they are running

6   northbound on Division Street.  Who was that man?

7   Paul Lee.  Daniel Kersten also said in court that

8   Adam Richardson was looking at what happened.

9       Now what about Daniel Kersten?  One of the best

10  witnesses we have because he's working there as a

11  bouncer.  It's his job to look around and see if

12  there's trouble.  He's not drinking any alcohol that

13  night, he's not a patron, not even half a beer.  He's

14  got military training.  He's observant.  And so what

15  does he see at the time?  He is watching, as he told

16  you, that there's some kind of dispute going on, and

17  he's keeping an eye on it but he doesn't see an

18  actual fight.  So doesn't seem like there's a

19  problem.  He turns away and then he turns around and

20  that is the time that the shooting is fixed at, at

21  1:50:25.

22      So let's watch that -- what happens and what

23  Daniel Kersten sees.  Yeah.  Very briefly.  Only very

24  briefly with the lights down.  We're going to play

25  this in real time.

89

1                ATTORNEY WEITZ:  For the record we're

2       starting at 13:50:18.

3                (Video playing.)

4                ATTORNEY VISHNY:  Kind of looking back.

5       Adam Richardson is looking towards the back, and you

6       can see -- stop.  You can see what happened.  Adam

7       Richardson is looking back to where it's happening,

8       Daniel Kersten looks, doesn't see much of a problem

9       going on.

10               We can turn the lights on.  Thanks.

11               Remember.  He's a bouncer.  He's supposed to

12      break up fights.  That's one of his jobs as a

13      bouncer.  Things seem okay.  He turns around.  Boom.

14      They are both looking in the direction.  So what does

15      Daniel Kersten notice?  He notices a guy with a white

16      puffy vest.  He sees the people who are around Joshua

17      Richards.  He sees them run out and to the right.

18      One of them he notices has a white puffy vest.  It

19      looks like that guy is trying to take his vest off.

20      Now we know ultimately Phong Lee does not take his

21      vest off until a little bit later when he dumps it in

22      the garbage can, but that's what he focuses on.

23               These are witnesses who have nothing to hide, no

24      reason not to give the best memory they have to the

25      police.

90

1        And Brittany Olson?  Josh's girlfriend?  Okay.

2    A lot has been said here.  Your boyfriend shot my

3    boyfriend.  The District Attorney was talking about

4    that before in her closing.  But what does this show

5    about where she goes?  Chong Lee -- can we run the

6    video again real quickly?  We may go back a few

7    seconds just to set it in context because it goes so

8    fast.

9        ATTORNEY WEITZ:  All right.  Again we are

10   starting at 13:50:18.

11       ATTORNEY VISHNY:  Go ahead, Mr. Weitz.

12       (Video played.)

13       ATTORNEY VISHNY:  Stop.  She's within a few

14   feet of Chong Lee.  If she supposedly thinks somehow

15   that he's with Alyson, why doesn't she go after him?

16   Why isn't she yelling, help, that guy shot my

17   boyfriend?  She doesn't know.  Who is she going

18   after?  She's going after Alyson.  And as we know --

19   and I think we can just do this with the lights on

20   for a quick second.  Keep playing the tape.  Go

21   ahead.  Thanks.  Alyson goes to the right with the

22   guys who did the shooting.

23       Now, Alyson was in and out of this bar.  She

24   came in with Chong Lee at one point.  Brittany and

25   Josh weren't there.  She came in and out with a

91

1     cigarette, according to the time line that Sergeant

2     Rabas developed, right, with Phong Lee both times.

3     We don't know where Brittany and Josh were at that

4     particular time.  Brittany had been drinking and she

5     was extremely upset and she was not acting

6     rationally.  She starts a fight with a woman, but she

7     starts a fight with the bouncers when she wants to

8     come back in.  She's ready to fight.  She's ready to

9     fight with the police officers.  You heard the

10    testimony.  If she thought it was Chong Lee, she

11    would have been pointing in that direction, but she

12    doesn't, she goes after Alyson, tell me where these

13    guys were.  She has no idea who is whose boyfriend.

14    That's a red herring in this case, and I'm going to

15    talk about more red herrings later.

16         So what happens when the police come down to

17    Luna, and they're there with -- within minutes?  It's

18    hard to imagine a crime occurring in Appleton,

19    Wisconsin that could be more detrimental to this

20    community than having a shooting occur at a crowded

21    bar on a Saturday night, Sunday morning full of

22    people.  There are not a lot of murders in this

23    community, thankfully, as we all know, and

24    fortunately the police officers here rarely have to

25    ever investigate a homicide, but when it happens, you

92

1    can bet your bottom dollar that this is the most
2    serious investigation, that's why people are being
3    woken up at home within 20 minutes of this happening
4    and being told get down here.  I don't care if it's
5    the middle of the night.  You got to come down to
6    Luna now.  That's why their lieutenant is telling
7    them to come down.  This crime happens in the middle
8    of the business district, and imagine what this town
9    is like if people are scared to go downtown.  So
10   there's a lot of pressure on the police.  They are
11   involved in protecting this community and this crime
12   needs to be solved and it needs to be solved quickly.

13       So let's talk about what's at the heart of the
14   case, the witnesses that came into court who the
15   prosecutor is relying on but more importantly even
16   who the police relied on to lead to this prosecution,
17   because the heart of the case is are these people
18   believable.  Because none of us were there or
19   actually witnessed this.  The police weren't there,
20   they didn't witness this, but these people were
21   there.  Can they be believed.  Are they accurate.
22   Are they reliable.  That's the questions you have to
23   ask yourself.

24       So let's start with them.  First, there is "I
25   can't remember anything" Phong Lee.  All right.  So

93

1          what does he say when he comes into the court?  Joe
2          is ahead, Paul is running already at the time of the
3          shot.  Paul is in a fight.  Phong, he's near the
4          front door at that particular time.  The -- the fight
5          is at the half wall.  You heard about that.  But
6          Phong puts himself at the front door at the time this
7          happened.  Now, what does the video show?  The video
8          shows it's not true.  You just saw that video.  You
9          just saw those guys run out.  You know that they go
10         Joe, Paul, Phong.  It's not accurate.  And then he
11         claims that he's got a sudden memory loss.  Right?
12         He can't remember anything in this courtroom.  So the
13         prosecutor starts questioning him, as they should,
14         about this so-called memory loss.  And what do they
15         ask him about telling the truth?  What does he say?
16         You're not telling the truth to help your friends.
17         And Mr. Maier said to him, so you don't tell the
18         truth to help Paul or Chong, and he says, no, just
19         Paul.  Paul is the guy that he wants to protect, and
20         you heard it out of his own mouth in this courtroom.
21         That's who he's out to protect.  That is his friend.
22             So what happens when the police go talk to him
23         on December 12th?  You think that what's happened
24         before isn't on his mind, that the police had come
25         and threatened him and told him, hey, buddy, you're

94

1    going to get 25 to life, the kinds of things they

2    said to everybody, put yourself on the witness line

3    or put yourself on the you're going to be prosecuted,

4    you're part of a conspiracy line. He doesn't know

5    that? Right? Police come to his job, 11:20 in the

6    morning, McDonalds. He doesn't want to talk to them

7    there. We don't think he makes a phone call and find

8    out what's up in town, that Paul has been arrested

9    the night before, that Chong has been arrested in the

10   morning?

11        We know that the police talked to Michael Xiong

12   when Paul was taken downtown at the end of the first

13   interrogation in Norka. We know that Sergeant Thao

14   went up to Michael Xiong and said to him, look,

15   Paul's been arrested for this murder, you know, we

16   want Hu and Chong to come in and help us with this.

17   Michael Xiong lives with Paul and Paul's sister Xeng.

18   You don't think these guys are talking on the phone?

19   Why, if Phong Lee has a phone and isn't talking,

20   because remember, on December 9th he's had a phone

21   taken away from him, right, why does that phone have

22   a factory reset on it? Why did the police do two

23   search warrants for call records for Phong Lee's

24   phone? Because he has two phones. No matter what he

25   said in court. The police aren't out after his

95

1    mother's phone, they're out after his phones to see

2    what he's been doing.  Right?  He had plenty of time

3    to call.  He was well prepared by the time the police

4    came in on December 9th.  So there it is, and just to

5    be clear, because I -- it bears repeating, this is

6    the exact testimony that he gave in court.  You don't

7    want to tell the truth until you have to help out

8    your buddy.  This is by Mr. Maier.  Answer:  Yes.

9    Whether that's Paul or Chong?  Answer:  Just Paul.

10   That's what Phong Lee is all about.

11        Now let's talk about hothead Paul Lee.  He also

12   suffers severely from selective memory.  Do you

13   remember how good his memory was for the fight?  He

14   knows that he went down to the bathroom, he came up

15   the stairs, he knows he did the punch with his right

16   hand, he knows the jacket that he had on, he knows

17   where Phong was, he knows where Paul was, and then

18   all of a sudden, poof, amnesia sets in when he gets

19   to the critical issues in the courtroom.  Okay?  What

20   does he say?  I put it all behind me.  Well, we can't

21   put it all behind us, and he hasn't put it behind him

22   either.  That is one heck of a bologna excuse.

23        So what kind of person is Paul Lee?  Or not what

24   kind of person, but what does he say, you know, oh,

25   he'll take on a guy with a bottle in one hand and an

96

1    e-cigarette in the other.  No problem.  He'll just
2    smash him over the head with the bottle.  That's what
3    he says.  And what does he think about the guy that
4    he hit?  In court he says, oh, the guy was the same
5    size as me.  No.  He wasn't the same size.  Paul Lee
6    is a very short guy, about five four or something of
7    that, I don't recall his exact height, but Josh, the
8    victim in this case, he's about six feet tall.  We
9    know that from the testimony.  A gun is a great
10   equalizer.  A gun is a great equalizer.  And what
11   does he say to the police?  Big guy?  No problem.
12   I'll take it on.  No.  His story does not make any
13   sense.  He says the police forced him?  They didn't
14   force him to say anything.  They didn't hold a gun to
15   his head.  They didn't deprive him of food or water.
16   They didn't beat him up.  They used some methods that
17   are, again, unreliable statements, and I'm going to
18   talk about that a little bit later.  What does he say
19   to the -- about ditching his clothes?  Not my
20   problem.  You remember that?  Not my problem.  So why
21   do you think he would tell the truth?  He even gets
22   to a point in the police interrogation where he
23   completely denies that it's his coat or even that
24   it's him in the pictures.  He says, oh, I wasn't
25   running out of there, I was fast walking.  I had

97

1    nothing in my hand, he tells the police repeatedly.

2    I had nothing, I had nothing, I had nothing.  Oh, I

3    have something, I have an e-cigarette, I have an

4    e-cigarette, I have an e-cigarette.

5        I think this is critical when Paul is talked to

6    the very first time by the police officers, what does

7    he say about what happened?  He's here, Phong is

8    here, the fight happens here.  So these arrows, they

9    go this way for the fight.  So what's happening?

10    They're facing off towards the bar, Josh is facing

11    off towards them, and they fight.  Josh's right cheek

12    is to the front door.  Now I know there is a lot of

13    diagrams and people who say differently, but why is

14    this reliable and why is this trustworthy and why

15    should this be believed?  Because this is really

16    important.  Because Daniel Kersten saw Josh right

17    when he went down, and do you remember what he said?

18    He said his feet were near the end of the half wall

19    and his head was by the stairs.  Have you ever seen

20    somebody suddenly pass out?  If you've ever had that

21    experience, you know that when somebody suffers a

22    certain loss of consciousness, they go straight down.

23    Right?  We don't know if backwards, forwards, but we

24    do know they go straight down.  We know that Joshua

25    Richards from that video was face up when the cell

98

1      phone pictures were taken.  That's what makes sense,

2      that he's there.  He could have spun around, we don't

3      know that for sure, as he went down, but that's where

4      his body ends up.  Because if it's what other people

5      said, if Joshua Richards is somewhere over here and

6      these guys are against this half wall here, he can't

7      fall with his feet over here and his head over here.

8      It's not possible.

9          You heard what the medical examiner said, this

10     -- his death was caused instantly.  By the way, while

11     we're on Paul Lee and the medical examiner, Paul Lee,

12     oh, I didn't hit him, punch him to the side.  You

13     know, Sergeant Rabas is telling him, look, you gave

14     him a left hook, because they know, the police know

15     right away even before the autopsy where the gunshot

16     went in.  What does he say?  I jabbed him in the

17     chin.  And he claims he had an e-cigarette with him.

18     Well that e-cigarette, you saw the testimony, that

19     thing is not like a regular lightweight cigarette.

20     That's got some weight on that thing.  There would

21     have been a mark if what he was saying is true.  But

22     what makes a lot more sense about the way it happens,

23     he's fighting with him, right, and we know, anybody

24     who's been in a fight knows, and I will tell you I've

25     had other people tell me this because I have not been

99

1        in fights, but we know that when people fight each

2        other, it's not like this.  Right?  When people do a

3        fighting stance, they turn their body, they rotate

4        it, cock a hand back, other one is forward, cheek.

5        Paul is right handed, Josh is shot in the left side

6        of the cheek.  We don't know exactly how it happened,

7        but what we do know is what the medical examiner told

8        us which is this could have happened from being hit

9        in the head -- in the side of the head with a gun

10       because it's a near contact wound and the gun could

11       hit, the bullet could go off, and what happens, what

12       happens with this bullet.  The bullet angle is

13       sharply upwards, it's near contact, and it is

14       somewhat front to back.  That is consistent.

15            Then there's "I'll tell you whatever I (sic)

16       want to hear" Joe Thor.  So what does he do?  He's

17       going to tell any story to anybody that's going to

18       work.  Story one, December 9th, I wasn't there.

19       Story 2.  Okay?  Now when the police are talking to

20       him and they want Paul, what does he tell them?

21       Okay.  He doesn't say I saw Paul do it.  That's been

22       repeated over and over.  We know that.  But we also

23       know he's positive it's not Phong, he's positive it's

24       not himself, but when it comes to Paul?  Hmm.

25       Possibly could be him, maybe it could be him, little

1    waffling there.  And so the police come back on

2    December 9th.  You think he doesn't know who's been

3    arrested?  But just in case he doesn't, how does this

4    start out, by the police officers telling him, and

5    I'll get to a little bit more of that later, that

6    Paul and Chong are in custody and that he's got to

7    help his friend Paul.  So what does he do?  He has a

8    growing story.  First he didn't see it.  Now he says

9    he saw a gray sleeve.  Then it's Chong told me on the

10   ride down.  Then he goes inside and makes -- does

11   something for four minutes, and then he comes out and

12   says, oh, Chong told me he flushed a gun down the

13   toilet at Sharks.  What is he doing?  And do you

14   remember him in court the way he describes this

15   fight?  That Paul is in a fight, that the half wall

16   is behind them.  Paul is in a fight.  Phong is on one

17   side, Joe is on another side.  Arms outstretched.

18   Arms outstretched.  Who the heck gets in a fight and

19   goes like that?  Okay.  Hit me now, big guy.  Hit me.

20   That is bologna.  It could not have possibly happened

21   that way.

22       Now what about Tou Shoua Lee?  And I'm going to

23   talk about him more, but he's not a suspect.  He

24   didn't run and dump his things in a dumpster.  He

25   says when he testified that Chong Lee was closest to

101

1    the door.  But you know what?  That can't possibly be
2    true because -- and I'll just -- we'll just use that
3    diagram.  That's fine.  This isn't his diagram, but
4    just using it to kind of show you roughly where it
5    is.  If Chong Lee is closest to the door and these
6    guys are back here the way he puts it, because he put
7    Josh, and it's on one of those boards, he puts him
8    kind of right here in between these foyers.  Right?
9    If what he says is true, that Chong comes by and
10   shoots him, Chong's got to be the first guy out the
11   door.  These guys are going to come later.  I mean
12   they would have to walk over the body to get the heck
13   out of there.  That's ridiculous.  Chong Lee, first
14   out the door, what he thinks, oh, gee I just shot
15   somebody.  Oh, after you.  Please.  Please, Phong,
16   please Paul, please Joe, why don't you go ahead of
17   me.  I'll just wait here and see if there's a chance
18   I could get caught.  Right?  And I'll just go to
19   Sharks and I'll just, you know, I think I'll stick
20   the bullets down the toilet because it's really good
21   to walk around with an empty gun.  You know?  This
22   story doesn't make any sense.
23        Now I want to talk about the police.  This trial
24   is not a referendum on the Appleton Police
25   Department.  That's not what this trial is all about.

102

1     The police officers are good people.  They care about
2     what they do.  That is absolutely clear.  And nobody
3     is criticizing them for the fact that they have ill
4     intent or bad motives or are trying to plant evidence
5     or anything of that nature.  That is not what this
6     case is about.  But you heard James Trainum, the
7     expert, the police expert, 27 years in the Washington
8     D.C. police department as a homicide detective, a
9     nationally known writer, speaker, trainer, a person
10    who goes and trains other police departments, that
11    when this happens, it's not done consciously, it's
12    done inadvertently, but there's still a problem and
13    it's still a mistake and it can still lead to the
14    wrong result.
15        So what happens as this develops?  We have
16    witnesses, Daniel Kersten, Adam Richardson.  They are
17    not asked to come back into the police department the
18    next day to be reinterviewed.  They are interviewed
19    very briefly right at the scene.  And while Daniel
20    Kersten has looked at some video or something of that
21    nature, Adam Richardson, who was looking right there
22    and sees this guy running out, number two, stuffing
23    something into his jacket, never did a photo lineup,
24    show him a bunch of pictures the way they're supposed
25    to do it, where you show the pictures.  I mean we

103

1          have a procedure in Wisconsin, it's really, really
2          carefully designed.  It's done to make sure that we
3          don't have mistaken identifications.  That's why you
4          show the pictures one at a time.  That's why the
5          Appleton Police Department, the officer showing the
6          pictures, they don't even know who the suspect is so
7          they can't even unconsciously communicate it.  That's
8          how important this is.  He's looking right at it.
9          They never show him pictures.  All right?  He doesn't
10         -- he says he doesn't know exactly who the shooter
11         is, but what about can he identify the guy, the
12         number two guy who he sees stuffing something in his
13         pocket?  Would that not be important if he's looking
14         at his face?  Wouldn't you like to know who he would
15         have identified the very next day while things are
16         fresh in his memory?
17              They focus on the first three people out the
18         door.  And that's a smart focus because, after all,
19         these guys are booking it.  Fast.  Running down the
20         street.  Paul Lee running with his hands in his
21         jacket pocket.  Where do they go?  To a dumpster.
22         Toss a hat, toss a vest.  You know, even though Paul
23         Lee doesn't toss his clothing, he's with these guys.
24         He's the one with his hands in his pockets.  Maybe
25         there's a reason he doesn't throw his coat in the

104

1          garbage.  What's in that coat?

2              But instead of using the kind of interview

3          methods that Mr. Trainum talked about, instead of

4          talking to more people to get their story, what do

5          the police do?  They've been, again, interrogating

6          these people, telling all three of them they're

7          guilty of something, using coercion, which I'll talk

8          about in a minute.  That's what they do.  And when

9          they switch the theory because things aren't going --

10         they're not getting anything, what do they do?  They

11         switch their theory based on a rumor.  All right?

12             Now, why does Alyson Blom tell Lisa that she

13         thinks it's Paul?  Because she didn't see who the

14         shooter was, right?  But she would know it's not

15         Chong, he's like literally right there with her.  You

16         saw them coming down from the area of the bar, and

17         you see where they are in proximity to each other

18         when they go out the door.  She's right by him.  If

19         she saw him do it, she -- if he was doing it and

20         she's right near, she should have been in a position

21         to see that.  But she talks to Lisa, somebody who is

22         not even there, Lisa who is the fiance or wife or I'm

23         not sure of Hu Lee, the brother, the older brother

24         here, and what does she say?  Oh, she passes along a

25         rumor.  Chong is the guy who did it.  Well, where did

1     that rumor come from?  Okay.  Use your common sense.

2     That rumor was passed along on December 9th.  Who was

3     at the Stutzman house on the evening of December 9th?

4     Joe Thor.  You don't think these people talk to each

5     other, these witnesses who all walk into court and

6     say, haven't talked to them for months, haven't

7     talked to them for weeks.  You believe that?  You

8     know?  You believe that, then I'm going sell you a

9     Caribbean island for a dollar tomorrow.  So use

10    common sense.  They have gotten together.  They have

11    spread a rumor.

12         And what does Chong tell the police in his

13    interview?  I have family problems.  All right?  So

14    -- and he specifically has family problems with Paul.

15    He tells that to the police.  So it's not too

16    surprising that Phong, best buddy who only wants to

17    cover for Paul but not for Chong, and Joe who is with

18    them get together and spread the rumor.  So the

19    police are operating on a rumor.  And what don't they

20    do?  They switch gears like that, right?  Because

21    Paul Lee is taken into the police department right

22    after this interview at Norka which starts at about

23    9:15, so we know it's about an hour-and-a-half,

24    10:45, they're putting the cuffs on him and taking

25    him downtown.  12:41 Sergeant Thao is going in that

1    room with an idea that he can solve this crime

2    because of a rumor and starts suggesting it's Chong

3    Lee.  That's what happens.  Based on a rumor.  Does

4    anybody first go to the Stutzman house and interview

5    her between 10:45?  No.  Does anybody find out how

6    this rumor is created?  No.  Does anybody do some

7    investigation?  No.  And so the police conduct their

8    interviews and the focus shifts.  They're sure it's

9    Paul, then they're sure it's Chong.

10       And they disclose facts that shouldn't be

11    disclosed, things we call holdback facts, like it's a

12    .25 caliber bullet.  I mean even Sergeant Rabas, when

13    he talks to Joe Thor again, says when Joe Thor asks

14    if it's a .22, well we can't tell you that.  Even

15    that happens.  You know?

16       Talk about it being a point blank shot?  So

17    where did this word point blank come in?  Okay?  When

18    is the first time the word point blank gets used in

19    the case?  It's used on December 9th when Sergeant

20    Schira is talking to Joe over at Lisa Stutzman's, and

21    what does he say, quote, you're standing right there

22    when it happened.  You're right in the mix.  Point

23    blank on the guy.  That's the first time the words

24    point blank come in in this investigation, and they

25    continue, point blank continues.  Because when

1    Sergeant Rabas talks to Paul Lee and is talking to

2    him and says they -- that he's the guy, he says, you

3    shot him in the head or someone else shot him in the

4    head point blank.  The point blank word is in there.

5    So when Paul adopts that word later on, that's not

6    really very surprising because the word point blank

7    has been put out there.  All right?

8        So what does Sergeant Schira say to Phong on

9    December 9th when he comes over and talks to him at

10   the courthouse?  What does he say?  And I'm reading

11   you quotes right out of these transcripts, and I'm

12   only selecting a couple because I'm sure you're like,

13   oh, my God, I've heard enough of this.  We're not

14   going to stay here another two weeks to rehash this

15   whole thing.  You can't get over the fact that we've

16   got a guy with a gun in his hand and you're in the

17   picture.  And he says, you're not the one?  You don't

18   have to convince us, buddy, you've got to convince

19   the DA's office that's going to charge you and the

20   jury that's going to look and say of course he knows.

21   Guilty.  Guilty.  Guilty.  That's how Phong Lee gets

22   interrogated.  And then -- but Paul Lee is not in

23   custody yet so there is still reason he's going to

24   try to cover up for his buddy.

25       And then they go to Joe Thor, it's the next day,

108

1          it's December 10th now.  They go to Joe Thor the next
2          day, and what do they say to him?  It's decision day.
3          Where do you want to fall on this?  You can be a
4          witness or you can be party to the crime.  You can
5          get on that witness line or it can be 25 to life.
6          And then Joe, what does he say?  That's where he says
7          he's sure it's not him, he's sure it's not Phong, but
8          it potentially could be Paul, it possibly, as he
9          said, could be Paul.
10              So then they talk to Paul Lee, and, gee, what a
11          surprise, Paul Lee denies doing it.  Paul Lee says,
12          I'm not going to take somebody else's time.  Well,
13          duh.  You think he's going to come in and say, yup, I
14          give it up, you yelled at me, I shot him.  No.  He's
15          not going to say that.  All right?  So Sergeant Rabas
16          is saying, you want to explain or do you want to go
17          down on this.  And Paul is saying, no, I didn't do
18          it, I didn't do it.  All right?  I didn't do it.  And
19          Sergeant Rabas is saying, you know, this is your last
20          chance, you're going to go down, all the way to life.
21          He talks about Paul blank -- point blank, excuse me.
22          Paul is going to own up?  That guy?  You think he
23          would take his own time?  What he doesn't realize is
24          he's drawing a drawing that matches what happens and
25          puts him in position to have done it.  It's easy to

1    deny stuff when the police are questioning you.  All
2    right?  Paul Lee, who cannot tell the truth to save
3    his life in a courtroom, who says, oh, I had nothing
4    in his hand, oh, I had an e-cigarette in my hand.  I
5    mean, it's so ridiculous that -- you saw the tape, it
6    was played twice, Sergeant Thao is in the background
7    laughing about it.  That's how ridiculous his
8    statements are.  You know?  And so he's told, you
9    know, we're going to take you to court.  And it's
10    serious time now, it's not play time, because at the
11    end of this interview, after being told you can walk
12    out the door, he can't walk out the door.  The cuffs
13    are on and it's time to go down to APD.
14        So then they get the rumor and the focus shifts.
15    12:41 a.m.  You saw a long segment of that tape.  You
16    got to watch it happen yourself.  You saw that it was
17    soft tone but harsh words.  Sergeant Thao:  You're
18    25.  I'm giving you the benefit of the doubt, that if
19    you're saying you're not the one but you hit him with
20    the gun, here's your last chance because there is
21    only two options, it's either you or it's somebody
22    else.  And then later he says, I'm going to ask you
23    one question.  This question is going to come down to
24    this -- to how you want to go about this, excuse me,
25    did Chong do the shooting.  He suggests the name.  So

110

1          here it is.  A life preserver is being offered to
2          Paul.  You think that guy wants to go down?  You
3          think that guy doesn't think they're serious at this
4          point now that he's in custody?  And what does
5          Sergeant Thao say?  If you're trying to cover for
6          someone or Chong, you're going to go down hard
7          because we have the proof on you, but if you're doing
8          it for him because you happen to be the youngest son,
9          now is your time.  Okay?  And when he says that --
10         and again his story keeps changing too.  Oh, I didn't
11         see it.  Oh, Chong came over on Monday or was it
12         Tuesday, no, it's Monday, oh, he came over on Monday.
13         And they start talking about a checklist, right?  And
14         then he starts talking about, no, he didn't come over
15         on Monday, actually I saw him at Joe's.  And what
16         does Sergeant Schira say?  We built this great case,
17         and all we got to do is get rid of this case.  So
18         they want to enlist him to help.  They tell him, talk
19         to Phong and talk to Joe.  You got to get these guys
20         to go to bat for you.
21             And then let's look at this written statement.
22         So what do we know about these?  Okay.  Hopefully
23         we'll be able to get them side by side so you can
24         compare.  Okay.  So we can't do it, but these are the
25         words from the tape.  Thank goodness we have recorded

1     statements in Appleton, Wisconsin and the State of

2     Wisconsin.  So this is what they're summing up to

3     him.  You got in an altercation with a guy by the

4     name of Josh at Luna.  While you were struggling with

5     the guy, fighting with the guy, Chong stepped up,

6     shot him in the side of the head.  You guys ran.  Um,

7     roughly an hour, hour-and-a-half later Chong came to

8     Joe Thor's house where he admitted to you and Joe

9     Thor to, ah, to Phong Lee that he F'd up, that he's

10    going away for awhile, and that he shot the guy.  Is

11    that about right?

12         Written statement.  While I was in Luna coming

13    back from the bathroom me and Josh got into an

14    argument.  When it got physical Chong came from

15    Josh's left side and point blanked Josh.  After

16    leaving Luna, me, Joe and Phong walked to Joe's.

17    Roughly an hour later Chong shows up and told us he

18    had F'd up and shot Josh.  Chong told me, Joe and

19    Phong that he ditched the gun and planned on leaving

20    town.  If this were a high school paper, those kids

21    would be getting called in to the principal's office

22    for plagiarism.  That's how close.  No, of course the

23    words aren't exactly the same, but that's how close

24    it was.

25         So what happens?  Paul offers to talk to Chong,

112

1          right?  Well, I can go try to talk to my brother.
2          And why does he offer to talk to him?  Because he's
3          the youngest one.  And I'll get back to that later.
4          So here's a perfect chance to create some evidence.
5          These guys are both at Appleton Police Department.
6          What do they have?  Rooms, cameras, recording
7          systems, systems that record when nobody else is in
8          the room.  Remember how Paul told us he slept the
9          whole time in between these interrogations?  He's not
10         sleeping.  He's literally saying on the stand I'm
11         sleeping, and we're watching him on the tape, sped
12         up, he's clearly wide awake this entire time.  All
13         right?  So here's the perfect chance to bring Chong
14         in, you leave the room, you coach Paul on what to
15         say, just like this they had coached -- remember that
16         woman who was not a witness in this case, but do you
17         remember the testimony by Sergeant Tauber, the one
18         who told the teacher, Dalinda Guzman, in Green Bay
19         that she could lose her job if she didn't cooperate
20         with them and tell everything she knew?  That she had
21         worked all these years to be a teacher?  Remember how
22         they set up the secret phone call and he talks about,
23         well, I'm just -- I'm talking about that to set up
24         the secret phone call.  Same thing could easily be
25         done here.  These two guys could talk while the

113

1    police recorded it.  Real evidence.  Real evidence.

2    Not made up statements.  Do they do it?  No.  So what

3    happens from there?  It's all about tearing down the

4    case against Paul, and they use the same tactics

5    because they've built this great case that they said

6    against Paul, and what do they want?  They want to

7    get the shooter.  They want to clear the case.  And

8    now what do they have that they haven't had?  They

9    have a witness, somebody who is going to say Chong

10   did it.  So they've got to go out and get other

11   people to say it.

12        So they go and they talk to Joe and they talk to

13   Phong.  So what is said.  So what does Rabas say to

14   Joe Thor?  We can -- you can get yourself on to that

15   witness line.  You remember what I talked about?

16   Yeah.  And you can get off that 25 to life line

17   'cause you -- your family depends on you.  Don't

18   forget about that.

19        We'll just take that off for now.

20        So we have a changing story, and you heard it.

21   They start by telling him, Chong's in custody, we --

22   Paul is not the guy who did the shotter (sic).  He's

23   told that right up front.  We went through this whole

24   thing in order.  And they eventually get him to say

25   stuff.  And what does he say?  Oh, yeah, the gray

114

1    sleeve, you showed me the picture with the gray
2    sleeve.  Remember that picture that he's shown before
3    where he doesn't want to say that Chong is there?
4    Right?  And I'm sure, you know, I mean the prosecutor
5    gets rebuttal.  I only get one chance up here, and I
6    can't read her mind.  I don't know what she's going
7    to say.  She may show you time lines, she may use
8    diagrams, she may say, oh, gee, you know, they didn't
9    coach him.  Who -- I have no idea what the response
10   is going to be.  But whatever it is, it doesn't
11   change the basic facts.  Okay?  He didn't identify
12   him the day before, maybe because he thinks Chong
13   will tell the truth about what happens.  Maybe he's
14   worried that Chong will say that it's his brother.
15   Maybe he's not counting on Chong to keep his mouth
16   shut.  We don't know what his reason is.  We do know
17   that he saw that picture, he saw the gray sleeve.
18   And he's saying it to the police, I saw the gray
19   sleeve.  Remember?  That's what it was.  Is this not
20   a bunch of nonsense?
21       I'm telling you something, these guys are right
22   there with Joshua Richards.  They're facing off
23   face-to-face, they're buddies, they run, they throw
24   their stuff into the garbage can.  You don't think
25   that they see who does the shooting?  You don't think

115

1      that if they didn't come into court and tell the

2      truth they would tell you that they saw?  Because

3      they saw.  I don't care how dark it is in that place,

4      this is a ridiculous story and you shouldn't buy it.

5           So then what does he do?  He goes in for the

6      four-minute break to supposedly get a phone number.

7      Right?  And you're going to buy that he's just afraid

8      that his brother's phone is going to be taken away?

9      How about, hello, what's going on here?  Did somebody

10     stick bullets down at Sharks?  What up?  Who's in

11     custody?  What should I say?  Police are talking to

12     me.  And then he comes out -- because he doesn't say

13     anything about these bullets when he's out there

14     beforehand.  No.  He comes out, and you heard the

15     four-minute segment where they're again reminding

16     him, Sergeant Lietzinger is saying, you know you

17     could get life, you better tell us, and boom, this

18     new fact, this supposedly great fact comes out.

19          And I'm going to talk a little later why that's

20     bologna too because this bullet thing is a total red

21     herring because those bullets couldn't have been

22     there.  We know that from the testimony.

23          And what does he say?  They still think at this

24     point that Paul has the gun.  They still think that.

25     And they ask him, what did Paul do with the gun.

116

1    What does he tell the police?  Paul didn't tell me

2    what he did with the gun.  I mean, really, talk about

3    talking out of both sides of your mouth.

4        And then what about Phong Lee?  Okay?  Phong has

5    been on notice.  He's been seen.  He's on notice.

6    They stopped by McDonalds.  He's got some phone

7    somewhere.  We know he's got two phones, two search

8    warrants.  Oh, and by the way, speaking of not

9    getting search warrants for phones?  No search

10   warrant for the phone that Joe's brother has to get

11   call records, that they're saying go in and take

12   these numbers?  I mean this excuse about that phone

13   is not active?  There is no carrier?  Well, hello,

14   they're talking about phone numbers just having been

15   called the other day on it, they want him to go look

16   up a phone number and they never do a search warrant?

17   This is a really not very good excuse for not doing

18   the job.

19        So what happens when they talk to Phong?  They

20   tell him who's in custody.  And Sergeant Thao walks

21   him through it.  So you guys walk up to Joe's place,

22   right?  Phong: Yes.  Sergeant Thao: Okay.  Here is

23   really important, okay?  We got you and Joe and Paul.

24   Phong: Yup.  Went to Joe's house.  Phong: Yeah.

25   Thao: Okay.  I know for sure, and I got information,

117

1     corroborated by many people, you guys were there for

2     maybe half an hour to almost an hour.  Yeah.  Thao:

3     Chong shows up.  Okay?  Right?  Phong:  Yup.  Thao:

4     And you guys went in the basement.  Phong:  Yeah.

5     Thao:  Chong told you what happened.  Yeah.  Whose

6     words are these anyways?  These are the words of a

7     man who made it perfectly clear on the stand he is

8     willing to cover for his buddy, Paul, but not ever

9     for Chong.  And that was not a defense question.

10        So then let's talk about Tou Shoua Lee.  What

11    does Tou Shoua Lee, now he's not involved in this, so

12    what does he tell the police?  Okay.  I saw a punch,

13    I heard a bang.  And maybe it was an instant, and

14    maybe it was five to ten seconds, as he relates it.

15    Okay?  We know he says both things when he's being

16    talked to.  But how do people think about time?  Do

17    you remember Josh's friend, or at least acquaintance,

18    I think acquaintance is more of a word, Michael

19    Verheyden who was on the party bus with him?  Michael

20    Verheyden was identified in the video as walking from

21    the front of the bar, we see him go out of the

22    picture, and we know from this time line that

23    thirteen seconds later the guy he's come on the bus

24    is laying on the floor with a bullet in his head.

25    How long did Mike Verheyden tell you that he was up

1     there trying to watch to see if there was a fight so

2     he could intervene?  His answer, ten minutes.  That's

3     what people naturally do with time.  Time seems

4     longer when you recount things.  That's a natural

5     human trait.  It makes much more sense that this was

6     instantaneous.  Why?  Because Daniel Kersten is

7     looking on that tape, he doesn't see anything worth

8     intervening, turns around, and boom, how many seconds

9     later is it that he hears the pop and goes over

10    there?  That's just how fast this happened.

11         And so what does Tou Shoua Lee say to Sergeant

12    Thao?  He doesn't know.  What does Sergeant Thao say?

13    I think you have an idea.  What does Tou Shoua?  I

14    don't know.  I'm serious.  I'm honest.  Sergeant

15    Thao:  It's Chong.  Sergeant Thao:  I want you to

16    know you're not the first to name Chong as the

17    shooter.  Excuse me, but Tou Shoua Lee had not named

18    Chong as the shooter.  He never said that.  He never

19    said that.  What is it that he said?  He's being

20    pressured into making a statement, right?  So when

21    he's trying to tell him this, this isn't good enough.

22    And remember, Tou Shoua Lee, for whatever reason, is

23    afraid of the police.  He's glad that it's Sergeant

24    Thao who has come over.  He doesn't trust the white

25    police officers.  He talks repeatedly about how he

119

1       wants to help himself.  Something is going on here

2       where he feels he needs to go along, and Sergeant

3       Thao walks him through this statement and slowly by

4       slowly through making suggestions.  And you saw the

5       cross-examination of Tou Shoua Lee.  I know it's been

6       a while, been almost two weeks, but you saw what

7       happened and what he said.  And what did he tell you

8       in court when I asked him?  I asked him, so Sergeant

9       Thao is leading you into making this statement about

10      Chong Lee.  Right.  And you pretty much felt you had

11      no choice but to say this, didn't you?  Correct.  You

12      did have some fear that if you didn't name Chong

13      something bad would happen to you, right?  Answer:

14      Right.

15          You know, I asked him leading questions.

16      Everybody has been asking leading questions in the

17      courtroom.  And what you've seen is that we have a

18      judge here who, if something is improper about

19      leading questions, stops it and says this isn't right

20      in the courtroom procedure.  There is no referee in a

21      police interrogation.  The police can ask people what

22      they want in the way they want, and apparently they

23      did.

24          What's so interesting in this case is that the

25      only person who wasn't intimidated like this was

1    Chong Lee. He wasn't threatened with 25 years to
2    life. He wasn't told you need to be on the witness
3    line or this line. And he clearly didn't want to
4    even tell them he was there, right? You remember
5    that. He's not telling them the truth. He's at
6    first denying that he's there. How long does it take
7    them to get him to say I was in Luna and explain
8    what's going on. It didn't take very long, okay, 30
9    minutes, 40 minutes at the most? So it doesn't
10    require, as Mr. Trainum says, threats to people, it
11    doesn't require that to get somebody to say this.
12    Okay? And then they talk to him about what he knew.
13    And he's not going to tell on his brother. He's not
14    going to tell on the youngest brother. But what does
15    he say? You have video, show me the video. Okay.
16    Reminiscent of Paul? Except for one difference.
17    Here's the difference, and this is what Paul told us
18    in cross-examination about the video. Question: So
19    you figured they probably didn't have the goods on
20    you. Answer: No. I didn't think they had the goods
21    on me. They told me that they had the video, so why
22    not show me a video, why keep showing pictures.
23    Chong Lee says, go look at your video. See what it
24    says. All right? Now he doesn't want to tell on his
25    brother, but what does he say, a killer is a killer,

121

1          a murderer is a murderer.  He is not going for their

2          common method of saying, look, this isn't so bad, you

3          know, nobody intended this.  No.  He says, a killer

4          is a killer, but he doesn't want to talk.  And he

5          tells them that eventually, that he doesn't want to

6          talk to them anymore.

7              So what about these statements?  What does James

8          Trainum say?  He has studied false statements and

9          he's worked, he's written, he's a consultant to

10         police departments, and what he talks about is that

11         there is a certain method that can get false

12         statements.  And despite the fact that there is

13         disagreement in the field of police work about what

14         to do among police trainers and educators -- and let

15         me just say something.  There is a reason they have

16         training.  Okay?  Do you want police officers on the

17         street who haven't learned how to use their gun, who

18         haven't learned how to collect evidence properly, who

19         haven't learned how to take witness statements

20         properly?  Is that -- that's not what we want.

21         There's a reason the Appleton Police Department and

22         police departments all over the country invest money

23         in training.  And this Reid interrogation people go

24         and teach, including at Fox Valley Technical College.

25         And what do they say in their own manual?  Manuals

1     that Sergeant Rabas and Sergeant Schira, training
2     that they've actually been sent to, and they're two
3     of the principal police detectives in this case.
4     What does Reid say?  Now I have to resort to glasses.
5     It is psychologically wrong for the interrogator to
6     remind the suspect of the punishment for his crime.
7     The alternative question should not offer -- threaten
8     consequences or offer promises of leniency.  And the
9     examples of improper questions?  Do you want to
10    cooperate with me and tell me what happened or spend
11    the next five to seven years behind bars.  And here's
12    another example.  Do you want to be charged with
13    first-degree murder which will mean life in prison or
14    was this just manslaughter.  And what do they say
15    about taking written statements?  Do not dictate what
16    the suspect should write.
17         Yes, Chong Lee didn't want people to come to his
18    preliminary hearing.  No dispute about the phone
19    calls, no dispute that they were made.  Right?  But
20    -- and the prosecutor has argued, and no doubt they
21    will argue in rebuttal, that this is evidence of
22    guilt because he wants to get out of it.  He's a
23    guilty guy so therefore he makes that call -- those
24    calls, rather, and therefore he writes those letters.
25    But there's another way to look at this.  I'm not

123

1    justifying the letters, I'm not justifying the calls,

2    but there's another way to look at it.  It can be

3    looked at as guilty; it can also be looked as what an

4    innocent person might do.  He's arrested on December

5    12th.  He's facing a preliminary hearing which takes

6    place on February 12th.  Clearly the guy does not

7    want to sit in jail.  Clearly he's telling witnesses

8    to say something different than what they told the

9    police.  But who's to say that what they told the

10   police was true?  We've already really gone over what

11   these guys have to say.  These guys and truth are

12   total strangers to each other.  They wouldn't know

13   what truth was if it came up and smacked them in the

14   face.  So telling them to change their stories,

15   that's not necessarily something that an innocent

16   person wouldn't do.  It's not proof that Chong Lee

17   committed this homicide.  And that he says, I'm mad,

18   I hate him, I'm angry, you know, wants them to come

19   to court and say they lied.  Well, they did lie.  No

20   surprise there.  And he's doing all of this knowing

21   he's being recorded, right?

22       And, you know, a lot has been made about Teng

23   Lee and these calls and what happened and, you know,

24   I'm not going to read call after call after call.

25   They've all been read to you.  But just a few things

1      I want to point out with Teng Lee. Who is it that's

2      talking about going out and doing things with the

3      witnesses? Who initiates that conversation? Okay.

4      Teng is the one who talks about how he's going to

5      track down Stephanie and Melanie. Teng is the one

6      who says he's going to send a message. And on that

7      call, which is call 16 on January 29th, Chong doesn't

8      really respond or whatever he says is inaudible.

9      Teng then says he's going to tell Stephanie and

10     Melanie not to come, and Chong first says, I know,

11     you have to tell them. But later in the call what

12     does he say? Forget it. Don't worry. Teng talks

13     about this. He's the one who initiates. Teng Lee in

14     call 12 on January 22nd, he tells Chong that he told

15     Paul, you need to go to court and tell the truth.

16     Call 17, February 2nd, Teng tells Chong that

17     Stephanie and Melanie said they weren't going to come

18     to court. Chong is surprised and says, whatever,

19     you're serious, are you serious. Did he have the

20     intent if he sounded that surprised?

21         And, you know, what about the calls with Paul?

22     What happens the very first call, or one of the very

23     first calls? It's actually call number 3, but it's

24     on December 12th. Who is it that says, no, before

25     they got me mad so I got angry and I yelled

1        inaudible.  Who says that first?  That's Paul Lee.

2        So when Chong Lee is talking to somebody else and

3        saying Paul says that he's nervous and scared and

4        that's why he said that, he's repeating back what his

5        brother told to him.  Okay?

6            So you've heard the evidence.  You saw the

7        demeanor.  Obviously Paul was scared and nervous.

8        And so the prosecution, you know, made a lot during

9        the trial, and maybe they're going to talk about it,

10       how Chong Lee says, mom didn't tell me to stay, I

11       would have disappeared already.  Well what do we know

12       about Chong?  He wanted to leave town before the

13       shooting happened.  On December 6th, two days

14       beforehand, he sent a Facebook message, or his

15       account, there is a message from his account to

16       Melanie Thao, and what does it say?  It talks about

17       wanting to leave town beforehand.  Not liking

18       Appleton, wanting to leave.  So that's already in

19       process.  Did Chong Lee leave town?  For a few hours,

20       a day, day-and-a-half.  He comes right back.  He

21       doesn't flee.

22           And Stephanie and Melanie on these calls at

23       various times, try and find the right ones, Stephanie

24       is saying, let's not talk because the police are

25       listening.  What does Chong say?  I don't care if

126

1          they listen.  I don't talk about anything.  What does

2          he say -- that's call 18 by the way.  What does he

3          say on call 14 after Stephanie says she and Melanie

4          talked to the police?  Say that if they talk to

5          Melanie already it's okay.  It's okay.  And then he

6          says, maybe they will try to bring you guys to court.

7          Forget it.  Let them do it.  I will go against them

8          in court.

9              But nobody is denying that these phone calls

10         were made.  You have the words, these are long calls,

11         you have the words where there is critical points,

12         you can make your decision whether or not his

13         intention was truly to intimidate people or not.  You

14         have the jury instruction, you will decide that.

15             Now, I just want to let you know that it took me

16         23 pages of notes to do this closing argument and I'm

17         on Page 19, because if I was sitting in your shoes, I

18         would want to be knowing how much longer this is

19         going to go.  So I'm just going to tell you where I'm

20         at so you know because I only get one chance.  The

21         prosecutor talked for a long time and she gets to

22         come up and offer rebuttal and I can't do that.

23             Here are some questions to go back and ask

24         yourself when you get in that jury room about what

25         happened.  What does the video show?  It shows that

127

1     Paul had something in his right hand.  If he hit Josh

2     in the chin with an e-cigarette, why isn't there a

3     mark?  Here's something to ask yourself.  If Paul has

4     nothing in his hands like Joe Thor said and he's wide

5     open like that, why does he have something in his

6     hands seconds later?  Is this punch and puff time?

7     That's ridiculous.  If Paul has nothing in his hand

8     or it's an e-cigarette in the right hand, what's in

9     the left hand?  The video appears to show something

10    in his left hand.  What is it?  We don't know.

11         If what these witnesses say is true, why don't

12    their stories match?  Why do Paul and Phong say, you

13    know what, Chong came over and said he F'd up, he did

14    the shooting.  Why does Joe tell the police, no, Paul

15    and Phong were gone and then Chong came over and told

16    me, and I think he's got different versions, either

17    that night at my house or on the ride down to

18    Milwaukee.  Why don't these stories match?  Because

19    if it really happened, these guys would get it right.

20         Why, if Chong is the shooter and is where the

21    prosecutor says he's standing, and the other people

22    didn't do it and they're backed against the wall, the

23    half wall, why isn't Chong Lee the first guy out the

24    door?  They'd have to step over where Daniel Kersten

25    told you he fell down, and Chong Lee would have an

128

1          easy path to the door.

2               Whose hands do you see in the tape when

3          everybody is running up Division Street?  You see two

4          different versions -- you've seen two different

5          versions -- I don't want to take the time to cue it

6          up, but you can ask to see it in the jury room.  So

7          whose hands are out there as they walk out the door?

8          You see Joe's hands, you see Phong's hands, you see

9          Chong's hands, you see Alyson's hands.  You don't see

10         Paul's hands for very long.  You see the hands,

11         things in the hands, hands going into the pocket, and

12         he's running.  And you think it's because it's cold

13         outside?  Well, for heaven's sake, if you're fast

14         walking and it's cold outside, zip your jacket up.

15         Right?  No.  He's booking it, hands in pockets with a

16         coat he doesn't throw away.

17              Ask yourself, these guys really didn't talk to

18         each other for months?  Really?  When Joe is at Hu

19         Lee's house the next day and rumors are being spread,

20         when Phong Lee is factory resetting his phone, when

21         Joe Lee -- when Joe Thor, rather, goes in and has a

22         four-minute break and then comes out with new facts.

23              Ask yourself, if these guys didn't do anything,

24         why are they throwing their clothes in the trash?

25         Because they're scared?  Of what?  They think Chong

129

1           Lee is the shooter and he's going to come after and

2           shoot them?  Remember that testimony?  Oh, I heard

3           there is some Asian guys, they're afraid about what's

4           going to happen, what Joe Thor had said to the

5           police.  They are aren't afraid of being shot, they

6           are afraid of Chong Lee.  You don't dump your

7           clothing in the garbage can when it's five degrees

8           outside.  Who are they afraid of?  They're afraid of

9           the police.  That's who they're afraid of.

10               And I want to talk about three red herrings in

11          this case.  Okay?  Number one, the coat.  There is no

12          basis whatsoever for Sergeant Rabas's opinion that

13          the coat on the November 22nd, 2013, Hilton hotel

14          video when Chong checks in is the exact same coat

15          that he's wearing.  And I, you know, prosecutor may

16          make much of this, show pictures, whatever, but

17          there's no basis to say that he had on a coat he had

18          on a little over a couple weeks earlier in Milwaukee.

19          And you know what?  They had every chance to take

20          that video and show it to these witnesses, they've

21          had two years to go reinterview people, right?  To go

22          verify and just show the pictures of Chong to people

23          he knows.  They don't need to do lineups for people

24          who know each other.  And say to Joe Thor, is this

25          the coat he was wearing; say to Phong Lee, this the

1           coat he was wearing; say to Paul Lee, is this the

2           coat he was wearing.  They weren't even asked this in

3           court.  They weren't asked.  Why not ask?  You know,

4           what we know about the Luna video is that things show

5           up differently based on the kind of fabric that they

6           are, and what we also know is that the police took

7           the DVR back to the Appleton Police Department.  They

8           had it just a few blocks away.  They have a coat that

9           they think is important enough to bring in from Chong

10          Lee's house, that they think is important enough to

11          send to the crime lab to see if there's blood after

12          Evan Weitz and I go to the police department and

13          start asking to see evidence, it becomes now

14          important enough to think about sending it to the

15          crime lab a month later.  They've got the DVR.  Okay?

16          I mean, look at the unbelievably beautiful high tech

17          creation of the Wisconsin State Patrol.  Wasn't that

18          amazing to look at that?  That thing is like a work

19          of art.  All right?  So we're high tech.  Millions of

20          points for these lasers to get this beautiful view of

21          what Luna is, and you can't drag a DVR machine down

22          the block and stick the coat in front of it and see

23          what it looks like and how it looks, the coat that

24          you have in police evidence?  You can't take Paul Lee

25          down there a few blocks and ask the owner to open the

131

1    place up and reenact what's in his hand under the
2    same conditions and showing both hands?  You can't do
3    that?  I mean, come on, that's investigation 101.

4         And what about these bullets that so much
5    importance is being attached to?  Okay.  Well, here's
6    what we know about the bullets.  They weren't there
7    because the bathroom was cleaned.  All right?  Chong
8    Lee was at Sharks on December 8th in the early
9    morning.  We know this.  Those two young ladies gave
10   him a ride, gave him a ride to Joe Thor's.  We
11   already know that, right?  Joe Thor, who is kind of a
12   relative, gives him the ride to what Chong says is
13   his mom's house.  They drive him over there.  But
14   what do we know?  The bathrooms are cleaned on
15   Monday.  The bathrooms were cleaned on Monday, but
16   they were super cleaned on Tuesday.  Remember the bar
17   guy, Phillip Moore, the bar manager, the one who has
18   to go fish the stuff out of the toilet, how he talked
19   about that, you know, it may be a lick and a promise
20   with some of the staff, and maybe you don't see, but
21   they do go and flush the toilets, right?  That's what
22   they do.  And then he goes there on Tuesday, he does
23   what he calls a deep cleaning.  I mean, I was
24   thinking, wow, that guy should get manager of the
25   year for his cleaning job, right?  And so he does it.

132

1      There is no bullets there.  Those bullets get put

2      there later.  And what does the plumber tell us?

3      Bullets are not going to come back up.  Okay?  You

4      can flush bullets down a toilet if you pour enough

5      water in quickly to get them down.  The same lines go

6      through sinks and toilet into eventually the holding

7      tank, right?  But bullets don't come back up.  So

8      that's not possible.  Those bullets have to have been

9      put there another time.

10      And what do you think, Chong Lee is going to go

11     frame himself by putting bullets in the toilet?

12     Well, we know the police certainly didn't do it.  Who

13     did that?  Who is throwing in bullets that are .25

14     caliber that just happen to match the gun that was

15     used, the gun that's never been recovered.  And why

16     would they do it.

17      And finally, the bulge.  The bulge that's never

18     been seen.  Sergeant Rabas, who has studied this tape

19     and looked at it over and over again trying to find

20     out what happens, being sure that this is a gun at a

21     certain point in Paul Lee's hand, Sergeant Schira

22     being sure that it's a gun in Paul Lee's hand, and

23     now two years later a bulge is noticed on a frame?

24     Are you kidding me?  Never written about in one

25     report, never one witness asked.  We know the witness

133

1     who said somebody had a bulge in a coat pocket, that

2     was Adam Richardson, and Adam Richardson said that

3     about the second guy out of the door, and who was

4     that guy, it's Paul Lee.

5          So here's some things that aren't red herrings.

6     Daniel Kersten and Adam Richardson never

7     reinterviewed.  Adam Richardson never shown pictures

8     to see if he can identify.  No injury to Josh other

9     than the bullet, an injury that is consistent with a

10     fight, consistent with facing off with somebody, and

11     the left side of their face connecting with

12     somebody's right hand.  No phone analysis of call

13     records of Joe's brother's phone.  Phong having a

14     factory reset.  Not taking the coat and the

15     e-cigarette to Luna.  No secret recordings that could

16     have been made between Chong and Paul.  No talking to

17     Lisa.  They used methods that every -- that we know

18     from Mr. Trainum, an expert, a -- with 27 years and

19     hundreds of investigations, who has talked to more

20     homicide suspects than you're going to get in

21     Appleton in possibly 25 or 30 years, one of these

22     officer's entire career.  What does he say?  Those

23     methods are known to sometimes produce false

24     statements.  Those methods are known to sometimes

25     produce false statements.  He doesn't come in here

134

1      and tell you, well, this is false or true.  That's up

2      to you, the jurors.

3           You have seen the witnesses yourself.  You make

4      your own decision.

5           And what about these people that Chong Lee goes

6      and talks to and says, you know, I'm the shooter, I

7      did the shooting.  What's the common denominator with

8      all of these people?  They didn't believe him.  Okay?

9      They're the ones who listened to the actual words.

10     You think Stephanie and Melanie Thao who go out to

11     dinner with him at Jet Sushi are going to go out

12     against the next night to BWW, Buffalo Wild Wings, if

13     they think this guy actually killed somebody?  They

14     said they didn't believe him.  Okay?  Because

15     apparently he brags about stuff all the time that's

16     not true.  Even bad stuff.  Okay?

17          But you're not here to decide this case even on

18     whether or not you don't like Chong Lee.  You don't

19     have to like him.  Okay?  This isn't about a

20     popularity contest.

21          What does Xai Thao say, what does Peter Moua

22     say, what did Jesus say?  They didn't believe him.

23     They thought he was kidding.  They didn't believe him

24     when they heard him talk.  And what did Peter Moua

25     say?  He said that Chong said he got the guy,

1          whatever that means, after he's threatened that he

2          can lose -- because remember what the police said,

3          they have connections with the radiology department.

4          We don't have the tape because that was lost, and

5          that's just a minor mistake in this case.

6               Now I'm going to talk a little bit about the

7          law, because this case has brought you from your

8          everyday life -- and I'm getting near the end, I'm on

9          my last page.  This case has brought you from your

10         everyday life into a world that you don't inhabit.

11         It's brought you into the courtroom to learn about

12         shootings and police interrogations.  It's brought

13         you into perhaps a culture that you haven't learned

14         about before.  I think very few of you knew that many

15         Hmong people or Hmong cultures, some people, and I

16         don't remember, said they were interested.  But what

17         is it that Paul Lee said during cross-examination

18         about his family when he was being questioned by

19         Sergeant Schira and Sergeant Thao who said there were

20         a lot of references to him being the youngest

21         brother, and I asked him, what does that mean to you?

22         That I'm the youngest.  And I asked, that you're

23         supposed to take care of your mom because you're the

24         youngest, right?  Yes.  And you're supposed to take

25         care of your family.  It's the obligation of the

136

1    youngest child.  I'm supposed to be the success.

2    Yes.  And just so I understand that, in your opinion,

3    in your personal culture, in Hmong culture, dating

4    even back to the old country, it's the responsibility

5    of the youngest child to take care of the parents,

6    correct?  Answer:  Yes.  And to be the success,

7    right?  Yes.  And that's an expectation in your

8    family?  Yes.  That no matter how many sorrows or how

9    many problems there are with older brothers, or

10   whatever trouble they get into, you're supposed to

11   succeed, right?  Yes.  And so if there's a problem in

12   the family, it can go to other people but not you.

13   Yes.  And then when I asked him it's the role of the

14   family to protect him as well, what does he say?  No.

15   It's not their role.  Just me.  I'm supposed to be

16   the success.

17       The judge has instructed you, and you'll get

18   written instructions to go into the jury room about

19   what the law is, and the law isn't that you go in

20   there and you say, you know what, I think it could be

21   Paul, I think it could be Chong, you know, some

22   evidence seems there either way to me, so Chong's on

23   trial so I'm going to find him guilty.  That's not

24   what the law is.  The law is that even when you

25   suspect that somebody committed a crime, you have to

137

1    find them not guilty unless it's proven to you beyond

2    a reasonable doubt that this is the person who did

3    it, who did each and every crime separately.  And

4    each and every charge here has a separate verdict.

5    So you have to look at each count and say has it been

6    proven to me beyond a reasonable doubt that Chong Lee

7    intimidated the witnesses.  And there's a separate

8    count for Joe, for Paul, for Stephanie and Melanie.

9    So you have to look at those calls and do an

10   individual analysis and say did this happen.  But

11   under those circumstances, and after listening to

12   those calls, you still have to make a separate

13   determination, did he kill Joshua Richards.  That's a

14   separate determination from what he did on the phone.

15   And as we know, those calls can be looked at in two

16   ways.

17        So what is a reasonable doubt?  What did -- what

18   does the judge tell us and what is the law?  A

19   reasonable doubt means a doubt based upon reason and

20   common sense.  It's a doubt for which a reason can be

21   given arising from a fair and rational consideration

22   of the evidence or, and key words, lack of evidence.

23   It means such a doubt as would cause a person of

24   ordinary prudence to pause or hesitate when called

25   upon to act in the most important affairs of life.

138

1      And they tell you, it's not to be based on

2      speculation, it's not to be based on what if this,

3      what if that.  And that's not what I've talked about.

4      I have gone through the problems in this case.  I

5      have gone through the problems in this case.  The

6      prosecutor didn't prove it beyond a reasonable doubt.

7           What is your most important moment in your life?

8      Is it whether you should lay a downpayment on a house

9      and if you're getting a good price?  Is it whether

10     you should take a vacation?  Is it whether you should

11     marry somebody?  Is it whether or not you want to

12     have a child?  Is it whether or not you should go to

13     college for a certain career?  Is it whether or not

14     you should take or quit your job?  Whatever stops you

15     and says, you know, I need to think about that,

16     that's what a reasonable doubt is.  Think about how

17     crucial this moment is when you sit in judgment on

18     somebody else.  If you have something that says to

19     you, you know what, I don't think I can look at

20     myself in the mirror and say, you know what, I was

21     right about that.  I didn't have any reasons to

22     doubt.  If you don't have that, it's your job to find

23     him not guilty, and it's something that you have to

24     do.

25           I know that this is a murder case.  This isn't

139

1    something small.  This is a momentous decision that
2    you as jurors will be living with for the rest of
3    your life.  Okay?  But why do we have this
4    instruction?  Because sometimes the police get it
5    wrong.  Sometimes they do.  Sometimes mistakes are
6    made, even by extremely well intentioned people who
7    want to solve a very bad crime.  Things like that
8    happen.  Sometimes it's suggested to witnesses,
9    things are said to witnesses that shouldn't be said.
10   Sometimes witnesses are told who the police want and
11   conform their statements accordingly.  Sometimes the
12   right investigation methods aren't used, and that's
13   why the proof is beyond a reasonable doubt.
14       It's been a long couple of weeks, but two weeks
15   ago when I was asking all of you questions in the
16   jury selection process, I asked each and everyone of
17   you what is it that you are more worried about, are
18   you more concerned about convicting an innocent
19   person or are you more concerned about a guilty
20   person walking the streets free to kill again, and
21   all of you agreed at that point that you would follow
22   the law, that there had to be proof beyond a
23   reasonable doubt.  Because you know what?  Those two
24   things, they don't really work against each other,
25   because when an innocent person is convicted, there

140

1          is a killer out there who will never be brought to

2          justice.  When an innocent person is convicted, there

3          is a killer out there who may hurt another person.

4          When an innocent person is convicted, somebody pays

5          the price for something they didn't do, and that's

6          why we have this system of justice so that it has to

7          be proven beyond a reasonable doubt and no juror

8          would ever have to have this on their hands.  That's

9          why we have this system.  It's every system that you

10         would want if it was your son or daughter sitting in

11         that chair.  Everything that you would want.  And

12         that's why we have the law.

13             We have made suggestions to you that it's Paul

14         Lee, but it's not our job to prove it's Paul Lee.  We

15         have shown you a reasonable hypothesis, as the jury

16         instruction says.  The jury instruction says if you

17         can reconcile the evidence upon every -- any

18         reasonable hypothesis you have to do so and find

19         Chong Lee not guilty.  We have given you a

20         hypothesis.

21             We are not prosecutors.  Proving a case beyond a

22         reasonable doubt is up to the State, and there's a

23         reason.  I ask you to go back into that jury room to

24         weigh the evidence and to find Chong Lee not guilty.

25             Thank you very much.

141

1                    THE COURT:  Attorney Schneider, about ten
2          minutes to prepare?
3                    ATTORNEY SCHNEIDER:  Can we approach?
4                    THE COURT:  You may.
5                    (Bench conference.)
6                    THE COURT:  All right.  So we're going to
7          let counsel prepare.  Realistically it will be about
8          20 minutes, and so feel free to -- if you haven't had
9          lunch, feel free to do so and we'll be back in a
10         little bit.  Please rise for the jury.
11                   (The jury was escorted out of the
12         courtroom.)
13                   ATTORNEY VISHNY:  Judge?
14                   THE COURT:  Yes.
15                   ATTORNEY VISHNY:  I would like to bring
16         something to the court's attention that I did not see
17         fit to interrupt my closing.  Occasionally when I
18         glanced over, Sergeant Rabas was making faces at me
19         during my closing argument.  I didn't want to
20         interrupt it.  However -- and I don't know if the
21         court looked over that way or not.  I am positive
22         that I saw this.  I have never observed a police
23         officer act in that manner.  I understand the
24         concerns of the Appleton Police Department, and it is
25         my job to attack their investigative methods.

142

1          However, I feel that's uncalled for.  I am asking the
2          court to either remove Sergeant Rabas from the
3          courtroom for the District Attorney's rebuttal or
4          make it clear to him and every police officer in this
5          room and every person in this room that faces should
6          not be made, whether it's to disparage the defense or
7          to cheer for the prosecution team.  I have never
8          witnessed this occur in a courtroom in my entire
9          35-and-a-half year career as a criminal defense
10         lawyer, and I am appalled and shocked and disturbed.
11         That's all I have to say.
12                 THE COURT:  Thank you, Counsel.  And
13         certainly, if that did happen, certainly I extend my
14         apologies for that.
15             What I am going to indicate, and it's true of
16         counsel, of those sitting in front of the bar, seated
17         behind the bar, I expect as I had indicated the
18         utmost professionalism at all times in here.  I
19         expect no expressions one way or the other, either of
20         displeasure or pleasure.  On that same token, I'm not
21         going to order Sergeant Rabas to be removed.
22         However, if I do see any expressions, I will, albeit
23         in a subtle way, remove those individuals from the
24         courtroom for the remainder of the proceedings.
25                 ATTORNEY VISHNY:  Thank you.

143

1                    THE COURT:  All right.  Thank you, Counsel.

2                    (Court in recess.)

3                    ATTORNEY VISHNY:  Judge, there is a couple

4          of things.  Number one, I want to acknowledge that

5          while I was talking in the closing when I looked over

6          at counsel table that I think I may have made a

7          mistake in the closing because I saw something in

8          Miss Schneider or Mr. Maier's face, and I wondered if

9          I had argued outside of the record on something which

10         was -- I said that -- and I may have confused and

11         thought I had done this, but I don't know if it was

12         testified to in court or if I'm getting it from the

13         transcripts about Joe Thor saying he was afraid

14         because there were Asians shooting in the bar.  I may

15         have made a mistake.  I want to apologize to counsel

16         and the court for that error.

17              I also, regarding the State, I think we've seen

18         now the exhibits.  I don't know if there are any

19         other exhibits the State is intending to use, you

20         know, and I'm sure the State won't argue outside the

21         record but just my standard practice to ask the court

22         to make sure that that doesn't happen.

23                   ATTORNEY SCHNEIDER:  Quite honestly, I

24         don't ever recall Adam Richards saying he saw

25         somebody stuff something in his pocket, and I was --

144

1    he was my witness so I take extensive notes, and he

2    talked about a guy in a white hat, so I think you

3    argued outside the record but I wasn't going to

4    object in the middle and have the court reporter pull

5    up the transcript but --

6         ATTORNEY VISHNY:  Our notes say that he did

7    say that the second person was concealing something

8    in the pocket.  So if I made a mistake, I made a

9    mistake.

10        ATTORNEY SCHNEIDER:  I'm not going to --

11   yeah.

12        ATTORNEY VISHNY:  You can say that, you

13   know, your recollection of the testimony is that

14   counsel was wrong.  So, I mean, our notes said that.

15        THE COURT:  Attorney Schneider.

16        ATTORNEY VISHNY:  We all have it in our

17   notes.

18        THE COURT:  Attorney Schneider, I'm

19   assuming you don't want me -- you're not asking me to

20   take any action on that.

21        ATTORNEY SCHNEIDER:  No.

22        THE COURT:  Just to leave it.

23        ATTORNEY SCHNEIDER:  Yeah.

24        ATTORNEY VISHNY:  Okay.  So, you know, I --

25   we all had it written in our notes.  That's where we

145

1      checked.

2                  THE COURT:  I don't think it was done to

3      intentionally, you know, try and get something in.

4                  ATTORNEY VISHNY:  So all I would ask is --

5      and obviously, you know, if I have made a mistake --

6      and the State has every right to talk about their

7      recollection of the evidence as opposed to mine.

8      And, you know, the jurors have notes and they can

9      make a decision, they can ask for readbacks.  But

10     what I am asking is that there not be argument that

11     infers that somehow the defense is blowing smoke and

12     just putting up smoke screens or words to that

13     effect.  That's improper argument.  I have never,

14     obviously, observed Miss Schneider do a closing

15     argument, I'm not familiar with the practice, but

16     I've seen this happen a lot in general with

17     prosecutors, and I just want to make sure that

18     suggestions that somehow the defense is just making

19     things up, you know.

20                 THE COURT:  I don't -- I mean, knowing this

21     counsel --

22                 ATTORNEY VISHNY:  Right.  I'm not saying

23     she would by the way.

24                 ATTORNEY SCHNEIDER:  I might point out that

25     you completely took them down the wrong path with the

146

1    Jared Randall video because I think I'm allowed to
2    talk about that.
3                THE COURT:  Jared Randall?
4                ATTORNEY SCHNEIDER:  She showed a video to
5    Johnny Thao and isn't that Alyson Blom and isn't that
6    her in the boots.  And then later when he came he's
7    not --
8                ATTORNEY VISHNY:  Of course you can say
9    that that mistake was made or that, you know, that I
10   asked -- I mean the answer is he said no so that's
11   fine.  I mean -- wait a minute.  One second.
12   Actually -- actually, let me say this.  I do object
13   to that because this is rebuttal.  Rebuttal has to
14   cover what the defense did in its closing.  Johnny
15   Thao was never referred to in my closing.  That video
16   was only referred to the extent that it showed people
17   running with their hands and where their hands were
18   located, so discussion of that would not be proper in
19   a rebuttal argument.
20               ATTORNEY SCHNEIDER:  If it's me saying why
21   I believe Chong's the shooter and you're saying
22   Paul's the shooter then I think that's fair game.
23               THE COURT:  I -- for that reason I would
24   allow it.
25               ATTORNEY VISHNY:  Okay.  But I --

147

1                    THE COURT:  Noted for the record.

2                    ATTORNEY VISHNY:  But, you know, if they

3        want to point out the defense cross-examined a

4        witness and they showed a video and the witness told

5        the defense lawyer they were wrong, that's obviously

6        fair game, but to say that this is like somehow a

7        smoke screen or trying to lie or trying to confuse

8        the issues is I think not proper, as well as any kind

9        of burden shifting that somehow it's some kind of

10       obligation for the defense to have put on certain

11       witnesses or, you know, call -- inferences like that,

12       and I -- unfortunately, I've seen it in a lot of

13       prosecutor closings, and I really don't want to

14       interrupt Miss Schneider, but if it happens I don't

15       have an alternative because I don't have another

16       argument so --

17                   ATTORNEY SCHNEIDER:  No.  I can tell you I

18       take offense to you saying there's a red herring.  I

19       have red hair, maybe I consider that offensive, but I

20       know it's a term people use.  I know it's a term

21       probably people 20 years ago used.  I don't know

22       that's a practical term half our jury understands.

23       So I'm going to stick to what I'm going to stick to

24       to say why we think Chong Lee did this.  I think I

25       can say they distracted you or tried to distract you,

148

1          that's typically how I say it.  I might say they're

2          trying to lob softballs on you that aren't focused on

3          what the issue is, but I don't say smoke screen, I've

4          never said smoke screen.

5                    ATTORNEY VISHNY:  First of all, if I

6          offended you, I really apologize because that never

7          even occurred to me and I'm very sorry.  And it's

8          probably something I should have thought of and I'm

9          really sorry.  So just -- I was thinking of a fish.

10         And I think saying that, I'm sorry, Miss Schneider,

11         what you said that the defense is I -- I think that

12         that's proper -- improper argument.  I'm not sure

13         what the phrase was that she just said.

14                   ATTORNEY SCHNEIDER:  Distract you.

15                   ATTORNEY VISHNY:  The defense is trying to

16         distract you from the truth.  No, the defense is

17         arguing the facts can be looked at a different way.

18         It's improper argument to say the defense is trying

19         to distract you from the truth.  That seems to me to

20         be blatantly -- or to say the defense is trying to

21         lob softballs.

22                   THE COURT:  I think Attorney Schneider can

23         say this is what we believe is the truth and we

24         disagree with what the assessment is.

25                   ATTORNEY VISHNY:  Absolutely.  I -- I mean

149

1         we're not supposed to say we believe, but that's a

2         common error of speech lawyers make all the time.  I

3         may have done it.  But to say that the defense is

4         trying to distract from the truth, that kind of

5         language is improper prosecution argument.  So I'm

6         going to ask the court to rule on that, you know, or

7         that the defense is lobbing softballs.  To say we

8         look at the evidence, we proved this case beyond a

9         reasonable doubt, here are the facts, that's

10        absolutely what they should be doing, they should

11        absolutely be disagreeing with me, but I really --

12        that's why I'm asking in advance so I don't have to

13        interrupt, but so that's my request.

14               THE COURT:  And what I'm going to allow is,

15        Attorney Schneider, you can say this is -- if you

16        want to address directly on point what the defense

17        has said and this is what they've presented, but

18        here's why we think this is what the version is, or

19        the true version, that I'll allow, but I don't want

20        to, again, no colloquialisms of we think they're

21        lying or --

22               ATTORNEY SCHNEIDER:  I don't say that.

23               THE COURT:  I know you wouldn't.

24               ATTORNEY SCHNEIDER:  Presenting issues that

25        we think are irrelevant.  Can I say that?

1               ATTORNEY VISHNY:  Of course.

2               THE COURT:  Okay.

3               ATTORNEY VISHNY:  Yeah.  I think that's

4     absolutely fair game as opposed to distract you like

5     there is something sleazy going on here.

6               ATTORNEY SCHNEIDER:  I just need one

7     minute.

8               THE COURT:  You let me know when you're

9     ready, Counsel.  I won't -- you're not -- you're not

10    rushed by me.

11              (Court in recess.)

12              (The jury was escorted into the courtroom.)

13              THE COURT:  Attorney Schneider, whenever

14    you're ready.

15              ATTORNEY SCHNEIDER:  Thank you.

16        I want to again thank each and every one of you

17    for your time and your attention and your focus.  I'm

18    sure when you got the jury summons you might have

19    gone yuck and maybe a few other things, but we do

20    appreciate your time and all the attention you've

21    given to this case, and we're going to spend a little

22    more time with you and us here in the courtroom and

23    then go back and start to deliberate.

24        Rebuttal is the opportunity for the State to

25    come back up because it is the State's burden to

1    prove to you the elements of the crime.  Did this

2    defendant cause the death of Joshua Richards, did he

3    intend to do so, did he possess a firearm.  We

4    already agree there's been a prior felony conviction

5    before today.  Did he then follow up and attempt to

6    prevent or dissuade Stephanie, Melanie, Joe and Paul

7    from coming and giving testimony at a hearing that

8    was required in this case.

9        And I have to apologize in my most sincere way,

10   because every time I get up at this point in a trial,

11   I can't ask you, please show me, and please do not

12   raise your hands, but I can't ask you, by a show of

13   hands, you know, is this issue that we believe the

14   defense is bringing up that we believe is irrelevant,

15   is that already clear in your mind.  I can't ask you,

16   you know, this guy, do you agree with this guy

17   because I can't ask you that question either.  So I

18   need to go through some things because it is the

19   State who bears the burden to prove to you.  So there

20   may be things I talk about that you may be thinking,

21   you know, Miss Schneider, after last Wednesday's

22   testimony I knew what my belief was on that.  I

23   really do apologize if I start to talk about things

24   that I believe defense has presented that are

25   irrelevant to your decision and your focus which

152

1        should be a search for the truth.

2            The State does bear the burden of proof.  In

3        jury selection, defense counsel talked about burden

4        of proof and made a reference to a touchdown.  Well,

5        you either score a touchdown or you don't score a

6        touchdown.  It's not like they give you

7        three-and-a-half points on a touchdown.  It's not

8        horseshoes.  Burden of proof is, if I'm painting you

9        a picture of a tree, and I paint you a trunk and I

10       paint some branches off of it, maybe I start to paint

11       a few leaves, I don't need to paint every last leaf

12       or every branch on that tree before you look at it

13       and know beyond a reasonable doubt it's a tree.  Your

14       job, as the judge has instructed you in this case, is

15       you are not to search for doubt.  You are to search

16       for the truth.  And the truth of this case is that

17       you can't just so happen to have so many things

18       happen in this case unless the State's theory and

19       what you've heard from our witnesses is correct and

20       that this defendant caused Joshua Richards' death

21       intentionally on December 8th, that he possessed a

22       firearm on that day, and that subsequent to that he

23       intimidated or attempted to prevent or dissuade all

24       of those witnesses from coming in.

25           This -- I'm not really going to focus on things

153

1    that I think at times have been brought up.  The

2    parking ramp images I think with Johnny Thao who was

3    testifying, some images were shown, isn't this Alyson

4    was questions asked of him.  Jared Randall came in

5    and told you, that's not me, that's not Alyson.

6    Okay?  Things that are irrelevant.

7        Reid technique.  It is not a requirement, and I

8    think some of you reacted when you heard this, in any

9    way in the entire State of Wisconsin that you be Reid

10   trained to be an officer.  It's one technique, it is

11   one approach.  But we heard a lot about Reid, and

12   then we had officers testify who had never been

13   trained in Reid.  As they told you, there is other

14   trainings.  It's one method or one approach.

15       I'm going to have to show you that jacket in a

16   little bit, and we'll talk through that jacket and

17   why Sergeant Rabas came to the opinion very early

18   this isn't the jacket the defendant was wearing in

19   the Luna images.

20       One thing I think should be stressed, you are to

21   first decide and deliberate on first-degree

22   intentional homicide.  Intent can be formed at the

23   moment or the instant before the act is being

24   committed.  At the moment he's intentionally removing

25   that firearm and pointing it up to Josh's head,

154

1          intentionally squeezing that trigger and sending one

2          bullet into Josh's head.  No one in this case is

3          saying that it was preplanned, that there was

4          premeditation.  This case is about someone who saw

5          his brother arguing or getting in a fight with

6          someone as he's walking in through the bar, pulls out

7          the gun because he's pissed, as he told Stephanie

8          what he saw, or Melanie, he pulls out the gun and he

9          shoots the guy.  It's an intentional act.  This isn't

10         reckless.  Only if you do not agree that it is

11         intentional should you go to reckless.

12             When you look at reckless, who would say that it

13         is not reckless?  Who would say doing that shows any

14         regard for human life?  I don't believe the evidence

15         and the testimony even comes close.

16             So while people sometimes struggle with why did

17         this happen, that's not a job or a question for you

18         to answer.  There is never a good reason why someone

19         puts a bullet into someone's head, why someone

20         intentionally brings a loaded firearm to a bar

21         downtown where you're drinking, where someone pulls

22         that gun out and puts it within inches of someone's

23         head and pulls that trigger.

24             Dan Kersten tells you he's sober and he's

25         standing by that doorway.  He's looking back and

155

1    forth.  He didn't -- at least the State believes he

2    never told you that he was worried about this fight

3    or this argument.  No.  He said he had passed by the

4    area where this was going on earlier and he saw some

5    of the same people but there was nothing going on.

6        I think defense showed you Adam Richardson

7    again.  Adam doesn't turn until the time of the shot.

8    Adam's sweet talking or talking to the girls who are

9    standing in front of him.  They're waiting to get a

10    car.  Adam isn't watching this fight.  Adam describes

11    a person he saw in that area wearing a white beanie,

12    or we would call it a stocking cap.  It's Michael

13    Thor has that type of hat on when they run out the

14    door.  He sees then this mass goes by.  Michael Thor

15    is actually one of the last people before there's a

16    span of time.  Adam Richardson never said, I saw the

17    shooter, this is what the shooter was wearing.

18        And Mike Verheyden, he thought everything was

19    done.  He -- the fight was over, it was not ramping

20    up, so I'm going to go have my cigarette, and then

21    (prosecutor slams fist on podium) no reason, no

22    warning, a boom sounds out and Josh is on the floor.

23        Defense may have made a point or an issue of the

24    fact we had a lot of people run out of the bar.

25    Yeah.  We had people who had nothing to do with this

156

1      run out.  Like Alyson, she had nothing to do with

2      this.  Dalinda had nothing to do with this.  Tom Lee,

3      he comes strolling through, you see right behind him

4      is Chong with his hands out pushing him out the door.

5      You can watch the video and make the assessment.

6          I asked Sergeant Thao yesterday, when you made

7      the observation of Paul Lee holding an item in his

8      hand that you thought might be a gun, did you put in

9      a report on this date and time I saw this.  No,

10     because they can make observations.  No different

11     than the observations he makes about the right pocket

12     of the defendant as he's walking out the door.

13         Sergeant Schira told you he's a firearms guy.

14     That .25, his hand is bigger than mine, four inches I

15     think he said, a .25 can be.  Small weapon.  He talks

16     about being a firearms guy.  When he sees that

17     e-cigarette, which back in December of 2013 wasn't a

18     thing as popular as they are now, when he sees that

19     image, in his opinion that's the same thing, that's

20     what it was.  No, they don't take Paul back to Luna

21     to try to do an exact image with that DVR because the

22     DVR system had been completely removed.  And you saw

23     from the video, we don't know what color and clothing

24     shows up against or as.  So I could take a picture of

25     all of you, everybody's clothing is going to be

157

1          different.  So how can we exactly replicate that back
2          at Luna because the woman who is standing in that
3          area, it's her elbow where you see Paul's hands, I
4          don't know what fabric, polyester, leather, cotton,
5          shiny material of a winter coat she had on.  So how
6          are we going to exactly replicate that?  There was no
7          way to.  So they took photos of Paul holding that
8          item.  Photos against a white board and photos
9          against a black to show the difference whether it's
10         reflecting against black or reflecting against white.
11         Paul talks about that e-cigarette at least three or
12         four times, according to Sergeant Rabas and Sergeant
13         Thao, when they're at Norka.  When he's saying, what,
14         do you think I'm the shooter.  And they saying, what
15         is in their hand, look at this, what's in your hand.
16         His e-cigarette could be in his hand.  That's what he
17         had that night.  He had just come up from the
18         bathroom.
19              Defense wants to make a big issue of Paul
20         running with his hands in his coat.  It was five
21         degrees out we heard.  He didn't zip up his coat.  He
22         told you he had been shot before, so when he hears
23         that pop, I'm out of here.  He doesn't ditch his
24         clothes, he tells you, and the State believes the
25         evidence and testimony shows he doesn't have any

158

1    reason to.  When he sees Phong and Joe doing that, he

2    says to them like what are you doing.

3        I want to spend a little time talking about Mr.

4    Trainum.  He comes in, talks about Reid, talks about

5    techniques, but agrees with me there is no technique

6    you need to follow, that you're required to follow,

7    that by law you must follow.  The judge has ruled

8    what's admissible, what you get to hear in court for

9    testimony, what officers did or didn't say during

10   those interviews.  There is no requirement, I asked

11   Sergeant Rabas, anywhere in the United States that

12   people be Reid trained.  No.  I thought it was

13   interesting that Mr. Trainum said, you know, he

14   thought it was improper when they were asking

15   witnesses, why did this happen, why did this happen,

16   was somebody coming at you, why.  Can you imagine a

17   case where you have a fight and they don't

18   investigate self-defense as part of that, where they

19   don't try to figure out were you coming at -- was

20   somebody coming at you and it justified that?  So

21   when Mr. Trainum says, oh, that was improper, they

22   shouldn't have been pushing like why did this happen,

23   they absolutely must ask that question.  They must

24   look into those issues.

25       Officers in this case did go out and corroborate

159

1     all of the facts in this case, the State believes the

2     evidence and testimony shows.  The officers in this

3     case told you there is no one set pattern you can use

4     when interviewing people.  You have to go based upon

5     the person you're speaking with.

6          We know from Mr. Trainum's testimony he wasn't

7     given everything.  I asked him if he had seen Hilton

8     images, images of the defendant in the coat, the

9     different coats, no, he hadn't gotten those things.

10    The State's position, and I asked him this, it's a

11    Monday morning quarterbacking.  It's great to come in

12    and nitpick and say you shouldn't have said this, you

13    shouldn't have said that, but that's not what these

14    officers did.  They did not elicit false statements.

15    I asked him, what can you tell me about what

16    percentage of this technique results in false

17    statements, and he doesn't know, he can't say because

18    there is no statistics about that.  It may produce

19    false statements.

20         These officers described for you that they have

21    to take it with who they are talking to, who they're

22    speaking with.  People who immediately tell you eight

23    times, nine times, I wasn't at Luna, do you think

24    it's fair for the officers to go, okay, thank you so

25    much, I'm going to leave now because we're only

160

1           investigating a homicide and you're telling me you

2           weren't there but I know you were?  Do you think that

3           would have been appropriate for any one of them to

4           take that approach to this case?  No.  Some of these

5           people don't want to talk.  Sergeant Schira used the

6           word street vernacular.  You sometimes got to talk to

7           them at that level, get them to understand.  None of

8           these people wanted to be the first one to say what

9           had happened.  And I think you could also see they

10          don't want to talk about other people that are there

11          because they know that officers are going to go talk

12          to those people, so while they may be willing to say

13          this is what I heard, they're not going to want to

14          say initially, yeah, and go talk to Joe and Phong and

15          all these other people who we saw there because they

16          know the police are going to.  And what are their

17          friends going to say to them?  Why did you put my

18          name in it?  I don't want to be involved in this.

19          You heard that from Alyson Blom.  She didn't want to

20          know after the fact.

21              There is a lot of difference -- and one thing I

22          didn't ask Mr. Trainum about this, is the tone and

23          intonation in your voice.  There's been a lot of

24          times officers were shown transcripts.  Didn't you

25          say A, B, C, D, E, F, G.  Or Mr. Trainum was reading

161

1    things to you.  Unless he's a linguistic specialist

2    or expert, it's his own tone, his own voice on it.  I

3    can say please go clean your room now to my kids.

4    That is one me.  I can say please go clean your room

5    now.  It has a completely different meaning.  So when

6    you're using transcripts and you're reading from

7    them, you can give whatever spin you want to them.

8         Joe tells you he's scared for his family and for

9    himself.  He doesn't want to talk about it.  Phong's

10   first reaction, I don't want to be a snitch, I don't

11   want to talk about what I know or what I saw.  Nobody

12   calls the police to report what happened.  Dalinda

13   did.  Marissa and Talisa did.

14        When Joe goes back in for this four minutes of

15   time on December 12th after Sergeant Rabas is there

16   talking to him at 1:00, they're asking him to go

17   check on his brother's phone, Chur's phone, because

18   Joe doesn't have his old cell phone.  There's even

19   discussion about that.  You didn't -- Sergeant Rabas:

20   You didn't want to bring us Chur's phone.  Because

21   they had already taken his other brother's phone,

22   Cassidy's phone.  And he says, yeah.  It's not Joe in

23   four minutes calling, hey, yeah, yesterday did you,

24   Phong, or Paul, um, yesterday, did you go plant those

25   bullets like we talked, those .22 bullets.  Because

162

1          if you listened to that conversation, immediately

2          after that when he brings up the bullets, he says,

3          well like you told me they were .22s, right?  He says

4          that twice to Sergeant Rabas.  Joe is not a master

5          mind, by any extreme stretch of the imagination, but

6          if Joe had gone to plant bullets based on that, the

7          people at Sharks would have find .22s, not .25s.

8              Now, Mr. Moore, I know he comes in and he

9          testifies, and he testified right after the owner,

10         the manager.  I think he talked about, I'm going to

11         use his term, you know, at the end of the night they

12         may like make sure there's no floaters, is what he

13         said, and flush the toilets.  Then on Tuesday they do

14         this cleaning.  The way he described it you would

15         have thought he cleaned that toilet as if Queen

16         Elizabeth herself was walking in.  What do you think

17         really is done to clean a toilet at a pool hall?  And

18         when it appears, this is a horrible way to say it,

19         stuff rolls downhill at that pool hall, because the

20         owner didn't want to get the bullets he made the

21         manager do it.  So I'm sure the manager has the

22         employees clean.  Mr. Peotter tells you you'd have to

23         dump a five-gallon bucket quickly down to possibly

24         get those bullets to flush through.  Those bullets

25         were there because the defendant put them there after

163

1    he ran from Luna.

2         Stephanie -- I'm sorry, Melanie tells you about

3    the gun.  He told her he broke it down and threw it

4    in the lake.  We weren't going to find it, despite us

5    trying to pump everything out that we could possibly

6    pump out in this case.

7         Defense talks about cell phone records.  I

8    should have gotten cell phone records.  What was it

9    gonna tell us?  People who knew each other were

10   talking to each other or calling each other.  Doesn't

11   -- isn't going to tell us exactly who was on either

12   end of that conversation, wasn't going to tell us

13   what was said in any of those conversations, and

14   within the first few days after this, we had many of

15   their phones.  So defense can claim we should have

16   gotten cell phone records or should have looked into

17   cell phone records.  They weren't gonna tell them

18   anything other than these people called each other a

19   lot.

20        Defense wants to make issue or brought up the

21   fact of the jacket and the coat.  Sergeant Rabas has

22   watched this video a number of times.  He's been able

23   to see how different colors reflect differently.  I

24   think one of the officers maybe even talked about how

25   his own coat may have reflected differently or

164

1            Sergeant Meyer's black leather coat shows up all

2       black.  We get a video image -- and I should back up.

3       January -- December 12th Joe Thor's talking about

4       seeing a gray sleeve by the hand, striping is even

5       what was testified about.  December 18th, Tou Shoua

6       Lee remembers Chong's coat being gray with darker

7       sleeves.  No one from Appleton Police Department had

8       seen any color images of the defendant in any coat by

9       the time those descriptions were given.  They can't

10      plant in their mind saying say it's blue, black, gray

11      or white.  They know that video may show something

12      gray, and you have no idea what color in the spectrum

13      it comes back.  So those two individuals give those

14      features about that coat when they don't yet have

15      this image of Chong Lee checking into the Hilton –

16      they get it on December 19th – when they don't have

17      this image of Chong Lee checking in at 6:43 a.m., the

18      day of the shooting.  And you can examine it for

19      yourself, but the coat he's wearing here at 6:45

20      a.m., I think Sergeant Rabas testified, does not

21      appear in any way to be consistent with the coat we

22      see on the Luna videos.

23           Then we have the coat.  A coat taken at the

24      house, because can you imagine a case where they

25      don't take anything, they don't know if it's relevant

165

1    so they're going to take anything and everything is

2    what was told to you.  Sergeant Rabas never said he

3    had the opinion this coat was the coat the defendant

4    was wearing.  And we talked about fabric and sleeves.

5    Fabric of this coat all the way up the sleeve is the

6    same.  The portion that comes across on the

7    shoulders, same fabric goes around the neck, down the

8    front of the coat, same fabric is on each pocket, on

9    each side, striping across that shoulder -- same

10   fabric across the shoulder down the sleeve.  All of

11   those areas would have shown up the same on the

12   video.  When you see the video image of Chong Lee,

13   this is not the coat based upon the fabric that's

14   depicted here.  Defense wants to make an issue of the

15   fact that, well, then they sent this coat for

16   testing, even though we didn't believe.  Could you

17   imagine if we didn't send it?  We sent it because we

18   didn't believe it was the coat, because if we hadn't,

19   you'd certainly hear about it.  Oh, my God, they

20   collected a coat from the defendant's house and they

21   never sent it down for testing.

22       What does DNA tell us on all of this stuff?

23   There's nothing.  There is no -- there is a blood

24   test done, there is nothing.  Sergeant Rabas

25   testified about the timing when this was done.  The

166

1      trial date was far off.  There is no requirement in

2      ten days, five days, three days you send stuff when

3      they don't have a belief this is the coat, and when

4      the lab has certain procedures about what you can and

5      can't send.

6           Defense wants to suggest there was a lot of

7      police pressure on them, keep downtown safe, they

8      need to solve this case right away.  They're doing

9      their jobs.  They're doing what everybody would

10     expect them to do.  They're doing -- when you get

11     people who lie to you and say I'm not there, I don't

12     know anything about it, and they know they're in the

13     area, they're going to push them.  These people don't

14     want to say what happened, but they didn't do it in a

15     way that produced anything but the people telling you

16     what they saw and heard.

17          Talk about Paul Lee's testimony.  She says, well

18     you didn't see the defendant Paul Lee sleeping.  What

19     was shown was a small portion between a break of two

20     interviews.  We didn't fast forward, and you probably

21     would remember, from the end of the 2:19 a.m.

22     interview until 11:58.  You didn't see seven, nine --

23     I'm sorry, nine hours of Paul in that room.  You saw

24     a small snippet.  So when Paul says he's sleeping, he

25     could have been sleeping in that other portion.

1               But again, why is that relevant?  It's something

2       I think that takes your focus off of what it should

3       be on.  Why is Paul hesitant when he comes in to

4       testify?  Look what this defendant has said to him on

5       the phone calls.  Look what Teng and the defendant

6       said in the phone calls.  You know they're not going

7       to want to come in if your brothers are there.  We're

8       going to watch them, there's a conversation about

9       that in one of the phone calls.  If this is a case of

10      Paul having a family feud with Chong, why doesn't he

11      at 20 minutes into the interview at Norka say, here's

12      the deal, my brother did it and I'm going to tell you

13      all the reasons why.  Because it isn't about a family

14      feud, it's about a brother who doesn't want to have

15      to give up his brother.

16              A lot of questions during closings by defense

17      about this punch of Paul.  Paul may have had – let me

18      grab a pen – we would probably argue had that

19      e-cigarette in his hand when he's getting in this

20      argument.  But if you're going to punch at somebody,

21      the top of your e-cigarette, unless – it's going to

22      seem very awkward to me to do – you go like this

23      isn't going to hit Josh's chin.  He thought he maybe

24      knicked him.  What is he described doing?  Stepping

25      back.  Joe Thor says he steps back like this because,

1      guess what, he just missed.  And do you think Josh is
2      probably upset at that point?  So he's stepping back
3      like this, Paul and -- or Paul's pushing Phong and
4      Joe back against that wall.  Tou Shoua, what does he
5      describe.  Seeing Paul punch the guy and then step
6      back.  Five, ten seconds, Chong walks in, right hand
7      goes as if it's going to punch Josh on the left side
8      of his face and then boom.
9           Yeah, Chue Thao laughed during Paul's interviews
10     because it was at the point when Paul described,
11     what, was a bullet going to fly around the room like
12     in movies.  That's when Chue Thao laughed, Sergeant
13     Thao.
14          Paul Lee's statement.  Defense showed you his
15     statement and then showed you in essence what was the
16     summary Sergeant Schira did.  I'm going to pull it
17     out.  My daughter loves colors.  Okay?  Remember we
18     walked through Paul Lee's statement.  I highlighted
19     one line, and then we walked through the interviews
20     to show everywhere Paul had talked about all of these
21     things prior to the time of Sergeant Schira
22     summarizing.  So I think the defense statement that
23     he just repeated what Sergeant Schira said, no, he
24     repeated what he had just told them over the last
25     several hours.  It isn't that this is exactly what

169

1    Sergeant Schira said and it only comes from that, it

2    comes because I walked you through it.

3         Yesterday when Sergeant Thao was on the stand,

4    Tou Shoua's statement was attacked.  Well, isn't it

5    true Sergeant Thao was asked, you just summarized at

6    the end.  He said, yeah, I did, like I do with most

7    people.  But I asked Sergeant Thao, if we walk back

8    through that interview, would all of those things be

9    found there.  I didn't want to do another pink and

10   yellow highlight for you.  Sergeant Thao said, yeah,

11   because those are all the things Tou Shoua talked to

12   me about during that interview.

13        It doesn't just so happen that Chong

14   intentionally shoots Josh in the head, goes to

15   Milwaukee, and then, according to defense, when he

16   had nothing to do with it, they're going to claim

17   then he's going to go to Milwaukee and tell people

18   he did it.  Who brags about shooting someone?  Use

19   your common sense and life experiences.  I mean, he

20   might brag about, what, a car or if he had a house or

21   how much money, but who says to three different

22   people in Milwaukee, I popped the guy, I shot the

23   guy.  And they were specifically asked, Xai Thao was

24   asked, when that comment was said, what was his

25   demeanor.  He was scared when he was saying it.

1     Defense asked, did you believe him.  Well who would

2     believe somebody would be so cold to kill someone and

3     the next day just go randomly talk about it.  It's

4     not like he was, ha, ha, this is funny and let's

5     laugh about it.

6          Stephanie said he was scared when he talked

7     about this.  Defense wants to make an issue over the

8     fact that Stephanie and Melanie went out for dinner

9     with him two nights in a row after he had said this

10    once.  Stephanie still talked to him a ton after he

11    was upstairs, after this case had been charged, on

12    the jail phone calls you heard her.  Stephanie my

13    love, Melanie, my love.  You heard Chong and Teng

14    joking and laughing about that.  Stephanie and

15    Melanie talk about the defendant saying he broke up

16    the gun, he threw it in the lake.  He described to

17    Stephanie what happened.  The victim is going to

18    swing and his brother pissed him off, he was really

19    tall, and that's the guy he shot.  That's what fits

20    the facts of this case.  So it's not I did it, he

21    gives details that are supported by other people,

22    it's corroborated by what other witnesses have to say

23    in this case.

24          Defense wants to make an issue over the fact

25    that the police should have done other things, like

1    when Chong is in one room at the Appleton Police

2    Department, saying can you please come with me, or

3    say to Paul, can you please come to me and put them

4    in the same room together at the police department.

5    Or bring -- maybe bring Chong a phone and say, here,

6    we have a call from you for Paul, can you take that

7    call, we'll step out and let you talk to him.  How

8    are they gonna do a one-party consent phone call

9    under those circumstances or put them together in the

10    room?

11        Lisa Stutzman was asked to come in and talk

12    about the opinion she gave to Alyson, the opinion

13    that Chong was involved or Chong was a shooter.  She

14    was asked, is it also your opinion Paul is the

15    shooter or could be the shooter.  I don't remember

16    which way it was phrased.  Her answer, no.

17        Sergeant Thao told you in all these calls he

18    listens to and the different points, which are many

19    -- many are in Hmong, not English, and many or most

20    done not with his own inmate ID number so does he

21    suspect we're going to be track it that way or does

22    he realize that or does he think if he talks in a

23    different language we might not be able to pick it

24    up.  But in those calls he's not bragging.  Or when

25    Stephanie talks about Melanie talked about what you

172

1    told us at B-dubs and at Sushis, he never says I was

2    just bragging, don't you know I was just joking about

3    that.  And I asked Sergeant Thao if any of the other

4    calls the defendant describes bragging.  No.  Never

5    says this accidentally went off.  I asked him if he

6    ever talked about it being an accident.  No.  In the

7    jail calls defense can try to say there wasn't intent

8    or he didn't -- on the intimidation charge he didn't

9    mean it.  Why don't them two just fucking don't even

10   show up either.  And his response, I know, you have

11   to tell them.  Not a lot of other implications by

12   telling people that.  Then the direct quote.  Tell

13   them to disappear.  Pretty direct you're attempting

14   to prevent or dissuade someone from coming in and

15   providing testimony at a hearing.

16        You also have to remember when we talk about

17   this area, this corridor, okay, we know from the cell

18   phone video, and I'm not going to play that video,

19   but we know Josh's body is by this half wall.

20   Officer VanderWielen at some point, because I asked

21   him to, Officer VanderWielen -- I said where on this

22   half wall.  He described for you this half wall

23   coming out and that being about Josh's mid-chest.  So

24   his chest was on this side, his feet are pointed this

25   way.  You have to remember the drawing Tou Shoua did

173

1    has this area recessed.  The wall comes directly out.

2    Paul Lee does two drawings.  Defense showed you the

3    first one that he was talking about.  Paul Lee does

4    the second drawing.

5              THE COURT:  Counsel, do you need lights

6    down?

7              ATTORNEY SCHNEIDER:  I'm trying not to make

8    you get up, Judge.  I don't think so.

9         Paul Lee does a second drawing at the police

10   department when he's now talking about who has done

11   things.  He puts the victim right here by the V, Paul

12   and Phong, consistent with where Josh is found when

13   officers arrive.  I don't think there is anybody in

14   this case that would try to allege anyone dragged

15   Josh's body from this point to the half wall.  You

16   got to look at this.  11 feet by 16 feet.  You have

17   all of those people packed in this area.  Probably

18   not much bigger than the area of a freethrow lane.

19   You have all those people packed into that area.

20        I want to talk to you and have you compare a

21   couple things in this case.  First, the fact that

22   Brittany -- it was brought up during closings somehow

23   that Brittany was out of control, you know, she tried

24   to fight with the people to get back in Luna.  What

25   would you do?  This person you loved had been shot in

174

1       front of you for no reason, you go outside, would you

2       fight your way back in to get by your loved one?

3       Heck 'ya.  She was emotional.  She was shocked by

4       what had happened.  She wanted to be by Josh, she

5       wanted to go back in to see him.  She described

6       kneeling down by him.

7             It's interesting because when you look at that

8       time period, okay, who does Brittany see come into

9       this area in the thirteen seconds before Josh is

10      shot?  Alyson walking with Chong.  So the last people

11      Brittany sees together in that area are Alyson and

12      Chong.  That's where they are.  So does it make sense

13      when Chong then walks up to Josh and pops him in the

14      side of the head she immediately runs after her,

15      tries -- and tackles her and says your boyfriend shot

16      my friend or your boyfriend shot my boyfriend?

17      Because based upon what she'd just seen, that's a

18      reasonable inference for her to make.

19            And then you look at Alyson, who, one, shocked

20      that she saw this flash in front of her eyes and then

21      saw Josh go down, runs out, then she gets tackled and

22      beat up.  So while she's yet probably not processing

23      everything she's seeing, when she's still extremely

24      emotional from being beat up, Johnny says to her,

25      what was that all about.  Her response is, my friend

1    shot that guy. Powerful statements that come very
2    early on in the sequence of this case.
3        I also want to point and highlight some things
4    to you, and you can use your common sense and your
5    life experiences when you think about this. Police
6    come talk to you and you have not done something --
7    something significant like a shooting. How are you
8    going to respond? Are you nuts? Are you crazy? Are
9    you saying it was me? I didn't do this. Are you
10   going to get loud with them? Are you going to yell
11   at them? Yes. I wasn't the shooter. I didn't have
12   a gun. I think all of you would agree, and I think
13   the evidence and testimony supports that's Paul's
14   reaction because Paul is not the shooter. Paul did
15   not have a gun. You compare that with the
16   defendant's interview. Laughing. Yawning. I think
17   we fast forwarded a short period of time where he
18   left, he turns around and puts his feet up against
19   the wall. Big guys don't go down the same. Murder
20   is murder. A killer is a killer. There is no
21   difference.
22       And then we have the letters that I am certain
23   were probably never expected we were going to find.
24   Or phone calls. And the phone call on December 12th
25   at 7:31 is not if my mom -- if mom hadn't asked me to

176

1     stay I would have moved to California, I would have
2     taken that trip.  The comment is, if mom didn't tell
3     me to stay I would have disappeared already, you
4     know.  It's not, the State would believe, his comment
5     that, oh, you know, I was going to take that vacation
6     and mom asked me to stay.  No.  If mom hadn't asked
7     me to stay, I would have disappeared already.
8         We have the letter he writes to Paul, which Paul
9     from a phone call I think got tore up, thrown in the
10    garbage.  I ain't even mad at you, little bro.  Don't
11    worry about nothing.  I'll be all good in the end.
12    You live to die anyways.  It's what you do in the
13    end, that's what counts.  Also remember what you told
14    me when Mao and Steph and them arguing.  You said, if
15    you don't got family back, then don't consider us
16    family.  Well I had your back.  I wouldn't let no one
17    touch you.  But remember your words.  You didn't have
18    my back, little bro, and that's the only thing you
19    failed me.
20        Phone call January 8th, 2014.  It's a phone call
21    with Stephanie and the defendant.  Stephanie:  We
22    showed you the whole thing, but she ends the
23    sentence, misses you inaudible.  Joe really does love
24    you too.  Chong:  Loves me, yeah.  More like kill me.
25    Like I was telling him and Paul inaudible I can just

177

```
 1    use my gun and shoot.  Bang.  And kill you two, you
 2    know.
 3              ATTORNEY VISHNY:  Judge, at this point, I'm
 4    sorry to interrupt, counsel, but I would like to
 5    approach.
 6              THE COURT:  You may.
 7              (Bench conference.)
 8              ATTORNEY SCHNEIDER:  There's been a request
 9    to show you that whole content, and we'll show it to
10    you.  We showed it to you earlier.
11        There's talk about taking down his Facebook
12    account.  Stephanie:  I think someone deactivated
13    your Facebook today.  I don't see Joe post.  Oh,
14    yeah.  He loves me a lot.  Stephanie:  He writes on
15    your wall every day.  You know he writes on your wall
16    every day that he misses you.  Inaudible Joe really
17    does love you too.  Chong:  Loves me, yes.  More like
18    kill me.  Like I was telling him and Paul inaudible I
19    can just use my gun and shoot.  Bang.  And kill you
20    two, you know.  Stephanie:  Yeah.  Chong:  Those two.
21    It's so heart breaking.  I don't even want to talk
22    about them.
23        At the end of many of the witnesses, either
24    myself or Attorney Maier, I think Attorney Duros as
25    well, asked them, is what you told us today what you
```

178

1       saw or what you heard.  Their answers were yes.  So

2       despite if law enforcement had to say, you know, this

3       is significant, serious, you need to tell us what's

4       going on, is what you told us today what you saw and

5       what you heard.  Yes.

6           Another call -- or another letter this defendant

7       writes to Michael Thor.  I don't look for trouble,

8       but when trouble comes, I end it.  That's why I don't

9       really want to hang out with trouble seeking people

10      'cause I know myself.  No hesitation.  I do

11      everything the smart way.  I make sure I had a way

12      out.  I never thought my family would do this to me.

13          The defendant in this case, I would believe

14      based on the phone calls and the letters, never

15      thought his family was going to say what happened,

16      that Joe wasn't going to come -- overcome his being

17      scared, Phong was going to get over being a snitch or

18      Paul was going to talk about what Chong did.

19          Thirteen seconds.  Thirteen seconds of time.

20      That cell phone video.  Defense can say it was not

21      loud or it was easy to see.  Not often we can

22      literally take you back to the time when someone's

23      been shot.  We showed you how dark it was, how

24      chaotic it was, how loud it was.  Loud enough you can

25      make out the words of the song.  Wake me up when it's

179

1          all over.  The song continues, when I'm wiser and I'm

2          older.  In this case, unfortunately, there is no

3          waking up for Joshua Richards because of what Chong

4          Lee did on December 8th of 2013.

5              There are words that you can use to describe

6          what happened, tragic, a nightmare, person who runs

7          from the scene after, unfathomable, incredible,

8          horrible, beyond reckless, cold, callous, an

9          execution, intentional; and I think there is one

10         final word the State has shown beyond a reasonable

11         doubt that you can attribute to the defendant and his

12         actions on this night and those that follow and that

13         word is guilty.

14             I'm asking you to return a guilty verdict for

15         first-degree intentional homicide, for possession of

16         firearm by a felon, and for the four counts of

17         intimidating a witness.

18             Thank you to so much for your time and attention

19         over these last several days.

20             THE COURT:  Thank you, Counsel.

21             Just a few brief instructions before we begin

22         your services and deliberation.

23             Now, members of the jury, the duties of counsel

24         and the court have been performed.  The case has been

25         argued by counsel and the court has instructed you

180

1      regarding the rules of law which should govern you in

2      your deliberations.  The time has now come when the

3      great burden of reaching a just, fair and

4      conscientious decision in this case is to be thrown

5      wholly upon you the jurors selected for this

6      important duty.

7          You will not be swayed by sympathy, prejudice or

8      passion.  You will be very careful and deliberate in

9      weighing the evidence.

10         I charge you to keep your duties steadfastly in

11     mind and as upright citizens to render a just and

12     true verdict.

13         You are to decide the case fairly and

14     impartially without fear or favor and without passion

15     or prejudice.  You are to decide only whether the

16     defendant is guilty or not guilty of the offenses

17     charged.

18         Any consequences of your verdict are matters for

19     the court alone to decide and must not affect your

20     deliberations.

21         Now, a form of the verdict will be submitted to

22     you concerning the charges against the defendant,

23     Chong Lee.

24         As to Count 1, three forms of verdict will be

25     submitted.  One reading:  We the jury find the

181

1    defendant Chong Lee guilty of first-degree

2    intentional homicide as charged in Count 1 of the

3    information.

4        The second or another reading:  We the jury find

5    the defendant Chong Lee guilty of first-degree

6    reckless homicide, a lesser included offense, as

7    charged in Count 1 of the information.

8        And the third reading:  We the defendant (sic)

9    find Chong Lee not guilty as to Count 1.

10        You are not, in any event, to find the defendant

11    guilty of more than one of those foregoing offenses.

12        If you are not satisfied beyond a reasonable

13    doubt that the defendant committed either one of the

14    offenses I have submitted to you, you must find the

15    defendant not guilty.

16        As to Count 2, one verdict form will be

17    submitted.  One reading:  We the defendant (sic) find

18    the defendant Chong Lee guilty or not guilty of

19    felony (sic) in possession of a firearm as charged in

20    Count 2 of the information.

21        As to Count 3, one verdict form will be

22    submitted.  One reading:  We the jury find the

23    defendant Chong Lee guilty or not guilty of party to

24    the crime intimidation of a witness as charged in

25    Count 3 of the information.

182

1    As to Count 4, one verdict form will be

2    submitted.  One reading:  We the jury find the

3    defendant Chong Lee guilty or not guilty of party to

4    the crime intimidation of a witness as charged in

5    Count 4 of the information.

6    As to Count 5, one verdict form will be

7    submitted reading:  We the jury find the defendant

8    Chong Lee guilty or not guilty of party to the crime

9    intimidation of a witness as charged in Count 5 of

10    the information.

11    As to Count 6, one verdict form will be

12    submitted.  One reading:  We the jury find the

13    defendant Chong Lee guilty or not guilty of party to

14    the crime intimidation of a witness as charged in

15    Count 6 of the information.

16    It is for you to determine whether the defendant

17    is guilty or not guilty of each of the offenses

18    submitted to you.

19    You must make findings as to each count of the

20    information.  Each count charges a separate crime and

21    you must consider each one separately.

22    Your verdict for the crime charged in one count

23    must not affect your verdict on any other count.

24    Now, because this is a criminal and not a civil

25    case, before you the jury may return a verdict which

183

1          may be legally received, the verdict must be reached

2          unanimously.  In a criminal case, all twelve jurors

3          must agree in order to arrive at a verdict.

4               When you retire to the jury room, select one of

5          your members to preside over your deliberations.  The

6          presiding juror's vote is entitled to no greater

7          weight than the vote of any other jurors.

8               If you need to communicate with the court while

9          you are deliberating, send a note through the bailiff

10         signed by the presiding juror.  To have a complete

11         record of this trial, it is important that you

12         communicate with the court only by a written note.

13              If you have questions, the court will talk with

14         the attorneys before answering so it may take some

15         time.  You should continue your deliberations while

16         you wait for an answer, and the court will answer any

17         questions in writing or orally here in open court.

18              When you have agreed upon your verdict, have it

19         signed and dated by the person you have selected to

20         preside.  After you have reached a verdict, the

21         presiding juror will notify the bailiff that a

22         verdict has been reached.  Everyone will return to

23         the courtroom, the verdict will be read in the record

24         in open court, and the court may ask each of you if

25         you agree with the verdict.

1            Now, as you may have surmised from this last

2       instruction, this case is to be submitted to twelve

3       jurors.  There are thirteen of you.  We have

4       maintained an alternate throughout this proceeding in

5       the event that someone would become unavailable or

6       some other circumstance would prevent participation.

7            That said, what I want to assure you that your

8       role in being available, although you will not be

9       participating in the deliberations, is no less

10      important than anyone who has already participated or

11      will be participating in the deliberations.  Your

12      role has been instrumental in allowing the attorneys

13      and myself to focus on the matters at hand, and so

14      although you will not be participating in the final

15      deliberations, nonetheless, I want to espouse my

16      deepest gratitude on behalf of myself, the attorneys,

17      and the county for your service up to this point.

18           So at this point I will ask my clerk to randomly

19      select.

20                THE CLERK:  No. 34, Emily Vandenberg.

21                THE COURT:  Miss Vandenberg.

22           Miss Vandenberg, again, I greatly thank you for

23      your service and your time.

24           Please rise for Miss Vandenberg.  Miss

25      Vandenberg, you are excused at this time.

185

1                (The selected juror was escorted out of the

2        courtroom.)

3                THE COURT:  At this time could we please

4        swear in the bailiff.

5                THE BAILIFF:  She's free to go?

6                THE COURT:  She is.  And if we could have

7        you back as quickly as possible, that would be

8        appreciated.

9            At this time please swear in the bailiff.

10                (Oath administered to bailiff.)

11                THE COURT:  Madam Bailiff, if you would

12        please come forward, I do have for you a copy of the

13        instructions as well as the verdict forms.

14                THE COURT:  Please remain standing while we

15        excuse our jury.

16                (The jury was escorted out of the

17        courtroom.)

18                THE COURT:  Anything, Attorney Schneider,

19        we need to address?

20                ATTORNEY SCHNEIDER:  I just don't know if

21        we want to agree on some exhibits that can probably

22        go in right away, some that can go in without you

23        needing to consult with us, and some we want to be

24        consulted about?

25                THE COURT:  And just so that the -- so

186

1          Attorneys Vishny and Schneider were aware, I did talk

2          to Attorneys Weitz and Maier.  As you may have

3          noticed, I included I think it was Instruction 460

4          which I incorporated 465 and so I did provide both of

5          those.

6                    ATTORNEY SCHNEIDER:  Yup.

7                    THE COURT:  The gallery may be seated if

8          you would like to.  If you would like to stand,

9          whatever your preference is at this time.

10                   ATTORNEY VISHNY:  I don't think they should

11         be in the jury room without being asked for.  I think

12         they're going to ask, but I have no objection to

13         anything in that pile of photographs, any of the

14         photographic evidence or diagrams that go into the

15         jury room, it's not an issue.

16             The -- you know, I think the more complicated

17         questions become -- and I also don't object to

18         diagrams that the police -- I think Miss Schneider is

19         holding quite a few of them.

20                   ATTORNEY SCHNEIDER:  Two of them.

21                   ATTORNEY VISHNY:  I don't object to

22         diagrams or the photograph from the Hilton hotel.  I

23         don't object to that going in.  I don't object to an

24         examination of the clothing or the e-cigarette or the

25         bullets, that kind of -- that would be fine.

187

1                    THE COURT:  I think the transcripts are
2        going to be the big issue.
3                    ATTORNEY SCHNEIDER:  Even the jail calls,
4        because we have to identify which one, or if they ask
5        for letters.
6                    ATTORNEY VISHNY:  Anything statement
7        oriented is going to have to have substantial
8        redactions and probably readbacks because, yeah, I
9        can't say that I know from memory what happened, so I
10       don't --
11                   THE COURT:  I don't.
12                   ATTORNEY VISHNY:  And the jail calls are
13       very problematic with the redactions.  You know, I --
14       my opinion would be we'd be better off in many ways
15       with readbacks.
16                   (Further proceedings held in a separate
17       transcript reported by Gloria Johnson.)
18
19
20
21
22
23
24
25

1

2

3                    C E R T I F I C A T E

4

5    STATE OF WISCONSIN      )
                             ) ss.:
6    COUNTY OF OUTAGAMIE     )

7

8

9            I, JOAN BIESE, RMR/CRR, do hereby certify that I
     am the official court reporter for Branch IV of the
10   Circuit Court of Outagamie County;

11           That as such court reporter, I made full and
     correct stenographic notes of the foregoing proceedings;
12
             That the same was later reduced to typewritten
13   form;

14           And that the foregoing proceedings is a full and
     correct transcript of my stenographic notes so taken.
15

16           Dated this 23rd day of August, 2016.

17

18

19                              _____

20                              JOAN BIESE, RMR/CRR

21

22

23

24

25

189