FILED
03-27-2018
Clerk of Circuit Court
Outagamie County
2013CF001074

1   STATE OF WISCONSIN    CIRCUIT COURT    OUTAGAMIE COUNTY

2   _____

**STATE OF WISCONSIN,**
3
                    Plaintiff,
4   v.                                    **Case No. 13-CF-1074**

5   **CHONG LENG LEE,**

6                    Defendant.

    _____
7
                    **POST-CONVICTION MOTION HEARING**
8   _____

9
    BEFORE:        **HONORABLE GREGORY B. GILL, JR.**
10                 Circuit Court Judge, Branch IV
                   Outagamie County Justice Center
11                 Appleton, WI  54911

12
    DATE:          **February 26, 2018**
13

14  APPEARANCES:   **MELINDA TEMPELIS**
                   District Attorney
15                 Appearing on behalf of the State

16                 **ALEX DUROS**
                   Assistant District Attorney
17                 Appearing on behalf of the State

18                 **ANA BABCOCK**
                   Attorney at Law
19                 Appearing on behalf of the Defendant

20                 **CHONG LENG LEE**
                   Defendant
21                 Appearing in person

22

23

24  Joan Biese
    Official Reporter, Branch IV
25  Outagamie County

1

Exhibit 28

```
 1                    I N D E X

 2

 3  WITNESS                                        PAGE

 4  DEBORAH VISHNY
        Examination by Attorney Babcock...................  10
 5      Examination by Attorney Tempelis.................  44
        Examination by Attorney Babcock...................  58
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           **TRANSCRIPT OF PROCEEDINGS**

2                   THE COURT:  We are on the record in

3           13CF1074, *State of Wisconsin v. Chong Lee*.

4                   Mr. Lee appears in person, along with his

5           counsel, Attorney -- is it Ana Babcock?

6                   ATTORNEY BABCOCK:  Ana, but I'll respond to

7           either.

8                   THE COURT:  Well, hereafter it's going to

9           be Attorney Babcock so not a problem.

10                  We also have with us then Outagamie County

11          District Attorney Melinda Tempelis, as well as

12          Outagamie County Assistant District Attorney Alex

13          Duros.

14                  And we are here today for Mr. Lee's motion for

15          post-conviction relief.

16                  And one of the questions I had at the outset, I

17          was -- I was reviewing your -- your brief, Counsel,

18          and I guess one of the items that I -- that I had

19          that was, I guess, a question of curiosity, is in

20          many if not most all of the instances, the issues

21          that you raise in terms of deficiencies of Attorney

22          Vishny, you also acknowledge that Attorney Vishny had

23          addressed those issues with me in either suppression

24          hearings or previously, but then seemed to take issue

25          with the fact that she didn't reiterate the same type

3

```
 1          of objection.  And, I guess, how is Attorney Vishny
 2          deficient?  If she understands my predispositions and
 3          my rulings, why would she waste my time by raising
 4          the same argument again, i.e. most particularly, you
 5          know, one example was beat the case.  And I think you
 6          acknowledged that was part of a significant
 7          suppression motion, and, quite frankly, and as a
 8          compliment to both the State and Attorney Vishny and
 9          Attorney Weitz, who was here as well, I mean this --
10          this case was extensively litigated in motion
11          practice, and I know you acknowledge that, but how
12          does one become deficient when they get a ruling from
13          the court in a suppression hearing but then simply
14          don't raise it again at trial?  They already --
15          parties already knew my answer.
16                    ATTORNEY BABCOCK:  Well, Your Honor, I
17          guess, speaking to beat the case specifically, the
18          court's order actually ruled that that evidence could
19          not come in and it ultimately did.  There was no
20          objection from defense counsel to that evidence.
21                    THE COURT:  Okay.  And I don't -- I don't
22          know that that's -- I don't have a recollection
23          independently of that, but I know there were other
24          instances where you acknowledge, by way of example,
25          your boyfriend shot my boyfriend, I think there was
```

```
 1       motion practice on that, and then I made my ruling,
 2       and I think you wanted an alternative objection was
 3       your point.
 4              ATTORNEY BABCOCK:  There is two potential
 5       issues with the boyfriend shot my boyfriend issue.
 6       One of those is being that the objection should have
 7       been -- well, it actually should have been repeatedly
 8       made to preserve the record.  If I would just
 9       challenge this court's ruling to the one objection on
10       appeal, the Court of Appeals would say -- would say,
11       well, there was no issue with it coming in through
12       all of these other witnesses, so your claim is
13       therefore forfeited.  So I have to make sure that I
14       preserve each individual instance of potential
15       ineffectiveness; but also that the objection should
16       have been made on more specific grounds or other
17       grounds.
18              THE COURT:  Okay.  Well, anything else
19       before we begin taking testimony then, Attorney
20       Tempelis?
21              ATTORNEY TEMPELIS:  I think that we would
22       have to address the defendant's agreement to waive
23       attorney/client privilege to allow Attorney Vishny to
24       testify before we're able to proceed any farther.
25              THE COURT:  Okay.  That's fine.
```

5

1        And, Mr. Lee, you do understand that during the

2   proceedings you were represented by Attorneys Vishny

3   and Weitz, you do recall that, correct?

4           THE DEFENDANT:  I do.

5           THE COURT:  You do understand, sir, that in

6   conjunction with that there is a privilege recognized

7   as the attorney/client privilege.  Do you understand

8   that, sir?

9           THE DEFENDANT:  Yes, I do.

10          THE COURT:  You understand, Mr. Lee, that

11  as a byproduct of that attorney/client privilege that

12  communications and strategies and the like that occur

13  between you and counsel are privileged, meaning,

14  absent you waiving that privilege, essentially,

15  parties are prevented from making inquiries of

16  Attorney Vishny as it relates to that subject matter.

17  Do you understand that?

18          THE DEFENDANT:  Yes, I do.

19          THE COURT:  And have you had a chance to

20  discuss that issue and the implications of the same

21  with Attorney Babcock?

22          THE DEFENDANT:  Yes, I have.

23          THE COURT:  And at this point in time, what

24  is your decision with respect to the -- invoking the

25  attorney/client privilege?

```
 1                    THE DEFENDANT:  I would waive it.

 2                    THE COURT:  Has anyone made any threats to

 3       get you to waive your right with respect to the

 4       attorney/client privilege?

 5                    THE DEFENDANT:  No one.

 6                    THE COURT:  Alternatively, has anyone made

 7       any promises to get you to waive your right with

 8       respect to the attorney/client privilege?

 9                    THE DEFENDANT:  None at all.

10                    THE COURT:  Very good, sir.

11            And you're satisfied with that inquiry, Attorney

12       Babcock?

13                    ATTORNEY BABCOCK:  I am, Your Honor.

14                    THE COURT:  All right.  Likewise, Attorney

15       Tempelis?

16                    ATTORNEY TEMPELIS:  Yes.

17                    THE COURT:  All right.  And then, with

18       that, are we prepared to proceed, Attorney Tempelis,

19       again?

20                    ATTORNEY TEMPELIS:  Yes.

21                    THE COURT:  Attorney Babcock.

22                    ATTORNEY BABCOCK:  I just have a couple

23       preliminary issues, Judge.  Given that this trial

24       was, well, actually two years ago to the date was one

25       of the first days of trial, I'm not sure that
```

7

```
 1        Attorney Vishny, while I'm sure she has a very good
 2        memory, may not recall each individual thing that was
 3        testified to.  I have brought paper copies of the
 4        transcripts that I may show her.  I'd prefer not to
 5        enter those into the record since they already are.
 6        Typically, in the old days, I would just ask the
 7        court for its copy, but now with efiling that doesn't
 8        really seem to be an option, so some of the
 9        transcripts, potentially some of the motions or the
10        orders of the court, if Attorney Vishny needs some
11        recollection of those, I would present those, but not
12        as an exhibit, with the court's permission.
13             THE COURT:  And that is fine, Counsel, with
14        the caveat that I would ask that when you utilize a
15        document that you make specific reference to whatever
16        that document is and, more specifically, whatever
17        page and/or paragraph may be included within that.
18        And as long as that document which you are
19        referencing is a part of the record somewhere else,
20        then that's fine, we don't need to have it
21        reintroduced.
22             ATTORNEY BABCOCK:  Thank you.
23             THE COURT:  The only other, and certainly
24        not an insignificant issue, Attorney Tempelis, the
25        victim rights statute has been complied with?
```

8

```
 1              ATTORNEY TEMPELIS:  It has been.

 2              THE COURT:  Okay.  Very good.

 3         Anything else preliminarily, Attorney Babcock?

 4              ATTORNEY BABCOCK:  Yes.  One final point.

 5    As the court recalls, there was co-counsel, Attorney

 6    Evan Weitz.  I believe I'm pronouncing that

 7    correctly, W-E-I-T-Z.

 8              THE COURT:  That's correct.

 9              ATTORNEY BABCOCK:  And I attempted to get

10    both attorneys here, but it was impossible to pick a

11    date where they were both available.  We had looked

12    out I think through May or June.  I -- I interpret

13    Attorney Vishny as being sort of the lead attorney in

14    this case, just from my review of the transcripts, so

15    I believe she will be able to answer questions in

16    terms of strategy, but to the extent she cannot, I

17    would be asking the court to continue the hearing to

18    secure the testimony of Attorney Weitz.

19              THE COURT:  Sure.  And then what I would do

20    at this point is I'd allow you to leave open that

21    request, because obviously we won't know until after

22    you've had Attorney Vishny's testimony until --

23    whether or not you'll need to exercise that request.

24    So I'll certainly take that under consideration.  And

25    then at the end, if you need to renew that, I'd
```

```
 1          certainly entertain a continuance request.

 2                    ATTORNEY BABCOCK:  Thank you, Judge.

 3                    THE COURT:  Anything else in preliminary

 4          matters?

 5                    ATTORNEY TEMPELIS:  I don't believe so.

 6                    THE COURT:  Okay.  Very good.

 7                    ATTORNEY BABCOCK:  The defense would call

 8          Attorney Deborah Vishny.

 9                    THE CLERK:  Please raise your right hand.

10                    (Oath administered to witness.)

11                    THE WITNESS:  Yes.

12                    THE CLERK:  Please state your full name and

13          spell it for the record please.

14                    THE WITNESS:  Deborah Vishny.

15          D-E-B-O-R-A-H, V, as in Victor, I-S-H-N-Y.

16                    THE COURT:  And, Counsel.

17                    EXAMINATION OF DEBORAH VISHNY

18          BY ATTORNEY BABCOCK:

19    Q     Attorney Vishny, how are you employed?

20    A     I'm an attorney with the Wisconsin State Public

21          Defender Milwaukee trial office.

22    Q     How long have you been in that position?

23    A     Over 37 years.

24    Q     Prior to taking that position, were you employed in

25          any other legal capacity?
```

10

```
1   A    This was the first job I got out of law school.

2   Q    And what does your practice area focus on?

3   A    Three quarters of my job pertains to training other

4        lawyers.  I'm the deputy training director of the

5        agency, and I'm the head of the statewide homicide

6        practice group.  Twenty-five percent of my work is

7        spent doing cases, the majority of which are

8        homicides.

9   Q    And when you try a homicide case, are you -- do you

10       typically have a co-counsel, another attorney, on the

11       case?

12  A    Yes.

13  Q    And is the co-counsel generally someone of equal

14       experience to you, lesser, greater experience?

15  A    Most of the time it's of lesser experience.

16  Q    And why is that?

17  A    Because I'm the most experienced lawyer in the state

18       in terms of doing homicide cases with the Wisconsin

19       State Public Defender, so part of my role is to

20       assist other lawyers in training them.  Generally

21       speaking, we just don't have enough people to put two

22       very experienced lawyers on a homicide case, though

23       sometimes we do.

24  Q    And the co-counsel in this case was Attorney Evan

25       Weitz; is that correct?
```

11

```
 1    A    For most of the time, yes.  There was somebody else
 2         in the beginning that he left the agency.
 3    Q    Am I pronouncing his last name correctly?
 4    A    Yes.
 5    Q    And do you recall what his experience level was at
 6         the time of the trial?
 7    A    I believe he had been an attorney for approximately
 8         four years.  I'm not really sure.  He was handling a
 9         mixed caseload of felony misdemeanors and
10         revocations, and he had done one jury trial.
11    Q    Do you know if that prior jury trial involved a
12         homicide?
13    A    No, I think it was a 980 or sexually violent person
14         case.
15    Q    So would it be fair to say that you were acting in
16         sort of a training role with regard to your
17         relationship with Attorney Weitz in this case?
18    A    I was the lead counsel, but Attorney Weitz is really
19         an exceptional lawyer, and I think that his
20         participation in this case was invaluable.
21    Q    Can you describe how you divided your roles, what his
22         role was versus yours?
23    A    Well, I think he came into the case between nine
24         months and a year after I had opened it.  Attorney
25         Weitz lived most of the time in the Appleton, Oshkosh
```

12

```
 1        area.  He was a member of the Oshkosh office.  So he
 2        would see Mr. Lee more frequently than I would
 3        because he had a greater physical proximity to him,
 4        though I saw Mr. Lee fairly frequently as well.  He
 5        had some of the witnesses.  He did the opening
 6        statement in the trial, he did the cross-examination
 7        of some of the witnesses.  In particular, he was more
 8        in charge of the part of the case that had to do with
 9        the intimidation of victim counts.  He was the person
10        in charge of really paying attention to the letters
11        and phone calls that Mr. Lee had made from the
12        Outagamie County Jail.  He was -- I know he had
13        Stephanie and Melanie Thao as his witnesses.  He,
14        behind the scenes, did a lot of the work of the
15        organizing of the file, made spreadsheets and things
16        of that nature.
17   Q    Did you make most of the strategic decisions or all
18        of the strategic decisions in the case or was
19        Attorney Weitz involved in some of that strategy?
20   A    We discussed everything in this case together and
21        brain stormed how we were trying the case and the
22        theory of the case together.
23   Q    Did either of you have ultimate authority to make a
24        decision as to what strategy you would employ?
25   A    We never really had to do that because we always came
```

13

```
 1            to an agreement.
 2      Q    When a sidebar would be made at trial, would
 3            Attorney -- would you approach the bench along with
 4            Attorney Weitz or were there ever occasions where
 5            only one of you would approach the bench?
 6      A    My recollection is that we always went up there
 7            together.
 8      Q    And would that have been the case deemed even if you
 9            were not the one making the objection?
10      A    Yes.
11      Q    Do you recall that I sent you a copy of the
12            post-conviction motion in this case?
13      A    Yes.
14      Q    Did you have a chance to review it?
15      A    Yes.
16      Q    Do you have sort of a general familiarity with some
17            of the issues that I've raised in that motion?
18      A    Generally speaking, yes.
19      Q    Now is it fair to say that in this case there was no
20            eyewitness presented at trial who could identify
21            Mr. Lee as the shooter?
22      A    I think that's correct.  I'm trying to think through
23            the people who were the closest, which would have
24            been his brother Paul, Joe Thor and Phong Lee.  I
25            don't think any of them -- I don't recall right now
```

14

```
 1          exactly if any of them say that they saw Chong do the
 2          shooting, but they were the most central and most
 3          important witnesses for the prosecution in the case.
 4          At least that was my view, at least as to being
 5          present in the bar itself and seeing what occurred.
 6     Q    Would you consider this case a direct evidence case
 7          or a circumstantial evidence case from the State's
 8          perspective?
 9     A    I think there was both.  Well, I don't really think
10          about cases from the State's perspective, but it
11          appears to me that there was both direct and
12          circumstantial evidence of the homicide.
13     Q    Excuse me.  Do you remember the witness Brittany
14          Olson?
15     A    Yes.
16     Q    And do you recall how she was -- what role she played
17          in this case?
18     A    She was the girlfriend of the deceased whose name was
19          Josh.  She had gone to the bar with him.  He had gone
20          on a party bus from the Green Bay area.  My
21          recollection of her was that she was extremely
22          intoxicated to the point where she couldn't give a
23          very cohesive version to the police when they talked
24          to her; and she did testify at the trial.
25     Q    Do you recall at trial whether she saw who actually
```

15

1    did the shooting?

2 A  I don't think she did, but I haven't reviewed her

3    testimony to prepare for today.

4 Q  And do you recall the witness Alyson Blom?

5 A  Yes.

6 Q  Do you recall how she was involved in this case?

7 A  Alyson Blom was part of a large circle of Mr. Lee's

8    friends who were present at the bar.  They had not

9    all gone to the bar together, however, they had come

10   from different places.  So she was an associate of

11   his friends.  And there was a video tape of people

12   pouring out of the bar after the shooting, and my

13   recollection is that after Mr. Thor, Mr. Phong and

14   Paul Lee, that she and a woman named Dalinda were

15   among the first people out of the bar.  I can't

16   remember if she was exactly in position number five

17   or number four or number six, but she was one of

18   those -- I believe she was one of those people.

19 Q  Do you recall what the State argued in terms of

20   Alyson Blom's proximity to Chong Lee?

21 A  My recollection is that they thought she was in the

22   vicinity during the time.  There was a map used

23   during the trial as an exhibit where different people

24   would put their positions on, and I don't remember

25   her exact position, but I think she may have been the

16

|    |   |                                                          |
|----|---|----------------------------------------------------------|
| 1  |   | first -- may have been the person who left               |
| 2  |   | immediately -- well, she left before Chong Lee on the    |
| 3  |   | videotape.  I know that.  He was behind her, and I       |
| 4  |   | thought Mr. Lee was the seventh person out, but I        |
| 5  |   | can't say for sure right now.                            |
| 6  | Q | Would the transcript help your recollection?             |
| 7  | A | Not unless I spent a long time reading, so I mean        |
| 8  |   | basically the State called her because she was           |
| 9  |   | present during the time of the shooting and they --      |
| 10 |   | but I don't believe that she testified that she saw      |
| 11 |   | Chong Lee shoot the victim in the case.  That's not      |
| 12 |   | my recollection.                                         |
| 13 | Q | Would you have any dispute that the State argued in      |
| 14 |   | openings that immediately behind Chong Lee was Alyson    |
| 15 |   | Blom?                                                    |
| 16 | A | Okay.  Then maybe he was behind her.  I wasn't sure      |
| 17 |   | if he was behind her or in front of her on the tape     |
| 18 |   | but if the tape showed that, I don't recall the State   |
| 19 |   | misrepresenting what the videotape showed, so I         |
| 20 |   | assume that would be accurate.                          |
| 21 | Q | And I believe you just testified that at trial Alyson   |
| 22 |   | Blom did not testify that she saw who actually did      |
| 23 |   | the shooting, correct?                                  |
| 24 | A | I don't think she did.                                  |
| 25 | Q | And do you recall the various events and what sort of   |

17

```
1          took place between Brittany and Alyson when they left
2          the bar?
3    A     Yes.  Brittany was immediately behind Alyson on the
4          videotape and was reaching -- I believe the videotape
5          showed her reaching her arm out to Alyson, and
6          immediately afterwards both women left Luna lounge
7          going to the right, and Brittany Olson attacked
8          Alyson.  And there were a couple of guys who had to
9          break up this fight.  That -- that's my recollection.
10         And then Alyson, she left.  I'm not sure if she got a
11         ride.  What I remember was it's a little conflated
12         what's in the discovery and what actually came out at
13         trial, but there were some different claims whether
14         she walked a certain amount or whether she got a ride
15         right away.  There were some inconsistent statements
16         that I remember, but I do know that Brittany Olson
17         attacked her.
18   Q     And do you recall that in the discovery there were
19         some certain comments that Brittany Olson made in
20         terms of your boyfriend shot my boyfriend?
21   A     Yes, that was what she said.
22               ATTORNEY BABCOCK:  May I approach, Judge?
23               THE COURT:  You may, Counsel.
24   Q     (BY ATTORNEY BABCOCK)  Attorney Vishny, I am showing
25         you what is Day 2 of the jury trial, February 25th,
```

```
 1          2016, at Page 142.  And if you want to just hold this
 2          top part, it might fall apart.
 3   A      That's fine.
 4   Q      Whose testimony am I looking at?
 5   A      That is the testimony of Officer Kuether.  And if you
 6          look down towards the bottom of the page, did you
 7          make an objection or did someone from the defense
 8          team make an objection?
 9                  THE COURT:  I think, just for
10          clarification, Attorney Babcock, I don't know that
11          you would know this, there are actually two Officer
12          Kuether's with the Appleton Police Department.  I
13          think you're probably referencing Officer Matt
14          Kuether -- Officer Sean Kuether.
15                  ATTORNEY BABCOCK:  Yes.  Thank you, Judge.
16   Q      (BY ATTORNEY BABCOCK)  Attorney Vishny, I'll just
17          direct you a little bit closer.  Line 11 you'll see
18          that there is a question by the prosecution?
19   A      There was an objection by Attorney Weitz which means
20          this would have been his witness.
21   Q      And then there was a bench conference held?
22   A      Correct.
23   Q      Did you approach the court at that bench
24          conference?
25   A      I'm sure I did.  I approached at every bench
```

19

1     conference.

2  Q   Do you recall specifically what that objection was?

3  A   No.

4         THE COURT:  I think, Counsel, if it aids,

5     to the best of my ability what I would attempt to do

6     is we would have the bench conference, and then when

7     the jury would leave, I would do my best to attempt

8     to summarize whatever the basis of that objection was

9     and the basis for the same.  The reason for that

10    approach was out of concerns for having there be any

11    prejudicial effect on the jury.  And while I

12    understand I'm not necessarily being asked to be a

13    witness, but I think it may add some clarification

14    and some understanding as to how some of the

15    protocols took place.  I don't remember whether that

16    suggestion was made by myself or whether that was an

17    agreement between respective counsel, but that was

18    the approach we took.  Quite frankly, I, by and

19    large, adopted that practice since that trial.

20         ATTORNEY BABCOCK:  Thank you, Judge.  It

21    was very apparent in the transcripts, and quite

22    helpful, because, quite frankly, a lot of judges

23    don't do that, but that is the point I'm going to get

24    to next.

25 Q   (BY ATTORNEY BABCOCK)  I believe if you can go on

20

```
 1       to --
 2   A   Page 154 where you have the next marking?
 3   Q   Could be.  Yes.
 4   A   Yes.  I've just read it.
 5   Q   And so was that objection made to this possible
 6       statement, your boyfriend shot my boyfriend, your
 7       friend shot my friend?
 8   A   It looks like that was part of it.  And I think
 9       that's relevant for the relevant issue that you're
10       trying to get to in reviewing your pleadings, yes, it
11       looks like that objection was made by Mr. Weitz and
12       that the court overruled it.  And I have an
13       independent recollection of the court overruling that
14       and saying it was an excited utterance.
15   Q   And from your recollection of that bench conference,
16       was hearsay the only evidentiary grounds that
17       Attorney Weitz raised?
18   A   I believe so.
19   Q   Attorney Vishny, I'm showing you the jury trial
20       transcript for Day 6, March 2nd, 2017.  It's at Page
21       63.  The relevant portion is right at the top of that
22       page, but if you need to review a little bit earlier
23       to get some context, I'd ask that you do that.
24   A   I don't think I need to if what you're raising is
25       that once the judge had stated that the statement,
```

21

```
 1        your boyfriend shot my boyfriend, once he had
 2        admitted that -- once the judge had ruled that that
 3        statement was admissible in the first witness who
 4        presented it, if what you're trying to get at is that
 5        we didn't object again, that would be accurate.
 6    Q   And is that because of the court's ruling, that it --
 7        it was admissible?
 8    A   Yes.
 9    Q   Do you recall another instance - I won't bring you
10        the transcript again unless you need to see it - but
11        where a similar statement came in through Johnny
12        Thao?
13    A   I don't recall it, but your pleadings say that they
14        do, so I assume that your pleadings are based on the
15        transcript and are accurate.
16    Q   And any objection or lack of objection to that same
17        information, would that have been for the same
18        reasons that you stated here, that the court already
19        said it could come in?
20    A   Yes.
21    Q   And did you ever make an objection that we are
22        objecting to it from every witness coming in, sort of
23        a blanket objection, or did you believe it was
24        preserved based on the one objection through one
25        witness?
```

22

```
 1    A    I don't recall making a continuing objection to that
 2         statement, and I wasn't really particularly concerned
 3         about preserving that objection either because I
 4         believed that the court gave a sound ruling for
 5         its -- the court gave a sound reason that it was an
 6         excited utterance, and although we made that
 7         objection, my review of the law of excited utterances
 8         is that I -- I didn't believe that any appellate
 9         court would ever overturn that ruling.  I think the
10         foundation had been laid for it.  So --
11    Q    And then moving on to Alyson Blom, a similar
12         statement came in through Johnny Thao as well?
13    A    Am I supposed to say something?  Is that a question?
14    Q    Just a minute.
15    A    Okay.  I'm sorry.
16    Q    Do you recall testimony that Johnny Thao said that
17         Alyson Blom said my boyfriend shot that guy?  Do you
18         recall that testimony?
19    A    I do not have an independent recollection of it, but
20         I saw that it was in your pleadings.
21    Q    Would it help in terms of testifying to your strategy
22         if you reviewed that testimony?
23    A    No, because Alyson Blom testified at the trial and
24         she denied that Chong Lee was ever her boyfriend, and
25         I don't remember if she denied that specific
```

23

```
 1              statement, but she was very clear that she and Chong

 2              Lee were not boyfriend and girlfriend.

 3    Q    So the reason for not objecting to that particular

 4              statement is what?

 5    A    Well, let me just say this generally speaking.

 6              Generally speaking, I don't, as a matter of course,

 7              object to every possible thing I could object to or I

 8              would be up at the judge's bench every other minute.

 9              Particularly in this trial, there was a lot to object

10              to.  And we didn't object on every other matter or --

11              a trial lawyer always has to make a decision whether

12              it's going to annoy the jurors and whether it's

13              something important enough to object to and whether

14              or not, if an objection is made, whether it's going

15              to be a significant issue in front of the Court of

16              Appeals.  And in my opinion, this really didn't

17              matter very much because Alyson Blom denied ever

18              having a relationship with Chong Lee, and some of her

19              testimony was helpful to the defense, and I thought

20              we got out helpful points, so it wouldn't have been

21              something that would have been of consequence.

22    Q    And do you have an independent recollection as you

23              sit here today in terms of why you did not object or

24              are you offering your general defense theories?

25    A    I'm offering my opinion as to what I think, and that
```

```
 1          is consistent with my best recollection, and I don't
 2          believe reviewing a transcript will enhance that.  I
 3          have very little recollection of Johnny Thao as a
 4          witness.  I have a much stronger recollection of
 5          Alyson Blom because she was a much more major figure
 6          in this case, and I recall our strategy in general,
 7          and I'm telling you generally the way I practice law.
 8          That's how I would have done it here.
 9     Q    And is that based on a hindsight review of the
10          case?
11     A    No.
12     Q    So --
13     A    That would have been my thinking at the time.
14     Q    Attorney Vishny, if you could just close that day
15          two, I don't want it to flip off there.  The big one.
16          But I'll have you keep it up there just in case.
17     A    No problem.
18     Q    Now, Attorney Vishny, do you recall filing -- there
19          were lots of suppression motions.  But do you recall
20          filing a motion to suppress the statements of Chong
21          Lee?
22     A    I'm sure I did.  It would be standard practice.  I
23          would think I did.  I believe you're challenging the
24          fact that we didn't pursue that, correct?
25     Q    Yes.
```

```
 1              Do you recall the grounds for -- well, I guess
 2         let me back up.  Do you recall when you filed that
 3         motion to suppress his statements?
 4    A    Whenever it was required by the court deadline, but
 5         otherwise I can't say.
 6    Q    And would you have any dispute that the jury trial in
 7         this case started on February 23rd, 2016?
 8    A    No.
 9    Q    If I told you that the motion to suppress Chong's
10         statements was filed on March 2nd, 2016, so midway
11         through the trial, would you dispute that at all?
12    A    No.  I didn't remember that, but I wouldn't dispute
13         it if that's what the court record said.
14    Q    Do you recall the basis for challenging his
15         statements?
16    A    I think that in the middle of his interrogation, I'm
17         recalling this from reading your pleadings, he
18         decided that he didn't want to make any further
19         statements, but I would actually have to review the
20         motion to see what I raised because I have not looked
21         at it since I filed it, or since during the trial,
22         let me put it that way.
23    Q    Attorney Vishny, I'm showing what you is already part
24         of the court record.  It is a motion to suppress that
25         was filed on March 2nd, 2016.  Couple of paragraphs
```

```
 1          down it will have the relevant information, if you
 2          just want to review it and let me know when you're
 3          finished.
 4     A    Okay.  I'm done.
 5     Q    And can you state with specificity what the precise
 6          grounds were that you raised in that motion?
 7     A    It's what I stated, that Chong Lee made a statement
 8          that he didn't want to talk to the police anymore and
 9          therefore the police should have stopped the
10          interrogation.
11     Q    And you had the court recording of his interrogation,
12          and it looks like probably a transcript before the
13          jury trial, correct?
14     A    Yes.
15     Q    Can you say why that motion wasn't filed any
16          earlier?
17     A    I can't say why it was filed any earlier.  I can tell
18          you why it was abandoned and not pursued.
19     Q    All right.  Go ahead.
20     A    Mr. Lee never made any admission to having been
21          involved in the homicide, so I didn't consider his
22          remarks to have been a confession.  His remark about
23          not wanting to talk to the police any further
24          occurred about -- quite a distance to the
25          interrogation.  His statements in advance of his
```

```
 1          remark to not want to talk to the police anymore were
 2          not helpful at all to his case.  What I remember is
 3          that I think he initially denied having been in the
 4          bar at all, when there was clear proof that he had
 5          been in there from the videotape.  His remarks after
 6          deciding to cut off interrogation, we felt -- well, I
 7          will say I felt that I consulted with my co-counsel,
 8          were more helpful to the case because he made
 9          comments referring to the police officer who
10          interrogated him, sergeant whoever who interrogated
11          him, was attempting to use a police interrogation
12          method of minimizing the offense but saying it could
13          have been in self-defense, which was a very common
14          part of the Reid, R-E-I-D, technique, and typically a
15          police interrogator does this to minimize the
16          seriousness of the offense in order to get a suspect
17          to admit to culpability, and in this particular case
18          Mr. Lee's response was not one to have that, okay, if
19          it's self-defense or to make an admission, but
20          instead Mr. Lee's response is that a killing -- these
21          are not exact words, but he said words to the effect
22          that a killing is a killing, murder is a murder, and
23          that it's wrong no matter what, and therefore it
24          really didn't fit any kind of typical response that
25          police are looking for in interrogation.  We thought
```

28

```
 1          that that statement was more helpful.  We knew that
 2          the beginning part of the interrogation was going to
 3          come in no matter what because he had not asserted
 4          his right to remain silent until fairly late in the
 5          proceedings, and we thought that when you took a look
 6          at his statements as a whole, because the State was
 7          going to play the beginning part prior to that no
 8          matter what the court ruled, that we thought we were
 9          better off having his entire statement in than just
10          having part of his statement in so we made that
11          decision.  Probably, you know, reconstructing my
12          memory of this, there is a lot of decisions that I
13          have to make during a trial, and maybe at one point I
14          thought, hmm, I'm not sure if I made the right
15          decision so let's file the motion now and think about
16          it later.  So that's probably why it was filed.  And
17          then we sat around and brain stormed the case, we --
18          and made a decision ultimately that we were better
19          off with the entire interrogation being played to the
20          jury than the -- just part of it.
21    Q     Now, going back to -- so you sat around and you --
22          and I guess, just to clarify, can you say that you
23          filed the motion and then made the strategic decision
24          to abandon it?  Do you have a specific recollection
25          of that decision?
```

29

| | | |
|---|---|---|
| 1 | A | I don't have a recollection specifically of it, but I |
| 2 | | do know that we discussed it.  I can't tell you what |
| 3 | | day, but we worked every night after court until |
| 4 | | about 11:00 every night and we would, you know, not |
| 5 | | only prepare for the next day but discuss what |
| 6 | | happened and what we were going to do and we worked |
| 7 | | on the weekends when the jury was out.  So at some |
| 8 | | point we discussed this. |
| 9 | Q | I'm sure you'll say that all evidence is important, |
| 10 | | but would you agree that a defendant's statement, |
| 11 | | particularly ones that are potentially inculpatory, |
| 12 | | are very important? |
| 13 | A | Yes. |
| 14 | Q | And before the trial, would it be fair to say that |
| 15 | | you took a very strong and thorough look at Chong |
| 16 | | Lee's statements in this case? |
| 17 | A | I'm sure I did. |
| 18 | Q | And are you able to say why you didn't file that |
| 19 | | motion earlier? |
| 20 | A | I must have decided at some point that we thought his |
| 21 | | statement was more helpful than harmful.  First of |
| 22 | | all, I'm not really sure whether the State told us |
| 23 | | that they were going to play his interrogation.  It |
| 24 | | would -- typically when a person I'm representing has |
| 25 | | denied the commission of an offense, in most cases |

30

```
 1          the prosecutor decides not to play the statement
 2          because under the rule of completeness, if they play
 3          part of it, then can I get in the exculpatory
 4          portions, and most prosecutors make a decision to not
 5          play that.  So I don't know if it's because the State
 6          did tell us whether or not they intended to play it
 7          until later, and once they did that, we decided to
 8          do -- to file the motion to preserve it or not.  I'm
 9          not sure what the State did.  I don't have a memory.
10          What I do have a memory of is that we didn't think
11          the statement really hurt us, except for the
12          beginning part that came beforehand where Mr. Lee
13          de -- denied being in the bar altogether because the
14          State could clearly prove that he wasn't being
15          truthful at that particular point in time.
16     Q    Now, you just testified that after the trial you
17          would go back and work on the case evenings and
18          weekends, correct?
19     A    Yes.
20     Q    So is it fair to say that time was at a minimum?
21     A    I felt I had enough time; we just worked very hard.
22     Q    But this suppression motion took some time to
23          prepare, correct?
24     A    It wouldn't take me very long because I -- I've
25          written so many suppression of statement motions, it
```

31

1      would be very -- I could probably do that motion in
2      under 30 minutes.
3  Q   Now, you testified a couple questions ago that you
4      didn't believe that the entire portion or at least
5      the portion that maybe wouldn't have come in was
6      hurtful; is that an accurate understanding?
7  A   It was my belief that because the State was going to
8      play the beginning part of this tape, which was the
9      part that hurt Mr. Lee's defense the most, that we
10     were better off with the entire tape in instead of
11     just the beginning part that occurred prior to him
12     saying he didn't want to talk to the police anymore.
13     So I had to look at the fact that they were going to
14     play this tape, and there was no grounds to suppress
15     approximately the first 40 or so minutes of the tape,
16     and make a decision what we thought better fit within
17     the defense theory of the case having just the
18     beginning part of the statement or having the
19     statement in its entirety.
20 Q   So making the decision that you wanted the entire
21     statement in, why did you file the motion to
22     suppress?
23 A   My best guess is the State told us, we did it to
24     preserve the record because we needed to get done and
25     we would think about it later.  I can't say with

```
 1        absolute certainty.  I do file motions pretty

 2        standard and then make decisions about whether I'm

 3        going to pursue them later.  That's not unusual for

 4        me.

 5   Q    Now moving on to this final issue with regard to beat

 6        the case, do you recall the prosecution filing a

 7        motion to admit that statement as relevant to a

 8        consciousness of guilt?

 9   A    My memory is that we filed it in our motion in

10        limine, but we had a long motion in limine with a lot

11        of law cited, and we put it in as part of that

12        general motion in limine to not allow that statement

13        in and that the prosecution I think eventually

14        responded.  That's how I thought it happened, but my

15        memory could be wrong.  I don't know if the

16        prosecutor did it independently and then we

17        responded.

18   Q    But there was a fair amount of litigation both in

19        court arguments and briefs going back and forth on

20        this beat the case issue?

21   A    I'm sure we did.  In fact, I remember researching it

22        and I remember the judge's ruling on it.

23   Q    What was the judge's ruling from your recollection?

24   A    The judge ruled that the phrase that Mr. Lee -- any

25        phrases he made - and I think a lot of them were made
```

33

| 1 | | over the phone from the jail – that he was going to |
|---|---|---|
| 2 | | beat his case would not be admissible into evidence |
| 3 | | because it wasn't really anything different than |
| 4 | | using a vernacular to say I'm going to be found not |
| 5 | | guilty and that that's not consciousness of guilt. |
| 6 | | The court ruled, and I believe we didn't dispute, |
| 7 | | that if the statement was made in conjunction with |
| 8 | | something like, don't go to court and testify so can |
| 9 | | I beat the case, it would be admissible under those |
| 10 | | circumstances because it would show consciousness of |
| 11 | | guilt and it would help prove the elements of the |
| 12 | | various intimidation counts, and under those |
| 13 | | circumstances it would be admissible but not as a |
| 14 | | general statement. |
| 15 | Q | I believe you testified earlier that Attorney Weitz |
| 16 | | handled the testimony of Stephanie Thao, correct? |
| 17 | A | That's correct. |
| 18 | Q | Are you able to speak to any strategy today in terms |
| 19 | | of Stephanie Thao and why things weren't objected |
| 20 | | to? |
| 21 | A | I would have to read the transcript of Miss Thao's |
| 22 | | testimony and look at this in context. |
| 23 | Q | I'm showing you Day 5 of the jury trial, March 1st, |
| 24 | | 2016, the transcript for that hearing. Page 218 is |
| 25 | | specifically what I'm going to direct your attention |

34

```
 1          to, but if you want to review the few pages before it
 2          to get some context and let me know.
 3     A    Is this the direct or the cross?
 4     Q    That is the direct?
 5     A    Okay.  Let me just take a look.  I'm finished
 6          reviewing it.
 7     Q    Do you recall what came in through that Exhibit 92?
 8     A    I don't have any independent recollection.  I have to
 9          rely on the transcript.
10     Q    Do you have any -- I guess I would start with, there
11          was no objection made to that testimony or that
12          exhibit, correct?
13     A    Apparently not.
14     Q    Do you have any recollection as to why or why not an
15          objection was made, if you can speak to that?
16     A    No, I don't.
17     Q    Now, I want to move to the last day of trial, just
18          sort of the specifics and dynamics of what was
19          happening.  So the final day of trial, do you recall
20          that there were jury instructions, closing -- closing
21          arguments, but there was no evidence presented that
22          day?
23     A    If that's what the record shows, that's what it
24          shows.  I -- that would make sense in light of the
25          length of the trial.
```

```
1   Q    There's a little uncertainty in the transcripts in

2        terms of how things happened.  I -- I'll have you

3        read Day 11 of the transcripts, but it appears that

4        once the jury was sent to deliberations, that court

5        reporter was sent home, and then once the verdict was

6        received, a new court reporter came in.  Is that what

7        happened, do you recall?

8   A    That rings a bell, but I don't really remember that

9        very well.

10  Q    I will show you Day 11 of the jury trial, the

11       transcript for that hearing.  March 9th, 2016.  If

12       you want to go to Page 185, and then if you just want

13       to review the couple of pages after that, you'll also

14       see the start of a second transcript for that same

15       day by a different court reporter, and let me know

16       when you're finished.

17  A    Okay.  The transcript shows that a different reporter

18       came on.  That's highlighted on Page 188.

19  Q    And so is it fair to say that from the time that the

20       jury was sent out to deliberate to the time a verdict

21       was rendered, there was no court reporter recording

22       proceedings?  Do you recall any of that?

23  A    I don't have an independent recollection, but it

24       seems that there was a separate court reporter so I'm

25       assuming if there were things that happened that it
```

```
 1         would be on the record with the second reporter.  I
 2         don't have any memory of who was sitting in the
 3         courtroom.
 4    Q    But after the jury was sent out to begin
 5         deliberations to the time a verdict was received,
 6         there were issues that came up, questions from the
 7         jury, that sort of thing, do you recall that?
 8    A    Yeah.  I think we did have to come back, if I
 9         remember correctly.
10    Q    And do you know whether those discussions were
11         handled in the courtroom or in chambers?
12    A    I have no memory one way or the other.
13    Q    Do you recall if there was a court reporter present
14         in the courtroom?
15    A    I have no recall one way or the other.
16    Q    Do you have a recollection of any of the specific
17         questions from the jury?
18    A    No.
19              THE COURT:  I think, Counsel, if it helps,
20         as a matter of practice, if I'm not mistaken, all
21         questions that would be asked by jurors would be
22         marked as an exhibit and then they would be made a
23         part of the record.
24              ATTORNEY BABCOCK:  But not -- there would
25         be no court reporter transcript describing the
```

```
 1      discussions relative to those jury questions?

 2                THE COURT:  I don't -- I don't know the

 3      specifics -- I mean I don't have an independent

 4      recollection.  I know that questions that would be

 5      asked, whether it's during a trial or afterwards, I

 6      would mark those as exhibits.

 7                ATTORNEY BABCOCK:  And, Judge, that's

 8      what -- I'm really trying to get clarification from

 9      my perspective.  I do have the questions marked, but

10      the actual discussion in terms of what would go to

11      the jury didn't appear in any of the transcripts, so

12      I'm just trying to see if Attorney Vishny knows

13      whether there was a third court reporter brought in

14      or --

15   A  I really have no memory at all about what happened.

16      I -- I do remember that we had to come back to the

17      court.  I don't even remember if we were waiting here

18      or we walked to our hotel and walked back to the

19      courthouse.  But I do know that there were reasons to

20      have discussions that were before the verdict

21      occurred.  That I remember.  And I can't tell you

22      anything else about it.

23   Q  Attorney Vishny, I am showing you what was marked as

24      Trial Exhibit 207, it was received by the court on

25      March 9th, 2016.  A note from the jury.  If you could
```

```
 1         just review that and let me know when you're

 2         finished.

 3    A    All the pages --

 4    Q    Yes.

 5    A    -- you want me to look at?

 6    Q    Yes, please.

 7    A    Okay.  I'm finished.

 8    Q    Do you recall that question coming from the jury?

 9    A    I don't have an independent recollection.  I'm

10         relying on the exhibit.

11    Q    And if you can turn to page -- the third page of the

12         letter that's attached to that exhibit?

13    A    Yes.

14    Q    I guess I should just back up.  This -- the documents

15         attached to 207, were those the items that went to

16         the jury in response to their question?

17    A    I assume so based on you handing me Exhibit 207.  I

18         wasn't there when the documents were delivered to the

19         jury.

20    Q    Do you recall whether there was discussions in terms

21         of what documents would go to the jury on that

22         particular issue?

23    A    I don't have an independent recollection.  I'm sorry.

24    Q    And again, on Page 3 of the letter that's attached to

25         that, do you see the reference to I'll beat this case
```

39

1       though?

2   A   I do.

3   Q   And it doesn't appear that we have a transcript of

4       that discussion.  Do you recall whether you objected

5       to that statement going to the jury?

6   A   I cannot tell you what was done in terms of the

7       statements going to the jury.  What I can tell you,

8       or what my recollection is, is that all of the

9       written documents that were put into evidence during

10      the trial that we had -- we had a bench conference

11      every morning, or at the conclusion, but usually in

12      the mornings prior to the documents being entered

13      into evidence.  There was an off-the-record

14      conference in chambers with the prosecutors, myself

15      and Mr. Weitz where there was a discussion

16      specifically about each item and what was going to be

17      redacted and what wasn't.  And there was a lot of

18      going back and forth in chambers about them, and then

19      the judge made his ruling about each and every item,

20      and that was what the State was able to show in the

21      courtroom regarding the case.  So I can't tell you

22      whether there was an objection or what happened at

23      the discussions about what exhibits would go back to

24      the jury room, but my belief is that each and every

25      exhibit or each and every piece of testimony that

```
 1          dealt with transcripts of phone calls from the jail
 2          or letters from the jail which were alleged to have
 3          been written by Mr. Lee were discussed and the judge
 4          made a ruling on those.  That's all I can remember.
 5    Q     Now, do you believe that that reference to I'll beat
 6          the case, that that statement going to the jury is
 7          consistent with the court's order that beat the case
 8          statements would not come in?
 9    A     That's what it looks like to me, that that should not
10          have gone there.
11    Q     And I just want to make sure I'm understanding, can
12          you offer any reason as to why -- or you don't know
13          whether you objected to that; is that correct?
14    A     I really don't.  I don't know what I looked at, and I
15          don't know if we just came in and talked in exhibit
16          numbers, but it shouldn't have been in evidence at
17          all consistent with the court's -- I mean this is my
18          opinion.  So my opinion, when I look at this
19          particular document and the statement that Mr. Lee
20          makes in here, so you have a letter here and there is
21          a lot that's been redacted, and he's talking in the
22          letter immediately before then that he hated his
23          brother and Joe for that, then there is a redaction,
24          and then it says, excuse my language, fucking punks
25          more like it.  I'm pretty sure I'll beat this case
```

41

1       though.  My opinion is that the court ruled in the

2       motions in limine that statements such as that should

3       not have got in front of the jury, so I'm not really

4       sure how that happened.  And I don't -- I cannot tell

5       you whether it was read to the jury during the trial.

6       I mean clearly nothing should go to a jury that's not

7       into evidence in a trial, so the only thing I can

8       tell you is that the motion in limine about the

9       statement beat the case, that motion in limine was

10      litigated prior to the commencement of the trial and

11      Judge Gill made his ruling before the trial began.

12          Then, in addition to that, what happened was

13      every single day he would make individual rulings

14      about the letters and the phone calls and the

15      contents of the transcripts.  Those would occur in

16      chambers and he would rule specifically on that.

17      Whatever the rulings show that the record -- whatever

18      happened, whatever the record shows regarding those

19      are what they show.  This was Mr. Weitz's evidence.

20      He may have a stronger recollection than I because he

21      primarily handled these things, but I was certainly

22      part of it.  So I don't know, but I'm making an

23      assumption from looking at this exhibit that it was

24      shown to the jury during the jury trial or it would

25      have never gone back in the first place, and I

```
 1          just -- I can't remember the conversation in chambers
 2          or whether the judge said he would allow it that time
 3          or whether it was a defense error and an oversight.
 4          It's possible it was.  I just can't say.
 5     Q    And just to make sure I'm understanding you
 6          correctly, so there were some of these evidentiary
 7          rulings that did happen in chambers without a court
 8          reporter there, correct?
 9     A    You know, I don't remember if -- I think we had
10          informal discussions and then the discussions were
11          put on the record.  That's -- that's my recollection,
12          that we were in chambers every day, just about every
13          day in the beginning, and we would go through what
14          the State wanted to introduce that day, and the judge
15          would make orders as to what would happen, and at
16          some point I believe there would be a court reporter
17          there who would -- the rulings would be made on the
18          record, but I don't have a real strong recollection
19          about that.  I'm sorry.
20                    ATTORNEY BABCOCK:  Thank you.  That's all I
21          have, Judge.
22                    THE COURT:  Attorney Tempelis, do you
23          need -- do you need a few minutes, are you all set?
24          I guess, more importantly, Attorney Vishny, do you
25          need a few minutes?
```

43

```
 1                    THE WITNESS:  No.  I'm fine.

 2                    ATTORNEY TEMPELIS:  All right.  Thank you.

 3                  EXAMINATION OF DEBORAH VISHNY

 4    BY ATTORNEY TEMPELIS:

 5    Q    Attorney Vishny, you talked a little bit in the

 6         beginning about your occupation.  How long had you --

 7         how long have you been with the State Public

 8         Defender's office?

 9    A    I began in 1980.

10    Q    When you -- have you always worked specifically for

11         them as a public defender as opposed to having your

12         own practice --

13    A    Yes.

14    Q    -- separate then.

15              When did you become licensed?

16    A    In June of 1981 I graduated law school, whenever the

17         bar admits people.

18    Q    So you've been practicing as a criminal defense

19         attorney for your entire career?

20    A    Correct.

21    Q    What -- how long -- you talked a little bit about

22         your special says as it relates related to the

23         homicide cases within the public defender's office

24         for the State.  How long have you had that

25         position?
```

```
 1   A    We formed the statewide homicide practice group, I
 2        can't tell you the exact date, I want to take a guess
 3        and say it was maybe about three years ago, four
 4        years ago.  I'm not really sure.  Prior to that we
 5        had a homicide practice group in the Milwaukee trial
 6        office.  We initiated that, I think, I'm going to say
 7        the late 1990s, and I was the head of it in Milwaukee
 8        ever since it originated; and my practice, excuse me,
 9        has been primarily homicide cases since the late
10        1990s.
11   Q    I don't know -- this is always a hard question to ask
12        somebody who's been practicing for a while.  Do you
13        have any way of knowing how many homicide cases
14        you've done or how many -- how many trials you have
15        in a year?  Is there any way for you to categorize
16        that in a way that makes the most sense for the
17        record?
18   A    Well, based on the required caseload that the public
19        defender's office has for me, which is much less than
20        most people, if I opened five homicide cases a year
21        for a period of 20 years, that would mean I would
22        handle a hundred homicide cases during that period of
23        time.  But that's -- it's kind of a complicated
24        answer because cases are weighted in the public
25        defender's office, so some of the cases are weighted
```

45

```
 1        more heavily.  So if they were all first-degree
 2        intentional homicides, it would be five a year.  I'm
 3        going to say it's mostly likely I've done about eight
 4        homicides a year for 20 years.  But that's a very
 5        rough number because there is some years where I
 6        didn't even make the full caseload, including the
 7        year of Chong Lee's case because his case was so
 8        overwhelming that, with my other responsibilities, I
 9        didn't make my entire caseload so I could devote the
10        proper attention and resources to his case.
11   Q    In addition to doing the cases that you talked about,
12        you talked about other responsibilities that you
13        have, and one of those are training other defense
14        attorneys for the public defender's office.  Could
15        you just explain that?
16   A    Well, I am the primary person who puts together
17        annual trial skills program which has been going on
18        for 25 years.  I've probably been the main person in
19        charge of it for about the last 18 to 20 years.  I --
20        I have the -- one of the major responsibilities for
21        the annual conference every fall, I have major
22        responsibility for the annual investigator program, I
23        have major responsibility for the new lawyer training
24        program.  We have what we call a road show where we
25        go out to six or seven or eight different locations
```

46

```
 1          around the state every year or two or three and focus
 2          on either evidence or fourth amendment or
 3          confessions, whatever the subject is, and I do that.
 4          I -- I attend many conferences, criminal defense
 5          conferences around the country, usually speaking at
 6          them, and then I listen to the other speakers while
 7          I'm there and try to, you know, absorb and learn new
 8          ideas when I'm at these conferences and share my
 9          knowledge with other members of the agency.
10     Q    Now, you also, if I -- if I understand correctly, do
11          you also teach at Marquette Law School or you have
12          taught there in the past?
13     A    Yes.
14     Q    And how long or what type of position would that have
15          been?
16     A    I've taught trial advocacy at Marquette Law School
17          since 1997, with the exception of 2017, I took a year
18          off because I thought I was going to be in trial
19          outside Milwaukee for seven weeks.
20     Q    And is there additional classes besides trial ad or
21          did you focus on trial ad?
22     A    I taught the criminal defense clinic from
23          approximately 2000.  I taught it for about six, seven
24          years, or five years, I'm not really sure, but until
25          the early 2000s -- no, wait a minute.  In the 1990s I
```

47

```
1         taught the criminal defense law clinic for, I don't
2         know, maybe it was five -- somewhere between five and
3         seven years, and then I changed over to trial
4         advocacy.
5    Q    As part of your experience both as a practicing
6         criminal defense attorney and then also with the
7         teaching you're doing either nationally, around the
8         State of Wisconsin, or within Marquette's law school,
9         I would imagine that it requires you to stay
10        up-to-date on new case law as it relates to the State
11        of Wisconsin and the United States Supreme Court,
12        among other jurisdictions?
13   A    Yes.
14   Q    Do you always practice state law or do you do some
15        federal work as well?
16   A    No federal work.
17   Q    When you first are retained for and representing
18        somebody in a homicide case and you start getting the
19        discovery, what is your practice in terms of going
20        through that and then also sharing that with the
21        defendant?
22   A    Well, I'm never retained, I'm appointed.
23   Q    I'm sorry.  Appointed.
24   A    That's okay.
25             When I receive discovery on a case, I usually do
```

48

```
1           a first read to kind of understand it, which in this
2           case took a really long time because there was a lot.
3           I copy the paper discovery for my clients, and I make
4           sure, if discovery is electronic, that arrangements
5           are made so my clients can review the electronic
6           portions of their discovery.
7    Q      And then after you have the opportunity to review
8           that, do you have discussions with them about the
9           discovery and about the theory of the case as you
10          might see it from a criminal defense perspective?
11   A      Yes.
12   Q      And did you have those conversations with Mr. Lee?
13   A      I mean I generally talked about the case.  I didn't
14          discuss every evidentiary decision with him.  So
15          the -- you know, the nature of the -- some of the
16          objections that are being raised by Miss Babcock, I
17          don't believe I discussed each and every one of those
18          things with Mr. Lee.
19   Q      Certainly.  But in regards to like generally
20          preparing for trial and having some discussions with
21          him about what witnesses you think are important,
22          what witnesses or thoughts that he might have for his
23          case, you might have those conversations with him?
24   A      In a general way, yes.  I mean my focus with my
25          clients is going to be generally on the theory of the
```

49

```
 1         case, what the theory of defense is going to be - I
 2         think that's a client's decision, not a
 3         lawyer's -whether or not the client should testify in
 4         a trial, what some of the defense strategy should be,
 5         you know, but I don't do things like discuss, you
 6         know, each and every decision that I make or
 7         objections I'm going to make in advance.  I don't,
 8         generally speaking, do that.
 9    Q    Certainly.  Now, when you talk about a defendant's
10         right to testify and having those conversations, as
11         part of that conversation would you have also talked
12         to him about the statements that he made to law
13         enforcement?
14    A    Yeah.  That would be part of -- all of the statements
15         that are made by any particular client, having
16         discussions with that client, we would talk about the
17         pros and cons of testimony, including what -- what a
18         prosecutor might cross-examine a client about.
19    Q    And certainly you would have conversations with him
20         about whether or not there should be any -- whether
21         or not he made statements to law enforcement, that
22         that might also impact his decision to testify or
23         not, you might talk about some of that strategy?
24    A    I don't recall specifically discussing that with
25         Mr. Lee in this particular case.  Generally speaking,
```

50

```
1              I would discuss it with my clients.
2      Q      Now you indicated you had gotten a video recording of
3              Mr. Lee's interview as well as a transcript.  Do you
4              recall that?
5      A      I received all of the video recordings from the State
6              in discovery, and then we had various secretaries
7              transcribe the recorded statements of – and there
8              were a lot of them in this case – by the witnesses.
9              In fact, I think that we -- and some of them had to
10             get sent out.  So we were getting transcripts almost
11             all the way up to trial in this case because there
12             were so many of them.
13     Q      And certainly the defendant's statements would -- or
14             statements or interviews to law enforcement would
15             have been one of them?
16     A      I know we have a transcript of it.
17     Q      Now, you indicated that Mr. Weitz was more local in
18             the Oshkosh area but that both of you met with him on
19             multiple occasions to prepare for trial and during
20             the course of the trial?
21     A      Yes.
22     Q      And you were able to go through all of the discovery
23             and all of the issues that you felt were necessary to
24             go through with him?
25     A      Yes.
```

```
 1   Q   In this case there were a lot of motions that were
 2       addressed prior to trial, would you agree?
 3   A   Yes.
 4   Q   And as a criminal defense attorney, you would
 5       certainly consider the filing of any motion to
 6       suppress the defendant's statements; would that be
 7       fair?
 8   A   Yes.
 9   Q   And in your experience and your knowledge, you know
10       that you have the ability to file that in advance of
11       trial or can file at any time during the course of
12       the trial before that testimony would come in?
13   A   A defendant's statement can be done at any time.  The
14       statutes require a judge to -- it's not waived if you
15       don't file it in advance of trial, whereas you may
16       waive other issues, let me put it that way.
17   Q   You could have still filed that as you did during the
18       course of the trial?
19   A   Apparently.
20   Q   And you did so in this case as indicated?
21   A   Apparently that's what the date stamps show.
22   Q   But that's an acceptable practice, correct?
23   A   It's not generally my practice, but I usually do that
24       in advance of trial.
25   Q   Okay.  And part of what you testified about
```

52

```
1          previously is that you had filed that to preserve the
2          record should you need to have that motion in advance
3          of his statements coming in.  Do you recall that?
4     A    Yeah, that must be true.
5     Q    And that during the course of the trial you made a
6          strategic decision not to pursue that motion any
7          further because you felt the first portion of that
8          was coming in and you wanted to try to mitigate
9          the -- with the second half; is that fair?
10    A    Yes.
11    Q    So that was a specific strategic decision on your
12         part with the defendant?
13    A    You mean did I discuss that decision with Mr. Lee,
14         when you say with the defendant, or did I make that
15         decision?
16    Q    That you made that decision.
17    A    I made that decision, yes.
18    Q    Do you recall if you talked to Mr. Lee about that?
19    A    I do not.
20    Q    Would it normally be in your practice to have a
21         conversation with him about that part of the case?
22    A    Not necessarily.
23    Q    And you were aware that you could have brought that
24         motion up if you in fact wanted to pursue that motion
25         further, correct?
```

53

```
 1   A   Yes.

 2   Q   And there were times as you previously talked about

 3       where you addressed motions and issues in the morning

 4       before trial?

 5   A   I think we did that every day.

 6   Q   And there would have certainly been times during

 7       lunch or at the conclusion of the day after the jury

 8       left that those issues, including that suppression

 9       motion, could have been heard, correct?

10   A   I think it could have been, but I think generally

11       speaking we had our conversations with the judge in

12       the mornings, not over lunch or at the end of the

13       day.

14   Q   Okay.  But there was certainly -- if you wanted to

15       have that motion heard, you certainly could have

16       asked the court for that, correct?

17   A   Of course.

18   Q   Now, in regards to the information regarding the

19       first topic about your boyfriend shot my boyfriend,

20       you had indicated that the court had already made a

21       ruling on that as it related to the excited

22       utterance, correct?

23   A   Yes.

24   Q   And after that particular issue was litigated, you

25       made a strategic decision not to keep coming back to
```

54

```
 1          that particular issue because you -- you determined
 2          when you want to keep objecting versus when it's
 3          something to just let go in a case, would you
 4          agree?
 5    A     I made a decision, I agree with that.
 6    Q     And throughout the course of the testimony of the
 7          witnesses, was it, as you recall, with that statement
 8          being made within minutes of the shooting and would
 9          certainly fall in line with what would be an excited
10          utterance as the testimony provided?
11    A     My review of the case law is that that's -- an
12          appellate court would uphold the admission of that
13          statement as an excited utterance.  It's a
14          discretionary decision by the trial judge, and I
15          don't think any appellate court would have said that
16          the trial judge abused his discretion with regard to
17          that statement.
18    Q     But during the course of the trial, there were many
19          witnesses who talked about the timing of that
20          statement as it related to the shooting.  Would that
21          be correct?
22    A     I think so.  The -- Miss Babcock referenced a few
23          different witnesses.
24    Q     Do you recall also taking up the issue prior to
25          Johnny Thao testifying as well outside of the
```

55

1       presence of the jury at all?

2    A   I don't recall.

3    Q   But if the transcript showed that, that would be

4        accurate?

5    A   If the transcript shows it, yes.

6    Q   Now, in regards to the third issue which is the beat

7        the case, you indicated or you had testified that

8        there were basically two types of statements

9        regarding the beat the case.  There were some

10       statements as it related to whether or not witnesses

11       were going to show up for trial and trying to beat

12       the case by not having them testify; is that fair?

13   A   I don't think those statements existed in the case.

14       What I believe Judge Gill ruled was that had those

15       statements existed, they would be admissible because

16       then they would be more probative than prejudicial.

17       The probative value would be outweighed.  And in our

18       motion in limine, I believe that we argued that the

19       way those statements existed in this particular case,

20       that probative value did not exist and those

21       statements were prejudicial and the prejudicial

22       impact outweighed the probative value.

23   Q   In regards to the Exhibit 207 which references

24       Exhibit 91, I think you perhaps still have that in

25       front of you, you talked about the statements about

56

1      him making comments about hating Paul and Joe, and

2      then you talked about, I think the language in here

3      said, fucking punks more like it, and then said, I'm

4      pretty sure I'll beat this case though.  Do you

5      recall that?

6  A    Yes.

7  Q    And that I'm pretty sure I'll beat this case though

8      could also be the statement of an innocent person who

9      is just saying I'm going to be found not guilty,

10     correct?

11  A    Yes.  It's my belief that this statement was of the

12     type that the judge said should not have been allowed

13     into evidence.

14  Q    And it's certainly something, though, that while he

15     says, I'm pretty sure I'll beat this case though,

16     could arguably be it's not saying that he did it,

17     he's just saying that he believes he can be found not

18     guilty.  Would that be fair?

19  A    I don't presume to know what's in Mr. Lee's mind when

20     he made a statement.  What I can say is that we

21     argued that statements of this nature should not be

22     permitted into evidence and that we got a ruling from

23     the judge in our favor that these kinds of statements

24     should not have been permitted into evidence, and

25     therefore I don't understand why this went to the

```
1          jury, or was presumably admitted during the course of
2          the trial, because it's my belief that the court
3          excluded statements of this nature because they were
4          not evidence of guilt.
5      Q   And during the course of the trial, however, you
6          indicated that each morning you would meet and you
7          would discuss each item that went back to the jury,
8          correct?
9      A   That's correct.  And I have no independent
10         recollection of this, but what I can say is we did
11         not make any strategic decision to allow this in
12         front of the jury.  I don't know if the judge later
13         ruled it was allowed in or whether there was an error
14         by defense counsel.  I cannot tell you because I
15         don't have an independent recollection.
16     Q   Okay.  But there is other things in here that are
17         clearly redacted?
18     A   Yes.  And I have no idea what they are.
19                  ATTORNEY TEMPELIS:  I don't think I have
20         anything further at this time.
21                  THE COURT:  Okay.  Attorney Babcock, any
22         follow-up questions?
23                  ATTORNEY BABCOCK:  Just a couple, Judge.
24              **EXAMINATION OF DEBORAH VISHNY**
25     **BY ATTORNEY BABCOCK:**
```

58

1    Q    Attorney Vishny, you were just asked about the beat

2         the case testimony or the portion that went to the

3         jury, and I believe you said that you could not

4         recall any strategic decision or lack thereof or

5         ruling in terms of why that went, correct?

6    A    Correct.

7    Q    But for certain there were discussions from the time

8         that the jury went to deliberate until the time the

9         verdict was rendered between the parties and the

10        judge, correct?

11   A    If the jury asked questions, I'm certain that Judge

12        Gill called us into court, read us the questions,

13        that we said what our position was on the questions.

14        That's standard practice, and I'm assuming that that

15        happened in this court.

16   Q    But based on what you've said today, is it fair to

17        say that you would not be able to reconstruct the

18        record to say what happened?

19   A    That's correct.

20   Q    Would Chong Lee have been present during those

21        discussions, would he have been in the courtroom?

22   A    I don't remember.

23   Q    Do you recall if you ever asked for him to be

24        present?

25   A    I don't remember.

```
1    Q    And, finally, obviously it's clear on the record that
2         you have a wealth of experience, certainly more than
3         I do, but there were a lot of moving parts in this
4         trial, it was a couple weeks long, is it possible
5         that you or your co-counsel could have simply missed
6         something?
7    A    Of course.
8                   ATTORNEY BABCOCK:  That's all I have,
9         Judge.
10                  THE COURT:  Attorney Tempelis, anything
11        further?
12                  ATTORNEY TEMPELIS:  No.
13                  THE COURT:  And I don't have any questions,
14        Attorney Vishny.
15                  THE WITNESS:  Am I excused?
16                  ATTORNEY BABCOCK:  From my perspective,
17        yes.
18                  THE COURT:  Attorney Tempelis?
19                  ATTORNEY TEMPELIS:  Yes.
20                  THE COURT:  All right.  You are excused.
21        Thank you.
22                  ATTORNEY BABCOCK:  Judge, I do believe
23        based on the testimony that it will be necessary to
24        call Attorney Weitz.  This is a big case, I think it
25        will be appealed in any event, so I would like to
```

60

```
1          preserve that.

2                    THE COURT:  Understood.  And I do know,

3          only because I've had Attorney Weitz subsequent, he's

4          now handling, I think, I want to say exclusively 980

5          cases, which I think necessitates him traveling to

6          multiple jurisdictions as a byproduct of that, and so

7          it may be difficult to pin him down at least in the

8          immediate future, but I'm fine, that's fine, we

9          can -- we'll figure it out.

10                   ATTORNEY BABCOCK:  Thank you, Judge.  I

11         believe the best procedure then would be if I could

12         maybe get some dates with your clerk, coordinate with

13         Attorney Weitz, and then I will move the Court of

14         Appeals for any necessary extension.

15                   THE COURT:  Okay.

16                   ATTORNEY BABCOCK:  Just a final point that

17         I wanted to bring up.  I want to on a potential

18         appeal avoid any argument of forfeiture in terms of

19         whether I ask -- I don't really want to ask Attorney

20         Weitz all these same questions and go through all of

21         this.  What I would propose is to be able to show him

22         a copy of the transcript from today's hearing, and if

23         the State objects to that, that's -- that's fine, but

24         I think that might be the most efficient method would

25         be to go through that transcript, say if he has a
```

```
 1          different recollection or would do anything
 2          different, otherwise I think I probably need to go
 3          through all of that with him.  I'm fine doing it
 4          either way, but I just wanted to hash that out ahead
 5          of time.
 6                    ATTORNEY TEMPELIS:  I think -- I think,
 7          because he would be sequestered for a hearing like
 8          this, it would make sense just to have him be asked
 9          the questions.
10                    THE COURT:  That's fine.
11                    ATTORNEY BABCOCK:  That's fine, Judge.
12          That's all.
13                    ATTORNEY VISHNY:  Are myself and Attorney
14          Weitz sequestered?  I didn't hear -- because I was
15          actually planning to discuss this with him.
16                    THE COURT:  I did not make that order.  Is
17          that what you're requesting, Attorney Babcock?
18                    ATTORNEY BABCOCK:  I am not.
19                    ATTORNEY TEMPELIS:  I would, just from the
20          standpoint that if he would have been here, I would
21          have asked.
22                    THE COURT:  Okay.  I'll grant the
23          sequestration.
24                    ATTORNEY VISHNY:  That's fine.  I just want
25          you to know that prior to the order and prior to me
```

1      testifying, I was emailing Attorney Weitz about some
2      of the things going on in the courtroom that don't
3      really bear on the testimony, but I don't think I
4      broke any court orders.
5              THE COURT:  And I would imagine -- I'm not
6      concerned.  I mean, quite frankly, Attorney Weitz
7      would have had a copy of the motion, and I think, you
8      know, he wouldn't know what transpired today, he
9      didn't know what questions you would be asked, and
10     I'm not concerned about that, Counsel.
11             ATTORNEY VISHNY:  Okay.  Thank you.
12             ATTORNEY BABCOCK:  That's all I have,
13     Judge.  Thank you.
14             THE COURT:  Attorney Tempelis, anything
15     further?
16             ATTORNEY TEMPELIS:  No.  I think just the
17     easiest thing would be is if we could have a phone
18     conference with your judicial assistant to try to
19     find a day where all the parties can meet, so that's
20     fine.
21             THE COURT:  I think that's fine.  What
22     we'll do is we'll have Attorney Weitz obviously get
23     on that so that we can coordinate the schedules to
24     make it as efficient as possible for everyone.
25             ATTORNEY BABCOCK:  Very good.  Thank you,

63

```
1          Judge.

2                      THE COURT:  Very good.  Thank you.  We will

3          be adjourned.

4                          (Proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:22-cv-00620-WCG    Filed 11/11/22    Page 64 of 65    Document 26-29

396-64

```
 1

 2

 3                    C E R T I F I C A T E

 4

 5   STATE OF WISCONSIN      )
                             ) ss.:
 6   COUNTY OF OUTAGAMIE     )

 7

 8

 9           I, JOAN BIESE, RMR/CRR, do hereby certify that I
     am the official court reporter for Branch IV of the
10   Circuit Court of Outagamie County;

11           That as such court reporter, I made full and
     correct stenographic notes of the foregoing proceedings;
12
             That the same was later reduced to typewritten
13   form;

14           And that the foregoing proceedings is a full and
     correct transcript of my stenographic notes so taken.
15

16           Dated this 27th day of March, 2018.

17

18
                             Electronically signed by
19                           Joan Biese, RPR/RMR/CRR
                             _____
20

21

22

23

24

25
```

65