FILED
05-03-2018
Clerk of Circuit Court
Outagamie County
2013CF001074

1    STATE OF WISCONSIN    CIRCUIT COURT    OUTAGAMIE COUNTY

2    _____

     **STATE OF WISCONSIN,**
3
                    Plaintiff,
4    v.                              **Case No. 13-CF-1074**

5    **CHONG LENG LEE,**

6                    Defendant.
     _____
7
                  **POST-CONVICTION MOTION HEARING**
8    _____

9
     BEFORE:        **HONORABLE GREGORY B. GILL, JR.**
10                  Circuit Court Judge, Branch IV
                    Outagamie County Justice Center
11                  Appleton, WI  54911

12
     DATE:          **May 1, 2018**
13

14   APPEARANCES:   **MELINDA TEMPELIS**
                    District Attorney
15                  Appearing on behalf of the State

16                  **ALEX DUROS**
                    Assistant District Attorney
17                  Appearing on behalf of the State

18                  **ANA BABCOCK**
                    Attorney at Law
19                  Appearing on behalf of the Defendant

20                  **CHONG LENG LEE**
                    Defendant
21                  Appearing in person

22

23

24   Joan Biese
     Official Reporter, Branch IV
25   Outagamie County

1

Exhibit 29

```
1                        I N D E X

2

3   WITNESS                                              PAGE

4   EVAN WEITZ
```
```
         Examination by Attorney Babcock...................   6
5        Examination by Attorney Tempelis..................  27
         Examination by Attorney Babcock...................  34
```
```
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2

| | |
|---|---|
| 1 | **TRANSCRIPT OF PROCEEDINGS** |
| 2 | THE COURT:  All right.  We are on the |
| 3 | record in 13CF1074, *State of Wisconsin v. Chong Lee*. |
| 4 | Mr. Lee appears in person along with his |
| 5 | counsel, Attorney Ana Babcock.  The State is |
| 6 | represented by Outagamie County District Attorney |
| 7 | Melinda Tempelis.  Also seated at counsel table is |
| 8 | Assistant District Attorney Alex Duros. |
| 9 | This is a continuation of a motion hearing which |
| 10 | had started on February 26th of this year.  At that |
| 11 | time, to the best of my recollection, we had |
| 12 | completed the questioning of Attorney Vishny, and we |
| 13 | were going to then have some questions of Attorney |
| 14 | Weitz; is that correct? |
| 15 | ATTORNEY BABCOCK:  Yes, Your Honor.  And |
| 16 | Attorney Weitz is here. |
| 17 | Just a couple preliminary matters.  As last |
| 18 | time, I do intend to show Attorney Weitz the |
| 19 | transcripts and one of the exhibits from the trial. |
| 20 | Like last time, I -- I don't plan on marking those as |
| 21 | separate exhibits since they're already part of the |
| 22 | court record. |
| 23 | Second, I do believe Attorney Weitz would like |
| 24 | the court to conduct a colloquy with my client in |
| 25 | terms of his waiver of the attorney/client privilege. |

3

```
1                    THE COURT:  Very good.  I'll do so at this

2          time.

3               Mr. Lee, please raise your right hand.

4                    (Oath administered to defendant.)

5                    THE DEFENDANT:  I do.

6                    THE COURT:  All right.

7               Now, Mr. Lee, we had previously had a -- a jury

8          trial where Attorney Evan Weitz was one of your

9          attorneys; he was -- he was co-counsel with Attorney

10         Vishny, correct?

11                   THE DEFENDANT:  Correct.

12                   THE COURT:  You do understand that as a

13         byproduct of that, there is a privilege that is

14         recognized under the law known as attorney/client

15         privilege.  You do understand that?

16                   THE DEFENDANT:  I do.

17                   THE COURT:  Amongst other things, that

18         would mean that any strategies, any discussions,

19         things of that nature, are essentially privileged

20         communications between yourself and Attorneys Weitz

21         and Vishny.

22                   THE DEFENDANT:  Yup.

23                   THE COURT:  And do you understand that that

24         is a privilege which would surpass and extend beyond

25         the completion of the trial?
```

4

```
 1                    THE DEFENDANT:  Yes, I do.

 2                    THE COURT:  And moreover, sir, you

 3         understand that that would be a privilege that

 4         Attorney Weitz would respect absent you waiving that

 5         privilege as the -- as the client.  Do you understand

 6         that?

 7                    THE DEFENDANT:  I understand.

 8                    THE COURT:  And with respect to that,

 9         Mr. Lee, what is your desire as it relates to the

10         attorney/client privilege as it relates to Attorney

11         Weitz's representation?

12                    THE DEFENDANT:  I'll waive it.

13                    THE COURT:  Has anyone made any threats or,

14         alternatively, forced you to waive your right or --

15         try that again.  Has anyone made any threats or,

16         alternatively, forced you to waive that privilege?

17                    THE DEFENDANT:  No.

18                    THE COURT:  Has anyone made any promises to

19         get you to waive that attorney/client privilege?

20                    THE DEFENDANT:  No.

21                    THE COURT:  Do you have any questions for

22         me on the attorney/client privilege?

23                    THE DEFENDANT:  No.

24                    THE COURT:  Do you need any additional time

25         to discuss this matter with Attorney Babcock as it
```

5

```
 1          relates to the pros, the cons of waiving that
 2          privilege?
 3                       THE DEFENDANT:  No.
 4                       THE COURT:  Okay.  And with that, then, I
 5          accept your waiver of the attorney/client privilege.
 6               Attorney Weitz, are you satisfied with that
 7          colloquy, sir?
 8                       ATTORNEY WEITZ:  I am, Your Honor.
 9                       THE COURT:  Okay.  Very good.
10               And with that, Attorney Babcock, are we prepared
11          to proceed?
12                       ATTORNEY BABCOCK:  I would call Attorney
13          Weitz to the stand.
14                       THE COURT:  Very good.
15                       (Judge administers oath to witness.)
16                       THE WITNESS:  I do.
17                       THE COURT:  You may be seated.
18               And could you please state your name, spell the
19          last for the record.
20                       THE WITNESS:  Evan Weitz.  Last name is
21          spelled W-E-I-T-Z.
22                       THE COURT:  All right.
23               And, Attorney Babcock, your witness.
24                    **EXAMINATION OF EVAN WEITZ**
25     **BY ATTORNEY BABCOCK:**
```

```
 1   Q    Attorney Weitz, how are you employed?

 2   A    I am an attorney for the State Public Defender's

 3        office.

 4   Q    And how long have you been employed in that

 5        capacity?

 6   A    Since September of 2011.

 7   Q    And when did you graduate from law school?

 8   A    Earlier in 2011.

 9   Q    So is it fair to say that your practice area has

10        always been criminal defense?

11   A    Correct.

12   Q    And do you recall the trial in this case?

13   A    I do.  It's been some time though.  It was about two

14        years ago.

15   Q    At the time had you ever been involved in a homicide

16        trial?

17   A    This would be the first homicide trial that I

18        actively represented someone in.  As an attorney I

19        was involved in some homicide cases in law school.

20   Q    And you had co-counsel in this case, correct,

21        Attorney Vishny?

22   A    Yes.

23   Q    Can you kind of describe the nature of your

24        professional relationship with Attorney Vishny in

25        terms of were you co-counsel on equal footing, was
```

7

```
 1        one of you lead counsel, second chair, what was that
 2        like?
 3   A    I would say Attorney Vishny was lead counsel in this
 4        case.  Certainly she had much more experience in
 5        trying homicide cases, so she was lead counsel.
 6        Also, I came into this case somewhat later on,
 7        replacing another attorney who left the public
 8        defender's office.
 9   Q    And how did you and Attorney Vishny divide up the
10        workload?  Did you cover some areas together, did
11        you -- were you responsible for some specific areas
12        only and her, too, can you kind of describe that?
13   A    I would say it was a pretty collaborative
14        relationship.  I don't know that I would say there
15        was any specific area.  Certainly there was areas
16        that one or the other of us spent more time working
17        on, but there was nothing that we didn't discuss
18        together as far as that goes.  In terms of witnesses,
19        we tried to divide those up in terms of who would
20        prepare what witnesses, but we did discuss those
21        preparations.
22   Q    So in terms of the witnesses, at trial, if there was
23        some objectionable information coming in from one of
24        the witnesses, would it be up to either of you to
25        object or would it -- was it -- would it fall within
```

```
1          the purview of the person who had prepared that
2          witness or was prepared for that witness?
3    A     My recollection was the objections would be the
4          responsibility of the person who was doing the
5          cross-examination or direct examination that day.
6    Q     So if Attorney Vishny was responsible for
7          cross-examination of a particular witness, some
8          potentially objectionable information came out, or an
9          objectionable question, would you, assuming that she
10         did not insert an objection, would you have objected
11         over her?
12   A     I probably would have maybe said something to her if
13         I thought that it was -- rose to the level that it
14         was extremely problematic and she was missing
15         something, but I can't recall whether or not that
16         ever occurred.
17   Q     And do you recall the witness Brittany Olson?
18   A     I do.
19   Q     Can you explain briefly who she was?
20   A     My recollection is that Brittany Olson would be the
21         girlfriend of the victim, Joshua Richards.
22   Q     And do you recall whether she testified that she saw
23         who the shooter was?
24   A     I can't recall that, whether she did one way or the
25         other.
```

9

```
 1    Q    Would you have any reason to dispute it if I told you

 2         the transcript doesn't identify her identifying the

 3         shooter?

 4    A    No, I would not dispute that.

 5    Q    And Alyson Blom, do you know who she is?

 6    A    She was one of the friends in the group of people

 7         that went to Luna that night.

 8    Q    And do you recall where she was in relation to

 9         Mr. Lee when they were exiting the bar that night?

10    A    When we're talking exiting, because there was various

11         cameras, are we talking about the front doors

12         exiting?

13    Q    Yes.

14    A    I believe she was either immediately in front of or

15         immediately behind Mr. Lee.

16    Q    And do you recall any evidence coming out at trial in

17         terms of any comments that Brittany made to Alyson?

18    A    I believe there was some talk of, your friend did

19         this, or your friend shot my friend or boyfriend or

20         something of that nature.

21    Q    And would you dispute that the State was arguing that

22         Mr. Lee was that friend of Alyson Blom's who Brittany

23         was accusing of the shooting?

24    A    I think that was an argument that they made.  I don't

25         know that that connection was ever clearly
```

```
 1          established, but I think the State did argue that.
 2                     ATTORNEY BABCOCK:  Judge, may I approach?
 3                     THE COURT:  You may.
 4     Q    (BY ATTORNEY BABCOCK)  Attorney Weitz, I am showing
 5          you a portion of the transcript from Day Two of the
 6          jury trial, February 25th, 2016.  I'll direct your
 7          attention to Page 142.
 8                     THE COURT:  That was Day Two transcript,
 9          Counsel?
10                     ATTORNEY BABCOCK:  Yes, Judge.
11     Q    (BY ATTORNEY BABCOCK)  If you could just take a
12          moment and review the highlighted portion on there.
13     A    (Witness complying.)  Okay.
14     Q    Are you -- after reading this transcript, are you
15          familiar with what this testimony was?
16     A    I believe it was one of the officers.  There was a
17          question posed to them of what upset woman was
18          saying.  I believe that was in reference to Brittany
19          Olson.
20     Q    And you objected to that question?
21     A    Yes.
22     Q    And it appears from the transcript that a bench
23          conference was held.  Do you recall what the basis of
24          your objection was?
25     A    I don't recall specifically.  I would probably guess
```

11

```
1          that it would be based on hearsay grounds.

2     Q    Now, if you want to flip to Page 154?

3     A    Okay.

4     Q    The judge, if you look on there, does make a summary

5          of that bench conference and indicates, as you have

6          just testified to, that you objected on hearsay

7          grounds.  Was there any other basis upon which you

8          objected?

9     A    I can't recall one way or another.

10    Q    Now, you objected on hearsay, but why -- apart from

11         it being hearsay, why was it important to keep that

12         statement out of court or outside of the jury?

13    A    Well, I guess it's hard for me to say specifically

14         what I was thinking at that particular moment.  I

15         certainly -- I think it would be problematic to bring

16         in any sort of statements through that officer as to

17         what that particular person was saying and was the

18         reason for the objection.

19    Q    Now, you knew that statement to be what you testified

20         to earlier in terms of your friend shot my friend or

21         your boyfriend shot my boyfriend, correct?

22    A    Correct.

23    Q    Did you believe that that statement was helpful for

24         the defense?

25    A    I don't think it would be.
```

12

```
 1    Q    Did you think it was hurtful for the defense?

 2    A    As I said before, I -- the degree to which -- how

 3         hurtful it would be, I don't know that there was ever

 4         a clear link established between Mr. Lee being the

 5         boyfriend of Alyson Blom.  I think that her -- if I

 6         recall correctly, her testimony was that she was not

 7         in a relationship with Mr. Lee, but I would agree

 8         that I don't think it was particularly helpful to the

 9         defense case.

10                   ATTORNEY BABCOCK:  May I approach again,

11         Judge?

12                   THE COURT:  You may, Counsel.

13    Q    (BY ATTORNEY BABCOCK)  I'm showing you Day Three of

14         the jury trial transcripts, February 26th, 2016.  If

15         you can turn to Page 13 on there.  And it's not a

16         complete version, so you might not go 13 pages in.

17             This particular witness is addressing Johnny

18         Thao; is that correct?

19    A    It appears so, yes.

20    Q    And was this your witness for cross-examination or

21         Attorney Vishny?

22    A    It looks like Attorney Vishny was doing the

23         cross-examination of Mr. Thao.

24    Q    And if you can look at that Page 13 at Line 18, can

25         you read what's indicated in that transcript?
```

13

```
 1    A    Do you want me to read it out loud?

 2    Q    Sure.

 3    A    Line 18 says:  Yes.  She stated something along the

 4         lines of your friend shot my friend.

 5    Q    And there was no objection from the defense?

 6    A    I don't see one.

 7    Q    Can you indicate any strategic reason why you would

 8         not object to that information coming in?

 9    A    I can't recall specifically one way or another.  I

10         would note, though, that it appears that this came

11         after the previous ruling on a similar objection as

12         to that particular statement being an excited

13         utterance.

14              ATTORNEY BABCOCK:  May I approach, Judge?

15              THE COURT:  You may, Counsel.

16    Q    (BY ATTORNEY BABCOCK)  I'm showing you what is the

17         Day Six transcript from March 2nd, 2016.  And if you

18         could turn to Page 57.  That's witness Jonathan

19         Nielsen, correct?

20    A    Yes.

21    Q    And who handled the cross-examination of

22         Mr. Nielsen?

23    A    It looks like I did.

24    Q    And if you could turn to Page 63 and read Lines 1

25         through 3.
```

```
 1   A     (Witness complying.)  Okay.

 2   Q     Could -- I guess to shorten things up, essentially,

 3         it's the same comment that we've been talking about,

 4         right, your boyfriend shot my boyfriend, something

 5         along those lines, correct?

 6   A     Yes.  The transcript says:  The girl who was

 7         attacking said to the effect of he shot my boyfriend,

 8         your boyfriend shot my boyfriend.

 9   Q     And again there is no objection there?

10   A     I don't see one.

11   Q     Any strategic reason why you would not object?

12   A     I can't recall one way or another.  Again, it could

13         have potentially been because of the prior ruling on

14         a similar objection.

15   Q     Now, going back to Alyson Blom, that was Attorney

16         Vishny's witness to cross-examine, correct?

17   A     I'd have to see the transcript.  I believe you're

18         correct.

19   Q     All right.  If you look at that Day Two transcript at

20         156?

21   A     Yes, that would be Attorney Vishny's witness.

22   Q     And I'd ask you to actually go now to the Day Three

23         transcript at Page 14.

24   A     Okay.

25   Q     And that would be Johnny Thao again.  If you
```

15

```
 1        reference Page 10, it would have his name?
 2    A   Yes, it appears so.
 3    Q   And then going back to, excuse me, Page 13.  I'm
 4        sorry about that.  Strike that.
 5            Did you find -- I guess with relation to the
 6        statement on Page 13, Line 18 and 19, did you find
 7        anything objectionable -- objectionable about that
 8        statement other than hearsay?
 9    A   I mean, it's difficult for me to say because kind of
10        the take-away point that I remember from Brittany
11        Olson is that she was particularly upset,
12        intoxicated, and seemed to be that her ability to
13        recall the events of that night or make observations
14        was somewhat questionable, so how much credence is
15        owed to her observations or statements I guess is a
16        question, so there potentially could be other
17        objections based on that.
18    Q   Now, I'll turn now to the motion to suppress
19        Mr. Lee's statements.  Now, you -- I sent you a copy
20        of my motion, correct, and you got a chance to review
21        it?
22    A   Yes.
23    Q   So you're somewhat familiar with these issues that
24        I'm discussing with you, right?
25    A   Correct.
```

```
1   Q   Now, in this case would it be fair to say that you
2       and Attorney Vishny filed many, many motions?
3   A   That would be perhaps an understatement.
4   Q   And typically in a case if you believe that there
5       were grounds to suppress your client's statement, is
6       that typically something you bring in advance of
7       trial or is it pretty standard to bring it during
8       trial?
9   A   I would say in advance.
10  Q   And do you recall in this case that you did file a
11      suppression motion based on Mr. Lee's assertion of
12      his right to remain silent during the interview and
13      that that was in the middle of the trial that you
14      filed that?
15  A   I can't recall specifically the filing timing, but I
16      believe there was a motion to that effect.
17  Q   Do you recall what the first day of the trial was?
18  A   What was addressed at the first day?
19  Q   If I told you it was February 24th, 2016, would you
20      have any reason to dispute that?
21  A   No.
22  Q   And if I told you that the motion to suppress the
23      defendant's statements was filed on March 2nd, 2016,
24      would you have any reason to dispute that?
25  A   If that's what's indicated on the motion.
```

17

```
 1   Q    Would you like to take a look at the motion?

 2   A    Sure.

 3             ATTORNEY BABCOCK:  May I approach, Judge?

 4             THE COURT:  You may, Counsel.

 5   A    Okay.

 6   Q    So would it be fair to say that that was several days

 7        into the trial that that motion was filed?

 8   A    It would appear so.

 9   Q    Did you believe that there were fairly compelling

10        grounds based on that motion to suppress Mr. Lee's

11        statements?

12   A    I -- certainly it appears that Mr. Lee did make a

13        statement that he didn't want to talk at some point

14        during the interrogation.

15   Q    And can you recall today why that motion was filed, I

16        guess, deep into the trial and not in advance of

17        trial?

18   A    I can't say why.  I don't recall one way or

19        another.

20   Q    And do you recall whether that motion was actually

21        litigated, calling the officer, having the officer

22        testify as to what happened in the interview, asking

23        the court to make a ruling on the suppression

24        issue?

25   A    I don't recall.  I'd have to read the transcript.
```

```
 1   Q    If I told you that that motion was not pursued in any
 2        of the transcripts, would you have any reason to
 3        dispute that?
 4   A    If that's what you're telling me, I trust that that
 5        is an accurate reflection of what occurred.
 6   Q    So based on the fact that you don't know whether it
 7        was pursued, is it fair to say that you cannot
 8        explain to us why it was abandoned?
 9   A    I do recall that there were some portions of the
10        interview that came post that particular statement of
11        Mr. Lee's that he didn't want to talk anymore that we
12        thought were perhaps helpful or better than the pre,
13        I guess, invocation statement.
14   Q    Do you recall specifically what those statements
15        were?
16   A    Well, I think prior to the statement of Mr. Lee's
17        that he didn't want to talk anymore, his -- my memory
18        serves me right, kind of his statements to police
19        were things along the lines of that he wasn't even at
20        Luna and some things that didn't necessarily make a
21        whole lot of sense given the other evidence.  Post
22        that statement there were some things that Mr. Lee
23        said that seemed to kind of rebut kind of -- the
24        police were trying to use the Reid technique to
25        suggest what do you think should happen to people who
```

19

```
 1          are responsible for someone's death and, you know,
 2          there may be reasons that someone is compelled to
 3          kill someone else, and Mr. Lee made some statements
 4          that it doesn't matter what your reasons are, if you
 5          kill someone, you kill someone, and you're equally
 6          responsible, and we thought that those were kind of
 7          helpful.  Or at least that's my recollection.
 8    Q     Now I want to turn to this issue of, as I call it,
 9          beat the case.  Do you recall that there were
10          significant litigation over some references by
11          Mr. Lee in terms of, I'm going to beat my case, I'll
12          beat this case, something along those lines?
13    A     Yes.
14    Q     And do you recall that the court ultimately ruled
15          that any reference to beat the case was
16          inadmissible?
17    A     I believe there was a ruling to that effect.
18                    ATTORNEY BABCOCK:  May I approach?
19                    THE COURT:  You may.
20    Q     (BY ATTORNEY BABCOCK)  I'm showing you the transcript
21          from Day Five, March 1st, 2016.  And if you could
22          just turn to Page 218.
23    A     Okay.
24    Q     Now, is there a Page 191 in that transcript that I've
25          given you?
```

20

```
 1   A    Yes.

 2   Q    So that witness is Stephanie Thao, correct?

 3   A    Correct.

 4   Q    Now, if you could again go to Page 218 please.

 5   A    Okay.

 6   Q    And this was your witness to cross-examine?

 7   A    I believe so, if my memory serves me right.

 8   Q    Now, on Page 218 it indicates she's talking about a

 9        letter that she received from Mr. Lee in the jail,

10        correct?

11   A    That's what it looks like the testimony is about.

12   Q    And then if you can turn to Page 220 and read for the

13        court Lines 6 and 7.

14   A    Fucking punks more like it.  I'm pretty sure I'll

15        beat this case though.

16   Q    And is it fair to say she was reading that from the

17        letter from Mr. Lee?  And you can scroll back up if

18        you need to.

19   A    That's the previous question from -- I believe

20        Mr. Maier was asking her to read the highlighted

21        portion of that letter.

22   Q    And there was no objection from you, correct?

23   A    I don't see one.

24   Q    Can you explain why you did not object when the court

25        ruled the beat the case phrase inadmissible?
```

```
 1   A    I don't remember specifically.  I would suspect
 2        because there was a number of letters, telephone
 3        calls, various things that the State sought to
 4        introduce as far as statements of Mr. Lee, and my
 5        memory is that we spent quite a bit of time in
 6        chambers going through each particular jail phone
 7        call and some letters from other witnesses, going
 8        through the portions that would be admissible and
 9        which persons were not allowed to come in.  I don't
10        have a specific recollection as to this letter and
11        what the decisions were, but I do remember that we
12        tried to carefully go through these before they were
13        being presented to the witnesses as far as what was
14        coming in and what was not coming in.
15   Q    Did the court make any rulings in terms of what would
16        come in and what would not come in while you were in
17        chambers?
18   A    I believe so as to which portions were admissible.
19   Q    And do you know if the court found this particular
20        portion of the letter, particularly the provision
21        relating to beat the case, admissible?
22   A    I can't say with specificity about this particular
23        letter, I just remember generally speaking that that
24        was something that we did for the letters and
25        telephone calls.
```

22

```
 1   Q   And do you recall whether you objected while you were

 2       in chambers having this discussion to the reference

 3       to beat the case coming into evidence?

 4   A   Again, I can't recall the specific discussions about

 5       this particular letter, just the general that that

 6       was something that was done in the case.

 7   Q   Now, do you recall the -- the final day of trial,

 8       that the evidence had concluded and that day just

 9       involved instructing the jury and closing

10       arguments?

11   A   Yes.

12   Q   And do you recall what happened -- I guess I'll just

13       walk you through this.  It's all in the transcripts.

14       Do you recall that when the jury -- when the judge

15       sent the jury out for deliberations -- let me back

16       up.  I sent you a copy of Day Eleven transcript,

17       correct?

18   A   I don't believe you did send me Day Eleven.

19              ATTORNEY BABCOCK:  May I approach?

20              THE COURT:  You may, Counsel.

21   Q   (BY ATTORNEY BABCOCK)  I'm showing you the Day Eleven

22       transcript from March 9th, 2016.  If you can turn to

23       Page 188 please.

24   A   Sure.

25   Q   Have you had a chance to review that?
```

```
 1    A    It appears that it's a discussion outside the
 2         presence of the jury.
 3    Q    I'm sorry.  I didn't hear that.
 4    A    It appears to be a discussion outside the presence of
 5         the jury.
 6    Q    And that bottom line indicates that further
 7         proceedings are held in a separate transcript
 8         recorded by Gloria Johnson, correct?
 9    A    That is the notation there.
10    Q    And then if you go down a few pages, there is another
11         transcript that states Jury Trial Day Eleven, same
12         date, and it indicates verdict, correct?
13    A    Yes.
14    Q    And that transcript just involves the reading of the
15         verdicts, polling of the jury, that sort of thing; is
16         that accurate?
17    A    That's what it appears to be.
18    Q    Now, between the time that the jury was sent out for
19         deliberations and the time that the verdict was
20         actually received on the record, there were a number
21         of questions submitted to the court by the jury; is
22         that correct?
23    A    I couldn't tell you how many.  I do remember that
24         there were some questions.
25    Q    And do you recall how you were alerted to those
```

```
 1        questions?

 2    A   I believe the court contacted us and then all the

 3        parties reconvened here in the courtroom.

 4    Q   And do you recall whether there was a court reporter

 5        during those discussions?

 6    A   I don't one way or another.

 7    Q   Do you recall whether Mr. Lee was present for these

 8        discussions?

 9    A   I don't remember one way or another.

10    Q   Are you able to recall the contents of what

11        specifically was discussed in terms of the questions

12        asked of the jury?

13              THE COURT:  Asked of the jury or by the

14        jury?

15              ATTORNEY BABCOCK:  By the jury.

16    A   If I saw the questions, I could remember what was

17        asked by the jury.

18              ATTORNEY BABCOCK:  May I approach?

19              THE COURT:  You may.

20    Q   (BY ATTORNEY BABCOCK)  I'm showing you what has

21        already been marked, or it's a copy of what's in the

22        court file of Jury Trial Exhibit 207.  Do you recall

23        that being one of the questions asked by the jury?

24    A   It appears so, that it's a question from one of the

25        jurors asking to see the letters from Chong to
```

```
 1         Stephanie and Melanie.
 2    Q    And if you page through past the first page, were
 3         those the letters that the court provided in response
 4         to the jury's question?
 5    A    It looks like it.
 6    Q    And if you go to the last page, can you see at the
 7         top of the page reference to beat the case, correct?
 8    A    Yes.
 9    Q    Do you recall specifically what was discussed in
10         terms of that particular question and whether
11         information would go to the jury?
12    A    I don't recall specifically what was discussed.  My
13         recollection was that we were careful about only
14         sending back what was testified to, which I believe
15         is why you see that there's redacted portions or
16         blacked out portions of the letters.
17    Q    And do you know how it was decided what would be
18         redacted?
19    A    Again, I think it's based on those conversations
20         about what was admissible and what was coming in and
21         what wasn't.
22    Q    Do you recall if you objected during that
23         conversation to the letter containing the phrase beat
24         the case going to the jury?
25    A    I don't recall one way or another.
```

```
 1                    ATTORNEY BABCOCK:  That's all I have,

 2          Judge.

 3                    THE COURT:  Attorney Tempelis, will you be

 4          taking the lead?

 5                    ATTORNEY TEMPELIS:  I will.  Thank you.

 6                    EXAMINATION OF EVAN WEITZ

 7     BY ATTORNEY TEMPELIS:

 8     Q    If we just want to start there and move back, it

 9          probably makes things go smoothest.

10               Now, that Exhibit 207, that was the same exhibit

11          with those letters that was referenced on Page 220

12          when that part was testified back on Day Five, right?

13          You had -- you had indicated that in reading Day Five

14          that there was a snippet of a letter that had been

15          testified to.  I think it was Page 220, Line 6

16          through 7.

17     A    The Day Five transcript on Page 217, I believe, is

18          where the discussion of that letter starts, and it

19          references Exhibit 92, which -- I don't see an

20          exhibit sticker on the photocopy I have, but I

21          believe that's that letter.

22     Q    Okay.  So when -- so the letter that was ultimately

23          given in 207 was essentially the same testimony that

24          had been provided earlier in the trial.

25     A    It looks like it's the same statement.
```

27

```
 1   Q   Okay.  So you were -- you had stated on direct that
 2       you were very careful that whatever letter went back
 3       to the jury only contained the information that was
 4       testified to at trial; is that correct?
 5   A   That's my recollection.
 6   Q   And from looking at Exhibit 207, there is a
 7       significant amount of that attached letter that is
 8       essentially blacked out; would that be accurate?
 9   A   That would appear to be accurate.
10   Q   And so only the portion as you can recall that was
11       testified to was ultimately shared, again to your
12       recollection.
13   A   That's my recollection.  I'd have to check the
14       transcript, but it appears that the statements that
15       were not blacked out were the ones that matched.
16   Q   Sure.  And you also testified that each day when you
17       were in -- during the course of the trial that there
18       were conferences between the court, Attorney Vishny,
19       yourself and the prosecutors for the State discussing
20       each individual exhibit and what was going to be used
21       and allowed in; is that accurate?
22   A   I don't know if it was each day.  I do remember that
23       there was one rather lengthy conference talking about
24       the telephone calls and the translations of those,
25       and I believe the letters were addressed at that one,
```

28

```
 1        too, if I remember correctly.

 2   Q    So that's consistent with what we're talking about as

 3        it relates to this particular piece of evidence?

 4   A    I would assume so, but as I testified earlier, I

 5        can't recall with specificity whether or not this

 6        particular letter was one that was discussed.

 7   Q    Okay.  And would you agree that there's a number of

 8        different ways that the "I'm pretty sure I'll beat

 9        this case" could be viewed, right?

10   A    Yes, I would agree.

11   Q    So if somebody believes that they're innocent or that

12        the jury should find them not guilty, I'm pretty sure

13        I'll beat this case would be something that someone

14        who believed they were not guilty might say.

15   A    I think that was the basis of the motions is that

16        it's not probative of anything one way or another.

17   Q    Okay.  But not harmful to your client either at the

18        time?

19   A    Depends how you interpret it.

20   Q    Right.  So, then, moving to the motion to suppress

21        statements that you had testified that there was this

22        comment that was made where the defendant indicated

23        he didn't want to talk anymore, correct?

24   A    I believe that was referenced in the motion, yes.

25   Q    And the defendant -- the defendant had done an
```

29

```
 1          interview with officers at the Appleton Police
 2          Department, correct?
 3     A    Yes.
 4     Q    And you had testified at the beginning portion of his
 5          interview that he made a lot of statements that were
 6          inconsistent with other pieces of evidence, correct?
 7     A    That's my recollection.
 8     Q    So, for example, him not being at the bar when there
 9          was clearly footage of him being there, as an
10          example, correct?
11     A    Correct.
12     Q    So then he makes the statement that he didn't want to
13          talk anymore, and it's your testimony that after that
14          statement there were actually statements that the
15          defendant made that were more helpful to defense that
16          he made; is that accurate?
17     A    That's my recollection, that there were some things
18          that came after that that were potentially helpful.
19     Q    And you and Attorney Vishny had talked about the
20          defendant's statements, I would imagine, with some
21          significance, correct?
22     A    I'm sure we did.
23     Q    And my -- my -- from what you talked about, my
24          understanding is that the two of you, even if you
25          divided up witnesses, were still talking about the
```

30

```
1        theory of the case and talking about issues in the
2        case that were presented as co-counsel, correct?
3    A   Yes.
4    Q   And certainly a decision to withdraw a motion and not
5        have it addressed may have very strategic reasons for
6        doing so, correct?
7    A   I would assume so.
8    Q   Because you had a lot of motions in this case prior
9        to trial; is that fair?
10   A   Yes.
11   Q   So when this issue wasn't addressed, do you recall a
12       strategic decision not to address it so you could
13       have those more helpful statements then come in to
14       off balance what was coming in on the front half of
15       that interview?
16   A   When I say that I remember that we thought that
17       those -- there was that portion of the interview that
18       was perhaps more helpful than the pre, I remember
19       that portion.  Whether or not that factored into
20       whether or not to pursue this motion to suppress
21       statements, I can't remember the connection between
22       those two, I just remember -- remembering that those
23       statements later in his interrogation were more
24       helpful.
25   Q   Is that part of Attorney Vishny's responsibility,
```

31

```
1        would have that have kind of fallen to her on that
2        particular decision, do you believe?
3   A    As I said, I mean, we certainly talked together about
4        things.  I don't recall one way or another who made a
5        decision about whether or not to pursue this.  I
6        just, quite frankly, don't remember.
7   Q    Okay.  Now, as it relates to the first issue, there
8        was testimony that different witnesses had testified
9        to the statement along the lines of your boyfriend
10       shot my boyfriend or my boyfriend shot that guy.  Do
11       you recall those statements?
12  A    Yes.
13  Q    You indicated that there was an objection early on
14       that the court had had a sidebar and then ultimately
15       put on the record that the court allowed that in as
16       an excited utterance.  Do you recall that?
17  A    Yes.
18  Q    When you were in trial, is it fair to say that there
19       are times where, once the court rules, that you don't
20       continue to object because you don't want to keep
21       having the jury focus on a particular item or
22       particular piece of information?
23  A    That could be one reason.
24  Q    And are there other strategies as to once the court
25       rules why a defense attorney might not continue to
```

```
 1          object to something the court has already ruled
 2          upon?
 3     A    Possibly.
 4     Q    And when -- after the Day Two statement was made and
 5          the court rules on that at the bench conference,
 6          there was testimony that that statement, I think you
 7          said on Day Three with Johnny Thao, that you had --
 8          or Attorney Vishny had not objected because, I think
 9          you said on direct that that had already been ruled
10          on.  Do you recall that?
11     A    I can't say why Attorney Vishny did or would not have
12          objected.
13     Q    But that would have been her call as that was her
14          witness?
15     A    Correct.
16     Q    So, then, when you have Mr. Nielsen on Day Six, that
17          statement has already come in at least two separate
18          times and the court has already ruled, correct?
19     A    The court has ruled once.  It came in another time.
20     Q    And so, then, you don't object on Day Six, but that's
21          the same -- essentially the same ruling that the
22          court already made; is that fair?
23     A    It's the same statement.
24     Q    Which the court already ruled upon, right?
25     A    Right.
```

33

```
1    Q    Okay.
2                    ATTORNEY TEMPELIS:  I don't have anything
3         else at this time.  Thank you.
4                    THE COURT:  Attorney Babcock, any
5         follow-up?
6                    ATTORNEY BABCOCK:  Just one follow-up on
7         the issue of the motion to suppress.
8                    EXAMINATION OF EVAN WEITZ
9    BY ATTORNEY BABCOCK:
10   Q    Now, Attorney Weitz, is it fair to say that in many
11        cases you, maybe at the infancy of the
12        representation, file a -- maybe a boilerplate motion
13        to suppress statements to preserve that issue in the
14        future?
15   A    It's possible.  That's one way of going about it.
16   Q    And if you do that, oftentimes that's abandoned
17        because you either discover there's no legal basis to
18        file that or for some reason you -- you don't want
19        the statement suppressed; is that true?
20   A    There is various reasons that you may pursue or not
21        pursue a motion, yes.
22   Q    And when you were in trial in this case, was the
23        trial going from eight a.m. to five p.m. each day?
24   A    Yeah.
25   Q    And I would assume you were working into the night
```

34

```
1         each evening?

2    A    I remember, yes, we would get done with the trial and

3         then spent the next probably five or six hours until

4         late in the evening preparing for the next day.

5    Q    And then you had to be up earlier again the next

6         morning and do it all again, right?

7    A    That's how it goes.

8    Q    So help me to understand.  I mean it sounds like time

9         was at somewhat of a premium, you had to spend your

10        time doing important things the night after each

11        trial, so why would you take the time to draft a

12        motion to suppress in the middle of trial and then

13        conclude that you actually didn't need that?  I mean,

14        I'm trying to figure out what went into the strategy

15        or the reasoning why -- why it was important enough

16        to draft in the middle of this busy trial initially.

17   A    And I really can't recall specifically this motion or

18        any discussions, so I don't know.

19   Q    But you did say that you do recall discussions that

20        you determined that ultimately the statements were

21        more helpful?

22   A    I remember discussions about that.  As I said on

23        cross-examination, I don't recall how that fits into

24        this particular motion and any decisions, but I do

25        remember discussions about the various kind of
```

35

1          portions of Mr. Lee's interview and early on how he
    2          was saying things that weren't particularly really
    3          helpful because they were refuted by the evidence,
    4          but then as the interview progressed, it seemed that
    5          there were things that kind of were more helpful in
    6          terms of him saying that there -- a person who does
    7          something like this should have responsibility and
    8          things like that.
    9    Q    And do you recall if those discussions happened
   10          before trial or during the trial?
   11    A    I would say probably both.  I know for sure they
   12          happened before trial.  I'm sure we probably talked
   13          about it during the trial at some point, but I can't
   14          recall specifically when -- at what point they may
   15          have occurred.
   16    Q    Do you recall specific discussions during the trial
   17          where you decided, okay, we filed this motion to
   18          suppress but now we're not going to pursue it?
   19    A    I don't recall one way or another.
   20                  ATTORNEY BABCOCK:  That's all I have,
   21          Judge.
   22                  THE COURT:  Attorney Tempelis?
   23                  ATTORNEY TEMPELIS:  No.  Thank you.
   24                  THE COURT:  Attorney Weitz, I don't have
   25          any questions.  You may be seated.

```
1              ATTORNEY BABCOCK:  If I co -- if I could

2         just get all those papers back.  Thank you.

3              THE WITNESS:  I'll bring them to you.

4              ATTORNEY BABCOCK:  So, Judge, at this point

5         I don't have any additional witnesses.

6              I am prepared to orally argue the case based on

7         what has been presented, really just supplementing

8         with what is in my initial motion based on the

9         testimony of trial counsel; but there is a new issue

10        that has come up that I learned about through the

11        testimony of Attorney Weitz and previously through

12        Attorney Vishny.  I'm aware that the -- this is going

13        to come as a surprise to the State, so I certainly

14        am -- think the court should give them an opportunity

15        to respond, but it's this issue with sort of this

16        missing record.  We didn't raise it earlier because I

17        wasn't sure without calling Attorney Weitz if we

18        would have someone who would be able to reconstruct

19        the record.  There are crucial portions of the record

20        that we don't have discussions of, and this is a

21        fairly awkward position for me to be in because that

22        duty to some extent does fall on the court, and so

23        I'm going to make my record with all respect to the

24        court for this.  I do need to make a record of it

25        this.
```

37

1          It sounds like from trial counsel's testimony
2     that there were in chambers, potentially, rulings on
3     admissibility of items, there could have been
4     objections to certain information coming in, and then
5     we also have this portion of the jury questions and
6     what was discussed after those jurors asked those
7     questions, what would go to them, what would be
8     redacted, whether there was any objection to certain
9     information going there, whether my client even knew
10    about what was happening or was present.  And the
11    case on point for this issue is *State v.  DeFillipo*,
12    D-E-F-I-L-L-I-P-O, 2005 Wisconsin Appellate 213.
13         And the reason that this issue hasn't been
14    raised earlier is that when there are portions of the
15    record missing, it's not necessarily grounds for a
16    new trial as long as that record can be
17    reconstructed.  And I've had this come up before
18    where transcripts were lost, notes were lost, and I
19    was able to get together with the trial attorneys and
20    they agreed on what happened at the hearing, the
21    court recalled what happened at the hearing, and we
22    were able to come up with a stipulation as to what
23    happened.  I have called everyone I could think of to
24    try to reconstruct this record, and from what the
25    testimony is, they just -- they can't remember

```
 1        exactly what was said.  I didn't call Attorney Duros,
 2        who I know was at the trial, but I did ask him if he
 3        recalled sort of what happened, was there a court
 4        reporter, what was going on during this time period,
 5        and he indicated that he could not.  The court also
 6        at the previous hearing indicated that it does not
 7        have a recollection in terms of what happened during
 8        that time period.
 9             So, based on that, under the DeFillipo case, an
10        inability to reconstruct a portion of the record is
11        grounds for a new trial, and we would be filing a
12        motion or moving to -- for a new trial based on those
13        grounds.
14                  THE COURT:  Okay.  Well, do you want -- do
15        you need to brief that any further?
16                  ATTORNEY BABCOCK:  I will do so, Judge.
17                  ATTORNEY TEMPELIS:  I think that should be
18        a motion and a brief in and of itself because
19        certainly that wasn't brought up for purposes of what
20        we were doing in the last two hearings so we'll want
21        to respond and look into it as well.
22                  THE COURT:  Correct.  I -- I would surmise
23        that would be the position taken by the State.
24                  ATTORNEY BABCOCK:  And I -- I completely
25        respect that.  That's in all fairness.
```

39

```
 1              THE COURT:  That's fine.  With that being
 2      the case, let me ask, Attorney Babcock, do you want
 3      to further summarize in some brief format what has
 4      transpired as a byproduct of testimony here for the
 5      last several days?
 6              ATTORNEY BABCOCK:  Well, Your Honor, being
 7      an appellate attorney, I certainly prefer the written
 8      word, so if I could simply include that in my brief
 9      on this reconstruction issue.  I would -- I know that
10      this may delay things, I would like to get the
11      transcript first just so I can be perfectly accurate
12      in terms of what exactly was said, so I would ask for
13      maybe two weeks after the transcript is prepared to
14      submit that brief.
15              THE COURT:  Why don't we -- we'll set -- I
16      was asking my court reporter about how much time it
17      would take to get the brief.  Why don't we -- an
18      initial submission we'll say May 25th, Attorney
19      Babcock, and then why don't we say June 15th for a
20      response, and then June 29th for a reply, if any.
21              ATTORNEY BABCOCK:  Thank you, Judge.
22              THE COURT:  That will be on both issues,
23      that being the substance that was addressed in the
24      initial motion, and then, of course, if there are any
25      items that are raised in the -- as you brought to
```

40

```
1          light now.
2                    ATTORNEY BABCOCK:  And, Judge, just to -- I
3          will prepare the order with regard to this
4          scheduling.  I will also request an extension from
5          the Court of Appeals, which I think it's perfectly
6          reasonable for them to grant.  I would just ask of
7          the court how long after the briefs are due would the
8          court like to render a ruling?
9                    THE COURT:  I imagine it would be 30 days.
10                   ATTORNEY BABCOCK:  All right.  I'll request
11         July 31st then.
12                   THE COURT:  All right.  Thank you.
13              Anything else, Attorney Babcock?
14                   ATTORNEY BABCOCK:  No, Your Honor.
15                   THE COURT:  Attorney Tempelis?
16                   ATTORNEY TEMPELIS:  No.  Thank you.
17                   THE COURT:  All right.  We are adjourned.
18                      (Proceedings concluded.)
19
20
21
22
23
24
25
```

```
 1

 2

 3                    C E R T I F I C A T E

 4

 5   STATE OF WISCONSIN     )
                            ) ss.:
 6   COUNTY OF OUTAGAMIE    )

 7

 8

 9          I, JOAN BIESE, RMR/CRR, do hereby certify that I
     am the official court reporter for Branch IV of the
10   Circuit Court of Outagamie County;

11          That as such court reporter, I made full and
     correct stenographic notes of the foregoing proceedings;
12
            That the same was later reduced to typewritten
13   form;

14          And that the foregoing proceedings is a full and
     correct transcript of my stenographic notes so taken.
15

16          Dated this 3rd day of May, 2018.

17

18
                              Electronically signed by
19                            Joan Biese, RPR/RMR/CRR
                              _____
20

21

22

23

24

25
```

42