IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

CHONG L. LEE,

   Petitioner,

  v.        Case No. 22-CV-620

RANDALL HEPP,

   Respondent.

## BRIEF OPPOSING PETITION FOR WRIT OF HABEAS CORPUS

## INTRODUCTION

Petitioner Chong L. Lee challenges his custody pursuant to a judgment of conviction for first-degree intentional homicide, unlawfully possessing a firearm as a convicted felon, and two counts of felony witness intimidation. (Dkt. 1:2.)

This Court should deny Lee's Petition and decline to issue a certificate of appealability. Lee's Ground One and Ground Two due process claims concerning nondisclosure and destruction of evidence fail because he has not shown that the Wisconsin Court of Appeals' decision rejecting them is contrary to, or an unreasonable application of, binding United States Supreme Court precedent. Lee's former Ground Three claim alleging ineffective assistance of trial counsel fails because he procedurally defaulted it and later abandoned it

in his brief. And Lee's renumbered Ground Three claim fails because he procedurally defaulted it and otherwise failed to show that the Wisconsin Court of Appeals' decision rejecting it is contrary to, or an unreasonable application of, binding United States Supreme Court precedent.

## STATEMENT OF THE CASE

The State charged Lee with first-degree intentional homicide by use of a dangerous weapon, possession of a firearm by a felon, solicitation of perjury, and four counts of felony intimidation of a witness as party to the crime. (Dkt. 26-6:4.) The charges arose from an early morning bar shooting that resulted in Joshua Richards's death. (Dkt. 26-6:2.)

Before trial, Lee moved to dismiss the homicide charge, arguing that police violated his due process rights by failing to disclose—and ultimately destroying—audio recordings of three witness interviews conducted within days of the shooting. (Dkt. 26-6:4–7.) In those interviews, witnesses Watou Lee, Mikey Thao, and Ryan Thao each provided physical descriptions of the gunman, though none specifically identified Lee by name.[1] (Dkt. 26-6:3.) Fearing for their safety, all three witnesses expressed desires not to be identified or involved in the case. (Dkt. 26-6:3.)

---

[1] For ease of reading, Respondent refers to several individuals by first name only given their shared surnames. Respondent will refer to the Petitioner as Lee.

Based on the witnesses' wishes, the State did not disclose to Lee that police had interviewed Watou, Mikey, or Ryan. (Dkt. 26-6:4.) Moreover, an officer would later testify that their interview recordings were ultimately destroyed given the witnesses' requests not to have their identities disclosed and based on the police's awareness that the recordings would be obtainable through discovery. (Dkt. 26-6:4.)

Nevertheless, Lee ultimately discovered the three witnesses' identities, police subsequently reinterviewed Watou, Mikey, and Ryan, and officers turned over their reports to the defense nearly a year and a half after the shooting. (Dkt. 26-6:4.) The substance of those interviews revealed that police had previously interviewed the same witnesses in December 2013, prompting Lee's counsel to request "reports, notes and recordings of the initial interviews." (Dkt. 26-6:4–5.) Defense counsel was subsequently advised that the recordings of the 2013 interviews were destroyed. (Dkt. 26-6:5.)

Lee subsequently moved to dismiss his homicide charge, arguing that police violated his right to due process by not disclosing and subsequently destroying the audio recordings of Watou's, Mikey's, and Ryan's initial interviews. (Dkt. 26-6:5.) The circuit court held that police violated Lee's right to due process by destroying potentially exculpatory evidence in bad faith but declined to dismiss the homicide charge, instead deciding that the appropriate

3

remedy would be to prohibit the State—but not Lee—from calling those three witnesses at trial. (Dkt. 26-6:5.)

Despite the witnesses' exclusion, the State presented overwhelming evidence that Lee was the person who killed Joshua Richards. This included four witnesses—Via Thao, Kong Vang, Stephanie Thao, and Joe Thor—who each testified that they personally heard Lee admit to the fatal shooting, two officer witnesses who testified that other men—Phong Lee and Paul Lee—advised during their interviews that Lee admitted to the shooting, and Melanie Thao, who testified that she did not hear Lee say anything about the shooting but later acknowledged that she previously told detectives that Lee, in fact, admitted to her about his role in the shooting. (Dkt. 26-21:136–37, 142.)

The jury ultimately convicted Lee of the charged homicide, possessing a firearm as a felon, and two counts of witness intimidation. (Dkt. 26-28:3–4.) The jury acquitted Lee of the remaining two counts of witness intimidation.[2] (Dkt. 26-28:4–5.) Lee was subsequently sentenced to life imprisonment with extended supervision release eligibility after February 1, 2048. (Dkt. 26-2:1.)

Lee subsequently moved for postconviction relief, arguing, *inter alia*, that his trial counsel was ineffective for not objecting to a witness reading into the record a letter that the circuit court had previously ruled inadmissible,

---

[2] During trial, the lone count of soliciting perjury was dismissed. (Dkt. 26-6:4; 26-26:144–45.)

whereby Lee expressed his belief that he would "beat this case." (Dkt. 26-6:5–6.) At the ensuing evidentiary hearing, neither of Lee's two trial attorneys could recall why there was no objection to the admission of that letter, and although both remembered being called into chambers when the jury asked to see it during their deliberations, neither the attorneys nor the court had any independent recollection of the off-the-record discussions. (Dkt. 26-6:6–7.)

The circuit court ultimately rejected Lee's various postconviction claims. (Dkt. 26-31.) Relevant to his current habeas claims, the circuit court ultimately rejected Lee's argument that the missing transcripts deprived him of his right to a meaningful appeal, holding that he failed to establish a "colorable need" for the missing transcripts and otherwise did not demonstrate how he was prejudiced by the transcripts' absence.[3] (Dkt. 26-6:7.)

Lee subsequently appealed, raising the same arguments, and the Wisconsin Court of Appeals affirmed. (Dkt. 26-6:2, 25.)

The court first rejected Lee's claim that the State's failure to disclose the initial interviews of Watou, Mikey, and Ryan constituted a due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963) at all, holding that Lee failed to establish that the suppressed evidence was favorable to him or material to a determination of his guilt or punishment. (Dkt. 26-6:8–16.)

---

[3] The court also rejected Lee's various ineffective-assistance-of-counsel claims. (Dkt. 26-31:6–18.)

The court next rejected Lee's due process claim under *Arizona v. Youngblood*, 488 U.S. 51 (1988) that he was entitled to a new trial due to the State's destruction of those earlier interview recordings, holding that the circuit court soundly exercised its discretion when it elected to bar the State from calling Watou, Mikey, and Ryan as witnesses at Lee's trial as a sanction for the evidence destruction rather than ordering Lee's homicide charge dismissed. (Dkt. 26-6:16–22.)

Finally, the court rejected Lee's claim that he was entitled to a new trial due to the absence of transcripts detailing the in-chambers discussions between the parties and the court concerning the admissibility of a letter read by Stephanie Thao during her testimony and the parties' discussion with the court concerning the jury's request to review that letter during its deliberations. (Dkt. 26-6:22–25.) The court reasoned that Lee failed to show a "colorable need" for the missing transcript given that he could have advanced alternative appellate arguments that the circuit court erred in providing the jury with the offending letter despite trial counsel's objection or trial counsel was ineffective for failing to object to the letter's admission. (Dkt. 26-6:22–25.)

Lee petitioned the Wisconsin Supreme Court for discretionary review, which the court denied. (Dkt. 26-7; 26-9.) Lee subsequently filed a petition for writ of certiorari with the United States Supreme Court, which that Court denied. (Dkt. 26-10; 26-11.)

Thereafter, Lee filed his Petition in this Court. (Dkt. 1.) Respondent filed an answer, (Dkt. 26), and Lee filed a brief in support of his Petition, (Dkt. 31). Respondent submits this brief in opposition to Lee's Petition.

## STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). The provisions of AEDPA "significantly constrain any federal court review of a state court conviction." *Searcy v. Jaimet*, 332 F.3d 1081, 1087 (7th Cir. 2003).

To obtain relief under AEDPA, a petitioner must show that the state court's decision denying him relief on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

The standard under 28 U.S.C. § 2254(d) "was meant to be" difficult to meet. *Richter*, 562 U.S. at 102. It is "highly deferential" to the state court's decision. *Davis v. Ayala*, 576 U.S. 257, 269 (2015). A decision is unreasonable and warrants a writ of habeas corpus only if it "was so lacking in justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Simply stated, 28 U.S.C. § 2254(d) allows habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.* at 102.

## ARGUMENT

### I. The Wisconsin Court of Appeals' decision was not contrary to, or an unreasonable application of, *Brady*.

Lee argues that the State's failure to disclose Watou's, Mikey's, and Ryan's initial police interviews violated his right to due process under *Brady*. (Dkt. 31:2–4.) The Wisconsin Court of Appeals disagreed, holding that Lee failed to establish that the suppressed recordings were favorable to him or material to the determination of his guilt. (Dkt. 26-6:8–16.) Because Lee has not shown that the court's decision was contrary to, or involved an unreasonable application of, *Brady* or any other clearly established Supreme Court precedent, he is due no relief on Ground One. 28 U.S.C. § 2254(d)(1).

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Court has explained that a "true *Brady* violation" has three requirements:

"The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

After identifying that correct legal standard governing its decision, the Wisconsin Court of Appeals rejected Lee's *Brady* claim, agreeing with the State that Lee had not satisfied two of those three requirements because he "ha[d] not shown that those interviews were either favorable to him or material to the determination of his guilt." (Dkt. 26-6:8–9.)

Supporting that conclusion, the court first explained why the suppressed evidence was not favorable to him as it was not exculpatory.[4] (Dkt. 26-6:9–11.)

---

[4] The Wisconsin Court of Appeals noted that Lee also advanced a new argument for the first time in his reply brief that evidence of the initial interviews of Watou, Mikey, and Ryan could have been used to impeach those witnesses at trial had they testified inconsistently. (Dkt. 26-6:9.) The court declined to consider Lee's new argument because Wisconsin law does not allow an appellant to raise an issue for the first time in its reply brief. (Dkt. 26-6:9 (citing *A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 588 N.W.2d 285, 292 (Ct. App. 1998)).

"[F]ailure to present a claim at the time, and in the way, required by the state is an independent [and adequate] state ground of decision, barring review in federal court." *Hogan v. McBride*, 74 F.3d 144, 146 (7th Cir. 1996). "The grounds for such a rule are fundamental fairness. It is inherently unfair for an appellant to withhold an argument from its main brief and argue it in its reply brief because such conduct would prevent any response from the opposing party." *A.O. Smith Corp.*, 588 N.W.2d at 292. Thus, Lee cannot now argue that the interview evidence was favorable to him for its impeachment power because he procedurally defaulted that argument in the state courts.

The court reasoned that (1) Lee failed to cite anything in the record suggesting that the witnesses either identified someone besides him as the shooter or described the shooter differently than him, (2) the witnesses' failure to identify Lee by name was not exculpatory given that two of the three witnesses did not know Lee, and the only witness who knew Lee believed that he was in jail on the night of the shooting, (3) Paul's arrest on the same day as the interviews did not suggest that Paul—not Lee—was the shooter, and (4) the fact that police destroyed the interview recordings did not mean that the evidence was exculpatory given the "plausible alternative motive for the destruction of the recordings." (Dkt. 26-6:9–11.)

The court then went on to explain how the suppressed evidence was also not material to the determination of Lee's guilt. (Dkt. 26-6:12–15.) The court recognized that "[e]vidence is material only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense." (Dkt. 26-6:11.) Applying that standard, the court explained why the suppressed evidence was not material: (1) "th[e] interviews did not exculpate [Lee]"; (2) police had reinterviewed the three witnesses, defense counsel had copies of those interviews for nearly nine months before trial, a defense investigator also interviewed Ryan before trial, and despite Ryan supposedly then describing the shooter inconsistently with Lee, Lee still elected not to call any of those witnesses at his trial; and (3) the evidence of

Lee's guilt was "strong," with seven witnesses testifying that Lee confessed to the shooting. (Dkt. 26-6:12–15.)

In short, Lee is not entitled to habeas relief on Ground One because reasonable jurists could agree with the Wisconsin Court of Appeals that Lee had failed to satisfy two of the three prerequisites to establish a *Brady* violation. *See Richter*, 562 U.S. at 102. Lee's counterarguments are unpersuasive.

Indeed, Lee's attempts to establish that the interview recordings were exculpatory rest on no more than baseless assumptions. In one breath, he seemingly acknowledges that he has not shown that the interview recordings were exculpatory, posing the rhetorical question, "Who knows now what exculpatory value could have come out of those witness interviews[?]" (Dkt. 31:3.) Yet immediately thereafter, he presumes, without any evidence backing his assumption, that the recordings must have been exculpatory or else police would not have destroyed them. (Dkt. 31:3.) But that's not proof that evidence is exculpatory; it's conjecture, plain and simple.

Perhaps realizing that his guesswork isn't enough to carry the day, Lee also suggests that the interview recordings were exculpatory because none of the three eyewitnesses to the shooting identified him by name and instead only provided physical descriptions of the shooter. (Dkt. 31:2–3.) But as the Wisconsin Court of Appeals recognized, that does not render the evidence

11

exculpatory given that none of the three witnesses identified anyone besides Lee as the shooter, nor was there evidence suggesting that the witnesses' descriptions were inconsistent with Lee. (Dkt. 26-6:10–11.) Moreover, the court astutely noted that there was good reason for none of the three witnesses to identify Lee as the shooter given that two witnesses didn't know Lee before the shooting, and the lone witness who knew Lee believed Lee was in the jail on the night of the shooting, which was not exculpatory given that video evidence proved Lee was at the bar when the shooting occurred. (Dkt. 26-6:10.)

But even assuming, *arguendo*, that Lee could show that the interview recordings were exculpatory, he still fell far short of establishing that the interview recordings were material to the determination of his guilt or innocence when considering the strength of the State's other evidence proving that he was the shooter. He seems to believe that the jury would have acquitted him had it heard that Mikey was unable to identify the shooter when he spoke with police. (Dkt. 31:4.) What Lee doesn't explain, however, is why the jury would question his guilt after hearing unrefuted evidence that he was at the shooting scene, paired with testimony from *five* witnesses who claimed to have directly heard his confession—Via Thao, Peter Moua, Kong Vang, Stephanie Thao, and Joe Thor—as well as testimony from police officers who claimed that *three* other witnesses—Melanie Thao, Phong Lee, and Paul Lee—also advised that Lee admitted to them his role in the shooting. (Dkt. 26-6:13–14.) Nor does

Lee explain why he declined to call Mikey, Ryan, or Watou as trial witnesses if he considered their observations helpful to his defense. (Dkt. 31:2–4.) Rather, he only complains that calling those witnesses at trial may have allowed the State to introduce even more inculpatory evidence against him, effectively conceding that the witnesses would have only hurt—rather than helped—his defense. (Dkt. 31:4.) Given that, it's rather difficult to see why Lee would believe those three witnesses had any exculpatory value.

In short, the Wisconsin Court of Appeals reasonably concluded that the suppressed witness interviews of Watou, Mikey, and Ryan were not favorable to Lee, nor were they material given the strength of the State's case against him. (Dkt. 26-6:16.) None of the Supreme Court authority Lee cites, including *Brady*, should lead this Court to conclude otherwise.

## II. The Wisconsin Court of Appeals' decision was not contrary to, or an unreasonable application of, *Youngblood*.

Lee argues that the State's destruction of Watou's, Mikey's, and Ryan's initial police interviews violated his right to due process under *Youngblood*. (Dkt. 31:4–10.) While the Wisconsin Court of Appeals agreed with Lee that a *Youngblood* violation occurred, it concluded that the circuit court soundly exercised its discretion when it selected evidence suppression—rather than barring his prosecution—as an appropriate remedy. (Dkt. 26-6:18–22.) Because Lee has not shown that the court's decision was contrary to, or

involved an unreasonable application of, *Youngblood* or any other clearly established Supreme Court precedent, he is due no federal habeas relief on Ground Two. 28 U.S.C. § 2254(d)(1).

In *Youngblood*, the Supreme Court declared that the State's failure to preserve *potentially* exculpatory evidence constitutes a due process violation only when bad faith on the part of police is shown. 488 U.S. at 57–58. Because the *Youngblood* Court decided that there was no showing of bad faith in that case, it reversed the decision of the Arizona Court of Appeals without deciding the appropriate remedy if police *had* acted in bad faith. *See id*. In arriving at its decision, the Court repeatedly referenced *California v. Trombetta*, 467 U.S. 479 (1984), which held just four years earlier that "when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecutor or suppressing . . . the State's most probative evidence." *Trombetta*, 467 U.S. at 487.

In Lee's case, after concluding that his due process right was violated, the Wisconsin Court of Appeals weighed the two options sanctioned by *Trombetta* and concluded that suppression was the appropriate remedy. (Dkt. 26-6:18–22.) In reaching that conclusion, the court noted Lee's argument that *some* other jurisdictions have concluded that "dismissal is the only remedy for a *Youngblood* violation" but observed that his argument was at odds with Wisconsin precedent. (Dkt. 26-6:19.) Moreover, the court went on to apply a

series of factors laid out in *State v. Amundson*, 69 Wis. 2d 554, 230 N.W.2d 775 (1975), *overruled on other grounds by State v. Wayerski*, 2019 WI 11, 385 Wis. 2d 344, 922 N.W.2d 468, noting at each of the three factors—the degree of bad faith on the State's part, the importance of the lost evidence, and the other evidence of Lee's guilt presented at his trial—each "support[ed] the circuit court's discretionary decision that suppression, rather than dismissal, was the appropriate remedy for the due process violation." (Dkt. 26-6:19–21.)

Despite that reasonable conclusion, Lee criticizes the Wisconsin court's decision for upholding that chosen remedy, but he cites no clearly established Supreme Court precedent providing that a *Youngblood* violation requires the dismissal of criminal charges and a bar to prosecution. (Dkt. 31:8–10.) On the contrary, he openly concedes that *Youngblood*—the Supreme Court decision upon which he basis his claim—failed to address the remedy for a potential due process violation. (Dkt. 31:9.) And he offers no support for his proposal that "the remedy contemplated by the Supreme Court was dismissal"; rather, he just points out that Arizona state courts—not the Supreme Court—concluded that dismissal was appropriate in the case being reviewed. (Dkt. 31:9.)

In the end, Lee conspicuously (yet seemingly inadvertently) concedes that there is no clearly established Supreme Court precedent requiring the state courts to dismiss and bar his prosecution based on the State's evidence destruction. Where there is no clearly established Supreme Court law on an

issue, a state court cannot be said to have unreasonably applied the law as to that issue. *Carey v. Musladin*, 549 U.S. 70, 77 (2006). Ground Two therefore fails.

### III. Lee procedurally defaulted and subsequently abandoned his ineffective-assistance-of-counsel claim(s).

In his Petition, Lee alleged as Ground Three that his trial counsel was constitutionally ineffective in several ways. (Dkt. 1:8.) Specifically, he argued that trial counsel was ineffective for failing to object to hearsay statements, failing to move to suppress Lee's statements, and failing to object to evidence previously deemed inadmissible from reaching the jury. (Dkt. 1:8.) This Court must decline to address those claims because they are procedurally defaulted and because Lee has abandoned them.

A federal court cannot grant a petition for a writ of habeas corpus unless the "applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To satisfy the exhaustion requirement, the petitioner must have "fully and fairly presented his claims to the state appellate courts" so as to afford the state courts a "meaningful opportunity to consider the substance of the claims that he later presents in his federal challenge." *Bintz v. Bertrand*, 403 F.3d 859, 863 (7th Cir. 2005). The petitioner must have fairly presented his claim to all levels of the state judiciary, including stages at which review is discretionary. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

Here, the Wisconsin Court of Appeals never addressed Lee's ineffective-assistance-of-counsel claims because, despite preserving them in the postconviction motion filed in the circuit court, Lee never pursued those claims on appeal. (Dkt. 26-3; 26-5; 26-6.) And if he attempted to revive the same claims by relitigating them in the state circuit court now, he would run into Wisconsin's statutory bar against relitigating claims that were previously adjudicated. Wis. Stat. § 974.06(4); *State v. Witkowski*, 163 Wis. 2d 985, 473 N.W.2d 512, 514 (Ct. App. 1991) ("A matter once litigated may not be relitigated in a subsequent postconviction proceeding no matter how artfully the defendant may rephrase the issue."). Therefore, Lee's ineffective-assistance-of-counsel claims are procedurally defaulted. *See O'Sullivan*, 526 U.S. at 848.

Moreover, despite Respondent alleging in his answer that Lee procedurally defaulted his ineffective-assistance-of-counsel claims, Lee makes no attempt to establish cause and prejudice to excuse his default; he merely excludes the claim from his brief, altogether. (Dkt. 31.) By not presenting argument in his supporting brief, Lee has abandoned his ineffective-assistance-of-counsel claims. *See Pole v. Randolph*, 570 F.3d 922, 937–38 (7th Cir. 2009); *Palmer v. Marion Cty.*, 327 F.3d 588, 597–98 (7th Cir. 2003).

17

Ultimately, whether due to his procedural default or his failure to include any supporting argument in his brief, Lee is entitled to no relief on his ineffective-assistance-of-counsel claims.

## IV. Lee procedurally defaulted his missing transcripts claim; default aside, he has not shown the Wisconsin Court of Appeals' decision rejecting it was contrary to, or an unreasonable application of, any Supreme Court precedent.

There are two overarching reasons why Lee is not entitled to relief on his renumbered Ground Three claim that the absence of transcripts deprived him of the right to a meaningful appeal.

First and foremost, even if cognizable in federal habeas, Lee did not fairly present his claim to the Wisconsin Court of Appeals or the Wisconsin Supreme Court. Fair presentment required Lee to not only exhaust his claims in the state courts but to also apprise the state courts "of the constitutional nature of the claim." *See Anderson v. Benik*, 471 F.3d 811, 815 (7th Cir. 2006). The Seventh Circuit has identified four factors to consider in assessing whether a petitioner has fairly presented his constitutional claim to the state court:

> 1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation.

*Id.* (quoting *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001)).

Case 2:22-cv-00620-WCG    Filed 04/11/23    Page 18 of 21    Document 35

Application of those four factors confirms that Lee did not adequately apprise the state courts of his intent to raise a federal constitutional claim. In his two appellate briefs and his petition for discretionary review, Lee cited no federal cases that engaged in any sort of constitutional analysis relating to his transcript claim. (Dkt. 26-3:32–44; 26-5:10–12; 26-7:26–31.) The only state case he cited to support his argument in those three pleadings, *State v. Perry*, 136 Wis. 2d 92, 401 N.W.2d 748 (1987), referenced some federal authority for the principle that the "usual remedy" for a transcript deficiency is a new trial, but the Wisconsin Supreme Court's decision plainly focused on whether incomplete trial transcripts deprived the defendant of a meaningful appeal guaranteed to him under the *Wisconsin* Constitution, *id.* at 752–55. Moreover, while Lee framed his argument in a manner suggesting his intent to bring a constitutional claim, his repeated references to the Wisconsin Constitution dispelled any notion that he intended to bring a *federal* constitutional claim. (Dkt. 26-3:33; 26-7:26.) And, finally, Lee did not allege a pattern of facts "well within the mainstream of constitutional litigation." *See Anderson*, 471 F.3d at 815. Rather, as already noted, Lee made it abundantly clear that he meant to bring a claim under the *Wisconsin* Constitution.

In short, all four fair-presentment factors confirm that Lee failed to alert the Wisconsin courts of his intent to raise a federal constitutional claim—a conclusion duly bolstered by the fact that the Wisconsin Court of Appeals

disposed of Lee's arguments by applying established state court precedent. By failing to apprise the state courts of his intent to bring a federal constitutional claim, Lee has procedurally defaulted his missing-transcript claim, and he does not attempt to establish cause and prejudice to excuse that default. This Court should reject Lee's claim on that basis.

Even if this Court were to overlook his procedural default, however, the second reason that Ground Three fails is that he points to no United States Supreme Court precedent that the Wisconsin Court of Appeals' decision contradicted or unreasonably applied in connection with his missing transcript claim. The only Supreme Court precedent Lee cites in support of his missing transcript claim—not his new, unexhausted claim that he or his attorney were improperly excluded from a critical stage at his trial—is *Hardy v. United States*, 375 U.S. 277 (1964). (Dkt. 31:10–11.)

Nowhere in *Hardy* did the Supreme Court suggest that a criminal defendant is automatically entitled to a new trial if a portion of his trial transcript is missing; rather, *Hardy* merely held that a federal statute required federal defendants, who have new counsel on appeal and present non-frivolous issues, to be provided with a full transcript on appeal. *Id*. at 282. The *Hardy* court expressly limited its holding to the statute at issue and did "not reach a consideration of constitutional requirements." *Id*. It naturally flows, then, that because *Hardy* is not a rule of constitutional law, Lee would not be entitled to

federal habeas relief on his missing transcript claim even if the Wisconsin Court of Appeals' decision conflicted with or unreasonably applied *Hardy*.

In short, Lee is entitled to no relief on Ground Three both because he procedurally defaulted it and because he has not shown that the Wisconsin Court of Appeals' decision disposing of it was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

## CONCLUSION

This Court should deny Lee's Petition and decline to issue a certificate of appealability.

Dated this 11th day of April 2023.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/ John W. Kellis
JOHN W. KELLIS
Assistant Attorney General
State Bar #1083400

Attorneys for Respondent

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7081
(608) 294-2907 (Fax)
kellisjw@doj.state.wi.us