UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

CHONG LENG LEE,

    Petitioner,

vs.

                                                                                                 Case No. 22-CV-620

RANDALL HEPP,

    Respondent.

---

## PETITIONER'S RESPONSE TO RESPONDENT'S BRIEF OF OPPOSITION

---

Chong Leng Lee (hereinafter Lee), pro se, makes this response to the respondent's brief in opposition to his petition for habeas relief.

### STATEMENT OF FACTS

Lee is currently incarcerated at Waupun Correctional Institution, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Lee was convicted in Outagamie County Circuit Court of First Degree Intentional Homicide with use of a dangerous weapon, felon in possession of a firearm, and two counts of intimidating a witness as a party to a crime. He was sentenced to life in prison with four years to run consecutively.

Lee's § 2254 petition asserts six grounds for relief. Dkt. No. 1. On June 8, 2022, Magistrate Judge William E. Duffin determined that the petition contained both exhausted and unexhausted claims and directed Lee to either file an amended petition that did not include any unexhausted claims or a motion for stay and abeyance. Dkt. No. 6. Lee subsequently filed a motion to stay on July 7, 2022. The action was reassigned to this Court on August 1, 2022. On September 26, 2022, this Court denied the motion to stay and dismissed the three unexhausted claims, then ordered the respondent to file an answer to the exhausted claims within sixty days. The respondent filed an

answer on November 11, 2022, and Lee responded to that answer on January 19, 2023. The Respondent then had until April 12, 2023, to file a brief opposing the petitioner's petition for habeas corpus and on April 11, 2023, they filed their brief. *See Dkt 35.* Due to Lee's prison going into lockdown he filed multiple extensions to this Court to extend the deadline for filing of this motion. Now Comes Lee's Motion in response to the respondent's last brief.

**ARGUMENT**

1. RESPONDENT'S STANDARD OF REVIEW

The respondent said it very well with his opening statement, "to obtain relief under AEDPA, a petitioner must show that the state court's decision denying him relief on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d) (1), or "was based on unreasonable determination of the facts in light of the evidence presented in the State court proceeding,"*id. § 2254(d) (2).*

A. **The Wisconsin's Court decisions were contrary to and unreasonable to established law.**

Under *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481, four aspects of materiality for *Brady* purposes bear emphasis. "First," favorable evidence is material, and constitutional error results from its suppression by the government, if there is a "reasonable probability" that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Thus, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. 473 U.S., at 682, 685, 105 S.Ct., at 3383–3384, 3385. *United States v. Agurs,* 427 U.S. 97, 112–113, 96 S.Ct. 2392, 2401–2402, 49 L.Ed.2d 342, distinguished. "Second," *Bagley* materiality is not a sufficiency of evidence test. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. "Third," contrary to the Fifth Circuit's assumption, once a reviewing court applying *Bagley* has found constitutional error, there is no need for further harmless-error review, since the constitutional standard for materiality under *Bagley* imposes a higher burden than the harmless-error standard of *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 1715, 123 L.Ed.2d 353. "Fourth," the state's disclosure obligation turns on the cumulative effect of all suppressed evidence favorable to the defense, not on the evidence

considered item by item. 473 U.S., at 675, and n. 7, 105 S.Ct., at 3380, and n. 7. Thus, the prosecutor, who alone can know what is undisclosed, must be assigned the responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. <u>Moreover, that responsibility remains regardless of any failure by the police to bring favorable evidence to the prosecutor's attention. To hold otherwise would amount to a serious change of course from the *Brady* line of cases.</u> **(Emphasis Added)**. As the more likely reading of the Fifth Circuit's opinion shows a series of independent materiality evaluations, rather than the cumulative evaluation required by *Bagley*, it is questionable whether that court evaluated the significance of the undisclosed evidence in this case under the correct standard. Pp. 1565–1569. Under *Giglio, 405 U.S. 150*, 92 S.Ct. 763, 31 L.Ed.2d 104, the government must disclose all material evidence that affects credibility; this type of information is deemed material so as to justify a retrial only if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different.

Now the respondent's argument is that there was no *Brady* violation in this case here because the evidence destroyed did not amount to the level of *Brady* material. Lee has shown this Court and the lower Courts on multiple occasions that the evidence was indeed *Brady* material as stated above.

In *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490, witness statements made to Officers which were suppressed by the state got *Kyles* a new trial. This case is similar in ways except mine is worse than *Kyles*. With mine, you have 100% certainty that these officers chose to destroy evidence knowing they would violate discovery laws (this is in their own words), Sergeant Rabas made, "he and the investigative team knew through the discovery process" given by the Wisconsin Statutes and United States Constitution, the defense team would be able to obtain it [the evidence] that they decided nothing would be retained." *See EX-A*. Now their excuse may be that the witnesses were scared for their safety, but so had plenty of other witnesses counted on other interviews played at trial requesting not to be named or asked to be not spoken with, yet they were put out there and not protected. When these witnesses first interviews and recordings were destroyed. I had been charged well over eight months, so they weren't afraid of me then. When Sgt. Thao who was in charge of doing these interviews of these witnesses along with Sgt. Rabas was questioned at a hearing about if I was a threat or did they feel like I was a threat to them they testified that I was not a threat and that I never had a violent crime and in fact it was indeed my younger brother Paul. *See EX-B*.

Now the standard review stated or "was based on unreasonable determination of the facts in light of the evidence presented in the State court proceeding,"id. § 2254(d) (2)," this was presented in front of the lower Courts. It was proven that the Appleton Police Department destroyed that evidence based on a lie. When Sgt. Rabas stated "we destroyed that evidence because we knew the defense would be able to get to it through discovery", he knew that was the truth and it contained valuable information. See *id ex A*. Mickey Thao saw who the shooter was and knows who I am and in his second interview still has not named me as the shooter but,

has described the shooters clothing and description in detail and it does not match mine but, is similar to someone else's in the case. The Officers testified that in their first interviews with him he does not mention my name, but does not recall anything else. These remarks fall into *Brady* material when you need to use it for credibility purposes. *Giglio*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. It is unreasonable to law. It goes against *Brady* and Lee has proven in all essence that his case has met all the prongs of *Brady* just as in *Kyles, Giglio, and Agurs*.

B. **Youngblood and its support for a dismissal rather than the lower court's bias and rash remedy.**

Respondent argues that other courts and the Supreme Court in *Youngblood* has never supported or suggested a dismissal in its language.

First we take a look at *Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In Youngblood and Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the U.S. Supreme Court developed a test to determine whether the government's failure to preserve evidence violated a defendant's due process rights.* Trombetta and other respondents challenged convictions for drunk driving after the breath samples showing their blood alcohol content were destroyed before they could independently test the samples. Trombetta, 467 U.S. at 483, 104 S.Ct. 2528. In upholding the convictions, the Supreme Court noted that the police officers had no apparent intent to destroy exculpatory evidence but rather acted in good faith and according to their protocol. Id. at 488, 104 S.Ct. 2528. Further, the breath test evidence was not apparently exculpatory; "the chances [were] extremely low that preserved samples would have been exculpatory." Id. at 489, 104 S.Ct. 2528. Finally, respondents had "alternative means of demonstrating their innocence," such as attacking the reliability of the testing. Id. at 490, 104 S.Ct. 2528.

Expanding on this test in *Youngblood,* the Court noted that while the prosecution must turn over material exculpatory evidence, the Supreme Court has been unwilling to "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58, 109 S.Ct. 333. *Youngblood* "refined" the *Trombetta* rule, distinguishing between "potentially useful evidence" and "exculpatory evidence" and requiring a showing of bad faith when the police fail to preserve evidence that is merely potentially useful. *State v. Greenwold*, 189 Wis.2d 59, 67, 525 N.W.2d 294 (Ct.App.1994) ( *Greenwold II* ) (quoting *Youngblood,* 488 U.S. at 57–58, 109 S.Ct. 333); see also *State v. Greenwold, 181 Wis.2d 881, 885, 512 N.W.2d 237 (Ct.App.1994) (Greenwold I )* (adopting Youngblood standard and noting refinement of Trombetta rule). After Youngblood, a defendant's due process rights as to the loss of evidence are violated if the police (1) fail to preserve evidence that is apparently exculpatory or (2) act in bad faith by failing to preserve evidence that is potentially exculpatory. *Greenwold II,* 189 Wis.2d at 67, 525 N.W.2d

294 (*citing Trombetta,* 467 U.S. at 489, 104 S.Ct. 2528, and *Youngblood,* 488 U.S. at 57–58, 109 S.Ct. 333). Thus, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333. Bad faith can only be shown if "(1) the officers were aware of the potentially exculpatory value or usefulness of the evidence they failed to preserve; and (2) the officers acted with official animus or made a conscious effort to suppress exculpatory evidence." *Greenwold II,* 189 Wis.2d at 69, 525 N.W.2d 294.

The *Youngblood* rule applies even when the defense has made a discovery request for potentially useful, outcome-determinative evidence; there is no due process violation from the destruction of such evidence unless the defendant can show the evidence was destroyed in bad faith. *Illinois v. Fisher,* 540 U.S. 544, 548, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004) (per curiam). Fisher was charged with possession of cocaine and made a discovery request for the bag of powdery substance the police had seized which had tested positive four times for cocaine. *Id.* at 545, 124 S.Ct. 1200. Fisher fled the state, and when he returned, ten years later, the evidence had been destroyed. *Id.* Fisher was convicted, but his conviction was overturned on appeal. *Id.* at 546, 124 S.Ct. 1200. The Illinois appellate court relied on *Illinois v. Newberry,* 166 Ill.2d 310, 209 Ill.Dec. 748, 652 N.E.2d 288 (1995), distinguishing Youngblood on the grounds that Fisher had requested the evidence and the evidence was Fisher's "only hope for exoneration." *Fisher,* 540 U.S. at 546–47, 124 S.Ct. 1200. The Illinois Supreme Court did not take the case. *Id.* at 547, 124 S.Ct. 1200.

In this case, the respondent argues that Lee has failed to make an argument of a show of support from the Supreme Court and other such Courts that would agree with dismissal of such a support a dismissal a *Youngblood* violation. To be told in *Youngblood* the argument never reached this point where Lee's case is at because it need not reach this far, but with respect *Youngblood* speaks clearly "Our decisions in related areas have stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government. In *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), we said that "[n]o actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them." *Id.,* at 325, 92 S.Ct., at 466; see also *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). Similarly, in *United States v. Valenzuela–Bernal, supra,* we considered whether the Government's deportation of two witnesses who were illegal aliens violated due process. We held that the prompt deportation of the witnesses was justified "upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution." Id., 458 U.S., at 872, 102 S.Ct., at 3449." *Youngblood, 109 S.Ct. at 337.*

In my case the Appleton police department collected these interviews and held them for over eight months while I was in custody and came to a court hearing, testified under oath that they knew through the discovery process I was able to obtain it and chose to destroy them. They can lie that their decision to destroy it was based off protecting these witnesses, but they failed to

follow proper procedures put into law to protect these witnesses. That is a hypocritical view when you look at it. Laws were put into place to redact witnesses names such as informants and such as we discussed in court hearings. The circuit court should have considered dismissal as a better option because I was without another option for a defense. I couldn't attack the police on their strategy to investigate, or even bring up the lost/destroyed evidence because of the Judge's remedy. So they gained a tactical advantage and it has caused such prejudice that I could not have brought to the jury's attention.

### C. Reconstruction and loss of transcripts.

The respondent likes to argue that Lee waived the right to argue this point. Lee has never waived this argument nor has he ever given up on this argument and this argument is not a Wisconsin only argument.

Lee argued the point that cases such as *State v. Perry*, 136 Wis.2d 92, 401 N.W.2d 748, and *State v. DeLeon*, 127 Wis.2d 74, 377 N.W.2d 635 (Ct.App.1985), had argued the points in which federal arguments had been made already which Lee himself is arguing and the Wisconsin Courts chose to shoot down which is pointless. This was their law. In *DeLeon*, it clearly states, "Rule 809.15(3), Stats., allows a party who believes the transcript is defective to move the court to correct the record. It offers little guidance, however, as to the procedure to be used when faced with this problem. Because it was intended that federal procedure be followed, we turn to an examination of Federal Rule of Appellate Procedure 10 entitled "The Record on Appeal." Now this case emphasizes the importance of federal laws and cases. It gives Lee an opening into federal laws. Recording of trial is one of the most important part trials otherwise there would be no trial. This is nationwide and no courtroom is without a court reporter.

### CONCLUSION

For the said reasons this Court should grant him his habeas relief.

Dated this 16th day of November, 2023.

[signature]

CHONG KONG LEE #439266

P.O. Box 351

Waupun, WI 53963