UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CHONG L. LEE,

Petitioner,

v. Case No. 22-C-620

BRAD MLODZIK,

Respondent.

---

**DECISION AND ORDER DENYING WRIT OF HABEAS CORPUS**

---

Petitioner Chong L. Lee, who is currently incarcerated at Waupun Correctional Institution, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He seeks relief from his conviction and sentence for first-degree intentional homicide with use of a dangerous weapon, felon in possession of a firearm, and two counts of intimidating a witness as a party to a crime. Chong Lee was convicted in Outagamie County Circuit Court and was sentenced to life in prison with extended supervision eligibility beginning on February 1, 2048. Dkt. No. 26-2. At screening, the court determined that Chong Lee was allowed to proceed on four of his six asserted grounds for relief and directed the Respondent to either file a motion seeking dismissal or answer the petition. Dkt. No. 13 at 9–10. Respondent answered the petition, and the case is now fully briefed. For the following reasons, the court will deny Chong Lee's petition for writ of habeas corpus.

**BACKGROUND**

The background facts are the same as the court outlined in its September 26, 2022 order denying Lee's motion to stay and screening his petition. Dkt. No. 13. Unless otherwise indicated, these facts are taken from the Wisconsin Court of Appeals' decision affirming the judgment of

conviction. *State v. Lee*, No. 2018AP1741-CR, 2020 WI App 6, 390 Wis. 2d 426, 939 N.W.2d 427 (Table); Dkt. No. 26-6. At approximately 1:50 a.m. on December 8, 2013, police responded to a call regarding a possible gunshot at the Luna Lounge in Appleton, Wisconsin. *Lee*, 390 Wis. 2d 426, ¶ 2. When officers arrived, they found the victim, Joshua Richards, who had been fatally shot in the head, on the floor near the bar's entrance. *Id.* A Luna Lounge security guard told police that "two Asian individuals" had left the scene after the shooting and that they were wearing white vests and white hats. *Id.* ¶ 3. Video footage from nearby traffic cameras and a security camera inside the Luna Lounge showed three individuals, who were later identified as Joe Thor, Paul Lee, and Phong Lee, running out of the building just after the shooting. The security camera footage also showed other individuals, including Chong Lee, exiting the Luna Lounge shortly after the shooting. *Id.* Chong Lee and Paul Lee are brothers. *Id.* (Because several of the individuals involved have the last name "Lee," for clarity, the court will use Chong Lee's first name to refer to him.)

Three days later, on December 11, 2013, police interviewed three possible witnesses to the shooting: Watou Lee, Mikey Thao, and Ryan Thao. *Id.* ¶ 4. The interviews were recorded. None of them identified Chong as the shooter. *Id.* Ryan Thao provided a description of the shooter's clothing and stated that the shooter had come "from the bar into the foyer area with other people." *Id.* Mikey Thao and Watou Lee also provided a description of the shooter. *Id.* All three witnesses told police that they were "very concerned" for their safety and "did not want to be identified" or "get involved" in what appeared to be a gang shooting. *Id.* That same day, police interviewed Paul Lee at his place of work. *Id.* ¶ 5. They did not ask Paul Lee about Chong during that interview because, at the time, they did not have any information suggesting that Chong was the shooter. *Id.* After about one-and-a-half hours, Paul Lee was taken into custody and transported to the Appleton

police station. *Id.* In the meantime, other officers interviewed "several females" who stated that Chong had "made some statements to them admitting to doing the shooting." *Id.* ¶ 6. Joe Thor also told police that Chong had admitted to being the shooter and disposing of the gun. *Id.* On December 12, 2013, police interviewed Paul Lee two more times while he was in custody at the Appleton police station. *Id.* During the second of those interviews, Paul Lee told police that Chong was the shooter. *Id.*

On December 16, 2013, a criminal complaint was filed charging Chong with one count of first-degree intentional homicide by use of a dangerous weapon and one count of possession of a firearm by a felon. *Id.* ¶ 7. An information filed in March 2014 added four counts of felony intimidation of a witness as a party to the crime, as well as a charge of solicitation of perjury, which was later dismissed. *Id.* The State did not initially disclose to the defense that shortly after the shooting, police had interviewed Watou Lee, Mikey Thao, and Ryan Thao. *Id.* ¶ 8.

The recordings of the interviews were retained for seven or eight months, before police destroyed them. *Id.* An officer later testified that the recordings were destroyed because the witnesses had requested that the police not disclose their identities and because the police "knew through discovery the defense would be able to obtain [the recordings]." *Id.* ¶ 8. Police were concerned about the safety of the witnesses and also feared that disclosure of the witnesses' statements could subject law enforcement to liability under what they knew as "the Monfils law" if such disclosure led to violence against the witnesses. Dkt. No. 26-12 at 65. The "Monfils law" refers to an amendment to Wisconsin's Open Records law, Wis. Stat. § 19.35(1), enacted in response to the murder of Thomas Monfils following the release of a recording of an anonymous report of a crime he made to the Green Bay Police Department to the person who reportedly committed the crime. *See Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998). The chief deputy who

failed to prevent the disclosure was held civilly liable for Monfils' death. The amendment added an exception to the general duty to allow the public to inspect government records where release of a record would "endanger an individual's life or safety." Wis. Stat. § 19.35(1)(am)2.a.

In the meantime, at some point, police inadvertently disclosed the identities of Watou Lee, Mikey Thao, and Ryan Thao to the defense. *Id.* ¶ 9. Police reinterviewed them in April 2015, and recordings and reports of those interviews were provided to the defense. *Id.* Based on that evidence, one of Chong's attorneys noted during a May 2015 motion hearing that it was clear police had interviewed the three witnesses before, and she requested "all reports, notes, and recordings of the initial interviews of these three individuals." *Id.* The defense then learned that the recordings of the December 2013 interviews had been destroyed. *Id.*

In September 2015, Chong moved to dismiss the first-degree intentional homicide charge, arguing that police had violated his right to due process by failing to disclose, and by later destroying, the recordings of the December 2013 interviews of Watou Lee, Mikey Thao, and Ryan Thao. *Id.* ¶ 10. Alternatively, Chong requested that the court suppress "any in court identification of Chong" by Watou Lee, Mikey Thao, and Ryan Thao and any testimony by those witnesses "that links Chong . . . to the homicide in this case." *Id.* The circuit court concluded that police had violated Chong's right to due process by destroying potentially exculpatory evidence in bad faith. *Id.* The court determined, however, that dismissal of the homicide charge was not an appropriate remedy and instead prohibited the State (but not Chong) from calling Watou Lee, Mikey Thao, and Ryan Thao to testify at trial. *Id.*

Chong's trial began in February 2016 and lasted eleven days. *Id.* ¶ 11. At trial, there was evidence that seven individuals had heard Chong confess to his involvement in the shooting, and an officer testified that Paul Lee had told police that Chong was the shooter. *Id.* Before trial, the

court ruled that evidence of Chong's statements to others that he would "beat this case" was inadmissible. *Id.* ¶ 12. Nevertheless, one witness, during her testimony, read a letter Chong had written to her following his arrest that included the statement, "I'm pretty sure I'll beat this case though." *Id.* Chong's trial attorneys did not object to that testimony. *Id.* The jury asked to see the letter during deliberations. *Id.* While there is no transcript of any discussion between the court and the parties regarding the jury's request, the record shows that the letter was provided to the jury. *Id.* The jury found Chong guilty of first-degree intentional homicide with use of a dangerous weapon, felon in possession of a firearm, and two counts of intimidating a witness as a party to a crime. *Id.* ¶ 13. Chong subsequently moved for postconviction relief, arguing, among other things, that his trial attorneys were ineffective by failing to object when the witness read the letter during her trial testimony. *Id.*

At a *Machner* hearing, Chong's lead trial attorney testified that she had no recollection as to why the defense did not object when the letter was read at trial. *Id.* ¶ 14. While she agreed that there likely were "discussions" between the circuit court and the parties about "issues that came up" after the jury began deliberating, she had no specific memory of those discussions. *Id.* During her testimony, the court similarly stated that it had no "independent recollection" of any discussion regarding the jury's request to see the letter. *Id.* Co-counsel also testified that he could not recall why the defense did not object when the letter was read at trial. *Id.* ¶ 15. He explained that the parties spent "quite a bit of time in chambers going through" various pieces of evidence and that the court made rulings in chambers as to what evidence was admissible. *Id.* He stated, "I don't have a specific recollection as to this letter and what the decisions were, but I do remember that we tried to carefully go through these before they were being presented to the witnesses as far as what was coming in and what was not coming in." *Id.* He further testified that he remembered

the jury had asked questions during its deliberations and that he believed the parties reconvened in the courtroom to discuss those questions, but he could not recall whether he objected during those discussions to the court sending the letter to the jury. *Id.* ¶ 16.

After the hearing, Chong argued that he had been denied his right to a meaningful appeal because there were no transcripts of the court's discussions with the parties regarding the admissibility of the letter and the jury's request to review it during deliberations. *Id.* ¶ 17. He asserted that, due to the lack of transcripts, he was "unable to show that counsel was deficient in failing to object because it is quite possible that counsel did object when this issue was address[ed] in chambers." *Id.* (alterations in original). Chong argued, in the alternative, that "if counsel did object in chambers, and the Court nonetheless ruled the evidence admissible, [Chong] cannot show that the Court erroneously exercised [its] discretion because there is no record of the Court's reasoning." *Id.* (alterations in original).

The circuit court denied the postconviction motion. *Id.* ¶ 18. It rejected Chong's claim that any missing transcripts deprived him of his right to a meaningful appeal, concluding that Chong had not demonstrated a "colorable need" for those transcripts. *Id.* Regardless, the court concluded that Chong could not show that absence of the transcripts had caused him any prejudice. *Id.* Chong appealed to the Wisconsin Court of Appeals, arguing that (1) the State violated his right to due process by failing to disclose the December 2013 interviews of Watou Lee, Mikey Thao, and Ryan Thao; (2) the State violated his right to due process by intentionally destroying the recordings of those interviews; and (3) the missing transcripts deprived him of his right to a meaningful appeal. *Id.* ¶ 19. The Wisconsin Court of Appeals affirmed. *Id.* ¶ 1. Chong went on to petition the Wisconsin Supreme Court for discretionary review, which was denied on July 15, 2020. Dkt. No. 26-9. The Supreme Court of the United States denied Chong's petition for writ of

certiorari on May 24, 2021. Dkt. No. 26-11. Thereafter, Chong filed his § 2254 petition with this court.

**LEGAL STANDARD**

Chong's petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, which limits the power of federal courts to grant writs of habeas corpus based on claims that were adjudicated on the merits by a state court. Under AEDPA, a federal court may grant habeas relief when a state court's decision on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" United States Supreme Court decisions, or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d); *see also Woods v. Donald*, 575 U.S. 312, 315–16 (2015). A state court decision is "contrary to . . . clearly established Federal law" if the court did not apply the proper legal rule or, in applying the proper legal rule, reached the opposite result as the Supreme Court would have on "materially indistinguishable" facts. *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court's decision is an unreasonable application of established precedent when that state court applies Supreme Court precedent in "an objectively unreasonable manner." *Id.* In addition, the determination of factual issues made by a state court is presumed to be correct and such presumption can only be overcome by of clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Under the standard set forth by Section 2254(d) of AEDPA, federal courts are "limited to a deferential review of the reasonableness, rather than the absolute correctness, of a state court decision." *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012) (citation omitted); *see also Searcy v. Jaimet*, 332 F.3d 1081, 1087 (7th Cir. 2003) (observing that AEDPA "significantly constrain[s] any federal court review of a state court conviction"). This is, and was meant to be,

an "intentionally" difficult standard to meet. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

**ANALYSIS**

Chong asserts four grounds for relief: (1) his due process rights were violated pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), when the State failed to disclose the existence of the recorded December 2013 police interviews of Watou Lee, Mikey Thao, and Ryan Thao; (2) his due process rights were violated pursuant to *Arizona v. Youngblood*, 488 U.S. 51 (1988), when the state intentionally destroyed the recordings of those interviews; (3) missing transcripts of the trial proceedings deprived him of the right to a meaningful appeal; and (4) ineffective assistance of trial counsel based on trial counsel's failure to object to hearsay statements, pursue a motion to suppress Chong Lee's statements, and object to evidence that was previously ruled to be inadmissible from being heard by the jury and reaching the jury during deliberations.

**A. Destruction of Evidence**

Chong claims that the State's failure to disclose the existence of the December 2013 recorded police interviews of Watou Lee, Mikey Thao, and Ryan Thao, and subsequent destruction of the recordings violated his due process rights under *Brady v. Maryland* and *Arizona v. Youngblood*. *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Shortly thereafter, the Court made clear that "the duty to disclose such evidence is applicable even though

there has been no request by the accused." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). The duty to disclose "encompasses impeachment evidence as well as exculpatory evidence." *Id.* Accordingly, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* at 281–82. "[F]avorable to an accused" means such evidence that, "if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676 (1985). The materiality requirement of *Brady* encompasses the question of prejudice, which means relief should be granted "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682.

*Youngblood* and *California v. Trombetta*, 467 U.S. 479 (1984), "govern a state's duty under the Due Process Clause of the Fourteenth Amendment to preserve evidence on behalf of a defendant." *McCarthy v. Pollard*, 656 F.3d 478, 484 (7th 2011). *Youngblood* is essentially an extension of *Brady* to physical items of evidence that might be favorable to the defense. *Nichols v. Weirsma*, 108 F.4th 545, 553 (7th Cir. 2024). Although in this case the Wisconsin Court of Appeals analyzed the issue separately under *Brady* and *Youngblood*, the issue presented was really a question of preservation of evidence, as opposed to disclosure. The fact that police had previously interviewed Watou Lee, Mikey Thao, and Ryan Thao was disclosed to the defense long before trial. It was the destruction of the recordings of the interviews that the defense claimed violated his right to due process of law and warranted dismissal of the charges against Chong.

In *McCarthy*, the Seventh Circuit explained that it's interpretation of *Trombetta* and *Youngblood* differs from that of Wisconsin courts. 656 F.3d at 484. The Seventh Circuit, which

is the controlling law in this court, "read[s] both cases to stand for the same proposition: the destruction of potentially exculpatory evidence violates the defendant's right to due process if (1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means." *Id.* Although the Wisconsin Court of Appeals did not apply precisely this test, its analysis falls well within the bounds of a reasonable application of both *Youngblood* and *Trombetta,* as understood by the Seventh Circuit.

To be sure, the Court of Appeals accepted the trial court's finding that the recordings had been destroyed in bad faith as "not clearly erroneous." Dkt. No. 26-6 ¶ 45. At the same time, the state appellate court noted that the trial court had "cited certain mitigating factors suggesting that it did not believe a high degree of bad faith was present." *Id.* ¶ 49. For example, "the [trial] court conceded that the destruction of evidence was motivated, at least in part, by the officers' desire to protect the witnesses' identities." *Id.* Indeed, according to the testimony at the motion hearing, the officers believed they were dealing with a gang murder. According to the testimony of at least one of the officers, they feared disclosure of the witnesses' identities would place them at serious risk of harm and potentially subject the officers and department to civil liability. Dkt. No. 26-12 at 40:13–16; 57:18–58:02; 65:06–14. The Court of Appeals also noted that the trial court had stated it did not believe that the police "engaged in intentional destruction of evidence in an attempt to usurp Chong's right to a fair trial." *Id.* Though these observations, when considered with the state courts' findings that the original witness statements were not exculpatory, are difficult to square with the trial court's finding of bad faith, it is not the role of this court to review a finding Respondent does not challenge.

Notwithstanding the state courts' findings of bad faith, Chong's due process argument based on the destruction of evidence fails. Chong argues that the December 2013 interviews were favorable to him as exculpatory evidence because Mikey Thao, who claimed to have seen the shooter and was the only one of the three witnesses that knew Chong before the night of the shooting, failed to identify Chong as the shooter and told police that he thought Chong was in jail on that night. Pet'r's Br. in Supp. at 4, Dkt. No. 31. The Wisconsin Court of Appeals rejected Chong's argument, concluding that such a statement was not favorable to him as exculpatory "because video evidence established that Chong was, in fact, at the Luna Lounge when the shooting occurred." *Lee*, 390 Wis. 2d 426, ¶ 26. In other words, had the evidence been disclosed, it would not have made the difference between conviction and acquittal.

Chong further contends that the State court erroneously concluded that, because Chong was at Luna and was seen on camera, the fact that Mikey Thao was unable to identify Chong as the shooter had no exculpatory value. He contends that this conclusion was "really incorrect and contradicts . . . laws set by the Supreme Court of the United States." Pet'r's Br. in Supp. at 3. Chong further argues that the suppressed evidence was favorable to him for impeachment purposes. He also claims that in the April 2015 interview, Mikey Thao described the shooter's clothing, but it did not match the clothes he was wearing. Instead, Chong claims the clothing Mikey Thao described was similar to that of another person who was involved in the case. Chong notes that the Officers testified that in their first interviews with Thao, he did not mention Chong's name and did not recall anything else. These remarks, Chong contends, constitute *Brady* material in that it suggests he was not the shooter. Pet'r's Reply Br. at 4, Dkt. No. 42.

The question that arises, however, is if the statements of Watou Lee, Mikey Thao, and Ryan Thao were exculpatory, why were they not called as witnesses for the defense? Chong offers

no evidence that their statements had changed between the first and second interviews, or that their testimony would have been different had they testified at trial. In other words, he has failed to establish that the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means, namely, in the form of the live testimony of the same witnesses. Nothing prevented Chong from calling all three as witnesses if he thought their inability to identify him three days after the shooting would have helped him. Had they testified inconsistently with the initial statements, he could have impeached them by calling the officers who interviewed them. Absent a showing that their testimony would have been different at trial than in the December 2013 interviews, Chong's claim that the December 2013 interviews were exculpatory must fail.

The Wisconsin Court of Appeals also concluded that the December 2013 interviews of Watou Lee, Mikey Thao, and Ryan Thao were not material to the determination of Chong's guilt. The Wisconsin Court of Appeals correctly recognized that "[e]vidence is material only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense." *Lee*, 390 Wis. 2d 426, ¶ 29 (citing *State v. Harris*, 2004 WI 64, ¶ 14, 272 Wis. 2d 80, 680 N.W.2d 737). Applying that standard, it offered three reasons why the December 2013 interviews were not material. *Id.* ¶ 30. "First, as discussed above, those interviews did not exculpate Chong." *Id.* Second, "there is no evidence that the State's suppression of the December 2013 interviews altered Chong's trial strategy." Defense counsel had copies of the 2015 interviews for nearly nine months before trial, a defense investigator also interviewed Ryan Thao before trial and, although Ryan Thao gave a description that excluded Chong as the shooter, Chong still elected not to call any of those witnesses at his trial. *Id.* ¶ 31.

Finally, "the State introduced strong evidence of [Chong Lee's] guilt at trial," with seven witnesses testifying that Chong Lee had confessed to the shooting. *Id.* ¶ 33.

Although Chong disagrees with the Wisconsin Court of Appeals' reasoning, he fails to show that it is contrary to or an unreasonable application of clearly established federal law or is unsupported by the evidence. § 2254(d). The only conceivable exculpatory statement Chong has identified was Mikey Thao's statement that he thought Chong was in jail on the night of the shooting. However, as the Wisconsin Court of Appeals pointed out, this statement was belied by the video evidence showing that Chong was present at the Luna Lounge on the night of the shooting. The video evidence overrides any potential exculpatory value that Mikey Thao's statement may have had. Chong has failed to cite any caselaw that would suggest that he was subjected to an unreasonable application of *Brady*, *Youngblood* or any other clearly established federal law or its progeny. The court therefore concludes that the state court's rejection of his due process claim was not contrary to, or an unreasonable application of such law and he is not entitled to relief on this claim.

B. **Absence of Transcripts**

Chong Lee next claims that the absence of transcripts of some of the proceedings denied him the opportunity to meaningfully appeal, which compels a new trial. Pet'r's Br. in Supp. at 10. It is undoubtedly true that the absence of a transcript for the trial that results in a conviction can amount to the denial of a defendant's right to appeal in violation of his to due process of law. *Pope v. Taylor*, 100 F.4th 918, 920–21 (7th 2024) (holding that 28-year delay in resolving appeal resulting in loss of transcripts of trial deprived petitioner of his due process right to meaningful direct appeal). But only a small portion of the record bearing on one relatively minor evidentiary issue was apparently missing in this case. The trial court had previously ruled that Chong's statement

to the effect he could "beat this case" would not be admitted because it was not relevant and would only confuse the issue. Despite this ruling, one of the witnesses was asked to read a letter Chong has written to her following his arrest that included the statement. Chong's attorneys did not object, and the jury asked to see the letter during their deliberations.

There is no transcript of any discussion between the court and the parties regarding the jury's request, but the record shows the letter was provided to the jury. At the hearing on Chong's motion for postconviction relief, neither the attorneys, nor the trial court, could recall what occurred in chambers or what discussion had occurred. Chong contends that either his attorneys were ineffective in failing to object to the testimony and the letter going to the jury, or the trial court erred in reconsidering his earlier decision and allowing the letter to go to the jury.

An evidentiary ruling can infringe on a defendant's right to due process. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). But due process is only "abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Id.* (cleaned up). The evidentiary issue Chong has raised does not rise to the level of a due process violation. Trial courts have substantial discretion in deciding whether questionable evidence is relevant and whether any probative value it may have is outweighed "by the danger of unfair prejudice confusion of the issues, or misleading the jury." *See* Wis. Stat. § 904.03. Considered in context, a ruling either way on the admissibility of the challenged statement would have been well within the trial court's discretion. *See* Dkt. No. 26-21 at 217:17–20:20. The admission of this evidence falls far short of depriving Chong of due process under clearly established federal law.

Nor did the absence of the transcript, which would have revealed whether his attorneys had objected or the trial court's reasoning for letting the letter go to the jury, deprive Chong of his right

to appeal. The Wisconsin Court of Appeals noted that where the record does not disclose the trial court's reasoning for an evidentiary ruling, it reviews the decision "independently" for an abuse of discretion. Dkt. No. 26-6, ¶ 59. Thus, had Chong argued on appeal that the trial court abused its discretion in allowing the letter to go to the jury, it would have decided that issue. Likewise, when the record fails to disclose whether counsel objected, the presumption is that counsel did not and the question becomes whether the failure to do so amounted to deficient performance under *Strickland v. Washington*, 468 U.S. 668, 687–91 (1984). It thus follows, as the Court of Appeals concluded, that Chong failed to show "a colorable need for the missing transcripts." Dkt. No 26-6, ¶ 60.

**C. Ineffective Assistance of Trial Counsel**

For the same reason and more, Chong falls short of establishing ineffective assistance of counsel. Chong initially asserted a claim of ineffective assistance of trial counsel based on trial counsel's failure to object to hearsay statements, pursue a motion to suppress Chong Lee's statements, and object to evidence that was previously ruled to be inadmissible from being heard by the jury and reaching the jury during deliberations. Dkt. No. 1 at 8. In addition to failing to establish deficient performance or prejudice, *see Strickland v. Washington*, 466 U.S. 668, 691–92 (1984), Chong has not properly exhausted, and thus abandoned, this ground for relief in his state court proceedings. Chong raised this issue in his postconviction motion but not on appeal. *Compare* Dkt. No. 26-31 at 4–18 (discussion and denial of Chong's postconviction motion for relief that his trial counsel rendered ineffective assistance) *with* Dkt. Nos. 26-3 & 26-5 (omitting any claim of ineffective assistance of trial counsel). Consequently, this ground for relief is not exhausted and is not properly before this court.

Moreover, since filing his petition, Chong has also abandoned his ineffective assistance of counsel claim in this court. Although Chong Lee initially asserted this claim in his petition as his third ground for relief, discussion of it is entirely missing from his briefs. For purposes of habeas relief, failure to brief a ground for relief in the district court means that such a ground for relief is forfeited. *See Pole v. Randolph*, 570 F.3d 922, 937 (7th Cir. 2009).

**CONCLUSION**

For the foregoing reasons, Chong Lee's petition for writ of habeas corpus (Dkt. No. 1) is **DENIED**. The Clerk is directed to enter judgment accordingly. A certificate of appealability will be **GRANTED** as to the issue of whether the destruction of evidence violated Chong Lee's right to due process, as reasonable jurists could conclude that Lee has made a substantial showing of the denial of a constitutional right. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Chong Lee is advised that the judgment entered by the Clerk is final. A dissatisfied party may appeal this court's decision to the United States Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Fed. R. App. P. 3, 4.

**SO ORDERED** at Green Bay, Wisconsin this 6th day of September, 2024.

s/ William C. Griesbach
William C. Griesbach
United States District Judge